TRANSCRIPT OF FEBRUARY 6, 2023 HEARING

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                          SOUTHERN DIVISION

 3    _____)
      MARYLAND SHALL ISSUE, INC., et al.,)
 4              Plaintiffs,              )
             v.                         )  Case No. 8:21-cv-01736-TDC
 5    MONTGOMERY COUNTY, MARYLAND,       )
                Defendant.              )
 6    _____)
                                           Greenbelt, Maryland
 7                                         February 6, 2023
                                           2:59 p.m.
 8

 9                           MOTIONS HEARING
                BEFORE THE HONORABLE THEODORE D. CHUANG
10
                         A P P E A R A N C E S
11
      ON BEHALF OF THE PLAINTIFFS:
12
             LAW OFFICES OF MARK W. PENNAK
13           7416 Ridgewood Avenue
             Chevy Chase, Maryland  20815
14           BY:  MARK WILLIAM PENNAK, ESQUIRE
                  (301) 873-3671
15                m.pennak@me.com, ESQUIRE

16    ON BEHALF OF THE DEFENDANT:

17           OFFICE OF THE COUNTY ATTORNEY
             101 Monroe Street, Third Floor
18           Rockville, Maryland  20850
             BY:  EDWARD BARRY LATTNER, ESQUIRE
19                (240) 777-6735
                  Edward.Lattner@MontgomeryCountyMD.gov
20           BY:  MATTHEW HOYT JOHNSON, ESQUIRE
                  (240) 777-6709
21                matthew.johnson3@montgomerycountymd.gov
             BY:  ERIN JEANNE ASHBARRY, ESQUIRE
22                (240) 777-6700
                  erin.ashbarry@montgomerycountymd.gov

23                    PATRICIA KLEPP, RMR
                     Official Court Reporter
24              6500 Cherrywood Lane, Suite 200
                    Greenbelt, Maryland  20770
25                       (301) 344-3228
```

1          P R O C E E D I N G S

2     (Call to order of the Court.)

3          THE COURTROOM DEPUTY:  All rise.  The United States

4  District Court for the District of Maryland is now in session,

5  the Honorable Theodore D. Chuang presiding.

6          THE COURT:  Thank you, everyone.  Please be seated.

7          THE COURTROOM DEPUTY:  The matter now pending before

8  this Court is Civil Action No. TDC-21-1736, Maryland Shall

9  Issue, Inc., et al. v. Montgomery County, Maryland.  We are here

10 today for the purpose of a motions hearing.  Counsel, please

11 identify yourselves for the record.

12         MR. PENNAK:  This is Mark Pennak, counsel for

13 plaintiffs.

14         THE COURT:  Good afternoon.

15         MR. LATTNER:  Good afternoon, Your Honor.  Edward

16 Lattner for Montgomery County, Maryland.

17         MR. JOHNSON:  Your Honor, Matthew Johnson, for

18 Montgomery County, Maryland.

19         MS. ASHBARRY:  Good afternoon.  Erin Ashbarry, for

20 Montgomery County, Maryland.

21         THE COURT:  Okay.  Good morning -- good afternoon,

22 everyone.  Thank you for joining us.  There are two pending

23 motions in this case, the motion to remand and the motion for

24 preliminary injunction, and we can talk about both.  I have

25 reviewed the briefs in both and have some questions, but I also

1    want to give the parties a chance to argue.

2            I generally don't set a firm time limit.  I'm thinking

3    perhaps 20 minutes a side.  And we can cover both issues at the

4    same time, although, since I may have some questions, it will

5    take you longer -- you know, if one side gets more time to

6    respond to my questions, then we'll try to make sure the other

7    side has equal time if they would like to have it.

8            Now, in terms of -- well, and I guess there's a couple

9    different ways to look at this, but the plaintiffs are the ones

10   seeking the preliminary injunction at this time.  The County is

11   seeking the remand.  I thought just for ease of the way I

12   thought about this, since the plaintiffs are the plaintiffs, why

13   don't we start with them on both issues, and then we'll hear

14   from the County, and then if there's any need for a response

15   from both sides on their respective motions as a brief rebuttal,

16   I can hear that.  So Mr. Pennak, you can go first.

17           MR. PENNAK:  Thank you, Your Honor.

18           THE COURT:  Just make sure you pull the microphone up.

19   Sometimes those things don't stay in the same place.

20           MR. PENNAK:  Is that better?

21           THE COURT:  I think that's okay, yes.

22           MR. PENNAK:  Okay.  Thank you, Your Honor.  Mark

23   Pennak, counsel for the plaintiffs.  So let me begin briefly

24   with the motion for remand, and I'll move quickly on to the

25   substantive motion.

```
 1              THE COURT:  Mm-hmm.

 2              MR. PENNAK:  The remand, in argue, would be beyond the

 3    scope of this Court's discretion.  There is no parallel

 4    proceedings in state court at this moment.  In our view, holding

 5    the case in abeyance, the federal claims in abeyance pending a

 6    remand to the state courts would basically create parallel

 7    proceedings, where none now exist, and that the Court has an

 8    affirmative obligation under controlling Supreme Court precedent

 9    to exercise its jurisdiction with respect to the federal claims.

10              There is no probability -- and we have outlined this

11    in our motions, so I'm happy to take questions on it.  There is

12    no probability that the -- any sort of decision on the state

13    claims and in state court could possibly decide all aspects of

14    the federal claims before the Court now.

15              In those situations, the Supreme Court has said that

16    there must be an obvious limiting construction of the state

17    claims where there are parallel proceedings.  That's -- and

18    where there are no parallel proceedings, as there are right now

19    no parallel proceedings, then the Court must -- has an

20    affirmative obligation to proceed to decide the federal claims.

