WRITTEN TESTIMONY OF MSI ON BILL 4-21



**President**
Mark W. Pennak

February 9, 2021

# WRITTEN TESTIMONY OF MARK W. PENNAK, PRESIDENT, MSI, IN OPPOSITION TO BILL 4-21 (Corrected)

I am the President of Maryland Shall Issue ("MSI"). Maryland Shall Issue is an all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. I am also an attorney and an active member of the Bar of the District of Columbia and the Bar of Maryland. I recently retired from the United States Department of Justice, where I practiced law for 33 years in the Courts of Appeals of the United States and in the Supreme Court of the United States. I am an expert in Maryland firearms Law, federal firearms law and the law of self-defense. I am also a Maryland State Police certified handgun instructor for the Maryland Wear and Carry Permit and the Maryland Handgun Qualification License and a certified NRA instructor in rifle, pistol and personal protection in the home, personal protection outside the home, muzzle loading as well as a range safety officer. I write in OPPOSITION TO BILL 4-21. For the reasons set forth below, this bill is preempted by State law and, if enacted, would be violative of the First Amendment and the Second Amendment of the Constitution. The Council would be well-advised to stay its hand and allow the General Assembly take the lead in these matters.

### The Bill Is Preempted:

State law, MD Code, Criminal Law, § 4-209, broadly preempts "the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun." The statute provides, as an exception, that the locality may regulate these subject matters '(i) with respect to minors; (ii) with respect to law enforcement officials of the subdivision; and (iii) except as provided in paragraph (2) of this subsection, within 100 yards of or in a park, church, school, public building, and other place of public assembly."

This bill violates Section 4-209 in multiple ways. First, and perhaps most egregiously, the bill defines a place of public assembly to include "a place where the public may assemble, whether the place is publicly or privately owned." The bill thus defines public "assembly" as a privately or publicly owned place where people "may assemble" and is thus utterly circular. It includes places where persons "may" assemble, not merely places where people do assemble or even regularly assemble.

**EXHIBIT C**

It could thus include any place, private or public, that people "may" assemble in the unknowable future.

Such an extraordinarily broad, circular definition is no definition at all. It is so vague as to violate the Due Process Clause of the Fourteenth Amendment. See *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1079 (4th Cir. 2006) (recognizing that "[a] statute is impermissibly vague if it either (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement" (internal quotations omitted). See also *Grayned v. City of Rockford*, 408 U.S. 104, 108-109, (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis"). This body has an obligation to define regulatory prohibitions, not make them so vague as to ensnare the innocent or lead to arbitrary enforcement, especially where the law affects Constitutional rights. *City of Chicago v. Morales*, 527 U.S. 41, 54 (1999). A statute will be deemed unconstitutionally vague if it (1) "fails to give ordinary people fair notice of the conduct it punishes," or (2) is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). The definition of place of public assembly fails that test.

Even more fundamentally, the bill's definition of place of public assembly is in conflict with Section 4-209. The proviso in Section 4-209 that allows the County to regulate firearms in within a 100 yards of "another place of public assembly" must read in context. See, e.g., *Berry v. Queen*, 469 Md. 674, 690, 233 A.3d 42 (2020) ("In order to interpret a word's specific meaning in a particular statute we look to the context in which the word is used.") (citation omitted). That proviso does not allow the County to regulate places where people "may" assemble, it allows regulation of a place within 100 yards "**another** place **of** public assembly," thus covering specific, existing locations where people typically already assemble.

The rule is that "'when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned.'" *In re Wallace W.*, 333 Md. 186, 190, 634 A.2d 53 (1993), quoting *Giant of Md. v. State's Attorney*, 274 Md. 158, 167, 334 A.2d 107, 113 (1975). This is simply an application of the canon of *ejusdem generis* which is based on "the supposition that if the legislature had intended the general words to be construed in an unrestricted sense, it would not have enumerated the specific things." *State v. 158 Gaming Devices*, 304 Md. 404, 429 n. 12, 499 A.2d 940 (1985). See also *State v. Sinclair*, 274 Md. 646, 650, 659, 337 A.2d 703 (1975). As the Supreme Court has also noted, the canon of *ejusdem generis* "limits general terms [that] follow specific ones to matters similar to those specified." *CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 294 (2011).

