No. 23-1719

In the
United States Court of Appeals
for the Fourth Circuit

MARYLAND SHALL ISSUE, *et al.*,
*Plaintiffs-Appellants*

v.

MONTGOMERY COUNTY, MARYLAND,
*Defendant-Appellee*

On Appeal from the United States District Court
for the District of Maryland

BRIEF OF APPELLANTS

David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
*Fax: (202) 220-9601*
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
*Attorneys for Plaintiff MSI*

Mark W. Pennak
Law Offices Of Mark W. Pennak
7416 Ridgewood Ave.
Chevy Chase, MD 20815
Tel: (301) 873-3671
mpennak@marylandshallissue.org
*Attorney for All Plaintiffs*

Matthew Larosiere
Law Office Of Matthew Larosiere
6964 Houlton Circle
Lake Worth, FL 33467
Tel: (561) 452-7575
larosieremm@gmail.com
*Attorney for Plaintiff MSI*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................2

INTRODUCTION .............................................................................2

STATEMENT OF THE CASE...............................................................4

    A.    Chapter 57, Bill 4-21 and Bill 21-22E ..............................4

        1. Bill 4-21 ........................................................4

        2. *Bruen* ..........................................................5

        3. Bill 21-22E ....................................................6

    B.    Proceedings Below ..........................................9

    C.    The District Court's Decision ............................11

SUMMARY OF ARGUMENT ............................................................14

ARGUMENT ...............................................................................16

I.    STANDARD OF REVIEW.......................................................16

II.    THE CHALLENGED PROVISIONS LIKELY VIOLATE PLAINTIFFS' SECOND AMENDMENT RIGHTS...........................................17

    A.    The Second Amendment's Plain Text Covers Plaintiffs' Conduct ....17

    B.    Controlling Historical Considerations Under *Bruen*...........................18

        1. The Relevant Historical Period Centers on 1791, not 1868 ..........18

        2. Analogues must be representative and "distinctly similar" .............26

C.    Houses of Worship .................................................................30

D.    Parks ........................................................................................34

E.    Recreational Facilities And Multipurpose Exhibition Facilities .........39

F.    Locations Not Open To The Public ......................................41

G.    The 100-Yard Exclusionary Zones .....................................42

III.    OTHER EQUITABLE FACTORS ..................................................49

A.    Plaintiffs Are Suffering Continuous Irreparable Injury .....................49

B.    The Requested Relief Would Not Harm The County .........................51

C.    The "Public Interest" Is Not Harmed ..................................53

CONCLUSION ........................................................................................54

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355 (4th Cir. 2012)............................53

*Air Evac EMS, Inc. v. McVey*, 37 F.4th 89 (4th Cir. 2022) ....................................16

*Andrews v. McCraw,* 2022 WL 19730492 (5th Cir. 2022)........................................25

*Antonyuk v. Hochul*, 2022 WL 16744700 (N.D.N.Y. 2022) .................30, 32, 36, 41

*Antonyuk v. Hochul,* 2022 WL 18228317 (2d Cir. 2022)........................................31

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
    176 A.3d 632 (Del. 2017)............................................................................36

*Centro Tepeyac v. Montgomery Cnty.*,
    722 F.3d 184 (4th Cir. 2013)......................................................................51

*Christian v. Nigrelli*,
    2022 WL 17100631 (W.D.N.Y. Nov. 22, 2022).....................................18, 41

*Di Base v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017)..............................................16

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............... 17, 19, 22, 27, 31, 33

*English v. State,* 35 Tex. 473 (1872).......................................................................32

*Espinoza v. Montana Department of Revenue*,
    140 S. Ct. 2246 (2020)................................................................................22

*FPC, Inc. v. McCraw*, 625 F. Supp. 3d 740 (N.D. Tex. 2022)..................................25

*Fraser v. ATF*, 2023 WL 3355339 (E.D. Va. May 10, 2023) .................................26

*Gamble v. United States*, 139 S. Ct. 1960 (2019).....................................................21

*Giovani Carandola, Ltd. v. Bason*,
    303 F.3d 507 (4th Cir. 2002) ................................................................51, 53

*Grimmett v. Freeman*, 2022 WL 3696689 (4th Cir. 2023)......................................49

*Hardaway v. Nigrelli*,
    2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022)...................................18, 30, 43

*Heffron v. Int'l Soc. For Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981).....................................................................................44

*Heller v. District of Columbia*, 670 F.3d 1224 (D.C. Cir. 2011)..............................22

*Hill v. State*, 53 Ga. 472 (1874) .............................................................................32

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ............................................................51

*Hirschfeld v. ATF*, 5 F.4th 407, 417 (4th Cir.), *as amended* (July 15, 2021),
    *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), *cert. denied*,
    142 S. Ct. 1447 (2022) ................................................................23

*In re Lipitor*, 892 F.3d 624 (4th Cir. 2018) ................................................16

*Koons v. Attorney General of New Jersey,* No. 23-1900,
    slip op. (3d Cir. June 20, 2023) ..........................................40, 41

*Koons v. Reynolds*, 2023 WL 128882 (D.N.J. Jan. 9, 2023) ...................49

*Koons v. Platkin*, 2023 WL 3478604
    (D.N.J. May 16, 2023) ...................... 17, 26, 28, 30, 31, 32, 33, 35, 40, 41, 53

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) .....................53

*Lynch v. Donnelly*, 465 U.S. 668 (1984) .................................................21

*Matter of Rounds*, 255 Md. App. 205, 279 A.3d 1048 (2022) .................5

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .........................19, 20, 28

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................23

*Morris v. Army Corps of Eng'rs*,
    60 F. Supp. 3d 1120 (D. Idaho 2014), *appeal dismissed*,
    2017 WL 11676289 (9th Cir. Dec. 15, 2017) ................................36

*MSI v. Montgomery County*,
    2023 WL 3276497 (D. Md. May 5, 2023) ....................................10

*MSI v. Montgomery County*,
    2022 WL 375461 (D. Md. Feb. 7, 2022) ..........................................9

*New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111
    (2022) ..................................... 2, 3, 5, 6, 17, 18, 19, 20, 21, 22, 23, 26, 27, 28,
    29, 30, 31, 33, 34, 37, 38, 40, 42, 43, 48, 49, 50, 52

*Nken v. Holder*, 556 U.S. 418 (2009) .....................................................51

*NRA v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2022), *vacated,*
    *rehearing en banc granted*, *NRA v. Bondi*, --- F.4th ---,
    2023 WL 4542153 (11th Cir. July 14, 2023) .........................12, 19

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) .......................................16

*People v. Chairez*, 104 N.E.3d 1158 (Ill. 2018) ......................................36

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ...........................................20

iv

*Rocky Mt. Gun Owners. v. Polis*,
   2023 WL 5017253 (D. Col. Aug. 7, 2023)....................................................38

*Rosenbloom v. Pyott,* 765 F.3d 1137 (9th Cir. 2014) .............................................23

*Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987).........................................................49

*Solomon v. Cook Cnty. Bd. of Comm'rs*,
   559 F. Supp. 3d 675 (N.D. Ill. 2021).................................................36, 37

*Teter v. Lopez*, --- F.4th ----, 2023 WL 5008203 (9th Cir. 2023)..............................24

*Timbs v. Indiana*, 139 S. Ct. 682 (2019) ...............................................20, 21

*United States v. Alston*, 2023 WL 4758734 (E.D.N.C. July 18, 2023) ......................24

*United States v. Bartuci*, --- F. Supp. 3d ----,
   2023 WL 2189530 (E.D. Cal. Feb. 23, 2023)...........................................24, 25

*United States v. Bilodeau*, 24 F.4th 705 (1st Cir. 2022) ...........................................50

*United States v. Connelly*,
   2022 WL 17829158 (W.D. Tex. Dec. 21, 2022)................................................25

*United States v. Daniels*, --- F.4th ----,
   2023 WL 5091317 (5th Cir. 2023).................................................24, 27

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)...................................37

*United States v. Price*,
   2022 WL 6968457 (S.D. W. Va. Oct. 12, 2022) ................................................25

*United States v. Rowson*, 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) ......................25

*United States v. Stambaugh*,
   2022 WL 16936043 (W.D. Okla. Nov. 14, 2022)...........................................25

*Virginia v. Moore*, 553 U.S. 164 (2008) ...............................................21

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).......................................16

*Wolford v. Lopez*, 2023 WL 5043805 (D. Haw. Aug. 8, 2023).................34, 37, 48

*Worth v. Harrington*, 2023 WL 2745673, at *11 (D. Minn. Mar. 31, 2023)........25, 26

## Statutes

18 U.S.C. § 922(b)(1) ...............................................23

MD Code, Criminal Law,
   § 6-411(b)(11)...............................................54
   § 4-209(b)(1)...............................................9

MD Code, Public Safety, § 5-306.................................................................4, 5, 52

N.J.S.A. § 2C:58-4.6(a)(24) ...................................................... 40

**<u>Legislative Material</u>**

2023 Maryland Session Laws Ch. 680 ...........................................................53, 54

**<u>Other Authorities</u>**

Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*,
40 Landscape J. 1 (2021) ............................................................35

Census Bulletin No. 65, U.S. Census Bureau (June 8, 1901),
https://bit.ly/3GkuFnm ...............................................................48

*Child Care Inspection Search Results*, Md. State Dep't of Educ.
(last visited Aug. 21, 2023), https://bit.ly/43XOwRq ...................................44

County Council, County Session (Nov. 15, 2022), https://bit.ly/3VydQdF.............7

County Executive, *Montgomery County to review concealed carry ban proposal*,
Fox 5 DC (Oct. 31, 2022), https://bit.ly/3ET5bv3 ..........................................7

Dep't of Natural Resources, Seneca Creek State Park,
https://bit.ly/45fSPc2 ...............................................................34, 35

