## No. 23-1719

# In the
# United States Court of Appeals
# for the Fourth Circuit

**MARYLAND SHALL ISSUE, *et al.*,**
*Plaintiffs-Appellants*

v.

**MONTGOMERY COUNTY, MARYLAND,**
*Defendant-Appellee*

On Appeal from the United States District Court
for the District of Maryland

### JOINT APPENDIX VOLUME I

Edward B. Lattner
Office of the County
 Montgomery County, MD
101 Monroe Street, Third Floor
Rockville, MD 20850-2580
Tel: (240) 777-66705
*edward.lattner@montgomerycountymd.gov*
*Counsel for Defendant-Appellee*

Mark W. Pennak
Law Offices of Mark W. Pennak
7416 Ridgewood Ave.
Chevy Chase, MD 20815
Tel: (301) 873-3671
*mpennak@marylandshallissue.org*
*Attorney for All Plaintiffs-Appellants*

David H. Thompson
Peter A. Patterson
COOKER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
*Counsel for Plaintiff-Appellant MSI*

# TABLE OF CONTENTS

## Volume I

Relevant Docket Entries ................................................................. JA001

Verified Second Amended Complaint for Declaratory and Equitable
Relief and for Compensatory Damages, Nominal Damages and
Attorney's Fees and Costs filed 11/30/2022 (D.E. #49) ............................. JA014

Attachments:

Exhibit A: Bill 4-21 Montgomery County, Maryland signed
04/16/2021 (D.E.#49-1)............................................................ JA099

Exhibit B: Bill 21-22 Montgomery County, Maryland signed
11/28/2022 (D.E.#49-2)............................................................ JA107

Exhibit C: Written Testimony of Mark W. Pennak, President,
MSI, In Opposition to Bill 4-21 (Corrected) dated 02/09/2021
(D.E.#49-3) ...................................................................... JA113

Exhibit D: Staff Report Memorandum re: Bill 21-22 dated
11/15/2022 (D.E.# 49-4)........................................................... JA122

Exhibit E: Declaration of Daniel Carlin-Weber on Behalf of
Maryland Shall Issue, Inc. dated 11/28/2002 (D.E.# 49-5)..................... JA350

Exhibit F: Declaration of Andrew Raymond dated 11/28/2022
(D.E.#49-6) ...................................................................... JA352

Exhibit G: Declaration of Carlos Rabanales dated 11/28/2022
(D.E.#49-7) ...................................................................... JA353

Exhibit H: Declaration of Brandon Ferrell dated 11/28/2022
(D.E.#49-8) ...................................................................... JA354

Exhibit I: Declaration of Deryck Weaver dated 11/28/2022
(D.E.#49-9) ...................................................................... JA355

Exhibit J: Declaration of Joshua Edgar dated 11/28/2022
(D.E.#49-10) ..................................................................... JA356

i

Exhibit K: Declaration of Ronald David dated 11/28/2022
   (D.E.#49-11) ................................................................................ JA357

Exhibit L: Declaration of Nancy David dated 11/28/2022
   (D.E.#49-12) ................................................................................ JA358

Exhibit M: Declaration of Eliyahu Shemony dated 11/28/2022
   (D.E.#49-13) ................................................................................ JA359

Attachments to Emergency Motion for Preliminary Injunction and
   Temporary Restraining Order filed 12/06/2022 (D.E.# 52):

Exhibit N: Declaration of David S. Sussman dated 11/30/2022
   (D.E.#52-1) .................................................................................. JA360

Exhibit O: Declaration of Allan D. Barall dated 12/01/2022
   (D.E.#52-2) .................................................................................. JA362

Exhibit P: Declaration of John Doe No. 1 dated 11/30/2022
   (D.E.#52-3) .................................................................................. JA366

Exhibit Q: Declaration of John Doe No. 2 dated 11/30/2022
   (D.E.#52-4) .................................................................................. JA369

Exhibit R: Declaration of Thomas Paine No. 1 dated 11/30/2022
   (D.E.#52-5) .................................................................................. JA374

Exhibit S: Declaration of John Smith No. 1 dated 11/30/2022
   (D.E.#52-6) .................................................................................. JA378

Attachments to Response in Opposition to Corrected Motion for
   Preliminary Injunction filed 12/30/2022 (D.E.#59):

Exhibit 1: Bill 21-22 Montgomery County, Maryland signed
   11/28/2022 (D.E.#59-5)................................................................ JA382

Exhibit 2: Staff Report Memorandum re: Bill 21-22 dated
   11/15/2022 (D.E.# 59-6)............................................................... JA388

## Volume II

Exhibit 3: Montgomery County Report: Child Care Demographics
2002 by Maryland Family Network (D.E.#59-7)....................................JA482

Exhibit 4: Bethesda Magazine Article: County Council passes
legislation prohibiting firearm use, carrying within 100 yards
of some public spaces by Steve Bohnel dated 11/15/2022
(D.E.# 59-8) ...............................................................................JA494

Exhibit 5: The Washington Post Article: Gun violence rises
sharply in Montgomery County, police chief says, by Dan
Morse dated 07/11/2022 (D.E.# 59-9).......................................JA497

Exhibit 6: The New York Times Article: Who Stops a 'Bad Guy
With A Gun'? by Larry Buchanan and Lauren Leatherby
dated 06/22/2022 (D.E.# 59-10) ...............................................JA499

Exhibit 7: 1831 or 1816 J. Bayon, General Digest of the
Ordinances and Resolutions of the Corporation of New
Orleans 371 (1831) (D.E.# 59-11)...........................................JA505

Exhibit 8: 1837 Me Public Laws (D.E.# 59-12)...........................................JA509

Exhibit 9: 1837 Md. Laws 108, ch. 100 (D.E.# 59-13)..............................JA513

Exhibit 10: 1837 Massachusetts 54-56 (1837) (D.E.# 59-14)....................JA515

Exhibit 11: 1843 Rhode Island (June, 1843) (D.E.# 59-15)........................JA519

Exhibit 12: 1852 N.M. Laws 67, §3 (D.E.# 59-16)....................................JA522

Exhibit 13: 1857 First Annual Report of the Board of
Commissioners of the Central Park 106 (D.E.# 59-17) .........................JA525

Exhibit 14: 1859 Conn. Acts 62, An Act in Addition to and in
Alteration of an Act for Forming and Conducting the Military
Force, ch. 82, §5 (D.E.# 59-18)...............................................JA527

Exhibit 15: 1861 New York Central Park Commissioners Fourth
Annual Report (D.E.# 59-19) ...................................................JA531

iii

Exhibit 16: 1867 Pennsylvania General Assembly, Omitted Laws, PL 1083 No. 1020, A Supp to An Act approp-ing ground in the city of Philadelphia (D.E.# 59-20) ................................... JA533

Exhibit 17: 1869 Tenn. Pub. Acts 23-24 (D.E.# 59-21) .............................. JA540

Exhibit 18: 1870 Ga. Laws 421 (D.E.# 59-22) ............................................ JA543

Exhibit 19: 1870 La. Acts 159-160, no. 100 (D.E.# 59-23) ....................... JA546

Exhibit 20: 1870 Acts of Assembly Relating to Fairmount Park Sect. 21 (1870) (D.E.# 59-24) ................................................................ JA550

Exhibit 21: 1870 Tex. Gen. Laws 63, ch. 46 (D.E.# 59-25) ........................ JA556

Exhibit 22: 1874 Md. Laws 366, ch. 250 (D.E.# 59-26) ............................. JA559

Exhibit 23: 1875 Mo. Laws 50-51, §1 (D.E.# 59-27) ................................. JA561

Exhibit 24: 1877 Va. Acts 305 (D.E.# 59-28) ............................................ JA564

Exhibit 25: 1879 J. Hockaday, Revised Statutes of the State of Missouri 1879 (D.E.# 59-29) ................................................................ JA571

Exhibit 26: 1879 Tex. Crim. Stat. Tit. IX, Ch. 4 (D.E.# 59-30) ................. JA574

Exhibit 27: 1881 The Revised Ordinance of the City of St. Louis, 635 (1881) (D.E.# 59-31) ............................................................. JA577

Exhibit 28: 1882 R. Clark, The Code of the State of Georgia 818 (1873) (D.E.# 59-32) ................................................................... JA579

Exhibit 29: 1883 Mo. Laws 76 (D.E.# 59-33) ............................................ JA583

Exhibit 30: 1886 Md. Laws 315, ch. 189 (D.E.# 59-34) ............................ JA585

Exhibit 31: 1887 N.M. Laws 56, An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, ch. 30, §4 (D.E.# 59-35) ........................................................................................ JA587

Exhibit 32: 1888 Annual Reports of the City Officers and City Boards of the City of Saint Paul (D.E.# 59-36) ...................................... JA591

Exhibit 33: 1888 J. Prentiss, 1888 Md. Code Pub. Local Law,
Vol. I (D.E.# 59-37)...................................................................JA593

Exhibit 34: 1889 Ariz. Sess. Laws 16-17 (D.E.# 59-38)...........................JA595

Exhibit 35: 1890 General Ordinances of the Town of Columbia,
in Boone County, Missouri 34, 35 (Lewis M. Switzler ed.,
1890) (D.E.# 59-39).................................................................JA599

Exhibit 36: 1890 Okla. Laws 495, art. 47, §7 (D.E.# 59-40) .....................JA602

Exhibit 37: 1891 Laws and Ordinances for the Government of
the Municipal Corporation of the City of Williamsport,
Pennsylvania 141 (1891) (D.E.# 59-41)...................................JA605

Exhibit 38: 1892 The Annotated Code of the General Statute
Laws of the State of Mississippi 327, §1030 (D.E.# 59-42) .................JA609

Exhibit 39: 1893 The Charter of the City of Wilmington (1893)
(Part VII, §7) (D.E.# 59-43) ....................................................JA611

Exhibit 40: 1893 W. McCartney, Statutes of Oklahoma (1893)
(D.E.# 59-44)..........................................................................JA614

Exhibit 41: 1893 A Digest of the Acts of Assembly Relating to
and the General Ordinances of the City of Pittsburgh (1893)
(D.E.# 59-45)..........................................................................JA617

Exhibit 42: 1894 The Revised Ordinances of the City of
Huntsville, Missouri, of 1894 (D.E.# 59-46)...........................JA622

Exhibit 43: 1895 Mich. Local Acts 596, §44 (D.E.# 59-47).......................JA627

Exhibit 44: 1897 A Digest of the Laws and Ordinances for the
Government of the Municipal Corporation of the City of
Reading, Penn (D.E.# 59-48)...................................................JA636

Exhibit 45: 1899 parks-boulder-co-1899 (D.E.# 59-49) ............................JA640

Exhibit 46: 1901 Revised Statutes of Arizona Territory 1252
(1901) (D.E.# 59-50) ...............................................................JA644

Exhibit 47: 1903 Mont. Laws 49, §3 (D.E.# 59-51)...................................JA647

Exhibit 48: 1903 City of Trenton, New Jersey, Charter and
Ordinances 390 (1903) (D.E.# 59-52) ...................................................... JA650

Exhibit 49: 1905 Amendments to the Revised Municipal Code
of Chicago of 1905 and New General Ordinances 40 (1905)
(D.E.# 59-53) .................................................................................... JA653

Exhibit 50: 1905 Minn. Laws 620, ch. 344 §53 (D.E.# 59-54) ................... JA657

Exhibit 51: 1906 Ordinances, Rules and Regulations of the
Department of Parks of the City of New York 7 (1916)
(D.E.# 59-5) ..................................................................................... JA659

Exhibit 52: 1906 A Digest of the Ordinances of Town Council
of the Borough of Phoenixville 135 (1906) (D.E.# 59-56) ................... JA663

Exhibit 53: 1909 General Municipal Ordinances of the City of
Oakland, Cal., Addendum at 15 (1909) (D.E.# 59-57) ......................... JA668

Exhibit 54: 1910 The Code of the City of Staunton, Virginia 115
(1910) (D.E.# 59-58) ......................................................................... JA670

Exhibit 55: 1917 The Code of Birmingham, Alabama 662-663
(1917) (D.E.# 59-59) ......................................................................... JA672

Exhibit 56: 1917 Wis. Sess. Laws 1243-44 (1917) (D.E.# 59-60) ............. JA675

Exhibit 57: 1921 N.C. Session Laws 54, Pub. Laws Extra Sess.,
ch. 6 §3 (D.E.# 59-61) ...................................................................... JA678

Exhibit 58: Montgomery County Code, Chapter 57. Weapons
(incl. Bill 21-22) (D.E.# 59-62) ......................................................... JA680

Attachments to Response to Motion for Preliminary Injunction (D.E.#62):

Exhibit A: Supplemental Declaration of Eliyahu Shemony
dated 01/03/2023 (D.E.# 62-1) .......................................................... JA700

Exhibit B: Supplemental Declaration of Allan D. Barall
dated 01/04/2023 (D.E.# 62-2) .......................................................... JA707

Exhibit C: Supplemental Declaration of John Smith No. 1
dated 12/04/2023 (D.E.#62-3) ........................................................... JA711

Transcript of Hearing re Motion to Remand and Motion for
    Preliminary Injunction heard on 02/06/2023 ................................................ JA714

Senate Bill 1: Criminal Law – Wearing, Carrying or
    Transporting Firearms – Restrictions (Gun Safety Act of
    2023) approved on May 16, 2023 ..................................................................... JA802

Memorandum Opinion filed 07/06/2023 (D.E. #82) ........................................ JA827

Order filed 07/06/2023 (D.E. #83) ..................................................................... JA867

Notice of Appeal filed 07/07/2023 (D.E. #84) ................................................. JA868

**U.S. District Court**
**District of Maryland (Greenbelt)**
**CIVIL DOCKET FOR CASE #: 8:21-cv-01736-TDC**

Maryland Shall Issue, Inc. et al v. Montgomery County, Maryland
Assigned to: Judge Theodore D. Chuang
Case in other court:  USCA, 23-01719
                    Circuit Court for Montgomery County,
                    Maryland, 485899V
Cause: 28:1441 Notice of Removal

Date Filed: 07/12/2021
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Maryland Shall Issue, Inc.**

represented by **Mark William Pennak**
Law Offices of Mark W. Pennak
7416 Ridgewood Ave
Chevy Chase, MD 20815
301 873 3671
Fax: 301 718 9315
Email: m.pennak@me.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Engage Armament LLC**

represented by **Mark William Pennak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Andrew Raymond**

represented by **Mark William Pennak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carlos Rabanales**

represented by **Mark William Pennak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brandon Ferrell**

represented by **Mark William Pennak**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Deryck Weaver**

represented by **Mark William Pennak**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joshua Edgar**                           represented by    **Mark William Pennak**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**I.C.E. Firearms & Defensive Training,**   represented by   **Mark William Pennak**
**LLC**                                                      (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ronald David**                           represented by    **Mark William Pennak**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Nancy David**                            represented by    **Mark William Pennak**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eliyahu Shemony**                        represented by    **Mark William Pennak**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*


V.

**Defendant**

**Montgomery County, Maryland**            represented by    **Edward Barry Lattner**
                                                             Office of the County Attorney for Montgomery
                                                             County MD
                                                             101 Monroe St Third Fl
                                                             Rockville, MD 20850-2580
                                                             12407776735
                                                             Fax: 12407776705
                                                             Email:
                                                             Edward.Lattner@MontgomeryCountyMD.gov
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Patricia Lisehora Kane**
                                                             Office of the Montgomery County Attorney
                                                             101 Monroe St 3rd Fl
                                                             Rockville, MD 20850
                                                             12407776743

Fax: 12407776706
Email:
patricia.kane@montgomerycountymd.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Jeanne Ashbarry**
Office of the County Attorney Montgomery
County Maryland
101 Monroe St Third Fl
Rockville, MD 20850
12407776700
Fax: 12407776705
Email:
erin.ashbarry@montgomerycountymd.gov
*ATTORNEY TO BE NOTICED*

**Matthew Hoyt Johnson**
Office of the County Attorney
101 Monroe Street, Third Floor
Rockville, MD 20850
2407776709
Fax: 2407776705
Email:
matthew.johnson3@montgomerycountymd.gov
*ATTORNEY TO BE NOTICED*

**Sean Charles O Hara**
Office of the County Attorney
101 Monroe Street, Third Floor
Rockville, MD 20850
240-777-6700
Fax: 240-777-6705
Email: sean.ohara@montgomerycountymd.gov
*TERMINATED: 09/26/2022*

**Amicus**

**Everytown for Gun Safety**          represented by  **Barry Joel Pollack**
Harris St. Laurent & Wechsler LLP
1775 Pennsylvania Ave., NW
Suite 650
Washington, DC 20006
202-617-5971
Email: bpollack@hs-law.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/12/2021 | 1 | NOTICE OF REMOVAL from Circuit Court for Montgomery County, Maryland, case number 485899V. ( Filing fee $ 402 receipt number 0416-9373391), filed by Montgomery County, Maryland. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet & Attachment, # 2 Attachment DE 1-State Court Complaint, # 3 Attachment DE 2-State Court Information Sheet, # 4 Attachment DE 3-State Court Scheduling Order, # 5 Attachment DE |

| | | |
|---|---|---|
| | | 4-State Court Notice of New Case Number, # 6 Attachment DE 5-State Court Summons, # 7 Attachment DE 6-State Court Notice of Pending Events, # 8 Attachment DE 7-State Court Plts' Emergency Motion for Ptl. Summary Judgment, # 9 Attachment DE 8-State Court Aff of Svc on Brian Frosh, # 10 Attachment DE 9-State Court Aff of Svc on Montgomery County, # 11 Attachment DE 10-State Court Notice of Hrg Date)(O Hara, Sean) (Entered: 07/12/2021) |
| 07/12/2021 | 2 | NOTICE of Appearance by Patricia Lisehora Kane on behalf of Montgomery County, Maryland (Kane, Patricia) (Entered: 07/12/2021) |
| 07/12/2021 | 3 | NOTICE of Appearance by Edward Barry Lattner on behalf of Montgomery County, Maryland (Lattner, Edward) (Entered: 07/12/2021) |
| 07/12/2021 | 4 | NOTICE of Appearance by Sean Charles O Hara on behalf of Montgomery County, Maryland (O Hara, Sean) (Entered: 07/12/2021) |
| 07/12/2021 | 5 | Local Rule 103.3 Disclosure Statement by Montgomery County, Maryland (O Hara, Sean) (Entered: 07/12/2021) |
| 07/12/2021 | 6 | Local Rule 103.5 Compliance (Attachments: # 1 Attachment Certified Copy of State Court Record)(O Hara, Sean) (Entered: 07/12/2021) |
| 07/12/2021 | 7 | STATE COURT COMPLAINT against Montgomery County, Maryland, filed by Deryck Weaver, Engage Armament LLC, Carlos Rabanales, Brandon Ferrell, Ronald David, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Nancy David, Joshua Edgar, Andrew Raymond.(heps, Deputy Clerk) (Entered: 07/13/2021) |
| 07/12/2021 | 8 | STATE COURT Plaintiff's Motion for Partial Summary Judgment by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Deryck Weaver(heps, Deputy Clerk) (Entered: 07/13/2021) |
| 07/12/2021 | | THE ABOVE DOCUMENTS (7-8) ARE COPIES OF ORIGINAL PAPERS FILED IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY. (heps, Deputy Clerk) (Entered: 07/13/2021) |
| 07/13/2021 | 9 | Standing Order Concerning Removal re 1 Notice of Removal,,, filed by Montgomery County, Maryland. Signed by Judge Theodore D. Chuang on 7/13/2021. (heps, Deputy Clerk) (Entered: 07/13/2021) |
| 07/13/2021 | 10 | RESPONSE re 9 Standing Order Concerning Removal filed by Montgomery County, Maryland.(O Hara, Sean) (Entered: 07/13/2021) |
| 07/19/2021 | 11 | CASE MANAGEMENT ORDER. Signed by Judge Theodore D. Chuang on 7/19/2021. (heps, Deputy Clerk) (Entered: 07/19/2021) |
| 07/19/2021 | 12 | PAPERLESS ORDER denying without prejudice 8 State Court Emergency Motion for Partial Summary Judgment. The Case Management Order states that "[n]o motions may be filed without first seeking a pre-motion conference with the Court." Case Management Order § II.A.1, ECF No. 11. Plaintiffs have not sought a pre-motion conference with the Court. Plaintiffs are directed to file a Notice of Intent to File a Motion pursuant to section II.A.2 of the Case Management Order by July 28, 2021. Parties are reminded that responses to the Notice of Intent are not permitted. A pre-motion conference is scheduled for August 2, 2021 at 2:00 p.m. To join the call at the scheduled time (1) Dial 1-888-557-8511. (2) Enter access code 3008173, followed by the # key. You will then be placed on hold until Chambers dials into the call, at which point you will be prompted to enter a security code. (3) When prompted, enter security code 08022021 followed by the # key. The call will be recorded, so please do not use speakerphones as they compromise sound quality. Also, we ask that parties not remain on the conference line after the Judge has left |

|  |  | the call, to ensure that the line is free for other calls that may be on the Judges calendar. In addition to the proposed motion, the parties should be prepared to address whether they consent, pursuant to 28 U.S.C. § 636(c), to have all further proceedings before a Magistrate Judge and whether they wish to participate in a mediation session with a Magistrate Judge, whether before, during, or after discovery. Parties are expected to consult with their clients and confer with each other on these issues in advance of the Pre-Motion Conference and, if possible, present joint views to the Court. Signed by Judge Theodore D. Chuang on 7/19/2021. (egms, Chambers) (Entered: 07/19/2021) |
| 07/19/2021 | 13 | Correspondence re: Notice of Intent to File Cross Motion for Summary Judgment and Motion to Dismiss (Lattner, Edward) (Entered: 07/19/2021) |
| 07/21/2021 | 14 | Request for Conference (Pennak, Mark) (Entered: 07/21/2021) |
| 07/23/2021 | 15 | Second Request for Conference (Pennak, Mark) (Entered: 07/23/2021) |
| 08/02/2021 | 16 | Case Management Conference held on 8/2/2021 before Judge Theodore D. Chuang.(Court Reporter: FTR Recording\2B) (ds2s, Deputy Clerk) (Entered: 08/02/2021) |
| 08/02/2021 | 17 | ORDER granting Plaintiffs leave to file proposed Motion to Sever and Remand. Signed by Judge Theodore D. Chuang on 8/2/2021. (jf3s, Deputy Clerk) (Entered: 08/03/2021) |
| 08/04/2021 | 18 | MOTION to Remand to State Court by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc.(Pennak, Mark) (Entered: 08/04/2021) |
| 08/18/2021 | 19 | RESPONSE in Opposition re 18 MOTION to Remand to State Court *Opposition to Motion to Sever and Remand* filed by Montgomery County, Maryland. (Attachments: # 1 Text of Proposed Order Proposed Order Denying Motion to Sever and Remand)(O Hara, Sean) (Entered: 08/18/2021) |
| 08/22/2021 | 20 | REPLY to Response to Motion re 18 MOTION to Remand to State Court filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Deryck Weaver.(Pennak, Mark) (Entered: 08/22/2021) |
| 08/22/2021 | 21 | REPLY to Response to Motion re 18 MOTION to Remand to State Court *CORRECTED* filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Deryck Weaver.(Pennak, Mark) (Entered: 08/22/2021) |
| 02/07/2022 | 22 | MEMORANDUM OPINION. Signed by Judge Theodore D. Chuang on 2/7/2022. (mg3s, Deputy Clerk) (Entered: 02/08/2022) |
| 02/07/2022 | 23 | ORDER granting in part and denying in part 18 Motion to Remand to State Court; directing parties to file a Joint Status Report every 90 days to report on the progress of the state court proceeding; within 14 days of the resolution of Counts 1, 2, and 3 in the state court proceeding, the parties shall file a Joint Status Report. Signed by Judge Theodore D. Chuang on 2/7/2022. (mg3s, Deputy Clerk) Modified on 2/15/2022 (c/m 2/15/2022 - mg3s, Deputy Clerk) (Entered: 02/08/2022) |
| 05/09/2022 | 24 | STATUS REPORT by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Deryck Weaver, STIPULATION re 23 Order on Motion to Remand to State Court, by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Deryck Weaver(Pennak, Mark) (Entered: 05/09/2022) |

| 08/08/2022 | 25 | MOTION to Consolidate Cases *Defendants Partial Consent Motion to Consolidate and Remand Counts I, II, and III* by Montgomery County, Maryland (Attachments: # 1 Text of Proposed Order Proposed Order)(O Hara, Sean) (Entered: 08/08/2022) |
| --- | --- | --- |
| 08/08/2022 | 26 | Supplement to *Motion to Consolidate and Remand* (O Hara, Sean) (Entered: 08/08/2022) |
| 08/08/2022 | 27 | STATUS REPORT *Joint Status Report 2* by Montgomery County, Maryland(Lattner, Edward) (Entered: 08/08/2022) |
| 08/09/2022 | 28 | RESPONSE in Opposition re (8 in 8:22-cv-01967-DLB) MOTION to Consolidate Cases *Defendants Partial Consent Motion to Consolidate and Remand Counts I, II, and III*, (25 in 8:21-cv-01736-TDC) MOTION to Consolidate Cases *Defendants Partial Consent Motion to Consolidate and Remand Counts I, II, and III* filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training LLC, Maryland Shall Issue, Inc.. (Attachments: # 1 Exhibit Exhibit A Order of Feb. 7, 2022, # 2 Exhibit Exhibit B Supp. Mem. in State court, # 3 Text of Proposed Order Proposed Order)Associated Cases: 8:21-cv-01736-TDC, 8:22-cv-01967-DLB(Pennak, Mark) (Entered: 08/09/2022) |
| 08/11/2022 | 29 | RESPONSE in Opposition re (8 in 8:22-cv-01967-DLB) MOTION to Consolidate Cases *Defendants Partial Consent Motion to Consolidate and Remand Counts I, II, and III*, (25 in 8:21-cv-01736-TDC) MOTION to Consolidate Cases *Defendants Partial Consent Motion to Consolidate and Remand Counts I, II, and III Corrected Opposition* filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training LLC, Maryland Shall Issue, Inc.. (Attachments: # 1 Exhibit Feb. 7, 2022 Opinion of the Court, # 2 Exhibit Supp. Memo. filed in State Court, # 3 Text of Proposed Order Proposed Order)Associated Cases: 8:21-cv-01736-TDC, 8:22-cv-01967-DLB(Pennak, Mark) (Entered: 08/11/2022) |
| 08/11/2022 | 30 | ORDER denying without prejudice 25 Partial Consent Motion to Consolidate and to Remand; directing that if Defendant seeks to file a Motion, they must file a Notice of Intent to File a Motion. Signed by Judge Theodore D. Chuang on 8/11/2022. (dg3s, Deputy Clerk) (Entered: 08/11/2022) |
| 08/12/2022 | 31 | NOTICE by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training LLC, Maryland Shall Issue, Inc. *Of Intent to File A Motion For Partial Summary Judgment* Associated Cases: 8:21-cv-01736-TDC, 8:22-cv-01967-DLB(Pennak, Mark) (Entered: 08/12/2022) |
| 08/15/2022 | 32 | Correspondence re: Notice of Intent to File Motion to Consolidate and Remand (O Hara, Sean) (Entered: 08/15/2022) |
| 08/16/2022 | 33 | RESPONSE in Opposition re (17 in 8:22-cv-01967-DLB) MOTION for Extension of Time to File Answer re (11) Amended Complaint, , (25 in 8:21-cv-01736-TDC) MOTION to Consolidate Cases *Defendants Partial Consent Motion to Consolidate and Remand Counts I, II, and III*, (8 in 8:22-cv-01967-DLB) MOTION to Consolidate Cases *Defendants Partial Consent Motion to Consolidate and Remand Counts I, II, and III* filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training LLC, Maryland Shall Issue, Inc..Associated Cases: 8:21-cv-01736-TDC, 8:22-cv-01967-DLB(Pennak, Mark) (Entered: 08/16/2022) |
| 08/24/2022 | 34 | PAPERLESS NOTICE. A CASE MANAGEMENT CONFERENCE is scheduled for August 26, 2022 at 10:00 a.m. to discuss 31 NOTICE OF INTENT TO FILE A MOTION FOR PARTIAL SUMMARY JUDGMENT AND 32 NOTICE OF INTENT TO FILE A MOTION TO CONSOLIDATE AND REMAND. To join the call at the scheduled time: (1) Dial 1-888-557-8511. (2) Enter access code 3008173, followed by the # key. You will then be placed on hold until Chambers dials into the call, at which point you will be prompted |

| | | |
|---|---|---|
| | | to enter a security code. (3) When prompted, enter security code 08261000 followed by the # key. The call will be recorded, so please do not use speakerphones as they compromise sound quality. Also, we ask that parties not remain on the conference line after the Judge has left the call, to ensure that the line is free for other calls that may be on the Judge's calendar. The parties should also be prepared to address whether they consent to have all further proceedings before a Magistrate Judge and whether they wish to participate in a mediation session with a Magistrate Judge, whether before, during, or after discovery. Parties are expected to consult with their clients and confer with each other on these issues in advance of the Case Management Conference and, if possible, present joint views to the Court. (ds2s, Deputy Clerk) (Entered: 08/24/2022) |
| 08/26/2022 | 35 | Case Management Conference held on 8/26/2022 before Judge Theodore D. Chuang. (Court Reporter: FTR Recording\2B) (ds2s, Deputy Clerk) (Entered: 08/26/2022) |
| 08/26/2022 | 36 | Consent MOTION to Consolidate Cases *8:21-cv-01736-TDC & 8:22-cv-01967-DLB* by Montgomery County, Maryland (Attachments: # 1 Text of Proposed Order Proposed Order-Consent Motion to Consolidate)(O Hara, Sean) (Entered: 08/26/2022) |
| 08/29/2022 | 37 | ORDER directing the parties to file a Consent Motion to Consolidate by 8/29/2022; granting Defendant leave to file the Proposed Motion to Remand by 9/9/2022 and setting a briefing schedule for the Motion; extending the deadline to file an Answer in both consolidated cases. Signed by Judge Theodore D. Chuang on 8/29/2022. (dg3s, Deputy Clerk) (Entered: 08/29/2022) |
| 09/01/2022 | 38 | ORDER Granting 36 Motion to Consolidate Cases; ORDERED that civil actions 8:21-cv-01736-TDC and 8:22-cv-01967-DLB be and hereby are CONSOLIDATED and that all future pleadings shall be filed under lead case 8:21-cv-01736-TDC. Signed by Judge Theodore D. Chuang on 9/1/2022. (heps, Deputy Clerk) (Entered: 09/01/2022) |
| 09/09/2022 | 39 | MOTION to Remand to State Court *Counts I, II and III and Stay Counts IV and V* by Montgomery County, Maryland (Attachments: # 1 Text of Proposed Order Proposed Order)(Lattner, Edward) (Entered: 09/09/2022) |
| 09/23/2022 | 40 | RESPONSE to Motion re 39 MOTION to Remand to State Court *Counts I, II and III and Stay Counts IV and V* filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc.. (Attachments: # 1 Exhibit Transcript Excerpt of July 19 State Court Hearing)(Pennak, Mark) (Entered: 09/23/2022) |
| 09/23/2022 | 41 | NOTICE to Substitute Attorney *Withdrawal of Appearance* (O Hara, Sean) (Entered: 09/23/2022) |
| 09/30/2022 | 42 | NOTICE to Substitute Attorney (Ashbarry, Erin) (Entered: 09/30/2022) |
| 09/30/2022 | 43 | NOTICE of Appearance by Matthew Hoyt Johnson on behalf of Montgomery County, Maryland (Johnson, Matthew) (Entered: 09/30/2022) |
| 09/30/2022 | 44 | REPLY to Response to Motion re 39 MOTION to Remand to State Court *Counts I, II and III and Stay Counts IV and V* filed by Montgomery County, Maryland.(Lattner, Edward) (Entered: 09/30/2022) |
| 11/29/2022 | 45 | (FILED IN ERROR - INCORRECT EVENT) UNREDACTED DOCUMENT (Attachments: # 1 Exhibit Bill 4-21, # 2 Exhibit Bill 21-22E, # 3 Exhibit MSI test. on Bill 4-21, # 4 Exhibit Staff Rep. on Bill 21-22E, # 5 Exhibit Decl. of Daniel Carlin-Weber, # 6 Exhibit Decl. of Andrew Raymond, # 7 Exhibit Decl. of Carlos Rabanales, # 8 Exhibit Decl. of Brandon Ferrell, # 9 Exhibit Decl. of Deryck Weaver, # 10 Exhibit Decl. of Joshua Edgar, # 11 Exhibit Decl. of Ronald David, # 12 Exhibit Decl. of Nancy David, # |

| | | |
|---|---|---|
| | | 13 Exhibit Decl. of Eliyahu Shemony, # 14 Attachment certificate of service)(Pennak, Mark) Modified on 11/30/2022 (hmls, Deputy Clerk). (Entered: 11/29/2022) |
| 11/29/2022 | 46 | STIPULATION re 49 Amended Complaint by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc. (Attachments: # 1 Attachment cert. of service)(Pennak, Mark) Modified on 11/30/2022 (hmls, Deputy Clerk). (Entered: 11/29/2022) |
| 11/29/2022 | 47 | Emergency Request for Conference (Pennak, Mark) (Entered: 11/29/2022) |
| 11/29/2022 | 48 | (FILED IN ERROR) UNREDACTED DOCUMENT (Pennak, Mark) Modified on 11/30/2022 (hmls, Deputy Clerk). (Entered: 11/29/2022) |
| 11/30/2022 | 49 | AMENDED COMPLAINT against Deryck Weaver, Engage Armament LLC, Carlos Rabanales, Brandon Ferrell, Ronald David, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Nancy David, Joshua Edgar, Andrew Raymond, filed by Deryck Weaver, Engage Armament LLC, Carlos Rabanales, Brandon Ferrell, Ronald David, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Nancy David, Joshua Edgar, Andrew Raymond. (Attachments: # 1 Exhibit Bill 4-21, # 2 Exhibit Bill 21-22E, # 3 Exhibit MSI Test. on Bill 4-21, # 4 Exhibit Bill 21-22E Staff Report, # 5 Exhibit Decl. of Daniel Carlin-Weber, # 6 Exhibit Decl. of Andrew Raymond, # 7 Exhibit Decl. of Carlos Rabanales, # 8 Exhibit Decl. of Brandon Ferrell, # 9 Exhibit Decl. of Deryck Weaver, # 10 Exhibit Decl. of Joshua Edgar, # 11 Exhibit Decl. of Ronald David, # 12 Exhibit Decl. of Nancy David, # 13 Exhibit Decl. of Eliyahu Shemony, # 14 Attachment Cert. of Service, # 15 Attachment Red Line Compare Doc.)(Pennak, Mark) (Entered: 11/30/2022) |
| 12/01/2022 | 50 | PAPERLESS NOTICE. A CASE MANAGEMENT CONFERENCE is scheduled for December 6, 2022 at 2:30 p.m. to discuss 47 NOTICE OF INTENT TO FILE A MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION. To join the call at the scheduled time: (1) Dial 1-888-557-8511. (2) Enter access code 3008173, followed by the # key. You will then be placed on hold until Chambers dials into the call, at which point you will be prompted to enter a security code. (3) When prompted, enter security code 12060230 followed by the # key. The call will be recorded, so please do not use speakerphones as they compromise sound quality. Also, we ask that parties not remain on the conference line after the Judge has left the call, to ensure that the line is free for other calls that may be on the Judge's calendar. The parties should also be prepared to address whether they consent to have all further proceedings before a Magistrate Judge and whether they wish to participate in a mediation session with a Magistrate Judge, whether before, during, or after discovery. Parties are expected to consult with their clients and confer with each other on these issues in advance of the Case Management Conference and, if possible, present joint views to the Court. (ds2s, Deputy Clerk) (Entered: 12/01/2022) |
| 12/06/2022 | 51 | Case Management Conference held on 12/6/2022 before Judge Theodore D. Chuang. (Court Reporter: FTR Recording\2B) (ds2s, Deputy Clerk) (Entered: 12/06/2022) |
| 12/06/2022 | 52 | Emergency MOTION for Preliminary Injunction *and Temporary Restraining Order* by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver (Attachments: # 1 Exhibit Decl. of David Sussman Exh. N, # 2 Exhibit Decl. of Allan Barall Exh. O, # 3 Exhibit Decl. of John Doe 1 Exh. P, # 4 Exhibit Decl. of John Doe 2 Exh. Q, # 5 Exhibit Decl. of Thomas Paine 1 Exh. R, # 6 Exhibit Decl. of John Smith 1 Exh. S, # 7 Text of Proposed Order Proposed Order, # 8 Text of Proposed Order Alternative Proposed Order, # 9 Attachment Cert. of Service)(Pennak, Mark) (Entered: 12/06/2022) |

| | | |
|---|---|---|
| 12/06/2022 | [53](#) | MOTION for Preliminary Injunction *memorandum in support* by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver(Pennak, Mark) (Entered: 12/06/2022) |
| 12/06/2022 | [54](#) | Corrected MOTION for Preliminary Injunction and Temporary Restraining Order *Corrected Supporting Memorandum* by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver (Attachments: # [1](#) Memorandum in Support Corrected, # [2](#) Affidavit Decl. of David Sussman Exh. N, # [3](#) Affidavit Decl. of Allan Barall Exh. O, # [4](#) Affidavit Decl. of John Doe No. 1 Exh. P, # [5](#) Affidavit Decl. of John Doe No. 2 Exh. Q, # [6](#) Affidavit Decl. of Thomas Paine No. 1 Exh. R, # [7](#) Affidavit Decl. of John Smith No. 1 Exh. S, # [8](#) Text of Proposed Order Proposed Order, # [9](#) Text of Proposed Order Alternative Proposed Order, # [10](#) Attachment Certificate of Service)(Pennak, Mark) Modified on 12/7/2022 (hmls, Deputy Clerk). (Entered: 12/06/2022) |
| 12/06/2022 | [55](#) | ORDER DENYING AS MOOT [39](#) Motion to Remand; GRANTING plaintiffs leave to file motion for temporary restraining order and a preliminary injunction. Signed by Judge Theodore D. Chuang on 12/6/2022. (hmls, Deputy Clerk) (Entered: 12/07/2022) |
| 12/07/2022 | [56](#) | NOTICE by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver *Notice of Supplemental Authorities* (Attachments: # [1](#) Attachment Second Circuit Order, # [2](#) Attachment District Court Decision, # [3](#) Attachment Cert. of Service)(Pennak, Mark) (Entered: 12/07/2022) |
| 12/09/2022 | [57](#) | MOTION to Remand to State Court *Renewed Motion to Remand Counts I, II, and III and Stay Counts IV Through VIII* by Montgomery County, Maryland (Attachments: # [1](#) Text of Proposed Order)(Lattner, Edward) (Entered: 12/09/2022) |
| 12/23/2022 | [58](#) | RESPONSE in Opposition re [57](#) MOTION to Remand to State Court *Renewed Motion to Remand Counts I, II, and III and Stay Counts IV Through VIII* filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver. (Attachments: # [1](#) Exhibit Transcript Excerpts from 7.19.22 Hearing, # [2](#) Text of Proposed Order Proposed Order, # [3](#) Attachment certificate of service)(Pennak, Mark) (Entered: 12/23/2022) |
| 12/30/2022 | [59](#) | RESPONSE in Opposition re [54](#) Corrected MOTION for Preliminary Injunction *Corrected Supporting Memorandum* filed by Montgomery County, Maryland. (Attachments: # [1](#) Attachment Table of Contents for Memorandum, # [2](#) Memorandum in Support, # [3](#) Text of Proposed Order, # [4](#) Attachment Defendant's Exhibit List, # [5](#) Exhibit 1 2761_1_22629_Bill_21-22E_Signed_20221128, # [6](#) Exhibit 2 2761_1_22588_Bill_21-22E_Action_20221115, # [7](#) Exhibit 3 Childcare stats, # [8](#) Exhibit 4 Council passes legislation prohibiting firearm use, carrying within 100 yards of some public places _ Bethesda Magazine & Bethesda Beat, # [9](#) Exhibit 5 Montgomery County gun violence has risen sharply, chief says - The Washington Post, # [10](#) Exhibit 6 NY Times Article, # [11](#) Exhibit 7 1831 or 1816 J. Bayon, General Digest of the Ordinances and Resolutions of the Corporation of New Orleans 371 (1831), # [12](#) Exhibit 8 1837 Me Public Laws, # [13](#) Exhibit 9 1837 Md. Laws 108, ch. 100, # [14](#) Exhibit 10 1837 Massachusetts, # [15](#) Exhibit 11 1843 Rhode Island, # [16](#) Exhibit 12 1852 N.M. Laws 67, § 3, # [17](#) Exhibit 13 1857 First Annual Report of the Board of Commissioners of the Central Park 106, # [18](#) Exhibit 14 1859 Conn. Acts 62, An Act in Addition to and in Alteration of An Act For Forming And Conducting The Military Force, chap. 82, § 5, # [19](#) Exhibit 15 1861 New York Central Park Commissioners Fourth Annual Report, # [20](#) Exhibit 16 1867 Pennsylvania General |

| | | |
|---|---|---|
| | | Assembly, Omitted Laws, PL 1083 No. 1020, A Supp to An Act approp-ing ground in the city of Philadelphia, # 21 Exhibit 17 1869 Tenn. Pub. Acts 23-24, # 22 Exhibit 18 1870 Ga. Laws 421, # 23 Exhibit 19 1870 La. Acts 159-160, no. 100, # 24 Exhibit 20 1870 Acts of Assembly Relating to Fairmount Park Sect. 21 (1870), # 25 Exhibit 21 1870 Tex. Gen. Laws 63, ch. 46, # 26 Exhibit 22 1874 Md. Laws 366, ch. 250, # 27 Exhibit 23 1875 Mo. Laws 50-51, § 1, # 28 Exhibit 24 1877 Va. Acts 305, # 29 Exhibit 25 1879 J. Hockaday, Revised Statutes of the State of Missouri 1879, # 30 Exhibit 26 1879 Tex. Crim. Stat. tit. IX, Ch. 4, # 31 Exhibit 27 1881 The Revised Ordinance of the City of St. Louis, 635 (1881), # 32 Exhibit 28 1882 R. Clark, The Code of the State of Georgia 818 (1873), # 33 Exhibit 29 1883 Mo. Laws 76, # 34 Exhibit 30 1886 Md. Laws 315, ch. 189, # 35 Exhibit 31 1887 N.M. Laws 56, An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, ch. 30, § 4, # 36 Exhibit 32 1888 Annual Reports of the City Officers and City Boards of the City of Saint Paul, # 37 Exhibit 33 1888 J. Prentiss, 1888 Md. Code Pub. Local Law, Vol. I, # 38 Exhibit 34 1889 Ariz. Sess. Laws 16-17, # 39 Exhibit 35 1890 GENERAL ORDINANCES OF THE TOWN OF COLUMBIA, IN BOONE COUNTY, MISSOURI 34, 35 (Lewis M. Switzler ed., 1890), # 40 Exhibit 36 1890 Okla. Laws 495, art. 47, § 7, # 41 Exhibit 37 1891 Laws and Ordinances for the Government of the Municipal Corporation of the City of Williamsport, Pennsylvania 141 (1891), # 42 Exhibit 38 1892 The Annotated Code of the General Statute Laws of the State of Mississippi 327, § 1030, # 43 Exhibit 39 1893 The Charter of the City of Wilmington (1893) (Part VII, § 7), # 44 Exhibit 40 1893 W. McCartney, Statutes of Oklahoma (1893), # 45 Exhibit 41 1893 A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh (1893), # 46 Exhibit 42 1894 The Revised Ordinances of the City of Huntsville, Missouri, of 1894, # 47 Exhibit 43 1895 Mich. Local Acts 596, § 44, # 48 Exhibit 44 1897 A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Penn, # 49 Exhibit 45 1899 parks-boulder-co-1899, # 50 Exhibit 46 1901 Revised Statutes of Arizona Territory 1252 (1901), # 51 Exhibit 47 1903 Mont. Laws 49, § 3, # 52 Exhibit 48 1903 City of Trenton, New Jersey, Charter and Ordinances 390 (1903), # 53 Exhibit 49 1905 Amendments to the Revised Municipal Code of Chicago of 1905 and New General Ordinances 40 (1905), # 54 Exhibit 50 1905 Minn. Laws 620, ch. 344, § 53, # 55 Exhibit 51 1906 Ordinances, Rules and Regulations of the Department of Parks of the City of New York 7 (1916), # 56 Exhibit 52 1906 A Digest of the Ordinances of Town Council of the Borough of Phoenixville 135 (1906), # 57 Exhibit 53 1909 General Municipal Ordinances of the City of Oakland, Cal., Addendum at 15 (1909), # 58 Exhibit 54 1910 The Code of the City of Staunton, Virginia 115 (1910), # 59 Exhibit 55 1917 The Code of City of Birmingham, Alabama 662 (1917), # 60 Exhibit 56 1917 Wis. Sess. Laws 1243-44, ch. 668, 29.57(4), # 61 Exhibit 57 1921 N.C. Sess. Laws 54, Pub. Laws Extra Sess., ch. 6, § 3, # 62 Exhibit 58 Ch. 57 incl. 21-22)(Ashbarry, Erin) (Entered: 12/30/2022) |
| 01/06/2023 | 60 | MOTION for Leave to File *Amicus Brief In Support Of Defendant's Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction* by Everytown for Gun Safety (Attachments: # 1 Exhibit A - Amicus Brief)(Pollack, Barry) (Entered: 01/06/2023) |
| 01/06/2023 | 61 | Local Rule 103.3 Disclosure Statement by Everytown for Gun Safety identifying Other Affiliate Everytown for Gun Safety Victory Fund, Other Affiliate Everytown for Gun Safety Victory Fund State Committee LLC for Everytown for Gun Safety.(Pollack, Barry) (Entered: 01/06/2023) |
| 01/09/2023 | 62 | REPLY to Response to Motion re 53 MOTION for Preliminary Injunction *memorandum in support,* 54 Corrected MOTION for Preliminary Injunction *Corrected Supporting Memorandum* filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Everytown for Gun Safety, Brandon Ferrell, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver. (Attachments: # 1 Exhibit Exh. A Supp. Decl. of Plaintiff Shemony, # 2 Exhibit Exh. B Supp. Decl. of Barall, |

| | | |
|---|---|---|
| | | # 3 Exhibit Exh. C Supp. Decl. of John Smith 01, # 4 Attachment Koons v. Reynolds slip op., # 5 Attachment certificate of service)(Pennak, Mark) (Entered: 01/09/2023) |
| 01/09/2023 | 63 | RESPONSE in Opposition re 60 MOTION for Leave to File *Amicus Brief In Support Of Defendant's Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction* filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver. (Attachments: # 1 Attachment certificate of service)(Pennak, Mark) (Entered: 01/09/2023) |
| 01/10/2023 | 64 | REPLY to Response to Motion re 60 MOTION for Leave to File *Amicus Brief In Support Of Defendant's Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction* filed by Everytown for Gun Safety. (Attachments: # 1 Exhibit A - Correspondence)(Pollack, Barry) (Entered: 01/10/2023) |
| 01/30/2023 | 65 | ORDER GRANTING 60 Motion for Leave to File Amicus Brief. Signed by Judge Theodore D. Chuang on 1/29/2023. (hmls, Deputy Clerk) (Entered: 01/30/2023) |
| 01/30/2023 | 66 | Amicus Brief in support of 59 Response in Opposition to Motion re 54 Corrected MOTION for Preliminary Injunction and Temporary Restraining Order filed by Everytown for Gun Safety. (hmls, Deputy Clerk) (Entered: 01/30/2023) |
| 01/30/2023 | 67 | PAPERLESS NOTICE that a HEARING on 54 Plaintiffs Emergency Motion for a Temporary Restraining Order and Emergency Motion for a Preliminary Injunction and 57 Defendants Renewed Motion to Remand Counts I, II and III and Stay Counts IV through VIII is scheduled for February 6, 2023 at 3:00 p.m. before Judge Theodore D. Chuang at the United States Courthouse located at 6500 Cherrywood Lane in Greenbelt, Maryland. The specific courtroom for the motions hearing will be available the week of the proceeding on the Court's website. (ds2s, Deputy Clerk) (Entered: 01/30/2023) |
| 01/30/2023 | 68 | NOTICE by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver re 54 Corrected MOTION for Preliminary Injunction *Corrected Supporting Memorandum* (Attachments: # 1 Attachment certificate of service)(Pennak, Mark) (Entered: 01/30/2023) |
| 01/30/2023 | 69 | NOTICE by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver re 54 Corrected MOTION for Preliminary Injunction *Corrected Supporting Memorandum Corrected for omission* (Attachments: # 1 Attachment slip opinion, # 2 Attachment certificate of service) (Pennak, Mark) (Entered: 01/30/2023) |
| 02/02/2023 | 70 | RESPONSE re 66 Response filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Everytown for Gun Safety, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver. (Attachments: # 1 Attachment cert. of service)(Pennak, Mark) (Entered: 02/02/2023) |
| 02/06/2023 | 71 | Motion Hearing held on 2/6/2023 before Judge Theodore D. Chuang re 57 MOTION to Remand to State Court *Renewed Motion to Remand Counts I, II, and III and Stay Counts IV Through VIII* filed by Montgomery County, Maryland, and 54 Corrected MOTION for Preliminary Injunction *Corrected Supporting Memorandum* filed by Andrew Raymond, I.C.E. Firearms & Defensive Training, LLC, Joshua Edgar, Carlos Rabanales, Deryck Weaver, Nancy David, Brandon Ferrell, Maryland Shall Issue, Inc., Engage Armament LLC, Eliyahu Shemony, Ronald David.(Court Reporter: Patricia Klepp\2B) (ds2s, Deputy Clerk) (Entered: 02/06/2023) |

| | | |
|---|---|---|
| 02/24/2023 | 72 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, Motions Hearing held on 2/6/23, before Judge Theodore D. Chuang. Court Reporter/Transcriber Patricia Klepp, Telephone number 3013443228. Total number of pages filed: 88. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 3/17/2023. Redacted Transcript Deadline set for 3/27/2023. Release of Transcript Restriction set for 5/25/2023. (pk4, Court Reporter) (Entered: 02/24/2023) |
| 03/28/2023 | 73 | NOTICE by Montgomery County, Maryland *of Supplemental Authorities* Associated Cases: 8:21-cv-01736-TDC, 8:22-cv-01967-TDC(Ashbarry, Erin) (Entered: 03/28/2023) |
| 03/28/2023 | 74 | RESPONSE re 73 Notice (Other) filed by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver. (Attachments: # 1 Exhibit Order in Bondi, # 2 Attachment Certificate of Service)(Pennak, Mark) (Entered: 03/28/2023) |
| 03/31/2023 | 75 | NOTICE by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver (Attachments: # 1 Attachment Slip op. of Worth v. Harrington, # 2 Attachment Transcript excerpts, # 3 Attachment Certificate of Service)(Pennak, Mark) (Entered: 03/31/2023) |
| 05/05/2023 | 76 | MEMORANDUM OPINION. Signed by Judge Theodore D. Chuang on 5/5/2023. (hmls, Deputy Clerk) (Entered: 05/05/2023) |
| 05/05/2023 | 77 | ORDER GRANTING IN PART and DENYING IN PART 57 Motion to Remand Counts I, II, and III and Stay Counts IV Through VIII. REMANDING Counts I, II, and III to the Circuit Court for Montgomery County. Signed by Judge Theodore D. Chuang on 5/5/2023. (hmls, Deputy Clerk) (Entered: 05/05/2023) |
| 05/05/2023 | 78 | Correspondence from Clerk to Circuit Court for Montgomery County re: Remand. (hmls, Deputy Clerk) (Additional attachment(s) added on 5/12/2023: # 1 Receipt Certified Mail) (hmls, Deputy Clerk). (Additional attachment(s) added on 5/15/2023: # 2 Return Correspondence) (hmls, Deputy Clerk). (Entered: 05/05/2023) |
| 05/18/2023 | 79 | NOTICE by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver *Notice of Supplemental Authorities* (Pennak, Mark) (Entered: 05/18/2023) |
| 06/19/2023 | 80 | NOTICE by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver *Supplemental Authority Re SB1* (Attachments: # 1 Attachment SB 1 As Enacted, # 2 Attachment Certificate of Service)(Pennak, Mark) (Entered: 06/19/2023) |
| 07/03/2023 | 81 | Request for Conference (Lattner, Edward) (Entered: 07/03/2023) |
| 07/06/2023 | 82 | MEMORANDUM OPINION. Signed by Judge Theodore D. Chuang on 7/6/2023. (hmls, Deputy Clerk) (Entered: 07/06/2023) |
| 07/06/2023 | 83 | ORDER DENYING 54 Motion for a Temporary Restraining Order and a Preliminary Injunction. Signed by Judge Theodore D. Chuang on 7/6/2023. (hmls, Deputy Clerk) (Entered: 07/06/2023) |

| 07/07/2023 | 84 | INTERLOCUTORY NOTICE OF APPEAL by Nancy David, Ronald David, Joshua Edgar, Engage Armament LLC, Brandon Ferrell, I.C.E. Firearms & Defensive Training, LLC, Maryland Shall Issue, Inc., Carlos Rabanales, Andrew Raymond, Eliyahu Shemony, Deryck Weaver. Filing fee $ 505, receipt number AMDDC-10694075. (Attachments: # 1 Certificate of Service)(Pennak, Mark) Modified on 7/7/2023 (slss, Deputy Clerk). (Entered: 07/07/2023) |
|---|---|---|
| 07/07/2023 | 85 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 84 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 07/07/2023) |
| 07/07/2023 | 86 | QC NOTICE: 84 Notice of Appeal, filed by Andrew Raymond, I.C.E. Firearms & Defensive Training, LLC, Joshua Edgar, Carlos Rabanales, Deryck Weaver, Nancy David, Brandon Ferrell, Maryland Shall Issue, Inc., Engage Armament LLC, Eliyahu Shemony, Ronald David was filed incorrectly. Wrong entry used when filing Notice of Appeal. If you are filing a Notice of Appeal in an open case use Interlocutory Appeal Entry. Correction has been made. (slss, Deputy Clerk) (Entered: 07/07/2023) |
| 07/08/2023 | 87 | Request for Conference (Pennak, Mark) (Entered: 07/08/2023) |
| 07/10/2023 | 88 | USCA Case Number 23-1719 for 84 Notice of Appeal, filed by Andrew Raymond, I.C.E. Firearms & Defensive Training, LLC, Joshua Edgar, Carlos Rabanales, Deryck Weaver, Nancy David, Brandon Ferrell, Maryland Shall Issue, Inc., Engage Armament LLC, Eliyahu Shemony, Ronald David. Case Manager - Jeffrey Neal (av4s, Deputy Clerk) (Entered: 07/10/2023) |

JA013

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**MARYLAND SHALL ISSUE, INC.**
**9613 Harford Rd., Ste C #1015**
**Baltimore, Maryland 21234-2150**

**ENGAGE ARMAMENT LLC**
**701 E. Gude Dr., Ste 101,**
**Rockville, Maryland 20850**

**ANDREW RAYMOND**
**14819 Poplar Hill Rd**
**Darnestown, MD 20874**                    **Case No. 8:21-cv-01736-TDC (L)**

**CARLOS RABANALES**                        **Case No. 8:22-cv-01967-DLB**
**7727 Green Valley Rd,**
**Frederick, Maryland 21701**

**BRANDON FERRELL**
**40 Mountain Laurel Court**
**Gaithersburg, Maryland 20879**

**DERYCK WEAVER**
**8712 Lowell Street**
**Bethesda, Maryland 20817**

**JOSHUA EDGAR**
**8416 Flower Hill Terr.**
**Gaithersburg, Maryland 20879**

**I.C.E. FIREARMS & DEFENSIVE**
**TRAINING, LLC,**
**24129 Pecan Grove Lane**
**Gaithersburg, Maryland 20882**

**RONALD DAVID**
**24129 Pecan Grove Lane**
**Gaithersburg, Maryland 20882**

**NANCY DAVID**
**24129 Pecan Grove Lane**
**Gaithersburg, Maryland 20882**

1

**ELIYAHU SHEMONY**
**1 Magic Mountain Court**
**Rockville, MD 20852**

*Plaintiffs,*

**v.**

**MONTGOMERY COUNTY,**
 **MARYLAND**
**101 Monroe Street**
**Rockville, Maryland 20850**

*Defendant.*

**VERIFIED SECOND AMENDED
COMPLAINT FOR DECLARATORY AND EQUITABLE RELIEF
AND FOR COMPENSATORY DAMAGES, NOMINAL DAMAGES AND
ATTORNEY'S FEES AND COSTS**

COME NOW, the Plaintiffs, through counsel, and sue the Defendant, and for cause state as follows:

**INTRODUCTION**

1.      On April 16, 2021, the Defendant, Montgomery County, Maryland ("the County") signed into law Bill 4-21, a copy of which is attached to this complaint as Exhibit A. Bill 4-21 became effective on July 16, 2021. Plaintiffs filed a complaint in the Circuit Court for Montgomery County, Maryland in May of 2021. That complaint was removed by the County to federal district court, where it was assigned Case No. 8:21-cv-01736-TDC. On February 7, 2022, this Court remanded most of the State law claims back to the Circuit Court of Montgomery County, but

2

retained jurisdiction over the "void for vagueness" claims alleged under the Due Process Clause of the Fourteenth Amendment and under the Article 24 of the Maryland Declaration of Rights.

2.      On July 22, 2022, in light of the historic decision of the Supreme Court in *New York State Rifle Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022), plaintiffs filed an amended complaint in the Circuit Court for Montgomery County to allege that Bill 4-21 also violated the Second Amendment to the United States Constitution in multiple ways. On August 8, 2022, the County removed the amended complaint to this Court under 28 U.S.C. § 1441, where it was assigned Case No. 8:22-cv-01967-DLB. By an order entered September 1, 2022, this Court consolidated Case No. 8:21-cv-01736-TDC with Case No. 8:22-cv-01967-DLB, and further ordered that "all future pleadings shall be filed under lead case 8:21-cv-01736-TDC."

3.      On November 15, 2022, the Montgomery County Council enacted Bill 21-22E, and that bill was signed on November 28, 2022 by the County Executive. (Exhibit B). By its terms, Bill 21-22E became effective immediately upon signature by the County Executive. Bill 21-22E amended Montgomery County Code Chapter 57 ("Chapter 57"), including amending portions of Chapter 57 that had been previously amended by Bill 4-21. Pursuant to its terms, Bill 21-22E became immediately effective upon that signature by the County Executive. This Second Amended Complaint challenges Chapter 57, as amended by Bill 4-21 and Bill 21-22E. Pursuant to 42 U.S.C. § 1983, Plaintiffs seek declaratory and injunctive relief, compensatory damages, and an award of nominal damages, for the County's violations of their Federal constitutional rights by Bill 21-22E, as alleged below. Plaintiffs further seek an award of attorneys' fees under 42 U.S.C. § 1988, in an amount to be determined, for the violations of their Federal constitutional rights, as alleged below. Plaintiffs seek declaratory and injunctive relief on their State constitutional and statutory law claims.

3

**JURISDICTION AND VENUE**

4.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 as this Amended Complaint seeks relief afforded by 42 U.S.C. § 1983 for violations of plaintiffs' rights arising under the United States Constitution. This Court has supplemental jurisdiction over claims arising under State law, including claims arising under the Maryland Constitution, under 28 U.S.C. § 1367.

5.    The sole defendant, Montgomery County, Maryland, is a Maryland municipality and carries on its regular business and maintains its principal offices in Montgomery County, Maryland. The events, actions and omissions challenged in this Second Amended Complaint arise in Montgomery County, Maryland. Venue is properly in this Court in this matter pursuant to 28 U.S.C. § 1391.

**MONTGOMERY COUNTY BILL 4-21**

6.    In relevant part, Bill 4-21 amended Section 57-1, to broaden the definition of a "gun or firearm" to include "**a ghost gun**" and, in addition, to provide the following new definitions (additions enacted by Bill 4-21 are **bolded**, portions of existing law that are deleted by Bill 4-21 are in *brackets and italics*):

a. A "**3D printing process**" is defined as "**a process of making a three-dimensional, solid object using a computer code or program, including any process in which material is joined or solidified under computer control to create a three-dimensional object;**"

b. A "**ghost gun**" is defined as "**a firearm, including an unfinished frame or receiver, that lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer under federal law or markings in accordance with 27 C.F.R. § 479.102. It does not include a firearm that has been rendered permanently**

4

inoperable, or a firearm that is not required to have a serial number in accordance with the **Federal Gun Control Act of 1968**;"

c. The term "**Undetectable gun**" is defined as:

**(A) a firearm that, after the removal of all its parts other than a major component, is not detectable by walk-through metal detectors commonly used at airports or other public buildings;**

**(B) a major component that, if subjected to inspection by the types of detection devices commonly used at airports or other public buildings for security screening, would not generate an image that accurately depicts the shape of the component; or**

**C) a firearm manufactured wholly of plastic, fiberglass, or through a 3D printing process.**

d. A "**Major component**" is defined as "**with respect to a firearm: (1) the slide or cylinder or the frame or receiver; and (2) in the case of a rifle or shotgun, the barrel**;"

e. A "Place of public assembly" is defined as **a place where the public may assemble, whether the place is publicly or privately owned, including** a *[government owned]* park *[identified by the Maryland-National Capital Park and Planning Commission]*; place of worship; [elementary or secondary] school; *[public]* library; *[government-owned or -operated]* recreational facility; **hospital**; **community health center; long-term facility**; or multipurpose exhibition facility, such as a fairgrounds or conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building.

7.    Bill 4-21 amended Section 57-7 of Chapter 57 to provide (new additions in bold):

**(c) A person must not give, sell, rent, lend, or otherwise transfer to a minor:**

**(1) a ghost gun or major component of a ghost gun;**

**(2) an undetectable gun or major component of an undetectable gun;**

5

or

(3) a computer code or program to make a gun through a 3D printing process.

(d) A person must not purchase, sell, transfer, possess, or transfer a ghost gun, including a gun through a 3D printing process, in the presence of a minor.

(e) A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

8.    Bill 4-21 also amended Section 57-11 of Chapter 57 to provide (new provisions added by Bill 4-21 are in **bold**, portions deleted by Bill 4-21 are in *brackets* and *italics*):

(a) [A] **In or within 100 yards of a place of public assembly, a** person must not:

(1) sell, transfer, possess, or transport **a ghost gun, undetectable gun,** handgun, rifle, or shotgun, or ammunition **or major component** for these firearms [*, in or within 100 yards of a place of public assembly*]*;* **or**

(2) **sell, transfer, possess, transport a firearm created through a 3D printing process.**

(b) This section does not:

* * * *;

(3) apply to the possession of a firearm or ammunition, **other than a ghost gun or an undetectable gun**, in the person's own home;

(4) apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner **who has a permit to carry the firearm**, or one authorized employee of the business

6

JA019

**who has a permit to carry the firearm**;

(5) apply to the possession of a handgun by a person who has

received a permit to carry the handgun under State law; or

(A) transported in an enclosed case or in a locked firearms rack

on a motor vehicle, **unless the firearm is a ghost gun or an**

**undetectable gun**; or

* * * *

9.    Bill 4-21 left unaltered the penalties for a violation of Chapter 57. Under Section 57-15 of Chapter 57, with an exception for violations of Section 57-8 not applicable here: "Any violation of this Chapter or a condition of an approval certificate issued under this Chapter is a Class A violation to which the maximum penalties for a Class A violation apply." Under Section 1-19 of the County Code, the maximum penalties applicable for a violation of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, are a $1,000 fine and 6 months in jail. Under Section 1-20(c) of the County Code, "[e]ach day any violation of County law continues is a separate offense."

**MONTGOMERY COUNTY Bill 21-22E**

10.    Bill 21-22E (Exhibit B) amends the scope of Chapter 57, including parts of Chapter 57 that were previously amended by Bill 4-21, to provide new definitions and to modify the areas in which the possession, transport, sale and transfer of firearms and components of firearms and "ghost guns" are prohibited. As set forth below, **boldface** designates language for a heading or defined term, underlining designates language added to existing law by Bill 21-22E, as originally introduced, **[single boldface brackets]** designates language deleted from existing law by Bill 21-22E as originally introduced, double underlining designates material added by amendment to Bill 21-22E, as originally introduced and **[[double boldface brackets]]** designates language deleted

7

from existing law or by amendment to Bill 21-22E, as originally introduced. As thus designated and passed by the Montgomery County Council on November 15, 2022, Bill 21-22E provides:

11.    As amended by Bill 21-22E, the Definitions section of Chapter 57 was amended to provide:

Sec. **1. [[Section]] Sections 57-1, 57-7, and 57-1 11 [[is]]** are amended as follows: **57-1. Definitions.**

*Gun* or *firearm:* Any rifle, shotgun, revolver, pistol, ghost gun, undetectable gun, air gun, air rifle or any similar mechanism by whatever name known which is designed to expel a projectile through a gun barrel by the action of any explosive, gas, compressed air, spring or elastic.

(2) "Ghost gun" means a firearm, including an unfinished frame or receiver, that:
    (A) lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer **[[under]]** in accordance with federal law; and
    (B) lacks markings and is not registered with the Secretary of the State Police in accordance with **[[27 C.F.R. § 479.102]]** Section 5-703(b)(2)(ii) of the Public Safety Article of the Maryland Code.

**[[It]]** "Ghost gun" does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968.

(8) "Undetectable gun" means:

(9) "Unfinished frame or receiver" means a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm.

Place of public assembly: A "place of public assembly" is:
(1) a **[[place where the public may assemble, whether the place is]]** publicly or privately owned: **[[, including a]]**
    (A) park;
    (B) place of worship;
    (C) school;
    (D) library;
    (E) recreational facility;
    (F) hospital;
    (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;

(H) long-term facility, including any licensed nursing home, group home, or care home; **[[or]]**
(I) multipurpose exhibition facility, such as a fairgrounds or conference center; or
(J) childcare facility;
(2) government building, including any place owned by or under the control of the County;
(3) polling place;
(4) courthouse;
(5) legislative assembly; or
(6) a gathering of individuals to collectively express their constitutional right to protest or assemble.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

12.    As amended by Bill 21-22E, section 57-7 of Chapter 57, was amended to provide:

**57-7. Access to guns by minors.**

(d) A person must not purchase, sell, transfer, possess, or **[[transfer]]** transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

13.    As amended by Bill 21-22E, section 57-11(b) of Chapter 57 was amended to delete the exception from the Chapter 57-11(a) prohibitions for a person holding a wear and carry permit issued by the Maryland State Police pursuant to MD Code, Public Safety, §5-306, and thus provides:

**57-11. Firearms in or near places of public assembly.**

(a) In or within 100 yards of a place of public assembly, a person must not:
(1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or
(2) sell, transfer, possess, or transport a firearm created through a 3D printing process.
(b) This section does not:
1) prohibit the teaching of firearms safety or other educational or sporting use in the areas described in subsection (a);
(2) apply to a law enforcement officer, or a security guard licensed to carry the firearm;
(3) apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;

9

(4) apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm; or

(5) **[**apply to the possession of a handgun by a person who has received a permit to carry the handgun under State law; or**]**

**[**(6)**]** apply to separate ammunition or an unloaded firearm:

(A) transported in an enclosed case or in a locked firearms rack on a motor vehicle, unless the firearm is a ghost gun or an undetectable gun; or

(B) being surrendered in connection with a gun turn-in or similar program approved by a law enforcement agency.

14.     Bill 21-22E, as enacted, went into effect immediately on the date it became law, providing:

**Sec. 2. Expedited Effective Date.** The Council declares that this legislation is necessary for the immediate protection of the public interest. This Act takes effect on the date on which it becomes law.

15.     Bill 21-22E, as enacted, provides a new severability clause, stating:

**Sec. 3. Severability.** If any provision of this Act, or any provision of Chapter 57, is found to be invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect.

16.     Bill 21-22E, as enacted, provides an interpretation provision, stating:

**Sec. 4.** This Act and Chapter 57 must be construed in a manner that is consistent with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives, including 87 FR 24652 (effective August 24, 2022), as amended.

### STATE AND FEDERAL FIREARMS LAW

**Federal Firearms Law:**

17.     Under Federal law, a person may legally manufacture a firearm for his own personal use. See 18 U.S.C. § 922(a). See *Defense Distributed v. Department of State*, 838 F.3d 451 (5th Cir. 2016). Firearms manufactured for personal use are not required to be serialized or engraved with a serial number under federal law. Only federally licensed manufacturers and importers are required to assign serial numbers to the firearms they manufacture or import. See 18 U.S.C. § 923(i).

10

18.    Under Federal law, 18 U.S.C. § 921(a)(3), "[t]he term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

19.    Effective August 24, 2022, the Federal Bureau of Alcohol, Tobacco and Firearms ("ATF") newly defined the term "frame or receiver" See 27 C.F.R. § 478.12. Federal law does not require the manufacturer or importer to place any serial number on the slide or cylinder of a handgun or on a barrel of a rifle or shotgun, but rather requires that "an individual serial number" be placed on the "frame or receiver." 27 C.F.R. § 478.92(a)(1)(i). See also 27 C.F.R. § 479.102. While these newly promulgated ATF regulations define a "frame or a receiver" in different ways, depending on the type of firearm, in no case is a frame or a receiver defined to mean the slide or cylinder of a handgun or the barrel of a rifle or shotgun.  See Definition of "Frame or Receiver," and Identification of Firearms, 87 Fed. Reg. 24652, 24735-2438 (April 26, 2022), amending 27 C.F.R. § 478.12. Maryland law does not regulate the placement of serial numbers. Section 4 of Bill 21-22E requires that Chapter 57 and Bill 21-22E "must be construed in a manner that is consistent" with these ATF regulations. A frame or receiver that has been serialized by a federally regulated firearms manufacturer is treated as a "firearm" under Federal law and is thus subject to the full panoply of federal regulation, including the performance of a background check otherwise required by federal law.

20.    Persons otherwise prohibited from owning firearms are still legally barred from the manufacture, sale, transfer, or possession of modern firearms or modern ammunition, regardless of the method of manufacture. Such possession, actual or constructive, is a violation of 18 U.S.C. §

11

922(g), which is punishable by up to 10 years imprisonment under federal law. See 18 U.S.C. § 924(a)(2). Possession of a firearm by a prohibited person is likewise a serious crime under Maryland law. See MD Code, Public Safety, § 5-101(g)(3), § 5-133(b)(1), § 5-205(b)(1).

21.     Under current federal law, it is unlawful to "manufacture, import, sell, ship, deliver, possess, transfer, or receive" any firearm that is not "detectable" by a "Security Exemplar" or any "major component" of which does not show up accurately on airport x-ray machines. 18 U.S.C. § 922(p). A knowing violation of that prohibition is a federal felony, punishable by five years of imprisonment and a fine. See 18 U.S.C. § 924(f). For these purposes, federal law provides that "the term "Security Exemplar" means an object, to be fabricated at the direction of the Attorney General, that is-- (i) constructed of, during the 12-month period beginning on the date of the enactment of this subsection, 3.7 ounces of material type 17-4 PH stainless steel in a shape resembling a handgun; and (ii) suitable for testing and calibrating metal detectors." 18 U.S.C. § 922(p)(2)(C).

22.     Law-abiding Americans, including hobbyists, have lawfully manufactured firearms for personal use since before the Revolutionary War and that practice continues up to the present day. While there is no definitive count of such personal-use firearms, the total number of such firearms manufactured for personal use is undoubtedly in the hundreds of thousands and are in common use throughout the United States and Maryland. Such firearms manufactured for personal use include rifles and pistols and all such firearms manufactured for personal use may be used for legitimate lawful purposes, including self-defense in and outside the home.

**The Second Amendment**

23.     The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S.

12

742 (2010). "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). The Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes." (Id. at 625). Privately made firearms ("PMFs") are bearable arms in common use and are typically possessed by law-abiding citizens for lawful purposes. Federal regulations provide that federal firearms licensees are authorized to engrave serial numbers onto the frame or receiver of any PMF that may come into their possession overnight. See 87 Fed. Reg. at 24667, 24707; 27 C.F.R. § 478.92(vi)(B). PMFs are therefore protected arms under the Second Amendment. *Heller*, 554 U.S. at 627 ("the sorts of weapons protected were those 'in common use at the time.'"). See also *Bruen*, 142 S.Ct. at 2118. The Second Amendment guarantees a right to use and possess firearms "for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.

24.    In *Bruen*, the Supreme Court held that the Second Amendment right to bear arms means "a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." 142 S.Ct. at 2135 n.8. The Second Amendment thus "presumptively guarantees" an individual's "right to 'bear' arms in public for self-defense." 142 S.Ct. 2135. The Court ruled that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2129. Under this test, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127. Thus, "when the Second Amendment's plain text covers an

13

individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2129-30.

**Maryland State Firearms Law:**

25. MD Code, Criminal Law, 4-203(a)(1), provides "[e]xcept as provided in subsection (b) of this section, a person may not: (i) wear, carry, or transport a handgun, whether concealed or open, on or about the person; (ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State." A violation of 4-203(a) is a strict liability offense, and a person may be convicted of the offense without regard to intent, knowledge or state of mind. *Lawrence v. State*, 476 Md. 384, 257 A.3d 588 (2021). A person convicted of a violation of 4-203(a) "is subject to imprisonment for not less than 30 days and not exceeding 3 years or a fine of not less than $250 and not exceeding $2,500 or both." MD Code, Criminal Law, 4-203(c)(2)(i).

26. Subsection (b)(2) of Section 4-203 provides that Section 4-203(a) does not prohibit "the wearing, carrying, or transporting of a handgun, in compliance with any limitations imposed under § 5-307 of the Public Safety Article, by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article."

27. Subsection (b)(3) of Section 4-203 further provides that Section 4-203 does not prohibit "the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is

14

unloaded and carried in an enclosed case or an enclosed holster." Such transport and carriage of long guns, such as rifles and shotguns, are permitted under Maryland law without restriction.

28.    Subsection (b)(4) of Section 4-203 further provides that Section 4-203 does not prohibit "the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources-sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while the person is engaged in, on the way to, or returning from that activity if each handgun is unloaded and carried in an enclosed case or an enclosed holster;"

29.    Subsection (b)(5) of Section 4-203 further provides that Section 4-203 does not prohibit " the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster."

30.    Subsection (b)(6) of Section 4-203 further provides that Section 4-203 does not prohibit "the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases." Such persons are not required to possess or obtain a Maryland carry permit under MD Code, Public Safety, § 5-306, for such uses and possession. There is no limitation on the number of handguns or types of ammunition that may be possessed, worn, carried or transported under this provision of Section 4-203(b)(6). Such transport, wear and carriage of rifles and shotguns in a person's residence, real estate or business are permitted under Maryland law without restriction.

15

31.     Subsection (b)(7) of Section 4-203 further provides that Section 4-203 does not prohibit "the wearing, carrying, or transporting of a handgun by a supervisory employee: (i) in the course of employment; (ii) within the confines of the business establishment in which the supervisory employee is employed; and (iii) when so authorized by the owner or manager of the business establishment." Such persons are not required to possess or obtain a Maryland carry permit under MD Code, Public Safety, § 5-306. There is no limitation on the number of handguns or ammunition that may be possessed, worn, carried or transported under this provision of Section 4-203(b)(7). There is no limitation on the number of supervisory employees whom the employer may authorize to carry a firearm under this section. Such transport, wear and carriage of rifles and shotguns by business employees on business premises are permitted under Maryland law without restriction.

32.     With the exception of possession in a vehicle of a **loaded** long gun by persons **without** a wear and carry permit, which is prohibited by MD Code, Natural Resources, § 10-410(c), transport and carriage of loaded long guns, such as rifles and shotguns, in public is permitted under Maryland law, unless taking place at specific places in which all firearms are banned, such as "public school property," MD Code, Criminal Law, § 4-102(b).

33.     Under MD Code, Public Safety, § 5-133(d)(2)(i), a person under the age of 21 may temporarily transfer and possess a regulated firearm, including a handgun, if the person is "1. under the supervision of another who is at least 21 years old and who is not prohibited by State or Federal law from possessing a firearm; and 2. acting with the permission of the parent or legal guardian of the transferee or person in possession." Under MD Code, Public Safety, § 5-133(d)(2)(iv), a person under the age of 21 may temporarily transfer or possess a regulated firearm, including a handgun, if the person is "1. participating in marksmanship training of a recognized organization; and 2. under

16

the supervision of a qualified instructor." Such transfer or possession of a long gun by or to a person under 21 is permissible without restriction.

34.     MD Code, Criminal Law, § 4-104, expressly permits a minor child under the age of 16 to have access to any firearm if that access "is supervised by an individual at least 18 years old" or if the minor child under the age of 16 has a certificate of firearm and hunter safety issued under § 10-301.1 of the Natural Resources Article of the Maryland Code. By necessary implication, access to a firearm by a minor child between the ages of 16 and 18 is permitted by Section 4-104 without restriction.

35.     The regulation of unserialized firearms is a matter of significant State-wide and national interest. In the 2021 General Assembly, such unserialized firearms were addressed in three bills. Two bills, House Bill 638 and Senate Bill 624, would have imposed extensive regulation on the possession and transfer of ghost guns, but would have also afforded a path for existing owners to retain possession of their existing, unserialized firearms that they had lawfully manufactured for personal use. One bill, House Bill 1291, would have banned unserialized firearms manufactured for personal use completely. Similar legislation was proposed in the 2020 General Assembly session, with House Bill 910 and Senate Bill 958, and in the 2019 General Assembly session, with House Bill 740 and Senate Bill 882. House Bill 740 passed the House of Delegates in 2019, and it instructed the Maryland State Police to "develop a plan for a system in the State for the registration of firearms not imprinted with a serial number issued by a federally licensed firearms manufacturer or importer and submit a report describing the system . . . ." In the 2021 Session, provisions of House Bill 638 were incorporated into other legislation that had passed the Senate (Senate Bill 190), and that bill, as amended, passed the House Judiciary Committee and was reported to the floor of the House of Delegates, where it was further amended. That bill ultimately did not pass the House.

17

36.    In the 2022 Session, the Maryland General Assembly enacted Senate Bill 387 and House Bill 425, into law on April 9, 2022, after Governor Hogan advised the General Assembly that he would allow these two bills to become law without his signature. SB 387 was thus enacted under Article II, Section 17(b) of the Maryland Constitution as Chapter 19. HB 425 was enacted under Article II, Section 17(b) of the Maryland Constitution, as Chapter 18. SB 387/HB 425 creates specific deadlines for compliance by existing owners of PMFs, including those regulated by Chapter 57, as amended by Bill 4-21 and Bill 21-22E. Section 57-1, as amended by Bill 4-21 and as further amended by Bill 21-22E, defines a PMF to be a "ghost gun," and Chapter 57 regulates such a PMF in a manner that is in conflict and inconsistent with this newly enacted, State-wide legislation. Senate Bill 387 and House Bill 425 are codified at MD Code, Public Safety, §§ 5-701-5-706.

37.    Under Maryland law, MD Code, Public Safety, § 5-101(h)(1), a "firearm" is defined as "(i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or (ii) the frame or receiver of such a weapon." Maryland law does not define "frame or receiver." Maryland law does not define or regulate the possession, sale or transfer of "major components" for firearms. Fully finished frames or receivers are commonly sold with serial numbers already engraved in compliance with Federal law and such fully finished frames or receivers may be lawfully assembled by law-abiding persons for personal use by obtaining other components that lawfully available and sold throughout the United States. Such serialized firearms are not "ghost guns" under the County's definition of that term.

38.    Maryland State law does not prohibit the possession of a loaded or unloaded long gun, e.g., a shotgun or rifle, in public. Maryland State law broadly prohibits a person from the wear, carry or transport of a loaded or unloaded handgun, MD Code, Criminal Law, 4-203(a), but expressly makes exceptions to that prohibition in MD Code, Criminal Law, 4-203(b). One such

18

exception is the wearing, carrying and transport of a loaded handgun on "real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases." MD Code, Criminal Law, 4-203(b)(6). Maryland State law likewise expressly permits the wearing, carrying, or transporting of a loaded or unloaded handgun, "by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article." MD Code, Criminal Law, 4-203(b)(2).

39.    Effective in July 2022, in compliance with the Supreme Court's June 23, 2022 decision in *Bruen*, and on the advice of the Maryland Attorney General and at the direction of the Governor, the Maryland State Police began to issue wear and carry permits on a "shall issue" basis without regard to whether the applicant showed that he or she possessed a "good and substantial reason" otherwise required by Maryland State law, MD Code, Public Safety, § 5-306(a)(6)(ii). The wear and carry permits issued by the Maryland State Police specifically state on the back of every permit that the permit is "not valid where firearms are prohibited by law."

40.    Like federal law, Maryland State law defines "frames or receivers" as firearms and regulates them as firearms. MD Code, Public Safety, 5-101(h). While Maryland State law does not define the terms "frames or receiver," Maryland State law does define an "unfinished frame or receiver" to mean "a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm." MD Code, Public Safety, § 5-701(h). Under Section 3 of House Bill 425 and Senate Bill 387, as enacted, the scope and meaning of "unfinished frame or receiver" is determined by reference to the 2022 federal regulations promulgated by the ATF.

41.    Maryland State law provides that a person "may not purchase, receive, sell, offer to sell, or transfer an unfinished frame or receiver unless it is required by federal law to be, and has been, imprinted with a serial number by a federally licensed firearms manufacturer or federally licensed firearms importer in compliance with all federal laws and regulations applicable to the manufacture and import of firearms." MD Code, Public Safety, § 5-703(a)(1). *Possession* of an "unfinished frame or receiver" is prohibited as of March 1, 2023, unless the firearm is "imprinted by a federally licensed firearms manufacturer, federally licensed firearms importer, or other federal licensee authorized to provide marking services, with a serial number in compliance with all federal laws and regulations applicable to the manufacture and import of firearms," MD Code, Public Safety, § 5-703(b)(2)(i), **OR** unless the firearm has been imprinted with a serial number by such a federal licensee in a specified manner and has been registered with the Secretary of the Maryland State Police. MD Code, Public Safety, § 5-703(b)(2)(ii). Either type of serialization is permissible under Maryland State law.

42.    Under Maryland State law, the prohibition on the possession of an unfinished frame or receiver does not apply to a possession of a firearm "unless a person knew or reasonably should have known that the firearm was not imprinted with a serial number as described under this subsection." MD Code, Public Safety, § 5-703(b)(1)(i). The prohibition of possession likewise does not apply to possession of an unfinished frame or receiver that was received through inheritance, if the frame or receiver is serialized within 30 days after such receipt. MD Code, Public Safety, § 5-703(b)(1)(ii). The prohibition on possession of an unfinished frame or receiver likewise does not apply to "a person that made or manufactured the unfinished frame or receiver, without the use of any prefabricated parts, and who is not otherwise prohibited from possessing the unfinished frame or receiver, for a period not exceeding 30 days after the person made or manufactured the unfinished

20

frame or receiver." MD Code, Public Safety, § 5-703(b)(1)(iii). The Maryland State Police is authorized by Maryland State law to issue regulations to carry out these provisions. MD Code, Public Safety, § 5-705.

43.     Subtitle 7 of Title 5 of the Public Safety Article "does not apply to a sale, an offer to sell, a transfer, or a delivery of a firearm or an unfinished frame or receiver to, or possession of a firearm or unfinished frame or receiver by: (i) a federally licensed firearms dealer; (ii) a federally licensed firearms manufacturer; or (iii) a federally licensed firearms importer; or (3) a transfer or surrender of a firearm or an unfinished frame or receiver to a law enforcement agency." MD Code, Public Safety, § 5-702(2).

**MARYLAND CONSTITUTIONAL AND STATUTORY PREEMPTION PROVISIONS**

44.     Maryland law contains several preemption statutes that broadly preempt local jurisdictions from regulating firearms:

*a*. MD Code, Public Safety, § 5-104, provides that "[t]his subtitle supersedes any restriction that a local jurisdiction in the State imposes on a sale of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the sale of a regulated firearm."

*b*. MD Code, Public Safety, § 5-133(a), provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm."

*c*. MD Code, Public Safety, § 5-134(a), provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the transfer by a private party of a

21

regulated firearm, and the State preempts the right of any local jurisdiction to regulate the transfer of a regulated firearm."

d. MD Code, Public Safety, § 5-207(a), enacted into law in 2021 as part of House Bill 4, provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the transfer by a private party of a rifle or shotgun, and the State preempts the right of any local jurisdiction to regulate the transfer of a rifle or shotgun."

e. MD Code, Criminal Law, § 4-209, provides:

(a) Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of:

(1) a handgun, rifle, or shotgun; and
(2) ammunition for and components of a handgun, rifle, or shotgun.

Exceptions

(b)(1) A county, municipal corporation, or special taxing district may regulate the purchase, sale, transfer, ownership, possession, and transportation of the items listed in subsection (a) of this section:

(i) with respect to minors;
(ii) with respect to law enforcement officials of the subdivision; and
(iii) except as provided in paragraph (2) of this subsection, within 100 yards of or in a park, church, school, public building, and other place of public assembly.

(2) A county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety, or other educational or sporting use of the items listed in subsection (a) of this section.

For purposes of these preemption provisions, a "regulated firearm" includes any handgun. MD Code, Public Safety, § 5-101(r)(1). For purposes of these preemption provisions, the terms "handgun," "rifle," and "shotgun" are defined in MD Code, Criminal Law, § 4-201.

45.    Section 6 of Chapter 13, of the 1972 Sessions Laws of Maryland provides: "That all restrictions imposed by the law, ordinances, or regulations of the political subdivisions on the

22

wearing, carrying, or transporting of handguns are superseded by this Act, and the State of Maryland hereby preempts the right of the political subdivisions to regulate said matters." This provision has been held to preclude Montgomery County from regulating the sale of ammunition in the County. See *Montgomery County v. Atlantic Guns, Inc.,* 302 Md. 540, 489 A.2d 1114 (1985).

46.     Montgomery County has chartered home rule under Section 3 of Article XI-A of the Maryland Constitution and, under that provision, the County is empowered to enact "local laws." Such local laws are "subject to the Constitution and Public General Laws of this State." (Id.). Article XI–A, § 6, of the Maryland Constitution provides further that "this Article shall not be construed to authorize the exercise of any powers in excess of those conferred by the Legislature upon said Counties or City as this Article sets forth." Under these provisions, Montgomery County is not empowered to enact "general laws." Under Maryland law, a general law "deals with the general public welfare, a subject which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state." *Steimel v. Board,* 278 Md. 1, 5, 357 A.2d 386, 388 (1976). Thus, "some statutes, local in form, have been held to be general laws, since they affect the interest of the whole state." *Cole v. Secretary of State,* 249 Md. 425, 434, 240 A.2d 272, 278 (1968). Similarly, "[a] law may be local in the sense that it operates only within a limited area, but general in so far as it affects the rights of persons without the area to carry on a business or to do the work incident to a trade, profession, or other calling within the area." *Dasch v. Jackson,* 170 Md. 251, 261, 183 A. 534, 538 (1936).

47.     Under the Maryland Express Powers Act, MD Code, Local Government, § 10-202(a), a "[a] county may enact local laws and may repeal or amend any local law enacted by the General Assembly on any matter covered by the express powers in this title." However, MD Code, Local Government, §10-206(a), provides that a county may pass an ordinance, resolution, or bylaw

23

only if such laws are "not inconsistent with State law." Similarly, MD Code, Local Government, §10-206(b), provides that "[a] county may exercise the powers provided under this title only to the extent that the powers are not preempted by or in conflict with public general law." Under binding precedent, a local law is inconsistent with State law when the local law prohibits an activity which is permitted by State law, or permits an activity prohibited by state law. See *City of Baltimore v. Sitnick*, 254 Md. 303, 317, 255 A.2d 376, 382 (1969) ("a political subdivision may not prohibit what the State by general public law has permitted").

## PARTIES

**Plaintiffs:**

48.    Plaintiff MARYLAND SHALL ISSUE, INC. ("MSI") is a Maryland corporation, located at 9613 Harford Rd., Ste C #1015, Baltimore, MD 21234-2150. MSI is an Internal Revenue Service certified Section 501(c)(4), non-profit, non-partisan, all-volunteer membership organization with approximately 2500 members statewide. MSI is dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. The purposes of MSI include promoting the exercise of the right to keep and bear arms and education, research, and legal action associated with the constitutional right to privately own, possess and carry firearms.

49.    MSI has one or more members who live in Montgomery County, and who possessed "ghost guns" banned by Chapter 57 in their homes and/or in their businesses and engaged in other conduct with "ghost guns" regulated by Chapter 57. These MSI members were forced to dispossess themselves of such "ghost guns" by the enactment of Bill 4-21. MSI has one or members in Montgomery County who legally sold so-called "ghost guns" and which are now banned by Chapter

57. Possession of these privately made firearms was perfectly legal under Maryland State law until the enactment of Bill 4-21, which made possession illegal in Montgomery County. But for the enactment of Bill 4-21 and Bill 21-22E and the threat of prosecution by the County, these members of MSI would continue to possess, transport, sell or transfer these privately made firearms and intend to do so in the future. Such MSI members fear prosecution under Chapter 57 if they should do so.

50. MSI has one or more members who live outside of Montgomery County, but who travel to and/or work within Montgomery County. MSI has one or more members who live in and/or travel through Montgomery County and who also possess a Maryland wear and carry permit issued by the Maryland State Police and the permit possessed by each such member states that the permit is "not valid where firearms are prohibited by law." These members with carry permits have in the past possessed and transport loaded firearms at or within 100 yards of the locations banned by Chapter 57, as amended Bill 21-22E, and possessed and transported such firearms throughout the County, except at those locations in which possession or transport was otherwise prohibited by State or federal law. These members of MSI with carry permits intend to continue to possess and carry loaded firearms at or within 100 yards of such locations banned by Chapter 57. These MSI members reasonably fear prosecution under Chapter 57 if they do so. Among the membership of MSI are "qualified instructors" who engage in firearms training, including firearms instruction of minors.

51. MSI has one or more members who live in Montgomery County, but who do not have a Maryland carry permit and who have, in the past, lawfully possessed or transported loaded firearms within 100 yards of at least one of the locations in which the possession and transport of loaded firearms are banned by Chapter 57. These MSI members intend to possess and carry a loaded firearm outside the home, as otherwise permitted by State and federal law, but reasonably fear prosecution under Chapter 57 if they do so.

52.    One or more MSI members with a wear and carry permit issued by the Maryland State Police intend to possess and transport firearms in the future at or within 100 yards the locations newly banned by Chapter 57, as amended by Bill 4-21 and Bill 21-22E, except for those locations in which the possession or transport of loaded firearms by permit holders would otherwise be prohibited by State or federal law. One or more MSI members without a wear and carry permit issued by the Maryland State Police intend to possess and transport firearms in the future at or within 100 yards the locations newly banned by Chapter 57, as amended by Bill 4-21 and Bill 21-22E, as otherwise permitted by State or federal law.

53.    MSI filed extensive comments with Montgomery County, objecting to Bill 4-21 prior to its enactment. A true and correct copy of those comments are attached to this Second Amended Complaint as Exhibit C. MSI likewise filed extensive comments with Montgomery County, objecting to Bill 21-22E prior to its enactment. A true and correct copy of those comments, along with other testimony presented to the County Council, are attached to this Second Amended Complaint as Exhibit D. The Chairman of MSI also presented oral testimony to the Montgomery County Council in opposition to Bill 21-22E on behalf of MSI. As a participant in this legislative process, MSI has represented the interests of its members in the subject matter addressed by Chapter 57.

54.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, burdens the ability of MSI members to keep and bear arms within Montgomery County, including firearms and "major components" that are otherwise lawful in Maryland, but nonetheless are banned by Chapter 57. These MSI members have standing to challenge Chapter 57, as amended by Bill 4-21 and Bill 21-22E. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) ("Where "the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has

26

caused him injury, and that a judgment preventing or requiring the action will redress it."). MSI has representational standing to sue on behalf its members who live in Montgomery County or who travel through Montgomery County or who otherwise are injured by the County's unlawful actions. *Hunt v. Washington State Apple Advert. Com'n.,* 432 U.S. 333, 342 (1977). Each of MSI's members who possesses, transports, sells or transfers firearms or "ghost guns" in Montgomery County is injured by Chapter 57, as amended by Bill 4-21 and Bill 21-22E. MSI has at least one such member. The interests that MSI seeks to protect are germane to MSI's purpose and neither the claims asserted herein nor the relief requested require the participation of MSI's individual members. See *Retail Industry Leaders Ass' v. Fielder,* 475 F.3d 180, 186 (4th Cir. 2007).

55.     Plaintiff ENGAGE ARMAMENT LLC ("Engage" or "Engage Armament"), is a Maryland corporation, and is located at 701 E. Gude Dr., Ste 101, Rockville, MD 20850, within Montgomery County. Engage is a federally licensed Type I dealer (retail dealer) a Type VII dealer (firearms manufacturer) and Type X dealer (manufacturer of destructive devices and ammunition for such devices). See 27 C.F.R. § 478.41 *et seq*. Pursuant to MD Code, Public Safety, § 5-106, Engage is a Maryland State licensed firearms dealer and is thus authorized by State law to engage "in the business of selling, renting or transferring regulated firearms." As a federal licensee, Engage is expressly exempt from subtitle 7, of Title 5, of the Public Safety Article of the Maryland Code and thus may sell, offer to sell, deliver and possess an "unfinished frame or receiver." MD Code, Public Safety, § 5-702(2). As such a licensee, Engage is also authorized by State law to perform serialization services for "unfinished frames or receivers" for the public. MD Code, Public Safety, § 5-703(b). Since the enactment of Bill 4-21, Engage has been prohibited from possessing the "ghost guns" banned by Chapter 57, and has thus likewise been prohibited from performing the serialization services otherwise expressly contemplated and permitted by MD Code, Public Safety, § 5-703(b).

27

As a consequence, Engage has lost substantial sales and fees associated with those activities and services.

56.    As part of its business as a Type VII federally licensed manufacturer, Engage manufactures firearms and uses and possesses components, including slides, cylinders, barrels and frames and receivers, and then assembles such components into finished firearms, which it then sells, all in full compliance with Federal and State law. From time to time, prior to the enactment of Bill 4-21, Engage stocked and sold unserialized unfinished framers or receivers, which were not frames or receivers under federal law, but which could be lawfully machined and built into firearms by the purchaser for personal use. These otherwise lawful items are banned as "ghost guns" by Chapter 57, as amended by Bill 4-21 and Bill 21-22E. But for the enactment of Bill 4-21 and Bill 21-22E, Engage would continue to conduct such business in compliance with State and federal law, but has not done so it fears prosecution under Chapter 57. Engage intends to continue to conduct such business in compliance with State and federal law. Engage reasonably fears prosecution under Chapter 57 if it does so. As part of its business, Engage has transferred firearms in the presence of a minor who is otherwise accompanied by a parent. Engage possesses on its business premises an extensive collection of books and articles related to firearms and other subjects and, from time to time, loans such materials to others and, in that sense, may arguably be said to possess and operate a privately owned library. Each of the owners and the employees have access to this "library." The business location of Engage is arguably at or within 100 yards of a "place of public assembly" as defined by Chapter 57, as amended by Bill 21-22E.

57.    Plaintiff ANDREW RAYMOND is an individual co-owner of Engage, and resides in Montgomery County, Maryland. Plaintiff Raymond regularly conducts the business activities of Engage. He is the father of two minor children who reside with him at his residence in Montgomery

28

County. From time to time, prior to the enactment of Bill 4-21, he possessed, assembled and disassembled a firearm in the presence of a minor child for purposes of instruction and intends to again possess, disassemble and assemble such "ghost guns" in the presence of his minor child. He reasonably fears prosecution under Chapter 57 if he does so. He may possess and transport unserialized firearm parts and components to and from Engage as part of the business of Engage. Prior to the enactment of Bill 4-21, he assembled firearms in the presence of his children in his residence. He intends to do so in the future but reasonably fears prosecution under Chapter 57 if he does so.

58.     Prior to the enactment of Bill 4-21, plaintiff Andrew Raymond owned and possessed "ghost guns" as defined by Chapter 57 in Montgomery County and intends to possess such "ghost guns" in the future. He reasonably fears prosecution under Chapter 57 if he does so. Pursuant to MD Code, Criminal Law, 4-203(b)(7), and as co-owner of Engage, he has authorized more than one supervisory employee at Engage to wear and carry loaded firearms within the business confines of Engage for their self-protection and for the protection of the business and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. At Engage, he possesses more than one firearm for the protection of himself and his business, as permitted by Maryland State law, and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. He possesses a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." As permitted by State law, he regularly carries a loaded firearm at work at Engage, while commuting to and from Engage, and at other places within the County, as otherwise allowed by Maryland State law. He intends to continue to carry a loaded firearm in the County in accordance with State and

federal law. He reasonably fears prosecution under Chapter 57 if he does so. He is a member of MSI.

59.    Plaintiff Andrew Raymond commutes daily to Engage from his home in Montgomery County, Maryland. During that commute, he passes within 100 yards of multiple places of worship, public parks, assisted living facilities, child care centers, schools, a police station, County owned or controlled property, and long-term facilities for assisted living. There is no practical way for him to commute to work without coming within 100 yards of such locations. He intends to continue to commute to his employment at Engage while carrying a loaded firearm in the County as otherwise permitted by State law, and reasonably fears prosecution under Chapter 57 if he does so. Prior to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, he possessed within his home one or more "ghost guns" as defined by Chapter 57, including a rifle and a pistol "ghost gun" and intends to again possess such "ghost guns" in the future. He reasonably fears prosecution under Chapter 57 if he does so.

60.    Plaintiff CARLOS RABANALES is an individual co-owner of Engage. He resides in Frederick County, Maryland, and regularly conducts the business activities of Engage in the County. As co-owner of Engage, he has authorized more than one supervisory employee at Engage to wear and carry loaded firearms within the business confines of Engage for their self-protection and for the protection of the business and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. At Engage, he possesses more than one firearm for the protection of himself and his business, as permitted by Maryland State law and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so.

61.    Prior to the enactment of Bill 4-21, plaintiff Carlos Rabanales possessed in the County one or more "ghost guns" as defined by Chapter 57, and intends to again possess such "ghost

guns" in the future. He reasonably fears prosecution under Chapter 57 if he does so. At Engage, he possesses more than one firearm for the protection of himself and his business. He may possess and transport unserialized firearm parts and components to and from Engage as part of the business of Engage. As permitted by State law, he regularly carries a loaded firearm at work at Engage and while commuting to and from Engage, as well as at other places within the County, as otherwise allowed by Maryland State law. He intends to carry a loaded firearm in the future in the County, in accordance with State and federal law. He reasonably fears prosecution under Chapter 57 if he should do so. He possesses a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." He is a member of MSI.

62.     Plaintiff Carlos Rabanales commutes daily to Engage in Montgomery County from his home in Frederick County, Maryland. During that commute, he routinely passes within 100 yards of child care facilities, parks, churches, a correctional facility, health care facilities, fairgrounds, recreational facilities (playgrounds), private and public schools, a hospital, a community center and government buildings. There is no practical way for him to commute to work without coming within 100 yards of most if not all such locations. He intends to continue to carry a loaded firearm during his commute to his place of employment at Engage and elsewhere in Montgomery County as otherwise permitted by State law. He reasonably fears prosecution under Chapter 57 if he does so.

63.     Plaintiff BRANDON FERRELL is an individual supervisory employee of Engage, and resides in Montgomery County, Maryland. His residence in Gaithersburg is arguably within 100 yards of a park and thus he would violate Chapter 57 if he were to step outside of his home onto his own real estate with a loaded firearm as he has done many times in the past and intends to continue

to do so in the future, as permitted by Maryland State law. He reasonably fears prosecution under Chapter 57 if he does so. Pursuant to MD Code, Criminal Law, 4-203(b)(7), he is a supervisory employee at Engage and wears and carries a fully loaded handgun in the course of his employment at Engage, "within the confines of a business establishment" as "authorized" by the owners of Engage. Prior to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, he possessed within his home one or more "ghost guns" as defined by Chapter 57, and intends to again possess such "ghost guns" in the future. He reasonably fears prosecution under Chapter if he does so. He is a member of MSI.

64.     Plaintiff Brandon Ferrell's home is located within 100 yards of a County park and thus he cannot step outside of his home onto his own real estate with a loaded firearm, as authorized by MD Code, Criminal Law, 4-203(b)(6), as he has done in the past and intends to continue to do so in the future, without violating Chapter 57, as amended by Bill 4-21 and Bill 21-22E. He reasonably fears prosecution under Chapter 57 if he does so. He is a member of MSI.

65.     While plaintiff Brandon Ferrell does not currently possess a wear and carry permit, he has applied for such a permit and expects to be issued such a permit within the 90 day window in which permit applications are adjudicated by the Maryland State Police, as specified in MD Code, Public Safety, 5-312(a)(2). During his daily commute to Engage, he passes within 100 yards of multiple places of worship, parks, long-term facilities for senior citizens, child care facilities, schools, places of worship, County owned or controlled property, a recreational facility and long-term facilities for assisted living. Once he is issued a wear and carry permit, he intends to carry a loaded firearm while commuting and while otherwise traveling within the County. There is no practical way for him to commute to work without coming within 100 yards of the locations in

which possession and transport of a loaded firearm is banned by Chapter 57, as amended by Bill 21-22E. He reasonably fears prosecution under Chapter 57 if he should he do so.

66.     Plaintiff DERYCK WEAVER is a supervisory employee of Engage, and resides in Bethesda, Maryland. His home is arguably within 100 yards of a "place of public assembly" as that term is defined in Bill 21-22E, and thus he cannot step outside of his home onto his property with a loaded firearm, as he has done many times in the past and intends to continue to do so in the future, without violating Chapter 57, as amended by Bill 4-21 and Bill 21-22E. He reasonably fears prosecution under Chapter 57 if he does so. He is the father of one minor child who lives with him at his residence. He is a qualified handgun instructor within the meaning of MD Code, Public Safety, §5-101(q), as well as a National Rifle Association-certified handgun instructor and National Rifle Association-certified Chief Range Safety Officer. He possesses a wear and carry permit as issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." He is a member of MSI.

67.     From time to time, prior to the enactment of Bill 4-21, plaintiff Deryck Weaver possessed, assembled and disassembled a "ghost gun" and other firearms in the presence of a minor child for purposes of instruction and intends to again disassemble and assemble such "ghost guns" and other firearms in the presence of his minor child. He has possessed and transported "ghost guns" in the presence of his child and intends to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. Pursuant to MD Code, Criminal Law, 4-203(b)(7), he has worn and carried a fully loaded handgun in the course of his employment at Engage, "within the confines of a business establishment" as "authorized" by the owners of Engage and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57, as amended by Bill 4-21 and Bill 21-22E if he does so. He is a member of MSI.

68.     Plaintiff Deryck Weaver commutes daily to Engage from his home in Montgomery County, Maryland. During his commute to Engage, he regularly passes within 100 yards of multiple places of worship, multiple parks, health care facilities, child care facilities, schools, a library, a County owned or controlled property, a recreational facility and long-term facilities for assisted living. There is no practical way for him to commute to work without coming within 100 yards of such locations. He intends to continue to carry a loaded firearm during his commute to his employment at Engage and elsewhere in Montgomery County, as otherwise permitted by State law, and reasonably fears prosecution under Chapter 57 if he does so.

69.     Plaintiff JOSHUA EDGAR works as a contractor at Engage, and resides in Gaithersburg, Maryland. His residence is within 100 yards of a park and thus he would immediately be in violation of Chapter 57, as amended by Bill 21-22E and Bill 4-21, should he step outside his home onto his real estate with a loaded firearm as he has done many times in the past and intends to continue to do so in the future, as permitted by MD Code, Criminal Law, 4-203(b)(6). He reasonably fears prosecution under Chapter 57 if he does so. Prior to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, he possessed within his home one or more "ghost guns" as defined by Chapter 57, and intends to again possess such "ghost guns" in the future. He reasonably fears prosecution under Chapter if he does so. From time to time, prior to the enactment of Bill 4-21, he assembled and disassembled a "ghost gun" in the presence of a minor child for purposes of instruction and intends to again disassemble and assemble such "ghost guns" in the presence of his minor child. He fears prosecution under Chapter 57 if he should do so. He possesses a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." He is a member of MSI.

34

70.    Plaintiff I.C.E. FIREARMS & DEFENSIVE TRAINING, LLC, ("ICE Firearms") is a Maryland corporation located at 24129 Pecan Grove Lane, Gaithersburg, Maryland. ICE Firearms provides firearm training to individuals with handguns, rifles and shotguns. ICE Firearms is arguably located within 100 yards of a "place of public assembly" as that term is used in Chapter 57, as amended by Bill 21-22E. ICE Firearms provides instruction in the safe use of firearms to adults, and to minors with the consent of their parents. Prior to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, ICE Firearms possessed within its location one or more "ghost guns" as defined by Chapter 57, and intends to again possess such "ghost guns" in the future. It reasonably fears prosecution under Chapter if it does so

71.    Plaintiff RONALD DAVID is the owner and operator of ICE Firearms. He resides in Gaithersburg, Maryland and his home is arguably within 100 yards of a school as that term is used by Bill 21-22E. Thus, should he step outside his home onto his real estate with a loaded firearm, as he has done many times in the past and intends to continue to do so in the future, as permitted by Maryland State law, he would violate Chapter 57. He reasonably fears prosecution under Chapter 57 if he does so. He is a "qualified handgun instructor" within the meaning of MD Code, Public Safety, § 5-101(q), and a National Rifle Association-certified Training Counselor in every shooting discipline. He possesses a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." He is a member of MSI.

72.    As permitted by State law, plaintiff Ronald David regularly carries a loaded firearm with him while (1) attending services at his place of worship located in the County, (2) at health care facilities during appointments with health care professionals in the County, (3) at fairgrounds in the County, (4) at recreational facilities within the County, and (5) at a park within the County, and intends to continue to do so at all these locations in the future. He reasonably fears prosecution under

Chapter 57 if he does so. He also regularly carries a loaded firearm with him while otherwise traveling within the County and does so within 100 yards of public and private schools, a polling place, a government building, parks, a library and a senior center, and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. Prior to the enactment of Bill 4-21, he likewise possessed one or more unfinished frames or receivers as defined and banned by Chapter 57 as a "ghost gun," and intends to possess such "ghost guns" in the future. He reasonably fears prosecution under Chapter 57 if he does so.

73.    Plaintiff NANCY DAVID resides in Gaithersburg, Maryland, and her home is arguably within 100 yards of a school as that term is used by Chapter 57, as amended by Bill 4-21 and Bill 21-22E. Thus, should she step outside her home onto her real estate with a loaded firearm, as she has done many times in the past and intends to continue to do so in the future, as permitted by Maryland State law, she would violate Chapter 57, as amended by Bill 4-21 and Bill 21-22E. She reasonably fears prosecution under Chapter 57 if she does so. She is a "qualified handgun instructor" within the meaning of MD Code, Public Safety, § 5-101(q). As permitted by State law she regularly carries a loaded firearm while otherwise traveling within the County and does so within 100 yards of schools, a polling place, a government building, parks, a library and intends to continue to do so in the future. She reasonably fears prosecution under Chapter 57 if she does so. She has a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." She is a member of MSI.

74.    Plaintiff ELIYAHU SHEMONY is an Orthodox Jew who is a former head of security for his synagogue located in the County. He was a member of the Special Forces of the Israeli Defense Force before immigrating to the United States and becoming an American citizen and is highly trained and proficient in the use of firearms. As permitted by State law, and because

36

Jewish synagogues and communities are under constant threat of attack in the United States[1] and in Montgomery County,[2] he regularly carries a loaded firearm while attending services at his synagogue for his own self-defense and for the defense of others and intends to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. As permitted by State law, he also regularly carries a loaded firearm with him (1) while going to and inside a public library in the County, and (2) while picking up minor children at their private school on private school property and intends to do so in the future. He reasonably fears prosecution under Chapter 57, as amended by Bill 4-21 and Bill 21-22E, if he does so. As permitted by State law, he also regularly carries a loaded firearm within 100 yards of a school, a childcare facility, a polling place, a government building, and the County building in which the County holds legislative assemblies, as well as other locations throughout Montgomery County and intends to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. He possesses a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." He is a member of MSI.

75.    Accompanying this Second Amended Complaint are the sworn declarations of each of the plaintiffs verifying the factual allegations set forth herein. (Exhibits E, F, G, H, I, J, K, L, M). Each of the foregoing individual plaintiffs, each of the two corporate plaintiffs and MSI members

---

[1] https://www.nytimes.com/2022/11/04/nyregion/new-jersey-synagogue-security-threat-suspect.html.

[2] https://www.washingtonpost.com/dc-md-va/2022/11/14/bethesda-trail-antisemetic-graffiti/; https://www.washingtonjewishweek.com/sharp-rise-in-anti-semitism-in-maryland-virginia-and-d-c-adl-reports/

37

are directly regulated by Chapter 57, as amended by Bill 4-21 and Bill 21-22E. Each of these plaintiffs and MSI members is injured by Chapter 57, as amended by Bill 4-21 and Bill 21-22E, in ways that are directly traceable to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, and these injuries are redressable through the relief sought in this case. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) ("Where "the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

76.     Chapter 57 is a penal statute as a violation of Chapter 57 is a Class A violation that can result in a $1,000 criminal fine and up to six months imprisonment for each day in which the violation continues. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, contains no *mens rea* requirement of any type and thus these punishments may be imposed without regard to the defendant's intent or knowledge or state of mind.

77.     Each of the plaintiffs is entitled to bring a pre-enforcement challenge to Chapter 57, as amended by Bill 4-21 and Bill 21-22E. In order to show injury in a pre-enforcement challenge, plaintiffs need only show "'an intention to engage in a course of conduct arguably affected with a constitutional interest.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014), quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). See also *FEC v. Cruz*, 142 S.Ct. 1638, 1649 (2022); *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,* 139 S.Ct. 2051 (2109) (noting that plaintiffs may bring "both facial, pre-enforcement challenges and as-applied challenges to agency action"). The allegations of each of the plaintiffs satisfy these requirements.

78.     Each of the plaintiffs in this case has engaged in constitutionally protected conduct in the past that would have violated Chapter 57, as amended by Bill 4-21 and Bill 21-22E, and each of the plaintiffs affirmatively have alleged that they fully intend to engage in such conduct in the

38

future. Each of these plaintiffs reasonably fears prosecution under Chapter 57 if they do so. Nothing "requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony*, 573 U.S. at 163. See also *Cruz*, 142 S.Ct. at 1649; *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 129 (2007); *Free Enter. Fund. v. Pub.Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010). Plaintiffs are not required "to risk criminal prosecution to determine the proper scope of regulation." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965). Maryland law provides that a plaintiff need only have "an interest such that he or she is personally and specifically affected in a way different from the public generally" to bring a pre-enforcement action. *Pizza di Joey, LLC v. Mayor of Baltimore*, 470 Md. 308, 343-44, 235 A.3d 873 (2020) (collecting cases).

79.    "[I]n numerous pre-enforcement cases" the Supreme Court "did not place the burden on the plaintiff to show an intent by the government to enforce the law against it," but rather the Court "presumed such intent in the absence of a disavowal by the government or another reason to conclude that no such intent existed." *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013). See *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010*); Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *Babbitt*, 442 U.S. at 301. The County in this case has not disavowed full enforcement of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, and there is no reason to believe that the County will not fully and vigorously fully enforce Chapter 57 at its time and place of choosing. Under the forgoing principles, the individual and corporate plaintiffs, and MSI, on behalf of its members, all have standing to seek pre-enforcement review of Chapter 57, as amended by Bill 4-21 and Bill 21-22E. See *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 217 (4th Cir. 2021).

**Defendant:**

80.     The Defendant is Montgomery County, Maryland, with its principal place and seat located in Rockville, Maryland. Montgomery County is a "person" for purposes of the relief sought by this suit within the meaning of MD Code, Courts and Judicial Proceedings, § 3-401, and 42 U.S.C. § 1983. Chapter 57, as amended by Bill 4-21 and Bill 21-22E. For purposes of Section 1983, the actions challenged herein are official actions and policies of the County. The County may be named and sued *eo nomine* under 42 U.S.C. § 1983. *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Starbuck v. Williamsburg James City County School Board,* 28 F.4th 529, 533-34 (4th Cir. 2022); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

### COUNT I – VIOLATIONS OF THE MARYLAND CONSTITUTION

81.     The Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint.

82.     Chapter 57, as amended by Bill 4-21 and Bill 21-22E, regulates "matters of significant interest to the entire state." *Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272, 278 (1968). Chapter 57, as so amended, "affects the rights of persons without the area to carry on a business or to do the work incident to a trade, profession, or other calling within the area." *Steimel v. Board,* 278 Md. 1, 5, 357 A.2d 386, 388 (1976).

83.     The General Assembly has repeatedly debated and introduced legislation, in both the House of Delegates and in the Senate, addressing the subject matters regulated by Chapter 57. One such bill, House Bill 740, passed the House of Delegates in 2019. More recently, the General Assembly has enacted into law Senate Bill 387 and House Bill 425. Senate Bill 387 was enacted under Article II, Section 17(b) of the Maryland Constitution as Chapter 19. House Bill 425 was enacted under Article II, Section 17(b) of the Maryland Constitution as Chapter 18. This legislative

activity is strong evidence that the matter is of general, state-wide interest, thereby demonstrating that Bill 4-21 is not a "local law" within the meaning of Article XI–A, § 3 of the Maryland Constitution and is thus *ultra vires*. See *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 631 A.2d 77 (1993).

84.      Chapter 57, as amended by Bill 4-21 and Bill 21-22E, has defined the "place of public assembly" to mean:

"(1) a publicly or privately owned:

     (A) park;

     (B) place of worship;

     (C) school;

     (D) library;

     (E) recreational facility;

     (F) hospital;

     (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;

     (H) long-term facility, including any licensed nursing home, group home, or care home;

     (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or

     (J) childcare facility;

(2) government building, including any place owned by or under the control of the County;

(3) polling place;

(4) courthouse;

(5) legislative assembly; or

(6) a gathering of individuals to collectively express their constitutional right to protest or assemble."

41

Chapter 57, as amended by Bill 4-21 and Bill 21-22E, has further defined the "place of public assembly" to mean:

"A 'place of public assembly' includes all property associated with the place, such as a parking lot or grounds of a building."

85.     Bill 4-21 amended Section 57-11 of Chapter 57 to provide: "(a) In or within 100 yards of a place of public assembly, a person must not: (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or (2) sell, transfer, possess, or transport a firearm created through a 3D printing process." Bill 21-22E left these provisions unaltered. Bill 4-21 left unaltered the pre-existing exemption for "a person who has received a permit to carry the handgun under State law" found in Section 57-11(b) of Chapter 57. Bill 21-22E amended Section 57-11(b) of Chapter 57 to eliminate the prior exemption for permit holders under Section 57-11. As thus amended, the bans imposed by Section 57-11(a) now apply equally to persons whom have been issued wear and carry permits by the Maryland State Police.

86.     Chapter 57's definition of a "place of public assembly," the bans imposed by Section 57-11(a) of Chapter 57, and the repeal of the pre-existing exception for permit holders by Bill 21-22E, makes it impracticable, if not virtually impossible, for any person with a carry permit issued by the Maryland State Police to legally carry a loaded firearm within most of Montgomery County because it would be virtually impossible, as a practical matter, for a person with a wear and carry permit to travel through the urban portions of Montgomery County without passing within 100 yards of the places at which possession and transport of a firearm is now banned Chapter 57, as amended by Bill 21-22E. Since Chapter 57 imposes no *mens rea* requirement, any possession or transport within such areas would create strict criminal liability for permit holders without regard to the permit holder's knowledge, intent or state of mind.

42

87.     Allowing county governments to expand their regulatory powers in the manner accomplished by Chapter 57, will create a nightmarish hodgepodge of local laws that vary from county to county, from city to city and from town to town, all of which could impose criminal penalties of the sort imposed by Montgomery County under Chapter 57. This reality directly and adversely affects the rights of non-residents of Montgomery County "to carry on a business or to do the work incident to a trade, profession, or other calling within the area." *Dasch v. Jackson*, 170 Md. 251, 261, 183 A. 534, 538 (1936). By criminalizing conduct that takes place within 100 yards of such locations, Montgomery County has exceeded its authority beyond that allowed by MD Code, Criminal Law, § 4-209. Through the enactment of Bill 4-21 and Bill 21-22E, the County has effectively nullified the preemption provisions of Section 4-209 as well as other provisions of Maryland firearms law, including express preemption provisions.

88.     Bill 4-21 is not a "local law" within the meaning of Article XI–A, § 3 of the Maryland Constitution because it regulates "matters of significant interest to the entire state" and "deals with" a matter "which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state." *Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272 (1968). Bill 4-21 also "affects the rights of persons without the area to carry on a business or to do the work incident to a trade, profession, or other calling within the area," including the rights of the plaintiffs. *Steimel v. Board*, 278 Md. 1, 5, 357 A.2d 386, 388 (1976). Bill 4-21 is thus unconstitutional under Article XI–A, § 3 of the Maryland Constitution.

89.     Under Section 3 of Article XI-A of the Maryland Constitution, all laws passed by the County are "subject to the Constitution and Public General Laws of this State." As more fully set forth in Count II, below, Bill 4-21 conflicts and is inconsistent with "General Laws" passed by

43

the General Assembly and is thus in violation of Article XI–A, § 3 of the Maryland Constitution for this additional reason.

90.    Under Section 6 of Article XI-A of the Maryland Constitution, the home rule powers conferred on the County by Article XI-A "shall not be construed to authorize the exercise of any powers in excess of those conferred by the Legislature upon said Counties or City as this Article sets forth." Under Section 6 of Article XI-A, the County's home rule powers thus do not include the power to pass any law that is in conflict or inconsistent with "General Laws" passed by the General Assembly as otherwise specified in Section 3 of Article XI-A of the Maryland Constitution. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, conflicts and is inconsistent with "General Laws" in violation of Section 3 of Article XI-A and thus is unconstitutional and *ultra vires* under Section 6 of Article XI-Al.

**COUNT II – VIOLATION OF THE EXPRESS POWERS ACT**

91.    Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint.

92.    Under the Express Powers Act, MD Code, Local Government, § 10-206, Montgomery County laws must be "not inconsistent with State law" and the County is barred from enacting laws that are "preempted by or in conflict with public general law." Under Section 3 of Article XI-A of the Maryland Constitution, all laws passed by the County are "subject to the Constitution and Public General Laws of this State."

93.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, violates the foregoing provisions of the Express Powers Act and Section 3 of Article XI-A in multiple ways:

*a.* MD Code, Criminal Law, § 4-209(a) preempts the County regulation of the "purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation"

44

of all firearms, but allows the County to regulate such matters "within 100 yards of or in a park, church, school, public building, and other place of public assembly." By redefining a "place of public assembly," the County has illegally expanded the scope of its authority provided by Section 4-209 beyond the bounds permitted by the language of Section 4-209. To the extent Bill 4-21 and Bill 21-22E purport to apply to these expanded areas, it is expressly preempted by the preemption provisions of Section 4-209(a).

*b.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans the "transfer" of all firearms within 100 yards of the County's illegally redefined "place of public assembly." In so far as this ban on such transfers includes regulated firearms that ban is separately preempted by MD Code, Public Safety, § 5-134(a), which provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the transfer by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the transfer of a regulated firearm."

*c.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans the "sale" of all firearms within 100 yards of the County's illegally redefined "place of public assembly." In so far as Chapter 57's ban on such sales includes rifles and shotguns, that ban is preempted by MD Code, Public Safety, § 5-207(a), which provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the transfer by a private party of a rifle or shotgun, and the State preempts the right of any local jurisdiction to regulate the transfer of a rifle or shotgun."

*d.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans the "possession" of all firearms within 100 yards of the County's illegally redefined "place of public assembly." In so far as this ban on such sales includes regulated firearms, including handguns, that ban is preempted by MD Code, Public Safety, § 5-133(a) which provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated

45

JA058

firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm.

        *e.* Chapter 57, as amended by Bill 4-21, expressly precludes any person, including a parent, from giving, lending or otherwise transferring to a minor a "ghost gun or a major component of a ghost gun." In so far as this provision regulates the temporary transfer of a regulated firearm, it illegally bans an activity that is expressly permitted by MD Code, Public Safety, § 5-133(d), which allows a minor to transfer and possess a regulated firearm under the active supervision of an adult with a parent's permission. Such transfers often include instruction in the use of firearms. To the extent that Bill 4-21 burdens such instruction, Bill 4-21 is preempted by MD Code, Criminal Law, § 4-209(b)(2), which provides that "[a] county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety, or other educational or sporting use of the items listed in subsection (a) of this section." These provisions fully apply to instruction in the use of unserialized regulated firearms lawfully manufactured for personal use.

        *f.* Chapter 57, as amended by Bill 4-21, expressly precludes any person, including a parent, from giving, lending or otherwise transferring to a minor a "ghost gun or a major component of a ghost gun," including the slide or a cylinder of a handgun or a barrel of a rifle. MD Code, Criminal Law, § 4-104, expressly permits a minor child under the age of 16 to have access to any firearm if that access "is supervised by an individual at least 18 years old" or if the minor child under the age of 16 has a certificate of firearm and hunter safety issued under § 10-301.1 of the Natural Resources Article. By necessary implication, access to a firearm by a minor child between the ages of 16 and 18 is likewise permitted by Section 4-104 without any restriction. These provisions fully apply to the transfer of unserialized firearms lawfully manufactured by an individual for personal

46

use. Bill 4-21's ban on lending, giving, or transferring a ghost gun to a minor is inconsistent with these provisions.

  *g.* Chapter 57, as amended by Bill 4-21 provides that a "person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor." MD Code, Criminal Law, § 4-104, expressly permits a minor child under the age of 16 to have access to any firearm if that access "is supervised by an individual at least 18 years old" or if the minor child under the age of 16 has a certificate of firearm and hunter safety issued under § 10-301.1 of the Natural Resources Article. By necessary implication, access to a firearm by a minor child between the ages of 16 and 18 is permitted by Section 4-104 without restriction. In so far as these provisions limit a minor's access to a ghost guns or components in a manner that Section 4-104 permits, Bill 4-21 is inconsistent with Section 4-104.

  *h.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, expressly bans the transport, in a vehicle and otherwise, of a "ghost gun," within 100 yards of the County's illegally expanded "place of public assembly." This ban on transport is inconsistent with MD Code, Criminal Law, § 4-203(b)(3), which provides that a person is permitted to transport a handgun "on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is unloaded and carried in an enclosed case or an enclosed holster." Transport of unloaded rifles and shotguns, including unserialized rifles and shotguns, is permitted under Maryland law without restriction.

47

*i.* Chapter 57, as amended Bill 4-21 and Bill 21-22E, expressly bans the "transport," in a vehicle and/or otherwise, of a "ghost gun" within 100 yards of the County's illegally expanded "place of public assembly." This ban is inconsistent with MD Code, Criminal Law, § 4-203(b)(5), which expressly permits "the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster." Such transport and carriage of unloaded rifles and shotguns, including unserialized rifles and shotguns, are permitted under Maryland law without restriction.

*j.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, expressly bans the sale, transfer, possession or transport of a firearm, including a "ghost gun" or a "major component" of any firearm, within 100 yards of the County's illegally expanded "place of public assembly." These bans are inconsistent with and preempted by § 6 of Ch. 13, of Session Laws of 1972 of Maryland, which expressly preempts all local law restrictions on the wearing, carrying, or transporting of handguns in the following language:

"SEC. 6. Be it further enacted, That all restrictions imposed by the law, ordinances, or regulations of the political subdivisions on the wearing, carrying, or transporting of handguns are superseded by this Act, and the State of Maryland hereby preempts the right of the political subdivisions to regulate said matters." See *Montgomery County v. Atlantic Guns, Inc*., 302 Md. 540, 543-44, 489 A.2d 1114, 1115-16 (1985).

*k.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, expressly bans the mere possession in the home of a "ghost gun" if the home is within 100 yards of the County's illegally expanded "place of public assembly." In so far as this ban on home possession applies to handguns, the ban is inconsistent with MD Code, Criminal Law, § 4-203(b)(6), which expressly permits "the

48

wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides….” Home possession of unserialized handguns, rifles and shotguns lawfully manufactured for personal use is currently permitted under Maryland law without restriction.

      *l*. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans possession of a firearm or ammunition by a business, if the business is within 100 yards of the County's illegally expanded “place of public assembly.” Section 57-11(b) of Chapter 57 provides that the bans otherwise imposed by Section 57-11(a) do not “apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm.” The requirement that the owner must have “a permit to carry the firearm” is inconsistent with MD Code, Criminal Law, § 4-203(b)(6), which permits “the wearing, carrying, or transporting of a handgun by a person . . . within the confines of a business establishment that the person owns or leases.” Such persons are not required to possess or obtain a Maryland carry permit. The limitation to possession of “one” firearm by the owner, imposed by Chapter 57, as amended by Bill 4-21, is likewise inconsistent with Section 4-203(b)(6), as that section imposes no limitation on the number of handguns that may be possessed, worn, carried or transported under this provision of Section 4-203(b)(6). Transport, wear, carriage and possession of rifles and shotguns, including unserialized rifles and shotguns, in a person's business are currently permitted under Maryland law without restriction.

      *m*. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans possession of a firearm or ammunition, if the business is within 100 yards of the County's illegally expanded “place of public assembly.” Chapter 57 provides that the bans otherwise imposed by Section 57-11(a) do not apply “to the possession of one firearm, and ammunition for the firearm, at a business by … one

authorized employee of the business who has a permit to carry the firearm." The requirement that the "authorized employee" must have "a permit to carry the firearm" is inconsistent with MD Code, Criminal Law, § 4-203(b)(7), which expressly permits "the wearing, carrying, or transporting of a handgun by a supervisory employee: (i) in the course of employment; (ii) within the confines of the business establishment in which the supervisory employee is employed; and (iii) when so authorized by the owner or manager of the business establishment." Such authorized persons covered by Section 4-203(b)(7) are not required to possess or obtain a Maryland carry permit to carry within the business confines of the employer's business. Chapter 57's limitation to possession of "one" firearm by "one" authorized employee is likewise inconsistent with Section 4-203(b)(7), as that section imposes no limitation on the number of handguns or ammunition that may be possessed, worn, carried or transported under this provision of Section 4-203(b)(7), and imposes no limitation on the number of employees who may be "authorized" by the employer under Section 4-203(b)(7). Transport, wear, carriage and possession of rifles and shotguns, by business employees are permitted under Maryland law without restriction.

*n.*   Chapter 57, as amended by Bill 4-21 and Bill 21-22E, provides that the bans otherwise imposed by Section 57-11(a) do not apply to "separate ammunition or an unloaded firearm: (A) transported in an enclosed case or in a locked firearms rack on a motor vehicle, unless the firearm is a ghost gun or an undetectable gun." These requirements are inconsistent with MD Code, Criminal Law, § 4-203(b)(3), which permits transports of an unloaded handgun "in an enclosed case or an enclosed holster," imposes no requirements whatsoever on the manner in which ammunition is transported, and imposes no ban whatsoever on the transport of a "ghost gun."

*o.* The Staff Report for the amendments to Bill 21-22E (attached hereto as Exhibit D) indicates that the amendments to the "ghost gun" provisions of Chapter 57 were intended to make

50

Bill 21-22E consistent with State law regulating PMFs. However, Chapter 57, as amended by Bill 21-22E, regulates "ghost guns" in Montgomery County in multiple ways that are in direct conflict or inconsistent with the State-wide regulation of PMFs imposed by Senate Bill 387, 2022 Session Laws, Chapter 19, and House Bill 425, 2022 Session Laws, Chapter 18, by:

> **(i)** imposing bans on possession, sale, transfer and transport of a "ghost gun" and on "major components" without regard to and in direct conflict with those provisions of MD Code, Public Safety, § 5-703(b)(1), that (1) expressly permit possession by persons who lack the requisite *mens rea* (subsection (b)(1)(i)), (2) allow possession through inheritance (subsection (b)(1)(ii)); and (3) allow possession associated with manufacture of an unfinished frame or receiver (subsection (b)(1)(iii));

> **(ii)** imposing bans on the possession, sale, transfer, or delivery of a "ghost gun" and on "major components" by a federally licensed dealer, firearms manufacturer and firearms importer, in direct conflict with those provisions of MD Code, Public Safety, § 5-702(2), which expressly allow such federally licensed dealers, manufacturers and importers to possess, sell, transfer and deliver "ghost guns";

> **(iii)** imposing bans on possession, sale, transfer, or delivery of a "ghost gun" by a federally licensed dealer, manufacturer or importer, and thus precluding such dealers, manufacturers or importers from performing serialization services expressly authorized and contemplated by MD Code, Public Safety, §§ 5-703(b)(1) and (b)(2);

51

**(iv)** imposing bans on the otherwise lawful possession of a "ghost gun" and of "major components" possessed by a person prior to March 1, 2023, as permitted by MD Code, Public Safety, § 5-703(b)(2);

**(v)** imposing bans on the possession of "ghost guns" and of "major components" by lawful owners and thus precluding such owners from serializing such "ghost guns" through federally licensed dealers, manufacturers and importers located in Montgomery County, as expressly authorized by MD Code, Public Safety, § 5-703(b)(2);

**(vi)** imposing bans on possession of "ghost guns" that have been serialized by "other federal licensee[s] authorized to provide marking services," as expressly permitted by MD Code, Public Safety, §§ 5-703(b)(2)(i), in addition to firearms serialized "by a licensed manufacturer, maker, or importer" as specified by Section 57-1(2)(A) of Chapter 57, as amended by Bill 21-22E;

**(vii)** continuing to impose bans on "major components" even though House Bill 425 and Senate Bill 387 do not regulate such components other than frames or receivers.

## COUNT III – VIOLATION OF THE MARYLAND TAKINGS CLAUSE AND DUE PROCESS CLAUSE

94.     Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count arises under the Maryland Takings Clause, Article III, § 40 of the Maryland Constitution, and the Due Process Clause, Article 24 of the Maryland Declaration of Rights.

95.     Personal property interests of Maryland residents are protected by both the Maryland Takings Clause, Article III, § 40 of the Maryland Constitution, and the Due Process Clause, Article 24 of the Maryland Declaration of Rights. These provisions are interpreted *in pari materia* with the Fifth Amendment of the United States Constitution, fully encompass personal property and may afford more protection than the Fifth Amendment. *Dua v. Comcast Cable*, 370 Md. 604, 805 A.2d 1061, 1070-72 (2002).

96.     Maryland's Taking Clause and Due Process Clause are violated "[w]henever a property owner is deprived of the beneficial use of his property or restraints are imposed that materially affect the property's value, without legal process or compensation." S*erio v. Baltimore County*, 384 Md. 373, 863 A.2d 952, 967 (2004).

97.     Maryland's Taking Clause and Due Process Clause govern retrospective laws. "Retrospective statutes are those 'acts which operate on transactions which have occurred or rights and obligations which existed before passage of the act." *Muskin v. State Dept. of Assessments and Taxation*, 422 Md. 544, 30 A.3d 962, 969 (2011).

98.     Under the Maryland's Taking Clause and Due Process Clause, "[n]o matter how 'rational' under particular circumstances, the State is constitutionally precluded from abolishing a vested property right or taking one person's property and giving it to someone else." *Dua v. Comcast Cable of Maryland, Inc*., 370 Md. 604, 623, 805 A.2d 1061 (2002).

99.     The property adversely affected and banned by the provisions of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, constitute protected personal property within the meaning of the Maryland Takings Clause and Due Process Clause as the term property for these purposes "embraces 'everything which has exchangeable value or goes to make up a man's wealth." *Dodds v. Shamer*, 339 Md. 540, 663 A.2d 1318, 1322 (1995). The personal property regulated by Chapter

57 has exchangeable value. Plaintiffs have vested property rights in the continued possession and use of the property regulated by Chapter 57.

100.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, is a retrospective ordinance as it will deprive the plaintiffs of the beneficial use and possession of their lawful vested property rights and property that was lawfully acquired and possessed prior to the County's enactment of Bill 4-21 and Bill 21-22E. The restraints and bans imposed by Chapter 57, as amended by Bill 4-21 and Bill 21-22E, materially affect the value of this previously lawfully acquired and possessed property, all without legal process or compensation.

101.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, violates Maryland Takings Clause, Article III, § 40, and the Due Process Clause, Article 24 of the Maryland Declaration of Rights. Under Maryland law, a court may enjoin a statute that violates Article 40 "unless and until condemnation proceedings in accordance with law be had, and just compensation awarded and paid for tendered." *Department of Natural Resources v. Welsh*, 308 Md. 54, 65, 521 A.2d 313, 318 (1986). Plaintiffs are entitled to declaratory and equitable relief for the unconstitutional taking of their vested property rights by Chapter 57.

**COUNT IV – THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT AND ARTICLE 24 OF THE MARYLAND DECLARATION OF RIGHTS**

**Chapter 57 is Unconstitutionally Vague**

102.    Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count addresses violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, defendant Montgomery County has acted under

54

"color of state law" within the meaning of Section 1983 in enacting Chapter 57, as amended by Bill 4-21 and Bill 21-22E. This Count also arises under Article 24 of the Maryland Declaration of Rights.

103.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Article 24 of the Maryland Declaration of Rights provides that "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

104.    The Due Process Clause of the Fourteenth Amendment prohibits the enactment or enforcement of vague legislation. *Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018) ("the prohibition of vagueness in criminal statutes…is an 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law"). A penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "[A] vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

105.    Such a statute need not be vague in all possible applications in order to be void for vagueness. *Johnson v. United States*, 576 U.S. 591, 602 (2015) ("our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp"). "*Johnson* made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'" *Dimaya*, 138 S.Ct. at 1214 n.3. A court "cannot construe a criminal statute on the assumption that the Government will use it responsibly," *United States v.*

*Stevens,* 559 U.S. 460, 480 (2010), and "cannot find clarity in a wholly ambiguous statute simply by relying on the benevolence or good faith of those enforcing it." *Wollschlaeger v. Governor, Fla*., 848 F.3d 1293, 1322 (11th Cir. 2017) (en banc).

106.    Article 24 of the Maryland Declaration of Rights prohibits the enactment or enforcement of vague legislation. *Galloway v. State*, 365 Md. 599, 614, 781 A.2d 851 (2001) ("The void-for-vagueness doctrine as applied to the analysis of penal statutes requires that the statute be "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties."). Under Article 24, a statute must provide "legally fixed standards and adequate guidelines for police ... and others whose obligation it is to enforce, apply, and administer [it]" and "must eschew arbitrary enforcement in addition to being intelligible to the reasonable person." (Id. at 615).

107.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, criminally punishes conduct that takes place at or within 100 yards of "a place of public assembly," which is defined to include, whether "publicly or privately owned," a "park; place of worship; school; library; recreational facility; hospital; community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; long-term facility, including any licensed nursing home, group home, or care home; or multipurpose exhibition facility, such as a fairgrounds or conference center or childcare facility." Chapter 57, as amended by Bill 4-21 and Bill 21-22E, includes within these places "all property associated with the place, such as a parking lot or grounds of a building."

108.    Nothing in Chapter 57 requires that any of these specified locations actually be open to the public at large and some, such a private schools, nursing homes, care homes, group homes, and childcare facilities, are not typically open to the public at all. Chapter 57, as amended by Bill 4-

56

21 and Bill 21-22E, fails to provide constitutionally adequate notice to the public and likewise fails to provide "legally fixed standards and adequate guidelines for police ... and others whose obligation it is to enforce, apply, and administer [it]" and fails to "eschew arbitrary enforcement in addition to being intelligible to the reasonable person."

109.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans conduct taking place at or within 100 yards of a publicly or private owned "library," but includes no definition of "library." Bill 4-21 deleted Chapter 57's former definition of "library" as limited to a "public" library and Chapter 57, as amended by Bill 4-21 and Bill 21-22E, now expressly covers libraries regardless of whether the place is "publicly or privately owned." The term "library" could thus be arguably read to include any "library" of any type or size, regardless of whether the library is in the home or private building, and regardless of whether the library is, in fact, open to the public. There is no published inventory of the locations of such "privately owned" libraries and plaintiffs are left to guess as to the locations of such "libraries." Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

110.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, does not define "recreational facility," but Bill 4-21 deleted the ordinance's former limitation to "government-owned or operated" recreational facility. The terms "recreation" or "recreational" has no established legal meaning and are exceeding broad in common usage. Thus "recreational facility" could be arguably read to include a backyard swing set or private playground, swimming pool, gym, billiards room, or any other place where any sort of "recreation" may take place, regardless of whether the facility is privately owned or is open to the public. Plaintiffs are left to guess as to the locations encompassed within the vague use of this term. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

111.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, covers "community health center, including any health care facility or community-based program licensed by the Maryland Department of Health," but does not define the term "community health center" or what the term includes, other than a program licensed by the Maryland Department of Health. As a practical matter, plaintiffs have no way of ascertaining whether a particular location has "a program licensed by the Maryland Department of Health." That term "community health center," has no well-established legal meaning. It could arguably include private doctor's offices or private clinics, which are located throughout the County. Plaintiffs are left to guess as to the locations encompassed within the vague use of this term. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

112.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, covers any publicly or privately owned "school," but Bill 4-21 amended Chapter 57 to delete the ordinance's former limitation to "elementary or secondary" school, and therefore the Chapter 57's bans are intended to go beyond the ban on possession of a firearm "on public school property," otherwise imposed by MD Code, Criminal Law, § 4-102(b). The term "school" as used in Chapter 57 thus arguably includes a ban on possession or transport of a firearm at or within 100 yards of any "school" of any size of any type, private or public, including public or private colleges or universities. The term "school" could likewise include a trade school, such as for electricians, hair salons, truck drivers, HVAC technicians, plumbers, travel agents, dental or medical assistants and medical billing and coding, or any other place where occupational or tutorial instruction may take place. Plaintiffs are left to guess as to the locations encompassed within the vague use of the term "school." Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

113.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, imposes its bans at or within 100 yards of a publicly or privately owned "park," but Bill 4-21 deleted the ordinance's former definition of "park" as including only a "government owned" park that was "identified by the Maryland-National Capital Park and Planning Commission." The term "park" may include a County or government-owned park, the term also could be arguably read to include a private commercial "park," any area with grass or trees, a sporting arena, or even an industrial park, regardless of whether the location is, in fact, open to the public. Plaintiffs are left to guess as to the locations encompassed within the vague use of "park." Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

114.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, covers any "long-term facility, including any licensed nursing home, group home, or care home" but does not define the term "long-term facility" or what the term includes other than any "licensed nursing home, group home, or care home." As a practical matter, plaintiffs have no way of ascertaining whether a particular location has been "licensed" as a "nursing home, group home, or care home." There is no established definition for the term "long-term facility," as that term is not even textually limited to facilities that offer care.  Plaintiffs are left to guess as to the locations encompassed within the vague use of this term. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

115.    The use of vague and undefined terms in Chapter 57, as amended by Bill 4-21 and Bill 21-22E, deprives ordinary people, including plaintiffs and MSI members, of adequate notice concerning where possession, transport, sale, or transfer of firearms is prohibited and where such conduct is not. This use of vague terms, including Chapter 57's reach into the home and other private

property, provides little or no guidance for enforcement and thus permits and encourages arbitrary and discriminatory enforcement of its provisions. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability for any violation without regard to the defendant's intent, knowledge or state of mind.

116.    Each of the individual and corporate plaintiffs and at least one member of MSI has engaged and intends to engage in conduct arguably regulated by the unconstitutionally vague provisions of Chapter 57, as amended by Bill 4-21 and Bill 21-22E. These persons have been chilled in the actions they may take by the prospect of enforcement of Chapter 57's unconstitutionally vague provisions. Each of the individual and corporate plaintiffs and MSI's members are hindered or chilled in their right to live or work in Montgomery County or to otherwise travel through Montgomery County by the threat of arbitrary or discriminatory enforcement of the unconstitutionally vague provisions of Chapter 57. Each of the plaintiffs has been harmed and is imminently threatened with future harm by the prospect of enforcement of the unconstitutionally vague provisions of Chapter 57.

117.    Pursuant to 42 U.S.C. § 1983, plaintiffs are entitled to declaratory and equitable relief and compensatory damages, including nominal damages, for the foregoing violations of their Due Process rights under the Fourteenth Amendment. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). Plaintiffs are likewise entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the foregoing violations of their Due Process rights under the Fourteenth Amendment. Plaintiffs are entitled to declaratory and equitable relief for their claims arising under Article 24 of the Maryland Declaration of Rights.

**COUNT V – DUE PROCESS**

**Violation of Fundamental Rights Regarding "Major Components"**

118.    Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count addresses violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, defendant Montgomery County has acted under "color of state law" within the meaning of Section 1983 in enacting Chapter 57, as amended by Bill 4-21 and Bill 21-22E. This Count also arises under Article 24 of the Maryland Declaration of Rights.

119.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, imposes its bans for possession, sale, transport or transfer of a "major component" of a firearm and defines that term to include "the slide or cylinder" of a handgun, and, in the case of a rifle or shotgun, the "barrel." Chapter 57, as amended by Bill 4-21 and Bill 21-22E, also bans the sale, rental, lending or the giving of a "major component" of a "ghost gun" to a minor or affording access to a "major component" to a minor. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, also bans, at or within 100 yards of its illegally defined place of "public assembly," the sale, transfer, possession, or transport of a "major component." While Chapter 57 makes an exception for a "firearm or ammunition" possessed in the home, no such exception is made for the home possession of a "major component" otherwise banned by Chapter 57. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

120.    A "major component" of a firearm, in so far as the term is defined by Chapter 57 to include "the slide or cylinder" of a handgun and, in the case of a rifle or shotgun, the "barrel," is not a firearm under federal or Maryland law and a "major component," as thus defined, may be lawfully obtained, purchased, transferred and transported by any person, including minors, without

61

restrictions under Federal and Maryland law. A "frame or receiver" is serialized under federal law. 18 U.S.C. § 923(i) ("Each licensed manufacturer or importer must "identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."). See also see 27 C.F.R. §§ 478.92, 479.102. Other than such frames or receivers, a "major component" of a firearm, including a slide or cylinder of a handgun, and the barrel of a rifle or shotgun, is not serialized under federal or State law. See 27 C.F.R. § 478.12(a)(1),(2), amended by 87 Fed. Reg., at 24735.

121.    A "major component," as thus defined by Chapter 57, can be lawfully used by a law-abiding person otherwise legally entitled to own and possess a firearm, to build a fully *serialized* firearm for personal use simply by using a frame or a receiver that has a serial number engraved in accordance with federal law, 18 U.S.C. § 923(i). Such serialized frames and receivers are treated as firearms under State and federal law and are commercially available for purchase or ordering from most if not all federally licensed firearms dealers, nationwide, subject to background checks and other regulatory provisions applicable to the sale or transfer of firearms. There is no practical way to distinguish a "major component" that can be used to build a *non-serialized* firearm from a "major component" that can be used to build *a serialized* firearm.

122.    A serialized firearm may be easily disassembled into its "major component" parts, including a slide, a cylinder or a barrel, for cleaning, repair or replacement. Many firearms are designed to facilitate the replacement or exchange of such "major components, including many if not most semi-automatic handguns, as well as many shotguns and rifles. See, e.g., 87 Fed. Reg. 24739, amending 27 C.F.R. 478.12(i) (providing that for the AR-15 type of firearms, "[t]he receiver is the lower part of the weapon that provides the housing for the trigger mechanism and hammer,

i.e., lower receiver"). Under Chapter 57, the mere possession of such "major components" of a serialized firearm are indistinguishable from the major components of a non-serialized firearm. Because Chapter 57 makes no exception for the possession of major components in the home, Chapter 57's bans also fully apply to the home. The definition of "major components" to include a slide, cylinder and a barrel and the criminalization of the mere possession of such components invites arbitrary and discriminatory enforcement actions at the unfettered whim and discretion of law enforcement officials. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability for mere possession of "major components" in the home and elsewhere without regard to the defendant's intent, knowledge or state of mind.

123.    The bans imposed by Chapter 57 with respect to "major components" of all firearms are arbitrary, irrational and fail to serve any legitimate government objective. Bill 21-22E provides that its terms are to be interpreted by reference to ATF regulations which do, in fact, define the term "frame or receiver." See, e.g, 27 C.F.R. 478.12 (defining a frame or receiver). Yet, Chapter 57, as amended by Bill 4-21 and Bill 21-22E irrationally then imposes bans on "major components" of firearms and then defines such major components to be a slide or cylinder of a handgun or the barrel of a long gun, notwithstanding that these "major components" are not firearms and not regulated under these same federal regulations.

124.    Chapter 57's bans on "major components" impose strict criminal liability on otherwise innocent conduct, including the mere possession or transport of "major components" that may arise from the disassembly of a serialized firearm lawfully owned and possessed. There is no legitimate or reasonable justification for such bans. See, e.g., *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (the Due Process Clause protects the individual against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective"). "The

63

touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). See also *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised).

125.    The Second Amendment right "to keep and bear Arms" necessarily encompasses and protects the possession, sale, transport and transfer of "major components" as without such major components there can be no firearm at all to "keep and bear" under the Second Amendment. Similarly, the right to "keep and bear Arms" necessarily implies the right to clean, maintain and repair such firearms so as to keep them ready for use for lawful self-defense. See *Andrews v. State*, 50 Tenn. 165, 178 (1871) (recognizing that "this right of keeping arms … necessarily involves the right to purchase and use them in such a way as is usual"), cited with approval in *Heller*, 554 U.S. at 608, 612, 629.

126.    Because these bans imposed by Chapter 57 with respect to "major components" interfere with the exercise of the fundamental Second Amendment right "to keep and bear Arms," they are subject to strict scrutiny under the Due Process Clause. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) (strict scrutiny is required "when state laws impinge on personal rights protected by the Constitution"); *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999) ("If the claimed violation is by legislative enactment (either facially or as applied), analysis proceeds by a different two-step process that does not involve any threshold "conscience-shocking" inquiry. The first step in this process is to determine whether the claimed violation involves one of "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,'" * * * If the asserted interest has been determined to be 'fundamental,' it is entitled in the second step to the protection of strict scrutiny judicial review of the challenged legislation.").

64

127.    In so far as Chapter 57 imposes bans on a "major component of a ghost gun," as defined to include a slide or cylinder of a handgun or a barrel of a long gun, it bans conduct protected by the Second Amendment. By definition, a "ghost gun" is merely a frame or receiver that has not been serialized. A slide and cylinder of a handgun and a barrel of a long gun are not serialized under controlling federal law and thus are used in ordinary firearms which are otherwise fully serialized in accordance with State and federal law. The "major component of a ghost gun" is thus indistinguishable from a "major component" of a serialized firearm. The County does not have a legitimate interest, much less a compelling interest, in imposing bans on "major components" of serialized firearms. Nor has the County employed the least restrictive means of accomplishing any legitimate government interest. The County's regulation of "major components" is unconstitutional under the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

128.    At least one of the individual and corporate plaintiffs and at least one member of MSI has engaged and intends to engage in conduct arguably regulated by the bans on "major components" by Chapter 57, including the actual or constructive possession of "major components" in the presence of a minor child and/or at or within 100 yards of those locations in which such possession and transport of a "major component" are banned by Chapter 57. These persons have been chilled in the exercise of constitutionally protected conduct they may undertake by the prospect of enforcement of Chapter 57's irrational provisions. Each of these plaintiffs intends to engage in that conduct in the future and has been harmed and is imminently threatened with future harm by the prospect of enforcement of the irrational provisions of Chapter 57.

129.    Pursuant to 42 U.S.C. § 1983, plaintiffs are entitled to declaratory and equitable relief and compensatory damages, including nominal damages, for the foregoing violations of their

Due Process rights under the Fourteenth Amendment. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). Plaintiffs are likewise entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the foregoing violations of their Due Process rights under the Fourteenth Amendment. Plaintiffs are entitled to declaratory and equitable relief for their claims arising under Article 24 of the Maryland Declaration of Rights.

<div align="center">

**COUNT VI – DUE PROCESS**

**Violation of Parental Rights**

</div>

130.    Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count addresses violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, defendant Montgomery County has acted under "color of state law" within the meaning of Section 1983 in enacting Chapter 57, as amended by Bill 4-21 and Bill 21-22E. This Count also arises under Article 24 of the Maryland Declaration of Rights.

131.    Section 57-7 of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, provides, in part that:

> (c) A person must not give, sell, rent, lend, or otherwise transfer to a minor: (1) a ghost gun or major component of a ghost gun; (2) an undetectable gun or major component of an undetectable gun; or (3) a computer code or program to make a gun through a 3D printing process.
>
> (d) A person must not purchase, sell, transfer, possess, or transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.
>
> (e) A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

These provisions impose absolute bans on all persons, making no exceptions for parents or a certified firearms instructor or for firearms training. And because these bans extend to a "major

component of a ghost gun" these bans imposed by these provisions extend to parts that are not legally considered to be firearms, such as a barrel of a long gun or the slide or a cylinder of handgun.

132.    One or more of the plaintiffs is a parent of minor children who resides with that plaintiff. Parents of minor children have a fundamental constitutional right protected by the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights "in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 64 (2000); *Frase v. Barnhart*, 379 Md. 100, 124, 840 A.2d 114 (2003); *Koshko v. Haining*, 398 Md. 404, 422-27, 921 A.2d 171 (2007). Parents have a constitutional right to instruct their children in the safe use and handling of firearms and components otherwise protected by the Second Amendment, including the assembly and disassembly of handguns and long guns. Such assembly and disassembly necessarily includes the possession and handling of a slide or cylinder of a handgun or the barrel of a long gun. That process may also include the possession of a serialized firearm or of a "ghost gun" prior to disassembly or after assembly. In so far as the bans imposed by Section 57-7 of Chapter 57 purport to apply to regulate parents and their relationships with their minor children, Section 57-7 of Chapter 57 violates the fundamental constitutional right of parents "in the care, custody, and control of their children."

133.    At least one or more of the individual plaintiffs is a parent with minor children who reside with him and has engaged in the conduct banned by the foregoing provisions of Section 57-7 of Chapter 57. These persons have been chilled in the actions they may take with their minor children by the prospect of enforcement of Section 57-7's unconstitutional provisions. Each of these plaintiffs intends to engage in such conduct in the future and has been harmed and is imminently threatened with future harm by the prospect of enforcement of Chapter 57.

134.    Pursuant to 42 U.S.C. § 1983, plaintiffs are entitled to declaratory and equitable relief and compensatory damages, including nominal damages, for the foregoing violations of their parental rights under the Due Process Clause of Fourteenth Amendment. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). Plaintiffs are likewise entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the foregoing violations of their Due Process rights under the Fourteenth Amendment. Plaintiffs are entitled to declaratory and equitable relief for their claims arising under Article 24 of the Maryland Declaration of Rights.

## COUNT VII -- SECOND AMENDMENT

### Violations of the Second Amendment Right to Armed Self-Defense in Public

135.    Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count addresses violations of the Second Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, defendant Montgomery County has acted under "color of state law" within the meaning of Section 1983 in enacting Chapter 57, as amended by Bill 4-21 and Bill 21-22E.

136.    The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme Court has squarely held that the Second Amendment bestows an individual right to keep and bear arms and that right may be exercised by all responsible, law-abiding Americans. *District of Columbia v. Heller,* 554 U.S. 570 (2008). The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

137.     On June 23, 2022, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). In *Bruen*, the Supreme Court held that the Second Amendment right to bear arms means "a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." 142 S.Ct. at 2135 n.8. This holding abrogates the holding of the Maryland Court of Appeals in *Williams v. State*, 417 Md. 479, 496, 10 A.3d 1167 (2011), that the Second Amendment does not apply outside the home. Under *Bruen*, "the Second Amendment guarantees a general right to public carry." *Bruen*, 142 S.Ct. at 2135.

138. The *Bruen* Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. The Court went on to reject the "means-end," two-step, intermediate scrutiny analysis used by the lower courts to sustain gun regulations, holding that "[d]espite the popularity of this two-step approach, it is one step too many." *Bruen*, 142 S.Ct. at 2127. The Court ruled that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126.

139.     The historical analogue required by *Bruen* to justify a firearms regulation looks to 1791 or, at the latest, 1868, when the 14th Amendment was adopted. See *Bruen*, 142 S.Ct. at 2135-36 (finding it unnecessary to resolve the scholarly dispute about which time period is controlling). That is because "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S.Ct. at 2136, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008). 20th century and late 19th century statutes and regulations "cannot

69

provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154 & n.28. Under *Bruen*, the historical analogue necessary to justify regulation must be "a well-established and representative historical analogue," not outliers. *Bruen*, 142 S.Ct. at slip op. at 2133.

140. Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. *Bruen*, 142 S.Ct. at 2133, 2153, 2147 n.22 & 2156. This analysis required by the Supreme Court is a legal inquiry that examines legal history, which is appropriately presented in the briefs. See *Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "legal questions" that judges are capable of addressing) (emphasis in original); see also id. at 2135 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). Accordingly, the required analysis is a legal inquiry and does not require fact-finding by a court.

141. *Bruen* holds that governments may presumptively regulate the public possession of firearms at "legislative assemblies, polling places, and courthouses" and notes that governments may also regulate firearms "in" schools and government buildings. *Bruen*, 142 S.Ct. at 2133, citing *Heller*, 554 U.S. at 599. *Bruen* states that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." (Id.). The *Bruen* Court rejected New York's "attempt to characterize New York's proper-cause requirement as "a 'sensitive-place' law," ruling that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 142 S.Ct. at 2134. As the Court explained, "[p]ut simply, there is no historical basis for New York

to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." (Id.).

142.     The government bears the burden of proof to show such "well-established and representative historical analogue." See *Bruen*, 142 S.Ct. at 2150 ("we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). Public safety concerns are not part of the analysis and cannot be used to justify any statute or regulation that restricts the general right to carry arms in public. Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S.Ct. at 2129-30. A government "may not simply posit that the regulation promotes an important interest," but rather "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2126. Under *Bruen*, a court must "closely scrutinize *all* gun restrictions for a historically grounded justification," *Frein v. Pennsylvania State Police*, 47 F.4th 247, 254 (3d Cir. 2022) (emphasis in original).

143.     The text of the Second Amendment, as construed by the Supreme Court and lower courts, indisputably covers the "possession, sale, transport, and transfer" of firearms and ammunition, as regulated by Chapter 57. In so far as these regulations imposed by Chapter 57 ban the possession or transport of a firearm in locations other than schools, government buildings, courthouses, polling places and legislative assemblies, as identified in *Bruen*, these prohibitions imposed by Chapter 57 are not supported by any showing that they are "consistent with this Nation's historical tradition of firearm regulation." Nothing in *Bruen* can be read to allow a State (or a municipality) to regulate or ban firearms at all these other places which the County defines to be a "place of public assembly." Nor may the County define any of these five areas, such as schools, in such a way that is inconsistent with how those terms were used and understood in 1791. There is,

for example, no history or tradition banning the possession of firearms in trade schools or other places of instruction of adults. The County thus violated the Second Amendment when it redefined "schools" in Bill 4-21 to expand that definition beyond primary and secondary schools, as the term was previously defined by Chapter 57 prior to Bill 4-21.

144.     In enacting Bill 21-22E after the Supreme Court's decision in *Bruen*, the County made no effort to identify any historical analogue for the restrictions and bans imposed by Chapter 57, as amended by Bill 21-22E. Beyond the five locations specifically identified by the Supreme Court in *Bruen*, *viz*, "in" schools, public buildings, polling places, courthouses and legislative assemblies, as these terms are properly understood and delineated by history and tradition, there is no appropriate historical analogue that would permit the County to ban all possession, sale, transfer or transport of firearms or ammunition at a "place of public assembly," as defined by Chapter 57, as amended Bill 21-22E. Nor is there any appropriate historical analogue for any such regulation within 100 yards of such locations. Montgomery County is no more a "sensitive place" than is Manhattan. See *Antonyuk v. Hochul*, --- F.Supp.3d ----, 2022 WL 16744700 at *86 (N.D.N.Y. 2022) (applying *Bruen* and holding unconstitutional New York's ban on possession of a firearm at or on (1) any location providing behavioral health or dependence services, (2) any place of worship, (3) any public parks and zoos, (4) airports where a person is complying with otherwise applicable federal regulations, (5) buses, (6) any establishment where alcohol is consumed, (7) theaters, conference centers and banquet halls, (8) any gathering of individuals to collectively express their constitutional rights, and (9) private property); *Hardaway v. Nigrelli,* --- F.Supp.3d ----, 2022 WL 11669872 at *17-18 (W.D.N.Y. 2022) (applying *Bruen* and holding that New York's ban on the possession of firearms in or at any place of worship violated the Second Amendment); *Christian v.*

72

*Nigrelli*, No. 22-cv-695 (W.D.N.Y. Nov. 22, 2022) (preliminarily enjoining New York's ban on carry on all private property open to the public).

145.    The restricted locations specified by Chapter 57's definition of a place of public assembly are very common and located on the major roads and in many neighborhoods throughout the County. The vagueness and/or ubiquity associated with these places makes avoiding such places impossible because, as a practical matter, there is no way for an ordinary permit holder to know, for example, the location of a "library" on privately owned land, or the meaning or location of a privately owned "recreational facility," a privately owned "park," or other privately or publicly owned locations in which possession and transport is banned by Chapter 57. A permit holder, particularly a person who may be unfamiliar with the area, could easily find himself or herself driving within 100 yards of any of these locations in which possession and transport is banned by Chapter 57 without any intent or knowledge of doing so. Such a permit holder would nonetheless be in violation of Chapter 57.

146.    Taken together, the broad sweep of the locations in which possession and transport are banned by Chapter 57, the vagueness associated with these places, and the strict criminal liability imposed by Chapter 57 for any violation, create an *in terrorem* effect for wear and carry permit holders who are at risk of arrest and prosecution for otherwise carrying a loaded firearm anywhere in the County, including those locations in which carry is otherwise permitted by State law. Any such arrest or prosecution could severely and adversely affect the plaintiffs' employment status, ability to conduct business or maintain other legal relationships. Such an arrest or prosecution would likely lead to a revocation of the person's wear and carry permit for carrying in places where firearms are prohibited by law, thus abrogating the ability of that person to exercise his or her Second Amendment right of armed self-defense in public, recognized in *Bruen*.

73

147. Because the Maryland wear and carry permit is "not valid where firearms are prohibited by law," any violation of Chapter 57 by a wear and carry permit holder could also easily lead to arrest and prosecution under MD Code, Criminal Law, § 4-203(a). A violation of Section 4-203(a) is a strict liability offense, and is punishable by up to three years imprisonment and a substantial fine for the first offense. Under federal law, 18 U.S.C. § 922(g), and 18 U.S.C. § 921(a)(20), any conviction under Section 4-203 would result in a lifetime federal firearms disability and the consequent destruction of the permit holder's Second Amendment rights. See *Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir.), *cert. denied,* 138 S.Ct. 500 (2017). Subsequent possession of a modern firearm or ammunition by a person subject to this firearms disability is a violation of 18 U.S.C. § 922(g), which is punishable by up to 10 years imprisonment under federal law. 18 U.S.C. § 924(a)(2). The same firearms disability is imposed under Maryland law. See MD Code, Public Safety, § 5-101(g)(3) (defining disqualifying crime), § 5-133(b)(1) (regulated firearms), § 5-205(b)(1) (long guns). A violation of MD Code Public Safety, § 5-133(b), is punishable by imprisonment for up to 5 years and/or a fine not exceeding $10,000. MD Code, Public Safety, § 5-144(b). A violation of MD Code, Public Safety, § 5-205(b), is punishable by up to 3 years imprisonment and/or a $1,000 fine. MD Code, Public Safety, § 5-205(e). These draconian punishments and disqualifications make the *in terrorem* effect of Chapter 57 even more severe.

148. Chapter 57 imposes strict criminal liability without regard to a person's intent or knowledge or state of mind. Given that imposition of strict liability and the proximity of the "sensitive places" to public roads and streets, an ordinary permit holder would find it impossible to avoid transporting a loaded firearm within 100 yards of such locations. Through Chapter 57, as amended by Bill 4-21 and Bill 21-22E, the County has enacted a legal scheme that effectively "den[ies] ordinary citizens their right to public carry." *Bruen*, 142 S.Ct. at 2138 n.9. Chapter 57

"defines the category of 'sensitive places' far too broadly" and "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S.Ct. at 2134. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, is therefore unconstitutional under the Second Amendment.

149.    Under the Second Amendment, the County may presumptively regulate the five, specific locations identified in *Bruen* and *Heller*, *viz*, "in" schools, public buildings, polling places, courthouses and legislative assemblies, to the extent such regulations are otherwise authorized by State law. Such places are relatively easy to identify and avoid by a permit holder and thus do not have the *in terrorem* effect inflicted by Chapter 57. The County may not enact or enforce firearms or ammunition regulations for any location or place *beyond* the five, specific locations that were specified as presumptively appropriate in *Bruen* and *Heller,* without identifying and proving that "a well-established and representative historical analogue" for any such regulation exists. The County has made no attempt to do so.

150.    There is no "well-established, representative historical analogue" for Chapter 57's bans on the possession, transport, sale or transfer of firearms and components at a "(A) park; (B) place of worship; … (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility, including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility" or for "all property associated with the place, such as a parking lot or grounds of a building" for these areas. Likewise, there is no "well-established, representative historical analogue" for Chapter 57's bans imposed on the 100-yard zone around any of these locations or at the five locations specified in *Bruen*, or for any other location.

151. The County made no apparent attempt to identify any such "well-established, representative historical analogues" prior to the enactment of Bill 21-22E. See Exhibit D. To the contrary, the lead sponsor of Bill 21-22E, the President of the County Council, expressed hostility to the Court's decision in *Bruen* and to the right of armed self-defense. https://www.youtube.com/watch?v=dt4-vSmq7sw&t=35s. The County Council did likewise. https://www.youtube.com/watch?v=i_H2cLLD2nY&t=7453s (starting at 2:04) The County Executive also expressed hostility to armed self-defense. https://www.fox5dc.com/news/montgomery-county-to-review-concealed-carry-ban-proposal (commenting that "there is no excuse for walking around with a gun in this County"). The County Council passed Bill 21-22E unanimously.

152. Chapter 57 is facially unconstitutional under the Second Amendment to the extent that it purports to impose any regulatory restrictions on the possession, transfer, sale or transport of firearms and ammunition in or at any place other than in the five specific locations specified in *Bruen* and *Heller*. Chapter 57 is also facially unconstitutional under the Second Amendment to the extent that it purports to impose any regulatory restrictions on the possession, transfer, sale or transport of firearms and ammunition in or at any place within 100 yards of any location.

153. Chapter 57 is unconstitutional under the Second Amendment *as* applied to the named plaintiffs and to any member of plaintiff MSI to the extent that it purports to impose any regulatory restrictions on the possession, transfer, sale or transport of firearms or ammunition in or at any place other than "in" the five specific locations specified in *Bruen* and *Heller*. Chapter 57 is unconstitutional under the Second Amendment as applied to the named plaintiffs and to any member of plaintiff MSI to the extent that it purports to impose any regulatory restrictions on the possession,

JA089

transfer, sale or transport of firearms or ammunition in or at any place within 100 yards of any location.

154.    To the extent that MD Code, Criminal Law, § 4-209(b), purports to authorize County or local regulation for areas other than "in" the five locations, or in any manner or scope beyond the manner or scope permitted in *Heller* and *Bruen*, it is likewise unconstitutional under the Second Amendment and thus cannot legally or constitutionally authorize such local regulation. To the extent that MD Code, Criminal Law, § 4-209(b) purports to authorize County or local regulation on the possession, transfer, sale or transport of firearms or ammunition in or at any place within 100 yards of *any* location it is likewise unconstitutional under the Second Amendment and thus cannot legally or constitutionally authorize any such local regulation.

155.    Each of the individual plaintiffs and MSI members with carry permits and who live in the County or transport loaded firearms in the County are directly, substantially and adversely affected by the foregoing violation of the Second Amendment. Such plaintiffs and MSI members with wear and carry permits have, prior to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, lawfully possessed and transported loaded firearms within the County at or within 100 yards of the locations that Chapter 57, bans the possession, transport, sale or transfer of firearms. All the individual plaintiffs and MSI members with carry permits intend to possess and transport firearms in such locations in the future. All these plaintiffs and MSI members have a reasonable fear of prosecution under Chapter 57 if they do so.

156.    The business locations of plaintiffs Engage Armament and ICE Firearms arguably are at or within 100 yards of one or more of the locations in which the possession, transport, sale and transfer of firearms is now banned by Chapter 57, as amended by Bill 21-22E. Under Chapter 57 Engage would be unable to engage and the possession, sales, transports and transfer of firearms,

at its business location. All these activities are essential for the operation of a business by a federally licensed and State licensed firearms dealer. Plaintiff Engage Armament, as a Type I, Type VII and Type X, federal firearms licensee, intends to continue to possess, transport, sell and transfer firearms and "major components" at its business establishment, as otherwise authorized by State and federal law. It reasonably fears prosecution under Chapter 57 if it does so.

157.    ICE Firearms likewise possesses, transports and temporarily transfers firearms at its business location as part of the firearms training programs it conducts. ICE Firearms intends to continue to possess, transport and temporarily transfer firearms at its business location. ICE Firearms reasonably fears prosecution under Chapter 57 should it engage in these activities now banned by Chapter 57. Engage Armament and ICE Firearms each have standing to bring this Second Amended Complaint on behalf of themselves and their actual and potential customers. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020).

158.    Pursuant to 42 U.S.C. § 1983, plaintiffs are entitled to declaratory and equitable relief and compensatory damages, including nominal damages, for the foregoing violations of their Second Amendment rights. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). Plaintiffs are likewise entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the foregoing violations of their Second Amendment rights.

<div style="text-align:center">

**COUNT VIII -- SECOND AMENDMENT**

**Violation of the Second Amendment Right to Possess**

**Privately Made Firearms and Components for Personal Use**

</div>

159.    Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count addresses violations of the Second Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For

purposes of this Count, defendant Montgomery County has acted under "color of state law" within the meaning of Section 1983 in enacting Chapter 57, as amended by Bill 4-21 and Bill 21-22E.

160.     The Second Amendment, as construed by the Supreme Court "'protects the possession and use of weapons that are in common use at the time'" the Second Amendment was adopted in 1791. *Bruen*, 142 S.Ct. at 2128, quoting *Heller*, 554 U.S. at 627 (internal quotes and citation omitted). "Ghost guns," as defined by Chapter 57, as amended by Bill 4-21 and Bill 21-22E, are simply ordinary long guns and pistols which lack a serial number engraved by a federally licensed manufacturer or importer. Such long guns and pistols without serial numbers are "bearable arms," and are suitable to be carried "upon the person" ready "for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S at 582, 584. Because "ghost guns" are simply firearms that lack a serial number, they fall within the "text" of the Second Amendment's right to "keep and bear Arms." Under *Bruen*, it is therefore the County's burden to demonstrate that "ghost guns" are not in common use and thus may be banned. See *Rigby v. Jennings*, --- F.Supp.3d ----, 2022 WL 4448220 at *7 (D. Del. 2022). The County made no attempt to do so.

161.     Serial numbers were not required to be engraved on firearms until the federal Gun Control Act of 1968, Public Law 90-618, 82 Stat. 1213 (1968), was enacted on October 22, 1968, and that portion of the Act requiring serial numbers (enacted as part of Section 102 of the Act) did not go into effect until December 16, 1968. See Section 105(a), 82 Stat. at 1226. During the time period around 1791, personally made firearms for personal use were in common use by law-abiding citizens for lawful purposes. None of these firearms were serialized during the relevant time period and no serialization was required. To this day, nothing in federal law requires persons to engrave serial numbers on firearms manufactured by non-licensees for personal use. Such manufacture is also permissible in the vast majority of States. To this day, unserialized rifles and pistols

manufactured by non-licensees for personal use are "in common use" for lawful purposes by law-abiding persons.

162.    The right to "keep and bear arms" protected by the Second Amendment indisputably covers the "possession" and "transport" of firearms and ammunition, including firearms that are defined by Chapter 57 as "ghost guns," and "major components" from which firearms may be assembled or built. There is a long tradition and history in the United States, dating back to before 1791 and extending to the present day, of manufacture and possession of firearms and components for personal use by otherwise law-abiding, responsible persons. See *Rigby v. Jennings*, --- F.Supp.3d ----, 2022 WL 4448220 (D. Del. 2022). The ATF regulations, issued in 2022, confirm that law-abiding persons are not required to serialize PMFs under federal law. See 87 Fed. Reg. 24653 ("the final rule does not mandate unlicensed persons to mark their own PMFs for personal use, or when they occasionally acquire them for a personal collection or sell or transfer them from a personal collection to unlicensed in-State residents consistent with Federal, State, and local law.").

163.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, flatly bans the possession, transport, sale and transfer of "ghost guns" and "major components," as defined in Chapter 57, at or within 100 yards of the specified locations, including in the home. These bans burden constitutionally protected conduct because the possession and transport of such items are textually within the scope of the Second Amendment's right to "keep and bear Arms." See *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014) (hollow-point ammunition); *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) (ammunition magazines over 10 rounds); *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (discussing authorities acknowledging the right to acquire arms*); Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (holding that the Second Amendment "implies a corresponding right to acquire and maintain proficiency" with arms). Under

*Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S.Ct. at 2126. The Second Amendment thus "presumptively protects" the right of otherwise law-abiding persons to "keep and bear" "ghost guns," and "major components," as those terms are defined by Chapter 57, as amended by Bill 4-21 and Bill 21-22E.

164.    *Bruen* holds that "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. As demonstrated by the Staff Report on the amendments made to Bill 21-22E (Exhibit D), in enacting Bill 4-21 and Bill 21-22E, the County made no apparent effort to demonstrate or determine that its regulation of "ghost guns" and "major components" are consistent "with this Nation's historical tradition of firearm regulation." The County "has not shown that these firearms and components are not commonly owned by law-abiding citizens for lawful purposes." *Rigby*, 2022 WL 4448220 at *8. Chapter 57's regulation of "ghost guns" and "major components" is inconsistent "with this Nation's historical tradition of firearm regulation." The County's bans on "ghost guns" and "major components" lack an historical analogue from "before, during, and even after the Founding." *Bruen*, 142 S.Ct. at 2131–32. Chapter 57's bans on "ghost guns" and "major components" are therefore unconstitutional under the Second Amendment.

165.    At least one of the individual plaintiffs and plaintiffs Engage and ICE Firearms and at least one MSI member have possessed "ghost guns" and "major components" in the County and intend to continue to do so in the future. All these persons reasonably fear prosecution under Chapter 57 if they do so. All these plaintiffs and MSI members thus are directly, substantially and adversely affected by the foregoing violation of the Second Amendment with respect to "ghost guns" and

"components." These plaintiffs and MSI members have, prior to the enactment of Bill 21-22E, lawfully possessed and transported "ghost guns" and "components" at or within 100 yards of one or more of the locations in which possession and transport of these items is banned by Chapter 57, as amended by Bill 21-22E. All such individual plaintiffs, and MSI members, intend to possess and transport such "ghost guns" and "major components" in their homes or businesses or at or within 100 yards of the locations at which Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans possession and transport of these items. All these plaintiffs and MSI members reasonably fear prosecution under Chapter 57 if they do so.

166.    The business location of plaintiffs Engage Armament is arguably at or within 100 yards of one or more of the locations in which the possession, transport, sale and transfer of firearms is now banned by Chapter 57, as amended by Bill 21-22E. Engage Armament uses, manufactures, transfers and sells "major components" as part of its business as a Type VII federally licensed firearms manufacturer. It would be unable to engage in any of these activities at its place of business. Plaintiff Engage Armament, as a Type I, Type VII and Type X federal firearms licensee and State firearms licensee, intends to possess, transport, sell and transfer "ghost guns" and "major components" at its business establishment. Engage Armament reasonably fears prosecution under Chapter 57 if it does so.

167.    ICE Firearms likewise is arguably located at or within 100 yards of one or more of the in which the possession, transport, sale and transfer of firearms are now banned by Chapter 57, as amended by Bill 21-22E. ICE Firearms likewise intends to continue to conduct its firearms training at its location, including using or providing "ghost guns" and "major components," to customers for use in training activities. ICE Firearms reasonably fears prosecution under Chapter 57 should it do so.

168.    To the extent that MD Code, Criminal Law, § 4-209(b), purports to authorize County regulation of "ghost guns" or "components" in any manner or scope beyond the manner or scope permitted in *Heller* and *Bruen*, it is likewise unconstitutional under the Second Amendment and thus cannot legally or constitutionally authorize Chapter 57's regulation of "ghost guns" and "major components."

169.    Pursuant to 42 U.S.C. § 1983, plaintiffs are entitled to declaratory and equitable relief and nominal damages, for the foregoing violations of their Second Amendment rights. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). Plaintiffs are likewise entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the foregoing violations of their Second Amendment rights.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request:

A. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E, is not a "local law," and is in conflict and inconsistent with the "General Law" as enacted by the General Assembly is thus unconstitutional under Article XI–A, § 3 and Article XI–A, § 6, of the Maryland Constitution, as more fully set forth in Count I, above;

B. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E, violates the Express Powers Act, MD Code, Local Government, § 10-206, in that it is in conflict or inconsistent with, and/or preempted by Maryland statutes, as more fully set forth in Count II, above;

C. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E, violates the Maryland Takings Clause, Article III § 40, and the Due Process Clause of Article 24 of the Maryland Declaration of Rights, in so far as it deprives plaintiffs and MSI

members of the beneficial use of their lawfully acquired, vested property rights, as more fully set forth in Count III above. In accordance with Maryland law, the Court should enjoin enforcement of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, until just compensation is paid, calculate the amount of compensation due, and order the County to pay such compensation to each plaintiff who was deprived of the use and possession of his property by Chapter 57;

D. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E, is void for vagueness under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights, as more fully set forth in Count IV, above;

E. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E is unconstitutional under the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights in so far as Chapter 57 regulates "major components" of firearms, as more fully set forth in Count V, above;

F. That this Court issue a declaratory judgment that Section 57-7 of Chapter 57 is unconstitutional under the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights in so far as Section 57-7 purports to regulate the rights of parents in relationship with their minor children, as more fully set forth in Count VI, above;

G. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E, are unconstitutional under the Second Amendment, as more fully set forth in Counts VII and VIII, above.

H. That this Court find that all plaintiffs have been and/or will be irreparably harmed by the conduct of defendant challenged in Counts I, II, III, IV, V, VI, VII and VIII, and enter a preliminary

and permanent injunction barring the County from enforcing Chapter 57, as amended by Bill 4-21 and Bill 21-22E, against plaintiffs and the members of MSI;

I. That this Court award plaintiff Engage compensatory damages for the County's violations of the its rights, including, without limitation, nominal damages, as authorized by 42 U.S.C. § 1983;

J. That this Court award all the plaintiffs and MSI members nominal damages, as authorized and required by 42 U.S.C. § 1983;

K. That this Court award attorney's fees and costs against defendant, as authorized by 42 U.S.C. § 1988;

L. That this Court award the plaintiffs such other and further relief as in law and justice they may be entitled to receive.

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd
Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005

</div>

Date: November 29, 2022                    *Counsel for Plaintiffs*

| | |
|---|---|
| Bill No. | 4-21 |
| Concerning: | Weapons - Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable Guns |
| Revised: 04/06/2021 | Draft No. 5 |
| Introduced: | January 19, 2021 |
| Enacted: | April 6, 2021 |
| Executive: | April 16, 2021 |
| Effective: | July 16, 2021 |
| Sunset Date: | None |
| Ch. 7 , Laws of Mont. Co. | 2021 |

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

Lead Sponsor: Council Vice-President Albornoz
Co-Sponsors: Council President Hucker, Councilmembers Katz, Jawando, Navarro, Friedson, Rice, Riemer and Glass

**AN ACT** to:
(1) define terms related to firearm laws;
(2) restrict the [[manufacture,]] possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms with respect to minors;
(3) restrict the [[manufacture,]] possession, use, sale, and transfer of ghost guns, undetectable guns, and certain other firearms within 100 yards of places of public assembly; and
(4) generally amend the law regarding firearms and other weapons.

By amending
    Montgomery County Code
    Chapter 57, Weapons
    Sections 57-1, 57-7, and 57-11

By adding
    Montgomery County Code
    Chapter 57, Weapons
    Section 57-16

| | |
|---|---|
| **Boldface** | *Heading or defined term.* |
| Underlining | *Added to existing law by original bill.* |
| [Single boldface brackets] | *Deleted from existing law by original bill.* |
| Double underlining | *Added by amendment.* |
| [[Double boldface brackets]] | *Deleted from existing law or the bill by amendment.* |
| * * * | *Existing law unaffected by bill.* |

*The County Council for Montgomery County, Maryland approves the following Act:*

## EXHIBIT A

BILL NO. 4-21

1    **Sec. 1. Sections 57-1, 57-7, and 57-11 are amended, and Section 57-16 is**
2    **added, as follows:**

3    **57-1. Definitions.**

4       In this Chapter, the following words and phrases have the following meanings:

5            *3D printing process*: a process of making a three-dimensional, solid
6            object using a computer code or program, including any process in
7            which material is joined or solidified under computer control to create a
8            three-dimensional object.

9                            *        *        *

10           *Gun* or *firearm*: Any rifle, shotgun, revolver, pistol, ghost gun,
11           undetectable gun, air gun, air rifle or any similar mechanism by
12           whatever name known which is designed to expel a projectile through a
13           gun barrel by the action of any explosive, gas, compressed air, spring or
14           elastic.

15       (1)    The term "antique firearm" means (a) any firearm (including any
16              firearm with a matchlock, flintlock, percussion cap, or similar
17              type of ignition system) manufactured in or before 1898; and (b)
18              any replica of any firearm described in subparagraph (a) if such
19              replica (i) is not designed or redesigned or using rimfire or
20              conventional centerfire fixed ammunition, or (ii) uses rimfire or
21              conventional centerfire fixed ammunition which is no longer
22              manufactured in the United States and which is not readily
23              available in the ordinary channels of commercial trade.

24       (2)    "Ghost gun" means a firearm, including an unfinished frame or
25              receiver, that lacks a unique serial number engraved or cased in
26              metal alloy on the frame or receiver by a licensed manufacturer,
27              maker or importer under federal law or markings in accordance

- 2 -

BILL NO. 4-21

| | | |
|---|---|---|
| 28 | | with <u>27 C.F.R. § 479.102. It does not include a firearm that has</u> |
| 29 | | <u>been rendered permanently inoperable, or a firearm that is not</u> |
| 30 | | <u>required to have a serial number in accordance with the Federal</u> |
| 31 | | <u>Gun Control Act of 1968.</u> |
| 32 | <u>(3)</u> | "Handgun" means any pistol, revolver or other firearm capable of |
| 33 | | being concealed on the person, including a short-barreled shotgun |
| 34 | | and a short-barreled rifle as these terms are defined below. |
| 35 | | "Handgun" does not include a shotgun, rifle, or antique firearm. |
| 36 | [(3)] <u>(4)</u> | "Rifle" means a weapon designed or redesigned, made or |
| 37 | | remade, and intended to be fired from the shoulder and designed |
| 38 | | or redesigned and made or remade to use the energy of the |
| 39 | | explosive in a fixed metallic cartridge to fire only a single |
| 40 | | projectile through a rifled bore for each single pull of the trigger. |
| 41 | [(4)] <u>(5)</u> | The term "short-barreled rifle" means a rifle having one |
| 42 | | (1) or more barrels less than sixteen (16) inches in length and any |
| 43 | | weapon made from a rifle (whether by alternation, modification |
| 44 | | or otherwise) if such weapon, as modified, has an overall length |
| 45 | | of less than twenty-six (26) inches. |
| 46 | [(5)] <u>(6)</u> | The term "short-barreled shotgun" means a shotgun having |
| 47 | | one (1) or more barrels less than eighteen (18) inches in length |
| 48 | | and any weapon made from a shotgun (whether by alteration, |
| 49 | | modification or otherwise) if such weapon as modified has an |
| 50 | | overall length of less than twenty-six (26) inches. |
| 51 | [(6)] <u>(7)</u> | "Shotgun" means a weapon designed or redesigned, made |
| 52 | | or remade, and intended to be fired from the shoulder and |
| 53 | | designed or redesigned and made or remade to use the energy of |
| 54 | | the explosive in a fixed shotgun shell to fire through a smooth |

- 3 -

JA101

BILL NO. 4-21

| | | |
|---|---|---|
| 55 | | bore either a number of ball shot or a single projectile for each |
| 56 | | single pull of the trigger. |
| 57 | (8) | "Undetectable gun" means: |
| 58 | (A) | a firearm that, after the removal of all its parts other than a |
| 59 | | major component, is not detectable by walk-through metal |
| 60 | | detectors commonly used at airports or other public |
| 61 | | buildings; |
| 62 | (B) | a major component that, if subjected to inspection by the |
| 63 | | types of detection devices commonly used at airports or |
| 64 | | other public buildings for security screening, would not |
| 65 | | generate an image that accurately depicts the shape of the |
| 66 | | component; or |
| 67 | (C) | a firearm manufactured wholly of plastic, fiberglass, or |
| 68 | | through a 3D printing process. |
| 69 | | *      *      * |

70  *Major component* means, with respect to a firearm:

71  (1)   the slide or cylinder or the frame or receiver; and

72  (2)   in the case of a rifle or shotgun, the barrel.

73  *Minor*: An individual younger than 18 years old.

74  *      *      *

75  *Place of public assembly*: A "place of public assembly" is a place where
76  the public may assemble, whether the place is publicly or privately
77  owned, including a [government owned] park [identified by the
78  Maryland-National Capital Park and Planning Commission]; place of
79  worship; [elementary or secondary] school; [public] library;
80  [government-owned or -operated] recreational facility; hospital;
81  community health center; long-term facility; or multipurpose exhibition

- 4 -

BILL NO. 4-21

| | | |
|---|---|---|
| 82 | | facility, such as fairgrounds or a conference center. A place of public |
| 83 | | assembly includes all property associated with the place, such as a |
| 84 | | parking lot or grounds of a building. |
| 85 | | *       *       * |

**57-7. Access to guns by minors.**

87  (a)  A person must not give, sell, rent, lend, or otherwise transfer any rifle or shotgun or any ammunition or major component for these guns in the County to a minor. This subsection does not apply when the transferor is at least 18 years old and is the parent, guardian, or instructor of the minor, or in connection with a regularly conducted or supervised program of marksmanship or marksmanship training.

93  (b)  An owner, employee, or agent of a gun shop must not allow a minor to, and a minor must not, enter the gun shop unless the minor is accompanied by a parent or other legal guardian at all times when the minor is in the gun shop.

97  (c)  A person must not give, sell, rent, lend, or otherwise transfer to a minor:

98  (1)  a ghost gun or major component of a ghost gun;

99  (2)  an undetectable gun or major component of an undetectable gun; or

101  (3)  a computer code or program to make a gun through a 3D printing process.

103  (d)  A person must not [[manufacture or assemble]] purchase, sell, transfer, possess, or transfer a ghost gun, including [[making]] a gun created through a 3D printing process, in the presence of a minor.

106  (e)  A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

- 5 -

BILL NO. 4-21

109  [(c)] (f)    This section must be construed as broadly as possible within the
110  limits of State law to protect minors.

111  **57-11. ~~Firearms in or near places of public assembly.~~**

112  (a)    [A] In or within 100 yards of a place of public assembly, a person must
113        not:

114  (1)    sell, transfer, [[manufacture, assemble,]] possess, or transport a
115        ghost gun, undetectable gun, handgun, rifle, or shotgun, or
116        ammunition or major component for these firearms[, in or within
117        100 yards of a place of public assembly]; or

118  (2)    sell, transfer, possess, or transport[[, or use a computer code to
119        create,]] a firearm created through a 3D printing process.

120  ~~(b)~~    This section does not:

121  (1)    prohibit the teaching of firearms safety or other educational or
122        sporting use in the areas described in subsection (a);

123  (2)    apply to a law enforcement officer, or a security guard licensed to
124        carry the firearm;

125  (3)    apply to the possession of a firearm or ammunition, other than a
126        ghost gun or an undetectable gun, in the person's own home;

127  (4)    apply to the possession of one firearm, and ammunition for the
128        firearm, at a business by either the owner who has a permit to
129        carry the firearm, or one authorized employee of the business
130        who has a permit to carry the firearm;

131  (5)    apply to the possession of a handgun by a person who has
132        received a permit to carry the handgun under State law; or

133  ((6)    apply to separate ammunition or an unloaded firearm:

- 6 -

JA104

BILL NO. 4-21

| 134 | | (A) | transported in an enclosed case or in a locked firearms rack |

134　　　　　(A)　transported in an enclosed case or in a locked firearms rack
135　　　　　　　　on a motor vehicle, unless the firearm is a ghost gun or an
136　　　　　　　　undetectable gun; or
137　　　　　(B)　being surrendered in connection with a gun turn-in or
138　　　　　　　　similar program approved by a law enforcement agency.
139　　　　　　　　　　　*　　　*　　　*

140　**57-15. Penalty.**

141　　　　Any violation of this Chapter or a condition of an approval certificate issued

142　under this Chapter is a Class A violation to which the maximum penalties for a Class

143　A violation apply. Any violation of Section 57-8 is a Class A civil violation.

144　**57-16. Reporting requirement.**

145　　　(a)　The County Police Department must submit a report annually to the

146　　　　　County Executive and the County Council regarding the availability and

147　　　　　use of ghost guns and undetectable guns in the County.

148　　　(b)　The report must include the number of ghost guns and undetectable

149　　　　　guns recovered by the Department during the prior year.

150　　　(c)　Each report must be available to the public on the Police Department's

151　　　　　website.

BILL No. 4-21

*Approved*:

_____   4/7/2021
Tom Hucker, President, County Council                Date

*Approved*:

_____   4/16/2021
Marc Elrich, County Executive                            Date

*This is a correct copy of Council action.*

_____   4/16/2021
Selena Mendy Singleton, Esq., Clerk of the Council        Date

- 8 -

JA106

Expedited Bill No. _21-22_

Concerning: _Weapons – Firearms In or Near Places of Public Assembly_

Revised: _11/10/2022_   Draft No. _2_

Introduced: _July 12, 2022_

Enacted: _November 15, 2022_

Executive: _November 28, 2022_

Effective: _November 28, 2022_

Sunset Date: _None_

Ch. _36_, Laws of Mont. Co. _2022_

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

---

Lead Sponsor: Council President Albornoz

Co-Sponsors: Councilmembers Hucker, Friedson, Jawando, Riemer, and Katz; Council Vice-President Glass; and Councilmember Rice

---

**AN EXPEDITED ACT** to:

    (1)    prohibit the possession of firearms in or near places of public assembly, with certain exemptions;

    (2)    remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly; and

    (3)    generally amend the law regarding restrictions against firearms in the County.

By amending

    Montgomery County Code

    Chapter 57, Weapons

    [[Section]] Sections 57-1, 57-7, and 57-11

| | |
|---|---|
| **Boldface** | _Heading or defined term._ |
| Underlining | _Added to existing law by original bill._ |
| **[Single boldface brackets]** | _Deleted from existing law by original bill._ |
| Double underlining | _Added by amendment._ |
| **[[Double boldface brackets]]** | _Deleted from existing law or the bill by amendment._ |
| * * * | _Existing law unaffected by bill._ |

_The County Council for Montgomery County, Maryland approves the following Act:_

**EXHIBIT B**

EXPEDITED BILL NO. 21-22

1    **Sec. 1.  [[Section]] <u>Sections 57-1, 57-7, and</u> 57-11 [[is]] <u>are</u> amended as**
2    **follows:**
3    **57-1. Definitions.**
4                                    \*        \*        \*
5           *Gun* or *firearm:* Any   rifle,   shotgun,   revolver,   pistol,   ghost   gun,
6           undetectable gun, air gun, air rifle or any similar mechanism by whatever
7           name known which is designed to expel a projectile through a gun barrel
8           by the action of any explosive, gas, compressed air, spring or elastic.
9                                    \*        \*        \*
10          (2)     "Ghost gun" means a firearm, including an unfinished frame or
11                  receiver, that<u>:</u>
12                  <u>(A)</u>    lacks a unique serial number engraved or cased in metal
13                         alloy on the frame or receiver by a licensed manufacturer,
14                         maker or importer [[under]] <u>in accordance with</u> federal law
15                         [or]<u>; and</u>
16                  <u>(B)</u>    <u>lacks</u> markings <u>and is not registered with the Secretary of</u>
17                         <u>the State Police</u> in accordance with [[27 C.F.R. § 479.102]]
18                         <u>Section 5-703(b)(2)(ii) of the Public Safety Article of the</u>
19                         <u>Maryland Code</u>.
20          [[It]] <u>"Ghost gun"</u> does not include a firearm that has been
21          rendered permanently inoperable, or a firearm that is not required
22          to have a serial number in accordance with the Federal Gun
23          Control Act of 1968.
24                                    \*        \*        \*
25          (8)     "Undetectable gun" means:
26                                    \*        \*        \*

- 2 -

EXPEDITED BILL NO. 21-22

| | | |
|---|---|---|
| 27 | (9) | "Unfinished frame or receiver" means a forged, cast, printed, |
| 28 | | extruded, or machined body or similar article that has reached a |
| 29 | | stage in manufacture where it may readily be completed, |
| 30 | | assembled, or converted to be used as the frame or receiver of a |
| 31 | | functional firearm. |
| 32 | | |
| 33 | | *     *     * |
| 34 | | *Place of public assembly*: A "place of public assembly" is: |
| 35 | (1) | a [[place where the public may assemble, whether the place is]] |
| 36 | | publicly or privately owned:[[, including a]] |
| 37 | | (A)  park; |
| 38 | | (B)  place of worship; |
| 39 | | (C)  school; |
| 40 | | (D)  library; |
| 41 | | (E)  recreational facility; |
| 42 | | (F)  hospital; |
| 43 | | (G)  community health center, including any health care facility |
| 44 | | or community-based program licensed by the Maryland |
| 45 | | Department of Health; |
| 46 | | (H)  long-term facility, including any licensed nursing home, |
| 47 | | group home, or care home; [[or]] |
| 48 | | (I)  multipurpose exhibition facility, such as a fairgrounds or |
| 49 | | conference center; or |
| 50 | | (J)  childcare facility; |
| 51 | (2) | government building, including any place owned by or under the |
| 52 | | control of the County; |

- 3 -

JA109

EXPEDITED BILL NO. 21-22

| 53 | | (3) | polling place; |
|---|---|---|---|
| 54 | | (4) | courthouse; |
| 55 | | (5) | legislative assembly; or |

56　　　　　　(6)　a gathering of individuals to collectively express their

57　　　　　　　　constitutional right to protest or assemble.

58　　　　A "place of public assembly" includes all property associated with the

59　　　　place, such as a parking lot or grounds of a building.

60　　　　　　　　　*　　*　　*

**57-7. Access to guns by minors.**

62　　　　　　　　　*　　*　　*

63　　(d)　A person must not purchase, sell, transfer, possess, or [[transfer]]

64　　　　transport a ghost gun, including a gun created through a 3D printing

65　　　　process, in the presence of a minor.

66　　　　　　　　　*　　*　　*

**57-11. Firearms in or near places of public assembly.**

68　　(a)　In or within 100 yards of a place of public assembly, a person must not:

69　　　　(1)　sell, transfer, possess, or transport a ghost gun, undetectable gun,

70　　　　　　handgun, rifle, or shotgun, or ammunition or major component for

71　　　　　　these firearms; or

72　　　　(2)　sell, transfer, possess, or transport a firearm created through a 3D

73　　　　　　printing process.

74　　(b)　This section does not:

75　　　　(1)　prohibit the teaching of firearms safety or other educational or

76　　　　　　sporting use in the areas described in subsection (a);

77　　　　(2)　apply to a law enforcement officer, or a security guard licensed to

78　　　　　　carry the firearm;

- 4 -

EXPEDITED BILL NO. 21-22

79       (3)    apply to the possession of a firearm or ammunition, other than a
80               ghost gun or an undetectable gun, in the person's own home;

81       (4)    apply to the possession of one firearm, and ammunition for the
82               firearm, at a business by either the owner who has a permit to carry
83               the firearm, or one authorized employee of the business who has a
84               permit to carry the firearm; or

85       (5)    [apply to the possession of a handgun by a person who has received
86               a permit to carry the handgun under State law; or]

87      [(6)]  apply to separate ammunition or an unloaded firearm:

88          (A)   transported in an enclosed case or in a locked firearms rack
89               on a motor vehicle, unless the firearm is a ghost gun or an
90               undetectable gun; or

91          (B)   being surrendered in connection with a gun turn-in or
92               similar program approved by a law enforcement agency.

93                         *    *    *

94    **Sec. 2. Expedited Effective Date.** The Council declares that this legislation is
95 necessary for the immediate protection of the public interest. This Act takes effect on
96 the date on which it becomes law.

97    **Sec. 3. Severability.** If any provision of this Act, or any provision of Chapter
98 57, is found to be invalid by the final judgment of a court of competent jurisdiction,
99 the remaining provisions must be deemed severable and must continue in full force
100 and effect.

101    **Sec. 4.** This Act and Chapter 57 must be construed in a manner that is consistent
102 with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives,
103 including 87 FR 24652 (effective August 24, 2022), as amended.

- 5 -

USCA4 Appeal: 23-1719     Doc: 30-1     Filed: 08/21/2023     Pg: 120 of 489

EXPEDITED BILL NO. 21-22

*Approved*:

_____     11/17/2022
Gabriel Albornoz, President, County Council             Date

*Approved*:

_____     11/28/2022
Marc Elrich, County Executive                                  Date

*This is a correct copy of Council action.*

_____     11/28/2022
Judy Rupp, Clerk of the Council                             Date

- 6 -

JA112



**President**
Mark W. Pennak

February 9, 2021

## WRITTEN TESTIMONY OF MARK W. PENNAK, PRESIDENT, MSI, IN OPPOSITION TO BILL 4-21 (Corrected)

I am the President of Maryland Shall Issue ("MSI"). Maryland Shall Issue is an all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. I am also an attorney and an active member of the Bar of the District of Columbia and the Bar of Maryland. I recently retired from the United States Department of Justice, where I practiced law for 33 years in the Courts of Appeals of the United States and in the Supreme Court of the United States. I am an expert in Maryland firearms Law, federal firearms law and the law of self-defense. I am also a Maryland State Police certified handgun instructor for the Maryland Wear and Carry Permit and the Maryland Handgun Qualification License and a certified NRA instructor in rifle, pistol and personal protection in the home, personal protection outside the home, muzzle loading as well as a range safety officer. I write in OPPOSITION TO BILL 4-21. For the reasons set forth below, this bill is preempted by State law and, if enacted, would be violative of the First Amendment and the Second Amendment of the Constitution. The Council would be well-advised to stay its hand and allow the General Assembly take the lead in these matters.

**The Bill Is Preempted:**

State law, MD Code, Criminal Law, § 4-209, broadly preempts "the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun." The statute provides, as an exception, that the locality may regulate these subject matters '(i) with respect to minors; (ii) with respect to law enforcement officials of the subdivision; and (iii) except as provided in paragraph (2) of this subsection, within 100 yards of or in a park, church, school, public building, and other place of public assembly."

This bill violates Section 4-209 in multiple ways. First, and perhaps most egregiously, the bill defines a place of public assembly to include "a place where the public may assemble, whether the place is publicly or privately owned." The bill thus defines public "assembly" as a privately or publicly owned place where people "may assemble" and is thus utterly circular. It includes places where persons "may" assemble, not merely places where people do assemble or even regularly assemble.

**EXHIBIT C**

It could thus include any place, private or public, that people "may" assemble in the unknowable future.

Such an extraordinarily broad, circular definition is no definition at all. It is so vague as to violate the Due Process Clause of the Fourteenth Amendment. See *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1079 (4th Cir. 2006) (recognizing that "[a] statute is impermissibly vague if it either (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement" (internal quotations omitted). See also *Grayned v. City of Rockford*, 408 U.S. 104, 108-109, (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis"). This body has an obligation to define regulatory prohibitions, not make them so vague as to ensnare the innocent or lead to arbitrary enforcement, especially where the law affects Constitutional rights. *City of Chicago v. Morales*, 527 U.S. 41, 54 (1999). A statute will be deemed unconstitutionally vague if it (1) "fails to give ordinary people fair notice of the conduct it punishes," or (2) is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). The definition of place of public assembly fails that test.

Even more fundamentally, the bill's definition of place of public assembly is in conflict with Section 4-209. The proviso in Section 4-209 that allows the County to regulate firearms in within a 100 yards of "another place of public assembly" must read in context. See, e.g., *Berry v. Queen*, 469 Md. 674, 690, 233 A.3d 42 (2020) ("In order to interpret a word's specific meaning in a particular statute we look to the context in which the word is used.") (citation omitted). That proviso does not allow the County to regulate places where people "may" assemble, it allows regulation of a place within 100 yards "**another** place **of** public assembly," thus covering specific, existing locations where people typically already assemble.

The rule is that "'when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned.'" *In re Wallace W.*, 333 Md. 186, 190, 634 A.2d 53 (1993), quoting *Giant of Md. v. State's Attorney*, 274 Md. 158, 167, 334 A.2d 107, 113 (1975). This is simply an application of the canon of *ejusdem generis* which is based on "the supposition that if the legislature had intended the general words to be construed in an unrestricted sense, it would not have enumerated the specific things." *State v. 158 Gaming Devices*, 304 Md. 404, 429 n. 12, 499 A.2d 940 (1985). See also *State v. Sinclair*, 274 Md. 646, 650, 659, 337 A.2d 703 (1975). As the Supreme Court has also noted, the canon of *ejusdem generis* "limits general terms [that] follow specific ones to matters similar to those specified." *CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 294 (2011).

Here, by using the term "another place of public assembly," the statute was obviously intended to include "another" place which is akin or similar to the places expressly mentioned in the same statutory sentence, viz. a "park," a "church," a "school" or a "public building." Privately owned businesses or private property in

general are not like any of these specific places. Read literally, the bill's definition of a "place of public assembly" dramatically expands the area subject to local regulation to include any place within 100 yards of a private business or private property that "may" be used as place of assembly as well as to any place within 100 yards of a park, school, church or a public building. A place of public assembly as defined by this bill could cover a private business or a private home used as a place for a book club to meet, or a private property used to host any sort of event, no matter how small or limited in scope. It intrudes into private homes and businesses in a wholly unprecedented way. That is a vast overreach of legislative power by the County. It will not go unchallenged.

Even if the definition of "another place of public assembly" is limited to private businesses, the term is unbelievably broad. Given the number of private businesses in the County, such application would expand the exception to a huge portion of the County, including literally thousands of private homes within a 100 yards of a business. This sweep into private homes is not saved by Section 57-11, as this bill amends Section 57-11 to directly regulate the mere possession of "a ghost gun or undetectable gun" in the person's own home. The Section 4-209 exception for "another" place of public assembly simply cannot be reasonably read to allow such all-encompassing regulation of private possession in one's own home.  This is particularly so given that State law expressly permits home possession of firearms, including handguns. MD Code, Criminal Law, § 4-203(b)(6) (providing that a person may wear, carry or transport a handgun "on real estate that the person owns or leases"). Nothing in Section 4-209 allows the County to regulate home possession of firearms. For these reasons alone, the bill's definition of "public assembly" will not survive judicial review. See *Montgomery County v. Atlantic Guns, Inc.*, 302 Md. 540, 489 A.2d 1114 (1985).

The bill conflicts with State law in other ways. The bill amends Section 57-11 to regulate possession of a firearm and ammunition at a business, providing that such owner may possess a firearm only if the owner "has a permit to carry the firearm." It similarly allows an authorized employee of the business to possess a firearm only if the employee "has a permit to carry the firearm." These amendments (requiring the owner and the employee to have a permit) bring the bill into direct conflict with State law. Specifically, MD Code, Criminal Law, § 4-203(b), expressly provides that a person need not have a permit to transport a handgun between the residence "and the place of business of the person" if the business is owned substantially by that person (Section 4-203(b)(3)), and further provides that a person may, without a permit, wear and carry a handgun "within the confines of a business establishment that the person owns or leases" (Section 4-203(b)(6)). Section 4-203(b)(7) extends the same right to wear and carry a handgun, without a permit, to an authorized supervisory employee within the confines of the business. These State law provisions are also not limited to "one" firearm, much less to ammunition for that one firearm, as required by this bill. These provisions of State law bar the County from regulating possession of firearms by business owners and employees.

Specifically, under the Express Powers Act, counties in Maryland have no power to pass legislation that is inconsistent with State law. See MD Code, Local

Government, §10-206(a) (providing that a county may pass an ordinance, resolution, or bylaw that is "not inconsistent with State law"). Thus, "[a] county may exercise the powers provided under this title only to the extent that the powers are not preempted by or in conflict with public general law." (Id. at §10-206(b)). It is thus well established that a local law is preempted by conflict when the local law prohibits an activity which is permitted by State law, or permits an activity prohibited by state law. See *City of Baltimore v. Sitnick*, 254 Md. 303, 317, 255 A.2d 376 (1969) ("a political subdivision may not prohibit what the State by general public law has permitted"). The bill obviously fails that test. Nothing in Section 4-209 allows the County to enact regulations that actually and directly ban conduct expressly permitted by State law. This County has already been rebuffed in its attempt to regulate ammunition by the Maryland Court of Appeals. See *Montgomery County v. Atlantic Guns, Inc.*, 302 Md. 540, 489 A.2d 1114 (1985). The limited exception for regulation allowed in Section 4-209 cannot be construed to allow the County to directly contravene State law in this manner. See, e.g., *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 297-98, 631 A.2d 77 (1993) ("state law may pre-empt local law in one of three ways: 1) pre-emption by conflict, 2) express pre-emption, or 3) implied pre-emption").

This bill also seeks to outlaw so called "ghost guns" to the extent possible and in so doing violates existing State law. For example, the bill bans the mere possession or transport of any firearm (including a ghost gun) within 100 yards of a place of public assembly. As noted, the bill expressly amends Section 57-11 to make clear that this ban applies to ghost guns in the home. As explained above, the County may not ban the possession of any firearms in the home as State law expressly permits such possession. MD Code, Public Safety, §4-203(b)(6). That includes ghost gun possessions in the home. The County may not regulate home possession of any firearm. Period. Full stop.

The bill also provides that a person "must not" "sell, transfer, possess, transport, or use a computer code to create, a firearm through a 3D printing process." That language is a grammatical mess. Does the bill ban the mere sale or possession of such code or does it ban such a sale or possession only when it is used "to create a firearm." If it bans the former, then the bill is blatantly unconstitutional under the First Amendment and Second Amendment, as discussed below, and preempted, as discussed above. If it bans only the latter, then the bill is nonsense, as it is hard to envision a "transport" or "sale" of code that "creates" a gun. Such poor draftsmanship is intolerable in a bill that would attach penalties for a Class A violation. *Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018) ("the prohibition of vagueness in criminal statutes…is 'essential' of due process required by both 'ordinary notions of fair play and the settled rules of law") (citation omitted). See also *Myers v. State*, 248 Md. App. 422, 437, 241 A.3d 997 (2020) ("The United States Supreme Court has stated that 'a vague law is no law at all.'"), quoting *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

The bill also bans "access" by a minor to any "major component" of a ghost gun and defines a major component to include "the slide or cylinder or the frame or receiver" or the barrel in the case of a rifle or shotgun. That limitation is inconsistent with

current State law that regulates access by a minor under the age of 16 to a loaded "firearm," not merely access to an unloaded component of a firearm. MD Code, Criminal Law, § 4-104. Current State law allows such access to an entire firearm, including a loaded firearm, if the child under the age of 16 has a hunter safety certificate. (Id.). The statute also expressly permits such access if supervised "by an individual at least 18 years old." (Id.). Once again, the bill improperly prohibits an activity permitted by State law.

Similarly, the bill provides that a person "must not" sell, lend or otherwise transfer a ghost gun to a minor and bans the manufacture or assembly of "a gun" (any gun) in the mere presence of a minor, including in the home, by a parent or firearms instructor or other adult. These bans are directly contrary to State law, which provides that a minor (or any person under 21) may "transfer" and possess a regulated firearm (including a handgun) if that person is under the supervision of a person over 21 or being trained by an instructor. MD Code, Public Safety, § 5-133(d). Such firearms instruction by an adult also frequently includes cleaning firearms, which is a process that necessarily includes disassembly and assembly of a firearm. Yet, this bill would ban these activities expressly permitted by State law. Indeed, Section 4-209(b)(2) flatly prohibits the County from banning firearms training, including the training of minors. That is exactly what this bill does by banning the assembly of any firearm in the mere "presence" of a minor and by banning the use of a ghost gun in the training or supervised access expressly allowed by Section 5-133(d).

**The Bill Violates The First Amendment:**

The bill amends Section 57-11 to ban the mere possession, transport, sale or transfer of computer software. Yet, there is no doubt that computer "software" or a "computer program" is fully protected by the First Amendment. See, e.g., *Junger v. Daley*, 209 F.3d 481, 482 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 449 (2d Cir. 2001) ("[C]omputer code, and computer programs constructed from code can merit First Amendment protection."). Banning computer programs is thus akin to banning a book and banning distribution of computer code is thus akin to banning the distribution of a book. Legally, if passed, the bill would turn County law enforcement officers into censors and the County government into a bunch of book burners.

The ban imposed by the bill is a purely "content-based" prior restraint on a First Amendment activities. See *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015). It is well-established that prior restraints to speech are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Under *Reed*, a facially content-neutral law will still be categorized as content-based if it "cannot be '"justified without reference to the content of the regulated speech,"' or ... adopted by the government 'because of disagreement with the message [the speech] conveys.'" 135 S.Ct. at 2227, quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Here, there is nothing remotely facially neutral

about the bans imposed by this bill. The bans are based on the County's "disagreement with the message." Such a prior restraint on the message cannot stand. See *Defense Distributed v. Dept. of State*, 838 F.3d 451, 468-70 (5th Cir. 2016), c*ert. denied* 138 S.Ct. 638 (2018) (Jones, J. dissenting on other grounds) (reaching the merits of the First Amendment claim not considered by the majority and noting that the government's restriction on the export of 3-D printing code was content-based and thus must be analyzed under strict scrutiny).

Moreover, every American has a First Amendment right to receive information. Although the First Amendment refers only to the right to speak, courts have long recognized that the Amendment also protects the right to receive the speech of others. See *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (stating that the "First Amendment ... afford[s] the public access to discussion, debate, and the dissemination of information and ideas"); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) (ban on advertising of prescription drug prices overturned); *Bigelow v. Virginia*, 421 U.S. 809, (1975) (ban on abortion advertising invalid); *Lamont v. Postmaster General*, 381 U.S. 301, (1965) (a postal regulation limiting the importation of Communist publications overturned); *Martin v. City of Struthers*, 319 U.S. 141 (1943) (ordinance prohibiting door-to-door solicitation invalid as to distribution of leaflets announcing a religious meeting). Every person in Maryland has a constitutional right to receive, purchase or otherwise obtain the very computer software or programs that the bill would ban.

**The Bill Is Unconstitutional Under The Second Amendment:**

As noted, the bill would ban mere possession of a "ghost gun" within 100 yards of broad and vague definition of a place of public assembly, including banning possession in the home. This bill is thus a gun ban, pure and simple. Such a gun ban violates the Second Amendment right of owners to possess firearms under *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742, 750 (2010). Even under the least demanding test ("intermediate scrutiny"), if the State can accomplish its legitimate objectives without a ban (a naked desire to penalize gun owners is not legitimate), then the State must use that alternative. *McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014). Stated differently, under intermediate scrutiny, the State has the burden to demonstrate that its law does not "burden substantially more [protected conduct] than is necessary to further the government's legitimate interest." Id. at 2535, quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989). See also *NY State Rifle & Pistol Ass'n. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015), cert. denied, 136 S.Ct. 2486 (2016) (striking down a 7 round load limit in a firearm magazine because the limit was "untethered from the stated rationale"). See also *Reynolds v. Middleton*, 779 F.3d 222, 232 (4th Cir. 2015) (holding that, under the intermediate scrutiny test as construed in *McCullen*, the government must "prove that it actually tried other methods to address the problem"). (Emphasis in original).

The test for "strict scrutiny" is even more demanding as, under that test, the State must prove both a "compelling need" and that it used the "least" restrictive alternative in addressing that need. See *United States v. Playboy Entm't. Grp., Inc.*,

529 U.S. 803, 813 (2000). More generally, the constitutionality of gun laws must be analyzed under the "text, history and tradition" test that was actually used in *Heller* and *McDonald.* See, e.g., *Heller v. District of Columbia*, 670 F.3d 1244, 1269 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). There is no "text, history or tradition" that could possibly support the types of bans imposed by this bill.

The manufacture of a homemade firearm or the use of a 3-D printer to create a homemade gun or gun component does not make that gun illegal in the slightest under long-standing federal law and state law. Under federal law, a person may legally manufacture a firearm for his own personal use. See 18 U.S.C. § 922(a). However, "it is illegal to transfer such weapons in any way." *Defense Distributed v. United States*, 838 F.3d 451, 454 (5th Cir. 2016). This manufacture "involves starting with an '80% lower receiver,' which is simply an unfinished piece of metal that looks quite a bit like a lower receiver but is not legally considered one and may therefore be bought and sold freely. It requires additional milling and other work to turn into a functional lower receiver." (Id)

Manufacturing an "80% lower" into a "functional lower receiver" is not a trivial process. It takes machine tools, expertise and hours of time. Miscues are common and, when made, essentially convert the "80% lower" into scrap metal. Individuals who undertake this process are overwhelmingly hobbyists, not criminals. Even after the receiver is successfully made, the owner would still have to purchase the additional parts, such as a barrel, the trigger, slide and all the internal parts to complete the assembly. All these additional parts are expensive. With the cost of the tools to mill the receiver, plus the cost of the parts, a final assembled homemade gun costs more to make than it would to actually buy an identical gun from a dealer. This bill would ban the hobby and penalize the hobbyist for the continued possession of any gun (within a 100 yards of a place of public assembly) that the hobbyist constructed prior to the enactment of the law. That result likely includes literally thousands of law-abiding people in Montgomery County.

Banning manufacture or the mere possession of any gun made by a 3-D printer, cannot be justified under any of these tests applicable to the Second Amendment. The bills' ban on the use of computers is akin to the argument that the Second Amendment protects only muskets that were used during the Revolutionary War, a contention that the Court in *Heller* rejected as "bordering on the frivolous." *Heller*, 554 U.S. at 582. Indeed, almost all firearms are manufactured using computer software. The County simply may not ban the possession of these types of arms. See *Defense Distributed v. Dept. of State*, 121 F.Supp.3d 680, 699 (W.D. Tex. 2015), *aff'd,* 838 F.3d 451 (5th Cir. 2016), *cert. denied,* 138 S.Ct. 638 (2018) (sustaining a regulation of 3-D printed guns under the Second Amendment because plaintiffs were "not prohibited from manufacturing their own firearms" and were "not prohibited from acquiring the computer files at issue").

Heller held that guns in "common use" by law abiding persons are prima facie protected arms under the Second Amendment. *Heller*, 554 U.S. at 627. Homemade guns easily satisfy this requirement as there are literally tens of thousands of such guns made over many years throughout the United States. Guns for personal use have been made at home for centuries, even before the Revolutionary War. The Council simply may not disregard that reality. See *Caetano v. Massachusetts*, 136 S.Ct.1027 (2016) (summarily reversing Massachusetts' highest court for failing to follow the reasoning of Heller in sustaining a state ban on stun guns); *Ramirez v. Commonwealth*, 479 Mass. 331, 332, 352 (2017) (on remand from *Caetano*, holding that "the absolute prohibition against civilian possession of stun guns under § 131J is in violation of the Second Amendment" and declaring the State's absolute ban to be "facially invalid"). Homemade guns are at least as much "in common use" as stun guns at issue in Caetano.

Here, the supposed evil that this bill purports to address is guns without serial numbers because such guns are not "traceable." Yet, tracing runs out after identification of the gun's first purchaser and firearms may be sold and resold many times in their lifetime. Criminals, who may not possess firearms at all, will not be deterred by the bill as possession of a firearm by a prohibited person is already a 10-year federal felony, 18 U.S.C. § 922(g), and a serious crime under existing State law, MD Code, Public Safety, § 5-101(g)(3), § 5-133(b)(1), § 5-205(b)(1). The few crimes that are solved by tracing guns left at a crime scene are only a small fraction of guns used in crimes because very few guns are actually traced by the ATF. See David B. Kopel, Clueless: The Misuse of BATF Firearms Tracing Data. http://www.davekopel.org/2A/LawRev/CluelessBATFtracing.htm. See also Police Departments Fail to Regularly Trace Crime Guns. https://www.thetrace.org/2018/12/police-departments-gun-trace-atf/. The ATF itself has cautioned against any use of trace data, noting that "[t]he firearms selected [for tracing] do not constitute a random sample and should not be considered representative of the larger universe of all firearms used by criminals, or any subset of that universe." Bureau of Alcohol, Tobacco, Firearms and Explosives. Firearms Trace Data, 2016: Maryland, https://www.atf.gov/docs/163521-mdatfwebsite15pdf/download. As the ATF further notes, "[n]ot all firearms used in crime are traced and not all firearms traced are used in crime," stating further that "[f]irearms are normally traced to the first retail seller, and sources reported for firearms traced do not necessarily represent the sources or methods by which firearms in general are acquired for use in crime."

But, if the concern is truly that these guns lack a serial number (rather than a desire to penalize gun owners), then that concern can be addressed without banning homemade guns. Specifically, there are alternatives to bans. For example, a new law passed in California (which is ranked by the Giffords Law Center as having the most restrictive gun laws in the nation) provides that a new resident to the state shall apply to the Department of Justice for a unique serial number within 60 days of arrival for any firearm the resident wishes to possess in the state that the resident previously self-manufactured or self-assembled or a firearm the resident owns, that does not have a unique serial number or other mark of identification. As of July 1, 2018, prior to manufacturing or assembling a new firearm, a person is

required to apply to California for a unique serial number. The gun owner is then simply required to engrave that number onto the receiver and report back to California that he or she has done so. As of January 1, 2019, owners of existing guns were required to apply for such serial numbers and perform this engraving. See California Penal Code §§ 29180-29184.

In short, assembly of new homemade guns and existing possession is permitted as long as this serial number is obtained, engraved and reported. California Penal Code §29180. In this way, the owner is identified and the gun is fully "traceable" and thus no longer a so-called "ghost gun." As this law indicates, there is no reason to take the extreme step of flatly banning homemade guns or converting existing owners into criminals. Under *Heller*, the County may not simply reject this alternative simply because a general ban is more convenient or cheaper. Gun owners may not be penalized for such flimsy reasons. See, e.g., *Board of Estimate of City of New York v. Morris*, 489 U.S. 688, 702 n.10 (1989); *Heller v. District of Columbia*, 801 F.3d 264, 310 (D.C. Cir. 2015) (Henderson, J., concurring in part and dissenting in part). Indeed, in 2018, the House Judiciary Committee in the General Assembly favorably reported a bill (HB 740) that expressly required the State Police to conduct a study of this California alternative. Such legislation may be enacted in the future. The Council has no role in such State-wide matters.

In sum, the Council should not venture out on this ill-conceived regulatory adventure that will, more likely than not, be struck down as preempted or otherwise invalidated by the courts. Waiting for the State to act also makes fiscal sense. If the State General Assembly decides to regulate "ghost guns," then the substantial litigation costs associated with defending that policy will be borne by the State, not by the County. Such legislation, if enacted by the General Assembly, will also undoubtedly conflict in some way with the bans that would be imposed by this bill, thereby resulting in the preemption of the County law. The Council should await action by the General Assembly. "Feel good" legislation is no substitute for sound legal judgment.

Sincerely,

Mark W. Pennak
President, Maryland Shall Issue, Inc.
mpennak@marylandshallissue.org



**Montgomery County Council**

| | |
|---|---|
| **Committee:** PS | AGENDA ITEM #4B |
| **Committee Review:** Completed | November 15, 2022 |
| **Staff:** Christine Wellons, Senior Legislative Attorney | **Action** |
| **Purpose:** Final action – vote expected | |
| **Keywords:** #FirearmsInPublicPlaces | |

---

**SUBJECT**

Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly

Lead Sponsors: Council President Albornoz

Co-Sponsors: Councilmembers Hucker, Friedson, Navarro, Jawando, Riemer, and Katz; Council Vice-President Glass; and Councilmember Rice

**EXPECTED ATTENDEES**

N/A

**COUNCIL DECISION POINTS & COMMITTEE RECOMMENDATION**

- Action – Council vote expected
- The Public Safety Committee (3-0) recommends enactment of Bill 21-22 as amended.

**DESCRIPTION/ISSUE**

Expedited Bill 21-22 would:
- (1) prohibit the possession of firearms in or near places of public assembly, with certain exemptions;
- (2) remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly: and
- (3) generally amend the law regarding restrictions against firearms in the County.

**SUMMARY OF KEY DISCUSSION POINTS**

The PS Committee recommends the enactment of Expedited Bill 21-22 with amendments to:

- clarify the definition of "place of public assembly" in light of recent Supreme Court jurisprudence;
- update provisions regarding ghost guns due to changes in Maryland law; and
- expressly add a severability clause to Chapter 57 of the County Code.

<u>**This report contains:**</u>

| | |
|---|---|
| Staff Report | Pages 1-8 |
| Expedited Bill 21-22 | © 1 |
| Legislative Request Report | © 7 |
| Fiscal Impact Statement | © 8 |
| Racial Equity and Social Justice Impact Statement | © 10 |
| Economic Impact Statement | © 16 |
| Public Testimony | © 18 |

**EXHIBIT D**

*Bruen* Decision                                           © 84

---

**Alternative format requests for people with disabilities.** If you need assistance accessing this report you may <u>submit alternative format requests</u> to the ADA Compliance Manager. The ADA Compliance Manager can also be reached at 240-777-6197 (TTY 240-777-6196) or at <u>adacompliance@montgomerycountymd.gov</u>

Agenda Item #4B
November 15, 2022
**Action**

**M E M O R A N D U M**

November 10, 2022

TO:　　　　County Council

FROM:　　　Christine Wellons, Senior Legislative Attorney

SUBJECT:　Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly

PURPOSE:　Final action – roll call vote expected

| **Committee recommendation (3-0):** approval of Bill 21-22 with amendments |
| --- |

　　　　Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly, sponsored by Lead Sponsor Council President Albornoz and Co-Sponsored by Councilmembers Hucker, Friedson, Navarro, Jawando, Riemer, Katz, Council Vice-President Glass and Councilmember Rice, was introduced on July 12, 2022. A Public Hearing occurred on July 26, 2022 and a Public Safety Committee worksession was held on October 31, 2022. Final action is scheduled for November 15, 2022.

　　　　Expedited Bill 21-22 would:

(1)　　prohibit the possession of firearms in or near places of public assembly, with certain exemptions;

(2)　　remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly: and

(3)　　generally amend the law regarding restrictions against firearms in the County.

**BACKGROUND**

　　　　In the Supreme Court decision of *New York State Rifle & Pistol Assn. v. Bruen, Superintendent of New York State Police,* Slip Opinion No. 20-843 (June 23, 2022), available at https://www.supremecourt.gov/opinions/21pdf/20-843_7j80.pdf, the Supreme Court overturned a requirement of New York's handgun carry law. The New York law had required an applicant for a handgun carry license to show "proper cause" for the license, and the Supreme Court held that the requirement violated the Second Amendment's right to bear arms. The Court explained, however, that "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutionally permissible.

Like New York, Maryland has a proper-cause requirement for wear-and-carry handgun licenses. *See* Md. Code Ann., Public Safety Section 5-306. Governor Hogan, in response to *Bruen*, instructed the Maryland State Police not to enforce the proper-cause element of the Maryland law. https://governor.maryland.gov/2022/07/05/governor-hogan-directs-maryland-state-police-to-suspend-good-and-substantial-reason-standard-for-wear-and-carry-permits/. Subsequently, the Court of Special Appeals struck down Maryland's proper cause requirement in late July. *In re Rounds*, 255 Md. App. 205 (2022).

As a result of the Supreme Court eliminating "just cause" requirements, more individuals in Maryland likely will carry firearms, regardless of whether the individuals have any good or substantial reason to carry them.

### BILL SPECIFICS

Expedited Bill 21-22 would **prevent an individual from possessing a firearm within 100 yards of a place of public assembly even when the individual has a wear-and-carry permit from the State of Maryland**. This restriction would strengthen current County law, which exempts individuals with permits from the restriction against carrying weapons within 100 yards of places of public assembly.

### LEGAL FRAMEWORK

Maryland law specifically allows counties to regulate the possession of certain firearms within 100 yards of a place of public assembly. Under the Criminal Law Article of the Maryland Code, § 4-209:

**State preemption**

(a) Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of:

(1) a handgun, rifle, or shotgun; and

(2) ammunition for and components of a handgun, rifle, or shotgun.

**Exceptions**

(b)(1) A county, municipal corporation, or special taxing district **may regulate the purchase, sale, transfer, ownership, possession, and transportation** of the items listed in subsection (a) of this section:

(i) with respect to minors;

(ii) with respect to law enforcement officials of the subdivision; and

(iii) except as provided in paragraph (2) of this subsection, **within 100 yards of or in a park, church, school, public building, and other place of public assembly**.

2

JA125

(2) A county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety, or other educational or sporting use of the items listed in subsection (a) of this section.

(Emphasis added).

There are many instances in which the State limits a person's ability to carry a weapon, regardless of whether the person has a permit.  *See* the Maryland State Police website, https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Firearms/WearandCarryPermit.aspx, which lists numerous state areas, such as State parks and State buildings, where a concealed carry permit does not apply.  Currently, the State law prevents permit carriers from possessing firearms at specific locations including school property, state buildings (not County buildings), state parks, the General Assembly, aircraft, Maryland Rest Areas, and certain daycares.  *See id*.

Notably, these restricted areas identified by the State Police do not include certain areas within the County's broader definition of "place of public assembly" – which was amended under Bill 4-21 bill to mean "a place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as a fairgrounds or conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building."

### SUMMARY OF PUBLIC HEARING

On July 26, 2022, the Council heard extensive testimony regarding Expedited Bill 21-22. (©15).  Many speakers supported the bill as necessary for public safety.  Many speakers opposed the bill based upon Second Amendment and safety concerns.

### SUMMARY OF PUBLIC SAFETY WORKSESSION

The Committee discussed the following issues, and adopted the following amendments.

1. **Supreme Court Approach to Identifying "Sensitive Places" – *i.e.*, places where Guns may be Banned**

Prior to *Bruen*, the judicial test to review firearms regulations consisted of two parts: (1) whether a gun regulation was consistent with Constitutional text and history; and (2) whether the regulation satisfied a means-ends balancing test (consisting of strict or intermediate scrutiny). Under *Bruen*, the Court has shifted so that only the first part of the test now matters; if the court concludes that a regulation is not consistent with the Constitutional text and history, it is invalid. It can no longer be resuscitated by a balancing test.

In *Bruen*, the Supreme Court explicitly rejected New York's identification of "sensitive places" where firearms may be banned, even for individuals who have wear-and-carry permits:

> Although we have no occasion to comprehensively define "sensitive places" in this case, **we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive**

3

*places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available."* Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. *But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly.* Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate *the general right to publicly carry arms for self-defense*….

Slip opinion at 21 (emphasis added).

The Court went on to identify five locations – schools, legislative assemblies, government buildings, polling places, and courthouses – it considers to be "sensitive places" where weapons may be totally prohibited. The Court left open the possibility that other locations where weapons were historically banned – or the modern counterparts of those locations – might qualify as "sensitive places."

.…[A]*nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin*. **So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster**.

Consider, for example, Heller's discussion of *"longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings*." 554 U. S., at 626. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g., legislative assemblies, polling places, and courthouses*—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); see also Brief for Independent Institute as Amicus Curiae 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. *And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible*.

Slip opinion at 21 (emphasis added).

**2.    Amendments to the Definition of "Place of Public Assembly"**

The County currently defines a "place of public assembly" as follows:

Place of public assembly: A "place of public assembly" is a place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health

4

center; long-term facility; or multipurpose exhibition facility, such as a fairgrounds or conference center.  A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building. (Sec. 57-1).

In order to make this definition more closely aligned with *Bruen*'s approach to "sensitive places" (as discussed above) – and in order to include places that *Bruen* has specifically said do qualify as "sensitive places" – the Committee voted to adopt the following amendment.

*After line 1, add the following.*

**57-1. Definitions**

\*       \*       \*

Place of public assembly: A "place of public assembly" is<u>:</u>

<u>(1)</u>    a **[**place where the public may assemble, whether the place is**]** publicly or privately owned<u>:</u>**[**, including a**]**

    <u>(A)</u>    park;

    <u>(B)</u>    place of worship;

    <u>(C)</u>    school;

    <u>(D)</u>    library;

    <u>(E)</u>    recreational facility;

    <u>(F)</u>    hospital;

    <u>(G)</u>    community health center<u>, including any health care facility or community-based program licensed by the Maryland Department of Health</u>;

    <u>(H)</u>    long-term facility<u>, including any licensed nursing home, group home, or care home</u>; **[**or**]**

    <u>(I)</u>    multipurpose exhibition facility, such as a fairgrounds or conference center<u>; or</u>

    <u>(J)</u>    <u>childcare facility;</u>

<u>(2)</u>    <u>government building, including any place owned by or under the control of the County;</u>

<u>(3)</u>    <u>polling place;</u>

<u>(4)</u>    <u>courthouse;</u>

<u>(5)</u>    <u>legislative assembly; or</u>

5

JA128

(6)     a gathering of individuals to collectively express their constitutional right to protest or assemble.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

\*       \*       \*

**3.      Severability Clause**

Given the fluctuating jurisprudence regarding the Second Amendment, the Committee voted to add a "severability clause" to the bill.  The purpose of the severability clause is to explicitly reflect the Council's intent that if any portion of the bill is found to be invalid, the remainder of the bill must remain in effect.  This is important so that if a court were to strike down portions of the County's law against carrying firearms in "places of public assembly", the remainder of the law would be enforceable.

*After line 31, insert the following.*

**Sec. 3. Severability.**  If any provision of this Act, or any provision of Chapter 57, is found to be invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect.

**4.      Alignment with Maryland Law**

After the adoption of Council Bill 4-21 (Ghost Guns), the General Assembly adopted ghost gun legislation requested by Attorney General Frosh (Chapter 1 of the 2022 Laws of Maryland).

In order to align County ghost gun definitions with those of the new state law – and in order to acknowledge that the ghost gun laws must be interpreted in accordance with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives – the Committee adopted the following amendments.

*After line 1, add the following.*

**57-1. Definitions**

\*       \*       \*

*Gun* or *firearm:* Any rifle, shotgun, revolver, pistol, ghost gun, undetectable gun, air gun, air rifle or any similar mechanism by whatever name known which is designed to expel a projectile through a gun barrel by the action of any explosive, gas, compressed air, spring or elastic.

\*       \*       \*

(2)     "Ghost gun" means a firearm, including an unfinished frame or receiver, that:

6

    (A)    lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer [under] in accordance with federal law; and

    (B)    lacks markings and is not registered with the Secretary of the State Police in accordance with [27 C.F.R. § 479.102] Section 5-703(b)(2)(ii) of the Public Safety Article of the Maryland Code.

[It] "Ghost gun" does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968.

*    *    *

(8)    "Undetectable gun" means:

*    *    *

(9)    "Unfinished frame or receiver" means a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm.

*Add the following uncodified section to Bill 21-22.*

    **Sec. 4.** This Act and Chapter 57 must be construed in a manner that is consistent with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives, including 87 FR 24652 (effective August 24, 2022), as amended.

### 5.    Technical Correction

    The Committee voted to adopt the following technical amendment to correct a typographical error in Section 57-7(d).

**57-7. Access to guns by minors.**

*    *    *

    (d)    A person must not purchase, sell, transfer, possess, or [transfer] transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

*    *    *

**NEXT STEP:** Roll call vote on whether to enact Expedited Bill 21-22 with amendments, as recommended by the Public Safety Committee.

| This packet contains: | Circle # |
|---|---|
| Expedited Bill 21-22 | 1 |
| Legislative Request Report | 7 |
| Fiscal Impact Statement | 8 |

7

Racial Equity and Social Justice Impact Statement    10
Economic Impact Statement    16
Public Testimony    18
*Bruen* Decision    84

Expedited Bill No.  21-22
Concerning:  Weapons – Firearms In or Near Places of Public Assembly
Revised:  11/10/2022   Draft No.  2
Introduced:  July 12, 2022
Expires:  January 12, 2024
Enacted:
Executive:
Effective:
Sunset Date:  None
Ch. _____, Laws of Mont. Co.

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

Lead Sponsor: Council President Albornoz
Co-Sponsors: Councilmembers Hucker, Friedson, Jawando, Riemer, and Katz; Council Vice-President Glass; and Councilmember Rice

**AN EXPEDITED ACT** to:

(1)   prohibit the possession of firearms in or near places of public assembly, with certain exemptions;

(2)   remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly; and

(3)   generally amend the law regarding restrictions against firearms in the County.

By amending
Montgomery County Code
Chapter 57, Weapons
[[Section]] Sections 57-1, 57-7, and 57-11

| | |
|---|---|
| **Boldface** | *Heading or defined term.* |
| Underlining | *Added to existing law by original bill.* |
| [Single boldface brackets] | *Deleted from existing law by original bill.* |
| Double underlining | *Added by amendment.* |
| [[Double boldface brackets]] | *Deleted from existing law or the bill by amendment.* |
| * * * | *Existing law unaffected by bill.* |

*The County Council for Montgomery County, Maryland approves the following Act:*

(1)

EXPEDITED BILL NO. 21-22

1    **Sec. 1.**  [[Section]] <u>Sections 57-1, 57-7, and</u> 57-11 [[is]] <u>are</u> amended as

2    **follows:**

3    **57-1. Definitions.**

4                             \*        \*        \*

5        *Gun* or *firearm:* Any rifle, shotgun, revolver, pistol, ghost gun,

6        undetectable gun, air gun, air rifle or any similar mechanism by

7        whatever name known which is designed to expel a projectile through a

8        gun barrel by the action of any explosive, gas, compressed air, spring or

9        elastic.

10                            \*        \*        \*

11   (2)    "Ghost gun" means a firearm, including an unfinished frame or

12          receiver, that<u>:</u>

13          <u>(A)</u>    lacks a unique serial number engraved or cased in metal

14                 alloy on the frame or receiver by a licensed manufacturer,

15                 maker or importer [[under]] <u>in accordance with</u> federal

16                 law<u>; and</u>

17          <u>(B)</u>    <u>lacks</u> markings <u>and is not registered with the Secretary of</u>

18                 <u>the State Police</u> in accordance with [[27 C.F.R. § 479.102]]

19                 <u>Section 5-703(b)(2)(ii) of the Public Safety Article of the</u>

20                 <u>Maryland Code</u>.

21   [[It]] <u>"Ghost gun"</u> does not include a firearm that has been

22          rendered permanently inoperable, or a firearm that is not required

23          to have a serial number in accordance with the Federal Gun

24          Control Act of 1968.

25                            \*        \*        \*

26   (8)    "Undetectable gun" means:

- 2 -

(2)

JA133

EXPEDITED BILL NO. 21-22

27                                    *        *        *

28    (9)    "Unfinished frame or receiver" means a forged, cast, printed,

29           extruded, or machined body or similar article that has reached a

30           stage in manufacture where it may readily be completed,

31           assembled, or converted to be used as the frame or receiver of a

32           functional firearm.

33

34                                    *        *        *

35    Place of public assembly: A "place of public assembly" is:

36    (1)    a [[place where the public may assemble, whether the place is]]

37           publicly or privately owned:[[, including a]]

38           (A)    park;

39           (B)    place of worship;

40           (C)    school;

41           (D)    library;

42           (E)    recreational facility;

43           (F)    hospital;

44           (G)    community health center, including any health care facility

45                  or community-based program licensed by the Maryland

46                  Department of Health;

47           (H)    long-term facility, including any licensed nursing home,

48                  group home, or care home; [[or]]

49           (I)    multipurpose exhibition facility, such as a fairgrounds or

50                  conference center; or

51           (J)    childcare facility;

- 3 -

(3)

JA134

EXPEDITED BILL NO. 21-22

| 52 | | (2) | government building, including any place owned by or under the |
|---|---|---|---|
| 53 | | | control of the County; |
| 54 | | (3) | polling place; |
| 55 | | (4) | courthouse; |
| 56 | | (5) | legislative assembly; or |
| 57 | | (6) | a gathering of individuals to collectively express their |
| 58 | | | constitutional right to protest or assemble. |

59    A "place of public assembly" includes all property associated with the

60    place, such as a parking lot or grounds of a building.

61                                    *        *        *

**57-7. Access to guns by minors.**

63                                    *        *        *

64    (d)    A person must not purchase, sell, transfer, possess, or [[transfer]]

65            transport a ghost gun, including a gun created through a 3D printing

66            process, in the presence of a minor.

67                                    *        *        *

**57-11. Firearms in or near places of public assembly.**

69    (a)    In or within 100 yards of a place of public assembly, a person must not:

70            (1)    sell, transfer, possess, or transport a ghost gun, undetectable gun,

71                    handgun, rifle, or shotgun, or ammunition or major component

72                    for these firearms; or

73            (2)    sell, transfer, possess, or transport a firearm created through a 3D

74                    printing process.

75    (b)    This section does not:

76            (1)    prohibit the teaching of firearms safety or other educational or

77                    sporting use in the areas described in subsection (a);

- 4 -

(4)

78    (2)   apply to a law enforcement officer, or a security guard licensed to
79           carry the firearm;

80    (3)   apply to the possession of a firearm or ammunition, other than a
81           ghost gun or an undetectable gun, in the person's own home;

82    (4)   apply to the possession of one firearm, and ammunition for the
83           firearm, at a business by either the owner who has a permit to
84           carry the firearm, or one authorized employee of the business
85           who has a permit to carry the firearm; <u>or</u>

86    (5)   [apply to the possession of a handgun by a person who has
87           received a permit to carry the handgun under State law; or]

88   [(6)]  apply to separate ammunition or an unloaded firearm:

89        (A)   transported in an enclosed case or in a locked firearms rack
90              on a motor vehicle, unless the firearm is a ghost gun or an
91              undetectable gun; or

92        (B)   being surrendered in connection with a gun turn-in or
93              similar program approved by a law enforcement agency.

94                 *     *     *

95    **Sec. 2.  Expedited Effective Date.**  The Council declares that this legislation
96 is necessary for the immediate protection of the public interest.  This Act takes effect
97 on the date on which it becomes law.

98    <u>**Sec. 3. Severability.**  If any provision of this Act, or any provision of Chapter</u>
99 <u>57, is found to be invalid by the final judgment of a court of competent jurisdiction,</u>
100 <u>the remaining provisions must be deemed severable and must continue in full force</u>
101 <u>and effect.</u>

EXPEDITED BILL NO. 21-22

102        **Sec. 4.** This Act and Chapter 57 must be construed in a manner that is

103    consistent with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and

104    Explosives, including 87 FR 24652 (effective August 24, 2022), as amended.

- 6 -

(6)

JA137

**LEGISLATIVE REQUEST REPORT**

Bill 21-22
*Weapons – Firearms in or Near Places of Public Assembly*

| | |
|---|---|
| **DESCRIPTION:** | The bill would prohibit the possession of firearms in or near areas of public assembly and remove an exemption that currently allows individuals with certain handgun permits to possess weapons within 100 yards of a place of public assembly. |
| **PROBLEM:** | Gun violence. |
| **GOALS AND OBJECTIVES:** | Protect the possession of certain areas within sensitive areas, e.,g., in or near places of public assembly. |
| **COORDINATION:** | Montgomery County Police Department |
| **FISCAL IMPACT:** | Office of Management and Budget |
| **ECONOMIC IMPACT:** | Office of Legislative Oversight |
| **RACIAL EQUITY AND SOCIAL JUSTICE IMPACT:** | Office of Legislative Oversight |
| **EVALUATION:** | To be done. |
| **EXPERIENCE ELSEWHERE:** | State of Maryland |
| **SOURCE OF INFORMATION:** | Christine Wellons, Senior Legislative Attorney |
| **APPLICATION WITHIN MUNICIPALITIES:** | Yes |
| **PENALTIES:** | N/A |

(7)

JA138

**Fiscal Impact Statement**
**Bill 21-22 – Weapons – Firearms In or Near Places of Public Assembly**

1. **Legislative Summary**

   Bill 21-22 would prohibit the possession of firearms in or near places of public assembly, remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly, and amend the law regarding restrictions against firearms in the County.

2. **An estimate of changes in County revenues and expenditures regardless of whether the revenues or expenditures are assumed in the recommended or approved budget. Includes source of information, assumptions, and methodologies used.**

   The Bill's impact on County expenditures is expected to be nominal.  Changes in the number of calls for service are expected to be small and can be absorbed within the Montgomery County Police Department's current staff complement.  There is no anticipated impact on County revenues.

3. **Revenue and expenditure estimates covering at least the next 6 fiscal years.**

   As stated in the response to question #2, the Bill's impact on County expenditures is expected to be nominal, and there is no anticipated impact on County revenues.

4. **An Actuarial analysis through the entire amortization period for each bill that would affect retiree pension or group insurance costs.**

   Not applicable.

5. **An estimate of expenditures related to County's information technology (IT) systems, including Enterprise Resource Planning (ERP) systems.**

   There is no anticipated impact on County information technology systems.

6. **Later actions that may affect future revenue and expenditures if the bill authorizes future spending.**

   Bill 21-22 does not authorize future spending.

7. **An estimate of the staff time needed to implement the bill.**

   Staff time required to administer the Bill is expected to be minimal. Officer training will be accomplished through an informational bulletin.

8. **An explanation of how the addition of new staff responsibilities would affect other duties.**

   No new staff would be required.

(8)

JA139

9.  **An estimate of costs when an additional appropriation is needed.**

    Not applicable.

10. **A description of any variable that could affect revenue and cost estimates.**

    Not applicable.

11. **Ranges of revenue or expenditures that are uncertain or difficult to project.**

    The number of additional calls that the Emergency Communications Center (ECC) may receive in a calendar year due to this Bill is difficult to quantify, but is expected to be minimal. The Department will reevaluate after one year.

12. **If a bill is likely to have no fiscal impact, why that is the case.**

    See response to question #2.

13. **Other fiscal impacts or comments.**

    Not applicable.

14. **The following contributed to and concurred with this analysis:**

    Darren Francke, Assistant Chief of Police, Management Services Bureau
    Dale Phillips, Director, Management and Budget Division
    Karla Thomas, Manager, Management and Budget Division
    Derrick Harrigan, Office of Management and Budget

    _____                      8/22/22
                                                                 _____
    Jennifer R. Bryant, Director                                        Date
    Office of Management and Budget

(9)

# Racial Equity and Social Justice (RESJ) Impact Statement

**Office of Legislative Oversight**

| EXPEDITED BILL 21-22: | WEAPONS – FIREARMS IN OR NEAR PLACES OF PUBLIC ASSEMBLY |

## SUMMARY

The Office of Legislative Oversight (OLO) finds the racial equity and social justice (RESJ) impact of Expedited Bill 21-22 is indeterminant due to insufficient information on the demographics of the Bill's beneficiaries, as well as on the potential effects on gun violence and police interactions in the County.

## PURPOSE OF RESJ IMPACT STATEMENT

The purpose of RESJ impact statements is to evaluate the anticipated impact of legislation on racial equity and social justice in the County. Racial equity and social justice refer to a **process** that focuses on centering the needs, leadership, and power of communities of color and low-income communities with a **goal** of eliminating racial and social inequities.[1] Achieving racial equity and social justice usually requires seeing, thinking, and working differently to address the racial and social harms that have caused racial and social inequities.[2]

## PURPOSE OF EXPEDITED BILL 21-22

Gun violence is a significant public health problem in the United States. In 2020, there were 45,222 gun-related deaths, 54 percent of which were suicides and 43 percent of which were homicides.[3] Gun homicides have recently been highlighted as a rapidly growing concern, potentially a result of distress during the pandemic.[4] In 2020, 79 percent of homicides involved a firearm, the highest percentage recorded in over 50 years.[5] Further, the firearm homicide rate jumped 35 percent in 2020, an increase deemed as historic by the Centers for Disease Control and Prevention (CDC).[6] The U.S. also stands out internationally when it comes to gun homicides. Among high-income countries with populations of 10 million or more, the U.S. ranks first in gun homicides, having a rate more than double the next country on the list, Chile, and 22 times greater than in the European Union as a whole.[7]

Following the Supreme Court decision on *New York State Rifle & Pistol Assn. v. Bruen, Superintendent of New York State Police*, Governor Larry Hogan ordered Maryland State Police to suspend the 'good and substantial reason' standard in reviewing applications for wear-and-carry permits.[8] Recent reports have noted a sharp increase in new permit applications in Maryland following the governor's orders.[9]

The goal of Expedited Bill 21-22 is to "prevent an individual from possessing a firearm within 100 yards of a place of public assembly even when the individual has a wear-and-carry permit from the State of Maryland."[10] The Bill achieves this goal through removing an exemption in County law that currently allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly.

**Office of Legislative Oversight**                                   **August 5, 2022**

(10)

Case 8:21-cv-01736-DLB   Document 40-4   Filed 11/30/22   Page 21 of 228

# RESJ Impact Statement
## Expedited Bill 21-22

State law currently prohibits permit carriers from possessing firearms at specific locations, including school property, state buildings, and state parks, among other locations. Bill 21-22 broadens the restricted areas established by the state to include places of public assembly as defined by County law, which includes parks, places of worship, schools, libraries, recreational facilities, hospitals, community health centers, long-term facilities, or multipurpose exhibition facilities, such as fairgrounds or conference centers. A place of public assembly can be publicly or privately owned, and includes all property associated with the place, such as a parking lot or grounds of a building.[11]

Expedited Bill 21-22 was introduced to the Council on July 12, 2022.

In February 2021, OLO published a RESJ impact statement (RESJIS) for Bill 4-21, Weapons – Protection of Minors and Public Places – Restrictions Against Ghost Guns and Undetectable Guns.[12] OLO builds on Bill 4-21's analysis for this RESJIS.

## GUN VIOLENCE AND RACIAL EQUITY

Black, Indigenous, and Other People of Color (BIPOC), have long experienced significant disparities in gun violence. Regarding the recent sharp increase in gun homicides, researchers at the CDC stated:

> "The firearm homicide rate in 2020 was the highest recorded since 1994 (1). However, the increase in firearm homicides was not equally distributed. Young persons, males, and Black persons consistently have the highest firearm homicide rates, and these groups experienced the largest increases in 2020. These increases represent the widening of long-standing disparities in firearm homicide rates. For example, the firearm homicide rate among Black males aged 10–24 years was 20.6 times as high as the rate among White males of the same age in 2019, and this ratio increased to 21.6 in 2020."[13]

While some attribute violence in BIPOC communities to individual behaviors and choices, these explanations often ignore the central role government has played in driving segregation and concentrated poverty, common conditions in communities stricken with violence. The following section provides an overview of studies that explore the relationship between violence, segregation, and concentrated poverty, with the intent of demonstrating that racial and ethnic disparities in gun violence are neither natural nor random. Please see the RESJIS for Expedited Bill 30-21, Landlord-Tenant Relations – Restrictions During Emergencies – Extended Limitations Against Rent Increases and Late Fees, for detailed background on the government's role in fostering segregation and the racial wealth divide.[14]

**Drivers of Gun Violence.** Multiple studies have pointed to residential segregation and concentrated poverty as strong predictors of violence, and more specifically gun violence, in communities, for instance:

- A study of 103 metropolitan areas over five decades found that "(1) racial segregation substantially increases the risk of homicide victimization for blacks while (2) simultaneously decreasing the risk of white homicide victimization. The result…is that (3) segregation plays a central role in driving black-white differences in homicide mortality."[15]

- A study of over 65,000 firearm-related deaths among U.S. youth ages 5 to 24 between 2007 and 2016 found that "higher concentration of county-level poverty was associated with increased rates of total firearm-related deaths." Moreover, "two-thirds of firearm-related homicides could be associated with living in a county with a high concentration of poverty."[16]

**Office of Legislative Oversight**                    2                    **August 5, 2022**
(11)

# RESJ Impact Statement
## Expedited Bill 21-22

- A study of U.S. gun violence data between 2014 and 2017 found that "gun violence is higher in counties with both high median incomes and higher levels of poverty." The researchers went on to state that the "findings may well be due to racial segregation and concentrated disadvantage, due to institutional racism, police-community relations, and related factors."[17]

- A study of shootings in Syracuse, New York between 2009 and 2015 found that "higher rates of segregation, poverty and the summer months were all associated with increased risk of gun violence."[18]

- A study of gunshot victims (GSVs) in Louisville, KY between 2012 and 2018 found that "[r]elative to green-graded neighborhoods, red-graded [redlined] neighborhoods had five times as many GSVs. This difference remained statistically significant after accounting for differences in demographic, racial, and housing characteristics of neighborhoods."[19]

- A study of 13 U.S. cities between 2018 and 2020 found that in 2020, "violence was higher in less-privileged neighborhoods than in the most privileged," where less-privileged neighborhoods demonstrated a higher degree of racial, economic, and racialized economic segregation.[20]

**Consequences of Gun Violence.** Gun violence has harmful effects that reverberate deeply in families and communities. As Dr. Thomas R. Simon, CDC Associate Director for Science, Division of Violence Prevention, stated to Vox "[p]art of the reason why violence is a public health problem is because of the significant and lasting health consequences for victims." The 2022 Vox article provides an overview of research on the toll of gun violence, including the following findings:[21]

- Survivors of gun violence are at an increased risk of chronic pain, psychiatric disorders, and substance abuse and are more likely to experience mental health challenges.

- More than 15,000 American children lose a parent to gun violence each year. Children who lose a parent (for any reason, including gun violence) are more likely to have lower educational attainment, which could lead to poorer health given the strong link between education and health outcomes.

- Even if a person has not directly lost a loved one to a gun incident, being exposed to gun violence in a community leads to mental health issues, including problems with social function, anxiety, and depression.

- A 2018 study of six American cities found that individual shootings cost between $583,000 and $2.5 million, depending on the city and whether the firearm injury was fatal or nonfatal.

**Data on Gun Violence.** National data in Table 1 demonstrates racial and ethnic disparities in gun homicides, whereby Black Americans had a firearm homicide rate eleven times that of White Americans in 2020. Latinx and Native Americans respectively had firearm homicide rates two and three times greater than Whites, while Asian/Pacific Islanders had a lower firearm homicide rate than Whites.

**Office of Legislative Oversight**           3           **August 5, 2022**

(12)

# RESJ Impact Statement
## Expedited Bill 21-22

**Table 1: 2020 Firearm Homicide Incidence by Race and Ethnicity, United States**

| Race and Ethnicity[22] | Number of Firearm Homicides | Rate of Firearm Homicides per 100,000 persons |
|---|---|---|
| Asian or Pacific Islander | 227 | 1.0 |
| American Indian or Alaska Native | 221 | 8.1 |
| Black | 11,904 | 26.6 |
| Latinx | 2,946 | 4.5 |
| White | 4,052 | 2.2 |

Note: Rates are age-adjusted
Source: Changes in Firearm Homicide and Suicide Rates Report, CDC

Local data also confirms racial and ethnic disparities in gun violence. A review of 2016-2018 data by Healthy Montgomery, the County's community health improvement initiative, found that Black residents had an age-adjusted firearm hospitalization rate of 8.6 per 100,000 persons, compared to 2.4 for Latinx residents, 1.2 for White residents, and 0.3 for Asian residents.[23]

## ANTICIPATED RESJ IMPACTS

To consider the anticipated impact of Expedited Bill 21-22 on RESJ in the County, OLO recommends the consideration of two related questions:

- Who are the primary beneficiaries of this bill?
- What racial and social inequities could passage of this bill weaken or strengthen?

**For the first question,** the primary beneficiaries of the Bill are presumably residents who frequent places of public assembly, as they could experience increased safety from more gun restrictions in these areas. However, there is no definitive data on the demographics of people who frequent places of public assembly in the County. As such, OLO cannot conclude whether there are racial or ethnic disparities among the primary beneficiaries of this Bill.

**For the second question,** OLO considers the effect this Bill could have on reducing gun violence in the County given its disproportionate impact on BIPOC residents. While there is strong evidence to suggest that restricting gun access can reduce gun violence,[24] there is little research on the effect of place-based restrictions such as those proposed in this Bill. Further, it is unclear how the enforcement of this law would potentially change police contact with residents, and whether that could worsen existing disparities in police interactions with BIPOC residents.[25]

Taken together, OLO finds that the RESJ impact of this Bill is indeterminant.

## RECOMMENDED AMENDMENTS

The Racial Equity and Social Justice Act requires OLO to consider whether recommended amendments to bills aimed at narrowing racial and social inequities are warranted in developing RESJ impact statements.[26] OLO finds that the RESJ impact of Expedited Bill 21-22 is indeterminant due to insufficient information on the demographics of the Bill's beneficiaries, as well as on the potential effects on gun violence and police interactions in the County. OLO does not offer recommended amendments since the Bill was not found to be inequitable.

**Office of Legislative Oversight**          4          **August 5, 2022**

(13)

# RESJ Impact Statement
## Expedited Bill 21-22

In their recently released study on increased gun violence, researchers at the CDC note, "[t]he findings of this study underscore the importance of comprehensive strategies that can stop violence now and in the future by addressing factors that contribute to homicide and suicide, including the underlying economic, physical, and social inequities that drive racial and ethnic disparities in multiple health outcomes."[27]  Should the Council seek to improve the RESJ impact of this Bill through incorporating recommended amendments or introducing companion legislation, the policy solutions highlighted by the CDC researchers in the study can be considered.

## CAVEATS

Two caveats to this racial equity and social justice impact statement should be noted.  First, predicting the impact of legislation on racial equity and social justice is a challenging analytical endeavor due to data limitations, uncertainty, and other factors.  Second, this RESJ impact statement is intended to inform the legislative process rather than determine whether the Council should enact legislation. Thus, any conclusion made in this statement does not represent OLO's endorsement of, or objection to, the bill under consideration.

## CONTRIBUTIONS

OLO staffer Janmarie Peña drafted this RESJ impact statement.

---

[1] Definition of racial equity and social justice adopted from "Applying a Racial Equity Lens into Federal Nutrition Programs" by Marlysa Gamblin, et.al. Bread for the World, and from Racial Equity Tools. https://www.racialequitytools.org/glossary
[2] Ibid
[3] John Gramlich, "What the Data Says about Gun Deaths in the U.S.," Pew Research Center, February 3, 2022. https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/
[4] Becky Sullivan and Nell Greenfieldboyce "Firearm-Related Homicide Rate Skyrockets Amid Stresses of the Pandemic, the CDC Says," Research News, NPR, May 10, 2022. https://www.npr.org/2022/05/10/1097916487/firearm-homicide-rates-soar-pandemic-cdc-says
[5] John Gramlich
[6] "Firearm Deaths Grow, Disparities Widen," CDC Newsroom, CDC, May 10, 2022. https://www.cdc.gov/media/releases/2022/s0510-vs-firearm-deathrates.html
[7] "On Gun Violence, the United States is an Outlier," Institute for Health Metrics and Evaluation," May 31, 2022. https://www.healthdata.org/acting-data/gun-violence-united-states-outlier
[8] "Governor Hogan Directs Maryland State Police to Suspend 'Good and Substantial Reason' Standard For Wear and Carry Permits," The Office of Governor Larry Hogan, July 5, 2022. https://governor.maryland.gov/2022/07/05/governor-hogan-directs-maryland-state-police-to-suspend-good-and-substantial-reason-standard-for-wear-and-carry-permits/
[9] Frederick Kunkle, "Supreme Court Ruling Sets Off Rush for Concealed Gun Permits in Maryland," Washington Post, July 18, 2022. https://www.washingtonpost.com/dc-md-va/2022/07/15/concealed-carry-maryland-guns-hogan/
[10] "Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly," Montgomery County, Maryland, July 12, 2022. https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2022/20220712/20220712_10A.pdf
[11] Ibid
[12] Racial Equity and Social Justice Impact Statement for Bill 4-21, Office of Legislative Oversight, Montgomery County, Maryland, February 8, 2021. https://montgomerycountymd.gov/OLO/Resources/Files/resjis/2021/RESJIS-Bill4-21.pdf
[13] Scott R. Kegler, Thomas R. Simon, et. al., "Vital Signs: Changes in Firearm Homicide and Suicide Rates – United States, 2019-2020," Morbidity and Mortality Weekly Report (MMWR), CDC, May 13, 2022. https://www.cdc.gov/mmwr/volumes/71/wr/mm7119e1.htm?s_cid=mm7119e1_w

**Office of Legislative Oversight**          5                    **August 5, 2022**

(14)

# RESJ Impact Statement
## Expedited Bill 21-22

---

[14] Racial Equity and Social Justice Impact Statement for Expedited Bill 30-21, Office of Legislative Oversight, Montgomery County, Maryland, September 9, 2021. https://montgomerycountymd.gov/OLO/Resources/Files/resjis/2021/Bill30-21RESJ.pdf

[15] Michael T. Light and Julia T. Thomas, "Segregation and Violence Reconsidered: Do Whites Benefit from Residential Segregation," American Sociological Review, July 9, 2019. https://journals.sagepub.com/doi/abs/10.1177/0003122419858731

[16] Jefferson T. Bennet, Lois K. Lee, et. al., "Association of County-Level Poverty and Inequities with Firearm-Related Mortality in US Youth," JAMA Pediatrics, November 22, 2021. https://jamanetwork.com/journals/jamapediatrics/article-abstract/2786452

[17] Blair T. Johnson, Anthony Sisti, et. al., "Community-Level Factors and Incidence of Gun Violence in the United States, 2014-2017," Social Science & Medicine, July 2021. https://www.sciencedirect.com/science/article/abs/pii/S0277953621003014

[18] David A. Larsen, Sandra Lane, et. al., "Spatio-Temporal Patterns of Gun Violence in Syracuse, New York 2009-2015," PLOS ONE, March 20, 2017. https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0173001

[19] Matthew Bennis, Matthew Ruther, et. al., "The Impact of Historical Racism on Modern Gun Violence: Redlining in the City of Louisville, KY," Injury, October 2020. https://www.sciencedirect.com/science/article/abs/pii/S0020138320305490

[20] Julia P. Schleimer, Shani A. Buggs, et. al., "Neighborhood Racial and Economic Segregation and Disparities in Violence During the COVID-19 Pandemic," American Journal of Public Health, January 2022. https://pubmed.ncbi.nlm.nih.gov/34882429/

[21] Keren Landman, "Guns Do More than Kill," Vox, June 6, 2022. https://www.vox.com/science-and-health/23151542/gun-deaths-firearm-injuries-violence-health-grief-mental-physical

[22] Latinx people are not included in other racial groups throughout this impact statement, unless where otherwise noted.

[23] "Healthy Montgomery Core Measures: Firearm Hospitalization," Healthy Montgomery, Montgomery County, Maryland, Accessed August 2, 2022. https://www.montgomerycountymd.gov/healthymontgomery/chart.html

[24] "Gauging the Effectiveness of Gun Control Laws," News from Columbia Law, Columbia Law School, March 10, 2016. https://www.law.columbia.edu/news/archive/gauging-effectiveness-gun-control-laws

[25] Elaine Bonner-Tompkins and Nataliza Carrizosa, OLO Report 2020-9: Local Policing Data and Best Practices, Office of Legislative Oversight, July 12, 2020. https://montgomerycountymd.gov/OLO/Resources/Files/2020%20Reports/OLOReport2020-9.pdf

[26] Bill 27-19, Administration – Human Rights – Office of Racial Equity and Social Justice – Racial Equity and Social Justice Advisory Committee – Established, Montgomery County Council

[27] Kegler, Simon, et. al.

**Office of Legislative Oversight**                    6                    **August 5, 2022**

(15)

# Economic Impact Statement
## Office of Legislative Oversight

## Expedited Bill 21-22      Weapons – Firearms In or Near Places of Public Assembly

## SUMMARY

The Office of Legislative Oversight (OLO) anticipates that enacting Bill 21-22 would have an insignificant impact on economic conditions in the County in terms of the Council's priority indicators.

## BACKGROUND

The goal of Bill 21-22 is to protect places in or near places of public assembly from gun violence.[1] The Bill would attempt to achieve this goal by amending the law regarding restrictions against firearms in the County in two ways. First, it would "prohibit the possession of firearms in or near areas of public assembly." Second, it would "remove an exemption that currently allows individuals with certain handgun permits to possess weapons within 100 yards of a place of public assembly."[2] If enacted, the change in law would take effect on the date it becomes law.[3]

## INFORMATION SOURCES, METHODOLOGIES, AND ASSUMPTIONS

Per Section 2-81B of the Montgomery County Code, the purpose of this Economic Impact Statement is to assess the impacts of Bill 21-22 on County-based private organizations and residents in terms of the Council's priority economic indicators and assess whether the Bill would likely result in a net positive or negative impact on overall economic conditions in the County.[4] It is doubtful that enacting Bill 21-22 would impact firearm sales from County-based gun shops. Moreover, while gun violence has direct and indirect economic costs for victims, perpetrators, and other stakeholders,[5] it is beyond the scope of this analysis to assess the effectiveness of the restrictions in preventing gun violence in the future. Thus, OLO does not anticipate the changes to the law regarding restrictions against firearms in the County to have significant economic impacts on private organizations, residents, or overall conditions in the County.

## VARIABLES

Not applicable

---

[1] Legislative Request Report.
[2] Bill 21-22.
[3] Ibid.
[4] Montgomery County Code, Sec. 2-81B.
[5] A State-by-State Examination of the Economic Costs of Gun Violence; Follman et al, "The True Cost of Gun Violence in America."

**Montgomery County (MD) Council**                                                    1

(16)

# Economic Impact Statement
Office of Legislative Oversight

## IMPACTS

WORKFORCE ▪ TAXATION POLICY ▪ PROPERTY VALUES ▪ INCOMES ▪ OPERATING COSTS ▪ PRIVATE SECTOR CAPITAL INVESTMENT ▪ ECONOMIC DEVELOPMENT ▪ COMPETITIVENESS

### Businesses, Non-Profits, Other Private Organizations

Not applicable

### Residents

Not applicable

## DISCUSSION ITEMS

Not applicable

## WORKS CITED

A State-by-State Examination of the Economic Costs of Gun Violence. U.S. Congress Joint Economic Committee, Democratic Staff. September 18, 2019.

Mark Follman, Julia Lurie, Jaeah Lee, and James West. "The True Cost of Gun Violence in America." *Mother Jones*. April 15, 2015.

Montgomery County Code. Sec. 2-81B, Economic Impact Statements.

Montgomery County Council. Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly. Introduced on July 12, 2022.

## CAVEATS

Two caveats to the economic analysis performed here should be noted. First, predicting the economic impacts of legislation is a challenging analytical endeavor due to data limitations, the multitude of causes of economic outcomes, economic shocks, uncertainty, and other factors. Second, the analysis performed here is intended to *inform* the legislative process, not determine whether the Council should enact legislation. Thus, any conclusion made in this statement does <u>not</u> represent OLO's endorsement of, or objection to, the Bill under consideration.

## CONTRIBUTIONS

Stephen Roblin (OLO) prepared this report.

**Montgomery County (MD) Council**　　　　　　　　　　　　　2

(17)



**In Support of Expedited Bill 21-22, Weapons -Firearms In or Near Places of Public Assembly**
*On behalf of the Association of Independent Schools of Greater Washington*

July 20, 2022

I am submitting this testimony as Executive Director of the Association of Independent Schools of Greater Washington ("AISGW") in support of *Expedited Bill 21-22, Weapons-Firearms In or Near Places of Public Assembly*. AISGW represents 78 member schools in the greater D.C. area, and our schools educate over 10,000 students in Montgomery County alone. *Expedited Bill 21-22* would prevent an individual from possessing a firearm within 100 yards of a "place of public assembly" even when the individual has a wear-and-carry permit from the State of Maryland. The definition of public assembly includes schools. This restriction strengthens current County law, which currently exempts individuals with permits from the restriction against carrying weapons within 100 yards of places of public assembly.

We commend the Montgomery County Council for these efforts to stem acts of gun violence that have become shockingly all too common in our communities and on our school grounds. The recent mass shooting at the Robb Elementary School in Uvalde, Texas, along with the persistent and terrifying recurrence of mass shootings across our country, have left school leaders once again consoling and calming their communities while searching for solutions to keep their school communities safe. Indeed, one of our very own AISGW schools was subject to a harrowing act of gun violence in April of this year.

We understand that Maryland State law already prohibits the wear, carry and transport of handguns and firearms on public school grounds. *CR 4-102.* Extending that protection to *all* schools, as well as other community gathering places throughout the County, however, is an important and – unfortunately – very necessary next step as we see this wave of gun violence continue. Moreover, we urge the County to consider any other steps that would keep our children safe, whether those include broader prevention and education efforts, or prohibitions such as this proposed legislation, aimed at preventing this violence from reoccurring.

I appreciate the opportunity to comment on the proposed legislation on behalf of our AISGW member schools and would welcome any chance to support further the goals of keeping our children and our school campuses protected from this persistent threat.

On Monday, July 11th, County Council President Gabe Albornoz introduced Bill 21-22, to remove the exemption for W&C permit holders from the county's ban on possessing firearms "in or within 100 yards of a place of public assembly," which includes parks and churches, banning carry in those places. I oppose this bill as an infringement on our residents' recently affirmed constitutional rights as issued by the US Supreme Court(i.e., Bruen case).

The bill provides no requirement for the county to clearly mark which of these areas are to be "gun-free zones," which will result in confusion among law-abiding citizens who are permit holders.

The legislation also makes no mention of whether the county intends to guarantee the safety of disarmed citizens in those places with measures, such as metal detectors or police presence. Gun free zone declarations are soft targets for criminals and those intent on wrecking havoc. |

Also, this proposed bill like many of the Democratic Party and left wing gun control policies of extreme gun control over the years have and will not work given high crime and murder rates in many Maryland cities and towns – not be law abiding gun owners but by criminals and unstable persons.

This proposed bill  will not improve safety of our citizens. Armed criminals, who already illegally carry without any permits and illegally possess firearms in violation of state and federal laws, will likely ignore the arbitrary boundaries created by this ordinance.

This bill would create more targets of opportunity for criminals and  prevent responsible law abiding citizens from their right of self-defense.  Recent mall shooter in Indiana was terminated by a law abiding citizen with a legal carry permit, saving untold additional lives.  Good people carrying self-defense capabilities are far more effective at deterring crime and reducing crazed mayhem than any police presence can do.  I urge the council to vote No on Bill 21-22 to keep Montgomery County safer than if it was passed into law.  If the Council approves this measure then the Council needs to address the safety of unarmed citizens in these gun free zones and take measure to ensure access to these "gun free zones" provides control points to ensure the safety of us.

(19)

To the members of the council,


My name is Anthony Nelson, and I have been a resident of Montgomery county since roughly 2013. I previously lived in Prince George's County where I experienced more than my fair share of crime directly or indirectly including robbery, home break-ins, and car theft. That was precisely part of my desire to move out to an area that for most of my life, I considered to be relatively low in crime and safe.

As a lifelong resident of Maryland, it has been a long frustrating road for the issue of self-defense and Maryland's views to the methods in which one chooses to defend themselves. For my entire adult life, I have had to accept lawfully, that I am not able to defend myself or my family to the best of my ability due to what many politician's refer to as "common-sense gun legislation." Up until July 5, 2022, Maryland has remained a "may issue" state in regards to the issuance of any type of permit to carry citing "good and substantial" reasoning which to most, felt like an arbitrary term that applied to a very small population. The recent Supreme Court Ruling and subsequent statement from Gov. Hogan suspending the "good and substantial" clause was an exciting time for many Marylanders and a restoration of a long  restricted constitutional right as well as the "unalienable right" to Life mentioned in the countries founding document. A right that governments were instituted to secure.

Despite the legislation that Maryland has upheld for all these years, touting some of the strictest gun laws on the books in the country, Maryland has remained competitive in the category of "most homicides by state" category. This can be partly contributed to Maryland's unwillingness to prosecute criminals who are in turn released and commit more heinous crimes; as well as enforce laws that are already on the books. As recent as June, Deputy First Class Glenn Hilliard was murdered by a man who should have been previously locked-up for being convicted of armed robbery. I would like to note that at the time of the armed robbery and at the time of the murder of Deputy Hilliard, the suspect was under the age of legal handgun ownership in the state of Maryland. At the time of this letter, just one week ago, a 15-year-old squeegee worker in Baltimore shot and killed a bat-wielding man in Baltimore. While all of the details of the case may never all be known, we know that a 15-year old boy was armed and it was stated that most of the boys who are on these corners providing this service are as well. This stands to show that no matter what laws are on the books, criminals will always willfully disobey them, and it is always the law-abiding citizen who is left at a disadvantage. This legislation is not aimed at keeping criminals from bringing guns into "public areas," because we all know that criminals will do it no matter what the law says. What we do know for sure is that criminals don't look for resistance or a fight, they look for victims and easy targets. This bill only creates more of the latter.

Driving into my home city of Olney now, there are road signs warning of car jackings. A January 2022 WTOP article titled "Homicides, carjackings up in Montgomery County" is a constant lingering thought in my head when I come to a stop light with my 3 small children who are under the age of 6 and wife all in the vehicle. The article denotes an 88% rise in homicides and 72% increase in carjackings. Average law-abiding citizens are tired of being a statistic. Having more trained citizens looking to protect themselves and their families suddenly becoming criminals because of a law based on no data is the exact reason why crime statistics in this county will continue to rise if this unconstitutional bill is passed.

Members of this council have stated that Marylanders want this bill passed; however I think it can be reasonably argued by the influx of applications for wear and carry permits, as well as the current backlog

(20)

of people trying to sign up for the class, is quite representative of the climate. This bill, while directly in opposition to the supreme court ruling and purpose for the ruling in the first place, stands to turn law-abiding citizens who took the time to get the training and spent upwards of $1000 in total to exercise a constitutional right into criminals.

I strongly urge the council to rescind this bill as it is in opposition to the recent supreme court ruling, as well as the basic human rights we all have, to defend ourselves and our families.


Thank you for your time and attention.


Sincerely,

Anthony Nelson

(21)

21 July, 2022

Mr. Gabe Albornoz
President, Montgomery County Council

Regarding Bill 21-22 to remove the exemption from Montgomery County Code § 57.11 for holders of Maryland Wear and Carry Permit from within 100 yards of "Place of Public Assembly.

Dear Mr. Albornoz,

I write to oppose Bill 21-22. This new bill would remove the existing exception for permit carry that has long existed in Montgomery County code, and is a clear violation of the Supreme Court's decision in *NYSRPA v. Bruen* as it would ban carry by a permit holder virtually everywhere including stores and businesses throughout Montgomery County. Carry permits will be useless in Montgomery County if this bill is enacted and allowed to stand.

I am a resident of Anne Arundel County; however, I frequent Montgomery County to access the wonderful care at a Johns Hopkins Wilmer Eye Institute in Bethesda. Unfortunately, I suffer from glaucoma, which has been difficult to control. While I am not allowed to carry within hospitals and medical clinics, Bill 21-22 would not allow me even to carry within the county in order to access quality health care. Why are you afraid of a law-abiding citizen, like me, who may find it necessary to find health care elsewhere should this law be passed?

Please do not vote for Bill 21-22.

Sincerely,
Cathy S. Wright

(22)

JA153

My name is Galen Muhammad and I am the State Director of Maryland and Washington, DC for the National African American Gun Association or NAAGA.  I am also the chapter president for the NAAGA chapter in Prince George's County – Onyx Sharpshooters.

I am **vehemently** opposed to this bill as I often travel through Montgomery County as a law-abiding citizen who is a concealed carry licensee. While I don't live in Montgomery County, the members of my gun club, others who are also concealed carry licensees and those who seek said license will be barred from conducting business or just traveling from Point A to Point B within Montgomery County.

As a certified firearms instructor, I also plan to visit my Montgomery County chapter and their events within the county and train residents of Montgomery County at locations in Montgomery County and I do travel with my concealed carry firearms.

This bill gives absolutely no consideration, nor does it mention the fact that those with the Wear & Carry license are **already prohibited** from many areas, including sporting events, federal, state, county and city buildings, public transportation, public schools, colleges and universities, banks, retail establishment with clearly posted signage, post offices **AND** their parking lots, etc. These are the proverbial "*bricks*" around which we, law-abiding citizens, who **legally** concealed carry legally navigate.  This *vague* bill being proposed seeks to be the "***mortar***" to fill in the gaps and add additional and unnecessary areas, creating and manufacturing a problem where there isn't one.

This bill also overlooks the mandatory firearms training that each licensee must attend to be qualified to receive the Wear & Carry license. During this training, we are taught that Maryland is **NOT** a Castle Doctrine state and that we have a duty to retreat, if possible.

I ask that this bill be given an unfavorable report.

(23)

JA154

To the Honorable Members of the County Council of Montgomery County, MD

Gabe Albornoz, Chairman
Andrew Friedson
Evan Glass
Tom Hucker
Will Jawando
Sidney Katz
Nancy Navarro
Craig Rice
Hans Riemer

From: Dr. Jack L. Rutner
Silver Spring MD

Re: Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly

This purpose of this testimonial letter is to raise questions to the Montgomery County Council about the constitutionality of the proposed legislation embodied in Bill 21-22.  This testimonial letter will cover three issues:
I.    The guidance provided by the Supreme Court to the Courts in the Bruen decision in how to adjudicate Second Amendment cases henceforth;
II.   The Supreme Court's discussion on sensitive places;
III.  The Supreme Court's reference to D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 *Charleston L. Rev.* 205 (2018), and Brief for Independent Institute as *Amicus Curiae* and how they would affect the constitutionality of Expedited Bill 21-22.

I: The Supreme Court in the Bruen decision (8: II) reviewed the two-step procedure Courts of Appeal have used since the *Heller* and *McDonald* decisions.  The Court held that, that was one step too many.  Specifically, the Court wrote:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. **To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.** Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." (My emphasis.)

The Court emphasizes this further when it writes (10: IIB):

> the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

On examining Expedited Bill 21-22 I find nowhere does it show how the proposed regulation expanding sensitive places to many places of public assembly falls within the scope of being consistent with "this Nation's historical tradition of firearm regulation." Absent such analysis Expedited Bill 21-22 appears to on infirm constitutional grounds.  On this basis alone a legal challenge to the constitutionality of 21-22 will prove successful in the federal courts.

II. With regard to sensitive places, the Court discussed the issue of sensitive places.  It wrote that expanding sensitive places to a large variety of places of public assembly is inconsistent with the

(24)

JA155

Second Amendment.  In particular, it writes (22) about New York State's view on sensitive places:

> In [New York State's] view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. **But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly.** Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. (My emphasis.)

Expedited Bill 21-22 does precisely what the Court counseled governments not to do, which is to expand the category of sensitive places to almost all places of public congregation.  According to the Court, that categorizes sensitive places far too broadly.  Indeed, based on the Court's language in Bruen, should the Council pass Expedited Bill 21-22, legal challenges to it would be successful because of the overly broad categorization of sensitive places.  When that is coupled with the absence of analysis demonstrating that 21-22 is consistent with this Nation's historical tradition of firearm regulation, then it would seem 21-22 is on very legally infirm constitutional grounds and will not be upheld in federal court.

III. The definition of public places in Expedited Bill 21-22 is derived from Bill 4-21.  They are:
> [A] place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as a fairgrounds or conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building."

Most of those places in 4-21 do not fall within the purview of public places based on the current references in its discussion in Bruen (21) regarding sensitive places.  There, it pointed to an article in *Charleston Law Review* from 2018 title the "Sensitive Places Doctrine" by Kopel and Greenlee (hereinafter, KG), and to the *Amicus Curia* Brief of the Independent Institute (hereinafter BII).  Both documents discuss sensitive places while the latter provides guidance on "longstanding" laws regarding such places/

In the KG article, there is a useful summary of the sensitive place doctrine (287*f.*), some of which I quote here (with my emphasis):
> *Extensions by analogy to schools and government buildings.* It is difficult to create a rationale for extending the "sensitive places" doctrine to places that are not schools or government buildings. As discussed above, there are few "longstanding" restrictions on other locations.
>
> Given the thin historical record, one can only guess about what factors make places "sensitive." Some of the guesses are: **places where most persons therein are minors (K-12 schools), places that concentrate adversarial conflict and can generate passionately angry emotions (courthouses, legislatures, polling places), or buildings containing people at acute personal risk of being targets of assassination (many government buildings).**
>
> **The answer cannot be that the places are crowded.** Sometimes they are, but no more so than a busy downtown sidewalk, and sidewalks are not sensitive places.

(25)

Rather than try to figure out analogies to "schools and government buildings," the better judicial approach for other locations is simply to give the government the opportunity to prove its case under heightened scrutiny.

**Buffer zones are not sensitive places.** **Heller allows for carry bans "in" sensitive places—not bans "around" or "near" sensitive places. Accordingly, buffer zones are not sensitive places.**

…

**Laws that broadly negate the right to arms are not legitimate precedents.** **Laws that widely prohibit bearing arms are contrary to the text of the Second Amendment. Accordingly, they are not a legitimate part of the history and tradition of the right to bear arms.**

In my opinion the critical passages for 21-22 in this summary by KG are those bolded. It is clear that Bill 21-22 would widely prohibit carrying arms in a large variety of places within the County. As KG observe, "Laws that widely prohibit bearing arms are contrary to the text of the Second Amendment." Moreover, as they suggest, an argument that such places are crowded will be insufficient to sustain the constitutionality of Bill 21-22 under heightened scrutiny.

Bill 21-22 defines places of public assembly to those listed in Bill 4-21. Most of those places though do not meet the criteria KG outline in their summary for sensitive places. The places I think that do not meet those criteria are places of worship, recreational facilities, hospital, community health centers, long-term facility, multipurpose exhibition facilities (e.g., fairgrounds or conference centers). Such places are not places where most persons are minors, they are not places which concentrate adversarial conduct and they are not places where passionate angry emotions are generated. Declaring them off limits to the legal carriage of guns therein again will prove to be on constitutionally infirm ground based the guidance in Bruen.

Another issue of Bill 21-22 is the creation 100-yard buffers zones around places of public assembly. Such buffer zones under Bruen are most likely not be justifiable for Second Amendment cases. KG reviewed several court cases regarding buffer zones around sensitive places of which I will summarize one. The case is an Illinois case termed, the *People v. Chairez*. The State of Illinois had made it illegal to carry a firearm within a 1,000-foot buffer zone around a state park. According to KG (269), the Illinois Supreme Court ruled: "that the law severely burdened the core of the right to bear arms, because it prohibited the carriage of weapons for self-defense and it affected the entire law-abiding population of Illinois." Moreover the Court found that the 'State was unable to support its "assertion that a 1000–foot firearm ban around a public park protects children, as well as other vulnerable persons, from firearm violence" ' (KG, 269*f.*). Bill 21-22 appears to contain both defects found in *People v. Chairez*: it affects the entire law-abiding population of Montgomery County; and the County will be unable to support an assertion that buffer zones protect children and vulnerable persons. Consequently, the buffer zones themselves are not sensitive places and would be ruled unconstitutional. Moreover, based on the guidance in the Bruen decision, even if the County could show that such buffer zones might protect children and vulnerable persons that would be insufficient to meet the criterion of being within "the historical tradition of firearm regulation" and so would be declared unconstitutional based solely on that.

We turn next to *Amicus Curiae* brief filed by Independent Institute (BII) in the Bruen Case for further guidance on the issue of sensitive places and longstanding traditions of restricting Second Amendment rights. In BII, there is a short review of American laws regarding sensitive places, which it sometimes terms, "gun-free zones." According to BII (11), in colonial America, "gun-free zones through the time of the Founding were limited …"

(26)

A notable exception was Maryland's ban on bringing weapons into houses of Assembly (government buildings). According to BII (12) Virginia followed up on that a century later when it 'forbade most (but not all) people from "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms." … Virginia's law also barred citizens from carrying arms "in other places," but only when such carrying was done "in terror of the country," *id.*, thus respecting a general right to peaceably carry but carving out a narrow exception for courts.' Thus, according to BII, government buildings would meet the criterion laid down in Bruen of being consistent with "this Nation's historic tradition of firearm regulation" insofar as such bans are longstanding traditions. On the other hand, a ban on firearms in a wide variety of places of public assembly, such as in 21-22, would not be consistent with that historic tradition because there is no longstanding tradition of banning firearms in such places. Hence, the constitutionality of a such a bill would no doubt not be upheld in federal court based on the guidance the Court provided in Bruen.

BII does indicate certain narrow conditions under which government can ban firearms consistent with the Second Amendment (see BII, 22). It writes:

> The most obvious way is to limit modern gun-free zones to areas in which the government has demonstrated a serious commitment and a realistic ability to ensure public safety. This can be accomplished by ensuring that would-be criminals are prevented by more than the normative power of a legal prohibition to remain unarmed through, *e.g.*, the provision of law enforcement officers and armed security, along with metal detectors or other defensive instruments.

It writes further (BII 24):

> If the government cannot (or chooses not to) provide protection similar to that at airports in other areas, then designating those areas as "gun free" necessarily eviscerates (*sic.*) the self-defense right and, accordingly, constitutes a Second Amendment violation.

It would appear from BII, that if the Council bans firearms in public places without its supplying adequate security and specifically by supplying adequate law enforcement personnel and metal detectors, it will have eviscerated the self-rights of the citizens of Montgomery County and anyone else who comes into the County. Hence, I think that under the current guidance found in Bruen, Expedited Bill 21-22 is on infirm constitutional grounds and will be found unconstitutional in federal court.

(27)

**The Institute for Forensic Psychology**

**Jack Leeb, PsyD**
Police & Public Safety Psychology
*Associate Member, International Association of Chiefs of Police*
*Associate Member, Maryland Chiefs of Police Association*
*Certified Force Science Analyst*

914 Brentwood Lane
Silver Spring, MD 20902
(301) 452-4900 voice
(301) 593-9191 fax
www.policetest.com
drleeb1@gmail.com

Date:   19 July 2022
To:     Montgomery County Council
Re:     Bill 21-22

As a police psychologist, firearms instructor, and MD Wear and Carry permit holder for over 20 years, I am very concerned about County Council bill 21-22, which would effectively negate the recent US Supreme Court decision affirming the right of law-abiding citizens to carry a firearm in public. As a police psychologist I have received threats over the years related to my work; I have also studied criminal behavior. As a firearms instructor I transport firearms to and from classes and the range and have witnessed firsthand over the past 25 years just how serious the average citizen who desires to possess a firearm is with regard to its use and safety in general. I have been comforted by the fact that I have the option to carry a firearm to protect myself and my family when out and about, and I have been proud of my fellow law-abiding citizens' clear desire to do the right thing with regard to the possession and use of a firearm.

I would remind Council members that, in general, concealed carry permit holders across the United States are far more law abiding than those who do not possess a permit. CCW permit holders do NOT commit crime; rather, law-abiding citizens who have the ability to defend themselves STOP crimes from occurring hundreds of times every day in the US, in most cases without firing a shot. Since criminals routinely ignore laws, these events would more frequently end in victimization of the law-abiding if we do not have the means to defend ourselves.If passed, not only would bill 21-22 deprive law-abiding citizens of the right to defend themselves and their families, but it would make anyone who is legally permitted to carry a firearm elsewhere in Maryland a criminal in Montgomery County. Expecting W&C permit holders to stop, unload their firearms before crossing the Montgomery County line, and store the firearm in a lock box is not only unrealistic, but also *unsafe*.

In addition, given Maryland's stringent background checks and training requirements, it is even less likely that a Marylander who legally carries a firearm would use it inappropriately or unlawfully. I respectfully ask that you re-consider bill 21-22 and not eliminate my right, and the right of other law-abiding citizens, to defend ourselves. I would be happy to discuss this matter with the Council as a whole, or with any members who might wish speak with me about this important topic.

Thank you.

Jack Leeb PsyD
Police and Public Safety Psychology
301 452-4900

I feel it is uncostitutional and unsafe for the general public to create unlimited gunfree zones to keep legally o
with little or no resistance or fear of being stopped or caught. Everyone that creates these laws are

Thank you

(29)

surrounded by their own armed security and don't have to defend theirselves or family on their own.

(30)

My name is James P. Tully. I am 55 years old and have been a Montgomery County Resident my Entire life. I have served in the Military, and for the past 22 years I have been a Uniformed Diplomatic Security Officer at the U.S. Department of State. I have been sworn in, as a Special Deputy U.S. Marshal, and have received training in Active Shooter Response. I am well acquainted with Gun Valence, and come to the conclusion that additional legislation does nothing to address criminal activity.

As a Maryland Ware and Carry Permit Holder, which I have had since 1995. I have strong Objections to Bill 21-22. By not allowing a permit holder to come within 100 yards of any place of public Assembly. This proposed bill will Make it impossible to travel any ware in Montgomery County with out being in violation of the law. An illegal weapons charge would result in criminal charges and having my Maryland Gun Permit revoked. These two actions would have an adverse effect on my current employment. Bill 21-20 will not allow me to travel in my car, or by foot, in my own neighborhood without passing within 100 yards of a school or state park.  I would not even be able to stand in my own back yard because my property is within 100 yards of a Montgomery County Park.

In addition, I object to definition of public venues, to including privately own property.  This is an example of extreme Government over reach. To Include Houses of worship is pure insanity. Multiple churches in this country have been the targets of active shooters. The reason being is that it is a soft target. The Active Shooters only has one mission, that is to kill as many people as they can. Not allowing people to defend themselves in their house of worship only would help facilitate another tragedy.

It is foolish to believe our local police departments can do any thing to prevent this sort of gun violence. Police resources are extreamly limited. The school Resource Officer was Removed from McGruder High School a few weeks before that school shooting. If I am not Mistaken, I believe a budget cut was cited as the reason. It is a tragedy that Montgomery County government took absolutely no responsibility for their lack of insight. The School Resource Officer would not have been in the school in the first place if there was not a clear and present known danger.

As a current Maryland Gun Permit Holder, I can say there is absolutely nothing wrong with the current restrictions that have been in place for many years. Most of the civilian gun violence does not involve permitholders anyway. This proposed Bill dose noting to stop Gun Violence and would only help facilitate more violence by preventing law abiding citizens from defending themselves. There is so much to say on this topic more to say on this topic. Brevity is of the upmost importance and I believe I made my point. In conclusion there is no reason this bill 21-22 be made into law.

**Commented [JT1]:** It

(31)

JA162

Hello,

I'm writing regarding Bill 21-22. I understand this bill removes the exemption for holders of Marylands Wear and Carry permit. This would make it illegal for permit holders to be within 100 yards of "Place of Public Assembly", which equates to everywhere in the county.

According to Data.montgomerycounty.md, from 6/1/2022 to 7/15/2022 there were over 4,800 founded crimes in Montgomery County. This equates to 106 crimes per day in the 45 day period. A quick internet search proves these are not legal permit holders committing these crimes. Bill 21-22 would leave me unable to protect myself from assault, burglary, theft, robbery and all such crimes were reported within the county. Why can a criminal have a weapon to commit these crimes but I, being a law abiding American citizen, cannot have one to protect myself from such crimes?

The Supreme Court upheld our right to defend ourselves outside our homes in the recent ruling of Bruen. Why are you attempting to subvert the Supreme Court and the constitution?

I have lived in WV, OH, PA and CO over my life. Maryland is the first place I have lived that I am afraid to be out of my home for an extended time. I am a law abiding citizen and I've completed all the necessary training and requirements in Maryland for a Wear and Carry permit. Carrying a weapon for protection is an overwhelming responsibility for the permit holder. Criminals have no requirements to meet and feel no such responsibility. It is reprehensible that a criminal is more protected than I am.

Bill 21-22 impacts my travel as I live in an adjoining county. I will no longer be able to see my physicians or patronize restaurants and shops in the county. I hope the officials of Montgomery County use statistics and facts and support their law abiding citizens.

Janice Hess Frederick County

1

(32)

July 15, 2022

Montgomery County Council
Legislative Branch
Bill 21-22

Gentlemen, I would respectfully vote against this bill. I have lived in Burtonsville,
Maryland for 16 years. I have seen an alarming rise in crime in this area, especially over
the last 4 years. This past week on July 10th, 2022 there was a shooting just down the
street from my house at the Briggs Chaney Market place. Over 60 shots were fired and
one innocent bystander was wounded by gunfire. This shooting happened within 2 hours
of a STRING of robberies in down town Silver Spring. Bill 21-22 would prevent law
abiding citizens from protecting themselves and their families and would do NOTHING
to prevent criminals from obtaining firearms and committing violence. I understand law
makers are desperate to solve gun violence but these laws don't affect criminals. There
are so many guns in this country, barring the banning of ALL guns, we need to be
smarter with possible solutions. Energy would be better spent on training and vetting of
carry applicants. Examining credentials and references for carry applicants would go a
long way to keeping us all safe.
Why do citizens need carry rights :
Unfortunately, there is a response time for police response. There are occasions when a
citizen will not have time to call and wait for the police. If I'm walking and attacked by
dogs I will not be able to call the police for help. If I'm walking and a robber threatens
me with a knife, I will not have the luxury of calling the police. Last year I called the
police to report a trespasser on my property. It took 40 minutes for the police to show up.

Respectfully,

John Murphy

(33)

JA164

Montgomery County Council                                      July 21, 2022
Legislative Branch
Bill 21-22

I would respectfully vote against this bill. Here are two examples why I feel this way.

On July 17, 2022 a gunman walked in to the food court of Greenwood Park Mall in Indiana. Shot and killed 3 innocent bystanders and wounded another 3. Elishjah Dicken, a 22 year old legally carrying, killed the gunman and was declared by local police and the Mayor a Hero who saved countless lives. YOUR bill would have prevented this intervention. WHERE WERE THE POLICE ???
WHERE WERE THE POLICE IN UVALDE ???

Closer to home in MONTGOMERY COUNTY yesterday, Wednesday July 20th at 1pm an elderly man out for a walk was attacked by a pit bull in Silver Spring. The owners had trouble stopping the attack even hitting the dog with their car. The victim is in the hospital. How many times does this happen ??  Google how many people are attacked by dogs every year. More than 4.5 million people are bitten by dogs in the USA each year. Many victims are killed.
I am elderly and walk every day in Burtonsville. I have been chased by stray dogs twice. You want to make Montgomery County safer ? How about banning pit bulls ? A breed known for vicious unprovoked attacks.
My house is close to 2 schools, a church, and the Burtonsville Library. No matter which direction I choose to walk I will be walking past one of these "Places of Public Assembly".
Every time I walk I fear being attacked by dogs. I am completely defenseless thanks to your carry laws.

John Murphy

(34)

My name is Jonathan Wrieden and I am a resident of Montgomery County. Bill 21-22 is blatantly unconstitutional and directly infringes on my right to self-defense. I was in the United States Army Infantry for ten years and am a combat veteran. I have more training than most police officers, yet this bill would prevent me from carrying a firearm in public for protection. Because of my extensive military training, I am an asset to society. If any of you were in a mass shooting scenario, you would want me there with a gun to save you. I do not trust the police to protect me or my wife in one of these situations. In most cases, mass shootings are over and the damage is already done before police can arrive. And even if police do arrive in time, I do not want to have to hope and pray they possess the courage to act, unlike the police officers in Uvalde. Furthermore, this bill will not stop criminals from carrying guns. That's why they're called criminals, because they break the law. If a criminal wants to carry out a mass shooting, then they are going to do it anyway and this bill will not stop them. This bill will only affect the law-abiding citizens. It will strip them of their right to protect themselves and their families. All law-abiding citizens can be assets to society. The solution is to properly train and equip them, not to strip them of their right to carry a firearm so that they are left defenseless against criminals. On July 17, 2022, an armed bystander shot a mass shooter who opened fire in a mall in Indiana. If it wasn't for this responsible citizen, the criminal would have killed many others. There are countless other examples of armed law-abiding citizens taking down mass shooters and thereby saving many lives while waiting for police to arrive. Do not let the recent sensationalizing of shootings in the media make you feel like you have to pass laws to make it look like you care enough to do something. This bill is nothing more than an emotional reaction to NYSRPA v. Bruen and it will not stand up in court. This bill does not pass the history and traditions test for constitutionality established by the Supreme Court in NYSRPA v. Bruen. You're going about it the wrong way. Focus on keeping guns out of the hands of criminals and keeping them in the hands of law-abiding citizens, the assets of society. That's the solution. I urge you not to pass Bill 21-22. It will cost lives, not save them. Thank you for your consideration.

(35)

Testimony regarding EXPEDITED BILL NO. 21-22,
Amending Montgomery County Code Chapter 57, Weapons, Section 57-11

                                                                    Michael Burke


**I rise in opposition to the language of the proposed Expedited Act to prohibit the possession of firearms in or near places of public assembly.**

As written -

**Section b) (2)** *(does not) apply to a law enforcement officer, or a security guard licensed to*

*carry the firearm…*

Please consider the extremely adverse consequences of your proposed bill.  Thousands of retired law enforcement officers reside in Montgomery County, while thousands more routinely travel through the county daily from across the greater DC Metropolitan Area.  You (the Council) and both the Montgomery County Police Department (MCPD), Montgomery County Sheriff's Office (MCSO) and the Maryland State Police (MSP) rely on these highly trained, well vetted, and experienced law enforcement veterans to assist them in maintaining the peace and responding to violent incidents (such as an active shooter).  Those retired officers, who carry their handguns under Maryland State Police Handgun Permits (issued at no cost to all former/retired Maryland officers and deputies) and retired Federal Agents and Officers (ATF, FBI, Secret Service, US Marshals, Military Police, Military Intelligence, and other counter-terrorist agencies) are prepared today, and tomorrow, to step in and STOP violent crime as it develops.  These men and women with decades of skills have been performing these public safety roles for decades.  I'm one of them.

Your bill would order thousands of women and men to DISARM and cease to function as unpaid auxiliary forces to safeguard the citizens of the County, and prevent them from coming to the aid and assistance of MCPD, MCSO, and MSP for fear of being arrested, detained, and prosecuted for unlawful possession of their handguns.  Is this what you truly desire?

Consider the cases of Deputy Chief State Fire Marshal Sander Cohen, and FBI Supervisory Special Agent Carlos Wolff.  These men took the extreme risk, both "off duty," to come to the aid of a Montgomery County citizen in distress, on Friday, December 8, 2017.  Both were killed that night.  Sander Cohen also served as a volunteer firefighter with the Rockville Volunteer Fire Department.  They died on I-270, near Great Falls Road, serving the citizens of Montgomery County, knowing the risks they faced by serving – you.

Consider the shooting at Magruder High School, in May 2022.  Off duty and retired law enforcement officers residing in the area responded to the report of "active shooter" at the school, knowing that meant placing their lives at risk – to potentially save CHILDREN, while the local precinct was short-staffed.  MCPD has 27 unfilled sworn positions, though brass and union leadership express concern for a "crisis" in the future.  Between April 2020 and April 2021,

                                                                             (36)


                                    JA167

Testimony regarding EXPEDITED BILL NO. 21-22,
Amending Montgomery County Code Chapter 57, Weapons, Section 57-11

Michael Burke

police resignations rose 26 percent, from 19 to 24, over the preceding 12 months. Retirements increased 18 percent, from 28 to 33, department data show.

The Law Enforcement Officers Safety Act (LEOSA) is a United States federal law, enacted in 2004, that allows two classes of persons—the "qualified law enforcement officer" and the "qualified retired or separated law enforcement officer"—to carry a concealed firearm in any jurisdiction in the United States, regardless of state or local law.  It is codified within the provisions of the Gun Control Act of 1968 as 18 USC § 926B and USC § 926C.  LEOSA also covers state and public university and/or college campus law enforcement officers (such as University of Maryland Police, Montgomery Community College Police, and approximately 20 other colleges and universities that have armed law enforcement officers).


18 USC § 926B

(a) Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b).

(b)This section shall not be construed to supersede or limit the laws of any State that—

(1) permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or

(2) prohibit or restrict the possession of firearms on any State or local government property, installation, building, base, or park.

(c), "qualified law enforcement officer" is defined as any individual employed by a governmental agency, who:

1. is authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law, and has statutory powers of arrest, or apprehension under section 807(b) of title 10, United States Code (article 7(b) of the Uniform Code of Military Justice); This includes state and public college/university police officers.
2. is authorized by the agency to carry a firearm;
3. is not the subject of any disciplinary action by the agency which could result in suspension or loss of police powers;
4. meets standards, if any, established by the agency which require the employee to regularly qualify in the use of a firearm;
5. is not under the influence of alcohol or another intoxicating or hallucinatory drug or substance; and
6. is not prohibited by Federal law from receiving a firearm.

(d) the individual must carry photographic identification issued by the governmental agency for which the individual is employed that identifies the employee as a police officer or law enforcement officer of the agency.

(37)

JA168

Testimony regarding EXPEDITED BILL NO. 21-22,
Amending Montgomery County Code Chapter 57, Weapons, Section 57-11

Michael Burke

In 2013, LEOSA was amended by the National Defense Authorization Act (NDAA) for Fiscal Year 2013, effective January 2, 2013, after **President Obama** signed Public Law 112-239 (H.R. 4310).

**Senator Patrick Leahy**, a key sponsor of the bill, remarked "The Senate has agreed to extend that trust to the law enforcement officers that serve within our military. They are no less deserving or worthy of this privilege and I am very pleased we have acted to equalize their treatment under the federal law". He further stated "The amendment we adopt today will place military police and civilian police officers within the Department of Defense on equal footing with their law enforcement counterparts across the country when it comes to coverage under LEOSA."

I cannot imagine that this Council wishes to oppose President Obama or Senator Leahy in recognizing the vast importance of recognizing these men and women as extremely valuable members of the community, people that you would disarm and render ineffective if you pass this bill as written.  Your statute seeks to nullify unknown thousands of Handgun Permits issued lawfully by the Maryland State Police, following deep and detailed background investigations, extensive training in the Use of Force, Marksmanship, and other legal education required by the General Assembly and the Maryland Police and Correctional Training Commissions (MPTC).

These well trained, well-armed County residents and visitors, individuals possessing handgun permits from around the DC Metropolitan Region, are NOT a threat to public safety- they are an unnoticed, unappreciated asset to protecting and serving the communities under your care.

(38)

William Adams


Opposition to Bill 21-22

How any elected official may feel personally about guns is not what they are obliged to act on. As an elected official, trusted to honor the US Constitution, the Maryland Constitution, and the collective wants of their constituents, they must be true to their responsibilities and act according to the wishes of their constituents within the bounds of the US Constitution. Therefore, the only right thing to do is to reject this bill as it clearly violates the 1st, 2nd, and 14th Amendments and is simply a dangerous bill.

Setting aside for a moment the Constitutional violations this bill presents; the question is why? Why do you feel compelled to deny a properly permitted firearm holder freedom of travel simply because they are now permitted to carry a firearm when previously there was no prohibition from doing so?  Is there evidence that anyone is now in greater danger, or is it simply speculation based on some misinformed notion that gun holders are dangerous? Handgun Permit (HGP) holders in this state have complied with the rigorous training and background checks requirements to obtain a permit, and as such, are shown to be safer, law-abiding, and even-tempered individuals.

This proposed law does NOTHING to improve the safety of Maryland citizens that may reside, work, or pass through your county.  As we have seen most recently at the Greenwood Park Mall in Indiana, an armed citizen legally carrying a concealed firearm stopped a mass shooter on a shooting rampage in the mall.  How many more lives would have been lost had a law like Bill 21-22 is proposing been in place in this Indiana town.  Bill 21-22 will prevent a legally armed citizen from responding to such an event in Montgomery County.

Anyone saying that the freedom to carry a firearm outside the home for self-defense or the protection of others is unnecessary and claiming that firearms in the public space is unsafe, is simply misinformed or ignoring the facts.  If you are truly concerned about the safety of the residents, workers, and visitors to Montgomery County, please direct your energies to stopping gang crime in your county and leave the law-abiding citizens of Maryland alone.

PLEASE, reject this bill!

Sincerely,
William Adams

(39)

Please allow law abiding citizens to exercise their constitutional rights in Montgomery county. Clearly, the statistics show that criminals are getting more and more brazen as we've felt the crime wave in our communities. We are already at a disadvantage against criminals. Please give us the opportunity to defend ourselves.

(40)

Testimony in support of Bill 21-22

Prohibiting firearms in or Near Places of Public Assembly

Good afternoon. My name is Mindy Landau, I am a resident of Potomac, MD in Montgomery County and I've lived and worked here as a federal employee, now retired, for 40 years. I am a co-lead of Brady United's Montgomery County Chapter and also represent Brady Maryland and our state executive committee. Thank you to the Montgomery County Council for giving me this opportunity to testify.

Bill 21-22 **will protect Montgomery County residents from an armed threats to our citizens in places where they work, play and socialize.** Our children should not have to fear that someone with a gun will invade their "safe" space for learning. Government workers and concertgoers should be able to go to work, concerts and parks without worrying whether the person next to them is carrying a gun. Our citizens don't want to feel anxious, intimidated, or afraid. We just want to be free and feel safe in the places we visit that give us joy. The presence of guns at or around these public places poses a danger to citizens' emotional and physical well-being. We must protect the citizens of this county and their ability to visit places of worship and parks freely and without fear of being shot.

Let's call it what it is - guns in public places represent armed threats, clear and simple. And intimidation is not what Montgomery County is about. This is why Brady United Against Gun Violence appreciates and strongly supports Council President Albornoz' bill.

By prohibiting firearms within 100 feet of a gathering place, this bill will help to ensure we are protecting the sacred right to assemble for our generation, and generations to come.

Although we respect the Second Amendment and rights of gun owners under the constitution and laws of Maryland, that right must be exercised so as not to infringe on constitutional rights of others, including the right to assemble peacefully. Gun laws are designed to do more than to protect physical safety alone. They can and do help preserve public order and the freedom of others to peaceably assemble, speak, and worship without fear and intimidation.

As a country, much work has been done over the last 100 years to ensure that freedoms, as represented by the right to assemble peacefully, is accessible by all - regardless of their race, socioeconomic class or disability. We must continue this work today. Thank you.

(41)

JA172

Good afternoon:  I am writing to express my concern with Bill 21-22.  The bill is problematic and worrisome in quite a few ways, but some more than others – and, of course, some more personally than others as well.

I expect to receive my Wear and Carry Permit later this year, as do many others now that the Supreme Court, in its *Bruen* ruling, has declared the "Good and Substantial Reason" portion of the permitting law to be unconstitutional. Currently, Montgomery County law forbids carrying a firearm within one hundred yards of any place of public assembly, specifying public parks as one such location, and makes an exception for those who have carry permits.  Bill 21-22 would remove this exemption, making it unlawful even for permit holders to carry in such areas.

My apartment lies about twenty yards from the border of a park owned by Montgomery County.  Although Bill 21-22 does make an exception for carrying within one's home, it would seem to make it impossible for me to walk out of my own front door while carrying my firearm. For me to comply with this bill, I would apparently have to unload my firearm, walk or drive to a location deemed suitable for carry by Montgomery County, then reload my firearm and go about my day.  (And, of course, I would need to perform the same procedure in reverse on my way home.)  This would make it so inconvenient to use my carry permit that it would effectively make my permit useless – which would defeat the purpose of getting the permit in the first place.

I urge you not to pass this bill.  If you do, someone in my circumstances will undoubtedly file a lawsuit against Montgomery County, and while I am not a lawyer, I find it difficult to see how the county could possibly win.  You could, in fact, end up having other restrictions besides this one thrown out by the court, leaving you with fewer carry restrictions than you had in the first place.

Very truly yours,


{signed}
Parrish S. Knight

(42)



16005 Frederick Road, 2nd Floor            Office: 443-325-5076
Woodbine, MD 21797                          Fax: 410-696-2022
Website: www.sillengineering.com   Email: info@sillengineering.com
                    Civil Engineering for Land Development

## SILL ENGINEERING GROUP, LLC

July 13, 2022

**Montgomery County Council**
Montgomery County, Maryland 21043

Re:    Council Bill 21-22
         OPPOSE

To Whom It May Concern,

As I read this proposed bill I am very concerned for my right to self-protection.  I have had a Maryland Wear and Carry Permit and other State's carry permits for many years now and routinely carry a firearm and travel into Montgomery County for business and personal reasons.  I believe this bill as worded will effectively ban firearm possession in the entire county, stripping me of my Constitutional Right to self-protection.  Please OPPOSE this bill.

Should you have any questions or comments regarding this matter, please do not hesitate to contact this office.

Sincerely,
SILL ENGINEERING GROUP, LLC

Paul M. Sill, PE, LEED AP

(43)

The United States is founded on laws. We as a people, follow the laws. When the government decided to not follow the laws, it is no longer a government.

To place the county under a gun free zone, will not serve law abiding citizens.  No one will be safe, crime will continue to rise.  There will be no reason to live in Montgomery County as it will be run by criminals and gangs.

Since  you are infringing on my right afforded to me by the Constitution of the United States. I am requesting that this bill be removed or voted down. It serves no law abiding citizens in Montgomery County.


Robert Utley

(44)

Simeon Pollock

Dear Mr. President,

I am writing to you as President of the Montgomery County Council, to ask the council through you, to please reconsider passing the ill advised bill 21-22 - Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.

Not only is this bill illegal following the Supreme Court's ruling in Bruen, it will only make criminals of otherwise law abiding citizens. It tries to superseded Maryland State law as well as tell the Maryland State Police (MSP) that it does not know how to vett and process Concealed Carry Permits.

The State of Maryland, through the MSP, already has in place an age limit - 21, a thorough vetting process for anyone wanting a Concealed Carry Permit (CCW). There are classes required for an HQL, more class time & testing for a CCW. This state process allows concealed handguns to be in the hands of responsible adults.

The bill before the council will only serve to make vetted, trained, responsible adults into criminals in MoCo.  Why do that?  The criminals who will attack the public won't follow this law. So what purpose does it serve? It will only put a burden on law abiding citizens.

As a religious Jew who makes his home in the USA & in Montgomery County, I am becoming increasingly alarmed at the rise in anti-semitism, plain old Jew hatred that is on display in this country and recently in our county, in the heavily Jewish neighborhood of Kemp Mill. I want to be able to fight back should anyone come and try to kill Jews just for being Jews and congregating in a synagogue. *Never Again,* means that we won't be attacked & slaughtered without fighting back.

In Israel where guns of all kinds are common place, it's usually a private citizen that stops an attack before the police or army can respond.  That can be here as well.

In many cases where synagogues were attacked in America, trained & armed congregants may have ended the attacks easily as most attackers are not trained in any way to use firearms if they are fired upon or face an armed citizen. Even in schools across the country, students & teachers are dying because no one is trained & armed to confront the attacker.  They are forced to wait for the police who will hopefully come & stop the attack.

Concealed guns grant the element of surprise to any would be attacker & just the knowledge that citizens may be trained & armed may prevent a future attack.

Please don't pass this legislation & make life for law abiding citizens more difficult.

(45)

Sincerely,

Simeon Pollock

(46)

Please follow the recent Supreme Ruling on firearms carry permits. You all took an oath to uphold the Constituion.

(47)

**Vincent C. McGinnis**

July 18, 2022

Dear Montgomery County Council,

**RE: Bill 21-22**

Montgomery County Bill 21-22 as written could restrict law-abiding citizens with a Maryland issued "wear and carry" permit from exercising their right, if they <u>live</u> "within 100 yards of a place of public assembly". My issue with that is, I live between 1 to 2 blocks from Seneca Valley High School (SVHS) and cannot avoid the high school. This law could nullify my right to bring a firearm outside my house; let alone carry one for personal protection, because of living in such close proximity to SVHS.

<u>Background:</u> I moved into the 'Olde Seneca Woods' development 35 years ago. I am 62 year old and I enjoy the convenient location and walking as much as possible. I walk to the FNB ATM on the corner of Crystal Rock Drive/118. I walk to the grocery store, the Post Office, the dry cleaners, and really anywhere I can. All this helps me get exercise and reduces dependence on my car. Though I love this location for all its convenience, I try to walk during the day; and not too late at night. That's because my house is located in the Crystal Rock Drive area (near The Hampton Apartments) and is one of the worst crime areas in Germantown. Just ask any Montgomery County Police Officer who has worked in Germantown. For this and other reasons, I applied for a Maryland State issued wear and carry permit.

Bill 21-22 as currently written could nullify my right to bring a firearm outside my house; let alone carrying one for protection; because I live in such close proximity to SVHS. This would gut the intent of recent change in the law for me and others who live so close to designated gun-free zones.

Thanks for listening my concern. I hope you can address this issue in the bill before its voted on.

Please feel free to call me with any questions you have.

Sincerely,

*Vincent C. McGinnis*

(48)

JA179

July 15, 2022

Reg:  Bill 21-22

Dear Council Members:

I do not support Bill 21-22.  I believe the bill is driven by the mistaken belief that "more guns on the street means more crime."

The Bill is intended to outlaw concealed carry almost everywhere in Montgomery County.

One needs only to know what happened in the 44 states that have either "shall issue" or "constitutional" (no permit required) concealed carry. The law-abiding who do not carry guns today, do not become criminals tomorrow after personal defense is permitted by the government.

No State that has permissive concealed carry has seen an increase in gun crimes by the law-abiding (source AWR Hawkins, John Lott Jr., et. al.)

Self-defense is a natural right.  A "belief" that concealed carry by the law abiding means more crime is unfounded and is subordinate to the natural right to survive.

I support Maryland law as it stands for concealed carry.  That is enough for public safety.  Bill 21-22 is not required.

Best Regards,

Cs//

Cary Secrest

(49)

JA180

**Public Testimony In Response to Bill 21-22, Weapons-Firearms In or Near Places of Public Assembly- July 26, 2022**

Good afternoon,

I am a resident of Montgomery County, MD (Gaithersburg/Damascus to be exact) and a law-abiding firearms owner.  I am also an attorney and a staunch believer in civil rights.  I am writing to express my grave concerns with the efforts of the county to curb exercise of civil rights by law-abiding firearms owners, as made plainly evident in the text of Bill 21-22.

As the Council is no doubt aware, the Bill of Rights to the US Constitution recognizes certain key and fundamental civil rights of US Citizens that the founders thought so profoundly important they bore being enumerated.  The Second Amendment to the Constitution protects the right of individuals to keep and bear arms.  The Supreme Court has continually held that this is a protected civil right.  Citizens have a constitutional right to keep and bear arms; to keep and bear arms of those types in ordinary use; and to keep and bear arms *in public* for purposes of self-defense and other lawful ends.  The Maryland Charter makes the US Constitution the supreme law of Maryland so, quite clearly, Marylanders have a constitutional right to wear and carry firearms in public.  As recognized by Governor Hogan, Marylanders no longer need convince the government that they should be allowed to exercise a civil right.  The proposed bill's definition of places of public assembly would act to essentially deprive those in or visiting Montgomery County of a right to defend themselves, even on private property.  This is in direct contravention to the recent Supreme Court decision in NYSRPA v. Bruen, but you are aware of this fact as the bill is in direct response to the decision in Bruen.

The Council is, nonetheless, pursuing a bill that directly and intentionally flies in the face of constitutional rights.  Section 4-209 of the Maryland Criminal Law Code also prohibits local governments from imposing certain restrictions on possession of firearms.  Bill 21-22 goes well beyond the exceptions permitted under Section 4-209.

Given that the Council is fully aware of the Constitutional rights that it seeks to intentionally infringe through attempted imposition of Bill 21-22, I want to draw your attention to 42 US Code Section 1983.  Section 1983 is a federal statute which provides a right for individuals to sue local government officials directly when those officials violate civil rights in the course of their duties. Given that the Council is aware that this bill would violate civil rights (it is clearly written with that express intent) Council members likely lose any defense of qualified immunity and become personally liable for their unconstitutional actions.   I for one would consider seeking a 1983 action if the Council passes a bill directly aimed at infringing my civil rights.

Putting the above aside for the moment, what is it that frightens the Council so much about the lawful exercise of civil rights?  Does the Council also intend to ban prayer within 100 yards of a place of public assembly? Does the fifth amendment not apply

(50)

JA181

within 100 yards of a place of public assembly?  Does the Council believe that individuals should lose their fourth amendment rights if within 100 yards of a place of public assembly?

Will the Council ban armed security or law enforcement at Council meetings or is it ok for the Council to be protected by firearms as long as the rest of us are not?  Given that gun control is really the last vestige of Jim Crow laws, maybe the Council is scared of minorities being able to defend themselves?  Is that it?

Representative Jamie Raskin, of whom I am no fan, recently publicly pointed out the ridiculousness of Bill 21-22 and that it is just a waste of precious taxpayer resources and likely to be overturned in court.  That said, he also called protection of constitutional civil rights draconian and foolish, so maybe he's not a great example.

I truly encourage you to listen to your better angels and recognize the foolishness of 21-22 and, instead, embrace an approach that protects civil liberties of all Montgomery County residents and guests.

Respectfully,


Matthew Hoffman

(51)

Members of the County Council

I am writing to express my opposition to Bill 21-22 as drafted.

As written, this proposed ordinance would effectively prohibit use of a Maryland wear and carry permit in any of the built up areas of Montgomery County as it would be nearly impossible to drive or walk up or down a major street (e.g., Georgia Avenue, Wisconsin Avenue, New Hampshire Avenue) without coming within 100 yards of any property attached to a place of public assembly.  Moreover, any Montgomery County resident with a wear or carry permit who lived or owned a business within 100 yards of any property attached to a place of public assembly would be barred from using the Maryland wear and carry permit while entering or exiting his residence or business.  Additionally, there are places in Montgomery County where the Beltway and U.S/ 29, for example, come within 100 yards of property attached to a place of public assembly.  Thus, this ordinance would criminalize use of a wear and carry permit while traveling through Montgomery County on the Beltway or U.S. 29.  It should not be difficult to see why the breath of this ban is inconsistent with the recent Supreme Court decision allowing legislatures to ban guns only in narrowly defined sensitive spaces.

There is also a problem with the vagueness of the definition of place of public assembly. By use of the term "including" the ordinance reads as if there are other unlisted places that may be considered a place of public assembly. With a criminal statute, the citizen is not supposed to have to guess what may or may not be included – particularly with a term that is broad enough to include, for example, any store.

There is a saying, "Bad cases make bad law."  Passing this ordinance as written will undoubtedly result in rejection by the courts and may very well result in a court decision that further restricts the right of a legislature to ban guns from sensitive spaces and thus winds up making gun control harder rather than easier.  In addition, passage of this ordinance as written will unnecessarily run up County legal fees with money that could be spent on productive initiatives.

In my 31-year career (1966-1997) in criminal justice (including positions as a police officer, probation officer, and parole officer in New York State, Staff Director of the U.S. Parole Commission, and Principal Technical Advisor of the U.S. Sentencing Commission), I have seen quite a few pieces of criminal justice legislation that were not well thought out and/or not well drafted.   In my opinion, this proposed ordinance, as written, falls in this category. Thus, I recommend strongly this proposed ordinance not be enacted as written. 1

(52)

JA183

Sincerely,

Peter B. Hoffman

Silver Spring, MD

1. If the "within 100 yards of" language were removed from this bill (so as to limit the prohibition to the actual property of the place of public assembly), and if the definition of place of public assembly was tightened to remove its vagueness, it might ameliorate the above noted issues.  Whether the proposed legislation is needed to address a real problem is another issue on which I take no position other than to note that during my career in criminal justice, I reviewed more than 25,000 files of convicted offenders and I remember only one case involving a crime committed with a handgun carried by a person having a permit to carry a handgun (not including offenses committed by persons who were authorized to vary a handgun because they were law enforcement officers).

(53)

Dear Counsel Members and constituents,

I am writing in regards to Bill Bill 21-22. Please allow me an opportunity to voice my concerns and kindly accept it for consideration. I will try to make this short and sweet.

I have lived in Montgomery County, Maryland for my whole life, except when I went to college. I am almost 42 years of age. Although I was a knucklehead growing up, I earned a Master's degree, volunteered for the fire department, am a member of a chamber of commerce, am Senior Home Safety Specialist, Client Liaison Manager and Marketing Coordinator and served on the community board of directors. Not to mention, my wife and I work hard, very hard. We have also been steadily employed our whole lives and we pay all our taxes on time.

As you make your decision, please take this into consideration, how is it fair that a criminal will be able to go to a mall with a gun, like it happened in 2016, but someone with my background has to be unarmed? Would that really make you feel safer? I live across the street from the mall. When I walk my dog, how do I know the proximity of when I am committing a crime by being 100ft of 100 people?

This approach will either force me to be unarmed, or deal with a subjective approach of a police officer. Why is it that the Supreme Court of the United States just made me, you and a lot of others like us more equal and you are voting to take that away? Please excuse me, but the laws you are considering will not make us safer.

Even if I don't carry arms, I feel a lot safer knowing that others who are responsible carry their arms. Montgomery County is a great county, but it's not in a secret bubble. Criminals are all over the place and they will not follow this law, nor will the criminals from neighboring counties who will flock here knowing how rich and unarmed our citizens are.

There have been many mass killings. The numbers are staggering. It's obvious some of you want to make guns go away. I honestly wish we could disarm all of America too, but we can't. It's ingrained in the constitution and the Supreme Court just clarified that. The law being considered will undoubtedly be challenged by many and it may end up being a very costly decision for our county. Please consider putting that time and money into schools, our infrastructure, and placing real criminals behind bars.

Please give me and other responsible citizens of Montgomery County the right and chance to defend ourselves if the unlikely, but life threatening, situation happens to arise. The elements of this law should be left up to private establishments on whether to allow or not allow arms.

It's great to require proper training and background checks. Maryland has good laws right now. Please, please, please do not create a law to punish the responsible citizens. This law can harm a responsible citizen with their lack of safety and/or having unfair legal repercussions.

(54)

Thank you for your open-mindedness and consideration. Please make that right decision and give the responsible citizens the equality that they deserve and that the rest of the country already has.

Respectfully,

Renan Augusto

(55)

Statement regarding Bill 21-22

Good afternoon, my name is Michele Walker.  I am a native of Maryland.  My husband and I have raised four children in Montgomery County since 1990.  Like our parents, we taught our children to respect our country and every person in it no matter their financial or educational status.  Sadly, there are those among us who do neither of those things.

Every American has the right and responsibility to defend not just themselves but their family, neighbors and other Americans whom they do not know personally.  The 2nd Amendment of the United States Constitution does not restrict American Citizens from wearing and carrying their firearms.  The Supreme Court has recently ruled against legislature that demands reason or need applications.  The courts have ruled against many restrictions that would infringe upon our  citizens rights.  There's an extremely low percentage of people using firearms to commit crimes or harm to others in comparison to the number of people who own one or more firearms that do not use them for those purposes.

There are numerous cases where a law abiding gun owner saved the day as a crime was happening.  Some were in convenience stores and saved the clerk or another customer from robbery and possible death.  A judge in Ohio was able to save himself from a criminal who was attempting to kill the judge right outside of the courthouse. In a mall a gunman was stopped by a citizen who had a permit.  None of us have the ability to know if we will be in one of those situations where a gun will be used with harmful intent but all of us would be grateful to be saved by someone who had our backs.  To those who want to push gun control, close your eyes and imagine yourself in one of those situations where there is an angry or upset person with a gun.  Now imagine if you have no one there to save your life because of these laws.  How would you feel if your close family member were just an innocent bystander harmed or killed because of the gun control law that prevented the possibility of someone to stop it from happening? None of us are exempt from the potentiality of being harmed by people who just don't care about the law or who are  out of their mind. None of us, that includes you too.

Please stop trying to unarm the law abiding citizens.  We have been taught  to respect the gun and use it properly.  Gun control does NOT work.   Look at the localities that have the strictest laws on the books and see that things have gotten progressively worse.  Chicago, New York and Philadelphia are shining examples of those cities.  Law abiding citizens do not have intent to go shoot up people or places.  We intend to protect ourselves and those around us from others who either have criminal intent or have a mental illness.  Address the real issues mentioned in the last sentence because it is not the gun, it's the person holding the gun.

(56)

To the Honorable Members of the County Council of Montgomery County, MD,

I urge you to vote against Expedited Bill 21-22, Weapons – Firearms in or Near Places of Public Assembly. I know you want to make me safer, but this bill does the exact opposite.

Antisemitic incidents are on the rise in the county, particularly by white supremacists[i]. White supremacists are the most likely of all extremists to use violence[ii]. They target synagogues because these facilities serve the Jewish community and assure the presence of a significant number of Montgomery County citizens at certain times of the week. Furthermore, In the orthodox community, Sabbath synagogue attendees do not carry their phones, so there would be a delay in alerting police to an active threat.

An additional factor impacting incident response is that Montgomery County police are understaffed and recruitment is down. Our sworn officers per capita is only half the national average[iii]. It is unrealistic to expect police to be able to engage with an active threat fast enough to prevent mass casualties.

Furthermore, turning places of worship (and essentially the entirety of the county) into gun free zones would do the precise opposite of its intent. It would serve as a welcome sign for potential mass murderers as to which locations they can "safely" unleash their mayhem[iv] — and there'll be nobody there (with a gun) to stop them! This is because the only people who will comply are law-abiding, licensed gun owners. Do you really think someone intent on mass murder will leave their gun at home because of this law?

Lastly, the expedited basis of this bill is unjustified. The CCW permit application process takes 90 days from submission to approval[v] plus a few days to mail the permit to the applicant.  This provides the MDSP sufficient time to perform a background investigation and interview up to three character witnesses. Before you can do that, you have to schedule and attend a 16-hour training class. You also need to take a live fire test with your instructor at a range to prove your proficiency firing a handgun. You also need to schedule and have your fingerprints taken to submit along with your application and fee. Then your CCW permitted citizen would have to select and purchase an appropriate concealed carry weapon, which in Maryland involves a minimum 7 day waiting period. Therefore, you have 90 to 120 days before the impact of additional CCW permit holders will be seen in the county.

CCW permit holders should be allowed to carry their concealed weapon to their place of worship specifically because of the heightened threat against places of worship. This bill will make it illegal for them to protect themselves specifically at the place they need it most. Therefore, I strongly urge you to vote against Expedited Bill 21-22.

Larry Jaffe
Silver Spring, MD

---

[i] "Sharp rise in anti-Semitism in Maryland, Virginia and D.C., ADL reports"
https://www.washingtonjewishweek.com/sharp-rise-in-anti-semitism-in-maryland-virginia-and-d-c-adl-reports/
and "ADL H.E.A.T. Map™ (Hate, Extremism, Antisemitism, Terrorism)" https://www.adl.org/resources/tools-to-track-hate/heat-map

(57)

ii "Domestic Extremism in America: Examining White Supremacist Violence in the Wake of Recent Attacks" https://www.humanrightsfirst.org/resource/domestic-extremism-america-examining-white-supremacist-violence-wake-recent-attacks Relevant excerpt below:

In Pittsburgh, Pennsylvania, the killer who attacked worshippers in a synagogue wrote that he believed Western Civilization was facing "extinction" and that refugees were "invaders";[5]

The Christchurch, New Zealand killer titled his writings "The Great Replacement" and targeted Muslims in a country he was initially only visiting;[6]

The shooter in El Paso, Texas targeted Latinx people in the United States but wrote that he "supported" the racist screed from Christchurch;[7]

In Poway, California, the shooter first targeted a mosque and then a month later opened fire in a synagogue, claiming that Jews were orchestrating a "planned genocide of the European race";[8]

And most recently, the killer in Buffalo, New York, spent weeks identifying a locale in which to murder Black Americans. His own screed was largely a plagiarism of the Christchurch shooter's "Great Replacement" text, but was so sloppy that at times he merely swapped out terms for one victimized community for another.[9]

This heartbreaking trail of violence illustrates how fluidly the Great Replacement conspiracy theory travels across borders and populations.

Unfortunately, these mass casualty attacks are only one element in the larger phenomenon of violent white supremacism and domestic extremism.

Over the last decade in available data, white supremacist terrorism in the United States has increased many times over. Of the 100 white supremacist attacks between 2000 and 2019, 80 of them occurred after 2009, according to the Global Terrorism Database (GTD).[10] And while these terrorist attacks have increased, they have also become more lethal. Mass casualty attacks perpetrated by white supremacist terrorists like the horrific attack in Buffalo, used to be a rare occurrence. Now, they are frequent tragedies.

iii "Departures, sagging recruitment plague Montgomery County police (bethesdamagazine.com)"
https://bethesdamagazine.com/bethesda-beat/police-fire/departures-sagging-recruitment-plague-montgomery-county-police-even-as-crime-soars/
iv "Mass Public Shootings keep occurring in Gun-Free Zones: 94% of attacks since 1950"
https://crimeresearch.org/2018/06/more-misleading-information-from-bloombergs-everytown-for-gun-safety-on-guns-analysis-of-recent-mass-shootings/
v "Wear and Carry Permit (maryland.gov)"
https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Firearms/WearandCarryPermit.aspx

(58)

My name is Gary Simon. I am a lifelong resident of Montgomery County. I am a law-abiding MD Wear and Carry Permit holder as well as a MD Qualified Handgun Instructor (QHIC). While I think it fair to say that my viewpoints and philosophies are not very similar to the majority of the esteemed council, I do wish to thank you for the time that each of you dedicate to serving our county. I am here today to ask that you do so from a perspective of practicality and one that adheres to the laws that make our country what it is today.

You have proposed a law, 21-22, in response to a decision of the Supreme Court in the NYSRPA v. Bruen matter. In doing so, you present a code that directly defies the majority opinion written by the Honorable Judge Thomas. I offer a portion of that decision for the record here today. I offer only text, removing citation and reference in the essence of time and brevity.

"Consider, for example, Heller's discussion of "longstanding" laws forbidding the carrying of firearms in sensitive places such as schools and government buildings. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons are altogether prohibited-e.g., legislative assemblies, polling places, and courthouses- we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying cold be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible. Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law enforcement and other public-safety professionals are presumptively available. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" too broadly. Respondent's argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York Police Department,".

I am a permit holding, law-abiding citizen who will certainly be effected by this error-filled piece of legislation. What I believe gives me the greatest concern is that a body such as yourselves would propose such a piece of legislation that you know would be challenged and likely overturned. Rather than focusing on laws that focus on criminal conduct and are centered on the solving of an issue at hand, you propose something that is nothing more than window dressing to your constituency so that you are able to say we tried to do something. Perhaps if this type of energy was directed at criminals rather than law-abiding citizens exercising their constitutionally protected rights, you might garner the support of people like myself.

Thank you for your time and consideration.

(59)

**Edward Walker**

**<u>Why I Oppose Bill 21-22 (and you should too)</u>**

**I oppose Bill 21-22 for many reasons. The being that it doesn't just turn a right into a privilege, it completely removes this constitutional right from the people. For example even with a Maryland wear and carry permit, I would be unable to leave my place of residence with a legally owned firearm, 100 yards from the ground of a place of public assembly would extend into the street. There is a library, a church and a bank a few blocks from my house on the main road. Which means I'd have to break the law to exercise my RIGHT to carry even if was not intending to carry in Montgomery county.**

**Another reason I oppose this bill, as we have seen time and time again the police fail to act and to defend civilians, the Uvalde shooting is a prime example of law enforcements inability, unwillingness and cowardice to act in the event of a mass shooting or violent encounter. There's also an old saying which comes to mind in these cases "when seconds count, cops are minutes away". Throughout the years and as recently July 17, 2022 we saw a law abiding citizen, good guy with a gun, stop a cold hearted criminal, bad guy with a gun, in 15 seconds. 15 seconds and the horrendous atrocity was ended. 15 seconds. The officers at Uvalde waited 1 hour and 15 minutes. 1 hour and 15 minutes compared to 15 seconds. This shouldn't even need to be discussed. The answer is clear the people deserve to maintain their RIGHT to carry in public.**

**This bill will turn law abiding citizens who would like to exercise their right to carry a firearm, legally with a permit, for defense into criminals, while criminals would still be criminals who don't care about our laws and will still carry because they are criminals. This bill is bad legislation that will only effect lawful gun owners.**

**Thank you for your time, even if you don't actually care what the people think and only give us this opportunity to make us feel as if our opinions actually matter to you. We'll see you in court if this passes. Have a nice day.**

(60)

Good afternoon. I'm Deborah Miller, the Director of Maryland Government and Community Relations for the JCRC of Greater Washington. The JCRC represents over 100 social services agencies, synagogues, and Jewish schools throughout the region. We work to build strong relationships and coalitions with other communities in pursuit of justice, tolerance, and equity for all. I am here today in support of Expedited Bill 21-22, which aims to reduce the dramatic rise in gun violence we are witnessing every day not only across the country, but in our county.

At the JCRC, one of our highest priorities is the safety and security of all faith-based institutions, particularly Jewish houses of worship, given the unprecedented increase in antisemitism- up 34% across the nation and 17% in Maryland according to the ADL. Additionally, MCPD's latest report on religious bias incidents shows that more than 85% targeted Jews, although they only make up only 10% of the County population. The Jewish community knows all too well the devastating impact of gun violence. In addition to the horrific targeting of African Americans, Asian Americans, and the LGBT Community throughout the country, we remember the Tree of Life tragedy in where 11 members of the Jewish community were murdered.

The importance of this legislation at this time cannot be underestimated. The JCRC is deeply disappointed by the Supreme Court's ruling striking down NY's concealed weapon permit law. We believe it will pose increased risk to public safety.  Houses of worship should be left to establish their own security plans. We do not want individuals who could walk in off the street with a weapon acting in their own individual capacity. It could lead to chaos and create an even more potentially deadly situation.

We will continue to advocate for common-sense gun safety measures throughout our region, because we know that the senseless violence, can only be stemmed by limiting easy access to such deadly weapons. While the Supreme Court taken a step backward to curb violence and ensure safety, we are grateful that in Montgomery County, our leaders are taking a step forward to counter this dangerous trend.  Fewer guns near or inside our places of assembly will create a safer environment for all of our residents. We thank the lead sponsor, Council President Gabe Albornoz as well as the entire council for its co-sponsorship.

(61)



Testimony of Montgomery County Young Democrats in Support of
Expedited Bill 21-22–Weapons–Firearms In or Near Places of Public
Assembly

July 25, 2022

Members of the County Council:

The Montgomery County Young Democrats strongly support Councilmember Albornoz's
Bill 21-22, which would ban the possession of guns in or near places of public
assembly, with a few exceptions. It would also remove an exemption that allows certain
people with permits to have guns within one hundred yards of these places. Gun
violence is a major problem in our county and country, resulting in tens of thousands of
deaths every year, and residents should not live in fear when they are out in public. This
proposal will tighten restrictions on guns and help ensure that people can participate in
public life without being intimidated.

Currently Maryland law allows people with wear-and-carry permits to possess guns
when they are within one hundred yards of or in parks, churchs, schools, public
buildings, and other places of public assembly. This bill bans people from selling,
transferring, possessing, or transporting guns in those areas. It includes reasonable
exemptions for police officers or security guards, business owners, residents who live
within 100 yards of a place of public assembly, and instructors for firearm safety and
use.

In order for people to thrive in Montgomery County and engage in its civic and
commercial life, they should feel welcome and not be subject to menacing threats. The
goal of this bill is to promote public safety and ease of mind. We want to minimize
concerns and worries that people have about people carrying weapons in and around
these places. People should be able to go to school, their places of worship, the mall, or

(62)

JA193

community centers without having to constantly look over their shoulder and worry about shooters.

Recently we have seen a troubling trend of people showing up with openly carried weapons outside polling places and other locations; these are blatant attempts to intimate people, discouraging them from voting and exercising their other political rights. And various authoritarian groups have shown up to various events, most notably Drag Queen Story Hour, and tried to disrupt them.

Bill 21-22 would help reduce acts of violence in county public spaces, counter attempts to intimidate people, and keep people safer. MCYD urges the County Council to vote yes on this bill.

Sincerely,

The Montgomery County Young Democrats

(63)

Montgomery County Council
Council Office Building
100 Maryland Avenue, 6th Floor
Rockville, MD 20850


July 25, 2022

Re: OPPOSE Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.


Esteemed Council Members:

I am writing you as a Maryland native, a Montgomery County business owner, and a registered Montgomery County voter to oppose Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly. I am also a Maryland Wear and Carry permit holder, earned with a substantial amount of background checks and training. While I understand your intent is to protect the lives of innocent people, this bill is vague and will create confusion for law-abiding citizens with carry permits.

Under this proposed bill, there is no definition of "places of public assembly," which can be construed as something as simple as a grocery store or bank without context. Since many of us with carry permits are frequently traveling from work and the primary purpose of the permit is to keep us safe in the disposition of our duties as a business owner while banking or traveling to and from our home, this vague wording places us at risk for breaking the law within the county where Maryland has provided us the right to protect our lives.

For instance, the specific addition of school parking lots places many of us at risk as we travel home from work while legally carrying a firearm. With the current cost of gasoline, it is ridiculous to expect us to go miles out of our way to return home.

The most substantial reason for my opposition to this bill is that it creates a patchwork regulation within the state of Maryland, which creates a challenging structure for law-abiding citizens of Montgomery County and Maryland to comply. This would also set a precedent where law-abiding citizens are placed at risk for prosecution from laws within a smaller jurisdiction without any type of signage to identify that legal firearm carrying is prohibited. It is challenging enough to recall which states have which specific laws and which areas are restricted.

In addition, there has been an inadequate amount of time since Bill 21-22 was introduced and the hearing date of July 26, 2022. Many Montgomery County residents are unaware of the aforementioned bill and have not had an opportunity to read or speak their affirmation or opposition to it. This quick vote seems underhanded and sneaky, something I am certain none of you wishes to be, particularly with the upcoming election.

Please oppose this bill and let us address gun violence from root cause mitigation. I would be honored to help with supporting the council with data and statistics on root cause mitigation and public awareness.


Sincerely,

Rachel King

(64)

## Testimony in Opposition of Council Bill 21-22

I submit this petition hosted on change.org in opposition of Council Bill 21-22.

https://chng.it/bKmKQXGq


Regards,
Katie Novotny

(65)

Dear Councilmembers,

I'm writing you as a resident of Montgomery county to let you know that I strongly oppose bill 21-22. I've lived here in Montgomery county for over 20 years now, I've seen the area go though lots of changes some good, some bad. Over the years, crime in the area is slowly getting worse and worse, from shootings happening less than a mile away from me, to muggings and armed assaults'. While I appreciate your efforts to try keep citizens safe, all this bill is doing is sending a message to criminals that the county is leaving its citizens defenseless. Stripping your law abiding citizens rights to protect themselves even when they've gone through the training, the background checks showing that the police approve of them to conceal a weapon is not a well thought out idea.

Someone that conceal carry's a firearm should be of sound mind and an upstanding citizen, there are checks and balances in place to restrict who can and cannot own and even conceal carry a firearm already in place. Thorough training is required, background checks are in place police have references to double check people who are applying. These should be more than enough. This is not going to be the wild west with people carrying a weapon exposed on their hip, These are going to be law abiding citizens, concealing a weapon, knowing it's a last line of defense incase something were to happen. With crimes going up, police response time going up, its not enough to solely rely on the police. I've had friends be victims of violent hate crimes, I've been in a situation where there was an attempted murder and was run to for help, in those 8-9 minutes of waiting for police to hopefully respond can often mean life or death for some.

I urge you to reconsider going through with this bill. Criminals will never listen to the letter of the law. Criminals see gun free zones as easy targets. Allowing your citizens the option to carry with a concealed carry permit is a deterrent in itself. Criminals may think twice, and move along not knowing who may or may not be able to defend themselves. Freedom is a two way street. Its often said ignorance of the law does not make you innocent. I've seen a lot of arguments that people should not have to worry who around them may or may not legally be carrying a weapon, well, ignorance of the law on their part does not make me a criminal. There have been a large number of situations where legal residents carrying a concealed firearm have kept horrible things from happening. A perfect example of this would be what just happened in Indiana. A mall where a "gun free zone" was in place 2 people broke that rule, one with the intent to cause harm to as many as he could, the other, a citizen with a concealed carry permit and a firearm out of sight. That citizen was able to save countless lives that day due to his training and fast thinking. While that is an extreme example it's also a realistic one.

In closing. Please reconsider passing this. I appreciate your attempts to make this county a "safer" place, but this will not accomplish it and will only hurt its citizens, and possibly even turn perfectly law abiding citizens into criminals just by wanting to legally protect themselves by carrying WITH a permit that has been issues by the police.

Thank you for your time,

Luke Roetman.

(66)

JA197

Testimony on Expedited Bill 21-22

Councilmembers,

My name is Daniel Sangaree and I'm a Montgomery County resident in Glenmont, a member of my community's home owners' association's board of directors, a married gay man, a registered and voting Democrat, and a Maryland Handgun Wear and Carry permit holder. My firearms training and experience includes handgun training by the Greene County (Missouri) Sheriff's Department as part of my university's criminal justice degree program, competitive handgun shooting as part of the American Criminal Justice Association, years of experience as a concealed weapons permit holder before moving to Maryland, Maryland's Handgun Qualification License training, and Maryland and DC's 16+ hours of concealed handgun permit training. This letter is my testimony in <u>opposition</u> to expedited Bill 21-22 currently under your consideration.

Bill 21-22 proposes to remove the exemption for Maryland handgun permit holders to the county's places of public assembly restrictions. As a permit holder this bill will affect me to a rather extreme degree. It is, in fact, a de facto ban on legal firearm carry throughout the populated areas of the county. Under even the much more objective definitions that existed before Bill 4-21, which this council previously passed, with the exemption removed I will not be able to do any of the following while otherwise legally armed:

- travel more than a block from my home in any direction on foot, Metro rail, or by car

- inspect, as a director, all of the property that is under my HOA's jurisdiction

- shop at my primary grocery store, the Safeway in Wheaton, or almost any of the grocery stores in the area, including: Giant in Aspen Hill, Lidl in Glenmont, Aldi in Glenmont, H-Mart

(67)

JA198

in Glenmont, Giant in Norbeck, Safeway in Norbeck, Giant in Wheaton, Target in Wheaton, Safeway in Kensington, and so many more.

- walk my dog on his normal route which was chosen entirely for conflict avoidance
- defend myself in my car during a rising trend of violent, armed carjackings in the county that police, by the laws of physics, are unable to defend us from

While I am only speaking for myself, as an HOA board member I have also noted that there are households within my HOA that, due to their proximity to a park, residents won't be able to legally leave their house at all while armed, either walking or by car. Many are likely even unaware that they are affected in this way. This specific scenario applies to many people in the county and that's before applying the vague definitions as provided in Bill 4-21.

The vague definitions for a place of public assembly brought by 4-21 add a truly dystopian lens through which to view this bill. This bill will allow police to arrest anyone who is otherwise legally armed nearly anywhere in the county based purely on the personal discretion and biases of the officer. It takes absolutely zero imagination to figure out exactly how that will be abused and what groups will be victimized by the wide latitude this bill would give police. But just to be absolutely clear, it will be people of color, queer people, and other oppressed minorities that bear the brunt of abuses by police from this just as they bear the brunt of all police abuses. This is exactly why The Black Attorneys of Legal Aid, the Bronx Defenders, and Brooklyn Defender Services, three public-defender groups in New York, filed an amicus brief in support of NY State Rifle and Pistol Association in NYSRPA v Bruen. To quote that brief, "virtually all our clients whom New York prosecutes for exercising their Second Amendment right are Black or Hispanic. And that is no accident. New York enacted its firearm licensing requirements to criminalize gun ownership by racial and ethnic minorities. That remains the effect of its enforcement by police and prosecutors today." ("Brief amici curiae of Black Attorneys of Legal Aid, et al. ", 2021)

(68)

Which brings me to the biggest problem with this bill. Either the members of this council have never visited a county jail, prison, or other place of incarceration or they came away from it with a wholly different takeaway than I did when I visited jails and prisons as part of my criminal justice program. This bill intends to send upstanding members of our community, vetted by the state police as law abiding and trained, to jail for up to six months for an act with no element of malice and likely an honest mistake or a matter of police/prosecutorial discretion. This result, which is explicitly what this bill demands, is cruel and honestly horrific. This is the exact opposite of criminal justice reform that the Democratic Party has called for over the past multiple decades.

I ask that the members of this council reject this bill which will only serve to criminalize upstanding, and disproportionately minority, members of our community.

Sincerely,

Daniel Sangaree

References

"BRIEF OF THE BLACK ATTORNEYS OF LEGAL AID, THE BRONX DEFENDERS, BROOKLYN DEFENDER SERVICES, ET AL. AS AMICI CURIAE IN SUPPORT OF PETITIONERS", July 2021. Accessible via Supreme Court of the United States website, Docket 20-843.

(69)

**Testimony for the Montgomery County Council
July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near
Places of Public Assembly
FAVORABLE**

To Council President Albornoz and members of the Public Safety
Committee,

My name is Lisa Morris. I am a volunteer with Maryland Moms
Demand Action and I live in North Potomac. I am submitting
written testimony in support of Expedited Bill 21-22, Weapons –
Firearms In or Near Places of Public Assembly.

I have lived in Montgomery County my entire life. I am also a gun
violence survivor as my life intersected with gun violence two
times. I feel and believe our safety as a community and
individuals/families are more at risk then ever.

The very dangerous decision made by the Supreme Court to
weaken states permitting systems is already seeing ripple effect
in states across the country, including in Maryland. States see
that a weakened permitting system has a 13-15% increase in the
rate of violent crimes. Research shows that when it is easier for
people to carry guns in public, violent crime goes ups.

Montgomery County is experiencing a rise in gun violence; the
last thing our county needs is guns where people gather.
The increased prevalence of guns outside the home only
increases the risk of violence in public places. This will further
endanger the public in Montgomery county and Maryland putting
families, children, individuals and law enforcement in danger in
what is already a gun violence and mass shooting epidemic.

Now the burden is more then ever on state and local officials to
define the spaces in our community where guns are not permitted

(70)

and to provide strong public safety and gun reform legislation to keep all of us safe from gun violence in our communities as we go about our daily lives.

 I urge you and the council to pass Bill 21-22.

Thank you and the all of the council members for all you do for our county.

Lisa Morris
Volunteer
Moms Demand Action for Gun Sense in America, Maryland Chapter

(71)

**Testimony for the Montgomery County Council**

**July 26, 2022**


**Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly**

**FAVORABLE**


To Council President Albornoz and members of the Public Safety Committee,


I am Peter Benjamin, a former mayor of the Town of Garrett Park.  I am submitting written testimony in support of Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.


I agree with the legislation proposed and respectfully suggest two additions:


1. Include within the definition of places of public assembly all modes of public transportation, including vehicles and facilities as well as school buses.

2. I believe that New York, in its action in response to the Bruen decision, dealt with weapons carried into private business.  I would propose a similar provision that would ban weapons in all places of business, including stores, offices, and service facilities unless the owner or operator chooses to allow weapons in its place of business, in which case the exemption must be posted prominently and publicly at all entrances.


Thank you for your consideration,

Peter Benjamin


(72)



**President**
Mark W. Pennak

**July 21, 2022**

## WRITTEN TESTIMONY OF MARK W. PENNAK, PRESIDENT, MSI, IN OPPOSITION TO BILL 21-22

I am the President of Maryland Shall Issue ("MSI"). Maryland Shall Issue is a Section 501(c)(4), all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. I am also an attorney and an active member of the Bar of the District of Columbia and the Bar of Maryland. I recently retired from the United States Department of Justice, where I practiced law for 33 years in the Courts of Appeals of the United States and in the Supreme Court of the United States. I am an expert in Maryland Firearms Law, federal firearms law and the law of self-defense. I am also a Maryland State Police certified handgun instructor for the Maryland Wear and Carry Permit and the Maryland Handgun Qualification License and a certified NRA instructor in rifle, pistol, personal protection in the home, personal protection outside the home, muzzle loading, as well as a range safety officer. This letter is submitted in opposition to Bill 21-22.

In Bill 21-22, the County would amend Section 57.11(b) of the County Code to eliminate the existing exemption for carry permit holders from the prohibitions found in Section 57.11(a). Section 57.11(a) provides: "In or within 100 yards of a place of public assembly, a person must not: (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or (2) sell, transfer, possess, or transport a firearm created through a 3D printing process." The County code defines the term "place of public assembly" extremely broadly to mean: "a place where the public may assemble, whether the place is publicly or privately owned." This definition goes on to include, but is not limited to, any "park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as fairgrounds or a conference center." See County Code Section 57.1 (definitions).

The County invokes as its authority for this bill, an exception provision to a State preemption statute, MD Code, Criminal Law, § 4-209(a). That statute provides: "(a) Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun." Section 4-209(b) contains exceptions to this general preemption, one of which is that a "county, municipal corporation, or special taxing district may regulate the purchase, sale, transfer, ownership, possession, and transportation of the items listed in subsection (a) of this section:

(73)

*** (iii) * * * within 100 yards of or in a park, church, school, public building, and other place of public assembly." MD Code, Criminal Law, 4-209(b)(1)(iii).

That exception provision is narrow and strictly construed. In *Mora v. City of Gaithersburg*, 462 F.Supp.2d 675, 689 (D.Md. 2006), *modified on other grounds,* 519 F.3d 216 (4th Cir. 2008), a federal district court here in Maryland held that "the Legislature" has "occup[ied] virtually the entire field of weapons and ammunition regulation," holding further there can be no doubt that "the exceptions [in Section 4-209(b)] to otherwise blanket preemption [in Section 4-209(a)] are narrow and strictly construable." As thus construed, Section 4-209(b)(1)(iii) does not authorize this legislation. Indeed, the extent of the County's power under this provision is currently in litigation in *MSI v. Montgomery County*, Case No.: 485899V (Mont. Co. Cir. Ct), where MSI and other plaintiffs have challenged the County's enactment of Bill 4-21 last year. Cross-motions for summary judgment in that case were filed and oral argument conducted on July 19, 2022. Bill 21-22 builds on the framework established by Bill 4-21 and effectively negates carry permits issued by the State Police throughout the County. If the County loses the Bill 4-21 suit, such a decision would necessarily mean that the County likewise lacks the authority to enact Bill 21-22, as currently drafted. The County would be well-advised to await a decision before doubling down on its misguided reliance on Section 4-209(b)(1)(iii).

But even assuming *arguendo* that the County has the power it claims under Section 4-209(b)(1)(iii), Bill 21-22 still fails as it is blatantly unconstitutional under the Second Amendment, as construed by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). In *Bruen*, the Supreme Court held that the Second Amendment right to bear arms means "a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." Slip op. at 24-25 n.8. Specifically, the Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. The Court went on to reject the "means-end," two step, intermediate scrutiny analysis used by the lower courts to sustain gun regulations, holding that "[d]espite the popularity of this two-step approach, it is one step too many." The Court ruled that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Any such historical analogue would have to date from 1791 or, at the latest, 1868, when the 14th Amendment was adopted. See *Bruen*, slip op. at 25-26. That is because "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, slip op. at 25, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-635 (2008).

*Bruen* also holds that governments may regulate the public possession of firearms at "legislative assemblies, polling places, and courthouses" and notes that governments may also regulate firearms "in" schools and government buildings. *Bruen*, slip op. at 21, citing *Heller*, 554 U.S. at 599. *Bruen* states that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive

(74)

places are constitutionally permissible." (Id.). But nothing in *Bruen* can be read to allow a State (or a municipality) to regulate or ban firearms at every location where the "public may assemble" regardless of whether the place is "publicly or privately owned." Indeed, the Court rejected New York's "attempt to characterize New York's proper-cause requirement as "a 'sensitive-place' law," ruling that "**expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly**." Slip op. at 22. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." (Id.).

In a courtroom, the County will bear the burden of proof to show the historical presence of such analogous regulations. See *Bruen*. at 52 ("we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). *Ipse dixit* declarations or avowed public safety concerns will not do. Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Slip op. at 8. Here, the text of the Second Amendment indisputably covers the "possession, sale, transport, and transfer" of firearms and ammunition, as regulated by Section 57.11(a) of the County Code. **In such cases, "the government may not simply posit that the regulation promotes an important interest," but rather "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."** Id. In short, under *Bruen*, "**the Second Amendment guarantees a general right to public carry**." *Bruen*, slip op. at 24.

The County has not and cannot make any such showing that eliminating the right to carry under a permit issued by the State Police "is consistent with this Nation's historical tradition of firearm regulation." Indeed, the very suggestion is nonsensical. There is no historical analogue that would permit the County to ban all possession of firearms in a church or a park, much less in any "other place of public assembly" as vastly defined by the County to include any place where the public "may assemble" regardless of whether such place is on public or private land. Montgomery County is no more a "sensitive place" than is Manhattan. Under the Second Amendment, the County may presumptively enact otherwise reasonable firearms regulations for these five, specific locations identified in *Bruen* and *Heller*, *viz*, in schools, public buildings, polling places, courthouses and legislative assemblies, **to the extent such regulation is otherwise authorized by State law**. As noted, the State has generally barred local regulation of firearms under Section 4-209(a). For example, the County has no authority to enact its own, "shall issue" licensing system that would supersede or conflict with that established by State law. Nor would it make any practical sense for the County to attempt to duplicate State law on such matters.

The State Police may continue to regulate public possession of handguns under its existing permit system as long as it issues permits on an objective, "shall issue" basis and the permitting system does not operate in such a way as to "deny ordinary citizens their right to public carry." See *Bruen*, slip op. at 30 n.9. But, there is no historical analogue that could justify regulating within 100 yards of those locations

or beyond those places. *Bruen* holds that the "Second Amendment guarantees a general right to public carry," and thus the County may not purport to ban the "possession, sale, transport, and transfer of firearms" within 100 yards of any location. Again, the burden is on the County to prove an historical analogue to the contrary.

Such bans are particularly nonsensical for persons who have obtained a wear and carry permit from the Maryland State Police. Under State law, MD Code, Public Safety, § 5-306(b), such individuals are subject to highly intrusive background investigations (including fingerprinting) conducted by the State Police and must undergo extensive training by State certified instructors, including passing a scored live-fire proficiency test. The undersigned is such a State Police-certified instructor. The State Police will continue to enforce those requirements even after *Bruen*. See Maryland State Police Advisory, LD-HPU-22-002 (July 5, 2022). Permit holders are among the most law-abiding individuals there are. They are not the problem. That has been true in all of the 43 States and the District of Columbia that issue permits on a "shall issue" basis. https://www.dailywire.com/news/report-concealed-carry-permit-holders-are-most-law-aaron-bandler/. Eliminating the exception for permit holders currently found in Section 57.11(b) of the County Code is utterly senseless from any calm, rational perspective.

Stated simply, regardless of the personal views of members of the Council County, this County is bound by the decisions of the Supreme Court, including decisions involving the Second Amendment. The County needs to rethink this Bill. If the County persists with the enactment of Bill 21-22, it will not survive judicial review. Defying the Supreme Court did not work for the racist proponents of segregation who refused to accept *Brown v. Board* in the 1950s and 1960s, and it will not work for any County attempt to defy *Bruen*. The Second Amendment is not a "second class right" that the County is free to ignore. *Bruen*, slip op. at 62. The sooner that members of the Council are able to put aside their personal opinions and accept that reality, the better. As stated in *Heller*, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. County taxpayer dollars have better uses than litigation that will most certainly ensue from any enactment of Bill 21-22. When plaintiffs prevail in such litigation (and they will), the County will also be on the hook for plaintiffs' attorneys' fees and costs under federal law, 42 U.S.C. § 1988, and those sums could well be substantial. The County Council should stop and think carefully before it goes down that road. Responsible, adult stewardship of the County requires nothing less. The County cannot say it was not put on notice or acted in ignorance of State law or the Second Amendment.

Respectfully,

*Mark W. Pennak*

Mark W. Pennak
President, Maryland Shall Issue, Inc.
mpennak@marylandshallissue.org

**Testimony for the Montgomery County Council**
**July 26, 2022**

**Expedited Bill 21-22, Weapons—Firearms In or Near Places of Public Assembly**
**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Jennifer Stein, and I am a long-standing volunteer with Maryland Moms Demand Action. I have lived in Montgomery County since 1995 and currently live in the Town of Chevy Chase. Together with my husband, Michael, we have raised a family here. I am submitting written testimony in support of Expedited Bill 21-22, Weapons—Firearms In or Near Places of Public Assembly.

Gun violence in our country has become a public health crisis of epic proportions. The statistics are so monumental—110 deaths and 200 more injuries every day—it is possible to become numb unless directly affected. But none of us is immune to the scourge of gun violence, which destroys lives, families, and communities. So far, Montgomery County has avoided a mass shooting in a sensitive public space, but this is not a matter of luck. Maryland's strong concealed carry permitting system was appropriate and necessary for public safety. Meanwhile, Montgomery County is experiencing a rise in gun violence—the last thing our county needs is guns where people gather. And no one should have to worry about gun violence when they take their kids to a playground, to a park, or drop them off at school.

The Supreme Court's dangerous decision striking down the "proper cause" discretionary requirement to conceal carry a firearm has already increased the risk of tragic mass shootings in our community. When permitting systems are weakened and more people may carry concealed weapons into sensitive public spaces, the research shows that deadly violence rises. States with no such discretion in issuing concealed carry permits have homicide rates 11% higher than states like Maryland and New York.

Now that the Supreme Court's concealed carry decision is the law of the land, Maryland and its local governments must take all reasonable action to protect children and adults from senseless gun violence within its borders. Expedited Bill 21-22, Weapons—Firearms In or Near Places of Public Assembly would be a commonsense, constitutional measure to help ensure public safety in the post-*Bruen* era. Montgomery County has the power under Maryland state law to regulate firearms as set forth in Expedited Bill 21-22. I urge the passage of this life-saving bill.

Sincerely,
Jennifer Stein
State Data Co-Lead
Moms Demand Action for Gun Sense in America, Maryland Chapter

(77)

Dear Sir or Ma'am -

In reference to Bill 4-21:

It is inherently dangerous to signal to criminals that the entire county is, in effect, a giant gun-free zone... "a place where the public may assemble" is literally and figuratively anywhere.

Please be reminded that the Colorado theater shooter specifically chose the particular theater because of it being in a gun-free zone, that is to say, free of law-abiding citizens capable of defending themselves. In doing so, he knew he could maximize the most damage in the least amount of time without a worry that someone, anyone could fight back.

Now, what are the chances of that happening here? That's the wrong question to ask. It's not about the chances, it's about the stakes - my life, and that of my family, is too great to risk.

I am open to any question or comments.

Very sincerely,

- Ben Figueroa

(78)

**Testimony for the Montgomery County Council**

**July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly**

**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Melissa Ladd. I am a volunteer with Maryland Moms Demand Action and I am a resident of Olney, and have lived in Montgomery County for 20 years. I am submitting written testimony in support of **Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.** Thank you for writing this bill in response to the misguided decision of the Supreme Court.

**The breadth of studies on concealed carry permitting show that when permitting restrictions are eased, the rate of violent crime increases.** A 2019 Study from Journal of Empirical Legal Studies shows that "RTC (Right to Carry) laws are associated with 13–15 percent *higher* aggregate violent crime rates 10 years after adoption".[1] Also, the Johns Hopkins School of Public Health research indicates that "By years 7 through 10 following the adoption of a RTC law, violent crime rates were 11% to 14% higher than predicted had such laws not been in place."[2] From a study by Duke University we learn that "increases in violent gun crime (29 percent), gun robbery (32 percent), and gun theft (35 percent) following the introduction of shall-issue concealed carry permit laws."[3]

We know that sensitive area prohibitions keep people safe where the risk of gun violence is elevated. Maryland law grants counties and other local authorities the power to regulate firearms in and near certain sensitive places, like those listed in this ordinance. The county must

---

[1] https://onlinelibrary.wiley.com/doi/abs/10.1111/jels.12219
[2] https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-violence-prevention-and-policy/_archive-2019/_pdfs/concealed-carry-of-firearms.pdf
[3] https://www.nber.org/system/files/working_papers/w30190/w30190.pdf?utm_source=The+Trace+mailing+list&utm_campaign=b670a8e418-EMAIL_CAMPAIGN_2019_09_24_04_06_COPY_01&utm_medium=email&utm_term=0_f76c3ff31c-b670a8e418-112434573

(79)

do all it can to keep guns out of these sensitive locations where our children and families gather, and where we and our elected representatives take part in the democratic process.

 Thank you for addressing this issue and I strongly urge you to pass Bill 21-22.

Sincerely,

Melissa Ladd

Chapter Leader

Moms Demand Action for Gun Sense in America, Maryland Chapter

(80)

**Testimony for the Montgomery County Council**
**July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly**
**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Joanna Pearl. I am a volunteer with Maryland Moms Demand Action, and I live in Kensington. I submit this written testimony in support of Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.

I recently moved to this area, and my family chose to live in Maryland because we hope and believe it will be a safe place to raise my four-year-old daughter. Every day, I worry that even here in our state, we and our children are not safe from gun violence as we do everyday things like go to a park, a synagogue, a library, or a community center.

Montgomery County is experiencing a rise in gun violence, and the last thing we need is guns where people gather. Maryland law grants counties and other local authorities the power to regulate firearms in and near certain sensitive places, like those listed in the ordinance. The county should do all it can to keep guns out of these sensitive locations where our children and families gather, and where we and our elected representatives take part in the democratic process.

A growing body of research shows that when it is easier for people to carry guns in public, violent crime goes up. Sensitive area prohibitions, however, keep people safe where the risk of gun violence is elevated. It is a myth that mass shooters target gun-free zones: a study of 30-year of shootings showed no evidence that a single mass shooter chose to target a place because it prohibited guns. Rather, studies have shown that most mass shooters were connected to the location or were motivated by hate, a perceived grievance, or an interpersonal conflict. Keeping guns out of sensitive areas, as this bill would do, will make us all safer.

I hope the Committee will pass Expedited Bill 21-22 and protect everyone in our community from gun violence. Thank you for your attention to this critically important issue.

Sincerely,
Joanna Pearl
Montgomery County Local Group Co-Lead
Moms Demand Action for Gun Sense in America, Maryland Chapter

(81)

I would like to submit brief testimony in opposition to Expedited Bill 21-22, Weapons - Firearms In or Near Places of Public Assembly.  I have four reasons for opposing this legislation:

It will not make me and my family less susceptible to violent crime.

While the legislation's intended purpose is to improve safety and protect county residents from violent offenders, I fail to see how this provision does that. Literally, all Montgomery County residents, including legally armed residents deemed responsible by the state police, will be more vulnerable to violent crime. Criminals will know they have the tactical advantage when pursuing targets in places of public gatherings such as bus stops, train stations, parks and shopping center parking lots. I found it ironic this bill was announced the same day county police announced the arrest of district residents performing armed robbery of MontCo residents waiting at bus stops. This type of crime will continue.

The legislation will place a greater burden on police officers

At a time when police officers are retiring at record paces and the number of recruits failing to meet those losses, current officers will be forced to bear a greater burden to prevent and respond to crimes, particularly violent crime, before and when they occur. As a native New Yorker, I have personally experienced moments of tranquillity turn to chaos in a matter of seconds. The time chaos ensues to the time when the police arrive seems like an eternity whether it is 30 seconds or three minutes. The truth is every individual is their own first responder.

The legislation will place greater liability costs on businesses

Businesses will bear additional costs to ensure occupants to their businesses are safe from criminal elements. Liability and security

(82)

JA213

insurance will increase as businesses look to protect themselves from lawsuits stemming from crimes committed on their premises.
Public officials need to reevaluate their objective and not target law abiding citizens.

It appears to me this legislation is not addressing the problem it is trying to solve: gun-related crime.

There is a process in place to ensure firearms are not in the hands of law abiding citizens who may not be suitable for owning firearms; are criminals looking to circumvent the law, and/or are individual with emotional or mental health issues. The county needs to trust this process and not disarmed county residents the state police deem responsible to legally own and carry firearms. There are also many laws in place designed to prevent the illegal purchase, use and distribution of firearms. Elected officials must trust the process and laws in place and only make changes which ensure law abiding citizens are protected not punished.

Thank you.

(83)

(Slip Opinion)          OCTOBER TERM, 2021          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL. *v.* BRUEN, SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 20–843.  Argued November 3, 2021—Decided June 23, 2022

The State of New York makes it a crime to possess a firearm without a license, whether inside or outside the home.  An individual who wants to carry a firearm outside his home may obtain an unrestricted license to "have and carry" a concealed "pistol or revolver" if he can prove that "proper cause exists" for doing so.  N. Y. Penal Law Ann. §400.00(2)(f). An applicant satisfies the "proper cause" requirement only if he can "demonstrate a special need for self-protection distinguishable from that of the general community."  *E.g.*, *In re Klenosky*, 75 App. Div. 2d 793, 428 N. Y. S. 2d 256, 257.

Petitioners Brandon Koch and Robert Nash are adult, law-abiding New York residents who both applied for unrestricted licenses to carry a handgun in public based on their generalized interest in self-defense. The State denied both of their applications for unrestricted licenses, allegedly because Koch and Nash failed to satisfy the "proper cause" requirement.  Petitioners then sued respondents—state officials who oversee the processing of licensing applications—for declaratory and injunctive relief, alleging that respondents violated their Second and Fourteenth Amendment rights by denying their unrestricted-license applications for failure to demonstrate a unique need for self-defense. The District Court dismissed petitioners' complaint and the Court of Appeals affirmed.  Both courts relied on the Second Circuit's prior decision in *Kachalsky* v. *County of Westchester*, 701 F. 3d 81, which had sustained New York's proper-cause standard, holding that the requirement was "substantially related to the achievement of an important governmental interest."  *Id.*, at 96.

(84)

2   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Syllabus

*Held*: New York's proper-cause requirement violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their Second Amendment right to keep and bear arms in public for self-defense.  Pp. 8–63.

(a) In *District of Columbia* v. *Heller*, 554 U. S. 570, and *McDonald* v. *Chicago*, 561 U. S. 742, the Court held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense.  Under *Heller*, when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and to justify a firearm regulation the government must demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation.  Pp. 8–22.

(1) Since *Heller* and *McDonald*, the Courts of Appeals have developed a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.  The Court rejects that two-part approach as having one step too many.  Step one is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history.  But *Heller* and *McDonald* do not support a second step that applies means-end scrutiny in the Second Amendment context.  *Heller*'s methodology centered on constitutional text and history.  It did not invoke any means-end test such as strict or intermediate scrutiny, and it expressly rejected any interest-balancing inquiry akin to intermediate scrutiny.  Pp. 9–15.

(2) Historical analysis can sometimes be difficult and nuanced, but reliance on history to inform the meaning of constitutional text is more legitimate, and more administrable, than asking judges to "make difficult empirical judgments" about "the costs and benefits of firearms restrictions," especially given their "lack [of] expertise" in the field.  *McDonald*, 561 U. S., at 790–791 (plurality opinion).  Federal courts tasked with making difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures.  While judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here.  The Second Amendment "is the very product of an interest balancing by the people," and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense.  *Heller*, 554 U. S., at 635.  Pp. 15–17.

(3) The test that the Court set forth in *Heller* and applies today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.  Of course, the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868.  But the Constitution

(85)

Cite as: 597 U. S. \_\_\_\_ (2022)     3

Syllabus

can, and must, apply to circumstances beyond those the Founders specifically anticipated, even though its meaning is fixed according to the understandings of those who ratified it. See, *e.g.*, *United States* v. *Jones*, 565 U. S. 400, 404–405. Indeed, the Court recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." 554 U. S., at 582.

To determine whether a firearm regulation is consistent with the Second Amendment, *Heller* and *McDonald* point toward at least two relevant metrics: first, whether modern and historical regulations impose a comparable burden on the right of armed self-defense, and second, whether that regulatory burden is comparably justified. Because "individual self-defense is 'the *central component*' of the Second Amendment right," these two metrics are "'*central*'" considerations when engaging in an analogical inquiry. *McDonald*, 561 U. S., at 767 (quoting *Heller*, 554 U. S., at 599).

To be clear, even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster. For example, courts can use analogies to "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" to determine whether modern regulations are constitutionally permissible. *Id.*, at 626. That said, respondents' attempt to characterize New York's proper-cause requirement as a "sensitive-place" law lacks merit because there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department. Pp. 17–22.

(b) Having made the constitutional standard endorsed in *Heller* more explicit, the Court applies that standard to New York's proper-cause requirement. Pp. 23–62.

(1) It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects. See *Heller*, 554 U. S., at 580. And no party disputes that handguns are weapons "in common use" today for self-defense. See *id.*, at 627. The Court has little difficulty concluding also that the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense. Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms, and the definition of "bear" naturally encompasses public carry. Moreover, the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," *id.*, at 592, and confrontation can surely take place outside the home. Pp. 23–24.

4    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Syllabus

(2) The burden then falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation.  To do so, respondents appeal to a variety of historical sources from the late 1200s to the early 1900s.  But when it comes to interpreting the Constitution, not all history is created equal.  "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."  *Heller*, 554 U. S., at 634–635.  The Second Amendment was adopted in 1791; the Fourteenth in 1868.  Historical evidence that long predates or postdates either time may not illuminate the scope of the right.  With these principles in mind, the Court concludes that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement.  Pp. 24–62.

(i) Respondents' substantial reliance on English history and custom before the founding makes some sense given *Heller*'s statement that the Second Amendment "codified a right 'inherited from our English ancestors.'"  554 U. S., at 599.  But the Court finds that history ambiguous at best and sees little reason to think that the Framers would have thought it applicable in the New World.  The Court cannot conclude from this historical record that, by the time of the founding, English law would have justified restricting the right to publicly bear arms suited for self-defense only to those who demonstrate some special need for self-protection.  Pp. 30–37.

(ii) Respondents next direct the Court to the history of the Colonies and early Republic, but they identify only three restrictions on public carry from that time.  While the Court doubts that just three colonial regulations could suffice to show a tradition of public-carry regulation, even looking at these laws on their own terms, the Court is not convinced that they regulated public carry akin to the New York law at issue.  The statutes essentially prohibited bearing arms in a way that spread "fear" or "terror" among the people, including by carrying of "dangerous and unusual weapons."  See 554 U. S., at 627.  Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are today "the quintessential self-defense weapon."  *Id.,* at 629.  Thus, these colonial laws provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.  Pp. 37–42.

(iii) Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate.  Respondents rely heavily on these restrictions, which generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes.  None of these restrictions imposed a substantial burden on public carry analogous to that imposed by New York's restrictive licensing regime.

(87)

JA218

Cite as: 597 U. S. ____ (2022)          5

Syllabus

*Common-Law Offenses.* As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.

*Statutory Prohibitions.* In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. But the antebellum state-court decisions upholding them evince a consensus view that States could not altogether prohibit the public carry of arms protected by the Second Amendment or state analogues.

*Surety Statutes.* In the mid-19th century, many jurisdictions began adopting laws that required certain individuals to post bond before carrying weapons in public. Contrary to respondents' position, these surety statutes in no way represented direct precursors to New York's proper-cause requirement. While New York presumes that individuals have no public carry right without a showing of heightened need, the surety statutes presumed that individuals had a right to public carry that could be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836). Thus, unlike New York's regime, a showing of special need was required only *after* an individual was reasonably accused of intending to injure another or breach the peace. And, even then, proving special need simply avoided a fee.

In sum, the historical evidence from antebellum America does demonstrate that the manner of public carry was subject to reasonable regulation, but none of these limitations on the right to bear arms operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose. Pp. 42–51.

(iv) Evidence from around the adoption of the Fourteenth Amendment also does not support respondents' position. The "discussion of the [right to keep and bear arms] in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves," *Heller*, 554 U. S., at 614, generally demonstrates that during Reconstruction the right to keep and bear arms had limits that were consistent with a right of the public to peaceably carry handguns for self-defense. The Court acknowledges two Texas cases—*English* v. *State*, 35 Tex. 473 and *State* v. *Duke*, 42 Tex. 455—that approved a statutory "reasonable grounds" standard for public carry analogous to New York's proper-cause requirement. But these decisions were outliers and therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public. See *Heller*, 554 U. S., at 632. Pp. 52–58.

(88)

JA219

6   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Syllabus

(v) Finally, respondents point to the slight uptick in gun regulation during the late-19th century. As the Court suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence. In addition, the vast majority of the statutes that respondents invoke come from the Western Territories. The bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry. See *Heller*, 554 U. S., at 614. Moreover, these territorial laws were rarely subject to judicial scrutiny, and absent any evidence explaining why these unprecedented prohibitions on all public carry were understood to comport with the Second Amendment, they do little to inform "the origins and continuing significance of the Amendment." *Ibid.*; see also The Federalist No. 37, p. 229. Finally, these territorial restrictions deserve little weight because they were, consistent with the transitory nature of territorial government, short lived. Some were held unconstitutional shortly after passage, and others did not survive a Territory's admission to the Union as a State. Pp. 58–62.

(vi) After reviewing the Anglo-American history of public carry, the Court concludes that respondents have not met their burden to identify an American tradition justifying New York's proper-cause requirement. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor have they generally required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general community" to carry arms in public. *Klenosky*, 75 App. Div. 2d, at 793, 428 N. Y. S. 2d, at 257. P. 62.

(c) The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U. S., at 780 (plurality opinion). The exercise of other constitutional rights does not require individuals to demonstrate to government officers some special need. The Second Amendment right to carry arms in public for self-defense is no different. New York's proper-cause requirement violates the Fourteenth Amendment by preventing law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms in public. Pp. 62–63.

818 Fed. Appx. 99, reversed and remanded.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. ALITO, J., filed a concurring opinion. KAVANAUGH, J., filed a concurring opinion, in which ROBERTS, C. J., joined. BARRETT, J., filed a concurring opinion. BREYER, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined.

(89)

Cite as: 597 U. S. ____ (2022)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–843

_____

NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS *v.* KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2022]

JUSTICE THOMAS delivered the opinion of the Court.

In *District of Columbia* v. *Heller*, 554 U. S. 570 (2008), and *McDonald* v. *Chicago*, 561 U. S. 742 (2010), we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense. In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree, and now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home.

The parties nevertheless dispute whether New York's licensing regime respects the constitutional right to carry handguns publicly for self-defense. In 43 States, the government issues licenses to carry based on objective criteria. But in six States, including New York, the government further conditions issuance of a license to carry on a citizen's showing of some additional special need. Because the State

(90)

2    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution.

### I
### A

New York State has regulated the public carry of handguns at least since the early 20th century. In 1905, New York made it a misdemeanor for anyone over the age of 16 to "have or carry concealed upon his person in any city or village of [New York], any pistol, revolver or other firearm without a written license . . . issued to him by a police magistrate." 1905 N. Y. Laws ch. 92, §2, pp. 129–130; see also 1908 N. Y. Laws ch. 93, §1, pp. 242–243 (allowing justices of the peace to issue licenses). In 1911, New York's "Sullivan Law" expanded the State's criminal prohibition to the possession of all handguns—concealed or otherwise—without a government-issued license. See 1911 N. Y. Laws ch. 195, §1, p. 443. New York later amended the Sullivan Law to clarify the licensing standard: Magistrates could "issue to [a] person a license to have and carry concealed a pistol or revolver without regard to employment or place of possessing such weapon" only if that person proved "good moral character" and "proper cause." 1913 N. Y. Laws ch. 608, §1, p. 1629.

Today's licensing scheme largely tracks that of the early 1900s. It is a crime in New York to possess "any firearm" without a license, whether inside or outside the home, punishable by up to four years in prison or a $5,000 fine for a felony offense, and one year in prison or a $1,000 fine for a misdemeanor. See N. Y. Penal Law Ann. §§265.01–b (West 2017), 261.01(1) (West Cum. Supp. 2022), 70.00(2)(e) and (3)(b), 80.00(1)(a) (West 2021), 70.15(1), 80.05(1). Meanwhile, possessing a loaded firearm outside one's home or place of business without a license is a felony punishable by

(91)

Cite as: 597 U. S. ____ (2022)      3

Opinion of the Court

up to 15 years in prison. §§265.03(3) (West 2017), 70.00(2)(c) and (3)(b), 80.00(1)(a).

A license applicant who wants to possess a firearm *at home* (or in his place of business) must convince a "licensing officer"—usually a judge or law enforcement officer—that, among other things, he is of good moral character, has no history of crime or mental illness, and that "no good cause exists for the denial of the license." §§400.00(1)(a)–(n) (West Cum. Supp. 2022). If he wants to carry a firearm *outside* his home or place of business for self-defense, the applicant must obtain an unrestricted license to "have and carry" a concealed "pistol or revolver." §400.00(2)(f). To secure that license, the applicant must prove that "proper cause exists" to issue it. *Ibid.* If an applicant cannot make that showing, he can receive only a "restricted" license for public carry, which allows him to carry a firearm for a limited purpose, such as hunting, target shooting, or employment. See, *e.g.*, *In re O'Brien*, 87 N. Y. 2d 436, 438–439, 663 N. E. 2d 316, 316–317 (1996); *Babernitz* v. *Police Dept. of City of New York*, 65 App. Div. 2d 320, 324, 411 N. Y. S. 2d 309, 311 (1978); *In re O'Connor*, 154 Misc. 2d 694, 696–698, 585 N. Y. S. 2d 1000, 1003 (Westchester Cty. 1992).

No New York statute defines "proper cause." But New York courts have held that an applicant shows proper cause only if he can "demonstrate a special need for self-protection distinguishable from that of the general community." *E.g.*, *In re Klenosky*, 75 App. Div. 2d 793, 428 N. Y. S. 2d 256, 257 (1980). This "special need" standard is demanding. For example, living or working in an area "'noted for criminal activity'" does not suffice. *In re Bernstein*, 85 App. Div. 2d 574, 445 N. Y. S. 2d 716, 717 (1981). Rather, New York courts generally require evidence "of particular threats, attacks or other extraordinary danger to personal safety." *In re Martinek*, 294 App. Div. 2d 221, 222, 743 N. Y. S. 2d 80, 81 (2002); see also *In re Kaplan*, 249 App. Div. 2d 199, 201, 673 N. Y. S. 2d 66, 68 (1998) (approving the New York

(92)

4     NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

City Police Department's requirement of "'extraordinary personal danger, documented by proof of recurrent threats to life or safety'" (quoting 38 N. Y. C. R. R. §5–03(b))).

When a licensing officer denies an application, judicial review is limited. New York courts defer to an officer's application of the proper-cause standard unless it is "arbitrary and capricious." *In re Bando*, 290 App. Div. 2d 691, 692, 735 N. Y. S. 2d 660, 661 (2002). In other words, the decision "must be upheld if the record shows a rational basis for it." *Kaplan*, 249 App. Div. 2d, at 201, 673 N. Y. S. 2d, at 68. The rule leaves applicants little recourse if their local licensing officer denies a permit.

New York is not alone in requiring a permit to carry a handgun in public. But the vast majority of States—43 by our count—are "shall issue" jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability.[1]   Meanwhile, only six

─────────────

[1]See Ala. Code §13A–11–75 (Cum. Supp. 2021); Alaska Stat. §18.65.700 (2020); Ariz. Rev. Stat. Ann. §13–3112 (Cum. Supp. 2021); Ark. Code Ann. §5–73–309 (Supp. 2021); Colo. Rev. Stat. §18–12–206 (2021); Fla. Stat. §790.06 (2021); Ga. Code Ann. §16–11–129 (Supp. 2021); Idaho Code Ann. §18–3302K (Cum. Supp. 2021); Ill. Comp. Stat., ch. 430, §66/10 (West Cum. Supp. 2021); Ind. Code §35–47–2–3 (2021); Iowa Code §724.7 (2022); Kan. Stat. Ann. §75–7c03 (2021); Ky. Rev. Stat. Ann. §237.110 (Lexis Cum. Supp. 2021); La. Rev. Stat. Ann. §40:1379.3 (West Cum. Supp. 2022); Me. Rev. Stat. Ann., Tit. 25, §2003 (Cum. Supp. 2022); Mich. Comp. Laws §28.425b (2020); Minn. Stat. §624.714 (2020); Miss. Code Ann. §45–9–101 (2022); Mo. Rev. Stat. §571.101 (2016); Mont. Code Ann. §45–8–321 (2021); Neb. Rev. Stat. §69–2430 (2019); Nev. Rev. Stat. §202.3657 (2021); N. H. Rev. Stat. Ann. §159:6 (Cum. Supp. 2021); N. M. Stat. Ann. §29–19–4 (2018); N. C. Gen. Stat. Ann. §14–415.11 (2021); N. D. Cent. Code Ann. §62.1–04–03 (Supp. 2021); Ohio Rev. Code Ann. §2923.125 (2020); Okla. Stat., Tit. 21, §1290.12 (2021); Ore. Rev. Stat. §166.291 (2021); 18 Pa. Cons. Stat. §6109 (Cum. Supp. 2016); S. C. Code Ann. §23–31–215(A) (Cum. Supp. 2021); S. D. Codified Laws §23–7–7 (Cum. Supp. 2021); Tenn. Code Ann. §39–17–1366 (Supp. 2021); Tex. Govt. Code Ann. §411.177 (West Cum. Supp. 2021); Utah Code §53–5–

(93)

Cite as: 597 U. S. ____ (2022)       5

Opinion of the Court

States and the District of Columbia have "may issue" licensing laws, under which authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license. Aside from New York, then, only California, the District of Columbia, Hawaii, Maryland, Massachusetts, and New

---

704.5 (2022); Va. Code Ann. §18.2–308.04 (2021); Wash. Rev. Code §9.41.070 (2021); W. Va. Code Ann. §61–7–4 (2021); Wis. Stat. §175.60 (2021); Wyo. Stat. Ann. §6–8–104 (2021). Vermont has no permitting system for the concealed carry of handguns. Three States—Connecticut, Delaware, and Rhode Island—have discretionary criteria but appear to operate like "shall issue" jurisdictions. See Conn. Gen. Stat. §29–28(b) (2021); Del. Code, Tit. 11, §1441 (2022); R. I. Gen. Laws §11–47–11 (2002). Although Connecticut officials have discretion to deny a concealed-carry permit to anyone who is not a "suitable person," see Conn. Gen. Stat. §29–28(b), the "suitable person" standard precludes permits only to those "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Dwyer* v. *Farrell*, 193 Conn. 7, 12, 475 A. 2d 257, 260 (1984) (internal quotation marks omitted). As for Delaware, the State has thus far processed 5,680 license applications and renewals in fiscal year 2022 and has denied only 112. See Del. Courts, Super. Ct., Carrying Concealed Deadly Weapon (June 9, 2022), https://courts.delaware.gov/ forms/download.aspx?ID=125408. Moreover, Delaware appears to have no licensing requirement for open carry. Finally, Rhode Island has a suitability requirement, see R. I. Gen. Laws §11–47–11, but the Rhode Island Supreme Court has flatly denied that the "[d]emonstration of a proper showing of need" is a component of that requirement. *Gadomski* v. *Tavares*, 113 A. 3d 387, 392 (2015). Additionally, some "shall issue" jurisdictions have so-called "constitutional carry" protections that allow certain individuals to carry handguns in public within the State without *any* permit whatsoever. See, *e.g.*, A. Sherman, More States Remove Permit Requirement To Carry a Concealed Gun, PolitiFact (Apr. 12, 2022), https://www.politifact.com/article/2022/apr/12/more-states-remove-per- mit-requirement-carry-concea/ ("Twenty-five states now have permitless concealed carry laws . . . The states that have approved permitless carry laws are: Alabama, Alaska, Arizona, Arkansas, Idaho, Indiana, Iowa, Georgia, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, New Hampshire, North Dakota, Ohio, Oklahoma, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, and Wyoming").

(94)

6   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

Jersey have analogues to the "proper cause" standard.[2] All of these "proper cause" analogues have been upheld by the Courts of Appeals, save for the District of Columbia's, which has been permanently enjoined since 2017. Compare *Gould* v. *Morgan*, 907 F. 3d 659, 677 (CA1 2018); *Kachalsky* v. *County of Westchester*, 701 F. 3d 81, 101 (CA2 2012); *Drake* v. *Filko*, 724 F. 3d 426, 440 (CA3 2013); *United States* v. *Masciandaro*, 638 F. 3d 458, 460 (CA4 2011); *Young* v. *Hawaii*, 992 F. 3d 765, 773 (CA9 2021) (en banc), with *Wrenn* v. *District of Columbia*, 864 F. 3d 650, 668 (CADC 2017).

B

As set forth in the pleadings below, petitioners Brandon Koch and Robert Nash are law-abiding, adult citizens of Rensselaer County, New York. Koch lives in Troy, while Nash lives in Averill Park. Petitioner New York State Rifle & Pistol Association, Inc., is a public-interest group organized to defend the Second Amendment rights of New Yorkers. Both Koch and Nash are members.

In 2014, Nash applied for an unrestricted license to carry a handgun in public. Nash did not claim any unique danger to his personal safety; he simply wanted to carry a handgun for self-defense. In early 2015, the State denied Nash's application for an unrestricted license but granted him a restricted license for hunting and target shooting only. In late 2016, Nash asked a licensing officer to remove the restrictions, citing a string of recent robberies in his neighborhood. After an informal hearing, the licensing officer denied the request. The officer reiterated that Nash's existing license permitted him "to carry concealed for purposes of off

---

[2] See Cal. Penal Code Ann. §26150 (West 2021) ("Good cause"); D. C. Code §§7–2509.11(1) (2018), 22–4506(a) (Cum. Supp. 2021) ("proper reason," *i.e.*, "special need for self-protection"); Haw. Rev. Stat. §§134–2 (Cum. Supp. 2018), 134–9(a) (2011) ("exceptional case"); Md. Pub. Saf. Code Ann. §5–306(a)(6)(ii) (2018) ("good and substantial reason"); Mass. Gen. Laws, ch. 140, §131(d) (2020) ("good reason"); N. J. Stat. Ann. §2C:58–4(c) (West Cum. Supp. 2021) ("justifiable need").

(95)

Cite as: 597 U. S. ____ (2022)          7

Opinion of the Court

road back country, outdoor activities similar to hunting,"
such as "fishing, hiking & camping etc." App. 41. But, at
the same time, the officer emphasized that the restrictions
were "intended to *prohibit* [Nash] from carrying concealed
in ANY LOCATION typically open to and frequented by the
general public." *Ibid.*

Between 2008 and 2017, Koch was in the same position
as Nash: He faced no special dangers, wanted a handgun
for general self-defense, and had only a restricted license
permitting him to carry a handgun outside the home for
hunting and target shooting. In late 2017, Koch applied to
a licensing officer to remove the restrictions on his license,
citing his extensive experience in safely handling firearms.
Like Nash's application, Koch's was denied, except that the
officer permitted Koch to "carry to and from work." *Id.*, at
114.

C

Respondents are the superintendent of the New York
State Police, who oversees the enforcement of the State's
licensing laws, and a New York Supreme Court justice, who
oversees the processing of licensing applications in Rensse-
laer County. Petitioners sued respondents for declaratory
and injunctive relief under Rev. Stat. 1979, 42 U. S. C.
§1983, alleging that respondents violated their Second and
Fourteenth Amendment rights by denying their unrestricted-
license applications on the basis that they had failed to
show "proper cause," *i.e.*, had failed to demonstrate a
unique need for self-defense.

The District Court dismissed petitioners' complaint and
the Court of Appeals affirmed. See 818 Fed. Appx. 99, 100
(CA2 2020). Both courts relied on the Court of Appeals'
prior decision in *Kachalsky*, 701 F. 3d 81, which had sus-
tained New York's proper-cause standard, holding that the
requirement was "substantially related to the achievement
of an important governmental interest." *Id.*, at 96.

(96)

JA227

8    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

We granted certiorari to decide whether New York's denial of petitioners' license applications violated the Constitution.  593 U. S. ___ (2021).

II

In *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense.  In doing so, we held unconstitutional two laws that prohibited the possession and use of handguns in the home.  In the years since, the Courts of Appeals have coalesced around a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny.

Today, we decline to adopt that two-part approach.  In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."  *Konigsberg* v. *State Bar of Cal.*, 366 U. S. 36, 50, n. 10 (1961).[3]

———————

[3] Rather than begin with its view of the governing legal framework, the dissent chronicles, in painstaking detail, evidence of crimes committed by individuals with firearms. See *post,* at 1–9 (opinion of BREYER, J.). The dissent invokes all of these statistics presumably to justify granting States greater leeway in restricting firearm ownership and use. But, as Members of the Court have already explained, "[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications."  *McDonald* v. *Chicago*, 561 U. S. 742, 783 (2010) (plurality opinion).

(97)

JA228

Cite as: 597 U. S. ____ (2022)      9

Opinion of the Court

### A

Since *Heller* and *McDonald*, the two-step test that Courts of Appeals have developed to assess Second Amendment claims proceeds as follows. At the first step, the government may justify its regulation by "establish[ing] that the challenged law regulates activity falling outside the scope of the right as originally understood." *E.g.*, *Kanter* v. *Barr*, 919 F. 3d 437, 441 (CA7 2019) (internal quotation marks omitted). But see *United States* v. *Boyd*, 999 F. 3d 171, 185 (CA3 2021) (requiring claimant to show "'a burden on conduct falling within the scope of the Second Amendment's guarantee'"). The Courts of Appeals then ascertain the original scope of the right based on its historical meaning. *E.g.*, *United States* v. *Focia*, 869 F. 3d 1269, 1285 (CA11 2017). If the government can prove that the regulated conduct falls beyond the Amendment's original scope, "then the analysis can stop there; the regulated activity is categorically unprotected." *United States* v. *Greeno*, 679 F. 3d 510, 518 (CA6 2012) (internal quotation marks omitted). But if the historical evidence at this step is "inconclusive or suggests that the regulated activity is *not* categorically unprotected," the courts generally proceed to step two. *Kanter*, 919 F. 3d, at 441 (internal quotation marks omitted).

At the second step, courts often analyze "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Ibid.* (internal quotation marks omitted). The Courts of Appeals generally maintain "that the core Second Amendment right is limited to self-defense *in the home*." *Gould*, 907 F. 3d, at 671 (emphasis added). But see *Wrenn*, 864 F. 3d, at 659 ("[T]he Amendment's core generally covers carrying in public for self defense"). If a "core" Second Amendment right is burdened, courts apply "strict scrutiny" and ask whether the Government can prove that the law is "narrowly tailored to achieve a compelling governmental interest." *Kolbe* v. *Hogan*, 849 F. 3d 114, 133 (CA4 2017) (internal quotation

(98)

JA229

10  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

marks omitted).  Otherwise, they apply intermediate scrutiny and consider whether the Government can show that the regulation is "substantially related to the achievement of an important governmental interest."  *Kachalsky*, 701 F. 3d, at 96.[4]  Both respondents and the United States largely agree with this consensus, arguing that intermediate scrutiny is appropriate when text and history are unclear in attempting to delineate the scope of the right.  See Brief for Respondents 37; Brief for United States as *Amicus Curiae* 4.

B

Despite the popularity of this two-step approach, it is one step too many.  Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context.  Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

1

To show why *Heller* does not support applying means-end scrutiny, we first summarize *Heller*'s methodological approach to the Second Amendment.

In *Heller*, we began with a "textual analysis" focused on

―――――――――
[4]See *Association of N. J. Rifle* & *Pistol Clubs, Inc.* v. *Attorney General N. J.*, 910 F. 3d 106, 117 (CA3 2018); accord, *Worman* v. *Healey*, 922 F. 3d 26, 33, 36–39 (CA1 2019); *Libertarian Party of Erie Cty.* v. *Cuomo*, 970 F. 3d 106, 127–128 (CA2 2020); *Harley* v. *Wilkinson*, 988 F. 3d 766, 769 (CA4 2021); *National Rifle Assn. of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F. 3d 185, 194–195 (CA5 2012); *United States* v. *Greeno*, 679 F. 3d 510, 518 (CA6 2012); *Kanter* v. *Barr*, 919 F. 3d 437, 442 (CA7 2019); *Young* v. *Hawaii*, 992 F. 3d 765, 783 (CA9 2021) (en banc); *United States* v. *Reese*, 627 F. 3d 792, 800–801 (CA10 2010); *GeorgiaCarry.Org, Inc.* v. *Georgia*, 687 F. 3d 1244, 1260, n. 34 (CA11 2012); *United States* v. *Class*, 930 F. 3d 460, 463 (CADC 2019).

(99)

JA230

the "'normal and ordinary'" meaning of the Second Amendment's language. 554 U. S., at 576–577, 578. That analysis suggested that the Amendment's operative clause—"the right of the people to keep and bear Arms shall not be infringed"—"guarantee[s] the individual right to possess and carry weapons in case of confrontation" that does not depend on service in the militia. *Id.*, at 592.

From there, we assessed whether our initial conclusion was "confirmed by the historical background of the Second Amendment." *Ibid.* We looked to history because "it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *Ibid.* The Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Id.*, at 599 (alterations and internal quotation marks omitted). After surveying English history dating from the late 1600s, along with American colonial views leading up to the founding, we found "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.*, at 595.

We then canvassed the historical record and found yet further confirmation. That history included the "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment," *id.*, at 600–601, and "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," *id.*, at 605. When the principal dissent charged that the latter category of sources was illegitimate "postenactment legislative history," *id.*, at 662, n. 28 (opinion of Stevens, J.), we clarified that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification" was "a critical tool of constitutional interpretation," *id.*, at 605 (majority opinion).

In assessing the postratification history, we looked to four

12  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

different types of sources.  First, we reviewed "[t]hree important founding-era legal scholars [who] interpreted the Second Amendment in published writings." *Ibid.*  Second, we looked to "19th-century cases that interpreted the Second Amendment" and found that they "universally support an individual right" to keep and bear arms.  *Id.*, at 610.  Third, we examined the "discussion of the Second Amendment in Congress and in public discourse" after the Civil War, "as people debated whether and how to secure constitutional rights for newly freed slaves."  *Id.*, at 614.  Fourth, we considered how post-Civil War commentators understood the right.  See *id.*, at 616–619.

After holding that the Second Amendment protected an individual right to armed self-defense, we also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right.  We noted that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  *Id.*, at 626.  "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Ibid.*  For example, we found it "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" that the Second Amendment protects the possession and use of weapons that are "'in common use at the time.'"  *Id.*, at 627 (first citing 4 W. Blackstone, Commentaries on the Laws of England 148–149 (1769); then quoting *United States* v. *Miller*, 307 U. S. 174, 179 (1939)).  That said, we cautioned that we were not "undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment" and moved on to considering the constitutionality of the District of Columbia's handgun ban.  554 U. S., at 627.

We assessed the lawfulness of that handgun ban by scrutinizing whether it comported with history and tradition.  Although we noted that the ban "would fail constitutional

(101)

Cite as: 597 U. S. ____ (2022)           13

Opinion of the Court

muster" "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," *id.*, at 628–629, we did not engage in means-end scrutiny when resolving the constitutional question. Instead, we focused on the historically unprecedented nature of the District's ban, observing that "[f]ew laws in the history of our Nation have come close to [that] severe restriction." *Id.*, at 629. Likewise, when one of the dissents attempted to justify the District's prohibition with "founding-era historical precedent," including "various restrictive laws in the colonial period," we addressed each purported analogue and concluded that they were either irrelevant or "d[id] not remotely burden the right of self-defense as much as an absolute ban on handguns." *Id.*, at 631–632; see *id.*, at 631–634. Thus, our earlier historical analysis sufficed to show that the Second Amendment did not countenance a "complete prohibition" on the use of "the most popular weapon chosen by Americans for self-defense in the home." *Id.*, at 629.

2

As the foregoing shows, *Heller*'s methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny.

Moreover, *Heller* and *McDonald* expressly rejected the application of any "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Heller*, 554 U. S., at 634 (quoting *id.*, at 689–690 (BREYER, J., dissenting)); see also *McDonald*, 561 U. S., at 790–791 (plurality opinion) (the Second Amendment does not permit—let alone require—"judges to assess

14   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

the costs and benefits of firearms restrictions" under means-end scrutiny). We declined to engage in means-end scrutiny because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U. S., at 634. We then concluded: "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." *Ibid.*

Not only did *Heller* decline to engage in means-end scrutiny generally, but it also specifically ruled out the intermediate-scrutiny test that respondents and the United States now urge us to adopt. Dissenting in *Heller*, JUSTICE BREYER's proposed standard—"ask[ing] whether [a] statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests," *id.*, at 689–690 (dissenting opinion)—simply expressed a classic formulation of intermediate scrutiny in a slightly different way, see *Clark* v. *Jeter*, 486 U. S. 456, 461 (1988) (asking whether the challenged law is "substantially related to an important government objective"). In fact, JUSTICE BREYER all but admitted that his *Heller* dissent advocated for intermediate scrutiny by repeatedly invoking a quintessential intermediate-scrutiny precedent. See *Heller*, 554 U. S., at 690, 696, 704–705 (citing *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180 (1997)). Thus, when *Heller* expressly rejected that dissent's "interest-balancing inquiry," 554 U. S., at 634 (internal quotation marks omitted), it necessarily rejected intermediate scrutiny.[5]

_____

[5]The dissent asserts that we misread *Heller* to eschew means-end scrutiny because *Heller* mentioned that the District of Columbia's handgun ban "would fail constitutional muster" "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Heller*, 554 U. S., at 628–629; see *post*, at 23 (opinion of BREYER, J.). But *Heller*'s passing observation that the District's ban would fail under any

Cite as: 597 U. S. ____ (2022)    15

Opinion of the Court

In sum, the Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny. We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." *Konigsberg*, 366 U. S., at 50, n. 10.

### C

This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms. 554 U. S., at 582, 595, 606, 618, 634–635. In that context, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States* v. *Playboy Entertainment Group*, *Inc.*, 529 U. S. 803, 816 (2000); see also *Philadelphia Newspapers*, *Inc.* v. *Hepps*, 475 U. S. 767, 777 (1986). In some cases, that burden includes showing whether the expressive conduct falls outside of the category of protected speech. See *Illinois ex rel. Madigan* v. *Telemarketing Associates*, *Inc.*, 538 U. S. 600, 620, n. 9 (2003). And to carry that burden, the government must generally point to *historical* evidence about the reach of the First Amendment's protections. See,

─────────
heightened "standar[d] of scrutiny" did not supplant *Heller*'s focus on constitutional text and history. Rather, *Heller*'s comment "was more of a gilding-the-lily observation about the extreme nature of D.C.'s law," *Heller* v. *District of Columbia*, 670 F. 3d 1244, 1277 (CADC 2011) (Kavanaugh, J., dissenting), than a reflection of *Heller*'s methodology or holding.

16  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

*e.g.*, *United States* v. *Stevens*, 559 U. S. 460, 468–471 (2010) (placing the burden on the government to show that a type of speech belongs to a "historic and traditional categor[y]" of constitutionally unprotected speech "long familiar to the bar" (internal quotation marks omitted)).

And beyond the freedom of speech, our focus on history also comports with how we assess many other constitutional claims. If a litigant asserts the right in court to "be confronted with the witnesses against him," U. S. Const., Amdt. 6, we require courts to consult history to determine the scope of that right. See, *e.g.*, *Giles* v. *California*, 554 U. S. 353, 358 (2008) ("admitting only those exceptions [to the Confrontation Clause] established at the time of the founding" (internal quotation marks omitted)). Similarly, when a litigant claims a violation of his rights under the Establishment Clause, Members of this Court "loo[k] to history for guidance." *American Legion* v. *American Humanist Assn.*, 588 U. S. ___, ___ (2019) (plurality opinion) (slip op., at 25). We adopt a similar approach here.

To be sure, "[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it." *McDonald*, 561 U. S., at 803–804 (Scalia, J., concurring). But reliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to "make difficult empirical judgments" about "the costs and benefits of firearms restrictions," especially given their "lack [of] expertise" in the field. *Id.*, at 790–791 (plurality opinion).[6]

──────────

[6]The dissent claims that *Heller*'s text-and-history test will prove unworkable compared to means-end scrutiny in part because judges are relatively ill equipped to "resolv[e] difficult historical questions" or engage in "searching historical surveys." *Post*, at 26, 30. We are unpersuaded. The job of judges is not to resolve historical questions in the abstract; it

Cite as: 597 U. S. ____ (2022)           17

Opinion of the Court

If the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of "intermediate scrutiny" often defer to the determinations of legislatures. But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. The Second Amendment "is the very *product* of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. *Heller*, 554 U. S., at 635. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.

### D

The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that

_____

is to resolve *legal* questions presented in particular cases or controversies. That "legal inquiry is a refined subset" of a broader "historical inquiry," and it relies on "various evidentiary principles and default rules" to resolve uncertainties. W. Baude & S. Sachs, Originalism and the Law of the Past, 37 L. & Hist. Rev. 809, 810–811 (2019). For example, "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *United States* v. *Sineneng-Smith*, 590 U. S. ___, ___ (2020) (slip op., at 3). Courts are thus entitled to decide a case based on the historical record compiled by the parties.

18   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

a modern regulation is unconstitutional.  And if some juris-
dictions actually attempted to enact analogous regulations
during this timeframe, but those proposals were rejected on
constitutional grounds, that rejection surely would provide
some probative evidence of unconstitutionality.

*Heller* itself exemplifies this kind of straightforward his-
torical inquiry.  One of the District's regulations challenged
in *Heller* "totally ban[ned] handgun possession in the
home." *Id*., at 628.  The District in *Heller* addressed a per-
ceived societal problem—firearm violence in densely popu-
lated communities—and it employed a regulation—a flat
ban on the possession of handguns in the home—that the
Founders themselves could have adopted to confront that
problem.  Accordingly, after considering "founding-era his-
torical precedent," including "various restrictive laws in the
colonial period," and finding that none was analogous to the
District's ban, *Heller* concluded that the handgun ban was
unconstitutional. *Id.,* at 631; see also *id.,* at 634 (describing
the claim that "there were somewhat similar restrictions in
the founding period" a "false proposition").

New York's proper-cause requirement concerns the same
alleged societal problem addressed in *Heller*: "handgun vio-
lence," primarily in "urban area[s]." *Ibid.*  Following the
course charted by *Heller*, we will consider whether "histor-
ical precedent" from before, during, and even after the
founding evinces a comparable tradition of regulation. *Id.,*
at 631.  And, as we explain below, we find no such tradition
in the historical materials that respondents and their *amici*
have brought to bear on that question.  See Part III–B, *in-
fra.*

While the historical analogies here and in *Heller* are rel-
atively simple to draw, other cases implicating unprece-
dented societal concerns or dramatic technological changes
may require a more nuanced approach.  The regulatory
challenges posed by firearms today are not always the same

(107)

Opinion of the Court

as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch* v. *Maryland*, 4 Wheat. 316, 415 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated. See, *e.g., United States* v. *Jones*, 565 U. S. 400, 404–405 (2012) (holding that installation of a tracking device was "a physical intrusion [that] would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted").

We have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century." 554 U. S., at 582. "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Ibid.* (citations omitted). Thus, even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. Cf. *Caetano* v. *Massachusetts*, 577 U. S. 411, 411–412 (2016) (*per curiam*) (stun guns).

Much like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge. Like all

20   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar." C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993). And because "[e]verything is similar in infinite ways to everything else," *id.,* at 774, one needs "some metric enabling the analogizer to assess which similarities are important and which are not," F. Schauer & B. Spellman, Analogy, Expertise, and Experience, 84 U. Chi. L. Rev. 249, 254 (2017). For instance, a green truck and a green hat are relevantly similar if one's metric is "things that are green." See *ibid.* They are not relevantly similar if the applicable metric is "things you can wear."

While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U. S., at 767 (quoting *Heller*, 554 U. S., at 599); see also *id.,* at 628 ("the inherent right of self-defense has been central to the Second Amendment right"). Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry. *McDonald*, 561 U. S., at 767 (quoting *Heller*, 554 U. S., at 599).[7]

_____

[7]This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry. Again, the Second Amendment is the "product of an interest balancing *by the people*," not the evolving product of federal judges. *Heller*, 554 U. S., at 635 (emphasis altered). Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances, and

(109)

Cite as: 597 U. S. ____ (2022)          21

Opinion of the Court

To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond* v. *Robinson*, 9 F. 4th 217, 226 (CA3 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U. S., at 626. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.,* legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); see also Brief for Independent Institute as *Amicus Curiae* 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible.

Although we have no occasion to comprehensively define

—————

contrary to the dissent's assertion, there is nothing "[i]roni[c]" about that undertaking. *Post,* at 30. It is not an invitation to revise that balance through means-end scrutiny.

(110)

22   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

"sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law.  In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34.  It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations.  But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly.  Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below.  See Part III–B, *infra*.  Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.

Like *Heller*, we "do not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." 554 U. S., at 626.  And we acknowledge that "applying constitutional principles to novel modern conditions can be difficult and leave close questions at the margins."  *Heller* v. *District of Columbia*, 670 F. 3d 1244, 1275 (CADC 2011) (Kavanaugh, J., dissenting).  "But that is hardly unique to the Second Amendment.  It is an essential component of judicial decisionmaking under our enduring Constitution." *Ibid.*  We see no reason why judges frequently tasked with answering these kinds of historical, analogical questions cannot do the same for Second Amendment claims.

(111)

Cite as: 597 U. S. ____ (2022)          23

Opinion of the Court

### III

Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement.

### A

It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects. See *Heller*, 554 U. S., at 580. Nor does any party dispute that handguns are weapons "in common use" today for self-defense. See *id.*, at 627; see also *Caetano*, 577 U. S., at 411–412. We therefore turn to whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense.

We have little difficulty concluding that it does. Respondents do not dispute this. See Brief for Respondents 19. Nor could they. Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms. As we explained in *Heller*, the "textual elements" of the Second Amendment's operative clause— "the right of the people to keep and bear Arms, shall not be infringed"—"guarantee the individual right to possess and carry weapons in case of confrontation." 554 U. S., at 592. *Heller* further confirmed that the right to "bear arms" refers to the right to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.*, at 584 (quoting *Muscarello* v. *United States*, 524 U. S. 125, 143 (1998) (Ginsburg, J., dissenting); internal quotation marks omitted).

This definition of "bear" naturally encompasses public carry. Most gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. Although individuals often "keep" firearms in their home, at the ready for self-defense, most do not "bear" (*i.e.*,

(112)

JA243

24   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

carry) them in the home beyond moments of actual confrontation. To confine the right to "bear" arms to the home would nullify half of the Second Amendment's operative protections.

Moreover, confining the right to "bear" arms to the home would make little sense given that self-defense is "the *central component* of the [Second Amendment] right itself." *Heller*, 554 U. S., at 599; see also *McDonald*, 561 U. S., at 767. After all, the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation," *Heller*, 554 U. S., at 592, and confrontation can surely take place outside the home.

Although we remarked in *Heller* that the need for armed self-defense is perhaps "most acute" in the home, *id.*, at 628, we did not suggest that the need was insignificant elsewhere. Many Americans hazard greater danger outside the home than in it. See *Moore* v. *Madigan*, 702 F. 3d 933, 937 (CA7 2012) ("[A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower"). The text of the Second Amendment reflects that reality.

The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense.

**B**

Conceding that the Second Amendment guarantees a general right to public carry, contra, *Young*, 992 F. 3d, at 813, respondents instead claim that the Amendment "permits a State to condition handgun carrying in areas 'frequented by the general public' on a showing of a non-speculative need for armed self-defense in those areas," Brief for Respondents 19 (citation omitted).[8] To support

---

[8]The dissent claims that we cannot answer the question presented without giving respondents the opportunity to develop an evidentiary record fleshing out "how New York's law is administered in practice, how

Cite as: 597 U. S. ____ (2022)          25

Opinion of the Court

that claim, the burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of firearm regulation. Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct.

Respondents appeal to a variety of historical sources from the late 1200s to the early 1900s. We categorize these periods as follows: (1) medieval to early modern England; (2) the American Colonies and the early Republic; (3) antebellum America; (4) Reconstruction; and (5) the late-19th and early-20th centuries.

We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Heller*, 554 U. S., at 634–635 (emphasis added). The Second Amendment was adopted in 1791; the

_____

much discretion licensing officers in New York possess, or whether the proper cause standard differs across counties." *Post,* at 20. We disagree. The dissent does not dispute that any applicant for an unrestricted concealed-carry license in New York can satisfy the proper-cause standard only if he has "'"a special need for self-protection distinguishable from that of the general community."'" *Post,* at 13 (quoting *Kachalsky* v. *County of Westchester*, 701 F. 3d 81, 86 (CA2 2012)). And in light of the text of the Second Amendment, along with the Nation's history of firearm regulation, we conclude below that a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense. See *infra*, at 62. That conclusion does not depend upon any of the factual questions raised by the dissent. Nash and Koch allege that they were denied unrestricted licenses because they had not "demonstrate[d] a special need for self-defense that distinguished [them] from the general public." App. 123, 125. If those allegations are proven true, then it simply does not matter whether licensing officers have applied the proper-cause standard differently to other concealed-carry license applicants; Nash's and Koch's constitutional rights to bear arms in public for self-defense were still violated.

(114)

JA245

26   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for courts to "reac[h] back to the 14th century" for English practices that "prevailed up to the 'period immediately before and after the framing of the Constitution.'" *Sprint Communications Co.* v. *APCC Services, Inc.*, 554 U. S. 269, 311 (2008) (ROBERTS, C. J., dissenting). It is quite another to rely on an "ancient" practice that had become "obsolete in England at the time of the adoption of the Constitution" and never "was acted upon or accepted in the colonies." *Dimick* v. *Schiedt*, 293 U. S. 474, 477 (1935).

As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law rights. The common law, of course, developed over time. *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters*, 459 U. S. 519, 533, n. 28 (1983); see also *Rogers* v. *Tennessee*, 532 U. S. 451, 461 (2001). And English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution. Even "the words of *Magna Charta*"—foundational as they were to the rights of America's forefathers—"stood for very different things at the time of the separation of the American Colonies from what they represented originally" in 1215. *Hurtado* v. *California*, 110 U. S. 516, 529 (1884). Sometimes, in interpreting our own Constitution, "it [is] better not to go too far back into antiquity for the best securities of our liberties," *Funk* v. *United States*, 290 U. S. 371, 382 (1933), unless evidence shows that medieval law survived to become our Founders' law. A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice.

Similarly, we must also guard against giving postenactment history more weight than it can rightly bear. It is true

Cite as: 597 U. S. ____ (2022)            27

Opinion of the Court

that in *Heller* we reiterated that evidence of "how the Sec-
ond Amendment was interpreted from immediately after its
ratification through the end of the 19th century" repre-
sented a "critical tool of constitutional interpretation." 554
U. S., at 605.  We therefore examined "a variety of legal and
other sources to determine *the public understanding* of [the
Second Amendment] after its . . . ratification." *Ibid.*  And,
in other contexts, we have explained that "'a regular course
of practice' can 'liquidate & settle the meaning of' disputed
or indeterminate 'terms & phrases'" in the Constitution.
*Chiafalo* v. *Washington*, 591 U. S. ___, ___ (2020) (slip op.,
at 13) (quoting Letter from J. Madison to S. Roane (Sept. 2,
1819), in 8 Writings of James Madison 450 (G. Hunt ed.
1908)); see also, *e.g., Houston Community College System* v.
*Wilson*, 595 U. S. ___, ___ (2022) (slip op., at 5) (same); The
Federalist No. 37, p. 229 (C. Rossiter ed. 1961) (J. Madison);
see generally C. Nelson, *Stare Decisis* and Demonstrably
Erroneous Precedents, 87 Va. L. Rev. 1, 10–21 (2001); W.
Baude, Constitutional Liquidation, 71 Stan. L. Rev. 1
(2019).  In other words, we recognize that "where a govern-
mental practice has been open, widespread, and unchal-
lenged since the early days of the Republic, the practice
should guide our interpretation of an ambiguous constitu-
tional provision." *NLRB* v. *Noel Canning*, 573 U. S. 513,
572 (2014) (Scalia, J., concurring in judgment); see also *My-
ers* v. *United States*, 272 U. S. 52, 174 (1926); *Printz* v.
*United States*, 521 U. S. 898, 905 (1997).

    But to the extent later history contradicts what the text
says, the text controls.  "'[L]iquidating' indeterminacies in
written laws is far removed from expanding or altering
them." *Gamble* v. *United States*, 587 U. S. ___, ___ (2019)
(THOMAS, J., concurring) (slip op., at 13); see also Letter
from J. Madison to N. Trist (Dec. 1831), in 9 Writings of
James Madison 477 (G. Hunt ed. 1910).  Thus, "post-
ratification adoption or acceptance of laws that are *incon-
sistent* with the original meaning of the constitutional text

28   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

obviously cannot overcome or alter that text." *Heller*, 670 F. 3d, at 1274, n. 6 (Kavanaugh, J., dissenting); see also *Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. ___, ___ (2020) (slip op., at 15).

As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms "took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." 554 U. S., at 614; cf. *Sprint Communications Co.*, 554 U. S., at 312 (ROBERTS, C. J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]"). And we made clear in *Gamble* that *Heller*'s interest in mid- to late-19th-century commentary was secondary. *Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading—including the text of the Second Amendment and state constitutions." *Gamble*, 587 U. S., at ___ (majority opinion) (slip op., at 23). In other words, this 19th-century evidence was "treated as mere confirmation of what the Court thought had already been established." *Ibid.*

A final word on historical method: Strictly speaking, New York is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. See, *e.g.*, *Barron ex rel. Tiernan* v. *Mayor of Baltimore*, 7 Pet. 243, 250–251 (1833) (Bill of Rights applies only to the Federal Government). Nonetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. See, *e.g.*, *Ramos* v. *Louisiana*, 590 U. S. ___, ___ (2020) (slip op., at 7); *Timbs* v. *Indiana*, 586 U. S. ___, ___–___ (2019) (slip op., at 2–3); *Malloy* v. *Hogan*, 378 U. S. 1, 10–11 (1964). And we have generally assumed that the

(117)

Cite as: 597 U. S. ____ (2022)                 29

Opinion of the Court

scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791. See, *e.g.*, *Crawford* v. *Washington*, 541 U. S. 36, 42–50 (2004) (Sixth Amendment); *Virginia* v. *Moore*, 553 U. S. 164, 168–169 (2008) (Fourth Amendment); *Nevada Comm'n on Ethics* v. *Carrigan*, 564 U. S. 117, 122–125 (2011) (First Amendment).

We also acknowledge that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government). See, *e.g.*, A. Amar, The Bill of Rights: Creation and Reconstruction xiv, 223, 243 (1998); K. Lash, Re-Speaking the Bill of Rights: A New Doctrine of Incorporation (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ("When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings"). We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry.

*        *        *

With these principles in mind, we turn to respondents' historical evidence. Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms. But apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly

(118)

30   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

prohibiting the public carry of commonly used firearms for self-defense. Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense.[9] We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement. Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional.

1

Respondents' substantial reliance on English history and custom before the founding makes some sense given our statement in *Heller* that the Second Amendment "codified a right 'inherited from our English ancestors.'" 554 U. S., at 599 (quoting *Robertson* v. *Baldwin*, 165 U. S. 275, 281 (1897)); see also *Smith* v. *Alabama*, 124 U. S. 465, 478

_____

[9]To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake* v. *Filko*, 724 F. 3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. *District of Columbia* v. *Heller*, 554 U. S. 570, 635 (2008). Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." *Ibid.* And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth* v. *Birmingham*, 394 U. S. 147, 151 (1969), rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell* v. *Connecticut*, 310 U. S. 296, 305 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

(119)

JA250

Cite as: 597 U. S. ____ (2022)    31

Opinion of the Court

(1888). But this Court has long cautioned that the English common law "is not to be taken in all respects to be that of America." *Van Ness* v. *Pacard*, 2 Pet. 137, 144 (1829) (Story, J., for the Court); see also *Wheaton* v. *Peters*, 8 Pet. 591, 659 (1834); *Funk*, 290 U. S., at 384. Thus, "[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*," not as they existed in the Middle Ages. *Ex parte Grossman*, 267 U. S. 87, 108–109 (1925) (emphasis added); see also *United States* v. *Reid*, 12 How. 361, 363 (1852).

We interpret the English history that respondents and the United States muster in light of these interpretive principles. We find that history ambiguous at best and see little reason to think that the Framers would have thought it applicable in the New World. It is not sufficiently probative to defend New York's proper-cause requirement.

To begin, respondents and their *amici* point to several medieval English regulations from as early as 1285 that they say indicate a longstanding tradition of restricting the public carry of firearms. See 13 Edw. 1, 102. The most prominent is the 1328 Statute of Northampton (or Statute), passed shortly after Edward II was deposed by force of arms and his son, Edward III, took the throne of a kingdom where "tendency to turmoil and rebellion was everywhere apparent throughout the realm." N. Trenholme, The Risings in the English Monastic Towns in 1327, 6 Am. Hist. Rev. 650, 651 (1901). At the time, "[b]ands of malefactors, knights as well as those of lesser degree, harried the country, committing assaults and murders," prompted by a more general "spirit of insubordination" that led to a "decay in English national life." K. Vickers, England in the Later Middle Ages 107 (1926).

The Statute of Northampton was, in part, "a product of . . . the acute disorder that still plagued England." A. Verduyn, The Politics of Law and Order During the Early

32   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

Years of Edward III, 108 Eng. Hist. Rev. 842, 850 (1993). It provided that, with some exceptions, Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." 2 Edw. 3 c. 3 (1328).

Respondents argue that the prohibition on "rid[ing]" or "go[ing] . . . armed" was a sweeping restriction on public carry of self-defense weapons that would ultimately be adopted in Colonial America and justify onerous public-carry regulations. Notwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages—has little bearing on the Second Amendment adopted in 1791. The Statute of Northampton was enacted nearly 20 years before the Black Death, more than 200 years before the birth of Shakespeare, more than 350 years before the Salem Witch Trials, more than 450 years before the ratification of the Constitution, and nearly 550 years before the adoption of the Fourteenth Amendment.

The Statute's prohibition on going or riding "armed" obviously did not contemplate handguns, given they did not appear in Europe until about the mid-1500s. See K. Chase, Firearms: A Global History to 1700, p. 61 (2003). Rather, it appears to have been centrally concerned with the wearing of armor. See, *e.g.*, Calendar of the Close Rolls, Edward III, 1330–1333, p. 131 (Apr. 3, 1330) (H. Maxwell-Lyte ed. 1898); *id.*, at 243 (May 28, 1331); *id.*, Edward III, 1327–1330, at 314 (Aug. 29, 1328) (1896). If it did apply beyond armor, it applied to such weapons as the "launcegay," a 10- to 12-foot-long lightweight lance. See 7 Rich. 2 c. 13 (1383); 20 Rich. 2 c. 1 (1396).

The Statute's apparent focus on armor and, perhaps,

(121)

Cite as: 597 U. S. ____ (2022)          33

Opinion of the Court

weapons like launcegays makes sense given that armor and lances were generally worn or carried only when one intended to engage in lawful combat or—as most early violations of the Statute show—to breach the peace. See, *e.g.*, Calendar of the Close Rolls, Edward III, 1327–1330, at 402 (July 7, 1328); *id.*, Edward III, 1333–1337, at 695 (Aug. 18, 1336) (1898). Contrast these arms with daggers. In the medieval period, "[a]lmost everyone carried a knife or a dagger in his belt." H. Peterson, Daggers and Fighting Knives of the Western World 12 (2001). While these knives were used by knights in warfare, "[c]ivilians wore them for self-protection," among other things. *Ibid.* Respondents point to no evidence suggesting the Statute applied to the smaller medieval weapons that strike us as most analogous to modern handguns.

When handguns were introduced in England during the Tudor and early Stuart eras, they did prompt royal efforts at suppression. For example, Henry VIII issued several proclamations decrying the proliferation of handguns, and Parliament passed several statutes restricting their possession. See, *e.g.*, 6 Hen. 8 c. 13, §1 (1514); 25 Hen. 8 c. 17, §1 (1533); 33 Hen. 8 c. 6 (1541); Prohibiting Use of Handguns and Crossbows (Jan. 1537), in 1 Tudor Royal Proclamations 249 (P. Hughes & J. Larkin eds. 1964). But Henry VIII's displeasure with handguns arose not primarily from concerns about their safety but rather their inefficacy. Henry VIII worried that handguns threatened Englishmen's proficiency with the longbow—a weapon many believed was crucial to English military victories in the 1300s and 1400s, including the legendary English victories at Crécy and Agincourt. See R. Payne-Gallwey, The Crossbow 32, 34 (1903); L. Schwoerer, Gun Culture in Early Modern England 54 (2016) (Schwoerer).

Similarly, James I considered small handguns—called dags—"utterly unserviceable for defence, Militarie practise, or other lawful use." A Proclamation Against Steelets,

(122)

JA253

34   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

Pocket Daggers, Pocket Dagges and Pistols (R. Barker printer 1616).  But, in any event, James I's proclamation in 1616 "was the last one regarding civilians carrying dags," Schwoerer 63.  "After this the question faded without explanation."  *Ibid.*  So, by the time Englishmen began to arrive in America in the early 1600s, the public carry of handguns was no longer widely proscribed.

When we look to the latter half of the 17th century, respondents' case only weakens.  As in *Heller*, we consider this history "[b]etween the [Stuart] Restoration [in 1660] and the Glorious Revolution [in 1688]" to be particularly instructive. 554 U. S., at 592.  During that time, the Stuart Kings Charles II and James II ramped up efforts to disarm their political opponents, an experience that "caused Englishmen . . . to be jealous of their arms."  *Id.*, at 593.

In one notable example, the government charged Sir John Knight, a prominent detractor of James II, with violating the Statute of Northampton because he allegedly "did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects."  *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686).  Chief Justice Holt explained that the Statute of Northampton had "almost gone in *desuetudinem*," *Rex* v. *Sir John Knight*, 1 Comb. 38, 38–39, 90 Eng. Rep. 330 (K. B. 1686), meaning that the Statute had largely become obsolete through disuse.[10]  And the Chief Justice further explained

_____

[10] Another medieval firearm restriction—a 1541 statute enacted under Henry VIII that limited the ownership and use of handguns (which could not be shorter than a yard) to those subjects with annual property values of at least £100, see 33 Hen. 8 c. 6, §§1–2—fell into a similar obsolescence.  As far as we can discern, the last recorded prosecutions under the 1541 statute occurred in 1693, neither of which appears to have been successful.  See *King and Queen* v. *Bullock*, 4 Mod. 147, 87 Eng. Rep. 315 (K. B. 1693); *King* v. *Litten*, 1 Shower, K. B. 367, 89 Eng. Rep. 644 (K. B. 1693).  It seems that other prosecutions under the 1541 statute during the late 1600s were similarly unsuccessful.  See *King* v. *Silcot*, 3 Mod. 280, 280–

Cite as: 597 U. S. ____ (2022)      35

Opinion of the Court

that the act of "go[ing] armed *to terrify* the King's subjects" was "a great offence at the *common law*" and that the Statute of Northampton "is but an affirmance of that law." 3 Mod., at 118, 87 Eng. Rep., at 76 (first emphasis added). Thus, one's conduct "will come within the Act,"—*i.e.*, would terrify the King's subjects—only "where the crime shall appear to be malo animo," 1 Comb., at 39, 90 Eng. Rep., at 330, with evil intent or malice. Knight was ultimately acquitted by the jury.[11]

――――――――

281, 87 Eng. Rep. 186 (K. B. 1690); *King* v. *Lewellin,* 1 Shower, K. B. 48, 89 Eng. Rep. 440 (K. B. 1689); cf. *King and Queen* v. *Alsop,* 4 Mod. 49, 50–51, 87 Eng. Rep. 256, 256–257 (K. B. 1691). By the late 1700s, it was widely recognized that the 1541 statute was "obsolete." 2 R. Burn, The Justice of the Peace, and Parish Officer 243, n. (11th ed. 1769); see also, *e.g.,* The Farmer's Lawyer 143 (1774) ("entirely obsolete"); 1 G. Jacob, Game-Laws II, Law-Dictionary (T. Tomlins ed. 1797); 2 R. Burn, The Justice of the Peace, and Parish Officer 409 (18th ed. 1797) (calling the 1541 statute "a matter more of curiosity than use").

In any event, lest one be tempted to put much evidentiary weight on the 1541 statute, it impeded not only public carry, but further made it unlawful for those without sufficient means to "kepe in his or their houses" any "handgun." 33 Hen. 8 c. 6, §1. Of course, this kind of limitation is inconsistent with *Heller*'s historical analysis regarding the Second Amendment's meaning at the founding and thereafter. So, even if a severe restriction on keeping firearms in the home may have seemed appropriate in the mid-1500s, it was not incorporated into the Second Amendment's scope. We see little reason why the parts of the 1541 statute that address public carry should not be understood similarly.

We note also that even this otherwise restrictive 1541 statute, which generally prohibited shooting firearms in any city, exempted discharges "for the defence of [one's] p[er]son or house." §4. Apparently, the paramount need for self-defense trumped the Crown's interest in firearm suppression even during the 16th century.

[11]The dissent discounts *Sir John Knight's Case,* 3 Mod. 117, 87 Eng. Rep. 75, because it only "arguably" supports the view that an evil-intent requirement attached to the Statute of Northampton by the late 1600s and early 1700s. See *post,* at 37. But again, because the Second Amendment's bare text covers petitioners' public carry, the respondents here shoulder the burden of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope. See *supra,* at 15. To the extent there are multiple plausible

36   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

Just three years later, Parliament responded by writing the "predecessor to our Second Amendment" into the 1689 English Bill of Rights, *Heller*, 554 U. S., at 593, guaranteeing that "Protestants . . . may have Arms for their Defence suitable to their Conditions, and as allowed by Law," 1 Wm. & Mary c. 2, §7, in 3 Eng. Stat. at Large 417 (1689). Although this right was initially limited—it was restricted to Protestants and held only against the Crown, but not Parliament—it represented a watershed in English history. Englishmen had "never before claimed . . . the right of the individual to arms." Schwoerer 156.[12]  And as that individual right matured, "by the time of the founding," the right to keep and bear arms was "understood to be an individual right protecting against both public and private violence." *Heller*, 554 U. S., at 594.

To be sure, the Statute of Northampton survived both *Sir John Knight's Case* and the English Bill of Rights, but it was no obstacle to public carry for self-defense in the decades leading to the founding. Serjeant William Hawkins, in his widely read 1716 treatise, confirmed that "no wearing of Arms is within the meaning of [the Statute of Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People." 1 Pleas of the Crown 136. To illustrate that proposition, Hawkins noted as an example that "Persons of Quality" were "in no Danger of Offending against this Statute by wearing common Weapons" because, in those circumstances, it would be clear that they

--------

interpretations of *Sir John Knight's Case*, we will favor the one that is more consistent with the Second Amendment's command.

[12] Even Catholics, who fell beyond the protection of the right to have arms, and who were stripped of all "Arms, Weapons, Gunpowder, [and] Ammunition," were at least allowed to keep "such necessary Weapons as shall be allowed . . . by Order of the Justices of the Peace . . . for the Defence of his House or Person." 1 Wm. & Mary c. 15, §4, in 3 Eng. Stat. at Large 399 (1688).

Cite as: 597 U. S. ____ (2022)          37

Opinion of the Court

had no "Intention to commit any Act of Violence or Disturb-
ance of the Peace." *Ibid.*; see also T. Barlow, The Justice of
Peace 12 (1745). Respondents do not offer any evidence
showing that, in the early 18th century or after, the mere
public carrying of a handgun would terrify people. In fact,
the opposite seems to have been true. As time went on, "do-
mestic gun culture [in England] softened" any "terror" that
firearms might once have conveyed. Schwoerer 4. Thus,
whatever place handguns had in English society during the
Tudor and Stuart reigns, by the time we reach the 18th cen-
tury—and near the founding—they had gained a fairly se-
cure footing in English culture.

At the very least, we cannot conclude from this historical
record that, by the time of the founding, English law would
have justified restricting the right to publicly bear arms
suited for self-defense only to those who demonstrate some
special need for self-protection.

2

Respondents next point us to the history of the Colonies
and early Republic, but there is little evidence of an early
American practice of regulating public carry by the general
public. This should come as no surprise—English subjects
founded the Colonies at about the time England had itself
begun to eliminate restrictions on the ownership and use of
handguns.

In the colonial era, respondents point to only three re-
strictions on public carry. For starters, we doubt that *three*
colonial regulations could suffice to show a tradition of pub-
lic-carry regulation. In any event, even looking at these
laws on their own terms, we are not convinced that they
regulated public carry akin to the New York law before us.

Two of the statutes were substantively identical. Colo-
nial Massachusetts and New Hampshire both authorized
justices of the peace to arrest "all Affrayers, Rioters, Dis-
turbers, or Breakers of the Peace, and such as shall ride or

(126)

JA257

38   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

go armed Offensively . . . by Night or by Day, in Fear or Affray of Their Majesties Liege People." 1692 Mass. Acts and Laws no. 6, pp. 11–12; see 1699 N. H. Acts and Laws ch. 1. Respondents and their *amici* contend that being "armed offensively" meant bearing any offensive weapons, including firearms. See Brief for Respondents 33. In particular, respondents' *amici* argue that "'offensive'" arms in the 1600s and 1700s were what Blackstone and others referred to as "'dangerous or unusual weapons,'" Brief for Professors of History and Law as *Amici Curiae* 7 (quoting 4 Blackstone, Commentaries, at 148–149), a category that they say included firearms, see also *post,* at 40–42 (BREYER, J., dissenting).

Respondents, their *amici,* and the dissent all misunderstand these statutes. Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself. See *supra,* at 34–37. For instance, the Massachusetts statute proscribed "go[ing] armed Offensively . . . in Fear or Affray" of the people, indicating that these laws were modeled after the Statute of Northampton to the extent that the statute would have been understood to limit public carry *in the late 1600s.* Moreover, it makes very little sense to read these statutes as banning the public carry of all firearms just a few years after Chief Justice Holt in *Sir John Knight's Case* indicated that the English common law did not do so.

Regardless, even if respondents' reading of these colonial statutes were correct, it would still do little to support restrictions on the public carry of handguns *today.* At most, respondents can show that colonial legislatures sometimes prohibited the carrying of "dangerous and unusual weapons"—a fact we already acknowledged in *Heller.* See 554 U. S., at 627. Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those "in common use at the

(127)

Opinion of the Court

time," as opposed to those that "are highly unusual in soci-
ety at large." *Ibid.* (internal quotation marks omitted).
Whatever the likelihood that handguns were considered
"dangerous and unusual" during the colonial period, they
are indisputably in "common use" for self-defense today.
They are, in fact, "the quintessential self-defense weapon."
*Id.*, at 629. Thus, even if these colonial laws prohibited the
carrying of handguns because they were considered "dan-
gerous and unusual weapons" in the 1690s, they provide no
justification for laws restricting the public carry of weapons
that are unquestionably in common use today.

The third statute invoked by respondents was enacted in
East New Jersey in 1686. It prohibited the concealed carry
of "pocket pistol[s]" or other "unusual or unlawful weap-
ons," and it further prohibited "planter[s]" from carrying all
pistols unless in military service or, if "strangers," when
traveling through the Province. An Act Against Wearing
Swords, &c., ch. 9, in Grants, Concessions, and Original
Constitutions of the Province of New Jersey 290 (2d ed.
1881) (Grants and Concessions). These restrictions do not
meaningfully support respondents. The law restricted only
concealed carry, not all public carry, and its restrictions ap-
plied only to certain "unusual or unlawful weapons," includ-
ing "pocket pistol[s]." *Ibid.* It also did not apply to all pis-
tols, let alone all firearms. "Pocket pistols" had barrel
lengths of perhaps 3 or 4 inches, far smaller than the 6-inch
to 14-inch barrels found on the other belt and hip pistols
that were commonly used for lawful purposes in the 1600s.
J. George, English Pistols and Revolvers 16 (1938); see also,
*e.g.*, 14 Car. 2 c. 3, §20 (1662); H. Peterson, Arms and Armor
in Colonial America, 1526–1783, p. 208 (1956) (Peterson).
Moreover, the law prohibited only the *concealed* carry of
pocket pistols; it presumably did not by its terms touch the

40    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

open carry of larger, presumably more common pistols, except as to "planters."[13]  In colonial times, a "planter" was simply a farmer or plantation owner who settled new territory.  R. Lederer, Colonial American English 175 (1985); New Jersey State Archives, J. Klett, Using the Records of the East and West Jersey Proprietors 31 (rev. ed. 2014), https://www.nj.gov/state/archives/pdf/proprietors.pdf.  While the reason behind this singular restriction is not entirely clear, planters may have been targeted because colonial-era East New Jersey was riven with "strife and excitement" between planters and the Colony's proprietors "respecting titles to the soil."  See W. Whitehead, East Jersey Under the Proprietary Governments 150–151 (rev. 2d ed. 1875); see also T. Gordon, The History of New Jersey 49 (1834).

In any event, we cannot put meaningful weight on this solitary statute.  First, although the "planter" restriction may have prohibited the public carry of pistols, it did not prohibit planters from carrying long guns for self-defense—including the popular musket and carbine.  See Peterson 41.  Second, it does not appear that the statute survived for very long.  By 1694, East New Jersey provided that no slave "be permitted to carry any gun or pistol . . . into the woods, or plantations" unless their owner accompanied them.  Grants and Concessions 341.  If slave-owning planters were prohibited from carrying pistols, it is hard to comprehend why slaves would have been able to carry them in the planter's presence.  Moreover, there is no evidence that the 1686 statute survived the 1702 merger of East and West New Jersey.  See 1 Nevill, Acts of the General Assembly of the Province of New-Jersey (1752).  At most eight years of

---

[13] Even assuming that pocket pistols were, as East Jersey in 1686 deemed them, "unusual or unlawful," it appears that they were commonly used at least by the founding. See, *e.g.*, G. Neumann, The History of Weapons of the American Revolution 150–151 (1967); see also H. Hendrick, P. Paradis, & R. Hornick, Human Factors Issues in Handgun Safety and Forensics 44 (2008).

(129)

Opinion of the Court

history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment.

Respondents next direct our attention to three late-18th-century and early-19th-century statutes, but each parallels the colonial statutes already discussed. One 1786 Virginia statute provided that "no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country." Collection of All Such Acts of the General Assembly of Virginia ch. 21, p. 33 (1794).[14] A Massachusetts statute from 1795 commanded justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth." 1795 Mass. Acts and Laws ch. 2, p. 436, in Laws of the Commonwealth of Massachusetts. And an 1801 Tennessee statute likewise required any person who would "publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person" to post a surety; otherwise, his continued violation of the law would be "punished as for a breach of the peace, or riot at common law." 1801 Tenn. Acts pp. 260–261.

A by-now-familiar thread runs through these three statutes: They prohibit bearing arms in a way that spreads "fear" or "terror" among the people. As we have already explained, Chief Justice Holt in *Sir John Knight's Case* interpreted this *in Terrorem Populi* element to require something more than merely carrying a firearm in public. See *supra*, at 34–35. Respondents give us no reason to think that the founding generation held a different view. Thus, all told, in the century leading up to the Second Amendment

_____

[14] The Virginia statute all but codified the existing common law in this regard. See G. Webb, The Office and Authority of a Justice of Peace 92 (1736) (explaining how a constable "may take away Arms from such who ride, or go, offensively armed, in Terror of the People").

Opinion of the Court

and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry.

3

Only after the ratification of the Second Amendment in 1791 did public-carry restrictions proliferate. Respondents rely heavily on these restrictions, which generally fell into three categories: common-law offenses, statutory prohibitions, and "surety" statutes. None of these restrictions imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime.

*Common-Law Offenses.* As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But as with the earlier periods, there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.

For example, the Tennessee attorney general once charged a defendant with the common-law offense of affray, arguing that the man committed the crime when he "'arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause terror to the people.'" *Simpson* v. *State*, 13 Tenn. 356, 358 (1833). More specifically, the indictment charged that Simpson "with force and arms being arrayed in a warlike manner . . . unlawfully, and to the great terror and disturbance of divers good citizens, did make an affray." *Id.*, at 361. The Tennessee Supreme Court quashed the indictment, holding that the Statute of Northampton was never part of Tennessee law. *Id.*, at 359. But even assuming that Tennesseans' ancestors brought with them the common law associated with the Statute, the *Simpson* court found that if the Statute had

(131)

Cite as: 597 U. S. ____ (2022)            43

Opinion of the Court

made, as an "independent ground of affray," the mere arming of oneself with firearms, the Tennessee Constitution's Second Amendment analogue had "completely abrogated it." *Id.*, at 360. At least in light of that constitutional guarantee, the court did not think that it could attribute to the mere carrying of arms "a necessarily consequent operation as terror to the people." *Ibid.*

Perhaps more telling was the North Carolina Supreme Court's decision in *State* v. *Huntly*, 25 N. C. 418 (1843) (*per curiam*). Unlike the Tennessee Supreme Court in *Simpson*, the *Huntly* court held that the common-law offense codified by the Statute of Northampton was part of the State's law. See 25 N. C., at 421–422. However, consistent with the Statute's long-settled interpretation, the North Carolina Supreme Court acknowledged "that the carrying of a gun for a lawful purpose "*per se* constitutes no offence." *Id.*, at 422–423. Only carrying for a "wicked purpose" with a "mischievous result . . . constitute[d a] crime." *Id.*, at 423; see also J. Haywood, The Duty and Office of Justices of Peace 10 (1800); H. Potter, The Office and Duties of a Justice of the Peace 39 (1816).[15] Other state courts likewise recognized that the common law did not punish the carrying of

───────────

[15] The dissent concedes that *Huntly*, 25 N. C. 418, recognized that citizens were "'at perfect liberty' to carry for 'lawful purpose[s].'" *Post*, at 42 (quoting *Huntly*, 25 N. C., at 423). But the dissent disputes that such "lawful purpose[s]" included self-defense, because *Huntly* goes on to speak more specifically of carrying arms for "business or amusement." *Id.*, at 422–423. This is an unduly stingy interpretation of *Huntly*. In particular, *Huntly* stated that "the citizen is at perfect liberty to carry his gun" "[f]or *any* lawful purpose," of which "business" and "amusement" were then mentioned. *Ibid.* (emphasis added). *Huntly* then contrasted these "lawful purpose[s]" with the "wicked purpose . . . to terrify and alarm." *Ibid.* Because there is no evidence that *Huntly* considered self-defense a "wicked purpose," we think the best reading of *Huntly* would sanction public carry for self-defense, so long as it was not "in such [a] manner as naturally will terrify and alarm." *Id.*, at 423.

44  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

deadly weapons *per se*, but only the carrying of such weapons "for the purpose of an affray, and in such manner as to strike terror to the people." *O'Neil* v. *State*, 16 Ala. 65, 67 (1849). Therefore, those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so.

*Statutory Prohibitions.* In the early to mid-19th century, some States began enacting laws that proscribed the concealed carry of pistols and other small weapons. As we recognized in *Heller*, "the majority of the 19th-century courts to consider the question held that [these] prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U. S., at 626. Respondents unsurprisingly cite these statutes[16]—and decisions upholding them[17]—as evidence that States were historically free to ban public carry.

In fact, however, the history reveals a consensus that States could *not* ban public carry altogether. Respondents'

_____

[16] Beginning in 1813 with Kentucky, six States (five of which were in the South) enacted laws prohibiting the concealed carry of pistols by 1846. See 1813 Ky. Acts §1, p. 100; 1813 La. Acts p. 172; 1820 Ind. Acts p. 39; Ark. Rev. Stat. §13, p. 280 (1838); 1838 Va. Acts ch. 101, §1, p. 76; 1839 Ala. Acts no. 77, §1. During this period, Georgia enacted a law that appeared to prohibit both concealed and open carry, see 1837 Ga. Acts §§1, 4, p. 90, but the Georgia Supreme Court later held that the prohibition could not extend to open carry consistent with the Second Amendment. See *infra*, at 45–46. Between 1846 and 1859, only one other State, Ohio, joined this group. 1859 Ohio Laws §1, p. 56. Tennessee, meanwhile, enacted in 1821 a broader law that prohibited carrying, among other things, "belt or pocket pistols, either public or private," except while traveling. 1821 Tenn. Acts ch. 13, §1, p. 15. And the Territory of Florida prohibited concealed carry during this same timeframe. See 1835 Terr. of Fla. Laws p. 423.

[17] See *State* v. *Mitchell*, 3 Blackf. 229 (Ind. 1833); *State* v. *Reid*, 1 Ala. 612, 616 (1840); *State* v. *Buzzard*, 4 Ark. 18 (1842); *Nunn* v. *State*, 1 Ga. 243 (1846); *State* v. *Chandler*, 5 La. 489 (1850); *State* v. *Smith*, 11 La. 633 (1856); *State* v. *Jumel*, 13 La. 399 (1858). But see *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822). See generally 2 J. Kent, Commentaries on American Law *340, n. *b*.

(133)

Cite as: 597 U. S. ____ (2022)                45

Opinion of the Court

cited opinions agreed that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry. That was true in Alabama. See *State* v. *Reid*, 1 Ala. 612, 616, 619–621 (1840).[18] It was also true in Louisiana. See *State* v. *Chandler*, 5 La. 489, 490 (1850).[19] Kentucky, meanwhile, went one step further—the State Supreme Court *invalidated* a concealed-carry prohibition. See *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822).[20]

The Georgia Supreme Court's decision in *Nunn* v. *State*, 1 Ga. 243 (1846), is particularly instructive. Georgia's 1837 statute broadly prohibited "wearing" or "carrying" pistols "as arms of offence or defence," without distinguishing between concealed and open carry. 1837 Ga. Acts 90, §1. To the extent the 1837 Act prohibited "carrying certain weapons *secretly*," the court explained, it was "valid." *Nunn*, 1

——————

[18] See *Reid*, 1 Ala., at 619 (holding that "the Legislature cannot inhibit the citizen from bearing arms openly"); *id.*, at 621 (noting that there was no evidence "tending to show that the defendant could not have defended himself as successfully, by carrying the pistol openly, as by secreting it about his person").

[19] See, *e.g.*, *Chandler*, 5 La., at 490 (Louisiana concealed-carry prohibition "interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality"); *Smith*, 11 La., at 633 (The "arms" described in the Second Amendment "are such as are borne by a people in war, or at least carried openly"); *Jumel*, 13 La., at 399–400 ("The statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only *a particular mode* of bearing arms which is found dangerous to the peace of society").

[20] With respect to Indiana's concealed-carry prohibition, the Indiana Supreme Court's reasons for upholding it are unknown because the court issued a one-sentence *per curiam* order holding the law "not unconstitutional." *Mitchell*, 3 Blackf., at 229. Similarly, the Arkansas Supreme Court upheld Arkansas' prohibition, but without reaching a majority rationale. See *Buzzard*, 4 Ark. 18. The Arkansas Supreme Court would later adopt Tennessee's approach, which tolerated the prohibition of all public carry of handguns except for military-style revolvers. See, *e.g.*, *Fife* v. *State*, 31 Ark. 455 (1876).

(134)

46   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

Ga., at 251. But to the extent the Act also prohibited "bearing arms *openly*," the court went on, it was "in conflict with the Constitutio[n] and *void*." *Ibid*.; see also *Heller*, 554 U. S., at 612. The Georgia Supreme Court's treatment of the State's general prohibition on the public carriage of handguns indicates that it was considered beyond the constitutional pale in antebellum America to altogether prohibit public carry.

Finally, we agree that Tennessee's prohibition on carrying "publicly or privately" any "belt or pocket pisto[l]," 1821 Tenn. Acts ch. 13, p. 15, was, on its face, uniquely severe, see *Heller*, 554 U. S., at 629. That said, when the Tennessee Supreme Court addressed the constitutionality of a substantively identical successor provision, see 1870 Tenn. Acts ch. 13, §1, p. 28, the court read this language to permit the public carry of larger, military-style pistols because any categorical prohibition on their carry would "violat[e] the constitutional right to keep arms." *Andrews* v. *State*, 50 Tenn. 165, 187 (1871); see also *Heller*, 554 U. S., at 629 (discussing *Andrews*).[21]

All told, these antebellum state-court decisions evince a consensus view that States could not altogether prohibit the public carry of "arms" protected by the Second Amendment or state analogues.[22]

_____

[21] Shortly after *Andrews*, 50 Tenn. 165, Tennessee codified an exception to the State's handgun ban for "an[y] army pistol, or such as are commonly carried and used in the United States Army" so long as they were carried "openly in [one's] hands." 1871 Tenn. Pub. Acts ch. 90, §1; see also *State* v. *Wilburn*, 66 Tenn. 57, 61–63 (1872); *Porter* v. *State*, 66 Tenn. 106, 107–108 (1874).

[22] The Territory of New Mexico made it a crime in 1860 to carry "any class of pistols whatever" "concealed or otherwise." 1860 Terr. of N. M. Laws §§1–2, p. 94. This extreme restriction is an outlier statute enacted by a territorial government nearly 70 years after the ratification of the Bill of Rights, and its constitutionality was never tested in court. Its value in discerning the original meaning of the Second Amendment is insubstantial. Moreover, like many other stringent carry restrictions

Cite as: 597 U. S. ____ (2022)          47

Opinion of the Court

*Surety Statutes.* In the mid-19th century, many jurisdictions began adopting surety statutes that required certain individuals to post bond before carrying weapons in public. Although respondents seize on these laws to justify the proper-cause restriction, their reliance on them is misplaced. These laws were not *bans* on public carry, and they typically targeted only those threatening to do harm.

As discussed earlier, Massachusetts had prohibited riding or going "armed offensively, to the fear or terror of the good citizens of this Commonwealth" since 1795. 1795 Mass. Acts and Laws ch. 2, at 436, in Laws of the Commonwealth of Massachusetts. In 1836, Massachusetts enacted a new law providing:

> "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided." Mass. Rev. Stat., ch. 134, §16.

In short, the Commonwealth required any person who was reasonably likely to "breach the peace," and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm. Between 1838 and 1871, nine other jurisdictions adopted variants of

──────────

that were localized in the Western Territories, New Mexico's prohibition ended when the Territory entered the Union as a State in 1911 and guaranteed in its State Constitution that "[t]he people have the right to bear arms for their security and defense, but nothing herein shall be held to permit the carrying of concealed weapons." N. M. Const., Art. II, §6 (1911); see *infra*, at 61.

(136)

JA267

48   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

the Massachusetts law.[23]

Contrary to respondents' position, these "reasonable-cause laws" in no way represented the "direct precursor" to the proper-cause requirement.  Brief for Respondents 27.  While New York presumes that individuals have *no* public carry right without a showing of heightened need, the surety statutes *presumed* that individuals had a right to public carry that could be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace."  Mass. Rev. Stat., ch. 134, §16 (1836).[24]  As William Rawle explained in an influential treatise, an individual's carrying of arms was "sufficient cause to require him to give surety of the peace" only when "attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them."  A View of the Constitution of the United States of America 126 (2d ed. 1829).  Then, even on such a showing, the surety laws did not *prohibit* public carry in locations frequented by the general community.  Rather, an accused arms-bearer "could go on carrying without criminal penalty" so long as he "post[ed] money that would be forfeited if he breached the peace or injured others—a requirement from which he was exempt if *he* needed self-defense."  *Wrenn*, 864 F. 3d, at 661.

Thus, unlike New York's regime, a showing of special need was required only *after* an individual was reasonably accused of intending to injure another or breach the peace.  And, even then, proving special need simply avoided a fee rather than a ban.  All told, therefore, "[u]nder surety laws

––––––––
[23] See 1838 Terr. of Wis. Stat. §16, p. 381; Me. Rev. Stat., ch. 169, §16 (1840); Mich. Rev. Stat., ch. 162, §16 (1846); 1847 Va. Acts ch. 14, §16; Terr. of Minn. Rev. Stat., ch. 112, §18 (1851); 1854 Ore. Stat. ch. 16, §17, p. 220; D. C. Rev. Code ch. 141, §16 (1857); 1860 Pa. Laws p. 432, §6; W. Va. Code, ch. 153, §8 (1868).

[24] It is true that two of the antebellum surety laws were unusually broad in that they did not expressly require a citizen complaint to trigger the posting of a surety.  See 1847 Va. Acts ch. 14, §16; W. Va. Code, ch. 153, §8 (1868).

(137)

Cite as: 597 U. S. ____ (2022)          49

Opinion of the Court

. . . everyone started out with robust carrying rights" and only those reasonably accused were required to show a special need in order to avoid posting a bond. *Ibid.* These antebellum special-need requirements "did not expand carrying for the responsible; it shrank burdens on carrying by the (allegedly) reckless." *Ibid.*

One Court of Appeals has nonetheless remarked that these surety laws were "a severe constraint on anyone thinking of carrying a weapon in public." *Young*, 992 F. 3d, at 820. That contention has little support in the historical record. Respondents cite no evidence showing the average size of surety postings. And given that surety laws were "intended merely for prevention" and were "not meant as any degree of punishment," 4 Blackstone, Commentaries, at 249, the burden these surety statutes may have had on the right to public carry was likely too insignificant to shed light on New York's proper-cause standard—a violation of which can carry a 4-year prison term or a $5,000 fine. In *Heller*, we noted that founding-era laws punishing unlawful discharge "with a small fine and forfeiture of the weapon . . . , not with significant criminal penalties," likely did not "preven[t] a person in the founding era from using a gun to protect himself or his family from violence, or that if he did so the law would be enforced against him." 554 U. S., at 633–634. Similarly, we have little reason to think that the hypothetical possibility of posting a bond would have prevented anyone from carrying a firearm for self-defense in the 19th century.

Besides, respondents offer little evidence that authorities ever enforced surety laws. The only recorded case that we know of involved a justice of the peace *declining* to require a surety, even when the complainant alleged that the arms-bearer "'did threaten to beat, wou[n]d, mai[m], and kill'" him. Brief for Professor Robert Leider et al. as *Amici Curiae* 31 (quoting *Grover* v. *Bullock*, No. 185 (Worcester Cty.,

(138)

JA269

50  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

Aug. 13, 1853)); see E. Ruben & S. Cornell, Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L. J. Forum 121, 130, n. 53 (2015). And one scholar who canvassed 19th-century newspapers— which routinely reported on local judicial matters—found only a handful of other examples in Massachusetts and the District of Columbia, all involving black defendants who may have been targeted for selective or pretextual enforcement.  See R. Leider, Constitutional Liquidation, Surety Laws, and the Right To Bear Arms 15–17, in New Histories of Gun Rights and Regulation (J. Blocher, J. Charles, & D. Miller eds.) (forthcoming); see also Brief for Professor Robert Leider et al. as *Amici Curiae* 31–32.  That is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry.[25]

Respondents also argue that surety statutes were severe restrictions on firearms because the "reasonable cause to fear" standard was essentially *pro forma*, given that "merely carrying firearms in populous areas breached the peace" *per se*.  Brief for Respondents 27.  But that is a counterintuitive reading of the language that the surety statutes actually used.  If the mere carrying of handguns breached the peace, it would be odd to draft a surety statute requiring a complainant to demonstrate "reasonable cause to fear an injury, or breach of the peace," Mass. Rev. Stat., ch. 134, §16, rather than a reasonable likelihood that the armsbearer carried a covered weapon.  After all, if it was the nature of the weapon rather than the manner of carry that

---

[25] The dissent speculates that the absence of recorded cases involving surety laws may simply "show that these laws were normally followed." *Post,* at 45.  Perhaps.  But again, the burden rests with the government to establish the relevant tradition of regulation, see *supra,* at 15, and, given all of the other features of surety laws that make them poor analogues to New York's proper-cause standard, we consider the barren record of enforcement to be simply one additional reason to discount their relevance.

Cite as: 597 U. S. ____ (2022)                51

Opinion of the Court

was dispositive, then the "reasonable fear" requirement would be redundant.

Moreover, the overlapping scope of surety statutes and criminal statutes suggests that the former were not viewed as substantial restrictions on public carry. For example, when Massachusetts enacted its surety statute in 1836, it reaffirmed its 1794 criminal prohibition on "go[ing] armed offensively, to the terror of the people." Mass. Rev. Stat., ch. 85, §24. And Massachusetts continued to criminalize the carrying of various "dangerous weapons" well after passing the 1836 surety statute. See, *e.g.*, 1850 Mass. Acts ch. 194, §1, p. 401; Mass. Gen. Stat., ch. 164, §10 (1860). Similarly, Virginia had criminalized the concealed carry of pistols since 1838, see 1838 Va. Acts ch. 101, §1, nearly a decade before it enacted its surety statute, see 1847 Va. Acts ch. 14, §16. It is unlikely that these surety statutes constituted a "severe" restraint on public carry, let alone a restriction tantamount to a ban, when they were supplemented by direct criminal prohibitions on specific weapons and methods of carry.

To summarize: The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly.

None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose.

(140)

JA271

52   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

4

Evidence from around the adoption of the Fourteenth Amendment also fails to support respondents' position. For the most part, respondents and the United States ignore the "outpouring of discussion of the [right to keep and bear arms] in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves" after the Civil War. *Heller*, 554 U. S., at 614. Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden. Nevertheless, we think a short review of the public discourse surrounding Reconstruction is useful in demonstrating how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens.

A short prologue is in order. Even before the Civil War commenced in 1861, this Court indirectly affirmed the importance of the right to keep and bear arms in public. Writing for the Court in *Dred Scott* v. *Sandford*, 19 How. 393 (1857), Chief Justice Taney offered what he thought was a parade of horribles that would result from recognizing that free blacks were citizens of the United States. If blacks were citizens, Taney fretted, they would be entitled to the privileges and immunities of citizens, including the right "to keep and carry arms *wherever they went*." *Id.*, at 417 (emphasis added). Thus, even Chief Justice Taney recognized (albeit unenthusiastically in the case of blacks) that public carry was a component of the right to keep and bear arms—a right free blacks were often denied in antebellum America.

After the Civil War, of course, the exercise of this fundamental right by freed slaves was systematically thwarted. This Court has already recounted some of the Southern abuses violating blacks' right to keep and bear arms. See *McDonald*, 561 U. S., at 771 (noting the "systematic efforts"

(141)

Cite as: 597 U. S. ____ (2022)          53

Opinion of the Court

made to disarm blacks); *id.*, at 845–847 (THOMAS, J., concurring in part and concurring in judgment); see also S. Exec. Doc. No. 43, 39th Cong., 1st Sess., 8 (1866) ("Pistols, old muskets, and shotguns were taken away from [freed slaves] as such weapons would be wrested from the hands of lunatics").

In the years before the 39th Congress proposed the Fourteenth Amendment, the Freedmen's Bureau regularly kept it abreast of the dangers to blacks and Union men in the postbellum South. The reports described how blacks used publicly carried weapons to defend themselves and their communities. For example, the Bureau reported that a teacher from a Freedmen's school in Maryland had written to say that, because of attacks on the school, "[b]oth the mayor and sheriff have warned the colored people to go armed to school, (which they do,)" and that the "[t]he superintendent of schools came down and brought [the teacher] a revolver" for his protection. Cong. Globe, 39th Cong., 1st Sess., 658 (1866); see also H. R. Exec. Doc. No. 68, 39th Cong., 2d Sess., 91 (1867) (noting how, during the New Orleans riots, blacks under attack "defended themselves . . . with such pistols as they had").

Witnesses before the Joint Committee on Reconstruction also described the depredations visited on Southern blacks, and the efforts they made to defend themselves. One Virginia music professor related that when "[t]wo Union men were attacked . . . they drew their revolvers and held their assailants at bay." H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, p. 110 (1866). An assistant commissioner to the Bureau from Alabama similarly reported that men were "robbing and disarming negroes upon the highway," H. R. Exec. Doc. No. 70, 39th Cong., 1st Sess., 297 (1866), indicating that blacks indeed carried arms publicly for their self-protection, even if not always with success. See also H. R. Exec. Doc. No. 329, 40th Cong., 2d Sess., 41 (1868) (describing a Ku Klux Klan outfit that rode "through the country

(142)

54   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

. . . robbing every one they come across of money, pistols, papers, &c."); *id.*, at 36 (noting how a black man in Tennessee had been murdered on his way to get book subscriptions, with the murderer taking, among other things, the man's pistol).

Blacks had "procured great numbers of old army muskets and revolvers, particularly in Texas," and "employed them to protect themselves" with "vigor and audacity." S. Exec. Doc. No. 43, 39th Cong., 1st Sess., at 8. Seeing that government was inadequately protecting them, "there [was] the strongest desire on the part of the freedmen to secure arms, revolvers particularly." H. R. Rep. No. 30, 39th Cong., 1st Sess., pt. 3, at 102.

On July 6, 1868, Congress extended the 1866 Freedmen's Bureau Act, see 15 Stat. 83, and reaffirmed that freedmen were entitled to the "full and equal benefit of all laws and proceedings concerning personal liberty [and] personal security . . . *including the constitutional right to keep and bear arms.*" §14, 14 Stat. 176 (1866) (emphasis added). That same day, a Bureau official reported that freedmen in Kentucky and Tennessee were still constantly under threat: "No Union man or negro who attempts to take any active part in politics, or the improvement of his race, is safe a single day; and nearly all sleep upon their arms at night, and carry concealed weapons during the day." H. R. Exec. Doc. No. 329, 40th Cong., 2d Sess., at 40.

Of course, even during Reconstruction the right to keep and bear arms had limits. But those limits were consistent with a right of the public to peaceably carry handguns for self-defense. For instance, when General D. E. Sickles issued a decree in 1866 pre-empting South Carolina's Black Codes—which prohibited firearm possession by blacks—he stated: "The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons. . . . And no

Cite as: 597 U. S. ____ (2022)      55

Opinion of the Court

disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess., at 908–909; see also *McDonald*, 561 U. S., at 847–848 (opinion of THOMAS, J.).[26]  Around the same time, the editors of The Loyal Georgian, a prominent black-owned newspaper, were asked by "A Colored Citizen" whether "colored persons [have] a right to own and carry fire arms."  The editors responded that blacks had "the *same* right to own and carry fire arms that *other* citizens have."  The Loyal Georgian, Feb. 3, 1866, p. 3, col. 4.  And, borrowing language from a Freedmen's Bureau circular, the editors maintained that "[a]ny person, white or black, may be disarmed if convicted of making an improper or dangerous use of weapons," even though "no military or civil officer has the right or authority to disarm any class of people, thereby placing them at the mercy of others." *Ibid.* (quoting Circular No. 5, Freedmen's Bureau, Dec. 22, 1865); see also *McDonald*, 561 U. S., at 848–849 (opinion of THOMAS, J.).[27]

—————

[26] Respondents invoke General Orders No. 10, which covered the Second Military District (North and South Carolina), and provided that "[t]he practice of carrying deadly weapons, except by officers and soldiers in the military service of the United States, is prohibited."  Headquarters Second Military Dist., Gen. Orders No. 10 (Charleston, S. C., Apr. 11, 1867), in S. Exec. Doc. No. 14, 40th Cong., 1st Sess., 64 (1867).  We put little weight on this categorical restriction given that the order also specified that a violation of this prohibition would "render the offender amenable to trial and punishment by military commission," *ibid.*, rather than a jury otherwise guaranteed by the Constitution.  There is thus little indication that these military dictates were designed to align with the Constitution's usual application during times of peace.

[27] That said, Southern prohibitions on concealed carry were not always applied equally, even when under federal scrutiny.  One lieutenant posted in Saint Augustine, Florida, remarked how local enforcement of concealed-carry laws discriminated against blacks: "To sentence a negro to several dollars' fine for carrying a revolver concealed upon his person, is in accordance with an ordinance of the town; but still the question naturally arises in my mind, 'Why is this poor fellow fined for an offence which is committed hourly by every other white man I meet in the streets?'" H. R. Exec. Doc. No. 57, 40th Cong., 2d Sess., 83 (1867); see

56   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

As for Reconstruction-era state regulations, there was little innovation over the kinds of public-carry restrictions that had been commonplace in the early 19th century. For instance, South Carolina in 1870 authorized the arrest of "all who go armed offensively, to the terror of the people," 1870 S. C. Acts p. 403, no. 288, §4, parroting earlier statutes that codified the common-law offense. That same year, after it cleaved from Virginia, West Virginia enacted a surety statute nearly identical to the one it inherited from Virginia. See W. Va. Code, ch. 153, §8. Also in 1870, Tennessee essentially reenacted its 1821 prohibition on the public carry of handguns but, as explained above, Tennessee courts interpreted that statute to exempt large pistols suitable for military use. See *supra*, at 46.

Respondents and the United States, however, direct our attention primarily to two late-19th-century cases in Texas. In 1871, Texas law forbade anyone from "carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person." 1871 Tex. Gen. Laws §1. The Texas Supreme Court upheld that restriction in *English* v. *State*, 35 Tex. 473 (1871). The Court reasoned that the Second Amendment, and the State's constitutional analogue, protected only those arms "as are useful and proper to an armed militia," including holster pistols, but not other kinds of handguns. *Id.*, at 474–475. Beyond that constitutional holding, the *English* court further opined that the law was not "contrary to public policy," *id.*, at 479, given that it "ma[de] all necessary exceptions" allowing deadly weapons to "be carried as means of self-defense," and therefore "fully cover[ed] all wants of society," *id.*, at 477.

Four years later, in *State* v. *Duke*, 42 Tex. 455 (1875), the Texas Supreme Court modified its analysis. The court reinterpreted Texas' State Constitution to protect not only

──────────

also H. R. Rep. No. 16, 39th Cong., 2d Sess., 427 (1867).

(145)

Cite as: 597 U. S. ____ (2022)       57

Opinion of the Court

military-style weapons but rather all arms "as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense." *Id.*, at 458. On that understanding, the court recognized that, in addition to "holster pistol[s]," the right to bear arms covered the carry of "such pistols at least as are not adapted to being carried concealed." *Id.*, at 458–459. Nonetheless, after expanding the scope of firearms that warranted state constitutional protection, *Duke* held that requiring any pistol-bearer to have "'reasonable grounds fearing an unlawful attack on [one's] person'" was a "legitimate and highly proper" regulation of handgun carriage. *Id.*, at 456, 459–460. *Duke* thus concluded that the 1871 statute "appear[ed] to have respected the right to carry a pistol openly when needed for self-defense." *Id.*, at 459.

We acknowledge that the Texas cases support New York's proper-cause requirement, which one can analogize to Texas' "reasonable grounds" standard. But the Texas statute, and the rationales set forth in *English* and *Duke*, are outliers. In fact, only one other State, West Virginia, adopted a similar public-carry statute before 1900. See W. Va. Code, ch. 148, §7 (1887). The West Virginia Supreme Court upheld that prohibition, reasoning that *no* handguns of any kind were protected by the Second Amendment, a rationale endorsed by no other court during this period. See *State* v. *Workman*, 35 W. Va. 367, 371–374, 14 S. E. 9, 11 (1891). The Texas decisions therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public.

In the end, while we recognize the support that postbellum Texas provides for respondents' view, we will not give disproportionate weight to a single state statute and a pair of state-court decisions. As in *Heller*, we will not "stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and

(146)

JA277

58   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

bear arms for defense" in public.  554 U. S., at 632.

5

Finally, respondents point to the slight uptick in gun regulation during the late-19th century—principally in the Western Territories.  As we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.  See *id.*, at 614; *supra*, at 28.[28]  Here, moreover, respondents' reliance on late-19th-century laws has several serious flaws even beyond their temporal distance from the founding.

The vast majority of the statutes that respondents invoke come from the Western Territories.  Two Territories prohibited the carry of pistols in towns, cities, and villages, but seemingly permitted the carry of rifles and other long guns everywhere.  See 1889 Ariz. Terr. Sess. Laws no. 13, §1, p. 16; 1869 N. M. Laws ch. 32, §§1–2, p. 72.[29]  Two others prohibited the carry of *all* firearms in towns, cities, and villages, including long guns.  See 1875 Wyo. Terr. Sess. Laws ch. 52, §1; 1889 Idaho Terr. Gen. Laws §1, p. 23.  And one Territory completely prohibited public carry of pistols *everywhere*, but allowed the carry of "shot-guns or rifles" for certain purposes.  See 1890 Okla. Terr. Stats., Art. 47, §§1–2, 5, p. 495.

These territorial restrictions fail to justify New York's

_____

[28]We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*.  As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.

[29]The New Mexico restriction allowed an exception for individuals carrying for "the lawful defence of themselves, their families or their property, and the same being then and there threatened with danger."  1869 Terr. of N. M. Laws ch. 32, §1, p. 72.  The Arizona law similarly exempted those who have "reasonable ground for fearing an unlawful attack upon his person."  1889 Ariz. Terr. Sess. Laws no. 13, §2, p. 17.

(147)

Cite as: 597 U. S. ____ (2022)      59

Opinion of the Court

proper-cause requirement for several reasons. First, the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry. For starters, "[t]he very transitional and temporary character of the American [territorial] system" often "permitted legislative improvisations which might not have been tolerated in a permanent setup." E. Pomeroy, The Territories and the United States 1861–1890, p. 4 (1947). These territorial "legislative improvisations," which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect "the origins and continuing significance of the Second Amendment" and we do not consider them "instructive." *Heller*, 554 U. S., at 614.

The exceptional nature of these western restrictions is all the more apparent when one considers the miniscule territorial populations who would have lived under them. To put that point into perspective, one need not look further than the 1890 census. Roughly 62 million people lived in the United States at that time. Arizona, Idaho, New Mexico, Oklahoma, and Wyoming combined to account for only 420,000 of those inhabitants—about two-thirds of 1% of the population. See Dept. of Interior, Compendium of the Eleventh Census: 1890, Part I.–Population 2 (1892). Put simply, these western restrictions were irrelevant to more than 99% of the American population. We have already explained that we will not stake our interpretation of the Second Amendment upon a law in effect in a single State, or a single city, "that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms" in public for self-defense. *Heller*, 554 U. S., at 632; see *supra,* at 57–58. Similarly, we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also "contradic[t] the overwhelming weight" of

(148)

JA279

60   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

other, more contemporaneous historical evidence.   *Heller*, 554 U. S., at 632.

Second, because these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality.   When States generally prohibited both open and concealed carry of handguns in the late-19th century, state courts usually upheld the restrictions when they exempted army revolvers, or read the laws to exempt at least that category of weapons.   See, *e.g.*, *Haile* v. *State*, 38 Ark. 564, 567 (1882); *Wilson* v. *State*, 33 Ark. 557, 560 (1878); *Fife* v. *State*, 31 Ark. 455, 461 (1876); *State* v. *Wilburn*, 66 Tenn. 57, 60 (1872); *Andrews*, 50 Tenn., at 187.[30] Those state courts that upheld broader prohibitions without qualification generally operated under a fundamental misunderstanding of the right to bear arms, as expressed in *Heller*.   For example, the Kansas Supreme Court upheld a complete ban on public carry enacted by the city of Salina in 1901 based on the rationale that the Second Amendment protects only "the right to bear arms as a member of the state militia, or some other military organization provided for by law."   *Salina* v. *Blaksley*, 72 Kan. 230, 232, 83 P. 619, 620 (1905).   That was clearly erroneous.   See *Heller*, 554 U. S., at 592.

Absent any evidence explaining *why* these unprecedented prohibitions on *all* public carry were understood to comport with the Second Amendment, we fail to see how they inform "the origins and continuing significance of the Amendment."   *Id.*, at 614; see also The Federalist No. 37,

───────────

[30] Many other state courts during this period continued the antebellum tradition of upholding concealed carry regimes that seemingly provided for open carry.   See, *e.g.*, *State* v. *Speller*, 86 N. C. 697 (1882); *Chatteaux* v. *State*, 52 Ala. 388 (1875); *Eslava* v. *State*, 49 Ala. 355 (1873); *State* v. *Shelby*, 90 Mo. 302, 2 S. W. 468 (1886); *Carroll* v. *State*, 28 Ark. 99 (1872); cf. *Robertson* v. *Baldwin*, 165 U. S. 275, 281–282 (1897) (remarking in dicta that "the right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons").

Opinion of the Court

at 229 (explaining that the meaning of ambiguous constitutional provisions can be "liquidated and ascertained *by a series of particular discussions and adjudications*" (emphasis added)).

Finally, these territorial restrictions deserve little weight because they were—consistent with the transitory nature of territorial government—short lived. Some were held unconstitutional shortly after passage. See *In re Brickey*, 8 Idaho 597, 70 P. 609 (1902). Others did not survive a Territory's admission to the Union as a State. See Wyo. Rev. Stat., ch. 3, §5051 (1899) (1890 law enacted upon statehood prohibiting public carry only when combined with "intent, or avowed purpose, of injuring [one's] fellow-man"). Thus, they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation.

Beyond these Territories, respondents identify one Western State—Kansas—that instructed cities with more than 15,000 inhabitants to pass ordinances prohibiting the public carry of firearms. See 1881 Kan. Sess. Laws §§1, 23, pp. 79, 92.[31] By 1890, the only cities meeting the population threshold were Kansas City, Topeka, and Wichita. See Compendium of the Eleventh Census: 1890, at 442–452. Even if each of these three cities enacted prohibitions by 1890, their combined population (93,000) accounted for only 6.5% of Kansas' total population. *Ibid.* Although other Kansas cities may also have restricted public carry unilaterally,[32] the lone late-19th-century state law respondents

——————
[31] In 1875, Arkansas prohibited the public carry of all pistols. See 1875 Ark. Acts p. 156, §1. But this categorical prohibition was also short lived. About six years later, Arkansas exempted "pistols as are used in the army or navy of the United States," so long as they were carried "uncovered, and in [the] hand." 1881 Ark. Acts p. 191, no. 96, §§1, 2.

[32] In 1879, Salina, Kansas, prohibited the carry of pistols but broadly exempted "cases when any person carrying [a pistol] is engaged in the pursuit of any lawful business, calling or employment" and the circumstances were "such as to justify a prudent man in carrying such weapon,

62   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Opinion of the Court

identify does not prove that Kansas meaningfully restricted public carry, let alone demonstrate a broad tradition of States doing so.

\*      \*      \*

At the end of this long journey through the Anglo-American history of public carry, we conclude that respondents have not met their burden to identify an American tradition justifying the State's proper-cause requirement. The Second Amendment guaranteed to "all Americans" the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions. *Heller*, 554 U. S., at 581. Those restrictions, for example, limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials. Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense. Nor, subject to a few late-in-time outliers, have American governments required law-abiding, responsible citizens to "demonstrate a special need for self-protection distinguishable from that of the general community" in order to carry arms in public. *Klenosky*, 75 App. Div., at 793, 428 N. Y. S. 2d, at 257.

IV

The constitutional right to bear arms in public for self-defense is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U. S., at 780 (plurality opinion). We know of no other constitutional right that an individual may exercise only after demonstrating to government offic-

———————

for the defense of his person, property or family." Salina, Kan., Rev. Ordinance No. 268, §2.

(151)

Cite as: 597 U. S. ____ (2022)           63

Opinion of the Court

ers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense.

New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JA283

Cite as: 597 U. S. ____ (2022)          1

ALITO, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 20–843

NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS *v.* KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2022]

JUSTICE ALITO, concurring.

I join the opinion of the Court in full but add the following comments in response to the dissent.

I

Much of the dissent seems designed to obscure the specific question that the Court has decided, and therefore it may be helpful to provide a succinct summary of what we have actually held. In *District of Columbia* v. *Heller*, 554 U. S. 570 (2008), the Court concluded that the Second Amendment protects the right to keep a handgun in the home for self-defense. *Heller* found that the Amendment codified a preexisting right and that this right was regarded at the time of the Amendment's adoption as rooted in "'the natural right of resistance and self-preservation.'" *Id.,* at 594. "[T]he inherent right of self-defense," *Heller* explained, is "central to the Second Amendment right." *Id.,* at 628.

Although *Heller* concerned the possession of a handgun in the home, the key point that we decided was that "the people," not just members of the "militia," have the right to use a firearm to defend themselves. And because many people face a serious risk of lethal violence when they venture

(153)

2    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

ALITO, J., concurring

outside their homes, the Second Amendment was understood at the time of adoption to apply under those circumstances. The Court's exhaustive historical survey establishes that point very clearly, and today's decision therefore holds that a State may not enforce a law, like New York's Sullivan Law, that effectively prevents its law-abiding residents from carrying a gun for this purpose.

That is all we decide. Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* v. *Chicago*, 561 U. S. 742 (2010), about restrictions that may be imposed on the possession or carrying of guns.

In light of what we have actually held, it is hard to see what legitimate purpose can possibly be served by most of the dissent's lengthy introductory section. See *post*, at 1–8 (opinion of BREYER, J.). Why, for example, does the dissent think it is relevant to recount the mass shootings that have occurred in recent years? *Post*, at 4–5. Does the dissent think that laws like New York's prevent or deter such atrocities? Will a person bent on carrying out a mass shooting be stopped if he knows that it is illegal to carry a handgun outside the home? And how does the dissent account for the fact that one of the mass shootings near the top of its list took place in Buffalo? The New York law at issue in this case obviously did not stop that perpetrator.

What is the relevance of statistics about the use of guns to commit suicide? See *post*, at 5–6. Does the dissent think that a lot of people who possess guns in their homes will be stopped or deterred from shooting themselves if they cannot lawfully take them outside?

The dissent cites statistics about the use of guns in domestic disputes, see *post,* at 5, but it does not explain why these statistics are relevant to the question presented in

(154)

Cite as: 597 U. S. ____ (2022)          3

ALITO, J., concurring

this case. How many of the cases involving the use of a gun in a domestic dispute occur outside the home, and how many are prevented by laws like New York's?

The dissent cites statistics on children and adolescents killed by guns, see *post,* at 1, 4, but what does this have to do with the question whether an adult who is licensed to possess a handgun may be prohibited from carrying it outside the home? Our decision, as noted, does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18, 18 U. S. C. §§922(x)(2)–(5), and bars the sale of a handgun to anyone under the age of 21, §§922(b)(1), (c)(1).[1]

The dissent cites the large number of guns in private hands—nearly 400 million—but it does not explain what this statistic has to do with the question whether a person who already has the right to keep a gun in the home for self-

—————

    [1]The dissent makes no effort to explain the relevance of most of the incidents and statistics cited in its introductory section (*post,* at 1–8) (opinion of BREYER, J.). Instead, it points to studies (summarized later in its opinion) regarding the effects of "shall issue" licensing regimes on rates of homicide and other violent crimes. I note only that the dissent's presentation of such studies is one-sided. See RAND Corporation, Effects of Concealed-Carry Laws on Violent Crime (Apr. 22, 2022), https://www.rand.org/research/gun-policy/analysis/concealed-carry/violent-crime-html; see also Brief for William English et al. as *Amici Curiae* 3 ("The overwhelming weight of statistical analysis on the effects of [right-to-carry] laws on violent crime concludes that RTC laws do not result in any statistically significant increase in violent crime rates"); Brief for Arizona et al. as *Amici Curiae* 12 ("[P]opulation-level data on licensed carry is extensive, and the weight of the evidence confirms that objective, non-discriminatory licensed-carry laws have two results: (1) statistically significant reductions in some types of violent crime, or (2) no statistically significant effect on overall violent crime"); Brief for Law Enforcement Groups et al. as *Amici Curiae* 12 ("[O]ver the period 1991–2019 the inventory of firearms more than doubled; the number of concealed carry permits increased by at least sevenfold," but "murder rates fell by almost half, from 9.8 per 100,000 people in 1991 to 5.0 per 100,000 in 2019" and "[v]iolent crimes plummeted by over half").

(155)

4    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

ALITO, J., concurring

defense is likely to be deterred from acquiring a gun by the knowledge that the gun cannot be carried outside the home. See *post*, at 3. And while the dissent seemingly thinks that the ubiquity of guns and our country's high level of gun violence provide reasons for sustaining the New York law, the dissent appears not to understand that it is these very facts that cause law-abiding citizens to feel the need to carry a gun for self-defense.

No one apparently knows how many of the 400 million privately held guns are in the hands of criminals, but there can be little doubt that many muggers and rapists are armed and are undeterred by the Sullivan Law. Each year, the New York City Police Department (NYPD) confiscates thousands of guns,[2] and it is fair to assume that the number of guns seized is a fraction of the total number held unlawfully. The police cannot disarm every person who acquires a gun for use in criminal activity; nor can they provide bodyguard protection for the State's nearly 20 million residents or the 8.8 million people who live in New York City. Some of these people live in high-crime neighborhoods. Some must traverse dark and dangerous streets in order to reach their homes after work or other evening activities. Some are members of groups whose members feel especially vulnerable. And some of these people reasonably believe that unless they can brandish or, if necessary, use a handgun in the case of attack, they may be murdered, raped, or suffer some other serious injury.

Ordinary citizens frequently use firearms to protect

---

[2] NYPD statistics show approximately 6,000 illegal guns were seized in 2021. A. Southall, This Police Captain's Plan To Stop Gun Violence Uses More Than Handcuffs, N. Y. Times, Feb. 4, 2022. According to recent remarks by New York City Mayor Eric Adams, the NYPD has confiscated 3,000 firearms in 2022 so far. City of New York, Transcript: Mayor Eric Adams Makes Announcement About NYPD Gun Violence Suppression Division (June 6, 2022), https://www1.nyc.gov/office-of-the-mayor/news/369-22/trascript-mayor-eric-adams-makes-announcement-nypd-gun-violence-suppression-division.

(156)

Cite as: 597 U. S. ____ (2022)          5

ALITO, J., concurring

themselves from criminal attack. According to survey data, defensive firearm use occurs up to 2.5 million times per year. Brief for Law Enforcement Groups et al. as *Amici Curiae* 5. A Centers for Disease Control and Prevention report commissioned by former President Barack Obama reviewed the literature surrounding firearms use and noted that "[s]tudies that directly assessed the effect of actual defensive uses of guns . . . have found consistently lower injury rates among gun-using crime victims compared with victims who used other self-protective strategies." Institute of Medicine and National Research Council, Priorities for Research To Reduce the Threat of Firearm-Related Violence 15–16 (2013) (referenced in Brief for Independent Women's Law Center as *Amicus Curiae* 19–20).

Many of the *amicus* briefs filed in this case tell the story of such people. Some recount incidents in which a potential victim escaped death or serious injury only because carrying a gun for self-defense was allowed in the jurisdiction where the incident occurred. Here are two examples. One night in 1987, Austin Fulk, a gay man from Arkansas, "was chatting with another man in a parking lot when four gay bashers charged them with baseball bats and tire irons. Fulk's companion drew his pistol from under the seat of his car, brandished it at the attackers, and fired a single shot over their heads, causing them to flee and saving the would-be victims from serious harm." Brief for DC Project Foundation et al. as *Amici Curiae* 31 (footnote omitted).

On July 7, 2020, a woman was brutally assaulted in the parking lot of a fast food restaurant in Jefferson City, Tennessee. Her assailant slammed her to the ground and began to drag her around while strangling her. She was saved when a bystander who was lawfully carrying a pistol pointed his gun at the assailant, who then stopped the assault and the assailant was arrested. *Ibid.* (citing C. Wethington, Jefferson City Police: Legally Armed Good Samaritan Stops Assault, ABC News 6, WATE.com (July 9, 2020),

(157)

6    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Alito, J., concurring

https://www.wate.com/news/local-news/jefferson-city-police-legally-armed-good-samaritan-stops-assault/).

In other incidents, a law-abiding person was driven to violate the Sullivan Law because of fear of victimization and as a result was arrested, prosecuted, and incarcerated. See Brief for Black Attorneys of Legal Aid et al. as *Amici Curiae* 22–25.

Some briefs were filed by members of groups whose members feel that they have special reasons to fear attacks. See Brief for Asian Pacific American Gun Owners Association as *Amicus Curiae*; Brief for DC Project Foundation et al. as *Amici Curiae*; Brief for Black Guns Matter et al. as *Amici Curiae*; Brief for Independent Women's Law Center as *Amicus Curiae*; Brief for National African American Gun Association, Inc., as *Amicus Curiae*.

I reiterate: All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional.

## II

This brings me to Part II–B of the dissent, *post*, at 11–21, which chastises the Court for deciding this case without a trial and factual findings about just how hard it is for a law-abiding New Yorker to get a carry permit. The record before us, however, tells us everything we need on this score. At argument, New York's solicitor general was asked about an ordinary person who works at night and must walk through dark and crime-infested streets to get home. Tr. of Oral Arg. 66–67. The solicitor general was asked whether such a person would be issued a carry permit if she pleaded: "[T]here have been a lot of muggings in this area, and I am scared to death." *Id.,* at 67. The solicitor general's candid answer was "in general," no. *Ibid.* To get a permit, the applicant would have to show more—for example, that she

(158)

Cite as: 597 U. S. ____ (2022)       7

ALITO, J., concurring

had been singled out for attack. *Id.,* at 65; see also *id.,* at 58. A law that dictates that answer violates the Second Amendment.

### III

My final point concerns the dissent's complaint that the Court relies too heavily on history and should instead approve the sort of "means-end" analysis employed in this case by the Second Circuit. Under that approach, a court, in most cases, assesses a law's burden on the Second Amendment right and the strength of the State's interest in imposing the challenged restriction. See *post,* at 20. This mode of analysis places no firm limits on the ability of judges to sustain any law restricting the possession or use of a gun. Two examples illustrate the point.

The first is the Second Circuit's decision in a case the Court decided two Terms ago, *New York State Rifle & Pistol Assn., Inc.* v. *City of New York,* 590 U. S. ___ (2020). The law in that case affected New York City residents who had been issued permits to keep a gun in the home for self-defense. The city recommended that these permit holders practice at a range to ensure that they are able to handle their guns safely, but the law prohibited them from taking their guns to any range other than the seven that were spread around the city's five boroughs. Even if such a person unloaded the gun, locked it in the trunk of a car, and drove to the nearest range, that person would violate the law if the nearest range happened to be outside city limits. The Second Circuit held that the law was constitutional, concluding, among other things, that the restriction was substantially related to the city's interests in public safety and crime prevention. See *New York State Rifle & Pistol Assn., Inc.* v. *New York,* 883 F. 3d 45, 62–64 (2018). But after we agreed to review that decision, the city repealed the law and admitted that it did not actually have any beneficial effect on public safety. See N. Y. Penal Law Ann.

8    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

ALITO, J., concurring

§400.00(6) (West Cum. Supp. 2022); Suggestion of Mootness in *New York State Rifle & Pistol Assn., Inc.* v. *City of New York*, O. T. 2019, No. 18–280, pp. 5–7.

Exhibit two is the dissent filed in *Heller* by JUSTICE BREYER, the author of today's dissent. At issue in *Heller* was an ordinance that made it impossible for any District of Columbia resident to keep a handgun in the home for self-defense. See 554 U. S., at 574–575. Even the respondent, who carried a gun on the job while protecting federal facilities, did not qualify. *Id.,* at 575–576. The District of Columbia law was an extreme outlier; only a few other jurisdictions in the entire country had similar laws. Nevertheless, JUSTICE BREYER's dissent, while accepting for the sake of argument that the Second Amendment protects the right to keep a handgun in the home, concluded, based on essentially the same test that today's dissent defends, that the District's complete ban was constitutional. See *id.,* at 689, 722 (under "an interest-balancing inquiry. . ." the dissent would "conclude that the District's measure is a proportionate, not a disproportionate, response to the compelling concerns that led the District to adopt it").

Like that dissent in *Heller*, the real thrust of today's dissent is that guns are bad and that States and local jurisdictions should be free to restrict them essentially as they see fit.[3] That argument was rejected in *Heller*, and while the dissent protests that it is not rearguing *Heller*, it proceeds to do just that. See *post*, at 25–28.

*Heller* correctly recognized that the Second Amendment

———————

[3] If we put together the dissent in this case and JUSTICE BREYER's *Heller* dissent, States and local governments would essentially be free to ban the possession of all handguns, and it is unclear whether its approach would impose any significant restrictions on laws regulating long guns. The dissent would extend a very large measure of deference to legislation implicating Second Amendment rights, but it does not claim that such deference is appropriate when any other constitutional right is at issue.

(160)

Cite as: 597 U. S. ____ (2022)          9

ALITO, J., concurring

codifies the right of ordinary law-abiding Americans to protect themselves from lethal violence by possessing and, if necessary, using a gun.  In 1791, when the Second Amendment was adopted, there were no police departments, and many families lived alone on isolated farms or on the frontiers.  If these people were attacked, they were on their own. It is hard to imagine the furor that would have erupted if the Federal Government and the States had tried to take away the guns that these people needed for protection.

Today, unfortunately, many Americans have good reason to fear that they will be victimized if they are unable to protect themselves.  And today, no less than in 1791, the Second Amendment guarantees their right to do so.

Cite as: 597 U. S. ____ (2022)　　　1

KAVANAUGH, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 20–843

NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS *v.* KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2022]

JUSTICE KAVANAUGH, with whom THE CHIEF JUSTICE joins, concurring.

The Court employs and elaborates on the text, history, and tradition test that *Heller* and *McDonald* require for evaluating whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense. See *District of Columbia* v. *Heller*, 554 U. S. 570 (2008); *McDonald* v. *Chicago*, 561 U. S. 742 (2010). Applying that test, the Court correctly holds that New York's outlier "may-issue" licensing regime for carrying handguns for self-defense violates the Second Amendment.

I join the Court's opinion, and I write separately to underscore two important points about the limits of the Court's decision.

*First*, the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense. In particular, the Court's decision does not affect the existing licensing regimes—known as "shall-issue" regimes—that are employed in 43 States.

The Court's decision addresses only the unusual discretionary licensing regimes, known as "may-issue" regimes, that are employed by 6 States including New York. As the

(162)

2    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

KAVANAUGH, J., concurring

Court explains, New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense. Those features of New York's regime—the unchanneled discretion for licensing officials and the special-need requirement—in effect deny the right to carry handguns for self-defense to many "ordinary, law-abiding citizens." *Ante*, at 1; see also *Heller*, 554 U. S., at 635. The Court has held that "individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U. S., at 767 (quoting *Heller*, 554 U. S., at 599). New York's law is inconsistent with the Second Amendment right to possess and carry handguns for self-defense.

By contrast, 43 States employ objective shall-issue licensing regimes. Those shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements. Brief for Arizona et al. as *Amici Curiae* 7. Unlike New York's may-issue regime, those shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense. As petitioners acknowledge, shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice. Tr. of Oral Arg. 50−51.

Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so. Likewise, the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States.

(163)

Cite as: 597 U. S. ____ (2022)          3

KAVANAUGH, J., concurring

*Second*, as *Heller* and *McDonald* established and the
Court today again explains, the Second Amendment "is nei-
ther a regulatory straightjacket nor a regulatory blank
check." *Ante*, at 21. Properly interpreted, the Second
Amendment allows a "variety" of gun regulations. *Heller*,
554 U. S., at 636. As Justice Scalia wrote in his opinion for
the Court in *Heller*, and JUSTICE ALITO reiterated in rele-
vant part in the principal opinion in *McDonald*:

> "Like most rights, the right secured by the Second
> Amendment is not unlimited. From Blackstone
> through the 19th-century cases, commentators and
> courts routinely explained that the right was not a
> right to keep and carry any weapon whatsoever in any
> manner whatsoever and for whatever purpose. . . .
> [N]othing in our opinion should be taken to cast doubt
> on longstanding prohibitions on the possession of fire-
> arms by felons and the mentally ill, or laws forbidding
> the carrying of firearms in sensitive places such as
> schools and government buildings, or laws imposing
> conditions and qualifications on the commercial sale of
> arms. [Footnote 26: We identify these presumptively
> lawful regulatory measures only as examples; our list
> does not purport to be exhaustive.]
>
> "We also recognize another important limitation on
> the right to keep and carry arms. *Miller* said, as we
> have explained, that the sorts of weapons protected
> were those in common use at the time. We think that
> limitation is fairly supported by the historical tradition
> of prohibiting the carrying of dangerous and unusual
> weapons." *Heller*, 554 U. S., at 626−627, and n. 26 (ci-
> tations and quotation marks omitted); see also *McDon-
> ald*, 561 U. S., at 786 (plurality opinion).

\*     \*     \*

With those additional comments, I join the opinion of the
Court.

Cite as: 597 U. S. \_\_\_\_ (2022)          1

BARRETT, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 20–843

NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS *v.* KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2022]

JUSTICE BARRETT, concurring.

I join the Court's opinion in full. I write separately to highlight two methodological points that the Court does not resolve. First, the Court does not conclusively determine the manner and circumstances in which postratification practice may bear on the original meaning of the Constitution. See *ante*, at 24–29. Scholars have proposed competing and potentially conflicting frameworks for this analysis, including liquidation, tradition, and precedent. See, *e.g.*, Nelson, Originalism and Interpretive Conventions, 70 U. Chi. L. Rev. 519 (2003); McConnell, Time, Institutions, and Interpretation, 95 B. U. L. Rev. 1745 (2015). The limits on the permissible use of history may vary between these frameworks (and between different articulations of each one). To name just a few unsettled questions: How long after ratification may subsequent practice illuminate original public meaning? Cf. *McCulloch* v. *Maryland*, 4 Wheat. 316, 401 (1819) (citing practice "introduced at a very early period of our history"). What form must practice take to carry weight in constitutional analysis? See *Myers* v. *United States*, 272 U. S. 52, 175 (1926) (citing a "legislative exposition of the Constitution . . . acquiesced in for a long term of years"). And may practice settle the meaning of individual

(165)

JA296

2    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BARRETT, J., concurring

rights as well as structural provisions? See Baude, Constitutional Liquidation, 71 Stan. L. Rev. 1, 49–51 (2019) (canvassing arguments). The historical inquiry presented in this case does not require us to answer such questions, which might make a difference in another case. See *ante*, at 17–19.

Second and relatedly, the Court avoids another "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or when the Bill of Rights was ratified in 1791. *Ante*, at 29. Here, the lack of support for New York's law in either period makes it unnecessary to choose between them. But if 1791 is the benchmark, then New York's appeals to Reconstruction-era history would fail for the independent reason that this evidence is simply too late (in addition to too little). Cf. *Espinoza* v. *Montana Dept. of Revenue*, 591 U. S. ___, ___–___ (2020) (slip op., at 15–16) (a practice that "arose in the second half of the 19th century . . . cannot by itself establish an early American tradition" informing our understanding of the First Amendment). So today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights. On the contrary, the Court is careful to caution "against giving postenactment history more weight than it can rightly bear." *Ante*, at 26.

(166)

Cite as: 597 U. S. ____ (2022)          1

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

No. 20–843

————

## NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL., PETITIONERS *v.* KEVIN P. BRUEN, IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 23, 2022]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

In 2020, 45,222 Americans were killed by firearms. See Centers for Disease Control and Prevention, Fast Facts: Firearm Violence Prevention (last updated May 4, 2022) (CDC, Fast Facts), https://www.cdc.gov/violenceprevention/firearms/fastfact.html. Since the start of this year (2022), there have been 277 reported mass shootings—an average of more than one per day. See Gun Violence Archive (last visited June 20, 2022), https://www.gunviolence archive.org. Gun violence has now surpassed motor vehicle crashes as the leading cause of death among children and adolescents. J. Goldstick, R. Cunningham, & P. Carter, Current Causes of Death in Children and Adolescents in the United States, 386 New England J. Med. 1955 (May 19, 2022) (Goldstick).

Many States have tried to address some of the dangers of gun violence just described by passing laws that limit, in various ways, who may purchase, carry, or use firearms of different kinds. The Court today severely burdens States' efforts to do so. It invokes the Second Amendment to strike down a New York law regulating the public carriage of con-

(167)

2    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

cealed handguns. In my view, that decision rests upon several serious mistakes.

First, the Court decides this case on the basis of the pleadings, without the benefit of discovery or an evidentiary record. As a result, it may well rest its decision on a mistaken understanding of how New York's law operates in practice. Second, the Court wrongly limits its analysis to focus nearly exclusively on history. It refuses to consider the government interests that justify a challenged gun regulation, regardless of how compelling those interests may be. The Constitution contains no such limitation, and neither do our precedents. Third, the Court itself demonstrates the practical problems with its history-only approach. In applying that approach to New York's law, the Court fails to correctly identify and analyze the relevant historical facts. Only by ignoring an abundance of historical evidence supporting regulations restricting the public carriage of firearms can the Court conclude that New York's law is not "consistent with the Nation's historical tradition of firearm regulation." See *ante,* at 15.

In my view, when courts interpret the Second Amendment, it is constitutionally proper, indeed often necessary, for them to consider the serious dangers and consequences of gun violence that lead States to regulate firearms. The Second Circuit has done so and has held that New York's law does not violate the Second Amendment. See *Kachalsky* v. *County of Westchester*, 701 F. 3d 81, 97–99, 101 (2012). I would affirm that holding. At a minimum, I would not strike down the law based only on the pleadings, as the Court does today—without first allowing for the development of an evidentiary record and without considering the State's compelling interest in preventing gun violence. I respectfully dissent.

I

The question before us concerns the extent to which the

(168)

Cite as: 597 U. S. ____ (2022)        3

BREYER, J., dissenting

Second Amendment prevents democratically elected officials from enacting laws to address the serious problem of gun violence. And yet the Court today purports to answer that question without discussing the nature or severity of that problem.

In 2017, there were an estimated 393.3 million civilian-held firearms in the United States, or about 120 firearms per 100 people. A. Karp, Estimating Global Civilian-Held Firearms Numbers, Small Arms Survey 4 (June 2018), https://www.smallarmssurvey.org/sites/default/files/resources/SAS-BP-Civilian-Firearms-Numbers.pdf. That is more guns per capita than in any other country in the world. *Ibid.* (By comparison, Yemen is second with about 52.8 firearms per 100 people—less than half the per capita rate in the United States—and some countries, like Indonesia and Japan, have fewer than one firearm per 100 people. *Id.,* at 3–4.)

Unsurprisingly, the United States also suffers a disproportionately high rate of firearm-related deaths and injuries. Cf. Brief for Educational Fund To Stop Gun Violence et al. as *Amici Curiae* 17–18 (Brief for Educational Fund) (citing studies showing that, within the United States, "states that rank among the highest in gun ownership also rank among the highest in gun deaths" while "states with lower rates of gun ownership have lower rates of gun deaths"). In 2015, approximately 36,000 people were killed by firearms nationwide. M. Siegel et al., Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States, 107 Am. J. Pub. Health 1923 (2017). Of those deaths, 22,018 (or about 61%) were suicides, 13,463 (37%) were homicides, and 489 (1%) were unintentional injuries. *Ibid.* On top of that, firearms caused an average of 85,694 emergency room visits for nonfatal injuries each year between 2009 and 2017. E. Kaufman et al., Epidemiological Trends in Fatal and Nonfatal Firearm Injuries in the US, 2009–2017, 181 JAMA Internal Medicine

4    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Breyer, J., dissenting

237 (2021) (Kaufman).

Worse yet, gun violence appears to be on the rise. By 2020, the number of firearm-related deaths had risen to 45,222, CDC, Fast Facts, or by about 25% since 2015. That means that, in 2020, an average of about 124 people died from gun violence every day. *Ibid*. As I mentioned above, gun violence has now become the leading cause of death in children and adolescents, surpassing car crashes, which had previously been the leading cause of death in that age group for over 60 years. Goldstick 1955; J. Bates, Guns Became the Leading Cause of Death for American Children and Teens in 2020, Time, Apr. 27, 2022, https://www.time.com/6170864/cause-of-death-children-guns/. And the consequences of gun violence are borne disproportionately by communities of color, and Black communities in particular. See CDC, Age-Adjusted Rates of Firearm-Related Homicide, by Race, Hispanic Origin, and Sex—National Vital Statistics System, United States, 2019, at 1491 (Oct. 22, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/mm7042a6-H.pdf (documenting 34.9 firearm-related homicides per 100,000 population for non-Hispanic Black men in 2019, compared to 7.7 such homicides per 100,000 population for men of all races); S. Kegler et al., CDC, *Vital Signs*: Changes in Firearm Homicide and Suicide Rates—United States, 2019–2020, at 656–658 (May 13, 2022), https://www.cdc.gov/mmwr/volumes/71/wr/pdfs/mm7119e1-H.pdf.

The dangers posed by firearms can take many forms. Newspapers report mass shootings occurring at an entertainment district in Philadelphia, Pennsylvania (3 dead and 11 injured); an elementary school in Uvalde, Texas (21 dead); a supermarket in Buffalo, New York (10 dead and 3 injured); a series of spas in Atlanta, Georgia (8 dead); a busy street in an entertainment district of Dayton, Ohio (9 dead and 17 injured); a nightclub in Orlando, Florida (50 dead and 53 injured); a church in Charleston, South Carolina (9 dead); a movie theater in Aurora, Colorado (12 dead and 50

(170)

Cite as: 597 U. S. ____ (2022) 5

BREYER, J., dissenting

injured); an elementary school in Newtown, Connecticut (26 dead); and many, many more. See, *e.g.,* R. Todt, 3 Dead, 11 Wounded in Philadelphia Shooting on Busy Street, Washington Post, June 5, 2022; A. Hernández, J. Slater, D. Barrett, & S. Foster-Frau, At Least 19 Children, 2 Teachers Killed at Texas Elementary School, Washington Post, May 25, 2022; A. Joly, J. Slater, D. Barrett, & A. Hernandez, 10 Killed in Racially Motivated Shooting at Buffalo Grocery Store, Washington Post, May 14, 2022; C. McWhirter & V. Bauerlein, Atlanta-Area Shootings at Spas Leave Eight Dead, Wall Street Journal, Mar. 17, 2021; A. Hassan, Dayton Gunman Shot 26 People in 32 Seconds, Police Timeline Reveals, N. Y. Times, Aug. 13, 2019; L. Alvarez & R. Pérez-Peña, Orlando Gunman Attacks Gay Nightclub, Leaving 50 Dead, N. Y. Times, June 12, 2016; J. Horowitz, N. Corasaniti, & A. Southall, Nine Killed in Shooting at Black Church in Charleston, N. Y. Times, June 17, 2015; R. Lin, Gunman Kills 12 at 'Dark Knight Rises' Screening in Colorado, L. A. Times, July 20, 2012; J. Barron, Nation Reels After Gunman Massacres 20 Children at School in Connecticut, N. Y. Times, Dec. 14, 2012. Since the start of this year alone (2022), there have already been 277 reported mass shootings—an average of more than one per day. Gun Violence Archive; see also Gun Violence Archive, General Methodology, https://www.gunviolencearchive.org/methodology (defining mass shootings to include incidents in which at least four victims are shot, not including the shooter).

And mass shootings are just one part of the problem. Easy access to firearms can also make many other aspects of American life more dangerous. Consider, for example, the effect of guns on road rage. In 2021, an average of 44 people each month were shot and either killed or wounded in road rage incidents, double the annual average between 2016 and 2019. S. Burd-Sharps & K. Bistline, Everytown for Gun Safety, Reports of Road Rage Shootings Are on the Rise (Apr. 4, 2022), https://www.everytownresearch.org/reports-

6   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

of-road-rage-shootings-are-on-the-rise/; see also J. Dono-hue, A. Aneja, & K. Weber, Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis, 16 J. Empirical Legal Studies 198, 204 (2019). Some of those deaths might have been avoided if there had not been a loaded gun in the car. See *ibid.*; Brief for American Bar Association as *Amicus Curiae* 17–18; Brief for Educational Fund 20–23 (citing studies showing that the presence of a firearm is likely to increase aggression in both the person carrying the gun and others who see it).

The same could be said of protests: A study of 30,000 protests between January 2020 and June 2021 found that armed protests were nearly six times more likely to become violent or destructive than unarmed protests. Everytown for Gun Safety, Armed Assembly: Guns, Demonstrations, and Political Violence in America (Aug. 23, 2021), https://www.everytownresearch.org/report/armed-assembly-guns-demonstrations-and-political-violence-in-america/ (finding that 16% of armed protests turned violent, compared to less than 3% of unarmed protests). Or domestic disputes: Another study found that a woman is five times more likely to be killed by an abusive partner if that partner has access to a gun. Brief for Educational Fund 8 (citing A. Zeoli, R. Malinski, & B. Turchan, Risks and Targeted Interventions: Firearms in Intimate Partner Violence, 38 Epidemiologic Revs. 125 (2016); J. Campbell et al., Risk Factors for Femicide in Abusive Relationships: Results From a Multisite Case Control Study, 93 Am. J. Pub. Health 1089, 1092 (2003)). Or suicides: A study found that men who own handguns are three times as likely to commit suicide than men who do not and women who own handguns are seven times as likely to commit suicide than women who do not. D. Studdert et al., Handgun Ownership and Suicide in California, 382 New England J. Med. 2220, 2224 (June 4, 2020).

(172)

Cite as: 597 U. S. ____ (2022)          7

BREYER, J., dissenting

Consider, too, interactions with police officers. The presence of a gun in the hands of a civilian poses a risk to both officers and civilians. *Amici* prosecutors and police chiefs tell us that most officers who are killed in the line of duty are killed by firearms; they explain that officers in States with high rates of gun ownership are three times as likely to be killed in the line of duty as officers in States with low rates of gun ownership. Brief for Prosecutors Against Gun Violence as *Amicus Curiae* 23–24; Brief for Former Major City Police Chiefs as *Amici Curiae* 13–14, and n. 21, (citing D. Swedler, M. Simmons, F. Dominici, & D. Hemenway, Firearm Prevalence and Homicides of Law Enforcement Officers in the United States, 105 Am. J. Pub. Health 2042, 2045 (2015)). They also say that States with the highest rates of gun ownership report four times as many fatal shootings of civilians by police officers compared to States with the lowest rates of gun ownership. Brief for Former Major City Police Chiefs as *Amici Curiae* 16 (citing D. Hemenway, D. Azrael, A. Connor, & M. Miller, Variation in Rates of Fatal Police Shootings Across US States: The Role of Firearm Availability, 96 J. Urb. Health 63, 67 (2018)).

These are just some examples of the dangers that firearms pose. There is, of course, another side to the story. I am not simply saying that "guns are bad." See *ante,* at 8 (ALITO, J., concurring). Some Americans use guns for legitimate purposes, such as sport (*e.g.,* hunting or target shooting), certain types of employment (*e.g.,* as a private security guard), or self-defense. Cf. *ante,* at 4–6 (ALITO, J., concurring). Balancing these lawful uses against the dangers of firearms is primarily the responsibility of elected bodies, such as legislatures. It requires consideration of facts, statistics, expert opinions, predictive judgments, relevant values, and a host of other circumstances, which together make decisions about how, when, and where to regulate guns more appropriately legislative work. That consideration counsels modesty and restraint on the part of judges

8    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

when they interpret and apply the Second Amendment.

Consider, for one thing, that different types of firearms may pose different risks and serve different purposes. The Court has previously observed that handguns, the type of firearm at issue here, "are the most popular weapon chosen by Americans for self-defense in the home." *District of Columbia* v. *Heller*, 554 U. S. 570, 629 (2008). But handguns are also the most popular weapon chosen by perpetrators of violent crimes. In 2018, 64.4% of firearm homicides and 91.8% of nonfatal firearm assaults were committed with a handgun. Dept. of Justice, Bureau of Justice Statistics, G. Kena & J. Truman, Trends and Patterns in Firearm Violence, 1993–2018, pp. 5–6 (Apr. 2022). Handguns are also the most commonly stolen type of firearm—63% of burglaries resulting in gun theft between 2005 and 2010 involved the theft of at least one handgun. Dept. of Justice, Bureau of Justice Statistics, L. Langton, Firearms Stolen During Household Burglaries and Other Property Crimes, 2005–2010, p. 3 (Nov. 2012).

Or consider, for another thing, that the dangers and benefits posed by firearms may differ between urban and rural areas. See generally Brief for City of Chicago et al. as *Amici Curiae* (detailing particular concerns about gun violence in large cities). Firearm-related homicides and assaults are significantly more common in urban areas than rural ones. For example, from 1999 to 2016, 89.8% of the 213,175 firearm-related homicides in the United States occurred in "metropolitan" areas. M. Siegel et al., The Impact of State Firearm Laws on Homicide Rates in Suburban and Rural Areas Compared to Large Cities in the United States, 1991–2016, 36 J. Rural Health 255 (2020); see also Brief for Partnership for New York City as *Amicus Curiae* 10; Kaufman 237 (finding higher rates of fatal assault injuries from firearms in urban areas compared to rural areas); C. Branas, M. Nance, M. Elliott, T. Richmond, & C. Schwab, Urban-Rural Shifts in Intentional Firearm Death: Different

(174)

Cite as: 597 U. S. ____ (2022)          9

BREYER, J., dissenting

Causes, Same Results, 94 Am. J. Pub. Health 1750, 1752 (2004) (finding higher rates of firearm homicide in urban counties compared to rural counties).

JUSTICE ALITO asks why I have begun my opinion by reviewing some of the dangers and challenges posed by gun violence and what relevance that has to today's case. *Ante,* at 2–4 (concurring opinion). All of the above considerations illustrate that the question of firearm regulation presents a complex problem—one that should be solved by legislatures rather than courts. What kinds of firearm regulations should a State adopt? Different States might choose to answer that question differently. They may face different challenges because of their different geographic and demographic compositions. A State like New York, which must account for the roughly 8.5 million people living in the 303 square miles of New York City, might choose to adopt different (and stricter) firearms regulations than States like Montana or Wyoming, which do not contain any city remotely comparable in terms of population or density. See U. S. Census Bureau, Quick Facts: New York City (last updated July 1, 2021) (Quick Facts: New York City), https://www.census.gov/quickfacts/newyorkcitynewyork/; Brief for City of New York as *Amicus Curiae* 8, 22. For a variety of reasons, States may also be willing to tolerate different degrees of risk and therefore choose to balance the competing benefits and dangers of firearms differently.

The question presented in this case concerns the extent to which the Second Amendment restricts different States (and the Federal Government) from working out solutions to these problems through democratic processes. The primary difference between the Court's view and mine is that I believe the Amendment allows States to take account of the serious problems posed by gun violence that I have just described. I fear that the Court's interpretation ignores these significant dangers and leaves States without the ability to address them.

(175)

JA306

10   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

## II

## A

New York State requires individuals to obtain a license in order to carry a concealed handgun in public. N. Y. Penal Law Ann. §400.00(2) (West Cum. Supp. 2022). I address the specifics of that licensing regime in greater detail in Part II–B below. Because, at this stage in the proceedings, the parties have not had an opportunity to develop the evidentiary record, I refer to facts and representations made in petitioners' complaint and in *amicus* briefs filed before us.

Under New York's regime, petitioners Brandon Koch and Robert Nash have obtained restricted licenses that permit them to carry a concealed handgun for certain purposes and at certain times and places. They wish to expand the scope of their licenses so that they can carry a concealed handgun without restriction.

Koch and Nash are residents of Rensselaer County, New York. Koch lives in Troy, a town of about 50,000, located eight miles from New York's capital city of Albany, which has a population of about 98,000. See App. 100; U. S. Census Bureau, Quick Facts: Troy City, New York (last updated July 1, 2021), https://www.census.gov/quickfacts/troycitynewyork; *id.*, Albany City, New York, https://www.census.gov/quickfacts/albanycitynewyork. Nash lives in Averill Park, a small town 12.5 miles from Albany. App. 100.

Koch and Nash each applied for a license to carry a concealed handgun. Both were issued restricted licenses that allowed them to carry handguns only for purposes of hunting and target shooting. *Id.*, at 104, 106. But they wanted "unrestricted" licenses that would allow them to carry concealed handguns "for personal protection and all lawful purposes." *Id.*, at 112; see also *id.*, at 40. They wrote to the licensing officer in Rensselaer County—Justice Richard

(176)

Cite as:  597 U. S. ____ (2022)           11

BREYER, J., dissenting

McNally, a justice of the New York Supreme Court—re-
questing that the hunting and target shooting restrictions
on their licenses be removed.  *Id.,* at 40, 111–113.  After
holding individual hearings for each petitioner, Justice
McNally denied their requests.  *Id.,* at 31, 41, 105, 107, 114.
He clarified that, in addition to hunting and target shoot-
ing, Koch and Nash could "carry concealed for purposes of
off road back country, outdoor activities similar to hunting,
for example fishing, hiking & camping."  *Id.,* at 41, 114.  He
also permitted Koch, who was employed by the New York
Court System's Division of Technology, to "carry to and
from work."  *Id.*, at 111, 114.  But he reaffirmed that Nash
was prohibited from carrying a concealed handgun in loca-
tions "typically open to and frequented by the general pub-
lic."  *Id.*, at 41.  Neither Koch nor Nash alleges that he ap-
pealed Justice McNally's decision.  Brief for Respondents
13; see App. 122–126.

Instead, petitioners Koch and Nash, along with the New
York State Rifle & Pistol Association, Inc., brought this law-
suit in federal court against Justice McNally and other
State representatives responsible for enforcing New York's
firearms laws.  Petitioners claimed that the State's refusal
to modify Koch's and Nash's licenses violated the Second
Amendment.  The District Court dismissed their complaint.
It followed Second Circuit precedent holding that New
York's licensing regime was constitutional.  See *Kachalsky*,
701 F. 3d, at 101.  The Court of Appeals for the Second Cir-
cuit affirmed.  We granted certiorari to review the constitu-
tionality of "New York's denial of petitioners' license appli-
cations."  *Ante,* at 8 (majority opinion).

B

As the Court recognizes, New York's licensing regime
traces its origins to 1911, when New York enacted the "Sul-
livan Law," which prohibited public carriage of handguns
without a license.  See 1911 N. Y. Laws ch. 195, §1, p. 443.

(177)

JA308

12   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

Two years later in 1913, New York amended the law to establish substantive standards for the issuance of a license. See 1913 N. Y. Laws ch. 608, §1, pp. 1627–1629.  Those standards have remained the foundation of New York's licensing regime ever since—a regime that the Court now, more than a century later, strikes down as unconstitutional.

As it did over 100 years ago, New York's law today continues to require individuals to obtain a license before carrying a concealed handgun in public.  N. Y. Penal Law Ann. §400.00(2); *Kachalsky*, 701 F. 3d, at 85–86.  Because the State does not allow the open carriage of handguns at all, a concealed-carry license is the only way to legally carry a handgun in public.  *Id.*, at 86.  This licensing requirement applies only to handguns (*i.e.,* "pistols and revolvers") and short-barreled rifles and shotguns, not to all types of firearms.  *Id.*, at 85.  For instance, the State does not require a license to carry a long gun (*i.e.,* a rifle or a shotgun over a certain length) in public.  *Ibid.*; §265.00(3) (West 2022).

To obtain a concealed-carry license for a handgun, an applicant must satisfy certain eligibility criteria.  Among other things, he must generally be at least 21 years old and of "good moral character."  §400.00(1).  And he cannot have been convicted of a felony, dishonorably discharged from the military, or involuntarily committed to a mental hygiene facility.  *Ibid.*  If these and other eligibility criteria are satisfied, New York law provides that a concealed-carry license "shall be issued" to individuals working in certain professions, such as judges, corrections officers, or messengers of a "banking institution or express company." §400.00(2).  Individuals who satisfy the eligibility criteria but do not work in one of these professions may still obtain a concealed-carry license, but they must additionally show that "proper cause exists for the issuance thereof." §400.00(2)(f).

The words "proper cause" may appear on their face to be

Cite as: 597 U. S. ____ (2022)           13

Breyer, J., dissenting

broad, but there is "a substantial body of law instructing licensing officials on the application of this standard." *Id.*, at 86. New York courts have interpreted proper cause "to include carrying a handgun for target practice, hunting, or self-defense." *Ibid.* When an applicant seeks a license for target practice or hunting, he must show "'a sincere desire to participate in target shooting and hunting.'" *Ibid.* (quoting *In re O'Connor*, 154 Misc. 2d 694, 697, 585 N. Y. S. 2d 1000, 1003 (Westchester Cty. 1992)). When an applicant seeks a license for self-defense, he must show "'a special need for self-protection distinguishable from that of the general community.'" 701 F. 3d, at 86 (quoting *In re Klenosky*, 75 App. Div. 2d 793, 793, 428 N. Y. S. 2d 256, 257 (1980)). Whether an applicant meets these proper cause standards is determined in the first instance by a "licensing officer in the city or county . . . where the applicant resides." §400.00(3). In most counties, the licensing officer is a local judge. *Kachalsky*, 701 F. 3d, at 87, n. 6. For example, in Rensselaer County, the licensing officer who denied petitioners' requests to remove the restrictions on their licenses was a justice of the New York Supreme Court. App. 31. If the officer denies an application, the applicant can obtain judicial review under Article 78 of New York's Civil Practice Law and Rules. *Kachalsky*, 701 F. 3d, at 87. New York courts will then review whether the denial was arbitrary and capricious. *Ibid.*

In describing New York's law, the Court recites the above facts but adds its own gloss. It suggests that New York's licensing regime gives licensing officers too much discretion and provides too "limited" judicial review of their decisions, *ante,* at 4; that the proper cause standard is too "demanding," *ante,* at 3; and that these features make New York an outlier compared to the "vast majority of States," *ante,* at 4. But on what evidence does the Court base these characterizations? Recall that this case comes to us at the pleading stage. The parties have not had an opportunity to conduct

(179)

JA310

14   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

discovery, and no evidentiary hearings have been held to develop the record.  See App. 15–26.  Thus, at this point, there is no record to support the Court's negative characterizations, as we know very little about how the law has actually been applied on the ground.

Consider each of the Court's criticisms in turn.  First, the Court says that New York gives licensing officers too much discretion and "leaves applicants little recourse if their local licensing officer denies a permit."  *Ante*, at 4.  But there is nothing unusual about broad statutory language that can be given more specific content by judicial interpretation.  Nor is there anything unusual or inadequate about subjecting licensing officers' decisions to arbitrary-and-capricious review.  Judges routinely apply that standard, for example, to determine whether an agency action is lawful under both New York law and the Administrative Procedure Act.  See, *e.g.,* N. Y. Civ. Prac. Law Ann. §7803(3) (2021); 5 U. S. C. §706(2)(A).   The arbitrary-and-capricious standard has thus been used to review important policies concerning health, safety, and immigration, to name just a few examples.  See, *e.g., Biden* v. *Missouri*, 595 U. S. ___, ___ (2022) (*per curiam*) (slip op., at 8); *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. ___, ___, ___ (2020) (slip op., at 9, 17); *Department of Commerce* v. *New York*, 588 U. S. ___, ___ (2019) (slip op., at 16); *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 41, 46 (1983).

Without an evidentiary record, there is no reason to assume that New York courts applying this standard fail to provide license applicants with meaningful review.  And there is no evidentiary record to support the Court's assumption here.  Based on the pleadings alone, we cannot know how often New York courts find the denial of a concealed-carry license to be arbitrary and capricious or on what basis.  We do not even know how a court would have reviewed the licensing officer's decisions in Koch's and

(180)

Cite as: 597 U. S. ____ (2022)             15

BREYER, J., dissenting

Nash's cases because they do not appear to have sought ju-
dicial review at all.  See Brief for Respondents 13; App. 122–
126.

Second, the Court characterizes New York's proper cause
standard as substantively "demanding."  *Ante,* at 3.  But,
again, the Court has before it no evidentiary record to
demonstrate how the standard has actually been applied.
How "demanding" is the proper cause standard in practice?
Does that answer differ from county to county?  How many
license applications are granted and denied each year?  At
the pleading stage, we do not know the answers to these
and other important questions, so the Court's characteriza-
tion of New York's law may very well be wrong.

In support of its assertion that the law is "demanding,"
the Court cites only to cases originating in New York City.
*Ibid.* (citing *In re Martinek*, 294 App. Div. 2d 221, 743
N. Y. S. 2d 80 (2002) (New York County, *i.e.,* Manhattan);
*In re Kaplan*, 249 App. Div. 2d 199, 673 N. Y. S. 2d 66
(1998) (same); *In re Klenosky*, 75 App. Div. 2d 793, 428
N. Y. S. 2d 256 (same); *In re Bernstein*, 85 App. Div. 2d 574,
445 N. Y. S. 2d 716 (1981) (Bronx County)).  But cases from
New York City may not accurately represent how the
proper cause standard is applied in other parts of the State,
including in Rensselaer County where petitioners reside.

To the contrary, *amici* tell us that New York's licensing
regime is purposefully flexible: It allows counties and cities
to respond to the particular needs and challenges of each
area.  See Brief for American Bar Association as *Amicus
Curiae* 12; Brief for City of New York as *Amicus Curiae* 20–
29.  *Amici* suggest that some areas may interpret words
such as "proper cause" or "special need" more or less
strictly, depending upon each area's unique circumstances.
See *ibid.*  New York City, for example, reports that it "has
applied the [proper cause] requirement relatively rigor-
ously" because its densely populated urban areas pose a
heightened risk of gun violence.  Brief for City of New York

16   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

as *Amicus Curiae* 20. In comparison, other (perhaps more rural) counties "have tailored the requirement to their own circumstances, often issuing concealed-carry licenses more freely than the City." *Ibid.*; see also *In re O'Connor*, 154 Misc. 2d, at 698, 585 N. Y. S. 2d, at 1004 ("The circumstances which exist in New York City are significantly different than those which exist in Oswego or Putnam Counties. . . . The licensing officers in each county are in the best position to determine whether any interest of the population of their county is furthered by the use of restrictions on pistol licenses"); Brief for Citizens Crime Commission of New York City as *Amicus Curiae* 18–19. Given the geographic variation across the State, it is too sweeping for the Court to suggest, without an evidentiary record, that the proper cause standard is "demanding" in Rensselaer County merely because it may be so in New York City.

Finally, the Court compares New York's licensing regime to that of other States. *Ante,* at 4–6. It says that New York's law is a "may issue" licensing regime, which the Court describes as a law that provides licensing officers greater discretion to grant or deny licenses than a "shall issue" licensing regime. *Ante,* at 4–5. Because the Court counts 43 "shall issue" jurisdictions and only 7 "may issue" jurisdictions, it suggests that New York's law is an outlier. *Ibid.*; see also *ante,* at 1–2 (KAVANAUGH, J., concurring). Implicitly, the Court appears to ask, if so many other States have adopted the more generous "shall issue" approach, why can New York not be required to do the same?

But the Court's tabulation, and its implicit question, overlook important context. In drawing a line between "may issue" and "shall issue" licensing regimes, the Court ignores the degree of variation within and across these categories. Not all "may issue" regimes are necessarily alike, nor are all "shall issue" regimes. Conversely, not all "may issue" regimes are as different from the "shall issue" re-

(182)

JA313

Cite as:  597 U. S. ____ (2022)           17

BREYER, J., dissenting

gimes as the Court assumes.  For instance, the Court rec-
ognizes in a footnote that three States (Connecticut, Dela-
ware, and Rhode Island) have statutes with discretionary
criteria, like so-called "may issue" regimes do.  *Ante,* at 5,
n. 1.  But the Court nonetheless counts them among the 43
"shall issue" jurisdictions because, it says, these three
States' laws operate in practice more like "shall issue" re-
gimes.  *Ibid.*; see also Brief for American Bar Association as
*Amicus Curiae* 10 (recognizing, conversely, that some "shall
issue" States, *e.g.,* Alabama, Colorado, Georgia, Oregon,
and Virginia, still grant some degree of discretion to licens-
ing authorities).

    As these three States demonstrate, the line between "may
issue" and "shall issue" regimes is not as clear cut as the
Court suggests, and that line depends at least in part on
how statutory discretion is applied in practice.  Here, be-
cause the Court strikes down New York's law without af-
fording the State an opportunity to develop an evidentiary
record, we do not know how much discretion licensing offic-
ers in New York have in practice or how that discretion is
exercised, let alone how the licensing regimes in the other
six "may issue" jurisdictions operate.

    Even accepting the Court's line between "may issue" and
"shall issue" regimes and assuming that its tally (7 "may
issue" and 43 "shall issue" jurisdictions) is correct, that
count does not support the Court's implicit suggestion that
the seven "may issue" jurisdictions are somehow outliers or
anomalies.  The Court's count captures only a snapshot in
time.  It forgets that "shall issue" licensing regimes are a
relatively recent development.  Until the 1980s, "may issue"
regimes predominated.  See *id.,* at 9; R. Grossman & S. Lee,
May Issue Versus Shall Issue: Explaining the Pattern of
Concealed-Carry Handgun Laws, 1960–2001, 26 Contemp.
Econ. Pol'y 198, 200 (2008) (Grossman).  As of 1987, 16
States and the District of Columbia prohibited concealed

(183)

18　NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

carriage outright, 26 States had "may issue" licensing regimes, 7 States had "shall issue" regimes, and 1 State (Vermont) allowed concealed carriage without a permit. Congressional Research Service, Gun Control: Concealed Carry Legislation in the 115th Congress 1 (Jan. 30, 2018). Thus, it has only been in the last few decades that States have shifted toward "shall issue" licensing laws. Prior to that, most States operated "may issue" licensing regimes without legal or practical problem.

Moreover, even considering, as the Court does, only the present state of play, its tally provides an incomplete picture because it accounts for only the number of States with "may issue" regimes, not the number of people governed by those regimes. By the Court's count, the seven "may issue" jurisdictions are New York, California, Hawaii, Maryland, Massachusetts, New Jersey, and the District of Columbia. *Ante,* at 5–6. Together, these seven jurisdictions comprise about 84.4 million people and account for over a quarter of the country's population. U. S. Census Bureau, 2020 Population and Housing State Data (Aug. 12, 2021) (2020 Population), https://www.census.gov/library/visualizations/interactive/2020-population-and-housing-state-data.html. Thus, "may issue" laws can hardly be described as a marginal or outdated regime.

And there are good reasons why these seven jurisdictions may have chosen not to follow other States in shifting toward "shall issue" regimes. The seven remaining "may issue" jurisdictions are among the most densely populated in the United States: the District of Columbia (with an average of 11,280.0 people/square mile in 2020), New Jersey (1,263.0), Massachusetts (901.2), Maryland (636.1), New York (428.7), California (253.7), and Hawaii (226.6). U. S. Census Bureau, Historical Population Density (1910–2020) (Apr. 26, 2001), https://www.census.gov/data/tables/time-series/dec/density-data-text.html. In comparison, the average population density of the United States as a whole is

Cite as: 597 U. S. ____ (2022)           19

BREYER, J., dissenting

93.8 people/square mile, and some States have population densities as low as 1.3 (Alaska), 5.9 (Wyoming), and 7.4 (Montana) people/square mile. *Ibid.* These numbers reflect in part the fact that these "may issue" jurisdictions contain some of the country's densest and most populous urban areas, *e.g.,* New York City, Los Angeles, San Francisco, the District of Columbia, Honolulu, and Boston. U. S. Census Bureau, Urban Area Facts (Oct. 8, 2021), https://www.census .gov/programs-surveys/geography/guidance/geo-areas/ urban-rural/ua-facts.html. New York City, for example, has a population of about 8.5 million people, making it more populous than 38 States, and it squeezes that population into just over 300 square miles. Quick Facts: New York City; 2020 Population; Brief for City of New York as *Amicus Curiae* 8, 22.

As I explained above, *supra,* at 8–9, densely populated urban areas face different kinds and degrees of dangers from gun violence than rural areas. It is thus easy to see why the seven "may issue" jurisdictions might choose to regulate firearm carriage more strictly than other States. See Grossman 199 ("We find strong evidence that more urban states are less likely to shift to 'shall issue' than rural states").

New York and its *amici* present substantial data justifying the State's decision to retain a "may issue" licensing regime. The data show that stricter gun regulations are associated with lower rates of firearm-related death and injury. See, *e.g.,* Brief for Citizens Crime Commission of New York City as *Amicus Curiae* 9–11; Brief for Former Major City Police Chiefs as *Amici Curiae* 9–12; Brief for Educational Fund 25–28; Brief for Social Scientists et al. as *Amici Curiae* 9–19. In particular, studies have shown that "may issue" licensing regimes, like New York's, are associated with lower homicide rates and lower violent crime rates than "shall issue" licensing regimes. For example, one study compared homicide rates across all 50 States during

20   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

the 25-year period from 1991 to 2015 and found that "shall issue" laws were associated with 6.5% higher total homicide rates, 8.6% higher firearm homicide rates, and 10.6% higher handgun homicide rates.  Siegel, 107 Am. J. Pub. Health, at 1924–1925, 1927.  Another study longitudinally followed 33 States that had adopted "shall-issue" laws between 1981 and 2007 and found that the adoption of those laws was associated with a 13%–15% increase in rates of violent crime after 10 years.  Donohue, 16 J. Empirical Legal Studies, at 200, 240.  Numerous other studies show similar results.  See, *e.g.,* Siegel, 36 J. Rural Health*,* at 261 (finding that "may issue" laws are associated with 17% lower firearm homicide rates in large cities); C. Crifasi et al., Association Between Firearm Laws and Homicide in Urban Counties, 95 J. Urb. Health 383, 387 (2018) (finding that "shall issue" laws are associated with a 4% increase in firearm homicide rates in urban counties); M. Doucette, C. Crifasi, & S. Frattaroli, Right-to-Carry Laws and Firearm Workplace Homicides: A Longitudinal Analysis (1992–2017), 109 Am. J. Pub. Health 1747, 1751 (Dec. 2019) (finding that States with "shall issue" laws between 1992 and 2017 experienced 29% higher rates of firearm-related workplace homicides); Brief for Social Scientists et al. as *Amici Curiae* 15–16, and nn. 17–20 (citing "thirteen . . . empirical papers from just the last few years linking ["shall issue"] laws to higher violent crime").

JUSTICE ALITO points to competing empirical evidence that arrives at a different conclusion.  *Ante,* at 3, n. 1 (concurring opinion).  But these types of disagreements are exactly the sort that are better addressed by legislatures than courts.  The Court today restricts the ability of legislatures to fulfill that role.  It does so without knowing how New York's law is administered in practice, how much discretion licensing officers in New York possess, or whether the proper cause standard differs across counties.  And it does so without giving the State an opportunity to develop the

(186)

Cite as: 597 U. S. ____ (2022)　　　　　21

BREYER, J., dissenting

evidentiary record to answer those questions. Yet it strikes down New York's licensing regime as a violation of the Second Amendment.

### III
#### A

How does the Court justify striking down New York's law without first considering how it actually works on the ground and what purposes it serves? The Court does so by purporting to rely nearly exclusively on history. It requires "the government [to] affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of 'the right to keep and bear arms.'" *Ante,* at 10. Beyond this historical inquiry, the Court refuses to employ what it calls "means-end scrutiny." *Ibid.* That is, it refuses to consider whether New York has a compelling interest in regulating the concealed carriage of handguns or whether New York's law is narrowly tailored to achieve that interest. Although I agree that history can often be a useful tool in determining the meaning and scope of constitutional provisions, I believe the Court's near-exclusive reliance on that single tool today goes much too far.

The Court concedes that no Court of Appeals has adopted its rigid history-only approach. See *ante,* at 8. To the contrary, every Court of Appeals to have addressed the question has agreed on a two-step framework for evaluating whether a firearm regulation is consistent with the Second Amendment. *Ibid.*; *ante,* at 10, n. 4 (majority opinion) (listing cases from the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and D. C. Circuits). At the first step, the Courts of Appeals use text and history to determine "whether the regulated activity falls within the scope of the Second Amendment." *Ezell* v. *Chicago*, 846 F. 3d 888, 892 (CA7 2017). If it does, they go on to the second step and consider "'the strength of the government's justification for restricting or regulating'" the Second

(187)

JA318

22   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

Amendment right. *Ibid.* In doing so, they apply a level of "means-ends" scrutiny "that is proportionate to the severity of the burden that the law imposes on the right": strict scrutiny if the burden is severe, and intermediate scrutiny if it is not. *National Rifle Assn. of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F. 3d 185, 195, 198, 205 (CA5 2012).

The Court today replaces the Courts of Appeals' consensus framework with its own history-only approach. That is unusual. We do not normally disrupt settled consensus among the Courts of Appeals, especially not when that consensus approach has been applied without issue for over a decade. See Brief for Second Amendment Law Professors as *Amici Curiae* 4, 13–15; see also this Court's Rule 10. The Court attempts to justify its deviation from our normal practice by claiming that the Courts of Appeals' approach is inconsistent with *Heller.* See *ante,* at 10. In doing so, the Court implies that all 11 Courts of Appeals that have considered this question misread *Heller.*

To the contrary, it is this Court that misreads *Heller.* The opinion in *Heller* did focus primarily on "constitutional text and history," *ante,* at 13 (majority opinion), but it did *not* "rejec[t] . . . means-end scrutiny," as the Court claims, *ante,* at 15. Consider what the *Heller* Court actually said. True, the Court spent many pages in *Heller* discussing the text and historical context of the Second Amendment. 554 U. S., at 579–619. But that is not surprising because the *Heller* Court was asked to answer the preliminary question whether the Second Amendment right to "bear Arms" encompasses an individual right to possess a firearm in the home for self-defense. *Id.*, at 577. The *Heller* Court concluded that the Second Amendment's text and history were sufficiently clear to resolve that question: The Second Amendment, it said, does include such an individual right. *Id.*, at 579–619. There was thus no need for the Court to go further—to look beyond text and history, or to suggest what

Cite as: 597 U. S. ____ (2022)           23

BREYER, J., dissenting

analysis would be appropriate in other cases where the text and history are not clear.

But the *Heller* Court did not end its opinion with that preliminary question. After concluding that the Second Amendment protects an individual right to possess a firearm for self-defense, the *Heller* Court added that that right is "not unlimited." *Id.,* at 626. It thus had to determine whether the District of Columbia's law, which banned handgun possession in the home, was a permissible regulation of the right. *Id.,* at 628–630. In answering that second question, it said: "Under *any of the standards of scrutiny that we have applied to enumerated constitutional rights*, banning from the home 'the most preferred firearm in the nation to "keep" and use for protection of one's home and family' would fail constitutional muster." *Id.,* at 628–629 (emphasis added; footnote and citation omitted). That language makes clear that the *Heller* Court understood some form of means-end scrutiny to apply. It did not need to specify whether that scrutiny should be intermediate or strict because, in its view, the District's handgun ban was so "severe" that it would have failed either level of scrutiny. *Id.,* at 628–629; see also *id.,* at 628, n. 27 (clarifying that rational-basis review was not the proper level of scrutiny).

Despite *Heller*'s express invocation of means-end scrutiny, the Court today claims that the majority in *Heller* rejected means-end scrutiny because it rejected my dissent in that case. But that argument misreads both my dissent and the majority opinion. My dissent in *Heller* proposed directly weighing "the interests protected by the Second Amendment on one side and the governmental public-safety concerns on the other." *Id.,* at 689. I would have asked "whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." *Id.,* at 689–690. The majority rejected my dissent,

24   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

not because I proposed using means-end scrutiny, but because, in its view, I had done the opposite. In its own words, the majority faulted my dissent for proposing "a *freestanding* 'interest-balancing' approach" that accorded with "*none of the traditionally expressed levels* [of scrutiny] (strict scrutiny, intermediate scrutiny, rational basis)." *Id.,* at 634 (emphasis added).

The majority further made clear that its rejection of freestanding interest balancing did *not* extend to traditional forms of means-end scrutiny. It said: "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach." *Ibid.* To illustrate this point, it cited as an example the First Amendment right to free speech. *Id.,* at 635. Judges, of course, regularly use means-end scrutiny, including both strict and intermediate scrutiny, when they interpret or apply the First Amendment. See, *e.g., United States* v. *Playboy Entertainment Group, Inc.,* 529 U. S. 803, 813 (2000) (applying strict scrutiny); *Turner Broadcasting System, Inc.* v. *FCC,* 520 U. S. 180, 186, 189–190 (1997) (applying intermediate scrutiny). The majority therefore cannot have intended its opinion, consistent with our First Amendment jurisprudence, to be read as rejecting all traditional forms of means-end scrutiny.

As *Heller*'s First Amendment example illustrates, the Court today is wrong when it says that its rejection of means-end scrutiny and near-exclusive focus on history "accords with how we protect other constitutional rights." *Ante,* at 15. As the Court points out, we do look to history in the First Amendment context to determine "whether the expressive conduct falls outside of the category of protected speech." *Ibid.* But, if conduct falls within a category of protected speech, we then use means-end scrutiny to determine whether a challenged regulation unconstitutionally burdens that speech. And the degree of scrutiny we apply

(190)

JA321

BREYER, J., dissenting

often depends on the type of speech burdened and the severity of the burden.  See, *e.g., Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. 721, 734 (2011) (applying strict scrutiny to laws that burden political speech); *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989) (applying intermediate scrutiny to time, place, and manner restrictions); *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 564–566 (1980) (applying intermediate scrutiny to laws that burden commercial speech).

Additionally, beyond the right to freedom of speech, we regularly use means-end scrutiny in cases involving other constitutional provisions.  See, *e.g., Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 546 (1993) (applying strict scrutiny under the First Amendment to laws that restrict free exercise of religion in a way that is not neutral and generally applicable); *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995) (applying strict scrutiny under the Equal Protection Clause to race-based classifications); *Clark* v. *Jeter*, 486 U. S. 456, 461 (1988) (applying intermediate scrutiny under the Equal Protection Clause to sex-based classifications); see also *Virginia* v. *Moore*, 553 U. S. 164, 171 (2008) ("When history has not provided a conclusive answer, we have analyzed a search or seizure in light of traditional standards of reasonableness").

The upshot is that applying means-end scrutiny to laws that regulate the Second Amendment right to bear arms would not create a constitutional anomaly.  Rather, it is the Court's rejection of means-end scrutiny and adoption of a rigid history-only approach that is anomalous.

B

The Court's near-exclusive reliance on history is not only unnecessary, it is deeply impractical.  It imposes a task on the lower courts that judges cannot easily accomplish. Judges understand well how to weigh a law's objectives (its

26  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Breyer, J., dissenting

"ends") against the methods used to achieve those objectives (its "means"). Judges are far less accustomed to resolving difficult historical questions. Courts are, after all, staffed by lawyers, not historians. Legal experts typically have little experience answering contested historical questions or applying those answers to resolve contemporary problems.

The Court's insistence that judges and lawyers rely nearly exclusively on history to interpret the Second Amendment thus raises a host of troubling questions. Consider, for example, the following. Do lower courts have the research resources necessary to conduct exhaustive historical analyses in every Second Amendment case? What historical regulations and decisions qualify as representative analogues to modern laws? How will judges determine which historians have the better view of close historical questions? Will the meaning of the Second Amendment change if or when new historical evidence becomes available? And, most importantly, will the Court's approach permit judges to reach the outcomes they prefer and then cloak those outcomes in the language of history? See S. Cornell, *Heller*, New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss," 56 UCLA L. Rev. 1095, 1098 (2009) (describing "law office history" as "a results oriented methodology in which evidence is selectively gathered and interpreted to produce a preordained conclusion").

Consider *Heller* itself. That case, fraught with difficult historical questions, illustrates the practical problems with expecting courts to decide important constitutional questions based solely on history. The majority in *Heller* undertook 40 pages of textual and historical analysis and concluded that the Second Amendment's protection of the right to "keep and bear Arms" historically encompassed an "individual right to possess and carry weapons in case of confrontation"—that is, for self-defense. 554 U. S., at 592; see also *id.,* at 579–619. Justice Stevens' dissent conducted an

(192)

equally searching textual and historical inquiry and con-
cluded, to the contrary, that the term "bear Arms" was an
idiom that protected only the right "to use and possess arms
in conjunction with service in a well-regulated militia." *Id.,*
at 651. I do not intend to relitigate *Heller* here. I accept its
holding as a matter of *stare decisis.* I refer to its historical
analysis only to show the difficulties inherent in answering
historical questions and to suggest that judges do not have
the expertise needed to answer those questions accurately.

For example, the *Heller* majority relied heavily on its in-
terpretation of the English Bill of Rights. Citing Black-
stone, the majority claimed that the English Bill of Rights
protected a "'right of having and using arms for self-preser-
vation and defence.'" *Id.,* at 594 (quoting 1 Commentaries
on the Laws of England 140 (1765)). The majority inter-
preted that language to mean a private right to bear arms
for self-defense, "having nothing whatever to do with ser-
vice in a militia." 554 U. S., at 593. Two years later, how-
ever, 21 English and early American historians (including
experts at top universities) told us in *McDonald* v. *Chicago*,
561 U. S. 742 (2010), that the *Heller* Court had gotten the
history wrong: The English Bill of Rights "did not . . . pro-
tect an individual's right to possess, own, or use arms for
private purposes such as to defend a home against bur-
glars." Brief for English/Early American Historians as
*Amici Curiae* in *McDonald* v. *Chicago*, O. T. 2009, No. 08–
1521, p. 2. Rather, these *amici* historians explained, the
English right to "have arms" ensured that the Crown could
not deny Parliament (which represented the people) the
power to arm the landed gentry and raise a militia—or the
right of the people to possess arms to take part in that mi-
litia—"should the sovereign usurp the laws, liberties, es-
tates, and Protestant religion of the nation." *Id.,* at 2–3.
Thus, the English right did protect a right of "self-preserva-
tion and defence," as Blackstone said, but that right "was to

28    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Breyer, J., dissenting

be exercised not by individuals acting privately or independently, but as a militia organized by their elected representatives," *i.e.,* Parliament. *Id.,* at 7–8. The Court, not an expert in history, had misread Blackstone and other sources explaining the English Bill of Rights.

And that was not the *Heller* Court's only questionable judgment. The majority rejected Justice Stevens' argument that the Second Amendment's use of the words "bear Arms" drew on an idiomatic meaning that, at the time of the founding, commonly referred to military service. 554 U. S., at 586. Linguistics experts now tell us that the majority was wrong to do so. See, *e.g.,* Brief for Corpus Linguistics Professors and Experts as *Amici Curiae* (Brief for Linguistics Professors); Brief for Neal Goldfarb as *Amicus Curiae*; Brief for Americans Against Gun Violence as *Amicus Curiae* 13–15. Since *Heller* was decided, experts have searched over 120,000 founding-era texts from between 1760 and 1799, as well as 40,000 texts from sources dating as far back as 1475, for historical uses of the phrase "bear arms," and they concluded that the phrase was overwhelmingly used to refer to "'war, soldiering, or other forms of armed action by a group rather than an individual.'" Brief for Linguistics Professors 11, 14; see also D. Baron, Corpus Evidence Illuminates the Meaning of Bear Arms, 46 Hastings Const. L. Q. 509, 510 (2019) ("Non-military uses of *bear arms* in reference to hunting or personal self-defense are not just rare, they are almost nonexistent"); *id.,* at 510–511 (reporting 900 instances in which "bear arms" was used to refer to military or collective use of firearms and only 7 instances that were either ambiguous or without a military connotation).

These are just two examples. Other scholars have continued to write books and articles arguing that the Court's decision in *Heller* misread the text and history of the Second Amendment. See generally, *e.g.,* M. Waldman, The Second Amendment (2014); S. Cornell, The Changing Meaning of

(194)

the Right To Keep and Bear Arms: 1688–1788, in Guns in Law 20–27 (A. Sarat, L. Douglas, & M. Umphrey eds. 2019); P. Finkelman, The Living Constitution and the Second Amendment: Poor History, False Originalism, and a Very Confused Court, 37 Cardozo L. Rev. 623 (2015); D. Walker, Necessary to the Security of Free States: The Second Amendment as the Auxiliary Right of Federalism, 56 Am. J. Legal Hist. 365 (2016); W. Merkel, *Heller* as Hubris, and How *McDonald* v. *City of Chicago* May Well Change the Constitutional World as We Know It, 50 Santa Clara L. Rev. 1221 (2010).

I repeat that I do not cite these arguments in order to relitigate *Heller*. I wish only to illustrate the difficulties that may befall lawyers and judges when they attempt to rely *solely* on history to interpret the Constitution. In *Heller*, we attempted to determine the scope of the Second Amendment right to bear arms by conducting a historical analysis, and some of us arrived at very different conclusions based on the same historical sources. Many experts now tell us that the Court got it wrong in a number of ways. That is understandable given the difficulty of the inquiry that the Court attempted to undertake. The Court's past experience with historical analysis should serve as a warning against relying exclusively, or nearly exclusively, on this mode of analysis in the future.

Failing to heed that warning, the Court today does just that. Its near-exclusive reliance on history will pose a number of practical problems. First, the difficulties attendant to extensive historical analysis will be especially acute in the lower courts. The Court's historical analysis in this case is over 30 pages long and reviews numerous original sources from over 600 years of English and American history. *Ante,* at 30–62. Lower courts—especially district courts—typically have fewer research resources, less assistance from *amici* historians, and higher caseloads than we do. They are therefore ill equipped to conduct the type of

30   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

searching historical surveys that the Court's approach requires. Tellingly, even the Courts of Appeals that have addressed the question presented here (namely, the constitutionality of public carriage restrictions like New York's) "have, in large part, avoided extensive historical analysis." *Young* v. *Hawaii*, 992 F. 3d 765, 784–785 (CA9 2021) (collecting cases). In contrast, lawyers and courts are well equipped to administer means-end scrutiny, which is regularly applied in a variety of constitutional contexts, see *supra,* at 24–25.

Second, the Court's opinion today compounds these problems, for it gives the lower courts precious little guidance regarding how to resolve modern constitutional questions based almost solely on history. See, *e.g., ante,* at 1 (BARRETT, J., concurring) ("highlight[ing] two methodological points that the Court does not resolve"). The Court declines to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment." *Ante,* at 20. Other than noting that its history-only analysis is "neither a . . . straightjacket nor a . . . blank check," the Court offers little explanation of how stringently its test should be applied. *Ante,* at 21. Ironically, the only two "relevan[t]" metrics that the Court does identify are "how and why" a gun control regulation "burden[s the] right to armed self-defense." *Ante,* at 20. In other words, the Court believes that the most relevant metrics of comparison are a regulation's means (how) and ends (why)—even as it rejects the utility of means-end scrutiny.

What the Court offers instead is a laundry list of reasons to discount seemingly relevant historical evidence. The Court believes that some historical laws and decisions cannot justify upholding modern regulations because, it says, they were outliers. It explains that just two court decisions or three colonial laws are not enough to satisfy its test. *Ante,* at 37, 57. But the Court does not say how many cases or laws would suffice "to show a tradition of public-carry

regulation." *Ante,* at 37.  Other laws are irrelevant, the
Court claims, because they are too dissimilar from New
York's concealed-carry licensing regime.  See, *e.g., ante,* at
48–49.  But the Court does not say what "representative
historical analogue," short of a "twin" or a "dead ringer,"
would suffice.  See *ante,* at 21 (emphasis deleted).  Indeed,
the Court offers many and varied reasons to reject potential
representative analogues, but very few reasons to accept
them.  At best, the numerous justifications that the Court
finds for rejecting historical evidence give judges ample
tools to pick their friends out of history's crowd.  At worst,
they create a one-way ratchet that will disqualify virtually
any "representative historical analogue" and make it nearly
impossible to sustain common-sense regulations necessary
to our Nation's safety and security.

Third, even under ideal conditions, historical evidence
will often fail to provide clear answers to difficult questions.
As an initial matter, many aspects of the history of firearms
and their regulation are ambiguous, contradictory, or dis-
puted.  Unsurprisingly, the extent to which colonial stat-
utes enacted over 200 years ago were actually enforced, the
basis for an acquittal in a 17th-century decision, and the
interpretation of English laws from the Middle Ages (to
name just a few examples) are often less than clear.  And
even historical experts may reach conflicting conclusions
based on the same sources.  Compare, *e.g.,* P. Charles, The
Faces of the Second Amendment Outside the Home: History
Versus Ahistorical Standards of Review, 60 Clev. St. L. Rev.
1, 14 (2012), with J. Malcolm, To Keep and Bear Arms: The
Origins of an Anglo-American Right 104 (1994).  As a result,
history, as much as any other interpretive method, leaves
ample discretion to "loo[k] over the heads of the [crowd] for
one's friends."  A. Scalia & B. Garner, Reading Law: The
Interpretation of Legal Texts 377 (2012).

Fourth, I fear that history will be an especially inade-

32    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Breyer, J., dissenting

quate tool when it comes to modern cases presenting modern problems. Consider the Court's apparent preference for founding-era regulation. See *ante,* at 25–28. Our country confronted profoundly different problems during that time period than it does today. Society at the founding was "predominantly rural." C. McKirdy, Misreading the Past: The Faulty Historical Basis Behind the Supreme Court's Decision in District of Columbia v. Heller, 45 Capital U. L. Rev. 107, 151 (2017). In 1790, most of America's relatively small population of just four million people lived on farms or in small towns. *Ibid.* Even New York City, the largest American city then, as it is now, had a population of just 33,000 people. *Ibid.* Small founding-era towns are unlikely to have faced the same degrees and types of risks from gun violence as major metropolitan areas do today, so the types of regulations they adopted are unlikely to address modern needs. *Id.,* at 152 ("For the most part, a population living on farms and in very small towns did not create conditions in which firearms created a significant danger to the public welfare"); see also *supra,* at 8–9.

This problem is all the more acute when it comes to "modern-day circumstances that [the Framers] could not have anticipated." *Heller,* 554 U. S., at 721–722 (Breyer, J., dissenting). How can we expect laws and cases that are over a century old to dictate the legality of regulations targeting "ghost guns" constructed with the aid of a three-dimensional printer? See, *e.g.,* White House Briefing Room, FACT SHEET: The Biden Administration Cracks Down on Ghost Guns, Ensures That ATF Has the Leadership It Needs To Enforce Our Gun Laws (Apr. 11, 2022), https://whitehouse.gov/briefing-room/statements-releases/2022/04/11/fact-sheet-the-biden-administration-cracks-down-on-ghost-guns-ensures-that-atf-has-the-leadership-it-needs-to-enforce-our-gun-laws/. Or modern laws requiring all gun shops to offer smart guns, which can only be fired by authorized users? See, *e.g.,* N. J. Stat. Ann. §2C:58–

(198)

Cite as: 597 U. S. ____ (2022)          33

BREYER, J., dissenting

2.10(a) (West Cum. Supp. 2022). Or laws imposing addi-
tional criminal penalties for the use of bullets capable of
piercing body armor? See, *e.g.,* 18 U. S. C. §§921(a)(17)(B),
929(a).

The Court's answer is that judges will simply have to em-
ploy "analogical reasoning." *Ante,* at 19–20. But, as I ex-
plained above, the Court does not provide clear guidance on
how to apply such reasoning. Even seemingly straightfor-
ward historical restrictions on firearm use may prove sur-
prisingly difficult to apply to modern circumstances. The
Court affirms *Heller*'s recognition that States may forbid
public carriage in "sensitive places." *Ante,* at 21–22. But
what, in 21st-century New York City, may properly be con-
sidered a sensitive place? Presumably "legislative assem-
blies, polling places, and courthouses," which the Court
tells us were among the "relatively few" places "where
weapons were altogether prohibited" in the 18th and 19th
centuries. *Ante,* at 21. On the other hand, the Court also
tells us that "expanding the category of 'sensitive places'
simply to all places of public congregation that are not iso-
lated from law enforcement defines th[at] category . . . far
too broadly." *Ante,* at 22. So where does that leave the
many locations in a modern city with no obvious 18th- or
19th-century analogue? What about subways, nightclubs,
movie theaters, and sports stadiums? The Court does not
say.

Although I hope—fervently—that future courts will be
able to identify historical analogues supporting the validity
of regulations that address new technologies, I fear that it
will often prove difficult to identify analogous technological
and social problems from Medieval England, the founding
era, or the time period in which the Fourteenth Amendment
was ratified. Laws addressing repeating crossbows,
launcegays, dirks, dagges, skeines, stilladers, and other an-
cient weapons will be of little help to courts confronting
modern problems. And as technological progress pushes

34  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Breyer, J., dissenting

our society ever further beyond the bounds of the Framers' imaginations, attempts at "analogical reasoning" will become increasingly tortured. In short, a standard that relies solely on history is unjustifiable and unworkable.

## IV

Indeed, the Court's application of its history-only test in this case demonstrates the very pitfalls described above. The historical evidence reveals a 700-year Anglo-American tradition of regulating the public carriage of firearms in general, and concealed or concealable firearms in particular. The Court spends more than half of its opinion trying to discredit this tradition. But, in my view, the robust evidence of such a tradition cannot be so easily explained away. Laws regulating the public carriage of weapons existed in England as early as the 13th century and on this Continent since before the founding. Similar laws remained on the books through the ratifications of the Second and Fourteenth Amendments through to the present day. Many of those historical regulations imposed significantly stricter restrictions on public carriage than New York's licensing requirements do today. Thus, even applying the Court's history-only analysis, New York's law must be upheld because "historical precedent from before, during, and . . . after the founding evinces a comparable tradition of regulation." *Ante,* at 18 (majority opinion) (internal quotation marks omitted).

### A. England.

The right codified by the Second Amendment was "'inherited from our English ancestors.'" *Heller*, 554 U. S., at 599 (quoting *Robertson* v. *Baldwin*, 165 U. S. 275, 281 (1897)); see also *ante,* at 30 (majority opinion). And some of England's earliest laws regulating the public carriage of weapons were precursors of similar American laws enacted

(200)

roughly contemporaneously with the ratification of the Second Amendment. See *infra,* at 40–42. I therefore begin, as the Court does, *ante,* at 30–31, with the English ancestors of New York's laws regulating public carriage of firearms.

The relevant English history begins in the late-13th and early-14th centuries, when Edward I and Edward II issued a series of orders to local sheriffs that prohibited any person from "going armed." See 4 Calendar of the Close Rolls, Edward I, 1296–1302, p. 318 (Sept. 15, 1299) (1906); *id.,* at 588 (July 16, 1302); 5 *id.,* Edward I, 1302–1307, at 210 (June 10, 1304) (1908); *id.,* Edward II, 1307–1313, at 52 (Feb. 9, 1308) (1892); *id.,* at 257 (Apr. 9, 1310); *id.,* at 553 (Oct. 12, 1312); *id.,* Edward II, 1323–1327, at 560 (Apr. 28, 1326) (1898); 1 Calendar of Plea and Memoranda Rolls of the City of London, 1323–1364, p. 15 (Nov. 1326) (A. Thomas ed. 1926). Violators were subject to punishment, including "forfeiture of life and limb." See, *e.g.,* 4 Calendar of the Close Rolls, Edward I, 1296–1302, at 318 (Sept. 15, 1299) (1906). Many of these royal edicts contained exemptions for persons who had obtained "the king's special licence." See *ibid.*; 5 *id.,* Edward I, 1302–1307, at 210 (June 10, 1304); *id.,* Edward II, 1307–1313, at 553 (Oct. 12, 1312); *id.,* Edward II, 1323–1327, at 560 (Apr. 28, 1326). Like New York's law, these early edicts prohibited public carriage absent special governmental permission and enforced that prohibition on pain of punishment.

The Court seems to suggest that these early regulations are irrelevant because they were enacted during a time of "turmoil" when "malefactors . . . harried the country, committing assaults and murders." *Ante,* at 31 (internal quotation marks omitted). But it would seem to me that what the Court characterizes as a "right of armed self-defense" would be more, rather than less, necessary during a time of "turmoil." *Ante,* at 20. The Court also suggests that laws that were enacted before firearms arrived in England, like

36  NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

these early edicts and the subsequent Statute of Northampton, are irrelevant. *Ante,* at 32. But why should that be? Pregun regulations prohibiting "going armed" in public illustrate an entrenched tradition of restricting public carriage of weapons. That tradition seems as likely to apply to firearms as to any other lethal weapons—particularly if we follow the Court's instruction to use analogical reasoning. See *ante,* at 19–20. And indeed, as we shall shortly see, the most significant prefirearm regulation of public carriage—the Statute of Northampton—was in fact applied to guns once they appeared in England. See *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)

The Statute of Northampton was enacted in 1328. 2 Edw. 3, 258, c. 3. By its terms, the statute made it a criminal offense to carry arms without the King's authorization. It provided that, without such authorization, "no Man great nor small, of what Condition soever he be," could "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." *Ibid.* For more than a century following its enactment, England's sheriffs were routinely reminded to strictly enforce the Statute of Northampton against those going armed without the King's permission. See Calendar of the Close Rolls, Edward III, 1330–1333, at 131 (Apr. 3, 1330) (1898); 1 Calendar of the Close Rolls, Richard II, 1377–1381, at 34 (Dec. 1, 1377) (1914); 2 *id.*, Richard II, 1381–1385, at 3 (Aug. 7, 1381) (1920); 3 *id.*, Richard II, 1385–1389, at 128 (Feb. 6, 1386) (1921); *id.*, at 399–400 (May 16, 1388); 4 *id.*, Henry VI, 1441–1447, at 224 (May 12, 1444) (1937); see also 11 Tudor Royal Proclamations, The Later Tudors: 1553–1587, pp. 442–445 (Proclamation 641, 21 Elizabeth I, July 26, 1579) (P. Hughes & J. Larkin eds. 1969).

The Court thinks that the Statute of Northampton "has little bearing on the Second Amendment," in part because

(202)

Cite as: 597 U. S. ____ (2022)          37

BREYER, J., dissenting

it was "enacted . . . more than 450 years before the ratification of the Constitution." *Ante,* at 32. The statute, however, remained in force for hundreds of years, well into the 18th century. See 4 W. Blackstone, Commentaries 148–149 (1769) ("The offence of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; *and is particularly prohibited by the Statute of Northampton*" (first emphasis in original, second emphasis added)). It was discussed in the writings of Blackstone, Coke, and others. See *ibid.*; W. Hawkins, 1 Pleas of the Crown 135 (1716) (Hawkins); E. Coke, The Third Part of the Institutes of the Laws of England 160 (1797). And several American Colonies and States enacted restrictions modeled on the statute. See *infra,* at 40–42. There is thus every reason to believe that the Framers of the Second Amendment would have considered the Statute of Northampton a significant chapter in the Anglo-American tradition of firearms regulation.

The Court also believes that, by the end of the 17th century, the Statute of Northampton was understood to contain an extratextual intent element: the intent to cause terror in others. *Ante,* at 34–38, 41. The Court relies on two sources that arguably suggest that view: a 1686 decision, *Sir John Knight's Case,* and a 1716 treatise written by Serjeant William Hawkins. *Ante,* at 34–37. But other sources suggest that carrying arms in public was prohibited *because* it naturally tended to terrify the people. See, *e.g.,* M. Dalton, The Country Justice 282–283 (1690) ("[T]o wear Armor, or Weapons not usually worn, . . . seems also be a breach, or means of breach of the Peace . . . ; *for* they strike a fear and terror in the People" (emphasis added)). According to these sources, terror was the natural consequence—not an additional element—of the crime.

I find this view more persuasive in large part because it is not entirely clear that the two sources the Court relies on

JA334

38   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

Breyer, J., dissenting

actually support the existence of an intent-to-terrify re-
quirement.   Start with *Sir John Knight's Case*, which, ac-
cording to the Court, considered Knight's arrest for walking
"'about the streets'" and into a church "'armed with guns.'"
*Ante,* at 34 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87
Eng. Rep., at 76).   The Court thinks that Knight's acquittal
by a jury demonstrates that the Statute of Northampton
only prohibited public carriage of firearms with an intent to
terrify.   *Ante,* at 34–35.   But by now the legal significance
of Knight's acquittal is impossible to reconstruct.   Brief for
Patrick J. Charles as *Amicus Curiae* 23, n. 9.   The primary
source describing the case (the English Reports) was noto-
riously incomplete at the time *Sir John Knight's Case* was
decided.   *Id.,* at 24–25.   And the facts that historians can
reconstruct do not uniformly support the Court's interpre-
tation.   The King's Bench required Knight to pay a surety
to guarantee his future good behavior, so it may be more
accurate to think of the case as having ended in "a condi-
tional pardon" than acquittal.   *Young*, 992 F. 3d, at 791; see
also *Rex* v. *Sir John Knight*, 1 Comb. 40, 90 Eng. Rep. 331
(K. B. 1686).   And, notably, it appears that Knight based his
defense on his loyalty to the Crown, not a lack of intent to
terrify.   3 The Entring Book of Roger Morrice 1677–1691:
The Reign of James II, 1685–1687, pp. 307–308 (T. Harris
ed. 2007).

   Similarly, the passage from the Hawkins treatise on
which the Court relies states that the Statute of Northamp-
ton's prohibition on the public carriage of weapons did not
apply to the "wearing of Arms . . . unless it be accompanied
with such Circumstances as are apt to terrify the People."
Hawkins 136.   But Hawkins goes on to enumerate rela-
tively narrow circumstances where this exception applied:
when "Persons of Quality . . . wea[r] common Weapons, or
hav[e] their usual Number of Attendants with them, for
their Ornament or Defence, in such Places, and upon such
Occasions, in which it is the common Fashion to make use

(204)

JA335

BREYER, J., dissenting

of them," or to persons merely wearing "privy Coats of Mail." *Ibid.* It would make little sense if a narrow exception for nobility, see Oxford English Dictionary (3d ed., Dec. 2012), https://www.oed.com/view/Entry/155878 (defining "quality," A.I.5.a), and "privy coats of mail" were allowed to swallow the broad rule that Hawkins (and other commentators of his time) described elsewhere. That rule provided that "there may be an Affray where there is no actual Violence; as where a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People, which is . . . strictly prohibited by [the Statute of Northampton]." Hawkins 135. And it provided no exception for those who attempted to "excuse the wearing such Armour in Publick, by alleging that . . . he wears it for the Safety of his Person from . . . Assault." *Id.,* at 136. In my view, that rule announces the better reading of the Statute of Northampton—as a broad prohibition on the public carriage of firearms and other weapons, without an intent-to-terrify requirement or exception for self-defense.

Although the Statute of Northampton is particularly significant because of its breadth, longevity, and impact on American law, it was far from the only English restriction on firearms or their carriage. See, *e.g.,* 6 Hen. 8 c. 13, §1 (1514) (restricting the use and ownership of handguns); 25 Hen. 8 c. 17, §1 (1533) (same); 33 Hen. 8 c. 6, §§1–2 (1541) (same); 25 Edw. 3, st. 5, c. 2 (1350) (making it a "Felony or Trespass" to "ride armed covertly or secretly with Men of Arms against any other, to slay him, or rob him, or take him, or retain him till he hath made Fine or Ransom for to have his Deliverance") (brackets and footnote omitted). Whatever right to bear arms we inherited from our English forebears, it was qualified by a robust tradition of public carriage regulations.

As I have made clear, I am not a historian. But if the foregoing facts, which historians and other scholars have

40   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

presented to us, are even roughly correct, it is difficult to see how the Court can believe that English history fails to support legal restrictions on the public carriage of firearms.

B. The Colonies.

The American Colonies continued the English tradition of regulating public carriage on this side of the Atlantic.  In 1686, the colony of East New Jersey passed a law providing that "no person or persons . . . shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province."  An Act Against Wearing Swords, &c., ch. 9, in Grants, Concessions, and Original Constitutions of the Province of New Jersey 290 (2d ed. 1881).  East New Jersey also specifically prohibited "planter[s]" from "rid[ing] or go[ing] armed with sword, pistol, or dagger." *Ibid.*  Massachusetts Bay and New Hampshire followed suit in 1692 and 1771, respectively, enacting laws that, like the Statute of Northampton, provided that those who went "armed Offensively" could be punished.  An Act for the Punishing of Criminal Offenders, 1692 Mass. Acts and Laws no. 6, pp. 11–12; An Act for the Punishing of Criminal Offenders, 1771 N. H. Acts and Laws ch. 6, §5, p. 17.

It is true, as the Court points out, that these laws were only enacted in three colonies.  *Ante,* at 37.  But that does not mean that they may be dismissed as outliers.  They were successors to several centuries of comparable laws in England, see *supra,* at 34–40, and predecessors to numerous similar (in some cases, materially identical) laws enacted by the States after the founding, see *infra,* at 41–42.  And while it may be true that these laws applied only to "dangerous and unusual weapons," see *ante,* at 38 (majority opinion), that category almost certainly included guns, see Charles, 60 Clev. St. L. Rev., at 34, n. 181 (listing 18th century sources defining "'offensive weapons'" to include "'Fire Arms'" and "'Guns'"); *State* v. *Huntly*, 25 N. C. 418, 422

(206)

JA337

BREYER, J., dissenting

(1843) (*per curiam*) ("A gun is an 'unusual weapon,' where-
with to be armed and clad"). Finally, the Court points out
that New Jersey's ban on public carriage applied only to
certain people or to the concealed carriage of certain
smaller firearms. *Ante,* at 39–40. But the Court's refusal
to credit the relevance of East New Jersey's law on this ba-
sis raises a serious question about what, short of a "twin"
or a "dead ringer," qualifies as a relevant historical ana-
logue. See *ante,* at 21 (majority opinion) (emphasis de-
leted).

### C. The Founding Era.

The tradition of regulations restricting public carriage of
firearms, inherited from England and adopted by the Colo-
nies, continued into the founding era. Virginia, for exam-
ple, enacted a law in 1786 that, like the Statute of North-
ampton, prohibited any person from "go[ing] nor rid[ing]
armed by night nor by day, in fairs or markets, or in other
places, in terror of the Country." 1786 Va. Acts, ch. 21.
And, as the Court acknowledges, "public-carry restrictions
proliferate[d]" after the Second Amendment's ratification
five years later in 1791. *Ante,* at 42. Just a year after that,
North Carolina enacted a law whose language was lifted
from the Statute of Northampton virtually verbatim (ves-
tigial references to the King included). Collection of Stat-
utes, pp. 60–61, ch. 3 (F. Martin ed. 1792). Other States
passed similar laws in the late-18th and 19th centuries.
See, *e.g.,* 1795 Mass. Acts and Laws ch. 2, p. 436; 1801
Tenn. Acts pp. 260–261; 1821 Me. Laws p. 285; see also
Charles, 60 Clev. St. L. Rev., at 40, n. 213 (collecting
sources).

The Court discounts these laws primarily because they
were modeled on the Statute of Northampton, which it be-
lieves prohibited only public carriage with the intent to ter-
rify. *Ante,* at 41. I have previously explained why I believe

(207)

JA338

42    NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

that preventing public terror was one *reason* that the Stat-
ute of Northampton prohibited public carriage, but not an
*element* of the crime.  See *supra,* at 37–39.  And, consistent
with that understanding, American regulations modeled on
the Statute of Northampton appear to have been under-
stood to set forth a broad prohibition on public carriage of
firearms without any intent-to-terrify requirement.  See
Charles, 60 Clev. St. L. Rev., at 35, 37–41; J. Haywood, A
Manual of the Laws of North-Carolina, pt. 2, p. 40 (3d
ed.1814); J. Ewing, The Office and Duty of a Justice of the
Peace 546 (1805).

The Court cites three cases considering common-law of-
fenses, *ante,* at 42–44, but those cases do not support the
view that only public carriage in a manner likely to terrify
violated American successors to the Statute of Northamp-
ton.  If anything, they suggest that public carriage of fire-
arms was not common practice.  At least one of the cases
the Court cites, *State* v. *Huntly*, wrote that the Statute of
Northampton codified a pre-existing common-law offense,
which provided that "riding or going armed with dangerous
or unusual weapons, is a crime against the public peace, *by*
terrifying the good people of the land." 25 N. C., at 420–421
(quoting 4 Blackstone, Commentaries, at 149; emphasis
added).  *Huntly* added that "[a] gun is an 'unusual weapon'"
and that "[n]o man amongst us carries it about with him, as
one of his every-day accoutrements—as a part of his dress—
and never, we trust, will the day come when any deadly
weapon will be worn or wielded in our peace-loving and law-
abiding State, as an appendage of manly equipment." 25
N. C., at 422.  True, *Huntly* recognized that citizens were
nonetheless "at perfect liberty" to carry for "lawful pur-
pose[s]"—but it specified that those purposes were "busi-
ness or amusement." *Id.,* at 422–423.  New York's law sim-
ilarly recognizes that hunting, target shooting, and certain
professional activities are proper causes justifying lawful
carriage of a firearm. See *supra,* at 12–13.  The other two

(208)

JA339

Cite as: 597 U. S. ____ (2022)          43

BREYER, J., dissenting

cases the Court cites for this point similarly offer it only
limited support—either because the atextual intent ele-
ment the Court advocates was irrelevant to the decision's
result, see *O'Neill* v. *State*, 16 Ala. 65 (1849), or because the
decision adopted an outlier position not reflected in the
other cases cited by the Court, see *Simpson* v. *State*, 13
Tenn. 356, 360 (1833); see also *ante,* at 42–43, 57 (majority
opinion) (refusing to give "a pair of state-court decisions"
"disproportionate weight"). The founding-era regulations—
like the colonial and English laws on which they were mod-
eled—thus demonstrate a longstanding tradition of broad
restrictions on public carriage of firearms.

D. The 19th Century.

Beginning in the 19th century, States began to innovate
on the Statute of Northampton in at least two ways. First,
many States and Territories passed bans on concealed car-
riage or on any carriage, concealed or otherwise, of certain
concealable weapons. For example, Georgia made it unlaw-
ful to carry, "unless in an open manner and fully exposed to
view, any pistol, (except horseman's pistols,) dirk, sword in
a cane, spear, bowie-knife, or any other kind of knives, man-
ufactured and sold for the purpose of offence and defence."
Ga. Code §4413 (1861). Other States and Territories en-
acted similar prohibitions. See, *e.g.,* Ala. Code §3274 (1852)
(banning, with limited exceptions, concealed carriage of "a
pistol, or any other description of fire arms"); see also *ante,*
at 44, n. 16 (majority opinion) (collecting sources). And the
Territory of New Mexico appears to have banned all car-
riage whatsoever of "any class of pistols whatever," as well
as "bowie kni[ves,] . . . Arkansas toothpick[s], Spanish dag-
ger[s], slung-shot[s], or any other deadly weapon." 1860
Terr. of N. M. Laws §§1–2, p. 94. These 19th-century bans
on concealed carriage were stricter than New York's law,
for they prohibited concealed carriage with at most limited
exceptions, while New York permits concealed carriage

(209)

JA340

44   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

with a lawfully obtained license.  See *supra,* at 12.  Moreover, as *Heller* recognized, and the Court acknowledges, "the majority of the 19th-century courts to consider the question held that [these types of] prohibitions on carrying concealed weapons *were lawful* under the Second Amendment or state analogues."  554 U. S., at 626 (emphasis added); see also *ante,* at 44.

The Court discounts this history because, it says, courts in four Southern States suggested or held that a ban on concealed carriage was only lawful if open carriage or carriage of military pistols was allowed.  *Ante,* at 44–46.  (The Court also cites *Bliss* v. *Commonwealth,* 12 Ky. 90 (1822), which invalidated Kentucky's concealed-carry prohibition as contrary to that State's Second Amendment analogue.  *Id.,* at 90–93.  *Bliss* was later overturned by constitutional amendment and was, as the Court appears to concede, an outlier.  See *Peruta* v. *County of San Diego,* 824 F. 3d 919, 935–936 (CA9 2016); *ante,* at 45.)  Several of these decisions, however, emphasized States' leeway to regulate firearms carriage as necessary "to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence."  *State* v. *Smith,* 11 La. 633 (1856); see also *Andrews* v. *State,* 50 Tenn. 165, 179–180 (1871) (stating that "the right to *keep*" rifles, shotguns, muskets, and repeaters could not be "*infringed* or *forbidden,*" but "[t]heir *use* [may] be subordinated to such regulations and limitations as are or may be authorized by the law of the land, passed to subserve the general good, so as not to infringe the right secured and the necessary incidents to the exercise of such right"); *State* v. *Reid,* 1 Ala. 612, 616 (1840) (recognizing that the constitutional right to bear arms "necessarily . . . leave[s] with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals").  And other courts upheld concealed-carry restrictions without any reference to an exception allowing

(210)

Cite as: 597 U. S. \_\_\_\_ (2022)      45

BREYER, J., dissenting

open carriage, so it is far from clear that the cases the Court cites represent a consensus view. See *State* v. *Mitchell*, 3 Blackf. 229 (Ind. 1833); *State* v. *Buzzard*, 4 Ark. 18 (1842). And, of course, the Court does not say whether the result in this case would be different if New York allowed open carriage by law-abiding citizens as a matter of course.

The second 19th-century innovation, adopted in a number of States, was surety laws. Massachusetts' surety law, which served as a model for laws adopted by many other States, provided that any person who went "armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon," and who lacked "reasonable cause to fear an assualt [*sic*]," could be made to pay a surety upon the "complaint of any person having reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, §16 (1836). Other States and Territories enacted identical or substantially similar laws. See, *e.g.,* Me. Rev. Stat., ch. 169, §16 (1840); Mich. Rev. Stat., ch. 162, §16 (1846); Terr. of Minn. Rev. Stat., ch. 112, §18 (1851); 1854 Ore. Stat., ch. 16, §17; W. Va. Code, ch. 153, §8 (1868); 1862 Pa. Laws p. 250, §6. These laws resemble New York's licensing regime in many, though admittedly not all, relevant respects. Most notably, like New York's proper cause requirement, the surety laws conditioned public carriage in at least some circumstances on a special showing of need. Compare *supra,* at 13, with Mass. Rev. Stat., ch. 134, §16.

The Court believes that the absence of recorded cases involving surety laws means that they were rarely enforced. *Ante,* at 49–50. Of course, this may just as well show that these laws were normally followed. In any case, scholars cited by the Court tell us that "traditional case law research is not especially probative of the application of these restrictions" because "in many cases those records did not survive the passage of time" or "are not well indexed or digitally searchable." E. Ruben & S. Cornell, Firearms

(211)

JA342

46   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L. J. Forum 121, 130–131, n. 53 (2015). On the contrary, "the fact that restrictions on public carry were well accepted in places like Massachusetts and were included in the relevant manuals for justices of the peace" suggests "that violations were enforced at the justice of peace level, but did not result in expensive appeals that would have produced searchable case law." *Id.*, at 131, n. 53 (citation omitted). The surety laws and broader bans on concealed carriage enacted in the 19th century demonstrate that even relatively stringent restrictions on public carriage have long been understood to be consistent with the Second Amendment and its state equivalents.

E. Postbellum Regulation.

After the Civil War, public carriage of firearms remained subject to extensive regulation. See, *e.g.,* Cong. Globe, 39th Cong., 1st Sess., 908 (1866) ("The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons"). Of course, during this period, Congress provided (and commentators recognized) that firearm regulations could not be designed or enforced in a discriminatory manner. See *ibid.*; Act of July 16, 1866, §14, 14 Stat. 176–177 (ensuring that all citizens were entitled to the "full and equal benefit of all laws . . . including the constitutional right to keep and bear arms . . . without respect to race or color, or previous condition of slavery"); see also The Loyal Georgian, Feb. 3, 1866, p. 3, col. 4. But that by-now uncontroversial proposition says little about the validity of nondiscriminatory restrictions on public carriage, like New York's.

What is more relevant for our purposes is the fact that, in the postbellum period, States continued to enact generally applicable restrictions on public carriage, many of

(212)

which were even more restrictive than their predecessors. See S. Cornell & J. Florence, The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation? 50 Santa Clara L. Rev. 1043, 1066 (2010). Most notably, many States and Western Territories enacted stringent regulations that prohibited *any* public carriage of firearms, with only limited exceptions. For example, Texas made it a misdemeanor to carry in public "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense" absent "reasonable grounds for fearing an [immediate and pressing] unlawful attack." 1871 Tex. Gen. Laws ch. 34, §1. Similarly, New Mexico made it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory." 1869 Terr. of N. M. Laws ch. 32, §1. New Mexico's prohibition contained only narrow exceptions for carriage on a person's own property, for self-defense in the face of immediate danger, or with official authorization. *Ibid.* Other States and Territories adopted similar laws. See, *e.g.,* 1875 Wyo. Terr. Sess. Laws ch. 52, §1; 1889 Idaho Terr. Gen. Laws §1, p. 23; 1881 Kan. Sess. Laws §23, p. 92; 1889 Ariz. Terr. Sess. Laws no. 13, §1, p. 16.

When they were challenged, these laws were generally upheld. P. Charles, The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters, 64 Clev. St. L. Rev. 373, 414 (2016); see also *ante,* at 56–57 (majority opinion) (recognizing that postbellum Texas law and court decisions support the validity of New York's licensing regime); *Andrews,* 50 Tenn., at 182 (recognizing that "a man may well be prohibited from carrying his arms to church, or other public assemblage," and that the carriage of arms other than rifles, shot guns, muskets, and repeaters "may be prohibited if the Legislature

48   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

deems proper, absolutely, at all times, and under all cir-
cumstances").

The Court's principal answer to these broad prohibitions
on public carriage is to discount gun control laws passed in
the American West. *Ante,* at 58–61. It notes that laws en-
acted in the Western Territories were "rarely subject to ju-
dicial scrutiny." *Ante,* at 60. But, of course, that may well
mean that "[w]e . . . can assume it settled that these" regu-
lations were "consistent with the Second Amendment." See
*ante,* at 21 (majority opinion). The Court also reasons that
laws enacted in the Western Territories applied to a rela-
tively small portion of the population and were compara-
tively short lived. See *ante,* 59–61. But even assuming that
is true, it does not mean that these laws were historical ab-
errations. To the contrary, bans on public carriage in the
American West and elsewhere constitute just one chapter
of the centuries-old tradition of comparable firearms regu-
lations described above.

F. The 20th Century.

The Court disregards "20th-century historical evidence."
*Ante,* at 58, n. 28. But it is worth noting that the law the
Court strikes down today is well over 100 years old, having
been enacted in 1911 and amended to substantially its pre-
sent form in 1913. See *supra,* at 12. That alone gives it a
longer historical pedigree than at least three of the four
types of firearms regulations that *Heller* identified as "pre-
sumptively lawful." 554 U. S., at 626–627, and n. 26; see C.
Larson, Four Exceptions in Search of a Theory: *District of
Columbia* v. *Heller* and Judicial *Ipse Dixit*, 60 Hastings
L. J. 1371, 1374–1379 (2009) (concluding that "'prohibi-
tions on the possession of firearms by felons and the men-
tally ill [and] laws imposing conditions and qualifications
on the commercial sale of arms'" have their origins in the
20th century); *Kanter* v. *Barr*, 919 F. 3d 437, 451 (CA7
2019) (Barrett, J., dissenting) ("Founding-era legislatures

(214)

BREYER, J., dissenting

did not strip felons of the right to bear arms simply because
of their status as felons"). Like JUSTICE KAVANAUGH, I un-
derstand the Court's opinion today to cast no doubt on that
aspect of *Heller*'s holding. *Ante,* at 3 (concurring opinion).
But unlike JUSTICE KAVANAUGH, I find the disconnect be-
tween *Heller*'s treatment of laws prohibiting, for example,
firearms possession by felons or the mentally ill, and the
Court's treatment of New York's licensing regime, hard to
square. The inconsistency suggests that the Court today
takes either an unnecessarily cramped view of the relevant
historical record or a needlessly rigid approach to analogi-
cal reasoning.

<div align="center">*     *     *</div>

The historical examples of regulations similar to New
York's licensing regime are legion. Closely analogous Eng-
lish laws were enacted beginning in the 13th century, and
similar American regulations were passed during the colo-
nial period, the founding era, the 19th century, and the 20th
century. Not all of these laws were identical to New York's,
but that is inevitable in an analysis that demands exami-
nation of seven centuries of history. At a minimum, the
laws I have recounted *resembled* New York's law, similarly
restricting the right to publicly carry weapons and serving
roughly similar purposes. That is all that the Court's test,
which allows and even encourages "analogical reasoning,"
purports to require. See *ante,* at 21 (disclaiming the neces-
sity of a "historical *twin*").

In each instance, the Court finds a reason to discount the
historical evidence's persuasive force. Some of the laws
New York has identified are too old. But others are too re-
cent. Still others did not last long enough. Some applied to
too few people. Some were enacted for the wrong reasons.
Some may have been based on a constitutional rationale
that is now impossible to identify. Some arose in histori-
cally unique circumstances. And some are not sufficiently

50   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

analogous to the licensing regime at issue here.  But if the examples discussed above, taken together, do not show a tradition and history of regulation that supports the validity of New York's law, what could?  Sadly, I do not know the answer to that question.  What is worse, the Court appears to have no answer either.

V

We are bound by *Heller* insofar as *Heller* interpreted the Second Amendment to protect an individual right to possess a firearm for self-defense.  But *Heller* recognized that that right was not without limits and could appropriately be subject to government regulation.  554 U. S., at 626–627.  *Heller* therefore does not require holding that New York's law violates the Second Amendment.  In so holding, the Court goes beyond *Heller*.

It bases its decision to strike down New York's law almost exclusively on its application of what it calls historical "analogical reasoning."  *Ante,* at 19–20.  As I have admitted above, I am not a historian, and neither is the Court.  But the history, as it appears to me, seems to establish a robust tradition of regulations restricting the public carriage of concealed firearms.  To the extent that any uncertainty remains between the Court's view of the history and mine, that uncertainty counsels against relying on history alone.  In my view, it is appropriate in such circumstances to look beyond the history and engage in what the Court calls means-end scrutiny.  Courts must be permitted to consider the State's interest in preventing gun violence, the effectiveness of the contested law in achieving that interest, the degree to which the law burdens the Second Amendment right, and, if appropriate, any less restrictive alternatives.

The Second Circuit has previously done just that, and it held that New York's law does not violate the Second Amendment.  See *Kachalsky*, 701 F. 3d, at 101.  It first evaluated the degree to which the law burdens the Second

(216)

Cite as: 597 U. S. ____ (2022)      51

BREYER, J., dissenting

Amendment right to bear arms. *Id.,* at 93–94. It concluded that the law "places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public," but does not burden the right to possess a firearm in the home, where *Heller* said "'the need for defense of self, family, and property is most acute.'" *Kachalsky*, 701 F. 3d, at 93–94 (quoting *Heller,* 554 U. S., at 628). The Second Circuit therefore determined that the law should be subject to heightened scrutiny, but not to strict scrutiny and its attendant presumption of unconstitutionality. 701 F. 3d, at 93–94. In applying such heightened scrutiny, the Second Circuit recognized that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention." *Id.,* at 97. I agree. As I have demonstrated above, see *supra,* at 3–9, firearms in public present a number of dangers, ranging from mass shootings to road rage killings, and are responsible for many deaths and injuries in the United States. The Second Circuit then evaluated New York's law and concluded that it is "substantially related" to New York's compelling interests. *Kachalsky*, 701 F. 3d, at 98–99. To support that conclusion, the Second Circuit pointed to "studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces." *Id.,* at 99. We have before us additional studies confirming that conclusion. See, *e.g., supra,* at 19–20 (summarizing studies finding that "may issue" licensing regimes are associated with lower rates of violent crime than "shall issue" regimes). And we have been made aware of no less restrictive, but equally effective, alternative. After considering all of these factors, the Second Circuit held that New York's law does not unconstitutionally burden the right to bear arms under the Second Amendment. I would affirm that holding.

52   NEW YORK STATE RIFLE & PISTOL ASSN., INC. *v.* BRUEN

BREYER, J., dissenting

New York's Legislature considered the empirical evidence about gun violence and adopted a reasonable licensing law to regulate the concealed carriage of handguns in order to keep the people of New York safe. The Court today strikes down that law based only on the pleadings. It gives the State no opportunity to present evidence justifying its reasons for adopting the law or showing how the law actually operates in practice, and it does not so much as acknowledge these important considerations. Because I cannot agree with the Court's decision to strike New York's law down without allowing for discovery or the development of any evidentiary record, without considering the State's compelling interest in preventing gun violence and protecting the safety of its citizens, and without considering the potentially deadly consequences of its decision, I respectfully dissent.

(218)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,    )
                                         )
*Plaintiffs,*                            )
                                         )
v.                                       )    Case No. 8:21-cv-01736-TDC **(L)**
                                         )    Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                  )
                                         )
*Defendant.*                             )

**DECLARATION OF DANIEL CARLIN-WEBER ON BEHALF OF MARYLAND
SHALL ISSUE, INC.**

COMES NOW, the declarant, DANIEL CARLIN-WEBER, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

1. My name is DANIEL CARLIN-WEBER and I am the Chairman of the Board of Directors of MARYLAND SHALL ISSUE, INC., a named plaintiff in the above captioned matter. I execute this declaration on behalf of MARYLAND SHALL ISSUE, INC. I am an adult over the age of 18, a Maryland resident and I am fully competent to give sworn testimony in this matter.

2. I have read and otherwise reviewed the allegations of the Second Amended Complaint in this matter. Based on personal knowledge, I hereby adopt, declare and verify that the factual allegations in the complaint that relate or refer to MARYLAND SHALL ISSUE, INC., are true.

SECOND SUPPLEMENTAL DECLARATION OF DANIEL CARLIN-WEBER - 1

**EXHIBIT E**

JA350

Dated this day of November 28, 2022:

DANIEL CARLIN-WEBER
Chairman of the Board of Directors,
Maryland Shall Issue, Inc.

SECOND SUPPLEMENTAL DECLARATION OF DANIEL CARLIN-WEBER - 2

1

2

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

4    MARYLAND SHALL ISSUE, INC., *et al.*,    )
                                              )
5    *Plaintiffs*,                            )
                                              )
6    v.                                       )    Case No. 8:21-cv-01736-TDC (L)
                                              )    Case No. 8:22-cv-01967-DLB
7                                             )
     MONTGOMERY COUNTY, MD.,                  )
8                                             )
     *Defendant*.                             )
9

10
                    **DECLARATION OF ANDREW RAYMOND**
11

12              COMES NOW, the declarant, ANDREW RAYMOND, and hereby solemnly

13   declares under penalties of perjury and states that based upon personal knowledge that the contents

14   of the following declaration are true:

15              1. My name is ANDREW RAYMOND, and I am named plaintiff in the above-

16   captioned matter and a co-owner of ENGAGE ARMAMENT, LLC, which is also a named plaintiff

17
     in the above captioned matter. I execute this declaration on behalf of myself and on behalf of
18
19   ENGAGE ARMAMENT, LLC. I am an adult over the age of 18, a Maryland resident and I am

20   fully competent to give sworn testimony in this matter.

21              2. I have read and otherwise reviewed the allegations of the Second Amended

22
     Complaint in this matter. Based on personal knowledge, I hereby adopt, declare and verify that
23
     the factual allegations in the complaint that relate or refer to myself and ENGAGE ARMAMENT
24
25   LLC, are true.

26                                          Dated this day of November 28, 2022:
                                            ANDREW RAYMOND
27

28

EXHIBIT F

JA352

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,    )
                                          )
*Plaintiffs*,                             )
                                          )
v.                                        )    Case No. 8:21-cv-01736-TDC **(L)**
                                          )    Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                    )
                                          )
*Defendant*.                              )

**DECLARATION OF CARLOS RABANALES**

COMES NOW, the declarant, CARLOS RABANALES, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

1. My name is CARLOS RABANALES., and I am named plaintiff in the above-captioned matter and a co-owner of ENGAGE ARMAMENT, LLC, which is also a named plaintiff in the above captioned matter.  I execute this declaration on behalf of myself and on behalf of ENGAGE ARMAMENT, LLC.  I am an adult over the age of 18, a Maryland resident and I am fully competent to give sworn testimony in this matter.

2. I have read and otherwise reviewed the allegations of the Second Amended Complaint in this matter.  Based on personal knowledge, I hereby adopt, declare and verify that the factual allegations in the complaint that relate or refer to myself and ENGAGE ARMAMENT, LLC, are true.

_____
Dated this day of November 28, 2022:
CARLOS RABANALES

**EXHIBIT G**

JA353

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,  )
                                        )
*Plaintiffs*,                           )
                                        )
v.                                      )    Case No. 8:21-cv-01736-TDC **(L)**
                                        )    Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                 )
                                        )
*Defendant*.                            )

**DECLARATION OF BRANDON FERRELL**

COMES NOW, the declarant, BRANDON FERRELL, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

1. My name is BRANDON FERRELL, and I am named plaintiff in the above-captioned matter. I am an adult over the age of 18, a Maryland resident and I am fully competent to give sworn testimony in this matter.

2. I have read and otherwise reviewed the allegations of the Second Amended Complaint in this matter. Based on personal knowledge, I hereby adopt, declare and verify that the factual allegations in the complaint that relate or refer to BRANDON FERRELL are true.

*Brandon Ferrell*
_____
Dated this day of November 28, 2022:
BRANDON FERRELL

EXHIBIT H

JA354

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,  )
)
*Plaintiffs*,  )
)
v.  )   Case No. 8:21-cv-01736-TDC (L)
)   Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,  )
)
*Defendant*.  )

**DECLARATION OF DERYCK WEAVER**

COMES NOW, the declarant, DERYCK WEAVER, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

1. My name is DERYCK WEAVER, and I am named plaintiff in the above-captioned matter. I am an adult over the age of 18, a Maryland resident and I am fully competent to give sworn testimony in this matter.

2. I have read and otherwise reviewed the allegations of the Second Amended Complaint in this matter. Based on personal knowledge, I hereby adopt, declare and verify that the factual allegations in the complaint that relate or refer to DERYCK WEAVER are true.

Dated this day of November 28, 2022:
DERYCK WEAVER

**EXHIBIT I**

1

2                    **IN THE UNITED STATES DISTRICT COURT**
3                        **FOR THE DISTRICT OF MARYLAND**

4   MARYLAND SHALL ISSUE, INC., *et al.*,      )
                                               )
5      *Plaintiffs*,                           )
                                               )
6   v.                                         )   Case No. 8:21-cv-01736-TDC (L)
                                               )   Case No. 8:22-cv-01967-DLB
7   MONTGOMERY COUNTY, MD.,                    )
                                               )
8                                              )
9      *Defendant*.                            )

10
                        **DECLARATION OF JOSHUA EDGAR**
11

12          COMES NOW, the declarant, JOSHUA EDGAR, and hereby solemnly declares

13   under penalties of perjury and states that based upon personal knowledge that the contents of the

14   following declaration are true:

15          1. My name is JOSHUA EDGAR, and I am named plaintiff in the above-captioned

16   matter. I am an adult over the age of 18, a Maryland resident and I am fully competent to give

17
     sworn testimony in this matter.
18

19          2. I have read and otherwise reviewed the allegations of the Second Amended

20   Complaint in this matter. Based on personal knowledge, I hereby adopt, declare and verify that

21   the factual allegations in the complaint that relate or refer to JOSHUA EDGAR are true.

22

23

24                                    Dated this day of November 28, 2022:
                                      JOSHUA EDGAR
25

26

27

28
                                 EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,          )
                                               )
*Plaintiffs,*                                  )
                                               )
v.                                             )   Case No. 8:21-cv-01736-TDC **(L)**
                                               )   Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                         )
                                               )
*Defendant.*                                   )

**DECLARATION OF RONALD DAVID**

COMES NOW, the declarant, RONALD DAVID, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

1. My name is RONALD DAVID, and I am named plaintiff in the above-captioned matter and the owner of I.C.E. FIREARMS & DEFENSIVE TRAINING, LLC, which is also a named plaintiff in the above captioned matter. I execute this declaration on behalf of myself and on behalf of I.C.E. FIREARMS & DEFENSIVE TRAINING, LLC. I am an adult over the age of 18, a Maryland resident and I am fully competent to give sworn testimony in this matter.

2. I have read and otherwise reviewed the allegations of the Second Amended Complaint in this matter. Based on personal knowledge, I hereby adopt, declare and verify that the factual allegations in the complaint that relate or refer to myself and I.C.E. FIREARMS & DEFENSIVE TRAINING, LLC, are true.

Dated this day of November 28, 2022:
RONALD DAVID

**EXHIBIT K**

JA357

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.,*          )
                                               )
*Plaintiffs,*                                  )
                                               )
v.                                             )     Case No. 8:21-cv-01736-TDC **(L)**
                                               )     Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                         )
                                               )
*Defendant.*                                   )

**DECLARATION OF NANCY DAVID**

    COMES NOW, the declarant, NANCY DAVID, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

    1. My name is NANCY DAVID, and I am named plaintiff in the above-captioned matter. I am an adult over the age of 18, a Maryland resident and I am fully competent to give sworn testimony in this matter.

    2. I have read and otherwise reviewed the allegations of the Second Amended Complaint in this matter. Based on personal knowledge, I hereby adopt, declare and verify that the factual allegations in the complaint that relate or refer to NANCY DAVID are true.

Dated this day of November 28, 2022:
NANCY DAVID

**EXHIBIT L**

1

2      **IN THE UNITED STATES DISTRICT COURT**
3      **FOR THE DISTRICT OF MARYLAND**

4      MARYLAND SHALL ISSUE, INC., *et al.*,       )
                                                     )
5      *Plaintiffs,*                                 )
                                                     )
6      v.                                            )      Case No. 8:21-cv-01736-TDC **(L)**
                                                     )      Case No. 8:22-cv-01967-DLB
7      MONTGOMERY COUNTY, MD.,                       )
                                                     )
8                                                    )
       *Defendant.*                                 )
9

10                  **DECLARATION OF ELIYAHU SHEMONY**
11
12              COMES NOW, the declarant, ELIYAHU SHEMONY, and hereby solemnly
13     declares under penalties of perjury and states that based upon personal knowledge that the contents
14     of the following declaration are true:
15              1. My name is ELIYAHU SHEMONY, and I am named plaintiff in the above-
16     captioned matter. I am an adult over the age of 18, a Maryland resident and I am fully competent
17     to give sworn testimony in this matter.
18
19              2. I have read and otherwise reviewed the allegations of the Second Amended
20     Complaint in this matter. Based on personal knowledge, I hereby adopt, declare and verify that
21     the factual allegations in the complaint that relate or refer to ELIYAHU SHEMONY are true.
22
23
24                      Dated this day of November 28, 2022:
                        ELIYAHU SHEMONY
25
26
27
28                              **EXHIBIT M**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,     )
                                          )
*Plaintiffs*,                             )
                                          )
v.                                        )     Case No. 8:21-cv-01736-TDC **(L)**
                                          )     Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                    )
                                          )
*Defendant*.                              )

**DECLARATION OF DAVID S. SUSSMAN**

COMES NOW, the declarant, DAVID S. SUSSMAN, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

1. My name is DAVID S. SUSSMAN, and I am member of Maryland Shall Issue, Inc., a plaintiff in the above-captioned matter. I am an adult over the age of 18, a Maryland resident and I am fully competent to give sworn testimony in this matter.

2. I am a retired US Army Officer with multiple overseas deployments. I serve as the volunteer Director of Security and Safety for a Montgomery County synagogue. I initially received my restricted Maryland Wear and Carry Permit exclusively for the purpose of performing my security duties at my synagogue as was specifically identified on that initial permit. I have since been approved for an unrestricted Maryland Wear and Carry Permit that I now hold.

3. We have a small congregation that chooses not to expend its limited budget to hire either off-duty Police Officers or other security services more than is necessary. Because I am a member of the congregation, I am more familiar with the other members, and more aware of what "normal" looks like. I and others like me are the overall best security solution for our

**EXHIBIT N**

congregation at this time of increased hate and violence against the Jewish community and other communities of faith.

4. As a result of the recent law passed in Montgomery County, I am concerned about the lack of clarity as to whether I can lawfully continue to possess a firearm to protect myself while performing overwatch and security duties at my synagogue, which could render the members of my congregation unprotected.

5. I hereby declare and that the factual allegations in the complaint that relate or refer to myself and MARYLAND SHALL ISSUE, INC., are true.

Dated this day of November 30, 2022:
DAVID S. SUSSMAN

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARYLAND SHALL ISSUE, INC., *et al*.,    ) | |
| ) | |
| *Plaintiffs*,    ) | |
| ) | |
| v.    ) | Case No. 8:21-cv-01736-TDC **(L)** |
| ) | Case No. 8:22-cv-01967-DLB |
| MONTGOMERY COUNTY, MD.,    ) | |
| ) | |
| *Defendant*.    ) | |

**DECLARATION OF ALLAN D. BARALL**

        COMES NOW, the declarant, ALLAN D. BARALL, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true to the best of my knowledge:

        1. My name is ALLAN D. BARALL, and I am member of Maryland Shall Issue, Inc., a plaintiff in the above-captioned matter. I am an adult over the age of 18, a Montgomery County, Maryland resident and I am fully competent to give sworn testimony in this matter.

        2. I am a member of my Jewish synagogue in Potomac, and I serve as a volunteer plain-clothed armed security member of that synagogue located in Montgomery County, Maryland with the permission of the rabbi and synagogue leadership.

        3. I chose to obtain my wear and carry handgun permit in 2020 at the request of the synagogue's rabbi. In addition to myriad notable international Antisemitic incidents that that took place prior to that year, according to the Anti-Defamation League in 2019 there were 2,107 anti-Semitic incidents recorded in the United States that year alone. Following the deadly October 2018 armed attack against the Tree of Life – Or L'Simcha Congregation in Pittsburgh, Pennsylvania, in

1

**EXHIBIT O**

JA362

2019 there were multiple violent attacks, including: an April 2019 armed attack against Chabad of Poway synagogue in Poway, California; a December 2019 knife attack against rabbi in Monsey, New York, and a December 2019 attack in a kosher grocery store in Jersey City, New Jersey.  In addition to service attendees, worshippers, and guests in our synagogue, we also have multiple priceless Hebrew Torah Scrolls that are adorned with silver. These Torah scrolls are routinely taken out of their storage for use during religious services, in preparation for upcoming services, and for frequent adjustment, checking, and repair.  In light of all of this, my synagogue's rabbi requested that I serve as an armed volunteer to enhance our security.

4. The unfortunate trend of Antisemitism I cite above has only gotten worse according to publicly available religious bias and hate crimes reports from both the Anti-Defamation League and the Federal Bureau of Investigation.  And, in 2021 while I was walking along a busy road to my synagogue for Sabbath services on a Saturday morning, the occupant of a passing car yelled an Antisemitic statement at me.

5. By way of background, I am a retired and decorated United States Army colonel. I faithfully served as an Army military intelligence officer for over 31 years with a security clearance above Top Secret and with polygraphs.  I served in Special Forces and Special Operations units in Afghanistan and other global locations, in major intelligence organizations, at the White House on the National Security Council staff, and at the Pentagon on the staff of the Chairman of the Joint Chiefs of Staff.  In one assignment with an Army unit designated to provide support to United States embassies I routinely qualified with weapons to the same certification standard as US Department of State Diplomatic Security officers on dynamic ranges.

6. In another synagogue that my family and I previously attended, I stood up, led, and managed a comprehensive security operation.  While effective, it was also required a

2

significant amount of manpower to staff multiple shifts across Saturday Sabbaths and many holidays throughout the year alongside paid off-duty and retired law enforcement officers hired by the synagogue.  While the off-duty and/or retired law enforcement officers are professional, they are also expensive and limited to working very few hours one day per week during the main service in the morning.  However, synagogues hold services and classes almost every day on weekdays, weekends, and government holidays.  Most importantly, the law enforcement officers generally lacked the innate awareness of Jewish cultural nuances and behaviors that indicate someone just doesn't belong at the synagogue at that time.

7. By its text, Bill 21-22E bans me and others with similar backgrounds, dispositions, and bona fides from wear and carry of firearms for protection at our synagogue, which is physically situated close to a road with relatively easy access.  Our current wear and carry permits, granted by the Maryland State Police after background checks, are no longer sufficient for carry in my synagogue, despite the request of my rabbi, under Montgomery passage of Bill 21-22E.  This exposes my synagogue, its property, and its members and guests – my friends and neighbors – to the very real risk of not being armed in the fact of an attack, like those I describe above.

8. It is my opinion that the result of Bill 21-22E infringes on my personal right of self-defense, on the collective rights of my congregation to permit and choose members to be armed, and creates risk in the face of an attack such as I describe above.  It is ironic that my rabbi, my community, the United States government and United States Armed Forces, and the State of Maryland trust me to be armed, but Montgomery County does not.

9. I hereby declare that the factual allegations in the complaint that relate or refer to myself and my synagogue are true to the best of my knowledge.

3

*/s/ Allan D. Barall*

Dated: December 1, 2022:
ALLAN D. BARALL

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,    )
                                         )
*Plaintiffs*,                            )
                                         )
v.                                       )    Case No. 8:21-cv-01736-TDC **(L)**
                                         )    Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                   )
                                         )
*Defendant*.                             )

### DECLARATION OF JOHN DOE NO.1

COMES NOW, the declarant, JOHN DOE NO.1, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

1. My name is JOHN DOE NO.1, and I am member of Maryland Shall Issue, Inc., a plaintiff in the above-captioned matter. I am an adult over the age of 18, a Montgomery County Maryland resident and I am fully competent to give sworn testimony in this matter. JOHN DOE NO. 1 is not my real name. I respectfully request that my identity remain anonymous. While I provide armed security to my synagogue, I have done so anonymously and the effectiveness of that security would be undermined if my role in doing so became public knowledge. Moreover, regretfully, I am concerned that my livelihood would be jeopardized should I be publicly associated with pro-Second Amendment advocacy.

2. I am an Orthodox Jew with a background in both armed and unarmed self-defense. I serve (anonymously) as a volunteer plain-clothed armed security member of an Orthodox synagogue located in Montgomery County Maryland at the request of the synagogue's Board and Rabbi ("leadership").

**EXHIBIT P**

JA366

3. At the request of the synagogue leadership, I initially applied for and received a restricted Maryland Wear and Carry Permit allowing me to be armed to, from and in the synagogue. Since then, I have been approved for and hold an unrestricted Maryland Wear and Carry Permit.

4. When I was originally asked to act in an armed security role, the synagogue's leadership were very concerned for the safety, welfare and security of our congregants. During the prior year, a Rabbi in Florida was murdered going to synagogue. Terrorists had attacked and killed all the members of the Mumbai (Bombay) Chabad Synagogue in India. Serious armed attacks against Jewish institutions in the U.S. had occurred in Los Angeles, Washington D.C., New York, Baltimore, and many other cities. Many congregants were killed at a synagogue in Har Nof Jerusalem; four people were executed at the Hyper Cacher market (Kosher Supermarket) in Paris; a congregant was killed outside the synagogue in Copenhagen, a child and son of the Chabad Rabbi were attacked in New Zealand.

5. More recently there were the tragic attacks on the Tree of Life Synagogue in Pittsburgh, Pennsylvania and the Poway Chabad Synagogue in California, that left many innocent congregants dead. There are nearly daily assaults on Jews in New York and across the country.

6. In the very recent past and very nearby, there has been vile anti-Semitic graffiti spray-painted on the fence at the entrance of the Bethesda Trolley Trail that included the images of three hanging bodies and the words, "no mercy for jews." I understand that this was the second such incident at this location this year. In fact, our synagogue has been defaced with anti-Semitic graffiti.

7. Even closer to home the avowed Neo-Nazi, who lives very close to our synagogue and who openly wears a shirt displaying a large swastika, has verbally accosted some of our synagogue members (these incidents have been reported to the police). While walking to

and from synagogue, I have been taunted and verbally accosted by passing motorists who have spit at me, called me "dirty Jew" and thrown loose change at me.

8. While our synagogue has a strong cooperative relationship with our local Montgomery County Police and the Maryland State Police, we are small and cannot afford to hire either off-duty Police Officers or other security services on a full-time basis. We also know the police are spread thin and a terrorist can inflict a great deal of harm before police could arrive at our location. In our congregation, small prayer groups meet early in the morning as well as in the late evening each day and are particularly vulnerable at these times. Because I am a long-time member of our congregation that regularly attends daily (both morning and evening), I know everyone who may be expected to visit, and who may require enhanced scrutiny, and I am well-situated to respond to a threat, should one G-d forbid, occur.

9. By its text, Bill 21-22E has banned the possession and transport of firearms at and within 100 yards of a "house of worship." That ban has stripped Jewish synagogues in the County of the armed protection provided by members of their congregations like me, thus leaving these places of worship vulnerable to attack. The urgency and need for such protection cannot be overstated.

10. I hereby declare that the factual allegations in the complaint that relate or refer to myself are true.

/s John Doe No. 1

Dated this day of November 30, 2022:
JOHN DOE NO.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,        )
                                             )
*Plaintiffs*,                                )
                                             )
v.                                           )   Case No. 8:21-cv-01736-TDC **(L)**
                                             )   Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                       )
                                             )
*Defendant*.                                 )

**DECLARATION OF JOHN DOE NO.2**

COMES NOW, the declarant, JOHN DOE NO.2, and hereby solemnly declares under penalties of perjury and states that, based upon personal knowledge, the contents of the following declaration are true:

1. My name is [JOHN DOE NO.2]; my true identity is being withheld for fear of being stigmatized or retaliated against, either professionally or personally, both of which are unfortunately becoming more prevalent in the current cultural and political climate. I am concerned that should my name become a matter of public record or even unintentionally leaked to the public, my professional reputation and ability to earn a livelihood to support my family could be negatively affected. I am also concerned for the social effects on my children should my name be publicly associated with an issue that many people do not fully appreciate and with regard to which many people are intolerant and would not hesitate to demonize me and my children. I am a member of Maryland Shall Issue, Inc., a plaintiff in the above-captioned matter. I am an adult over the age of 18, a resident of Montgomery County, Maryland and I am fully competent to give sworn testimony in this matter.

**EXHIBIT Q**

2. In addition to being a resident of Montgomery County, I have been a Maryland Wear and Carry Permit holder for nearly five years.  I have over twenty-five years of experience and training in self-defense and have completed countless hours of firearms safety and skill training, with instruction from military, law enforcement and civilian instructors.  I currently serve as the chair of my synagogue's security committee and volunteer as a member of our synagogue's small and discrete armed security team at the request of our Rabbi.  As the grandchild of four Holocaust survivors, I had a conversation with my synagogue Rabbi in 2016 wherein I voiced concerns regarding the alarming rise in attacks against synagogues, Jewish institutions, and Jewish individuals.  The Rabbi shared my concerns and agreed that our small synagogue needed a small group of well-trained, responsible, armed congregants willing and able to defend the synagogue's congregants, until police arrived, in case of emergency (including in the event of an attack on the synagogue by individuals with weapons).  It was for this reason that I initially obtained my Wear and Carry Permit at the request of my synagogue's Rabbi, and as an identifiably Jewish individual, this continues to be one of the main reasons that I have legally carried a firearm for the past five years.

3. Over the last few years, there has been a marked increase in the frequency of attacks against synagogues, Jewish institutions and Jewish individuals worldwide, nationally and on the East Coast (Pittsburgh, New York, Florida and right here in Montgomery County).  Most recently, antisemitic and vandalistic threats were made against the Montgomery County Jewish community - in the past 2 weeks, there have been at least two incidents of antisemitic graffiti (one at the Bethesda Trolley Trail, which  including the words, "no mercy for Jews" and murderous depictions of lynchings or hangings and another with swastikas near the intersection of Old Georgetown Road and Tuckerman Lane) and prior to that there was an incident in August 2022.

which included swastikas and white power symbols. There have even been incidents over the past few months (which have been reported to the county police department) of members of our synagogue and other synagogues nearby being accosted, taunted and even threatened while walking to synagogue. There is also an individual who lives within walking distance of our synagogue and at least two other synagogues, a Jewish daycare facility a Jewish school (and various other places of worship and schools) who has a military background, but appears to suffer from mental illness and regularly wears a T-shirt depicting a swastika and who has verbally accosted members of the Jewish community. The police have stated that his speech is constitutionally protected and there's nothing they can do unless and until he breaks a law or harms a member of the community. His antagonism towards the local Jewish community combined with his mental illness and his military training creates a potentially volatile and dangerous situation for the members of the local Jewish community, the nearby houses of worship and Jewish institutions and the visibly Jewish children in our neighborhood. Should this individual suffer some sort of "psychological break" or psychological episode, it will likely not matter to him that he is within 100 yards of a "place of public assembly" as defined in the Montgomery County Code and prohibiting law-abiding citizens from having the means to protect themselves and their loved ones, will likely only increase the harm inflicted in any potentially violent attack by this individual on what he now knows to be an unarmed and unprotected community. Montgomery County Bill 21-22E disarms the Jewish community and other communities of faith, hamstrings our ability to protect ourselves and our loved ones and makes us and our institutions softer and more vulnerable targets for anyone wishing to attack Jews and cause death and suffering to an already vulnerable community and who, by dint of the fact that he or she wishes to illegally harm others, quite

obviously does not care about any legal restrictions imposed by law on the law-abiding citizens of our county or the State of Maryland.

4. Our synagogue is a small Jewish congregation that cannot afford to hire armed security or off-duty police officers at every service (3 times per day, 365 days per year). Additionally, as a member who attends services regularly, I am in many ways better-suited to notice things that are out of the ordinary or individuals who are potential threats than the random employee of a security guard company or a random police officer. In today's climate of increased antisemitism and violence against synagogues and other Jewish institutions as well as other communities of faith, it is imperative that members of all faiths be able to feel safe and secure in their houses of worship and have the means to protect themselves with any lifesaving means if threatened by violent criminals who, in any case, ignore the laws and do not apply for Maryland Wear and Carry permits prior to committing crimes.

5. In this time of rising crime rates and increased threat against the Jewish community, prohibiting members of the Jewish community (and other faith communities) from carrying firearms for self-defense and personal protection (a) makes our institutions more vulnerable to attack by those evil individuals and groups who wish to do us harm and have no regard for the laws in any event and (b) forces individuals to choose between (i) their desire to be safe and secure in their places of worship, (ii) their desire to be law-abiding citizens, and (iii) their desire to freely and openly practice their religious faith, protected by the First and Fourteenth Amendments of the Constitution of the United States, as well as the Declaration of Rights of the Constitution of Maryland.

6. As a visible and identifiable Jewish individual, I regularly and legally carry a loaded firearm nearly everywhere I go, which includes parks, the private Jewish day school that

my children attend, libraries, recreational facilities, healthcare facilities, and childcare facilities. Furthermore, because my home is located within 100 yards of a house of worship, under Montgomery County Bill 21-22E, I am prohibited from leaving my house with a firearm (including in my own yard). Additionally, the roads in my neighborhood and those on which I commute daily are lined by houses of worship, schools, parks, healthcare facilities, recreational facilities, long-term facilities and childcare facilities, as such Montgomery County Bill 21-22E, prohibits me from leaving my home with my firearm.

7. I hereby declare that the factual allegations in the complaint that relate or refer to myself and MARYLAND SHALL ISSUE, INC., are true.

/s/ John Doe No.2

Dated this day of November 30, 2022:
JOHN DOE NO.2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al*.,   )
                               )
*Plaintiffs*,             )
                               )
v.                            )   Case No. 8:21-cv-01736-TDC **(L)**
                               )   Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,   )
                               )
*Defendant*.           )

**DECLARATION OF THOMAS PAINE NO.1**

       COMES NOW, the declarant, THOMAS PAINE NO.1, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

       1. My name is THOMAS PAINE NO.1, and I am member of Maryland Shall Issue, Inc., a plaintiff in the above-captioned matter. I am an adult over the age of 18, a Frederick County Maryland resident and I am fully competent to give sworn testimony in this matter. THOMAS PAINE NO. 1 is not my real name. I respectfully request that my identity remain anonymous. While I provide armed security to my Church, I have done so anonymously and the effectiveness of that security would be undermined if my role in doing so became public knowledge. Moreover, regretfully, I am concerned that my livelihood would be jeopardized should I be publicly associated with pro-Second Amendment advocacy.

       2. I am a Deacon at my Church in Montgomery County and I serve (anonymously) as a volunteer plain-clothed armed security member of my Church located in Montgomery County Maryland with the permission of the pastor and church council.

<div align="center">1</div>

**EXHIBIT R**

3. I chose to obtain my wear and carry permit in 2019 when the church decided to form a security team since the church dealt with large sums of checks and cash during Sunday services. I have attended the church for 53 years and back in the late 80's early 90's the church had anonymous bomb threats against it while my mother was the church secretary to which the Montgomery County police would do patrols on Sundays and Wednesdays during services for a few months. Since the shutdowns of Covid the church can no longer pay for an armed security service, it is now just armed church members providing security for the church. Also due to the violence seen across the country in every day places one might find themselves at a store or church like the Walmart shooting in Chesapeake VA on November 22, 2022 where 6 people were killed and 4 injured; Nightclub shooting in Colorado Springs on November 19, 2022 where 5 people were killed and 25 others were injured; Greenwood Park Mall in Indiana on July 17, 2022 where 3 people were killed before he gunman was killed by an armed citizen stopping the attack; Collierville Kroger Shooting on September 23, 2021 where one was killed and 14 injured; Colorado Springs Shooting at a trailer park on May 9, 2021 where 6 people were killed at a birthday party in a trailer park; West Freeway Church of Christ in White Settlement, Texas on December 29, 2019 where 2 congregants were killed before armed church security ended the threat by shooting the perpetrator; Sutherland Springs Church Shooting in Sutherland Springs, Texas on November 5, 2017 where 26 people were killed and 22 injured; Charleston church shooting in Charleston, South Carolina on June 17, 2015 where 9 congregants were killed. Our church has been concerned for safety for several years as we used to hire an off duty officer to provide security but have moved to armed church members.

2

4. Other religions have also experienced deadly attacks such as Jewish synagogues. Terrorists had attacked and killed all the members of the Mumbai (Bombay) Chabad Synagogue in India. Serious armed attacks against Jewish institutions in the U.S. had occurred in Los Angeles, Washington D.C., New York, Baltimore, and many other cities. Many congregants were killed at a synagogue in Har Nof Jerusalem; four people were executed at the Hyper Cacher market (Kosher Supermarket) in Paris; a congregant was killed outside the synagogue in Copenhagen, a child and son of the Chabad Rabbi were attacked in New Zealand.

5. We know the police are spread thin and a terrorist can inflict great deal of harm before police could arrive at our location. In our congregation, small prayer groups meet early in the morning on weekends as well as in the evening during the week on occasion and are particularly vulnerable at these times. Bill 21-22E has made it impossible for our churches security team members to transport a firearm to the church to protect the members thus leaving us at the mercy of the evil that exists in the world.

6. By its text, Bill 21-22E has banned the possession and transport of firearms at and within 100 yards of health care facilities (doctors' offices, urgent care facilities, nursing homes, hospitals) Parks (any kind) and any government property or facility operated or controlled by Montgomery County. The bill also removes the exception for authorized Maryland Wear and Carry permit holders. The effect of this on any permit holder is that in large parts of the County it is now a crime to carry with a permit in order to protect oneself. It is very difficult to know which one of these restricted places is within 100 yards (300 feet) of any place a permit holder may be. Because of these 100-yard exclusion zones, and the uncertainty concerning their locations, it is difficult if not impossible to transport a firearm in the County, including to and from the Church, with a wear and carry permit.

7. By its text, Bill 21-22E has banned the possession and transport of firearms at and within 100 yards of a "house of worship." That ban has stripped Christian Churches, as well as other houses of worship in the County, of the armed protection provided by members of their congregations like me, thus leaving these places of worship vulnerable to attack. The urgency and need for such protection cannot be overstated.

8. I hereby declare and that the factual allegations in the complaint that relate or refer to myself and my Church are true.

*/s/ Thomas Paine No. 1*

---

Dated: November 30, 2022:
THOMAS PAINE NO.1

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al*.,   )
         )
*Plaintiffs*,   )
         )
v.   )   Case No. 8:21-cv-01736-TDC **(L)**
         )   Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,   )
         )
*Defendant*.   )

**DECLARATION OF JOHN SMITH NO.1**

       COMES NOW, the declarant, JOHN SMITH NO.1, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

       1. My name is JOHN SMITH NO.1, and I am member of Maryland Shall Issue, Inc., a plaintiff in the above-captioned matter.  I am an adult over the age of 18, a Montgomery County Maryland resident and I am fully competent to give sworn testimony in this matter. JOHN SMITH NO. 1 is not my real name. I respectfully request that my identity remain anonymous. While I provide armed security to my Church, I have done so anonymously and the effectiveness of that security would be undermined if my role in doing so became public knowledge.  Moreover, regretfully, I am concerned that my livelihood would be jeopardized should I be publicly associated with pro-Second Amendment advocacy.

       2. I am a Deacon at my Church in Montgomery County and I serve (anonymously) as a volunteer plain-clothed armed security member of my Church located in Montgomery County Maryland with the permission of my pastor and other Deacons.

**EXHIBIT S**

3. After the U.S. Supreme Court's *Bruen* decision in June of this year I decided to obtain a Maryland Wear and Carry Permit for self-defense to include carrying a concealed firearm at church. I applied for and received an unrestricted Maryland Wear and Carry Permit earlier this fall.

4. I chose to obtain a MD wear and Carry permit due to the violence seen across the country in every day places one might find themselves such as a store or church like the Walmart shooting in Chesapeake VA on November 22, 2022 where 6 people were killed and 4 injuried; Nightclub shooting in Colorado Springs on November 19, 2022 where 5 people were killed and 25 others were injured; Greenwood Park Mall in Indiana on July 17, 2022 where 3 people were killed before he gunman was killed by an armed citizen stopping the attack; Collierville Kroger Shooting on September 23, 2021 where one was killed and 14 injured; Colorado Springs Shooting at a trailer park on May 9, 2021 where 6 people were killed at a birthday party in a trailer park; West Freeway Church of Christ in White Settlement, Texas on December 29, 2019 where 2 congregants were killed before armed church security ended the threat by shooting the perpetrator; Sutherland Springs Church Shooting in Sutherland Springs, Texas on November 5, 2017 where 26 people were killed and 22 injured;  Charleston church shooting in Charleston, South Carolina on June 17, 2015 where 9 congregants were killed. Our church has been concerned for safety for several years as we used to hire an off duty officer to provide security but have moved to armed church members.

5. Other religions have also experienced deadly attacks such as Jewish synagogues. Terrorists had attacked and killed all the members of the Mumbai (Bombay) Chabad Synagogue in India.  Serious armed attacks against Jewish institutions in the U.S. had occurred in Los Angeles, Washington D.C., New York, Baltimore, and many other cities.  Many congregants were killed at

a synagogue in Har Nof Jerusalem; four people were executed at the Hyper Cacher market (Kosher Supermarket) in Paris; a congregant was killed outside the synagogue in Copenhagen, a child and son of the Chabad Rabbi were attacked in New Zealand.

6. More recently there were the tragic attacks on the Tree of Life Synagogue in Pittsburgh, Pennsylvania and the Poway Chabad Synagogue in California that left many innocent congregants dead. There are nearly daily assaults on Jews in New York and across the country.

7. We know the police are spread thin and a terrorist can inflict great deal of harm before police could arrive at our location. In our congregation, small prayer groups meet early in the morning on weekends as well as in the evening during the week on occasion and are particularly vulnerable at these times.

8. By its text, Bill 21-22E has banned the possession and transport of firearms at and within 100 yards of health care facilities (doctors offices, urgent care facilities, nursing homes, hospitals) Parks (any kind) and any government property or facility operated or controlled by Montgomery County. The bill also removes the exception for authorized Maryland Wear and Carry permit holders. The effect of this on any permit holder is that in large parts of the County it is now a crime to carry with a permit in order to protect oneself. It is very difficult to know which one of these restricted places is within 100 yards (300 feet) of any place a permit holder may be.

9. By its text, Bill 21-22E has banned the possession and transport of firearms at and within 100 yards of a "house of worship." That ban has stripped Christian Churches, as well as other houses of worship in the County, of the armed protection provided by members of their

congregations like me, thus leaving these places of worship vulnerable to attack. The urgency and need for such protection cannot be overstated.

*/s/ John Smith*

Dated: November 30, 2022:
JOHN SMITH NO. 1

Expedited Bill No. 21-22

Concerning: Weapons – Firearms In or Near Places of Public Assembly

Revised: 11/10/2022 Draft No. 2

Introduced: July 12, 2022

Enacted: November 15, 2022

Executive: November 28, 2022

Effective: November 28, 2022

Sunset Date: None

Ch. 36 , Laws of Mont. Co. 2022

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

Lead Sponsor: Council President Albornoz

Co-Sponsors: Councilmembers Hucker, Friedson, Jawando, Riemer, and Katz; Council Vice-President Glass; and Councilmember Rice

**AN EXPEDITED ACT** to:

(1) prohibit the possession of firearms in or near places of public assembly, with certain exemptions;

(2) remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly; and

(3) generally amend the law regarding restrictions against firearms in the County.

By amending

Montgomery County Code

Chapter 57, Weapons

[[Section]] Sections 57-1, 57-7, and 57-11

| | |
|---|---|
| **Boldface** | *Heading or defined term.* |
| Underlining | *Added to existing law by original bill.* |
| [Single boldface brackets] | *Deleted from existing law by original bill.* |
| Double underlining | *Added by amendment.* |
| [[Double boldface brackets]] | *Deleted from existing law or the bill by amendment.* |
| * * * | *Existing law unaffected by bill.* |

*The County Council for Montgomery County, Maryland approves the following Act:*

EXHIBIT

1

EXPEDITED BILL NO. 21-22

1    **Sec. 1.  [[Section]] <u>Sections 57-1, 57-7, and</u> 57-11 [[is]] <u>are</u> amended as**
2    **follows:**

3    **57-1. Definitions.**

4                              \*        \*        \*

5            *Gun* or *firearm:* Any   rifle,   shotgun,   revolver,   pistol,   ghost   gun,
6            undetectable gun, air gun, air rifle or any similar mechanism by whatever
7            name known which is designed to expel a projectile through a gun barrel
8            by the action of any explosive, gas, compressed air, spring or elastic.

9                              \*        \*        \*

10           (2)      "Ghost gun" means a firearm, including an unfinished frame or
11                    receiver, that<u>:</u>
12                    <u>(A)</u>    lacks a unique serial number engraved or cased in metal
13                           alloy on the frame or receiver by a licensed manufacturer,
14                           maker or importer [[under]] <u>in accordance with</u> federal law
15                           [or]<u>; and</u>
16                    <u>(B)</u>    <u>lacks</u> markings <u>and is not registered with the Secretary of</u>
17                           <u>the State Police</u> in accordance with [[27 C.F.R. § 479.102]]
18                           <u>Section 5-703(b)(2)(ii) of the Public Safety Article of the</u>
19                           <u>Maryland Code</u>.
20           [[It]] <u>"Ghost gun"</u> does not include a firearm that has been
21           rendered permanently inoperable, or a firearm that is not required
22           to have a serial number in accordance with the Federal Gun
23           Control Act of 1968.

24                              \*        \*        \*

25           (8)      "Undetectable gun" means:

26                              \*        \*        \*

- 2 -

JA383

EXPEDITED BILL NO. 21-22

| | | |
|---|---|---|
| 27 | (9) | "Unfinished frame or receiver" means a forged, cast, printed, |
| 28 | | extruded, or machined body or similar article that has reached a |
| 29 | | stage in manufacture where it may readily be completed, |
| 30 | | assembled, or converted to be used as the frame or receiver of a |
| 31 | | functional firearm. |
| 32 | | |
| 33 | | *      *      * |

34    *Place of public assembly*: A "place of public assembly" is:

35    (1)    a [[place where the public may assemble, whether the place is]]
36           publicly or privately owned:[[, including a]]
37           (A)    park;
38           (B)    place of worship;
39           (C)    school;
40           (D)    library;
41           (E)    recreational facility;
42           (F)    hospital;
43           (G)    community health center, including any health care facility
44                  or community-based program licensed by the Maryland
45                  Department of Health;
46           (H)    long-term facility, including any licensed nursing home,
47                  group home, or care home; [[or]]
48           (I)    multipurpose exhibition facility, such as a fairgrounds or
49                  conference center; or
50           (J)    childcare facility;
51    (2)    government building, including any place owned by or under the
52           control of the County;

- 3 -

JA384

EXPEDITED BILL NO. 21-22

53    (3)  polling place;

54    (4)  courthouse;

55    (5)  legislative assembly; or

56    (6)  a  gathering  of  individuals  to  collectively  express  their

57       constitutional right to protest or assemble.

58    A "place of public assembly" includes all property associated with the

59    place, such as a parking lot or grounds of a building.

60       *   *   *

61 **57-7. Access to guns by minors.**

62       *   *   *

63  (d)  A  person  must  not  purchase,  sell,  transfer,  possess,  or  [[transfer]]

64    transport a ghost gun, including a gun created through a 3D printing

65    process, in the presence of a minor.

66       *   *   *

67 **57-11.  Firearms in or near places of public assembly.**

68  (a)  In or within 100 yards of a place of public assembly, a person must not:

69    (1)  sell, transfer, possess, or transport a ghost gun, undetectable gun,

70       handgun, rifle, or shotgun, or ammunition or major component for

71       these firearms; or

72    (2)  sell, transfer, possess, or transport a firearm created through a 3D

73       printing process.

74  (b)  This section does not:

75    (1)  prohibit the teaching of firearms safety or other educational or

76       sporting use in the areas described in subsection (a);

77    (2)  apply to a law enforcement officer, or a security guard licensed to

78       carry the firearm;

- 4 -

EXPEDITED BILL NO. 21-22

79       (3)    apply to the possession of a firearm or ammunition, other than a
80                 ghost gun or an undetectable gun, in the person's own home;

81       (4)    apply to the possession of one firearm, and ammunition for the
82                 firearm, at a business by either the owner who has a permit to carry
83                 the firearm, or one authorized employee of the business who has a
84                 permit to carry the firearm; <u>or</u>

85       (5)    [apply to the possession of a handgun by a person who has received
86                 a permit to carry the handgun under State law; or]

87     [(6)]  apply to separate ammunition or an unloaded firearm:

88          (A)   transported in an enclosed case or in a locked firearms rack
89                 on a motor vehicle, unless the firearm is a ghost gun or an
90                 undetectable gun; or

91          (B)   being surrendered in connection with a gun turn-in or
92                 similar program approved by a law enforcement agency.

93                        \*     \*     \*

94     **Sec. 2.  Expedited Effective Date.**  The Council declares that this legislation is
95 necessary for the immediate protection of the public interest.  This Act takes effect on
96 the date on which it becomes law.

97     <u>**Sec. 3. Severability.**  If any provision of this Act, or any provision of Chapter</u>
98 <u>57, is found to be invalid by the final judgment of a court of competent jurisdiction,</u>
99 <u>the remaining provisions must be deemed severable and must continue in full force</u>
100 <u>and effect.</u>

101     <u>**Sec. 4.** This Act and Chapter 57 must be construed in a manner that is consistent</u>
102 <u>with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives,</u>
103 <u>including 87 FR 24652 (effective August 24, 2022), as amended.</u>

- 5 -

EXPEDITED BILL NO. 21-22

*Approved*:

_____    11/17/2022
Gabriel Albornoz, President, County Council                Date

*Approved*:

_____    11/28/2022
Marc Elrich, County Executive                              Date

*This is a correct copy of Council action.*

_____    11/28/2022
Judy Rupp, Clerk of the Council                            Date

- 6 -



**Montgomery County Council**

**Committee:** PS
**Committee Review:** Completed
**Staff:** Christine Wellons, Senior Legislative Attorney
**Purpose:** Final action – vote expected
**Keywords:** #FirearmsInPublicPlaces

AGENDA ITEM #4B
November 15, 2022
**Action**

---

**SUBJECT**

Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly

Lead Sponsors: Council President Albornoz

Co-Sponsors: Councilmembers Hucker, Friedson, Navarro, Jawando, Riemer, and Katz; Council Vice-President Glass; and Councilmember Rice

**EXPECTED ATTENDEES**

N/A

**COUNCIL DECISION POINTS & COMMITTEE RECOMMENDATION**

- Action – Council vote expected
- The Public Safety Committee (3-0) recommends enactment of Bill 21-22 as amended.

**DESCRIPTION/ISSUE**

Expedited Bill 21-22 would:
  (1)   prohibit the possession of firearms in or near places of public assembly, with certain exemptions;
  (2)   remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly: and
  (3)   generally amend the law regarding restrictions against firearms in the County.

**SUMMARY OF KEY DISCUSSION POINTS**

The PS Committee recommends the enactment of Expedited Bill 21-22 with amendments to:

- clarify the definition of "place of public assembly" in light of recent Supreme Court jurisprudence;
- update provisions regarding ghost guns due to changes in Maryland law; and
- expressly add a severability clause to Chapter 57 of the County Code.

**This report contains:**

| | |
|---|---|
| Staff Report | Pages 1-8 |
| Expedited Bill 21-22 | © 1 |
| Legislative Request Report | © 7 |
| Fiscal Impact Statement | © 8 |
| Racial Equity and Social Justice Impact Statement | © 10 |
| Economic Impact Statement | © 16 |
| Public Testimony | © 18 |

**EXHIBIT 2**

*Bruen* Decision                                                © 84

**Alternative format requests for people with disabilities.** If you need assistance accessing this report you may submit alternative format requests to the ADA Compliance Manager. The ADA Compliance Manager can also be reached at 240-777-6197 (TTY 240-777-6196) or at adacompliance@montgomerycountymd.gov

Agenda Item #4B
November 15, 2022
**Action**

# M E M O R A N D U M

November 10, 2022

TO:             County Council

FROM:           Christine Wellons, Senior Legislative Attorney

SUBJECT:        Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly

PURPOSE:        Final action – roll call vote expected

| **Committee recommendation (3-0):** approval of Bill 21-22 with amendments |
| --- |

Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly, sponsored by Lead Sponsor Council President Albornoz and Co-Sponsored by Councilmembers Hucker, Friedson, Navarro, Jawando, Riemer, Katz, Council Vice-President Glass and Councilmember Rice, was introduced on July 12, 2022. A Public Hearing occurred on July 26, 2022 and a Public Safety Committee worksession was held on October 31, 2022. Final action is scheduled for November 15, 2022.

Expedited Bill 21-22 would:

(1)     prohibit the possession of firearms in or near places of public assembly, with certain exemptions;

(2)     remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly: and

(3)     generally amend the law regarding restrictions against firearms in the County.

**BACKGROUND**

In the Supreme Court decision of *New York State Rifle & Pistol Assn. v. Bruen, Superintendent of New York State Police,* Slip Opinion No. 20-843 (June 23, 2022), available at https://www.supremecourt.gov/opinions/21pdf/20-843_7j80.pdf, the Supreme Court overturned a requirement of New York's handgun carry law. The New York law had required an applicant for a handgun carry license to show "proper cause" for the license, and the Supreme Court held that the requirement violated the Second Amendment's right to bear arms. The Court explained, however, that "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutionally permissible.

Like New York, Maryland has a proper-cause requirement for wear-and-carry handgun licenses.  *See* Md. Code Ann., Public Safety Section 5-306.  Governor Hogan, in response to *Bruen*, instructed the Maryland State Police not to enforce the proper-cause element of the Maryland law.  https://governor.maryland.gov/2022/07/05/governor-hogan-directs-maryland-state-police-to-suspend-good-and-substantial-reason-standard-for-wear-and-carry-permits/.  Subsequently, the Court of Special Appeals struck down Maryland's proper cause requirement in late July. *In re Rounds*, 255 Md. App. 205 (2022).

As a result of the Supreme Court eliminating "just cause" requirements, more individuals in Maryland likely will carry firearms, regardless of whether the individuals have any good or substantial reason to carry them.

BILL SPECIFICS

Expedited Bill 21-22 would **prevent an individual from possessing a firearm within 100 yards of a place of public assembly even when the individual has a wear-and-carry permit from the State of Maryland**.  This restriction would strengthen current County law, which exempts individuals with permits from the restriction against carrying weapons within 100 yards of places of public assembly.

LEGAL FRAMEWORK

Maryland law specifically allows counties to regulate the possession of certain firearms within 100 yards of a place of public assembly.  Under the Criminal Law Article of the Maryland Code, § 4-209:

**State preemption**

(a) Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of:

(1) a handgun, rifle, or shotgun; and

(2) ammunition for and components of a handgun, rifle, or shotgun.

**Exceptions**

(b)(1) A county, municipal corporation, or special taxing district **may regulate the purchase, sale, transfer, ownership, possession, and transportation** of the items listed in subsection (a) of this section:

(i) with respect to minors;

(ii) with respect to law enforcement officials of the subdivision; and

(iii) except as provided in paragraph (2) of this subsection, **within 100 yards of or in a park, church, school, public building, and other place of public assembly**.

2

(2) A county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety, or other educational or sporting use of the items listed in subsection (a) of this section.

(Emphasis added).

There are many instances in which the State limits a person's ability to carry a weapon, regardless of whether the person has a permit.  *See* the Maryland State Police website, https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Firearms/WearandCarryPermit.aspx, which lists numerous state areas, such as State parks and State buildings, where a concealed carry permit does not apply.  Currently, the State law prevents permit carriers from possessing firearms at specific locations including school property, state buildings (not County buildings), state parks, the General Assembly, aircraft, Maryland Rest Areas, and certain daycares.  *See id*.

Notably, these restricted areas identified by the State Police do not include certain areas within the County's broader definition of "place of public assembly" – which was amended under Bill 4-21 bill to mean "a place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as a fairgrounds or conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building."

**SUMMARY OF PUBLIC HEARING**

On July 26, 2022, the Council heard extensive testimony regarding Expedited Bill 21-22. (©15).  Many speakers supported the bill as necessary for public safety.  Many speakers opposed the bill based upon Second Amendment and safety concerns.

**SUMMARY OF PUBLIC SAFETY WORKSESSION**

The Committee discussed the following issues, and adopted the following amendments.

1.   **Supreme Court Approach to Identifying "Sensitive Places" – *i.e.*, places where Guns may be Banned**

Prior to *Bruen*, the judicial test to review firearms regulations consisted of two parts: (1) whether a gun regulation was consistent with Constitutional text and history; and (2) whether the regulation satisfied a means-ends balancing test (consisting of strict or intermediate scrutiny). Under *Bruen*, the Court has shifted so that only the first part of the test now matters; if the court concludes that a regulation is not consistent with the Constitutional text and history, it is invalid. It can no longer be resuscitated by a balancing test.

In *Bruen*, the Supreme Court explicitly rejected New York's identification of "sensitive places" where firearms may be banned, even for individuals who have wear-and-carry permits:

Although we have no occasion to comprehensively define "sensitive places" in this case, *we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive*

3

> *places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available."* Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. *But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly.* Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate *the general right to publicly carry arms for self-defense*….

Slip opinion at 21 (emphasis added).

The Court went on to identify five locations – schools, legislative assemblies, government buildings, polling places, and courthouses – it considers to be "sensitive places" where weapons may be totally prohibited. The Court left open the possibility that other locations where weapons were historically banned – or the modern counterparts of those locations – might qualify as "sensitive places."

> ….[A]*nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin*. **So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.**

> Consider, for example, Heller's discussion of *"longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings*." 554 U. S., at 626. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g., legislative assemblies, polling places, and courthouses*—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); see also Brief for Independent Institute as Amicus Curiae 11–17. We therefore can assume it settled that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. *And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible*.

Slip opinion at 21 (emphasis added).

## 2.   Amendments to the Definition of "Place of Public Assembly"

The County currently defines a "place of public assembly" as follows:

> Place of public assembly: A "place of public assembly" is a place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health

4

JA393

center; long-term facility; or multipurpose exhibition facility, such as a fairgrounds or conference center.  A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building. (Sec. 57-1).

In order to make this definition more closely aligned with *Bruen*'s approach to "sensitive places" (as discussed above) – and in order to include places that *Bruen* has specifically said do qualify as "sensitive places" – the Committee voted to adopt the following amendment.

*After line 1, add the following.*

**57-1. Definitions**

\*      \*      \*

Place of public assembly: A "place of public assembly" is:

(1)    a [place where the public may assemble, whether the place is] publicly or privately owned:[, including a]

      (A)    park;

      (B)    place of worship;

      (C)    school;

      (D)    library;

      (E)    recreational facility;

      (F)    hospital;

      (G)    community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;

      (H)    long-term facility, including any licensed nursing home, group home, or care home; [or]

      (I)    multipurpose exhibition facility, such as a fairgrounds or conference center; or

      (J)    childcare facility;

(2)    government building, including any place owned by or under the control of the County;

(3)    polling place;

(4)    courthouse;

(5)    legislative assembly; or

5

(6)    a gathering of individuals to collectively express their constitutional right to protest or assemble.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

\*        \*        \*

**3.     Severability Clause**

Given the fluctuating jurisprudence regarding the Second Amendment, the Committee voted to add a "severability clause" to the bill.  The purpose of the severability clause is to explicitly reflect the Council's intent that if any portion of the bill is found to be invalid, the remainder of the bill must remain in effect.  This is important so that if a court were to strike down portions of the County's law against carrying firearms in "places of public assembly", the remainder of the law would be enforceable.

*After line 31, insert the following.*

**Sec. 3. Severability.**  If any provision of this Act, or any provision of Chapter 57, is found to be invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect.

**4.     Alignment with Maryland Law**

After the adoption of Council Bill 4-21 (Ghost Guns), the General Assembly adopted ghost gun legislation requested by Attorney General Frosh (Chapter 1 of the 2022 Laws of Maryland).

In order to align County ghost gun definitions with those of the new state law – and in order to acknowledge that the ghost gun laws must be interpreted in accordance with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives – the Committee adopted the following amendments.

*After line 1, add the following.*

**57-1. Definitions**

\*        \*        \*

*Gun* or *firearm:* Any rifle, shotgun, revolver, pistol, ghost gun, undetectable gun, air gun, air rifle or any similar mechanism by whatever name known which is designed to expel a projectile through a gun barrel by the action of any explosive, gas, compressed air, spring or elastic.

\*        \*        \*

(2)    "Ghost gun" means a firearm, including an unfinished frame or receiver, that:

6

(A)  lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer [under] in accordance with federal law; and

(B)  lacks markings and is not registered with the Secretary of the State Police in accordance with [27 C.F.R. § 479.102] Section 5-703(b)(2)(ii) of the Public Safety Article of the Maryland Code.

[It] "Ghost gun" does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968.

*    *    *

(8)  "Undetectable gun" means:

*    *    *

(9)  "Unfinished frame or receiver" means a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm.

*Add the following uncodified section to Bill 21-22.*

    **Sec. 4.** This Act and Chapter 57 must be construed in a manner that is consistent with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives, including 87 FR 24652 (effective August 24, 2022), as amended.

**5.    Technical Correction**

    The Committee voted to adopt the following technical amendment to correct a typographical error in Section 57-7(d).

**57-7. Access to guns by minors.**

*    *    *

    (d)    A person must not purchase, sell, transfer, possess, or [transfer] transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

*    *    *

**NEXT STEP:** Roll call vote on whether to enact Expedited Bill 21-22 with amendments, as recommended by the Public Safety Committee.

| This packet contains: | Circle # |
| --- | --- |
| Expedited Bill 21-22 | 1 |
| Legislative Request Report | 7 |
| Fiscal Impact Statement | 8 |

7

Racial Equity and Social Justice Impact Statement     10
Economic Impact Statement     16
Public Testimony     18
*Bruen* Decision     84

JA397

Expedited Bill No. <u>21-22</u>
Concerning: <u>Weapons – Firearms In or Near Places of Public Assembly</u>
Revised: <u>11/10/2022</u> Draft No. <u>2</u>
Introduced: <u>July 12, 2022</u>
Expires: <u>January 12, 2024</u>
Enacted: _____
Executive: _____
Effective: _____
Sunset Date: <u>None</u>
Ch. _____, Laws of Mont. Co. _____

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

Lead Sponsor: Council President Albornoz
Co-Sponsors: Councilmembers Hucker, Friedson, Jawando, Riemer, and Katz; Council Vice-President Glass; and Councilmember Rice

**AN EXPEDITED ACT** to:
    (1)   prohibit the possession of firearms in or near places of public assembly, with certain exemptions;
    (2)   remove an exemption that allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly; and
    (3)   generally amend the law regarding restrictions against firearms in the County.

By amending
    Montgomery County Code
    Chapter 57, Weapons
    [[Section]] <u>Sections 57-1, 57-7, and</u> 57-11

| | |
|---|---|
| **Boldface** | *Heading or defined term.* |
| <u>Underlining</u> | *Added to existing law by original bill.* |
| [Single boldface brackets] | *Deleted from existing law by original bill.* |
| <u>Double underlining</u> | *Added by amendment.* |
| [[Double boldface brackets]] | *Deleted from existing law or the bill by amendment.* |
| * * * | *Existing law unaffected by bill.* |

*The County Council for Montgomery County, Maryland approves the following Act:*

(1)

EXPEDITED BILL NO. 21-22

1      **Sec. 1.** [[Section]] <u>Sections 57-1, 57-7, and</u> 57-11 [[is]] <u>are</u> amended as

2   **follows:**

3   **57-1. Definitions.**

4                       *     *     *

5      *Gun* or *firearm:* Any rifle, shotgun, revolver, pistol, ghost gun,

6      undetectable gun, air gun, air rifle or any similar mechanism by

7      whatever name known which is designed to expel a projectile through a

8      gun barrel by the action of any explosive, gas, compressed air, spring or

9      elastic.

10                     *     *     *

11      (2)   "Ghost gun" means a firearm, including an unfinished frame or

12             receiver, that<u>:</u>

13             <u>(A)</u>   lacks a unique serial number engraved or cased in metal

14                      alloy on the frame or receiver by a licensed manufacturer,

15                      maker or importer [[under]] <u>in accordance with</u> federal

16                      law<u>; and</u>

17             <u>(B)</u>   <u>lacks</u> markings <u>and is not registered with the Secretary of</u>

18                      <u>the State Police</u> in accordance with [[27 C.F.R. § 479.102]]

19                      <u>Section 5-703(b)(2)(ii) of the Public Safety Article of the</u>

20                      <u>Maryland Code</u>.

21             [[It]] <u>"Ghost gun"</u> does not include a firearm that has been

22             rendered permanently inoperable, or a firearm that is not required

23             to have a serial number in accordance with the Federal Gun

24             Control Act of 1968.

25                     *     *     *

26      (8)   "Undetectable gun" means:

- 2 -

(2)

EXPEDITED BILL NO. 21-22

27                                    *        *        *

28        (9)    "Unfinished frame or receiver" means a forged, cast, printed,

29                extruded, or machined body or similar article that has reached a

30                stage in manufacture where it may readily be completed,

31                assembled, or converted to be used as the frame or receiver of a

32                functional firearm.

33

34                                    *        *        *

35        Place of public assembly: A "place of public assembly" is:

36        (1)    a [[place where the public may assemble, whether the place is]]

37                publicly or privately owned:[[, including a]]

38                (A)    park;

39                (B)    place of worship;

40                (C)    school;

41                (D)    library;

42                (E)    recreational facility;

43                (F)    hospital;

44                (G)    community health center, including any health care facility

45                        or community-based program licensed by the Maryland

46                        Department of Health;

47                (H)    long-term facility, including any licensed nursing home,

48                        group home, or care home; [[or]]

49                (I)    multipurpose exhibition facility, such as a fairgrounds or

50                        conference center; or

51                (J)    childcare facility;

- 3 -

(3)

JA400

EXPEDITED BILL NO. 21-22

52      (2)    government building, including any place owned by or under the
53            control of the County;

54      (3)    polling place;

55      (4)    courthouse;

56      (5)    legislative assembly; or

57      (6)    a gathering of individuals to collectively express their
58            constitutional right to protest or assemble.

59      A "place of public assembly" includes all property associated with the
60      place, such as a parking lot or grounds of a building.

61                *     *     *

62 **57-7. Access to guns by minors.**

63                *     *     *

64    (d)    A person must not purchase, sell, transfer, possess, or **[[transfer]]**
65        transport a ghost gun, including a gun created through a 3D printing
66        process, in the presence of a minor.

67                *     *     *

68 **57-11.  Firearms in or near places of public assembly.**

69    (a)    In or within 100 yards of a place of public assembly, a person must not:

70      (1)    sell, transfer, possess, or transport a ghost gun, undetectable gun,
71            handgun, rifle, or shotgun, or ammunition or major component
72            for these firearms; or

73      (2)    sell, transfer, possess, or transport a firearm created through a 3D
74            printing process.

75    (b)    This section does not:

76      (1)    prohibit the teaching of firearms safety or other educational or
77            sporting use in the areas described in subsection (a);

- 4 -

(4)

| 78 | | (2) | apply to a law enforcement officer, or a security guard licensed to |
| 79 | | | carry the firearm; |
| 80 | | (3) | apply to the possession of a firearm or ammunition, other than a |
| 81 | | | ghost gun or an undetectable gun, in the person's own home; |
| 82 | | (4) | apply to the possession of one firearm, and ammunition for the |
| 83 | | | firearm, at a business by either the owner who has a permit to |
| 84 | | | carry the firearm, or one authorized employee of the business |
| 85 | | | who has a permit to carry the firearm; or |
| 86 | | (5) | [apply to the possession of a handgun by a person who has |
| 87 | | | received a permit to carry the handgun under State law; or] |
| 88 | | [(6)] | apply to separate ammunition or an unloaded firearm: |
| 89 | | | (A) transported in an enclosed case or in a locked firearms rack |
| 90 | | | on a motor vehicle, unless the firearm is a ghost gun or an |
| 91 | | | undetectable gun; or |
| 92 | | | (B) being surrendered in connection with a gun turn-in or |
| 93 | | | similar program approved by a law enforcement agency. |
| 94 | | | *       *       * |

95     **Sec. 2.  Expedited Effective Date.**  The Council declares that this legislation

96 is necessary for the immediate protection of the public interest.  This Act takes effect

97 on the date on which it becomes law.

98     <u>**Sec. 3. Severability.**  If any provision of this Act, or any provision of Chapter</u>

99 <u>57, is found to be invalid by the final judgment of a court of competent jurisdiction,</u>

100 <u>the remaining provisions must be deemed severable and must continue in full force</u>

101 <u>and effect.</u>

- 5 -

(5)

JA402

EXPEDITED BILL NO. 21-22

102      **Sec. 4.** This Act and Chapter 57 must be construed in a manner that is

103   consistent with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and

104   Explosives, including 87 FR 24652 (effective August 24, 2022), as amended.

- 6 -

(6)

**LEGISLATIVE REQUEST REPORT**

Bill 21-22
*Weapons – Firearms in or Near Places of Public Assembly*

| | |
|---|---|
| **DESCRIPTION:** | The bill would prohibit the possession of firearms in or near areas of public assembly and remove an exemption that currently allows individuals with certain handgun permits to possess weapons within 100 yards of a place of public assembly. |
| **PROBLEM:** | Gun violence. |
| **GOALS AND OBJECTIVES:** | Protect the possession of certain areas within sensitive areas, e.,g., in or near places of public assembly. |
| **COORDINATION:** | Montgomery County Police Department |
| **FISCAL IMPACT:** | Office of Management and Budget |
| **ECONOMIC IMPACT:** | Office of Legislative Oversight |
| **RACIAL EQUITY AND SOCIAL JUSTICE IMPACT:** | Office of Legislative Oversight |
| **EVALUATION:** | To be done. |
| **EXPERIENCE ELSEWHERE:** | State of Maryland |
| **SOURCE OF INFORMATION:** | Christine Wellons, Senior Legislative Attorney |
| **APPLICATION WITHIN MUNICIPALITIES:** | Yes |
| **PENALTIES:** | N/A |

(7)

JA404

**Fiscal Impact Statement**
**Bill 21-22 – Weapons – Firearms In or Near Places of Public Assembly**

1. **Legislative Summary**

   Bill 21-22 would prohibit the possession of firearms in or near places of public assembly,
   remove an exemption that allows individuals with certain handgun permits to possess
   handguns within 100 yards of a place of public assembly, and amend the law regarding
   restrictions against firearms in the County.

2. **An estimate of changes in County revenues and expenditures regardless of whether the
   revenues or expenditures are assumed in the recommended or approved budget.
   Includes source of information, assumptions, and methodologies used.**

   The Bill's impact on County expenditures is expected to be nominal.  Changes in the number
   of calls for service are expected to be small and can be absorbed within the Montgomery
   County Police Department's current staff complement.  There is no anticipated impact on
   County revenues.

3. **Revenue and expenditure estimates covering at least the next 6 fiscal years.**

   As stated in the response to question #2, the Bill's impact on County expenditures is
   expected to be nominal, and there is no anticipated impact on County revenues.

4. **An Actuarial analysis through the entire amortization period for each bill that would
   affect retiree pension or group insurance costs.**

   Not applicable.

5. **An estimate of expenditures related to County's information technology (IT) systems,
   including Enterprise Resource Planning (ERP) systems.**

   There is no anticipated impact on County information technology systems.

6. **Later actions that may affect future revenue and expenditures if the bill authorizes
   future spending.**

   Bill 21-22 does not authorize future spending.

7. **An estimate of the staff time needed to implement the bill.**

   Staff time required to administer the Bill is expected to be minimal. Officer training will be
   accomplished through an informational bulletin.

8. **An explanation of how the addition of new staff responsibilities would affect other
   duties.**

   No new staff would be required.

(8)

9.  **An estimate of costs when an additional appropriation is needed.**

    Not applicable.

10. **A description of any variable that could affect revenue and cost estimates.**

    Not applicable.

11. **Ranges of revenue or expenditures that are uncertain or difficult to project.**

    The number of additional calls that the Emergency Communications Center (ECC) may receive in a calendar year due to this Bill is difficult to quantify, but is expected to be minimal. The Department will reevaluate after one year.

12. **If a bill is likely to have no fiscal impact, why that is the case.**

    See response to question #2.

13. **Other fiscal impacts or comments.**

    Not applicable.

14. **The following contributed to and concurred with this analysis:**

    Darren Francke, Assistant Chief of Police, Management Services Bureau
    Dale Phillips, Director, Management and Budget Division
    Karla Thomas, Manager, Management and Budget Division
    Derrick Harrigan, Office of Management and Budget

8/22/22

Jennifer R. Bryant, Director                              Date
Office of Management and Budget

(9)

Case 8:21-cv-01736-TDC   Document 59-3   Filed 11/09/21   Page 20 of 34

# Racial Equity and Social Justice (RESJ) Impact Statement
## Office of Legislative Oversight

**EXPEDITED BILL 21-22:**    **WEAPONS – FIREARMS IN OR NEAR PLACES OF PUBLIC ASSEMBLY**

## SUMMARY

The Office of Legislative Oversight (OLO) finds the racial equity and social justice (RESJ) impact of Expedited Bill 21-22 is indeterminant due to insufficient information on the demographics of the Bill's beneficiaries, as well as on the potential effects on gun violence and police interactions in the County.

## PURPOSE OF RESJ IMPACT STATEMENT

The purpose of RESJ impact statements is to evaluate the anticipated impact of legislation on racial equity and social justice in the County. Racial equity and social justice refer to a **process** that focuses on centering the needs, leadership, and power of communities of color and low-income communities with a **goal** of eliminating racial and social inequities.[1] Achieving racial equity and social justice usually requires seeing, thinking, and working differently to address the racial and social harms that have caused racial and social inequities.[2]

## PURPOSE OF EXPEDITED BILL 21-22

Gun violence is a significant public health problem in the United States. In 2020, there were 45,222 gun-related deaths, 54 percent of which were suicides and 43 percent of which were homicides.[3] Gun homicides have recently been highlighted as a rapidly growing concern, potentially a result of distress during the pandemic.[4] In 2020, 79 percent of homicides involved a firearm, the highest percentage recorded in over 50 years.[5] Further, the firearm homicide rate jumped 35 percent in 2020, an increase deemed as historic by the Centers for Disease Control and Prevention (CDC).[6] The U.S. also stands out internationally when it comes to gun homicides. Among high-income countries with populations of 10 million or more, the U.S. ranks first in gun homicides, having a rate more than double the next country on the list, Chile, and 22 times greater than in the European Union as a whole.[7]

Following the Supreme Court decision on *New York State Rifle & Pistol Assn. v. Bruen, Superintendent of New York State Police*, Governor Larry Hogan ordered Maryland State Police to suspend the 'good and substantial reason' standard in reviewing applications for wear-and-carry permits.[8] Recent reports have noted a sharp increase in new permit applications in Maryland following the governor's orders.[9]

The goal of Expedited Bill 21-22 is to "prevent an individual from possessing a firearm within 100 yards of a place of public assembly even when the individual has a wear-and-carry permit from the State of Maryland."[10] The Bill achieves this goal through removing an exemption in County law that currently allows individuals with certain handgun permits to possess handguns within 100 yards of a place of public assembly.

**Office of Legislative Oversight**                    **August 5, 2022**

(10)

# RESJ Impact Statement
## Expedited Bill 21-22

State law currently prohibits permit carriers from possessing firearms at specific locations, including school property, state buildings, and state parks, among other locations. Bill 21-22 broadens the restricted areas established by the state to include places of public assembly as defined by County law, which includes parks, places of worship, schools, libraries, recreational facilities, hospitals, community health centers, long-term facilities, or multipurpose exhibition facilities, such as fairgrounds or conference centers. A place of public assembly can be publicly or privately owned, and includes all property associated with the place, such as a parking lot or grounds of a building.[11]

Expedited Bill 21-22 was introduced to the Council on July 12, 2022.

In February 2021, OLO published a RESJ impact statement (RESJIS) for Bill 4-21, Weapons – Protection of Minors and Public Places – Restrictions Against Ghost Guns and Undetectable Guns.[12] OLO builds on Bill 4-21's analysis for this RESJIS.

## GUN VIOLENCE AND RACIAL EQUITY

Black, Indigenous, and Other People of Color (BIPOC), have long experienced significant disparities in gun violence. Regarding the recent sharp increase in gun homicides, researchers at the CDC stated:

> "The firearm homicide rate in 2020 was the highest recorded since 1994 (1). However, the increase in firearm homicides was not equally distributed. Young persons, males, and Black persons consistently have the highest firearm homicide rates, and these groups experienced the largest increases in 2020. These increases represent the widening of long-standing disparities in firearm homicide rates. For example, the firearm homicide rate among Black males aged 10–24 years was 20.6 times as high as the rate among White males of the same age in 2019, and this ratio increased to 21.6 in 2020."[13]

While some attribute violence in BIPOC communities to individual behaviors and choices, these explanations often ignore the central role government has played in driving segregation and concentrated poverty, common conditions in communities stricken with violence. The following section provides an overview of studies that explore the relationship between violence, segregation, and concentrated poverty, with the intent of demonstrating that racial and ethnic disparities in gun violence are neither natural nor random. Please see the RESJIS for Expedited Bill 30-21 , Landlord-Tenant Relations – Restrictions During Emergencies – Extended Limitations Against Rent Increases and Late Fees, for detailed background on the government's role in fostering segregation and the racial wealth divide.[14]

**Drivers of Gun Violence.** Multiple studies have pointed to residential segregation and concentrated poverty as strong predictors of violence, and more specifically gun violence, in communities, for instance:

- A study of 103 metropolitan areas over five decades found that "(1) racial segregation substantially increases the risk of homicide victimization for blacks while (2) simultaneously decreasing the risk of white homicide victimization. The result…is that (3) segregation plays a central role in driving black-white differences in homicide mortality."[15]

- A study of over 65,000 firearm-related deaths among U.S. youth ages 5 to 24 between 2007 and 2016 found that "higher concentration of county-level poverty was associated with increased rates of total firearm-related deaths." Moreover, "two-thirds of firearm-related homicides could be associated with living in a county with a high concentration of poverty."[16]

**Office of Legislative Oversight**                    2                    **August 5, 2022**

(11)

# RESJ Impact Statement
## Expedited Bill 21-22

- A study of U.S. gun violence data between 2014 and 2017 found that "gun violence is higher in counties with both high median incomes and higher levels of poverty." The researchers went on to state that the "findings may well be due to racial segregation and concentrated disadvantage, due to institutional racism, police-community relations, and related factors."[17]

- A study of shootings in Syracuse, New York between 2009 and 2015 found that "higher rates of segregation, poverty and the summer months were all associated with increased risk of gun violence."[18]

- A study of gunshot victims (GSVs) in Louisville, KY between 2012 and 2018 found that "[r]elative to green-graded neighborhoods, red-graded [redlined] neighborhoods had five times as many GSVs. This difference remained statistically significant after accounting for differences in demographic, racial, and housing characteristics of neighborhoods."[19]

- A study of 13 U.S. cities between 2018 and 2020 found that in 2020, "violence was higher in less-privileged neighborhoods than in the most privileged," where less-privileged neighborhoods demonstrated a higher degree of racial, economic, and racialized economic segregation.[20]

**Consequences of Gun Violence.** Gun violence has harmful effects that reverberate deeply in families and communities. As Dr. Thomas R. Simon, CDC Associate Director for Science, Division of Violence Prevention, stated to Vox "[p]art of the reason why violence is a public health problem is because of the significant and lasting health consequences for victims." The 2022 Vox article provides an overview of research on the toll of gun violence, including the following findings:[21]

- Survivors of gun violence are at an increased risk of chronic pain, psychiatric disorders, and substance abuse and are more likely to experience mental health challenges.

- More than 15,000 American children lose a parent to gun violence each year. Children who lose a parent (for any reason, including gun violence) are more likely to have lower educational attainment, which could lead to poorer health given the strong link between education and health outcomes.

- Even if a person has not directly lost a loved one to a gun incident, being exposed to gun violence in a community leads to mental health issues, including problems with social function, anxiety, and depression.

- A 2018 study of six American cities found that individual shootings cost between $583,000 and $2.5 million, depending on the city and whether the firearm injury was fatal or nonfatal.

**Data on Gun Violence.** National data in Table 1 demonstrates racial and ethnic disparities in gun homicides, whereby Black Americans had a firearm homicide rate eleven times that of White Americans in 2020. Latinx and Native Americans respectively had firearm homicide rates two and three times greater than Whites, while Asian/Pacific Islanders had a lower firearm homicide rate than Whites.

# RESJ Impact Statement
## Expedited Bill 21-22

**Table 1: 2020 Firearm Homicide Incidence by Race and Ethnicity, United States**

| Race and Ethnicity[22] | Number of Firearm Homicides | Rate of Firearm Homicides per 100,000 persons |
|---|---|---|
| Asian or Pacific Islander | 227 | 1.0 |
| American Indian or Alaska Native | 221 | 8.1 |
| Black | 11,904 | 26.6 |
| Latinx | 2,946 | 4.5 |
| White | 4,052 | 2.2 |

Note: Rates are age-adjusted
Source: Changes in Firearm Homicide and Suicide Rates Report, CDC

Local data also confirms racial and ethnic disparities in gun violence. A review of 2016-2018 data by Healthy Montgomery, the County's community health improvement initiative, found that Black residents had an age-adjusted firearm hospitalization rate of 8.6 per 100,000 persons, compared to 2.4 for Latinx residents, 1.2 for White residents, and 0.3 for Asian residents.[23]

## ANTICIPATED RESJ IMPACTS

To consider the anticipated impact of Expedited Bill 21-22 on RESJ in the County, OLO recommends the consideration of two related questions:

- Who are the primary beneficiaries of this bill?
- What racial and social inequities could passage of this bill weaken or strengthen?

**For the first question,** the primary beneficiaries of the Bill are presumably residents who frequent places of public assembly, as they could experience increased safety from more gun restrictions in these areas. However, there is no definitive data on the demographics of people who frequent places of public assembly in the County. As such, OLO cannot conclude whether there are racial or ethnic disparities among the primary beneficiaries of this Bill.

**For the second question,** OLO considers the effect this Bill could have on reducing gun violence in the County given its disproportionate impact on BIPOC residents. While there is strong evidence to suggest that restricting gun access can reduce gun violence,[24] there is limited research on the effect of place-based restrictions such as those proposed in this Bill. Further, it is unclear how the enforcement of this law would potentially change police contact with residents, and whether that could worsen existing disparities in police interactions with BIPOC residents.[25]

Taken together, OLO finds that the RESJ impact of this Bill is indeterminant.

## RECOMMENDED AMENDMENTS

The Racial Equity and Social Justice Act requires OLO to consider whether recommended amendments to bills aimed at narrowing racial and social inequities are warranted in developing RESJ impact statements.[26] OLO finds that the RESJ impact of Expedited Bill 21-22 is indeterminant due to insufficient information on the demographics of the Bill's beneficiaries, as well as on the potential effects on gun violence and police interactions in the County. OLO does not offer recommended amendments since the Bill was not found to be inequitable.

**Office of Legislative Oversight**          4          **August 5, 2022**

(13)

# RESJ Impact Statement
## Expedited Bill 21-22

In their recently released study on increased gun violence, researchers at the CDC note, "[t]he findings of this study underscore the importance of comprehensive strategies that can stop violence now and in the future by addressing factors that contribute to homicide and suicide, including the underlying economic, physical, and social inequities that drive racial and ethnic disparities in multiple health outcomes."[27]  Should the Council seek to improve the RESJ impact of this Bill through incorporating recommended amendments or introducing companion legislation, the policy solutions highlighted by the CDC researchers in the study can be considered.

## CAVEATS

Two caveats to this racial equity and social justice impact statement should be noted.  First, predicting the impact of legislation on racial equity and social justice is a challenging analytical endeavor due to data limitations, uncertainty, and other factors.  Second, this RESJ impact statement is intended to inform the legislative process rather than determine whether the Council should enact legislation. Thus, any conclusion made in this statement does not represent OLO's endorsement of, or objection to, the bill under consideration.

## CONTRIBUTIONS

OLO staffer Janmarie Peña drafted this RESJ impact statement.

---

[1] Definition of racial equity and social justice adopted from "Applying a Racial Equity Lens into Federal Nutrition Programs" by Marlysa Gamblin, et.al. Bread for the World, and from Racial Equity Tools. https://www.racialequitytools.org/glossary
[2] Ibid
[3] John Gramlich, "What the Data Says about Gun Deaths in the U.S.," Pew Research Center, February 3, 2022. https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/
[4] Becky Sullivan and Nell Greenfieldboyce "Firearm-Related Homicide Rate Skyrockets Amid Stresses of the Pandemic, the CDC Says," Research News, NPR, May 10, 2022. https://www.npr.org/2022/05/10/1097916487/firearm-homicide-rates-soar-pandemic-cdc-says
[5] John Gramlich
[6] "Firearm Deaths Grow, Disparities Widen," CDC Newsroom, CDC, May 10, 2022. https://www.cdc.gov/media/releases/2022/s0510-vs-firearm-deathrates.html
[7] "On Gun Violence, the United States is an Outlier," Institute for Health Metrics and Evaluation," May 31, 2022. https://www.healthdata.org/acting-data/gun-violence-united-states-outlier
[8] "Governor Hogan Directs Maryland State Police to Suspend 'Good and Substantial Reason' Standard For Wear and Carry Permits," The Office of Governor Larry Hogan, July 5, 2022. https://governor.maryland.gov/2022/07/05/governor-hogan-directs-maryland-state-police-to-suspend-good-and-substantial-reason-standard-for-wear-and-carry-permits/
[9] Frederick Kunkle, "Supreme Court Ruling Sets Off Rush for Concealed Gun Permits in Maryland," Washington Post, July 18, 2022. https://www.washingtonpost.com/dc-md-va/2022/07/15/concealed-carry-maryland-guns-hogan/
[10] "Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly," Montgomery County, Maryland, July 12, 2022. https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2022/20220712/20220712_10A.pdf
[11] Ibid
[12] Racial Equity and Social Justice Impact Statement for Bill 4-21, Office of Legislative Oversight, Montgomery County, Maryland, February 8, 2021. https://montgomerycountymd.gov/OLO/Resources/Files/resjis/2021/RESJIS-Bill4-21.pdf
[13] Scott R. Kegler, Thomas R. Simon, et. al., "Vital Signs: Changes in Firearm Homicide and Suicide Rates – United States, 2019-2020," Morbidity and Mortality Weekly Report (MMWR), CDC, May 13, 2022. https://www.cdc.gov/mmwr/volumes/71/wr/mm7119e1.htm?s_cid=mm7119e1_w

**Office of Legislative Oversight**          5          **August 5, 2022**

(14)

# RESJ Impact Statement
## Expedited Bill 21-22

[14] Racial Equity and Social Justice Impact Statement for Expedited Bill 30-21, Office of Legislative Oversight, Montgomery County, Maryland, September 9, 2021. https://montgomerycountymd.gov/OLO/Resources/Files/resjis/2021/Bill30-21RESJ.pdf

[15] Michael T. Light and Julia T. Thomas, "Segregation and Violence Reconsidered: Do Whites Benefit from Residential Segregation," American Sociological Review, July 9, 2019. https://journals.sagepub.com/doi/abs/10.1177/0003122419858731

[16] Jefferson T. Bennet, Lois K. Lee, et. al., "Association of County-Level Poverty and Inequities with Firearm-Related Mortality in US Youth," JAMA Pediatrics, November 22, 2021. https://jamanetwork.com/journals/jamapediatrics/article-abstract/2786452

[17] Blair T. Johnson, Anthony Sisti, et. al., "Community-Level Factors and Incidence of Gun Violence in the United States, 2014-2017," Social Science & Medicine, July 2021. https://www.sciencedirect.com/science/article/abs/pii/S0277953621003014

[18] David A. Larsen, Sandra Lane, et. al., "Spatio-Temporal Patterns of Gun Violence in Syracuse, New York 2009-2015," PLOS ONE, March 20, 2017. https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0173001

[19] Matthew Bennis, Matthew Ruther, et. al., "The Impact of Historical Racism on Modern Gun Violence: Redlining in the City of Louisville, KY," Injury, October 2020. https://www.sciencedirect.com/science/article/abs/pii/S0020138320305490

[20] Julia P. Schleimer, Shani A. Buggs, et. al., "Neighborhood Racial and Economic Segregation and Disparities in Violence During the COVID-19 Pandemic," American Journal of Public Health, January 2022. https://pubmed.ncbi.nlm.nih.gov/34882429/

[21] Keren Landman, "Guns Do More than Kill," Vox, June 6, 2022. https://www.vox.com/science-and-health/23151542/gun-deaths-firearm-injuries-violence-health-grief-mental-physical

[22] Latinx people are not included in other racial groups throughout this impact statement, unless where otherwise noted.

[23] "Healthy Montgomery Core Measures: Firearm Hospitalization," Healthy Montgomery, Montgomery County, Maryland, Accessed August 2, 2022. https://www.montgomerycountymd.gov/healthymontgomery/chart.html

[24] "Gauging the Effectiveness of Gun Control Laws," News from Columbia Law, Columbia Law School, March 10, 2016. https://www.law.columbia.edu/news/archive/gauging-effectiveness-gun-control-laws

[25] Elaine Bonner-Tompkins and Nataliza Carrizosa, OLO Report 2020-9: Local Policing Data and Best Practices, Office of Legislative Oversight, July 12, 2020. https://montgomerycountymd.gov/OLO/Resources/Files/2020%20Reports/OLOReport2020-9.pdf

[26] Bill 27-19, Administration – Human Rights – Office of Racial Equity and Social Justice – Racial Equity and Social Justice Advisory Committee – Established, Montgomery County Council

[27] Kegler, Simon, et. al.

# Economic Impact Statement
**Office of Legislative Oversight**

## Expedited Bill 21-22

## Weapons – Firearms In or Near Places of Public Assembly

## SUMMARY

The Office of Legislative Oversight (OLO) anticipates that enacting Bill 21-22 would have an insignificant impact on economic conditions in the County in terms of the Council's priority indicators.

## BACKGROUND

The goal of Bill 21-22 is to protect places in or near places of public assembly from gun violence.[1] The Bill would attempt to achieve this goal by amending the law regarding restrictions against firearms in the County in two ways. First, it would "prohibit the possession of firearms in or near areas of public assembly." Second, it would "remove an exemption that currently allows individuals with certain handgun permits to possess weapons within 100 yards of a place of public assembly."[2] If enacted, the change in law would take effect on the date it becomes law.[3]

## INFORMATION SOURCES, METHODOLOGIES, AND ASSUMPTIONS

Per Section 2-81B of the Montgomery County Code, the purpose of this Economic Impact Statement is to assess the impacts of Bill 21-22 on County-based private organizations and residents in terms of the Council's priority economic indicators and assess whether the Bill would likely result in a net positive or negative impact on overall economic conditions in the County.[4] It is doubtful that enacting Bill 21-22 would impact firearm sales from County-based gun shops. Moreover, while gun violence has direct and indirect economic costs for victims, perpetrators, and other stakeholders,[5] it is beyond the scope of this analysis to assess the effectiveness of the restrictions in preventing gun violence in the future. Thus, OLO does not anticipate the changes to the law regarding restrictions against firearms in the County to have significant economic impacts on private organizations, residents, or overall conditions in the County.

## VARIABLES

Not applicable

---

[1] Legislative Request Report.
[2] Bill 21-22.
[3] Ibid.
[4] Montgomery County Code, Sec. 2-81B.
[5] A State-by-State Examination of the Economic Costs of Gun Violence; Follman et al, "The True Cost of Gun Violence in America."

**Montgomery County (MD) Council**                                                                 1

(16)

# Economic Impact Statement

Office of Legislative Oversight

## IMPACTS

WORKFORCE  ▪  TAXATION POLICY  ▪  PROPERTY VALUES  ▪  INCOMES  ▪  OPERATING COSTS  ▪  PRIVATE SECTOR CAPITAL INVESTMENT  ▪  ECONOMIC DEVELOPMENT  ▪  COMPETITIVENESS

### Businesses, Non-Profits, Other Private Organizations

Not applicable

### Residents

Not applicable

## DISCUSSION ITEMS

Not applicable

## WORKS CITED

A State-by-State Examination of the Economic Costs of Gun Violence. U.S. Congress Joint Economic Committee, Democratic Staff. September 18, 2019.

Mark Follman, Julia Lurie, Jaeah Lee, and James West. "The True Cost of Gun Violence in America." *Mother Jones*. April 15, 2015.

Montgomery County Code. Sec. 2-81B, Economic Impact Statements.

Montgomery County Council. Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly. Introduced on July 12, 2022.

## CAVEATS

Two caveats to the economic analysis performed here should be noted. First, predicting the economic impacts of legislation is a challenging analytical endeavor due to data limitations, the multitude of causes of economic outcomes, economic shocks, uncertainty, and other factors. Second, the analysis performed here is intended to *inform* the legislative process, not determine whether the Council should enact legislation. Thus, any conclusion made in this statement does not represent OLO's endorsement of, or objection to, the Bill under consideration.

## CONTRIBUTIONS

Stephen Roblin (OLO) prepared this report.

### Montgomery County (MD) Council

2

(17)



**In Support of Expedited Bill 21-22, Weapons -Firearms In or Near Places of Public Assembly**
*On behalf of the Association of Independent Schools of Greater Washington*

July 20, 2022

I am submitting this testimony as Executive Director of the Association of Independent Schools of Greater Washington ("AISGW") in support of *Expedited Bill 21-22, Weapons-Firearms In or Near Places of Public Assembly*. AISGW represents 78 member schools in the greater D.C. area, and our schools educate over 10,000 students in Montgomery County alone. *Expedited Bill 21-22* would prevent an individual from possessing a firearm within 100 yards of a "place of public assembly" even when the individual has a wear-and-carry permit from the State of Maryland. The definition of public assembly includes schools. This restriction strengthens current County law, which currently exempts individuals with permits from the restriction against carrying weapons within 100 yards of places of public assembly.

We commend the Montgomery County Council for these efforts to stem acts of gun violence that have become shockingly all too common in our communities and on our school grounds. The recent mass shooting at the Robb Elementary School in Uvalde, Texas, along with the persistent and terrifying recurrence of mass shootings across our country, have left school leaders once again consoling and calming their communities while searching for solutions to keep their school communities safe. Indeed, one of our very own AISGW schools was subject to a harrowing act of gun violence in April of this year.

We understand that Maryland State law already prohibits the wear, carry and transport of handguns and firearms on public school grounds. *CR 4-102.* Extending that protection to *all* schools, as well as other community gathering places throughout the County, however, is an important and – unfortunately – very necessary next step as we see this wave of gun violence continue. Moreover, we urge the County to consider any other steps that would keep our children safe, whether those include broader prevention and education efforts, or prohibitions such as this proposed legislation, aimed at preventing this violence from reoccurring.

I appreciate the opportunity to comment on the proposed legislation on behalf of our AISGW member schools and would welcome any chance to support further the goals of keeping our children and our school campuses protected from this persistent threat.

On Monday, July 11th, County Council President Gabe Albornoz introduced Bill 21-22, to remove the exemption for W&C permit holders from the county's ban on possessing firearms "in or within 100 yards of a place of public assembly," which includes parks and churches, banning carry in those places. I oppose this bill as an infringement on our residents' recently affirmed constitutional rights as issued by the US Supreme Court(i.e., Bruen case).

The bill provides no requirement for the county to clearly mark which of these areas are to be "gun-free zones," which will result in confusion among law-abiding citizens who are permit holders.

The legislation also makes no mention of whether the county intends to guarantee the safety of disarmed citizens in those places with measures, such as metal detectors or police presence. Gun free zone declarations are soft targets for criminals and those intent on wrecking havoc. |

Also, this proposed bill like many of the Democratic Party and left wing gun control policies of extreme gun control over the years have and will not work given high crime and murder rates in many Maryland cities and towns – not be law abiding gun owners but by criminals and unstable persons.

This proposed bill  will not improve safety of our citizens. Armed criminals, who already illegally carry without any permits and illegally possess firearms in violation of state and federal laws, will likely ignore the arbitrary boundaries created by this ordinance.

This bill would create more targets of opportunity for criminals and  prevent responsible law abiding citizens from their right of self-defense.  Recent mall shooter in Indiana was terminated by a law abiding citizen with a legal carry permit, saving untold additional lives.  Good people carrying self-defense capabilities are far more effective at deterring crime and reducing crazed mayhem than any police presence can do.  I urge the council to vote No on Bill 21-22 to keep Montgomery County safer than if it was passed into law.  If the Council approves this measure then the Council needs to address the safety of unarmed citizens in these gun free zones and take measure to ensure access to these "gun free zones" provides control points to ensure the safety of us.

(19)

To the members of the council,


My name is Anthony Nelson, and I have been a resident of Montgomery county since roughly 2013. I previously lived in Prince George's County where I experienced more than my fair share of crime directly or indirectly including robbery, home break-ins, and car theft. That was precisely part of my desire to move out to an area that for most of my life, I considered to be relatively low in crime and safe.

As a lifelong resident of Maryland, it has been a long frustrating road for the issue of self-defense and Maryland's views to the methods in which one chooses to defend themselves. For my entire adult life, I have had to accept lawfully, that I am not able to defend myself or my family to the best of my ability due to what many politician's refer to as "common-sense gun legislation." Up until July 5, 2022, Maryland has remained a "may issue" state in regards to the issuance of any type of permit to carry citing "good and substantial" reasoning which to most, felt like an arbitrary term that applied to a very small population. The recent Supreme Court Ruling and subsequent statement from Gov. Hogan suspending the "good and substantial" clause was an exciting time for many Marylanders and a restoration of a long  restricted constitutional right as well as the "unalienable right" to Life mentioned in the countries founding document. A right that governments were instituted to secure.

Despite the legislation that Maryland has upheld for all these years, touting some of the strictest gun laws on the books in the country, Maryland has remained competitive in the category of "most homicides by state" category. This can be partly contributed to Maryland's unwillingness to prosecute criminals who are in turn released and commit more heinous crimes; as well as enforce laws that are already on the books. As recent as June, Deputy First Class Glenn Hilliard was murdered by a man who should have been previously locked-up for being convicted of armed robbery. I would like to note that at the time of the armed robbery and at the time of the murder of Deputy Hilliard, the suspect was under the age of legal handgun ownership in the state of Maryland. At the time of this letter, just one week ago, a 15-year-old squeegee worker in Baltimore shot and killed a bat-wielding man in Baltimore. While all of the details of the case may never all be known, we know that a 15-year old boy was armed and it was stated that most of the boys who are on these corners providing this service are as well. This stands to show that no matter what laws are on the books, criminals will always willfully disobey them, and it is always the law-abiding citizen who is left at a disadvantage. This legislation is not aimed at keeping criminals from bringing guns into "public areas," because we all know that criminals will do it no matter what the law says. What we do know for sure is that criminals don't look for resistance or a fight, they look for victims and easy targets. This bill only creates more of the latter.

Driving into my home city of Olney now, there are road signs warning of car jackings. A January 2022 WTOP article titled "Homicides, carjackings up in Montgomery County" is a constant lingering thought in my head when I come to a stop light with my 3 small children who are under the age of 6 and wife all in the vehicle. The article denotes an 88% rise in homicides and 72% increase in carjackings. Average law-abiding citizens are tired of being a statistic. Having more trained citizens looking to protect themselves and their families suddenly becoming criminals because of a law based on no data is the exact reason why crime statistics in this county will continue to rise if this unconstitutional bill is passed.

Members of this council have stated that Marylanders want this bill passed; however I think it can be reasonably argued by the influx of applications for wear and carry permits, as well as the current backlog

(20)

JA417

of people trying to sign up for the class, is quite representative of the climate. This bill, while directly in opposition to the supreme court ruling and purpose for the ruling in the first place, stands to turn law-abiding citizens who took the time to get the training and spent upwards of $1000 in total to exercise a constitutional right into criminals.

I strongly urge the council to rescind this bill as it is in opposition to the recent supreme court ruling, as well as the basic human rights we all have, to defend ourselves and our families.


Thank you for your time and attention.


Sincerely,

Anthony Nelson

(21)

21 July, 2022

Mr. Gabe Albornoz
President, Montgomery County Council

Regarding Bill 21-22 to remove the exemption from Montgomery County Code § 57.11 for holders of Maryland Wear and Carry Permit from within 100 yards of "Place of Public Assembly.

Dear Mr. Albornoz,

I write to oppose Bill 21-22. This new bill would remove the existing exception for permit carry that has long existed in Montgomery County code, and is a clear violation of the Supreme Court's decision in *NYSRPA v. Bruen* as it would ban carry by a permit holder virtually everywhere including stores and businesses throughout Montgomery County. Carry permits will be useless in Montgomery County if this bill is enacted and allowed to stand.

I am a resident of Anne Arundel County; however, I frequent Montgomery County to access the wonderful care at a Johns Hopkins Wilmer Eye Institute in Bethesda. Unfortunately, I suffer from glaucoma, which has been difficult to control. While I am not allowed to carry within hospitals and medical clinics, Bill 21-22 would not allow me even to carry within the county in order to access quality health care. Why are you afraid of a law-abiding citizen, like me, who may find it necessary to find health care elsewhere should this law be passed?

Please do not vote for Bill 21-22.

Sincerely,
Cathy S. Wright

(22)

My name is Galen Muhammad and I am the State Director of Maryland and Washington, DC for the National African American Gun Association or NAAGA. I am also the chapter president for the NAAGA chapter in Prince George's County – Onyx Sharpshooters.

I am **vehemently** opposed to this bill as I often travel through Montgomery County as a law-abiding citizen who is a concealed carry licensee. While I don't live in Montgomery County, the members of my gun club, others who are also concealed carry licensees and those who seek said license will be barred from conducting business or just traveling from Point A to Point B within Montgomery County.

As a certified firearms instructor, I also plan to visit my Montgomery County chapter and their events within the county and train residents of Montgomery County at locations in Montgomery County and I do travel with my concealed carry firearms.

This bill gives absolutely no consideration, nor does it mention the fact that those with the Wear & Carry license are **already prohibited** from many areas, including sporting events, federal, state, county and city buildings, public transportation, public schools, colleges and universities, banks, retail establishment with clearly posted signage, post offices **AND** their parking lots, etc. These are the proverbial "*bricks*" around which we, law-abiding citizens, who **legally** concealed carry legally navigate. This *vague* bill being proposed seeks to be the "***mortar***" to fill in the gaps and add additional and unnecessary areas, creating and manufacturing a problem where there isn't one.

This bill also overlooks the mandatory firearms training that each licensee must attend to be qualified to receive the Wear & Carry license. During this training, we are taught that Maryland is **NOT** a Castle Doctrine state and that we have a duty to retreat, if possible.

I ask that this bill be given an unfavorable report.

(23)

JA420

To the Honorable Members of the County Council of Montgomery County, MD

Gabe Albornoz, Chairman
Andrew Friedson
Evan Glass
Tom Hucker
Will Jawando
Sidney Katz
Nancy Navarro
Craig Rice
Hans Riemer

From: Dr. Jack L. Rutner
Silver Spring MD

Re: Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly

This purpose of this testimonial letter is to raise questions to the Montgomery County Council about the constitutionality of the proposed legislation embodied in Bill 21-22. This testimonial letter will cover three issues:
I.   The guidance provided by the Supreme Court to the Courts in the Bruen decision in how to adjudicate Second Amendment cases henceforth;
II.  The Supreme Court's discussion on sensitive places;
III. The Supreme Court's reference to D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 *Charleston L. Rev.* 205 (2018), and Brief for Independent Institute as *Amicus Curiae* and how they would affect the constitutionality of Expedited Bill 21-22.

I: The Supreme Court in the Bruen decision (8: II) reviewed the two-step procedure Courts of Appeal have used since the *Heller* and *McDonald* decisions. The Court held that, that was one step too many. Specifically, the Court wrote:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. **To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.** Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." (My emphasis.)

The Court emphasizes this further when it writes (10: IIB):

> the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

On examining Expedited Bill 21-22 I find nowhere does it show how the proposed regulation expanding sensitive places to many places of public assembly falls within the scope of being consistent with "this Nation's historical tradition of firearm regulation." Absent such analysis Expedited Bill 21-22 appears to on infirm constitutional grounds. On this basis alone a legal challenge to the constitutionality of 21-22 will prove successful in the federal courts.

II. With regard to sensitive places, the Court discussed the issue of sensitive places. It wrote that expanding sensitive places to a large variety of places of public assembly is inconsistent with the

(24)

JA421

Second Amendment.  In particular, it writes (22) about New York State's view on sensitive places:

> In [New York State's] view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." Brief for Respondents 34. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. **But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly.** Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. (My emphasis.)

Expedited Bill 21-22 does precisely what the Court counseled governments not to do, which is to expand the category of sensitive places to almost all places of public congregation.  According to the Court, that categorizes sensitive places far too broadly.  Indeed, based on the Court's language in Bruen, should the Council pass Expedited Bill 21-22, legal challenges to it would be successful because of the overly broad categorization of sensitive places.  When that is coupled with the absence of analysis demonstrating that 21-22 is consistent with this Nation's historical tradition of firearm regulation, then it would seem 21-22 is on very legally infirm constitutional grounds and will not be upheld in federal court.

III. The definition of public places in Expedited Bill 21-22 is derived from Bill 4-21.  They are:
> [A] place where the public may assemble, whether the place is publicly or privately owned, including a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as a fairgrounds or conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building."

Most of those places in 4-21 do not fall within the purview of public places based on the current references in its discussion in Bruen (21) regarding sensitive places.  There, it pointed to an article in *Charleston Law Review* from 2018 title the "Sensitive Places Doctrine" by Kopel and Greenlee (hereinafter, KG), and to the *Amicus Curia* Brief of the Independent Institute (hereinafter BII)  Both documents discuss sensitive places while the latter provides guidance on "longstanding" laws regarding such places/

In the KG article, there is a useful summary of the sensitive place doctrine (287*f.*), some of which I quote here (with my emphasis):
> *Extensions by analogy to schools and government buildings.* It is difficult to create a rationale for extending the "sensitive places" doctrine to places that are not schools or government buildings. As discussed above, there are few "longstanding" restrictions on other locations.
> Given the thin historical record, one can only guess about what factors make places "sensitive." Some of the guesses are: **places where most persons therein are minors (K-12 schools), places that concentrate adversarial conflict and can generate passionately angry emotions (courthouses, legislatures, polling places), or buildings containing people at acute personal risk of being targets of assassination (many government buildings).**
> **The answer cannot be that the places are crowded.** Sometimes they are, but no more so than a busy downtown sidewalk, and sidewalks are not sensitive places.

(25)

Rather than try to figure out analogies to "schools and government buildings," the better judicial approach for other locations is simply to give the government the opportunity to prove its case under heightened scrutiny.

***Buffer zones are not sensitive places.* Heller allows for carry bans "in" sensitive places—not bans "around" or "near" sensitive places. Accordingly, buffer zones are not sensitive places.**

…

***Laws that broadly negate the right to arms are not legitimate precedents.* Laws that widely prohibit bearing arms are contrary to the text of the Second Amendment. Accordingly, they are not a legitimate part of the history and tradition of the right to bear arms.**

In my opinion the critical passages for 21-22 in this summary by KG are those bolded.  It is clear that Bill 21-22 would widely prohibit carrying arms in a large variety of places within the County.  As KG observe, "Laws that widely prohibit bearing arms are contrary to the text of the Second Amendment." Moreover, as they suggest, an argument that such places are crowded will be insufficient to sustain the constitutionality of Bill 21-22 under heightened scrutiny.

Bill 21-22 defines places of public assembly to those listed in Bill 4-21.  Most of those places though do not meet the criteria KG outline in their summary for sensitive places.  The places I think that do not meet those criteria are places of worship, recreational facilities, hospital, community health centers, long-term facility, multipurpose exhibition facilities (e.g., fairgrounds or conference centers).  Such places are not places where most persons are minors, they are not places which concentrate adversarial conduct and they are not places where passionate angry emotions are generated.  Declaring them off limits to the legal carriage of guns therein again will prove to be on constitutionally infirm ground based the guidance in Bruen.

Another issue of Bill 21-22 is the creation 100-yard buffers zones around places of public assembly.  Such buffer zones under Bruen are most likely not be justifiable for Second Amendment cases.  KG reviewed several court cases regarding buffer zones around sensitive places of which I will summarize one. The case is an Illinois case termed, the *People v. Chairez*.  The State of Illinois had made it illegal to carry a firearm within a 1,000-foot buffer zone around a state park.  According to KG (269), the Illinois Supreme Court ruled: "that the law severely burdened the core of the right to bear arms, because it prohibited the carriage of weapons for self-defense and it affected the entire law-abiding population of Illinois."  Moreover the Court found that the 'State was unable to support its "assertion that a 1000–foot firearm ban around a public park protects children, as well as other vulnerable persons, from firearm violence" ' (KG, 269*f.*).  Bill 21-22 appears to contain both defects found in *People v. Chairez*: it affects the entire law-abiding population of Montgomery County; and the County will be unable to support an assertion that buffer zones protect children and vulnerable persons.  Consequently, the buffer zones themselves are not sensitive places and would be ruled unconstitutional.  Moreover, based on the guidance in the Bruen decision, even if the County could show that such buffer zones might protect children and vulnerable persons that would be insufficient to meet the criterion of being within "the historical tradition of firearm regulation" and so would be declared unconstitutional based solely on that.

We turn next to *Amicus Curiae* brief filed by Independent Institute (BII) in the Bruen Case for further guidance on the issue of sensitive places and longstanding traditions of restricting Second Amendment rights.  In BII, there is a short review of American laws regarding sensitive places, which it sometimes terms, "gun-free zones."  According to BII (11), in colonial America, "gun-free zones through the time of the Founding were limited …"

(26)

 A notable exception was Maryland's ban on bringing weapons into houses of Assembly (government buildings).  According to BII (12) Virginia followed up on that a century later when it 'forbade most (but not all) people from "com[ing] before the Justices of any Court, or other of their Ministers of Justice, doing their office, with force and arms." … Virginia's law also barred citizens from carrying arms "in other places," but only when such carrying was done "in terror of the country," *id.*, thus respecting a general right to peaceably carry but carving out a narrow exception for courts.' Thus, according to BII, government buildings would meet the criterion laid down in Bruen of being consistent with "this Nation's historic tradition of firearm regulation" insofar as such bans are longstanding traditions.   On the other hand, a ban on firearms in a wide variety of places of public assembly, such as in 21-22, would not be consistent with that historic tradition because there is no longstanding tradition of banning firearms in such places.  Hence, the constitutionality of a such a bill would no doubt not be upheld in federal court based on the guidance the Court provided in Bruen.

BII does indicate certain narrow conditions under which government can ban firearms consistent with the Second Amendment (see BII, 22).  It writes:

> The most obvious way to limit modern gun-free zones to areas in which the government has demonstrated a serious commitment and a realistic ability to ensure public safety. This can be accomplished by ensuring that would-be criminals are prevented by more than the normative power of a legal prohibition to remain unarmed through, *e.g.*, the provision of law enforcement officers and armed security, along with metal detectors or other defensive instruments.

It writes further (BII 24):

> If the government cannot (or chooses not to) provide protection similar to that at airports in other areas, then designating those areas as "gun free" necessarily eviscerates (*sic.*) the self-defense right and, accordingly, constitutes a Second Amendment violation.

 It would appear from BII, that if the Council bans firearms in public places without its supplying adequate security and specifically by supplying adequate law enforcement personnel and metal detectors, it will have eviscerated the self-rights of the citizens of Montgomery County and anyone else who comes into the County.  Hence, I think that under the current guidance found in Bruen, Expedited Bill 21-22 is on infirm constitutional grounds and will be found unconstitutional in federal court.

(27)

**IIOP**

The Institute for Forensic Psychology

**Jack Leeb, PsyD**
Police & Public Safety Psychology
*Associate Member, International Association of Chiefs of Police*
*Associate Member, Maryland Chiefs of Police Association*
*Certified Force Science Analyst*

914 Brentwood Lane
Silver Spring, MD 20902
(301) 452-4900 voice
(301) 593-9191 fax
www.policetest.com
drleeb1@gmail.com

Date:   19 July 2022
To:     Montgomery County Council
Re:     Bill 21-22

As a police psychologist, firearms instructor, and MD Wear and Carry permit holder for over 20 years, I am very concerned about County Council bill 21-22, which would effectively negate the recent US Supreme Court decision affirming the right of law-abiding citizens to carry a firearm in public. As a police psychologist I have received threats over the years related to my work; I have also studied criminal behavior. As a firearms instructor I transport firearms to and from classes and the range and have witnessed firsthand over the past 25 years just how serious the average citizen who desires to possess a firearm is with regard to its use and safety in general. I have been comforted by the fact that I have the option to carry a firearm to protect myself and my family when out and about, and I have been proud of my fellow law-abiding citizens' clear desire to do the right thing with regard to the possession and use of a firearm.

I would remind Council members that, in general, concealed carry permit holders across the United States are far more law abiding than those who do not possess a permit. CCW permit holders do NOT commit crime; rather, law-abiding citizens who have the ability to defend themselves STOP crimes from occurring hundreds of times every day in the US, in most cases without firing a shot. Since criminals routinely ignore laws, these events would more frequently end in victimization of the law-abiding if we do not have the means to defend ourselves. If passed, not only would bill 21-22 deprive law-abiding citizens of the right to defend themselves and their families, but it would make anyone who is legally permitted to carry a firearm elsewhere in Maryland a criminal in Montgomery County. Expecting W&C permit holders to stop, unload their firearms before crossing the Montgomery County line, and store the firearm in a lock box is not only unrealistic, but also *unsafe*.

In addition, given Maryland's stringent background checks and training requirements, it is even less likely that a Marylander who legally carries a firearm would use it inappropriately or unlawfully. I respectfully ask that you re-consider bill 21-22 and not eliminate my right, and the right of other law-abiding citizens, to defend ourselves. I would be happy to discuss this matter with the Council as a whole, or with any members who might wish speak with me about this important topic.

Thank you.

Jack Leeb PsyD
Police and Public Safety Psychology
301 452-4900

(28)

JA425

I feel it is uncostitutional and unsafe for the general public to create unlimited gunfree zones to keep legally o
with little or no resistance or fear of being stopped or caught. Everyone that creates these laws are

Thank you

(29)

e surrounded by their own armed security and don't have to defend theirselves or family on their own.

(30)

My name is James P. Tully. I am 55 years old and have been a Montgomery County Resident my Entire life. I have served in the Military, and for the past 22 years I have been a Uniformed Diplomatic Security Officer at the U.S. Department of State. I have been sworn in, as a Special Deputy U.S. Marshal, and have received training in Active Shooter Response. I am well acquainted with Gun Valence, and come to the conclusion that additional legislation does nothing to address criminal activity.

As a Maryland Ware and Carry Permit Holder, which I have had since 1995. I have strong Objections to Bill 21-22. By not allowing a permit holder to come within 100 yards of any place of public Assembly. This proposed bill will Make it impossible to travel any ware in Montgomery County with out being in violation of the law. An illegal weapons charge would result in criminal charges and having my Maryland Gun Permit revoked. These two actions would have an adverse effect on my current employment.

Bill 21-20 will not allow me to travel in my car, or by foot, in my own neighborhood without passing within 100 yards of a school or state park. I would not even be able to stand in my own back yard because my property is within 100 yards of a Montgomery County Park.

In addition, I object to definition of public venues, to including privately own property.  This is an example of extreme Government over reach. To Include Houses of worship is pure insanity. Multiple churches in this country have been the targets of active shooters. The reason being is that it is a soft target. The Active Shooters only has one mission, that is to kill as many people as they can. Not allowing people to defend themselves in their house of worship only would help facilitate another tragedy.

It is foolish to believe our local police departments can do any thing to prevent this sort of gun violence. Police resources are extreamly limited. The school Resource Officer was Removed from McGruder High School a few weeks before that school shooting. If I am not Mistaken, I believe a budget cut was cited as the reason. It is a tragedy that Montgomery County government took absolutely no responsibility for their lack of insight. The School Resource Officer would not have been in the school in the first place if there was not a clear and present known danger.

As a current Maryland Gun Permit Holder, I can say there is absolutely nothing wrong with the current restrictions that have been in place for many years. Most of the civilian gun violence does not involve permitholders anyway. This proposed Bill dose noting to stop Gun Violence and would only help facilitate more violence by preventing law abiding citizens from defending themselves. There is so much to say on this topic more to say on this topic. Brevity is of the upmost importance and I believe I made my point. In conclusion there is no reason this bill 21-22 be made into law.

> **Commented [JT1]:** It

(31)

Hello,

I'm writing regarding Bill 21-22. I understand this bill removes the exemption for holders of Marylands Wear and Carry permit. This would make it illegal for permit holders to be within 100 yards of "Place of Public Assembly", which equates to everywhere in the county.

According to Data.montgomerycounty.md, from 6/1/2022 to 7/15/2022 there were over 4,800 founded crimes in Montgomery County. This equates to 106 crimes per day in the 45 day period. A quick internet search proves these are not legal permit holders committing these crimes. Bill 21-22 would leave me unable to protect myself from assault, burglary, theft, robbery and all such crimes were reported within the county. Why can a criminal have a weapon to commit these crimes but I, being a law abiding American citizen, cannot have one to protect myself from such crimes?

The Supreme Court upheld our right to defend ourselves outside our homes in the recent ruling of Bruen. Why are you attempting to subvert the Supreme Court and the constitution?

I have lived in WV, OH, PA and CO over my life. Maryland is the first place I have lived that I am afraid to be out of my home for an extended time. I am a law abiding citizen and I've completed all the necessary training and requirements in Maryland for a Wear and Carry permit. Carrying a weapon for protection is an overwhelming responsibility for the permit holder. Criminals have no requirements to meet and feel no such responsibility. It is reprehensible that a criminal is more protected than I am.

Bill 21-22 impacts my travel as I live in an adjoining county. I will no longer be able to see my physicians or patronize restaurants and shops in the county. I hope the officials of Montgomery County use statistics and facts and support their law abiding citizens.

Janice Hess Frederick County

1

(32)

JA429

July 15, 2022

Montgomery County Council
Legislative Branch
Bill 21-22

Gentlemen, I would respectfully vote against this bill. I have lived in Burtonsville,
Maryland for 16 years. I have seen an alarming rise in crime in this area, especially over
the last 4 years. This past week on July 10th, 2022 there was a shooting just down the
street from my house at the Briggs Chaney Market place. Over 60 shots were fired and
one innocent bystander was wounded by gunfire. This shooting happened within 2 hours
of a STRING of robberies in down town Silver Spring. Bill 21-22 would prevent law
abiding citizens from protecting themselves and their families and would do NOTHING
to prevent criminals from obtaining firearms and committing violence. I understand law
makers are desperate to solve gun violence but these laws don't affect criminals. There
are so many guns in this country, barring the banning of ALL guns, we need to be
smarter with possible solutions. Energy would be better spent on training and vetting of
carry applicants. Examining credentials and references for carry applicants would go a
long way to keeping us all safe.
Why do citizens need carry rights :
Unfortunately, there is a response time for police response. There are occasions when a
citizen will not have time to call and wait for the police. If I'm walking and attacked by
dogs I will not be able to call the police for help. If I'm walking and a robber threatens
me with a knife, I will not have the luxury of calling the police. Last year I called the
police to report a trespasser on my property. It took 40 minutes for the police to show up.

Respectfully,

John Murphy

(33)

Montgomery County Council                              July 21, 2022
Legislative Branch
Bill 21-22

I would respectfully vote against this bill. Here are two examples why I feel this way.

On July 17, 2022 a gunman walked in to the food court of Greenwood Park Mall in
Indiana. Shot and killed 3 innocent bystanders and wounded another 3. Elishjah Dicken, a
22 year old legally carrying, killed the gunman and was declared by local police and the
Mayor a Hero who saved countless lives. YOUR bill would have prevented this
intervention. WHERE WERE THE POLICE ???
WHERE WERE THE POLICE IN UVALDE ???

Closer to home in MONTGOMERY COUNTY yesterday, Wednesday July 20th  at 1pm
an elderly man out for a walk was attacked by a pit bull in Silver Spring. The owners had
trouble stopping the attack even hitting the dog with their car. The victim is in the
hospital. How many times does this happen ??  Google how many people are attacked by
dogs every year. More than 4.5 million people are bitten by dogs in the USA each year.
Many victims are killed.
I am elderly and walk every day in Burtonsville. I have been chased by stray dogs twice.
You want to make Montgomery County safer ? How about banning pit bulls ? A breed
known for vicious unprovoked attacks.
My house is close to 2 schools, a church, and the Burtonsville Library. No matter which
direction I choose to walk I will be walking past one of these "Places of Public
Assembly".
Every time I walk I fear being attacked by dogs. I am completely defenseless thanks to
your carry laws.

John Murphy

(34)

JA431

My name is Jonathan Wrieden and I am a resident of Montgomery County. Bill 21-22 is blatantly unconstitutional and directly infringes on my right to self-defense. I was in the United States Army Infantry for ten years and am a combat veteran. I have more training than most police officers, yet this bill would prevent me from carrying a firearm in public for protection. Because of my extensive military training, I am an asset to society. If any of you were in a mass shooting scenario, you would want me there with a gun to save you. I do not trust the police to protect me or my wife in one of these situations. In most cases, mass shootings are over and the damage is already done before police can arrive. And even if police do arrive in time, I do not want to have to hope and pray they possess the courage to act, unlike the police officers in Uvalde. Furthermore, this bill will not stop criminals from carrying guns. That's why they're called criminals, because they break the law. If a criminal wants to carry out a mass shooting, then they are going to do it anyway and this bill will not stop them. This bill will only affect the law-abiding citizens. It will strip them of their right to protect themselves and their families. All law-abiding citizens can be assets to society. The solution is to properly train and equip them, not to strip them of their right to carry a firearm so that they are left defenseless against criminals. On July 17, 2022, an armed bystander shot a mass shooter who opened fire in a mall in Indiana. If it wasn't for this responsible citizen, the criminal would have killed many others. There are countless other examples of armed law-abiding citizens taking down mass shooters and thereby saving many lives while waiting for police to arrive. Do not let the recent sensationalizing of shootings in the media make you feel like you have to pass laws to make it look like you care enough to do something. This bill is nothing more than an emotional reaction to NYSRPA v. Bruen and it will not stand up in court. This bill does not pass the history and traditions test for constitutionality established by the Supreme Court in NYSRPA v. Bruen. You're going about it the wrong way. Focus on keeping guns out of the hands of criminals and keeping them in the hands of law-abiding citizens, the assets of society. That's the solution. I urge you not to pass Bill 21-22. It will cost lives, not save them. Thank you for your consideration.

(35)

Testimony regarding EXPEDITED BILL NO. 21-22,
Amending Montgomery County Code Chapter 57, Weapons, Section 57-11

Michael Burke

**I rise in opposition to the language of the proposed Expedited Act to prohibit the possession of firearms in or near places of public assembly.**

As written -

**Section b) (2)** *(does not) apply to a law enforcement officer, or a security guard licensed to*

*carry the firearm...*

Please consider the extremely adverse consequences of your proposed bill.  Thousands of retired law enforcement officers reside in Montgomery County, while thousands more routinely travel through the county daily from across the greater DC Metropolitan Area.  You (the Council) and both the Montgomery County Police Department (MCPD), Montgomery County Sheriff's Office (MCSO) and the Maryland State Police (MSP) rely on these highly trained, well vetted, and experienced law enforcement veterans to assist them in maintaining the peace and responding to violent incidents (such as an active shooter).  Those retired officers, who carry their handguns under Maryland State Police Handgun Permits (issued at no cost to all former/retired Maryland officers and deputies) and retired Federal Agents and Officers (ATF, FBI, Secret Service, US Marshals, Military Police, Military Intelligence, and other counter-terrorist agencies) are prepared today, and tomorrow, to step in and STOP violent crime as it develops.  These men and women with decades of skills have been performing these public safety roles for decades.  I'm one of them.

Your bill would order thousands of women and men to DISARM and cease to function as unpaid auxiliary forces to safeguard the citizens of the County, and prevent them from coming to the aid and assistance of MCPD, MCSO, and MSP for fear of being arrested, detained, and prosecuted for unlawful possession of their handguns.  Is this what you truly desire?

Consider the cases of Deputy Chief State Fire Marshal Sander Cohen, and FBI Supervisory Special Agent Carlos Wolff.  These men took the extreme risk, both "off duty," to come to the aid of a Montgomery County citizen in distress, on Friday, December 8, 2017.  Both were killed that night.  Sander Cohen also served as a volunteer firefighter with the Rockville Volunteer Fire Department.  They died on I-270, near Great Falls Road, serving the citizens of Montgomery County, knowing the risks they faced by serving – you.

Consider the shooting at Magruder High School, in May 2022.  Off duty and retired law enforcement officers residing in the area responded to the report of "active shooter" at the school, knowing that meant placing their lives at risk – to potentially save CHILDREN, while the local precinct was short-staffed.  MCPD has 27 unfilled sworn positions, though brass and union leadership express concern for a "crisis" in the future.  Between April 2020 and April 2021,

(36)

JA433

Testimony regarding EXPEDITED BILL NO. 21-22,
Amending Montgomery County Code Chapter 57, Weapons, Section 57-11

Michael Burke

police resignations rose 26 percent, from 19 to 24, over the preceding 12 months. Retirements increased 18 percent, from 28 to 33, department data show.

The Law Enforcement Officers Safety Act (LEOSA) is a United States federal law, enacted in 2004, that allows two classes of persons—the "qualified law enforcement officer" and the "qualified retired or separated law enforcement officer"—to carry a concealed firearm in any jurisdiction in the United States, regardless of state or local law.  It is codified within the provisions of the Gun Control Act of 1968 as 18 USC § 926B and USC § 926C.  LEOSA also covers state and public university and/or college campus law enforcement officers (such as University of Maryland Police, Montgomery Community College Police, and approximately 20 other colleges and universities that have armed law enforcement officers).

18 USC § 926B

(a) Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b).

(b)This section shall not be construed to supersede or limit the laws of any State that—

(1) permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or

(2) prohibit or restrict the possession of firearms on any State or local government property, installation, building, base, or park.

(c), "qualified law enforcement officer" is defined as any individual employed by a governmental agency, who:

1. is authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law, and has statutory powers of arrest, or apprehension under section 807(b) of title 10, United States Code (article 7(b) of the Uniform Code of Military Justice); This includes state and public college/university police officers.
2. is authorized by the agency to carry a firearm;
3. is not the subject of any disciplinary action by the agency which could result in suspension or loss of police powers;
4. meets standards, if any, established by the agency which require the employee to regularly qualify in the use of a firearm;
5. is not under the influence of alcohol or another intoxicating or hallucinatory drug or substance; and
6. is not prohibited by Federal law from receiving a firearm.

(d) the individual must carry photographic identification issued by the governmental agency for which the individual is employed that identifies the employee as a police officer or law enforcement officer of the agency.

(37)

Testimony regarding EXPEDITED BILL NO. 21-22,
Amending Montgomery County Code Chapter 57, Weapons, Section 57-11

Michael Burke

In 2013, LEOSA was amended by the National Defense Authorization Act (NDAA) for Fiscal Year 2013, effective January 2, 2013, after **President Obama** signed Public Law 112-239 (H.R. 4310).

**Senator Patrick Leahy**, a key sponsor of the bill, remarked "The Senate has agreed to extend that trust to the law enforcement officers that serve within our military. They are no less deserving or worthy of this privilege and I am very pleased we have acted to equalize their treatment under the federal law". He further stated "The amendment we adopt today will place military police and civilian police officers within the Department of Defense on equal footing with their law enforcement counterparts across the country when it comes to coverage under LEOSA."

I cannot imagine that this Council wishes to oppose President Obama or Senator Leahy in recognizing the vast importance of recognizing these men and women as extremely valuable members of the community, people that you would disarm and render ineffective if you pass this bill as written.  Your statute seeks to nullify unknown thousands of Handgun Permits issued lawfully by the Maryland State Police, following deep and detailed background investigations, extensive training in the Use of Force, Marksmanship, and other legal education required by the General Assembly and the Maryland Police and Correctional Training Commissions (MPTC).

These well trained, well-armed County residents and visitors, individuals possessing handgun permits from around the DC Metropolitan Region, are NOT a threat to public safety- they are an unnoticed, unappreciated asset to protecting and serving the communities under your care.

(38)

JA435

William Adams


Opposition to Bill 21-22

How any elected official may feel personally about guns is not what they are obliged to act on. As an elected official, trusted to honor the US Constitution, the Maryland Constitution, and the collective wants of their constituents, they must be true to their responsibilities and act according to the wishes of their constituents within the bounds of the US Constitution. Therefore, the only right thing to do is to reject this bill as it clearly violates the 1st, 2nd, and 14th Amendments and is simply a dangerous bill.

Setting aside for a moment the Constitutional violations this bill presents; the question is why? Why do you feel compelled to deny a properly permitted firearm holder freedom of travel simply because they are now permitted to carry a firearm when previously there was no prohibition from doing so?  Is there evidence that anyone is now in greater danger, or is it simply speculation based on some misinformed notion that gun holders are dangerous? Handgun Permit (HGP) holders in this state have complied with the rigorous training and background checks requirements to obtain a permit, and as such, are shown to be safer, law-abiding, and even-tempered individuals.

This proposed law does NOTHING to improve the safety of Maryland citizens that may reside, work, or pass through your county.  As we have seen most recently at the Greenwood Park Mall in Indiana, an armed citizen legally carrying a concealed firearm stopped a mass shooter on a shooting rampage in the mall.  How many more lives would have been lost had a law like Bill 21-22 is proposing been in place in this Indiana town.  Bill 21-22 will prevent a legally armed citizen from responding to such an event in Montgomery County.

Anyone saying that the freedom to carry a firearm outside the home for self-defense or the protection of others is unnecessary and claiming that firearms in the public space is unsafe, is simply misinformed or ignoring the facts.  If you are truly concerned about the safety of the residents, workers, and visitors to Montgomery County, please direct your energies to stopping gang crime in your county and leave the law-abiding citizens of Maryland alone.

PLEASE, reject this bill!

Sincerely,
William Adams

(39)

Please allow law abiding citizens to exercise their constitutional rights in Montgomery county. Clearly, the statistics show that criminals are getting more and more brazen as we've felt the crime wave in our communities. We are already at a disadvantage against criminals. Please give us the opportunity to defend ourselves.

(40)

Testimony in support of Bill 21-22

Prohibiting firearms in or Near Places of Public Assembly

Good afternoon. My name is Mindy Landau, I am a resident of Potomac, MD in Montgomery County and I've lived and worked here as a federal employee, now retired, for 40 years. I am a co-lead of Brady United's Montgomery County Chapter and also represent Brady Maryland and our state executive committee. Thank you to the Montgomery County Council for giving me this opportunity to testify.

Bill 21-22 **will protect Montgomery County residents from an armed threats to our citizens in places where they work, play and socialize.** Our children should not have to fear that someone with a gun will invade their "safe" space for learning. Government workers and concertgoers should be able to go to work, concerts and parks without worrying whether the person next to them is carrying a gun. Our citizens don't want to feel anxious, intimidated, or afraid. We just want to be free and feel safe in the places we visit that give us joy. The presence of guns at or around these public places poses a danger to citizens' emotional and physical well-being. We must protect the citizens of this county and their ability to visit places of worship and parks freely and without fear of being shot.

Let's call it what it is - guns in public places represent armed threats, clear and simple. And intimidation is not what Montgomery County is about. This is why Brady United Against Gun Violence appreciates and strongly supports Council President Albornoz' bill.

By prohibiting firearms within 100 feet of a gathering place, this bill will help to ensure we are protecting the sacred right to assemble for our generation, and generations to come.

Although we respect the Second Amendment and rights of gun owners under the constitution and laws of Maryland, that right must be exercised so as not to infringe on constitutional rights of others, including the right to assemble peacefully. Gun laws are designed to do more than to protect physical safety alone. They can and do help preserve public order and the freedom of others to peaceably assemble, speak, and worship without fear and intimidation.

As a country, much work has been done over the last 100 years to ensure that freedoms, as represented by the right to assemble peacefully, is accessible by all - regardless of their race, socioeconomic class or disability. We must continue this work today. Thank you.

(41)

Good afternoon:  I am writing to express my concern with Bill 21-22.  The bill is problematic and worrisome in quite a few ways, but some more than others – and, of course, some more personally than others as well.

I expect to receive my Wear and Carry Permit later this year, as do many others now that the Supreme Court, in its *Bruen* ruling, has declared the "Good and Substantial Reason" portion of the permitting law to be unconstitutional. Currently, Montgomery County law forbids carrying a firearm within one hundred yards of any place of public assembly, specifying public parks as one such location, and makes an exception for those who have carry permits.  Bill 21-22 would remove this exemption, making it unlawful even for permit holders to carry in such areas.

My apartment lies about twenty yards from the border of a park owned by Montgomery County.  Although Bill 21-22 does make an exception for carrying within one's home, it would seem to make it impossible for me to walk out of my own front door while carrying my firearm. For me to comply with this bill, I would apparently have to unload my firearm, walk or drive to a location deemed suitable for carry by Montgomery County, then reload my firearm and go about my day.  (And, of course, I would need to perform the same procedure in reverse on my way home.)  This would make it so inconvenient to use my carry permit that it would effectively make my permit useless – which would defeat the purpose of getting the permit in the first place.

I urge you not to pass this bill.  If you do, someone in my circumstances will undoubtedly file a lawsuit against Montgomery County, and while I am not a lawyer, I find it difficult to see how the county could possibly win.  You could, in fact, end up having other restrictions besides this one thrown out by the court, leaving you with fewer carry restrictions than you had in the first place.

Very truly yours,


{signed}
Parrish S. Knight

(42)



16005 Frederick Road, 2nd Floor                    Office: 443-325-5076
Woodbine, MD 21797                                      Fax: 410-696-2022
Website: www.sillengineering.com     Email: info@sillengineering.com
                 Civil Engineering for Land Development

## SILL ENGINEERING GROUP, LLC

July 13, 2022

**Montgomery County Council**
Montgomery County, Maryland 21043

                     Re:    Council Bill 21-22
                              OPPOSE

To Whom It May Concern,

       As I read this proposed bill I am very concerned for my right to self-protection.  I have had a Maryland Wear and Carry Permit and other State's carry permits for many years now and routinely carry a firearm and travel into Montgomery County for business and personal reasons.  I believe this bill as worded will effectively ban firearm possession in the entire county, stripping me of my Constitutional Right to self-protection.  Please OPPOSE this bill.

       Should you have any questions or comments regarding this matter, please do not hesitate to contact this office.

                         Sincerely,
                         SILL ENGINEERING GROUP, LLC

                         Paul M. Sill, PE, LEED AP

(43)

The United States is founded on laws. We as a people, follow the laws. When the government decided to not follow the laws, it is no longer a government.

To place the county under a gun free zone, will not serve law abiding citizens.  No one will be safe, crime will continue to rise.  There will be no reason to live in Montgomery County as it will be run by criminals and gangs.

Since  you are infringing on my right afforded to me by the Constitution of the United States. I am requesting that this bill be removed or voted down. It serves no law abiding citizens in Montgomery County.


Robert Utley

(44)

Simeon Pollock

Dear Mr. President,

I am writing to you as President of the Montgomery County Council, to ask the council through you, to please reconsider passing the ill advised bill 21-22 - Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.

Not only is this bill illegal following the Supreme Court's ruling in Bruen, it will only make criminals of otherwise law abiding citizens. It tries to superseded Maryland State law as well as tell the Maryland State Police (MSP) that it does not know how to vett and process Concealed Carry Permits.

The State of Maryland, through the MSP, already has in place an age limit - 21, a thorough vetting process for anyone wanting a Concealed Carry Permit (CCW). There are classes required for an HQL, more class time & testing for a CCW. This state process allows concealed handguns to be in the hands of responsible adults.

The bill before the council will only serve to make vetted, trained, responsible adults into criminals in MoCo.  Why do that?  The criminals who will attack the public won't follow this law. So what purpose does it serve? It will only put a burden on law abiding citizens.

As a religious Jew who makes his home in the USA & in Montgomery County, I am becoming increasingly alarmed at the rise in anti-semitism, plain old Jew hatred that is on display in this country and recently in our county, in the heavily Jewish neighborhood of Kemp Mill. I want to be able to fight back should anyone come and try to kill Jews just for being Jews and congregating in a synagogue. *Never Again,* means that we won't be attacked & slaughtered without fighting back.

In Israel where guns of all kinds are common place, it's usually a private citizen that stops an attack before the police or army can respond.  That can be here as well.

In many cases where synagogues were attacked in America, trained & armed congregants may have ended the attacks easily as most attackers are not trained in any way to use firearms if they are fired upon or face an armed citizen. Even in schools across the country, students & teachers are dying because no one is trained & armed to confront the attacker.  They are forced to wait for the police who will hopefully come & stop the attack.

Concealed guns grant the element of surprise to any would be attacker & just the knowledge that citizens may be trained & armed may prevent a future attack.

Please don't pass this legislation & make life for law abiding citizens more difficult.

(45)

Sincerely,

Simeon Pollock

(46)

Please follow the recent Supreme Ruling on firearms carry permits. You all took an oath to uphold the Constituion.

(47)

Vincent C. McGinnis


July 18, 2022

Dear Montgomery County Council,

**RE: Bill 21-22**

Montgomery County Bill 21-22 as written could restrict law-abiding citizens with a Maryland issued "wear and carry" permit from exercising their right, if they <u>live</u> "within 100 yards of a place of public assembly". My issue with that is, I live between 1 to 2 blocks from Seneca Valley High School (SVHS) and cannot avoid the high school. This law could nullify my right to bring a firearm outside my house; let alone carry one for personal protection, because of living in such close proximity to SVHS.

<u>Background:</u> I moved into the 'Olde Seneca Woods' development 35 years ago. I am 62 year old and I enjoy the convenient location and walking as much as possible. I walk to the FNB ATM on the corner of Crystal Rock Drive/118. I walk to the grocery store, the Post Office, the dry cleaners, and really anywhere I can. All this helps me get exercise and reduces dependence on my car. Though I love this location for all its convenience, I try to walk during the day; and not too late at night. That's because my house is located in the Crystal Rock Drive area (near The Hampton Apartments) and is one of the worst crime areas in Germantown. Just ask any Montgomery County Police Officer who has worked in Germantown. For this and other reasons, I applied for a Maryland State issued wear and carry permit.

Bill 21-22 as currently written could nullify my right to bring a firearm outside my house; let alone carrying one for protection; because I live in such close proximity to SVHS. This would gut the intent of recent change in the law for me and others who live so close to designated gun-free zones.

Thanks for listening my concern. I hope you can address this issue in the bill before its voted on.

Please feel free to call me with any questions you have.


Sincerely,

*Vincent C. McGinnis*

(48)

July 15, 2022

Reg:  Bill 21-22

Dear Council Members:

I do not support Bill 21-22.  I believe the bill is driven by the mistaken belief that "more guns on the street means more crime."

The Bill is intended to outlaw concealed carry almost everywhere in Montgomery County.

One needs only to know what happened in the 44 states that have either "shall issue" or "constitutional" (no permit required) concealed carry. The law-abiding who do not carry guns today, do not become criminals tomorrow after personal defense is permitted by the government.

No State that has permissive concealed carry has seen an increase in gun crimes by the law-abiding (source AWR Hawkins, John Lott Jr., et. al.)

Self-defense is a natural right.  A "belief" that concealed carry by the law abiding means more crime is unfounded and is subordinate to the natural right to survive.

I support Maryland law as it stands for concealed carry.  That is enough for public safety.  Bill 21-22 is not required.

Best Regards,

Cs//

Cary Secrest

(49)

JA446

**Public Testimony In Response to Bill 21-22, Weapons-Firearms In or Near Places of Public Assembly- July 26, 2022**

Good afternoon,

I am a resident of Montgomery County, MD (Gaithersburg/Damascus to be exact) and a law-abiding firearms owner.  I am also an attorney and a staunch believer in civil rights.  I am writing to express my grave concerns with the efforts of the county to curb exercise of civil rights by law-abiding firearms owners, as made plainly evident in the text of Bill 21-22.

As the Council is no doubt aware, the Bill of Rights to the US Constitution recognizes certain key and fundamental civil rights of US Citizens that the founders thought so profoundly important they bore being enumerated.  The Second Amendment to the Constitution protects the right of individuals to keep and bear arms.  The Supreme Court has continually held that this is a protected civil right.  Citizens have a constitutional right to keep and bear arms; to keep and bear arms of those types in ordinary use; and to keep and bear arms *in public* for purposes of self-defense and other lawful ends.  The Maryland Charter makes the US Constitution the supreme law of Maryland so, quite clearly, Marylanders have a constitutional right to wear and carry firearms in public.  As recognized by Governor Hogan, Marylanders no longer need convince the government that they should be allowed to exercise a civil right.  The proposed bill's definition of places of public assembly would act to essentially deprive those in or visiting Montgomery County of a right to defend themselves, even on private property.  This is in direct contravention to the recent Supreme Court decision in NYSRPA v. Bruen, but you are aware of this fact as the bill is in direct response to the decision in Bruen.

The Council is, nonetheless, pursuing a bill that directly and intentionally flies in the face of constitutional rights.  Section 4-209 of the Maryland Criminal Law Code also prohibits local governments from imposing certain restrictions on possession of firearms.  Bill 21-22 goes well beyond the exceptions permitted under Section 4-209.

Given that the Council is fully aware of the Constitutional rights that it seeks to intentionally infringe through attempted imposition of Bill 21-22, I want to draw your attention to 42 US Code Section 1983.  Section 1983 is a federal statute which provides a right for individuals to sue local government officials directly when those officials violate civil rights in the course of their duties. Given that the Council is aware that this bill would violate civil rights (it is clearly written with that express intent) Council members likely lose any defense of qualified immunity and become personally liable for their unconstitutional actions.   I for one would consider seeking a 1983 action if the Council passes a bill directly aimed at infringing my civil rights.

Putting the above aside for the moment, what is it that frightens the Council so much about the lawful exercise of civil rights?  Does the Council also intend to ban prayer within 100 yards of a place of public assembly? Does the fifth amendment not apply

(50)

JA447

within 100 yards of a place of public assembly?  Does the Council believe that individuals should lose their fourth amendment rights if within 100 yards of a place of public assembly?

Will the Council ban armed security or law enforcement at Council meetings or is it ok for the Council to be protected by firearms as long as the rest of us are not?  Given that gun control is really the last vestige of Jim Crow laws, maybe the Council is scared of minorities being able to defend themselves?  Is that it?

Representative Jamie Raskin, of whom I am no fan, recently publicly pointed out the ridiculousness of Bill 21-22 and that it is just a waste of precious taxpayer resources and likely to be overturned in court.  That said, he also called protection of constitutional civil rights draconian and foolish, so maybe he's not a great example.

I truly encourage you to listen to your better angels and recognize the foolishness of 21-22 and, instead, embrace an approach that protects civil liberties of all Montgomery County residents and guests.

Respectfully,


Matthew Hoffman

(51)

Members of the County Council

I am writing to express my opposition to Bill 21-22 as drafted.

As written, this proposed ordinance would effectively prohibit use of a Maryland wear and carry permit in any of the built up areas of Montgomery County as it would be nearly impossible to drive or walk up or down a major street (e.g., Georgia Avenue, Wisconsin Avenue, New Hampshire Avenue) without coming within 100 yards of any property attached to a place of public assembly.  Moreover, any Montgomery County resident with a wear or carry permit who lived or owned a business within 100 yards of any property attached to a place of public assembly would be barred from using the Maryland wear and carry permit while entering or exiting his residence or business.  Additionally, there are places in Montgomery County where the Beltway and U.S/ 29, for example, come within 100 yards of property attached to a place of public assembly.  Thus, this ordinance would criminalize use of a wear and carry permit while traveling through Montgomery County on the Beltway or U.S. 29.  It should not be difficult to see why the breath of this ban is inconsistent with the recent Supreme Court decision allowing legislatures to ban guns only in narrowly defined sensitive spaces.

There is also a problem with the vagueness of the definition of place of public assembly. By use of the term "including" the ordinance reads as if there are other unlisted places that may be considered a place of public assembly. With a criminal statute, the citizen is not supposed to have to guess what may or may not be included – particularly with a term that is broad enough to include, for example, any store.

There is a saying, "Bad cases make bad law."  Passing this ordinance as written will undoubtedly result in rejection by the courts and may very well result in a court decision that further restricts the right of a legislature to ban guns from sensitive spaces and thus winds up making gun control harder rather than easier.  In addition, passage of this ordinance as written will unnecessarily run up County legal fees with money that could be spent on productive initiatives.

In my 31-year career (1966-1997) in criminal justice (including positions as a police officer, probation officer, and parole officer in New York State, Staff Director of the U.S. Parole Commission, and Principal Technical Advisor of the U.S. Sentencing Commission), I have seen quite a few pieces of criminal justice legislation that were not well thought out and/or not well drafted.   In my opinion, this proposed ordinance, as written, falls in this category. Thus, I recommend strongly this proposed ordinance not be enacted as written. 1

(52)

JA449

Sincerely,

Peter B. Hoffman

Silver Spring, MD

1. If the "within 100 yards of" language were removed from this bill (so as to limit the prohibition to the actual property of the place of public assembly), and if the definition of place of public assembly was tightened to remove its vagueness, it might ameliorate the above noted issues.  Whether the proposed legislation is needed to address a real problem is another issue on which I take no position other than to note that during my career in criminal justice, I reviewed more than 25,000 files of convicted offenders and I remember only one case involving a crime committed with a handgun carried by a person having a permit to carry a handgun (not including offenses committed by persons who were authorized to vary a handgun because they were law enforcement officers).

(53)

Dear Counsel Members and constituents,

I am writing in regards to Bill Bill 21-22. Please allow me an opportunity to voice my concerns and kindly accept it for consideration. I will try to make this short and sweet.

I have lived in Montgomery County, Maryland for my whole life, except when I went to college. I am almost 42 years of age. Although I was a knucklehead growing up, I earned a Master's degree, volunteered for the fire department, am a member of a chamber of commerce, am Senior Home Safety Specialist, Client Liaison Manager and Marketing Coordinator and served on the community board of directors. Not to mention, my wife and I work hard, very hard. We have also been steadily employed our whole lives and we pay all our taxes on time.

As you make your decision, please take this into consideration, how is it fair that a criminal will be able to go to a mall with a gun, like it happened in 2016, but someone with my background has to be unarmed? Would that really make you feel safer? I live across the street from the mall. When I walk my dog, how do I know the proximity of when I am committing a crime by being 100ft of 100 people?

This approach will either force me to be unarmed, or deal with a subjective approach of a police officer. Why is it that the Supreme Court of the United States just made me, you and a lot of others like us more equal and you are voting to take that away? Please excuse me, but the laws you are considering will not make us safer.

Even if I don't carry arms, I feel a lot safer knowing that others who are responsible carry their arms. Montgomery County is a great county, but it's not in a secret bubble. Criminals are all over the place and they will not follow this law, nor will the criminals from neighboring counties who will flock here knowing how rich and unarmed our citizens are.

There have been many mass killings. The numbers are staggering. It's obvious some of you want to make guns go away. I honestly wish we could disarm all of America too, but we can't. It's ingrained in the constitution and the Supreme Court just clarified that. The law being considered will undoubtedly be challenged by many and it may end up being a very costly decision for our county. Please consider putting that time and money into schools, our infrastructure, and placing real criminals behind bars.

Please give me and other responsible citizens of Montgomery County the right and chance to defend ourselves if the unlikely, but life threatening, situation happens to arise. The elements of this law should be left up to private establishments on whether to allow or not allow arms.

It's great to require proper training and background checks. Maryland has good laws right now. Please, please, please do not create a law to punish the responsible citizens. This law can harm a responsible citizen with their lack of safety and/or having unfair legal repercussions.

(54)

JA451

Thank you for your open-mindedness and consideration. Please make that right decision and give the responsible citizens the equality that they deserve and that the rest of the country already has.

Respectfully,

Renan Augusto

(55)

Statement regarding Bill 21-22

Good afternoon, my name is Michele Walker.  I am a native of Maryland.  My husband and I have raised four children in Montgomery County since 1990.  Like our parents, we taught our children to respect our country and every person in it no matter their financial or educational status.  Sadly, there are those among us who do neither of those things.

Every American has the right and responsibility to defend not just themselves but their family, neighbors and other Americans whom they do not know personally.  The 2nd Amendment of the United States Constitution does not restrict American Citizens from wearing and carrying their firearms.  The Supreme Court has recently ruled against legislature that demands reason or need applications.  The courts have ruled against many restrictions that would infringe upon our  citizens rights.  There's an extremely low percentage of people using firearms to commit crimes or harm to others in comparison to the number of people who own one or more firearms that do not use them for those purposes.

There are numerous cases where a law abiding gun owner saved the day as a crime was happening.  Some were in convenience stores and saved the clerk or another customer from robbery and possible death.  A judge in Ohio was able to save himself from a criminal who was attempting to kill the judge right outside of the courthouse. In a mall a gunman was stopped by a citizen who had a permit.  None of us have the ability to know if we will be in one of those situations where a gun will be used with harmful intent but all of us would be grateful to be saved by someone who had our backs.  To those who want to push gun control, close your eyes and imagine yourself in one of those situations where there is an angry or upset person with a gun.  Now imagine if you have no one there to save your life because of these laws.  How would you feel if your close family member were just an innocent bystander harmed or killed because of the gun control law that prevented the possibility of someone to stop it from happening? None of us are exempt from the potentiality of being harmed by people who just don't care about the law or who are  out of their mind. None of us, that includes you too.

Please stop trying to unarm the law abiding citizens.  We have been taught  to respect the gun and use it properly.  Gun control does NOT work.   Look at the localities that have the strictest laws on the books and see that things have gotten progressively worse.  Chicago, New York and Philadelphia are shining examples of those cities.  Law abiding citizens do not have intent to go shoot up people or places.  We intend to protect ourselves and those around us from others who either have criminal intent or have a mental illness.  Address the real issues mentioned in the last sentence because it is not the gun, it's the person holding the gun.

(56)

JA453

To the Honorable Members of the County Council of Montgomery County, MD,

I urge you to vote against Expedited Bill 21-22, Weapons – Firearms in or Near Places of Public Assembly. I know you want to make me safer, but this bill does the exact opposite.

Antisemitic incidents are on the rise in the county, particularly by white supremacists[i]. White supremacists are the most likely of all extremists to use violence[ii]. They target synagogues because these facilities serve the Jewish community and assure the presence of a significant number of Montgomery County citizens at certain times of the week. Furthermore, In the orthodox community, Sabbath synagogue attendees do not carry their phones, so there would be a delay in alerting police to an active threat.

An additional factor impacting incident response is that Montgomery County police are understaffed and recruitment is down. Our sworn officers per capita is only half the national average[iii]. It is unrealistic to expect police to be able to engage with an active threat fast enough to prevent mass casualties.

Furthermore, turning places of worship (and essentially the entirety of the county) into gun free zones would do the precise opposite of its intent. It would serve as a welcome sign for potential mass murderers as to which locations they can "safely" unleash their mayhem[iv] — and there'll be nobody there (with a gun) to stop them! This is because the only people who will comply are law-abiding, licensed gun owners. Do you really think someone intent on mass murder will leave their gun at home because of this law?

Lastly, the expedited basis of this bill is unjustified. The CCW permit application process takes 90 days from submission to approval[v] plus a few days to mail the permit to the applicant.  This provides the MDSP sufficient time to perform a background investigation and interview up to three character witnesses. Before you can do that, you have to schedule and attend a 16-hour training class. You also need to take a live fire test with your instructor at a range to prove your proficiency firing a handgun. You also need to schedule and have your fingerprints taken to submit along with your application and fee. Then your CCW permitted citizen would have to select and purchase an appropriate concealed carry weapon, which in Maryland involves a minimum 7 day waiting period. Therefore, you have 90 to 120 days before the impact of additional CCW permit holders will be seen in the county.

CCW permit holders should be allowed to carry their concealed weapon to their place of worship specifically because of the heightened threat against places of worship. This bill will make it illegal for them to protect themselves <u>specifically at the place they need it most</u>. Therefore, I strongly urge you to vote against Expedited Bill 21-22.

Larry Jaffe
Silver Spring, MD

---

[i] "Sharp rise in anti-Semitism in Maryland, Virginia and D.C., ADL reports"
https://www.washingtonjewishweek.com/sharp-rise-in-anti-semitism-in-maryland-virginia-and-d-c-adl-reports/
and "ADL H.E.A.T. Map™ (Hate, Extremism, Antisemitism, Terrorism)" https://www.adl.org/resources/tools-to-track-hate/heat-map

(57)

---

[ii]"Domestic Extremism in America: Examining White Supremacist Violence in the Wake of Recent Attacks" https://www.humanrightsfirst.org/resource/domestic-extremism-america-examining-white-supremacist-violence-wake-recent-attacks Relevant excerpt below:

 In Pittsburgh, Pennsylvania, the killer who attacked worshippers in a synagogue wrote that he believed Western Civilization was facing "extinction" and that refugees were "invaders";[5]

The Christchurch, New Zealand killer titled his writings "The Great Replacement" and targeted Muslims in a country he was initially only visiting:[6]

The shooter in El Paso, Texas targeted Latinx people in the United States but wrote that he "supported" the racist screed from Christchurch;[7]

In Poway, California, the shooter first targeted a mosque and then a month later opened fire in a synagogue, claiming that Jews were orchestrating a "planned genocide of the European race";[8]

And most recently, the killer in Buffalo, New York, spent weeks identifying a locale in which to murder Black Americans. His own screed was largely a plagiarism of the Christchurch shooter's "Great Replacement" text, but was so sloppy that at times he merely swapped out terms for one victimized community for another.[9]

This heartbreaking trail of violence illustrates how fluidly the Great Replacement conspiracy theory travels across borders and populations.

Unfortunately, these mass casualty attacks are only one element in the larger phenomenon of violent white supremacism and domestic extremism.

Over the last decade in available data, white supremacist terrorism in the United States has increased many times over. Of the 100 white supremacist attacks between 2000 and 2019, 80 of them occurred after 2009, according to the Global Terrorism Database (GTD).[10] And while these terrorist attacks have increased, they have also become more lethal. Mass casualty attacks perpetrated by white supremacist terrorists like the horrific attack in Buffalo, used to be a rare occurrence. Now, they are frequent tragedies.

[iii] "Departures, sagging recruitment plague Montgomery County police (bethesdamagazine.com)"
https://bethesdamagazine.com/bethesda-beat/police-fire/departures-sagging-recruitment-plague-montgomery-county-police-even-as-crime-soars/
[iv] "Mass Public Shootings keep occurring in Gun-Free Zones: 94% of attacks since 1950"
https://crimeresearch.org/2018/06/more-misleading-information-from-bloombergs-everytown-for-gun-safety-on-guns-analysis-of-recent-mass-shootings/
[v] "Wear and Carry Permit (maryland.gov)"
https://mdsp.maryland.gov/Organization/Pages/CriminalInvestigationBureau/LicensingDivision/Firearms/WearandCarryPermit.aspx

(58)

My name is Gary Simon. I am a lifelong resident of Montgomery County. I am a law-abiding MD Wear and Carry Permit holder as well as a MD Qualified Handgun Instructor (QHIC). While I think it fair to say that my viewpoints and philosophies are not very similar to the majority of the esteemed council, I do wish to thank you for the time that each of you dedicate to serving our county. I am here today to ask that you do so from a perspective of practicality and one that adheres to the laws that make our country what it is today.

You have proposed a law, 21-22, in response to a decision of the Supreme Court in the NYSRPA v. Bruen matter. In doing so, you present a code that directly defies the majority opinion written by the Honorable Judge Thomas. I offer a portion of that decision for the record here today. I offer only text, removing citation and reference in the essence of time and brevity.

"Consider, for example, Heller's discussion of "longstanding" laws forbidding the carrying of firearms in sensitive places such as schools and government buildings. Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons are altogether prohibited-e.g., legislative assemblies, polling places, and courthouses- we are also aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled that these locations were "sensitive places" where arms carrying cold be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible. Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law enforcement and other public-safety professionals are presumptively available. It is true that people sometimes congregate in "sensitive places," and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" too broadly. Respondent's argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York Police Department,".

I am a permit holding, law-abiding citizen who will certainly be effected by this error-filled piece of legislation. What I believe gives me the greatest concern is that a body such as yourselves would propose such a piece of legislation that you know would be challenged and likely overturned. Rather than focusing on laws that focus on criminal conduct and are centered on the solving of an issue at hand, you propose something that is nothing more than window dressing to your constituency so that you are able to say we tried to do something. Perhaps if this type of energy was directed at criminals rather than law-abiding citizens exercising their constitutionally protected rights, you might garner the support of people like myself.

Thank you for your time and consideration.

(59)

**Edward Walker**

**Why I Oppose Bill 21-22 (and you should too)**

**I oppose Bill 21-22 for many reasons. The being that it doesn't just turn a right into a privilege, it completely removes this constitutional right from the people. For example even with a Maryland wear and carry permit, I would be unable to leave my place of residence with a legally owned firearm, 100 yards from the ground of a place of public assembly would extend into the street. There is a library, a church and a bank a few blocks from my house on the main road. Which means I'd have to break the law to exercise my RIGHT to carry even if was not intending to carry in Montgomery county.**

**Another reason I oppose this bill, as we have seen time and time again the police fail to act and to defend civilians, the Uvalde shooting is a prime example of law enforcements inability, unwillingness and cowardice to act in the event of a mass shooting or violent encounter. There's also an old saying which comes to mind in these cases "when seconds count, cops are minutes away". Throughout the years and as recently July 17, 2022 we saw a law abiding citizen, good guy with a gun, stop a cold hearted criminal, bad guy with a gun, in 15 seconds. 15 seconds and the horrendous atrocity was ended. 15 seconds. The officers at Uvalde waited 1 hour and 15 minutes. 1 hour and 15 minutes compared to 15 seconds. This shouldn't even need to be discussed. The answer is clear the people deserve to maintain their RIGHT to carry in public.**

**This bill will turn law abiding citizens who would like to exercise their right to carry a firearm, legally with a permit, for defense into criminals, while criminals would still be criminals who don't care about our laws and will still carry because they are criminals. This bill is bad legislation that will only effect lawful gun owners.**

**Thank you for your time, even if you don't actually care what the people think and only give us this opportunity to make us feel as if our opinions actually matter to you. We'll see you in court if this passes. Have a nice day.**

(60)

JA457

Good afternoon. I'm Deborah Miller, the Director of Maryland Government and Community Relations for the JCRC of Greater Washington. The JCRC represents over 100 social services agencies, synagogues, and Jewish schools throughout the region. We work to build strong relationships and coalitions with other communities in pursuit of justice, tolerance, and equity for all. I am here today in support of Expedited Bill 21-22, which aims to reduce the dramatic rise in gun violence we are witnessing every day not only across the country, but in our county.

At the JCRC, one of our highest priorities is the safety and security of all faith-based institutions, particularly Jewish houses of worship, given the unprecedented increase in antisemitism- up 34% across the nation and 17% in Maryland according to the ADL. Additionally, MCPD's latest report on religious bias incidents shows that more than 85% targeted Jews, although they only make up only 10% of the County population. The Jewish community knows all too well the devastating impact of gun violence. In addition to the horrific targeting of African Americans, Asian Americans, and the LGBT Community throughout the country, we remember the Tree of Life tragedy in where 11 members of the Jewish community were murdered.

The importance of this legislation at this time cannot be underestimated. The JCRC is deeply disappointed by the Supreme Court's ruling striking down NY's concealed weapon permit law. We believe it will pose increased risk to public safety.  Houses of worship should be left to establish their own security plans. We do not want individuals who could walk in off the street with a weapon acting in their own individual capacity. It could lead to chaos and create an even more potentially deadly situation.

We will continue to advocate for common-sense gun safety measures throughout our region, because we know that the senseless violence, can only be stemmed by limiting easy access to such deadly weapons. While the Supreme Court taken a step backward to curb violence and ensure safety, we are grateful that in Montgomery County, our leaders are taking a step forward to counter this dangerous trend.  Fewer guns near or inside our places of assembly will create a safer environment for all of our residents. We thank the lead sponsor, Council President Gabe Albornoz as well as the entire council for its co-sponsorship.

(61)



Testimony of Montgomery County Young Democrats in Support of
Expedited Bill 21-22–Weapons–Firearms In or Near Places of Public
Assembly

July 25, 2022

Members of the County Council:

The Montgomery County Young Democrats strongly support Councilmember Albornoz's
Bill 21-22, which would ban the possession of guns in or near places of public
assembly, with a few exceptions. It would also remove an exemption that allows certain
people with permits to have guns within one hundred yards of these places. Gun
violence is a major problem in our county and country, resulting in tens of thousands of
deaths every year, and residents should not live in fear when they are out in public. This
proposal will tighten restrictions on guns and help ensure that people can participate in
public life without being intimidated.

Currently Maryland law allows people with wear-and-carry permits to possess guns
when they are within one hundred yards of or in parks, churchs, schools, public
buildings, and other places of public assembly. This bill bans people from selling,
transferring, possessing, or transporting guns in those areas. It includes reasonable
exemptions for police officers or security guards, business owners, residents who live
within 100 yards of a place of public assembly, and instructors for firearm safety and
use.

In order for people to thrive in Montgomery County and engage in its civic and
commercial life, they should feel welcome and not be subject to menacing threats. The
goal of this bill is to promote public safety and ease of mind. We want to minimize
concerns and worries that people have about people carrying weapons in and around
these places. People should be able to go to school, their places of worship, the mall, or

(62)

community centers without having to constantly look over their shoulder and worry about shooters.

Recently we have seen a troubling trend of people showing up with openly carried weapons outside polling places and other locations; these are blatant attempts to intimate people, discouraging them from voting and exercising their other political rights. And various authoritarian groups have shown up to various events, most notably Drag Queen Story Hour, and tried to disrupt them.

Bill 21-22 would help reduce acts of violence in county public spaces, counter attempts to intimidate people, and keep people safer. MCYD urges the County Council to vote yes on this bill.

Sincerely,

The Montgomery County Young Democrats

(63)

Montgomery County Council
Council Office Building
100 Maryland Avenue, 6th Floor
Rockville, MD 20850


July 25, 2022

Re: OPPOSE Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.


Esteemed Council Members:

I am writing you as a Maryland native, a Montgomery County business owner, and a registered Montgomery County voter to oppose Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly. I am also a Maryland Wear and Carry permit holder, earned with a substantial amount of background checks and training. While I understand your intent is to protect the lives of innocent people, this bill is vague and will create confusion for law-abiding citizens with carry permits.

Under this proposed bill, there is no definition of "places of public assembly," which can be construed as something as simple as a grocery store or bank without context. Since many of us with carry permits are frequently traveling from work and the primary purpose of the permit is to keep us safe in the disposition of our duties as a business owner while banking or traveling to and from our home, this vague wording places us at risk for breaking the law within the county where Maryland has provided us the right to protect our lives.

For instance, the specific addition of school parking lots places many of us at risk as we travel home from work while legally carrying a firearm. With the current cost of gasoline, it is ridiculous to expect us to go miles out of our way to return home.

The most substantial reason for my opposition to this bill is that it creates a patchwork regulation within the state of Maryland, which creates a challenging structure for law-abiding citizens of Montgomery County and Maryland to comply. This would also set a precedent where law-abiding citizens are placed at risk for prosecution from laws within a smaller jurisdiction without any type of signage to identify that legal firearm carrying is prohibited. It is challenging enough to recall which states have which specific laws and which areas are restricted.

In addition, there has been an inadequate amount of time since Bill 21-22 was introduced and the hearing date of July 26, 2022. Many Montgomery County residents are unaware of the aforementioned bill and have not had an opportunity to read or speak their affirmation or opposition to it. This quick vote seems underhanded and sneaky, something I am certain none of you wishes to be, particularly with the upcoming election.

Please oppose this bill and let us address gun violence from root cause mitigation. I would be honored to help with supporting the council with data and statistics on root cause mitigation and public awareness.


Sincerely,

Rachel King

(64)

JA461

## Testimony in Opposition of Council Bill 21-22

I submit this petition hosted on change.org in opposition of Council Bill 21-22.

https://chng.it/bKmKQXGq


Regards,
Katie Novotny

(65)

Dear Councilmembers,

I'm writing you as a resident of Montgomery county to let you know that I strongly oppose bill 21-22. I've lived here in Montgomery county for over 20 years now, I've seen the area go though lots of changes some good, some bad. Over the years, crime in the area is slowly getting worse and worse, from shootings happening less than a mile away from me, to muggings and armed assaults'. While I appreciate your efforts to try keep citizens safe, all this bill is doing is sending a message to criminals that the county is leaving its citizens defenseless. Stripping your law abiding citizens rights to protect themselves even when they've gone through the training, the background checks showing that the police approve of them to conceal a weapon is not a well thought out idea.

Someone that conceal carry's a firearm should be of sound mind and an upstanding citizen, there are checks and balances in place to restrict who can and cannot own and even conceal carry a firearm already in place. Thorough training is required, background checks are in place police have references to double check people who are applying. These should be more than enough. This is not going to be the wild west with people carrying a weapon exposed on their hip, These are going to be law abiding citizens, concealing a weapon, knowing it's a last line of defense incase something were to happen. With crimes going up, police response time going up, its not enough to solely rely on the police. I've had friends be victims of violent hate crimes, I've been in a situation where there was an attempted murder and was run to for help, in those 8-9 minutes of waiting for police to hopefully respond can often mean life or death for some.

I urge you to reconsider going through with this bill. Criminals will never listen to the letter of the law. Criminals see gun free zones as easy targets. Allowing your citizens the option to carry with a concealed carry permit is a deterrent in itself. Criminals may think twice, and move along not knowing who may or may not be able to defend themselves. Freedom is a two way street. Its often said ignorance of the law does not make you innocent. I've seen a lot of arguments that people should not have to worry who around them may or may not legally be carrying a weapon, well, ignorance of the law on their part does not make me a criminal. There have been a large number of situations where legal residents carrying a concealed firearm have kept horrible things from happening. A perfect example of this would be what just happened in Indiana. A mall where a "gun free zone" was in place 2 people broke that rule, one with the intent to cause harm to as many as he could, the other, a citizen with a concealed carry permit and a firearm out of sight. That citizen was able to save countless lives that day due to his training and fast thinking. While that is an extreme example it's also a realistic one.

In closing. Please reconsider passing this. I appreciate your attempts to make this county a "safer" place, but this will not accomplish it and will only hurt its citizens, and possibly even turn perfectly law abiding citizens into criminals just by wanting to legally protect themselves by carrying WITH a permit that has been issues by the police.

Thank you for your time,

Luke Roetman.

(66)

JA463

Testimony on Expedited Bill 21-22

Councilmembers,

My name is Daniel Sangaree and I'm a Montgomery County resident in Glenmont, a member of my community's home owners' association's board of directors, a married gay man, a registered and voting Democrat, and a Maryland Handgun Wear and Carry permit holder. My firearms training and experience includes handgun training by the Greene County (Missouri) Sheriff's Department as part of my university's criminal justice degree program, competitive handgun shooting as part of the American Criminal Justice Association, years of experience as a concealed weapons permit holder before moving to Maryland, Maryland's Handgun Qualification License training, and Maryland and DC's 16+ hours of concealed handgun permit training. This letter is my testimony in opposition to expedited Bill 21-22 currently under your consideration.

Bill 21-22 proposes to remove the exemption for Maryland handgun permit holders to the county's places of public assembly restrictions. As a permit holder this bill will affect me to a rather extreme degree. It is, in fact, a de facto ban on legal firearm carry throughout the populated areas of the county. Under even the much more objective definitions that existed before Bill 4-21, which this council previously passed, with the exemption removed I will not be able to do any of the following while otherwise legally armed:

- travel more than a block from my home in any direction on foot, Metro rail, or by car

- inspect, as a director, all of the property that is under my HOA's jurisdiction

- shop at my primary grocery store, the Safeway in Wheaton, or almost any of the grocery

  stores in the area, including: Giant in Aspen Hill, Lidl in Glenmont, Aldi in Glenmont, H-Mart

(67)

in Glenmont, Giant in Norbeck, Safeway in Norbeck, Giant in Wheaton, Target in Wheaton,

Safeway in Kensington, and so many more.

- walk my dog on his normal route which was chosen entirely for conflict avoidance

- defend myself in my car during a rising trend of violent, armed carjackings in the county that

   police, by the laws of physics, are unable to defend us from

While I am only speaking for myself, as an HOA board member I have also noted that there are

households within my HOA that, due to their proximity to a park, residents won't be able to legally leave

their house at all while armed, either walking or by car. Many are likely even unaware that they are

affected in this way. This specific scenario applies to many people in the county and that's before

applying the vague definitions as provided in Bill 4-21.

The vague definitions for a place of public assembly brought by 4-21 add a truly dystopian lens

through which to view this bill. This bill will allow police to arrest anyone who is otherwise legally armed

nearly anywhere in the county based purely on the personal discretion and biases of the officer. It takes

absolutely zero imagination to figure out exactly how that will be abused and what groups will be

victimized by the wide latitude this bill would give police. But just to be absolutely clear, it will be people

of color, queer people, and other oppressed minorities that bear the brunt of abuses by police from this

just as they bear the brunt of all police abuses. This is exactly why The Black Attorneys of Legal Aid, the

Bronx Defenders, and Brooklyn Defender Services, three public-defender groups in New York, filed an

amicus brief in support of NY State Rifle and Pistol Association in NYSRPA v Bruen. To quote that brief,

"virtually all our clients whom New York prosecutes for exercising their Second Amendment right are

Black or Hispanic. And that is no accident. New York enacted its firearm licensing requirements to

criminalize gun ownership by racial and ethnic minorities. That remains the effect of its enforcement by

police and prosecutors today." ("Brief amici curiae of Black Attorneys of Legal Aid, et al. ", 2021)

(68)

Which brings me to the biggest problem with this bill. Either the members of this council have never visited a county jail, prison, or other place of incarceration or they came away from it with a wholly different takeaway than I did when I visited jails and prisons as part of my criminal justice program. This bill intends to send upstanding members of our community, vetted by the state police as law abiding and trained, to jail for up to six months for an act with no element of malice and likely an honest mistake or a matter of police/prosecutorial discretion. This result, which is explicitly what this bill demands, is cruel and honestly horrific. This is the exact opposite of criminal justice reform that the Democratic Party has called for over the past multiple decades.

I ask that the members of this council reject this bill which will only serve to criminalize upstanding, and disproportionately minority, members of our community.

Sincerely,

Daniel Sangaree

References

"BRIEF OF THE BLACK ATTORNEYS OF LEGAL AID, THE BRONX DEFENDERS, BROOKLYN DEFENDER SERVICES, ET AL. AS AMICI CURIAE IN SUPPORT OF PETITIONERS", July 2021. Accessible via Supreme Court of the United States website, Docket 20-843.

(69)

**Testimony for the Montgomery County Council**
**July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near**
**Places of Public Assembly**
**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Lisa Morris. I am a volunteer with Maryland Moms Demand Action and I live in North Potomac. I am submitting written testimony in support of Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.

I have lived in Montgomery County my entire life. I am also a gun violence survivor as my life intersected with gun violence two times. I feel and believe our safety as a community and individuals/families are more at risk then ever.

The very dangerous decision made by the Supreme Court to weaken states permitting systems is already seeing ripple effect in states across the country, including in Maryland. States see that a weakened permitting system has a 13-15% increase in the rate of violent crimes. Research shows that when it is easier for people to carry guns in public, violent crime goes ups.

Montgomery County is experiencing a rise in gun violence; the last thing our county needs is guns where people gather.
The increased prevalence of guns outside the home only increases the risk of violence in public places. This will further endanger the public in Montgomery county and Maryland putting families, children, individuals and law enforcement in danger in what is already a gun violence and mass shooting epidemic.

Now the burden is more then ever on state and local officials to define the spaces in our community where guns are not permitted

(70)

JA467

and to provide strong public safety and gun reform legislation to keep all of us safe from gun violence in our communities as we go about our daily lives.

 I urge you and the council to pass Bill 21-22.

Thank you and the all of the council members for all you do for our county.

Lisa Morris
Volunteer
Moms Demand Action for Gun Sense in America, Maryland Chapter

(71)

**Testimony for the Montgomery County Council**

**July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly**

**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

I am Peter Benjamin, a former mayor of the Town of Garrett Park.  I am submitting written testimony in support of Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.

I agree with the legislation proposed and respectfully suggest two additions:

1. Include within the definition of places of public assembly all modes of public transportation, including vehicles and facilities as well as school buses.

2. I believe that New York, in its action in response to the Bruen decision, dealt with weapons carried into private business.  I would propose a similar provision that would ban weapons in all places of business, including stores, offices, and service facilities unless the owner or operator chooses to allow weapons in its place of business, in which case the exemption must be posted prominently and publicly at all entrances.

Thank you for your consideration,

Peter Benjamin

(72)



**MARYLAND SHALL ISSUE®**
SELF DEFENSE IS A CIVIL RIGHT

**President**
Mark W. Pennak

**July 21, 2022**

## WRITTEN TESTIMONY OF MARK W. PENNAK, PRESIDENT, MSI, IN OPPOSITION TO BILL 21-22

I am the President of Maryland Shall Issue ("MSI"). Maryland Shall Issue is a Section 501(c)(4), all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. I am also an attorney and an active member of the Bar of the District of Columbia and the Bar of Maryland. I recently retired from the United States Department of Justice, where I practiced law for 33 years in the Courts of Appeals of the United States and in the Supreme Court of the United States. I am an expert in Maryland Firearms Law, federal firearms law and the law of self-defense. I am also a Maryland State Police certified handgun instructor for the Maryland Wear and Carry Permit and the Maryland Handgun Qualification License and a certified NRA instructor in rifle, pistol, personal protection in the home, personal protection outside the home, muzzle loading, as well as a range safety officer. This letter is submitted in opposition to Bill 21-22.

In Bill 21-22, the County would amend Section 57.11(b) of the County Code to eliminate the existing exemption for carry permit holders from the prohibitions found in Section 57.11(a). Section 57.11(a) provides: "In or within 100 yards of a place of public assembly, a person must not: (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or (2) sell, transfer, possess, or transport a firearm created through a 3D printing process." The County code defines the term "place of public assembly" extremely broadly to mean: "a place where the public may assemble, whether the place is publicly or privately owned." This definition goes on to include, but is not limited to, any "park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multipurpose exhibition facility, such as fairgrounds or a conference center." See County Code Section 57.1 (definitions).

The County invokes as its authority for this bill, an exception provision to a State preemption statute, MD Code, Criminal Law, § 4-209(a). That statute provides: "(a) Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun." Section 4-209(b) contains exceptions to this general preemption, one of which is that a "county, municipal corporation, or special taxing district may regulate the purchase, sale, transfer, ownership, possession, and transportation of the items listed in subsection (a) of this section:

(73)

JA470

*** (iii) * * * within 100 yards of or in a park, church, school, public building, and other place of public assembly." MD Code, Criminal Law, 4-209(b)(1)(iii).

That exception provision is narrow and strictly construed. In *Mora v. City of Gaithersburg*, 462 F.Supp.2d 675, 689 (D.Md. 2006), *modified on other grounds,* 519 F.3d 216 (4th Cir. 2008), a federal district court here in Maryland held that "the Legislature" has "occup[ied] virtually the entire field of weapons and ammunition regulation," holding further there can be no doubt that "the exceptions [in Section 4-209(b)] to otherwise blanket preemption [in Section 4-209(a)] are narrow and strictly construable." As thus construed, Section 4-209(b)(1)(iii) does not authorize this legislation. Indeed, the extent of the County's power under this provision is currently in litigation in *MSI v. Montgomery County*, Case No.: 485899V (Mont. Co. Cir. Ct), where MSI and other plaintiffs have challenged the County's enactment of Bill 4-21 last year. Cross-motions for summary judgment in that case were filed and oral argument conducted on July 19, 2022. Bill 21-22 builds on the framework established by Bill 4-21 and effectively negates carry permits issued by the State Police throughout the County. If the County loses the Bill 4-21 suit, such a decision would necessarily mean that the County likewise lacks the authority to enact Bill 21-22, as currently drafted. The County would be well-advised to await a decision before doubling down on its misguided reliance on Section 4-209(b)(1)(iii).

But even assuming *arguendo* that the County has the power it claims under Section 4-209(b)(1)(iii), Bill 21-22 still fails as it is blatantly unconstitutional under the Second Amendment, as construed by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). In *Bruen*, the Supreme Court held that the Second Amendment right to bear arms means "a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." Slip op. at 24-25 n.8. Specifically, the Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. The Court went on to reject the "means-end," two step, intermediate scrutiny analysis used by the lower courts to sustain gun regulations, holding that "[d]espite the popularity of this two-step approach, it is one step too many." The Court ruled that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Any such historical analogue would have to date from 1791 or, at the latest, 1868, when the 14th Amendment was adopted. See *Bruen*, slip op. at 25-26. That is because "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, slip op. at 25, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634–635 (2008).

*Bruen* also holds that governments may regulate the public possession of firearms at "legislative assemblies, polling places, and courthouses" and notes that governments may also regulate firearms "in" schools and government buildings. *Bruen*, slip op. at 21, citing *Heller*, 554 U.S. at 599. *Bruen* states that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive

places are constitutionally permissible." (Id.). But nothing in *Bruen* can be read to allow a State (or a municipality) to regulate or ban firearms at every location where the "public may assemble" regardless of whether the place is "publicly or privately owned." Indeed, the Court rejected New York's "attempt to characterize New York's proper-cause requirement as "a 'sensitive-place' law," ruling that "**expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly**." Slip op. at 22. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." (Id.).

In a courtroom, the County will bear the burden of proof to show the historical presence of such analogous regulations. See *Bruen*. at 52 ("we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). *Ipse dixit* declarations or avowed public safety concerns will not do. Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Slip op. at 8. Here, the text of the Second Amendment indisputably covers the "possession, sale, transport, and transfer" of firearms and ammunition, as regulated by Section 57.11(a) of the County Code. **In such cases, "the government may not simply posit that the regulation promotes an important interest," but rather "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."** Id. In short, under *Bruen*, "**the Second Amendment guarantees a general right to public carry**." *Bruen*, slip op. at 24.

The County has not and cannot make any such showing that eliminating the right to carry under a permit issued by the State Police "is consistent with this Nation's historical tradition of firearm regulation." Indeed, the very suggestion is nonsensical. There is no historical analogue that would permit the County to ban all possession of firearms in a church or a park, much less in any "other place of public assembly" as vastly defined by the County to include any place where the public "may assemble" regardless of whether such place is on public or private land. Montgomery County is no more a "sensitive place" than is Manhattan. Under the Second Amendment, the County may presumptively enact otherwise reasonable firearms regulations for these five, specific locations identified in *Bruen* and *Heller*, *viz*, in schools, public buildings, polling places, courthouses and legislative assemblies, **to the extent such regulation is otherwise authorized by State law**. As noted, the State has generally barred local regulation of firearms under Section 4-209(a). For example, the County has no authority to enact its own, "shall issue" licensing system that would supersede or conflict with that established by State law. Nor would it make any practical sense for the County to attempt to duplicate State law on such matters.

The State Police may continue to regulate public possession of handguns under its existing permit system as long as it issues permits on an objective, "shall issue" basis and the permitting system does not operate in such a way as to "deny ordinary citizens their right to public carry." See *Bruen*, slip op. at 30 n.9. But, there is no historical analogue that could justify regulating within 100 yards of those locations

Page 3 of 4

(75)

JA472

or beyond those places. *Bruen* holds that the "Second Amendment guarantees a general right to public carry," and thus the County may not purport to ban the "possession, sale, transport, and transfer of firearms" within 100 yards of any location. Again, the burden is on the County to prove an historical analogue to the contrary.

Such bans are particularly nonsensical for persons who have obtained a wear and carry permit from the Maryland State Police. Under State law, MD Code, Public Safety, § 5-306(b), such individuals are subject to highly intrusive background investigations (including fingerprinting) conducted by the State Police and must undergo extensive training by State certified instructors, including passing a scored live-fire proficiency test. The undersigned is such a State Police-certified instructor. The State Police will continue to enforce those requirements even after *Bruen*. See Maryland State Police Advisory, LD-HPU-22-002 (July 5, 2022). Permit holders are among the most law-abiding individuals there are. They are not the problem. That has been true in all of the 43 States and the District of Columbia that issue permits on a "shall issue" basis. https://www.dailywire.com/news/report-concealed-carry-permit-holders-are-most-law-aaron-bandler/. Eliminating the exception for permit holders currently found in Section 57.11(b) of the County Code is utterly senseless from any calm, rational perspective.

Stated simply, regardless of the personal views of members of the Council County, this County is bound by the decisions of the Supreme Court, including decisions involving the Second Amendment. The County needs to rethink this Bill. If the County persists with the enactment of Bill 21-22, it will not survive judicial review. Defying the Supreme Court did not work for the racist proponents of segregation who refused to accept *Brown v. Board* in the 1950s and 1960s, and it will not work for any County attempt to defy *Bruen*. The Second Amendment is not a "second class right" that the County is free to ignore. *Bruen*, slip op. at 62. The sooner that members of the Council are able to put aside their personal opinions and accept that reality, the better. As stated in *Heller*, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. County taxpayer dollars have better uses than litigation that will most certainly ensue from any enactment of Bill 21-22. When plaintiffs prevail in such litigation (and they will), the County will also be on the hook for plaintiffs' attorneys' fees and costs under federal law, 42 U.S.C. § 1988, and those sums could well be substantial. The County Council should stop and think carefully before it goes down that road. Responsible, adult stewardship of the County requires nothing less. The County cannot say it was not put on notice or acted in ignorance of State law or the Second Amendment.

Respectfully,

Mark W. Pennak
President, Maryland Shall Issue, Inc.
mpennak@marylandshallissue.org

**Testimony for the Montgomery County Council**
**July 26, 2022**

**Expedited Bill 21-22, Weapons—Firearms In or Near Places of Public Assembly**
**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Jennifer Stein, and I am a long-standing volunteer with Maryland Moms Demand Action. I have lived in Montgomery County since 1995 and currently live in the Town of Chevy Chase. Together with my husband, Michael, we have raised a family here. I am submitting written testimony in support of Expedited Bill 21-22, Weapons—Firearms In or Near Places of Public Assembly.

Gun violence in our country has become a public health crisis of epic proportions. The statistics are so monumental—110 deaths and 200 more injuries every day—it is possible to become numb unless directly affected. But none of us is immune to the scourge of gun violence, which destroys lives, families, and communities. So far, Montgomery County has avoided a mass shooting in a sensitive public space, but this is not a matter of luck. Maryland's strong concealed carry permitting system was appropriate and necessary for public safety. Meanwhile, Montgomery County is experiencing a rise in gun violence—the last thing our county needs is guns where people gather. And no one should have to worry about gun violence when they take their kids to a playground, to a park, or drop them off at school.

The Supreme Court's dangerous decision striking down the "proper cause" discretionary requirement to conceal carry a firearm has already increased the risk of tragic mass shootings in our community. When permitting systems are weakened and more people may carry concealed weapons into sensitive public spaces, the research shows that deadly violence rises. States with no such discretion in issuing concealed carry permits have homicide rates 11% higher than states like Maryland and New York.

Now that the Supreme Court's concealed carry decision is the law of the land, Maryland and its local governments must take all reasonable action to protect children and adults from senseless gun violence within its borders. Expedited Bill 21-22, Weapons—Firearms In or Near Places of Public Assembly would be a commonsense, constitutional measure to help ensure public safety in the post-*Bruen* era. Montgomery County has the power under Maryland state law to regulate firearms as set forth in Expedited Bill 21-22. I urge the passage of this life-saving bill.

Sincerely,
Jennifer Stein
State Data Co-Lead
Moms Demand Action for Gun Sense in America, Maryland Chapter

(77)

Dear Sir or Ma'am -

In reference to Bill 4-21:

It is inherently dangerous to signal to criminals that the entire county is, in effect, a giant gun-free zone... "a place where the public may assemble" is literally and figuratively anywhere.

Please be reminded that the Colorado theater shooter specifically chose the particular theater because of it being in a gun-free zone, that is to say, free of law-abiding citizens capable of defending themselves. In doing so, he knew he could maximize the most damage in the least amount of time without a worry that someone, anyone could fight back.

Now, what are the chances of that happening here? That's the wrong question to ask. It's not about the chances, it's about the stakes - my life, and that of my family, is too great to risk.

I am open to any question or comments.

Very sincerely,

- Ben Figueroa

(78)

**Testimony for the Montgomery County Council**

**July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly**

**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Melissa Ladd. I am a volunteer with Maryland Moms Demand Action and I am a resident of Olney, and have lived in Montgomery County for 20 years. I am submitting written testimony in support of **Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.** Thank you for writing this bill in response to the misguided decision of the Supreme Court.

**The breadth of studies on concealed carry permitting show that when permitting restrictions are eased, the rate of violent crime increases.** A 2019 Study from Journal of Empirical Legal Studies shows that "RTC (Right to Carry) laws are associated with 13–15 percent *higher* aggregate violent crime rates 10 years after adoption".[1] Also, the Johns Hopkins School of Public Health research indicates that "By years 7 through 10 following the adoption of a RTC law, violent crime rates were 11% to 14% higher than predicted had such laws not been in place."[2] From a study by Duke University we learn that "increases in violent gun crime (29 percent), gun robbery (32 percent), and gun theft (35 percent) following the introduction of shall-issue concealed carry permit laws."[3]

We know that sensitive area prohibitions keep people safe where the risk of gun violence is elevated. Maryland law grants counties and other local authorities the power to regulate firearms in and near certain sensitive places, like those listed in this ordinance. The county must

---

[1] https://onlinelibrary.wiley.com/doi/abs/10.1111/jels.12219
[2] https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-violence-prevention-and-policy/_archive-2019/_pdfs/concealed-carry-of-firearms.pdf
[3] https://www.nber.org/system/files/working_papers/w30190/w30190.pdf?utm_source=The+Trace+mailing+list&utm_campaign=b670a8e418-EMAIL_CAMPAIGN_2019_09_24_04_06_COPY_01&utm_medium=email&utm_term=0_f76c3ff31c-b670a8e418-112434573

(79)

do all it can to keep guns out of these sensitive locations where our children and families gather, and where we and our elected representatives take part in the democratic process.

 Thank you for addressing this issue and I strongly urge you to pass Bill 21-22.

Sincerely,

Melissa Ladd

Chapter Leader

Moms Demand Action for Gun Sense in America, Maryland Chapter

(80)

**Testimony for the Montgomery County Council**
**July 26, 2022**

**Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly**
**FAVORABLE**

To Council President Albornoz and members of the Public Safety Committee,

My name is Joanna Pearl. I am a volunteer with Maryland Moms Demand Action, and I live in Kensington. I submit this written testimony in support of Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly.

I recently moved to this area, and my family chose to live in Maryland because we hope and believe it will be a safe place to raise my four-year-old daughter. Every day, I worry that even here in our state, we and our children are not safe from gun violence as we do everyday things like go to a park, a synagogue, a library, or a community center.

Montgomery County is experiencing a rise in gun violence, and the last thing we need is guns where people gather. Maryland law grants counties and other local authorities the power to regulate firearms in and near certain sensitive places, like those listed in the ordinance. The county should do all it can to keep guns out of these sensitive locations where our children and families gather, and where we and our elected representatives take part in the democratic process.

A growing body of research shows that when it is easier for people to carry guns in public, violent crime goes up. Sensitive area prohibitions, however, keep people safe where the risk of gun violence is elevated. It is a myth that mass shooters target gun-free zones: a study of 30-year of shootings showed no evidence that a single mass shooter chose to target a place because it prohibited guns. Rather, studies have shown that most mass shooters were connected to the location or were motivated by hate, a perceived grievance, or an interpersonal conflict. Keeping guns out of sensitive areas, as this bill would do, will make us all safer.

I hope the Committee will pass Expedited Bill 21-22 and protect everyone in our community from gun violence. Thank you for your attention to this critically important issue.


Sincerely,
Joanna Pearl
Montgomery County Local Group Co-Lead
Moms Demand Action for Gun Sense in America, Maryland Chapter

(81)

I would like to submit brief testimony in opposition to Expedited Bill 21-22, Weapons - Firearms In or Near Places of Public Assembly.  I have four reasons for opposing this legislation:

It will not make me and my family less susceptible to violent crime.

While the legislation's intended purpose is to improve safety and protect county residents from violent offenders, I fail to see how this provision does that. Literally, all Montgomery County residents, including legally armed residents deemed responsible by the state police, will be more vulnerable to violent crime. Criminals will know they have the tactical advantage when pursuing targets in places of public gatherings such as bus stops, train stations, parks and shopping center parking lots. I found it ironic this bill was announced the same day county police announced the arrest of district residents performing armed robbery of MontCo residents waiting at bus stops. This type of crime will continue.

The legislation will place a greater burden on police officers

At a time when police officers are retiring at record paces and the number of recruits failing to meet those losses, current officers will be forced to bear a greater burden to prevent and respond to crimes, particularly violent crime, before and when they occur. As a native New Yorker, I have personally experienced moments of tranquillity turn to chaos in a matter of seconds. The time chaos ensues to the time when the police arrive seems like an eternity whether it is 30 seconds or three minutes. The truth is every individual is their own first responder.

The legislation will place greater liability costs on businesses

Businesses will bear additional costs to ensure occupants to their businesses are safe from criminal elements. Liability and security

(82)

JA479

insurance will increase as businesses look to protect themselves from lawsuits stemming from crimes committed on their premises.
Public officials need to reevaluate their objective and not target law abiding citizens.

It appears to me this legislation is not addressing the problem it is trying to solve: gun-related crime.

There is a process in place to ensure firearms are not in the hands of law abiding citizens who may not be suitable for owning firearms; are criminals looking to circumvent the law, and/or are individual with emotional or mental health issues. The county needs to trust this process and not disarmed county residents the state police deem responsible to legally own and carry firearms. There are also many laws in place designed to prevent the illegal purchase, use and distribution of firearms. Elected officials must trust the process and laws in place and only make changes which ensure law abiding citizens are protected not punished.

Thank you.

(83)

(Slip Opinion)          OCTOBER TERM, 2021                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ET AL. *v.* BRUEN, SUPERINTENDENT OF NEW YORK STATE POLICE, ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 20–843.   Argued November 3, 2021—Decided June 23, 2022

The State of New York makes it a crime to possess a firearm without a license, whether inside or outside the home.  An individual who wants to carry a firearm outside his home may obtain an unrestricted license to "have and carry" a concealed "pistol or revolver" if he can prove that "proper cause exists" for doing so.  N. Y. Penal Law Ann. §400.00(2)(f ).  An applicant satisfies the "proper cause" requirement only if he can "demonstrate a special need for self-protection distinguishable from that of the general community."  *E.g., In re Klenosky*, 75 App. Div. 2d 793, 428 N. Y. S. 2d 256, 257.

 Petitioners Brandon Koch and Robert Nash are adult, law-abiding New York residents who both applied for unrestricted licenses to carry a handgun in public based on their generalized interest in self-defense. The State denied both of their applications for unrestricted licenses, allegedly because Koch and Nash failed to satisfy the "proper cause" requirement.  Petitioners then sued respondents—state officials who oversee the processing of licensing applications—for declaratory and injunctive relief, alleging that respondents violated their Second and Fourteenth Amendment rights by denying their unrestricted-license applications for failure to demonstrate a unique need for self-defense. The District Court dismissed petitioners' complaint and the Court of Appeals affirmed.  Both courts relied on the Second Circuit's prior decision in *Kachalsky* v. *County of Westchester*, 701 F. 3d 81, which had sustained New York's proper-cause standard, holding that the requirement was "substantially related to the achievement of an important governmental interest."  *Id.*, at 96.

(84)