21    And that's the Hawaii Housing Authority case.

22              THE COURT:  So that's a diff- -- so there's two issues

23    here.  And I know the County has created sort of complicated

24    constructs in terms of what they want and what they don't want,

25    but I understand your point on the stay.
```

1              On the initial issue of remand of the state claims,

2     which is, I believe -- and as I said in the first ruling of this

3     type earlier on, it's governed by 28 U.S.C. 1367, and one of the

4     issues -- predominate is one issue, but there's also the

5     question of whether they're novel or complex issues of state

6     law.  So regardless of what happens with the stay, isn't it up

7     to the Court, as a matter of that supplemental jurisdiction

8     statute, to decide whether it's better positioned to address

9     these claims that are here on supplemental jurisdiction or to

10    let the state handle those?

11             MR. PENNAK:  Well, I think the state -- the County,

12    that is -- agrees that if the case is not held in abeyance, or

13    at least the federal claims are not held in abeyance, then it

14    would prefer that the state claims not be remanded for further

15    adjudication to avoid ongoing parallel proceedings taking place

16    at the same time.  We agree with that.  So there is a -- we do

17    agree, however, that the federal claims should be adjudicated

18    first, because they encompass relief that is broader --

19             THE COURT:  Do you agree, or that's your position?

20    I'm not sure that's their position.

21             MR. PENNAK:  That's their papers, in their papers,

22    Your Honor.  So if I -- unless I've misread their papers, I

23    think they have taken the position that they do not want a

24    remand on the -- to create parallel proceedings and have two

25    ongoing proceedings going on at the same time.  So in that

1  sense, the abeyance question decides the remand question

2  as well.

3          THE COURT:  Well, does it or doesn't it?  I mean, this

4  is about supplemental jurisdiction.  Isn't that the Court's

5  decision, regardless of what the parties want?

6          MR. PENNAK:  Well, ultimately, yes, Your Honor, but on

7  the other hand, what -- the proper course in our view would be

8  for the Court to hold onto the state claims and then dispose of

9  them as appropriate after adjudicating the federal claims.  That

10  the Court has plenty of discretion and may do so at that time,

11  but I don't think it would be appropriate for the Court to

12  create two parallel proceedings going on at the same time.

13          THE COURT:  Okay, I understand that.  What about -- so

14  when you say that the Court should resolve this -- federal

15  claims first, I think, even if I were to agree -- if I were to

16  agree with you that a stay is not necessary or appropriate, what

17  would be the requirement that one look -- effectively, you're

18  asking me to stay the state claims and to focus only on the

19  federal claims first, including the constitutional claims, when

20  many of these issues could be resolved, perhaps, under your

21  theories, without even getting into constitutional issues, just

22  looking at the state -- the County's authority.  So why would I

23  then have to effectively stay the state claims --

24          MR. PENNAK:  You don't.

25          THE COURT:  -- and focus only on the claims that you

1    want me focus on?

2        MR. PENNAK:  You don't, Your Honor.  And you could

3    adjudicate all the claims at the same time.  In our view, that's

4    a cumbersome approach, and it would have this Court deciding

5    state law claims, so better remedies are decided by the state

6    courts so as to get an actual binding decision rather than what

7    effectively --

8        THE COURT:  Well, doesn't that counsel in favor of

9    remand?  I guess I don't understand.  You want the state to

10   decide it, but you don't want the state to have those claims.

11       MR. PENNAK:  Well, it's a question of remand when.  So

12   the question here would be the remand after deciding the federal

13   claims.  Or you could remand them right now and the state courts

14   can decide whether to stay its claims as well, but our point is,

15   is that you cannot hold in abeyance the federal claims.

16       THE COURT:  That I understand is your position.  I

17   guess I'm just having a hard time trying to figure out, if

18   you're saying I should handle the federal claims first, are we

19   basically keeping these away from the state if eventually

20   they're supposed to go to the state in your view?

21       MR. PENNAK:  I don't think you're keeping them away

22   from the state, only because the state does not want the claims

23   to be adjudicated in parallel proceedings, so they haven't asked

24   for that.  In fact, they've disavowed that proceeding.

25       So they -- as I understand, the County's position here

1    is that they would prefer to have all the claims adjudicated in

2    this Court rather than have two active ongoing cases.  And we

3    agree with that.  That just makes sense.  Now, this Court has --

4              THE COURT:  You've also suggested perhaps having the

5    case -- the state claim sent to the -- what's now the

6    Supreme Court of Maryland, certifying the questions.

7              MR. PENNAK:  We have.  We think that's a preferred way

8    of doing it.

9              THE COURT:  But isn't that also parallel proceedings?

10             MR. PENNAK:  Well, it's not two trial court

11   proceedings.  So I think the Court certainly has discretion to

12   certify the state law claims at any time, and we wouldn't object

13   to that.  I'm happy to litigate the state law questions in the

14   Court -- Supreme Court of Maryland -- now it's called the

15   Supreme Court.  I keep calling that Court of Appeals.

16             THE COURT:  I know, it's hard for all of us.

17             MR. PENNAK:  But no, we wouldn't object to that.  If

18   the Court wants to certify those questions directly to the

19   Supreme Court of Maryland, we're fine with that.  And they could

20   do so today as far as I'm concerned.

21             THE COURT:  So is it set up for that?  Obviously,

22   they're only supposed to get pure legal questions, and on the

23   one hand, the arguments on the state law are, to some degree --

24   well, I guess I'm not completely sure they're pure legal

25   questions.  Are they, or aren't they?

1          MR. PENNAK:  There are no factual disputes in this

2    case at all.  So the pure legal questions on Count One and Count

3    Two, and Count Three, for that matter, are whether or not, under

4    Count One, the state has at least occupied the field, if you

5    will, with respect to county litigation.  That's a state

6    constitutional issue.  And the question on the scope of the

7    Express Powers Act lodged in Count Two is a question of whether

8    or not the authority granted to the County by 4-209(b)(1) of the

9    criminal code of Maryland is that superseding all the preemption

10   provisions otherwise set forth not only in 4-209(a) but also in

11   a multitude of other preemption provisions set forth in county

12   law -- I mean state law, which are all briefed in the -- in our

13   papers -- or in the complaint, that is, and previously briefed

14   in state claims.

15          Now, the County says (b)(1) trumps all these cases on

16   all these preemption provisions.  We say that, no, those --

17   those actually have to be interpreted in tandem, together, so

18   they can be reconciled, and that the exceptions found in (b)(1)

19   are to be narrowly construed under existing state law which says

20   exceptions to an otherwise broad provision is always narrowly

21   construed.

22          So this Court, in the Mora case, has always held that

23   those are supposed to be narrowly construed, and we think that's

24   the right view of the law, but that is a question for a

25   state court.  The Maryland Court of Appeals -- I'm sorry, the

1  Supreme Court can certainly decide that as a matter of law.  And

2  if it does, then the Supreme Court can then decide whether or

3  not the County has exceeded those levels with respect to the

4  4-21 and 21-22E enacted by the Montgomery County Council.

5          So those are legal questions, and we have no problem

6  with that.  Certainly, the takings claim in Count Three is a

7  question of state law as well, so that Court can decide --

8          THE COURT:  Aren't there other factual issues in the

9  takings claim, though?

10         MR. PENNAK:  Not on the question of liability.

11 Certainly on -- with respect to the amount of the taking to be

12 compensated for.  That can be resolved separately than whether

13 or not there is a taking claim as a matter of law.

14         Now, the County has sought to dismiss that as simply

15 not cognizable, and that's a legal question that the

16 Supreme Court of Maryland can certainly decide.  There's

17 conflicting law in the circuits on that, and there is

18 Supreme Court law on this, but Maryland law is decided

19 independently of other claims, so the Court of -- I'm sorry, the

20 Supreme Court of Maryland could then certainly decide what the

21 Maryland Constitution requires without necessarily deciding what

22 the federal case law decides.  And that's all questions that can

23 be appropriately presented to the Maryland Supreme Court.  Those

24 are questions of law, and those can be certified.  And I'm happy

25 to draft up particular certification questions if the Court --

1    THE COURT:  I'm still having trouble with the idea

2  that that's okay but not having the Circuit Court handle these

3  issues in terms of whether there's parallel proceedings or not.

4    MR. PENNAK:  Well, it could well dispose of those

5  three claims.  If the County prevails in the Supreme Court of

6  Maryland, those claims are over.  If the County doesn't prevail

7  on those, they can be sent back to this Court, who then can

8  remand it to the Court in trial court below, and in the state

9  courts.  And by that time, I would hope that we would have the

10  federal claims fully proceeding and mostly decided.

11    THE COURT:  Well, so am I right that -- I mean, if we

12  could snap our fingers now and get a ruling on these state

13  claims, I know your position is that wouldn't necessarily

14  resolve everything in this case, but wouldn't that narrow the

15  issues over here, because if they're right, some parts of the

16  County's law will be invalidated, correct, in the state parts?

17    MR. PENNAK:  Only in part, only in part.  And

18  indeed --

19    THE COURT:  I didn't say in total, but I'm saying, at

20  least in part, and that would narrow the issues, wouldn't it?

21    MR. PENNAK:  Not really, Your Honor, and the reason is

22  that there's no doubt that (b)(1) accords the County some

23  authority.  We had never disputed that.  And that's creating

24  authority to regulate possession and transporting, carry, and

25  sales, all the items that are listed in (b) -- 4-209(a).  That

1    includes parks, which we say they can't regulate at all under

2    the Second Amendment.  That includes places worship, which we

3    say they can't regulate at all under the Second Amendment.  That

4    includes all other places of public assembly, very broad term,

5    which we say they cannot regulate at all under the

6    Second Amendment.

7            THE COURT:  Well, with some exceptions, right, the

8    courthouses, the legislatures, and so forth.

9            MR. PENNAK:  Yes, with five narrow exceptions that the

10   Supreme Court articulated in Bruen, and those five we haven't

11   contested for purposes of this motion.  But there's no doubt

12   that the County has defined places of public assem- -- and

13   they're up them, to define their terms, to be very, very broad,

14   well beyond the ability of the five exceptions articulated in

15   Bruen.  But those places which they have expressly been

16   authorized by 4-209 are certainly among the places they cannot

17   regulate then under the Second Amendment.  That is the issue

18   before the Court right now on the motion for a PI and a TRO.

19           THE COURT:  Okay.  So why don't we move to the motion,

20   then, your motion.  So as I read it -- because again, you're

21   asking for preliminary relief, and as I read it, there are two

22   core issues there.  One is the places of worship, another is

23   the -- within 100 yards of a place of public assembly.  Those

24   are the two things that you're most concerned about, correct?

25           MR. PENNAK:  Well, I wouldn't want to limit that to

1   just those.  We don't think there's any place -- any regulations

2   permissible for parks either.  And we think a place of schools

3   should be narrowly defined to exclude --

4            THE COURT:  Well, I mean, maybe I misread it, but I

5   mean, again, you know, the irreparable harm at issue here

6   focuses on individuals going down roads, not knowing where they

7   can or cannot carry.  You have a couple plaintiffs, or several

8   plaintiffs, who have this argument regarding their ability to

9   provide security at a place of worship.

10           I mean, unfortunately, for better or for worse, as you

11  can tell, it's taken a little time to get to this point in the

12  case.  And if I analyze those two issues, that's one piece.  If

13  you're asking me to go down the entire list of everything in the

14  statute and basically decide this case right now, it's going to

15  take a while.  Is that really what you want?

16           MR. PENNAK:  I think the Court could issue a TRO

17  simply on the 100-yard exclusionary --

18           THE COURT:  We're not doing a TRO; we're just doing a

19  preliminary injunction here.  I'm not going to do this twice.

20           MR. PENNAK:  So we have asked for a preliminary

21  injunction on all those elements in the County's -- what the

22  County has regulated and certainly within 100 yards of all those

23  individual places.  Those are thousands and thousands of

24  locations within the county.  Giving us a PI on just churches

25  won't cut it, because we're still exposed to the 100-yard

1   places -- of all the other places that are identified in this

2   legislation.  So for example, we don't know what a private

3   recreational -- or privately-owned recreational facility

4   includes, and so nobody has an idea --

5           THE COURT:  You're basically asking me to decide the

6   whole case right now; is that what you're asking?

7           MR. PENNAK:  So on the preliminary injunction, yes,

8   Your Honor.  That is exactly what the parties have done in

9   litigation pending in New Jersey and in New York; the Court has

10  gone down every last place.

11          THE COURT:  Well, that's fine.  I guess the question

12  is -- and I haven't focused on this, because again, maybe I

13  misunderstood.  I thought the motion itself -- and I thought

14  this came up in the call; maybe I misunderstood, but -- that you

15  have your whole case, but those were the two issues that were

16  sort of underlying the motion.

17          Now, if you're saying that you want a preliminary

18  injunction that -- saying that your clients -- that the statute

19  can't be enforced as to, let's say, nursing homes, or hospitals,

20  or things -- I forgot what the exact list of things that we

21  haven't been talking about are -- I'm not sure I read where any

22  of the plaintiffs really have standing on those things.  I

23  haven't heard of any of them having any reason to go to some of

24  those facilities on the list.  I heard about the places of

25  worship, I understand the argument on the 100 yards; I haven't

1    heard much else on other locations.

2        MR. PENNAK:  So the most urgent facilities are

3    certainly the ones within 100 yards.  And so if the Court were

4    to decide the 100-yard question separately and thus include all

5    these other places in which the 100-yard exclusion zone

6    applies -- and there's a long list of them, and I don't have

7    them memorized either, but they're right in the statute -- I

8    mean, that would go a long way with preserving the right of

9    individuals to be able to carry throughout the county, with

10   carry permits issued by the Maryland State Police.

11       We would also ask the Court to address carry in

12   churches, in churches, not within just 100 yards, because we

13   have plaintiffs, including declarants and members of MSI, who

14   are providing armed security, or at least did before the County

15   enacted this law, to those places of worship that are now unable

16   to do so, leaving those places unprotected.  That's an extremely

17   urgent issue.  I agree with the Court on that.  The 100-yard

18   routine exclusionary zones basically makes carry impossible

19   anywhere in the county because you can't go anywhere in the

20   county without crossing into an exclusionary zone.

21       THE COURT:  So I understood that argument.  Again, I'm

22   just trying to understand which plaintiff has provided enough

23   facts in your motion, or in your complaint, or in evidence to

24   show that there's any harm associated with inability to go to,

25   let's say, a nursing home or one of those facilities, long-term

1  care facilities.  I don't know if I've seen that.

2  　　　　MR. PENNAK:  So in the compliant, or the verified

3  complaint, we have allegations about going into a private

4  school, inside a private school to pick up minor children.

5  That's in the complaint.  That's Ron David.  We have Eli Shemony

6  talking about going inside a library with a carry permit.  We

7  have other people -- those are in the complaint itself.

8  　　　　Now, I quite grant you, we don't have individualized

9  allegations going to each one of these places.  And if the Court

10 were simply to address only the places where there are

11 allegations of going inside, that would be sufficient on the

12 current record to get rid of the 100-yard exclusionary zones.

13 We -- the allegations of this complaint make very, very clear

14 that all of those places, with the possible exception of places

15 where people gather for First Amendment purposes, all of those

16 places my plaintiffs go within 100 yards of.  Every one of them.

17 　　　　So to that extent, the Court's going to have to

18 address those places, because you can't drive in the county

19 without going through an exclusionary zone measured by the

20 parking lot of a church, or a school, or a recreational

21 facility, whatever that means.  And we have no idea what a

22 private library is or where they're located, because we don't

23 know what private libraries are.  It could be the private

24 libraries kept on the premises of Plaintiff Engage.  They have

25 an extensive firearms library.  So they may fall within it and

1    have to close.  So that is before the Court as well.

2         So we have individual plaintiffs who live within

3    100 yards of a county park, who walk their dogs in the county

4    park, who walk past the county park, can't get out of their

5    driveway or off their property without coming within 100 yards.

6    So the park issue is presented to you because people use parks.

7    And my plaintiffs use parks.

8         THE COURT:  Okay.  So why don't we move on to -- among

9    the topics that come up in the briefing is this issue of --

10   well, I guess I'll go to this because we're on it, even though

11   we might need to come back to some other things.

12        You make this argument that, to the extent -- and I

13   know you have many arguments against their list of statutes, but

14   one argument you make is, some of these restrictions on, in

15   particular, parks, but other locations as well.  In parks --

16   you know, the restriction was designed to keep people from

17   shooting wildlife, or birds, and things like that, and so you

18   shouldn't factor that in.

19        I guess I'm not sure I fully understand the argument,

20   because the idea here is, regardless of the purpose, there is a

21   history of preventing people from having guns in certain

22   locations, for whatever purpose, and it would burden a right.

23   If you have a right to walk through a park with a gun and they

24   say, well, you can't have one because of our birds, they've

25   still prevented you from having the gun.  And just for purposes

1  of the historical analysis, why isn't that a legitimate example?

2          MR. PENNAK:  Because it's directly precluded by Bruen,

3  which enunciated quite expressly in the opinion two metrics, and

4  the metrics are how and why.  Why is the restriction imposed?

5  Now, if you're imposing the restriction because you want to

6  protect the flora and fauna of the park, that's not intended to

7  restrict the exercise of Second Amendment rights.  Geese don't

8  have Second Amendment rights.  So wildlife --

9          THE COURT:  I guess I'm not -- I'm just trying to

10 understand it, because again, let's put ourselves back a couple

11 of hundred years.  If someone is walking through a park, has a

12 gun, and says, I want to protect my right to self-defense here

13 in the park, and some park ranger type person says, Well, sorry,

14 you know, we're protecting the birds here, and our duly-enacted

15 statute says that you can't have a gun here, and you say, Well,

16 I don't want use it for birds, I just want to use it to protect

17 myself, it seems as if under that statute, they would have said,

18 I'm sorry, you can't have the gun.

19         MR. PENNAK:  Perhaps --

20         THE COURT:  I mean, so -- I mean, if it didn't impact

21 their rights, I could understand that, but it seems as if that

22 was a burden that was accepted.  Again, assuming that everything

23 else about this checks out.

24         MR. PENNAK:  And that is precisely the reason the

25 Court articulated the two metrics that the Court commanded the

1  Courts to use in determining what the appropriate analogues --

2  and again, that metric includes why was this restriction

3  imposed.  The Court is very clear on that.

4       THE COURT:  Okay.

5       MR. PENNAK:  And so if the restriction -- the reason,

6  it had nothing to do with the central right of self-protection,

7  then, that is not an historical analogue.  And it doesn't matter

8  if there is an incidental effect on the --

9       THE COURT:  Remind me again, which part of Bruen are

10  you -- what reference -- maybe you can point me to the right

11  passage in that.

12       MR. PENNAK:  Yes, Your Honor.  If you give me a

13  moment, I will look it up.

14       THE COURT:  Sure.

15       I mean, if you don't have it at the ready, I can look

16  for it.  I just thought, maybe since you were referring to that

17  point, you would -- you would be a little closer to it than I

18  am.

19       MR. PENNAK:  The opinions are very big.

20       THE COURT:  I know, I know.

21       MR. PENNAK:  We cite -- and -- to a pincite throughout

22  our papers, which unfortunately, the papers are pretty lengthy

23  too, but the Court can simply do a search on metric and, you

24  know, the Court will find it, and the how and why is a direct

25  quote from the Bruen opinion.

1        THE COURT:  Okay.  I'm finding it on 2133, but --

2        MR. PENNAK:  That's right.

3        THE COURT:  -- I'm just trying to understand how --

4   what the "why" means.

5        MR. PENNAK:  And this is confirmed, if I may, by

6   several Courts who have rejected restrictions in New York and

7   New Jersey on carry in park, precisely because they didn't

8   satisfy that particular metric.  So that metric is really

9   important.  And I take the Supreme Court at its word.  I mean,

10  that's all I can say about why they have that provision in

11  there, but the Court took pains to talk about it.

12       THE COURT:  I mean, is it just that line, how and why,

13  or is there some further description of why in the opinion

14  somewhere?

15       MR. PENNAK:  Well, the Court went on to articulate in

16  that context that this is a general right to carry in public,

17  and they say it over and over and over again in different

18  places.  So the presumption is that there is -- these five

19  particular areas are the exception to that general presumption

20  and that, therefore, the state, in this case, the County,

21  carries the burden of proof to show that there's other places

22  like these five in the historical analysis.

23       Now, in our view, the historical analysis centers on

24  1791, when the Bill of Rights were adopted by the people.

25       THE COURT:  Didn't Bruen say that was an open

1    question?

2         MR. PENNAK:  Bruen said it wasn't going to resolve the

3    scholarly debate, but if you read the analysis -- we set this

4    forth in our response to the Everytown brief -- the Court

5    actually, when it looked into the substantive areas, it looked

6    to the 1791 era and shortly thereafter, in the early 18th

7    century.  It did not look at the post Civil War cases or

8    statutes.  And it said very expressly that the Courts are

9    75 years after the adoption of the First -- of the

10   Second Amendment and the Bill of Rights and, thus, entitled to

11   less weight.

12        And you'll see that again in the cases they cite for

13   the proposition that 1791 is the central inquiry.  They cite

14   Ramos and the Timbs decision, both of which held that the scope

15   of the Second Amendment is the same for the states and for the

16   federal government.  And for the federal government, no one's

17   ever argued, that I know of, that the federal government is

18   confined -- the Second Amendment means something, by reference

19   to 1868 --

20        THE COURT:  Yeah, but this is the state government

21   we're dealing with here, correct?

22        MR. PENNAK:  But the Supreme Court says it means the

23   same.

24        THE COURT:  Okay.  So then, on the sensitive places,

25   two questions.  One is that Bruen doesn't even really give much

1  history, and I think this is one of the things that is a little

2  bit curious about the opinion.  It says that, "The historical

3  record yields relatively few 18th and 19th century sensitive

4  places where weapons were altogether prohibited, but we're also

5  aware of no disputes regarding the lawfulness of such

6  prohibitions."

7       So they don't actually cite many examples, if any,

8  regarding schools, government buildings, legislative assemblies,

9  polling places, and courthouses.  And then it also lists this

10  as, e.g., legislative assemblies, polling places, and

11  courthouses.  So I think -- from what -- it sounded to me like

12  you were saying that you agree that there can be other sensitive

13  places, it just needs to be established that there are others,

14  and so far, it hasn't been.

15       MR. PENNAK:  The County bears the burden to show a

16  well established representative historical analogue, and that --

17  so that's a quote from the Supreme Court.  Bruen says it has to

18  be well established, it has to be representative, and it has to

19  be an historical analogue, and in our view, the historical

20  analogue is best resolved by the same history that the Supreme

21  Court looked at in Bruen when it identified those five, and

22  that's the late 1700s and the early 1800s.

23       Now, the County hasn't cited a single statute from

24  that period that could possibly be analogous to the five or --

25  could justify any of the restrictions it has imposed in this

1  statute.  So the -- if the Court said, as well, that if there's

2  the absence of historical analogues for the relevant time

3  periods, that is enough, by itself, to preclude regulation in

4  those areas, unless there's some unusual technological change

5  for justifying a different set of analogues.  But the County's

6  attempt here is to deal with the same historical analogue that's

7  always been the problem in society, and that is misuse of

8  firearms and violence in the public.

9         So that's -- that's the same remedy that the County

10  has sought here.  That's the same remedy that our ancestors

11  found in the founding era, so there's no justifications to go

12  beyond the fact that there is no historical analogue for these

13  restrictions that the County has imposed.

14         THE COURT:  So am I correct, though, that -- I mean,

15  you said, and I think you're right, they haven't given us

16  statutes from the 1700s.  They have given us some from the

17  1800s, post -- or around the time of 1868.  Are you saying that

18  if I were to conclude that 1868 or so is -- can be considered

19  that -- I mean, what do you make of the statutes they provided?

20         For example, in the places of worship, which is one of

21  the key areas we're discussing today, they seem to have several

22  examples in which there's a reference to keep, you know, no

23  firearms inside, not -- you know, places of worship in the same

24  sentence as schools or other sensitive places.  So is your

25  argument on that really just the 1791/1868 division, or is there

1    some other argument as to why those are insufficient?

2         MR. PENNAK:  So there are additional requirements.

3    And so it's -- it goes beyond the fact that they postdate the

4    Civil War era, which the Supreme Court said in its opinion is

5    entitled to less deference.  It is -- they haven't established

6    that there was an enduring tradition associated with those

7    statutes that -- we don't know when they expired or whether they

8    continue to this day, but it's the County's burden to do that.

9    They don't establish that it was well established.  Not just one

10   or two statutes; to be well established means there is a

11   consensus of statutes at the time.

12        It has to be also representative, not just of those

13   particular jurisdictions but more broadly than those

14   jurisdictions.  For example, the laws enacted for the

15   territories are categorically out of the question because the

16   Supreme Court said you can't -- those laws were not instructive.

17   Supreme Court said, in footnote 28, the laws enacted after 1900

18   are categorically not instructive and thus may not be

19   considered.  And as -- although it's postdating the Civil War

20   era, those statutes are too few in number and too -- come too

21   late in the day to be a well-established representative

22   analogue.

23        Now, the Court was quite clear on that.  So could

24   you -- the Court consider post 1860 -- post Civil War statutes?

25   Yes.  But then the Court would have also say that those were

1    well established at the time, they were enduring, that they were

2    comparable restrictions to those imposed by the County

3    government, they were similarly relevant in terms that they were

4    enacted for the purpose, under the Court's two metrics that the

5    Court identified, the how and the why, and then I'm going to

6    have to show that they actually are justified as an historical

7    analogue more representative of the nation as the time it

8    existed.

9         For example, they cited an 1817 City of New Orleans

10   statute on dance halls.  You know, at the time, the City of

11   New Orleans was 27,000 people, and it was less than 1 percent of

12   the population of the United States.  The Court looked to such

13   factors to see if they were well established and representative.

14        Now, every Court, every District Court to have

15   examined this question of areas, of sensitive places areas, and

16   those are -- right now, there's six, they have unanimously

17   considered that the very statutes, post-Civil War statutes that

18   the County cites are not well established and representative.

19        THE COURT:  When you say six, I think you've cited --

20   you're not talking about this -- looking at these particular

21   statutes; you're talking about analogous situations around the

22   country?

23        MR. PENNAK:  No, the actual statutes on which the

24   County relies on were addressed in Koons and Siegel.

25        THE COURT:  Oh, you're talking about their underlying