Here, by using the term "another place of public assembly," the statute was obviously intended to include "another" place which is akin or similar to the places expressly mentioned in the same statutory sentence, viz. a "park," a "church," a "school" or a "public building." Privately owned businesses or private property in

general are not like any of these specific places. Read literally, the bill's definition of a "place of public assembly" dramatically expands the area subject to local regulation to include any place within 100 yards of a private business or private property that "may" be used as place of assembly as well as to any place within 100 yards of a park, school, church or a public building. A place of public assembly as defined by this bill could cover a private business or a private home used as a place for a book club to meet, or a private property used to host any sort of event, no matter how small or limited in scope. It intrudes into private homes and businesses in a wholly unprecedented way. That is a vast overreach of legislative power by the County. It will not go unchallenged.

Even if the definition of "another place of public assembly" is limited to private businesses, the term is unbelievably broad. Given the number of private businesses in the County, such application would expand the exception to a huge portion of the County, including literally thousands of private homes within a 100 yards of a business. This sweep into private homes is not saved by Section 57-11, as this bill amends Section 57-11 to directly regulate the mere possession of "a ghost gun or undetectable gun" in the person's own home. The Section 4-209 exception for "another" place of public assembly simply cannot be reasonably read to allow such all-encompassing regulation of private possession in one's own home. This is particularly so given that State law expressly permits home possession of firearms, including handguns. MD Code, Criminal Law, § 4-203(b)(6) (providing that a person may wear, carry or transport a handgun "on real estate that the person owns or leases"). Nothing in Section 4-209 allows the County to regulate home possession of firearms. For these reasons alone, the bill's definition of "public assembly" will not survive judicial review. See *Montgomery County v. Atlantic Guns, Inc.*, 302 Md. 540, 489 A.2d 1114 (1985).

The bill conflicts with State law in other ways. The bill amends Section 57-11 to regulate possession of a firearm and ammunition at a business, providing that such owner may possess a firearm only if the owner "has a permit to carry the firearm." It similarly allows an authorized employee of the business to possess a firearm only if the employee "has a permit to carry the firearm." These amendments (requiring the owner and the employee to have a permit) bring the bill into direct conflict with State law. Specifically, MD Code, Criminal Law, § 4-203(b), expressly provides that a person need not have a permit to transport a handgun between the residence "and the place of business of the person" if the business is owned substantially by that person (Section 4-203(b)(3)), and further provides that a person may, without a permit, wear and carry a handgun "within the confines of a business establishment that the person owns or leases" (Section 4-203(b)(6)). Section 4-203(b)(7) extends the same right to wear and carry a handgun, without a permit, to an authorized supervisory employee within the confines of the business. These State law provisions are also not limited to "one" firearm, much less to ammunition for that one firearm, as required by this bill. These provisions of State law bar the County from regulating possession of firearms by business owners and employees.

Specifically, under the Express Powers Act, counties in Maryland have no power to pass legislation that is inconsistent with State law. See MD Code, Local

Government, §10-206(a) (providing that a county may pass an ordinance, resolution, or bylaw that is "not inconsistent with State law"). Thus, "[a] county may exercise the powers provided under this title only to the extent that the powers are not preempted by or in conflict with public general law." (Id. at §10-206(b)). It is thus well established that a local law is preempted by conflict when the local law prohibits an activity which is permitted by State law, or permits an activity prohibited by state law. See *City of Baltimore v. Sitnick*, 254 Md. 303, 317, 255 A.2d 376 (1969) ("a political subdivision may not prohibit what the State by general public law has permitted"). The bill obviously fails that test. Nothing in Section 4-209 allows the County to enact regulations that actually and directly ban conduct expressly permitted by State law. This County has already been rebuffed in its attempt to regulate ammunition by the Maryland Court of Appeals. See *Montgomery County v. Atlantic Guns, Inc.*, 302 Md. 540, 489 A.2d 1114 (1985). The limited exception for regulation allowed in Section 4-209 cannot be construed to allow the County to directly contravene State law in this manner. See, e.g., *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 297-98, 631 A.2d 77 (1993) ("state law may pre-empt local law in one of three ways: 1) pre-emption by conflict, 2) express pre-emption, or 3) implied pre-emption").

This bill also seeks to outlaw so called "ghost guns" to the extent possible and in so doing violates existing State law. For example, the bill bans the mere possession or transport of any firearm (including a ghost gun) within 100 yards of a place of public assembly. As noted, the bill expressly amends Section 57-11 to make clear that this ban applies to ghost guns in the home. As explained above, the County may not ban the possession of any firearms in the home as State law expressly permits such possession. MD Code, Public Safety, §4-203(b)(6). That includes ghost gun possessions in the home. The County may not regulate home possession of any firearm. Period. Full stop.