GIS Open Data, Montgomery Cnty., Md.,
https://bit.ly/3qjHLfb (updated Nov. 2020)....................................34, 44
   Bikeways, https://bit.ly/43XYB0M.....................................................44
   Colleges and Universities, https://bit.ly/3KvzjQK......................................44
   Communities with Municipalities, https://bit.ly/47xT18H .........................44
   Doctors, https://bit.ly/3DKRbU8.......................................................45
   Fire Stations, https://bit.ly/3YjY08F .................................................44
   HHS Facilities, https://bit.ly/3OINW5I................................................44
   Hospitals, https://bit.ly/3OLu9Tw.....................................................44
   Libraries, https://bit.ly/45cUwab.......................................................44
   MARC Commuter Train locations, https://bit.ly/451ctsz ...........................44
   Metro Stations, https://bit.ly/3OlQNjH ..............................................44
   Places of Worship, https://bit.ly/3OLbfvG............................................44
   Post Office Data, https://bit.ly/3DI3Ert..............................................44
   Private Schools, https://bit.ly/3rWuj1g ..............................................44
   Public Elementary Schools, https://bit.ly/3DKgyoV ................................44
   Public High Schools, https://bit.ly/3DJZjnK.........................................44

Public Middle Schools, https://bit.ly/3KsT8bF ...........................................44

Recreation Centers, https://bit.ly/457wXzA...........................................39, 44

John R. Lott, Jr., *Concealed Carry Permit Holders Across the United States: 2022*, CRIME PREVENTION RSCH. CTR. (Dec. 12, 2022), https://bit.ly/3O02TPA ...........................................52

Media Briefing (June 29, 2022), https://bit.ly/3B9ucB4 ........................................... 6

MONTGOMERY PARKS: CAPITAL CRESCENT TRAIL, https://bit.ly/459RCD8 (June 9, 2023) ...........................................35

MONTGOMERY PARKS: HAWLINGS RIVER STREAM VALLEY, https://bit.ly/3s3iMxj (July 28, 2022)...........................................34

MONTGOMERY PARKS: LITTLE BENNETT REGIONAL PARK, https://bit.ly/3DLKFMP (Aug. 14, 2023) ...........................................34

NAT'L PARK SERV., CHESAPEAKE & OHIO CANAL, https://bit.ly/3s4fCcz (May 3, 2023) ...........................................35

*National Census Est. as of July 1, 2022*, https://bit.ly/44Wt7JL ...........................................40

*National Census for 1820,* https://bit.ly/3GKpw7T ...........................................38

Press Release (July 12, 2022), https://bit.ly/3VvCf3u...........................................7

Public Safety Committee Work Session (Oct. 31, 2022), https://bit.ly/3P1mmz9 ...........................................7

Mark W. Smith, *'Not all History is Created Equal': In the Post-*Bruen *World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022, https://bit.ly/3CMSKjw ...........................................18

*The Earliest New York City Parks*, N.Y. CITY DEP'T OF PARKS & RECREATION, https://on.nyc.gov/3hBZXfe ...........................................35, 36

*Top 10 Best Art Galleries Near Montgomery County, Maryland*, YELP (last visited Aug. 21, 2023), https://bit.ly/3QMo22u ...........................................39

𝕴𝖓 𝖙𝖍𝖊
𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
𝖋𝖔𝖗 𝖙𝖍𝖊 𝕱𝖔𝖚𝖗𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

## No. 23-1719

**MARYLAND SHALL ISSUE, *et al.*,**
*Plaintiffs-Appellants*

v.

**MONTGOMERY COUNTY, MARYLAND,**
*Defendant-Appellee*

On Appeal from the United States District Court
for the District of Maryland

## JURISDICTIONAL STATEMENT

In a Verified Second Amended Complaint, filed November 30, 2022, plaintiffs challenge a Montgomery County ordinance, Chapter 57 of the Montgomery County Code ("Chapter 57"), as unconstitutional under the Second Amendment. The United States District Court for the District of Maryland had subject matter jurisdiction over that suit pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The district court entered an order on July 6, 2023, denying plaintiffs' motion for a preliminary injunction against the enforcement of Chapter 57. JA827. Plaintiffs

1

timely noticed an appeal from that denial on July 7, 2023. JA868. This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the district court erred in holding that the County may ban carrying firearms at or within a publicly or privately owned place of worship, park, recreational facility, or multipurpose exhibition facility.

2.    Whether the district court erred in holding that the County may impose 100-yard buffer zones around any privately or publicly owned place of "public assembly," and thereby effectively criminalize firearm possession and transport by carry-permit holders throughout the County.

3.    Whether the district court erred in holding that the equities and public interest weighed against preliminarily enjoining the enforcement of the County's challenged carry bans.

## INTRODUCTION

In *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court confirmed that the Second Amendment protects a "general right to publicly carry arms for self-defense," *id.* at 2134, and therefore held that New York violated the Second Amendment by restricting carry licenses to individuals who could demonstrate a "special need for self-protection distinguishable from that of the general community," *id.* at 2123. Before *Bruen*, Maryland similarly limited

carry licenses to a select few, but *Bruen* made clear that limitation was unconstitutional.

Montgomery County chose resistance. Shortly after *Bruen*, the County amended its laws to bar carrying even by permit holders in a long list of purported places of public assembly—including places of worship, public parks, recreation facilities, and multipurpose exhibition facilities. To make matters worse, Montgomery County barred carrying firearms not only *in* these locations but also anywhere within 100 yards *around* the outer edges of these locations. The right to carry firearms in Montgomery County, therefore, is a fiction, as thousands of unmarked, overlapping buffer zones make it basically impossible for a law-abiding citizen to lawfully possess and transport a firearm in the County.

Montgomery County's restrictions are fundamentally incompatible with the Second Amendment. Indeed, the restrictions are perverse as they prohibit individuals in potentially vulnerable locations such as churches and synagogues from arming themselves for their own defense, thus making those places even more inviting targets for violent, hate-filled criminals. That is flatly contrary to the Founding-era solution, which was to *arm* potentially vulnerable people, not disarm them. The County's restrictions also fly in the face of *Bruen*'s determination that law-abiding citizens have a general right to carry subject only to limitation in "exceptional circumstances." *Id*. at 2156. Montgomery County has flipped that on its head, as the

3

County's law permits carry only in an exceptional location and effectively precludes any movement from that location to any other location. The County's carry restrictions violate the Second Amendment and should be enjoined for the duration of this lawsuit.

## STATEMENT OF THE CASE

Plaintiffs are Maryland Shall Issue, Inc. ("MSI"), a Section 501(c)(4) membership advocacy organization; Engage Armament, a State and Federally licensed firearms dealer; ICE Firearms, a firearms instruction business; and eight individuals who live and/or work in Montgomery County. Each individual plaintiff has a Maryland wear and carry permit issued by the Maryland State Police pursuant to MD Code, Public Safety, § 5-306.[1] Plaintiffs challenge the constitutionality of Chapter 57 of the Montgomery County ordinances, as amended by two County bills, Bill 4-21, enacted in 2021, and Bill 21-22E, enacted in November 2022.

### A.    Chapter 57, Bill 4-21 and Bill 21-22E

#### 1.    Bill 4-21

Bill 4-21 was enacted April 16, 2021, and became effective July 16, 2021. JA099. It amended Section 57-11(a) of the Montgomery County Code to ban all

---

[1] The Verified Second Amendment Complaint alleges that each of the individual plaintiffs had a wear and carry permit issued by the Maryland State Police, save for plaintiff Brandon Ferrell, who alleged that his application for a carry permit was pending at that time. JA042-JA050. Plaintiff Ferrell has since received his carry permit.

firearms at or within 100 yards of a "place of public assembly," defined to include a list of particular places as well as any "place where the public may assemble, whether the place is publicly or privately owned." *See* Verified Second Amended Complaint ("SAC") at ¶ 6(e)(8). JA014. This amendment effectively banned firearms everywhere in public, but Bill 4-21 did not amend the preexisting exception, then found in County Code, § 57-11(b)(5), for persons who had been issued a carry permit by the Maryland State Police.

### 2.    *Bruen*

On June 23, 2022, the Supreme Court decided *NYSRPA v. Bruen*. *Bruen* held that New York violated the Second Amendment by requiring carry-permit applicants to demonstrate "proper cause" for carrying a loaded handgun in public.[2] The Court held that the Second Amendment protected "the general right to publicly carry arms for self-defense." 142 S. Ct. at 2134. The Second Amendment thus "presumptively guarantees" an individual's "right to 'bear' arms in public for self-defense," and "a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." *Id.* at 2135 & n.8. The Court ruled that "the standard for applying the Second Amendment" "is as follows:

---

[2] Permits in Maryland are now issued on a "shall issue" basis. *See Matter of Rounds*, 255 Md.App. 205, 213, 279 A.3d 1048 (2022) (invalidating the "good and substantial reason" requirement found in MD Code, Public Safety, § 5-306(a)(6)(ii), as contrary to *Bruen*).

When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129. Under this test, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

*Bruen* identified three locations—polling places, legislative assemblies, and courthouses—where the Court "assumed" that a state may altogether prohibit firearms. *Id.* at 2133. The Court stated that "courts can use analogies to those historical regulations of 'sensitive places'" to assess whether "modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id.* at 2134. Thus, under *Bruen,* if governments seek to restrict firearm carry at any purportedly "sensitive" location, the government must prove that the location is analogous to a Founding-era polling place, legislative assembly, and courthouse—in other words, a specific location where comprehensive security is already provided by the government.

### 3.    Bill 21-22E

County officials immediately defied *Bruen*. The County Executive was particularly vocal in that opposition. *See* Media Briefing (June 29, 2022), https://bit.ly/3B9ucB4 (starting at 01:29). Acting quickly, the President of the

6

Montgomery County Council introduced Bill 21-22E that, as introduced, would have repealed the existing exemption to the public-assembly ban for carry-permit holders. The sponsor touted the Bill, saying: "This legislation will help to ensure that we do everything possible to minimize the number of guns in our public space." Press Release (July 12, 2022), https://bit.ly/3VvCf3u. The County held a public hearing at which MSI and others pointed out that banning carry by permit holders at any location at which the public "may assemble" was indefensible after *Bruen*. JA204.

In response, the sponsor amended the Bill to change the definition of "place of public assembly" to its current language, set forth below, JA126, complaining that *Bruen* made it more difficult for the County to enact policies that "prevent someone's Second Amendment right from infringing on the right of me and my family to go to a movie theater without having to wonder or worry about someone sitting next to me is carrying a gun on them." Public Safety Committee Work Session (Oct. 31, 2022), https://bit.ly/3P1mmz9 (starting at 01:40). Those views were endorsed by the leadership of the Montgomery County Police Department, *id.*, by the County Council, County Session (Nov. 15, 2022), https://bit.ly/3VydQdF (starting at 02:04:13), and by the County Executive, *Montgomery County to review concealed carry ban proposal*, Fox 5 DC (Oct. 31, 2022), https://bit.ly/3ET5bv3 (starting at 02:05). Bill 21-22E was enacted as emergency legislation and went into effect immediately upon the signature of the County Executive on November 28, 2023.