```
1   historical statutes.
2           MR. PENNAK:  Yes.
3           THE COURT:  Not our County bill here.
4           MR. PENNAK:  No, no.  No, I'm sorry, Your Honor.
5           THE COURT:  Right, okay.
6           MR. PENNAK:  So the very statutes on which the County
7   relies as historical analogues have already been rejected in
8   every single District Court decision to address this.
9           THE COURT:  And has one of the circuits picked it up
10  yet?  I know some time has passed since --
11          MR. PENNAK:  The Sec- -- New York has appealed the
12  various decisions of the New York District Courts, and there's
13  two circuits -- two districts there, there's the Western
14  District and the Northern District.  And on an appeal of a PI
15  that the -- New York has prosecuted, that's set for oral
16  argument on -- they have five different opinions set for oral
17  argument in tandem on March 20th, 2023, next month.
18          THE COURT:  The Second Circuit?
19          MR. PENNAK:  Second Circuit.
20          THE COURT:  Nobody else is ahead of that, on the --
21          MR. PENNAK:  Nobody's ahead of that.  The New Jersey
22  cases, that's Siegel and Koons, have -- those are TROs, and
23  those are not appealable, and so there has been no appeal of
24  that.  Now, we may get a PI on those motion- -- on those cases
25  soon, and those are appealable.  And so the -- New Jersey may
```

1    have the option of appealing that to the Third Circuit at that

2    time.

3              THE COURT:  Right, Mm-hmm.

4              MR. PENNAK:  We already have one Fifth Circuit

5    decision, the Radimi case that we cite in our papers.  It just

6    came down on the proper historical analysis, and we commanded

7    that Court of Appeals decision to the Court's attention for the

8    analysis it followed, not necessarily for sensitive places, but

9    for the presumptions created by Bruen in terms of the general

10   right of self-defense.

11             So we start with that.  The general right means, carry

12   in public, and everything after that can't be sufficient to

13   actually nullify that general right.  And the Court --

14   Supreme Court said, in Bruen, that New York's attempt to

15   restrict the island of Manhattan, it takes the sensitive places

16   analysis way too far, because it cannot mean wherever someone

17   publicly assembles.  And that is precisely the rationale that

18   the County has advanced in justification of its ordinance,

19   we're -- the County has told the Court that we're trying to ban

20   firearms wherever people may gather, and that is precisely the

21   analysis that the Supreme Court rejected.

22             THE COURT:  And I understand that, and I agree with

23   you that something as large or as broad as the island of

24   Manhattan is not going to fly these days.

25             The -- two other questions I have before I turn to the

1  County.  One is, you agree that under Bruen, the right as

2  articulated up to this point, it had been -- before Bruen, it

3  had been, you know, the right to -- law-abiding citizens to

4  carry a firearm for self-defense in the home, or to have one in

5  the home.  Bruen extended it to in public, to carry it for the

6  right of self-defense.

7          MR. PENNAK:  Well, there was a split --

8          THE COURT:  That's the right as it currently stands as

9  articulated by the Supreme Court; is that correct?

10          MR. PENNAK:  I think there was a split in the circuits

11  on why the Court took the case.  The Seventh Circuit in Moore

12  and in the D.C. circuit in Wrenn had both said that the right

13  fully extends to public carry outside the home.  So the question

14  before the Court in Bruen was whether the right could be

15  confined to the home, and the Court answered that quite

16  definitively, said no, it can't, because the right encompasses

17  the right to self-defense in case of confrontation outside or

18  inside the home.  And that was the textual reading the Court

19  gave to the Second Amendment right, and it was informed by the

20  right of self-defense, which the Court said obtains just as well

21  or if not more outside the home as opposed to inside the home.

22          THE COURT:  But the right doesn't extend beyond

23  self-defense, does it, in terms of saying --

24          MR. PENNAK:  Well, yes --

25          THE COURT:  -- if someone said, Hey, I want to be able

1  to, you know, threaten people because I choose to do so, that

2  would never he -- or that would not be currently viewed as

3  protected Second Amendment activity, would it?

4          MR. PENNAK:  Agreed, but it doesn't just limit it to

5  self-defense.  I mean, that's the central consideration.

6  For example, the Court said in Heller that the right extends to

7  the use of firearms for all lawful purposes.  That would

8  include, for example, target shooting, or hunting, or other

9  items such as that, which are perfectly lawful.  So lawful

10 purposes is a hallmark, not just self-defense, even though

11 self-defense is at the core.  So the right of self-defense

12 informs text, and the Court was very clear on that.

13         THE COURT:  So when Bruen talked about things outside

14 the home, where does it take it beyond the right of

15 self-defense?  That's what I just want to understand.

16         MR. PENNAK:  Well, the Court reaffirmed Heller, and

17 Heller addressed the scope of the right.  So what the Court held

18 in Bruen, that the right identified in Heller extends exactly

19 the same way, not only to inside the home but to outside the

20 home as well.  So the scope of the right is -- in the home

21 extends, without exception, to everything outside the home.  You

22 normally don't do hunting inside the home, but the Court

23 identified hunting in Heller.  You don't do target practice

24 inside the home, although I suppose you could, so that goes

25 outside the home.

1        THE COURT:  Well, so I'm just reading the first

2  paragraph of Bruen.  It says, "In Heller, we recognize the

3  Second and Fourteenth Amendment protect the rights of an

4  ordinary law-abiding citizen to possess a handgun in the home

5  for self-defense."  That's how they define the right.  Then they

6  say, "In this case, you know, the parties agree that ordinary

7  law-abiding citizens have a similar right to carry handguns

8  publicly for their self-defense," and then it says, "We do agree

9  and now hold consistent with Heller and McDonald that the Second

10  and Fourteenth Amendments protect an individual's right to carry

11  a handgun for self-defense outside the home."  So I don't see

12  anything in there about things other than self-defense.

13        MR. PENNAK:  So again, Your Honor, I would suggest

14  that the Court look back to what Heller identified as lawful

15  purposes.  So certainly, the right of self-defense is at its

16  core, and indeed, this case presents that right, because of the

17  all the plaintiffs have carry permits, and all of those

18  plaintiffs are now precluded from carrying in the county.  Now,

19  that includes people such as a number of my plaintiffs,

20  Plaintiff Shemony, for example, who provides armed security and

21  were issued permits for the very purpose of providing armed

22  security to a synagogue, and to churches, and --

23        THE COURT:  Okay.  So I understand the argument that

24  that's covered by Heller, but am I correct that you would agree

25  that that's beyond self-defense, that's defending other people,

1  defending institutions?  And I understand that you're saying

2  that's all covered, but that's a different concept, isn't it?

3          MR. PENNAK:  I don't think it is, because even in

4  Maryland law -- and I've studied this law.  Maryland law

5  recognizes the right to exercise lethal force in defense of

6  another.  And that's always been the rule in common law as well.

7  So you certainly have that right, and that's a legitimate

8  exercise of lethal force.  You certainly have a right in this

9  state to hunt, with a hunter's safety certificate, and you have

10 the right in this state, recognizing state law, to take your

11 firearm to the range and shoot with it.

12          So those are legitimate lawful purposes, and I think

13 to the extent the right extends beyond simply the right of

14 self-defense, although the central -- self-defense certainly

15 informs the scope of the text.

16          THE COURT:  Okay.

17          MR. PENNAK:  So yes, it's fair to say that Bruen

18 focused on self-defense, but it's not fair to say that it's the

19 exclusive scope of the right.

20          THE COURT:  So can I just -- and one last question

21 regarding -- you brought up the plaintiffs who were seeking to

22 provide security for the places of worship, and you've

23 identified the history of it, which is that they have these

24 permits.  That was presumably the stated reason why I need a

25 gun, as opposed -- back in the day when you had to have a

1    reason, and the County's pulled that away because now the permit

2    is a "shall issue" approach.

3         I believe the statute does -- the County statute,

4    County ordinance has -- individuals are permitted to have guns,

5    if they're -- or you can have guns if you're basically a

6    security guard.  And I'm not sure what the requirements for that

7    are, so maybe you can tell me if you happen to know how hard it

8    would be for someone to be designated as such under the County

9    statute.  And then relatedly, I think it also says that, you

10   know, a business can have one employee who has a gun.  And

11   again, I don't know whether, you know, practically how difficult

12   that would be to designated someone, let's say at a church, or a

13   synagogue, or some other place of worship, as the employee.

14        Again, whether that means they have to have a W-2 form

15   and be paid, I don't know, but what do you know about those two

16   at least avenues to have someone provide some security at a

17   private facility?

18        MR. PENNAK:  So it is -- as a practical matter, it's

19   impossible to have one person at a business like a church, which

20   is open -- and many of these synagogues and churches are open

21   24/7 -- to have one person providing security.  It's -- even if

22   you concede that a church is a business -- and I'm not sure

23   that's what's contemplated by the exception in 57-11B -- it is

24   limited to one employee, and they're limited to one firearm.

25   Now, some of these churches are large enough that you want to

1   have two people at the same time fully armed.  And that's how

2   the practice --

3         THE COURT:  Well, as a practical matter, since

4   I think -- and forgive me, since I don't know if it's in the

5   affidavits already submitted, but are any of these plaintiffs

6   who are in this position part of a group of people, or are they

7   the only person at their place of worship with this arrangement

8   with the leadership of the institution?

9         MR. PENNAK:  So they're not the only persons.  So

10  declarant Barall talks about setting up a group of people

11  setting up security in his synagogue.  And as a practical

12  matter, because the synagogue or the church is open for extended

13  hours, you're not going to have the same person there all the

14  time; it's simply not feasible.  So you have a group of people

15  who provide this armed security for places of worship, and that

16  they can't do anymore.  I mean, that seems to me utterly clear.

17        THE COURT:  So taking the employee example to one

18  side, what about the security guard example, which I think don't

19  think is limited by numbers of people.

20        MR. PENNAK:  That's correct, Your Honor.  They could

21  have a security guard, but there's a whole regulatory structure

22  that I'm not intimately familiar with, about what it takes to

23  become a security guard in Maryland.  And it's a professional

24  occupation that is licensed and regulated by the Maryland State

25  Police; it's not trivial.  And indeed, the --

1    THE COURT:  You're saying there's like licensing

2    requirements, et cetera?

3    MR. PENNAK:  Yes, exactly.

4    THE COURT:  Okay.

5    MR. PENNAK:  So they must be licensed in Maryland as

6    in elsewhere, but in particular, Maryland has some pretty

7    stringent requirements for becoming a security guard.  And they

8    have indeed a different firearms course associated for security

9    guards.  So that is not, as an option, very easily accommodated

10    here, and it's an expensive option, because they're not members

11    of the synagogue itself.

12    And the synagogue members are picked because they know

13    their community.  They know who's there, who should be there,

14    and who's a stranger.  They know what's going on around them

15    because this is their part of their lives.  Hiring an external

16    security guard is not the same protection at all.  They do not

17    have the funds to hire County police to provide the security,

18    and the County police simply aren't there, and by the time they

19    got there, the rampage would have been completed.  So that's why

20    these people are frightened.  And they are frightened.

21    THE COURT:  Okay.  Anything else you want to offer?

22    MR. PENNAK:  So I want to stress again that it is the

23    County's burden, and it must be carried as a comparable burden

24    by the reference to the metrics that the Supreme Court outlined,

25    and that they haven't done it.  And they certainly haven't done

1    it for the 150 -- the 100-yard exclusionary zone, which

2    effectively nullifies the right to carry, the general right to

3    carry that the Supreme Court articulated in Bruen.

4            So on that grounds, then, we believe that a PI should

5    issue immediately to restore the status quo ante with people who

6    already had carry permits, many of them, so that they can

7    continue to carry what they already have.  By the way, this

8    includes people who got carry permits because their lives were

9    in danger, people who were -- had a protective order taken out

10   against some violent people, judges, prosecutors, people who

11   were assigned -- presumed a risk category by the Maryland State

12   Police and were issued permits on that basis.  Since the County

13   ordinance sweeps those people as well as ordinary citizens into

14   its prohibition, that's -- basically, the County has stripped

15   everybody of their right to self-defense.

16           THE COURT:  So just -- so as I understand it -- I

17   hadn't thought about this, but now that you're bringing it up,

18   am I correct that all the individual plaintiffs were people in

19   that category who had a permit before?

20           MR. PENNAK:  There is about half and half.

21           THE COURT:  Okay.  And the other half didn't have a

22   permit before?

23           MR. PENNAK:  They had a restricted permit,

24   for example, or had no permit at all.

25           THE COURT:  So I know one of your major arguments in

1  terms of sort one of the main things you're looking for, at

2  least like even if it was a narrow ruling at a minimum, you

3  would want to have the ability of these folks who used to have

4  permits have the same rights that they used to have or same

5  privileges -- the same -- same authority to do what they used to

6  do.  That would solve the problem for some of your plaintiffs

7  but not all of them.

8       MR. PENNAK:  Correct.  And that would also

9  contravene -- such a limited ruling would contravene the

10 Supreme Court's holding that this right belongs to the people,

11 the law-abiding and responsible citizens who cannot be

12 distinguished from people who have demonstrated a proper cause

13 or, in Maryland's case, a substantial reason.  So I don't think

14 it would be legitimate for the Court to narrow a PI to just the

15 people who had it before because that creates the very same

16 categorization that the Supreme Court struck down.

17       THE COURT:  Well, I'm not saying that's what I want to

18 do, but at the same time, I don't know if I agree with you that

19 it's legally impermissible, because on a preliminary injunction,

20 one looks at, among other factors, balance of the equities,

21 public interest, which -- I understand the Supreme Court says

22 you can't do a means-end test for the overall right, but in

23 terms those four prongs, in terms of whether we're going to make

24 a preliminary determination now, awaiting a final ruling, of

25 course, whether the most urgent situation isn't a fair thing to

1  consider, which is what those two prongs of the preliminary

2  injunction test are designed to deal with.

3          MR. PENNAK:  Well, I'd like address that briefly.

4          THE COURT:  Mm-hmm.

5          MR. PENNAK:  So what the Supreme Court said is that

6  there's a general right to carry by all law-abiding citizens who

7  have managed to obtain a carry permit.  That's not a trivial

8  process in Maryland, by the way; it's hard to do.  I'm an

9  instructor, I teach this course.  So this is something that they

10  now have a recognized -- Supreme Court recognized right to

11  carry, and the deprivation of that right is itself irreparable.

12  For every single day this ordinance remains in place, they are

13  deprived of that right.  That's irreparable by -- under any

14  standard.

15          THE COURT:  Okay, I understand.  Okay, thank you.

16          MR. PENNAK:  Thank you, Your Honor.

17          THE COURT:  Mr. Lattner, is it, who's going to handle

18  this?  Okay.

19          MR. LATTNER:  Your Honor, I was going to address the

20  motion to remand and stay.

21          THE COURT:  Why don't you just pull the microphone

22  closer to you so we can all hear.

23          MR. LATTNER:  Oh, sure, sorry.  I was going to address

24  the motion to remand or stay briefly, then Mr. Johnson was going

25  to address the standing issue, and finally, Ms. Ashbarry to

1    address the Second Amendment issue, the historical -- the

2    historical inquiry.

3            On the motion to remand or stay, the County's position

4    is that if the Court is going to rule on injunctive relief under

5    the Second Amendment, the County would request that you retain