The bill also provides that a person "must not" "sell, transfer, possess, transport, or use a computer code to create, a firearm through a 3D printing process." That language is a grammatical mess. Does the bill ban the mere sale or possession of such code or does it ban such a sale or possession only when it is used "to create a firearm." If it bans the former, then the bill is blatantly unconstitutional under the First Amendment and Second Amendment, as discussed below, and preempted, as discussed above. If it bans only the latter, then the bill is nonsense, as it is hard to envision a "transport" or "sale" of code that "creates" a gun. Such poor draftsmanship is intolerable in a bill that would attach penalties for a Class A violation. *Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018) ("the prohibition of vagueness in criminal statutes…is 'essential' of due process required by both 'ordinary notions of fair play and the settled rules of law'") (citation omitted). See also *Myers v. State*, 248 Md. App. 422, 437, 241 A.3d 997 (2020) ("The United States Supreme Court has stated that 'a vague law is no law at all.'"), quoting *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

The bill also bans "access" by a minor to any "major component" of a ghost gun and defines a major component to include "the slide or cylinder or the frame or receiver" or the barrel in the case of a rifle or shotgun. That limitation is inconsistent with

current State law that regulates access by a minor under the age of 16 to a loaded "firearm," not merely access to an unloaded component of a firearm. MD Code, Criminal Law, § 4-104. Current State law allows such access to an entire firearm, including a loaded firearm, if the child under the age of 16 has a hunter safety certificate. (Id.). The statute also expressly permits such access if supervised "by an individual at least 18 years old." (Id.). Once again, the bill improperly prohibits an activity permitted by State law.

Similarly, the bill provides that a person "must not" sell, lend or otherwise transfer a ghost gun to a minor and bans the manufacture or assembly of "a gun" (any gun) in the mere presence of a minor, including in the home, by a parent or firearms instructor or other adult. These bans are directly contrary to State law, which provides that a minor (or any person under 21) may "transfer" and possess a regulated firearm (including a handgun) if that person is under the supervision of a person over 21 or being trained by an instructor. MD Code, Public Safety, § 5-133(d). Such firearms instruction by an adult also frequently includes cleaning firearms, which is a process that necessarily includes disassembly and assembly of a firearm. Yet, this bill would ban these activities expressly permitted by State law. Indeed, Section 4-209(b)(2) flatly prohibits the County from banning firearms training, including the training of minors. That is exactly what this bill does by banning the assembly of any firearm in the mere "presence" of a minor and by banning the use of a ghost gun in the training or supervised access expressly allowed by Section 5-133(d).

### The Bill Violates The First Amendment:

The bill amends Section 57-11 to ban the mere possession, transport, sale or transfer of computer software. Yet, there is no doubt that computer "software" or a "computer program" is fully protected by the First Amendment. See, e.g., *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."); *Universal City Studios, Inc. v. Corley,* 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."). Banning computer programs is thus akin to banning a book and banning distribution of computer code is thus akin to banning the distribution of a book. Legally, if passed, the bill would turn County law enforcement officers into censors and the County government into a bunch of book burners.

The ban imposed by the bill is a purely "content-based" prior restraint on a First Amendment activities. See *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015). It is well-established that prior restraints to speech are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Under *Reed*, a facially content-neutral law will still be categorized as content-based if it "cannot be '"justified without reference to the content of the regulated speech,"' or … adopted by the government 'because of disagreement with the message [the speech] conveys.'" 135 S.Ct. at 2227, quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Here, there is nothing remotely facially neutral

about the bans imposed by this bill. The bans are based on the County's "disagreement with the message." Such a prior restraint on the message cannot stand. See *Defense Distributed v. Dept. of State*, 838 F.3d 451, 468-70 (5th Cir. 2016), c*ert. denied* 138 S.Ct. 638 (2018) (Jones, J. dissenting on other grounds) (reaching the merits of the First Amendment claim not considered by the majority and noting that the government's restriction on the export of 3-D printing code was content-based and thus must be analyzed under strict scrutiny).

Moreover, every American has a First Amendment right to receive information. Although the First Amendment refers only to the right to speak, courts have long recognized that the Amendment also protects the right to receive the speech of others. See *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (stating that the "First Amendment ... afford[s] the public access to discussion, debate, and the dissemination of information and ideas"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) (ban on advertising of prescription drug prices overturned); *Bigelow v. Virginia*, 421 U.S. 809, (1975) (ban on abortion advertising invalid); *Lamont v. Postmaster General*, 381 U.S. 301, (1965) (a postal regulation limiting the importation of Communist publications overturned); *Martin v. City of Struthers*, 319 U.S. 141 (1943) (ordinance prohibiting door-to-door solicitation invalid as to distribution of leaflets announcing a religious meeting). Every person in Maryland has a constitutional right to receive, purchase or otherwise obtain the very computer software or programs that the bill would ban.