A major change made by Bill 21-22E was to amend Section 57-11(b) of Chapter 57 to eliminate the exemption for carry-permit holders from the bans on carrying firearms otherwise imposed by Section 57-11(a). SAC ¶ 85, JA055. Bill 21-22E also amended Chapter 57's definition for a "place of public assembly," removing Bill 4-21's inclusion of any place where the public "may assemble" and substituting a long list of general types of locations that the County now deems to be places of public assembly. Specifically, Bill 21-22E redefined "place of public assembly" to mean:

> (1) a publicly or privately owned:
> (A) park; (B) place of worship; (C) school; (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility, including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility;
> (2) government building, including any place owned by or under the control of the County;
> (3) polling place;
> (4) courthouse;
> (5) legislative assembly; or
> (6) a gathering of individuals to collectively express their constitutional right to protest or assemble.

A "place of public assembly" also includes all property associated with the place, such as a parking lot or grounds of a building. SAC ¶ 11, JA022.

The bans imposed by Section 57-11(a) now create 100-yard exclusionary zones around each of the newly defined "place[s] of public assembly." Under Section 57-15, "[a]ny violation of this Chapter . . . is a Class A violation to which the maximum

8

penalties for a Class A violation apply." Under Section 1-19 of the County Code, the maximum penalties for a violation of Chapter 57 are a $1,000 fine and 6 months in jail. Under Section 1-20(c) of the County Code, "[e]ach day any violation of County law continues is a separate offense."

### B.    Proceedings Below

On May 28, 2021, plaintiffs filed a complaint challenging Bill 4-21. Count I alleged that Bill 4-21 exceeded the County's powers under Maryland's Constitution, Count II alleged that Bill 4-21 conflicted with numerous State laws and preemption statutes and Count III alleged that Bill 4-21 was a taking under the State Constitution. Count IV alleged that parts of Bill 4-21 were unconstitutionally vague under the federal and State Constitutions. On July 12, 2021, the County removed the case to federal district court. On February 7, 2022, the district court remanded Counts I, II and III to State court, *MSI v. Montgomery County*, 2022 WL 375461 (D. Md. Feb. 7, 2022), retaining jurisdiction over Count IV. The parties accordingly proceeded in the Circuit Court for Montgomery County by filing cross motions for summary judgment on the State law claims.

In that State-court proceeding, plaintiffs filed a supplemental brief on *Bruen*, arguing that the County's authority to enact local laws under MD Code, Criminal Law, § 4-209(b)(1), should be narrowly construed to avoid constitutional issues under *Bruen*. On July 17, 2022, the State court heard argument on the cross-motions for

summary judgment. At the hearing the County argued that *Bruen* should not be considered on the State claims because the complaint, at that time, did not contain a Second Amendment claim. Accordingly, on July 22, 2022, plaintiffs filed, in State court, the First Amended Verified Complaint, adding a new Count alleging that Bill 4-21 was unconstitutional under the Second Amendment as construed in *Bruen*. On July 27, 2022, the State court denied both motions as moot. On August 8, 2022, the County removed the First Amended Complaint to federal district court.

On November 28, 2022, the County enacted Bill 21-22E. Plaintiffs filed the Verified Second Amended Complaint on November 30, 2022, JA014, retaining all the State law-claims in Counts I-III and challenging Chapter 57 in multiple federal claims. *See* Verified Second Amended Complaint Counts IV, V, VI, VII and VIII. JA067. Count VII challenges Chapter 57 as a violation of the Second Amendment. JA081.

On December 6, 2022, plaintiffs filed an emergency motion for a TRO and preliminary injunction, seeking immediate relief as to Count VII only. The district court held argument on that motion on February 6, 2023. JA714. On May 5, 2023, the district again remanded the State-law claims in Counts I-III to State court and retained all the federal claims in Counts IV-VIII. *MSI v. Montgomery County*, 2023 WL 3276497 (D. Md. May 5, 2023). On July 6, 2023, the district court denied plaintiffs' motion for a preliminary injunction and plaintiffs filed a timely notice of

appeal from that order on July 7, 2023. On July 17, 2023, plaintiffs filed with this Court an emergency motion for an injunction pending appeal. On August 3, 2023, the Court denied the motion "without prejudice to consideration of a future, timely motion." Order, Dkt. 21 at 1. Plaintiffs thereafter filed a motion seeking clarification of the circumstances for such a "future, timely motion" and alternatively renewing their motion for an injunction pending appeal. That motion remains pending.

## C.    The District Court's Decision

At the February 6, 2023, hearing, the district court refused to entertain plaintiffs' request for a TRO and considered only the motion for a preliminary injunction. JA726. The district court's July 6, 2023, opinion accompanying its order thus addressed solely plaintiffs' request for a preliminary injunction. JA827.

The district court first rejected the County's argument that plaintiffs lacked standing to challenge Chapter 57 in a pre-enforcement action, finding that "Plaintiffs have sufficiently alleged 'an actual and well-founded fear that the law will be enforced against them' and thus an imminent, impending injury based on a reasonable fear of prosecution.'" JA837 (quoting *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 393 (1988)). The district court thus found "standing as to the Second Amendment claims relating to the prohibitions on carrying a firearm at a private school, a childcare facility, a place of worship, a public park, a

11

recreational facility or multipurpose exhibition facility, a public library, and within 100 yards of any place of public assembly." JA841.

On the merits, the district court acknowledged that Section 57-11(a) expressly provides that its bans apply regardless of whether the covered locations are privately or publicly owned and that Section 57-11(a) does not require that privately owned locations be otherwise open to the public. The court nonetheless ruled, *sua sponte*, that all "locations referenced in the definition of 'place of public assembly' meet the definition only if they are actually open to members of the public." JA833.

The district court also held that "the historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment." JA845 (quoting *NRA v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2022), *vacated, rehearing en banc granted*, *NRA v. Bondi*, --- F.4th ---, 2023 WL 4542153 (11th Cir. July 14, 2023)). The district court then addressed the specific locations at issue, finding sufficient analogues from the Reconstruction Era and the late 19th and early 20th century to establish, in its view, the requisite historical tradition of banning carry at those locations.

Finally, the district court held that plaintiffs had failed to show irreparable injury. Even though the court acknowledged that an ongoing denial of a constitutional right was irreparable as a matter of law, the court opined that

12

irreparable harm was lacking because "[p]laintiffs have not provided any examples of prosecutions against permit holders for possessing a firearm in the scenarios they have referenced, such as a prosecution for possessing a firearm on a public street or area that happens to be within 100 yards of a place of public assembly, or for carrying a firearm at a place of worship with the permission of the leadership of that institution," and because plaintiffs purportedly had not "established that a specific incident of violence for which a firearm would be necessary for self-defense is imminent or likely." JA865.

The court also found that the balance of the equities favored the County because, even though *Bruen* abolished interest balancing, the court considered itself entitled to consider the County's argument that "reducing the risk of gun violence" favored denying a preliminary injunction. JA865-JA866. The court likewise dismissed the demonstrated "particular need" for permit holders to continue to carry at their places of worship, holding that such locations could use security guards. JA866.

In this appeal, plaintiffs challenge the denial of a preliminary injunction against the bans on carrying firearms at a place of worship, public park, recreational facility, and multipurpose exhibition facility, as well as the buffer zones around all listed places of "public assembly." Plaintiffs likewise seek review of the district court's refusal to read Chapter 57 as written, *viz.,* the court's holding that Chapter

57 bans do not encompass privately owned locations that are not otherwise open to the public.

## SUMMARY OF ARGUMENT

1.    Carrying firearms in public for self-defense is protected by the plain text of the Second Amendment, and there is no historical record from the Founding establishing a regulatory tradition to the contrary at any location at issue. Under *Bruen*, a court must focus its historical analysis on the Founding era. Yet the district court looked past the Founding era, where the challenged bans were unheard of, and used much later evidence to justify the County's bans. In doing so, the district court failed to follow *Bruen*, relied on a since-vacated Eleventh Circuit panel opinion, and ignored this Court's analysis in *Hirschfeld v. ATF* which recognized that 1791 is the "critical year" for determining the scope of the Second Amendment right.

2.    In sustaining the County's ban on carry by permit holders in places of worship, the district court ignored Founding-era evidence permitting—and sometimes expressly requiring—carry in such places. This evidence, and the concomitant lack of any relevant historical analogues for the County's bans, establishes that Plaintiffs are likely to succeed on the merits of their Second Amendment claim. The same is true of the County's bans on firearm carry at public parks, recreational facilities, and multipurpose exhibition facilities, as well as the County's 100-yard buffer zones around all listed places of "public assembly." There

14

is no Founding-era support for such bans, and the district court again flouted *Bruen* by giving controlling weight to laws enacted in the late 19th and early 20th centuries, laws enacted by a few small municipalities, and laws from the Territories. As *Bruen* also explained, New York may not "effectively eviscerate" the Second Amendment right to public carry by designating the island of Manhattan as a "sensitive place." Here, by creating thousands of interlocking, 100-yard exclusionary zones, the County has effectively banned carry by permit holders throughout the 506 square miles of the County, an area almost 20 times larger and far less densely populated than Manhattan.

3.      The ongoing denial of a constitutional right is an irreparable injury. Full stop. Yet, despite *Bruen*'s prohibition against conditioning Second Amendment rights on a showing of "special need," the district court required precisely such a showing to establish an injury here. Then, by giving controlling weight to the County's unsupported claim that banning carry by permit holders was necessary to promote public safety, the district court resurrected the means-ends balancing test that *Bruen* repudiated. The district court thus erred in holding that the equities and public interest weigh against the requested injunctive relief.

# ARGUMENT

## I.     STANDARD OF REVIEW

A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Preliminary injunctions are "intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Base v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (collecting case law). "[A] preliminary injunction can also act to restore, rather than merely preserve, the status quo, even when the nonmoving party has disturbed it." *Id.* at 231.