6    the state law claims.  Having said that, I think it makes sense

7    that the state law claims would be adjudicated first.  Again,

8    this dovetails with the reason that we are seeking the remand in

9    the first place, because those are dispositive and would serve

10   to avoid having to decide Second Amendment claims.  So whether

11   the federal claims are stayed and the state law claims are

12   remanded for disposition by the state or the state law claims

13   remain here in this Court, those are the claims that should be

14   adjudicated first.

15           THE COURT:  Why do we have to have a sequencing?  Why

16   can't we just look at all of them?  And then again, with a

17   typical analysis, if you start with non-constitutional

18   arguments, you look at those.  If you can solve case that way,

19   then you do.  If not, you move to the constitutional arguments.

20   I mean, why do you need to have a stay, particularly if it all

21   stays here?  Why do we need to have a sequencing and say, You

22   still have to do the state law claims first?

23           MR. LATTNER:  Well, if it all stays here, I think it's

24   logical that in order to avoid deciding on the Second Amendment

25   issues, that decision would be made on the state law issues.  I

1  guess it could all be briefed and argued, and then the Court,

2  you know, in the menu of options, if it found there was no

3  authority under state law, I think that is determinative and

4  comprehensive, and that would be the end of it.

5  THE COURT:  I mean, wouldn't it -- just as a practical

6  matter, I guess -- I'm not sure I understand your position.

7  You're the ones who filed this motion in the first instance.

8  You didn't want the claims in the state court before, now you

9  do, but only if they go first.  I mean, as a practical matter,

10 you're the ones who said that it was all briefed, it was ready

11 to go -- I mean, I don't know if this is true, but that the

12 state court could issue a ruling relatively soon, and yet you

13 don't want to give them that opportunity, because as a practical

14 matter -- I mean, we'll deal with the preliminary injunction,

15 but whatever it is, it's not a final ruling.

16 And so the state, with whatever -- how far along they

17 were in that process, they could give you your ruling on the

18 state claims before this Court could get to a final resolution.

19 I mean, so that practically would give you what you want, and

20 yet, you're sort of trying to insist that it all happen here and

21 to dictate the order in which things are done here.

22 I don't understand it.  I mean, if you really want the

23 state claims to be adjudicated first, why not just have them go

24 back?  And just as a practical matter of the resources involved,

25 especially now that Mr. Pennak has made clear that, you know,

1   this can't be resolved just focusing on the worshiping, and the

2   places of worship, and the 100 yards; we have to go through

3   every single last piece of this.  And even the Supreme Court

4   said, and they acknowledge, it's a very complicated exercise.

5           The state law analysis, as complicated as it is,

6   doesn't require that much digging through the history of the

7   country.  I mean, as a practical matter, they would do that

8   first, I think, and yet, you don't want to be in two different

9   places, even though -- even the plaintiffs are happy to be in

10  two different places; they just want it to be the Supreme Court

11  of Maryland and not the Circuit Court.

12          MR. LATTNER:  Right, we don't want to be in two

13  places, and if the Court is -- and I assume the Court is going

14  to be issuing a ruling on injunctive relief, having entertained,

15  you know, the motions, and we're here today on argument on the

16  preliminary injunction, then the County's request would be that

17  this Court retain, that the County is not interested in seeking

18  a remand and a stay.  But still, the state law claims should be

19  resolved earlier in the process in accordance with the doctrine

20  of avoiding unnecessary decisions on constitutional matters,

21  and --

22          THE COURT:  Well, what about the certification to the

23  Supreme Court; what's wrong with that?

24          MR. LATTNER:  I guess, that's up to this Court if it

25  feels necessary, that if there's undecided issues as to state

1    law authority, I -- the County doesn't believe that is required.

2    The County believes that it -- the law will be clear and doesn't

3    require certification.  That is -- I guess that is an option.

4          THE COURT:  I think what I'm troubled by is that both

5    sides seem to -- well, maybe you less so, but Mr. Pennak seems

6    to think, and he said it several times, a state court should

7    decide this; that's why he's all for the certification process.

8    I think his big concern is that we don't leave the federal

9    claims off to the side on ice, I think, but he has recognized,

10   as I think I said in the first motion to remand, these are new

11   and first impression issues of state law.  There's preemption

12   issues.  There's -- it's about the relationship between the

13   state government and the County governments.  The State

14   Constitution's involved.  The states never had a chance -- state

15   courts have never had a chance weigh in on this.

16         It seems to me, these are classic novel, complex

17   issues of state law that really should be handled by a

18   state court.  And I'm not sure that Mr. Pennak's even

19   disagreeing with that; he just -- he's concerned, and I

20   understand it, that he doesn't want to wait forever to get to

21   the federal claims.

22         And I understand that.  But I also don't understand,

23   therefore -- I mean, I guess I'm not sure, are -- you seem to

24   also agree, this is an important state law issue, and yet, you

25   want me to decide those instead of a state court.

1          MR. LATTNER:  If this Court is going to entertain, and

2    I believe it will be entertaining the Second Amendment claims,

3    then at that point, the County is not interested in having the

4    state law claims remanded to state court, so we then have

5    parallel litigation.

6          THE COURT:  But not being interested -- I mean, this

7    is a matter of jurisdiction.  Isn't it my call, with or without

8    a motion, whether I want to exercise supplemental jurisdiction

9    over these claims?

10          MR. LATTNER:  Ultimately, yes, yes, it is, it is your

11   call.  I mean, this was put forth by the County's motion, and

12   the County, you're right, originally did not seek remand of the

13   state law claims, but that was before the County had spent and

14   the parties had spent months in state court briefing and arguing

15   the state law issues, which were ready for disposition by the

16   state court.  So yes, it is, ultimately.  This Court could sever

17   the state law claims, and then we would be proceeding on two

18   tracks.  The other option, as you noted, is certifying the

19   question to the Maryland Supreme Court.

20          THE COURT:  But you're also on two tracks at that

21   point too, right?  Maybe it's a -- it might be a different part

22   of your office, I don't know, but as an institution, it's the

23   same thing.

24          MR. LATTNER:  No, it is -- it is two tracks.  It's a

25   different track, but you're right; there's a track in state

1    court and a track before this Court.  It's just that the state

2    law question should be resolved first, particularly if that

3    results in avoidance of having to decide the thorny

4    Second Amendment questions.

5          That is really -- I won't go through the -- you know,

6    the sum and substance.  You can read what we have in our

7    filings.  I'll just say that Count One and Count Two are

8    determinative.  I mean, in paragraph 90 of the

9    Second Amendment -- Amended Complaint, the plaintiffs argue that

10   Chapter 57, as amended by Bill 4-21 and Bill 21-22E, conflicts

11   and is inconsistent with the general laws, in violation of

12   Section 3 of Article 11A, and that's the State Constitution, the

13   Home Rule Amendment, and is thus unconstitutional and

14   ultra vires under the Home Rule Amendment.  So that would --

15   even just Count One, and ditto for Count Two.  If the County has

16   no authority to have this regulation for firearms, then it has

17   no authority even as to the Bruen five, if you will.

18         THE COURT:  Well, I thought that was part of the

19   argument, though, was that constitutionally, at least those five

20   categories, schools, I think they're saying only public schools,

21   but some kind of schools can be included, or there can be

22   regulation, and I thought the state law does give the County

23   authority to regulate in such -- you know, places of public

24   assembly, at least narrowly defined, which they're since

25   conceding can include things like schools, public schools,

1   courthouses, et cetera.

2           MR. LATTNER:  That's what the --

3           THE COURT:  So that part, regardless of what the --

4   I think their point is that that part's going to remain no

5   matter what, because they're not arguing you don't have the

6   authority to keep guns out of the courthouses, for example.

7           MR. LATTNER:  Well, I can just tell you what the

8   complaint says, which is that Chapter 57 is invalid, it is

9   ultra vires and unconstitutional under Maryland law.  So --

10          THE COURT:  Okay.  Well, that --

11          MR. LATTNER:  Hence the argument.

12          THE COURT:  That's Count One.  What about Count Two?

13          MR. LATTNER:  Similarly, paragraph 93 of the

14  complaint, they say, "Chapter 57 is amended by Bill 4-21, and

15  Bill 21-22E violates the foregoing provisions of the Express

16  Powers Act and Section 3 of Article 11A in multiple ways," and

17  then it goes on to list all of the laws that plaintiffs consider

18  that either conflict or preempt the County's regulation.  So

19  that also would be determinative.  If the County has no

20  authority to regulate firearms under 4-209 of the criminal law

21  article, then the Bruen five doesn't matter, and hence the

22  argument that those claims, those issues should be addressed

23  first, whether it's in this court or in the state court.

24          But apparently -- you know, it will be in this Court.

25  This Court is taking up the First Amendment -- I'm sorry, the

1  Second Amendment claim, and it would make sense that those

2  claims would -- the claims as to the authority would be taken up

3  first in order to avoid disposition under the Second Amendment.

4        I'll just mention, you know, as has already been

5  discussed, New York and New Jersey have cases dealing with those

6  states' laws regulating firearms.  Something different, I don't

7  think either of those cases involved a state law challenge to

8  the authority, which is what we have here, which makes a

9  distinction, at least provides -- provides the distinction that

10 the County is urging and the reason to take up those claims

11 first.  So unless there are any other questions --

12        THE COURT:  You can move to the preliminary injunction

13 motion, I think.

14        MR. LATTNER:  Sure.  Then I will turn it over to my

15 co-counsel.

16        MR. JOHNSON:  Good afternoon, Your Honor.

17        THE COURT:  Good afternoon.  So you just to want focus

18 standing only?

19        MR. JOHNSON:  Yes, I'll be talking about standing, and

20 my colleague, Erin Ashbarry, will be talking about the

21 historical analogues.

22        THE COURT:  So just so I'm understanding, you would

23 agree that at least to proceed, we only need one plaintiff with

24 standing, correct?

25        MR. JOHNSON:  As to each of the sensitive -- or the

1    places of public assembly, yes.  And I'm happy to discuss --

2         THE COURT:  Okay.

3         MR. JOHNSON:  -- how the plaintiffs have not met the

4    burden as of standing for any of those locations.

5         THE COURT:  Well, and you may -- because you seem --

6    this is your core issue, you may be better positioned than

7    Mr. Pennak and I were to answer that question about, for

8    purposes of at least where we stand now, which is the

9    preliminary injunction motion, but as of now, you know, do we

10   have somebody who's actually articulated facts showing that

11   they're burdened by those particular parts of the various

12   sub-locations?

13        And I think it's pretty obvious that at least there's

14   someone who is alleging a harm associated with the places of

15   worship, the 100-yard issue.  Maybe you have different issues on

16   standing beyond that, but just in terms of people who have shown

17   that those are places that they are going to or likely to go to.

18        MR. JOHNSON:  I'd say no -- no, Your Honor, not based

19   upon the case law in the -- in the supplemental briefings and

20   the additional authorities.

21        THE COURT:  Can you just push the microphone a little

22   bit more.  Thank you.

23        MR. JOHNSON:  I'm sorry, could you say that again,

24   Your Honor?

25        THE COURT:  Just use the micro- -- stay close to the

1  microphone, please.

2        MR. JOHNSON:  Sure.  So I believe the first thing

3  here, Your Honor, this is an extraordinary remedy.  You know,

4  we're not saying that the plaintiffs cannot prevail through the

5  ultimate course of this litigation.  What we're saying, the here

6  and the now on this quasi summary judgment standard, a

7  pre-enforcement PI, they haven't met that as to any of the

8  sensitive locations.

9        Now, that's for two reasons, Your Honor.  And I think

10  you hit the nail on the head early on in the argument when you

11  talked about how the plaintiffs have focused on the 100-yard --

12  what they're calling a ban, and we're calling a buffer zone, and

13  which has existed, Your Honor, since 1997.  And the second is as

14  to places of worship.  That was our reading as well, too,

15  Your Honor, and that's borne out by their affidavits, which, on

16  the issue of standing, the plaintiffs bear the burden of that,

17  not the County.  We don't have to disprove standing, Mr. Pennak

18  said a number of times, and he may have been referring to the

19  historical analogue, but they have the burden of proof on

20  standing.  They haven't met that, Your Honor.

21        Now, one of the issues, too, you discussed,

22  Your Honor, was the issue of self-defense.  And I think that's

23  extremely important in this case based on the relief requested

24  by the plaintiffs for their -- their first alternative relief

25  is, they -- (1) TRO and preliminary relief should be granted,

1  restrain the County from enforcing Section 57-11A of the

2  County Code as to permit holders who provide armed security to

3  places of worship and/or to private schools and thus allow them

4  to continue to do so.  Who provide armed security to places,

5  that's not about self-defense.

6       If you do a word search through Bruen, you'll find

7  that self-defense comes up 128 times, Your Honor.  If you do the

8  same search for others, and similar words such as that, you come

9  up with 12 hits, and none of that talk about the defense of

10  others, which is -- if you view the affidavits as a whole, and

11  the precise language in that affidavits of certain individuals,

12  it's very much about standing in the place of the church and

13  trying to assert standing on their behalf.  There's no affidavit

14  on behalf of any place of worship or a private school that says,

15  We want to employ these people or put forward these people as

16  armed security.

17       And if you look at the affidavits --

18       THE COURT:  Well, I mean, why would you need that?  I

19  mean, they're just trying to say -- I'm not sure what the

20  argument is.  Your argument is that the proper plaintiff is the

21  institution, or you're saying that this isn't a self-defense

22  theory, this is some other theory?

23       MR. JOHNSON:  Both, Your Honor.  And that it's -- that

24  if -- Thomas Paine, number one, an affidavit submitted in this

25  case, "We strip churches of armed protection, leaving churches

1    open to attack."  This is the following line, "The urgency and

2    need for such protection cannot be overstated."  It's not about

3    self-defense, that's not about carrying a weapon outside the

4    home for your self-defense; it's about self-defense of others.

5    And they're asserting the right of a church, and none of the

6    affidavits say that -- or the declarations say that the

7    plaintiffs have the authority to do so.  So I think as to a

8    personal case in controversy, which this has to be, Bruen is

9    a -- it's an individual private right.

10            THE COURT:  Okay, I understand that point, but what

11   about the 100-yard --

12            MR. JOHNSON:  Sure.

13            THE COURT:  I seem to recall there were some

14   descriptions of people saying, Look, I want to drive down the

15   street, I don't know if I'm -- I probably -- I inevitably am

16   going to go within 100 yards of one of these locations, so when

17   I'm on that street, walking or driving, when I want to protect

18   myself, I'm in violation.  So what about those individuals?

19            MR. JOHNSON:  So Your Honor, I agree that there --

20   there were allegations -- and I don't think those have to be

21   pled with the specificity as required by the Siegel Court in

22   terms of how often they go out.  Just say you go out into the

23   County and you're within a 100 yards, fine, we would accept

24   that, but if you look at the Siegel Court, Your Honor, talking

25   about going to specific locations, Turtle Back Zoo, Van Saun

1    Zoo, those plaintiffs specifically named the places they were

2    going to.  None of the plaintiffs here have done that, Your

3    Honor.  And --

4            THE COURT:  Didn't one of them talk about their house

5    being within 100 yards of something?

6            MR. JOHNSON:  Sure, Your Honor, but again, to prove

7    standing, it's not just saying, I have a constitutional --