### The Bill Is Unconstitutional Under The Second Amendment:

As noted, the bill would ban mere possession of a "ghost gun" within 100 yards of broad and vague definition of a place of public assembly, including banning possession in the home. This bill is thus a gun ban, pure and simple. Such a gun ban violates the Second Amendment right of owners to possess firearms under *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742, 750 (2010). Even under the least demanding test ("intermediate scrutiny"), if the State can accomplish its legitimate objectives without a ban (a naked desire to penalize gun owners is not legitimate), then the State must use that alternative. *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014). Stated differently, under intermediate scrutiny, the State has the burden to demonstrate that its law does not "burden substantially more [protected conduct] than is necessary to further the government's legitimate interest." Id. at 2535, quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989). See also *NY State Rifle & Pistol Ass'n. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015), cert. denied, 136 S.Ct. 2486 (2016) (striking down a 7 round load limit in a firearm magazine because the limit was "untethered from the stated rationale"). See also *Reynolds v. Middleton*, 779 F.3d 222, 232 (4th Cir. 2015) (holding that, under the intermediate scrutiny test as construed in *McCullen*, the government must "prove that it actually tried other methods to address the problem"). (Emphasis in original).

The test for "strict scrutiny" is even more demanding as, under that test, the State must prove both a "compelling need" and that it used the "least" restrictive alternative in addressing that need. See *United States v. Playboy Entm't. Grp., Inc.*,

529 U.S. 803, 813 (2000). More generally, the constitutionality of gun laws must be analyzed under the "text, history and tradition" test that was actually used in *Heller* and *McDonald*. See, e.g., *Heller v. District of Columbia*, 670 F.3d 1244, 1269 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). There is no "text, history or tradition" that could possibly support the types of bans imposed by this bill.

The manufacture of a homemade firearm or the use of a 3-D printer to create a homemade gun or gun component does not make that gun illegal in the slightest under long-standing federal law and state law. Under federal law, a person may legally manufacture a firearm for his own personal use. See 18 U.S.C. § 922(a). However, "it is illegal to transfer such weapons in any way." *Defense Distributed v. United States*, 838 F.3d 451, 454 (5th Cir. 2016). This manufacture "involves starting with an '80% lower receiver,' which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver." (Id).

Manufacturing an "80% lower" into a "functional lower receiver" is not a trivial process. It takes machine tools, expertise and hours of time. Miscues are common and, when made, essentially convert the "80% lower" into scrap metal. Individuals who undertake this process are overwhelmingly hobbyists, not criminals. Even after the receiver is successfully made, the owner would still have to purchase the additional parts, such as a barrel, the trigger, slide and all the internal parts to complete the assembly. All these additional parts are expensive. With the cost of the tools to mill the receiver, plus the cost of the parts, a final assembled homemade gun costs more to make than it would to actually buy an identical gun from a dealer. This bill would ban the hobby and penalize the hobbyist for the continued possession of any gun (within a 100 yards of a place of public assembly) that the hobbyist constructed prior to the enactment of the law. That result likely includes literally thousands of law-abiding people in Montgomery County.

Banning manufacture or the mere possession of any gun made by a 3-D printer, cannot be justified under any of these tests applicable to the Second Amendment. The bills' ban on the use of computers is akin to the argument that the Second Amendment protects only muskets that were used during the Revolutionary War, a contention that the Court in *Heller* rejected as "bordering on the frivolous." *Heller*, 554 U.S. at 582. Indeed, almost all firearms are manufactured using computer software. The County simply may not ban the possession of these types of arms. See *Defense Distributed v. Dept. of State*, 121 F.Supp.3d 680, 699 (W.D. Tex. 2015), *aff'd,* 838 F.3d 451 (5th Cir. 2016), *cert. denied,* 138 S.Ct. 638 (2018) (sustaining a regulation of 3-D printed guns under the Second Amendment because plaintiffs were "not prohibited from manufacturing their own firearms" and were "not prohibited from acquiring the computer files at issue").