The element of a likelihood of success does not require a "certainty of success," but only that the plaintiff "make a clear showing that he is likely to succeed at trial." *Di Biase*, 872 F.3d at 230. The standard of review is whether the district court abused its discretion in denying a motion for a preliminary injunction. "[R]elated legal conclusions involved in that decision [are reviewed] de novo." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 102 (4th Cir. 2022); *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). An error of law is *per se* an abuse of discretion. *In re Lipitor*, 892 F.3d 624, 632 (4th Cir. 2018).

16

## II.    THE CHALLENGED PROVISIONS LIKELY VIOLATE PLAINTIFFS' SECOND AMENDMENT RIGHTS

"[T]he Second Amendment guarantees a general right to public carry," meaning that ordinary, law-abiding citizens are entitled to "'bear' arms in public for self-defense." 142 S. Ct. at 2135. Accordingly, the "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Id*. at 2156 (emphasis added). To determine whether a government restriction is constitutional, the first question is whether "the Second Amendment's plain text covers an individual's conduct"; if so, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30. It is the government's burden to "affirmatively prove that its firearms regulation is part of th[at] historical tradition," and the Court is "not obliged to sift the historical materials for evidence" itself. *Id*. at 2127, 2150. If the government fails to bear this burden, its restrictions must be enjoined. The County's law fails this test.

### A.    The Second Amendment's Plain Text Covers Plaintiffs' Conduct

The plain text of the Second Amendment protects Plaintiffs' proposed course of conduct. The Supreme Court has defined the Second Amendment's key terms: "The people" means "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; and to "bear" simply means to "carry." *District of Columbia v. Heller*, 554 U.S. 570, 580–82, 584 (2008). "Nothing in the Second

17

Amendment's text draws a home/public distinction," *Bruen*, 142 S. Ct. at 2134, or for that matter, any distinction between locations at all. Plaintiffs and MSI members are Americans who seek to carry bearable arms in public locations for self-defense. These undisputed facts end the textual inquiry: "the plain text of the Second Amendment protects [Plaintiffs'] proposed course of conduct—carrying handguns publicly for self-defense." *Id*. at 2134. Accordingly, "the burden falls on [the County] to show that [the challenged bans are] consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135; *see also Koons v. Platkin*, 2023 WL 3478604, at *62 (D.N.J. May 16, 2023); *Christian v. Nigrelli*, 2022 WL 17100631, at *7 (W.D.N.Y. Nov. 22, 2022); *Hardaway v. Nigrelli*, 2022 WL 16646220, at *13 (W.D.N.Y. Nov. 3, 2022).

## B.    Controlling Historical Considerations Under *Bruen*

### 1.    The Relevant Historical Period Centers on 1791, not 1868

The relevant time period for the historical inquiry that *Bruen* requires is the Founding, centering on 1791. *Bruen*, 142 S. Ct. at 2135–36; *see also* Mark W. Smith, *'Not all History is Created Equal': In the Post-*Bruen *World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*, SSRN, Oct. 1, 2022, https://bit.ly/3CMSKjw. The district court therefore erred in relying on statutes and ordinances enacted after 1868—some even enacted as late as the 20th century. In doing so, the court followed the same wayward path trod in

*Bondi*—in a panel decision has now been vacated and is thus no longer precedent. *See Bondi*, 61 F.4th 1346; JA845.

The Second Amendment binds the States and the federal government alike. *Bruen* made explicit that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," and "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137 (internal quotation marks omitted). Likewise in *McDonald v. City of Chicago*, the Court held that "incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." 561 U.S. 742, 765 (2010) (internal quotation marks omitted). And *Heller* established that, as applied against the Federal Government, the Second Amendment has the same scope today as at the Founding. *See Heller*, 554 U.S. at 576–77. By relying on evidence from the Reconstruction era and later, therefore, the district court improperly applied a different standard for a municipal regulation than applicable to federal regulations.

Nor was the now-vacated *Bondi* panel decision—opining that Reconstruction-era evidence is more probative than Founding-era evidence—remotely justified by *Bruen*. Although the *Bruen* Court noted an "academic" debate surrounding whether courts should look to 1791 or 1868 to determine the scope of the Second Amendment

right as incorporated by the Fourteenth Amendment, the Court found no need to resolve that question because it had no bearing on the case at hand. *Id.* at 2138 ("[T]he public understanding of the right to keep and bear arms in both 1791 and 1868 was, *for all relevant purposes*, the same with respect to public carry.") (emphasis added). *Bruen* therefore did not disturb the Court's established precedent holding that 1791 is the relevant date when applying the Bill of Rights to the Federal Government and that the Bill of Rights applies the same to both the States and the Federal Government.

While there may be an "academic" debate, there is no such debate in the case law. While the Second Amendment extends to the States via the Due Process Clause of the Fourteenth Amendment, that is true of *every* Bill of Rights provision that has been incorporated against the States. To accept 1868 as "more probative" would be contrary to virtually every decision that has incorporated the Bill of Rights as against the States. *See McDonald*, 561 U.S. at 764–65 & nn.12, 13. *Bruen* relied on two recent decisions, *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Timbs v. Indiana*, 139 S. Ct. 682 (2019). *Ramos* held that the Sixth Amendment right to a unanimous jury verdict was incorporated against the States and overruled prior precedent that had allowed the States to adopt a different rule under a "dual track" approach to incorporation. The relevant historical benchmark for the Court's analysis was 1791. *See* 140 S. Ct. at 1396 (discussing the history in "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791).

Similarly, in *Timbs*, the Court held that the Excessive Fines provision of the Eighth Amendment was incorporated against the States. 139 S. Ct. at 686–87. The Court once again looked to the scope of the right as it existed in 1791. *Id*. at 687–88 (discussing "colonial-era provisions" and the "constitutions of eight States"). The Court's other precedents are in accord. *See, e.g.*, *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (explaining that *Heller* sought to determine "the public understanding in 1791 of the right codified by the Second Amendment"); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *cf. Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation of the Establishment Clause by Congress in 1789 takes on special significance."). In short, accepting 1868 as the "more probative era" would effectively throw out 80 years of jurisprudence that has looked to 1791 in addressing the incorporation of Bill of Rights provisions. Thus, when the Second Amendment was incorporated against the states, it carried with it the meaning established by the historical tradition in 1791— "when the people adopted" it. *Bruen*, 142 S. Ct. at 2137 (cleaned up).

Moreover, the *actual analysis* in *Bruen* focused on Founding-era practice. The Court stressed that the "post-Civil war discussion of the right to bear arms, [which] 'took place 75 years after the ratification of the Second Amendment, . . . do[es] *not provide as much insight* into its original meaning as earlier sources.'" *Id.* at 2137–38

21

(quoting *Heller*, 554 U.S. at 614) (emphasis added). *Bruen* likewise stated that courts should "guard against giving post-enactment history more weight than it can rightly bear." *Id.* at 2136. Justice Barrett, in her concurring opinion, stressed that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 2163 (Barrett, J., concurring). This analysis aligns with the Court's broader precedent, where, as *Bruen* noted, the Court has "assumed that the scope of the protection Applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.* at 2137. Thus, in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2258–59 (2020), the Court held that "more than *30*" provisions of state law enacted "in the second half of the 19th Century" could not "evince a tradition that should inform our understanding of the Free Exercise Clause" when those provisions were not grounded in Founding-era practice (emphasis added).

In all events, "to the extent later history contradicts" the text of the Second Amendment, "the text controls" and the text did not change in 1868. *Bruen*, 142 S. Ct. at 2137. "'[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id.* (quoting *Heller v. District of Columbia*, 670 F.3d 1224, 1274, n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). 20th-century and late-19th-century statutes and

regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 2154 & n.28. Thus, restrictions on the right to keep and bear arms adopted during or after the Reconstruction era may be confirmatory of earlier legislation but cannot alone provide the historical analogue required by *Bruen*. In other words, only "enduring" and "well-established" restrictions with roots in the Founding are relevant in assessing whether the challenged restrictions comport with the Second Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

This Court's decision in *Hirschfeld v. ATF*, 5 F.4th 407, 417 (4th Cir.), *as amended* (July 15, 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 1447 (2022), is instructive.[3] *Hirschfeld* held that "[w]hen evaluating the original understanding of the Second Amendment, 1791—the year of ratification—is 'the critical year for determining the amendment's historical meaning.'" *Id.* at 419. In so holding, *Hirschfeld* relied on *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), where the Seventh Circuit looked to 1791 as the "critical" period in assessing the scope of the Second Amendment right as applied to a State ban on carry outside the home. Although *Hirschfeld* involved a federal statute, 18 U.S.C. § 922(b)(1), the Court's

---

[3] While the decision in *Hirschfeld*, which involved the federal ban on handgun sales to 18-to-20-year-olds, was vacated as moot when the plaintiffs no longer fell within that age range, such decisions are still persuasive precedent. *Rosenbloom v. Pyott,* 765 F.3d 1137, 1154 n.14 (9th Cir. 2014) ("decisions vacated for reasons unrelated to the merits may be considered for the persuasive of their reasoning").

holding that 1791 was the "critical" period, and its reliance on *Moore*, are plainly at war with the district court's holding that purported analogues from 1868 and later control the scope of the Second Amendment right. Tellingly, the district court never cited *Hirschfeld* or *Moore*, much less addressed these holdings, even though Plaintiffs thoroughly briefed this issue in opposition to the brief filed by the County's amicus. *Hirschfeld* followed Supreme Court precedent, and this Court should follow *Hirschfeld*.