8    there's a constitutional infringement upon my actions, therefore

9    I have standing.  You also --

10           THE COURT:  No, no, I'm saying, if someone says -- and

11   maybe I -- maybe I misread it, but if someone says, My house is

12   100 yards from one of these locations, if I'm in my house with a

13   gun, I'm in violation.  Whether they specifically say, I'm going

14   to be in my house or not, I mean, it's pretty clear that they're

15   going to spend time in their own house.  So why isn't someone

16   like that --

17           MR. JOHNSON:  I think the plaintiffs' argument is, if

18   they go outside their house, they would be within --

19           THE COURT:  Well, either way, whether it's in the

20   driveway or what have you, or the street in front, I mean, it's

21   pretty clear, someone's going to go outside their house at some

22   point, right?

23           MR. JOHNSON:  Yes, Your Honor, it is, but again, you

24   have to show a credible threat of prosecution, right?  As I've

25   stated, the --

1           THE COURT:  So 100 -- okay, I understand -- I read

2    that part, and I wasn't sure -- admittedly, I don't know whether

3    the arguments worked in other jurisdictions, but you pass a

4    statute, you're -- I mean, I haven't seen any kind of statements

5    from the County, the Police Department or anybody else, saying,

6    Well, we're not enforcing this against former permit holders,

7    which I guess is some percentage of the plaintiffs, or

8    people in -- I mean, any of the scenarios.  I mean, you're just

9    saying trust us, we're not going prosecute you?

10          MR. JOHNSON:  Your Honor, but that's not -- that's not

11   the burden here.  And I think, respectfully, I believe that's a

12   legal fallacy, is to say that no jurisdiction's ever required a

13   Court to say, We're not going to enforce our laws.  So any- --

14          THE COURT:  Okay, but what is enough?  Because, I

15   mean, you pass a law and the person says, I have a gun, I'm

16   going to do something or go somewhere where I would be in

17   violation; what do they need to show, that they actually have

18   been arrested?  I don't think that's the standard.  So --

19          MR. JOHNSON:  No, it's not, but it's not -- it's not

20   to prove that you would be but it's imminent.  And Your Honor, I

21   think, to that point, having a plaintiff say, I'm going to do

22   this, those statements are made by some of the declarants in

23   this very lawsuit.  So if the argument is, as of November 28,

24   2022, you have to stop this law because we don't know if we

25   could be arrested, we're concerned about that.  You have

1   Mr. Shemony, you have -- is it Mr. Wilson, I believe, stating, I

2   carry a loaded firearm in a library, I carry it when I go pick

3   my child up at a private school.  Their addresses are listed on

4   the front of the complaint.  I'd submit to the Court,

5   Your Honor, that probable cause exists to arrest those people

6   right now.  It hasn't happened.  And if you go back to this law,

7   Your Honor --

8           THE COURT:  Give me an example of a case where that

9   sort of argument has worked, where one says, Look, they stated

10  not just that they would do something illegal under this law but

11  that they've got some facts showing it is the kind of thing they

12  might do.  They might pick up their child, they might go to the

13  church or the synagogue to provide whatever security.  I

14  understand the other argument.  And the answer is like, Well,

15  they haven't been arrested yet so there's no standing.  I mean,

16  again, doesn't that basically make the requirement that you have

17  to get arrested?

18          MR. JOHNSON:  No, it doesn't, but it --

19          THE COURT:  Does it have to be that some officer goes

20  up to them and says, I'm going to arrest you, I'm not going to

21  do it today, but I'm going to arrest you tomorrow, and then you

22  can file your complaint?  I don't understand, how do you show

23  the imminent threat without actually having it go to completion,

24  under your theory?

25          MR. JOHNSON:  Well, Your Honor, you have to put

1    forward some kind of facts.

2         THE COURT:  Well, give me an example of something

3    that's worked in another case.

4         MR. JOHNSON:  So not necessarily something that's

5    worked in a case, but I'll bring it right to this case,

6    Your Honor.  And again, you have a law on the books from 1997

7    where there was a 100-yard buffer zone.  That's 25 years of data

8    as to how that was enforced, what the arrest rate was, who was

9    arrested.  There's been absolutely no -- no evidence put forward

10   about -- that there would be any kind of corollary or any kind

11   of, you know, comparative argument as to what happened before

12   this amendment and what happened afterwards.

13        THE COURT:  So again, what case says you look at the

14   arrest rate to decide this?  Is there such a case --

15        MR. JOHNSON:  No, but I think that's --

16        THE COURT:  -- historically?  I mean, there are all

17   these other gun cases, which, again, I haven't looked at this

18   exact issue on, including Bruen, including Heller, other cases

19   like that.  Then you have other categories of things.  I think

20   there used to be historically, you know, some these cases

21   regarding things that were challenged constitutionally,

22   you know, private conduct, sexual relations, so forth.  I mean,

23   has anyone succeeded with the argument that you don't have

24   standing because the arrest rate isn't high enough?

25        MR. JOHNSON:  I don't think it's specifically to here

1 but --

2          THE COURT:  I mean, I'm not saying it's a terrible

3 argument, I'm just saying give me something that supports your

4 argument other than just the idea.  Is there a case that

5 supports that concept?

6          MR. JOHNSON:  Your Honor, there's no specific case on

7 point, but the idea is --

8          THE COURT:  How about not on point?  How about that

9 says vaguely that arrest rates -- without a significant enough

10 arrest rate, you don't have standing?

11          MR. JOHNSON:  It's not specifically arrest rates, but

12 if you look at Susan B. Anthony, if you look at Barall, you look

13 at any of these cases, it talks about prior arrest.  They weigh

14 that heavily.  All of those cases do, they discuss it.  And it's

15 not the burden of the state to say we're not going to enforce

16 our laws, ergo, standing exists.  That would make it --

17          THE COURT:  So why was this law put in place then, if

18 you're not going to enforce it?

19          MR. JOHNSON:  Your Honor, why would any law with a

20 criminal component be put in place?  I think it -- the main

21 point is that -- and when I talk about the historical

22 significance of the law being in place since 1997, it's still

23 yet to be seen.  You know, jaywalkings's on the books, and

24 speeding's on the books, and don't cheat on your taxes, those

25 are on the books, right.  Now, what -- what kind of time,

1    effort, resources has the County put into for County officials,

2    Police Department, Police Department and the State's Attorney,

3    who would ultimately make the decision as to whether these are

4    prosecuted.

5         THE COURT:  Okay.  Give me the case that tells me that

6    I look at all those things, how many times the State's Attorney

7    has done something, how many police officers write tickets for

8    jaywalking.  Where is the case that says all of those things

9    factor into this, and if you don't have enough arrests or

10   tickets for jaywalking, you know, there's no imminent risk.  I

11   mean, again, I'm not saying it's a bad argument, I just don't

12   know where this is coming from.  Give me a case.

13        MR. JOHNSON:  Well, the -- sure -- Your Honor --

14        THE COURT:  What's your best case on this whole topic,

15   or do you even have one, or is this just trying to --

16        MR. JOHNSON:  So in terms of like prior arrests

17   records, no, but the case -- the Supreme Court cases are

18   replete, including the SBA list case, talking about prior

19   arrests.  Also, the case involving the pamphleting, I believe

20   that was it.  I can't remember the case right now, but they all

21   talk about prior arrests.  They all go into -- they all go into

22   analysis on that.  And I don't think that the absence of it

23   means that there's standing.  And if that's the case and

24   Plaintiffs' argument is that We have a standing because there's

25   a law on the books, then anybody who's the target of a law --

1          THE COURT:  What was the pamphleting case?

2          MR. JOHNSON:  That was -- they talk about that, Your

3   Honor, in ... that's Steffel, Your Honor, I believe,

4   S-T-E-F-F-E-L.

5          THE COURT:  Is it in your brief?

6          MR. JOHNSON:  Yes, Your Honor.

7          THE COURT:  Okay.

8          MR. JOHNSON:  Yeah, it was -- it's the Steffel case,

9   Your Honor.  So the plaintiffs have to show something in terms

10  of -- you can't just say there's a law targeting us, the

11  Supreme Court case law.  And these ideas -- and just because

12  there's not case law backing it to say that if you find an

13  arrest record, therefore, that can prove you have standing;

14  these are ideas.  These are the ways that the plaintiffs could

15  prove standing, and which they haven't; they're just saying --

16         THE COURT:  So what was shown -- what was sufficient

17  in Bruen itself; do you know?

18         MR. JOHNSON:  Sufficient to show that there was

19  standing?

20         THE COURT:  Yes.

21         MR. JOHNSON:  I'd say off the top of my head, I do not

22  know, Your Honor.

23         THE COURT:  I mean, isn't that the best marker for --

24  it's the exact same fact pattern.  Someone challenging a state

25  ordinance on Second Amendment grounds.  And I don't know the

 1  answer either, because frankly, I didn't think that you were

 2  going to lean on this that hard, but since you are, again, I

 3  definitely don't remember reading about how, Well, the arrest

 4  rate was high enough.  Now -- but there must have something.

 5  According to you, you need to show something.  So what did they

 6  show in that case that got them over the top?

 7          MR. JOHNSON:  What did they show in Bruen, Your Honor,

 8  to get them over top?

 9          THE COURT:  Right.

10          MR. JOHNSON:  They looked at the historical analogue

11  and decided that the actions that they were taking --

12          THE COURT:  No, no, to say that they had standing,

13  that there was a potential that they could get arrested for

14  walking around with a gun.

15          MR. JOHNSON:  Oh, yeah, they applied for permits,

16  Your Honor.  That's what it was.

17          THE COURT:  Okay.  So it's a permits situation,

18  slightly different than this.

19          MR. JOHNSON:  Yeah.  And if you think about it, how

20  would -- if you're going to establish that you have a credible

21  threat -- and some of these plaintiffs said they're doing it,

22  right?  If you're going to establish a credible threat of

23  traveling around the County, how would that occur?  How would an

24  arrest occur where a police officer pulls you over for some

25  other reason, sees a gun in your car --

1           THE COURT:  That happens all the time.

2           MR. JOHNSON:  True.

3           THE COURT:  Have you seen my criminal docket?

4           MR. JOHNSON:  I'm sure.

5           THE COURT:  I mean, almost every case is someone who

6   got pulled over for a broken taillight and then they find a gun.

7           MR. JOHNSON:  Sure.

8           THE COURT:  I mean, that's most of the cases.

9           MR. JOHNSON:  But take it further than that, here,

10  Your Honor, because we're not just talking about finding a gun.

11  It would have to be someone with a wear and carry permit, and

12  the officer would have stop on the Beltway and say, Oh, we're

13  near Holy Cross; I'm going to choose to issue you a criminal

14  citation over --

15          THE COURT:  Okay.  If this is really so unlikely, why

16  don't you just resolve this motion by just agreeing that you're

17  not going to enforce it on these individuals until the case is

18  over?  We could short-circuit this entire motion process if you

19  said, Look, there's no potential harm, because we're going

20  commit -- I mean, again, it doesn't have to be because you filed

21  this case, but the people who had permits before, who had these

22  legitimate reasons that were accepted by the County under the

23  old system, I assume you didn't mean to say that you didn't

24  think those reasons were legitimate anymore, it's just that you

25  didn't like the fact that the permit requirement is so broad now

1   that you weren't comfortable exempting permit holders the way

2   you used to.

3          And I understand that, but again, if this is so

4   remote, why not just put it on paper and say, at least during

5   the life of this case, we're not going to do anything against

6   these individuals, you know, we'll accept effectively an

7   injunction on this point, temporary as it is, until the final

8   ruling in the case.  I mean, why wouldn't you just do that, if

9   you're so certain that no one's going to get prosecuted?

10          MR. JOHNSON:  Two reasons, Your Honor, is, one, I'd

11  like to keep my job, and I don't really -- I can't speak on

12  that.  The County --

13          THE COURT:  Well, no, I think it's a very legitimate

14  position; we've seen it in other cases before.  A motion for

15  preliminary injunction, everyone says, There's no need to

16  adjudicate this, we all -- we can all agree that at least during

17  the life of this case, no action's going to be taken so that the

18  Court can take -- you know, give it the time and attention it

19  deserves rather than coming to a rush to judgment.  Attorneys

20  agree to that all the time.

21          MR. JOHNSON:  Sure.  Yeah, there's -- I will say I do

22  not have authority, as I sit here, to agree with that.  But

23  number two, more importantly, Your Honor, that's not the burden,

24  on the County to say, We're not going enforce our laws.  And the

25  Supreme Court --

1          THE COURT:  Well, I'm just saying you're trying to

2   convince me that there's just no basis to think that anybody

3   would ever -- the County would do anything to anybody over this

4   law, which again, why have the law, then?

5          MR. JOHNSON:  I understand your point --

6          THE COURT:  I think we need to move on from that area.

7          MR. JOHNSON:  Okay, that is --

8          THE COURT:  I mean, honestly, that's where I think the

9   crux of the issue is.  I hadn't given much thought to the

10  standing issue.  You've given me a few things to think about,

11  but I think we've covered enough ground that I can think about

12  them.

13         MR. JOHNSON:  Thank you.  Your Honor, if I can just

14  look over and see if there's just anything else that -- that

15  I think that the -- would help the Court here in looking at the

16  standing issue.

17     (Pause.)

18         MR. JOHNSON:  No.  Thank you, Your Honor.

19         THE COURT:  Okay.  Ms. Ashbarry, thank you for

20  waiting.

21         MS. ASHBARRY:  Yes.  Good afternoon, Your Honor.

22         THE COURT:  So we're on to I think the preliminary

23  injunction motion itself, the merits of it.

24         MS. ASHBARRY:  Correct.

25         THE COURT:  And I know that you heard some of my

1  discussion with the -- with Mr. Pennak about this.  So -- and I
2  don't know where we should start, but even though I understand
3  Mr. Pennak's motion's broader than this, I thought it would be
4  helpful to start a little -- with the places of worship and the
5  100-yard zone in particular.  Starting with the 100-yard zone,
6  I think Mr. Johnson said it's been around for a long time, but
7  it wasn't -- it was an exception, if I'm not -- correct, for the
8  permit holders, correct?
9          MS. ASHBARRY:  That's correct, Your Honor, that's
10 correct.
11         THE COURT:  So are you aware of any authority out
12 there on buffer zones, any recent cases that have addressed that
13 specific issue?
14         MS. ASHBARRY:  Yes, Your Honor.  Just as an initial
15 matter, the state law that authorizes the County to regulate
16 firearms includes this 100-yard buffer zone.
17         THE COURT:  Yeah, I'm asking more about -- I mean, you
18 could tell, I have a huge appetite to do the state law
19 preemption/authority issue.
20         MS. ASHBARRY:  Right.
21         THE COURT:  I'm just looking from a constitutional
22 standpoint.
23         MS. ASHBARRY:  Right.
24         THE COURT:  Are there any cases that say they are
25 constitutional, these buffer zones?  Or not, that they're not.

1          MS. ASHBARRY:  Well, I have -- I -- we cite three

2     cases in our brief -- in our opposition, Your Honor, which

3     admittedly all precede Bruen and so therefore have to be viewed

4     under -- with that in mind.  But the main case that comes to

5     mind is United States v. Class case, which was a D.C. Circuit

6     case.  And the defendant in that case was contesting his

7     conviction for having a firearm in a parking lot that was

8     1,000 yards away from the U.S. Capitol.  And the D.C. circuit

9     determined that that parking lot, 1,000 yards -- pardon me,

10    1,000 feet away from the U.S. Capitol was a sensitive place and

11    that the Second Amendment did not attach and did not protect his

12    right to carry firearms there.

13          Additionally, there are two other cases that were

14    cited, also pre-Bruen, but they are federal cases in which

15    defendants who had firearms in the parking lots of postal

16    service property were challenging their convictions under the

17    Second Amendment, and both Courts held that those areas around

18    the postal service were sensitive enough and were considered to

19    be essentially part of the U.S. Postal Service because Postal

20    Service transactions were taking place in those parking lots.

21    And similar to Class, people coming to and from those buildings