Heller held that guns in "common use" by law abiding persons are prima facie protected arms under the Second Amendment. *Heller*, 554 U.S. at 627. Homemade guns easily satisfy this requirement as there are literally tens of thousands of such guns made over many years throughout the United States. Guns for personal use have been made at home for centuries, even before the Revolutionary War. The Council simply may not disregard that reality. See *Caetano v. Massachusetts*, 136 S.Ct.1027 (2016) (summarily reversing Massachusetts' highest court for failing to follow the reasoning of Heller in sustaining a state ban on stun guns); *Ramirez v. Commonwealth,* 479 Mass. 331, 332, 352 (2017) (on remand from *Caetano*, holding that "the absolute prohibition against civilian possession of stun guns under § 131J is in violation of the Second Amendment" and declaring the State's absolute ban to be "facially invalid"). Homemade guns are at least as much "in common use" as stun guns at issue in Caetano.

Here, the supposed evil that this bill purports to address is guns without serial numbers because such guns are not "traceable." Yet, tracing runs out after identification of the gun's first purchaser and firearms may be sold and resold many times in their lifetime. Criminals, who may not possess firearms at all, will not be deterred by the bill as possession of a firearm by a prohibited person is already a 10-year federal felony, 18 U.S.C. § 922(g), and a serious crime under existing State law, MD Code, Public Safety, § 5-101(g)(3), § 5-133(b)(1), § 5-205(b)(1). The few crimes that are solved by tracing guns left at a crime scene are only a small fraction of guns used in crimes because very few guns are actually traced by the ATF. See David B. Kopel, Clueless: The Misuse of BATF Firearms Tracing Data. http://www.davekopel.org/2A/LawRev/CluelessBATFtracing.htm. See also Police Departments Fail to Regularly Trace Crime Guns. https://www.thetrace.org/2018/12/police-departments-gun-trace-atf/. The ATF itself has cautioned against any use of trace data, noting that "[t]he firearms selected [for tracing] do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe." Bureau of Alcohol, Tobacco, Firearms and Explosives. Firearms Trace Data, 2016: Maryland, https://www.atf.gov/docs/163521-mdatfwebsite15pdf/download. As the ATF further notes, "[n]ot all firearms used in crime are traced and not all firearms traced are used in crime," stating further that "[f]irearms are normally traced to the first retail seller, and sources reported for firearms traced do not necessarily represent the sources or methods by which firearms in general are acquired for use in crime."

But, if the concern is truly that these guns lack a serial number (rather than a desire to penalize gun owners), then that concern can be addressed without banning homemade guns. Specifically, there are alternatives to bans. For example, a new law passed in California (which is ranked by the Giffords Law Center as having the most restrictive gun laws in the nation) provides that a new resident to the state shall apply to the Department of Justice for a unique serial number within 60 days of arrival for any firearm the resident wishes to possess in the state that the resident previously self-manufactured or self-assembled or a firearm the resident owns, that does not have a unique serial number or other mark of identification. As of July 1, 2018, prior to manufacturing or assembling a new firearm, a person is

required to apply to California for a unique serial number. The gun owner is then simply required to engrave that number onto the receiver and report back to California that he or she has done so. As of January 1, 2019, owners of existing guns were required to apply for such serial numbers and perform this engraving. See California Penal Code §§ 29180-29184.

In short, assembly of new homemade guns and existing possession is permitted as long as this serial number is obtained, engraved and reported. California Penal Code §29180. In this way, the owner is identified and the gun is fully "traceable" and thus no longer a so-called "ghost gun." As this law indicates, there is no reason to take the extreme step of flatly banning homemade guns or converting existing owners into criminals. Under *Heller*, the County may not simply reject this alternative simply because a general ban is more convenient or cheaper. Gun owners may not be penalized for such flimsy reasons. See, e.g., *Board of Estimate of City of New York v. Morris*, 489 U.S. 688, 702 n.10 (1989); *Heller v. District of Columbia*, 801 F.3d 264, 310 (D.C. Cir. 2015) (Henderson, J., concurring in part and dissenting in part). Indeed, in 2018, the House Judiciary Committee in the General Assembly favorably reported a bill (HB 740) that expressly required the State Police to conduct a study of this California alternative. Such legislation may be enacted in the future. The Council has no role in such State-wide matters.

In sum, the Council should not venture out on this ill-conceived regulatory adventure that will, more likely than not, be struck down as preempted or otherwise invalidated by the courts. Waiting for the State to act also makes fiscal sense. If the State General Assembly decides to regulate "ghost guns," then the substantial litigation costs associated with defending that policy will be borne by the State, not by the County. Such legislation, if enacted by the General Assembly, will also undoubtedly conflict in some way with the bans that would be imposed by this bill, thereby resulting in the preemption of the County law. The Council should await action by the General Assembly. "Feel good" legislation is no substitute for sound legal judgment.

Sincerely,

Mark W. Pennak
President, Maryland Shall Issue, Inc.
mpennak@marylandshallissue.org