*Hirschfeld* and *Moore* are not alone in looking to 1791. The Fifth and Ninth Circuits have recently done likewise. *See United States v. Daniels*, --- F.4th ----, 2023 WL 5091317 at *8 (5th Cir. 2023) ("Even if the public understanding of the right to bear arms did evolve, it could not change the meaning of the Second Amendment, which was fixed when it first applied to the federal government in 1791."); *Teter v. Lopez*, --- F.4th ----, 2023 WL 5008203 (9th Cir. 2023) (holding that butterfly knives were protected arms and that the State had failed to show that a ban was justified by a historical analogue dating back to the Founding). The district courts have also uniformly looked to 1791. *See, e.g., United States v. Alston*, 2023 WL 4758734, at *5 (E.D.N.C. July 18, 2023) ("The further a historical practice strays from 1791—the year in which the Second Amendment was adopted—the less probative it is when determining whether a law complies with the Amendment's command."); *United States v. Bartuci*, 2023 WL 2189530, at *6 (E.D. Cal. Feb. 23, 2023) ("the best way to

do the historical analysis is by understanding the scope the Second Amendment had when it was adopted in 1791 and to look to 1868 when the Fourteenth Amendment was adopted as potentially confirmative evidence"); *United States v. Rowson*, 2023 WL 431037, at *22 (S.D.N.Y. Jan. 26, 2023) ("Viewing these laws in combination, the above historical laws bespeak a 'public understanding of the [Second Amendment] right' in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness."); *United States v. Connelly*, 2022 WL 17829158, at *2 n.5 (W.D. Tex. Dec. 21, 2022) (rejecting the government's reliance on "several historical analogues from 'the era following ratification of the Fourteenth Amendment in 1868'"); *United States v. Stambaugh*, 2022 WL 16936043, at *2 (W.D. Okla. Nov. 14, 2022) ("the government must identify a historical analogue in existence near the time the Second Amendment was adopted in 1791") (citation omitted); *United States v. Price*, 2022 WL 6968457, at *1 (S.D. W. Va. Oct. 12, 2022) ("Because the Second Amendment was adopted in 1791, only those regulations that would have been considered constitutional then can be constitutional now."); *FPC, Inc. v. McCraw*, 625 F. Supp. 3d 740, 756 (N.D. Tex. 2022), *appeal dismissed sub nom. Andrews v. McCraw,* 2022 WL 19730492 (5th Cir. 2022).

Even before the en banc order in *Bondi* vacated the panel decision, other courts had expressly rejected the approach followed by the panel. Thus, in *Worth v.*

*Harrington*, the court noted, *contra Bondi*, the "rather clear signs that the Supreme Court favors 1791 as the date for determining the historical snapshot of 'the people' whose understanding of the Second Amendment matters." 2023 WL 2745673, at *11 (D. Minn. Mar. 31, 2023). As that court explained, *Bruen* "made no small effort to distance itself from even *Heller's* reliance on post-enactment history except to the extent that such history was consistent with the founding era public meaning." *Id.* at *11 (citing *Bruen*, 142 S. Ct. at 2136–37); *see also Fraser v. ATF*, 2023 WL 3355339, at *15 & n.21 (E.D. Va. May 10, 2023) (following *Hirschfeld* and *Worth*, and rejecting *Bondi*).

### 2.    Analogues must be representative and "distinctly similar"

To be probative, historical analogues also must be "representative." Historical "outlier" requirements from a few jurisdictions or from territorial governments must be disregarded. *Bruen*, 142 S. Ct. at 2133, 2153, 2147 n.22, 2154 n.28, & 2156. Regulations from only a handful of States or that covered only a small portion of the population are not enough to demonstrate that modern regulations are consistent with a national regulatory tradition. *Id.* at 2155 (rejecting regulations applying to only 1% of the American population); *see also Koons*, 2023 WL 3478604, at *78, *85 (finding regulations covering 10% and 15% of American population insufficient). *Bruen* also categorically rejected reliance on laws enacted in the Territories, including "Arizona, Idaho, New Mexico, Oklahoma," holding that such laws "are *most unlikely* to reflect

'the origins and continuing significance of the Second Amendment'" and thus are not "'instructive.'" *Bruen*, 142 S. Ct. at 2154 (quoting *Heller*, 554 U.S. at 614) (emphasis added).[4]

Where the challenged law addresses "a general societal problem" of a type also present during the Founding, *Bruen*, 142 S. Ct. at 2131-32, the historical analogues must also be "distinctly similar" to the challenged regulation, which is to say that the analogues must have burdened ordinary, law-abiding citizens' right to carry for self-defense in a distinctly similar manner and for distinctly similar reasons as the challenged regulation. *Id.* at 2132. *See Daniels*, 2023 WL 5091317 at *4 (holding that the "kind of similarity" is dependent on whether the challenged regulation "'addresses a general societal problem'" or an "'unprecedented societal concern' that the Founding generation did not experience"). "The lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen,* 142 S. Ct. at 2131.

---

[4] Specifically, *Bruen* rejected New York's reliance on three colonial statutes (1686 East New Jersey, 1692 Massachusetts, and 1699 New Hampshire), *see* 142 S. Ct. at 2142–44; three late-18th-century and early-19th-century state laws that "parallel[ed] the colonial statutes" (1786 Virginia, 1795 Massachusetts, and 1801 Tennessee), *id*. at 2144–45; four additional 19th-century state laws (1821 Tennessee, 1870 and 1871 Texas, and 1887 West Virginia), *id*. at 2147, 2153; five late-19th-century regulations from the Western Territories (1869 New Mexico, 1875 Wyoming, 1889 Idaho, 1889 Arizona, and 1890 Oklahoma), *id*. at 2154–55; and one 19th-century Western state law (1881 Kansas), *id*. at 2155–56.

*Bruen* also explained that the analogical inquiry is guided by two "metrics": "how and why" any restriction was historically imposed during the Founding era. *Id.* at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* (emphasis in original) (quoting *McDonald*, 561 U.S. at 767). For example, historical poaching and hunting restrictions are generally insufficient to demonstrate the constitutionality of a modern-day restriction on carrying firearms during day-to-day life. Both *how* hunting laws burdened the right to carry firearms for self-defense (when hunting) and *why* they did so (to regulate hunting and reduce the taking of certain animals in certain places during certain seasons) have nothing to do with restricting the right of self-defense in modern-day Maryland. *See, e.g.*, *Koons*, 2023 WL 3478604, at *64–*65.

While *Bruen* cited *Heller*'s earlier suggestion (in dicta) that "schools and government buildings" potentially could be considered "sensitive places," *Bruen* approved only its three listed places as the basis for the analogical inquiry going forward: "courts can use analogies to *those* historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen,* 142 S. Ct. at 2133 (emphasis added). Accordingly, "sensitive places" cannot be construed "too broadly." Thus, a modern law restricting firearm carry in purportedly sensitive

places must be "distinctly similar" to historical regulations at these three types of places. *Id*. at 2131, 2134. In no event would this analysis permit a result that "would in effect exempt cities" or entire States "from the Second Amendment" or "eviscerate the general right to publicly carry arms for self-defense." *Id*. at 2134. After all, governments may bar the carrying of firearms in only "exceptional circumstances." *Id*. at 2145. The exception cannot become the rule. Finally, the historical analysis required by the Supreme Court is a legal inquiry that examines legal history, which is appropriately presented in briefs. *See id*. at 2130 & nn.6, 8.

The County bears the burden to "affirmatively prove" that its restrictions on public carry by permit holders are consistent with the Nation's historical tradition. *Id*. at 2127. Because Chapter 57 does not purport to address anything other than "a general societal problem," the County must show "distinctly similar" and representative historical analogues from the Founding era sufficient to establish that its law "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. The County has failed to carry that burden in banning all firearms at any of the challenged "places of public assembly" listed in Chapter 57. In particular, the County has not carried its burden to prove that its imposition of thousands of 100-yard exclusionary zones around such places is consistent with any "distinctly similar historical regulation" from the Founding. Indeed, there is **no** analogue from **any** era that could remotely support effectively banning permit holders from possessing and transporting

29

firearms throughout the entire County, the burden imposed here. *Bruen*, 142 S. Ct. at 2131. The district court therefore erred in holding that plaintiffs failed to show a likelihood of success.

### C.    Houses of Worship

The district court's decision is devoid of Founding-era support for regulating firearm carry at houses of worship and instead rests on late-19th-century and Territorial analogues. It thus runs afoul of *Bruen*, and the court's cited analogues show no relevant regulatory tradition in their own right. Three other district courts—in *Koons*, 2023 WL 3478604, at *73-*74, *Antonyuk v. Hochul*, 2022 WL 16744700, at *60-*63 (N.D.N.Y. 2022), and *Hardaway*, 2022 WL 16646220, at *13-*17 (W.D.N.Y. 2022)—have already examined this issue in great detail and rightly enjoined state laws that banned firearms in places of worship.

Houses of worship in the County have turned to armed security provided by permit holders who are members of their congregations, like plaintiff Eli Shemony, SAC ¶ 74, JA049-JA050, JA700 and MSI member declarants Allan Barall, JA362, JA707, David Sussman, JA360, and others, JA366, JA369, JA 374, JA378, JA711. These individuals were accorded permits by the Maryland State Police for the *express purpose* of providing security at their own houses of worship. *Id.* Chapter 57 strips these churches and synagogues of that protection, rendering these places and their congregants "sitting ducks" for mass murderers. JA708. The Second

Circuit has accordingly refused to stay district court injunctions against similar restrictions for "persons who have been tasked with the duty to keep the peace at places of worship." *Hardaway v. Nigrelli*, No. 22-2933, Dkt. 53 (2d Cir. 2023); *Antonyuk v. Hochul,* 2022 WL 18228317 (2d Cir. 2022).

There is zero Founding-era support for the district court's contrary holding. In fact, "the historical evidence demonstrates that six out of the thirteen original colonies *required* their citizens to go armed when attending religious services or public assemblies." *Koons*, 2023 WL 3478604, at *73 (emphasis added); *see also Heller*, 554 U.S. at 601 ("Many colonial statutes required individual arms bearing for public-safety reasons."). This Founding-era evidence of an American tradition allowing carry in places of worship cannot be contradicted by later 19th-century evidence. *Bruen*, 142 S. Ct. at 2154 (citing *Heller*, 554 U.S. at 614).

Like the County in this case, New Jersey in *Koons* and New York in *Antonyuk* relied on late-19th-century laws from Georgia (1870), Texas (1870), and Missouri (1875); the Territories of Arizona (1889) and Oklahoma (1890); and two municipal ordinances, one from Columbia, Missouri (1890) and one from Stockton, Kansas (1887). *Koons*, 2023 WL 3478604, at *74; *Antonyuk*, 2022 WL 16744700, at *61, *64. The district court here addressed many of the very same laws in upholding the

County's restrictions at places of worship. JA849.[5] The court in *Koons* ruled that the "above laws are not 'well-established' and 'representative' historical firearm regulations to justify prohibiting Carry Permit holders from carrying their handguns at public gatherings." *Koons*, 2023 WL 3478604, at *75. Similarly, *Antonyuk* afforded the territorial laws of Arizona and Oklahoma "little weight," noting that *Bruen* had instructed that statutes from the Territories were "deserving of 'little weight' because they were 'localized' and 'rarely subject to judicial scrutiny' and 'short lived.'" *Antonyuk*, 2022 WL 16744700, at *64.