22    essentially were entitled to the same protections nearby as they

23    were in the actual buildings themselves.

24          So those -- there were three cases that we were able

25    to find that essentially validated the concept of having a

1   buffer zone, if you will, around these sensitive locations.

2           THE COURT:  So they weren't decided based on the fact

3   that Heller doesn't go beyond the home?

4           MS. ASHBARRY:  No, Your Honor.

5           THE COURT:  You know, they were decided on the

6   sensitive places and how far that takes you?

7           MS. ASHBARRY:  Correct, correct.

8           THE COURT:  But am I right, I mean, under your

9   statute, the parking lots are part of the sensitive place, so --

10          MS. ASHBARRY:  Yes.

11          THE COURT:  -- they're just talking about 100 yards

12  beyond that.

13          MS. ASHBARRY:  Yes, yes.

14          THE COURT:  So under that -- and what were the last

15  two cases called, the parking lot cases?

16          MS. ASHBARRY:  Your Honor, one was called Bonidy,

17  B-O-N-I-D-Y, and the other one was called Dorosan,

18  D-O-R-O-S-A-N.

19          THE COURT:  And these are in the brief, or not?

20          MS. ASHBARRY:  Yes, Your Honor, those are in the

21  brief.

22          THE COURT:  Okay.

23          MS. ASHBARRY:  And then also, Your Honor, we had

24  numerous historical examples of buffer zones.  I think that one

25  was in Somerset County in Maryland in 1837.  There is a 50-yard

1   buffer zone around lines for waterfowl, essentially, to protect

2   the waterfowl from hunting.  Additionally, in Maryland,

3   historically, a person could not have a weapon within 1 mile of

4   a polling place, a mile of a polling place.

5           THE COURT:  So what about -- and the polling place

6   might be different, but you heard my discussion with Mr. Pennak

7   about the waterfowl-type cases, and I wanted to get your

8   perspective on that because his argument -- my question was,

9   well, why is it that -- why does is it matter what the purpose

10  was, the point is, someone with a gun who otherwise would think

11  they have a Second Amendment right to carry it at or near the

12  park is told no, you can't, and that infringes on their right.

13  Now, he points us to the language in Bruen about you look at why

14  this provision was enacted.  So what's your response to that

15  point?

16          MS. ASHBARRY:  My response to that is the how and why

17  for the regulation was not the only factor that the Court said

18  should be examined as far as the scope of the government's

19  ability to regulate.  The Court was very clear in Bruen that

20  this historical analogue analysis is not meant to be a

21  straitjacket.  Ultimately, whether we're talking about Somerset

22  County in 1837 or the numerous municipal statutes banning

23  weapons and guns, all of them have buffer zones, Your Honor,

24  that limit or restrict the right to carry in a certain area.

25  And the County's position is, these are sufficient analogues to

1  support its argument that within these areas of public assembly

2  identified by the County, there's a buffer zone that

3  historically is supported.

4          And furthermore, Your Honor, there are state laws

5  presently that incorporate the concept of buffer zones.  You

6  can't have them, again, at polling places, within 100 feet of a

7  polling place on election day.  At the state level, within 1,000

8  feet of a public demonstration, you cannot have a firearm if you

9  have been advised by a law enforcement officer to move away.

10          THE COURT:  Aren't you just kind of identifying things

11  for Mr. Pennak's next case?  I mean, I'm not sure the fact that

12  the state passed it but it hasn't been put through the Bruen

13  analysis, it only takes us so far, doesn't it?

14          MS. ASHBARRY:  Yes and no, Your Honor.  I think

15  that -- again, the County has established that we have

16  historical examples to support -- numerous historic examples to

17  support this concept of a buffer zone to protect the people or

18  the activity in these sensitive locations.

19          THE COURT:  So in this case, why was it that the

20  County used this 100-yard zone?  I know you said you can under

21  the state statute, but that doesn't mean that you should or that

22  that's the right policy answer.  What was the rationale for

23  doing that, given that, as has been said in the briefs, I mean,

24  this may be different from 100 years ago or 200 years ago, where

25  you would have your park or your post office, and there would be

1  a lot of space around it.  I mean, we are in a densely populated

2  area now.  100 yards can take you several blocks away from a

3  building, and there's a lot of things people want to do in those

4  areas, or can do, and now they can't, including the former

5  permit holder.

6       So where do the 100 yards come from, just as a matter

7  of how this is defined effectively as the equivalent of a

8  sensitive place, given how densely populated these areas are?

9  And you could be, again, several blocks away from one of these

10 locations where the whole point -- everything you're around is

11 not technically sensitive and yet you're swept in by this law.

12      MS. ASHBARRY:  You know, Your Honor, I don't want to

13 speculate as to why 100 yards was included in the legislation.

14 I can tell the Court that with respect to Bill 21-22 at issue

15 here, the main focus of the Council -- and I think Exhibit 2 to

16 our opposition is essentially the packet that the Council

17 received ahead of the bill, and the focus was Bruen and ensuring

18 that our law complied with Bruen in the sensitive location

19 definition.

20      I think that that 100-yard buffer zone has been there

21 essentially because it was in the state law.  I think -- I would

22 be speculating at this point -- I think it essentially would be

23 there because of the power of firearms today and their

24 ability -- the distance with which they could fire.  But,

25 you know, Your Honor, I don't think that there's anything in the

1    record before the Court today that answers that question, and I

2    would not, again, want to speculate on that issue.

3              THE COURT:  Okay.  So then can you -- well, you said

4    you're not aware of any Courts that have analyzed and either

5    upheld or struck down buffer zone legislation since Bruen?

6              MS. ASHBARRY:  Correct.

7              THE COURT:  Okay.  So let me ask for some

8    clarification both on the 100-yard issue and -- well, on the

9    places of worship, really all the areas.  Are you arguing that

10   these locations that are deemed public places of public assembly

11   are sensitive places in the sense that if they're not explicitly

12   listed, like the schools, they are -- fall into that category,

13   they just weren't listed in the case because the case said these

14   are examples, or are you saying that these are not sensitive

15   places, but they meet the last part of the Bruen test, where you

16   do the historical analysis, there's a tradition of regulation in

17   those locations?  It doesn't matter to you either way?

18             MS. ASHBARRY:  You know, I'm not -- you know, I'm not

19   sure I follow your question, Your Honor.

20             THE COURT:  Well, the question is -- so the way I look

21   at it is, the sensitive places have sort of a favored spot in

22   this area, at least under the case.  And again, it's always been

23   curious to me, at least since this case came out, that they give

24   virtually no examples of statutes and the like regarding these

25   sensitive places, they just say, Well, no one ever complained

1  about these areas, even though we can't really find very many

2  examples, but everyone knows they're sensitive, so it's okay.

3  And on the other hand, as Mr. Pennak points out, when you just

4  get to the last level of the historical record, there's at least

5  ways to read the case, as he has read it, that you need a lot of

6  examples, you need a really deep tradition, which, frankly,

7  hasn't been set forth for those sensitive places.

8       So to me, I look at something like schools -- and it's

9  in that list -- you don't need to find that many cases because

10  they pretty much said if you can qualify as a sensitive place,

11  you're okay.  We can get into this question of the definition of

12  schools that he's raised, but if it's something that's not in

13  that area, then you do need to have this historical showing.

14  And I understand that they're sort of related because how

15  you know it's something sensitive requires some sense of

16  history, but I think -- to me, I'm looking at them as two

17  different categories, and I don't know which ones are on which

18  side of that or the other.

19       MS. ASHBARRY:  I think I understand what Your Honor is

20  saying, and you know, the County agrees with your point of view

21  with respect to Bruen, that the Court declared these five zones

22  to be -- or five areas to be sensitive without doing a detailed

23  look at the historical record as part of its declaration.  But

24  what's key from the County's perspective is, again, none of the

25  Courts that have -- or neither Bruen -- Bruen did not say that

1   those examples are exhaustive; they are examples.

2           THE COURT:  So how do I decide that something else is

3   a sensitive place, that has this favored status, and how do I

4   decide whether some of these are not really sensitive places in

5   the same category, but then we look at your -- the question of

6   whether you've shown enough of a historical tradition separate

7   and apart from whether they're sensitive places?

8           MS. ASHBARRY:  Right.  And Your Honor, from the

9   County's perspective, there's two ways you can get there.  One

10  is to say that an area or a sensitive location is analogous to

11  one of these five sensitive places in Bruen.  And that's

12  expressly stated in Bruen at -- Court's indulgence -- page 2133,

13  "Courts can use analogies to those historical regulations of

14  sensitive places" -- and this is in the paragraph where it's

15  listing the five sensitive places -- "to determine that modern

16  regulations prohibiting the carry of firearms in new and

17  analogous sensitive places are constitutionally permissible."

18  And I think, Your Honor, with respect to childcare facilities,

19  that would be a prime example where the County would say those

20  are analogous to schools, one of the five sensitive locations

21  identified in Bruen, where governments may constitutionally

22  regulate firearms.

23          With respect to locations that are not analogous to

24  the existing five approved locations for regulation, that's when

25  you have to look to the historical tradition.  So with respect

1   to places of worship, for example, the County would suggest that

2   the Court, under Bruen, would need to look to the statutory

3   analogues identified by the County that prohibited firearms in

4   places of worship.  And the County did identify a number of

5   states that had laws prohibiting firearms at places of worship

6   on the books in excess of a decade.  A couple of those statutes

7   were considered by the Supreme Courts of the day and approved,

8   expressly approved by those courts.

9           THE COURT:  Which ones are those?

10          MS. ASHBARRY:  Your Honor, I believe that that is the

11   Georgia and Texas Supreme Court cases, which I believe are Hill

12   and English.

13          THE COURT:  Okay.  So am I correct, from the way you

14   describe this, you want me to make the analogy that a childcare

15   facility is a sensitive place.  Are you asking me to do that for

16   any other of the listed places of public assembly, or are you

17   leaning only on the historical record for all of those?

18   Understanding that, I think to some degree, the sensitive place

19   determination does require a look at history as well.

20          MS. ASHBARRY:  Correct, Your Honor.  The County would

21   point to childcare facilities as well as private schools, to the

22   extent that those are challenged by plaintiffs here.  The

23   County's argument there is that the Bruen Court did not say only

24   public schools in its ruling, never did.  Neither it Heller,

25   which also referred to schools as a sensitive location.

1          THE COURT:  Would you agree, though, that that doesn't
2  necessarily cover colleges and universities?
3          MS. ASHBARRY:  Your Honor, the County's law, before
4  its recent amendments, was limited to I believe primary and
5  secondary schools -- is that correct -- but as revised by 21-22,
6  it's schools.  And so the County would argue that it's a broad
7  interpretation of that term, and it would encompass universities
8  and colleges, to the extent there are any in Montgomery County.
9          THE COURT:  Well, we have Montgomery College, to start
10  with.
11          MS. ASHBARRY:  Yes, yes.
12          THE COURT:  But you're saying that -- the statute
13  covers that, but does -- are you saying that colleges and
14  universities are sensitive places, under the Bruen construct?
15          MS. ASHBARRY:  Yes.
16          THE COURT:  So what is the analogy that you're
17  drawing, then, because when I think of -- is it that these are
18  places of educational teaching, or is it that this is a place
19  where children are frequently found in large numbers?  What is
20  the thing that makes it sensitive, and what's the basis for that
21  position?
22          MS. ASHBARRY:  I would say both of those.  In other
23  words, not only has the County -- well, schools today, with
24  respect to childcare facilities for children who are younger
25  than kindergarten age frequently combine both preschool and

1    childcare, Your Honor.  And so to the extent -- ultimately, a

2    school for those individuals, for that group, they're minors,

3    they're away from the protection of their parents, and therefore

4    are -- and that's very similar to a school, historically,

5    Your Honor.

6            And with respect to institutions of higher education,

7    the County would argue that falls under the definition of a

8    school in Bruen.  And also, we would point to there are numerous

9    historical statutes that ban weapons at places of -- for

10   education or literary purposes.

11           THE COURT:  No, I understand that argument.  I'm just

12   trying to understand, what is your definition of sensitive

13   places and which parts of the statute fit within that, and I

14   think you're trying to argue colleges and universities fit

15   within that because they're analogous to schools.

16           MS. ASHBARRY:  Yes.

17           THE COURT:  And I'm just trying to understand --

18   honestly, I don't know if there is any source you can tell me

19   that helps define sensitive places better than just the case

20   itself and that one word, "schools," but you're saying it's

21   anyplace there's a lot of children, anyplace involving learning.

22           MS. ASHBARRY:  Yes.

23           THE COURT:  Not "and" but "or," one or the other.

24           MS. ASHBARRY:  Yes.

25           THE COURT:  And the basis for that is just your own

1  analysis; there's no further elucidation of the term "schools"

2  in this case other than the word itself.

3          MS. ASHBARRY:  Correct, Your Honor.

4          THE COURT:  Or is there?  Because I haven't found

5  anything easy to focus on, but --

6          MS. ASHBARRY:  That's correct, Your Honor, and

7  furthermore, you know, the statute authorizing the County --

8  again, the state statute authorizing the County -- authorizes

9  the County to ban weapons at schools.  It's a very broad term in

10 the state statute as well.

11         THE COURT:  Is schools defined anywhere?  Again, I

12 don't know what the Bruen Court meant by that, and I'm not going

13 to say they were necessarily thinking about either a federal

14 statute or something else, but I'm not sure it's the most

15 natural reading of the term to say that it includes colleges and

16 universities.  I think your argument that it would include

17 private schools is probably stronger between those two.  But is

18 there some sort of textual or definition-based argument you can

19 make that colleges and universities are covered by schools?

20         MS. ASHBARRY:  Not within Bruen, Your Honor, no, but

21 with respect to the spirit of the other historical analogues

22 that have been presented to the Court in our filing, that

23 locations for educational or literary purposes are historically

24 locations where firearms were banned or prohibited.

25         THE COURT:  Okay.  So any other categories you're

1  saying you have an argument on how it's a sensitive place, as

2  opposed to just something I should just look at the history of?

3          MS. ASHBARRY:  Well, you know -- yes, Your Honor.

4  Essentially, for -- we're very clear in our papers which

5  provisions of the law we view as falling under the exist- -- the

6  existing five areas identified in Bruen.  Private school --

7  buffer zones in private schools, we make our arguments and

8  provide analogues to the Court.  And similar with respect to

9  places of worship.  And I don't -- all of the -- in other words,

10 all of the areas in the County's defin- -- definition of public

11 assembly are either analogous to these five sensitive locations

12 in Bruen or have an historical tradition to support a finding

13 that the County may constitute --

14         THE COURT:  I'm just trying to understand.  I thought

15 just a moment ago you said places of worship was not a sensitive

16 place, and now I just heard you say it was, so which one is it?

17         MS. ASHBARRY:  Yes.  Yes, it is, Your Honor, it is, it

18 is.  My apologies; I did not mean to confuse the Court.  It is a

19 sensitive location where the County could -- may

20 constitutionally ban firearms.

21         THE COURT:  And what's the reasoning behind that

22 theory?  It's analogous to which of the five, or how do you get

23 it into that category?

24         MS. ASHBARRY:  That -- the County does not argue it's

25 analogous to one of the Bruen five.  Instead, the County argues