In particular, the court in *Koons* dismissed New Jersey's reliance on an 1870 Georgia law, noting that the decision sustaining that law, *Hill v. State*, 53 Ga. 472 (1874), "rests on a militia-based reading of the right to keep and bear arms." 2023 WL 3478604, at *76. The same flaw afflicted the decision of the Texas Supreme Court in *English v. State,* 35 Tex. 473, 477–78 (1872), which sustained the 1870 and 1871 Texas statutes on the mistaken premise that "arms" referred only to arms possessed by the militia and used solely for military purposes. That premise was rejected by *Heller*'s holding that the Second Amendment protects an individual right

---

[5] The district court also cited a Huntsville, Missouri ordinance enacted in 1894, which was not addressed in *Koons*. JA849. As noted above, ordinances from a few municipalities out of the more than 10,000 localities that existed as of 1900 cannot remotely establish an American tradition.

apart from militia membership, *Heller*, 554 U.S. at 592, and *English* and the Texas laws were thus rejected as outliers in *Bruen*, 142 S. Ct. at 2153.

That leaves the Missouri and Virginia laws, but these statutes imposed a ban only on *concealed* carry, not a complete ban on all firearms, like Chapter 57. Specifically, the Missouri statute banned a person only from "having concealed about his person" firearms and other weapons. JA562. Likewise, the Virginia statute applied only if "a person habitually carry about his person, hid from common observation," a pistol or other weapon. JA565. These statues thus did not "impose a comparable burden on the right of armed self-defense" which is the "'*central'* consideration when engaging in an analogical inquiry." *Bruen*, 142 S. Ct. at 2133 (citations omitted).

Moreover, at the Founding, Virginia allowed "each county's chief militia officer to *order* all enlisted militiamen 'to go armed to their respective parish churches,'" *Koons*, 2023 WL 3478604, at *73 (emphasis added), and, as the district court noted, that did not change until 1878. JA864. By refusing to consider Founding-era evidence, the district court ignored this tradition and *Bruen*'s teaching that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." 142 S. Ct. at 2154. The same point applies to the 1875 Missouri statute. And regardless, courts must "not give disproportionate weight to a single state statute" nor "stake [their]

interpretation of the Second Amendment upon a law in effect in a single State." *Id.*
at 2153–54.

### D.     Parks

Chapter 57 also bans firearms in all parks in the County, regardless of whether
such parks are privately or publicly owned. As another district court recently noted
when striking down a similar restriction, the government again must "show that
prohibiting the carrying of firearms in areas frequented by the general public," such
as parks, is "consistent with this Nation's historical tradition." *Wolford v. Lopez*,
2023 WL 5043805, at *15 (D. Haw. Aug. 8, 2023); *see also Bruen*, 142 S. Ct. at
2135. Without a single piece of Founding-era evidence to support this regulation,
the County failed to shoulder this burden.

There are 693 public parks in Montgomery County. *See* GIS OPEN DATA,
MONTGOMERY CTY., MD., https://bit.ly/3qjHLfb (updated Nov. 2020) ("GIS Open
Data"). Those parks range in size from one square block, like Elm Street Park and the
Caroline Freeland Urban Park in Bethesda, to Hawlings River Stream Valley Park at
550 acres, *see* MONTGOMERY PARKS: HAWLINGS RIVER STREAM VALLEY,
https://bit.ly/3s3iMxj (July 28, 2022), to Little Bennett Regional Park at 3,700 acres,
*see* MONTGOMERY PARKS: LITTLE BENNETT REGIONAL PARK,
https://bit.ly/3DLKFMP (Aug. 14, 2023), to even larger parks like Seneca Creek State
Park at 6,300 acres, *see* DEP'T OF NATURAL RESOURCES, SENECA CREEK STATE PARK,

https://bit.ly/45fSPc2. Parks include the Capitol Crescent Trail which runs for miles from Bethesda to the C&O Canal. *See* MONTGOMERY PARKS: CAPITAL CRESCENT TRAIL, https://bit.ly/459RCD8 (June 9, 2023). Parks also include the C&O National Historical Park which runs for 184 miles along the Potomac River to Cumberland, MD, comprising thousands of acres along entire western boundary of the County. *See* NAT'L PARK SERV., CHESAPEAKE & OHIO CANAL, https://bit.ly/3s4fCcz (May 3, 2023). The areas encompassed by the County's bans at and within 100 yards of parks are immense. Contrary to the district court's belief, these locations are not all "densely populated areas." JA852.

There is nothing new about parks, and there is nothing new about potential violence in parks or in public green spaces set aside by the government generally. Boston Common is considered "America's oldest park" and was established in 1634. *See Koons*, 2023 WL 3478604, at *83. Not only was it commonly used for militia purposes (making it far from a gun-free zone), "[t]he Common also served as a site for informal socializing and recreation" including "[s]trolling," "[h]orse- and carriage-riding," "sports," "entertainment," and "raucous celebrations." Anne Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 LANDSCAPE J. 1, 3–6 (2021). Similar spaces existed throughout the colonies. In New York, for example, City Hall Park began as a "public common" in the 17th century. *The Earliest New York City Parks*, N.Y.

CITY DEP'T OF PARKS & RECREATION, https://on.nyc.gov/3hBZXfe. New York's

Bowling Green Park was established in 1733. *Id.*

Despite the existence of such parks at the Founding, there is no analogous

historical tradition of banning firearms by ordinary, law-abiding citizens. Moreover,

much of the land covered by Chapter 57 is composed of "vast expanses" of the great

outdoors "where people are generally free to roam." *Antonyuk,* 2022 WL 16744700

at *66. Neither the district court nor the County has pointed to a historical tradition

of banning firearms at such locations during the Founding era. Even before *Bruen*,

courts had rejected attempts to characterize such locations as "sensitive places." *See,*

*e.g.*, *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 658 (Del. 2017)

(holding that State parks and State forests were not "sensitive places" and that the

County's ban on firearms in such places was unconstitutional under Delaware's

version of the Second Amendment); *People v. Chairez*, 104 N.E.3d 1158, 1176 (Ill.

2018) (holding that an Illinois statute that banned possession of firearms within 1000

feet of a public park violated Second Amendment and rejecting argument that area

was a "sensitive" place); *Morris v. Army Corps of Eng'rs*, 60 F. Supp. 3d 1120,

1123–25 (D. Idaho 2014), *appeal dismissed*, 2017 WL 11676289 (9th Cir. Dec. 15,

2017) (rejecting argument that U.S. Army Corps of Engineers' outdoor recreation

sites were sensitive places); *Solomon v. Cook Cnty. Bd. of Comm'rs*, 559 F. Supp. 3d

675, 690–96 (N.D. Ill. 2021) (finding that a forest preserve district was not a "sensitive place").[6]

Without any Founding-era evidence, the district court focused exclusively on mid- to late-19th century and 20th-century regulations that covered urban parks in a few specific cities. JA850-JA851. This evidence is insufficient under *Bruen.* Again, according to the 1900 census, more than 10,000 municipalities existed at the time, so these few local, outlier regulations cannot be probative of "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. And none of regulations reached anything close to the County-wide acreage covered by Chapter 57 and thus did not impose a "comparable burden" and were not "distinctly similar" to the County's bans.

The district court also relied on an 1817 New Orleans ordinance addressing weapons in ballrooms, an 1870 Tennessee statute banning firearms at "any fair, racecourse, or other public assembly," the 1870 Texas statute discussed above, and territorial laws. JA853. These laws are entitled to no weight. Along with categorically discounting territorial laws, *Bruen* noted that the 1870 Tennessee

---

[6] *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), which addressed restrictions on firearms in a national park area, is no longer precedent after *Bruen*. *See Bruen*, 142 S. Ct. at 2124 (abrogating *Masciandaro* and decisions of other courts that had applied a "two step" means-ends test or intermediate scrutiny to sustain firearms restrictions); *id.* at 2126–27 & n.4; *Wolford*, 2023 WL 5043805, at *14 (*Masciandaro* . . . in light of *Bruen*, is no longer good law.").

statute had been interpreted "to exempt large pistols suitable for military use." 142 S. Ct. at 2147, 2153, 2155. That law thus did not impose a restriction "comparable" to the "burdens" imposed by Chapter 57. *Id.* at 2133. And the 1817 New Orleans ordinance is a single unrepresentative law in a city that, according to the 1820 census, had a population of 27,000—roughly three ten-thousandths of 1% of the total U.S. population of 9.6 million at the time. *See National Census for 1820,* https://bit.ly/3GKpw7T. Such a law neither establishes nor represents a national tradition. *See Bruen*, 142 S. Ct. at 2154-55. At any rate, absent "any confirmation in the form of founding era regulations," courts cannot give weight to "three pre-Civil War regulations," let alone just one. *Rocky Mt. Gun Owners. v. Polis*, 2023 WL 5017253, at *18 (D. Col. Aug. 7, 2023).

The district court also relied on a 1905 Minnesota statute, a 1917 Wisconsin statute, and a 1921 North Carolina statute. JA850–JA851. *Bruen*, by contrast, refused to "address any of the 20th-century historical evidence brought to bear by respondents or their amici" because, like "late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." 142 S. Ct. at 2154 n.28. The district court simply ignored that instruction, compounding its mistaken reliance on non-Founding-era sources.