```
 1   that there is an historical tradition for regulation of firearms
 2   at places of worship.  And in fact, we provide numerous statutes
 3   where firearms were banned at places of worship.  Additionally,
 4   as mentioned, the Georgia and Texas Supreme Courts considered
 5   statutes that were in effect at the same time and agreed that --
 6         THE COURT:  I mean, I'm still having trouble, because,
 7   I mean, I admit that there's perhaps a lot of overlap in the
 8   analysis, but what you've just described is, it is one for which
 9   the historical record supports this, not that it's analogous to
10   one of the five categories.
11         MS. ASHBARRY:  Correct.  And either it's acceptable
12   under the Court's analysis of Bruen --
13         THE COURT:  Well, I'm just trying to understand which
14   bucket you're putting it in, or at least are you putting it in
15   the category, you have an argument on how it's analogous to one
16   of the five?
17         MS. ASHBARRY:  The County's not arguing that churches
18   are analogous to the five -- to government buildings.
19         THE COURT:  Okay.  Or that it's a sensitive place in
20   some other way that is the same concept, as opposed to just,
21   again, meaning outside this sensitive place doctrine at this
22   point.
23         MS. ASHBARRY:  Well, again, under Bruen, there's two
24   ways something can qualify as a sensitive place:  One, it's
25   analogous to the five locations identified, or there's an
```