### E.    Recreational Facilities And Multipurpose Exhibition Facilities

Chapter 57 further defines as a "place of public assembly" any privately or publicly owned "recreational facility" and any "multipurpose exhibition facility, such as a fairgrounds or conference center." The exact number of such facilities cannot be determined because these terms are not defined. GIS Open Data indicates there are 42 publicly owned recreation centers alone. *See* Recreation Centers, https://bit.ly/457wXzA. But, the bans at "privately owned" "recreational" facilities arguably includes all places where "recreation" is available, such as pool halls, climbing walls, bars, swimming pools, YMCA facilities, private gyms, skating rinks, the iFLY Indoor Skydiving, and the like. It could also include all privately or publicly owned golf courses. And though "exhibition facilities" is defined to include all publicly or privately owned "conference centers" and "fairgrounds," it is otherwise left undefined and thus may also include any place where an exhibition of any type is conducted, including art galleries. *Top 10 Best Art Galleries Near Montgomery County, Maryland*, YELP (last visited Aug. 21, 2023), https://bit.ly/3QMo22u (listing ten art galleries in the County). The district court lumped recreational facilities and exhibition facilities together with "public parks" in conducting its analysis, reasoning that "such facilities, like parks, are locations at which large numbers of people gather to engage in recreation." JA853. That reasoning ignores *Bruen*'s holding that the government may not ban arms simply

39

because the public may "congregate" or gather in a given location. 142 S. Ct. at 2134. Like New York's attempt to effectively render Manhattan a gun-free zone, the County's indiscriminate bans at these locations sweep so broadly that they effectively "eviscerate" the "general right to publicly carry arms for self-defense." *Id.*

In any event, indoor recreational facilities and conference centers are not like parks, so the burdens imposed by these Sections cannot be justified even by the County's (also unjustified) park ban. Montgomery County is home to over one million people. *National Census Est. as of July 1, 2022*, https://bit.ly/44Wt7JL. Accordingly, privately owned "recreational" facilities, given the County's vague definition, could outnumber the 693 public parks in the County. The district court identified *no* historical analogues for extending the ban to these areas. And there is no Founding-era support for banning firearms wherever people may recreate.

Such a ban mirrors the presumptive ban for possession on private property enjoined in *Koons*, which held that the right to carry for self-defense "presumptively" extends to private property open to the public unless the owner affirmatively "withdraw[s] consent." *Koons*, 2023 WL 3478604 at *61. The court thus enjoined enforcement of New Jersey's presumptive ban on carry by permit holders on private property, N.J.S.A. § 2C:58-4.6(a)(24). *Id.* at *61-*62. On appeal, the Third Circuit refused to stay that part of the district court's order. *See Koons v. Attorney General of*

40

*New Jersey,* No. 23-1900, slip op. 2 and n.1 (3d Cir. June 20, 2023). There is no "distinctly similar" historical tradition of firearm regulation from the Founding suggesting otherwise. *See*, e.g., *Koons*, 2023 WL 3478604 at *68. *See also Christian*, 2022 WL 17100631 at *9; *Antonyuk*, 2022 WL 16744700 at *79-*81. Indeed, the County's ban is even more extreme: recreation center owners may not even allow others to carry at these locations with express permission.

### F.    Locations Not Open To The Public

The district court held, s*ua sponte*, that Chapter 57 includes only those facilities that "are actually open to members of the public," JA833, but the *County* did not advance that construction below. To the contrary, the County affirmatively embraced application of Chapter 57 to *all* privately owned locations listed in Chapter 57, without any such limitation, including at privately owned private libraries, such as maintained by plaintiff Engage Armament, SAC ¶ 56, JA041. *See* Dist. Ct. Dkt. 59-2 at 24, 26, 29, 34, 36, 37. The County has also refused to disavow enforcement of any part of its law, JA764-JA773, as the district court noted in sustaining plaintiffs' standing, JA837. The County is the master of its own laws, and it has chosen to ban firearms at and within 100 yards of all private libraries, parks, places of worship and recreational facilities and other "places of public assembly," regardless of whether such locations are otherwise open to the public.

Read as written, the County's law's total ban on all firearms at non-public locations is indefensible as it would criminalize private owners and invitees for possession, sale or transport of a firearm (or a component of a firearm) on wholly private property. Whether or not that is the best reading of the law, which the state courts can and will decide, it is the one the County has advanced and thus necessitates injunctive relief. Nothing in *Heller* or *Bruen* can be read to allow such a total ban on firearms on private property. The court's refusal to address and enjoin enforcement with respect to such areas exposes plaintiffs, such as Engage Armament, ICE Firearms and others, to arbitrary enforcement at the County's whim. This Court should order the district court to enjoin any enforcement of Chapter 57 as to any location not otherwise open to the public.

## G.    The 100-Yard Exclusionary Zones

Even apart from these specific locations, *Bruen* additionally prohibits the County's attempt to ban firearm carry throughout the County via 100-yard exclusionary zones. Again, *Bruen* assumes that governments may regulate carrying firearms at "legislative assemblies, polling places, and courthouses," and "courts can use analogies to those historical regulations of 'sensitive places'" in assessing modern "sensitive-place" regulations. 142 S. Ct. at 2133. These three locations are alike in that they share the presence of comprehensive, State-provided security. *See* Br. of Cntr. for Human Liberty as *Amicus Curiae* at 8–17, *Antonyuk v. Nigrelli*, No.

22-2908, Dkt. 313 (Feb. 9, 2023); *Hardaway*, 2022 WL 16646220, at *14 (noting that these areas "are typically secured locations"). *Bruen* rejected New York's "attempt to characterize its proper-cause requirement as "a 'sensitive-place' law," ruling that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly" because it "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Id.* at 2134.

Chapter 57 bans firearms at ten broadly encompassing privately **or** publicly owned types of places as well as at an additional five other types of locations (government buildings, polling places, courthouses, legislative assemblies, and gatherings of persons expressing constitutional rights). The bans extend to "all property associated with the place, such as a parking lot or grounds of a building," meaning that the 100-yard zone is measured from the edge of the grounds, or any parking lots associated with each of the challenged locations. Thus measured, these bans create thousands of often interlocking 100-yard exclusionary zones that effectively ban carry by a permit holder throughout the County, including on all major roads and many side roads and sidewalks as well as vast acreage of private property otherwise open to the public. The 100-yard zones extend to adjoining streets and sidewalks where people walk or drive daily and where the law accords

special recognition of their right to go about their business. *See Heffron v. Int'l Soc. For Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981) (observing that a public street serves "a necessary conduit in the daily affairs of a locality's citizens").

The property affected by the County's 100-yard exclusionary zones is vast. The Maryland State Department of Education website lists 1,218 childcare facilities in Montgomery County. *Child Care Inspection Search Results*, MD. STATE DEP'T OF EDUC. (last visited Aug. 21, 2023), https://bit.ly/43XOwRq. According to GIS Open Data official sources, there are 1,262 public bikeways, https://bit.ly/43XYB0M, 605 houses of worship, https://bit.ly/3OLbfvG, 693 public parks, https://bit.ly/3qjHLfb, 260 private schools, https://bit.ly/3rWuj1g, 136 public elementary schools, https://bit.ly/3DKgyoV, 40 public middle schools, https://bit.ly/3KsT8bF, 25 high schools, https://bit.ly/3DJZjnK, 42 public recreation centers, https://bit.ly/457wXzA, 24 public libraries, https://bit.ly/45cUwab, 17 hospitals, https://bit.ly/3Olu9Tw, 14 County health centers, https://bit.ly/3OINW5I and 11 colleges and universities, https://bit.ly/3KvzjQK.

GIS Open Data lists 106 local governments, https://bit.ly/47xT18H, 40 Post Offices, https://bit.ly/3DI3Ert, 38 fire stations, https://bit.ly/3YjY08F, 13 Metro stations, https://bit.ly/3OlQNjH, and 11 MARC commuter train locations, https://bit.ly/451ctsz. These links show the address of each location and thus permit a 100-yard boundary to be drawn around each such location using Google Maps.

Doing so results in a graphic[7] that shows the massive web of often interlocking exclusionary zones covering every downtown area and every major road and many minor sideroads in the County, all of which effectively prevent a permit holder from moving about in the County. Several plaintiffs and a declarant cannot even leave their own homes without intruding into such a 100-yard zone. SAC ¶¶ 63, 66, 69, 71, 73, JA045-JA049, Supp. Decl. of John Smith No. 1 ¶5, JA712-JA713.

Those thousands of prohibited locations only scratch the surface. Chapter 57 also prohibits any firearm at or within 100 yards of "any health care facility" licensed by the Maryland Department of Health. According to the Maryland Board of Physicians, there are 4,508 active physicians practicing primarily at 1,307 unique addresses just in the cities of Bethesda, Gaithersburg, Rockville, and Silver Spring. https://bit.ly/3DKRbU8. This data also does not include many "privately owned" locations, such as "recreational facilities," "conference centers," urgent care centers, and pharmacies offering clinical services. It is impossible for the average permit holder to be aware of many of these locations as he or she moves about in the County.

A few examples drawn from the above sources illustrate Chapter 57's effectively blanket ban on carrying firearms in the County. As measured from the southern edge of the Caroline Freeland Urban Park in downtown Bethesda, the 100-

---

[7] Such a graphic was filed with this Court in support of plaintiffs' pending motion for an injunction pending appeal. *See* Supp. Decl. of Daniel Carlin-Weber at 9. Dkt. 10.

yard exclusion zone would ban possession and transport by a permit holder at a Giant Food grocery and other businesses open to the public, not to mention private offices and homes within that zone. As measured from the one square block comprising Elm Street Park in Chevy Chase, the 100-yard exclusionary zone would ban travel with a firearm along Wisconsin Avenue, which is the main street in downtown Bethesda. Similarly, the Capital Crescent Trail (a County park) runs for miles from Bethesda to the C&O Canal. A 100-yard arc from where the Trail intersects Bradley Boulevard in Bethesda would again include several stores as well as numerous private offices and apartment buildings. Just north of Bethesda, Route 355 borders Walter Reed Hospital on one side and the National Institutes of Health on the other. A bit further north is Temple Hill Baptist Church, well within 100 yards of Route 355. Parks, places of worship, and other covered locations lie up and down Rockville Pike and Wisconsin Ave, U.S. Route 29 and Georgia Avenue in Silver Spring, and along all other major roads throughout the County.

Permit holders are also effectively banned from traveling with firearms in the County on I-495 (the Capital Beltway) and I-270, and all major roadways in the County. The Beltway is easily within 100 yards of the athletic grounds of Montgomery Blair High School, Holy Cross Hospital parking lots, Sligo Creek Stream Valley Park, the Sligo Creek Golf Course and Rose Nix Elementary School. It also runs along Rock Creek Park for approximately three miles and next to the

Bethesda Country Club and the Burning Tree Club, both of which are arguably a "recreational facility" under Chapter 57. In short, most of I-495 in the County lies within exclusion zones. Similarly, I-270 runs within 100 yards of the Robert C. McDonell Campground and Wolftree Park, Julius West Middle School, the iFLY Indoor Skydiving, Browns Station Park, and the New Covenant Fellowship Church parking lot. State Route 355 is not an alternative route, as it runs along the Little Bennett Regional Park in northern Montgomery County for miles and borders many parks, churches, recreational facilities, and schools, including County government buildings, fairgrounds, and Montgomery College. Indeed, it would be difficult for a permit holder to enter the County with a firearm given that the County is bounded by parks, from Hawlings River Stream Valley Park to the north on State Rte. 97, to the C&O National Park along the western edge, to Rock Creek Park, which intersects the Beltway to the south. Even in these few examples, Chapter 57's infringement on Second Amendment rights is immense.