```
1   historical tradition.
2         THE COURT:  Oh, okay.  I guess, maybe we're just --
3   it's semantics, because again, I think of the sensitive places
4   as those five or things that are equivalent, and the other part
5   is the core of the analysis, which is how they look at
6   everything now.  But I think I understand your point.
7         MS. ASHBARRY:  Okay.
8         THE COURT:  So the only ones that you have an analogy
9   to the five are schools, colleges, private schools,
10  universities, and childcare facilities.
11        MS. ASHBARRY:  Yes, yes, yes.
12        THE COURT:  Not parks, not assisted living facilities,
13  things like that.
14        MS. ASHBARRY:  Correct, Your Honor, that's correct.
15        THE COURT:  Okay.  So what's the -- again, I was
16  hoping to kind of stay within the core of things for purposes of
17  the motion, but what's the argument on how these assisted living
18  facilities fit within your -- you know, meet the test of Bruen?
19        MS. ASHBARRY:  Ultimately, Your Honor, the County
20  identified various statutes that essentially protect vulnerable
21  populations, and so -- that are gathered in large areas.  So to
22  the extent an assisted living facility falls in that same
23  bucket, so to speak, the County would argue that the statutes
24  identified support a finding of an historical tradition of
25  regulation of firearms at those locations.
```

1          THE COURT:  And what are the vulnerable populations

2   protected by the historical statutes besides children, or are

3   you just using the children part from schools and otherwise?

4          MS. ASHBARRY:  Well, in the assisted living arena, it

5   would be, you know, those individuals that are in need of

6   assisted living services or -- and the Court's indulgence.

7          THE COURT:  No, I'm just saying that -- what

8   historical examples and statutes that protected certain

9   locations with vulnerable populations are you referring to when

10  you're saying that you can fairly say that these assisted living

11  facilities fall within that -- it is a fair analogy there.

12         MS. ASHBARRY:  Your Honor, the County pointed to that

13  healthcare facilities, hospitals could fall under the protection

14  or be analogized to those statutes that prohibited firearms at

15  places where persons were assembled for educational, literary,

16  or scientific purposes.  Additionally, the County pointed out

17  that historically, individuals with mental illnesses were not

18  eligible to serve in the militia, state militias, and we

19  attached two statutes to that effect.  And ultimately, these are

20  a reflection of the fact that individuals of, you know, perhaps

21  less than 100 percent physical or mental health should not be

22  around firearms, and firearms around them may be prohibited.

23  And in fact, in Heller, the Supreme Court identified individuals

24  with mental illnesses as a category of persons that may be

25  prohibited constitutionally from firearms.

1          THE COURT:  Okay.  My last question on these

2     categories is whether -- are there examples of cases that have

3     ruled on this issue of the places of worship -- possession in

4     places of worship under the Bruen theory, whether it's sensitive

5     places or otherwise?

6          MS. ASHBARRY:  There are, Your Honor, pending in

7     federal court in New York State.  I believe that that's --

8     Antonyuk is one, and that's the one that is presently before the

9     Second Circuit.  Additionally, Goldstein v. Hochul, but I don't

10    think that there is a decision yet in that case.  And to the

11    extent that the Court in Antonyuk held that a place of worship

12    was not a sensitive location, the County would simply argue it's

13    not binding precedent for this Court and that the County's

14    analysis under Bruen is correct.

15         THE COURT:  And what about this larger debate that

16    Mr. Pennak has pointed out, the 1791 versus the 1868; what's

17    your best argument or authority for the idea that I can and

18    should rely on your examples which are largely from the 19th

19    century and not the 18th century?

20         MS. ASHBARRY:  Well, Your Honor, as indicated in

21    Bruen, that debate has not been resolved.  The County would

22    argue that 1791 should not be the sole focus for the Court and

23    that later years are an appropriate era for the Court to

24    consider and are the -- is the appropriate era for the Court to

25    consider with respect to the regulation of firearms.  This is a

1    very thorny area, and frankly, we did not get into it in our

2    brief, given our page limits, because there are law review

3    articles on this issue alone.

4            And additionally, it's a very thorny area in that,

5    you know, the Supreme Court said in 1830 in the Barron case that

6    the Bill of Rights does not apply to the states, and so

7    therefore, a lot of the law interpreting the right to bear arms

8    in the 1800s is not necessarily under the Second Amendment, but

9    the -- it's under the comparable second amendments in the state

10   constitutions in place.  But you know, Your Honor, the County

11   would urge the Court to consider the statutes that we've put

12   forth, the numerous statutes that we've attached as evidence of

13   firearm regulations historically.

14           THE COURT:  Okay, thank you.  Anything else you want

15   to offer that I didn't get to?

16           MS. ASHBARRY:  Your Honor, the County would simply

17   just point out -- and this is in our brief -- that, you know,

18   there are a number of parallels between the County's prohibition

19   against public carry and state law.  So for instance, state law

20   prohibits the carry of weapons at day cares.  So even if the

21   Court were to enter an injunction on that, it would not

22   necessarily cure the alleged irreparable harm that plaintiffs

23   assert that they would experience.  And again, that is in our

24   papers, and I won't go into it at length, but --

25           THE COURT:  That's an interesting point to focus on

1   just as we -- I mean, on the key issues that are most focused on

2   the places of worship and the 100-yard buffer zone, does the

3   state have any laws that overlay what the County does on those

4   topics?

5          MS. ASHBARRY:  No, Your Honor.  The state does have

6   prohibitions at day cares, public schools, state parks, state

7   museums, Ravens Stadium, Camden Yards, et cetera.  So again, the

8   County's position is that its law is very same similar -- is

9   either the same or similar to those laws.  And so to the extent

10  plaintiffs have been able to carry and comply with those state

11  laws without suffering irreparable harm, it begs the question

12  how, by virtue of the County's law, is irreparable harm

13  generated, given the similarities between the two?

14         THE COURT:  Okay.  Thank you.

15         MS. ASHBARRY:  Thank you, Your Honor.

16         THE COURT:  So Mr. Pennak, we've been going quite a

17  while.  I think both sides had quite a bit of time.  I think,

18  because I had you go first, even though the other side filed a

19  motion for remand, I'm not really sure it's appropriate to give

20  you rebuttal on that topic, but I can give you a little rebuttal

21  on the motion for preliminary injunction, which is your motion.

22  But I'd ask you to keep it very limited to sort of the one or

23  two points that you have something directly to say in response

24  to what any of counsel say, just so that we keep this relatively

25  fair among the sides.

1          MR. PENNAK:  That's fine, Your Honor, and I will be

2    very brief.  So on the question of standing, there is a case on

3    point with respect to the likelihood of a case -- of a statute

4    being enforced.  That's the Fourth Circuit's decision in Bryant.

5    That's cited repeatedly in our brief.  And the Court said there

6    is a presumption that there is -- a statute will be enforced.

7    Indeed, in that case, it was a 50-year-old statute that had

8    never been enforced, and yet the Court said, Nonetheless, we're

9    going to entertain a challenge to it.  So that's on point, it's

10   controlling authority, disposes of the matter.  Each of the

11   plaintiffs here have said that they have engaged in this conduct

12   in the past, they -- that's now prohibited, they intend to

13   engage in it in the future, and that they would be arrested if

14   they did, that they fear arrest.  And that's enough, under all

15   the case law.

16          So let me move on to where these matters arise in

17   individual places.  On paragraph 72 of the Second Amendment

18   claim, we have allegations by plaintiff Ronald David, and he

19   says, "regularly carries a loaded firearm with him while

20   attending services at his place of worship in the county, at

21   healthcare facilities during appointments with healthcare

22   professionals in the county, at fairgrounds in the county, at

23   recreational facilities in the county, at a park in the county,

24   and he intends to do so in the future."  So those particular

25   subjects have already been particularly identified.

1          Now, you have the declarations that are already of
2    record that show that people are carrying not just for the
3    self-defense of others in their congregations but for their own
4    self-defense, and you have -- that's pretty clear, because you
5    hardly can defend others if you're not defending yourself as
6    well.  So it's not simply a matter of whether or not there's an
7    historical justification for defending others.  At the very time
8    you're defending others, you're also defending yourself.  And
9    that's why Plaintiff Eli Shemony says that he carries for
10   himself.  That's in the declaration as well, and it's also in
11   his affidavit -- or I mean his allegations in the complaint
12   on -- in the complaint itself.

13          So you have very specific allegations here with
14   respect to churches, and synagogues, and places of worship, and
15   other facilities.  Now, we don't know what a recreational
16   facility means.  Some of it's obvious, but it can certainly
17   include your backyard playground, because -- and I want to
18   stress this.  This statute the County has enacted does not limit
19   it to any place which are open to the public.  So that a private
20   library in a private home is covered.  The private library at
21   Engage, which says in the complaint that they had maintained a
22   library, is covered.  So it's extraordinarily broad.  So they've
23   defined public assembly by taking out "public," to include
24   expressly all privately-owned property and without regard to
25   their relieving public access to it.  Now, how in the world are

1  you supposed to figure out that?  That goes into the irreparable

2  injury part, because the irreparable injury, part of that

3  analysis is whether or not you have any means of avoiding an

4  arrest, if you even know what you're doing is actually a

5  violation of the County law.

6          The County law does not contain a mens rea

7  requirement, just like the state law does not contain a mens rea

8  requirement.  So you don't even have to know that what you're

9  doing is illegal; they can still arrest you for it.  And again,

10 if you're arrested for a violation of this County law, you're

11 likely to also be arrested for a violation of state law because

12 the carry permit that we've asked for relief on says on the very

13 back of it that it's not valid where firearms are prohibited by

14 law.  And the State Police construe that to mean that that

15 includes County laws or regulations.  So that's a three-year

16 disqualifier and a lifetime disqualifier.  That's a three-year

17 sentence with a lifetime disqualifier.  So that's a huge interim

18 effect associated with that because you lose your access to

19 firearms for life and can spend three years in prison.

20         THE COURT:  Okay.  So I understand.

21         MR. PENNAK:  So --

22         THE COURT:  That was the standing issue.  Anything

23 else, or ...

24         MR. PENNAK:  As to places of worship, the statute that

25 they're -- the County is citing take place in the late 1800s,

1  1870, 1888.  There's some of which go all the way into the

2  1900s.  Our whole point here is that those cannot be deemed to

3  be analogous, much less representative, to the right as it was

4  established in 1791 because they have not pointed to anything.

5  Now, they acknowledged as well, the places of worship -- there

6  were statutes at the time in the Colonial period which required

7  people to bring their firearms to church.  No one disputes that.

8  That carried forward to 1791.  So there has to be something to

9  do to negate that, and they pointed to nothing until they get

10  all the way up to 1870s.  That's not good enough.  That's our

11  whole point.

12        Now, I've looked back on our motion, and we've asked

13  for preliminary relief as to all permit holders without regard

14  to when they got their permit, and that we think is completely

15  appropriate because it restores --

16        THE COURT:  All permit holders?

17        MR. PENNAK:  All permit holders, period, full stop.

18        THE COURT:  And just to clarify, though, you're saying

19  that -- because maybe I misread this the first time.  You're not

20  saying people who had a permit under the old system.

21        MR. PENNAK:  That's correct.

22        THE COURT:  But people who may have just gotten one

23  now under a "shall issue" type --

24        MR. PENNAK:  Those people are certainly encompassed

25  within that relief request.

1    THE COURT:  Okay, I understand.  Maybe I wasn't clear

2  on that before.  I understand.

3    MR. PENNAK:  So I wanted to clarify that for the

4  Court.  If you look back to our motion itself, it makes that

5  very clear, that you -- includes all permit holders, which are

6  the very people that are affected by 21-22E, because they were

7  previously exempted from the County law.  In 21-22E --

8    THE COURT:  Well, really, people who had a permit

9  under the old system were exempted.

10   MR. PENNAK:  Well, no, it doesn't say that,

11  Your Honor.

12   THE COURT:  The -- we don't need to argue about it,

13  it's late, but I just -- you know, we can agree to disagree on

14  that point, that it's -- I don't think it's the same thing to

15  say that someone who just got a permit yesterday is in the same

16  spot as someone who had a permit three years ago under the

17  system where they had to have a reason and they were exempted.

18  I mean, if they just got a permit since the passage of this

19  bill, there's no way you can say they were exempted before,

20  right?  I mean, I don't know any of your plaintiffs fall into

21  that category, maybe they don't, but I do think it's different

22  in terms of saying they were exempted before.

23   MR. PENNAK:  Some had permits prior to the passage of

24  this, some did not.  But I would say as a matter of law, the

25  Supreme Court has abolished the distinction between people who

1  had them before under a good and substantial reason requirement

2  and people who simply don't have that requirement now.

3         THE COURT:  Mm-hmm, Mm-mm, yeah.

4         MR. PENNAK:  So I think that distinction is now put to

5  rest by Bruen itself.  So those people suffered the same

6  irreparable injury that anyone else does as a matter of

7  constitutional law.

8         THE COURT:  Okay, I understand.

9         MR. PENNAK:  So I appreciate the Court's attention

10 today.  I'm happy to entertain any further questions.

11        THE COURT:  I think I'm fine for now.  Obviously, if

12 there's a need for any additional briefing or otherwise, we'll

13 let you know.  I will take this matter under advisement.

14 I think the argument was important for me to fully understand

15 each side's positions and their bests arguments, so I appreciate

16 everyone's time and energy today.

17        Obviously, I know that -- well, on the one hand, the

18 motion for preliminary injunction obviously needs to be dealt

19 with quickly.  I assure you, I have other similar motions in

20 other cases that are also -- I'm moving to try to get through.

21 And part of the issue is not just giving you an answer but

22 giving you the right one, at least as best as I can do, and

23 that's -- in an area such as this, with these -- the historical

24 analysis that comes up, it's not an easy exercise.  And so I'll

25 do my best to get it to you as soon as possible.  And the motion

1    to remand, obviously, while not entirely a prerequisite, is

2    something that we should resolve in the same time frame.

3          So is there anything else about this case that I

4    should know about, any new developments, factually, legally, not

5    things that could have come up in the argument but just -- you

6    know, sometimes there's, you know, potential changes in the

7    statute for some reason, because there was a change during the

8    life cycle of all our litigation here, discussions among the

9    sides about some sort of accommodations that might be reached,

10   anything like that, or is it just -- you're just waiting for a

11   ruling?

12         MR. PENNAK:  There have been no settlement

13   discussions, Your Honor, certainly not.  I think the County has

14   adhered to that position throughout.  We're certainly not

15   backing off.

16         THE COURT:  Okay.  And the County's -- there's no

17   imminent changes in the law like there -- occurred in

18   the last -- during the life cycle of this case?

19         MR. LATTNER:  Not that I know of, Your Honor.

20         THE COURT:  Okay.  Okay, well, thank you very much.

21         MR. PENNAK:  Thank you, Your Honor.

22         THE COURTROOM DEPUTY:  All rise.  This Honorable Court

23   now stands adjourned.

24      (The proceedings were adjourned at 4:56 p.m.)

25

1    CERTIFICATE OF OFFICIAL REPORTER

2        I, Patricia Klepp, Registered Merit Reporter, in and for

3    the United States District Court for the District of Maryland,

4    do hereby certify, pursuant to 28 U.S.C. § 753, that the

5    foregoing is a true and correct transcript of the

6    stenographically-reported proceedings held in the above-entitled

7    matter and the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9                              Dated this 23rd day of February, 2023.

10

11                    _____/s/_____

12                    PATRICIA KLEPP, RMR
                      Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25