The district court ignored all this information and relied on an 1886 Maryland law that banned carry within 300 yards of a *polling place* in *four* of the twenty-three Maryland counties at the time. JA856. The court further relied on an 1870 Louisiana statute that banned carry within one-half mile of any place of registration for elections and an 1892 Mississippi law that banned students—and *only* students—from carrying firearms within two miles of a college, university, or school. *Id.* None

of these restrictions existed at the Founding, and none effectively banned carry throughout an area remotely as large as the entire County. None burdened the "general right" to carry in any way "comparable" to Chapter 57. *Bruen*, 142 S. Ct. at 2133–34. There is no "distinctly similar" historical analogue.

The district court also relied on five *municipal* ordinances imposing 50- or 100-yard buffer zones around "parks, squares, or common areas." JA857. The earliest of these ordinances was enacted in 1870 and the latest in 1903. And these were *five* municipalities out of the **10,602** incorporated cities, towns, villages, and boroughs in the United States estimated by the 1900 census. *See* Census Bulletin No. 65, U.S. Census Bureau (June 8, 1901), https://bit.ly/3GkuFnm. No "historical tradition" can be found in such a tiny sample of local ordinances, particularly where the sample is comprised solely of ordinances enacted in the late-19th or early-20th century. *See Bruen*, 142 S. Ct. at 2136; *Wolford*, 2023 WL 5043805 at *23-*24. The district court cited no ordinance, let alone a statute, dating to the Founding. The post-Founding statutes it relied upon were not relevantly similar, and in any event, they could not justify an effective ban on firearm carry in an entire County in direct contravention of *Bruen*.

## III.    OTHER EQUITABLE FACTORS

### A.    Plaintiffs Are Suffering Continuous Irreparable Injury

Plaintiffs suffer continuing harm from the County's denial of their right to public carry. The denial of a constitutional right is an irreparable harm. *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("the denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction"); *Grimmett v. Freeman*, 2022 WL 3696689, at *2 (4th Cir. 2023) ("Infringing constitutional rights generally constitutes irreparable harm"); *Koons v Reynolds*, 2023 WL 128882, at *23 (D.N.J. Jan. 9, 2023).

The district court seemed to accept this point, JA864, but suggested that Plaintiffs were not irreparably harmed because they had not demonstrated that "a specific incident of violence for which a firearm would be necessary for self-defense is imminent or likely." JA865. As *Bruen* reaffirmed, however, "[t]he right to 'keep and bear Arms' historically encompassed an 'individual right to possess and carry weapons *in case of* confrontation.'" 142 S. Ct. at 2176 (emphasis added) (citation omitted). The right to carry "in case of confrontation" is lost if Plaintiffs must wait until a deadly threat is "imminent or likely." Indeed, *Bruen* rejected such a requirement by prohibiting governments from "condition[ing] handgun carrying in areas 'frequented by the general public' on a showing of a nonspeculative need for armed self-defense in those areas." *Id.* at 2135. Accordingly, a Plaintiff need not

49

show an "imminent or likely" need for self-defense to exercise the "general right" recognized in *Bruen*. *Id.* at 2134.

The district court also erred in suggesting that Plaintiffs had "not persuasively demonstrated how the Second Amendment right to armed self-defense extends to a right to act as an armed security guard for private institutions." JA866. In this case, those rights are the same. Plaintiff Shemony alleges that "he regularly carries a loaded firearm while attending services at his synagogue *for his own self-defense and for the defense of others*." SAC ¶ 74, JA050 (emphasis added). The declaration of Allan D. Barall, JA362, details the threats to which Jewish synagogues are subject. *See* also Declaration of John Doe No. 2, ¶¶ 2-6, JA370-JA373. Employing full-time security guards at small synagogues is neither affordable nor effective, as explained in the Declaration of John Doe No. 1, ¶ 8, JA368, the Barall Declaration ¶ 6, JA363-JA364, and the Sussman Declaration, ¶¶ 3,4, JA360-JA361. Churches are no different. *See* Declaration of John Smith No. 1, JA378.

Each individual Plaintiff, and the members of MSI, are currently subject to the threat of arrest and prosecution if they possess, sell, transfer, or transport a firearm in violation of Chapter 57. The threat of criminal liability under Chapter 57 thus hangs over the heads of Plaintiffs and MSI members who live throughout the State, creating a continuing *in terrorem* effect against the exercise of constitutional rights. *See United States v. Bilodeau*, 24 F.4th 705, 713–14 (1st Cir. 2022).

**B.      The Requested Relief Would Not Harm The County**

Although "[t]he first two factors of the traditional standard"—likelihood of success on the merits and irreparable injury—"are the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), there is also no basis to conclude that the relief sought will "substantially injure" other parties. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). "A state is 'in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.'" *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Giovani Carandola, Ltd. v. Bason,* 303 F.3d. 507, 521 (4th Cir. 2002)). Carry by permit holders did not harm the County before the enactment of Bill 21-22E and it would not now. While *Bruen* allows more people to obtain carry permits under "shall issue" laws, 142 S. Ct. at 2138 n.9, that is because "the people" have a constitutional right to bear arms.

Contrary to the district court's ruling, JA865, the County's unsupported belief that allowing permit holders to exercise their constitutional rights might impair public safety does not provide grounds for denying relief. The County has no legitimate or cognizable interest in discouraging the exercise of a constitutional right. The district court referred generally to gun violence in 2020 and to a rise in such incidents in Montgomery County from 2021 to 2022. JA865–866. Relying on such statistics at the equities stage merely reinserts the sort of interest balancing that,

51

as the court recognized, *Bruen* prohibits. JA865. Just as courts may no longer "engage in independent means-end scrutiny under the guise of an analogical inquiry," *Bruen*, 142 S. Ct. at 2133 n.7, courts may not conduct a means-ends scrutiny under the guise of balancing the equities. Doing so risks "eviscerat[ing] the general right to publicly carry arms for self-defense," just as means-ends scrutiny did before *Bruen*. *Id.* at 2134. "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Id.* at 2156 (citation omitted); *see also id.* at 2131 ("The Second Amendment is the very *product* of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense.") (internal quotation marks omitted).

Regardless, there is no evidence that thoroughly vetted permit holders—a group that disproportionately abides by the law—are responsible for a rise in gun violence. *See* John R. Lott, Jr., *Concealed Carry Permit Holders Across the United States: 2022*, CRIME PREVENTION RSCH. CTR. (Dec. 12, 2022), https://bit.ly/3O02TPA, at 42–47. Even before *Bruen*, the Maryland State Police found "good and substantial reason" to issue carry permits to synagogue and church members to provide security under MD Code, Public Safety, § 5-306(a)(6)(ii), the requirement now invalidated under *Bruen*. *See* Barall Decls., JA362, JA707.

Allowing permit holders to continue carrying firearms for defense of themselves and others does not harm the County; rather, it comports with the tradition of maintaining public safety through public carry at places of worship and other places of public assembly. *See Koons,* 2023 WL 3478604, at *72–*73. It would also restore the *status quo* that existed before Bill 21-22E's enactment, and a preliminary injunction restoring the *status quo ante* is fully appropriate under equitable principles. *See Aggarao v. MOL Ship Mgmt. Co*., 675 F.3d 355, 378 (4th Cir. 2012) ("The status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the 'last uncontested status between the parties which preceded the controversy.'") (citation omitted).

### C.    The "Public Interest" Is Not Harmed

Where, as here, the defendant is the government, the public interest merges with the above balance of the equities. Preserving Plaintiffs' Second Amendment rights is in the public interest, because it is always the case that "upholding constitutional rights is in the public interest." *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011); *see also Giovani Carandola*, 303 F.3d at 521.

Contrasting Bill 21-22E with Maryland's new State-wide regulations of public carry, enacted this year in Senate Bill 1 ("SB 1"), illustrates that the Maryland General Assembly does not share the County's view of the public interest. *See* 2023

53

Maryland Session Laws Ch. 680. Although parts of SB 1 have been challenged as unconstitutional, SB 1 does not impose buffer zones or ban firearms in any place of worship, parks, recreational facility, or multipurpose exhibition facility. It bans firearms in only few of the health care facilities banned by the County and preserves a private property owner's right to allow carry by others. SB 1 also affirmatively allows permit holders to carry firearms in a vehicle, even in areas in which firearms are otherwise banned by SB 1. *Id.* (amending MD Code, Criminal Law, § 6-411(b)(11)). While *Bruen*'s abrogation of means-end scrutiny has eliminated the relevance of such inquiries, SB 1 makes clear that the County's much more expansive restrictions are not necessary for public safety.

## CONCLUSION

For the foregoing reasons, the judgment below should be reversed.

Dated: August 21, 2023

*/s/ David H. Thompson*
David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
*Attorneys for Plaintiff MSI*

Respectfully submitted,

*/s/ Mark W. Pennak*
Mark W. Pennak
Law Offices Of Mark W. Pennak
7416 Ridgewood Ave.
Chevy Chase, MD 20815
Tel: (301) 873-3671
mpennak@marylandshallissue.org
*Attorney for All Plaintiffs*

Matthew Larosiere
Law Office Of Matthew Larosiere
6964 Houlton Circle
Lake Worth, FL 33467
Tel: (561) 452-7575
larosieremm@gmail.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure, the undersigned counsel here certifies that the forgoing Brief of Appellants contains 12,827 words, not counting those items which may be excluded under Rule 32(f), and uses a 14 point, Times New Roman proportional font.

s/ Mark W. Pennak

_____

MARK W. PENNAK
Counsel for Plaintiffs-Appellants

Dated: August 21, 2023

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on August 21, 2023, the forgoing "Brief of Appellants" and "Joint Appendix" were served on all counsel of record via ECF service:

s/ Mark W. Pennak

_____
MARK W. PENNAK
Counsel for Plaintiffs-Appellants

Dated: August 21, 2023