## No. 23-1719

### In the
### United States Court of Appeals
### for the Fourth Circuit

**MARYLAND SHALL ISSUE,** *et al.*,
*Plaintiffs-Appellants*

v.

**MONTGOMERY COUNTY, MARYLAND,**
*Defendant-Appellee*

On Appeal from the United States District Court
for the District of Maryland

### JOINT APPENDIX VOLUME II

Edward B. Lattner
Office of the County
 Montgomery County, MD
101 Monroe Street, Third Floor
Rockville, MD 20850-2580
Tel: (240) 777-66705
*edward.lattner@montgomerycountymd.gov*
*Counsel for Defendant-Appellee*

Mark W. Pennak
Law Offices of Mark W. Pennak
7416 Ridgewood Ave.
Chevy Chase, MD 20815
Tel: (301) 873-3671
*mpennak@marylandshallissue.org*
*Attorney for All Plaintiffs-Appellants*

David H. Thompson
Peter A. Patterson
COOKER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
*Counsel for Plaintiff-Appellant MSI*

# TABLE OF CONTENTS

## Volume I

Relevant Docket Entries .................................................................. JA001

Verified Second Amended Complaint for Declaratory and Equitable
Relief and for Compensatory Damages, Nominal Damages and
Attorney's Fees and Costs filed 11/30/2022 (D.E. #49) ............................ JA014

Attachments:

Exhibit A: Bill 4-21 Montgomery County, Maryland signed
04/16/2021 (D.E.#49-1)........................................................... JA099

Exhibit B: Bill 21-22 Montgomery County, Maryland signed
11/28/2022 (D.E.#49-2)........................................................... JA107

Exhibit C: Written Testimony of Mark W. Pennak, President,
MSI, In Opposition to Bill 4-21 (Corrected) dated 02/09/2021
(D.E.#49-3) ..................................................................... JA113

Exhibit D: Staff Report Memorandum re: Bill 21-22 dated
11/15/2022 (D.E.# 49-4)......................................................... JA122

Exhibit E: Declaration of Daniel Carlin-Weber on Behalf of
Maryland Shall Issue, Inc. dated 11/28/2002 (D.E.# 49-5)................... JA350

Exhibit F: Declaration of Andrew Raymond dated 11/28/2022
(D.E.#49-6) ..................................................................... JA352

Exhibit G: Declaration of Carlos Rabanales dated 11/28/2022
(D.E.#49-7) ..................................................................... JA353

Exhibit H: Declaration of Brandon Ferrell dated 11/28/2022
(D.E.#49-8) ..................................................................... JA354

Exhibit I: Declaration of Deryck Weaver dated 11/28/2022
(D.E.#49-9) ..................................................................... JA355

Exhibit J: Declaration of Joshua Edgar dated 11/28/2022
(D.E.#49-10) .................................................................... JA356

i

Exhibit K: Declaration of Ronald David dated 11/28/2022
(D.E.#49-11) ........................................................................... JA357

Exhibit L: Declaration of Nancy David dated 11/28/2022
(D.E.#49-12) ........................................................................... JA358

Exhibit M: Declaration of Eliyahu Shemony dated 11/28/2022
(D.E.#49-13) ........................................................................... JA359

Attachments to Emergency Motion for Preliminary Injunction and
Temporary Restraining Order filed 12/06/2022 (D.E.# 52):

Exhibit N: Declaration of David S. Sussman dated 11/30/2022
(D.E.#52-1) ............................................................................. JA360

Exhibit O: Declaration of Allan D. Barall dated 12/01/2022
(D.E.#52-2) ............................................................................. JA362

Exhibit P: Declaration of John Doe No. 1 dated 11/30/2022
(D.E.#52-3) ............................................................................. JA366

Exhibit Q: Declaration of John Doe No. 2 dated 11/30/2022
(D.E.#52-4) ............................................................................. JA369

Exhibit R: Declaration of Thomas Paine No. 1 dated 11/30/2022
(D.E.#52-5) ............................................................................. JA374

Exhibit S: Declaration of John Smith No. 1 dated 11/30/2022
(D.E.#52-6) ............................................................................. JA378

Attachments to Response in Opposition to Corrected Motion for
Preliminary Injunction filed 12/30/2022 (D.E.#59):

Exhibit 1: Bill 21-22 Montgomery County, Maryland signed
11/28/2022 (D.E.#59-5) ......................................................... JA382

Exhibit 2: Staff Report Memorandum re: Bill 21-22 dated
11/15/2022 (D.E.# 59-6) ........................................................ JA388

Volume II

Exhibit 3: Montgomery County Report: Child Care Demographics
2002 by Maryland Family Network (D.E.#59-7)...................................JA482

Exhibit 4: Bethesda Magazine Article: County Council passes
legislation prohibiting firearm use, carrying within 100 yards
of some public spaces by Steve Bohnel dated 11/15/2022
(D.E.# 59-8)........................................................................................JA494

Exhibit 5: The Washington Post Article: Gun violence rises
sharply in Montgomery County, police chief says, by Dan
Morse dated 07/11/2022 (D.E.# 59-9).....................................................JA497

Exhibit 6: The New York Times Article: Who Stops a 'Bad Guy
With A Gun'? by Larry Buchanan and Lauren Leatherby
dated 06/22/2022 (D.E.# 59-10)..............................................................JA499

Exhibit 7: 1831 or 1816 J. Bayon, General Digest of the
Ordinances and Resolutions of the Corporation of New
Orleans 371 (1831) (D.E.# 59-11).........................................................JA505

Exhibit 8: 1837 Me Public Laws (D.E.# 59-12)...........................................JA509

Exhibit 9: 1837 Md. Laws 108, ch. 100 (D.E.# 59-13)...............................JA513

Exhibit 10: 1837 Massachusetts 54-56 (1837) (D.E.# 59-14).....................JA515

Exhibit 11: 1843 Rhode Island (June, 1843) (D.E.# 59-15)........................JA519

Exhibit 12: 1852 N.M. Laws 67, §3 (D.E.# 59-16)......................................JA522

Exhibit 13: 1857 First Annual Report of the Board of
Commissioners of the Central Park 106 (D.E.# 59-17) .........................JA525

Exhibit 14: 1859 Conn. Acts 62, An Act in Addition to and in
Alteration of an Act for Forming and Conducting the Military
Force, ch. 82, §5 (D.E.# 59-18)..............................................................JA527

Exhibit 15: 1861 New York Central Park Commissioners Fourth
Annual Report (D.E.# 59-19) ..................................................................JA531

Exhibit 16: 1867 Pennsylvania General Assembly, Omitted Laws, PL 1083 No. 1020, A Supp to An Act approp-ing ground in the city of Philadelphia (D.E.# 59-20) .................................. JA533

Exhibit 17: 1869 Tenn. Pub. Acts 23-24 (D.E.# 59-21) ............................. JA540

Exhibit 18: 1870 Ga. Laws 421 (D.E.# 59-22) ............................................ JA543

Exhibit 19: 1870 La. Acts 159-160, no. 100 (D.E.# 59-23) ...................... JA546

Exhibit 20: 1870 Acts of Assembly Relating to Fairmount Park Sect. 21 (1870) (D.E.# 59-24) ................................................................ JA550

Exhibit 21: 1870 Tex. Gen. Laws 63, ch. 46 (D.E.# 59-25)........................ JA556

Exhibit 22: 1874 Md. Laws 366, ch. 250 (D.E.# 59-26) ............................. JA559

Exhibit 23: 1875 Mo. Laws 50-51, §1 (D.E.# 59-27) ................................. JA561

Exhibit 24: 1877 Va. Acts 305 (D.E.# 59-28) ............................................ JA564

Exhibit 25: 1879 J. Hockaday, Revised Statutes of the State of Missouri 1879 (D.E.# 59-29) .................................................................. JA571

Exhibit 26: 1879 Tex. Crim. Stat. Tit. IX, Ch. 4 (D.E.# 59-30)................. JA574

Exhibit 27: 1881 The Revised Ordinance of the City of St. Louis, 635 (1881) (D.E.# 59-31) ............................................................ JA577

Exhibit 28: 1882 R. Clark, The Code of the State of Georgia 818 (1873) (D.E.# 59-32) ............................................................................ JA579

Exhibit 29: 1883 Mo. Laws 76 (D.E.# 59-33)............................................. JA583

Exhibit 30: 1886 Md. Laws 315, ch. 189 (D.E.# 59-34)............................. JA585

Exhibit 31: 1887 N.M. Laws 56, An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, ch. 30, §4 (D.E.# 59-35)........................................................................................ JA587

Exhibit 32: 1888 Annual Reports of the City Officers and City Boards of the City of Saint Paul (D.E.# 59-36)...................................... JA591

iv

Exhibit 33: 1888 J. Prentiss, 1888 Md. Code Pub. Local Law,
Vol. I (D.E.# 59-37).................................................................... JA593

Exhibit 34: 1889 Ariz. Sess. Laws 16-17 (D.E.# 59-38)........................... JA595

Exhibit 35: 1890 General Ordinances of the Town of Columbia,
in Boone County, Missouri 34, 35 (Lewis M. Switzler ed.,
1890) (D.E.# 59-39)................................................................. JA599

Exhibit 36: 1890 Okla. Laws 495, art. 47, §7 (D.E.# 59-40) ...................... JA602

Exhibit 37: 1891 Laws and Ordinances for the Government of
the Municipal Corporation of the City of Williamsport,
Pennsylvania 141 (1891) (D.E.# 59-41)................................... JA605

Exhibit 38: 1892 The Annotated Code of the General Statute
Laws of the State of Mississippi 327, §1030 (D.E.# 59-42) ................. JA609

Exhibit 39: 1893 The Charter of the City of Wilmington (1893)
(Part VII, §7) (D.E.# 59-43) ..................................................... JA611

Exhibit 40: 1893 W. McCartney, Statutes of Oklahoma (1893)
(D.E.# 59-44)............................................................................ JA614

Exhibit 41: 1893 A Digest of the Acts of Assembly Relating to
and the General Ordinances of the City of Pittsburgh (1893)
(D.E.# 59-45)............................................................................ JA617

Exhibit 42: 1894 The Revised Ordinances of the City of
Huntsville, Missouri, of 1894 (D.E.# 59-46).......................... JA622

Exhibit 43: 1895 Mich. Local Acts 596, §44 (D.E.# 59-47)....................... JA627

Exhibit 44: 1897 A Digest of the Laws and Ordinances for the
Government of the Municipal Corporation of the City of
Reading, Penn (D.E.# 59-48).................................................. JA636

Exhibit 45: 1899 parks-boulder-co-1899 (D.E.# 59-49) ............................ JA640

Exhibit 46: 1901 Revised Statutes of Arizona Territory 1252
(1901) (D.E.# 59-50) ............................................................... JA644

Exhibit 47: 1903 Mont. Laws 49, §3 (D.E.# 59-51).................................... JA647

Exhibit 48: 1903 City of Trenton, New Jersey, Charter and
Ordinances 390 (1903) (D.E.# 59-52) .................................................... JA650

Exhibit 49: 1905 Amendments to the Revised Municipal Code
of Chicago of 1905 and New General Ordinances 40 (1905)
(D.E.# 59-53) ................................................................................ JA653

Exhibit 50: 1905 Minn. Laws 620, ch. 344 §53 (D.E.# 59-54) ................... JA657

Exhibit 51: 1906 Ordinances, Rules and Regulations of the
Department of Parks of the City of New York 7 (1916)
(D.E.# 59-5) ................................................................................ JA659

Exhibit 52: 1906 A Digest of the Ordinances of Town Council
of the Borough of Phoenixville 135 (1906) (D.E.# 59-56) .................... JA663

Exhibit 53: 1909 General Municipal Ordinances of the City of
Oakland, Cal., Addendum at 15 (1909) (D.E.# 59-57) .......................... JA668

Exhibit 54: 1910 The Code of the City of Staunton, Virginia 115
(1910) (D.E.# 59-58) ...................................................................... JA670

Exhibit 55: 1917 The Code of Birmingham, Alabama 662-663
(1917) (D.E.# 59-59) ...................................................................... JA672

Exhibit 56: 1917 Wis. Sess. Laws 1243-44 (1917) (D.E.# 59-60) .............. JA675

Exhibit 57: 1921 N.C. Session Laws 54, Pub. Laws Extra Sess.,
ch. 6 §3 (D.E.# 59-61) .................................................................... JA678

Exhibit 58: Montgomery County Code, Chapter 57. Weapons
(incl. Bill 21-22) (D.E.# 59-62) ........................................................ JA680

Attachments to Response to Motion for Preliminary Injunction (D.E.#62):

Exhibit A: Supplemental Declaration of Eliyahu Shemony
dated 01/03/2023 (D.E.# 62-1) ........................................................ JA700

Exhibit B: Supplemental Declaration of Allan D. Barall
dated 01/04/2023 (D.E.# 62-2) ........................................................ JA707

Exhibit C: Supplemental Declaration of John Smith No. 1
dated 12/04/2023 (D.E.#62-3) .......................................................... JA711

vi

Transcript of Hearing re Motion to Remand and Motion for
  Preliminary Injunction heard on 02/06/2023 ................................................ JA714

Senate Bill 1: Criminal Law – Wearing, Carrying or
  Transporting Firearms – Restrictions (Gun Safety Act of
  2023) approved on May 16, 2023 .................................................... JA802

Memorandum Opinion filed 07/06/2023 (D.E. #82) ........................................ JA827

Order filed 07/06/2023 (D.E. #83) ..................................................... JA867

Notice of Appeal filed 07/07/2023 (D.E. #84) ................................................ JA868

**MARYLAND FAMILY NETWORK**

EXHIBIT
3

Frequently Requested Child Care Information

Maryland Child Care Resource Network

# Child Care Demographics

# 2022

# Montgomery County Report

Montgomery County is Maryland's most populous jurisdiction and one of its most affluent. It has a stable and significant office market and is a major economic engine for the state. The county is home to an array of groundbreaking innovations such as mapping the human genome, developing life-saving therapies, building premier cybersecurity defenses, and driving world-class IT advancements. Educational and research organizations such as the John Hopkins University's Montgomery County Campus, the Howard Hughes Medical Institute, the Henry M. Jackson Foundation, and the Universities at Shady Grove are located in Montgomery County. Federal facilities in the county include the National Institute of Health, the National Institute of Standards and Technology, and the Food and Drug Administration.

Successful industries in Montgomery County include information technology, telecommunications, biotechnology, software development, aerospace engineering, professional services, and government/federal contractors. The county's private sector industries generate $75.1 billion in economic output and continue to be a major economic contributor to the state of Maryland. Major private sector employers include Emergent Solutions, Choice Hotels, Adventist, GEICO, Giant Food, Kaiser Permanente, Astra Zeneca, and Lockheed Martin.

1. http://commerce.maryland.gov/Documents/ResearchDocument/AlleganyBef.pdf Source: Maryland Department of Commerce, Brief Economic Facts, 2019.
2. https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm#type=1&year=2020&qtr=1&own=5&ind=10&supp=0 Source: U.S. Bureau of Labor Statistics, Quarterly Census of Employment and Wages, March 2020.
3. https://www.dllr.state.md.us/lmi/emplists/ Source: Maryland Department of Labor, Major Employers List- Workforce Information & Performance, 2020

*The Maryland Child Care Resource Network and Maryland Family Network, Inc. are co-publishers of this Montgomery County Report for the Network's Maryland Child Care Demographics Report series. The series includes reports for the State, for each of Maryland's 23 counties and the City of Baltimore.*

This publication was produced as a work for hire for the benefit of, and with funds from, the Maryland State Department of Education.

## Child Population 2010

| Age Group | Number in age group |
|---|---|
| 0-1 | 24,936 |
| 2-4 | 38,796 |
| 5-9 | 64,300 |
| 10-11 | 25,567 |
| Total | 153,599 |

Source: Maryland Department of Planning (MDP), 2010 Census Summary File 1.

## Child Care Costs as Compared to Other Major Household Expenses

The estimated current median family income in Montgomery is $127,971[6]. A family of four that included a couple and two children ages 0-23 months and 2-4 years can be expected to have the following yearly household expenses:

| Expense | | Cost | % of Income |
|---|---|---|---|
| Child Care | | $ 35,766 | 27.95% |
| Infant[1] | $15,832 | | |
| Preschooler[2] | $19,943 | | |
| Food[3] | | $ 11,396 | 8.91% |
| Housing[4] | | $ 29,976 | 23.42% |
| Taxes[5] | | $ 26,328 | 20.57% |
| Total | | $103,466 | 80.85% |

[1] Average cost of full-time care in a family child care home (LOCATE, 2021). [2] Average cost of full-time care in a child care center (LOCATE, 2021). [3] National average cost of food at home based on a moderate cost plan (Cost of Food at Home Estimated for Food Plans at Four Cost Level, July 2021), U.S. Average, United States Department of Agriculture. [4] Based on U.S. Bureau of the Census 2010 median selected owner costs with a mortgage; included mortgage, taxes, insurance and utilities. [5] State and local taxes per Comptroller of Maryland (2021), Medicare and FICA taxes per moneychimp.com (2021). Taxes do not reflect Earned Income Credit. [6] Current income as shown in the Geolytics Report dated July 2021. This data cannot be compared to previous data.

## Average Weekly Cost of Full-time Child Care[1]

**Montgomery County**

| | Family Child Care Programs | Child Care Centers |
|---|---|---|
| 0-23 months | $ 304.46 | $ 448.69 |
| 2-4 years | $ 276.94 | $ 383.34 |
| 5 years[1] | $ 258.59 | $ 343.21 |
| School Age Full[2] | $ 242.66 | $ 299.01 |
| School Age B/A[3] | $ 152.22 | $ 160.78 |

Source: MFN/LOCATE: Child Care, 6/21.
[1] Average cost of full time care for a 5 year old. Defined as child being in full time care or being in kindergarten and out-of-school child care, i.e., holidays, school closures and summers. [2] Average cost of full time care for a 6+ year old (out-of-school child care, i.e., holidays, school closures and summers). [3] Average cost of before and after school child care.

## Number of Montgomery Children under 12 with Mothers in the Work Force[1]

169,523 – 82.4%[2] of total 2021 child population under 12 (205,732).

[1] Source: MFN/LOCATE: Child Care. [2] Percent based on 2010 census data. Total population number based on GeoLytics, Inc. report, 2021.

MONTGOMERY

Child Care
# Demographics

## Montgomery County

## Population Information

### Child Population

|  | 2000 | | 2010 | |
|---|---|---|---|---|
|  | Montgomery | Maryland | Montgomery | Maryland |
| 0-3 years | 35,779 | 209,218 | 37,926 | 217,560 |
| 3-4 years | 24,394 | 144,175 | 25,806 | 146,928 |
| 5 years | 12,246 | 74,546 | 12,766 | 72,700 |
| 6-9 years | 51,057 | 316,772 | 51,534 | 294,168 |
| 10-11 years | 26,248 | 162,481 | 25,567 | 151,023 |
| Total | 149,724 | 907,192 | 153,599 | 882,379 |

Source: U.S. Bureau of the Census, 2000, 2010.

### Female Population (selected ages)

| Age Group | 2000 | 2010 |
|---|---|---|
| 20-24 | 21,948 | 26,737 |
| 25-29 | 29,724 | 33,733 |
| 30-34 | 36,155 | 34,514 |
| Total | 87,827 | 94,984 |

Source: U.S. Bureau of the Census, 2000, 2010.

### Work Force Information
#### Total Population Ages 16+ in Work Force

|  | Montgomery | Maryland |
|---|---|---|
| **2010** | | |
| Female | 275,943 | 1,570,193 |
| Male | 291,702 | 1,623,215 |
| **2000** | | |
| Female | 230,995 | 1,351,034 |
| Male | 246,128 | 1,418,491 |
| **Change** | | |
| Female | 19.5% (+) | 16.2% (+) |
| Male | 18.5% (+) | 14.4% (+) |

Source: U.S. Bureau of the Census, 2000, 2010 American Community Survey (ACS).

### Females (16+) with Children

| Age Group | 2000 | 2010 | Change |
|---|---|---|---|
| Total females (16+) with children under 6 | 29,250 | 73,664 | N/A* |
| Total females (16+) with children under 6 in the work force | 19,676 | N/A* | N/A* |
| Total females (16+) with children 6-17 | 64,240 | 154,931 | N/A* |
| Total females (16+) with children 6-17 in the work force | 50,541 | N/A* | N/A* |

Source: U.S. Bureau of the Census, 2010 ACS.
* Comparable data not available for 2010 census.

### Total Population

|  | Montgomery | Maryland |
|---|---|---|
| 2010 | 971,777 | 5,773,552 |
| 2000 | 873,341 | 5,296,486 |
| 1995 | 810,000 | 5,046,079 |
| 1990 | 757,027 | 4,780,753 |
| 1980 | 579,053 | 4,216,975 |

Source: U.S. Bureau of the Census, 2010, 2000, 1990, 1980.

### Male Population (selected ages)

| Age Group | 2000 | 2010 |
|---|---|---|
| 20-24 | 21,736 | 27,294 |
| 25-29 | 27,839 | 32,506 |
| 30-34 | 32,849 | 31,640 |
| Total | 82,424 | 91,440 |

Source: U.S. Bureau of the Census, 2000, 2010.

### Households

|  | 2000 | 2010 |
|---|---|---|
| Total household population | 863,910 | 962,877 |
| Total # of households | 324,565 | 357,086 |
| Average household size | 2.66 | 2.70 |

Source: U.S. Bureau of the Census, 2000, 2010.

MONTGOMERY

2

# Montgomery County

Child Care
**Demographics**

## Census Information

### Families and Poverty

|  | 2000 | % | 2010 | % | %Change |
|---|---|---|---|---|---|
| All Families | 224,225 | 100% | 244,898 | 100% | 9.2%(+) |
| Families Below Poverty Level | 8,428 | 3.8% | 12,000 | 4.9% | 42.4%(+) |
| All Families w/Children Under 6 | 27,701 | N/A* | 27,951 | 100% | N/A* |
| Families w/Children Under 5 Below Poverty Level | 2,808 | N/A* | N/A* | 4.9% | N/A* |
| All Families w/Children Under 18 | 113,665 | 100% | 118,482 | 100% | 4.2%(+) |
| Families w/Children Under 18 Below Poverty Level | 6,110 | 5.4% | 9,597 | 8.1% | 57.1%(+) |

Source: U.S. Bureau of the Census, 2000, 2010. Prepared by MDP.
*Comparable data not available from 2010 Census.

### Educational Attainment

|  | %Adult Pop. Over Montgomery | %Adult Pop. Over 25 Yrs | Maryland | 25 Yrs |
|---|---|---|---|---|
| High School Grad or Higher | 605,912 | 90.6% | 3,410,847 | 88.1% |
| Bachelor's Degree or Higher | 377,710 | 56.5% | 1,396,843 | 36.1% |

Source: U.S. Bureau of the Census, 2010 ACS.

### Children and Poverty

|  | 2000 | % | 2010 | % | %Change |
|---|---|---|---|---|---|
| Total Related Children Under 18 | 205,941 | 100% | 212,397 | 100% | 3.1%(+) |
| Total Children Under 18 Below Poverty Level | 13,516 | 6.6% | 20,602 | 9.7% | 52.4%(+) |
| Total Children Under 5 Below Poverty Level | 3,698 | 6.8% | N/A* | 8.4% | N/A* |
| Total Children 5-17 Below Poverty Level | 9,818 | 6.5% | N/A* | 10.2% | N/A* |

Source: U.S. Bureau of the Census, 2000, 2010. Prepared by MDP.
*Comparable data not available from 2010 Census.

### Families

**Montgomery**

|  | Total # of All Families With Related Children | | Total # of All Families With Related Children Under Age 18 |
|---|---|---|---|
|  | Total | Under Age 6 |  |
| 2000 | 224,225 | 27,701 | 113,665 |
| 2010 | 224,898 | 30,680 | 126,250 |
| Change | 0.3%(+) | 10.8%(+) | 11.1%(+) |

**Maryland**

|  | Total # of All Families With Related Children | | Total # of All Families With Related Children Under Age 18 |
|---|---|---|---|
|  | Total | Under Age 6 |  |
| 2000 | 1,359,318 | 150,011 | 662,172 |
| 2010 | 1,447,002 | 170,870 | 728,045 |
| Change | 6.5%(+) | 13.9%(+) | 9.9%(+) |

Source: U.S. Bureau of the Census, 2000, 2010. Prepared by MDP.

MONTGOMERY

3

JA484

# Child Care
# Demographics

# Montgomery County

## Income, Unemployment and Housing Information

### Annual Wage Rate Information

| | |
|---|---|
| Public School Teacher Salary (Montgomery County)[1] | $69,529 |
| Public School Teacher Salary Average (MD)[1] | $63,849 |
| Nonpublic School Teacher Average (Maryland) | $60,500 |
| Family Child Care Provider (Maryland) | $41,177 |
| Child Care Center Director (Maryland) | $40,539 |
| Center Senior Staff/Teacher (Maryland) | $25,537 |
| Center Aide (Maryland) | $17,889 |

[1]Maximum teacher salary with Bachelor's and Standard Professional Certificate (SPC). Sources: MSDE, Sept 2021, Association of Independent Maryland Schools (AIMS), 2020-21 school year, and MFN's 2021 Statewide Survey of Family Child Care Providers and Child Care Centers.

### Family Income

**Median Family Income, 2010 Census**

| | |
|---|---|
| Montgomery | $120,664 |
| Maryland | $83,137 |

Source: U.S. Bureau of the Census, 2010 ACS.

**Median Household Income[1]:**

| | |
|---|---|
| Montgomery | $109,754 |
| Maryland | $85,454 |

| Income Distribution | Percent Households | |
|---|---|---|
| | Montgomery | Maryland |
| under $25,000 | 9.1% | 13.2% |
| $25,000 - $49,999 | 12.2% | 16.0% |
| $50,000 - $74,999 | 12.6% | 15.3% |
| $75,000 + | 66.1% | 55.5% |

Source: [1]GeoLytics, Inc. report, 2021. U.S. Bureau of the Census, 2015-2019 American Community Survey 5-Year Estimates. Data is not directly comparable to 2010 or earlier reports.
NOTE: Percentages may not total 100% because of rounding

### Unemployment Rate

| | Montgomery | Maryland |
|---|---|---|
| 2000 | 1.6% | 3.4% |
| 2001 | 2.6% | 4.0% |
| 2002 | 2.5% | 3.9% |
| 2003 | 2.5% | 4.1% |
| 2004 | 2.2% | 3.9% |
| 2005 | 2.8% | 3.9% |
| 2006 | 2.7% | 3.7% |
| 2007 | 2.7% | 3.6% |
| 2008 | 3.3% | 4.5% |
| 2009 | 5.3% | 7.1% |
| 2010 | 5.5% | 7.3% |
| 2011 | 5.5% | 7.2% |
| 2012 | 4.9% | 6.5% |
| 2013 | 4.9% | 6.2% |
| 2014 | 4.5% | 5.6% |
| 2015 | 4.0% | 5.0% |
| 2016 | 3.6% | 4.5% |
| 2017 | 3.2% | 4.3% |
| 2018 | 3.8% | 4.5% |
| 2019 | 3.4% | 3.9% |
| 2020 | 8.1% | 8.3% |
| 2021 | 6.4% | 6.7% |

Maryland Department of Labor, Licensing and Regulation (DLLR) 6/2021.

### Housing Information

| | Montgomery | Maryland |
|---|---|---|
| Owner-Occupied housing | 238,022 (66%) | 1,426,267 (67%) |
| Renter-Occupied housing | 121,454 (34%) | 701,172 (33%) |

Note: Percentage is based on total occupied housing units.

| | Montgomery | Maryland |
|---|---|---|
| Mean value of Owner-Occupied Housing | $447,200 | $301,400 |
| Median Selected Monthly Owner Costs With a Mortgage | $2,498 | $2,016 |
| Median Gross Residential Monthly Rent | $1,466 | $1,131 |

Source: U.S. Bureau of the Census, 2010 ACS.

MONTGOMERY

JA485

# Montgomery County

## Child Care Demographics

## Supply of Regulated Early Childhood Programs and Education

**Children's Programs by Type with Capacity/Enrollment**

| | # of Programs | Capacity[1] |
|---|---|---|
| Family Child Care Providers | 743 | 5,874 |
| *OCC Licensed Group Programs | 425 | 34,511 |
| 8-12 Hour Child Care Centers | 259 | 21,120 |
| Infant/Toddler | 141 | 2,467 |
| Part-Day | 54 | N/A |
| Before/after School (School & Center-Based) | 266 | 22,088 |
| Employer-Sponsored Centers | 7 | 843 |
| Nursery Schools | 103 | N/A |
| Private Kindergarten | 48 | N/A |
| **Head Start | 2 | 856 |
| ***Public Pre-Kindergarten Sites | 1 | N/A |

[1]Some providers may still be closed due to COVID 19 considerations.
[2]Public Pre K Closure due to COVID-19.
*Note: Numbers do not total because facilities may have more than one type of program. Unless otherwise indicated, all programs are privately funded.
** Federally funded programs which include Head Start, Early Head Start and Home-based Head Start.
***State funded.
Source:  MFN/LOCATE Child Care, 6/21; Maryland State Department of Education; Department of Health and Mental Hygiene.

### Education

**Public and Private Schools (Elementary and Middle)**

| | Public | Private* |
|---|---|---|
| Elementary Schools | 135 | 24 |
| Middle Schools | 40 | 0 |
| Combined | 0 | 88 |

**Elementary School Enrollment**

| | Public | Private* |
|---|---|---|
| Pre-Kindergarten | 3,597 | 3,974 |
| Kindergarten | 10,347 | 1,591 |
| Grades 1 - 6 | 70,835 | 9,092 |
| Total | 84,779 | 14,657 |

Source: MSDE, 2020-21 school year. Enrollment figures are for September 30, 2020. Private schools include MSDE approved schools and those operated by a tax-exempt religious organization which hold a letter of exemption from approval in accordance with State law.

*Self reported data from Maryland Nonpublic Schools as reported to MSDE.*Self reported data from Maryland Nonpublic Schools as reported to MSDE.

**MONTGOMERY**

Child Care
# Demographics
## Montgomery County

## Supply of Regulated Early Childhood Programs and Education

**Density of Family Providers and Center Programs by Community/Zip Code**

The following chart shows the number of registered family child care providers and licensed full-day child care centers in Montgomery as of June 30, 2021.

| Community/ Zip Code | Family Providers | 8-12 Hour % | Centers | % |
|---|---|---|---|---|
| Ashton 20861 | 2 | 0.3 | 1 | 0.4 |
| Bethesda 20814 | 7 | 0.9 | 13 | 5.0 |
| Bethesda 20816 | 2 | 0.3 | 6 | 2.3 |
| Bethesda 20817 | 27 | 3.6 | 12 | 4.6 |
| Bethesda 20892 | 0 | 0.0 | 2 | 0.8 |
| Boyds 20841 | 10 | 1.3 | 2 | 0.8 |
| Brookeville 20833 | 3 | 0.4 | 0 | 0.0 |
| Burtonsville 20866 | 15 | 2.0 | 2 | 0.8 |
| Cabin John 20818 | 1 | 0.1 | 1 | 0.4 |
| Chevy Chase 20815 | 1 | 0.1 | 6 | 1.2 |
| Clarksburg 20871 | 35 | 4.7 | 2 | 0.8 |
| Damascus 20872 | 15 | 2.0 | 3 | 1.2 |
| Darnestown 20874 | 3 | 0.4 | 1 | 0.4 |
| Darnestown 20878 | 0 | 0.0 | 1 | 0.4 |
| Derwood 20855 | 7 | 0.9 | 3 | 1.2 |
| Gaithersburg 20877 | 22 | 3.0 | 9 | 3.1 |
| Gaithersburg 20878 | 33 | 4.4 | 11 | 4.2 |
| Gaithersburg 20879 | 24 | 3.2 | 5 | 1.9 |
| Gaithersburg 20882 | 8 | 1.1 | 1 | 0.4 |
| Gaithersburg 20886 | 7 | 0.9 | 1 | 0.4 |
| Gaithersburg 20899 | 0 | 0.0 | 1 | 0.4 |
| Garrett Park 20896 | 0 | 0.0 | 1 | 0.4 |
| Germantown 20874 | 66 | 8.9 | 13 | 5.0 |
| Germantown 20876 | 38 | 5.1 | 11 | 3.5 |
| Kensington 20895 | 10 | 1.3 | 7 | 2.7 |
| Laytonsville 20882 | 1 | 0.1 | 0 | 0.0 |
| Montgomery Village 20886 | 20 | 2.7 | 3 | 1.2 |
| Mount Airy 21771 | 1 | 0.1 | 0 | 0.0 |
| North Bethesda 20852 | 1 | 0.1 | 2 | 0.8 |
| North Potomac 20878 | 11 | 1.5 | 5 | 1.9 |
| Olney 20832 | 21 | 2.8 | 9 | 3.5 |
| Poolesville 20837 | 3 | 0.4 | 3 | 1.2 |
| Potomac 20854 | 22 | 3.0 | 17 | 6.6 |
| Rockville 20850 | 20 | 2.7 | 18 | 6.9 |
| Rockville 20851 | 11 | 1.5 | 5 | 1.9 |
| Rockville 20852 | 9 | 1.2 | 11 | 4.2 |
| Rockville 20853 | 38 | 5.1 | 7 | 2.7 |
| Rockville 20855 | 8 | 1.1 | 4 | 1.5 |
| Sandy Spring 20860 | 1 | 0.1 | 1 | 0.4 |
| Silver Spring 20901 | 36 | 4.8 | 8 | 3.1 |
| Silver Spring 20902 | 59 | 7.9 | 10 | 3.9 |
| Silver Spring 20903 | 16 | 2.2 | 3 | 0.8 |
| Silver Spring 20904 | 35 | 4.7 | 14 | 5.4 |
| Silver Spring 20905 | 13 | 1.7 | 4 | 1.5 |
| Silver Spring 20906 | 62 | 8.3 | 11 | 4.2 |
| Silver Spring 20910 | 6 | 0.7 | 8 | 3.1 |
| Spencerville 20868 | 1 | 0.1 | 1 | 0.4 |
| Takoma Park 20912 | 9 | 1.2 | 6 | 2.3 |
| Wheaton 20902 | 3 | 0.4 | 1 | 0.4 |
| Totals | 743 | 100.0% | 259 | 100.0% |

Source: MFN/LOCATE: Child Care, 6/21. NOTE: Percentages may not total 100% because of rounding.

MONTGOMERY

JA487

# Montgomery County

Child Care
## Demographics

### Supply of Regulated Child Care

**Density of Regulated Family Child Care Homes in Montgomery County**

1 dot = 1 home



Source: MFN/LOCATE: Child Care, 6/21.

**Density of Licensed 8-12 Hour Child Care Centers in Montgomery County**

1 dot = 1 center



Source: MFN/LOCATE: Child Care, 6/21.

MONTGOMERY

### Child Care
# Demographics
## Montgomery County

## Supply of Regulated Child Care

### Number of Children 0-5 Years Per Regulated Child Care Space by Census Tract



No Providers
0 to 1
1 to 2
2 to 4
4 or more
Children per Regulated Space

This map is based on census tracts defined by the U.S. Bureau of the Census. It does not accurately delineate land/water boundaries in some census tracts.
Sources: U.S. Bureau of the Census, 2010. MFN/LOCATE: Child Care, 6/21.

### Past and Anticipated Growth Patterns for Family/Center Providers

#### Family Child Care Providers in Montgomery 2017-2026



Number of Family Child Care Providers

877, 849, 821, 819, 743, 732, 703, 673, 643, 613

—— Actual Number of Family Child Care Providers
···· Predicted Number of Family Child Care Providers

Years

#### Center-based Programs in Montgomery 2017-2026
#### Full-day (8 to 12 hours)



Number of Full-day Programs

285, 291, 287, 283, 259, 263, 257, 251, 245, 239

—— Actual Number of Center-based Programs
···· Predicted Number of Center-based Programs

Years

These predictions were generated with the use of the Multiple Regression Analysis and Forecasting template. The predictions generated by the Model do not reflect the effects of current changes to social programs affecting child care.
Source: MFN/LOCATE: Child Care, 6/21.

MONTGOMERY

USCA4 Appeal: 23-1719     Doc: 30-2     Filed: 08/21/2023     Pg: 17 of 396

# Montgomery County

**Child Care Demographics**

## Demand for Child Care

### Children Served by Age

N=368



Infant/Toddler
(unborn to 23 mos)
189 children/
51.4%

Preschool
(24 to 59 mos)
77 children/
20.9%

School-Age
(6 yrs and older)
83 children/22.6%

Kindergarten
(Age 5)
19 children/5.2%

Source: LOCATE: Child Care at Maryland Family Network, Baltimore (7/1/20-6/30/21).

NOTE: Percentages may not total 100% because of rounding.

### Children Served by Locational Preferences for Care

N=368



Near Either Residence,
Employment,
or School
51 children/13.9%

Near Employment
16 children/4.3%

Near Residence
281 children/76.4%

Near School
7 children/1.9%

On Route
13 children/3.5%

Other
1 child/0.2%

Source: LOCATE: Child Care at Maryland Family Network, Baltimore (7/1/20-6/30/21).

NOTE: Percentages may not total 100% because of rounding.

### Children Served by Type of Care Preferred

N=368



Family or Group Care
215 children/
58.4%

Family Child Care
39 children/
10.6%

Group Care
107 children/29.1%

No Preference Given
7 children/1.9%

Source: LOCATE: Child Care at Maryland Family Network, Baltimore (7/1/20-6/30/21).

NOTE: Percentages may not total 100% because of rounding.

### Reason Child Care is Needed

N=368



Parent Looking for
Employment
24 children/6.5%

Education
24 children/6.5%

Work Demands
of Parent's Job
272 children/
73.9%

Socialization
20 children/5.4%

Parent Attending
School
14 children/3.8%

Job Training
Program
6 children/1.6%

Previous Care Closed
2 children/0.6%

Not Satisfied
with Care
3 children/0.8%

Behavioral Concerns
2 children/0.6%

Parent Respite
1 child/0.3%

Source: LOCATE: Child Care at Maryland Family Network, Baltimore (7/1/20-6/30/21).

NOTE: Percentages may not total 100% because of rounding.

**MONTGOMERY**

## Child Care
# Demographics

# Montgomery County

## Demand for Child Care

**Number of Children Served by LOCATE: Child Care**
368 children (7/1/20-6/30/21)

**Full-time or Part-time Care Needs of Children Served**                     N=368

| | |
|---|---|
| Full-time: 299 children (81.2%) | |
| Part-time: 62 children (16.8%) | |
| Other*: 7 children (1.9%) | |

* Includes requests for sick, backup and temporary care.

Source: LOCATE: Child Care at Maryland Family Network, Baltimore (7/1/20-6/30/21).

Note: Percentage may not total 100% because of rounding.

**Major Reasons Parents Could Not Find Child Care in Montgomery County**

| Reason | Count |
|---|---|
| Other | 4 |
| Cost | 2 |
| No vacancies for Preschool | 2 |
| Hours of Operation/ part time | 1 |
| Location | 1 |
| No vacancies for School-Age | 1 |
| Quality of Care | 1 |

Source: LOCATE: Child Care at Maryland Family Network, Baltimore (7/1/20-6/30/21).

**Major Factors Important to Parents Who Found Child Care in Montgomery County**

| Factor | Count |
|---|---|
| Caregiver | 29 |
| Educational program | 25 |
| Environment | 20 |
| Proximity to home, work, school | 16 |
| Cost | 11 |
| Hours of operation/part time | 6 |
| Only program/provider with vacancy | 4 |

Source: LOCATE: Child Care at Maryland Family Network, Baltimore (7/1/20-6/30/21).

**Child Care Scholarship Program (CCS)\***

**July 2021 Children Receiving Child Care Scholarship**
2,003

Source: Maryland State Department of Education 2020.
* Formerly Child Care Subsidy Program

**Fiscal Year 2020 Monthly Average Number of Children Receiving WPA**
259

NOTE: ¹Child Care Scholarship Program (formerly Child CCS Program) is a statewide program funded with federal and state dollars and administered by the Maryland Department of Human Resources*. ²WPA, The Working Parents Assistance Program is a County-funded subsidy program. Source: WPA Automated System, 2020. WPA implemented the new subsidy tables on September 1, 2019 and the new income guidelines on November 9, 2019 in response to the changes of the State's income levels in August 1, 2019 and new subsidy rates in September 1, 2019.

## Supply of Child Care

**Child Care Scholarship Program (CCS)\***

**Number of Family Child Care Providers serving WPA Children in Montgomery County**
23

**Number of Child Care Centers serving WPA Children in Montgomery County**
63

* Formerly Child Care Subsidy Program
Source: WPA Automated System, 2020. WPA implemented the new subsidy tables on September 1, 2019 and the new income guidelines on November 9, 2019 in response to the changes of the State's income levels in August 1, 2019 and new subsidy rates in September 1, 2019.

**Number of Family Child Care Providers Serving SCCSP Children in Montgomery County**
246 (33.1% of total family providers)

**Number of Child Care Centers Serving SCCSP Children in Montgomery County**
86 (30.4% of total centers)

**Montgomery County FY21 Allocation (estimated)**
$23,222,573 = 2,122 estimated number of children enrolled

Source: Maryland State Department of Education, Office of Child Care

**Special Needs Child Care**

**Family providers who serve/have served children with special needs**
296 (39.8% of total family child care providers in Montgomery)

**Centers who serve/have served children with special needs**
157 (60.6% of total child care centers in Montgomery)

Source: LOCATE: Child Care at Maryland Family Network, Baltimore (7/1/20-6/30/21).

**MONTGOMERY**

10

JA491

## Montgomery County

## Child Care Demographics

## Definitions

**Before/After-School Care:** School-Age child care offers care to children enrolled in Kindergarten or above. Care is provided before and/or after school and during school holidays/vacations. Programs are licensed by the Office of Child Care. Programs may operate from a school building or other licensed facility.

**Census of Population and Housing:** There are two versions of the Census questionnaire: a short form which asks a limited number of population and housing questions of all households, and a long form questionnaire which asks additional social and economic questions of a sample of all households. The user should note that data obtained from a sample are subject to sampling variability, and that there are limitations to many of these data.

**Child Care:** The care or supervision of a child when the child's parent has given the child's care over to another for some portion of a 24-hour-day as a supplement to the parent's primary care of the child. (OCC)

**Child Care Center:** Child care provided in a facility that, for part or all of the day, provides care to children in the absence of the parent. Centers are licensed by the Office of Child Care.

**Child Care Scholarship Program (CCS)*:** Provides financial assistance to eligible families in securing care for their children in registered family child care homes or licensed child care centers while parents/guardians are attending school, working, or in job training.

**Children with Special Needs:** Children who, because of a disability or other special educational, developmental, physical, emotional, behavioral, or medical condition, require additional care, or whose activities are restricted by a certain condition. (OCC)

**Current Median Family Income:** Current median family income is the value shown in a Geolytics Report dated July 2021.

**Current Population Estimates:** Current population estimates are based on GeoLytics, Inc. Reports.

**Educational Attainment:** The highest level of school completed or the highest degree received. Educational attainment figures were used for persons over 25 years of age. (U.S. Bureau of the Census)

**Employer-Sponsored Centers:** A child care center located on-site or off-site which is sponsored by a corporation, business, or other employer. Employees are given priority for enrollment slots.

**Family Child Care:** The care given to a child younger than 13 years old or to a developmentally disabled person younger than 21 years old, in place of parental care for less than 24 hours a day, in a residence other than the child's residence and for which the provider is paid. Regulations allow a family child care provider to care for as many as eight children at any time. (OCC)

**Family Household Income:** Family includes a householder and one or more persons living in the same household who are related to the householder by birth, marriage, or adoption. A household can contain only one family for purposes of census tabulations. (U.S. Bureau of the Census)

**Head Start:** Project Head Start provides comprehensive developmental services for children from low-income families. Head Start is comprised of four components including Education, Health, Parent Involvement, and Social Services. Head Start Centers serve children from age 3 to school entry age from income eligible families.

**Infant/Toddler:** In the State of Maryland, "infant" means a child under 18 months old. "Toddler" means a child 18 months old or older but younger than 2 years old. (OCC) MFN reports "infant" as a child birth through 23 months of age.

**Kindergarten:** An instructional program for children who are 5 years old by September 1st of each academic year. Programs may be operated by a private or public school. Kindergarten is the year of school which precedes entrance to first grade.

**Nursery Schools:** An instructional program approved or exempted by the Maryland State Department of Education for children who are two through four years old. The maximum length of the program is 6 hours per day, however most operate only a few hours per day and may meet only two or three times per week for a nine month period.

**Owner Costs with Mortgage (Selected Monthly):** The sum of payments for mortgages, deeds of trust, contracts to purchase, or similar debts on the property; real estate taxes; fire hazard, and flood insurance on the property; utilities; and fuels. It also includes, where appropriate, the monthly condominium fees or mobile home costs. A housing unit is owner-occupied if the owner or co-owner lives in the unit even if it is mortgaged or not fully paid for. (U.S. Bureau of the Census)

**MONTGOMERY**

11

## Definitions, cont.

**Part Day:** A program regulated by OCC with an educational focus for children one or two years before entering kindergarten. These programs are usually 2-3 hrs/day, 2-3 days/week, nine months/year.

**Pre-Kindergarten:** These are publicly funded pre-kindergarten programs for eligible 4-year-old children administered by local boards of education or qualified vendors. The programs have the overall goal of providing learning experiences to help children develop and maintain school readiness skills necessary for successful school performance. Local school systems shall enroll all 4-year-old applicants from economically disadvantaged or homeless families.

**Poverty Level:** The poverty guideline for a family of four persons was $26,500 in 2021. (U.S. Department of Health and Human Services, Jan 2021)

**Renter Occupied Gross Monthly Rent:** Monthly contract rent plus the estimated average monthly cost of utilities and fuels, if these are paid by the renter. All occupied housing units which are not owner-occupied, whether they are rented for cash rent or occupied without payment of cash rent, are classified as renter-occupied. (U.S. Bureau of the Census)

**Unemployment Rate:** Civilians 16 years old and over are classified unemployed if they (1) were neither "at work" nor "with a job but not at work" during the reference week, and (2) were looking for work during the last four weeks, and (3) were available to accept a job. Also included were civilians who did not work at all during the reference week and were waiting to be called back to a job from which they had been laid off. (U.S. Bureau of the Census)

The Maryland Child Care Resource Network is a public/private partnership designed to expand and improve child care delivery in Maryland. Maryland Family Network manages the Network and operates as its Statewide Coordinating Entity. Funding for this publication was made available by Maryland Family Network, the Maryland State Department of Education, and Maryland's business community.

For more information regarding the Child Care Demographic Reports, contact:

**Maryland Family Network**
1001 Eastern Avenue, 2nd Floor
Baltimore, Maryland 21202
*tel* 410.659.7701 *fax* 410.783.0814
*www.marylandfamilynetwork.org*

For information regarding technical assistance and training for the child care community, contact:

**Montgomery County Child Care Resource and Referral Center**
1401 Rockville Pike, Suite 200
Rockville, MD 20852
*tel* 240.777.3110

*This publication was produced as a work for hire for the benefit of, and with funds from, the Maryland State Department of Education.*

©2022 Maryland State Department of Education
©2022 Maryland Family Network









Government

# County Council passes legislation prohibiting firearm use, carrying within 100 yards of some public places

Bill could be challenged by second amendment groups

by **Steve Bohnel**
November 15, 2022 1:33 pm



Credit: Getty Images

*This story was updated at 2 p.m. Nov. 15, 2022, to include more information about the bill.*

The County Council voted 8-0 to approve a bill that prohibits the possession of firearms within 100 yards of some public places throughout the county, including those with wear and carry permits issued by Maryland

12/29/22, 4:23 PM    County Council passes legislation prohibiting firearm use, carrying within 100 yards of some public places | Bethesda Magazine …

Case 8:21-cv-01736-TDC   Document 59-8   Filed 12/30/22   Page 2 of 3

State Police.

County Council Member Tom Hucker (District 5) was absent from Tuesday's meeting, but he supported the legislation when it was passed last month in the council's Public Safety committee, 3-0. County Council President Gabe Albornoz and other council members said the bill was needed in light of recent shootings, including one at Clyde's Restaurant in Chevy Chase earlier this week.

The bill specifically delineates where firearms would be prohibited. According to the bill, the places of public assembly include: a park; place of worship; school; library; recreational facility; hospital; "community health center including any health care facility or community-based program licensed by the Maryland Department of Health;" "[a] long-term facility including any licensed nursing home, group home, or care home;" and a

Bethesda Bethesda BEAT                                                    NEWSLETTERS  ☰ 

It also includes government buildings or government-owned property, polling places and other facilities. Law enforcement officers are exempted, and the bill is effective as law once County Executive Marc Elrich (D) signs it, said Christine Wellons, the County Council's lead attorney.

Rich Madaleno, the county's chief administrative officer, told Bethesda Beat he believes Elrich will sign the bill.

Advertisement



Before the Tuesday vote, Albornoz (at-large) said that recent events — including a fatal shooting of multiple football players at the University of Virginia, and the shooting at Clyde's — has him and colleagues concerned about gun violence, and the number of guns in the county, state, and country.

Albornoz said he's heard criticism that "more policy" is not the answer. But he added that many firearms that county police are recovering and obtaining are coming from places where gun laws are less restrictive. He believes, as do other council members, that more guns are not the answer.

"As the parent of four children, this is not the world I want my kids growing up in," said Albornoz, who was lead sponsor of the bill.

Advertisement

12/29/22, 4:23 PM          County Council passes legislation prohibiting firearm use, carrying within 100 yards of some public places | Bethesda Magazine …

Case 8:21-cv-01736-TDC   Document 59-8   Filed 12/30/22   Page 3 of 3



Albornoz told Bethesda Beat after the vote that a violation of the law would result in a fine. Kristin Trible, a senior legislative aide to Albornoz, wrote in an email that a violation would "be a misdemeanor, punishable by fine up to $1000 and/or 6 months in jail."

The bill could potentially face a legal challenge from second-amendment rights groups in the state, including Maryland Shall Issue. That group, and other opponents, has said that the council's bill would be in violation of county residents' Second Amendment rights, especially given the Supreme Court's recent ruling in New York State Rifle & Pistol Association, Inc., et al. v. Bruen. That ruling was hailed as a victory for concealed carry supporters in the state of New York.

But Albornoz told Bethesda Beat that he and colleagues worked extensively with the county attorney's office to make sure the bill aligned with the findings in Bruen.

Advertisement

If it is challenged in court, council members would work with the Montgomery County State's Attorney's office, Maryland Attorney General's office and county attorney's office to defend the new law, the council president added.

"We believe we're on solid ground," Albornoz said.

JA496

**The Washington Post**

*Democracy Dies in Darkness*

LOCAL CRIME & PUBLIC SAFETY

# Gun violence rises sharply in Montgomery County, police chief says

Chief Marcus Jones made remarks – citing year-to-date jumps – as county leaders introduced gun-control measure

By Dan Morse

Updated July 11, 2022 at 10:29 p.m. EDT  |  Published July 11, 2022 at 6:50 p.m. EDT

Gun violence has risen sharply in Montgomery County this year, with nonfatal shootings nearly double what they were 12 months ago, the jurisdiction's top officer said Monday.

Police Chief Marcus Jones made the remarks to reporters as county leaders discussed a proposed legislative action that would scale back the places someone could carry a handgun. He also spoke the day after dozens of gunshots were fired in a shopping center parking lot in Montgomery's Briggs Chaney area, sending a victim to the hospital with serious injuries and driving bullets into several businesses.

"Literally 60 rounds were fired in that parking lot," Jones said. "It just shows you that gun violence has become sort of the norm, which is not where we need to be."

While gun-related homicides are essentially flat compared with the same period last year, nonfatal shootings are up 75 percent and noncontact shootings have increased 29 percent, according to figures provided by the police department Monday.

"It is of grave concern," Jones said.

Leaders in Montgomery County following the rise in violence this year have cited several explanations.

One is the availability of firearms — in particular guns that can be assembled at home from parts ordered online. Residents build "ghost guns" — so named because they have no serial numbers — or buy them on the streets already assembled, police say.

Another big factor behind the violence, leaders say, is the disruption of so many young lives because of covid-19. Teenagers didn't have the structure of in-person classes or after-school programs.

"Kids on the cusp of being at risk fell toward criminality," Jessica Zarrella, a Montgomery County defense attorney and former prosecutor, said in an interview earlier this year.

Gabe Albornoz, president of the Montgomery County Council, added that the police department is stretched thin because officers are retiring at a higher rate than new police academy prospects are coming in — a trend Albornoz noted is taking place nationwide.

"It's a perfect negative storm," he said.

Under legislative action to be introduced Tuesday, Albornoz said, the county would make a "zone text amendment" to forbid a person — even if they have a "wear-and-carry permit" from the state — from taking a gun into a "place of public assembly."

The council president said such locations "are purposely wide-ranging," and could include places of worship, shopping centers and businesses.

"Montgomery County has been seeing an uptick in violence," said Lee Holland, president of the Montgomery Police Union. "It's alarming the number of shootings our members are responding to on a weekly and in some cases daily basis."

As of the end of June, homicides involving guns, victims and suspects under the age of 21 have more than doubled from 2021 to 2022, according to data from the Montgomery County Police Department.

"There are several contributors to the community violence, including drug robberies and interpersonal disputes or beefs, many of which begin or escalate on social media," according to a recent report to the County Council on youth safety.

Between June 2021 and June 2022, according to the report, "there have been 20 firearm homicide victims in the County, of which eight were 21 and younger."

The report also said county police have recovered more than 730 guns. About 110 of those were ghost guns. "These numbers are on track to overtake last year's total of 1,192 recovered firearms," the report said.

Tom Didone, who retired as a Montgomery assistant chief a year ago, agreed that the availability of firearms — ghost guns in particular — and the destabilizing effect of covid-19 have contributed to increased shooting violence.

"I think it's all related," he said.

Didone remains active on traffic safety matters with the International Association of Chiefs of Police. The No. 1 concern he hears from chiefs around the country is how do they get their officers to reengage in traffic stops.

"We're still getting guns off the streets. It's just not the same percentage," he said.

Such stops have received scrutiny over the years because they can escalate into a fatal shooting by police and there have been concerns nationwide about disparities in such stops.

Didone acknowledged that, around the country, too many officers took the practice too far — coming up with any excuse to pull over a car, for example. But he said that as long as officers are making true traffic stops — running a red light, talking on a cellphone — he would welcome a return to officers more often using that as a chance to try to find guns.

"Officers have to get back to doing our job. Montgomery is moving back in this direction faster than a lot of places," Didone said.

**CLARIFICATION**

This story has been updated with a clarification from Montgomery County police on gun violence numbers.

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg: 26 of 396

12/8/22, 11:49 AM                          How Often Do Police Stop Active Shooters? - The New York Times
                          Case 8:21-cv-01736-TDC    Document 59-10    Filed 12/30/22    Page 1 of 6

The New York Times    https://nyti.ms/3OeHgJU

# Who Stops a 'Bad Guy With a Gun'?

By Larry Buchanan and Lauren Leatherby   June 22, 2022



How 433 active shooting attacks ended

**249** attacks ended before the police arrived.

**In 185,** the attacker ... left the scene **113 times.**

died by suicide **72 times.**

**In 64,** a bystander ...

subdued the attacker **42 times.**

shot the attacker **22 times.**

The bystander was a ...
**12** citizen.
**7** security guard.
**3** off-duty officer.

**184** attacks ended after the police arrived.

**In 131,** the police ... shot the attacker **98 times.**

subdued the attacker **33 times.**

**In 53,** the attacker ...

died by suicide **38 times.**

surrendered **15 times.**

Source: ALERRT Center

The lengthy police response to a school shooting in Uvalde, Texas, and the death of an armed security guard as part of an attack on a Buffalo supermarket last month have drawn fresh scrutiny to a recurring (and uniquely American) debate: What role should the police and bystanders play in active shooter attacks, and what interventions would best stop the violence?

The debate has moved to Capitol Hill as lawmakers consider gun safety legislation that could increase funding for mental health services, school safety and other measures aimed at keeping guns out of the hands of dangerous people. "What stops armed bad guys is armed good guys," Senator Ted Cruz suggested in the wake of the Uvalde shooting, echoing many other gun rights advocates over the years.

Researchers who study active shooter events say it can be difficult to draw broad policy conclusions from individual episodes, but a review of data from two decades of such attacks reveals patterns in how they unfold, and how hard they are to stop once they have begun.

There were at least 433 active shooter attacks — in which one or more shooters killed or attempted to kill multiple unrelated people in a populated place — in the United States from 2000 to 2021. The country



EXHIBIT
**6**

experienced an average of more than one a week in 2021 alone.

**Active shooter attacks by year**




Source: ALERRT Center

The data comes from the Advanced Law Enforcement Rapid Response Training Center at Texas State University, whose researchers work with the F.B.I. to catalog and examine these attacks. Unlike mass shooting tallies that count a minimum number of people shot or killed, the active attack data includes episodes with fewer casualties, but researchers exclude domestic shootings and gang-related attacks.

Researchers caution that some older attacks may be missing from the data, but they feel confident in their overall assessment that shootings are increasing. What is less clear is how to limit the damage of these attacks, given how quickly they unfold and how powerful the weapons used can be.

Most attacks captured in the data were already over before law enforcement arrived. People at the scene did intervene, sometimes shooting the attackers, but typically physically subduing them. But in about half of all cases, the attackers commited suicide or simply stopped shooting and fled.

"It's direct, indisputable, empirical evidence that this kind of common claim that 'the only thing that stops a bad guy with the gun is a good guy with the gun' is wrong," said Adam Lankford, a professor at the University of Alabama, who has studied mass shootings for more than a decade. "It's demonstrably false, because often they are stopping themselves."

**Police officers shoot or physically subdue the shooter in less than a third of attacks.**



JA500



Most events end before the police arrive, but police officers are usually the ones to end an attack if they get to the scene while it is ongoing.

Hunter Martaindale, director of research at the ALERRT Center, said the group has used the data to train law enforcement that "When you show up and this is going on, you are going to be the one to solve this problem."

Information on police response time is incomplete, but in the available data, it took law enforcement three minutes, on average, to arrive at the scene of an active shooting.

Yet, even when law enforcement responds quickly — sometimes within seconds — or if officers are already on the scene when the attack begins, active shooters can still wound and kill many people.

"Law enforcement could be one minute out, and if that individual is proficient with the weapon system they're using, they can quickly go through a lot of ammunition," Mr. Martaindale said. "And if they're proficient in their accuracy, you could have very high victim counts."

In **Dayton, Ohio,** in 2019, an attacker shot 26 people and killed nine outside a downtown bar in the 32 seconds before a police officer on duty shot the attacker. A week earlier, at the **Gilroy Garlic Festival** in Northern California, nearby officers engaged an attacker within a minute of his opening fire, but after 20 people had been shot. Three victims died and the attacker died by suicide.

"There's not a lot that can be done to stop someone in the opening seconds of harming a significant number of people," Mr. Lankford said.

And, like in Uvalde, law enforcement does not always bring an attack to a quick end. When a gunman opened fire at the **Pulse nightclub in Orlando, Fla.,** in 2016, a detective working extra duty shot at the gunman from outside the club. More police officers began arriving less than two minutes later. But the police did not enter the club for several minutes, after the gunman had paused his initial assault. Police officers ended the attack when they shot the gunman three hours after the assault began. Forty-nine people were killed and 53 more were wounded.

**Bystanders stop some attackers, more often with physical force than with a gun.**

JA501



In the wake of deadly shootings, gun rights advocates often push to arm more people, citing prominent examples where a "good guy with a gun" stopped a "bad guy."

After a gunman shot 46 people in a church in **Sutherland Springs, Texas**, in 2017, an armed neighbor arrived at the scene and exchanged gunfire with the gunman, injuring him, until the gunman fled.

But armed bystanders shooting attackers was not common in the data — 22 cases out of 433. In 10 of those, the "good guy" was a security guard or an off-duty police officer.

"The actual data show that some of these kind of heroic, Hollywood moments of armed citizens taking out active shooters are just extraordinarily rare," Mr. Lankford said.

In fact, having more than one armed person at the scene who is not a member of law enforcement can create confusion and carry dire risks. An armed bystander who shot and killed an attacker in 2021 in **Arvada, Colo.**, was himself shot and killed by the police, who mistook him for the gunman.

It was twice as common for bystanders to physically subdue the attackers, often by tackling or striking them. At **Seattle Pacific University** in 2014, a student security guard pepper sprayed and tackled a gunman who was reloading his weapon during an attack that killed one and injured three others. The guard took the attacker's gun away and held the attacker until law enforcement arrived.

When a gunman entered a classroom at the **University of North Carolina at Charlotte** in 2019, a student tackled him. The student was shot and killed, but the police chief said the attack would have had a far worse death toll had the student not intervened.

## One in four attacks ends in a shooter suicide.



JA502



In more than a quarter of episodes, the attackers ended the shootings by turning the guns on themselves.

Many attackers died by suicide before the police arrived. At a **Binghamton, N.Y.**, immigration services center in 2009, an attacker shot 17 people, killing 13, before turning the gun on himself. A middleschooler died by suicide after shooting two fellow students and a teacher in **Sparks, Nev.**, in 2013. After shooting 471 people at the **Route 91 Harvest Festival in Las Vegas** from a hotel room overlooking the festival, the gunman died by suicide before the police arrived to his room.

The share of attackers who die by suicide is most likely a fraction of those who have suicidal expectations, Mr. Lankford said. Based on evidence attackers leave before attacks, like online posts or suicide notes, more say they expect to die. Sometimes they expect to provoke law enforcement to kill them, Mr. Lankford said.

Police officers exchanged gunfire in 2018 with a gunman who shot 12 people at a bar in **Thousand Oaks, Calif.**, before he shot himself.

At **Virginia Tech** in 2007, a gunman locked doors to the building, initially stalling the police, before attacking students and professors, eventually shooting 49 people. But once law enforcement was able to enter, the attacker shot himself as police officers approached.

**One in four attackers leaves the scene (though most are later caught).**



after the police
arrived.

22 times.

In 131,
the police ...

shot the attacker **98 times.**

subdued the attacker **33 times.**

In 53,
the attacker ...

died by suicide **38 times.**

surrendered **15 times.**

About a quarter of shootings ended when the attacker or attackers stopped of their own accord and left the scene, then were apprehended or died by suicide at another location.

Many attacks that end when the shooter flees are spontaneous; for example, one may stem from a dispute that escalates when one party pulls out a gun.

In **San Antonio** in 2019, a man had a disagreement with the staff of a moving company, then opened fire on the company's workers before running away. The police apprehended him later without incident. Last year, a man who was kicked out of a nightclub in **Wichita, Kan.**, after a fight returned and shot six people, killing one. He fled the scene, and the police arrested him a month later in Phoenix.

Because these kinds of attacks are generally not planned, attackers may be more inclined to flee in hopes of getting away, Mr. Martaindale said.

But many premeditated attacks also ended when the attacker or attackers left the scene. After a gunman shot 34 people in 2018 at **Marjory Stoneman Douglas High School in Parkland, Fla.**, he dropped his weapon and fled the school with other students, bypassing police officers who had arrived on the scene but had not yet attempted to intervene. After fleeing, the gunman walked to a Walmart, bought a drink at a Subway and stopped at a McDonald's before he was apprehended by the police on a residential street.

In **El Paso**, a gunman shot 45 people, killing 23, in a Walmart before fleeing the scene. The police arrested him down the road without incident.

Why attackers stop themselves is a hard thing to know, but Mr. Lankford, after studying shooters for years, has some guesses. One is that sometimes, shooters plan for a dramatic confrontation with the police that does not happen. Another possibility, he said, is that the reality of their actions sets in.

Note: The ALERRT active attack database includes a small number of attacks in which a knife or a vehicle was the attacker's primary weapon. These were excluded from the analysis.

**Correction:** June 22, 2022
An earlier version of a chart with this article misstated the number of times in 433 separate active shooter attacks that the shooter left the scene and the number of times police officers shot the attacker. As the article and charts within it correctly noted, it was 113 times and 98 times, respectively, not 108 and 97.

JA504

Case 8:21-cv-01736-TDC   Document 59-11   Filed 12/30/22   Page 1 of 4



# GENERAL DIGEST

OF THE

# ORDINANCES AND RESOLUTIONS

OF THE

## Corporation of New-Orleans.

**MADE BY ORDER OF THE CITY COUNCIL,**

BY THEIR SECRETARY,

D. AUGUSTIN, ESQ. COUNSELLOR AT LAW.

PRINTED BY JEROME BAYON,

CORNER OF CHARTRES AND PT. LOUIS STREETS.

1831.

**EXHIBIT 7**

Generated on 2022-12-28 18:37 GMT  /  https://hdl.handle.net/2027/nyp.33433014832483
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

record book, kept for that purpose, all ordinances, bye-laws and resolutions which shall be passed henceforward by the City Council; the same shall be signed by the Recorder and by the Mayor, if by him approved in said record book which shall make a part of the archives of the Council and be regularly signed after each sitting. It shall also be the duty of the Secretary to keep in the French and English languages, an index of the proceedings, bye-laws, ordinances and resolutions passed by the City Council. In consideration of this increase of his duties, resolved that the resolution of the twenty-ninth of May eighteen hundred and twenty-four, reducing the Secretary's salary be and the same is hereby repealed, and his said salary reinstated and fixed at the sum of eighteen hundred dollars per annum, payable monthly from the first instant.

*Approved, March* 11, 1831.

## THEATRES AND BALLS.

*An Ordinance concerning the public exhibition and theatres of New-Orleans.*

THE CITY COUNCIL ORDAINS AS FOLLOWS :

ART. 1. No person shall exhibit, or cause to be exhibited any dramatic composition, ballad, pantomime, or other performance of that kind, in any theatre in the city of New-Orleans, where all persons are admitted for their money ; nor shall any person entertain the public with any display of fireworks, rope-dancing, or any performance of what kind soever it be, without having previously obtained from the Mayor of New-Orleans a license of permission for that purpose, on penalty of a fine of not less than twenty dollars nor exceeding one hundred dollars for every such offence; and the said license shall express the object and the length of time for which it is granted.

ART. 2. The day and hour of every public spectacle shall be appointed by the Mayor, and it shall be the duty of every manager, acting manager, or other person having the management or direction of any theatre or public exhibition, to apply to the Mayor for his orders on that subject, and strictly to conform thereto, announcing to the public the hour which shall have thus been appointed for the performances to commence. On the said days of performance, the stage, pit, boxes, galleries, lobbies and corridors must be carefully swept and cleansed, and as soon as the house is opened it must be lighted up, as also the lobbies, corridors and galleries : the outward doors shall be opened half an hour before the performance begins, and shall constantly remain open during its continuance; nor shall they be shut, neither shall the lights be extinguished until all the spectators have retired. And every manager, acting manager or other person having the management or direction of a theatre or public spectacle, offending against any provision of this article, or neglecting to conform to the orders of the Mayor or other com-

Generated on 2022-12-28 18:43 GMT / https://hdl.handle.net/2027/nyp.33433014832483
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

## THEATRES AND BALLS.                    371

trate invited by the Mayor to replace him thereto in case of his absence. Provided that the place so reserved for the Mayor or other persons sent in his place shall be furnished without said managers being entitled to any compensation, and they shall adhere to this condition before obtaining a license to open their theatres.

ART. 14.  The Mayor, as often as he may deem it necessary, shall examine whether the theatres, places of public resort be constructed with the requisite solidity, and carefully kept in repair, so that the public may assemble there without danger ; and he shall take suitable measures to prevent the accidents that might result from any negligence in that respect on the part of the proprietors, tenants or other persons having the management or direction of the said theatres, places of public spectacles, or other places of public resort.

ART. 15.  The manager, acting manager or other person having the management or direction of a theatre, shall place and constantly keep, within the play-house, several large tubs, and at least one fire-engine in good repair, which must be filled on days of performance ; and on failure of complying with this requisite, and until the manager shall have complied with it, the Mayor shall order the theatre to be and remain shut up.

ART. 16.  By virtue of the powers granted by law to the Mayor and City Council, the Mayor shall cause to be shut up any place of public resort, whenever the maintenance of order, the public safety or tranquillity may require it.

*Approved, June 8, 1816.*

### *An Ordinance respecting public Balls.*

#### THE CITY COUNCIL ORDAINS AS FOLLOWS :

ART. 1.  It shall not be lawful for any person to enter into a public ball-room with any cane, stick, sword or any other weapon, and every person having either a cane, stick, sword or any other weapon, shall, before he enter the ball-room, deposite the same at the office which shall be at the door of the entrance of said ball-room, where there will be a person appointed to receive and take care of such articles which he shall carefully keep, affixing to each article a number, a check of which he shall give to the owner ; and said articles shall not be returned to the persons respectively depositing them, until said persons are quitting the balls and produce their checks.

ART. 2.  Every person entering in any public ball-room, in contravention to the above provision, shall pay a fine of five dollars ; and every person giving a public ball without having previously established an office at the door of the entrance of said ball-room, and without appointing a person to receive and take care, in the manner aforesaid, of the articles before mentioned shall pay a fine of twenty-five dollars, and if the offence is repeated, the offender shall forfeit the right to hold any further permission to give such public balls.

Generated on 2022-12-28 18:35 GMT  /  https://hdl.handle.net/2027/nyp.33433018324B3
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by **Google**

Original from
NEW YORK PUBLIC LIBRARY

## THEATRES AND BALLS.　　　373

ART. 3.　Every person who shall commit any disorder, tumult, violence, insult, indecency, or shall commit an assault or battery in a public ball-room shall be taken before the Mayor, or any other justice of the peace, to be dealt with according to law.

ART. 4.　Any person giving a public ball, who shall prolong the duration of the same beyond the hour fixed by the license or permit which he must obtain, for this purpose, of the Mayor of this city, shall pay a fine of twenty-five dollars, for each and every offence.

*Approved October* 27, 1817.

*An Ordinance to authorize the Mayor to appoint constables for the police of the theatres, public exhibitions and balls.*

THE CITY COUNCIL ORDAINS AS FOLLWS :

ART. 1.　The Mayor shall nominate and appoint a sufficient number of men to be constables, and to form, under that denomination, a guard for the theatres, public exhibitions and balls, in order there to receive and execute the orders and directions of the Mayor, or of the commissaries of police, as to what concerns the maintenance of good order in the aforesaid premises : provided always, that the said constables shall be employed as a guard only at authorised theatres, spectacles and balls, and that their number shall not exceed five men for each of said theatres, exhibitions and balls.

ART. 2.　The constables on guard at said theatres or exhibitions, shall be paid by the managers, acting-managers or other persons having the direction of the exhibition, at the rate of one dollar for each constable, every time of performance ; and every constable on duty at a ball, shall be entitled to require from the person keeping such balls, the said compensation of one dollar, when the ball ends at midnight, and that of two dollars in case of any ball authorised for a later hour of the night.

ART. 3.　In no case shall the above mentioned service be at the expense of the city, nor shall any of the men composing the city guard, be employed on that duty, unless in case of any disturbance breaking out in any of the aforesaid places, and then only till tranquillity be restored.

ART. 4.　All persons are forbidden to oppose or obstruct any of the aforesaid constables in the legal execution of his office, or to utter against them invectives or opprobrious language in the discharge of their duty ; and every person herein offending, shall pay a fine of from ten to fifty dollars for every such offence.

*Approved, November* 5, 1817.

*An Ordinance laying a tax on public balls and public exhibitions.*

THE CITY COUNCIL ORDAINS AS FOLLOWS :

ART. 1.　It shall not be lawful for any person to give any public ball, either to white persons or free persons of colour, at any place within the extent of the city, or to exhibit any inferior spectacle where the public are admitted for money, such as a circus, for equestrian exhibitions, panoramas,

Generated on 2022-12-28 18:36 GMT / https://hdl.handle.net/2027/nyp.33433014832483
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

# PUBLIC LAWS

OF THE

# STATE OF MAINE.

———

### Chapter 252.

..N ACT providing for the acceptance of the public money, apportioned to the State of Maine, on deposite, by the Government of the United States.

*Be it enacted by the Senate and House of Representatives in Legislature assembled,* That the Treasurer of this State is hereby authorized to receive on the terms prescribed in the thirteenth section of the Act of Congress, entitled "An Act to regulate the deposites of the public money," approved the twenty-third day of June, eighteen hundred and thirty-six, the proportion of the moneys thereby directed to be deposited with the several States which may, according to the provisions of that section, be deposited with this State, and to sign and deliver to the Secretary of the Treasury of the United States such certificates of deposites therefor as may be required under the provisions of that section, and to pledge the faith of this State for the safe keeping and repayment thereof in such manner as may be necessary to entitle the Treasurer to receive, for and in behalf of this State, said proportion of the monies before mentioned.

*Treasurer of State to receive the proportion of surplus funds belonging to Maine.*

[*Approved by the Governor January 26, 1837.*]
2


EXHIBIT
8

## MILITIA.                                    423

missioned Officer or private so appointed, shall refuse or neglect to perform all or any of the duties of said office during said term, (except keeping the records,) he shall forfeit and pay not less than ten *Penalty for their refusing to perform said duty.* nor more than twenty dollars.   And in case of the absence, sickness, or other inability of the Clerk of any Company, the commanding Officer thereof may appoint a Clerk pro tempore; or upon satisfactory evidence that no member of the Company will accept the office pro tempore, he may order any *—Clerk pro tem. may be appointed in case of absence or sickness of Clerk.* non-commissioned Officer or private in like manner to perform all the duties of the office of Clerk (except keeping the records,) until the Clerk shall be able to perform the same, or some other person be appointed, not exceeding the term of three months; and any person so ordered, refusing or *Penalty for refusing to perform said duty.* neglecting to perform all the duties of said office (except keeping the records,) shall forfeit and pay not less than ten nor more than twenty dollars.   In all such cases the records of the Company shall be *Records to be kept by commanding Officer, and to be competent evidence.* kept by the commanding Officer as long as such vacancy, absence, sickness or other inability shall continue: and the records so kept shall be competent evidence of such orders and temporary appointments, as well as of all other matters of which such records would be evidence if kept by the Clerk.

  SECT. 4.   *Be it further enacted,*  That all fines and forfeitures incurred in neglecting military duty, *How fines are to be collected and how to be disposed of.* by members of any Company without Officers, (except forfeitures for refusing to give notice when ordered by the Officer detailed to command such Company, as provided in the second section of this Act or by the commanding Officer of the Regiment; and except forfeitures incurred by Clerks in neglecting to return the roll as required by the first section of this Act,) shall be prosecuted and collected by the Officer detailed to command said Company as provided in the second section of this Act, substantially in the manner that Clerks of Companies are

424                    MILITIA.

authorized and required to do by "An Act to organize, govern and discipline the Militia of this State," passed March 8, A. D. 1834, to which this is additional; one half of the amount recovered to be to the use of the Regiment, and the other half to the use of the Officer; and the Officer so prosecuting shall be a competent witness in the case. All fines and forfeitures incurred under the first, second and third sections of this Act, shall be recovered by indictment, or by action on the case, by any person whatever, one half of the sum recovered to be to the use of the State, and the other half to the use of the prosecutor.

No idiot, lunatic, common drunkard, vagabond, pauper, or person convicted of any infamous crime to be eligible for office,—nor unless able bodied, &c., &c.

Persons ineligible not be commissioned.

—vacancy to be filled.

SECT. 5.  *Be it further enacted,*  That no idiot, lunatic, common drunkard, vagabond, pauper, nor any person convicted of any infamous crime, nor any other than white, able-bodied, male citizens, shall be eligible to any office in the Militia; and whenever it shall appear to the Commander-in-Chief, that any person thus ineligible has received a majority of votes cast at any election of Officers, he shall not commission him, but, with the advice and consent of the Council, shall declare said election null and void, and appoint some person to fill the vacancy.

Students in Colleges made liable to do military duty.

SECT. 6.  *Be it further enacted,*  That all students attending any of the several colleges, academies or seminaries of this State, shall be holden and compelled to do military duty as other persons, in the town where said colleges, academies or seminaries are established.

Verbal notice to appear on a future day may be given on parade.

SECT. 7.  *Be it further enacted,*  That whenever any Company shall be paraded, the commanding Officer thereof is hereby authorized verbally to notify the men so paraded, to appear on some future day not exceeding thirty days from the time of such notification, for any military duty required by law, and such notification shall be legal as it respects the men present.

USCA4 Appeal: 23-1719     Doc: 30-2     Filed: 08/21/2023     Pg: 39 of 3

SECT. 8. *Be it further enacted,* That all commanding officers, subaltern Officers, and all Clerks of Companies be and they hereby are made competent witnesses in law, to testify to all or any facts within their knowledge, in any suit commenced by said Clerk or commanding Officer, for the collection of any fine or forfeiture named in this Act, or in the several Acts to which this is additional.

*Officers and Clerks of Companies made witnesses.*

SECT. 9. *Be it further enacted,* That whenever any action shall have been commenced, for any fine or forfeiture, by any Clerk of any Company, and said Clerk shall die, resign or refuse, or in any other way be disqualified to prosecute said suit so commenced, it shall be lawful and is hereby made the duty of the commanding Officer of the Company, to assume and prosecute said suit to final judgment and execution; and whenever any fine or forfeiture shall have been incurred by any private or non-commissioned Officer of any Company, and there shall be no Clerk, or the Clerk shall resign or die, or be disqualified, it shall be lawful for any Clerk appointed after said fine or forfeiture has been incurred, to sue for and recover the same; *Provided* said action shall be commenced within the time prescribed by law.

*In case of death of Clerk, commanding Officer, to continue prosecution for fines to final judgment —and to commence them where there is no Clerk.*

SECT. 10. *Be it further enacted,* That a copy of the record of any Court Martial, certified by the President of such Court, together with a duly authenticated copy of the order convening said Court, shall be conclusive and sufficient evidence to sustain in any Court, any action commenced for the recovery of any fine and costs, or part costs, or either, agreeably to the provisions of an Act to which this is additional.

*Copy of records of Courts Martial made evidence in cases.*

SECT. 11. *Be it further enacted,* That if any Captain or commanding Officer shall neglect or refuse to make, or cause to be made, a return of the state of his Company as it existed on the day of the annual inspection in May, to the command-

*Fine imposed on commanding Officers who neglect to make returns of the May Inspection.*

EXHIBIT

9

1837.                    LAWS OF MARYLAND.

CHAP. 100. this State, and that a hearing was had at March term, eighteen hundred and thirty-four, when allegations preferred by his creditors were sustained; that an appeal was taken from the decision, bond with security filed, which bond was lost or mislaid; that said Schleigh is in fact actually insolvent:—Therefore,

**Insolvent**

*Be it enacted by the General Assembly of Maryland,* That Daniel H. Schleigh, of Washington county, is hereby empowered to apply for and obtain the benefit of the insolvent laws of this State, as if allegations never had been sustained against him, by his complying with all the provisions of the insolvent laws of this State.

---

## CHAPTER 100.

Passed Feb. 28, 1838.

*An act for the preservation of Wild Fowl in the waters of Smith's Island and its vicinity, in Somerset county.*

**Prohibition in the limits**

SECTION 1. *Be it enacted by the General Assembly of Maryland,* That from and after the first day of May next, it shall not be lawful for any person or persons, by day or night. to navigate or paddle any open skiff, canoe or open boat of any description, on board of which open skiff, canoe or open boat aforesaid may be any offensive weapon, gun, musket, fowling piece or pistol, within the region usually known as included from Hearn's Straits, in Somerset county, to the upper side of Holland's Straits, within fifty yards of any blind for shooting fowl, with intent to shoot or molest any wild fowl or fowls within the region aforesaid.

**Penalty for violating**

SEC. 2. *And be it enacted,* That the discovering or finding of any offensive weapon, gun, musket, fowling piece or pistol in any open skiff, canoe or open boat as aforesaid, within fifty yards of any blind for shooting fowl, shall, in all cases within the region aforesaid, be deemed prima facie evidence of intent to shoot or molest said wild fowls, and shall subject the offender in each and every case, to a penalty of ten dollars, to be recovered before the district court of Somerset county, by action of debt, in the name of the State, or

THOMAS W. VEAZEY, ESQUIRE, GOVERNOR.    1837.

qui tam action, one-half of which penalty shall be for CHAP. 101.
the benefit of the informer, and the remaining half
shall be paid over to the commissioners of Somerset
county, for the benefit of said county.

SEC. 3. *And be it enacted*, That the informer shall Witness
be deemed a competent witness in each and every pro-
secution under this act.

---

## CHAPTER 101.

*An act entitled, an act to Incorporate the Carroll Acade-* Passed Feb. 26,
*my and House of Public Worship.*    1838

SECTION 1. *Be it enacted by the General Assembly of* Persons incor-
*Maryland,* That William Shriver, Peter E. Myers, porated
James Hierd, William Burgoon and Joseph Keefer,
be appointed trustees for a school erected in Carroll
county, district number three, called "the Carroll
Academy and House of Public Worship," and their
successors to be appointed, as hereinafter directed,
shall forever hereafter be, and they are hereby erected
and established, and declared to be one body politic
and corporate, with perpetual succession, in deed and
in law, by the name, and style and title of the Trus- Style
tees of "The Carroll Academy and House of Public
Worship;" by which name and style the said trustees
and their successors shall be capable in law and in Corporate pow-
equity to hold property, the value of which shall, at ers
no time, exceed the sum of one thousand dollars for
the said Academy and House of Public Worship.

SEC. 2. *And be it enacted*, That the said house shall House of Wor-
be open and free for all Christian denominations to ship
worship in; *provided*, no meeting for public worship
shall interfere with school hours, unless by consent of
a majority of the trustees.

SEC. 3. *And be it enacted*, That if a vacancy occur Case of vacan-
in the board of trustees, the same shall be filled by cy
the remaining trustees, until the next annual election
of the same,

SEC. 4. *And be it enacted*, That on the first day of Annual elec-
January in every year, an election shall be held by the tion
qualified voters at the academy; which said election

THE

# GENERAL LAWS

OF THE

## Commonwealth of Massachusetts

PASSED AT THE

## JANUARY SESSION, 1837.

---

NOTE.  [The omitted chapters are those which contain the Special Statutes.]

---

## CHAPTER 1.

AN ACT CONCERNING THE SURPLUS REVENUE OF THE UNITED STATES.

Treasurer authorized to receive, &c., Commonwealth's proportion of public money.

THE treasurer and receiver general of this Commonwealth is hereby authorized to receive, on the terms prescribed in the thirteenth section of the act of Congress, entitled, "an act to regulate the deposits of the public money," approved the twenty-third day of June, eighteen hundred and thirty-six, the proportion of the moneys thereby directed to be deposited with the several states, which may according to the provisions of that section be deposited with this state; and to sign, and deliver to the secretary of the treasury of the United States, such certificates of deposit therefor as may be required under the provisions of that section; and to pledge the faith of this state for the safe keeping and repayment thereof, in such manner as may be necessary to entitle the treasurer and receiver general to receive, for and in behalf of this state, said proportion of the moneys before mentioned.  [January 19, 1837.]

*[margin: Treasurer authorized to receive, &c., Commonwealth's proportion of public money.]*

*[margin: And to sign certificates of deposit, &c.]*

---

## CHAPTER 13.

AN ACT RELATING TO THE SALARY OF THE SERGEANT AT ARMS.

Salary of Sergeant at Arms increased.

FROM and after the first day of January, one thousand eight hundred and thirty-seven, the sergeant at arms shall receive an annual salary of one thousand dollars, instead of eight hundred and fifty dollars, as provided in the sixty-fifth section of the thirteenth chapter of the Revised Statutes.  [February 14, 1837.]

*[margin: Salary $1,000.]*

3

EXHIBIT
10

USCA4 Appeal: 23-1719     Doc: 30-2        Filed: 08/21/2023      Pg: 43 of 396

# CHAPTER 240.

### AN ACT CONCERNING THE MILITIA.

SECTION
1. Who shall be enrolled in the militia, and included in military returns.
2. Who shall appoint division inspectors, &c.
3. When commissions of staff officers expire.
4. Adjutant general to present his account to governor and council in February.
5. How military returns shall be made; penalties for neglect; by whom penalties sued for.
6. Certain yearly returns dispensed with; majority of voters present may elect

SECTION
company officers.
7. On what terms members of voluntary companies exempted from duty in standing company.
8. Division inspector to keep roster, &c.; his compensation.
9. How fines, &c. of members of volunteer companies may be collected and disposed of.
10. When towns required to provide powder, &c.: forfeiture for not providing.
11. Sections of former statute repealed.

**Who shall be enrolled in the militia, and included in military returns.**

SECT. 1.   Every able-bodied white male citizen resident within this Commonwealth, who is, or shall be, of the age of eighteen, and under the age of forty five years, excepting idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime, shall be enrolled in the militia, and included in the military returns: *provided*, that nothing herein contained shall be so construed as to render any of the exempts mentioned in the first, second and third sections of the twelfth chapter of the Revised Statutes, liable to do military duty otherwise than is therein provided.

**Who shall appoint division inspectors, &c.**

SECT. 2.   Division inspectors and division quarter masters shall hereafter be appointed by the respective major generals, and approved by the commander in chief.

**When commissions of staff officers expire.**

SECT. 3.   The commissions of all staff officers, appointed by any commanding officer, shall expire after the commanding officer shall be discharged or vacate his commission, as soon as his successor is commissioned.

**Adjutant general to present his account to governor and council in February.**

SECT. 4.   The adjutant general shall annually, in the month of February, lay before the governor and council, for adjustment, an account of all expenditures of money made by him as adjutant general and acting quarter master general, with vouchers to support the same; and such accounts shall be settled by the governor and council.

**How military returns shall be made; penalties for neglect; by whom penalties sued for.**

SECT. 5.   The military returns shall continue to be made, as provided in the thirty first and thirty second sections of the twelfth chapter of the Revised Statutes, excepting, that every commanding officer of a brigade shall make and transmit returns of the state of his brigade, to the commanding officer of the division to which he belongs, in the month of July annually; and every commanding officer of such division shall make and transmit returns of the state of his division to the adjutant general in the month of August annually.   And the penalty for neglecting to make the returns as provided for in the thirty first and thirty second sections of the twelfth chapter of the Revised Statutes, and in this section, shall be as follows:

Every captain or commanding officer of a company, who shall

1837.—Chap. 240.  Sect. 6—10.                    **55**

neglect to make returns, for each instance of such neglect, ten dollars.

Every commanding officer of a regiment or separate battalion, who shall neglect to make returns, for each instance of such neglect, twenty-five dollars.

Every commanding officer of a brigade, who shall neglect to make returns, for each instance of such neglect, fifty dollars.

Every commanding officer of a division, who shall neglect to make returns, for each instance of such neglect, seventy-five dollars.

Every brigade major and inspector who shall neglect to make returns, for each instance of such neglect, fifty dollars.

The above fines and forfeitures to be prosecuted for by the officer to whom the respective returns should be made, in any court of competent jurisdiction, and paid into the treasury of the Commonwealth.

Sect. 6.  So much of the one hundred and fourteenth section of the twelfth chapter of the Revised Statutes as requires clerks of companies to make annual returns to the brigade majors, and the brigade majors to the commander-in-chief; and so much of the fifty-eighth section of the twelfth chapter of the Revised Statutes as requires a majority of the qualified voters of the company to be present at an election of officers, is hereby repealed; and a majority of the legal voters present at any company election, duly notified, may elect company officers. *[margin: Certain yearly returns dispensed with; majority of voters present may elect company officers.]*

Sect. 7.  No non-commissioned officer or private of any company raised at large, shall be required to perform military duty in the standing company within whose limits he resides: *provided,* that when notified of his enrolment in such standing company, or otherwise requested, he shall produce within ten days, to the commanding officer of such standing company, a certificate from the commanding officer of his own company, that he is a member thereof; and if any such non-commissioned officer or private remove out of the limits within which his company is raised, he shall continue to be a member thereof. *[margin: On what terms members of volunteer companies exempted from duty in standing company.]*

Sect. 8.  The division inspector of each division shall constantly keep a correct roster of the division to which he belongs, and an orderly book, in which he shall record all orders received and issued; and he shall receive annually the same compensation which is now by law allowed to the oldest aid-de-camp of each major general; and so much of the twenty-seventh section of the twelfth chapter of the Revised Statutes as provides that the oldest aid-de-camp of each major general shall keep such roster and orderly book, is hereby repealed. *[margin: Division inspector to keep roster, &c.; his compensation.]*

Sect. 9.  All fines and forfeitures, incurred by the members of volunteer companies, may be collected by such persons and disposed of in such manner, for the benefit of said companies, as a majority of the members thereof may determine. *[margin: How fines, &c. of members of volunteer companies may be collected and disposed of.]*

Sect. 10.  Whenever in the opinion of the commander-in-chief it shall be necessary, he shall issue his proclamation, requiring all towns to provide, and deposit in some suitable and convenient place therein, sixty-four pounds of good powder; one hundred pounds of musket balls, each of the eighteenth *[margin: When towns required to provide powder, &c.; forfeiture for not providing.]*

8

**56**            1837.—Chap. 241.  Sect. 1—2.

part of a pound; one hundred and twenty-eight flints suitable for muskets; three copper, iron, or tin camp kettles, for every sixty-four soldiers enrolled in said town; and the same proportion of the aforesaid articles for a greater or less number, and so to keep the same, until he shall by proclamation declare the same no longer necessary.

Any town which shall neglect to provide and keep deposited all or any of the aforesaid articles, as above required, shall forfeit the sum provided in the one hundred and sixth section of the twelfth chapter of the Revised Statutes.

*Sections of former statute repealed.*

Sect. 11.  The forty-sixth and forty-seventh sections of the twelfth chapter, and all other provisions of the Revised Statutes which are inconsistent with this act, are hereby repealed. [April 20, 1837.]

## CHAPTER 241.

### AN ACT RELATING TO COMMON SCHOOLS.

| Section | Section |
|---|---|
| 1. Board of education, how constituted; term of office, &c. | 3. Board to make yearly report of its doings, with suggestions, &c. |
| 2. Board to make yearly abstract of school returns: May appoint a secretary; his duty, &c. | 4. Governor may draw for secretary's salary. |

*Board of education, how constituted; term of office, &c.*

Sect. 1.  His excellency the governor, with the advice and consent of the council, is hereby authorized to appoint eight persons, who, together with the governor and lieutenant governor ex officiis, shall constitute and be denominated the board of education; and the persons so appointed shall hold their offices for the term of eight years: *provided*, the first person named in said board shall go out of office at the end of one year, the person next named shall go out of office at the end of two years, and so of the remaining members, one retiring each year, and in the order in which they are named, till the whole board be changed; and the governor, with the advice and consent of the council as aforesaid, shall fill all vacancies in said board, which may occur from death, resignation or otherwise.

*Board to make yearly abstract of school returns.*

*May appoint a secretary; his duty, &c.*

Sect. 2.  The board of education shall prepare and lay before the Legislature, in a printed form, on or before the second Wednesday of January, annually, an abstract of the school returns received by the secretary of the Commonwealth, and the said board of education may appoint their own secretary, who shall receive a reasonable compensation for his services, not exceeding one thousand dollars per annum, and who shall, under the direction of the board, collect information of the actual condition and efficiency of the common schools, and other means of popular education, and diffuse as widely as possible throughout every part of the Commonwealth, information of the most approved and successful methods of arranging the studies and conducting the education of the young, to the end that all children in this Commonwealth, who depend upon common schools for instruction, may have the best education which those schools can be made to impart.

# JUNE, 1843.

At the General Assembly of the STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, begun and holden by adjournment, at Newport, within and for said State, on the third Monday of June, in the year of our Lord one thousand eight hundred and forty-three, and of Independence the sixty-seventh.

## PRESENT:

His Excellency JAMES FENNER, Governor:

His Honor BYRON DIMAN, Lieutenant Governor.

### SENATORS FROM THE SEVERAL TOWNS:

| Town | Senator |
|---|---|
| Newport, | EDWARD W. LAWTON. |
| Providence, | ALBERT C. GREENE, |
| Portsmouth, | JOHN MANCHESTER. |
| Warwick, | JOHN BROWN FRANCIS. |
| Westerly, | |
| New-Shoreham, | SIMON R. SANDS. |
| North-Kingstown, | JEFFREY DAVIS. |
| South-Kingstown, | ELISHA R. POTTER. |
| East-Greenwich, | WILLIAM GREENE. |
| Jamestown, | GEORGE C. CARR. |
| Smithfield, | ISAAC WILKINSON. |
| Scituate, | JOB RANDALL. |
| Glocester, | SAMUEL STEERE. |
| Charlestown, | ASA CHURCH, Jun. |
| West-Greenwich, | GEORGE DAWLEY. |
| Coventry, | ELISHA HARRIS. |
| Exeter, | SAMUEL PHILLIPS. |
| Middletown, | JOSEPH I. BAILEY. |
| Bristol, | NATHANIEL BULLOCK. |
| Tiverton, | DAVID DURFEE. |
| Little-Compton, | NATHANIEL CHURCH. |
| Warren, | JOSEPH SMITH. |
| Cumberland, | OLNEY BALLOU. |
| Richmond, | ISRAEL ANTHONY. |
| Cranston, | ANSON POTTER. |
| Hopkinton, | JOSIAH W. LANGWORTHY. |
| Johnston, | CYRUS BROWN. |
| North-Providence, | LEVI C. EATON. |
| Barrington, | JAMES BOWEN. |
| Foster, | SAMUEL TILLINGHAST. |
| Burrillville, | OTIS WOOD. |

### THE SECRETARY.

George Rivers, Esq. Clerk.

**EXHIBIT 11**

# MILITIA LAW.

## STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS.

*In General Assembly, June Session, A. D. 1843.*

AN ACT TO REGULATE THE MILITIA.

*It is enacted by the General Assembly as follows :*

*Of the Enrolled Militia.*

Section 1. Every able bodied white male citizen, in this State, who is or shall be of the age of eighteen years, and not exceeding the age of forty-five years, excepting persons absolutely exempted by the provisions of this act, and idiots, lunatics, common drunkards, paupers, vagabonds, and persons convicted of any infamous crime, shall be enrolled in the militia, as hereinafter provided.

See. 2. In addition to the persons exempted from military duty by the act of Congress, there shall also be exempted from the performance of such duty, the following persons to wit : all persons who have holden the office of Governor, or Lieutenant Governor ; all persons who, after the last day of February, A. D. 1796, shall have holden any military commission or commissions, or staff office, with the rank of an officer of the line, for the space of five years successively, and who shall have been engaged thereon according to law, and been honorably discharged ; and also all persons who shall have holden any such military commission or commissions, or staff office aforesaid, for a less term than five years, and who have been superseded without their consent.

Sec. 3. Persons of the following descriptions, as long as they shall remain of said descriptions, shall be exempted from the performance of military duty, to wit : the justices and clerks of the supreme judicial court, the justices and clerks of

**2**

the courts of common pleas, the Secretary of State, the Attorney General, the General Treasurer, the sheriff of each county, one ferryman at each stated ferry, who usually navigates the boat, the keepers of light houses within this State, all settled or ordained ministers of the gospel, the president, professors, tutors, students, and steward of Brown University, the town councils of the several towns, the Mayor and Aldermen of the city of Providence, town and city treasurers, town and city clerks, practising physicians, practising surgeons—not including the pupils of either—preceptors and ushers of academies and schools, and engine men ; and provided that no engine shall have more than twenty men, unless otherwise provided by special enactment ; the members of fire hook and ladder companies, and chartered fire hose companies ; all persons belonging to the Society of Friends, commonly called Quakers, and the inhabitants of the towns of New-Shoreham and Jamestown, and of the island of Prudence, and such others as shall make oath or affirmation that they are conscientiously scrupulous against bearing arms, which fact shall appear to the commanding officer, by certificate of the magistrate before whom said oath or affirmation was given.

Sec. 4. It shall be the duty of the assessors of taxes in each town in this State, and in the city of Providence, annually to prepare a list or roll of all persons liable to be enrolled in the militia, as provided in the first section, together with all persons liable to do duty in case of invasion, insurrection, riot, and tumult, living within their respective limits, whether such persons be or be not attached to any chartered or regimental companies ; and to place the same in the hands of the town clerk of such town, and of the said city of Providence, and it shall be the duty of every such clerk to record such list or roll of names in a proper book of record, to be kept for that purpose, in every town in this State, and in the city of Providence. Annual returns of the militia, thus enrolled, shall be transmitted to the Adjutant General in the month of October, in each and every year, by the clerks aforesaid, and by him to the President of the United States. It shall also be the duty of said assessors to assess upon the persons liable to be enrolled in the militia as aforesaid, except in the towns of New Shoreham and Jamestown, and that portion of the town of Portsmouth forming the island of Prudence, a tax of fifty

# LAWS

OF THE

## TERRITORY OF NEW MEXICO,

PASSED BY THE SECOND

# LEGISLATIVE ASSEMBLY

IN THE CITY OF SANTA FÉ,

AT A SESSION BEGUN ON THE SIXTH DAY OF DECEMBER, 1852.

—————————

SANTA FÉ:
JAMES L. COLLINS & CO., PRINTERS.
MDCCCLIII.

**EXHIBIT 12**

Digitized from Best Copy Available

LAWS OF THE THIRD SESSION.                    67

the Justices of the Peace or Court in which the suit may be
brought, with imprisonment for a time demanded by the gravity
of the offence.

SEC. 4.  All acts and parts of acts repugnant to this act
shall be and are by these presents repealed.

SEC. 5.  This act shall take effect, from and after its ap-
proval.

Translation.

AN ACT

*Prohibiting the carrying a certain class of Arms, within the
Settlements and in Balls.*

Sec. 1.  Kind of arms prohibited.
Sec. 2.  Duties of sheriffs and constables.
Sec. 3.  Licenses for dances, obligations required from judge of probate.
Sec. 4.  Punishment for violation of this law.
Sec. 5.  Disposition of fines.

*Be it enacted by the Legislative Assembly of the Territory
of New Mexico :*

SEC. 1.  That each and every person is prohibited from
carrying short arms, such as pistols, daggers, knives, and other
deadly weapons, about their persons concealed, within the settle-
ments, and any person who violates the provisions of this act,
shall be fined in a sum not exceeding ten dollars, nor less than
two dollars, or shall be imprisoned for a term not exceeding
fifteen days nor less than five days.

SEC. 2.  That the Sheriffs of the different counties, and Con-
stables of the different precincts, are hereby required to enforce
the observance and compliance of the provisions of the preceding
section, having power to take with them, two or more armed
persons, when they are on patrol at night, in order to make
themselves respected while on such duty, and it is hereby made
the duty of the Probate Judges and Justices of the Peace to aid
and assist said officers in the prompt discharge of their duties.

SEC. 3.  Any person desiring to give a Ball or Fandango,
they shall apply to the Probate Judge or a Justice of the Peace

Digitized from Best Copy Available

JA523

USCA4 Appeal: 23-1719    Doc: 30-2       Filed: 08/21/2023    Pg: 51 of 3

Case 8:21-cv-01736-TDC   Document 59-16   Filed 12/30/22   Page 3 of 3

for a License for the same—who, after having granted such license, shall inform the applicant, that he must maintain good order, and for this purpose he shall swear him to faithfully discharge his duties as police officer and perform said duties during such Ball or Fandango, possessing the powers of a Sheriff, and that he will not permit any person to enter said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with fire arms or other deadly weapons, whether they be shown or concealed upon their persons and if any person or persons shall enter said Balls or Fandangos or ante-chamber, with deadly weapons upon their person, upon conviction for such offence before any Probate Judge or Justice of the Peace, they shall suffer the punishment prescribed in the first section of this Law.

*Provided*, that, in case any person desires a license for a ball or fandango, who shall not be competent, the Probate Judge or Justice of the Peace as the case may be, shall require him to present a competent person, who shall discharge the duties of a Police Officer, and shall swear him as prescribed in the foregoing section.

SEC. 4.    That any person or persons giving Balls or Fandangos shall be liable to the punishments prescribed in the foregoing sections of this Law—if they permit any person or persons armed to remain in said Balls or Fandangos, they shall also be subject to the same penalties of the Police Officers who fail to discharge their duties or violate the provisions of this Law.

SEC. 5.    That all fines collected by the provisions of this Law shall be applied to the use of the respective counties.

Translation.

# AN ACT

*Providing for the payment of the  Salaries of  Territorial Officers, not otherwise provided for by Law.*

Sec. 1.    Payment of officers under the Kearney code.
Sec. 2.    How audited and paid.

Digitized from Best Copy Available

# FIRST

# ANNUAL REPORT

ON THE

## IMPROVEMENT

OF

# THE CENTRAL PARK,

### NEW YORK. —

JANUARY 1, 1857.

**NEW YORK:**
CHAS. W. BAKER, PRINTER, 29 BEEKMAN STREET.

1857.

**EXHIBIT 13**

Generated on 2022-12-29 13:57 GMT / https://hdl.handle.net/2027/hvd.32044106439805
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

106

# APPENDIX.

———

## A.

### ORDINANCES OF THE CENTRAL PARK.

The Board of Commissioners of the Central Park do ordain as follows:

All persons are forbidden—

To enter or leave the Park except by the gateways.

To climb or walk upon the wall.

To turn cattle, horses, goats, or swine into the Park.

To carry firearms or to throw stones or other missiles within it.

To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, or other constructions upon the Park;

Or to converse with, or in any way to hinder those engaged in its construction.

Two pounds are hereby established within the Central Park, for the impounding of horses, cattle, sheep, goats, dogs, swine, and geese found trespassing upon said Park. All such animals found at large upon the Park may be taken by any person or persons, and driven or carried to one of the said pounds, and may be kept enclosed therein during five days, at the end of which time, if not previously claimed, they may be sold at public auction; provided that within two days after they shall have been impounded, notice of the sale shall have been conspicuously posted in the pound.

Any person claiming property in such impounded animals before the day of sale, may recover the same after suitable proof of his or her right thereto, upon payment for each animal

Generated on 2022-12-29 13:56 GMT  /  https://hdl.handle.net/2027/hvd.32044106439805
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

# PUBLIC ACTS,

## PASSED BY THE GENERAL ASSEMBLY

OF THE

## State of Connecticut,

**MAY SESSION, 1859.**



STATE OF CONNECTICUT,

OFFICE OF THE SECRETARY OF STATE, JUNE, 1859.

HARTFORD:

DAY & CLARK, STATE PRINTERS.

1859.

**EXHIBIT**

**14**

---

## MILITARY FORCE.           61

---

shall be forever precluded from claiming and showing that said taxes have not been paid, but it shall be taken as conclusively proved that said taxes have been paid. *Provided, however,* that in all cases where the select- men of any town in this state have heretofore returned to the town clerk a list of the names of persons whose state or town taxes have been by them abated, and have neglected to subscribe their names thereto, the same shall not, by reason of such neglect, be thereby invalidated, and may be proved by any other proper evidence. <span style="font-size:smaller">Omission of sig- natures of select- men not to inval- idate lists of abatements heretofore made.</span>

SEC. 4. Any collector of taxes knowingly and de- signedly making a false certificate, and any selectman of any town knowingly and designedly making a false list of persons whose taxes shall be abated under this act, shall pay a fine not exceeding two hundred dollars; said offence to be a crime, and to be prosecuted and pro- ceeded with like other criminal offences. <span style="font-size:smaller">Penalty for mak- ing false certifi- cate or list.</span>

SEC. 5. The fifth section of the act to which this is an addition, and all acts and parts of acts inconsistent herewith, are hereby repealed.

Approved, June 24th, 1859.

---

### CHAPTER LXXXII.

An Act in addition to and in alteration of "An Act for forming and conducting the Military Force."

*Be it enacted by the Senate and House of Representa- tives in General Assembly convened:*

SEC. 1. There shall be one parade annually, some- time in the month of May, for one day only, by company; also one parade annually, for one day only, by regiment or brigade, in the month of August or September, as the commanding officer of the division shall direct, with the approval of the commander-in-chief. <span style="font-size:smaller">Parades.</span>

SEC. 2. Chaplains, surgeons, paymasters, engineers and sergeant-majors, may appear on horseback only on days of general review; on all other occasions, they shall appear on foot. <span style="font-size:smaller">What officers may appear on horseback, on days of general review, only.</span>

SEC. 3. Every company that shall comply with the provisions of the military laws, shall be allowed, out of <span style="font-size:smaller">Allowance for rent of armory and drill-room.</span>

| 62 | MILITARY. |
|----|-----------|

the state treasury, the sum of seventy-five dollars per annum, as rent for armory and drill-room, upon a certificate from the adjutant-general that such company is justly entitled to receive the same.

**Allowance to governor's guards.** SEC. 4. Any company of governor's guards which shall do duty in accordance with the provisions of law, shall be allowed seventy-five dollars per annum for armory rent.

**Temporary erections for sale of liquors or gaming, near parade ground, may be abated as nuisances.** SEC. 5. If any booth, shed, tent, or other temporary erection, within one mile of any military parade-ground, muster-field or encampment, shall be used and occupied for the sale of spirituous or intoxicating liquor, or for the purpose of gambling, the officer commanding said parade-ground, muster-field or encampment, the sheriff or deputy-sheriff of the county, or any justice of the peace, selectman, or constable of the town in which such booth, shed, tent, or other temporary erection is situated, upon having notice or knowledge that the same is so used or occupied, shall notify the owner or occupant thereof to vacate and close the same immediately; and, if said owner or occupant shall refuse or neglect so to do, said commanding officer, sheriff, deputy-sheriff, justice of the peace, selectman or constable, may forthwith abate such booth, shed, tent, or other such temporary erection, as a nuisance, and may pull down or otherwise destroy the same, with the assistance of any force, civil or military.

**Board of officers may be appointed to prepare system of regulations.** SEC. 6. The commander-in-chief is hereby authorized to appoint a board of officers to prepare a system of general regulations for the government of the militia, for which services no compensation shall be claimed or allowed.

**Quarter-master-general to inspect armories, gun houses, &c., annually.** SEC. 7. It shall be the duty of the quarter-master-general, annually, to inspect the armories and gun-houses of the several companies, and also the rooms occupied by the regimental bands; and, on or before the first day of November, to make to the adjutant-general a full report of the condition of the same, and what companies are entitled to the allowance for armory rent; for **Compensation.** which services he shall be allowed the sum of nine cents for every mile of necessary travel.

**Companies may adopt and enforce regulations and by-laws.** SEC. 8. Each company may adopt, by a vote of two-thirds of its members, rules, regulations and by-laws for the government of its members, not inconsistent with the militia laws; and such rules, regulations and by-laws

---

COMMUNITIES AND CORPORATIONS.                    68

---

shall be binding, and may be enforced by process of law; and any member who shall violate any such rule, regulation or by-law, may be expelled from his company by a major vote of the same, provided that such vote is approved by the commander of the regiment.

SEC. 9.   Assessors of persons liable to pay the commutation tax, as provided in section nine of the act approved June 28, 1856, shall be allowed the sum of one cent for each person so assessed ; and each collector of commutation taxes shall be allowed the sum of two cents for each tax actually collected and paid into the town treasury by him ; and, if any assessor or collector shall refuse or neglect to perform the duty required by said act, he shall forfeit to the state not less than fifty nor more than one hundred dollars.  *Compensation of assessors and collectors of commutation tax.*  *Penalty for neglect.*

SEC. 10.   Second lieutenants of companies are hereby required to attend the officers' drill, established by act approved June 29, 1855, and to comply with all laws relative thereto.  *Second lieutenants required to attend officers' drill.*

SEC. 11.   This act shall take effect from and after its passage ; and section twenty-eight, of the act approved July 1, 1854,—section one, of the act approved June 28, 1856,—section one, section nine, of the act approved June 25, 1857,—and all other acts or parts of acts, inconsistent herewith, are hereby repealed.   Section three, of the act approved June 29th, 1855, is hereby re-enacted.  *To take effect from passage.*  *Repeal.*  *Re-enactment of provision of 1855, for officers' drill.*

Approved, June 24th, 1859.

---

### CHAPTER LXXXIII.

An Act concerning Communities and Corporations.

*Be it enacted by the Senate and House of Representatives in General Assembly convened:*

The secretaries or clerks of all stock fire and fire and marine insurance companies who are by law required to make returns to the comptroller, in the month of January of each year, shall, at the time of making said return, pay the expense of making the record of the same.  *Insurance companies to pay expense of recording returns to comptroller.*

Approved, June 24th, 1859.

# FOURTH ANNUAL REPORT

OF THE

# BOARD OF COMMISSIONERS

OF THE

## CENTRAL PARK.

JANUARY, 1861.

————◄●►————

NEW YORK:

WM. C. BRYANT & CO., PRINTERS, 41 NASSAU STREET, CORNER LIBERTY.

1861.

Digitized by Google

Original from
HARVARD UNIVERSITY

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg

se 1:22-cv-00734-GTS-CFH   Document 20-40   Filed 08/15/22   Page 2
Case 8:21-cv-01736-TDC   Document 59-19   Filed 12/30/22   Page 2 of 2

106

# APPENDIX.

———

## A.

### ORDINANCES OF THE CENTRAL PARK.

The Board of Commissioners of the Central Park do ordain as follows:

All persons are forbidden—

To enter or leave the Park except by the gateways.

To climb or walk upon the wall.

To turn cattle, horses, goats, or swine into the Park.

To carry firearms or to throw stones or other missiles within it.

To cut, break, or in any way injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, or other constructions upon the Park ;

Or to converse with, or in any way to hinder those engaged in its construction.

Two pounds are hereby established within the Central Park, for the impounding of horses, cattle, sheep, goats, dogs, swine, and geese found trespassing upon said Park. All such animals found at large upon the Park may be taken by any person or persons, and driven or carried to one of the said pounds, and may be kept enclosed therein during five days, at the end of which time, if not previously claimed, they may be sold at public auction; provided that within two days after they shall have been impounded, notice of the sale shall have been conspicuously posted in the pound.

Any person claiming property in such impounded animals before the day of sale, may recover the same after suitable proof of his or her right thereto, upon payment for each animal

Digitized by Google

Original from
HARVARD UNIVERSITY

**PUBLIC GROUNDS APPROPRIATED**

**Act of Apr. 14, 1868, P.L. 1083, No. 1020          Cl. 11**

A SUPPLEMENT

To an act, entitled "An Act appropriating ground for public
purposes in the city of Philadelphia," approved the
twenty-sixth day of March, Anno Domini one thousand eight
hundred and sixty-seven.

Section 1.  Boundaries of Park

The boundaries of the Fairmount Park in the City of
Philadelphia shall be the following, to wit: Beginning at a
point in the north-easterly line of property owned and occupied
by the Reading Railroad Company, near the City Bridge over the
river Schuylkill at the falls, where said north-easterly line
would be intersected by the land dividing the property of H.
Duhring from that of F. Stoever and T. Johnson, if the same
were extended from thence in a south-westerly direction upon
said dividing line, and its prolongation to the middle of the
Ford Road, from thence by a line passing through the southeast
corner of Forty-ninth and Lebanon Streets to George's Run;
thence along the several courses of said run to a point fourteen
hundred and eighty-seven and a half feet from the middle of the
Pennsylvania Railroad, measured at right angles thereto; thence
by a straight line through the northeast corner of Forty-Third
and Hancock Streets, to the northerly side of Girard Avenue
near Fortieth Street; thence by the said northerly line of
Girard Avenue to the easterly side of the Junction Railroad as
now used; thence by the said easterly side of the Junction
Railroad and the Pennsylvania Railroad to the north side of
Haverford Street; thence by the northerly side of said Haverford
Street to the westerly side of Bridgewater Street; thence by
said Bridgewater Street to the north line of Bridge Street;
thence by said Bridge Street to the west abutment of the
Suspension Bridge; hence by the northwesterly side of the
Suspension Bridge and Callowhill Street to the angle in said
street, on the southwesterly side of Fairmount Basin; thence
by the northerly side of Callowhill and Biddle Streets to the
westerly side of Twenty-fifth Street; thence by the said
Twenty-fifth Street to the southwesterly side of Pennsylvania
Avenue; thence by the southwesterly side of Pennsylvania Avenue
to the west side of Twenty-third Street; thence along the
westerly side of Twenty-third Street to the southwesterly line
of Ridge Avenue; thence along the said Ridge Avenue to the
southwesterly line of South Laurel Hill Cemetery (north of
Huntingdon Street); thence by and along said property line to
such a distance from the shore line of the River Schuylkill as
will permit the location of a carriage road one hundred feet
wide upon its margin; thence along said river shore and its
several courses as may be most practicable, at the same distance
as above specified (provided said distance shall not exceed one
hundred and fifty feet), to a point opposite the intersection
of the Ridge Turnpike and School Lane; thence northwardly to a
point on the southwesterly side of said Turnpike Road opposite
to the southeasterly side of said School Lane; thence by the
southwesterly side of the Ridge Turnpike Road and its several
courses to the southeasterly side of the Wissahickon Creek;
thence by the several courses of the said southeasterly side of
Wissahickon Creek to the Schuylkill River; thence across the
watercourse of said river to the northeasterly line of the
Reading Railroad Company's property as now occupied and in use,
at the city boundary line; thence along said northeasterly line,
as now occupied and used by said railroad company, to the place

EXHIBIT
**16**

of beginning, excepting, nevertheless, thereout the several
water-works and their appurtenances, which are included within
these boundaries, and such uses of the premises immediately
adjacent to the same, and such other portions of the ground as
are described in this section, as the City of Philadelphia may
from time to time require for the purposes of its Water
Department. 1868, April 14, P.L. 1083, Sec. 1; 1869, April 21,
P.L. 1194, Sec. 8.

Section 2.  Robert's Hollow Drive
There shall be laid out and constructed a road of easy and
practicable grades, extending from the intersection of the
northerly line of the park by Belmont Avenue on the westerly
side of the River Schuylkill, to the head of Robert's Hollow,
and thence along said hollow and the River Schuylkill to the
foot of City Avenue, laid out with the ground contiguous thereto
for ornamentation, of such width and so constructed as the
Commissioners of Fairmount Park, appointed under authority of
the act of the General Assembly of the Commonwealth, may
determine. And such road and its contiguous ground are hereby
declared to be a part of the aforesaid park; and the said park
commissioners are hereby authorized and required to ascertain,
by a proper survey, the limits thereof, which survey they shall
file in the Survey Department of the City of Philadelphia.

It shall also be the duty of said park commissioners to
appropriate the shores of the Wissahickon Creek, on both sides
of the same from its mouth to the Paul's Mill Road, and of such
width as may embrace the road now passing along the same; and
may also protect the purity of the water of said creek, and by
passing along the crest of the heights which are on either side
of said creek, may preserve the beauty of its scenery. The said
park commissioners are hereby authorized and required to cause
a proper survey to be made of said grounds upon the Wissahickon,
and to file said survey in the Survey Department of the City
of Philadelphia, and the grounds and creek hereby appropriated
are declared to be a part of Fairmount Park. 1868, April 14,
P.L. 1083, Sec. 2.

Section 3.  Title to Ground
The title to and ownership of the ground within said
boundaries shall be vested in the City of Philadelphia,
excepting therefrom so much as shall be required by the
Schuylkill Navigation Company, the Philadelphia and Reading,
the Junction and connecting railroad companies for the execution
of their franchises, as now provided by law. 1868, April 14,
P.L. 1083, Sec. 3.

Section 4.  Release of Ground not Embraced in Boundaries
So much of the ground as was embraced in the act to which
this is a supplement, approved the twenty-sixth day of March,
one thousand eight hundred and sixty-seven, (Act of 1867, March
26, P.L. 547) and is not included in the above boundaries, is
hereby released from all claim of title by the said city, with
the same effect as if it had never been included. 1868, April
14, P.L. 1083, Sec. 4.

Section 5.  Grounds Subject to Control of Commissioners;
Comepnsation
All the grounds taken within the boundaries of the Fairmount
Park by the first section of this act shall be subject to all
the powers and control given, by the act (Act of 1867, March
26, P.L. 547) to which this is a supplement, to the City of
Philadelphia and the park commissioners designated by or
appointed under said act; and the owners of all ground taken
for the park, and others interested therein, shall be

compensated as in said act is directed and provided. 1868, April 14, P.L. 1083, Sec. 5.

Section 6.  Vacation and Opening of Roads and Streets

The said commissioners shall have power and authority, from time to time, to vacate any street or road within the boundaries of the park (excepting Girard Avenue), and to open for public use such other roads, avenues and streets therein as they deem necessary. 1868, April 14, P.L. 1083, Sec. 6.

Section 8.  Footways on Boundary Streets

The jurisdiction of the commissioners of the park shall extend to the breadth of the footway next the park, in all avenues or streets which shall bound upon the park, and they shall direct the manner in which such footways shall be laid out, curbed, paved, planted and ornamented; which footways shall not be less than twenty feet in width on any avenue or street of the width of one hundred feet, and of like proportion upon any street or avenue of a greater or less width, unless otherwise directed by the commissioners. 1868, April 14, P.L. 1083, Sec. 8.

Section 9.  Compensation for Buildings; Removal of Buildings, etc.; Taking Possession

The said park commissioners or jury, who shall assess the compensation to the owners for the ground taken, shall ascertain and make compensation for buildings as well as the ground taken; but all buildings and machinery and fixtures not required by the Park Commission shall be removed by the owners thereof whenever payment of the compensation awarded them shall be made or tendered to them, and upon such payment or tender the park commissioners shall forthwith take possession of the premises.

If any owner or lessee of ground taken cannot be found, notice of the taking and valuation of his land shall be given by advertisement in two daily papers published in Philadelphia six times, and in the Legal Intelligencer twice, and the amount awarded in such case to the owner or lessee shall remain in the City Treasury until such owner shall produce the decree of the court having jurisdiction in the premises, ordering the said moneys to be paid to him or his legal representatives. 1868, April 14, P.L. 1083, Sec. 9.

Section 10.  Rrports of Commissioners and Jury; Duration of Jury's Powers; Appointment for One or More Cases; Payment of Valuation

The said commissioners and jury may make partial or special reports from time to time to the court as they may be ready to do so, and the court may act upon such reports separately, and the powers of the jury shall continue, unless limited by the court or they be appointed by the court to make report, until they shall have reported on all the cases on which they have been appointed, although a term or terms of the courts shall have intervened; and jurors, not to exceed six in number, may be appointed upon one or more cases according to the order of the court made; and whenever any report of the said commissioners or of the jury shall have been confirmed by the court, the valuation made shall be forthwith payable by the City of Philadelphia. 1868, April 14, P.L. 1083, Sec. 10.

Section 11.  Loans for Purposes of Park

The City of Philadelphia shall be authorized and required to raise by loans, from time to time, such sums of money as shall be necessary to make compensation for all grounds heretofore taken or to be taken for said Fairmount Park, and for the laying out and construction thereof for public use; for the permanent care and improvement thereof, and for all culverts and other means for preserving the Schuylkill water pure for

the use of the citizens of said city, and shall annually assess taxes for keeping in repair and good order the said park; and shall also provide for the payment of the interest on all said loans, and the usual sinking fund for the redemption thereof. 1868, April 14, P.L. 1083, Sec. 11.

Section 12.   Officers and Employees

The said park commissioners shall, from time to time, appoint such officers, agents, and subordinates as they may deem necessary, for the purposes of this act and the act (Act of 1867, March 26, P.L. 547) to which this a supplement; and they shall prescribe the duties and the compensation to be paid them. 1868, April 14, P.L. 1083, Sec. 12.

Section 13.   Acquisition and Sale of Lands

It shall be lawful for said park commissioners to acquire title to the whole of any tract of land, part of which shall fall within the boundaries mentioned in the first section of this act, and to take conveyance thereof in the name of the City of Philadelphia; and such part thereof as shall lie beyond or without the said park limits, again to sell and convey in absolute fee-simple to any purchaser or purchasers thereof, by deeds to be signed by the mayor, under the seal of the city, to be affixed by direction of councils, either for cash, or part cash and part to be secured by bond and mortgage to the city, paying all cash into the City Treasury. Provided, That the proceeds of such sales shall be paid into the Sinking Fund for the redemption of the loan created under the provisions of this act: Provided also, That no commissioner, nor any officer under the Park Commission, shall in anywise be directly interested in any such sale of lands by the commissioners as aforesaid; and if any commissioner or officer aforesaid shall act in violation of this proviso, he shall, if a commissioner, be subject to expulsion; if an officer, to be discharged by a majority of the votes of the Board of Park Commissioners, after an opportunity afforded of explanation and defense. 1868, April 14, P.L. 1083, Sec. 13; 1870, Jan. 27, P.L. 93, Sec. 2.

Section 14.   Annual Report

The said board of commissioners shall annually hereafter, in the month of December, make to the Mayor of the City of Philadelphia a report of their proceedings, and a statement of their expenditures for the preceding year. 1868, April 14, P.L. 1083, Sec. 14.

Section 15.   Leases of Houses and Buildings

The said park commissioners shall have exclusive power to lease from year to year all houses and buildings within the park limits, which may be let without prejudice to the interests and purposes of the park by leases to be signed by their president and secretary, and to collect the rents and pay them into the City Treasury. 1868, April 14, P.L. 1083, Sec. 15.

Section 16.   Club Houses and Zoological and Other Buildings

All houses and buildings now built or to be built on any part of the park grounds, by or for boat or skating clubs, or zoological or other purposes, shall be taken to have rights subordinate to the public purposes intended to be subserved by acquiring and laying out the park, and shall be subject to the regulations of said park commissioners under licenses, which shall be approved by the commission and signed by the president and secretary, and will subject them to their supervision and to removal or surrender to the city whensoever the said commissioners may require. 1868, April 14, P.L. 1083, Sec. 16.

Section 17.   Acceptance of Devises, Bequests and Donations

The said park commissioners shall have power to accept, in the name and behalf of the City of Philadelphia devises,

bequests and donations of lands, moneys, objects of art and natural history, maps and books, or other things, upon such trusts as may be prescribed by the testator or donor: Provided, Such trusts be satisfactory to the commission and compatible with the purposes of said park. 1868, April 14, P.L. 1083, Sec. 17.

Section 18.  Creation of Debts and Obligations

None of the park commissioners nor any person employed by them shall have power to create any debt or obligation to bind said Board of Commissioners, except by the express authority of the said commissioners at a meeting duly convened. 1868, April 14, P.L. 1083, Sec. 18.

Section 19.  Government and Management of Park; Improvements; Repressing Disorders

The said park commissioners shall have the power to govern, manage, lay out, plant and ornament the said Fairmount Park, and to maintain the same in good order and repair, and to construct all proper bridges, buildings, railways and other improvements, therein, and to repress all disorders therein under the provisions hereinafter contained. 1868, April 14, P.L. 1083, Sec. 19.

Section 20.  Licensing of Passenger Railways

The said park commissioners shall have authority to license the laying down and the use for a term of years from time to time of such passenger railways as they may think will comport with the use and enjoyment of the said park by the public, upon such terms as said commissioners may agree, all emoluments from which shall be paid into the City Treasury. 1868, April 14, P.L. 1083, Sec. 20.

Section 21.  Park to be Under Regulations Specified and Such Others as may be Established

The said park shall be under the following rules and regulations, and such others as the park commissioners may from time to time ordain:

1.  No person shall turn cattle, goats, swine, horses, or other animals, loose into the park.

2.  No person shall carry fire-arms, or shoot birds, in the park, or within fifty yards thereof, or throw stones or other missiles therein.

3.  No one shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures, or statuary, or foul any fountains or springs within the park.

4.  No person shall drive or ride therein at a rate exceeding seven miles an hour.

5.  No one shall ride or drive therein upon any other than upon the avenues and roads.

6.  No coach or vehicle, used for hire, shall stand upon any part of the park for the purpose of hire, nor except in waiting for persons taken by it into the park, unless in either case at points designated by the commission.

7.  No wagon, or vehicle of burden or traffic, shall pass through the park except upon such road or avenue as shall be designated by the park commissioners for burden transportation.

8.  No street railroad car shall come within the lines of the park without the license of the Park Commission.

9.  No person shall expose any article for sale within the park without the previous license of the Park Commission.

10.  No person shall take ice from the Schuylkill within the park without the license of the said commission first had, upon such terms as they may think proper.

11.  No threatening, abusive, insulting or indecent language shall be allowed in the park.

12.  No gaming shall be allowed therein, nor any obscene or indecent act therein.

13.  No person shall go in to bathe within the park.

14.  No person shall fish, or disturb the water-fowl in the pool, or any pond, or birds in any part of the park, nor discharge any fireworks therein, nor affix any bills or notices therein.

15.  No person shall have any musical, theatrical or other entertainment therein without the license of the park commissioners.

16.  No person shall enter or leave the park except by such gates or avenues as may be for such purposes arranged.

17.  No gathering or meeting of any kind, assembled through advertisements, shall be permitted in the park without the previous permission of the commission; nor shall any gathering or meeting for political purposes in the park be permitted under any circumstances.

18.  No intoxicating liquors shall be allowed to be sold within said park.  1868, April 14, P.L. 1083, Sec. 21.

Section 22.  Compensation for Licenses

If said park commissioners should license the taking of ice in said park, or the entry of any street railroad car therein, or articles for sale, or musical entertainments, it may be with such compensation as they may think proper, to be paid into the City Treasury.

Any person who shall violate any of said rules and regulations, and any others which shall be ordained by the said park commissioners, for the government of said park, not inconsistent with this act, or the laws and Constitutions of this State and the United States---the power to ordain which rules and regulations is hereby expressly given to said commissioners---shall be guilty of a misdemeanor, and shall pay such fine as may be prescribed by said park commissioners, not to exceed five dollars for each and every violation thereof, to be recovered before any alderman of said city, as debts of that amount are recoverable, which fines shall be paid into the City Treasury.

Any person violating any of said rules and regulations shall be further liable to the full extent of any damage by him or her committed, in trespass or other action; and any tenant or licensed party who shall violate the said rules, or any of them, or consent to or permit the same to be violated on his, or her, or their premises, shall forfeit his, or her, or their lease or license, and shall be liable to be forthwith removed by a vote of the Park Commission; and every lease and license shall contain a clause making it cause of forfeiture thereof for the lessee or party licensed to violate or permit or suffer any violation of said rules and regulations or any of them.

It shall be the duty of the police appointed to duty in the park, without warrant, forthwith to arrest any offender against the preceding rules and regulations, whom they may detect in the commission of such offence, and to take the persons so arrested forth with before a magistrate having competent jurisdiction.  1868, April 14, P.L. 1083, Sec. 22.

Section 23.  Disposition and Use of Moneys Received

All rents, license charges and fees, all fines, proceeds of all sales, except of lands purchased, and profits of whatsoever kind, to be collected, received, or howsoever realized, shall be paid into the City Treasury as a fund to be exclusively appropriated by councils for park purposes, under the direction

of said commission: Provided, That moneys or property given or bequeathed to the park commissioners upon specified trusts shall be received and receipted for by their treasurer, and held and applied according to the trusts specified. 1868, April 14, P.L. 1083, Sec. 23.

Section 24.   Widening and Straightening Approaches

The councils of the City of Philadelphia be and they are hereby authorized to widen and straighten any street laid upon the public plans of said city, as they may think requisite to improve the approaches to Fairmount Park. 1868, April 14, P.L. 1083, Sec. 24.

Section 26.   Proceedings to Assess Damages

The damages for ground and property taken for the purpose of this act shall be ascertained, adjusted and assessed in like manner as is prescribed by the act (Act of 1867, March 26, P.L. 547) to which this is a supplement. 1868, April 14, P.L. 1083, Sec. 26.

Section 27.   Park Police

The said park commissioners shall employ, equip, and pay a park force, adequate to maintain good order therein and in all houses thereupon; which force shall be subject to the orders of the mayor upon any emergency; and so far as said force shall consist of others than the hands employed to labor in the park, it shall be appointed and controlled as the other police of the city. 1868, April 14, P.L. 1083, Sec. 27.

Section 28.   Solicitor

There shall be appointed by the commissioners of Fairmount Park, a solicitor, whose duty it shall be under their direction to attend to the assessment of damages, and to such other business of a legal nature connected with the park as the commissioners may require; he shall receive during the present year and hereafter, until otherwise ordered by councils, the same compensation as is now provided for the assistant solicitor named in the said twenty-eighth section. (Act of 1868, April 14, P.L. 1083, Sec. 28, repealed.) 1870, Jan. 27, P.L. 93, Sec. 5.

JA539

# A C T S

OF THE

# STATE OF TENNESSEE,

PASSED BY THE FIRST SESSION OF

## THE THIRTY-SIXTH GENERAL ASSEMBLY

### FOR THE YEARS 1869-70.

———————————

PUBLISHED BY AUTHORITY.

———————————

NASHVILLE, TENN.:

JONES, PURVIS & CO., PRINTERS TO THE STATE.

1870.

EXHIBIT
**17**

23

## CHAPTER XXI.

AN ACT to Amend An Act, passed on the 13th of March, 1868, entitled "An Act to amend the revenue laws of the State."

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That An Act to amend the revenue laws of the State, passed on the 13th day of March, 1868, Hotels and Livery Stable be so amended as to impose a tax of fifty cents on each room except two in a hotel or tavern, and a tax of fifty cents on each stall in a livery stable, or stable kept by hotel or tavern keepers, instead of one dollar, as now imposed by law.

SEC. 2. *Be it further enacted,* That this Act take effect from and after its passage.

W. O'N. PERKINS,
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed November 27, 1869.

———

## CHAPTER XXII.

AN ACT to Amend the Criminal Laws of the State.

SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee,* That all voters in this State shall be To vote in Civil District or Ward. required to vote in the civil district or ward in which they may reside. Any person violating this Act shall be guilty of a misdemeanor, and upon conviction thereof shall not be fined less than twenty nor more than fifty dollars; *Provided,* that sheriffs and other officers holding elections shall be permitted to vote at any ward or precinct in which they may hold an election.

SEC. 2. *Be it further enacted,* That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, Deadly Weapons. race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, bowie-knife, Arkansas tooth-pick, or weapon in form, shape

JA541

24

or size, resembling a bowie-knife, or Arkansas tooth-pick, or other deadly or dangerous weapon.

SEC. 3. *Be it further enacted*, That all persons convicted under the second section of this Act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the Court.

*Penalty.*

SEC. 4. *Be it further enacted*, That no liquor shop in this State, shall be kept open on election days, nor shall any person, on said days, give or sell intoxicating liquors to any person for any purpose at or near an election ground.

*Liquor Shops.*

SEC. 5. *Be it further enacted*, That the grand juries of this State shall have inquisitorial powers concerning the commission of the offenses created by these Acts, and may send for witnesses, as in cases of gaming, illegal voting, tippling and offenses now prescribed by law.

*Grand Juries.*

SEC. 6. *Be it further enacted*, That it shall be the duty of the Circuit and Criminal Judges of this State to give the above in special charge to the several grand juries of the courts.

*Judges.*

SEC. 7. *Be it further enacted*, That there shall be no property exempt from execution for fines and costs for this offense; *Provided*, That, if from any cause, there should be a failure to hold an election in any civil district or ward, then nothing in this Act shall be so construed as to prevent any voter from voting in any other civil district or ward in his county or town, for State or county officers, at the time prescribed by law.

*Proviso.*

SEC. 8. *Be it further enacted*, That this Act shall take effect from and after its passage.

W. O'N. PERKINS.
*Speaker of the House of Representatives.*
D. B. THOMAS,
*Speaker of the Senate.*

Passed December 1, 1869.

# ACTS AND RESOLUTIONS

OF THE

# GENERAL ASSEMBLY

OF THE

# STATE OF GEORGIA,

PASSED IN ATLANTA, GEORGIA,

AT THE

# SESSION OF 1870.

COMPILED AND PUBLISHED BY AUTHORITY.

ATLANTA, GEORGIA:
PRINTED BY THE PUBLIC PRINTER.
1870.

EXHIBIT
**18**

JA543

PUBLIC LAWS.—Penal Code—Amendments to.    421

To preserve the peace and harmony of the people of this State, etc.

# TITLE XVI.

## PENAL CODE—AMENDMENTS TO.

| Sections. | Sections. |
|---|---|
| 1. Carrying deadly weapons to certain places prohibited. | 5. Section 415 of the Code changed—*nolle prosequi*. |
| 2. Violation—misdemeanor—penalty. | 6. All indictments, etc., submitted to a jury. |
| 3. Chain-gang punishment prohibited. | |
| 4. Punishment in lieu of chain-gang. | |

### (No. 285.)

*An Act to preserve the peace and harmony of the people of this State, and for other purposes.*

Section 1. *Be it enacted, etc.,* That, from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds. *(marginal: Carrying deadly weapons to certain places prohibited. Exception.)*

Sec. 2. *Be it further enacted,* That if any person or persons shall violate any portion of the above recited section of this act, he, she or they shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the court. *(marginal: Violation a misdemeanor—penalty.)*

Sec. 3. All laws and parts of laws militating against this act are hereby repealed.

Approved October 18, 1870.

---

### (No. 286.)

*An Act to alter and amend section 4245 of Irwin's Revised Code, by striking out of said section the words " to work in a chain-gang on the public works," and for other purposes.*

Section 1. *Be it enacted, etc.,* That the words "to work in a chain-gang on the public works," which occur in fourth and fifth lines of section 4245 of Irwin's Code, be, and the same are hereby, *(marginal: Chain-gang punishment prohibited.)*

**122**    PUBLIC LAWS.—PENAL CODE—AMENDMENTS TO.

To repeal Section 415 of the Revised Code.

stricken from said section, and chain-gangs shall no longer exist, or be tolerated in the State of Georgia, for persons convicted of misdemeanors.

Sec. 2. *Be it further enacted,* That said section be further amended, by substituting for the words herein stricken out, the words " to work on the city or town streets, or county roads, not longer than six months ; but in no case shall such prisoners be chained or otherwise confined in a gang, but shall be guarded."

*Punishment in lieu of chain-gang.*

Sec. 3. *Be it further enacted,* That all laws and parts of laws in conflict with this act be, and they are hereby, repealed.

Approved October 27, 1870.

———

### (No. 287.)

*An Act to repeal section four hundred and fifteen (415) of Irwin's Revised Code, in relation to entering nolle prosequis, and to prescribe the mode of settlement in criminal cases.*

SECTION 1. *Be it enacted, etc.,* That section four hundred and fifteen (415) of Irwin's Revised Code of Georgia, which said section authorizes Solicitors-General in this State to enter a *nolle prosequi* on indictments, be, and the same is hereby repealed, and no *nolle prosequi* shall be allowed, except it be in open court, for some fatal defect in the bill of indictment, to be judged of by the court, in which case the presiding Judge shall order another bill of indictment to be forthwith submitted to the grand jury.

*Section 415 of Code, as to nolle prosequi, repealed.*

*Judge shall order second bill.*

Sec. 2. *And be it further enacted by the authority aforesaid,* That all cases of indictments, or special presentments, shall be submitted to and passed upon by the jury, under the direction of the presiding Judge, unless there is a settlement thereof between the prosecutor and defendant, which settlement shall be good and valid only by the approval and order of the court on examination into the merits of the case.

*All indictments submitted to jury.*

*Settlement—when good.*

Sec. 3. *And be it further enacted, etc.,* That all laws and parts of laws conflicting with this act be, and the same are hereby, repealed.

Approved October 28, 1870.

145

No. 100.]           AN ACT

To regulate the conduct and to maintain the freedom and purity of elections; to prescribe the mode of making, and designate the officers who shall make the returns thereof; to prevent fraud, violence, intimidation, riot, tumult, bribery or corruption at elections or at any registration or revision of registration; to limit the powers and duties of the sheriffs of the parishes of Orleans and Jefferson; to prescribe the powers and duties of the Board and officers of the Metropolitan Police in reference to elections; to prescribe the mode of entering on the rolls of the Senate and House of Representatives the names of members; to empower the Governor to preserve peace and order, to enforce the laws; to limit the powers and duties of the Mayors of the cities of New Orleans and Jefferson with regard to elections; to prohibit District or Parish Judges from issuing certain writs to Commissioners of Election; to make an appropriation for the expenses of the next revision of the registration and of the next election; and to enforce article one hundred and three of the constitution.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That all elections for State, parish and judicial officers, members of the General Assembly, and for members of Congress shall be held on the first Monday in November, and said elections shall be styled the general elections. *[Time of holding elections.]*

They shall be held in the manner and form, and subject to the regulations hereinafter prescribed, and no other.

SEC. 2. *Be it further enacted, etc.,* That elections for Representatives in the General Assembly shall be held on the first Monday of November, one thousand eight hundred and seventy, and every two (2) years thereafter; and all elections to supply the place of Senators in the General Assembly, whose terms of service shall have expired, shall be held at the same time as herein provided for the election of Representatives. *[Elections for representatives in the General Assembly. Elections for State senators.]*

SEC. 3. *Be it further enacted, etc.,* That all elections shall be held in each parish at the several election polls or voting places to be established as is hereinafter prescribed. *[When held.]*

SEC. 4. *Be it further enacted, etc.,* That all elections shall be completed in one day, and the polls shall be kept open at each poll or voting place, from the hour of six in the morning until six o'clock in the afternoon. *[When completed—polls open.]*

SEC. 5. *Be it further enacted, etc.,* That each parish in this State, except the parishes of Orleans and Jefferson, is hereby fixed as an election precinct, and the supervisor of registration in each of said parishes shall direct what number of polls or voting places shall be established in each precinct, fix the places of holding the election, and appoint commissioners of election for each poll or voting place. In the city of New Orleans, each ward shall constitute a precinct, and in the remaining part of the parish of Orleans, the supervisor of registration for the said parish shall fix both the precincts and voting places in each precinct, and in the parish of Jefferson, the supervisor of registration shall fix both the precincts and the voting places in each precinct; in the parishes of Orleans and Jefferson the supervisor of registration of each parish shall appoint commissioners of election therefor, as in the other parishes. Any duly registered voter may vote at any poll or voting place within his precinct. *[Election precincts. Voting places.]*

SEC. 6. *Be it further enacted, etc.,* That the elections at each poll or voting place shall be presided over by three commissioners of election, residents of the parish, who shall be able to read and write, to be appointed by the supervisor of registration for the parish, *[Commissioners of election.]*

19

**EXHIBIT**

**19**

JA546

mechanic any part of the wages due to such laborer, employe, tenant or mechanic, on account of any vote which such laborer, employe, tenant or mechanic has given or purposes to give, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than five hundred dollars, one-half of which shall go to the school fund of the parish in which the offense was committed, and by imprisonment in the parish prison for not less than three months.

SEC. 69. *Be it further enacted, etc.*, That any person who shall molest, disturb, interfere with, or threaten with violence, any commissioner of election or person in charge of the ballot boxes, while in charge of the same, between the time of the close of the polls and the time that said ballot boxes are delivered to the supervisor of registration, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, or by imprisonment in the penitentiary not less than one year, or both, at the discretion of the court. *Interference with commissioners, etc.*

SEC. 70. *Be it further enacted, etc.*, That any person not authorized by this law to receive or count the ballots at an election, who shall, during or after any election, and before the votes have been counted by the supervisors of registration, disturb, displace, conceal, destroy, handle or touch any ballot, after the same has been received from the voter by a commissioner of election, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be punished by a fine of not less than one hundred dollars, or by imprisonment for not less than six months, or both, at the discretion of the court. *Disturbing the counting of ballots.*

SEC. 71. *Be it further enacted, etc.*, That any person not authorized by this law to take charge of the ballot boxes at the close of the election who shall take, receive, conceal, displace or [in] any manner handle or disturb any ballot box at any time between the hour of the closing of the polls and the transmission of the ballot box to the supervisor of registration, or during such transmission, or at any time prior to the counting of the votes by the supervisor of registration, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, or by imprisonment in the penitentiary not less than one year, or both, at the discretion of the court. *Interference with ballot boxes.*

SEC. 72. *Be it further enacted, etc.*, That if any person shall by bribery, menace, willful falsehood, or other corrupt means, directly or indirectly attempt to influence any elector of this State in the giving his vote or ballot, or to induce him to withhold the same, or disturb or hinder him in the free exercise of the right of suffrage at any election in this State, he shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than five hundred dollars, and be imprisoned in the parish prison for a term not exceeding six months, and shall also be ineligible to any office in the State for the term of two years. *Interference with free exercise of right of suffrage.*

SEC. 73. *Be it further enacted, etc.*, That it shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dol- *Weapons.*

160

lars, and by imprisonment in the parish jail for not less than one month; provided, that the provisions of this section shall not apply to any commissioner or officer of the election or supervisor or assistant supervisor of registration, police officer or other person authorized to preserve the peace on days of registration or election.

**Liquors.**

SEC. 74. *Be it further enacted, etc.,* That no person shall give, sell or barter any spirituous or intoxicating liquors to any person on the day of election, and any person found guilty of violating the provisions of this section shall be fined in a sum of not less than one hundred dollars, nor more than three hundred dollars, which shall go to the school fund.

**Corruptly voting.**

SEC. 75. *Be it further enacted, etc.,* That whoever, knowing that he is not a qualified elector, shall vote or attempt to vote at any election, shall be fined in a sum not to exceed one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Double vote.**

SEC. 76. *Be it further enacted, etc.,* That whoever shall knowingly give or vote two or more ballots folded as one at any election, shall be fined in a sum not to exceed one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Bribery to influence voters.**

SEC. 77. *Be it further enacted, etc.,* That whoever by bribery or by a promise to give employment or higher wages to any person, attempts to influence any voter at any election, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the parish prison for not less than three months.

**Obtaining illegal voting.**

SEC. 78. *Be it further enacted, etc.,* That whoever willfully aids or abets any one, not legally qualified, to vote or attempt to vote at any election, shall be fined in a sum of not less than fifty dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Disorderly houses.**

SEC. 79. *Be it further enacted, etc.,* That whoever is disorderly at any poll or voting place during an election, shall be fined in a sum not less than twenty dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Meetings of citizens.**

SEC. 80. *Be it further enacted, etc.,* That whoever shall molest, interrupt or disturb any meeting of citizens assembled to transact or discuss political matters, shall be fined in a sum not less than fifty dollars, to be recovered by prosecution before any court of competent jurisdiction.

Any sheriff, constable or police officer present at the violation of this section shall forthwith arrest the offender or offenders, and convey him or them, as soon as practicable, before the proper court.

**Imprisonment.**

SEC. 81. *Be it further enacted, etc.,* That the court imposing any fine, as directed in sections seventy-four, seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine and eighty of this act, shall commit the person so fined to the parish prison until the fine is paid; *Provided,* That said imprisonment shall not exceed six months.

**Perjury.**

SEC. 82. *Be it further enacted, etc.,* That in cases where any oath or affirmation shall be administered by any supervisor of registration, assistant supervisor of registration or commissioner of election, in the performance of his duty as prescribed by law, any person swearing or affirming falsely in the premises shall be deemed guilty of perjury, and subjected to the penalties provided by the law for perjury.

**Duty of Governor to insure peace.**

SEC. 83. *Be it further enacted, etc.,* That the Governor shall take all necessary steps to secure a fair, free and peaceable election; and shall, on the days of election, have paramount charge and con-

161

trol of the peace and order of the State, over all peace and police officers, and shall have the command and direction in chief of all police officers, by whomsoever appointed, and of all sheriffs and constables in their capacity as officers of the peace.

SEC. 84. *Be it further enacted, etc.* That to defray the expenses of the next revision of registration, and of the next general election, there is hereby appropriated out of any funds in the treasury not otherwise appropriated, the sum of fifty thousand dollars ($50,000), or so much thereof as may be necessary. — Expenses

SEC. 85. *Be it further enacted, etc.,* That all laws or parts of laws contrary to the provisions of this act, and all laws relating to the same subject matter are hereby repealed, and that this act shall take effect from and after its passage. — Repeal.

(Signed)                MORTIMER CARR,
                    Speaker of the House of Representatives.

(Signed)                OSCAR J. DUNN,
            Lieutenant Governor and President of the Senate.

Approved March 16, 1870.
(Signed)                H. C. WARMOTH,
                    Governor of the State of Louisiana.

A true copy:
        GEO. E. BOVEE,
                    Secretary of State.

———

[No. 101.]                AN ACT

To define and regulate the cost of the Clerks, Sheriffs, Recorders and Notaries Public throughout the State of Louisiana, and providing forfeitures and penalties for overcharging or failing to perform their duties, and the mode of collecting their fees.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That the clerks of the district courts throughout the State shall be entitled to demand and receive the following fees of office, and no more; and they shall not be entitled to charge any other fees of office than those specially set forth therein, for any services as clerks which they may be required to render: — Fees of clerks.

For indorsing, registering and filing petition, for all, ten cents.

For indorsing, registering and filing answer, for all, ten cents.

For issuing citation, with copy of same, with certificate and seal on each, fifty cents, one charge for both.

For issuing attachment, with copy of same, with certificates and seals on both, one dollar, one charge for both.

For issuing *fieri facias,* with seal, fifty cents.

For issuing writ of seizure and sale, with seal, one dollar.

For issuing writ of sequestration, with copy of same, with certificates and seals, one dollar, one charge for both.

For issuing writ of *certiorari,* with copy of same, with certificates and seals, one dollar, one charge for both.

21

USCA4 Appeal: 23-1719    Doc: 30-2       Filed: 08/21/2023      Pg: 77 of 39...

Case 8:21-cv-01736-TDC   Document 59-24   Filed 12/30/22   Page 1 of 6

# ACTS OF ASSEMBLY

RELATING TO

# FAIRMOUNT PARK.

PHILADELPHIA:

KING & BAIRD, PRINTERS, No. 607 SANSOM STREET.

1870.

EXHIBIT
**20**

Generated on 2022-12-27 18:16 GMT / https://hdl.handle.net/2027/mdp.39015067213663
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# A SUPPLEMENT

To an Act, entitled "An Act appropriating ground for public purposes, in the City of Philadelphia," approved the twenty-sixth day of March, Anno Domini one thousand eight hundred and sixty-seven.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same,* That the boundaries of the Fairmount Park in the City of Philadelphia shall be the following, to wit: Beginning at a point in the northeasterly line of property owned and occupied by the Reading Railroad Company, near the City bridge over the river Schuylkill at the Falls, where said northeasterly line * [is intersected by the line dividing property of H. Duhring from that of F. Stoever and T. Johnson; extending] from thence in a southwesterly direction upon said dividing line and its prolongation to the middle of the Ford road; from thence by a line passing through the southeast corner of Forty-ninth and Lebanon streets to George's run; thence along the several courses of said run to a point fourteen hundred and eighty-seven and a half feet from the middle of the Pennsylvania Railroad, measured at right angles thereto ; thence by a straight line through the northeast corner of Forty-third and Hancock

---

\* Amended by Act of April 21, 1869, Sec. 8, page 27.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2022-12-27 18:11 GMT  /  https://hdl.handle.net/2027/mdp.39015067213663
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

18

Sect. 19. The said Park Commissioners shall have the power to govern, manage, lay out, plant and ornament the said Fairmount Park, and to maintain the same in good order and repair; and to construct all proper bridges, buildings, railways, and other improvements therein, and to repress all disorders therein under the provisions hereinafter contained.

Sect. 20. That the said Park Commissioners shall have authority to license the laying down, and the use for a term of years, from time to time, of such passenger railways as they may think will comport with the use and enjoyment of the said Park by the public, upon such terms as said Commissioners may agree; all emoluments from which shall be paid into the City Treasury.

Sect. 21. The said Park shall be under the following rules and regulations, and such others as the Park Commissioners may from time to time ordain:

I. No persons shall turn cattle, goats, swine or horses or other animals loose into the Park.

II. No persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof, or throw stones or other missiles therein.

III. No one shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures or statuary, or foul any fountains or springs within the Park.

Generated on 2022-12-27 18:09 GMT  /  https://hdl.handle.net/2027/mdp.39015067213663
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by     Original from
UNIVERSITY OF MICHIGAN

JA552

19

IV. No person shall drive or ride therein at a rate exceeding seven miles an hour.

V. No one shall ride or drive therein, upon any other than upon the avenues and roads.

VI. No coach or vehicle used for hire, shall stand upon any part of the Park for the purpose of hire, nor except in waiting for persons taken by it into the Park, unless in either case at points designated by the Commission.

VII. No wagon or vehicle of burden or traffic shall pass through the Park, except upon such road or avenue as shall be designated by the Park Commissioners for burden transportation.

VIII. No street railroad car shall come within the lines of the Park without the license of the Park Commission.

IX. No person shall expose any article for sale within the Park without the previous license of the Park Commission.

X. No person shall take ice from the Schuylkill within the Park without the license of the said Commission first had, upon such terms as they may think proper.

XI. No threatening, abusive, insulting, or indecent language shall be allowed in the Park.

XII. No gaming shall be allowed therein, nor any obscene or indecent act therein.

Generated on 2022-12-27 18:09 GMT  /  https://hdl.handle.net/2027/mdp.39015067213663
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

20

XIII. No person shall go in to bathe within the Park.

XIV. No person shall fish or disturb the water-fowl in the pool, or any pond, or birds in any part of the Park, nor discharge any fire-works therein, nor affix any bills or notices therein.

XV. No person shall have any musical, theatrical, or other entertainment therein, without the license of the Park Commissioners.

XVI. No person shall enter or leave the Park except by such gates or avenues as may be for such purpose arranged.

XVII. No gathering or meeting of any kind, assembled through advertisement, shall be permitted in the Park without the previous permission of the Commission; nor shall any gathering or meeting for political purposes in the Park be permitted under any circumstances.

XVIII. That no intoxicating liquors shall be allowed to be sold within said Park.

SECT. 22. Any person who shall violate any of said rules and regulations, and any others which shall be ordained by the said Park Commissioners, for the government of said Park, not inconsistent with this act, or the laws and constitutions of this State and United States—the power to ordain which rules and regulations is hereby expressly given to said Commissioners

Generated on 2022-12-27 18:10 GMT  /  https://hdl.handle.net/2027/mdp.39015067213663
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by  Google

Original from
UNIVERSITY OF MICHIGAN

23

force shall be subject to the orders of the Mayor upon any emergency; and so far as said force shall consist of others than the hands employed to labor in the Park, it shall be appointed and controlled as the other police of the City.

SECT. 28. [There shall be an additional assistant appointed by the City Solicitor, whose duty it shall be, under the direction of the City Solicitor, to attend to the assessments of damages, and to such other business of a legal nature connected with the Park as said Commissioners may require.]*

Approved April 14, 1868.

---

* Repealed by the 5th section of the Act of January 27, 1870, page 30.

Generated on 2022-12-27 18:12 GMT  /  https://hdl.handle.net/2027/mdp.39015067213663
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

USCA4 Appeal: 23-1719     Doc: 30-2     Filed: 08/21/2023     Pg: 83 o

# GENERAL LAWS

### OF THE

## TWELFTH LEGISLATURE,

### OF THE

# STATE OF TEXAS.

------

## CALLED SESSION.

------

**BY AUTHORITY.**



### AUSTIN:

PRINTED BY TRACY, SIEMERING & CO.

1870.

**EXHIBIT 21**

JA556

## CHAPTER XLVI.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1.  *Be it enacted by the Legislature of the State of Texas*, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2.  That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

---

## CHAPTER XLVII.

### AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1.  *Be it enacted by the Legislature of the State of Texas*, That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

**64**                    GENERAL LAWS.

county of Hill; said election shall be held at such places and under such rules and regulations as the Governor may prescribe.

SEC. 2. That the returns of said election shall be made to the Secretary of State, within twenty days after said election shall have been held, and the town receiving two-thirds of the votes cast shall be the permanent county seat of the county of Hill, but should no place receive two-thirds of the votes cast, the present county seat shall remain the permanent one.

SEC. 3. That the Governor shall, within twenty days after the returns of said election shall have been received, notify the Police Court of the county of Hill of the result of said election.

SEC. 4. That this act be in force from and after passage.

Approved August 12, 1870.

———

CHAPTER XLVIII.

AN ACT MAKING APPROPRIATIONS FOR THE PAYMENT OF THE EXPENSES OF MAINTAINING RANGING COMPANIES ON THE FRONTIER.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the sum of seven hundred and fifty thousand dollars, or so much thereof as may be necessary, be and the same is hereby appropriated, out of any moneys in the State Treasury (derived from the sale or hypothecation of the bonds of the State issued for frontier protection), for the purpose of paying all expenses connected with the organization, arming and maintenance of the ranging companies on the frontier, called into service under the provisions of the act approved June 13, 1870.

SEC. 2. That this appropriation shall be expended under the direction of the Governor; and the Comptroller of Public Accounts shall, under the special direction of the Governor, audit all claims and accounts incurred for the purposes hereinbefore mentioned, and shall draw his warrant on the Treasurer for the payment of the same.

SEC. 3. That this act shall take effect from and after its passage.

Approved August 12, 1870.

———

LAWS OF MARYLAND.

dred and forty-five, chapter three hundred and ten,
the Maryland Tract Society was incorporated with a
provision that the said act should inure for thirty
years from the date of its passage, and it is therefore
necessary that the corporate franchises, granted by ·
the said act, should be renewed and extended in order
to promote and continue the beneficent purposes of
said corporation; therefore—

Renewed and
extended

SECTION 1. *Be it enacted by the General Assembly of
Maryland*, That the corporate franchises granted by
the said act of Assembly, entitled " an act to incor-
porate the Maryland Tract Society," passed at De-
cember session, eighteen hundred and forty-five,
chapter three hundred and ten, be and the same are
hereby renewed and extended without any limitation
as to the duration of said corporation; provided, how-
ever, that the said General Assembly reserves to itself
the right at any time to amend, alter or repeal this
act.

In force      ʋ

SEC. 2 *And be it enacted*, That this act shall take
effect from the date of its passage.

Approved April 11th, 1874.

**EXHIBIT**

**22**

---•-•-•---

## CHAPTER 250.

AN ACT to prevent the carrying of guns, pistols,
dirks, dirk-knives, razors, billies or bludgeons, by
any person in Kent, Queen Anne's or Montgomery
counties, on the day of election in said counties.

Not lawful to
carry

SECTION 1 *Be it enacted by the General Assembly of
Maryland*, That from and after the passage of this
act, it shall not be lawful for any person in Kent,
Queen Anne's or Montgomery counties, to carry, on
the days of election, secretly or otherwise, any gun,
pistol, dirk, dirk-knife, razor, billy or bludgeon; and
any person violating the provisions of this act shall
be deemed guilty of a misdemeanor, and on con-
viction thereof, before any justice of the peace in either

of said counties, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county, until the same is paid.

Sec. 2. *And be it enacted,* That the fines collected Fines under this act shall be paid by the officer collecting the same, to the school commissioners of the county where such offence shall have been committed, for school purposes.

Sec. 3. *And be it enacted,* That any constable of either of said counties, or the sheriff thereof, who shall refuse to arrest any person violating any provision Discharged. of this act, upon information of such offence, shall be deemed guilty of a misdemeanor, and on conviction thereof, before the Circuit Court for such county, shall be fined not less than twenty nor more than fifty dollars, and shall forthwith be discharged from office.

Approved, April 6th, 1874.

---

### CHAPTER 251.

AN ACT for the relief of the Cambridge and Chesapeake Railroad Company.

Section 1. *Be it enacted by the General Assembly of Maryland,* That the Cambridge and Chesapeake Railroad Company, be and it is hereby authorized and To demand empowered, to demand and receive for the transportation of passengers, goods, produce, merchandise or property of any description, upon said railroad, such sum or sums of money, as the President and Directors of said Company shall from time to time deem reasonable and proper.

Sec. 2. *And be it enacted,* That upon every subscription to the capital stock of said company there Subscriptions shall be paid, at the time of making the subscription, to capital stock the sum of one dollar on every share subscribed, and

Missouri. Laws

# LAWS OF MISSOURI.

## GENERAL AND LOCAL LAWS

PASSED AT THE

REGULAR SESSION

OF THE

## TWENTY-EIGHTH GENERAL ASSEMBLY,

BEGUN AND HELD AT

THE CITY OF JEFFERSON, WEDNESDAY, JANUARY 6, 1875.

*BY AUTHORITY.*




JEFFERSON CITY:
REGAN & CARTER, STATE PRINTERS AND BINDERS.
1875.



Generated on 2022-12-28 18:18 GMT / https://hdl.handle.net/2027/uc1.a0001948006
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

same is hereby amended so as to read as follows:   Section 56.   Every person who shall willfully and maliciously break, destroy or injure the door or window of any dwelling house, shop, store, or other house or building, or sever therefrom, or from the gate, fence or inclosure, or any part thereof, any material of which it is formed, or sever from the freehold any produce thereof, or anything attached thereto, or pull down, injure or destroy any gate, post, railing or fence, or any part thereof, or cut down, lap, girdle, or otherwise injure or destroy any fruit or ornamental or shade tree, being the property of another, or who shall cut down, lap, girdle, or otherwise injure or destroy any ornamental or shade tree standing or growing on any common or public ground, or any street, alley, sidewalk or promenade, or who shall, without the consent of the owner, cut down, destroy or carry any timber or trees whatsoever, being on any land not his own, and not the property of the United States, or who shall buy or in any way receive any timber, wood or trees that shall have been cut down upon or carried away from the lands of another, without the consent of the owner thereof, knowing the same to have been so cut down or taken away as aforesaid, or who shall willfully break, destroy or injure any goods, wares, merchandise or other personal property of another, shall, upon conviction, be adjudged guilty of a misdemeanor.

SEC. 2.   This act to take effect and be in force from and after its passage.

Approved March 18, 1875.

———————

CRIMES AND PUNISHMENTS: CARRYING CONCEALED WEAPONS.

AN ACT to prevent the carrying of weapons in public assemblies of the people. and to repeal "An act to prevent the carrying concealed weapons," approved March 26, 1874.

SECTION
1. General provisions ; penalty.
2. Inconsistent act repealed.

SECTION
3. Act to take effect.

*Be it enacted by the General Assembly of the State of Missouri, as follows :*

SECTION 1.   Whoever shall, in this state, go into any church or place where people have assembled for religious worship, or into any school room, or into any place where people be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for other than militia drill, or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot, or other deadly weapon, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by imprisonment in the county jail not to exceed six months, or by a fine

Generated on 2022-12-28 18:17 GMT / https://hdl.handle.net/2027/uc1.a0001940006
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

not less than ten nor more than one hundred dollars, or by both such fine and imprisonment: *Provided*, That this act shall not apply to any person whose duty it is to bear arms in the discharge of duties imposed by law.

Sec. 2. All acts and parts of acts inconsistent with this act are hereby repealed.

Sec. 3. This act shall take effect and be in force from and after its passage.

This bill having remained with the Governor ten days (Sundays excepted), and the General Assembly being in session, it has become a law this thirtieth day of March, A. D. eighteen hundred and seventy-five.

MICH'L K. McGRATH, *Secretary of State.*

---

ELECTIONS: Regulating Ballots, Poll-Books, etc.

AN ACT to amend sections 14 and 17 of chapter 2 of the General Statutes of Missouri, relating to elections, the same being sections 14 and 17 of chapter 51 of Wagner's Statutes.

| SECTION | SECTION |
|---|---|
| 1. Ballots, how prepared. | 3. Inconsistent acts repealed. |
| 2. Ballots, how to be counted. | 4. Act to take effect. |

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1. That section fourteen of the above recited act be amended so as to read as follows: Section 14. Each voter at any election shall, in full view, deliver to one of the judges of election a single ballot, which shall be a piece of white paper, on which shall be written or printed the names of the persons voted for, with a designation of the office which he or they may be intended to fill: *Provided,* That in counties having a population of one hundred thousand and over, said ballot shall not bear upon it any device whatever, nor shall there be any writing or printing thereon, except the names of persons, and the designations of the office to be filled, leaving a margin on either side of the printed matter for substituting names. Each ballot may bear a plain written or printed caption thereon, composed of not more than three words, expressing its political character, but on all such ballots the said caption or headlines shall not, in any manner, be designed to mislead the voter as to the name or names thereunder. Any ballot not conforming to the provisions of this act shall be considered fraudulent, and the same shall not be counted.

SEC. 2. That section seventeen of the above recited act be amended so as to read as follows: Section 17. After the poll-books are signed in the manner hereinafter provided in the form of the poll-books, the ballot boxes shall be opened and the tickets shall be taken

Generated on 2022-12-28 18:17 GMT / https://hdl.handle.net/2027/uc1.a0001940006
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

# ACTS

AND

## JOINT RESOLUTIONS

PASSED BY

# THE GENERAL ASSEMBLY

OF THE

# STATE OF VIRGINIA

DURING THE

## SESSION OF 1877-78.

**EXHIBIT 24**

RICHMOND:

R. F. WALKER, SUPERINTENDENT PUBLIC PRINTING.

1878.

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg: 92

*Justices, and persons acting under their orders, guiltless, if a person be killed, &c.; if either of them killed, all engaged in the assembly guilty.*

5. If, by any means taken under authority of this chapter to disperse any such assembly, or arrest and secure those engaged in it, any person present, as spectator or otherwise, be killed or wounded, any judge or justice exercising such authority, and every one acting under his order, shall be held guiltless; and if the judge or justice, or any person acting under the order of either of them, be killed or wounded in taking such means, or by the rioters, all persons engaged in such assembly shall be deemed guilty of such killing or wounding.

*[margin: Persons acting under authority by killing of another engaged in a riot, or spectator, hold guiltless. If persons engaged in suppressing a riot be killed. &c., rioters deemed guilty of killing, &c]*

*Punishment of rioter, when dwelling-house injured, and when not.*

6. If any rioter pull down or destroy, in whole or in part, any dwelling-house, or assist therein, he shall be confined in the penitentiary not less than two nor more than five years; and though no such house be so injured, every rioter, and every person unlawfully or tumultuously assembled, shall be confined in jail not more than one year, and fined not exceeding one hundred dollars.

*[margin: Where dwelling-house is destroyed in whole or part Penalty Where house is not injured Penalty]*

*Carrying concealed weapons.*

7. If a person habitually carry about his person, hid from common observation, any pistol, dirk, bowie-knife, or any weapon of the like kind, he shall be fined not more than fifty dollars.

*[margin: Habitual carrying of concealed weapons Penalty]*

---

## CHAPTER VII.

### OF OFFENCES AGAINST MORALITY AND DECENCY—PROTECTION OF RELIGIOUS MEETINGS.

*Persons marrying when former husband or wife is living; proviso.*

1. Any person who, being married, shall, during the life of the former husband or wife, marry another person in this state, or, if the marriage with such other person take place out of the state, shall thereafter cohabit with such other person in this state, shall be confined in the penitentiary not less than three, nor more than eight years.

*[margin: Marrying when former husband or wife is living Penalty]*

2. The preceding section shall not extend to a person whose former husband or wife have been continually absent from such person for seven years next before marriage of such person to another, and shall not have been known by such person to be living within that time; nor to a person who shall, at the time of the subsequent marriage,

*[margin: Proviso]*

302                    ACTS OF ASSEMBLY.

have been divorced from the bond of the former marriage, or whose former marriage shall at that time have been declared void by the sentence of a court of competent jurisdiction.

### Marriage within prohibited degrees punished.

**Marriage in violation of §§9, 10, ch. 104, Code of 1873**

**Penalty**

**Residents of state, within prohibited degrees, or white person or negro, going out of state to be married, and afterwards returning**

**Penalty**

**Cohabitation evidence of marriage**

3. If any person marry in violation of the ninth or tenth section of chapter one hundred and four of the Code of eighteen hundred and seventy-three, he shall be confined in jail not more than six months, or fined not exceeding five hundred dollars, at the discretion of the jury. And if any person, resident in this state, and within the degrees of relationship mentioned in those sections, or any white person and negro, shall go out of this state for the purpose of being married, and with the intention of returning, and be married out of it, and afterwards return to and reside in it, cohabiting as man and wife, they shall be as guilty, and be punished as if the marriage had been in this state. The fact of their cohabitation here as man and wife shall be evidence of their marriage.

### Issuing license or celebrating marriage contrary to law.

**Issuing marriage license contrary to law**

**Penalty**

**Performing marriage ceremony without license, or without authority**

**Penalty**

4. If any clerk of a court knowingly issue a marriage license contrary to law, he shall be confined in jail not more than one year, and fined not exceeding five hundred dollars.

5. If any person knowingly perform the ceremony of marriage without lawful license, or affiliate in celebrating the rites of marriage without being authorized by law to do so, he shall be confined in jail not more than one year, and fined not exceeding five hundred dollars.

### Adultery and lewdness.

**Adultery and fornication**

**Penalty**

**Lewdness**

**Penalty**

**Penalty for second offence**

6. If a person commit adultery or fornication, he shall be fined not less than twenty dollars.

7. If any persons, not married to each other, lewdly and lasciviously associate and cohabit together, or, whether married or not, be guilty of open and gross lewdness and lasciviousness, they shall be fined not less than fifty nor more than five hundred dollars; and upon a repetition of the offence, and conviction thereof, they shall also be imprisoned in the county or corporation jail, at the discretion of the court or justice, for not less than six nor more than twelve months.

### White person marrying a negro, or celebrating such marriage.

**Marriage of a white person with a negro**

**Penalty**

8. Any white person who shall intermarry with a negro, or any negro who shall intermarry with a white person, shall be confined in the penitentiary not less than two nor more than five years.

ACTS OF ASSEMBLY.                                303

9. Any person who shall perform the ceremony of mar- Penalty for performing marriage service
riage between a white person and a negro, shall forfeit two
hundred dollars, of which the informer shall have one-half.

### Keeping house of ill-fame; obscene books, prints, &c.

10. If a person keep a house of ill-fame, resorted to for Keeping house of ill-fame
the purpose of prostitution or lewdness, he shall be confined
in jail not more than one year, and fined not exceeding two Penalty
hundred dollars; and in a prosecution for this offence, the General character of house may be proved
general character of such house may be proved.

11. If a person import, print, publish, sell or distribute, Obscene books, &c
any book or other thing containing obscene language, or
any print, picture, figure or description, manifestly tending
to corrupt the morals of youth; or introduce into any family
or place of education, or buy, or have in his possession any
such thing for the purpose of sale, exhibition or circulation,
or with intent to introduce it into any family or place of
education, he shall be confined in jail not more than one Penalty
year, and fined not exceeding two hundred dollars.

### Crime against nature.

12. If any person shall commit the crime of buggery, Buggery
either with mankind or with any brute animal, he shall be
confined in the penitentiary not less than two nor more than Penalty
five years.

### Violation of sepulture; injuries to burial-grounds.

13. If a person, unlawfully, disinter or displace a dead Violation of sepulture
human body, or any part of a dead human body, which shall
have been deposited in any vault or other burial place, he
shall be confined in jail not more than one year, and fined Penalty
not exceeding five hundred dollars.

14. Every person who shall willfully and maliciously de- Willful and malicious injury to tombs, &c., in a cemetery, &c
stroy, mutilate, deface, injure, or remove any tomb, monu-
ment, grave-stone, or other structure placed within any
cemetery, grave-yard, or place of burial, or within any lot
belonging to any memorial or monumental association, or
any fences, railing, or other works for the protection or orna-
ment of any tomb, monument, grave-stone, or other structure
aforesaid; or of any cemetery lot within any cemetery; or
shall willfully or maliciously destroy, remove, cut, break, or
injure any tree, shrub, or plant within any cemetery or lot
of any memorial or monumental association; or who shall
willfully or maliciously destroy, mutilate, injure, or remove
and carry away any flowers, wreaths, vases, or other orna-
ments placed upon or around any grave, tomb, monument,
or lot in any cemetery, grave-yard, or other place of burial;
or who shall willfully obstruct proper ingress and egress to Obstruction of way to cemeteries, &c
and from any cemetery or lot belonging to any memorial
association, shall be guilty of a misdemeanor, and be pun-

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg: 95

Penalty

ished by a fine not exceeding one hundred dollars, or by imprisonment in jail not exceeding six months.

### Cruelty to animals; profanity and drunkenness.

Cruelty to animals

15. If a person cruelly beat or torture any horse, animal or other beast, whether his own or that of another, he shall be fined not exceeding fifty dollars.

Penalty

Profanity and drunkenness

16. If any person, arrived at the age of discretion, profanely curse or swear, or get drunk, he shall be fined by a justice one dollar for each offence.

Penalty

### Violation of the Sabbath.

Violation of Sabbath

17. If a person, on a Sabbath day, be found laboring at any trade or calling, or employ his apprentices or servants in labor or other business, except in household or other work of necessity or charity, he shall forfeit two dollars for each offence; every day any servant or apprentice is so employed constituting a distinct offence.

Penalty

### Exceptions as to the mail, and as to certain persons.

Transportation of mail excepted

18. No forfeiture shall be incurred under the preceding section for the transportation on Sunday of the mail, or of passengers and their baggage. And the said forfeiture shall not be incurred by any person who conscientiously believes that the seventh day of the week ought to be observed as a Sabbath, and actually refrains from all secular business and labor on that day: provided he does not compel an apprentice or servant, not of his belief, to do secular work or business on Sunday, and does not on that day disturb any other person.

Exception as to certain religionists

Proviso

Sale of intoxicating liquors prohibited between certain hours

19. No bar-room, saloon, or other place for the sale of intoxicating liquors, shall be opened, and no intoxicating bitters or other drink shall be sold in any bar-room, restaurant, saloon, store, or other place, from twelve o'clock on each and every Saturday night of the week, until sunrise of the succeeding Monday morning; and any person violating the provisions of this section, shall be deemed guilty of a misdemeanor, and, if convicted, shall be punished by fine not less than ten nor more than five hundred dollars; and shall, moreover, at the discretion of the court, forfeit his license: provided that this law shall not apply to any city having police regulations on this subject, and an ordinance inflicting a penalty equal to the penalty inflicted by this section.

Penalty

Proviso

Disturbance of religious worship

20. If a person willfully interrupt or disturb any assembly met for the worship of God, or being intoxicated, if he disturb the same, whether willfully or not, he shall be confined in jail not more than six months, and fined not exceeding one hundred dollars, and a justice may put him under restraint during religious worship, and bind him for not more than one year to be of good behavior.

Penalty

ACTS OF ASSEMBLY.                                    305

21. If any person carrying any gun, pistol, bowie-knife, *Carrying dangerous weapons at a place of worship or on Sunday*
dagger, or other dangerous weapon, to any place of worship
while a meeting for religious purposes is being held at such
place, or without good and sufficient cause therefor, shall
carry any such weapon on Sunday at any place other than
his own premises, shall be fined not less than twenty dollars. *Penalty*
If any offence under this section be committed at a place of *Offenders subject to arrest without warrant*
religious worship, the offender may be arrested on the order
of a conservator of the peace, without warrant, and held
until warrant can be obtained, but not exceeding three hours.
It shall be the duty of justices of the peace, upon their own *Duty of justice where he knows of offence under this section*
knowledge, or upon the affidavit of any person, that an offence
under this section has been committed, to issue a warrant for
the arrest of the offender.

### Protection of religious assemblies; prohibition against sale of liquors or other things near such meetings; proviso.

22. If any person shall erect, place, or have any booth, *Sale of liquors, &c., prohibited*
stall, tent, carriage, boat, vessel, vehicle, or other contrivance
whatever, for the purpose or use of selling, giving, or other-
wise disposing of any kind of spirituous and fermented
liquors, or any other articles of traffic; or shall sell, give,
barter, or otherwise dispose of any spirituous or fermented
liquors, or any other articles of traffic within three miles of
any camp-meeting, or other place of religious worship, during
the time of holding any meeting for religious worship at such
place, such person, on conviction before a justice of the
peace, for the first offence, shall be fined not less than ten *Penalty*
dollars, nor more than twenty dollars, and stand committed
to jail until the fine and costs are paid; and for the second *Penalty for second offence*
offence, shall be fined as aforesaid, and be imprisoned not
less than ten nor more than thirty days.

23. If any person shall commit any offence against the *Additional penalty*
provisions of the preceding section, he shall, in addition to
the penalties therein mentioned, forfeit all such spirituous or
fermented liquors, and other articles of traffic, and all the chests
and other things containing the same, belonging to and in
the possession of the person so offending, together with such
booth, stall, tent, carriage, boat, vessel, vehicle, or other con-
trivance or thing prepared and used in violation of said sec-
tion; and it shall be the duty of any sheriff, deputy sheriff, *Duty of sheriffs, &c., to arrest offender and seize the property*
or constable, if he sees any person violating the preceding
section, to arrest the offender and carry him before a justice
of the peace.  The sheriff, deputy sheriff, or constable, when
he arrests the offender, shall seize the property hereby de-
clared to be forfeited, or shall seize the same on a warrant
against the offender, if such offender cannot be found; and
the justice of the peace before whom such offender is con-
victed, or before whom the warrant is returned that the
offender cannot be found, shall enter judgment of condemna- *Judgment of condemnation*
tion against such property, and issue a fieri facias for the

39

JA569

306                              ACTS OF ASSEMBLY.

Fi. fa. to issue    sale thereof: provided the person who has been returned not
Proviso    found, and whose property has been condemned in his ab-
sence, may appear at any time before the sale of the property
and have the case tried as if he had appeared at the return
of the warrant.

To whom pro-    24. The provisions of the two preceding sections shall not
visions not to    apply to any licensed tavern-keeper, merchant, shop-keeper,
apply    farmer, or other person in the usual and lawful transaction
of his ordinary business, in the usual place of transacting
such business, or to any person having permission, in writing
from the superintendent of such meeting, to sell such articles
Proviso    as may be named in such permission: provided this permis-
sion shall not extend to the sale of any spirituous or fer-
mented liquors.

### Right of appeal.

Right of appeal    25. Nothing in this chapter shall prevent the courts of
preserved    record from exercising their common law or statutory juris-
diction in all cases for disturbing public worship: provided
Proviso    that the party convicted under the twenty-second or twenty-
third sections of this chapter shall have the right to appeal
to the next county court for the county where the convic-
tion is had, upon giving bail for his appearance at court, and
upon such appeal shall be entitled to a trial by jury: and
Persons pro-    provided further, that when any person or persons are pro-
ceeded against    ceeded against under the twenty-second or twenty-third sec-
not subject to    tions of this chapter, he or they shall not be held to answer
answer before
grand jury    for the same offence before any grand jury or court of record,
except as herein provided.

### Temporary police force for religious meetings.

Temporary po-    26. The supervisor, or any justice of the magisterial dis-
lice authorized    trict where the meeting is held, shall have power to appoint
a temporary police to enforce the provisions of this chapter.

---

## CHAPTER VIII.

### OF OFFENCES AGAINST PUBLIC HEALTH.

### Selling unsound provisions.

Sale of unsound    1. If a person knowingly sell any diseased, corrupted, or
provisions    unwholesome provisions, whether meat or drink, without
making the same known to the buyer, he shall be confined
Penalty    in jail not more than six months, and fined not exceeding
one hundred dollars.

JA570

USCA4 Appeal: 23-1719     Doc: 30-2     Filed: 08/21/2023     Pg: 98 of 39

THE

# REVISED STATUTES

OF THE

## STATE OF MISSOURI.

# 1879.

TO WHICH ARE PREFIXED THE DECLARATION OF INDEPENDENCE, WASHINGTON'S
FAREWELL ADDRESS, ARTICLES OF CONFEDERATION, CONSTITUTION OF THE
UNITED STATES, ACT OF CONGRESS FOR THE FORMATION OF A STATE
GOVERNMENT, ORDINANCE OF THE CONVENTION ASSENTING THERETO,
AND CONSTITUTION OF MISSOURI: WITH AN APPENDIX CONTAIN-
ING CERTAIN ACTS OF CONGRESS, AND PRACTICAL FORMS,
REQUIRED TO BE PUBLISHED THEREIN.

REVISED AND PROMULGATED BY THE XXXTH GENERAL ASSEMBLY.

---

## VOLUME ONE.

---

COLLATED AND ANNOTATED BY JOHN A. HOCKADAY, THOMAS H. PARRISH,
BENJAMIN F. McDANIEL AND DANIEL H. McINTYRE, COMMITTEE
APPOINTED FOR THAT PURPOSE.

---

PUBLISHED BY AUTHORITY OF CHAPTER 46, ARTICLE V, OF THE REVISED STATUTES OF THE STATE OF MISSOURI.

---

CITY OF JEFFERSON:
CARTER & REGAN, STATE PRINTERS AND BINDERS.
1879.



EXHIBIT
25

Generated on 2022-12-28 15:31 GMT / https://hdl.handle.net/2027/nyp.33433089855322
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by 

Original from
NEW YORK PUBLIC LIBRARY

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg: 99 o

Case 8:21-cv-01736-TDC    Document 59-29    Filed 12/30/22    Page 2 of 3

# CHAPTER 24.

## OF CRIMES AND CRIMINAL PROCEDURE.

ARTICLE I—Offenses against the government and the supremacy of the law.

II—Offenses against the lives and persons of individuals.

III—Offenses against public and private property.

IV—Offenses affecting records, currency, instruments or securities.

V—Offenses affecting the administration of justice.

VI—Offenses by persons in office or affecting public trusts and rights.

VII—Offenses against public order and public peace.

VIII—Offenses against public morals and decency or the public police, and miscellaneous offenses.

IX—Miscellaneous provisions and matters of practice.

X—Local jurisdiction of public offenses.

XI—Limitations of criminal actions and prosecutions.

XII—Surety to keep the peace.

XIII—Arrest and preliminary examination.

XIV—Jurisdiction and mode of procedure.

XV—Of grand juries and their proceedings.

XVI—Indictments and process thereon.

XVII—Proceedings before trial.

XVIII—Trials and incidental proceedings.

XIX—Verdict and judgment and proceedings thereon.

XX—New trial and arrest of judgment.

XXI—Appeals and writs of error.

XXII—Miscellaneous proceedings.

XXIII—Procedure before justices in misdemeanors.

XXIV—Relief of insolvents confined on criminal process.

XXV—Costs in criminal cases.

## ARTICLE I.

### OFFENSES AGAINST THE GOVERNMENT AND THE SUPREMACY OF THE LAW.

| SECTION | SECTION |
|---|---|
| 1227. Treason, punishment of. | 1230. Combinations to overturn state government. |
| 1228. Misprision of treason, how punished. | 1231. Levying war against people of state. |
| 1229. Giving aid to enemies of state—punishment. | |

SEC. 1227. *Treason, punishment of.*—Every person who shall commit treason against the state, by levying war against the same, or by adhering to the enemies thereof, by giving them aid and comfort, shall, upon conviction, suffer death, or be sentenced to imprisonment in the penitentiary for a period of not less than ten years. (G. S. 776, § 1.)

SEC. 1228. *Misprision of treason, how punished.*—Every person who shall have knowledge that any other person has committed, or is about to commit, treason against this state, and who shall conceal the same, shall be deemed guilty of misprision of treason, and, on conviction, shall be punished by imprisonment in the penitentiary for a period not exceeding seven years, or by imprisonment in the county jail not less than four months, and by fine not less than one thousand dollars. (G. S. 776, § 2.)

SEC. 1229. *Giving aid to enemies of state—punishment.*—Any person who, while this state shall be engaged in war, in cases authorized by the constitution of the United States, shall attempt or endeavor to join, or give aid or comfort to, the enemies of the state, or shall counsel, advise, persuade or induce any other person to join, give aid or comfort to them, in this state or elsewhere, shall, upon conviction, be punished by imprisonment in the penitentiary for a period not exceeding ten years, or by fine not less than one thousand nor exceeding five thousand dollars. (G. S. 777, § 3.)

Generated on 2022-12-28 15:31 GMT / https://hdl.handle.net/2027/nyp.33433089055322
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg: 100

Sec. 1271.  *Abandonment of children.*—If any father or mother of any child under the age of six years, or any other person to whom such child shall have been confided, shall expose such child in a street, field or other place, with intent wholly to abandon it, he or she shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding five years, or in the county jail not less than six months.  (G. S. 781, § 39.)

Sec. 1272.  *Mistreatment of apprentices.*—If any master or mistress of an apprentice or other person having the legal care and control of any infant, shall, without lawful excuse, refuse or neglect to provide for such apprentice or infant, necessary food, clothing or lodging, or shall unlawfully and purposely assault such apprentice or infant, whereby his life shall be endangered, or his health shall have been or shall be likely to be permanently injured, the person so offending shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or by imprisonment in the county jail not exceeding one year, or by a fine of not more than one thousand dollars, or by both such fine and imprisonment. (New section.)

Sec. 1273.  *Abandonment of wife or child.*—If any man shall, without good cause, abandon or desert his wife, or abandon his child or children under the age of twelve years born in lawful wedlock, and shall fail, neglect or refuse to maintain and provide for such wife, child or children, he shall, upon conviction, be punished by imprisonment in the county jail not more than one year, or by a fine of not less than fifty, nor more than one thousand dollars, or by both such fine and imprisonment.  No other evidence shall be required to prove that such husband was married to such wife, or is the father of such child or children, than would be necessary to prove such fact or facts in a civil action.  (Laws 1867, p. 112, amended—*m.*)

Sec. 1274.  *Carrying deadly weapons, etc.*—If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the county jail not exceeding three months, or by both such fine and imprisonment.  (Laws 1874, p. 43; laws 1875, p. 50, and laws 1877, p. 240, amended.)

Sec. 1275.  *Above section not to apply to certain officers.*—The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.  (New section.)

Sec. 1276.  *Fire arms not to be discharged near court house.*—Hereafter it shall be unlawful for any person in this state, except he be a sheriff or other officer in the discharge of official duty, to discharge or fire off any

---

(m)  Wife held to be a competent witness to prove fact of abandonment.  43 Mo. 429.  The fact that the defendant has brought suit for divorce is no defense.  52 Mo. 173.

Generated on 2022-12-28 15:29 GMT / https://hdl.handle.net/2027/nyp.33433069055322
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google    Original from NEW YORK PUBLIC LIBRARY

# THE

# REVISED STATUTES

OF

# TEXAS:

ADOPTED

# BY THE REGULAR SESSION

OF THE

# SIXTEENTH LEGISLATURE,

## A. D. 1879.

———————

PUBLISHED BY AUTHORITY OF THE STATE OF TEXAS.

(PURSUANT TO CHAPTER 151, ACTS 1879.)

———————

**EXHIBIT
26**

GALVESTON:
A. H. BELO & CO., STATE PRINTERS.
1879.

42          TITLE IX.—OFFENSES AGAINST PUBLIC PEACE.—CH. 3, 4.

who continue so unlawfully assembled, or engaged in a riot, after being warned to disperse, shall be punished by the addition of one-half the penalty to which they would otherwise be liable, if no such warning had been given.

---

# CHAPTER THREE.

## AFFRAYS AND DISTURBANCES OF THE PEACE.

| | Article | | Article |
|---|---|---|---|
| "Affray" defined | 313 | Shooting in public place | 316 |
| Disturbance of the peace | 314 | Horse-racing on public road or street | 317 |
| "Public place" defined | 315 | | |

"Affray" defined.
P.C. 381.

ARTICLE 313. If any two or more persons shall fight together in a public place, they shall be punished by fine not exceeding one hundred dollars.

Disturbance of the peace.
(Act June 20, 1876, p. 24.)
P.C. 382.

ART. 314. If any person shall go into any public place, or into or near any public house, or along any public street or highway near any private house, and shall use loud and vociferous or obscene, vulgar or indecent language, or swear, or curse, or expose his person, or rudely display any pistol or other deadly weapon in such public place, or upon such public street or highway, or near such private house, in a manner calculated to disturb the inhabitants thereof, he shall be fined in a sum not exceeding one hundred dollars.

"Public place" defined.
P.C. 383.

ART. 315. A public place within the meaning of the two preceding articles, is any public road, street or alley, of a town or city, inn, tavern, store, grocery, work-shop, or any place to which people commonly resort for purposes of business, recreation or amusement.

Shooting in public place.
(Act Nov. 12, 1866, p. 210.)

ART. 316. If any person shall discharge any gun, pistol, or fire-arms of any description, on or across any public square, street or alley in any city, town or village in this state, he shall be fined in a sum not exceeding one hundred dollars.

Horse-racing on public road or street.
(Act May 19, 1873, pp. 83–4.)

ART. 317. Any person who shall run, or be in any way concerned in running any horse race in, along, or across any public square, street or alley in any city, town or village, or in, along or across any public road within this state, shall be fined in a sum not less than twenty-five nor more than one hundred dollars.

---

# CHAPTER FOUR.

## UNLAWFULLY CARRYING ARMS.

| | Article | | Article |
|---|---|---|---|
| Unlawfully carrying arms | 318 | Arrest without warrant | 322 |
| Not applicable, when and to whom | 319 | Officer failing to arrest, punishable | 323 |
| Carrying arms in church or other assembly | 320 | Not applicable to, frontier counties | 323 |
| Not applicable, to whom | 321 | | |

Unlawfully carrying arms.
(Act April 12, 1871, p. 25.)

ARTICLE 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

Not applicable when and to whom.
(Act April 12, 1871, p. 25.)

ART. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own prem-

TITLE IX.—OFFENSES AGAINST PUBLIC PEACE.—CH. 4.        43

ises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.

ART. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

*Carrying arms in church or other assembly (Act April 12, 1871, p. 25.)*

ART. 321. The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

*Not applicable to whom. (Act April 12, 1871, p. 25.)*

ART. 322. Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars.

*Arrest without warrant. Officer failing punished. (Act April 12, 1871, p. 26.)*

ART. 323. The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians.

*Not applicable to frontier counties. (Act April 12, 1871, p. 26.)*

# THE

# REVISED ORDINANCE

OF THE

## CITY OF ST. LOUIS,

TOGETHER WITH

THE CONSTITUTION OF THE UNITED STATES, CONSTITUTION
OF THE STATE OF MISSOURI, THE SCHEME FOR THE
SEPARATION OF THE GOVERNMENTS OF THE
CITY AND COUNTY OF ST. LOUIS, THE
CHARTER OF THE CITY, AND A
DIGEST OF THE LAWS AP-
PLICABLE TO THE
CITY.

9155

M. J. SULLIVAN, Reviser.

ST. LOUIS:
TIMES PRINTING HOUSE, FIFTH AND CHESTNUT.
1881.

Generated on 2022-12-29 14:46 GMT / https://hdl.handle.net/2027/nyp.33433014085702
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

EXHIBIT
27

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg: 10

Case 8:21-cv-01736-TDC   Document 59-31   Filed 12/30/22   Page 2 of 2

## ARTICLE XI.

### PROTECTION OF BIRDS.

| SECTION | SECTION |
|---|---|
| 1. Disturbance of birds or nests prohibited. | 4. Penalty for throwing same. |
| 2. Penalty for disturbing same. | 5. Protection of all birds, except hawks, &c., intended. |
| 3. Throwing stones, wood, &c., prohibited. | 6. Duty of police. |

SECTION 1.   All persons are forbidden to molest, injure or disturb in any way, any small bird in the city of St. Louis, or the nest, young or brood of any small bird in said city. **Birds, or nests not to be disturbed. Ord. 8436, sec. 1.**

SEC. 2.   If any person shall willfully injure, molest, take or disturb in any way, any small bird in the city of St. Louis, or the nest, eggs, young or brood of any such small bird, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall forfeit and pay to said city not less than five dollars for each bird so by him injured, molested, taken or disturbed, and not less than twenty dollars for each nest of eggs or brood of young of any such small bird in the city of St. Louis, so by him injured, molested taken or disturbed. **Penalty for disturbing birds or nests. Ibid. sec. 2.**

SEC. 3.   No person shall throw from his hand any fragment of stone, wood, metal or other missile capable of inflicting injury, in any street, alley, walk or park of the city of St. Louis, or use or have in his possession ready for use in any street, alley, walk or park of the city of St. Louis, any sling, cross bow and arrow, air gun or other contrivance for ejecting, discharging or throwing any fragment, bolt, arrow, pellet, or other missile of stone, metal, wood or other substance capable of inflicting injury or annoyance. **Throwing stones, wood, &c., prohibited. Ibid. sec. 3.**

SEC. 4.   If any person shall throw from his hand, in any alley, street, walk or park of the city of St. Louis, any missile of wood, stone, metal or other substance, or sub- **Penalty. Ibid. sec. 4.**

Digitized by Google        Original from NEW YORK PUBLIC LIBRARY



# THE CODE

OF THE

# STATE OF GEORGIA.

PREPARED BY

## R. H. CLARK, T. R. R. COBB AND D. IRWIN.

REVISED AND CORRECTED BY

## DAVID IRWIN.

SECOND EDITION

REVISED, CORRECTED AND ANNOTATED BY

## DAVID IRWIN, GEO. N. LESTER AND W. B. HILL.

## FOURTH EDITION.

PREPARED BY

## GEO. N. LESTER, C. ROWELL AND W. B. HILL.

ATLANTA, GEORGIA:
Jas. P. Harrison & Co., Printers and Publishers.
1882.

EXHIBIT
28

USCA4 Appeal: 23-1719　　　Doc: 30-2　　　Filed: 08/21/2023　　　Pg: 107 of 396

## PART IV.—TITLE I.—DIVISION IX　　　1179

*Offenses against the public peace and tranquility.*

## NINTH DIVISION.

### OFFENSES AGAINST THE PUBLIC PEACE AND TRANQUILITY.

*(handwritten margin note: Mob violence; i.e Lynching. /93. 128)*

SECTION.
4513. Unlawful assemblies.
4514. Riot.
4515. Affrays.
4516. Dueling, challenging.
4517. Seconds.
4518. Dueling, fighting.
4519. Officers not preventing.
4520. Charging the "coward."
4521. Libel.

SECTION.
4522. Printer, witness.
4523. Truth proved.
4524. Forcible entry.
4525. Forcible detainer.
4526. Punishment.
4527. Carrying deadly weapons.
4528. Prohibited at public places.
4528. (a.) Pointing weapon at another.
4529. Other offenses.

§4513. (4440.) (4399.) *Unlawful assemblies.* If two or more persons assemble for the purpose of disturbing the public peace, or committing any unlawful act, and do not disperse on being commanded to do so by a Judge, Justice, Sheriff, constable, coroner, or other peace officer, such person so offending shall be guilty of a misdemeanor, and, on conviction, shall be punished as prescribed in section 4310 of this Code.

§4514. (4441.) (4400.) *Riot.* If any two or more persons, either with or without a common cause of quarrel, do an unlawful act of violence, or any other act in a violent and tumultuous manner, such persons so offending shall be guilty of a riot, and, on conviction, shall be punished [as prescribed in section 4310 of this Code.] (a.) (a) Acts of 1865-6, p. 233.

Demand for trial by one of those engaged in a riot, the others continuing their case: 17 Ga., 618. Construction of this law: 20 Ga., 839. No new trial where the charge of the Court was correct, and there was some evidence to support the verdict: 28 Ga., 192. There was no riot where two men fail to fighting each other: 22 Ga., 488. It cannot be committed unless as many as two act in the commission of a common intent: 30 Ga., 27. Where severance on trial of persons charged with a riot is within the Court's discretion: 34 Ga., 10. Sufficient evidence of identity and misnomer in name of one appearing on trial of the other separately, did not vitiate: 38 Ga., 184. Motion in arrest of judgment refused, the facts set up by defendant not appearing from the Court's records: 42 Ga., 203-205. May be tried separately, and the acquittal of one did not operate as an acquittal of the other: 51 Ga., 375. Severance and conviction of all, joint motion for a new trial unobjected to; costs: 52 Ga., 664-7. A weak case, but the verdict not disturbed, no written defense or plea being filed: 60 Ga., 127-8. Two of three convicted under sufficient evidence: 64 Ga., 361.

2 Whart. Cr. Law, ¿2475; 2 Bish. *Ib.*, ¿1096; 2 Bish. Cr. Proc., ¿992; 3 Gr. Ev., ¿216; 2 Arch. Cr. Pr. and Pl., 1697. "Horning serenade" is: 35 Am. R., 210.

§4515. (4442.) (4401.) *Affrays.* An affray is the fighting of two or more persons in some public place, to the terror of the citizens and disturbance of the public tranquility. Persons so offending shall be indicted, and, on conviction, shall be punished [as prescribed in section 4310 of this Code]; (a.) and it shall be considered a great aggravation of this offense if any contempt or disobedience of the magistrate, or other peace officer commanding the peace, shall be proved. (a) Acts of 1865-6, p. 233.

Two indicted, both must be convicted or neither; words alone will not constitute, but words with acts will; one aiding, assisting and abetting guilty as principal: 13 Ga., 322.

2 Whart. Cr. Law, ¿2494; 2 Bishop *Ib.*, ¿32-37; 2 Bish. Cr. Proc., ¿16; 2 Arch. Cr. Pr. and Pl., 1709; 30 Am. R., 86.

§4516. (4443.) (4402.) *Dueling.* If any person shall deliberately challenge, by word or writing, the person of another, to fight with sword, pistol, or other deadly weapon, or if any person so challenged shall accept the said challenge, in either case, such person so giving, or sending, or accepting any such challenge, shall, on conviction, be punished by a fine not less than five hundred dollars, and be imprisoned in the common jail of the county for any time not exceeding six months. Or, if the jury should so recommend, such person shall, in addition to the fine herein imposed, be punished by imprisonment and labor in

USCA4 Appeal: 23-1719     Doc: 30-2     Filed: 08/21/2023     Pg: 108 of 396

Case 8:21-cv-01736-TDC    Document 59-32    Filed 12/30/22    Page 3 of 4

and considered the author himself, and be indicted and punished as such; and may, moreover, be punished for a contempt of the Court, as any other witness refusing to testify.

§4523. (4450.) (4409.) *The truth is evidence.* In all cases of indict- §2979. ment for a libel, or for slander, the person prosecuted shall be allowed to give the truth in evidence.

§4524. (4451.) (4410.) *Forcible entry.* Forcible entry is the violently §4085 *et seq.* taking possession of lands and tenements with menaces, force and arms, and without authority of law.

The prosecutor dispossessed, or from whom possession detained, a competent witness: 24 Ga., 191. The force must be private, not public, and when the entry under legal process by landlord was not within the terms of this section: 61 Ga., 496.

2 Whart. Cr. Law, §2013; 2 Bish. *Ib.*, §463; 2 Arch. Cr. Pr. and Pl., 1128.

§4525. (4452.) (4411.) *Forcible detainer.* Forcible detainer is the vio- §4085 *et seq.* lently keeping possession of lands and tenements with menaces, force and arms, and without authority of law.

Section cited: 43 Ga., 433.

§4526. (4453.) (4412.) *Punishment for forcible entry or detainer.* Any person who shall be guilty of a forcible entry, or a forcible detainer, or both, may be indicted, and, on conviction, shall be punished by fine or imprisonment in the common jail of the county, or both, at the discretion of the Court: and the Court before whom the conviction takes place shall cause restitution of possession of the premises to be made to the party aggrieved: *Provided, always,* that if the party forcibly detaining lands and tenements, or those under whom he claims, shall have been in peaceable possession of the same for the space of three years or more, immediately preceding the filing of the complaint, such person or party shall not be subject to the penalties of this section, nor shall restitution of possession be made: *and provided, also,* that the only questions to be submitted to and determined by the jury in trials for forcibly entry, or forcible detainer, shall be the possession and the force, without regard to the merits of the title on either side.

§4527. (4454.) (4413.) *Carrying concealed weapons.* Any person hav- Act of 1837, *amd.* ing or carrying about his person, unless in an open manner and fully C. p. 848. /F2-3, 4F exposed to view, any pistol ~~(except horseman's pistol)~~, dirk, sword in a Acts of 1851 -2, p. 269. cane, spear, bowie knife, or any other kind of knives manufactured (a) Acts of 1865 6, p. and sold for the purpose of offense and defense, shall be guilty of a 283. misdemeanor, and, on conviction, shall be punished as prescribed in section 4310 of this Code.

Constitutionality of the Act of 1837: 1 Ga., 243 251. Act of 1851-2 did not repeal section 4570: 12 Ga., 1. If weapons carried so that others could see and know it was a pistol or weapon, it was no violation of the Act of 1851-2, although some part of it concealed from view: 32 Ga., 225. Otherwise if so far concealed, although partially exposed to view, so that it could not be readily seen and recognized as a pistol: 32 Ga., 292. Carrying concealed weapons is not always in law evidence of malice: 33 Ga., 303. When cannot prove defendant's custom to carry weapons exposed to view, on a charge of having concealed weapons at a certain time and place: 36 Ga., 242. As to the strict enforcement of this part of the criminal law: 31 Ga., 420-421. Army repeaters and horseman's pistols on the same footing, but not when carried concealed: 44 Ga., 221-2. When no evidence of motive in putting pistol in defendant's pocket: 46 Ga., 294. The Court should not express an opinion on the facts; counsel can present their view of the law and the facts to the jury: 10 Ga., 213; 56/503. Sufficient evidence to sustain the verdict of guilty: 52 Ga., 40. Continuance, evidence: 61 Ga., 481. When mainspring of the weapon disabled so as to prevent its discharge, was no excuse: 61 Ga., 417. Where no legal jeopardy, and newly discovered evidence not a ground for new trial: 60 Ga., 601.

2 Bish. Cr. Law, §120; 2 Whart. *Ib.*, §2496; 25 Am. R., 561-3, n. Pistols, one unloaded and one without tube, not weapons: 36 Am. R., 15.

§4528. *Deadly weapons not to be carried to public places.* No person in (a) Acts of this State is permitted or allowed to carry about his or her person, any 1870, p. 421. Acts of 1878 dirk, bowie knife, pistol or revolver, or any kind of deadly weapon to -9, p. 64. any Court of justice, or any election ground or precinct, or any place of

1182   PART IV.—TITLE I.—DIVISION IX.

Offenses against the public peace and tranquility.

public worship, or any other public gathering in this State, except militia muster-grounds ; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court : *Provided*, that this section shall not apply to any Sheriff, deputy Sheriff, coroner, constable, marshal, policeman, or other arresting officer or officers in this State or their posses, acting in the discharge of their official duties.

Indictment sufficient, and this law not unconstitutional : 53 Ga., 472. What is a deadly weapon : 30 Ga., 138 ; 41/155 ; 15/223.

§4528. (a.) *Pointing weapon at another.* Any person who shall intentionally point or aim a gun or pistol, whether loaded or unloaded, at another, not in a sham battle by the military, and not in self-defense, or in defense of habitation, property or person, or other instances standing upon like footing of reason and justice, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished as prescribed in section 4310 of this Code.

Acts of 1880–1, p. 151.

§4529. (4455.) (4414.) *Other offenses against public peace.* All other offenses against the public peace, not provided for in this Code, shall be prosecuted and indicted as heretofore, and the punishment in every such case, shall be [as prescribed in section 4310 of this Code.] (a.)

(a) Acts of 1865–6, p. 233.

Section cited : 53 Ga., 127.

*Rioting case as shooting at a misdemeanor.*
*192 – 108.*

# LAWS OF MISSOURI,

PASSED AT THE SESSION OF THE

# THIRTY-SECOND GENERAL ASSEMBLY,

BEGUN AND HELD AT THE CITY OF JEFFERSON,

## WEDNESDAY, JANUARY 3, 1883.

(REGULAR SESSION.)

*BY AUTHORITY.*



JEFFERSON CITY:
STATE JOURNAL COMPANY, STATE PRINTERS.
1883.

76                    CRIMES AND CRIMINAL PROCEDURE.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1. Any person or persons doing a commission business in this state who shall receive cattle, hogs, sheep, grain, cotton or other commodities consigned or shipped to him or them for sale on commission, and who shall wilfully make a false return to his or their consignor or shipper, in an account of sale or sales of any such cattle, hogs, sheep, grain, cotton or other commodities made and rendered by such person or persons for and to such consignor or shipper, either as to weights or prices, shall be guilty of a misdemeanor and shall, on conviction, be punished by imprisonment in the county jail not exceeding one year, or by a fine not exceeding five hundred dollars nor less than two hundred dollars, or by fine not less than one hundred dollars and imprisonment in the county jail not less than three months.

Approved April 2, 1883.

---

## CRIMES AND CRIMINAL PROCEDURE: CONCEALED WEAPONS.

AN ACT to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled "Of Crimes and Criminal Procedure."

SECTION 1. Carrying concealed weapon, etc., penalty for increased.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

SECTION 1. That section 1274 of the Revised Statutes of Missouri be and the same is hereby amended by inserting the word "twenty" before the word "five" in the sixteenth line of said section, and by striking out the word "one" in the same line and inserting in lieu thereof the word "two," and by striking out the word "three" in the seventeenth line of said section and inserting in lieu thereof the word "six," so that said section, as amended, shall read as follows: Section 1274. If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

Approved March 5, 1883.

JA584

## HENRY LLOYD, Esquire, Governor.    315

G. L. Copeland; and also to issue his warrant
upon the Treasurer for the sum of sixty dol-
lars, payable to the order of Abram Zarks;
and also to issue his warrant upon the Treas-
urer for the sum of sixty dollars, payable to
the order of C. E. Gordon; the said sums of
money having been paid for State license erro-
neously issued to said persons by the Clerk of
the Circuit Court of Anne Arundel county.

SEC. 2. *And be it enacted,* That this act shall    Effective.
take effect from the date of its passage.

Approved April 7, 1886.

### CHAPTER 189.

AN ACT to prevent the carrying of guns, pis-
tols, dirk-knives, razors, billies or bludgeons
by any person in Calvert county, on the days
of election in said county, within one mile
of the polls.

SECTION 1. *Be it enacted by the General As-*
*sembly of Maryland,* That from and after the
passage of this act, it shall not be lawful for
any person in Calvert county to carry, on the
days of election and primary election, within
three hundred yards of the polls, secretly, or
otherwise, any gun, pistol, dirk, dirk-knife,
razor, billy or bludgeon, and any person violat-    Unlawful to
ing the provisions of this act, shall be deemed    carry weapons
guilty of a misdemeanor, and on conviction    to the polls.
thereof by the Circuit Court of Calvert county
having criminal jurisdiction thereof, or before
any Justice of the Peace in said county, shall
be fined not less than ten nor more than fifty
dollars for each offence, and on refusal or
failure to pay said fine, shall be committed to
the Jail of the county until the same is paid.

SEC. 2. *And be it enacted,* That the fines col-
lected under this act shall be paid by the offi-

**EXHIBIT**

**30**

JA585

316                    LAWS OF MARYLAND.

Fines go to
schools.

cer collecting the same, to the School Commissioners of the county in which the offence was committed, for School purposes.

Misdemeanor.

Penalty.

SEC. 3. *And be it enacted*, That any Constable of said county, or the Sheriff thereof, who shall refuse to arrest any person violating any provision of this act, upon information of such offence, shall be deemed guilty of a misdemeanor, and on conviction thereof before the Circuit Court for Calvert county, as the case may be, shall be fined not less than fifty nor more than one hundred dollars, and shall, in the discretion of the Court, be discharged from office.

Effective.

SEC. 4. *And be it enacted*, That this act shall take effect from the date of its passage.

Approved April 7, 1886.

## CHAPTER 190.

AN ACT to repeal section three of the acts of eighteen hundred and eighty-four, chapter sixteen, entitled an act for the protection of birds in Prince George's and Anne Arundel counties, and to re-enact the same with amendments, and to add new sections thereto.

Repealed and
re-enacted.

SECTION 1. *Be it enacted by the General Assembly of Maryland*, That section three of chapter sixteen of the acts of eighteen hundred and eighty-four, entitled an act for the protection of birds in Prince George's and Anne Arundel counties, be and the same is hereby repealed and re-enacted so as to read as follows, and that new sections be added thereto.

SEC. 3. *And be it enacted*, That it shall not be lawful for any person or persons in said counties to shoot, kill or catch or in any way to

Сн. 30.]  CRIMES.  **55**

in the third degree shall be punished by imprisonment for not less than three nor more than twenty-one years, in the territorial penitentiary.

Sec. 5. It is the true intent of this act to repeal said **Intent of repeal.** sections 687, 688, 689, 695, 699, 700, 702 and 703, referred to in the first section of this act, only so far as the same apply to offenses committed after the passage of this act, but the said sections are to be held and remain in force and apply to all acts done and offenses committed prior to the passage of this act, and all pending prosecutions and those hereafter instituted for acts done prior to the passage of this act shall be commenced and carried on and punishment be had under the said sections 687, 688, 689, 695, 699, 700, 702 and 703, which said sections are hereby continued in force only for that purpose.

Sec. 6. This act shall be in force from and after its passage.

Approved February 24, 1887.

---

## CHAPTER XXX.

### CRIMES-WEAPONS.

---

An Act to prohibit the unlawful carrying and use of deadly weapons.

---

*Be it enacted by the Legislative Assembly of the Territory of New Mexico:*

Section 1. That any person who shall hereafter carry a **Carrying any deadly weapon.** deadly weapon, either concealed or otherwise, on or about the settlements of this territory, except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family or property, the same being then and there threatened with danger, or except such carrying be done by legal authority, upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than three hundred, or by imprisonment not less than sixty days, nor more than six months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

**EXHIBIT 31**

56                         CRIMES—WEAPONS.                    [CH. 30.

Threatening any person.

SEC. 2. Any person who shall draw a deadly weapon on another, or who shall handle a deadly weapon in a threatening manner, at or towards another, in any part of this territory, except it be in the lawful defense of himself, his family or his property, or under legal authority, upon conviction thereof, shall be fined in any sum not less than one hundred dollars, nor more than five hundred dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary not less than three months nor more than eighteen months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Assault with deadly weapon.

SEC. 3. Any person who shall unlawfully assault or strike at another with a deadly weapon, upon conviction thereof shall be punished by a fine not exceeding one thousand dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary, not exceeding three years, in the discretion of the court or jury trying the same.

Flourishing deadly weapon.

SEC. 4. Any person who shall unlawfully draw, flourish or discharge a rifle, gun or pistol within the limits of any settlement in this territory, or within any saloon, store, public hall, dance hall or hotel, in this territory, except the same be done by lawful authority, or in the lawful defense of himself, his family or his property, upon conviction thereof shall be punished by a fine of not more than one thousand dollars, or by imprisonment for a term of not more than three years, or by both such fine and imprisonment, in the discretion of the court or jury trying the same. The word "settlement," as used in this act, shall be construed to mean any point within three hundred yards of any inhabited house, in the territory of New Mexico.

Insulting person while armed.

SEC. 5. Any person being armed with a deadly weapon, who shall, by words, or in any other manner, insult or assault another, upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, nor more than three hundred dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary for not less than three months, nor more than one year, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Jurisdiction of offenses.

SEC. 6. Justices of the peace, as well as the district courts shall have concurrent jurisdiction of all offenses committed under the first section of this act; but of offenses committed under the remaining sections hereof, justices of the peace shall not have jurisdiction except as committing magistrates, and it is made the duty of the justices of the peace of the several counties of the territory before whom any person is brought or arraigned for the violation of any

Ch. 30.]                    CRIMES—WEAPONS.                    57

of the above sections, other than section one of this act, if reasonable grounds exist to believe such person guilty, to bind such person over in a good and sufficient bond to the district court of such county, and in default of such bond to commit to jail as in other felonies.

SEC. 7. It shall not be necessary, in the trial of any cause arising under the provisions of this act to prove that the person charged was not, at the time of violating the said provisions, in the lawful defense of himself, his family or property, or acting by lawful authority, but the accused must prove that he was, at such time, within the exception claimed. *What accused must prove.*

SEC. 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. *Deadly weapon, definition of.*

SEC. 9. Persons traveling may carry arms for their own protection while actually prosecuting their journey and may pass through settlements on their road without disarming; but if such travelers shall stop at any settlement for a longer time than fifteen minutes they shall remove all arms from their person or persons, and not resume the same until upon eve of departure. *Travelers may carry arms.*

SEC. 10. Sheriffs and constables of the various counties, and marshals and police of cities and towns, in this territory, and their lawfully appointed deputies, may carry weapons, in the legal discharge of the duties of their respective offices, when the same may be necessary, but it shall be for the court or the jury to decide from the evidence whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons are punished, for the violation of the preceding sections of this act. *Officers may carry arms when.*

SEC. 11. Every keeper of hotel, boarding house, bar room, drinking saloon or place where liquor is sold, or dance hall, in this territory, shall keep conspicuously posted up a copy of this act, in both the English and Spanish languages, and it is hereby made the duty of every such keeper of a hotel, boarding house, bar room, drinking saloon or place where liquor is sold, or dance hall, or the person in charge of the same, who shall become cognizant of any violations *Duty of hotel and saloon keepers, &c.*

58                          CRIMES—WEAPONS.                    [CH. 30.

of the provisions of this act, in, upon or about their premises, to immediately and at once direct the attention of such violator to the provisions of this act, and upon a failure of such keeper of a hotel, boarding house, bar room, drinking saloon, or place where liquor is sold, or dance hall, or the person in charge thereof, to so do, he or they shall be liable to pay a fine of not less than $5, nor more than $50.

**Duty of judges.**    SEC. 12. It shall be the duty of the judges of the several district courts of this territory, at the charging of the grand jury of the several counties, to direct the attention of the said grand juries to the provisions of this act, and require that they make diligent inquiry as to any violation of the same.

**Duty of county commissioners.**    SEC. 13. The boards of county commissioners of the several counties of this territory are hereby directed and required to have printed in both English and Spanish a sufficient number of copies of this act for the use of and to be furnished to all persons applying for the same; and it is made the duty of the several sheriffs and collectors of said counties to furnish to each person with a license a copy of this act, in both English and Spanish.

SEC. 14. All fines and penalties accruing from the violation of the provisions of this act shall be paid into the county treasury of the county in which such violation occurs to the credit and for the benefit of the school fund of said county.

SEC. 15. This act shall have full force and effect from and after the first day of March, 1887.

Approved February 18, 1887.

# ANNUAL REPORTS

OF THE

# CITY OFFICERS AND CITY BOARDS

OF THE

# CITY OF SAINT PAUL,

FOR THE FISCAL YEAR ENDING DECEMBER 31, 1888.

GLOBE JOB OFFICE,
D. RAMALEY & SON, PRINTERS,
1889.

EXHIBIT
32

Digitized by Google

JA591

## RULES AND REGULATIONS OF THE PUBLIC PARKS AND GROUNDS
## OF THE CITY OF SAINT PAUL.

1.  No person shall drive or ride in any Park in the City of Saint Paul at a rate exceeding seven (7) miles per hour.

2.  No person shall ride or drive upon any other part of any Park than the avenues and roads.

3.  No coach or vehicle used for hire shall stand upon any part of any Park for the purpose of hire, unless licensed by the Board of Park Commissioners.

4.  No person shall indulge in any threatening or abusive, insulting or indecent language in any Park.

5.  No person shall engage in any gaming nor commit any obscene or indecent act in any Park.

6.  No person shall carry firearms or shoot birds in any Park or within fifty yards thereof, or throw stones or other missiles therein.

7.  No person shall disturb the fish or water fowl in any pool or pond or birds in any part of any Park, or annoy, strike, injure, maim or kill any animal kept by direction of the Board of Park Commissioners, either running at large or confined in a close; nor discharge any fireworks, nor affix any bills or notices therein.

8.  No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, bridges, structures or statuary, or foul any fountain, well or spring within any Park.

9.  No person shall throw any dead animal or offensive matter, or substance of any kind into any lake, stream or pool, within the limits of any Park.

10. No person shall go in to bathe within the limits of any Park.

11. No person shall turn cattle, goats, swine, horses, dogs or other animals loose in any Park, nor shall any animals be permitted to run at large therein.

12. No person shall injure, deface or destroy any notices, rules or regulations for the government of any Park, posted or in any other way fixed by order or permission of the Board of Park Commissioners within the limits of any Park.

13. Complaints against any employe of any Park may be made at the office of the Superintendent of Parks.

14. No person shall use any Park drive for business purposes, or for the transportation of farm products, dirt or any like material, or for the passage of teams employed for such purposes.

Any person who shall violate any of the foregoing rules and regulations shall be guilty of a misdemeanor, and for each and every offense shall be fined not less than the sum of Five Dollars ($5), nor more than Fifty Dollars ($50), which sum shall be paid into the city treasury for park purposes.

JOHN D. ESTABROOK,

Superintendent.

Digitized by Google



HALL OF RECORDS

ANNAPOLIS, MARYLAND

# THE MARYLAND CODE.

# Public Local Laws,

### CODIFIED BY

## JOHN PRENTISS POE.

**ADOPTED BY THE GENERAL ASSEMBLY OF MARYLAND
MARCH 14, 1888.**

*Including also the Public Local Acts of the Session of 1888
incorporated therein.*

BY AUTHORITY OF THE  STATE OF MARYLAND.

## VOLUME I,

CONTAINING ARTICLE 1, ALLEGANY COUNTY, TO ARTICLE 10,
DORCHESTER COUNTY.

1409

BALTIMORE:
KING BROS., PRINTERS AND PUBLISHERS.
1888.

**EXHIBIT
33**

604           CALVERT COUNTY.           [ART. 5.

Allegany, Worcester and Kent counties, and Baltimore city, and all cities, towns or burroughs in which dogs are taxed by municipal ordinance, are exempted from the operation of sections 157 to 162 of article 81 of the public general laws, title "Revenue and Taxes."

### ELECTION DISTRICTS.

P. L. L., (1860,) art. 4, sec. 80.

**69.** Calvert county is divided into three election districts, according to their present bounds and limits, in each of which districts all elections for public officers shall be held, at the place now established by law.

1872, ch. 77.

**70.** The county commissioners are authorized to redistrict or increase the number of election precincts in said county if in their judgment it may seem needful and necessary.

1886, ch. 189.

**71.** It shall not be lawful for any person in Calvert county to carry, on the days of election and primary election, within three hundred yards of the polls, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeahor, and on conviction thereof by the circuit court for Calvert county, or before any justice of the peace in said county, shall be fined not less than ten nor more than fifty dollars for each offence, and on refusal or failure to pay said fine, shall be committed to the jail of the county until the same is paid.

Ibid.

**72.** The fines collected under the preceding section shall be paid by the officer collecting the same to the school commissioners of the county for school purposes.

Ibid.

**73.** Any constable of said county, or the sheriff thereof, who shall refuse to arrest any person violating section 71, upon information of such offence, shall be deemed guilty of a misdemeanor, and on conviction thereof before the circuit court for Calvert

# SESSION LAWS

OF THE

## FIFTEENTH

# LEGISLATIVE ASSEMBLY

OF THE

## TERRITORY OF ARIZONA.

———————

SESSION BEGUN ON THE TWENTY-FIRST DAY
OF JANUARY, A. D. 1889.

**EXHIBIT**
**34**

16                    LAWS OF ARIZONA.

SEC. 3.    This Act shall take effect from and after its passage.

Approved March 18, 1889.

---

No. 12.                    AN ACT

Concerning the Transaction of Judicial Business on Legal Holidays.

*Be it enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1.    No Court of Justice shall be open, nor shall any Judicial business be transacted on any Legal Holiday, except for the following purposes:

1.    To give, upon their request, instructions to a Jury when deliberating on their verdict.

2.    To receive a verdict or discharge a Jury.

3.    For the exercise of the powers of a magistrate in a criminal action, or in a proceeding of a criminal nature; provided, that the Supreme Court shall always be open for the transaction of business; and provided further, that injunctions, attachments, claim and delivery and writs of prohibition may be issued and served on any day.

SEC. 2.    All Acts and parts of Acts in conflict with this Act are hereby repealed.

SEC. 3.    This Act shall be in force and effect from and after its passage.

Approved March 18, 1889.

---

No. 13.                    AN ACT

Defining and Punishing Certain Offenses Against the Public Peace.

*Be it Enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1.    If any person within any settlement, town, village or city within this Territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which he is convicted, the weapon or weapons so carried.

SEC. 2.    The preceding article shall not apply to a person in actual service as a militiaman, nor as a peace officer

or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.

SEC. 3.   If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this Territory are collected to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the County the weapon or weapons so found on his person.

SEC. 4.   The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated.

SEC. 5.   Any person violating any of the provisions of Articles 1 and 3, may be arrested without warrant by any peace officer and carried before the nearest Justice of the Peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by a fine not exceeding three hundred dollars.

SEC. 6.   Persons traveling may be permitted to carry arms within settlements or towns of the Territory for one-half hour after arriving in such settlements or town, and while going out of such towns or settlements; and Sheriffs and Constables of the various Counties of this Territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties of their respective offices.

SEC. 7.   It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted up in a conspicuous place in his bar room, or reception room if there be no bar in the house, a plain notice to travelers to divest themselves of their weapons in accordance with Section 9 of this Act, and the Sheriffs of the various Counties

18          LAWS OF ARIZONA.

shall notify the keepers of hotels, boarding houses and drinking saloons in their respective Counties of their duties under this law, and if after such notification any keeper of a hotel, boarding house or drinking saloon, shall fail to keep notices posted as required by this Act, he shall, on conviction thereof before a Justice of the Peace, be fined in the sum of five dollars to go to the County Treasury.

SEC. 8.    All Acts or parts of Acts in conflict with this Act are hereby repealed.

SEC. 9.    This Act shall take effect upon the first day of Apr 1, 1889.

Approved March 18, 1889.

———

No. 14.                AN ACT

To Amend Paragraph 492, Revised Statutes.

*Be it Enacted by the Legislative Assembly of the Terrritory of Arizona:*

SECTION 1.    That Paragraph 492, Chapter 5, Title 13, of the R vised Statutes, be amended so as to read as follows: "If he fail to attend in person or by deputy any term of the District Court, the Court may designate some other person to perform the duties of District Attorney during his absence from Court, who shall receive a reasonable compensation to be certified by the Court, and paid out of the County Treasury, which the Court shall by order direct to be deducted from the salary of the District Attorney, if the absence of such Attorney is not excused by such Court."

SEC. 2.    That all Acts and parts of Acts in conflict with this Act be, and the same are, hereby repealed.

SEC. 3.    That this Act shall take effect and be in force from and after its passage.

Approved March 19, 1889.

———

No. 15.                AN ACT

To Provide for the Payment of Boards of Supervisors of the Counties within the Territory of Arizona.

*Be it Enacted by the Legislative Assembly of the Territory of Arizona:*

SECTION 1.    Each member of the Board of Supervisors within this Territory shall be allowed as compensation for their services Five Dollars per day for each day's actual attendance at the sitting of said Board, at which sitting any County business is transacted; and twenty cents per mile actually traveled

*Columbia, Mo.*

# GENERAL ORDINANCES, *etc.*

OF THE

# TOWN OF COLUMBIA,

IN

## BOONE COUNTY, MISSOURI,

REVISED, PUBLISHED AND PROMULGATED BY
AUTHORITY OF THE BOARD OF TRUS-
TEES OF SAID TOWN, IN
THE YEAR 1890.

———————

TO WHICH ARE APPENDED

THE PROVISIONS OF THE STATE CONSTITUTION RE-
SPECTING MUNICIPAL CORPORATIONS; ALSO THE
GENERAL AND SPECIAL CHARTERS
OF SAID TOWN.

———————

REVISED BY LEWIS M. SWITZLER.

———————

COLUMBIA, MO.:
STATESMAN BOOK AND JOB OFFICE PRINT.
1890.

EXHIBIT
35

Digitized by Google

JA599

USCA4 Appeal: 23-1719     Doc: 30-2          Filed: 08/21/2023     Pg:

34                    GENERAL ORDINANCES.

or spirituous liquors, or any composition of which fermented, vinous or spiritous liquors form a part. *Provided,* that this section shall not be so construed as to prevent any druggist from selling or giving away, in good faith, wine for sacramental purposes, or alcohol for art, mechanical or scientific purposes on the applicant therefor, and seller thereof, complying with the laws of this state in such case made and provided; nor to prevent the selling or giving away by druggists of alcohol, or intoxicating liquors, on a written prescription, dated and signed, first had and obtained from some regularly registered and practising physician, and then only when such physician shall state in such prescription the name of the person for whom the same is prescribed and that such intoxicating liquor is prescribed as a necessary remedy in such case.

Sec. 159.  Any person who shall sell or give away, to any person already intoxicated, any intoxicating liquor shall be deemed guilty of a misdemeanor and be fined if a druggist selling or giving away on prescription, not less than twenty-five dollars; if any other person, not less than forty dollars.

Passed May 22, 1890.


CHAPTER XVII.

CARRYING CONCEALED WEAPONS—FIRING GUNS, PISTOLS, FIRE CRACKERS, ETC.

*Be it ordained by the Board of Trustees of the Town of Columbia as follows:*

Sec. 160.  Any person who shall fire or discharge, or who shall cause the same to be done by any person under his authority or control, any gun, pistol, cannon, anvil, or any device or contrivance, charged with any explosive, shall be deemed guilty of a misdemeanor and on conviction be fined not less than ten dollars for each offense.

Sec. 161.  Any person who shall ignite or explode any explosive compound, or suffer the same to be done by any person under his control, or who shall fire, or cause to be fired or exploded, or suffer the same to be done by any person under his control, any fire cracker, or crackers, Roman candles, rockets, torpedoes, squibs, or any other kind of fireworks whatever, shall be deemed guilty of a misdemeanor and on conviction be fined not less than five dollars for each offense.

Digitized by Google

GENERAL ORDINANCES.                    35

Sec. 162.  Any person who shall be guilty of carrying concealed upon or about his person any pistol, bowie knife, dirk, dagger, slung shot, or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than one hundred dollars for every such offense.

Sec. 163.  Any person who shall go into any church, or place where people have assembled for religious worship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose, other than for military drill, or meetings called under the militia laws of this state, carrying concealed or in sight upon or about his person, any fire arms or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than one hundred nor more than one hundred and fifty dollars for ever such offense.

Sec. 164.  Any person who shall be guilty of exhibiting any fire arms, or other deadly or dangerous weapon in a rude, angry, or threatening manner; or who shall carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, shall be deemed guilty of a misdemeanor, and shall upon conviction be fined not less than fifty dollars for every such offense.

*Provided,* that the three last preceding sections shall not apply to police officers, nor to any officer whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to any posse when lawfully summoned and on duty; nor shall section 162 apply to persons moving or traveling peaceably through the state.

Passed May 22, 1890.

Digitized by Google

JA601

# THE

# STATUTES OF OKLAHOMA

## 1890.

Compiled under the supervision and direction of Robert Martin,
Secretary of the Territory,

—BY—

## WILL T. LITTLE,  L. G. PITMAN and R. J. BARKER,

—FROM—

The Laws Passed by the First Legislative Assembly of the Territory.

GUTHRIE, OKLAHOMA:
THE STATE CAPITAL PRINTING CO.,
PUBLISHERS.
1891.

EXHIBIT
**36**

CRIMES AND PUNISHMENT.    495

(2430) § **6.** Every person who, with intent to extort any money or other property from another, sends to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat, such as is specified in the second section of this article, is punishable in the same manner as if such money or property were actually obtained by means of such threat.

*Chap. 25.*

*Sending threatening letter.*

(2431) § **7.** Every person who unsuccessfully attempts by means of any verbal threat such as is specified in the second section of this article, to extort money or other property from another is guilty of a misdemeanor.

*Attempting to export money.*

## ARTICLE 47.—CONCEALED WEAPONS.

SECTION.
1. Prohibited weapons enumerated.
2. Same.
3. Minors.
4. Public officials, when privileged.
5. Arms, when lawful to carry.

SECTION.
6. Degree of punishment.
7. Public buildings and gatherings.
8. Intent of persons carrying weapons.
9. Pointing weapon at another.
10. Violation of certain sections.

(2432) § **1.** It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

*Prohibited weapons enumerated.*

(2433) § **2.** It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

*Same.*

(2434) § **3.** It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

*Minors.*

(2435) § **4.** Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: *Provided, however,* That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

*Public officials, when privileged.*

(2436) § **5.** Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

*Arms, when lawful to carry.*

(2437) § **6.** Any person violating the provisions of any one of the foregoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent con-

*Degree of punishment.*

496                          CRIMES AND PUNISHMENT.

Chap. 25.

viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

**Public buildings and gatherings.**

(2438) § **7.** It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

**Intent of persons carrying weapons.**

(2439) § **8.** It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

**Pointing weapons at another.**

(2440) § **9.** It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

**Violation of section seven.**

(2441) § **10.** Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months.

## Article 48.—False Personation and Cheats.

SECTION.
1. False impersonation, punishment for.
2. False impersonation and receiving money.
3. Personating officers and others.
4. Unlawful wearing of grand army badge.
5. Fines, how paid.
6. Obtaining property under false pretenses.

SECTION.
7. False representation of charitable purposes.
8. Falsely representing banking corporations.
9. Using false check.
10. Holding mock auction.

**Punishment for false impersonation.**

(2442) § **1.** Every person who falsely personates another, and in such assumed character, either:

First. Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second. Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third. Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth. Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.

# LAWS

—AND—

# ORDINANCES,

FOR THE GOVERNMENT OF THE MUNICIPAL CORPORATION OF THE

## CITY OF WILLIAMSPORT, PENNSYLVANIA,

IN FORCE APRIL 1st, 1891.



PUBLISHED BY AUTHORITY OF THE CITY COUNCILS.

## IN FOUR PARTS.



WILLIAMSPORT, PA.:
PENNSYLVANIA GRIT BOOK AND JOB PRINTING HOUSE.
1891.

UNIVERSITY
REFORM CLUB,
Committee on
MUNICIPAL ADMINISTRATION.
JA605

Digitized by Google

# PART IV.

## ORDINANCES

OF THE CITY OF WILLIAMSPORT, PA.

Digitized by Google

140                    ORDINANCES.

## AN ORDINANCE

Brandon Park *Prescribing the rules and regulations for the government and protection of Brandon Park, imposing penalties for the violation of the same, and closing part of Packer street.*

Regulations.    SECTION 1. *Be it ordained by the select and common councils of the city of Williamsport,* That the following rules and regulations be and are hereby established as the rules and regulations for the government and protection of Brandon Park, viz.:

Driving.        1.    No person shall drive or ride in Brandon Park at a rate exceeding seven miles an hour.

Upon roads.     2.    No person shall ride or drive upon any part of the park, except on the avenues and roads.

Vehicles prohibited.    3.    No vehicle of burden or traffic shall be permitted within said park, except when employed in the business of the park.

Regulating speed.    4.    No bicycles, tricycles or other vehicles of a similar nature, shall be driven at a greater speed than seven miles per hour in the park.

Law of road.    5.    When carriages, bicycles, tricycles or equestrians meet, the parties respectively shall keep to the right as the law of the road.

Entrance and exit.    6.    No person shall enter or leave the park except by such gates or avenues as may be for such purposes arranged.

Led horses.     7.    No person shall bring or lead a horse or horses within the limits of the park not harnessed and attached to a vehicle, or mounted by an equestrian.

Animals at large.    8.    No person shall turn cattle, goats, swine, horses, dogs or other animals loose into the park.

Shrubbery.      9.    No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, flowers, fruit, turf, or any of the buildings, fences, bridges, structures or statuary, or foul any fountains or springs within the park, nor throw stones or rubbish of any kind into any lake or pond of the park, or bathe in the same.

Nuisances.      10.    No person shall throw any dead animal or offensive matter or substance of any kind within the boundaries of the park.

Fish, etc.      11.    No person shall disturb the fish or water fowl in the pool or pond, or birds in any part of the park, or annoy, strike, injure, maim or kill any animal kept by direction of the commissioners, either running at large or confined.

Trees.          12.    No person shall attach a swing to, fasten a horse to, nor climb a tree in said park.

Bills and notices.    13.    No person shall injure, deface or destroy any notices, rules or regulations for the government of the park posted or in any other manner permanently fixed by order or permission of the commissioners of the park, nor affix any bills or notices within the limits of the same.

Traffic prohibited.    14.    No person shall expose any article for sale within the park.

Digitized by Google

ORDINANCES. 141

15. No person shall have any musical or other entertain- Parades, etc., prohibited. ment in the park, nor shall any parade or procession take place in or pass through the park, nor shall any picnic, gathering or public meeting of any kind be permitted therein without the previous permission of the commissioners.

16. No person shall engage in any play at base ball, Games prohibited. cricket, shinny, foot-ball, croquet, or at any other athletic games within the limits of the park, except on such grounds only as shall be specially designated for such purposes by the park commissioners.

17. No person shall introduce any spirituous, malt or Liquors prohibited. brewed liquors into said park, either for his own use, to sell, or to give away, nor shall any intoxicated person enter or remain in said park.

18. No person shall curse or swear or use threatening or Swearing. abusive language, or fight or throw stones, or behave in a riotous or disorderly manner in said park.

19. No person shall indulge in any insulting or indecent Nuisances. language, or commit a nuisance in the park.

20. No person shall engage in playing cards or gambling Gambling. in said park.

21. No person shall carry fire-arms, or shoot in the park, Firearms. or discharge any fire-works, or throw stones or missiles therein.

SEC. 2. Any person who shall violate any of said rules and Penalty. regulations shall be liable to a fine of not less than five dollars nor more than fifty dollars, to be recovered before any alderman of the city of Williamsport, with costs, together with judgment of imprisonment not exceeding thirty days, if the amount of said judgment and costs shall not be paid, which fines shall be paid into the city treasury for park purposes.

SEC. 3. Packer street, where it passes through the park, is Street vacated. hereby abandoned as a public highway and declared to be a part of the park, subject to the rules and regulations adopted for its government and protection.

APPROVED—June 18th, 1890.

F. H. KELLER,

*Mayor.*

Digitized by Google

# THE ANNOTATED CODE

——OF THE——

## GENERAL STATUTE LAWS

——OF——

# THE STATE OF MISSISSIPPI,

——PREPARED BY——

R. H. THOMPSON, GEORGE G. DILLARD,
and R. B. CAMPBELL,

——AND——

Reported to and amended and adopted by the Legislature at its Regular
Session in 1892.

————————

.PUBLISHED BY AUTHORITY OF THE LEGISLATURE.

————————

NASHVILLE, TENN.:
MARSHALL & BRUCE, LAW PUBLISHERS.
1892.

EXHIBIT
**38**

CRIMES AND MISDEMEANORS.                    1030–1034

years to have or to own, or to carry concealed, in whole or in part, any weapon the carrying of which concealed is prohibited, shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than twenty dollars nor more than two hundred dollars, or may be imprisoned not more than sixty days in the county jail, or both.

**1030** (2988). **The same; college students not to have, etc.**—A student of any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher, instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both.

**1031** (2804). **The same; exhibiting in rude, angry, or threatening manner, etc.**—If any person, having or carrying any dirk, dirk-knife, sword, sword-cane, or any deadly weapon, or other weapon the carrying of which concealed is prohibited, shall, in the presence of three or more persons, exhibit the same in a rude, angry, or threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person so offending, upon conviction thereof, shall be fined in a sum not exceeding five hundred dollars or be imprisoned in the county jail not exceeding three months, or both. In prosecutions under this section it shall not be necessary for the affidavit or indictment to aver, nor for the state to prove on the trial, that any gun, pistol, or other fire-arm was charged, loaded, or in condition to be discharged.

The omission of the word "manner," after the words "rude, angry, and threatening," in an indictment, is a formal defect, and may be amended as such. In such indictment it is unnecessary to aver that the defendant was "carrying" the weapon. Gamblin v. State, 45 Miss., 658.

**1032** (2769). **Disturbance of family; noises and offensive conduct.**—A person who willfully disturbs the peace of any family or person by an explosion of gunpowder or other explosive substance, or by loud or unusual noise, or by any tumultuous or offensive conduct, shall be punished by fine and imprisonment, or either; the fine not to exceed one hundred dollars, and the imprisonment not to exceed six months in the county jail.

What constitutes the offensive conduct, or the nature or character of the offensive conduct, should be stated in the affidavit or indictment. Finch v. State, 64 Miss., 461.

This section and the next one are intended to protect the peace of families. An affidavit or indictment averring the disturbance merely of an individual, charges no offense under either section. Brooks v. State 67 Miss., 577.

**1033** (2770). **The same; using abusive, etc., language, etc.**—Any person who enters the dwelling-house of another, or the yard or curtilage thereof, or upon the public highway, or any other place near such premises, and in the presence or hearing of the family of the possessor or occupant thereof, or of any member thereof, or of any female, makes use of abusive, profane, vulgar, or indecent language, or is guilty of any indecent exposure of his person at such place, shall be punished for a misdemeanor.

Place is material. An indictment charging the use of abusive language in a yard, is not sustained by proof of its use near the yard. Quin v. State, 65 Miss., 479.

**1034** (2767). **Disturbance of worship; proceedings and penalty.**—If any person shall willfully disturb any congregation of persons lawfully assembled for reli-

327

Case 8:21-cv-01736-TDC   Document 59-43   Filed 12/30/22   Page 1 of 3



*WILLARD HALL, PO.*
*ATTORNEY-AT-LAW,*
*JAN 15 1894*
*WILMINGTON, DEL*

# THE CHARTER

OF THE

# TY OF WILMINGTON

As Amended to May 6th, 1893;

## ts of the General Assembly

### RELATING TO THE CITY,

#### INCLUDING THE SESSION OF 1893;

*(being vol. 19. Laws of Del.)*

—AND—

## INANCES, AND RULES AND REGULATIONS

Of Departments of the City Government,

s Amended and in Force, September 1st, 1893;

—ALSO—

## E ORIGINAL BOROUGH CHARTER.

PUBLISHED BY ORDER OF THE COUNCIL.

**EXHIBIT 39**

WILMINGTON, DEL.:

DIAMOND PRINTING COMPANY,

1893.





Digitized by Google

JA611

# PART VII.

# RULES AND REGULATIONS

OF THE

## BOARD OF PARK COMMISSIONERS.

Digitized by Google

## RULES AND REGULATIONS OF THE BOARD OF PARK COMMISSIONERS,

### As Amended and in Force September 1st, 1893.

1.   No person shall ride or drive upon any other part of the Park than upon such roads as may be designated for such purposes. . . . . . . . . . . . . . . . . . Penalty, $5 00

2.   No person shall be permitted to bring led horses within the limits of the Park, or to turn any horses, cattle, goats, swine, dogs, or other animals loose in the Park. . . . . Penalty. $5 00

3.   No person shall indulge in any threatening, abusive, insulting, or indecent language in the Park. . . . Penalty, $5 00

4   No person shall engage in gaming, or commit any obscene or indecent act in the Park. . . . . . Penalty, $10 00

5.   No person shall go into bathe in any of the waters within the Park. . . . . . . . . . . . . . . . Penalty, $5 00

6.   No person shall throw any dead animal or offensive matter or substance of any kind into the Brandywine, or into any spring, brook, or other water, or in any way foul any of the same, which may be within the boundaries of the Park   Penalty, $5 00

7.   No person  shall carry fire-arms or shoot birds or other animals within the Park, or throw stones or other missiles therein.
Penalty. $5 00

8.   No person shall disturb birds, or annoy, strike, injure or kill any animal, whether wild or domesticated, within the Park.
Penalty, $5 00

9.   No person shall cut, break, or in anywise injure or deface any trees, shrubs, plants, turf or rocks, or any buildings, fences, bridges, or other structures within the Park.
Penalty, $10 00

10   No person shall injure, deface, or destroy any notices, rules or regulations for the government of the Park posted or in any other manner permanently fixed, by order or permission of the Board of Park Commissioners or their officers or employes.
Penalty, $10 00

*Adopted October* 12, 1887.

Digitized by Google

# THE STATUTES

OF

# OKLAHOMA,

## 1893.



---

**Being a Compilation of all the Laws now in force in the Territory of Oklahoma.**

---

Compiled Under the Direction and Supervision of Robert Martin, Secretary of the Territory

BY

**W. A. McCARTNEY, JOHN H. BEATTY and J. MALCOLM JOHNSTON,**

a Committee Elected by the Legislative Assembly.

---

GUTHRIE, OKLAHOMA,
STATE CAPITAL PRINTING CO.,
1893.

EXHIBIT
**40**

Digitized by Google

CRIMES AND PUNISHMENT.                              503

(2402) § 6.  Every person who, with intent to extort any *Chap. 25.* money or other property from another, sends to any person any *Sending* letter or other writing, whether subscribed or not, expressing or *threatening* implying, or adapted to imply, any threat, such as is specified in *letter.* the second section of this article, is punishable in the same manner as if such money or property were actually obtained by means of such threat.

(2403) § 7.  Every person who unsuccessfully attempts by means *Attempting* of any verbal threat such as is specified in the second section of *money.* this article, to extort money or other property from another is guilty of a misdemeanor.

## ARTICLE 45.—CONCEALED WEAPONS.

| SECTION. | | SECTION. | |
|---|---|---|---|
| 1. | Prohibited weapons enumerated. | 6. | Degree of punishment. |
| 2. | Same. | 7. | Public buildings and gatherings. |
| 3. | Minors. | 8. | Intent of persons carrying weapons. |
| 4. | Public officials, when privileged. | 9. | Pointing weapon at another. |
| 5. | Arms, when lawful to carry. | 10. | Violation of certain sections. |

(2404) § 1.  It shall be unlawful for any person in the Terri- *Prohibited* tory of Oklahoma to carry concealed on or about his person, sad- *weapons* dle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, *enumerated.* slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

(2405) § 2.  It shall be unlawful for any person in the Terri- *Same.* tory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

(2406) § 3.  It shall be unlawful for any person within this *Minors.* Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

(2407) § 4.  Public officers while in the discharge of their *Public offi-* duties or while going from their homes to their place of duty, or *cials, when* returning therefrom, shall be permitted to carry arms, but at no *privileged.* other time and under no other circumstances: *Provided, however,* That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

(2408) § 5.  Persons shall be permitted to carry shot-guns or *Arms, when* rifles for the purpose of hunting, having them repaired, or for kill- *lawful to* ing animals, or for the purpose of using the same in public muster *carry.* or military drills, or while travelling or removing from one place to another, and not otherwise.

(2409) § 6.  Any person violating the provisions of any one of *Degree of* the foregoing sections, shall on the first conviction be adjudged *punishment.* guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court.  On the second and every subsequent con-

Digitized by Google

504　　　　　　　　　　CRIMES AND PUNISHMENT.

**Chap. 25.** viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

**Public buildings and gatherings.** (2410) § **7.** It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

**Intent of persons carrying weapons.** (2411) § **8.** It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

**Pointing weapons at another.** (2412) § **9.** It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

**Violation of section seven.** (2413) § **10.** Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months.

ARTICLE 46.—FALSE PERSONATION AND CHEATS.

SECTION.
1. False impersonation, punishment for.
2. False impersonation and receiving money.
3. Personating officers and others.
4. Unlawful wearing of grand army badge.
5. Fines, how paid.
6. Obtaining property under false pretenses.

SECTION.
7. False representation of charitable purposes.
8. Falsely representing banking corporations.
9. Using false check.
10. Holding mock auction.

**Punishment for false impersonation.** (2414) § **1.** Every person who falsely personates another, and in such assumed character, either:

First. Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second. Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or.

Third. Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth. Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.

Digitized by Google

496                ORDINANCES—EXECUTIVE DEPARTMENTS.

## BUREAU OF PARKS.

July 31, 1893, § 1.
O. B. 9, 262.

**Bureau of parks created.**

1.   There shall be and is hereby created a bureau to be known as the "bureau of parks," which bureau shall consist of one superintendent whose compensation shall be two hundred dollars per month, one superintendent, whose compensation shall be one hundred and fifty dollars per month, and one assistant superintendent whose compensation shall be one hundred and twenty-five dollars per month, one clerk whose compensation shall be eighty-three dollars and thirty-three cents per month, and such foremen and laborers as may be required from time to time, at the same pay as like labor in other departments of the city (*a*).

**Officers and employees.**

July 6, 1896.
O. B. 11, 159.

**Preamble.**

2.   WHEREAS, The control, maintenance, supervision and preservation of the public parks is by law vested in the department of public works ; and

WHEREAS, It is essential to proper exercise of these powers that persons should be employed as watchmen in the public parks for the protection of the public property therein.

**Preamble.**

Ibid § 1.

**Watchmen compensation.**

3.   *Be it ordained, &c.*, That the director of the department of public works shall, and he is hereby authorized to employ such watchmen as may be necessary for the properly caring for, maintaining and protecting the public property in the public parks of this city at the daily compensation of two dollars and fifty cents each.

Ibid. § 2.

4.   The compensation of such watchmen shall be paid out of appropriation No. 36, public parks.

July 27, 1893, § 1.
O. B. 9, 260.

**Rules adopted.**

5.   Upon the passage and approval of this ordinance the following rules and regulations shall be and are hereby established for the management and protection of the parks and public grounds of the city of Pittsburgh, to wit :

*First.*   No person shall injure, deface or destroy any notices, rules or regulations for the government of the parks, posted or in any other manner permanently fixed by order of the chief of department of public works.

*Second.*   No person shall be allowed to turn any chickens, ducks, geese or other fowls, or any cattle, goats, swine, horses or other animals loose within the parks or to bring led horses or a horse that is not harnessed and attached to a vehicle or mounted by an equestrian.

*Third.*   No person shall be allowed to carry firearms, or to shoot or throw stones at or to set snares for birds, rabbits, squirrels or fish, within the limits of the parks or within one hundred yards thereof.

*Fourth.*   No person shall cut, break, pluck or in anywise injure or deface the trees, shrubs, plants, turf or any of the buildings, fences, structures or statuary, or place or throw anything whatever in any springs or streams within the parks, or fasten a horse to a tree, bush or shrub.

(*a*)  As amended by ordinance of Nov. 23, 1896. O. B. 9, p. 320, and ordinance of March 31, 1896. O. B. 11, p. 40.

**EXHIBIT 41**

Digitized by Google

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg: 145

PUBLIC WORKS—PARKS.                               497

*Fifth.*    No military or other parade or procession, or funeral  <span style="float:right">July 27, 1883.</span>
shall take place in or pass through the limits of the parks with-  Park rules.
out permission from the chief of department of public works.

*Sixth.*    No one shall ride or drive therein except on the
avenues or roads, or at a rate of speed exceeding eight miles
per hour.

*Seventh.*    No gathering or meeting of any kind, assembled
through advertisement, shall be permitted in the parks without
previous permission of the chief of the department of public
works, nor shall any gathering or meeting for political purposes
in the park be permitted under any circumstances.

*Eighth.*    No wagon or vehicle of burden or traffic shall pass
through the park, except on such road or avenue as shall be
designated by the chief of the department of public works for
burden transportation.

*Ninth.*    No coach or vehicle used for hire, shall stand upon
any part of the parks for the purpose of hire, nor except in
waiting for persons taken by it into the park, unless at points
designated by the chief of the department of public works.

*Tenth.*    No profane, indecent, abusive or insulting language,
gambling or drunkenness shall be allowed within the parks, nor
shall any one be allowed to introduce any spirituous liquors
within the limits of the same, either for his own use or for sale.

*Eleventh*    No person shall climb any tree or attach any swing
thereto, without the consent of the superintendent.

*Twelfth.*    No picnic shall take place in the parks without a
written permission for the purpose being obtained from the
superintendent, in which shall be designated the spot where it
shall be held, and parties holding picnics shall clean up the
ground that has been occupied by them on quitting it, and not
leave paper and other refuse on the ground.

*Thirteenth.*    No person shall disturb any picnic in the parks,
or intrude himself or herself on it without the consent of those
composing it.

*Fourteenth.*    No person shall stand, walk or sit on any fence,
wall or embankment, or stand, slide, sit or roll upon any slope
of the parks.

*Fifteenth.*    No person shall set up any booth, table or stand
for the sale of any article whatever, without the consent of the
chief of the department of public works, previously obtained in
writing.

*Sixteenth.*    When carriages or equestrians meet, the parties
respectively shall keep to the right as the law of the road.

*Seventeenth.*    No person shall drive any vehicle displaying any
placard or advertisement of any kind along any road or avenue
in the parks, nor shall any person display any placards or
advertisements of any kind, or post or fix any notice or bill or
other writing or printing of any kind on any tree, lamp-post,
hydrant, curbstone, coping, flagstone, fence, wall, building or
other place within the parks.

*Eighteenth.*    No benches or seats shall at any time be removed

**33**

Digitized by Google

USCA4 Appeal: 23-1719       Doc: 30-2       Filed: 08/21/2023       Pg: 14

498                   ORDINANCES—EXECUTIVE DEPARTMENTS.

July 27, 1893     or changed from their places in the parks, except by the order
first obtained of the superintendent.

*Nineteenth.*   Bicycles and tricycles shall be restricted to the
use of the roadways, and be controlled by the same law which
governs horses, vehicles and equestrians, and must pass to the
right, when meeting the same or each other.   When passing a
carriage or equestrian from the rear to the front, it must be done
to the left side and at a moderate rate of speed.   Bicycles and
tricycles must not travel more than two abreast.

*Twentieth.*   All racing with horses, vehicles, tricycles and
bicycles is prohibited at any time, and bicycles and tricycles
must not be driven or propelled at greater speed than eight
miles per hour.

Ibid. § 2.        6.   Any violation of any of the foregoing rules shall subject
Penalty.          the party so offending to a fine of twenty-five dollars, to be col-
lected by summary process.

Aug. 28, 1871. § 1.   7.   The citizens of the Sixth and Fourteenth wards of the city
O. B. 3, 122.     of Pittsburgh, residing in the vicinity of Bluff street, shall be
Improvement       and are hereby authorized to enclose with a good substantial
of part of Bluff  fence a portion of Bluff street, from Gist to Magee street, as
street as a park  follows, viz: Commencing at Gist street thirty feet south of the
authorized.       northern curb line, and thence running by a line preserving the
same width to Magee street, said fence to be constructed with
openings at the street crossings, and at such other points as may
be deemed proper openings for the convenient access of foot
passengers.   Said citizens shall be further authorized to lay off
the grounds south of said fence to the line of said street with
walks, and within said enclosure, and on the outside thereof, to
plant trees and shrubbery, erect fountains and make other im-
provements thereon suitable for a public promenade: *Provided,*
That no trees or other improvements shall be placed upon said
street within a distance of twenty feet from the north curb line
of said street.

Ibid. § 2.        8.   Said improvements shall be made and maintained at the
City not liable   expense of the parties making the same, and the city shall not
for expense.      be liable for any expense contracted for or on account of the
same.

Ibid. § 3.        9.   Said city reserves the right to direct the grading and pav-
City may grade    ing of said street at any time hereafter, without compensation
and pave.         for the improvement which may be made thereon as fully as if
this ordinance had not been adopted.

Ibid. § 4.        10.   Said improvements and the maintenance and care of the
same shall be under the charge of such persons as may be se-
lected by subscribers to the fund for making the same.

Ibid. § 5.        11.   It shall be unlawful for any person to injure or destroy
Penalty for in-   any fence, trees, shrubbery or other improvement upon said
juring improve-   ground; and if any person shall wilfully injure or destroy the
ments.            same, or any part thereof, he or she shall forfeit and pay the
sum of ten dollars, in addition to a sum sufficient to repair or
replace the damage, to be recovered by action in the name of the
city of Pittsburgh, or by summary conviction before the mayor

Digitized by Google

PUBLIC WORKS—PARKS.                           499

or any alderman of said city, and the sum so recovered shall be *Aug. 28, 1871.*
paid to the person having charge of said improvements, to be
expended upon the same.

12.  The superintendent of the water works shall be author-  *Ibid. § 6.*
ized to direct a supply of water, free of charge, for not more  Supply of water
than two fountains upon said ground at all reasonable times  for two foun-
and to reasonable amounts, from the first day of April to the  tains authorized.
fifteenth day of October in each year: *Provided,* That said
superintendent shall be authorized to prevent the unnecessary
waste of water, and to prohibit its use during times of short
supply.

13.  WHEREAS, The public market-house on Second street is  *Sept. 27, 1858.*
of no benefit to the city ;                                      *O. B. 2, 125.*

*And whereas,* The heirs and legal representatives of the es-  *Preamble.*
tate of James O'Hara have, by deed dated the seventeenth day
of May, one thousand eight hundred and twenty, and on the
ninth of August, one thousand eight hundred and fifty-eight,
consented that the ground dedicated by the late James O'Hara,
on Second between Ross and Grant streets, may be used as a
public square or area ; therefore,

14.  *Be it ordained, &c.,* That all that portion of Second street  *Ibid. § 1.*
extending from Grant to Ross street, and used for the purpose  Second street
of a market house, be and the same is hereby devoted to the  market to be
purpose of a public park, to be ornamented in such manner as  made a park.
shall be directed by the mayor of the city and members of coun-
cils for the time being of the Second ward, who are hereby  Rules.
authorized to adopt such rules for the same as may, in their
judgment, be proper, and to keep the same posted on the gate-
posts thereof :  *Provided,* The whole expense of removing the
market-house and of constructing said public park and keeping  Proviso.
the same in repair, shall be provided by voluntary subscription,
and shall in no case be a charge on the city treasury.

15.  Any person that shall injure or destroy any tree, shrub  *Ibid. § 2.*
or any other thing within said park, or the wall or fence that  Penalty for
may surround it, shall, upon conviction before the mayor, be  injuries.
fined a sum not exceeding five dollars, in addition to the
amount necessary to repair any injury so done, to be recovered
as like penalties are by law recoverable.

16.  It shall be lawful to erect within the said area or park  *Ibid. § 3.*
one or more fountains, to be supplied from the public water pipes  Fountains.
without any charge for the use of the water.

17.  Before the work necessary for said improvement shall be  *Ibid. § 4.*
commenced, the mayor and members of councils from the
Second ward shall meet at the mayor's office and choose from
among themselves one president, one secretary, and one treas-
urer, and shall proceed to agree upon a plan of the work, &c.

18.  For the purpose of constructing and maintaining a public  Sept. 14, 1880 § 1.
park, there shall be and is hereby set aside, dedicated and appro-  *O. B. 7, 131.*
priated so much of the ground belonging to said city as is not  Dedication of
indispensably necessary for the safe and proper use of the reser-  Herron Hill
voir known as the Herron Hill Reservoir.  Park.

Digitized by Google

JA620

500                ORDINANCES—EXECUTIVE DEPARTMENTS.

**Sept. 14, 1889, § 2.**
**Improvement.**
19.   The chief of the department of public works of said city be and he is hereby authorized and directed to improve all said ground lying around, adjacent to and connected with said reservoir, and which shall not be found actually necessary for the operation of said reservoir, to be used and enjoyed as a public park, to be known as and by the name of the "Herron Hill Park."

**Sept. 16, 1889, § 1.**
**Dedication of Highland Park.**
20.   For the purpose of constructing and maintaining a public park, there shall be and is hereby set aside, dedicated and appropriated so much of the ground belonging to said city as is not indispensably necessary for the safe and proper use of the reservoirs known as the Highland Reservoirs.

**Ibid. § 2.**
**Improvements.**
21.   The chief of the department of public works of said city be and he is hereby authorized and directed to improve all said ground lying around, adjacent to and connected with said reservoirs or which may be added thereto, and which shall not be found actually necessary for the operation of said reservoirs, to be used and enjoyed as a public park, to be known as and by the name of "Highland Park."

### BUREAU OF CITY PROPERTY.

**Dec. 17, 1887, § 18.**
**O. B. 6, 227.**
**Bureau created.**
**Title of head.**
**Salary.**
**Duties.**
**Clerk.**
1.   There shall be and is hereby created a bureau to be known as the bureau of city property, the head of which shall be known as superintendent of city property, and who shall receive the sum of one hundred and fifty dollars per month as his compensation. The duties of this bureau shall be to take charge of all public property belonging to said city not otherwise conferred upon some other department, including markets, city buildings, wharves, and such other property of the city as is not specially conferred elsewhere: *Provided,* That the chief clerk of this bureau shall act as clerk of the Diamond markets without extra compensation.

**Feb. 28 1890, § 1.**
**O. B. 7, 321.**
**Salary of clerk of bureau of city property.**
2.   From and after the date of the passage of this ordinance, the salary of the clerk to the bureau of city property (who also acts as clerk of markets) shall be and is hereby fixed at fifteen hundred dollars per annum, and the said clerk to the bureau of city property shall receive compensation for his services at the rate of fifteen hundred dollars per annum from and after the date of the approval or passage of this ordinance.

**City Code, 234, § 1.**
**Penalty for injuring.**
**Proviso.**
3.   If any person shall destroy or injure in any way whatsoever any public property within this city, he shall forfeit and pay for every such offense a fine of not less than ten dollars and not exceeding fifty dollars, besides the amount of the costs and expenses of repairing the same: *Provided,* That when the injury is accidental no further fine shall be imposed than the amount of the cost and expense of repairing.

**Ibid. § 2.**
**City officers to report to controller.**
4.   It shall be the duty of every city officer to report to the controller any damage or injury which may be done to any public property in his possession, that the same may be laid

Digitized by Google

# THE REVISED ORDINANCES, *etc.*

## —OF THE—

# CITY OF HUNTSVILLE, MISSOURI,

## OF 1894.

COLLATED, REVISED, PRINTED AND PUBLISHED BY
AUTHORITY OF THE MAYOR AND BOARD OF
ALDERMEN OF THE CITY OF HUNTSVILLE,
MISSOURI, UNDER AN ORDINANCE OF
THE SAID CITY, ENTITLED:

"AN ORDINANCE IN RELATION TO ORDINANCES, AND
THE PUBLICATION THEREOF." APPROVED ON
THE 11TH DAY OF JUNE, 1894.

HERALD PRINT,
HUNTSVILLE, MISSOURI:
1894.

EXHIBIT
42



CC
Huntsville M.
3
1894

43-612

58 THE REVISED ORDINANCES.

## AN ORDINANCE IN RELATION TO BUTCHERS.

*Be it ordained by the Board of Aldermen of the City of Huntsville, Missouri, as follows:*

SECTION 1.   No person shall carry on the business of a butcher within the city without taking out license therefor, and no person shall be permitted, under such license, to sell or dispose of meats at more than one place or stand within the city.

SECTION 2.   For the purposes of this ordinance a butcher is defined to be any person engaged in selling or disposing of fresh meats for food in quantities less than one quarter

SECTION 3.   Nothing herein contained shall be so construed as to prevent any grocer, at his place of business, from selling game, poultry or cured meats.

SECTION 4.   This ordinance shall take effect and be in force from and after its passage, approval and publication, and any person violating any provision of said ordinance shall be deemed guilty of a misdemeanor and upon conviction shall be punished by a fine in any sum not exceeding one hundred dollars.

S. G. RICHESON,
Pres. of the Board of Aldermen.

Approved July 17, 1894.

Attest:                                          S. G. RICHESON, Mayor.
J. A. HEETHER, Clerk.

———o———

## AN ORDINANCE IN RELATION TO CARRYING DEADLY WEAPONS.

*Be it ordained by the Board of Aldermen of the City of Huntsville. Missouri, as follows:*

SECTION 1.   If within the city any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under militia law of the state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weap-

Case 8:21-cv-01736-TDC   Document 59-46   Filed 12/30/22   Page 4 of 5

FIRE-ARMS.                          59

on, or shall, in the presence of one or more persons, exhibit any such
weapon in a rude, angry or threatening manner, or shall have or
carry any such weapon upon or about his person when intoxicated or
under the influence of intoxicating drinks, he shall be deemed guilty
of a misdemeanor, and, upon conviction thereof, shall be punished by
a fine of not less than five nor more than one hundred dollars, or by
imprisonment in the city prison not exceeding thirty days nor less
than five days or by both such fine and imprisonment; provided, the
Mayor may grant permisson to any person to discharge gun, pistol or
other fire-arms under proper circumstances shown to him.

SECTION 2.  The next preceding section shall not apply to police
officers, nor to any officer or person whose duty it is to execute process
or warrants, or to suppress breaches of the peace, or to make arrests,
nor to persons moving or traveling peaceably through this state; and
it shall be good defense to the charge of carrying such weapon, if the
defendant shall show that he has been threatened with great bodily
harm, or had good reason to carry the same in the necessary defense
of his home, person or property.

SECTION 3.  This ordinance shall take effect and be in force from
and after its passage, approval and publication.

S. G. RICHESON,
Pres. of the Board of Aldermen.

Approved July 17, 1894.

Attest:                                    S. G. RICHESON, Mayor.
J. A. HEETHER, Clerk.

————o————

AN ORDINANCE IN RELATION TO THE USE OF FIRE-ARMS.

*Be it ordained by the Board of Aldermen of the City of Huntsville,
Missouri, as follows:*

SECTION 1.  It shall be unlawful for any person to discharge or
fire off any gun, pistol or other fire-arm or other explosive within the
city limits, unless by written permission of the Mayor.

SECTION 2.  Nothing in the preceding section shall be construed
as applying to officers in the discharge of their duties, licensed shoot-
ing galleries, or military funerals.

SECTION 3.  Any person violating the provisions of this ordinance
shall be deemed guilty of a misdemeanor, and upon conviction shall be
punished by a fine in any sum not exceeding one hundred dollars.

Case 8:21-cv-01736-TDC   Document 59-46   Filed 12/30/22   Page 5 of 5

60              THE REVISED ORDINANCES.

SECTION 4.   This ordinance shall take effect and be in force from and after its passage, approval and publication.

S. G. RICHESON,
Pres. of the Board of Aldermen.

Approved July 17, 1894.

Attest:                               S. G. RICHESON, Mayor.
   J. A. HEETHER, Clerk.

———o———

## AN ORDINANCE IN RELATION TO DISTURBANCES OF THE PEACE.

*Be it ordained by the Board of Aldermen of the City of Huntsville, Missouri, as follows:*

SECTION 1.   If any person or persons within the city shall wilfully disturb the peace of any neighborhood, or any family or of any person by loud and offensive or indecent conversation, or by threatening, quarreling, challenging or fighting, every person so offending shall upon conviction, be adjudged guilty of a misdemeanor and punished by a fine in any sum not exceeding one hundred dollars, or by imprisonment in the city prison not exceeding thirty days.

SECTION 2.   This ordinance shall take effect and be in force from and after its passage, approval and publication.

S. G. RICHESON,
Pres. of the Board of Aldermen

Approved July 17, 1894

Attest:                               S. G. RICHESON, Mayor.
   J. A. HEETHER, Clerk.

———o———

## AN ORDINANCE IN RELATION TO ASSAULTS AND BATTERIES.

*Be it ordained by the Board of Aldermen of the City of Huntsville, Missouri, as follows:*

SECTION 1.   Any person who shall within the city assault or beat or wound another, under such circumstances as not to constitute any felonious assault, shall upon conviction be deemed guilty of a misde-

JA626

# LOCAL ACTS

OF

# THE LEGISLATURE

OF THE

## STATE OF MICHIGAN

PASSED AT THE

## REGULAR SESSION OF 1895

WITH AN APPENDIX



## BY AUTHORITY

EXHIBIT
**43**

LANSING
ROBERT SMITH & CO., STATE PRINTERS AND BINDERS
1895

USCA4 Appeal: 23-1719    Doc: 30-2        Filed: 08/21/2023    Pg: 155 of

tion (so called), and also all that part of said city lying and
being east of the east bank of the Au Sable river, be and the
same is hereby detached from the city of Au Sable, in said
county of Iosco, State of Michigan, and the same shall be, and
is hereby attached to the township of Au Sable in said county
and State aforesaid.   But the territory hereby detached shall Territory de-
not be relieved in any manner from its just share and propor- be relieved of
tion of the present legal bonded indebtedness of said city of its share of
Au Sable, together with interest thereon, and said indebted- indebtedness.
ness shall be apportioned in accordance with the provisions of
act number thirty-eight of the session laws of eighteen hun-
dred and eighty-three, approved April twenty-first, eighteen
hundred and eighty-three, entitled "An act to provide for the
adjustment of rights and liabilities on division of territory of
cities and townships," and acts amendatory thereof.

SEC. 2.   This act shall not be construed as nullifying or This act not to
repealing an act entitled "An act to incorporate the board of incorporating
education of the city of Au Sable," being act number two the board of
hundred and eighty-five of the local acts of eighteen hundred education.
and ninety-one, and the persons elected as members of such
board of education under the provisions thereof shall continue
to have and exercise all the duties, powers and jurisdictions
conferred upon them by the provisions thereof, within the ter-
ritory and district in which their jurisdiction now extends.

SEC. 3.   The matter of procedure in the matter of appor- Procedure in
tioning, levying and collecting taxes for the support of the taxes.
schools within said district, and for altering the boundaries
thereof, shall be the same as near as may be as is provided by
law in the case of fractional school districts.

Approved May 24, 1895.

------

[ No. 436. ]

AN ACT to amend an act entitled "An act supplemental to
the charter of the city of Detroit, and relating to parks,
boulevards and other public grounds in said city, and to
repeal act number three hundred and seventy-four of the
local acts of eighteen hundred and seventy-nine, entitled
'An act to provide for the establishment and maintenance of
a broad street or boulevard about the limits of the city of
Detroit and through portions of the townships of Ham-
tramck, Greenfield and Springwells, in the county of Wayne,'
approved May twenty-one, eighteen hundred and seventy-
nine," as amended by act number four hundred and fifteen
of the local acts of eighteen hundred and ninety-three,
approved May twenty-ninth, eighteen hundred and ninety-
three, by amending sections six, seven and fourteen thereof,
and to add to said act twenty new sections to stand as sec-
tions thirty-two, thirty-three, thirty-four, thirty-five, thirty-

592                  LOCAL ACTS, 1895.—No. 436.

six, thirty-seven, thirty-eight, thirty-nine, forty, forty-one, forty-two, forty-three, forty-four, forty-five, forty-six, forty-seven, forty-eight, forty-nine, fifty and fifty-one of said act.

**SECTION 1.** *The People of the State of Michigan enact,* That an act entitled "An act supplemental to the charter of the city of Detroit, and relating to parks, boulevards and public grounds in said city, and to repeal act number three hundred and seventy-four of the local acts of eighteen hundred and seventy-nine, entitled 'An act to provide for the establishment and maintenance of a broad street or boulevard about the limits of the city of Detroit and through portions of the townships of Hamtramck, Greenfield and Springwells, in the county of Wayne,' approved May twenty-one, eighteen hundred and seventy-nine," as amended by act number four hundred and fifteen of the local acts of eighteen hundred and ninety-three, approved May twenty-nine, eighteen hundred and ninety-three, be amended by amending sections six, seven and fourteen thereof, and by adding twenty new sections to stand as sections thirty-two, thirty-three, thirty-four, thirty-five, thirty-six, thirty-seven, thirty-eight, thirty-nine, forty, forty-one, forty-two, forty-three, forty-four, forty-five, forty-six, forty-seven, forty-eight, forty-nine, fifty and fifty-one, to read as follows:

*Act amended and sections added.*

**SEC. 6.** The commissioners shall have the control and management, and shall have charge of the improvement of all the parks and public grounds of said city, including the island park (known as "Belle Isle park"), and of such parks or public grounds as may hereafter be acquired, laid out, purchased or dedicated for public use in said city. And they shall likewise have control, management and charge of the improvement and maintenace of the boulevard, which was laid out and established as provided by the (said) act creating said board of boulevard commissioners, and of any other boulevard which may at any time be hereafter acquired, laid out, established or located by said city. The authority hereby conferred shall not be construed as giving charge or control to said commissioners over and to the improvement of any ordinary public street or alley. When the estimated cost of any work or improvement ordered by said commissioners shall exceed the sum of one thousand dollars, the same shall be done by contract, after advertisements for bids in at least two daily papers, printed in said city, for at least seven days.

*Commissioners to have control, management, and charge of improvements of all parks and public grounds.*

*When improvements to be done by contract.*

**SEC. 7.** The said commissioners may make all needful rules and regulations for the management, maintenance and care of the said parks, public grounds and boulevard or boulevards, and for the regulation thereof, and the common council of said city may provide by ordinance for the observance of the same, and may also in like manner provide for the observance and enforcement of any other rules and regulations duly made by said commissioners under any of the provisions of this act. And said common council may by ordinance further provide for the preservation and protection of the parks, public grounds

*May make rules and regulations for maintenance and care of.*

*Protection of.*

JA629

USCA4 Appeal: 23-1719     Doc: 30-2     Filed: 08/21/2023     Pg: 157 of

LOCAL ACTS, 1895.—No. 436.                    593

and boulevards, and any of the property in charge of said commissioners against any destruction or injury, and prevent the destruction or injury to or the taking of any trees, shrubs, plants, flowers or other things set out, planted or used by said commissioners in beautifying, improving or ornamenting said parks, public grounds or boulevards, and to prevent any disorder or disturbance on or about said parks, public grounds or boulevards, or any encroachment thereon or interference with the quiet and peaceable use and enjoyment of the same for the purpose for which the same are established and maintained. Said ordinances may provide for the punishment for any breach or violation of any of their provisions by like penalties provided for violation of ordinances of said city. The commissioners of metropolitan police for the city of Detroit, upon the request of said commissioners of parks and boulevards, shall detail for service in any of the grounds under the charge of said park and boulevard commissioners, so many of the police force as may be necessary to maintain order and protect the property thereon, and any policeman on duty on said grounds may remove therefrom any person who may violate any of the rules and regulations of said commissioners, or any of the ordinances of said city, adopted as aforesaid, relating to said parks, public grounds or boulevards: *Provided,* That said commissioners of parks and boulevards, may in lieu of such detail by said commissioners of metropolitan police, appoint as many persons as may be necessary to maintain order and protect the property on any of the grounds, under the charge of the said park and boulevard commissioners, and such persons so appointed shall have all the powers of regularly appointed policemen of said city in and upon said grounds, but not elsewhere. *Police commissioner to detail police to maintain order and protect property on request.*

SEC. 14.   The grounds of which said commissioners may have control shall be used and enjoyed solely for the purposes for which they were established: *Provided,* That privileges for the hiring of boats and vehicles and other like purposes such as are usual in public parks may be let by the commissioners for a period not exceeding three years, but the same shall be exercised and permitted only upon the same being subject to their supervision and direction, and to such orders, rules and regulations as the said commissioners may make at any time: *Provided further,* That said commissioners may prohibit the construction, use and maintenance of any and all railway or tramway cars, tracks, engines or motors on Belle Isle park, or other city park or boulevard. *To be used for purpose for which they were established. Proviso. Further proviso.*

SEC. 32.   No person shall bring, drive or lead any swine, goat, cattle or any other animal other than horses or other beasts of burden in, on or along the boulevard, Belle Isle or any other parks or public grounds in charge of the commissioners of parks and boulevards; and no person shall lead any horse, mule or other animal on said boulevard or the driveways of either of said parks, or draw a second carriage, wagon or other vehicle with any horse or other motive power, nor drive thereon any *Driving or leading any swine, goat or cattle on or along boulevard or parks prohibited.*

75

USCA4 Appeal: 23-1719     Doc: 30-2     Filed: 08/21/2023     Pg: 158 of

594                         LOCAL ACTS, 1895.—No. 436.

horse, before any sleigh or sled, unless there shall be a sufficient number of bells attached to harness of such horse, or to such sleigh or sled to warn persons of their approach.

**Driving or speeding.**
SEC. 33.   No person shall ride or drive in said park or along said boulevard at a rate of speed exceeding eight miles per hour, excepting that horses may be speeded on such parts of said boulevard or Belle Isle park as may be set apart by said commissioners for that purpose, and then only under such regulations as the commissioners may prescribe.

**Riding, driving, or drawing any velocipede, bicycle, hand-cart, horse or animal on the walks, etc., prohibited.**
SEC. 34.   No person shall ride, drive or draw any velocipede, bicycle, tricycle, wheelbarrow, handcart or any other vehicle, or any horse or other animal on the footwalks or sidewalk, grass plots or planting places of said parks or boulevard, or upon any other part or portion thereof, excepting upon the carriage drives; and no person shall permit any vehicle or animal to stand upon such roadways or carriage drives to the obstruction of the way or inconvenience of travel, and no person shall solicit passengers for hire on either of said park or boulevard, excepting by direction or permission of said commissioners.

**Not to tie any animal to trees, shrubs, electric light tower or lamp post.**
SEC. 35.   No person shall tie any animal to any tree or shrub, electric light tower, lamp post, fire hydrant, or dock or building in said park or boulevard, nor pluck, break, trample upon or interfere with any grass, flower, plant or shrub in any of said parks or boulevards, or climb, peel, cut, deface, remove, injure or destroy any tree or shrub in any public park or boulevard, or pasture any animal on the grass in any of said parks or boulevards, and no person shall stand, walk or lie upon any part of any public park or boulevard laid out and appropriated for shrubbery or for grass when there shall have been placed thereon a sign having the words, ''Keep off the grass,'' or other similar words thereon.

**No heavy traffic permitted.**
SEC. 36.   No heavy traffic shall be permitted on said boulevard or any of said parks, and no person shall drive any wagon, cart, dray, truck or other vehicle for the carrying of or laden with merchandise, manure, coal, wood or building material of **Proviso.** any kind: *Provided,* That where there is no alley or side street by which premises fronting on the boulevard can be reached, trucks and such heavy vehicles carrying goods, merchandise or other articles to or from any house or premises abutting on the boulevard shall be permitted to enter thereon at the cross street nearest said house or premises in a direction in which the same are moving, and deliver or receive such goods, merchandise or articles, but shall not proceed thereon **Further proviso.** further than the nearest cross street thereafter: *Provided further,* That nothing in this section shall prevent the driving of milk wagons and ordinary light grocery or meat delivery wagons, along the boulevard for the accommodation of residents thereon.

**Not to cut, break or injure any property, or post notices.**
SEC. 37.   No person shall cut, break or in any way injure any electric light tower, lamp post, fence, bridge, dock, building, fountain or other structure or property in or upon any of said parks or boulevards, and no person shall post or fix any

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg: 159 of

LOCAL ACTS, 1895.—No. 436.                    595

notice or bill or other writing or printing on any tree, tower, lamp post, hydrant, curbstone, coping, flagstone, fence, dock, bridge, wall, building or other place under the charge or control of said commissioners.

SEC. 38.   No person shall drive any vehicle displaying any placard or advertisement of any kind along said boulevard or on or along the driveway of any of said parks, nor shall any person display any placard or any advertisement of any kind on or upon or along the said boulevard or any of the said parks for advertising only. <span style="font-size:small">Not to drive any display advertisement or placards along the parks or boulevards.</span>

SEC. 39.   No person shall dig, remove or carry away any sward, sand, turf or earth in or from any public park, or boulevard, and no person shall open or dig up or tunnel under any part or portion of the boulevard without a permit from the commissioners of parks and boulevards, and before granting any such permit the applicant therefor shall be required to deposit with the secretary of said commissioners such sum of money as the superintendent of the boulevard or such other officer as the commissioners may designate for that purpose, shall estimate, will fully cover any expense to be incurred by the commissioners in connection with such opening or tunneling, and the commissioners may make suitable regulations and conditions with respect to issuing said permits.   And said commissioners may retain the actual expense, which shall be certified by the superintendent, which may be incurred by the commissioners in connection with any work done by them, for the purpose of restoring any roadway, sidewalk, planting place or other portion of said boulevard, and the secretary shall refund to the person to whom said permit shall be issued the difference, if any, between the amount deposited and the amount so certified by the superintendent.   Carriage or driveways and footwalks connecting with any premises adjoining the boulevard, or hitching posts thereon, shall be allowed only on a permit issued under this section, and the material used in making such ways, walks or posts shall be determined by the said commissioners. <span style="font-size:small">Not to dig, remove or carry away any sward, sand or turf from parks.</span>

SEC. 40.   No person shall place or deposit any dead carcass, ordure, filth, dirt, stone, ashes, garbage or rubbish of any kind, or other matter or substance on the said boulevard, or of any of said public parks, and no person shall wade into or throw any wood, sand, stone, or other substance into any basin, pool, lake or fountain in any public park, or bathe or fish in any of the waters thereon, except on Belle Isle park, where persons may bathe and swim, but only under such restrictions and conditions as may be prescribed by the commissioners of parks and boulevards; and no person shall send or ride any animal into same, nor shall any person kill, molest or disturb any fish, fowl or animals kept thereon. <span style="font-size:small">Not to deposit dead carcasses, filth, dirt, stones, etc., on the boulevard or parks.</span>

SEC. 41.   No person shall build or place any fence, or other barrier around any grass plot or planting place on said boulevard or public park, or place any building or obstruction of any kind thereon. <span style="font-size:small">Not to build any fence or barrier around grass plots or planting place.</span>

SEC. 42.   No person shall play at any game whatever in or upon said boulevard, or on any of the said parks, under the <span style="font-size:small">Not to play certain games.</span>

USCA4 Appeal: 23-1719     Doc: 30-2          Filed: 08/21/2023      Pg: 160 of

596                              LOCAL ACTS, 1895.—No. 436.

**Proviso.** charge of the said commissioners: *Provided, however,* That ball, cricket, lawn tennis and other like games of recreation may be played upon such portions of said parks as may be designated from time to time by the commissioners and under such rules and regulations as may be prescribed by them.

**Not to engage in sport liable to frighten horses.** SEC. 43.   No person shall engage in any sport or exercise upon said boulevard or park as shall be liable to frighten horses, injure travelers, or embarrass the passage of vehicles thereon.

**Not to discharge firearms or fireworks.** SEC. 44.   No person shall fire or discharge any gun or pistol or carry firearms, or throw stones or other missiles within said park or boulevard, nor shall any person fire, discharge or set off any rocket, cracker, torpedo, squib or other fireworks or things containing any substance of any explosive character on said park or boulevard, without the permission of said commissioners, and then only under such regulations as they shall prescribe.

**No person shall expose or offer any article or thing for sale, play any musical instrument, etc., without permission of commissioners.** SEC. 45.   No person shall expose any article or thing for sale or do any hawking or peddling in or upon said parks or boulevard, and no person, without the consent of said commissioners, shall play upon any musical instrument, or carry or display any flag, banner, target or transparency, nor shall any military or target company, or band or procession parade, march, drill or perform any evolution, movement or ceremony within any of said parks, or upon or along said boulevard, without the permission of said commissioners, and no person shall do or perform any act tending to the congregating of persons on said boulevard or in said parks.

**Gambling and disorderly conduct.** SEC. 46.   No person shall gamble, nor make any indecent exposure of himself or herself, nor use any obscene language, or be guilty of disorderly conduct, or make, aid, countenance or assist in making any disorderly noise, riot, or breach of the peace, within the limits of the said parks or boulevards; and **Intoxicating liquors.** no person shall sell or dispose of any intoxicating liquors in or upon any public park without the consent of the said commissioners.

**All boats, carriages, railroad cars, and vehicles running for hire to be licensed.** SEC. 47.   All boats and vessels, carriages, railroad cars and other vehicles running for hire to and from said Belle Isle park, or any other park, shall be duly licensed and shall be subject to all the rules and regulations that may be established by said commissioners or by the common council from time to time, and no person shall carry on the business of carrying passengers to and from either of said parks unless their vehicles shall be so licensed. And no person commanding or having charge of any boat, carrying passengers for hire shall land or permit any passengers thereform to land at any dock on Belle Isle park, excepting such as may be designated for that purpose by the commissioners, and no person having charge of any vessel shall fasten or tie the same at any wharf or dock in Belle Isle park, excepting for the purpose of receiving or discharging passengers as permitted by this section.

SEC. 48.   No person shall place or deposit or allow to be placed or keep or deposit on any part of said boulevard any

LOCAL ACTS, 1895.—No. 436. 597

building material without the written permission of said commissioners, which permit shall state the space to be occupied and the length of time during which said permit shall be in force, and every person having use of any portion of said boulevard for the purpose of erecting or repairing any building or for placing or keeping any building material or any other article or thing thereon which shall cause any obstruction to travel thereon or render the same in any respect dangerous to travelers thereon, shall cause two red lights to be placed in conspicuous places, one at the end of said obstruction, from sunset until sunrise in the morning of each day during the time such obstruction shall remain, and shall also construct and maintain proper safeguards, and a good and safe plank sidewalk around such obstruction, which sidewalk shall be at least two feet wide, and no such permit shall be granted under this section unless in the application therefor the party applying shall agree to indemnify the city against all liability from injury to any person or property arising from such obstruction. *[margin: Not to deposit building material on any part of boulevard without written permission of commissioners. Red lights to be placed in conspicuous places.]*

SEC. 49. No person shall conduct or permit any funeral procession or hearse to be driven upon the boulevard: *Provided*, That nothing herein contained shall be construed to prevent the removal of any corpse from any house abutting upon said boulevard, and the forming of the funeral procession thereon, but the hearse or procession shall not proceed further thereon than the nearest paved cross street in the direction in which said hearse shall move. *[margin: Funeral processions not to drive on boulevard. Proviso.]*

SEC. 50. No person shall remove any house or building on, along or across the boulevard, except on the written permission of said commissioners, which shall be issued only upon such terms and conditions, and under such regulations as they may prescribe, and upon a deposit with the secretary of said commissioners of such sum as may be fixed by said commissioners, and as they shall estimate will fully cover all damages to walks, roadways, grass plots, trees and other property and improvements of said boulevard, and said permit shall be issued only upon the express condition that said moving shall be commenced and completed between the hours of one and six o'clock in the forenoon, and the occupancy of the said boulevard shall continue only between said hours and after said moving shall have been completed, the roadway, grass plot, walks and other property and improvements shall be restored to their former condition by the said commissioners or under the supervision of their superintendent, and their superintendent shall thereupon certify to the secretary the actual expense incurred in such restoration, and the secretary shall refund to the person to whom said permit shall be issued the difference, if any, between the amount deposited and the amount so certified by the superintendent. *[margin: Not to remove any house or building on or along the boulevard without written permission of commissioner.]*

SEC. 51. Any violation of the provisions of this act shall be punished in the recorder's court by a fine not to exceed one hundred dollars and costs, and, in the imposition of any fine and costs, the court may make a further sentence, that the offender be imprisoned in the Detroit House of Correction *[margin: Penalty for violation.]*

598                          LOCAL ACTS, 1895.—No. 437.

---

until the payment of such fine, for any period of time not exceeding six months.

This act is ordered to take immediate effect.

Approved May 24, 1895.

---

[ No. 437. ]

AN ACT to amend sections two, five, seven and eleven of act number three hundred eighty-three of the local acts of eighteen hundred ninety-three, entitled "An act to provide for the election of two justices of the peace and for the appointment of a justice clerk in and for the city of Saginaw, and to define their jurisdiction and to fix their compensation; and to abolish and discontinue the five offices of justice of the peace of said city, upon the expiration of the terms of the present incumbents thereof; and to provide for the filing of the files, records and dockets belonging to or appertaining to the offices abolished and discontinued, and for the issuance of executions upon judgments appearing on said dockets and to repeal all provisions of the charter of the city of Saginaw and of all other acts or parts of acts in any wise contravening the provisions of this act," approved May thirteenth, eighteen hundred ninety-three.

*Sections amended.*

SECTION 1. *The People of the State of Michigan enact,* That sections two, five, seven and eleven of act number three hundred eighty-three of the local acts of eighteen hundred ninety-three, entitled "An act to provide for the election of two justices of the peace, and for the appointment of a justice clerk in and for the city of Saginaw, and to define their jurisdiction and to fix their compensation, and to abolish and discontinue the five offices of justices of the peace of said city, upon the expiration of the terms of the present incumbents thereof, and to provide for the filing of the files, records and dockets belonging to or appertaining to the offices abolished and discontinued, and for the issuance of executions upon judgments on said dockets, and to repeal all provisions of the charter of the city of Saginaw and of all other acts or parts of acts in any wise contravening the provisions of this act," approved May thirteenth, eighteen hundred ninety-three, be amended so as to read as follows:

*Justices to have same jurisdiction as justices of townships.*

*Jurisdiction of civil cases.*

SEC. 2.   The said justices of the peace for the city of Saginaw shall have the same jurisdiction and powers and perform the same duties as are now exercised and performed, or may at any time hereafter be conferred by law upon justices of the peace for townships, together with jurisdiction in civil cases, where either of the parties to any such action reside in the county of Saginaw, and such further jurisdiction as may be provided by statute.   In cases of examination of offenders by either of said justices, for offenses committed against the crim-

JA635

# A DIGEST

OF THE

# LAWS AND ORDINANCES

FOR THE GOVERNMENT OF THE MUNICIPAL CORPORATION OF THE

## CITY OF READING, PENNSYLVANIA,

IN FORCE APRIL 1, 1897.



[PUBLISHED BY AUTHORITY OF THE CITY COUNCILS.]

COMPILED BY LOUIS RICHARDS.

READING, PA.:
EAGLE BOOK PRINT, 542 PENN STREET.
1897.


Digitized by Google

JA636

USCA4 Appeal: 23-1719     Doc: 30-2        Filed: 08/21/2023     Pg: 16

CITY PARK.                    239

law authorizing cities of this commonwealth to acquire by pur- | 2 April 1896.
chase, or otherwise, private property for public park purposes.[1]

15. That the Mount Penn Gravity Railroad Company be and | 7 May 1889 § 1. J. 1889-90, App. 266.
is hereby granted the right to occupy a portion of the northeast
section of Penn's Common with their railroad and station ap- | Right of way granted to Mount Penn Gravity R. R. Company.
purtenances, and also the right to cross the Mineral Spring
property of the city of Reading with their railroad track.

16. That the right to occupy Penn's Common is granted sub- | Id. § 2.
ject to the control and management of the common commis- | Conditions.
sioners, and the right to cross the Mineral Spring property is
granted subject to the control and management of the water
commissioners.

17. That the rights herein are granted to the said railroad | Id. § 3.
company for the purpose of constructing, maintaining and op- | Purpose.
erating a gravity railroad, and shall continue during the cor-
porate existence of the said company.

18. The employees of the water and park departments shall | 5 Feb. 1894 § 2. J. 1893-94, App. 632.
and are hereby directed to be paid semi-monthly, by pay roll,
to be approved by the proper departments or committees ; said | Mode of payment of employees of park and water departments.
pay roll to contain name of person, kind and time of service,
rate per day, amount due, and a receipt to be signed by the
person receiving the amount set opposite his name, and shall be
prepared and certified by the superintendent of each of said de- | Pay rolls to be certified by superintendent.
partments to the city clerk and city controller.

19. Upon presentation to the city clerk of pay rolls properly | Id. § 3.
certified and approved as beforementioned, the city clerk shall | How warrants to be drawn and moneys disbursed.
and he is hereby directed to draw warrants as follows : * * *
* * * For the park department, "to the order of the super-
intendent."

Said officials to dispose of the money in the manner indicated
on the pay roll, and to be responsible for the proper disburse-
ment of the same.[2]

### II. Park Rules and Regulations.

20. That the following rules and regulations be and are hereby | 30 Dec. 1887 § 1. J. 1887-88, App. 339.
established as the rules and regulations for the government and
protection of Penn's Common, viz.:

(1) No person shall drive or ride in Penn's Common at a | Limit of speed.
rate exceeding seven miles an hour.

(2) No one shall ride or drive therein, upon any part of the | Driving confined to roads.
common, than upon the avenues and roads.

(3) No vehicle of burden or traffic shall pass through the | Vehicles of burden.
common.

(4) No person shall enter or leave the common except by | Entrance and exit.
such gates or avenues as may be for such purposes arranged.

(5) No coach or vehicle used for hire shall stand upon any | Coaches for hire.
part of the common for the purposes of hire.

(6) No person shall indulge in any threatening, abusive, in- | Threatening language, etc.
sulting or indecent language in the common.

---

[1] See the ordinance of October 1, 1889 (Jour. 1889-90, App. 294), forever exempting from being paved a triangular piece of ground at the intersection of Centre Avenue, Third and Windsor Streets, 108 feet on Third and 51 feet on Windsor Street, deeded by the owners to citizens of the vicinity for conversion into a park : "*Provided*, That it be sodded and laid out with walks of proper width, and that it be improved and beautified and kept as a park."

[2] By the resolution of May 14, 1889, the common commissioners were requested to see that all persons employed at the park are residents and taxpayers of the city, and to give such as were willing to earn off their taxes preference when they apply for work. Jour. 1889-90, App. 333.

Digitized by Google

240                         CITY PARK.

30 Dec. 1887.        (7) No person shall engage in any gaming, nor commit any
Gaming and       obscene or indecent act in the common.
obscenity.

Firearms, etc.       (8) No person shall carry firearms, or shoot in the common,
or within fifty yards thereof, or throw stones or other missiles
therein.

Disturbance of       (9) No person shall disturb the fish or water fowl in the pool
fish, birds or   or pond, or birds in any part of the common, or annoy, strike,
animals.         injure, maim or kill any animal kept by direction of the commis-
Fireworks.       sioners, either running at large or confined in a close, nor dis-
Placards.        charge any fireworks, nor affix any bills or notices therein.

Injury to trees,     (10) No person shall cut, break, or in any wise injure or de-
shrubbery,       face the trees, shrubs, plants, turf or any of the buildings,
statuary, etc.   fences, bridges, structures or statuary, or foul any fountains or
springs within the common.

Dead animals,       (11) No person shall throw any dead animal or offensive
etc.             matter or substance of any kind within the boundaries of Penn's
Common.

Animals at          (12) No person shall turn cattle, goats, swine, horses, dogs
large.           or other animals loose into the common.  Nor shall they be
permitted in or around the common, unless accompanied by
the owner ; and whether accompanied by the owner or not, if
any of said animals are found running at large in and about the
said common, it shall be lawful for, and the park watchman
or any of his assistants shall have full power and authority to
impound them, or any of them, and if the said animals or any
Impounding       of them are not called for by their respective owners within
and disposition  forty-eight hours after the impounding of the same, it shall be
of estrays.      lawful for the city authorities to sell and dispose of the said
animals or kill the same.[1]

Tearing down        (13) No person shall injure, deface or destroy any notices,
notices.         rules or regulations for the government of the common, posted
or in any other manner permanently fixed by order or permis-
sion of the commissioners of Penn's Common, within the limits
of the same.

Leading of          (14) No person shall be permitted to bring or lead horses
horses.          within the limits of Penn's Common, or a horse that is not
harnessed and attached to a vehicle, or mounted by an eques-
trian.

Fakirs.             (15) No person shall expose any article for sale within the
common, without the previous license of the commissioners.

Musical enter-      (16) No person shall have any musical, theatrical or other
tainments, etc.  entertainment therein, nor shall any military or other parade
Parades or fu-   or procession, or funeral, take place in or pass through the
neral proces-    limits of the common, without the license of the common com-
sions.           missioners.

Public meet-        (17) No gathering or meeting of any kind, assembled through
ings.            advertisement, shall be permitted in the common without the
previous permission of the commissioners.

Games of            (18) No person shall engage in any play at base ball, cricket,
sport.           shinney, foot ball, croquet, or at any other games with ball and
bat, nor shall [any] foot race or horse race be permitted within the
limits of the common, except on such grounds only as shall be
specially designated for such purpose.

---

[1] This rule amended as above by ordinance of June 26, 1895, Jour. 1895-96, App. 549.

Digitized by Google

CITY PARK—CLERKS OF COUNCILS.　　　241

21. Any person who shall violate any of said rules and regulations shall be guilty of a misdemeanor, and for each and every such offence shall pay the sum of five dollars, to be recovered before any alderman of the city of Reading, with costs, together with judgment of imprisonment not exceeding thirty days, if the amount of said judgment and costs shall not be paid, which fines shall be paid into the city treasury for common purposes.[1]

*30 Dec. 1887 § 2. Penalty.*

---

[1] These rules are supplemented by a series of additional regulations adopted by the board of park commissioners, June 14, 1895, prescribing the duties of the superintendent, gardener and park police.

## Clerks of Councils.

1. Election of clerk of select council.
2. Term.
3. Duties.

4. Salary.
5. Repeal.
6. Duties of clerk of common council.

1. That the office of clerk of select council be and the same is hereby established. Said clerk of select council to be elected on the day fixed for the organization of council, or as soon thereafter as practicable ; a majority of the votes cast shall be necessary for an election.

*9 Mar. 1891 § 1. J. 1890-91, App. 352. Election of clerk of select council.*

2. The term of office of the said clerk shall be one year, or until his successor shall have been duly elected and qualified.

*Id. § 2. Term.*

3. That it shall be the duty of the said clerk to keep a regular and accurate journal of the acts and proceedings of the said branch and prepare the same for printing, together with a calendar of unfinished business at each stated meeting ; he shall also act as clerk of councils in joint convention.

*Id. § 3. Duties.*

4. That the salary of the clerk of select council shall be three hundred dollars per annum, payable as the salaries of other city officials are payable.[1]

*Id. § 4. Salary.*

5. That the ordinance, entitled "An ordinance defining the duties and fixing the bond and salary of the clerk of select council," approved by the mayor December 24th, 1875, and any other ordinance or ordinances, or part of ordinance or ordinances conflicting with the provisions of this ordinance, be and the same are hereby repealed so far as the same affects this ordinance.

*Id. § 5. Repeal.*

6. It shall be the duty of the clerk of the common council to keep a regular and accurate journal of the proceedings of said branch and prepare the same for printing, together with a calendar of unfinished business at each stated meeting.[2]

*31 Dec. 1875 § 1. J. 1875-76, App. 247. Duties of clerk of common council.*

---

[1] By Section 4 of the act of March 21, 1865, creating the Reading Water Board (*ante*, p. 136), the clerk of select council is *ex-officio* secretary of that body. His annual salary in that capacity is three hundred and sixty dollars.

[2] The annual salary of the clerk of common council remains at two hundred and fifty dollars, as fixed by the salary ordinance of February 17, 1877, (Jour. 1876-77, App. 188), those of all other officers therein named having been changed by subsequent legislation.

Digitized by Google

Case 6:Civo-o5736-TDC  Document 56-49  Filed 12/20/22  Page 1 of 4

# REVISED

# ORDINANCES

— OF THE —

# CITY OF BOULDER

Published by Authority of the City.

OSCAR F. A. GREENE,

COMPILER.

**EXHIBIT 45**

1899:
Printed by Ricketts & Kerr, at The News Office,
BOULDER, COLORADO.



MAR 11 1909

Case 6:21-cv-01736-TDC  Document 55+6  Filed 12/16/22  Page 2 of 4

thirty-two in township one north of range seventy west, is hereby named and shall hereafter be known as VALVER-DAN PARK.

**510. Washington Park.**

SEC. 5. That the city property in the west half of the south-west quarter of section twenty-five in township one north of range seventy-one west, shall be named and here-after known as WASHINGTON PARK.

## PARKS.

An Ordinance for the Protection of the Several Parks Belonging to the City and of the Buildings and Reservoirs and Trees and Other Improvements at and Within Said Parks, and to Pro-vide Penalties for Injuring the Same.

Passed October 4, 1898.

(With amendment as noted.)

**511. No firearms or shooting in.**

SECTION I. Any person other than the police officers of the city who shall take or carry or cause to be taken or carried into any of the parks belonging to the City of Boulder, any gun, pistol, revolver, or other firearm, or who shall shoot any firearm at or towards or over or into or upon any of said parks, shall be deemed guilty of a misdemeanor. (As amended August 2, 1899.)

**512. No powder or explosives in.**

SEC. 2. Any person who shall take or carry or cause to be taken or carried into any of said parks, any powder of any quality or kind or any explosive or dangerous or inflammable or combustible substance, shall be deemed guilty of a misdemeanor.

**513. No fires or explosives.**

SEC. 3. Any person who shall start any fire or cause or permit to be started any fire in any of said parks, not

Case 6:Doc:e5178c/DC  Document 6m6  Filed 12/26/22  Page 4 of 4

being thereunto first authorized by the Mayor, or who shall in any of said parks fire or explode any fire-crackers, torpedoes, or any other substance or thing containing powder or other explosive substance, shall be deemed guilty of a misdemeanor.

### 514. Injury to property.

SEC. 4.  Any person who shall deface, tear down, destroy or injure in any manner whatsoever any fence, building, furniture, seat, structure, excavation, post, bracket, lamp, awning, fire plug, hydrant, water pipe, tree, shrub, plant, flower, railing, bridge, culvert, or any other property whatsoever belonging to the city or to any private corporation or persons in, at or upon any of said parks, shall be deemed guilty of a misdemeanor.

### 515. Injury continued.

SEC. 5.  Any person who shall injure or damage in any manner whatsoever any property of the city at, in or upon any of said parks by cutting, hacking, bending, breaking, burning, daubing with paint or other substances, hitching of horses or other animals, or by means of fire, or by effecting such acts in any other manner, shall be deemed guilty of a misdemeanor.

### 516. Violation—Misdemeanor Penalty.

SEC. 6.  Any person upon conviction of any misdemeanor specified in any of the five preceding sections herein shall be fined not less than five and not more than three hundred dollars.

### PARKS.

An Ordinance in Relation to Cottages in Texado Park.
Passed April 17th, 1899.

WHEREAS, a contract was made on, to-wit, the 19th day of March, A. D. 1898, at Boulder, Colorado, by and

BY AUTHORITY OF THE LEGISLATIVE
ASSEMBLY.

———

# THE

# REVISED   STATUTES

OF

# ARIZONA  TERRITORY

CONTAINING ALSO

THE LAWS PASSED BY THE TWENTY-FIRST LEGISLATIVE
ASSEMBLY, THE CONSTITUTION OF THE UNITED
STATES, THE ORGANIC LAW OF ARIZONA
AND THE AMENDMENTS OF CON-
GRESS RELATING THERETO.

———

## 1901

———

COLUMBIA, MISSOURI
PRESS OF E. W. STEPHENS
1901

EXHIBIT
**46**

Generated on 2022-12-28 15:54 GMT  /  https://hdl.handle.net/2027/nyp.33433089076062
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

Title 11]                CRIMES AGAINST THE PUBLIC PEACE.                    1251

noise, or by tumultuous or offensive conduct, or by threatening, traducing, quarreling, challenging to fight or fighting, or who applies any violent or abusive or obscene epithets to another, is punishable by fine not exceeding two hundred dollars, or by imprisonment in the county jail for not exceeding two months.

**380.** If two or more persons assemble for the purpose of disturbing the public peace, or committing any unlawful act, and do not disperse on being desired or commanded so to do by a public officer, the persons so offending are severally guilty of a misdemeanor.

*Persons assembling to disturb the peace.*

**381.** Any person who shall, purposely or carelessly, discharge any gun, pistol or other firearm in any saloon, dance house, store or other public house or business house in this territory, thereby endangering the life or person of another, or thereby disturbing any of the inmates thereof, or who shall thereby injure, destroy or damage any property therein, or who shall discharge the same in any city, village or town of this territory, except in necessary self-defense, shall be fined in any sum not exceeding three hundred dollars, or be imprisoned in the county jail for a period not exceeding six months, or shall be punished by both such fine and imprisonment.

*Discharging guns in certain places.*

**382.** It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty), to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket-knife, not manufactured and used for the purpose of offense and defense.

*Certain arms not to be carried concealed.*

**383.** Any person violating any of the provisions of the preceding section shall be guilty of a misdemeanor, and may be arrested with or without a warrant, either in the day-time or night-time, and taken before the nearest justice of the peace for trial; and any peace officer who shall fail, neglect or refuse to arrest any such person on his own knowledge of the violation of said section, or upon the information from some credible person, or who shall appoint any person a deputy, not intended to be used in regular service, but as a mere pretext for the purpose of carrying a concealed weapon, shall be guilty of a misdemeanor.

*Penalty for carrying concealed weapons.*

*Arrest of violators.*

**384.** Any person found guilty of violating any of the provisions of the two preceding sections shall be punished by a fine of not less than five nor more than three hundred dollars, and shall forfeit to the county, such weapon or weapons.

*Punishment.*

**385.** If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in

*Carrying weapons concealed while in villages, etc.*

Generated on 2022-12-28 15:57 GMT / https://hdl.handle.net/2027/nyp.33433009076062
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by 

Original from
NEW YORK PUBLIC LIBRARY

USCA4 Appeal: 23-1719   Doc: 30-2        Filed: 08/21/2023       Pg: 173 of 396

Case 8:21-cv-01736-TDC   Document 59-50   Filed 12/30/22   Page 3 of 3

saddlebags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie-knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted the weapon or weapons so carried.

**Peace officers and militiamen may carry.**

**386.**   The preceding section shall not apply to a person in actual service as a militiaman, nor as a peace officer or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own premises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack upon legal process.

**Carrying certain weapons to church.**

**387.**   If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any election precinct, on the day or days of any election, where any portion of the people of this territory are called to vote at any election, or to any other place where people may be assembled to minister or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of a knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

**Peace officers not included.**

**388.**   The preceding section shall not apply to peace officers or other persons authorized or permitted by law to carry arms at the places therein designated.

**Violators may be arrested, how.**

**389.**   Any person violating any of the provisions of sections 384 and 385 may be arrested without warrant by any peace officer and carried before the nearest justice of the peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by a fine not exceeding three hundred dollars.

**Travelers may carry arms, when.**

**390.**   Persons traveling may be permitted to carry arms within settlements or towns of the territory, for one-half hour after arriving in such settlements or towns, and while going out of such towns or

Generated on 2022-12-28 15:56 GMT  /  https://hdl.handle.net/2027/nyp.33433009076662
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

 Digitized by Google          Original from
NEW YORK PUBLIC LIBRARY

# GENERAL  LAWS.

## CHAPTER I.

An Act to repeal Sections 3698 and 3699 of the Political Code of the State of Montana, relating to the Board of Appraisers of real estate.

*Be it Enacted by the Legislative Assembly of the State of Montana*:

Section 1.   That Sections 3698 and 3699 of the Political Code of the State of Montana be, and the same are hereby repealed.

Sections  3698 and 3699  Political Code repealed.

Section 2.   All Acts and parts of Acts in conflict with the provisions of this Act are hereby repealed.

Repealing clause.

Section 3.   This Act shall take effect and be in force from and after its passage and approval.  ·

When act takes effect.

Approved Feby 6th 1903

## CHAPTER II.

"An Act Entitled An Act to Amend Sections six and seven of an act to Provide for the Appointment of a Board of Sheep Commissioners, and to define their powers and duties.   Approved March 5, 1897."



**EXHIBIT 47**

*Be it Enacted by the Legislative Assembly of the State of Montana*:

Section 1.   That Section six of an act entitled "An Act to Provide for the Appointment of a Board of Sheep Commissioners and to Define their Powers and Duties, approved March 5, 1897," shall be amended to read as follows:

Section 6 of Act to provide for Board of Sheep Commissioners approved March 5th, 1897, amended.

Section 6.   The Board must make an annual report

Annual report.

JA647

CHAPTER XXXV—ACTS 1903                    **49**

## CHAPTER XXXV.

An Act to prohibit unlawful carrying of concealed
weapons, to provide penalties for violations of this
act and to define the meaning of the term concealed
weapons.

*Be it Enacted by the Legislative Assembly of the State of*
*Montana:*

### Section 1.

Any person in this State who shall carry concealed
or partially concealed on or about his person any re-
volver, pistol, dirk, dagger, slung shot, sword cane, or
knuckles made of any metal or any hard substance
shall be deemed guilty of a misdemeanor and shall
be punished by a fine of not less than twenty five nor
more than two hundred dollars, or by imprisonment in
the County jail not less than ten nor more than thirty
days, or by both such fine and imprisonment.

*Carrying weapons concealed or partially concealed about person.*

*Penalty.*

### Section 2.

The preceeding section shall not apply to a person
in actual service as a militiaman, nor to a police officer
or policeman, or person summoned to his aid nor to a
revenue or other civil officer engaged in the discharge
of official duty, nor to the carrying of arms on one's
own premises, or place of business.

*Reservation.*

Section 3. If any person shall go into any church
or religious assembly, any school room or other
place where persons are assembled for amusement or
for educational or scientific purposes, or into any cir-
cus, show, or public exhibition of any kind, or into a
ball room, social party, or social gathering, or to any
election precinct or any place of registration, on the
day or days of any election or registration, where any
portion of the people of the State are collected to
register or vote at any election, or to any other place
where people may be assembled to perform any public
duty, or at any public assembly, and shall have or carry
concealed or partially concealed about his person a

*Carrying weapons in certain places.*

50                    CHAPTER XXXV—ACTS 1903

Penalty.

pistol or other firearm, dirk, dagger, slung shot, sword cane, knuckles, or bowie knife, he shall be punished by a fine of not less than fifty nor more than five hundred dollars.

## Section 4.

Reservation.

The preceding section shall not apply to peace officers or other persons authorized or permitted by law to carry arms at the places therein designated. "And any District Judge of any judicial district of the State of Montana, may, upon satisfactory proof being produced before him of the good moral character and peaceable disposition of any person, grant permission

Permit of District Judge.

to such person to bear concealed or otherwise a "pistol" or "revolver" for such a period of time as such judge may deem necessary."

## Section 5.

Arrest.

Any person violating any of the provisions of sections one and three of this act may be arrested without warrant by any peace officer and carried before the nearest justice of the peace for trial: and any peace

Peace officer failing to arrest.

officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some creditable person, shall be punished by a fine not ex

Penalty.

ceeding five hundred dollars.

## Section 6.

"Concealed weapon" defined.

The term concealed weapons shall be taken to mean any weapon mentioned in the foregoing sections which shall be wholly or partially covered by the clothing or wearing apparel of the person so carrying the weapon.

## Section 7.

Act not to apply to county designated by proclamation by Governor.

The provisions of this Act shall not apply to or be in force in any county which the governor may designate by proclamation as a frontier county and liable to incursions by hostile Indians.

JA649

# CITY OF TRENTON,

## NEW JERSEY.

---

# CHARTER AND ORDINANCES;

ALSO CERTAIN

ACTS OF THE LEGISLATURE RELATING

TO MUNICIPAL DEPARTMENTS,

AND

A TABLE OF CASES CITED IN THE FOOT NOTES.

---

Revised, Compiled and Published

BY ORDER OF THE COMMON COUNCIL.

---

**EXHIBIT 48**

TRENTON, N. J.:
THE JOHN L. MURPHY PUBLISHING CO., PRINTERS.
1903.

Digitized by Google

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023

390                              CITY OF TRENTON.

to the amount to be raised by taxes in said city; and said portion of the principal so raised shall be paid yearly to the sinking fund commission of the city of Trenton, to be used exclusively for the liquidation of said bonds; *provided, however,* that whenever the amount of moneys in the hands of said commission shall be sufficient for the redemption of said bonds, no further sums shall be raised by taxation.

**When to take effect.**

9. That this ordinance shall take effect immediately.

**An Ordinance providing for the government and protection of public parks and squares of the city of Trenton.**

**Vol. 6, p. 121.**                                  Approved June 26th, 1890.

*The Inhabitants of the City of Trenton do ordain:*

**Rate of speed for driving or riding.**

1. No one shall drive or ride in Cadwalader park at a rate exceeding seven miles an hour.

**Driving, where allowed.**

2. No one shall ride or drive in or upon any of the public squares of this city or upon any other part of said park than upon its avenues and roads.

**What vehicles not allowed in park.**

3. No vehicle of burden or traffic shall pass through said park.

**How persons shall enter.**

4. No person shall enter or leave said park or squares except by such gates or avenues as may be for such purpose arranged.

**Wagons not to stand in park for hire.**

5. No coach or vehicle used for hire shall stand upon any part of said park for the purpose of hire.

**No threatening language to be used.**

6. No person shall indulge in any threatening, abusive, insulting or indecent language in said park or squares.

**No obscene act to be permitted.**

7. No person shall engage in any gaming nor commit any obscene or indecent act in the said park or squares.

**No person to carry firearms.**

8. No person shall carry firearms or shoot birds in said park or squares, or within fifty yards thereof, or throw stones or other missiles therein.

**No person to annoy any of the animals.**

9. No person shall disturb the fish or water fowl in the pools, ponds or other waters, or birds in any part of said park or squares, or annoy, strike, injure, maim or kill any animal kept by direction of common council or the park committee thereof, either running at large or confined in a close, nor discharge any fireworks nor affix any bills therein.

**Not to deface trees or buildings.**

10. No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf, or any of the

Digitized by Google

SPECIAL ORDINANCES.—PARKS.                   391

outbuildings, fences, bridges, structures or statuary, or foul any fountains or springs within said park or squares.

11. No person shall throw any dead animal or offensive matter or substance of any kind into any pool, pond or other waters within the boundaries of said park or squares. **Not to throw any offensive matter in water.**

12. No person shall go into bathe within said park. **Bathing prohibited.**

13. No person shall turn cattle, goats, swine, horses, dogs or other animals loose in said park or squares. **No animals to go loose in park.**

14. No person shall injure, deface or destroy any notices, rules or regulations for the government of the said park or squares, posted or in any other way permanently fixed by order or permission of the common council or the park committtee thereof, within the limits of the same. **Notices not to be defaced.**

15. That for each and every violation of any of the foregoing provisions of this ordinance the person or persons so violating shall forfeit and pay a fine of ten dollars, to be enforced and collected according to law. **Penalty.**

### An Ordinance to name the Five Points "Monument Park."

*The Inhabitants of the City of Trenton do ordain:*

1. That the locality commonly known as the Five Points, being that portion of the city bounded and described by Pennington avenue on the north, Broad street on the east, the southerly line of the lands recently purchased by the city of Trenton for a public park, by an ordinance passed common council February twenty-first, one thousand eight hundred and ninety-three, entitled "An ordinance to authorize the purchase of lands for the purposes of a public park," on the south, and the line of North Warren street, on the west, shall be hereby designated and known as "Monument Park." **Ordinance of June 28th, 1898, Sec. 1, Vol. 6, p. 411.**

2. That all ordinances or parts of ordinances inconsistent herewith, be and the same are hereby repealed. *Ib., § 2.*

Digitized by Google

Chicago School of Civics
and Philanthropy.

AMENDMENTS TO

## "The Revised Municipal Code of Chicago of 1905"

(PASSED MARCH 20, 1905)

AND

# New General Ordinances

Passed by the City Council of the City of Chicago
Between March 20, 1905, and
December 31, 1906

Compiled and Arranged by
EDWARD J. PADDEN
Chief Clerk

PRINTED BY ORDER OF THE CITY COUNCIL

ADRIAN C. ANSON
City Clerk
Chicago, Illinois

EXHIBIT
49

DECEMBER, 1906

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2022-12-29 16:35 GMT  /  https://hdl.handle.net/2027/mdp.39015006990090
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

JA653

38                    AMENDMENTS, R. M. C. 1905.

Sections 1554 to 1569 *inclusive.* (*As amended April 7, 1906, pages 3454 to 3456, Council Proceedings.*)

## ARTICLE I.  (CHAPTER XLV.)

### PARKS, PUBLIC PLAY GROUNDS AND BATHING BEACHES.

**1554.  Bureau Established**].—There is hereby established a bureau of the Municipal Government to be known as the Bureau of Parks, Public Play Grounds and Bathing Beaches, which shall embrace the Superintendent of City Parks, Superintendent of Public Play Grounds and Bathing Beaches, the Secretary, and such other employees as the City Council may by ordinance provide.  Such Bureau shall be under the sole supervision and control of the Special Park Commission as constituted by a resolution of the City Council passed November 6, 1899, and amended November 27, 1899.

**1555.  Superintendent of City Parks—Duties**].—There is hereby created the office of Superintendent of City Parks.  He shall be under the immediate jurisdiction and control of the Special Park Commission, and shall have the management and control of all City Parks, Public Squares, and other open spaces at street intersections, subject to the supervision of said Commission, and he shall also perform such other duties as the said Commission shall direct.  He shall have full power, direction and control over all such employees as may be provided for by the City Council in connection with the improvement, maintenance and management of such Parks, Squares and other open spaces.

**1556.  Superintendent of Public Play Grounds and Bathing Beaches—Duties**].—There is also hereby created the office of Superintendent of Public Play Grounds and Bathing Beaches.  He shall be under the immediate jurisdiction and control of the Special Park Commission and shall have the management and control of all Public Play Grounds and Bathing Beaches, and of all matters pertaining to the administration, improvement, conduct and regulation thereof, subject to the supervision of said Commission; and shall also perform such other duties as the said Commission shall direct.  He shall have full power, direction and control over all such employees as may be provided for by the City Council in connection with the improvement, maintenance and management of such Public Play Grounds and Bathing Beaches.

**1557.  Secretary—Duties**].—There is also hereby created the office of Secretary of the Bureau of Parks, Public Play Grounds and

Generated on 2022-12-29 16:34 GMT  /  https://hdl.handle.net/2027/mdp.39015066996099
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from
UNIVERSITY OF MICHIGAN

JA654

40                    AMENDMENTS, R. M. C. 1905.

Ground or Bathing Beach of the City is enclosed, no person shall en-
ter or leave the same except by the gateways. No person shall climb
or walk upon the walls or fences thereof. Any of the entrances to
such Parks, Public Play Grounds or Bathing Beaches of the city may
be closed at any time by the direction of the officer or employee in
charge of same.

**1561. Animals Prohibited**].—No person shall turn or lead any
cattle, horses, goat, swine or other animals into any of such Parks,
Public Play Grounds or Bathing Beaches.

**1562. Firearms—Missiles**].—All persons are forbidden to carry
firearms or to throw stones or other missiles within any of the Parks,
Public Play Grounds or Bathing Beaches of the City, and all persons
are forbidden to cut, break or in any way injure or deface trees, shrubs,
plants, turf or any of the buildings, fences, bridges or other construc-
tion or property contained therein.

**1563. Peddling and Hawking Prohibited**].—No person shall ex-
pose any article or thing for sale within any such Parks, Public Play
Grounds or Bathing Beaches, nor shall any hawking or peddling be
allowed therein.

**1564. Indecent Words—Fortune Telling**].—No threatening,
abusive, insulting or indecent language shall be allowed in any part
of such Parks, Public Play Grounds or Bathing Beaches; nor shall
any conduct be permitted whereby a breach of the peace may be oc-
casioned; nor shall any person tell fortunes or play any game of chance
at or with any table or instrument of gaming, nor shall any person
commit any obscene or indecent act therein.

**1565. Bill Posting Prohibited**].—No person shall post or other-
wise affix any bills, notice or other paper upon any structure or thing
within any such Park, Public Play Ground or Bathing Beach belong-
ing to the city, nor upon any of the gates or inclosures thereof.

**1566. Prohibited Uses**].—No person shall play upon any musi-
cal instrument, nor shall any person take into, or carry or display in
any Park, Public Play Ground or Bathing Beach, any flag, banner,
target or transparency, nor shall any military company parade, drill,
or perform therein, any military or other evolutions or movements,
without a special permit from the Special Park Commission.

**1567. Bonfires**].—No person shall light, make or use any bonfire
in any such Park, Public Play Ground or Bathing Beach.

**1568. Grass**].—No person shall go upon the grass, lawn or turf

Generated on 2022-12-29 16:33 GMT  /  https://hdl.handle.net/2027/mdp.39015086990099
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

JA655

41                          AMENDMENTS, R. M. C. 1905.

of any of the City Parks, except when and where the word "common"
is posted, indicating that persons are at liberty at that time and place
to go on the grass.

**1569. Penalty**].—Any person who shall violate any of the pro-
visions in this article shall be fined not less than five dollars nor more
than one hundred dollars for each offense.

---

SECTION 1592.  (*As amended May* 21, 1906, *page* 415, *Council Pro-
ceedings.*)

**1592. Peddlers from Wagons—General Peddlers—Fish Peddlers
—Oil Peddlers—Wood Peddlers—License Fee**].—The fee to be charged
for a license to peddle from a wagon or other vehicle drawn or pro-
pelled by animal power other than that supplied by a human being or
drawn or propelled by mechanical power shall be fifty dollars per an-
num.  Such license shall entitle the licensee to use one such wagon or
similar vehicle in and about his business.  For each additional wagon
or other similar vehicle used by him in and about his business he shall
pay an annual license fee of fifty dollars.  Provided, however, that per-
sons desiring a license to peddle fish, solely, from a wagon or other
similar vehicle on Thursdays and Fridays of each week only, may be
licensed for such purpose and shall be required to pay for such license
the sum of fifteen dollars per annum for each and every wagon used by
such licensee for that purpose.

Provided, also, that the licenses issued to persons who pay $15.00
per annum only therefor, shall be plainly stamped or marked so as
to indicate that the licensee is authorized to peddle fish on Thursdays
and Fridays of each week only, and that all tags issued to such li-
censees who pay such sum of $15.00 per annum shall be of a different
design from tags issued to peddlers who pay $50.00 per annum as li-
cense fees.

---

SECTIONS 1594 *and* 1595.  (*See "Peddling, Free Permits for, Etc.,"
page* 129 *post.*)

---

SECTIONS 1616, 1620, 1621, 1631, 1633, 1635, 1639, 1644, 1646,
1647, 1653, 1656, 1658, 1664, 1667, 1680 and 1705.  (*As amended June*
18, 1906, *pages* 912 *to* 914, *Council Proceedings.*)

**1616. Stop Cocks**].—Every service pipe shall be provided with

Generated on 2022-12-29 16:34 GMT  /  https://hdl.handle.net/2027/mdp.39015069398090
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

598                 GENERAL LAWS.            [Chap.

H. F. No. 794.                    CHAPTER 344.

Game
and fish.
*An act for the preservation, propagation, protection, taking, use and transportation of game and fish, and certain harmless birds and animals.*

### GENERAL PROVISIONS.

Be it enacted by the Legislature of the State of Minnesota:

SECTION 1. Game and Fish Commission—Appointment—Terms—A state game and fish commission is hereby created, consisting of five (5) members to be appointed by the governor for a term of four (4) years each. Those heretofore appointed pursuant to chapter three hundred thirty-six (336) of the laws of 1903 shall continue in office until the expiration of their respective terms. Vacancies arising from any cause shall be filled by the governor. Members shall serve without compensation except for necessary expenses to be paid upon an itemized statement thereof duly audited by said commission.

Term of
present com.

SEC. 2. Office—Said commission shall have an office in the capitol and be supplied with suitable stationery, a seal and blanks and postage for the transaction of its business.

SEC. 3. General Powers—Duties—Said commission shall enforce the laws of this state involving the protection and propagation of all game animals, game birds, fish and harmless birds and animals.

Said commission shall have general charge of—

Propagation
and pro-
tection.
1. The propagation and preservation of such varieties of game and fish as it shall deem to be of public value.

Statistics.
2. The collection and diffusion of such statistics and information as shall be germane to the purpose of this act.

Fish
hatcheries.
3. The construction, control and management of all state fish hatcheries, including the control of grounds owned or leased for such purposes.

Spawn or
fry from
U. S. com.
of fisheries
and others.
4. The receiving from the United States commissioner of fisheries or other person, and the gathering, purchase and distribution to the waters of this state, of all fish spawn or fry.

Stocking
of waters.
5. The taking of fish from the public waters of the state for the propagation and stocking of other waters therein.

**EXHIBIT
50**

JA657

620          GENERAL LAWS          [Chap.

in shipping fish, either within or without this state, shall be plainly marked with the name and address of the consignor and consignee, and with the contents of the package.

**In counties of 150,000 and over.**

SEC. 51.   Sale of Fish Prohibited, When—No person shall sell, have in possession with intent to sell, or offer for sale any fish caught in any lake situated partly or wholly within a county in this state that has a population of one hundred and fifty thousand, or over.

## MISCELLANEOUS PROVISIONS.

SEC. 52.   Game and Fish Taken in One Day.—No person shall wantonly waste or destroy any of the birds, animals or fish of the kinds mentioned in this chapter.

**Fifteen birds in one day.**

**Twenty-five fish.**

**Exception.**

The catching, taking or killing of more than fifteen birds by any one person in any one day, or the catching, taking or killing of more than twenty-five fish by any one person in any one day, except fish caught, taken or killed in the Mississippi river or international waters with nets or seines, as by this chapter permitted, shall be deemed a wanton waste, and destruction of all such birds or fish caught, taken or killed in excess of such number.

**Hunting, etc., prohibited.**

SEC. 53.   State Parks.—No person shall pursue, hunt, take, catch, or kill any wild bird or animal of any kind within the limits of any territory set apart, designated, used or maintained as a state public park, or within one-half mile of the outer limits thereof or have any such bird or animal or any part thereof in his possession or under his control within said park or within one-half mile of said outer limits.

**As to fire arms.**

No person shall have in his possession within any such park or within one-half mile of the outer limits thereof, any gun, revolver, or other firearm unless the same is unloaded, and except after the same has been sealed by the park commissioner or a deputy appointed by him, and except also such gun or other firearm at all times during which it may be lawfully had in such park remains so sealed and unloaded.   Upon application to the park commissioner or any deputy appointed by him, it is hereby made his duty to securely seal any gun or firearm in such a manner that it cannot be loaded or discharged without breaking such seal.   The provisions of this section shall apply to all persons including Indians.

**To residents.**

SEC. 54.   Sale of Game by Commission—The game and fish commission is hereby authorized to sell to resi-



ORDINANCES, RULES AND
REGULATIONS

OF THE

DEPARTMENT *of* PARKS

OF THE

CITY OF NEW YORK (city)

**EXHIBIT**

**51**

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

USCA4 Appeal: 23-1719    Doc: 30-2    File

OF THE

# DEPARTMENT OF PARKS

## *of the* CITY OF NEW YORK

———

The Park Board under Chapter 610 of the Charter (3d Edition, 1906) ordains as follows:

### CHAPTER 17.

## PARKS, PARKWAYS AND PARK-STREETS.

(REGULATIONS OF THE PARK BOARD.)

Article 1.  General provisions.
2.  Traffic regulations.
3.  Building and other projections.
4.  Miscellaneous.

### ARTICLE 1.

Section 1.  Definitions.
2.  Interfering with lands or improvements thereon.
2.  Sub-surface disturbances.
4.  Over-head wires.
5.  Destruction of or injury to park property.

1

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

JA660

other highway under the jurisdiction of the park commissioner, except in accordance with a permit therefor issued by the commissioner or his supervisor of recreation nor otherwise than in accordance with the terms of such permit.

§16. Animals at large. No horse or other animal shall be allowed to go at large in any park or upon any park-street, except dogs that are restrained by a chain or leash not exceeding 6 feet in length.

§17. Disorderly conduct. No person shall, in any park,

1. Use threatening, abusive or insulting language;

2. Do any obscene or indecent act;

3. Throw stones or other missiles;

4. Beg or publicly solicit subscriptions or contributions;

5. Tell fortunes;

6. Play games of chance, or use or operate any gaming table or instrument;

7. Climb upon any wall, fence, shelter, seat, statute or other erection;

8. Fire or carry any firearm, firecracker, torpedo or fireworks;

9. Make a fire;

10. Enter or leave except at the established entrance-ways;

11. Enter any park for the purpose of loitering and remaining therein after 12 o'clock at night, except as, on special occasions, the occupation and use thereof may be authorized beyond the regular hours;

7

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

JA661

USCA4 Appeal: 23-1719   Doc: 30-2

v-01736-TDC   Document 59-55   Filed 12/30/22

12.  Do any act tending to a breach of the public peace.

13.  Bring into any park a beverage containing alcohol, except for delivery to a restaurant therein, duly licensed by the State Excise Department, with the permission of the commissioner of parks having jurisdiction, or consume publicly, except within the premises of a restaurant, duly licensed as aforesaid, any beverage containing alcohol.

All persons doing any act injurious to a park shall be removed therefrom by the park keepers or by the police.  When necessary to the protection of life or property, the officers and keepers of the park may remove all persons from any designated part thereof.

§18.  No parent, guardian or custodian of a minor shall permit or allow such minor to do any act prohibited by any provision of this chapter.

## ARTICLE 2.

### TRAFFIC REGULATIONS.

Section 30.  Use of drives and bridle paths.
      31.  Vehicles obstructing assemblies.
      32.  Towing vehicles.
      33.  Restrictions on certain vehicles.
      34.  Public hacks, cabs and automobiles.
      35.  Carriers of offensive refuse or heavy materials.
      36.  Smoky motor vehicles.
      37.  Park-streets.

8

Generated on 2022-12-29 17:07 GMT / https://hdl.handle.net/2027/loc.ark:/13960/t1gq2b2b4
Public Domain / http://www.hathitrust.org/access_use#pd

Digitized by
INTERNET ARCHIVE

Original from
LIBRARY OF CONGRESS

Phoenixville, Pa. -- Ordinances, etc.
"

# A DIGEST

OF THE

# ORDINANCES

OF

## TOWN COUNCIL

OF THE

## BOROUGH OF PHOENIXVILLE

TOGETHER WITH THE ACTS OF ASSEMBLY AND
DECREES OF COURT ESPECIALLY
RELATING TO PHOENIXVILLE

———

*Originally compiled by P. G. Carey, Esq.,*
*Revised by H. P. Waitneight, Esq., 1896, and*
*by Samuel A. Whitaker, Esq., 1906.*

———

PHOENIXVILLE, PA.
"THE DAILY REPUBLICAN" PRINT.
1906



EXHIBIT
**52**

Digitized by Google

JA663

ORDINANCES. 133

shall give a bond annually, to be approved by the court.

13. The Collector of Taxes shall have all the power for the collection of said taxes, during his term of office, heretofore vested in collectors of county taxes under existing laws, and be subject to the same liabilities and penalties for neglect or violation of the duties of his office. <span style="float:right">Act 25 June, 1885. § 5<br>Powers</span>

14. The accounts of Collectors of Taxes shall be settled by Township or Borough Auditors of the proper Township or Borough, and he shall state a separate account for each different tax collected by him; but collectors of county and State taxes shall settle with the County Commissioners, as heretofore. <span style="float:right">Ibid § 11<br>Accounts</span>

15. If any vacancy shall take place in the office of Tax Collector * * * the Court of Quarter Sessions * * * upon petition of Town Council or any citizen who is a resident of said Borough, Township, ward, setting forth the fact that a vacancy does exist, shall appoint a suitable person to fill said vacancy for the full or unexpired term. <span style="float:right">Act 2 July, 1895<br>Vacancy</span>

### ORDINANCES.

(See CHARTER § 7, I; 8, IV; 10, I; 11, III; 13; BURGESS § 7, 10.)

1. The secretary shall * * * transcribe the by-laws, rules, regulations and ordinances adopted into a book kept for that purpose, and when signed by the presiding officer shall attest the same, preserve the records and documents of the corporation, certify copies of any book, paper, record, by-law, rule, regulation, ordinance or proceeding of the corporation under the seal thereof, which copies so certified shall be good evidence of the act or thing certified, and shall attest the execution of all instruments under the same record, the publication of all enactments, and attest the same by his signature thereto, and shall file of record the proof of service of all notices as required by this act or of supplements hereto, his ceretificate whereof shall be good evidence of such notice. Every ordinance and resolution which shall be passed by said Council shall be presented to the Chief Burgess of such Borough. If he approve he shall sign it, but if he shall not approve he shall return it with his objections to said Council at the next regular meeting thereof, when said objections shall be en- <span style="float:right">Act 3 April, 1851. § 8<br>Secretary to transcribe<br>To certify copies<br>certified copies to be evidence<br>Act 28 May, 1893</span>

Digitized by Google

134                 PARADISE STREET, PARK ALLEY.

tered at large in the minute book, and said Council shall
proceed to a reconsideration of such ordinance or resolu-
tion. If after such reconsideration two-thirds of all the
members elected to said Council shall vote to pass such
ordinance or resolution it shall become and be of as full
**To be pre-** force and effect as if said Chief Burgess had signed it;
**sented to chief**
**burgess** but in such cases the votes of the members of Council shall
be determined by the yeas and nays, and the names of the
members voting shall be entered on the minutes of said
Council: *Provided,* That when the number of Council-
men is less than nine, a majority of Council and one vote
**Veto and pas-** more shall be required to pass an ordinance over the veto.
**sage over** If such ordinance or resolution shall not be returned by
the Chief Burgess at the next regular meeting of said
Council after the same shall have been presented to him,
the same shall likewise become and be in as full force
and effect as if he had signed it: *Provided,* That before
any ordinance shall come into force and effect as afore-
said the same shall be recorded in the Borough ordinance
book with the certificate of the secretary and be adver-
tised as heretofore required by law.

### PARADISE STREET.

**Ord. 25 Feb.**
**1875** 1. The width of  *  *  *  Paradise street from Nutts
avenue to the Borough line  *  *  *  shall be  *  *  *
forty feet.
**Ord. 26 Feb.**
**1877. § 4** 2. Ordained  *  *  *  that Paradise street begin at
a limestone in Nutts avenue, a corner of lands of Benja-
min Moyer and Joseph Rapp, thence south thirty-two and
one-half degrees west 508 feet six inches to an iron monu-
ment planted to indicate the centre of Pennsylvania ave-
nue, thence the same course 250 feet to the centre of Ches-
ter avenue, thence the same course continued 250 feet to
the centre of Columbia avenue, thence the same course
continued 980 feet six inches to a spike at the Borough
line.

### PARK ALLEY.

**Ord. 28 Sept.**
**1874** 1. Ordained, etc., that an alley twenty feet wide 150
feet east of Main street, dedicated by the Phoenix Iron
**Dedicated and**
**accepted** Company to the use of the public, running in a parallel line
with Main street from Washington avenue to Second ave-

Digitized by Google

USCA4 Appeal: 23-1719   Doc: 30-2   Filed: 08/21/2023   Pg: 19

nue, be and the same is hereby accepted and ordered to be marked on the Borough plot.

2. Park alley be and is hereby continued from Third Ord. 5 Aug., avenue south to Fifth avenue, the centre line of said alley 1895 to be 190 feet east of the centre line of Main street, said Continued alley to be twenty feet wide, or ten feet on each side of above described centre line.

3. The owners of lots or lands bounding on and oppo- Ord. 8 Aug., site the sidewalks along  *   *   *   both sides of Park 1886 alley from Washington avenue to Second avenue *   *   *   are hereby required to put up curbstones at the Curb, pave edge of the sidewalks and to pave and gutter the said side- and gutter walks under the direction of the Borough Surveyor and the Street Committee.   *   *   *

[If neglected after thirty days' notice Street Committee to have work done and file lien therefor.   See Quick street § 4.]

## PARKS.

1. The following rules and regulations shall be adopted Ord. 2 July, for the government and protection of Reeves Park, in the 1878 Borough of Phoenixville:

### SECTION I, PENAL.

1. No person shall enter or leave the park except by Rules of such gates or avenues as may be for such purposes ar- Reeves' Park ranged.

2. No person shall indulge in any threatening, abusive, insulting or indecent language in the park.

3. No person shall engage in gaming or commit any obscene or indecent act in the park.

4. No person shall carry fire-arms or shoot birds or throw stones or other missiles therein.

5. No person shall cut, break or in anywise injure or deface the trees, shrubs, plants, turf or any of the build- ings, seats, fences, lamps or statuary in the park.

6. No person shall turn cattle, goats, swine, horses, dogs or other animals loose into the park.

7. No person shall injure, deface or destroy any notices, rules or regulations posted, or in any other manner per- manently fixed for the government of the park.

8. No person shall engage in any play at baseball,

Digitized by Google

**PAVEMENTS.**

cricket, shinny, football or any other games with ball and bat, except croquet, within the limits of the park.

Any person who shall violate any of said rules and regulations shall be guilty of a misdemeanor, and for each and every such offence shall pay the sum of five dollars, to be recovered before the Burgess or either of the Justices of the Peace of the Borough of Phoenixville, which fines shall be paid into the Borough treasury for park purposes.

### SECTION 2, LICENSES.

1. No person shall expose any article for sale within the park without permission from the Town Council or its representative.

2. No person or persons shall have any musical, theatrical or other entertainments therein, nor shall any military or other parade or procession take place in the park without permission from the Town Council or its representative.

3. No gathering or meeting of any kind, assembled through advertisement, shall be permitted in the park without permission from Council or its legal representative.

### SECTION 3, PROHIBITIONS.

1. No gathering or meeting for political purposes, nor spirituous or malt liquors shall be allowed within the park under any circumstances.

N. B.—And we do hereby earnestly appeal to all peaceable, law-abiding citizens, entreating that in the exercise of their proprietary rights they will diligently co-operate in the enforcement of all lawful measures for the care and preservation of all things pertaining to Reeves Park. It is *your own property;* won't you take care of it?

## PARTY WALLS.

(See CHARTER § 7, VII.; BUILDINGS § 1 TO 4.)

## PAVEMENTS.

(See CHARTER § 7; BUILDINGS § 4, 5; FINES AND PENALTIES § 5, 6, 7, 19, 20.)

Act 20 April, 1905    1. All Boroughs are hereby authorized and empowered to direct and require the grading, paving, repaving and repairing of all sidewalks on the streets of the Borough,

Digitized by Google

# GENERAL

# Municipal Ordinances

—OF THE—

## City of Oakland, Cal.

IN EFFECT NOVEMBER 1st, 1909

COMPILED AND ANNOTATED
BY AUTHORITY OF THE CITY COUNCIL.

**EXHIBIT**
**53**

Generated on 2022-12-29 16:58 GMT / https://hdl.handle.net/2027/hvd.32044028036240
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

OF THE CITY OF OAKLAND, CAL.                  15

SEC. 4.   No military or other parade or procession or funeral shall take place, or pass through the limits of the parks under the control of the Park Commission, without the order or permission of the Park Commissioners.

SEC. 5.   No person shall engage in any play, at baseball, cricket, shinney, football, croquet, or at any other game, with ball and bat, within the limits of the parks under the control of this Commission, except on such grounds only as shall be specially designated for such purpose.

SEC. 6.   No person shall be permitted to use the shores of Lake Merritt as a landing place for boats, or keep thereat boats for hire, or floating boathouses with pleasure boats for hire, except by special order or permission of the Park Commissioners, and only at places designated by and under restrictions determined upon by said Commissioners.

SEC. 7.   No regatta or boat race by clubs shall take place upon Lake Merritt without special permission granted by the Park Commission.

SEC. 8.   No person shall turn loose into the parks controlled by this Commission any cattle, goats, swine, horses, or other animals.

SEC. 9.   No person shall carry firearms, or shoot birds or throw stones or other missles within the boundaries of the parks controlled by the Park Commission.

SEC. 10.   No person shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures, or statuary or foul any fountains or springs within the parks controlled by the Park Commission.

SEC. 11.   No person shall drive or ride within the boundaries of the parks controlled by the Park Commission at a rate exceeding seven miles an hour.

SEC. 12.   No person shall ride or drive within the limits of the parks controlled by the Park Commission upon any other than the avenues and roads therefor.

SEC. 13.   No coach or vehicle used for hire shall stand upon any part of the parks controlled by the Park Commission for the purpose of hire, nor except in waiting for persons taken by it into the parks, unless in either case at points designated by the Park Commission.

SEC. 14.   No wagon or vehicle of burden or traffic shall pass through the parks, except upon such road or avenue as shall be designated by the Park Commissioners for burden transportations.

SEC. 15.   No person shall expose or display any article for sale within the parks without the order or permission of the Park Commission.

Generated on 2022-12-29 17:02 GMT  /  https://hdl.handle.net/2027/hvd.32044020036240
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by 

Original from
HARVARD UNIVERSITY

JA669

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg: 197

Case 8:21-cv-01736-TDC   Document 59-58   Filed 12/30/22   Page 1 of 2

# THE CODE

OF THE

# CITY OF STAUNTON, VIRGINIA

CONTAINING

## THE CHARTER AND GENERAL LAWS

## AND ORDINANCES

**EXHIBIT**
**54**

1910
SHULTZ PRINTING CO.
Staunton, Va.

Generated on 2022-12-29 17:06 GMT  /  https://hdl.handle.net/2027/nyp.33433015092219
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

JA670

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    Pg: 1

Case 8:21-cv-01736-TDC   Document 59-58   Filed 12/30/22   Page 2 of 2

## CHAPTER II.

**OF THE PUBLIC PARKS AND THE GOVERNMENT THEREOF.**

**Sec. 134.  Park Policeman.**

There shall be selected by the council a park policeman whose duty it shall be to have carried out the rules and regulations for the government of the park.

**Sec. 135.  Acts prohibited in Park.**

All persons are forbidden to enter or leave the park except by the gateways; to climb or walk upon any of the walls or fence, to turn cattle, horses, goats or swine into the park; to carry firearms, or to throw stones or other missiles within it; to cut, break, or in any way injure or deface the trees, benches, shrubs, plants, turf, or any of the buildings, fences, bridges, or other constructions upon the park; or to converse with, or in any way hinder those engaged in its construction.

**Sec. 136.  Fast driving, etc., prohibited.**

No animal or wheeled vehicle shall travel on any part of the park, except upon the driveway, nor at a rate exceeding seven miles per hour.   Persons on horseback shall not travel at a rate exceeding seven miles per hour.

**Sec. 137.  "Standing" or "hitching" places.**

No animal or vehicle shall be permitted to stand upon any driveway or carriage road of the park, or any part thereof, and no animal or vehicle shall be permitted to be hitched or allowed to stand at any place within the park enclosure, except such places as may be provided and designated as "standing" or "hitching" places.   Nor shall any person upon the park solicit or invite passengers.

**Sec. 138.  Vehicles for hire in park.**

No hackney coach, carriage or other vehicle for hire, shall stand upon any part of the park for the purpose of taking in any

Generated on 2022-12-29 17:05 GMT  /  https://hdl.handle.net/2027/nyp.33433015092210
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google          Original from
NEW YORK PUBLIC LIBRARY

*Birmingham, Ala. — Ordinances*

# THE CODE

## of

# CITY OF BIRMINGHAM

## ALABAMA

UNIVERSITY OF ILLINOIS LIBRARY

PREPARED BY

HENRY L. ANDERTON  JUL 8   1919

BY AUTHORITY OF THE COMMISSION
OF THE CITY OF BIRMINGHAM



1917



EXHIBIT
55

Digitized by Google

662          *PARKS AND PUBLIC PLACES*

## CHAPTER XLIV

------

# Parks and Public Places

Sec. 1542. **All Parks Dedicated to Public Use.** All the parks heretofore marked out and dedicated to the city, and all public parks hereafter acquired by the city shall be and remain set apart and dedicated to the use of the public as parks and public grounds, and the same shall be regulated and governed in such manner as the Commission may from time to time ordain.

Sec. 1543. **For the Protection of Parks.** Any person who wilfully or maliciously breaks, cuts, disfigures, injures or destroys any tree, shrub, plant or flower within the enclosure of any of the public parks of the city, or any railing, structure or monument therein, or who shall hitch any horse or animal to any tree or shrub therein, shall, on conviction, be fined not less than one nor more than one hundred dollars.

Sec. 1544. **Conduct in Parks.** No person shall enter or leave any of the public parks of the City of Birmingham except by the gateways; no person shall climb or walk upon the walls or fences thereof; no person shall turn or lead any cattle, horses, goat, swine or other animals into any of such parks; no person shall carry firearms or throw stones or other missiles within any of such public parks; no person shall expose any article or thing for sale within any of such parks, nor shall any hawking or peddling be allowed therein; no threatening, abusive, insulting or indecent language shall be allowed in any part of any of such parks calculated to provoke a breach of the peace, nor shall any person tell fortunes or play at any game of chance at or with any table or instrument of gaming nor commit any obscene or indecent act there-

Digitized by Google

USCA4 Appeal: 23-1719    Doc: 30-2    Filed: 08/21/2023    P

Case 8:21-cv-01736-TDC    Document 59-59    Filed 12/30/22    Page 3 of 3

in; no person shall post or otherwise affix any bills, notice or other paper upon any structure or thing within any such park nor upon any gate or enclosure thereof; no person shall play upon any musical instrument, nor shall any person take into, carry or display in any such public park any flag, banner, target or transparency; no military company shall parade, drill or perform therein any military or other movements; no person shall light, make or use any fire in any such public park; no person shall go upon the grass, lawn or turf of the parks, except when and where the word "common" is posted, indicating that persons are at that time and place at liberty to go on the grass.

Sec. 1545. **Commission May Close Entrances.** The Commission may direct that any of the entrances to the public parks be closed at any time, and when so closed in obedience to such directions no person shall enter at any such place.

Sec. 1546. **Obstructions on Plats Along Public Streets.** It shall be unlawful for any person in possession of any lot or parcel of ground abutting on any public highway in the City of Birmingham to erect, maintain or permit any other person to erect or maintain or to continue or fail to remove within a reasonable time after notice or knowledge of the presence thereof of any wire, chain, rope or other obstruction or guard on any grass plat or parkway on any public highway in the City of Birmingham, unless such guard or obstruction shall conform to the following specifications, to-wit: The upright posts or stakes shall be made of dressed lumber four inches square and shall extend above the ground not less than three feet and shall be painted white. The cross bar shall consist of some rigid material and may be made either of iron pipe, an iron bar or a wooden bar which shall be placed at a height of not less than three feet above the surface of the ground and such bar or pipe shall also be painted white and shall be securely fastened to the said stakes or posts, which stakes shall be firmly placed in the ground and not more than eight feet apart.

Digitized by Google

USCA4 Appeal: 23-1719      Doc: 30-2      Filed: 08/21/2023      Pg: 202 of

Case 8:21-cv-01736-TDC   Document 59-60   Filed 12/30/22   Page 1 of 3

No. 666, A.]                    [Published July 16, 1917.

# CHAPTER 668

AN ACT to repeal sections 62.04 to 62.58, inclusive, and sections 4562d, 4567b, and 4567c; to create a new chapter to be numbered 29, and sixty-four new sections thereof, to be numbered 29.01 to 29.63, inclusive; to amend sections 4567d and 4567f; and to create sections 4562d and 172—41, relating to wild animals, and the regulation of the enjoyment, disposition and conservation thereof, prescribing penalties, and creating a conservation fund.

*The people of the State of Wisconsin, represented in Senate and Assembly, do enact as follows:*

SECTION 1.  Sections 62.04 to 62.58, inclusive, and sections 4562d, 4567b, and 4567c of the statutes are repealed.

SECTION 2.  A new chapter is added to the statutes, to be numbered and entitled as follows: "CHAPTER 29. WILD ANIMALS, AND THE REGULATION OF THE ENJOYMENT, DISPOSITION AND CONSERVATION THEREOF."

SECTION 3.  Sixty-four new sections are added to the statutes, to be inserted in chapter 29, and to be numbered and to read:

## TABLE OF CONTENTS

### CHAPTER 29

WILD ANIMALS, AND THE REGULATION OF THE ENJOYMENT, DISPOSITION AND CONSERVATION THEREOF; GENERAL CONTROL AND REGULATION

29.01   General definitions:
      (1) Wild animal.
      (2) Carcass.
      (3) Game; game fish; rough fish.
      (4) Waters classified.
      (5) Hunting.
29.02   Title to wild animals.
29.03   Public nuisances.
29.04   Abandoned dams.
29.05   Police powers; searches; seizures.
      (1) Arrests.
      (2) Investigations.
      (3) Search warrants.

**EXHIBIT 56**

LAWS OF WISCONSIN—Ch. 668.          1243

of any person, grant a permit to such person to take and transport wild animals for propagation within the state, under the supervision of the commission or its deputies

29.56  FOREST COUNTY GAME REFUGE.  Townships thirty-eight north, of range twelve and thirteen east, Forest county, shall be known as the Forest County Refuge.  No person shall at any time or in any manner, hunt any game within said refuge.

29.57  WILD LIFE REFUGES.  (1) Establishment.  The owner or owners of any tract, or contiguous tracts, of land comprising in the aggregate not less than one hundred and sixty acres located outside the limits of any city or village, may apply to the state conservation commission for the establishment of said lands as a wild life refuge.  The commission may thereupon employ such means as it may deem wise to inform itself regarding the premises; and if, upon inspection, investigation, hearing, or otherwise, it shall appear to the satisfaction of the commission that the establishment of said lands as a wild life refuge will promote the conservation of one or more useful species or varieties not native within this state. it may by order designate and establish the said lands as a wild life refuge.

(2) Enclosure.  Within thirty days after the date of such order the owner or owners of the said lands shall enclose the same, wherever the same are not already enclosed by a fence, with a single substantial wire, and shall post and maintain along the said wire or fence, at each interval of twenty rods, signs or notices, furnished by the state conservation commission, proclaiming the establishment of said refuge.

(3) Publication.  No such order shall be effective until at least thirty days after the date of its issue; nor unless the commission shall have caused notice thereof to be given by its publication, once in each week for three successive weeks next preceding the date of its effect, in at least one newspaper published in the county embracing the said lands.  Thereupon the said lands shall be a wild life refuge, and shall so remain for a period of not less than five years, from and after the date of effect stated in said order.

(4) Absolute Protection.  No owner of lands embraced within any such wild life refuge, and no other person whatever, shall hunt or trap within the boundaries of any wild life refuge, state park, or state fish hatchery lands; nor have in his possession or under his control therein any gun or rifle, unless the same is unloaded and knocked down or enclosed within its carry-

1244        LAWS OF WISCONSIN—Ch. 668.

ing case; but nothing herein shall prohibit, prevent, or interfere with the state conservation commission, or its deputies, agents or employes, in the destruction of injurious animals.

(5) Animals procured by commission. The state conservation commission may place within any such wild life refuge, for the purpose of propagation, wild animals of any species or variety.

## DESTRUCTION OF INJURIOUS ANIMALS

29.58 MUSKRATS INJURING DAMS. The owner or lessee of any dam may in any manner capture or kill muskrats at any time when said muskrats are injuring or destroying such dams or the levees connected therewith; but shall not sell, barter, or give to any other person the skin of any muskrat captured or killed during the close season therefor.

29.59 BEAVER CAUSING DAMAGE. (1) Complaint. Upon complaint in writing, by the owner or lessee of any lands, to the state conservation commission, that beaver are causing damage thereto the commission shall employ such means as it may deem wise to inquire into the matter; and if, upon inspection, investigation, hearing, or otherwise, it shall appear to the satisfaction of the commission that the facts stated in such complaint are true, it may, by written permit, authorize the said owner or lessee to capture and remove such beaver, as hereinafter prescribed.

(2) Supervision. No beaver shall be captured or killed under such permit except only during such period of time, from and after the first day of January in each year, as may be limited by the commission, and then only under the direct supervision of a deputy conservation warden.

(3) Disposition of animals. The owner or lessee shall capture, alive and without avoidable injury, such number of beaver as may be designated by the commission, for delivery to zoological parks or collections or for transplantation to other localities within the state; all others shall be killed and skinned with care to conserve the value of the skins, which shall be shipped without delay to Madison, consigned to the state conservation commission.

(4) Sale and disposition of proceeds. All such skins shall be sold by the commission, in the manner of a sale of confiscated game, and the proceeds paid into the conservation fund.

(5) In Price, Rusk, and Sawyer counties. Licenses for the taking, catching or killing of beaver in Price, Rusk, and Sawyer

Session]            1921—Chapter 5—6                          53

*First.* To supplement the funds in those counties specified in section two of this act, in order to provide a six months school term in each of said counties;  *Supplements to county funds.*

*Second.* After the provisions of section two have been complied with, then the State Board of Education shall apportion the residue of the funds provided in this section in order to pay the salaries of the county superintendents and assistant superintendents for six months, and all city superintendents, all supervisors not otherwise provided for, all principals of elementary schools having ten or more teachers, and principals of standard high schools, for three months.  *Apportionment of residue. County superintendents and assistants. City superintendents. Supervisors. Principals of elementary and high schools.*

Sec. 5. That section five thousand four hundred and eighty-eight of the Consolidated Statutes, as amended, be and the same is hereby further amended by adding at the end thereof the following: "*Provided,* that no action in the nature of a writ of mandamus shall be brought against the board of county commissioners to compel said board to levy a rate of taxation greater than the rate authorized by the General Assembly."  *Proviso: mandamus for increase of tax rate not to lie.*

Sec. 6. All laws and clauses of laws in conflict with the provisions of this act are hereby repealed.  *Repealing clause.*

Sec. 7. This act shall be in full force and effect on and after the date of its ratification.

Ratified this the 20th day of December, A.D. 1921.

--------

### CHAPTER 6

### AN ACT TO PROTECT ANIMALS AND GAME IN PARKS AND GAME RESERVATIONS IN EITHER PRIVATE OR PUBLIC PARKS OR PLACES.

*The General Assembly of North Carolina do enact:*

Section 1. That it shall be unlawful for any person or persons to hunt, trap, capture, willfully disturb, or kill any animal or bird of any kind whatever, or take the eggs of any bird within the limits of any park or reservation for the protection, breeding, or keeping of any animals, game, or other birds, including buffalo, elk, deer, and such other animals or birds as may be kept in the aforesaid park or reservation, by any person or persons either in connection with the Government of the United States, or any department thereof, or held or owned by any private person or corporation.  *Protection of game in parks or reservations.*

Sec. 2. That any person or persons who shall hunt, trap, capture, willfully disturb, or kill any animal or bird, or take the eggs of any bird of any kind or description in any park or reservation  *Misdemeanor.*

**EXHIBIT**

**57**

JA678

54                          1921—Chapter 6—7—8                [Extra

Punishment.

as described in section one of this act, at any time during the year, shall be guilty of a misdemeanor, and shall be fined or imprisoned in the discretion of the court for each and every offense.

Carrying weapons in parks or reservations. Misdemeanor.

Sec. 3. That any person who shall carry a pistol, revolver, or gun in any park or reservation such as is described in section one of this act, without having first obtained the written permission of the owner or manager of said park or reservation, shall be guilty of a misdemeanor, or shall be fined or imprisoned, in the discretion of the court, for each and every offense.

Punishment.

Application of act.

Sec. 4. That the provisions of this act shall apply only to that part of the State of North Carolina situated west of the main line of the Southern Railway running from Danville, Virginia, by Greensboro, Salisbury, Charlotte, and Atlanta, Georgia.

Repealing clause.

Sec. 5. All laws and clauses of laws in conflict with this act are hereby repealed.

Sec. 6. That this act shall be in force from and after its ratification.

Ratified this the 15th day of December, A.D. 1921.

———

## CHAPTER 7

AN ACT TO CHANGE THE MONTH DURING WHICH AC-COUNTS OF STATE OFFICERS ARE EXAMINED BY COM-MISSIONERS OF THE LEGISLATURE.

*The General Assembly of North Carolina do enact:*

Date changed.

Section 1. That section seven thousand six hundred and ninety-two of the Consolidated Statutes be and the same is hereby amended by striking out the word "December" in line six of said section and inserting in lieu thereof the word "July."

Sec. 2. That this act shall be in force from and after its ratification.

Ratified this the 10th day of December, A.D. 1921.

———

## CHAPTER 8

AN ACT TO AUTHORIZE THE TREASURER TO BORROW NOT EXCEEDING $710,000 FOR THE STATE PUBLIC SCHOOL FUND.

Preamble: tax at special session.

Purpose.

Whereas the special session of the General Assembly of one thousand nine hundred and twenty, chapter ninety-one, section one, Public Laws, provided a State tax of thirteen cents for the purpose of paying "one-half the annual salary of the county superintendents and three months salary of all teachers of all sorts

JA679

MONTGOMERY COUNTY CODE

**INCLUDES Bill 21-22**

# Chapter 57.   Weapons.

**Cross references-**Furnishing weapons to citizens during emergencies, § 2-15; special zoning requirements for rifle, pistol or skeet shooting ranges, §§ 59-G-2.51, 59-G-2.52.

**State law references-**Carrying weapons, Ann. Code of Md., art. 27, § 36 et seq.; sale, etc., of switchblade knives, Ann. Code of Md., art. 27, § 339; machine guns, Ann. Code of Md., art. 27, §§ 372-383; pistols, Ann. Code of Md., art. 27, §§ 441-448.

§ 57-1. Definitions.
§ 57-2. Firearm Safety Committee.
§ 57-3. Change in urban area boundary.
§ 57-4. Discharge of guns in the urban area.
§ 57-5. Discharge of guns outside the urban area.
§ 57-6. Discharge of bows.
§ 57-7. Access to guns by minors.
§ 57-8.   Child safety handgun devices and handguns
§ 57-9. Unlawful ownership or possession of firearms.
§ 57-10. Keeping guns on person or in vehicles.
§ 57-11. Firearms in or near places of public assembly.
§ 57-12. Sale of fixed ammunition.
§ 57-13. Use of public funds.
§ 57-14. Exemptions from Chapter.
§ 57-15. Penalty.
§ 57-16. Reporting requirement.

## Sec. 57-1. Definitions.

In this Chapter, the following words and phrases have the following meanings:

*3D printing process:* a process of making a three-dimensional, solid object using a computer code or program, including any process in which material is joined or solidified under computer control to create a three-dimensional object.

*Child safety handgun box:* A secure, lockable box designed to hold the handgun being transferred that:

(1)      requires a key or combination to remove;

(2)      renders the handgun inoperable when locked; and

EXHIBIT
58

1

MONTGOMERY COUNTY CODE

(3)      is approved by Executive regulation under method (2).

*Child safety handgun device:* A child safety handgun lock or child safety handgun box.

*Child safety handgun lock:* A device that when locked in place prevents movement of the trigger of the handgun being transferred without first removing the lock by use of a key or combination.   "Child safety handgun lock" also includes any other device that can be attached to a handgun and:

(1)      requires a key or combination to remove;

(2)      renders the handgun inoperable when locked in place; and

(3)      is approved by Executive regulation under method (2).

*Crime of violence:* Murder, voluntary manslaughter, rape, mayhem, kidnapping, robbery, burglary, housebreaking, arson, assault with intent to murder, ravish or rob, assault with deadly weapon or assault with intent to commit any offense punishable by imprisonment for more than one (1) year.

*Firearm dealer:* A person required by State or federal law to obtain a:

(1)      regulated firearms dealer's license; or

(2)      temporary transfer permit to display a regulated firearm at a gun show.

*Fixed ammunition:* Any ammunition composed of a projectile or projectiles, a casing, an explosive charge and a primer, all of which shall be contained as one (1) unit. Cartridges designed, made and intended to be used exclusively (i) in a device for signaling and safety purposes required or recommended by the United States Coast Guard or (ii) for industrial purposes, shall not be considered fixed ammunition. Curios or relics, as defined in regulations promulgated by the United States Secretary of the Treasury pursuant to 18 United States Code, section 921(A)(13), shall not be considered fixed ammunition.

*Fugitive from justice:* Any person for whom criminal proceedings have been instituted, warrant issued or indictment presented to the grand jury, who has fled from a sheriff or other peace officer within this state, or who has fled from any state, territory, District of Columbia or possession of the United States, to avoid prosecution for crime of violence or to avoid giving testimony in any criminal proceeding involving a felony or treason.

*Gun* or *firearm:* Any rifle, shotgun, revolver, pistol, ghost gun, undetectable gun, air gun, air rifle or any similar mechanism by whatever name known which is designed to expel a projectile through a gun barrel by the action of any explosive, gas, compressed air, spring or elastic.

2

MONTGOMERY COUNTY CODE

(1)    The term "antique firearm" means (a) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and (b) any replica of any firearm described in subparagraph (a) if such replica (i) is not designed or redesigned or using rimfire or conventional centerfire fixed ammunition, or (ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

(2)    "Ghost gun" means a firearm, including an unfinished frame or receiver, that:

    (A)    lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer in accordance with federal law; and

    (B)    lacks markings and is not registered with the Secretary of the State Police in accordance with Section 5-703(b)(2)(ii) of the Public Safety Article of the Maryland Code.

        "Ghost gun" does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968.

(3)    "Handgun" means any pistol, revolver or other firearm capable of being concealed on the person, including a short-barreled shotgun and a short-barreled rifle as these terms are defined below.  "Handgun" does not include a shotgun, rifle, or antique firearm.

(4)    "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(5)    The term "short-barreled rifle" means a rifle having one (1) or more barrels less than sixteen (16) inches in length and any weapon made from a rifle (whether by alternation, modification or otherwise) if such weapon, as modified, has an overall length of less than twenty-six (26) inches.

(6)    The term "short-barreled shotgun" means a shotgun having one (1) or more barrels less than eighteen (18) inches in length and any weapon made from a shotgun (whether by alteration, modification or otherwise) if such weapon as modified has an overall length of less than twenty-six (26) inches.

(7)    "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a

3

smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

(8)    "Undetectable gun" means:

(A)    a firearm that, after the removal of all its parts other than a major component, is not detectable by walk-through metal detectors commonly used at airports or other public buildings;

(B)    a major component that, if subjected to inspection by the types of detection devices commonly used at airports or other public buildings for security screening, would not generate an image that accurately depicts the shape of the component; or

(C)    a firearm manufactured wholly of plastic, fiberglass, or through a 3D printing process.

(9)    "Unfinished frame or receiver" means a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm.

*Gun shop:* An establishment where a handgun, rifle, or shotgun, or ammunition or major component of these guns is sold or transferred.   "Gun shop" does not include an area of an establishment that is separated by a secure, physical barrier from all areas where any of these items is located.

*Gun show:* Any organized gathering where a gun is displayed for sale.

*Major component* means, with respect to a firearm:

(1)    the slide or cylinder or the frame or receiver; and

(2)    in the case of a rifle or shotgun, the barrel.

*Minor:* An individual younger than 18 years old.

*Pistol* or *revolver:* Any gun with a barrel less than twelve (12) inches in length that uses fixed ammunition.

*Place of public assembly:* A "place of public assembly" is:

(1)    a publicly or privately owned:

(A)    park;

4

JA683

MONTGOMERY COUNTY CODE

        (B)     place of worship;

        (C)     school;

        (D)     library;

        (E)     recreational facility;

        (F)     hospital;

        (G)     community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;

        (H)     long-term facility, including any licensed nursing home, group home, or care home;

        (I)     multipurpose exhibition facility, such as a fairgrounds or conference center; or

        (J)     childcare facility;

    (2)     government building, including any place owned by or under the control of the County;

    (3)     polling place;

    (4)     courthouse;

    (5)     legislative assembly; or

    (6)     a gathering of individuals to collectively express their constitutional right to protest or assemble.

    A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

*Record plat* means a subdivision plat recorded in the County's land records.

*Sell* or *purchase:* Such terms and the various derivatives of such words shall be construed to include letting on hire, giving, lending, borrowing or otherwise transferring.

*Sporting use:* "Sporting use" of a firearm and ammunition means hunting or target shooting in compliance with all federal, State, and local laws.   Sporting use includes:

    (a)     participation in a managed hunt sponsored by a government agency; and

5

JA684

(b)    the sale or other transfer of ammunition by a sporting club for immediate, on-site use at the club.

*Tax assessment record* means the information maintained by the State Department of Assessments and Taxation in its Real Property Database on each parcel of real property located in the County, including the tax map for each parcel.

*Urban area:* That part of the County within the following boundaries:   Beginning at a point where the Maryland/District of Columbia boundary line in the County intersects with the Maryland/Virginia boundary line on the southwest side of the Potomac River; running then northwest along the Maryland/Virginia boundary line to the emptying of Watts Branch into the Potomac River; then northwest along the northeast side of the Potomac River to the emptying of Seneca Creek into the Potomac River; then north along Seneca Creek to Route 112 (Seneca Road); then east along Route 112 to Route 28 (Darnestown Road); then northwest along Route 28 to Route 118 (Darnestown-Germantown Road); then north along Route 118 to Route 117 (Clopper Road); then northwest along Route 117 to Little Seneca Creek; then northeast along Little Seneca Creek to Black Hill Regional Park; then along the eastern boundary of Black Hill Regional Park to the Park's southernmost intersection with I-270; then northwest along I-270 to Little Seneca Creek; then north along Little Seneca Creek to West Old Baltimore Road; then east along West Old Baltimore Road to Route 355 (Frederick Road); then south along Route 355 to Brink Road; then southeast on Brink Road to the Town of Laytonsville; then along the northern boundary of the Town of Laytonsville to Route 420 (Sundown Road); then east along Route 420 to Route 650 (Damascus Road); then southeast along Route 650 to Route 97 (Georgia Avenue); then south along Route 97 to Brighton Dam Road; then northeast along Brighton Dam Road to Route 650 (New Hampshire Avenue); then south along Route 650 to Route 108; then east along Route 108 to the Potomac Electric Power Company transmission line property; then southeast along the east side of the Potomac Electric Power Company right-of-way to Batson Road; then following along the southern boundary of the Washington Suburban Sanitary Commission property to Kruhm Road; then southeast along Kruhm Road to the Potomac Electric Power Company right-of-way; then southeast along the east side of the Potomac Electric Power Company right-of-way to Route 198; then east along Route 198 to the Prince George's County/Montgomery County boundary line; then southwest along the Montgomery County/Prince George's County boundary line to the Montgomery County/District of Columbia boundary line; then along the Montgomery County/District of Columbia boundary line to the beginning point.

*Vehicle:* Any motor vehicle, as defined in the Transportation Article of the Annotated Code of Maryland, trains, aircraft and vessels. (1981 L.M.C., ch. 42, § 1; 1983 L.M.C., ch. 50, § 1; CY 1991 L.M.C., ch. 21, § 1; 1993 L.M.C., ch. 50, § 1; 1997 L.M.C., ch. 3, § 1; 1997 L.M.C., ch. 14, §1; 1997 L.M.C., ch. 16; 2001 L.M.C., ch. 11, § 1; 2007 L.M.C., ch. 21, § 1; 2018 L.M.C., ch. 34, § 1; 2021 L.M.C., ch. 7, §1.)

**Sec. 57-2. Firearm Safety Committee.**

6

MONTGOMERY COUNTY CODE

(a)     There is a Firearm Safety Committee with 7 voting members appointed by the County Executive and confirmed by the County Council. The voting members should be trained and experienced in the safe and sportsmanlike use of weapons. The Executive must designate one voting member to serve as Chair. The Police Range Officer must serve as a non-voting member of the Committee.

(b)     The Committee issues indoor and outdoor target, trap, skeet,   and shooting range approval certificates. The Committee may specify the type of gun and ammunition   that may be used on   the range. An approval certificate is valid for 3 years. Before issuing a certificate, the Committee must find that:

   (1)     the discharge of guns on the range will not jeopardize life or property; and

   (2)     the applicant for the certificate is the owner, lessee, or person lawfully in possession of the land where the range is located.

(c)      The Committee must inspect any firing range operated by the Police Department every 3 years.

(d)     The Committee must create a standard safety checklist to assure that all firing ranges are evaluated using the same criteria.

(e)      The Committee must keep a copy of each certificate.(1981 L.M.C., ch. 42, § 1; FY 1991 L.M.C., ch. 9, § 1; CY 1991 L.M.C., ch. 21, § 1; 2005 L.M.C., ch. 24, § 1.)
   **Cross reference**-Boards and commissions generally, § 2-141 et seq.

## Sec. 57-3. Change in urban area boundary.

On February 1 each year, the County Executive, after consulting with the Firearm Safety Committee, may recommend to the County Council any appropriate change in the boundary of the urban area based on new development or reported incidents of weapons discharged near developed areas. In addition, the County Executive, without consultation, may recommend any amendment to the boundary of the urban area at any other time.   (CY 1991 L.M.C., ch. 21, § 1; 2001 L.M.C., ch. 11, § 1; 2005 L.M.C., ch. 24, § 1; 2018 L.M.C., ch. 34, § 1.)
   **Editor's note**—Section 57-3, formerly § 57-2A, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.

## Sec. 57-4. Discharge of guns in the urban area.

(a)     *Prohibition.*   Except as provided in subsection (b), a person, other than a peace officer or employee of the Maryland Department of Natural Resources performing official duties, must not discharge a gun within the urban area.

7

MONTGOMERY COUNTY CODE

(b)    *Exceptions.*   Except as provided in Sections 57-7 and 57-11, a person may discharge a gun:

(1)    on any indoor or outdoor target, trap, skeet, or shooting range that the Firearms Safety Committee has inspected and approved in writing;

(2)    in a private basement or cellar target range;

(3)    when necessary to protect life or property;

(4)    to kill a dangerous animal;

(5)    for discharge of blank cartridges in musical and theatrical performances, parades, or sporting events;

(6)    for salutes by firing squads at military funerals;

(7)    if approved by the Chief of Police, under a deer damage control permit issued by the Maryland Department of Natural Resources;

(8)    for the purpose of deer hunting on private property that is at least 50 acres in size if:

(A)    the person discharges the gun from an elevated position;

(B)    the person does not load the gun until the person is located in the elevated position;

(C)    the person unloads the gun before descending from the elevated position;

(D)    the projectile has a downward trajectory;

(E)    the property owner complies with any public notice requirements in applicable regulations; and

(F)    the property owner gives written notice to the Chief of Police at least 15 days before any gun is discharged on the property which:

1.    identifies the day or days on which deer hunting will occur;

2.    identifies the time that deer hunting will begin and end each day;

3.    lists the name of each individual who will participate in deer hunting; and

8

JA687

MONTGOMERY COUNTY CODE

    4.       includes a copy of the record plat or tax assessment record for the property; or

(9)    on property owned by the Maryland-National Capital Park and Planning Commission as a part of a deer management program conducted or sanctioned by the Commission that complies with safety requirements approved by the Chief of Police.

(c)    *50-acre threshold.*

(1)    Subject to the requirements of paragraph (2), up to 5 owners of contiguous parcels of property may aggregate their property to meet the 50-acre threshold in subsection (b)(8).

(2)    If property owners aggregate their parcels to achieve the 50-acre threshold in subsection (b)(8), a person may discharge a gun for the purpose of deer hunting on the aggregated property if the person obtains written permission from each property owner, which must include a copy of the record plat or tax assessment record for each parcel in the aggregated property.

(d)    A person who discharges a gun under the authority granted in subsection (b)(7), (b)(8), or (b)(9) is subject to the restrictions imposed by Section 57-5(a) on the discharge of a gun outside the urban area.

(e)    *Regulations*. The County Executive must adopt regulations under method (2) which:

(1)    establish procedures and criteria that the Chief of Police must use to decide whether it is safe to discharge a gun under the circumstances specified in subsection (b)(7); and

(2)    to implement subsection (b)(8):

    (A)    require signs to be posted along the perimeter of each applicable property at least 15 days before any gun is discharged on the property;

    (B)    specify the size, wording, and location of each sign; and

    (C)    identify a method to determine the number of signs that must be posted. (1981 L.M.C., ch. 42, § 1; CY 1991 L.M.C., ch. 21, § 1; 1997 L.M.C., ch. 14, §1; 2001 L.M.C., ch. 11, § 1; 2005 L.M.C., ch. 24, § 1; 2007 L.M.C., ch. 21, § 1.)

9

JA688

MONTGOMERY COUNTY CODE

**Editor's note**—Section 57-4, formerly § 57-3, was renumbered and amended pursuant to 2001 L.M.C., ch. 11, § 1.

### Sec. 57-5. Discharge of guns outside the urban area.

(a)   *Prohibition.*  Except as provided in subsection (c)(1) through (c)(6), outside the urban area, a person, other than a peace officer or employee of the Maryland Department of Natural Resources performing official duties, must not:

    (1)   discharge a gun:

        (A)   onto, across, or within 50 yards of a public road;

        (B)   onto or across property located within 50 yards of a public road;

        (C)   into or within the safety zone (150 yards of a building or camp designed for human occupancy)   without the owner or occupant's written consent; or

        (C)   from, onto, or across public or private property without the owner or occupant's written consent;

    (2)   discharge a full metal jacketed bullet of any caliber from a gun; or

    (3)   except as provided in subsection (b), discharge any fixed ammunition of a caliber higher than .25 caliber from a rifle or pistol.

(b)   *Exception - High Caliber Ammunition.*  A person may discharge fixed ammunition of a caliber higher than .25 from a rifle or pistol at:

        (A)   legal game or varmints on the ground; or

        (B)   a target on or near the ground that will not deflect a bullet.

(c)   *Other Exceptions.*  Except as provided in Sections 57-7 and 57-11, a person may discharge a gun:

    (1)   on any indoor or outdoor target, trap, skeet, or shooting range that the Firearm Safety Committee has inspected and approved in writing;

    (2)   in a private basement or cellar target range;

    (3)   when necessary to protect life or property;

    (4)   to kill a dangerous animal;

10

(5)     for discharge of blank cartridges in musical and theatrical performances, parades, or sporting events;

(6)     for salutes by firing squads at military funerals; or

(7)     under a deer damage control permit issued by the Maryland Department of Natural Resources. (1981 L.M.C., ch. 42, § 1; CY 1991 L.M.C., ch. 21, § 1; 1997 L.M.C., ch. 14, §1; 2001 L.M.C., ch. 11, § 1; 2005 L.M.C., ch. 24, § 1; 2007 L.M.C., ch. 21, § 1.)

**Editor's note**—Section 57-5, formerly § 57-4, was renumbered and amended pursuant to 2001 L.M.C., ch. 11, § 1.

## Sec. 57-6. Discharge of bows.

(a)     *Prohibition.*   A person must not discharge a bow in the County:

(1)     from, onto, or across a public road;

(2)     in violation of the archery hunting safety zone established in Md. Code, Natural Resources, §10-410, as amended, surrounding a building or camp designed for human occupancy without the owner or occupant's written consent; or

(3)     from, onto, or across public or private property without the owner or occupant's written consent;

(b)     *Exception.*   Subsection (a) does not apply to target archery practiced in compliance with safety guidelines established in regulations adopted under method (2).

(c)     A bow hunter must report the failure to recover a wounded deer to the County Police at the end of an unsuccessful search for the animal.   (CY 1991 L.M.C., ch. 21, § 1; 2001 L.M.C., ch. 11, § 1; 2007 L.M.C., ch. 21, § 1; 2014 L.M.C., ch. 27, § 1; 2017 L.M.C., ch. 26, §1.)

**Editor's note**—Section 57-6, formerly § 57-4A, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.

## Sec. 57-7. Access to guns by minors.

(a)     A person must not give, sell, rent, lend, or otherwise transfer any rifle or shotgun or any ammunition or major component for these guns in the County to a minor. This subsection does not apply when the transferor is at least 18 years old and is

11

MONTGOMERY COUNTY CODE

the parent, guardian, or instructor of the minor, or in connection with a regularly conducted or supervised program of marksmanship or marksmanship training.

(b)     An owner, employee, or agent of a gun shop must not allow a minor to, and a minor must not, enter the gun shop unless the minor is accompanied by a parent or other legal guardian at all times when the minor is in the gun shop.

(c)     A person must not give, sell, rent, lend, or otherwise transfer to a minor:

    (1)     a ghost gun or major component of a ghost gun;

    (2)     an undetectable gun or major component of an undetectable gun; or

    (3)     a computer code or program to make a gun through a 3D printing process.

(d)     A person must not purchase, sell, transfer, possess, or transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

(e)     A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

(f)     This section must be construed as broadly as possible within the limits of State law to protect minors.   (1981 L.M.C., ch. 42, § 1; 1997 L.M.C., ch. 14, § 1; 2001 L.M.C., ch. 11, § 1; 2021 L.M.C., ch. 7, §1.)

**Editor's note**—Section 57-7, formerly § 57-5, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.

### Sec. 57-8. Child safety handgun devices and handguns.

(a)     *Findings.*  The unintentional discharge of handguns often causes accidental death or injury to children.   Additional safeguards are needed to protect children from injury or death from the unintentional discharge of loaded and unlocked handguns.   Requiring a firearm dealer who transfers a handgun to provide a child safety handgun device when a handgun is transferred can prevent unintentional injuries and fatalities to children
.

(b)     *Child safety handgun device.*

    (1)     A firearm dealer who sells, leases, or otherwise transfers a handgun in the County must provide to the recipient of the handgun a child safety handgun device for the handgun at the time of the transfer.   The dealer may charge for the child safety handgun device.

12

MONTGOMERY COUNTY CODE

    (2)    A person who purchases or otherwise receives a handgun from a firearm dealer (or any transferor who would be a firearm dealer if the transfer occurred in the State) after October 8, 1997 must obtain a child safety handgun device for the handgun:

        (A)    at the time of a transfer in the County; or

        (B)    before entering the County with the handgun if the transfer occurred outside the County and the transferee resides in the County.

(c)    *Notices*.

    (1)    A firearm dealer who sells, leases, or otherwise transfers a handgun must post conspicuously in the dealer's place of business a notice of:

        (A)    the requirement in subsection (b) for a child safety handgun device; and

        (B)    the prohibition in State law of storing or leaving a loaded firearm in a location where an unsupervised child can gain access to the firearm.

    (2)    If the firearm dealer transferring a handgun does not maintain a place of business in a commercial establishment, the dealer must provide the notices required by paragraph (1) in writing when transferring the handgun.

(d)    *Enforcement.*    The Department of Health and Human Services and any other department designated by the County Executive enforces this section.

(f)    *Regulations.*    The Executive may adopt regulations under method (2) to implement this Section.   (1997 L.M.C., ch. 16; 2001 L.M.C., ch. 11, § 1.)

    **Editor's note**—Section 57-8, formerly § 57-5A, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.

### Sec. 57-9. Unlawful ownership or possession of firearms.

    A person must not possess, exercise control over, use, carry, transport, or keep a rifle, shotgun, or pistol, if the person:

    (a)    is an unlawful user of , addicted to, or is under treatment for an addiction to, marijuana or any depressant or stimulant drug or narcotic drug (as defined in Maryland Criminal Law Code Annotated, sections 1-101, 5-101, 5-401, 5-404, and 5-604); or

MONTGOMERY COUNTY CODE

(b)    has been convicted in any court of a crime of violence, trafficking in narcotics, a criminal violation of any of the provisions of Maryland Public Safety Code Annotated, sections 5-101 to 5-138, 5-142, or any federal firearms control law; or

(c)    is a fugitive from justice; or

(d)    has been confined to any hospital or institution for treatment of a mental disorder or for mental illness unless a licensed physician has by affidavit stated that the physician is familiar with the person's history of mental illness and that in the physician's opinion the person is not disabled by such illness in a manner which should prevent the person from possessing a rifle or a shotgun; or

(e)    has been confined to any hospital or institution for treatment of alcoholism unless a licensed physician has by affidavit stated that the physician is familiar with the person's history of alcoholism and that, in the physician's opinion, the person is no longer suffering from a disability in such a manner which should prevent the person from possessing a rifle or shotgun.   (1981 L.M.C., ch. 42, § 1; 2001 L.M.C., ch. 11, § 1; 2004 L.M.C., ch. 22, §1.)

**Editor's note**—Section 57-9 is cited and quoted at Furda v. State, 421 Md. 332, 26 A.3d 918 (2011) where the Court of Appeals reversed the decision of the Court of Special Appeals; see also companion case at 194 Md. App. 1, 1 A.3d 528 (2010), also citing Section 57-9.

Section 57-9, formerly § 57-6, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.


**Sec. 57-10. Keeping guns on person or in vehicles.**

It shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition unless:

(a)    *Lawful mission.* Such person is then engaged upon a lawful mission for which it is necessary to carry a gun upon his person; or

(b)    *Special guard, special police, etc.* Such person is employed as a special guard, special police officer or special detective and has been lawfully deputized by the sheriff for the county, or has been appointed a constable in the county, or has been licensed under the laws of the state, should such a law be enacted, to carry such gun and then is on or in the immediate vicinity of the premises of any employer whose occupation lawfully requires the employment of a person carrying a gun while in the discharge of the duties of such employment; or

(c)    *Military service.* Such person is then lawfully engaged in military service or as a duly authorized peace officer; or

14

MONTGOMERY COUNTY CODE

(d)    *Hunting, target practice, etc.* Such person is engaged in lawful hunting, drill, training or target practice on property of which he is the owner or lessee or on property with the prior permission of the owner or lessee thereof; or

(e)    *Going to or returning from hunting, target practice, etc.* Such person is engaged in going to or from lawful hunting, drill training or target practice, or in delivering such gun to or carrying it from a gunsmith or repairman, or is engaged in any other lawful transfer of possession; provided, that such person shall be on or traveling upon a public highway or property of which he is the owner or lessee or on property with the prior permission of the owner or lessee thereof; provided further, that such gun shall not be loaded with explosive ammunition. (1981 L.M.C., ch. 42, § 1; 2001 L.M.C., ch. 11, § 1.)

**Editor's note**—Section 57-10, formerly § 57-7, was renumbered pursuant to 2001 L.M.C., ch. 11, § 1.


**Sec. 57-11.    Firearms in or near places of public assembly.**

(a)    In or within 100 yards of a place of public assembly, a person must not:

(1)    sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or

(2)    sell, transfer, possess, or transport a firearm created through a 3D printing process.

(b)    This section does not:

(1)    prohibit the teaching of firearms safety or other educational or sporting use in the areas described in subsection (a);

(2)    apply to a law enforcement officer, or a security guard licensed to carry the firearm;

(3)    apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;

(4)    apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm; or

(5)    apply to separate ammunition or an unloaded firearm:

15

MONTGOMERY COUNTY CODE

    (A)    transported in an enclosed case or in a locked firearms rack on a motor vehicle, unless the firearm is a ghost gun or an undetectable gun; or

    (B)    being surrendered in connection with a gun turn-in or similar program approved by a law enforcement agency.

(c)    This section does not prohibit a gun show at a multipurpose exhibition facility if:

    (1)    the facility's intended and actual primary use is firearms sports (hunting or target, trap, or skeet shooting) or education (firearms training); or

    (2)    no person who owns or operates the facility or promotes or sponsors the gun show received financial or in-kind support from the County (as defined in Section 57-13(a)) during the preceding 5 years, or after December 1, 2001, whichever is shorter; and

    (A)    no other public activity is allowed at the place of public assembly during the gun show; and

    (B)    if a minor may attend the gun show:

    (i)    the promoter or sponsor of the gun show provides to the Chief of Police, at least 30 days before the show:

    (a)    photographic identification, fingerprints, and any other information the Police Chief requires to conduct a background check of each individual who is or works for any promoter or sponsor of the show and will attend the show; and

    (b)    evidence that the applicant will provide adequate professional security personnel and any other safety measure required by the Police Chief, and will comply with this Chapter; and

    (ii)    the Police Chief does not prohibit the gun show before the gun show is scheduled to begin because:

    (a)    the promoter or sponsor has not met the requirements of clause (i); or

    (b)    the Police Chief has determined that an individual described in clause (i)(a) is not a responsible individual.

16

JA695

MONTGOMERY COUNTY CODE

(d)    Notwithstanding subsection (a), a gun shop owned and operated by a firearms dealer licensed under Maryland or federal law on January 1, 1997, may conduct regular, continuous operations after that date in the same permanent location under the same ownership if the gun shop:

   (1)    does not expand its inventory (the number of guns or rounds of ammunition displayed or stored at the gun shop at one time) or square footage by more than 10 percent, or expand the type of guns (handgun, rifle, or shotgun) or ammunition offered for sale since January 1, 1997;

   (2)    has secure locks on all doors and windows;

   (3)    physically secures all ammunition and each firearm in the gun shop (such as in a locked box or case, in a locked rack, or with a trigger lock);

   (4)    has adequate security lighting;

   (5)    has a functioning alarm system connected to a central station that notifies the police; and

   (6)    has liability insurance coverage of at least $1,000,000. (1997 L.M.C., ch. 14, §§1, 2; 1998 L.M.C., ch. 2, §§1, 2; 2001 L.M.C., ch. 11, § 1; 2021 L.M.C., ch. 7, §1.)

   **Editor's note**—Section 57-11, formerly § 57-7A, was renumbered and amended pursuant to 2001 L.M.C., ch. 11, § 1.

## Sec. 57-12. Sale of fixed ammunition.

(a)    *Legislative intent.* The purpose of this section is to provide support to state and local law enforcement officials in their efforts against crime and violence by placing controls on the flow of dangerous ammunition, in addition to those provided by federal law, and to encourage compliance with the state police department's program of voluntary firearm registration. It is not the purpose of this section to place any undue or unnecessary restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, or to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes. It is not the purpose of this section to create, nor does it permit the creation of, any separate system of county registration of firearms or ammunition, or the levying of any county fee in connection with any registration of firearms or ammunition. It is specifically not the intent of this section to serve as a revenue generating measure.

(b)    *Registration of ammunition dealers.* Any ammunition dealer (as defined in 18 United States Code, section 921 et seq.) who conducts business in Montgomery

17

JA696

MONTGOMERY COUNTY CODE

County is required to register with the Montgomery County department of police by maintaining on file with that department, at all times, a valid, current copy of his federal ammunition dealer's license.

(c)  *Conditions for sale.* No ammunition dealer may sell fixed ammunition to any other person, unless:

    (1)  The sale is made in person;

    (2)  The purchaser exhibits, at the time of sale, a valid registration certificate or, in the case of a nonresident, proof that the firearm is lawfully possessed in the jurisdiction where the purchaser resides;

    (3)  The fixed ammunition to be sold is of the same caliber or gauge as the firearm described in the registration certificate, or other proof in the case of a nonresident; and

    (4)  The purchaser signs a receipt for the ammunition which shall be maintained by the licensed dealer for a period of one (1) year from the date of sale.

(d)  *Exceptions.* The provisions of this section shall not apply to the sale of fixed ammunition:

    (1)  Which is suitable for use only in rifles or shotguns generally available in commerce, or to the sale of component parts of these types of ammunition;

    (2)  To any person licensed to possess fixed ammunition under an act of Congress and the law of the jurisdiction where the person resides or conducts business; or

    (3)  To any law enforcement officer of federal, state, local or any other governmental entity, if the officer has in his possession a statement from the head of his agency stating that the fixed ammunition is to be used in the officer's official duties.

(e)  *Penalties.* Any ammunition dealer who sells fixed ammunition in violation of the provisions of this section shall be guilty of a class C violation, pursuant to section 1-19 of the Montgomery County Code, punishable only by a civil penalty in the amount of fifteen dollars ($15.00).

(f)  *Exception for incorporated municipalities.* This section shall not be effective in any incorporated municipality which by law has authority to enact a law on the same subject. If any such incorporated municipality adopts this section and requests the county to enforce the adopted provisions thereof within its corporate limits, the county may thereafter administer and enforce the same within the

18

MONTGOMERY COUNTY CODE

incorporated municipality. The county executive is authorized to enter into agreements with incorporated municipalities to enforce and administer the provisions so adopted and to collect the administrative costs of implementation from such municipalities. (1983 L.M.C., ch. 50, § 2.)

**Editor's note**--The above section was held to be invalid by the Court of Appeals in Montgomery County, Maryland, et al. v. Atlantic Gunds, Inc., et al., 302 Md. 540, 489 A.2d 1114 (1985).

### Sec. 57-13. Use of public funds.

(a)     The County must not give financial or in-kind support to any organization that allows the display and sale of guns at a facility owned or controlled by the organization.   Financial or in-kind support means any thing of value that is not generally available to similar organizations in the County, such as a grant, special tax treatment, bond authority, free or discounted services, or a capital improvement constructed by the County.

(b)     An organization referred to in subsection (a) that receives direct financial support from the County must repay the support if the organization allows the display and sale of guns at the organization's facility after receiving the County support.   The repayment must include the actual, original value of the support, plus reasonable interest calculated by a method specified by the Director of Finance.   (2001 L.M.C., ch. 11, § 1.)

**Editor's note**—2001 L.M.C., ch. 11, § 2, states:
(a) Section 57-13 of the County Code, as amended by Section 1 of this Act, applies to:
    (1) support that an organization receives from the County after December 1, 2001; and
    (2) the display of a gun for sale at the facility after December 1, 2001.
(b) Section 57-13 expires on December 1, 2011.
    Section 57-13 is cited but not interpreted in Frank Krasner Enterprises, Ltd. v. Montgomery County, 401 F.3d 230 (4th Cir. 2005) because appellants lacked standing.

### Sec. 57-14. Exemptions from Chapter.

Nothing in this Chapter applies to the purchase, ownership, or possession of a bona fide antique gun that is incapable of use as a gun.   Except as provided in Sections 57-7 and 57-11, nothing in this Chapter prohibits the owner or tenant of any land from carrying or discharging a gun on that land for the purpose of killing predatory animals which prey on livestock. (1981 L.M.C., ch. 42, § 1; 1997 L.M.C., ch. 14, §1; 2001 L.M.C., ch. 11, § 1; 2007 L.M.C., ch. 21, § 1.)
**Editor's note**—Section 57-14, formerly § 57-8, was renumbered, amended, and retitled pursuant to 2001 L.M.C., ch. 11, § 1.

19

JA698

MONTGOMERY COUNTY CODE

### Sec. 57-15. Penalty.

Any violation of this Chapter or a condition of an approval certificate issued under this Chapter is a Class A violation to which the maximum penalties for a Class A violation apply. Any violation of Section 57-8 is a Class A civil violation. (Mont. Co. Code 1965, § 109-9; 1983 L.M.C., ch. 22, § 1; CY 1991 L.M.C., ch. 21, § 1; 1997 L.M.C., ch. 16; 2001 L.M.C., ch. 11, § 1.)

**Editor's note**—Section 57-15, formerly § 57-9, was renumbered and amended pursuant to 2001 L.M.C., ch. 11, § 1.

### Sec. 57-16. Reporting requirement.

(a)     The County Police Department must submit a report annually to the County Executive and the County Council regarding the availability and use of ghost guns and undetectable guns in the County.

(b)     The report must include the number of ghost guns and undetectable guns recovered by the Department during the prior year.

(c)     Each report must be available to the public on the Police Department's website. (2021 L.M.C., ch. 7, §1.)

JA699

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC., *et al.*,        )
                                             )
*Plaintiffs,*                                )
                                             )
v.                                           )   Case No. 8:21-cv-01736-TDC **(L)**
                                             )   Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                       )
                                             )
*Defendant.*                                 )

### SUPPLEMENTAL DECLARATION OF ELIYAHU SHEMONY

COMES NOW, the declarant, ELIYAHU SHEMONY, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following supplemental declaration are true:

1. My name is ELIYAHU SHEMONY, and I am named plaintiff in the above-captioned matter. I am an adult over the age of 18, a Maryland resident and I am fully competent to give sworn testimony in this matter.

2. I am a member and the former security director of the Magen David Sephardic Congregation ("MDSC") synagogue in Rockville, Maryland. I served as the security director for MDSC for nearly 20 years through the end of 2021.

3. Jewish communities, and especially religious institutions, are considered one of the top targets for violent attacks by the United States Office of Homeland Security. This was made abundantly clear by the deadly attacks on the Tree of Life Synagogue in Pittsburgh, Pennsylvania as well as the Chabad Congregation in Poway, California. In addition, the number of antisemitic incidents in Montgomery County has risen sharply over the past year, including hateful and threatening graffiti less than half a mile from our synagogue's location.

EXHIBIT A

4. As part of the security protocols we enacted at MDSC, I obtained a Maryland wear and carry permit approximately five years ago. We felt that the ability to legally carry a firearm in synagogue and outside was a necessary tool to protect our community. Upon being granted the permit, I carried a firearm to all daily religious services during the week as well as on the Sabbath (Saturday), including MDSC functions and trips taking place outside of the synagogue and on days other than on the Sabbath.

5. In an email dated November 18, 2022, I was informed by the president of MDSC, Mr. Elliot Totah, that since Montgomery County Bill 21-22 was passed, I was no longer allowed to carry a firearm in the synagogue. A true and correct copy of that email is attached as Exhibit 1. On November 18, 2022, I received a second email from Mr. Totah, explaining the reasons behind his first email. A true and correct copy of that email is attached as Exhibit 2. On December 9, 2022 MDSC he also sent a memorandum to the MDSC Community which stated that because of th enactment of Bill 21-22E, MDSC had decided to use metal detection wands at the entrances "t ensure that we did not run afoul of the new legislation." A true and correct copy of that MDS memorandum is attached as Exhibit 3.

6. The November 18 email stated that if I continued to carry a firearm to synagogue, he would notify the police and have me arrested.

7. In this email, he specifically stressed the following points:

1)    This was not a voluntary policy change for the synagogue, but rather a reaction to the passing of Bill 21-22E and was put in place in order for the synagogue to be in "full compliance" with the law;

2)  This was the specific guidance he received from Montgomery County' "office of the County Attorney General" and from "a County Council member;" and

3)  If, at any future date, the court were to grant a Temporary Restraining Order (TRO), Temporary Injunction (TI), or strike down the law, Mr. Totah would reevaluate the decision.

8. The following week, when Bill 21-22 was officially signed into law, MDSC began using metal detectors to "comply" with Bill 21-22. I have complied with Bill 21-22E and the MDSC Community memorandum. My family and I don't feel safe anymore at MDSC because we have been stripped of our ability to defend ourselves from attack. My family and I are thus chilled in the exercise of our right to practice our Jewish faith.

9. The leadership of the synagogue refuses to amend this measure as long Bill 21-22 is in place, even though they are aware of the security risk it possesses, because Jewish law requires obedience to civil law. Exhibit 3.

Dated: JAN , 3 , 2023

ELIYAHU SHEMONY

| From: | etotah@oxbridgedev.com |
|---|---|
| To: | "Eli Shemony" |
| Subject: | Montgomery County - New Gun Control Legislation |
| Date: | Friday, November 18, 2022 10:06:03 AM |

Eli,

I hope you are doing well.

As you may have already seen in the weekly MDSC announcements, we've been forced to take new gun control legislation enacted by the Montgomery County Council very seriously. Since I believe you've brought firearms into MDSC in the past, I wanted to make sure you are familiar with the new law and its impact on your ability to do so moving forward. Due to liability and licensing requirements, our security company will require any individual who unlawfully brings a firearm into MDSC to leave the premises or they will call law enforcement—I really want to make sure it doesn't come to this.

If you'd like to discuss further, please let me know. Otherwise, please be sure that you attend MDSC services from now on without any firearms at the premises or on your person. This is not a policy decision on the part of the Board or any officer of the congregation—this is a new countywide law that we have no choice but to abide by.

Thank you and Shabbat Shalom,

**Elliot Totah**

**The Oxbridge Group**
**Phone:** 301-294-4150 ext 1
**Web:** www.oxbridgedev.com
1250 Connecticut Ave NW, Suite 700
Washington, DC 20036

EXHIBIT 1

| | |
|---|---|
| **From:** | Elliot Totah |
| **To:** | Eli Shemony |
| **Subject:** | Re: Montgomery County - New Gun Control Legislation |
| **Date:** | Friday, November 18, 2022 4:03:24 PM |

Eli,

I stand corrected. Based on updated guidance we just received from the office of the Attorney General, the County Executive still needs to sign this bill into law (which it appears he intends to do). We will maintain the status quo until and if the bill is signed into law at which time my original email to you will stand.

Elliot Totah
The Oxbridge Group
Sent from my iTotah

**EXHIBIT 2**

# Magen David Sephardic Congregation
## Beit Eliahu Synagogue

### The Sephardic Synagogue of the Nation's Capital

Shalom MDSC Community,

Last week we made an adjustment to our security protocol for all who enter the synagogue during Shabbat Shacharit and other larger gatherings. Our team of security professionals is now using a metal detection wand to ensure the safety of all those who pass through our doors. We wanted to explain this recent change and provide further insight into how it came about.

The introduction of the wand arose from the passage of new gun control legislation in Montgomery County on November 28, 2022 which prohibits anyone from carrying a gun in or around public places of assembly, including places of worship. The only exclusions are licensed security guards and individuals in law enforcement.

To ensure that we did not run afoul of the new legislation, we opted for the most halachically permissible method of enforcement: metal detection wands. This decision ensures that we respect *Dina D'malkhuta Dina*, the principle of obedience to civil law, as well as mitigates liability for the synagogue and our contractors.

In the event the law changes or is stayed/repealed, we will revisit our protocol. In the meantime, we appreciate everyone's cooperation in making Magen David as safe as possible. If you continue to have any halakhic concerns, please refer to the links below and note that a basket will be available to remove any metal items in your pocket prior to being wanded.

1. Staying Safe And Secure: Are All Security Measures Permitted On Shabbos? - The Bais HaVaad Halacha Center
2. shabbos security wand | שאל את הרב | דין (din.org.il)

Should you have any other questions, do not hesitate to contact us.

Thank you for your understanding.

Sincerely,

EXHIBIT 3

Elliot Totah, President
Frederic Richardson, Board Member & Chair of the Security Committee
Bernard Suissa, Board Member & Chair of the Religious Committee

Magen David Sephardic Congregation | 11215 Woodglen Drive, 301-770-6818, Rockville, MD 20852

Unsubscribe ceo@epicacct.com

Update Profile | Constant Contact Data Notice

Sent by office@magendavidsephardic.org in collaboration with



Try email marketing for free today!

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,  )
                                        )
*Plaintiffs*,                           )
                                        )
v.                                      )    Case No. 8:21-cv-01736-TDC **(L)**
                                        )    Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                 )
                                        )
*Defendant*.                            )

**SUPPLEMENTAL DECLARATION OF ALLAN D. BARALL**

     COMES NOW, the declarant, ALLAN D. BARALL, and hereby solemnly declares under penalties of perjury that the statements in this supplemental declaration are based upon personal knowledge that the contents of this supplemental declaration are true to the best of my knowledge and belief:

     1. My name is ALLAN D. BARALL, and I am member of Maryland Shall Issue, Inc., a plaintiff in the above-captioned matter. I am an adult over the age of 18, a Montgomery County, Maryland resident and I am fully competent to give sworn testimony in this matter.

     2. This Declaration is a follow-on to my previously submitted declaration, dated December 1, 2022.

     3. Montgomery County, the Defendant in the Opposition to the Plaintiffs' Emergency Motion for Temporary Restraining Order and Emergency Motion for a Preliminary Injunction, states that "no irreparable harm" exists because of passing of County Bill 21-22E. I believe this is an incorrect statement.

1

**EXHIBIT B**

4. I am a law-abiding citizen. Upson passage of Bill 21-22E I stopped carrying a handgun in my synagogue even though I was specifically requested to carry by the synagogue's rabbi and senior leadership for security measures. Knowing that the new law would only affect law-abiding, permit holding people, I heard at least three independent persons state that they now feel like "sitting ducks" in my synagogue. This exact, precise phrase was used by separate, independent individuals. And, I am personally aware of at least two individuals who have now stopped coming to the synagogue because they no longer feel that it is safe to do so in light of the County's enactment of Bill 21-22E.

5. Orthodox Jews often attend services at a synagogue two or three times a day. Synagogues are especially open places. My specific synagogue is mere feet off a busy road where the congregation has its collective back to windows that face the street. It is especially easy for someone with ill intent to enter.

6. A report issued on December 28, 2022, entitled the "Hate Crime Accountability Project" documents that 194 antisemitic assaults occurred between 2018 and 2022. (https://bit.ly/3X4BNtn.) Among the incidents noted in the report was that two men were arrested on November 18, 2022, for a plot to attack a New York City synagogue. "What might have been the next Pittsburgh or Poway synagogue massacre was averted," the CEO of UJA-Federation of New York, Eric Goldstein, said, referring to the 2018 and 2019 massacres at Jewish houses of worship. (https://bit.ly/3i6KEfq.) I believe that the same sort of antisemitic attack could just as easily happen at my synagogue or any other synagogue in the Montgomery County, and that it is only a matter of time.

7. The Defendant states that "… Plaintiff's fear is outweighed by the fear the non-permit holding public may have that a stranger standing next to them – of unknown current state

2

or temperament – is carrying a loaded firearm as they exercise their First Amendment right to assemble in a place of public assembly". Referenced is a quote from the Montgomery County Council President "on the right of me and my family to go to a movie theater without having to wonder or worry about someone sitting next to me is carrying a gun on them." First of all, in order to obtain a wear and carry permit, I went through a background check from the State police, including fingerprinting, an interview with a State investigator, and reference checks. It is thus simply not correct to state that my "state of temperament" is "unknown." Further, if the County believes that "wonder or worry" about a legally armed permit holder is a harm, then I believe that the "wonder or worry" of me and my fellow synagogue members about "being sitting ducks" to antisemitic criminal attack is even a greater harm. Since the law passed, I have not seen a single police officer at my synagogue, and I have attended consistently three services daily. Without the ability to defend myself, the additional anxiety and worry about my physical safety is, indeed, "irreparable harm" to me.

8. The County is, understandably, attempting to curtail the number of firearm-related deaths in the U.S. The Defendant quotes the Montgomery County Police Chief Marcus Jones who stated on July 11, 2022, that "gun violence has become sort of the norm, which is not where we need to be … It is of grave concern." I agree entirely, which is why I obtained a wear and carry permit.

9. At hearing on this bill, County Council members cited the recent events of the University of Virginia shooting and the shooting outside of Clyde's restaurant in Bethesda. I conducted an online search and determined that neither of those shootings was caused by a permit-holding person. I believe that the County should understand that Bill 21-22E only affects the law-abiding person like me; I believe that it does nothing to protect the law-abiding citizen from the

3

criminal element who I believe will continue to illegally carry just as they illegally carried prior to

the enactment of Bill 21-22E.

*/s/ Allan D. Barall*

Dated: January 4, 2023:
ALLAN D. BARALL

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND SHALL ISSUE, INC., *et al.*,    )
                                          )
*Plaintiffs*,                             )
                                          )
v.                                        )    Case No. 8:21-cv-01736-TDC **(L)**
                                          )    Case No. 8:22-cv-01967-DLB
MONTGOMERY COUNTY, MD.,                    )
                                          )
*Defendant*.                              )

**SUPPLEMENTAL DECLARATION OF JOHN SMITH NO.1**

COMES NOW, the declarant, JOHN SMITH NO.1, and hereby solemnly declares under penalties of perjury and states that based upon personal knowledge that the contents of the following declaration are true:

1. My name is JOHN SMITH NO.1, and I am member of Maryland Shall Issue, Inc., a plaintiff in the above-captioned matter. This Supplemental Declaration is for the purpose of adding to my prior declaration previously submitted. I am an adult over the age of 18, a Montgomery County Maryland resident and I am fully competent to give sworn testimony in this matter. JOHN SMITH NO. 1 is not my real name. I respectfully request that my identity remain anonymous.  While I have provided armed security to my Church, I have done so anonymously and the effectiveness of that security were it occur in the future would be undermined if my role in doing so became public knowledge.  Moreover, regretfully, I am concerned that my livelihood would be jeopardized should I be publicly associated with pro-Second Amendment advocacy.

2. I am a Deacon at my Church in Montgomery County and I serve (anonymously) as a volunteer plain-clothed armed security member of my Church located in Montgomery County Maryland with the permission of my pastor and other Deacons. Prior to the

**EXHIBIT C**

Supreme Court's decision in *NYSRPA v. Bruen* in June of 2022, I obtained a restricted Maryland wear and carry permit from the Maryland State Police for the specified purpose of providing armed security for my Church. I have since been issued an unrestricted wear and carry permit by the State Police.

3. In light of County Council and County Executive for Montgomery County, Maryland enacting bill 21.22E I am no longer able to carry a weapon to my Church in Germantown, MD.  I am no longer able to provide protection to my family or other congregants due to the potential penalties related to the bill if I were found in violation of them. Potentially losing my Second Amendment rights for life is a serious threat to me and I cannot afford to take that chance. Because of bill 21-22E, our Church had no choice but to bar all members who had a carry permit from carrying a firearm on Church grounds and during Church activities taking place outside of those grounds.

4. Due to the 100-yard provision and removal of the exception of for Maryland wear and carry permit holders I do not see how I, or any person wishing to practice their Second Amendment rights to bear arms, can move around the County without violating the law. I live in the 20878 zip code.  My neighborhood has several parks and an elementary school.  Since the law now includes all property of the defined sensitive locations and not just the buildings 100 yards/300 feet pretty much covers any road in front of any of the listed locations.

5. There is a path to a park opposite the entrance to the street on which I live.  The park path behind the homes across from my street is 100 feet from cross street to my street, so driving anywhere from my home or walking in my neighborhood puts me in violation of this law as soon as I walk to the head of my street.  Since I live on a cul-de-sac I have no choice when leaving my home to go that way, forcing me to violate the law if I were to carry my firearm with

my permit.  I cannot walk in approximately half of my neighborhood due to the number of parks, the elementary school and the 100 yard/300 feet exclusion zone. If I travel to some local shopping centers it is virtually impossible to carry a firearm with a permit due to the types of sensitive places the County has banned weapons on or near.  For example at the Muddy Branch Square Shopping Center on Muddy Branch road, the buildings of the shopping center are roughly shaped in a U configuration with the parking lot filling in the space in front of the stores. There is an urgent care facility on the north end of the shopping center; a County liquor store on the west side; an eye doctor in the southwest corner.

6.  Using Google maps measuring tool, I have determined that it is not possible to patronize any store while carrying a firearm with a permit based on the distance rule and the sensitive places as well as entering and exiting the parking lot puts one closer to the sensitive, prohibited   places. If I wanted to go to the Kentland's Shopping area in Gaithersburg, MD from my home it is impossible to not violate the newly enacted law as any route I would take there has me pass by any number of parks, places of worship, schools, a library, community health centers, childcare facilities, and/or government buildings including any place owned by or under the control of the County.

*/s/ John Smith No. 1*

Dated: December 4, 2023
JOHN SMITH NO.1

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      SOUTHERN DIVISION

 3   _____)
     MARYLAND SHALL ISSUE, INC., et al.,)
 4                  Plaintiffs,         )
            v.                          )  Case No. 8:21-cv-01736-TDC
 5   MONTGOMERY COUNTY, MARYLAND,       )
                     Defendant.         )
 6   _____)
                                           Greenbelt, Maryland
 7                                         February 6, 2023
                                           2:59 p.m.
 8
                            MOTIONS HEARING
 9              BEFORE THE HONORABLE THEODORE D. CHUANG

10                  A P P E A R A N C E S

11   ON BEHALF OF THE PLAINTIFFS:

12        LAW OFFICES OF MARK W. PENNAK
          7416 Ridgewood Avenue
13        Chevy Chase, Maryland  20815
          BY:  MARK WILLIAM PENNAK, ESQUIRE
14             (301) 873-3671
               m.pennak@me.com, ESQUIRE
15
     ON BEHALF OF THE DEFENDANT:
16
          OFFICE OF THE COUNTY ATTORNEY
17        101 Monroe Street, Third Floor
          Rockville, Maryland  20850
18        BY:  EDWARD BARRY LATTNER, ESQUIRE
               (240) 777-6735
19             Edward.Lattner@MontgomeryCountyMD.gov
          BY:  MATTHEW HOYT JOHNSON, ESQUIRE
20             (240) 777-6709
               matthew.johnson3@montgomerycountymd.gov
21        BY:  ERIN JEANNE ASHBARRY, ESQUIRE
               (240) 777-6700
22             erin.ashbarry@montgomerycountymd.gov

23                  PATRICIA KLEPP, RMR
                    Official Court Reporter
24             6500 Cherrywood Lane, Suite 200
                 Greenbelt, Maryland  20770
25                    (301) 344-3228
```

JA714

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (Call to order of the Court.) |
| 3 | THE COURTROOM DEPUTY:  All rise.  The United States |
| 4 | District Court for the District of Maryland is now in session, |
| 5 | the Honorable Theodore D. Chuang presiding. |
| 6 | THE COURT:  Thank you, everyone.  Please be seated. |
| 7 | THE COURTROOM DEPUTY:  The matter now pending before |
| 8 | this Court is Civil Action No. TDC-21-1736, Maryland Shall |
| 9 | Issue, Inc., et al. v. Montgomery County, Maryland.  We are here |
| 10 | today for the purpose of a motions hearing.  Counsel, please |
| 11 | identify yourselves for the record. |
| 12 | MR. PENNAK:  This is Mark Pennak, counsel for |
| 13 | plaintiffs. |
| 14 | THE COURT:  Good afternoon. |
| 15 | MR. LATTNER:  Good afternoon, Your Honor.  Edward |
| 16 | Lattner for Montgomery County, Maryland. |
| 17 | MR. JOHNSON:  Your Honor, Matthew Johnson, for |
| 18 | Montgomery County, Maryland. |
| 19 | MS. ASHBARRY:  Good afternoon.  Erin Ashbarry, for |
| 20 | Montgomery County, Maryland. |
| 21 | THE COURT:  Okay.  Good morning -- good afternoon, |
| 22 | everyone.  Thank you for joining us.  There are two pending |
| 23 | motions in this case, the motion to remand and the motion for |
| 24 | preliminary injunction, and we can talk about both.  I have |
| 25 | reviewed the briefs in both and have some questions, but I also |

1  want to give the parties a chance to argue.

2          I generally don't set a firm time limit.  I'm thinking

3  perhaps 20 minutes a side.  And we can cover both issues at the

4  same time, although, since I may have some questions, it will

5  take you longer -- you know, if one side gets more time to

6  respond to my questions, then we'll try to make sure the other

7  side has equal time if they would like to have it.

8          Now, in terms of -- well, and I guess there's a couple

9  different ways to look at this, but the plaintiffs are the ones

10 seeking the preliminary injunction at this time.  The County is

11 seeking the remand.  I thought just for ease of the way I

12 thought about this, since the plaintiffs are the plaintiffs, why

13 don't we start with them on both issues, and then we'll hear

14 from the County, and then if there's any need for a response

15 from both sides on their respective motions as a brief rebuttal,

16 I can hear that.  So Mr. Pennak, you can go first.

17         MR. PENNAK:  Thank you, Your Honor.

18         THE COURT:  Just make sure you pull the microphone up.

19 Sometimes those things don't stay in the same place.

20         MR. PENNAK:  Is that better?

21         THE COURT:  I think that's okay, yes.

22         MR. PENNAK:  Okay.  Thank you, Your Honor.  Mark

23 Pennak, counsel for the plaintiffs.  So let me begin briefly

24 with the motion for remand, and I'll move quickly on to the

25 substantive motion.

4

```
 1          THE COURT:  Mm-hmm.
 2          MR. PENNAK:  The remand, in argue, would be beyond the
 3   scope of this Court's discretion.  There is no parallel
 4   proceedings in state court at this moment.  In our view, holding
 5   the case in abeyance, the federal claims in abeyance pending a
 6   remand to the state courts would basically create parallel
 7   proceedings, where none now exist, and that the Court has an
 8   affirmative obligation under controlling Supreme Court precedent
 9   to exercise its jurisdiction with respect to the federal claims.
10          There is no probability -- and we have outlined this
11   in our motions, so I'm happy to take questions on it.  There is
12   no probability that the -- any sort of decision on the state
13   claims and in state court could possibly decide all aspects of
14   the federal claims before the Court now.
15          In those situations, the Supreme Court has said that
16   there must be an obvious limiting construction of the state
17   claims where there are parallel proceedings.  That's -- and
18   where there are no parallel proceedings, as there are right now
19   no parallel proceedings, then the Court must -- has an
20   affirmative obligation to proceed to decide the federal claims.
21   And that's the Hawaii Housing Authority case.
22          THE COURT:  So that's a diff- -- so there's two issues
23   here.  And I know the County has created sort of complicated
24   constructs in terms of what they want and what they don't want,
25   but I understand your point on the stay.
```

5

1        On the initial issue of remand of the state claims,

2 which is, I believe -- and as I said in the first ruling of this

3 type earlier on, it's governed by 28 U.S.C. 1367, and one of the

4 issues -- predominate is one issue, but there's also the

5 question of whether they're novel or complex issues of state

6 law.  So regardless of what happens with the stay, isn't it up

7 to the Court, as a matter of that supplemental jurisdiction

8 statute, to decide whether it's better positioned to address

9 these claims that are here on supplemental jurisdiction or to

10 let the state handle those?

11        MR. PENNAK:  Well, I think the state -- the County,

12 that is -- agrees that if the case is not held in abeyance, or

13 at least the federal claims are not held in abeyance, then it

14 would prefer that the state claims not be remanded for further

15 adjudication to avoid ongoing parallel proceedings taking place

16 at the same time.  We agree with that.  So there is a -- we do

17 agree, however, that the federal claims should be adjudicated

18 first, because they encompass relief that is broader --

19        THE COURT:  Do you agree, or that's your position?

20 I'm not sure that's their position.

21        MR. PENNAK:  That's their papers, in their papers,

22 Your Honor.  So if I -- unless I've misread their papers, I

23 think they have taken the position that they do not want a

24 remand on the -- to create parallel proceedings and have two

25 ongoing proceedings going on at the same time.  So in that

6

1  sense, the abeyance question decides the remand question

2  as well.

3       THE COURT:  Well, does it or doesn't it?  I mean, this

4  is about supplemental jurisdiction.  Isn't that the Court's

5  decision, regardless of what the parties want?

6       MR. PENNAK:  Well, ultimately, yes, Your Honor, but on

7  the other hand, what -- the proper course in our view would be

8  for the Court to hold onto the state claims and then dispose of

9  them as appropriate after adjudicating the federal claims.  That

10  the Court has plenty of discretion and may do so at that time,

11  but I don't think it would be appropriate for the Court to

12  create two parallel proceedings going on at the same time.

13       THE COURT:  Okay, I understand that.  What about -- so

14  when you say that the Court should resolve this -- federal

15  claims first, I think, even if I were to agree -- if I were to

16  agree with you that a stay is not necessary or appropriate, what

17  would be the requirement that one look -- effectively, you're

18  asking me to stay the state claims and to focus only on the

19  federal claims first, including the constitutional claims, when

20  many of these issues could be resolved, perhaps, under your

21  theories, without even getting into constitutional issues, just

22  looking at the state -- the County's authority.  So why would I

23  then have to effectively stay the state claims --

24       MR. PENNAK:  You don't.

25       THE COURT:  -- and focus only on the claims that you

1    want me focus on?

2        MR. PENNAK:  You don't, Your Honor.  And you could

3    adjudicate all the claims at the same time.  In our view, that's

4    a cumbersome approach, and it would have this Court deciding

5    state law claims, so better remedies are decided by the state

6    courts so as to get an actual binding decision rather than what

7    effectively --

8        THE COURT:  Well, doesn't that counsel in favor of

9    remand?  I guess I don't understand.  You want the state to

10   decide it, but you don't want the state to have those claims.

11       MR. PENNAK:  Well, it's a question of remand when.  So

12   the question here would be the remand after deciding the federal

13   claims.  Or you could remand them right now and the state courts

14   can decide whether to stay its claims as well, but our point is,

15   is that you cannot hold in abeyance the federal claims.

16       THE COURT:  That I understand is your position.  I

17   guess I'm just having a hard time trying to figure out, if

18   you're saying I should handle the federal claims first, are we

19   basically keeping these away from the state if eventually

20   they're supposed to go to the state in your view?

21       MR. PENNAK:  I don't think you're keeping them away

22   from the state, only because the state does not want the claims

23   to be adjudicated in parallel proceedings, so they haven't asked

24   for that.  In fact, they've disavowed that proceeding.

25       So they -- as I understand, the County's position here

8

1   is that they would prefer to have all the claims adjudicated in

2   this Court rather than have two active ongoing cases.  And we

3   agree with that.  That just makes sense.  Now, this Court has --

4            THE COURT:  You've also suggested perhaps having the

5   case -- the state claim sent to the -- what's now the

6   Supreme Court of Maryland, certifying the questions.

7            MR. PENNAK:  We have.  We think that's a preferred way

8   of doing it.

9            THE COURT:  But isn't that also parallel proceedings?

10           MR. PENNAK:  Well, it's not two trial court

11  proceedings.  So I think the Court certainly has discretion to

12  certify the state law claims at any time, and we wouldn't object

13  to that.  I'm happy to litigate the state law questions in the

14  Court -- Supreme Court of Maryland -- now it's called the

15  Supreme Court.  I keep calling that Court of Appeals.

16           THE COURT:  I know, it's hard for all of us.

17           MR. PENNAK:  But no, we wouldn't object to that.  If

18  the Court wants to certify those questions directly to the

19  Supreme Court of Maryland, we're fine with that.  And they could

20  do so today as far as I'm concerned.

21           THE COURT:  So is it set up for that?  Obviously,

22  they're only supposed to get pure legal questions, and on the

23  one hand, the arguments on the state law are, to some degree --

24  well, I guess I'm not completely sure they're pure legal

25  questions.  Are they, or aren't they?

1          MR. PENNAK:  There are no factual disputes in this

2     case at all.  So the pure legal questions on Count One and Count

3     Two, and Count Three, for that matter, are whether or not, under

4     Count One, the state has at least occupied the field, if you

5     will, with respect to county litigation.  That's a state

6     constitutional issue.  And the question on the scope of the

7     Express Powers Act lodged in Count Two is a question of whether

8     or not the authority granted to the County by 4-209(b)(1) of the

9     criminal code of Maryland is that superseding all the preemption

10    provisions otherwise set forth not only in 4-209(a) but also in

11    a multitude of other preemption provisions set forth in county

12    law -- I mean state law, which are all briefed in the -- in our

13    papers -- or in the complaint, that is, and previously briefed

14    in state claims.

15          Now, the County says (b)(1) trumps all these cases on

16    all these preemption provisions.  We say that, no, those --

17    those actually have to be interpreted in tandem, together, so

18    they can be reconciled, and that the exceptions found in (b)(1)

19    are to be narrowly construed under existing state law which says

20    exceptions to an otherwise broad provision is always narrowly

21    construed.

22          So this Court, in the Mora case, has always held that

23    those are supposed to be narrowly construed, and we think that's

24    the right view of the law, but that is a question for a

25    state court.  The Maryland Court of Appeals -- I'm sorry, the

1  Supreme Court can certainly decide that as a matter of law.  And

2  if it does, then the Supreme Court can then decide whether or

3  not the County has exceeded those levels with respect to the

4  4-21 and 21-22E enacted by the Montgomery County Council.

5          So those are legal questions, and we have no problem

6  with that.  Certainly, the takings claim in Count Three is a

7  question of state law as well, so that Court can decide --

8          THE COURT:  Aren't there other factual issues in the

9  takings claim, though?

10         MR. PENNAK:  Not on the question of liability.

11 Certainly on -- with respect to the amount of the taking to be

12 compensated for.  That can be resolved separately than whether

13 or not there is a taking claim as a matter of law.

14         Now, the County has sought to dismiss that as simply

15 not cognizable, and that's a legal question that the

16 Supreme Court of Maryland can certainly decide.  There's

17 conflicting law in the circuits on that, and there is

18 Supreme Court law on this, but Maryland law is decided

19 independently of other claims, so the Court of -- I'm sorry, the

20 Supreme Court of Maryland could then certainly decide what the

21 Maryland Constitution requires without necessarily deciding what

22 the federal case law decides.  And that's all questions that can

23 be appropriately presented to the Maryland Supreme Court.  Those

24 are questions of law, and those can be certified.  And I'm happy

25 to draft up particular certification questions if the Court --

1    THE COURT:  I'm still having trouble with the idea

2  that that's okay but not having the Circuit Court handle these

3  issues in terms of whether there's parallel proceedings or not.

4    MR. PENNAK:  Well, it could well dispose of those

5  three claims.  If the County prevails in the Supreme Court of

6  Maryland, those claims are over.  If the County doesn't prevail

7  on those, they can be sent back to this Court, who then can

8  remand it to the Court in trial court below, and in the state

9  courts.  And by that time, I would hope that we would have the

10  federal claims fully proceeding and mostly decided.

11    THE COURT:  Well, so am I right that -- I mean, if we

12  could snap our fingers now and get a ruling on these state

13  claims, I know your position is that wouldn't necessarily

14  resolve everything in this case, but wouldn't that narrow the

15  issues over here, because if they're right, some parts of the

16  County's law will be invalidated, correct, in the state parts?

17    MR. PENNAK:  Only in part, only in part.  And

18  indeed --

19    THE COURT:  I didn't say in total, but I'm saying, at

20  least in part, and that would narrow the issues, wouldn't it?

21    MR. PENNAK:  Not really, Your Honor, and the reason is

22  that there's no doubt that (b)(1) accords the County some

23  authority.  We had never disputed that.  And that's creating

24  authority to regulate possession and transporting, carry, and

25  sales, all the items that are listed in (b) -- 4-209(a).  That

12

```
 1    includes parks, which we say they can't regulate at all under

 2    the Second Amendment.  That includes places worship, which we

 3    say they can't regulate at all under the Second Amendment.  That

 4    includes all other places of public assembly, very broad term,

 5    which we say they cannot regulate at all under the

 6    Second Amendment.

 7              THE COURT:  Well, with some exceptions, right, the

 8    courthouses, the legislatures, and so forth.

 9              MR. PENNAK:  Yes, with five narrow exceptions that the

10    Supreme Court articulated in Bruen, and those five we haven't

11    contested for purposes of this motion.  But there's no doubt

12    that the County has defined places of public assem- -- and

13    they're up them, to define their terms, to be very, very broad,

14    well beyond the ability of the five exceptions articulated in

15    Bruen.  But those places which they have expressly been

16    authorized by 4-209 are certainly among the places they cannot

17    regulate then under the Second Amendment.  That is the issue

18    before the Court right now on the motion for a PI and a TRO.

19              THE COURT:  Okay.  So why don't we move to the motion,

20    then, your motion.  So as I read it -- because again, you're

21    asking for preliminary relief, and as I read it, there are two

22    core issues there.  One is the places of worship, another is

23    the -- within 100 yards of a place of public assembly.  Those

24    are the two things that you're most concerned about, correct?

25              MR. PENNAK:  Well, I wouldn't want to limit that to
```

1  just those.  We don't think there's any place -- any regulations

2  permissible for parks either.  And we think a place of schools

3  should be narrowly defined to exclude --

4         THE COURT:  Well, I mean, maybe I misread it, but I

5  mean, again, you know, the irreparable harm at issue here

6  focuses on individuals going down roads, not knowing where they

7  can or cannot carry.  You have a couple plaintiffs, or several

8  plaintiffs, who have this argument regarding their ability to

9  provide security at a place of worship.

10         I mean, unfortunately, for better or for worse, as you

11  can tell, it's taken a little time to get to this point in the

12  case.  And if I analyze those two issues, that's one piece.  If

13  you're asking me to go down the entire list of everything in the

14  statute and basically decide this case right now, it's going to

15  take a while.  Is that really what you want?

16         MR. PENNAK:  I think the Court could issue a TRO

17  simply on the 100-yard exclusionary --

18         THE COURT:  We're not doing a TRO; we're just doing a

19  preliminary injunction here.  I'm not going to do this twice.

20         MR. PENNAK:  So we have asked for a preliminary

21  injunction on all those elements in the County's -- what the

22  County has regulated and certainly within 100 yards of all those

23  individual places.  Those are thousands and thousands of

24  locations within the county.  Giving us a PI on just churches

25  won't cut it, because we're still exposed to the 100-yard

14

 1    places -- of all the other places that are identified in this

 2    legislation.  So for example, we don't know what a private

 3    recreational -- or privately-owned recreational facility

 4    includes, and so nobody has an idea --

 5            THE COURT:  You're basically asking me to decide the

 6    whole case right now; is that what you're asking?

 7            MR. PENNAK:  So on the preliminary injunction, yes,

 8    Your Honor.  That is exactly what the parties have done in

 9    litigation pending in New Jersey and in New York; the Court has

10    gone down every last place.

11            THE COURT:  Well, that's fine.  I guess the question

12    is -- and I haven't focused on this, because again, maybe I

13    misunderstood.  I thought the motion itself -- and I thought

14    this came up in the call; maybe I misunderstood, but -- that you

15    have your whole case, but those were the two issues that were

16    sort of underlying the motion.

17            Now, if you're saying that you want a preliminary

18    injunction that -- saying that your clients -- that the statute

19    can't be enforced as to, let's say, nursing homes, or hospitals,

20    or things -- I forgot what the exact list of things that we

21    haven't been talking about are -- I'm not sure I read where any

22    of the plaintiffs really have standing on those things.  I

23    haven't heard of any of them having any reason to go to some of

24    those facilities on the list.  I heard about the places of

25    worship, I understand the argument on the 100 yards; I haven't

1  heard much else on other locations.

2      MR. PENNAK:  So the most urgent facilities are

3  certainly the ones within 100 yards.  And so if the Court were

4  to decide the 100-yard question separately and thus include all

5  these other places in which the 100-yard exclusion zone

6  applies -- and there's a long list of them, and I don't have

7  them memorized either, but they're right in the statute -- I

8  mean, that would go a long way with preserving the right of

9  individuals to be able to carry throughout the county, with

10  carry permits issued by the Maryland State Police.

11      We would also ask the Court to address carry in

12  churches, in churches, not within just 100 yards, because we

13  have plaintiffs, including declarants and members of MSI, who

14  are providing armed security, or at least did before the County

15  enacted this law, to those places of worship that are now unable

16  to do so, leaving those places unprotected.  That's an extremely

17  urgent issue.  I agree with the Court on that.  The 100-yard

18  routine exclusionary zones basically makes carry impossible

19  anywhere in the county because you can't go anywhere in the

20  county without crossing into an exclusionary zone.

21      THE COURT:  So I understood that argument.  Again, I'm

22  just trying to understand which plaintiff has provided enough

23  facts in your motion, or in your complaint, or in evidence to

24  show that there's any harm associated with inability to go to,

25  let's say, a nursing home or one of those facilities, long-term

 1   care facilities.  I don't know if I've seen that.

 2        MR. PENNAK:  So in the compliant, or the verified

 3   complaint, we have allegations about going into a private

 4   school, inside a private school to pick up minor children.

 5   That's in the complaint.  That's Ron David.  We have Eli Shemony

 6   talking about going inside a library with a carry permit.  We

 7   have other people -- those are in the complaint itself.

 8        Now, I quite grant you, we don't have individualized

 9   allegations going to each one of these places.  And if the Court

10   were simply to address only the places where there are

11   allegations of going inside, that would be sufficient on the

12   current record to get rid of the 100-yard exclusionary zones.

13   We -- the allegations of this complaint make very, very clear

14   that all of those places, with the possible exception of places

15   where people gather for First Amendment purposes, all of those

16   places my plaintiffs go within 100 yards of.  Every one of them.

17        So to that extent, the Court's going to have to

18   address those places, because you can't drive in the county

19   without going through an exclusionary zone measured by the

20   parking lot of a church, or a school, or a recreational

21   facility, whatever that means.  And we have no idea what a

22   private library is or where they're located, because we don't

23   know what private libraries are.  It could be the private

24   libraries kept on the premises of Plaintiff Engage.  They have

25   an extensive firearms library.  So they may fall within it and

1    have to close.  So that is before the Court as well.

2        So we have individual plaintiffs who live within

3    100 yards of a county park, who walk their dogs in the county

4    park, who walk past the county park, can't get out of their

5    driveway or off their property without coming within 100 yards.

6    So the park issue is presented to you because people use parks.

7    And my plaintiffs use parks.

8        THE COURT:  Okay.  So why don't we move on to -- among

9    the topics that come up in the briefing is this issue of --

10   well, I guess I'll go to this because we're on it, even though

11   we might need to come back to some other things.

12       You make this argument that, to the extent -- and I

13   know you have many arguments against their list of statutes, but

14   one argument you make is, some of these restrictions on, in

15   particular, parks, but other locations as well.  In parks --

16   you know, the restriction was designed to keep people from

17   shooting wildlife, or birds, and things like that, and so you

18   shouldn't factor that in.

19       I guess I'm not sure I fully understand the argument,

20   because the idea here is, regardless of the purpose, there is a

21   history of preventing people from having guns in certain

22   locations, for whatever purpose, and it would burden a right.

23   If you have a right to walk through a park with a gun and they

24   say, well, you can't have one because of our birds, they've

25   still prevented you from having the gun.  And just for purposes

18

1    of the historical analysis, why isn't that a legitimate example?

2          MR. PENNAK:  Because it's directly precluded by Bruen,

3    which enunciated quite expressly in the opinion two metrics, and

4    the metrics are how and why.  Why is the restriction imposed?

5    Now, if you're imposing the restriction because you want to

6    protect the flora and fauna of the park, that's not intended to

7    restrict the exercise of Second Amendment rights.  Geese don't

8    have Second Amendment rights.  So wildlife --

9          THE COURT:  I guess I'm not -- I'm just trying to

10   understand it, because again, let's put ourselves back a couple

11   of hundred years.  If someone is walking through a park, has a

12   gun, and says, I want to protect my right to self-defense here

13   in the park, and some park ranger type person says, Well, sorry,

14   you know, we're protecting the birds here, and our duly-enacted

15   statute says that you can't have a gun here, and you say, Well,

16   I don't want use it for birds, I just want to use it to protect

17   myself, it seems as if under that statute, they would have said,

18   I'm sorry, you can't have the gun.

19         MR. PENNAK:  Perhaps --

20         THE COURT:  I mean, so -- I mean, if it didn't impact

21   their rights, I could understand that, but it seems as if that

22   was a burden that was accepted.  Again, assuming that everything

23   else about this checks out.

24         MR. PENNAK:  And that is precisely the reason the

25   Court articulated the two metrics that the Court commanded the

JA731

1   Courts to use in determining what the appropriate analogues --

2   and again, that metric includes why was this restriction

3   imposed.  The Court is very clear on that.

4            THE COURT:  Okay.

5            MR. PENNAK:  And so if the restriction -- the reason,

6   it had nothing to do with the central right of self-protection,

7   then, that is not an historical analogue.  And it doesn't matter

8   if there is an incidental effect on the --

9            THE COURT:  Remind me again, which part of Bruen are

10  you -- what reference -- maybe you can point me to the right

11  passage in that.

12           MR. PENNAK:  Yes, Your Honor.  If you give me a

13  moment, I will look it up.

14           THE COURT:  Sure.

15           I mean, if you don't have it at the ready, I can look

16  for it.  I just thought, maybe since you were referring to that

17  point, you would -- you would be a little closer to it than I

18  am.

19           MR. PENNAK:  The opinions are very big.

20           THE COURT:  I know, I know.

21           MR. PENNAK:  We cite -- and -- to a pincite throughout

22  our papers, which unfortunately, the papers are pretty lengthy

23  too, but the Court can simply do a search on metric and, you

24  know, the Court will find it, and the how and why is a direct

25  quote from the Bruen opinion.

1          THE COURT:  Okay.  I'm finding it on 2133, but --

2          MR. PENNAK:  That's right.

3          THE COURT:  -- I'm just trying to understand how --

4     what the "why" means.

5          MR. PENNAK:  And this is confirmed, if I may, by

6     several Courts who have rejected restrictions in New York and

7     New Jersey on carry in park, precisely because they didn't

8     satisfy that particular metric.  So that metric is really

9     important.  And I take the Supreme Court at its word.  I mean,

10    that's all I can say about why they have that provision in

11    there, but the Court took pains to talk about it.

12         THE COURT:  I mean, is it just that line, how and why,

13    or is there some further description of why in the opinion

14    somewhere?

15         MR. PENNAK:  Well, the Court went on to articulate in

16    that context that this is a general right to carry in public,

17    and they say it over and over and over again in different

18    places.  So the presumption is that there is -- these five

19    particular areas are the exception to that general presumption

20    and that, therefore, the state, in this case, the County,

21    carries the burden of proof to show that there's other places

22    like these five in the historical analysis.

23         Now, in our view, the historical analysis centers on

24    1791, when the Bill of Rights were adopted by the people.

25         THE COURT:  Didn't Bruen say that was an open

21

1   question?

2          MR. PENNAK:  Bruen said it wasn't going to resolve the

3   scholarly debate, but if you read the analysis -- we set this

4   forth in our response to the Everytown brief -- the Court

5   actually, when it looked into the substantive areas, it looked

6   to the 1791 era and shortly thereafter, in the early 18th

7   century.  It did not look at the post Civil War cases or

8   statutes.  And it said very expressly that the Courts are

9   75 years after the adoption of the First -- of the

10   Second Amendment and the Bill of Rights and, thus, entitled to

11   less weight.

12          And you'll see that again in the cases they cite for

13   the proposition that 1791 is the central inquiry.  They cite

14   Ramos and the Timbs decision, both of which held that the scope

15   of the Second Amendment is the same for the states and for the

16   federal government.  And for the federal government, no one's

17   ever argued, that I know of, that the federal government is

18   confined -- the Second Amendment means something, by reference

19   to 1868 --

20          THE COURT:  Yeah, but this is the state government

21   we're dealing with here, correct?

22          MR. PENNAK:  But the Supreme Court says it means the

23   same.

24          THE COURT:  Okay.  So then, on the sensitive places,

25   two questions.  One is that Bruen doesn't even really give much

1　history, and I think this is one of the things that is a little

2　bit curious about the opinion.  It says that, "The historical

3　record yields relatively few 18th and 19th century sensitive

4　places where weapons were altogether prohibited, but we're also

5　aware of no disputes regarding the lawfulness of such

6　prohibitions."

7　　　　　So they don't actually cite many examples, if any,

8　regarding schools, government buildings, legislative assemblies,

9　polling places, and courthouses.  And then it also lists this

10　as, e.g., legislative assemblies, polling places, and

11　courthouses.  So I think -- from what -- it sounded to me like

12　you were saying that you agree that there can be other sensitive

13　places, it just needs to be established that there are others,

14　and so far, it hasn't been.

15　　　　　MR. PENNAK:  The County bears the burden to show a

16　well established representative historical analogue, and that --

17　so that's a quote from the Supreme Court.  Bruen says it has to

18　be well established, it has to be representative, and it has to

19　be an historical analogue, and in our view, the historical

20　analogue is best resolved by the same history that the Supreme

21　Court looked at in Bruen when it identified those five, and

22　that's the late 1700s and the early 1800s.

23　　　　　Now, the County hasn't cited a single statute from

24　that period that could possibly be analogous to the five or --

25　could justify any of the restrictions it has imposed in this

 1   statute.  So the -- if the Court said, as well, that if there's

 2   the absence of historical analogues for the relevant time

 3   periods, that is enough, by itself, to preclude regulation in

 4   those areas, unless there's some unusual technological change

 5   for justifying a different set of analogues.  But the County's

 6   attempt here is to deal with the same historical analogue that's

 7   always been the problem in society, and that is misuse of

 8   firearms and violence in the public.

 9            So that's -- that's the same remedy that the County

10   has sought here.  That's the same remedy that our ancestors

11   found in the founding era, so there's no justifications to go

12   beyond the fact that there is no historical analogue for these

13   restrictions that the County has imposed.

14            THE COURT:  So am I correct, though, that -- I mean,

15   you said, and I think you're right, they haven't given us

16   statutes from the 1700s.  They have given us some from the

17   1800s, post -- or around the time of 1868.  Are you saying that

18   if I were to conclude that 1868 or so is -- can be considered

19   that -- I mean, what do you make of the statutes they provided?

20            For example, in the places of worship, which is one of

21   the key areas we're discussing today, they seem to have several

22   examples in which there's a reference to keep, you know, no

23   firearms inside, not -- you know, places of worship in the same

24   sentence as schools or other sensitive places.  So is your

25   argument on that really just the 1791/1868 division, or is there

1    some other argument as to why those are insufficient?

2        MR. PENNAK:  So there are additional requirements.

3    And so it's -- it goes beyond the fact that they postdate the

4    Civil War era, which the Supreme Court said in its opinion is

5    entitled to less deference.  It is -- they haven't established

6    that there was an enduring tradition associated with those

7    statutes that -- we don't know when they expired or whether they

8    continue to this day, but it's the County's burden to do that.

9    They don't establish that it was well established.  Not just one

10   or two statutes; to be well established means there is a

11   consensus of statutes at the time.

12       It has to be also representative, not just of those

13   particular jurisdictions but more broadly than those

14   jurisdictions.  For example, the laws enacted for the

15   territories are categorically out of the question because the

16   Supreme Court said you can't -- those laws were not instructive.

17   Supreme Court said, in footnote 28, the laws enacted after 1900

18   are categorically not instructive and thus may not be

19   considered.  And as -- although it's postdating the Civil War

20   era, those statutes are too few in number and too -- come too

21   late in the day to be a well-established representative

22   analogue.

23       Now, the Court was quite clear on that.  So could

24   you -- the Court consider post 1860 -- post Civil War statutes?

25   Yes.  But then the Court would have also say that those were

JA737

1    well established at the time, they were enduring, that they were

2    comparable restrictions to those imposed by the County

3    government, they were similarly relevant in terms that they were

4    enacted for the purpose, under the Court's two metrics that the

5    Court identified, the how and the why, and then I'm going to

6    have to show that they actually are justified as an historical

7    analogue more representative of the nation as the time it

8    existed.

9            For example, they cited an 1817 City of New Orleans

10   statute on dance halls.  You know, at the time, the City of

11   New Orleans was 27,000 people, and it was less than 1 percent of

12   the population of the United States.  The Court looked to such

13   factors to see if they were well established and representative.

14           Now, every Court, every District Court to have

15   examined this question of areas, of sensitive places areas, and

16   those are -- right now, there's six, they have unanimously

17   considered that the very statutes, post-Civil War statutes that

18   the County cites are not well established and representative.

19           THE COURT:  When you say six, I think you've cited --

20   you're not talking about this -- looking at these particular

21   statutes; you're talking about analogous situations around the

22   country?

23           MR. PENNAK:  No, the actual statutes on which the

24   County relies on were addressed in Koons and Siegel.

25           THE COURT:  Oh, you're talking about their underlying

26

```
1    historical statutes.
2              MR. PENNAK:  Yes.
3              THE COURT:  Not our County bill here.
4              MR. PENNAK:  No, no.  No, I'm sorry, Your Honor.
5              THE COURT:  Right, okay.
6              MR. PENNAK:  So the very statutes on which the County
7    relies as historical analogues have already been rejected in
8    every single District Court decision to address this.
9              THE COURT:  And has one of the circuits picked it up
10   yet?  I know some time has passed since --
11             MR. PENNAK:  The Sec- -- New York has appealed the
12   various decisions of the New York District Courts, and there's
13   two circuits -- two districts there, there's the Western
14   District and the Northern District.  And on an appeal of a PI
15   that the -- New York has prosecuted, that's set for oral
16   argument on -- they have five different opinions set for oral
17   argument in tandem on March 20th, 2023, next month.
18             THE COURT:  The Second Circuit?
19             MR. PENNAK:  Second Circuit.
20             THE COURT:  Nobody else is ahead of that, on the --
21             MR. PENNAK:  Nobody's ahead of that.  The New Jersey
22   cases, that's Siegel and Koons, have -- those are TROs, and
23   those are not appealable, and so there has been no appeal of
24   that.  Now, we may get a PI on those motion- -- on those cases
25   soon, and those are appealable.  And so the -- New Jersey may
```

1   have the option of appealing that to the Third Circuit at that

2   time.

3           THE COURT:  Right, Mm-hmm.

4           MR. PENNAK:  We already have one Fifth Circuit

5   decision, the Radimi case that we cite in our papers.  It just

6   came down on the proper historical analysis, and we commanded

7   that Court of Appeals decision to the Court's attention for the

8   analysis it followed, not necessarily for sensitive places, but

9   for the presumptions created by Bruen in terms of the general

10  right of self-defense.

11          So we start with that.  The general right means, carry

12  in public, and everything after that can't be sufficient to

13  actually nullify that general right.  And the Court --

14  Supreme Court said, in Bruen, that New York's attempt to

15  restrict the island of Manhattan, it takes the sensitive places

16  analysis way too far, because it cannot mean wherever someone

17  publicly assembles.  And that is precisely the rationale that

18  the County has advanced in justification of its ordinance,

19  we're -- the County has told the Court that we're trying to ban

20  firearms wherever people may gather, and that is precisely the

21  analysis that the Supreme Court rejected.

22          THE COURT:  And I understand that, and I agree with

23  you that something as large or as broad as the island of

24  Manhattan is not going to fly these days.

25          The -- two other questions I have before I turn to the

1    County.  One is, you agree that under Bruen, the right as

2    articulated up to this point, it had been -- before Bruen, it

3    had been, you know, the right to -- law-abiding citizens to

4    carry a firearm for self-defense in the home, or to have one in

5    the home.  Bruen extended it to in public, to carry it for the

6    right of self-defense.

7             MR. PENNAK:  Well, there was a split --

8             THE COURT:  That's the right as it currently stands as

9    articulated by the Supreme Court; is that correct?

10            MR. PENNAK:  I think there was a split in the circuits

11   on why the Court took the case.  The Seventh Circuit in Moore

12   and in the D.C. circuit in Wrenn had both said that the right

13   fully extends to public carry outside the home.  So the question

14   before the Court in Bruen was whether the right could be

15   confined to the home, and the Court answered that quite

16   definitively, said no, it can't, because the right encompasses

17   the right to self-defense in case of confrontation outside or

18   inside the home.  And that was the textual reading the Court

19   gave to the Second Amendment right, and it was informed by the

20   right of self-defense, which the Court said obtains just as well

21   or if not more outside the home as opposed to inside the home.

22            THE COURT:  But the right doesn't extend beyond

23   self-defense, does it, in terms of saying --

24            MR. PENNAK:  Well, yes --

25            THE COURT:  -- if someone said, Hey, I want to be able

1  to, you know, threaten people because I choose to do so, that

2  would never he -- or that would not be currently viewed as

3  protected Second Amendment activity, would it?

4          MR. PENNAK:  Agreed, but it doesn't just limit it to

5  self-defense.  I mean, that's the central consideration.

6  For example, the Court said in Heller that the right extends to

7  the use of firearms for all lawful purposes.  That would

8  include, for example, target shooting, or hunting, or other

9  items such as that, which are perfectly lawful.  So lawful

10  purposes is a hallmark, not just self-defense, even though

11  self-defense is at the core.  So the right of self-defense

12  informs text, and the Court was very clear on that.

13          THE COURT:  So when Bruen talked about things outside

14  the home, where does it take it beyond the right of

15  self-defense?  That's what I just want to understand.

16          MR. PENNAK:  Well, the Court reaffirmed Heller, and

17  Heller addressed the scope of the right.  So what the Court held

18  in Bruen, that the right identified in Heller extends exactly

19  the same way, not only to inside the home but to outside the

20  home as well.  So the scope of the right is -- in the home

21  extends, without exception, to everything outside the home.  You

22  normally don't do hunting inside the home, but the Court

23  identified hunting in Heller.  You don't do target practice

24  inside the home, although I suppose you could, so that goes

25  outside the home.

1        THE COURT:  Well, so I'm just reading the first

2  paragraph of Bruen.  It says, "In Heller, we recognize the

3  Second and Fourteenth Amendment protect the rights of an

4  ordinary law-abiding citizen to possess a handgun in the home

5  for self-defense."  That's how they define the right.  Then they

6  say, "In this case, you know, the parties agree that ordinary

7  law-abiding citizens have a similar right to carry handguns

8  publicly for their self-defense," and then it says, "We do agree

9  and now hold consistent with Heller and McDonald that the Second

10  and Fourteenth Amendments protect an individual's right to carry

11  a handgun for self-defense outside the home."  So I don't see

12  anything in there about things other than self-defense.

13        MR. PENNAK:  So again, Your Honor, I would suggest

14  that the Court look back to what Heller identified as lawful

15  purposes.  So certainly, the right of self-defense is at its

16  core, and indeed, this case presents that right, because of the

17  all the plaintiffs have carry permits, and all of those

18  plaintiffs are now precluded from carrying in the county.  Now,

19  that includes people such as a number of my plaintiffs,

20  Plaintiff Shemony, for example, who provides armed security and

21  were issued permits for the very purpose of providing armed

22  security to a synagogue, and to churches, and --

23        THE COURT:  Okay.  So I understand the argument that

24  that's covered by Heller, but am I correct that you would agree

25  that that's beyond self-defense, that's defending other people,

1    defending institutions?  And I understand that you're saying

2    that's all covered, but that's a different concept, isn't it?

3         MR. PENNAK:  I don't think it is, because even in

4    Maryland law -- and I've studied this law.  Maryland law

5    recognizes the right to exercise lethal force in defense of

6    another.  And that's always been the rule in common law as well.

7    So you certainly have that right, and that's a legitimate

8    exercise of lethal force.  You certainly have a right in this

9    state to hunt, with a hunter's safety certificate, and you have

10   the right in this state, recognizing state law, to take your

11   firearm to the range and shoot with it.

12        So those are legitimate lawful purposes, and I think

13   to the extent the right extends beyond simply the right of

14   self-defense, although the central -- self-defense certainly

15   informs the scope of the text.

16        THE COURT:  Okay.

17        MR. PENNAK:  So yes, it's fair to say that Bruen

18   focused on self-defense, but it's not fair to say that it's the

19   exclusive scope of the right.

20        THE COURT:  So can I just -- and one last question

21   regarding -- you brought up the plaintiffs who were seeking to

22   provide security for the places of worship, and you've

23   identified the history of it, which is that they have these

24   permits.  That was presumably the stated reason why I need a

25   gun, as opposed -- back in the day when you had to have a

1 reason, and the County's pulled that away because now the permit

2 is a "shall issue" approach.

3       I believe the statute does -- the County statute,

4 County ordinance has -- individuals are permitted to have guns,

5 if they're -- or you can have guns if you're basically a

6 security guard.  And I'm not sure what the requirements for that

7 are, so maybe you can tell me if you happen to know how hard it

8 would be for someone to be designated as such under the County

9 statute.  And then relatedly, I think it also says that, you

10 know, a business can have one employee who has a gun.  And

11 again, I don't know whether, you know, practically how difficult

12 that would be to designated someone, let's say at a church, or a

13 synagogue, or some other place of worship, as the employee.

14       Again, whether that means they have to have a W-2 form

15 and be paid, I don't know, but what do you know about those two

16 at least avenues to have someone provide some security at a

17 private facility?

18       MR. PENNAK:  So it is -- as a practical matter, it's

19 impossible to have one person at a business like a church, which

20 is open -- and many of these synagogues and churches are open

21 24/7 -- to have one person providing security.  It's -- even if

22 you concede that a church is a business -- and I'm not sure

23 that's what's contemplated by the exception in 57-11B -- it is

24 limited to one employee, and they're limited to one firearm.

25 Now, some of these churches are large enough that you want to

1  have two people at the same time fully armed.  And that's how

2  the practice --

3          THE COURT:  Well, as a practical matter, since

4  I think -- and forgive me, since I don't know if it's in the

5  affidavits already submitted, but are any of these plaintiffs

6  who are in this position part of a group of people, or are they

7  the only person at their place of worship with this arrangement

8  with the leadership of the institution?

9          MR. PENNAK:  So they're not the only persons.  So

10 declarant Barall talks about setting up a group of people

11 setting up security in his synagogue.  And as a practical

12 matter, because the synagogue or the church is open for extended

13 hours, you're not going to have the same person there all the

14 time; it's simply not feasible.  So you have a group of people

15 who provide this armed security for places of worship, and that

16 they can't do anymore.  I mean, that seems to me utterly clear.

17         THE COURT:  So taking the employee example to one

18 side, what about the security guard example, which I think don't

19 think is limited by numbers of people.

20         MR. PENNAK:  That's correct, Your Honor.  They could

21 have a security guard, but there's a whole regulatory structure

22 that I'm not intimately familiar with, about what it takes to

23 become a security guard in Maryland.  And it's a professional

24 occupation that is licensed and regulated by the Maryland State

25 Police; it's not trivial.  And indeed, the --

34

1          THE COURT:  You're saying there's like licensing

2   requirements, et cetera?

3          MR. PENNAK:  Yes, exactly.

4          THE COURT:  Okay.

5          MR. PENNAK:  So they must be licensed in Maryland as

6   in elsewhere, but in particular, Maryland has some pretty

7   stringent requirements for becoming a security guard.  And they

8   have indeed a different firearms course associated for security

9   guards.  So that is not, as an option, very easily accommodated

10  here, and it's an expensive option, because they're not members

11  of the synagogue itself.

12          And the synagogue members are picked because they know

13  their community.  They know who's there, who should be there,

14  and who's a stranger.  They know what's going on around them

15  because this is their part of their lives.  Hiring an external

16  security guard is not the same protection at all.  They do not

17  have the funds to hire County police to provide the security,

18  and the County police simply aren't there, and by the time they

19  got there, the rampage would have been completed.  So that's why

20  these people are frightened.  And they are frightened.

21          THE COURT:  Okay.  Anything else you want to offer?

22          MR. PENNAK:  So I want to stress again that it is the

23  County's burden, and it must be carried as a comparable burden

24  by the reference to the metrics that the Supreme Court outlined,

25  and that they haven't done it.  And they certainly haven't done

1    it for the 150 -- the 100-yard exclusionary zone, which

2    effectively nullifies the right to carry, the general right to

3    carry that the Supreme Court articulated in Bruen.

4            So on that grounds, then, we believe that a PI should

5    issue immediately to restore the status quo ante with people who

6    already had carry permits, many of them, so that they can

7    continue to carry what they already have.  By the way, this

8    includes people who got carry permits because their lives were

9    in danger, people who were -- had a protective order taken out

10   against some violent people, judges, prosecutors, people who

11   were assigned -- presumed a risk category by the Maryland State

12   Police and were issued permits on that basis.  Since the County

13   ordinance sweeps those people as well as ordinary citizens into

14   its prohibition, that's -- basically, the County has stripped

15   everybody of their right to self-defense.

16           THE COURT:  So just -- so as I understand it -- I

17   hadn't thought about this, but now that you're bringing it up,

18   am I correct that all the individual plaintiffs were people in

19   that category who had a permit before?

20           MR. PENNAK:  There is about half and half.

21           THE COURT:  Okay.  And the other half didn't have a

22   permit before?

23           MR. PENNAK:  They had a restricted permit,

24   for example, or had no permit at all.

25           THE COURT:  So I know one of your major arguments in

1  terms of sort one of the main things you're looking for, at

2  least like even if it was a narrow ruling at a minimum, you

3  would want to have the ability of these folks who used to have

4  permits have the same rights that they used to have or same

5  privileges -- the same -- same authority to do what they used to

6  do.  That would solve the problem for some of your plaintiffs

7  but not all of them.

8          MR. PENNAK:  Correct.  And that would also

9  contravene -- such a limited ruling would contravene the

10 Supreme Court's holding that this right belongs to the people,

11 the law-abiding and responsible citizens who cannot be

12 distinguished from people who have demonstrated a proper cause

13 or, in Maryland's case, a substantial reason.  So I don't think

14 it would be legitimate for the Court to narrow a PI to just the

15 people who had it before because that creates the very same

16 categorization that the Supreme Court struck down.

17         THE COURT:  Well, I'm not saying that's what I want to

18 do, but at the same time, I don't know if I agree with you that

19 it's legally impermissible, because on a preliminary injunction,

20 one looks at, among other factors, balance of the equities,

21 public interest, which -- I understand the Supreme Court says

22 you can't do a means-end test for the overall right, but in

23 terms those four prongs, in terms of whether we're going to make

24 a preliminary determination now, awaiting a final ruling, of

25 course, whether the most urgent situation isn't a fair thing to

37

1    consider, which is what those two prongs of the preliminary

2    injunction test are designed to deal with.

3            MR. PENNAK:  Well, I'd like address that briefly.

4            THE COURT:  Mm-hmm.

5            MR. PENNAK:  So what the Supreme Court said is that

6    there's a general right to carry by all law-abiding citizens who

7    have managed to obtain a carry permit.  That's not a trivial

8    process in Maryland, by the way; it's hard to do.  I'm an

9    instructor, I teach this course.  So this is something that they

10   now have a recognized -- Supreme Court recognized right to

11   carry, and the deprivation of that right is itself irreparable.

12   For every single day this ordinance remains in place, they are

13   deprived of that right.  That's irreparable by -- under any

14   standard.

15           THE COURT:  Okay, I understand.  Okay, thank you.

16           MR. PENNAK:  Thank you, Your Honor.

17           THE COURT:  Mr. Lattner, is it, who's going to handle

18   this?  Okay.

19           MR. LATTNER:  Your Honor, I was going to address the

20   motion to remand and stay.

21           THE COURT:  Why don't you just pull the microphone

22   closer to you so we can all hear.

23           MR. LATTNER:  Oh, sure, sorry.  I was going to address

24   the motion to remand or stay briefly, then Mr. Johnson was going

25   to address the standing issue, and finally, Ms. Ashbarry to

1  address the Second Amendment issue, the historical -- the

2  historical inquiry.

3          On the motion to remand or stay, the County's position

4  is that if the Court is going to rule on injunctive relief under

5  the Second Amendment, the County would request that you retain

6  the state law claims.  Having said that, I think it makes sense

7  that the state law claims would be adjudicated first.  Again,

8  this dovetails with the reason that we are seeking the remand in

9  the first place, because those are dispositive and would serve

10  to avoid having to decide Second Amendment claims.  So whether

11  the federal claims are stayed and the state law claims are

12  remanded for disposition by the state or the state law claims

13  remain here in this Court, those are the claims that should be

14  adjudicated first.

15          THE COURT:  Why do we have to have a sequencing?  Why

16  can't we just look at all of them?  And then again, with a

17  typical analysis, if you start with non-constitutional

18  arguments, you look at those.  If you can solve case that way,

19  then you do.  If not, you move to the constitutional arguments.

20  I mean, why do you need to have a stay, particularly if it all

21  stays here?  Why do we need to have a sequencing and say, You

22  still have to do the state law claims first?

23          MR. LATTNER:  Well, if it all stays here, I think it's

24  logical that in order to avoid deciding on the Second Amendment

25  issues, that decision would be made on the state law issues.  I

1  guess it could all be briefed and argued, and then the Court,

2  you know, in the menu of options, if it found there was no

3  authority under state law, I think that is determinative and

4  comprehensive, and that would be the end of it.

5         THE COURT:  I mean, wouldn't it -- just as a practical

6  matter, I guess -- I'm not sure I understand your position.

7  You're the ones who filed this motion in the first instance.

8  You didn't want the claims in the state court before, now you

9  do, but only if they go first.  I mean, as a practical matter,

10 you're the ones who said that it was all briefed, it was ready

11 to go -- I mean, I don't know if this is true, but that the

12 state court could issue a ruling relatively soon, and yet you

13 don't want to give them that opportunity, because as a practical

14 matter -- I mean, we'll deal with the preliminary injunction,

15 but whatever it is, it's not a final ruling.

16        And so the state, with whatever -- how far along they

17 were in that process, they could give you your ruling on the

18 state claims before this Court could get to a final resolution.

19 I mean, so that practically would give you what you want, and

20 yet, you're sort of trying to insist that it all happen here and

21 to dictate the order in which things are done here.

22        I don't understand it.  I mean, if you really want the

23 state claims to be adjudicated first, why not just have them go

24 back?  And just as a practical matter of the resources involved,

25 especially now that Mr. Pennak has made clear that, you know,

1  this can't be resolved just focusing on the worshiping, and the

2  places of worship, and the 100 yards; we have to go through

3  every single last piece of this.  And even the Supreme Court

4  said, and they acknowledge, it's a very complicated exercise.

5       The state law analysis, as complicated as it is,

6  doesn't require that much digging through the history of the

7  country.  I mean, as a practical matter, they would do that

8  first, I think, and yet, you don't want to be in two different

9  places, even though -- even the plaintiffs are happy to be in

10  two different places; they just want it to be the Supreme Court

11  of Maryland and not the Circuit Court.

12       MR. LATTNER:  Right, we don't want to be in two

13  places, and if the Court is -- and I assume the Court is going

14  to be issuing a ruling on injunctive relief, having entertained,

15  you know, the motions, and we're here today on argument on the

16  preliminary injunction, then the County's request would be that

17  this Court retain, that the County is not interested in seeking

18  a remand and a stay.  But still, the state law claims should be

19  resolved earlier in the process in accordance with the doctrine

20  of avoiding unnecessary decisions on constitutional matters,

21  and --

22       THE COURT:  Well, what about the certification to the

23  Supreme Court; what's wrong with that?

24       MR. LATTNER:  I guess, that's up to this Court if it

25  feels necessary, that if there's undecided issues as to state

1　law authority, I -- the County doesn't believe that is required.

2　The County believes that it -- the law will be clear and doesn't

3　require certification.  That is -- I guess that is an option.

4　　　　THE COURT:  I think what I'm troubled by is that both

5　sides seem to -- well, maybe you less so, but Mr. Pennak seems

6　to think, and he said it several times, a state court should

7　decide this; that's why he's all for the certification process.

8　I think his big concern is that we don't leave the federal

9　claims off to the side on ice, I think, but he has recognized,

10　as I think I said in the first motion to remand, these are new

11　and first impression issues of state law.  There's preemption

12　issues.  There's -- it's about the relationship between the

13　state government and the County governments.  The State

14　Constitution's involved.  The states never had a chance -- state

15　courts have never had a chance weigh in on this.

16　　　　It seems to me, these are classic novel, complex

17　issues of state law that really should be handled by a

18　state court.  And I'm not sure that Mr. Pennak's even

19　disagreeing with that; he just -- he's concerned, and I

20　understand it, that he doesn't want to wait forever to get to

21　the federal claims.

22　　　　And I understand that.  But I also don't understand,

23　therefore -- I mean, I guess I'm not sure, are -- you seem to

24　also agree, this is an important state law issue, and yet, you

25　want me to decide those instead of a state court.

1          MR. LATTNER:  If this Court is going to entertain, and

2     I believe it will be entertaining the Second Amendment claims,

3     then at that point, the County is not interested in having the

4     state law claims remanded to state court, so we then have

5     parallel litigation.

6          THE COURT:  But not being interested -- I mean, this

7     is a matter of jurisdiction.  Isn't it my call, with or without

8     a motion, whether I want to exercise supplemental jurisdiction

9     over these claims?

10          MR. LATTNER:  Ultimately, yes, yes, it is, it is your

11     call.  I mean, this was put forth by the County's motion, and

12     the County, you're right, originally did not seek remand of the

13     state law claims, but that was before the County had spent and

14     the parties had spent months in state court briefing and arguing

15     the state law issues, which were ready for disposition by the

16     state court.  So yes, it is, ultimately.  This Court could sever

17     the state law claims, and then we would be proceeding on two

18     tracks.  The other option, as you noted, is certifying the

19     question to the Maryland Supreme Court.

20          THE COURT:  But you're also on two tracks at that

21     point too, right?  Maybe it's a -- it might be a different part

22     of your office, I don't know, but as an institution, it's the

23     same thing.

24          MR. LATTNER:  No, it is -- it is two tracks.  It's a

25     different track, but you're right; there's a track in state

1   court and a track before this Court.  It's just that the state

2   law question should be resolved first, particularly if that

3   results in avoidance of having to decide the thorny

4   Second Amendment questions.

5           That is really -- I won't go through the -- you know,

6   the sum and substance.  You can read what we have in our

7   filings.  I'll just say that Count One and Count Two are

8   determinative.  I mean, in paragraph 90 of the

9   Second Amendment -- Amended Complaint, the plaintiffs argue that

10  Chapter 57, as amended by Bill 4-21 and Bill 21-22E, conflicts

11  and is inconsistent with the general laws, in violation of

12  Section 3 of Article 11A, and that's the State Constitution, the

13  Home Rule Amendment, and is thus unconstitutional and

14  ultra vires under the Home Rule Amendment.  So that would --

15  even just Count One, and ditto for Count Two.  If the County has

16  no authority to have this regulation for firearms, then it has

17  no authority even as to the Bruen five, if you will.

18          THE COURT:  Well, I thought that was part of the

19  argument, though, was that constitutionally, at least those five

20  categories, schools, I think they're saying only public schools,

21  but some kind of schools can be included, or there can be

22  regulation, and I thought the state law does give the County

23  authority to regulate in such -- you know, places of public

24  assembly, at least narrowly defined, which they're since

25  conceding can include things like schools, public schools,

44

1    courthouses, et cetera.

2              MR. LATTNER:  That's what the --

3              THE COURT:  So that part, regardless of what the --

4    I think their point is that that part's going to remain no

5    matter what, because they're not arguing you don't have the

6    authority to keep guns out of the courthouses, for example.

7              MR. LATTNER:  Well, I can just tell you what the

8    complaint says, which is that Chapter 57 is invalid, it is

9    ultra vires and unconstitutional under Maryland law.  So --

10             THE COURT:  Okay.  Well, that --

11             MR. LATTNER:  Hence the argument.

12             THE COURT:  That's Count One.  What about Count Two?

13             MR. LATTNER:  Similarly, paragraph 93 of the

14   complaint, they say, "Chapter 57 is amended by Bill 4-21, and

15   Bill 21-22E violates the foregoing provisions of the Express

16   Powers Act and Section 3 of Article 11A in multiple ways," and

17   then it goes on to list all of the laws that plaintiffs consider

18   that either conflict or preempt the County's regulation.  So

19   that also would be determinative.  If the County has no

20   authority to regulate firearms under 4-209 of the criminal law

21   article, then the Bruen five doesn't matter, and hence the

22   argument that those claims, those issues should be addressed

23   first, whether it's in this court or in the state court.

24             But apparently -- you know, it will be in this Court.

25   This Court is taking up the First Amendment -- I'm sorry, the

1   Second Amendment claim, and it would make sense that those

2   claims would -- the claims as to the authority would be taken up

3   first in order to avoid disposition under the Second Amendment.

4            I'll just mention, you know, as has already been

5   discussed, New York and New Jersey have cases dealing with those

6   states' laws regulating firearms.  Something different, I don't

7   think either of those cases involved a state law challenge to

8   the authority, which is what we have here, which makes a

9   distinction, at least provides -- provides the distinction that

10  the County is urging and the reason to take up those claims

11  first.  So unless there are any other questions --

12           THE COURT:  You can move to the preliminary injunction

13  motion, I think.

14           MR. LATTNER:  Sure.  Then I will turn it over to my

15  co-counsel.

16           MR. JOHNSON:  Good afternoon, Your Honor.

17           THE COURT:  Good afternoon.  So you just to want focus

18  standing only?

19           MR. JOHNSON:  Yes, I'll be talking about standing, and

20  my colleague, Erin Ashbarry, will be talking about the

21  historical analogues.

22           THE COURT:  So just so I'm understanding, you would

23  agree that at least to proceed, we only need one plaintiff with

24  standing, correct?

25           MR. JOHNSON:  As to each of the sensitive -- or the

1  places of public assembly, yes.  And I'm happy to discuss --

2          THE COURT:  Okay.

3          MR. JOHNSON:  -- how the plaintiffs have not met the

4  burden as of standing for any of those locations.

5          THE COURT:  Well, and you may -- because you seem --

6  this is your core issue, you may be better positioned than

7  Mr. Pennak and I were to answer that question about, for

8  purposes of at least where we stand now, which is the

9  preliminary injunction motion, but as of now, you know, do we

10  have somebody who's actually articulated facts showing that

11  they're burdened by those particular parts of the various

12  sub-locations?

13          And I think it's pretty obvious that at least there's

14  someone who is alleging a harm associated with the places of

15  worship, the 100-yard issue.  Maybe you have different issues on

16  standing beyond that, but just in terms of people who have shown

17  that those are places that they are going to or likely to go to.

18          MR. JOHNSON:  I'd say no -- no, Your Honor, not based

19  upon the case law in the -- in the supplemental briefings and

20  the additional authorities.

21          THE COURT:  Can you just push the microphone a little

22  bit more.  Thank you.

23          MR. JOHNSON:  I'm sorry, could you say that again,

24  Your Honor?

25          THE COURT:  Just use the micro- -- stay close to the

1  microphone, please.

2           MR. JOHNSON:  Sure.  So I believe the first thing

3  here, Your Honor, this is an extraordinary remedy.  You know,

4  we're not saying that the plaintiffs cannot prevail through the

5  ultimate course of this litigation.  What we're saying, the here

6  and the now on this quasi summary judgment standard, a

7  pre-enforcement PI, they haven't met that as to any of the

8  sensitive locations.

9           Now, that's for two reasons, Your Honor.  And I think

10 you hit the nail on the head early on in the argument when you

11 talked about how the plaintiffs have focused on the 100-yard --

12 what they're calling a ban, and we're calling a buffer zone, and

13 which has existed, Your Honor, since 1997.  And the second is as

14 to places of worship.  That was our reading as well, too,

15 Your Honor, and that's borne out by their affidavits, which, on

16 the issue of standing, the plaintiffs bear the burden of that,

17 not the County.  We don't have to disprove standing, Mr. Pennak

18 said a number of times, and he may have been referring to the

19 historical analogue, but they have the burden of proof on

20 standing.  They haven't met that, Your Honor.

21          Now, one of the issues, too, you discussed,

22 Your Honor, was the issue of self-defense.  And I think that's

23 extremely important in this case based on the relief requested

24 by the plaintiffs for their -- their first alternative relief

25 is, they -- (1) TRO and preliminary relief should be granted,

48

1    restrain the County from enforcing Section 57-11A of the

2    County Code as to permit holders who provide armed security to

3    places of worship and/or to private schools and thus allow them

4    to continue to do so.  Who provide armed security to places,

5    that's not about self-defense.

6            If you do a word search through Bruen, you'll find

7    that self-defense comes up 128 times, Your Honor.  If you do the

8    same search for others, and similar words such as that, you come

9    up with 12 hits, and none of that talk about the defense of

10   others, which is -- if you view the affidavits as a whole, and

11   the precise language in that affidavits of certain individuals,

12   it's very much about standing in the place of the church and

13   trying to assert standing on their behalf.  There's no affidavit

14   on behalf of any place of worship or a private school that says,

15   We want to employ these people or put forward these people as

16   armed security.

17           And if you look at the affidavits --

18           THE COURT:  Well, I mean, why would you need that?  I

19   mean, they're just trying to say -- I'm not sure what the

20   argument is.  Your argument is that the proper plaintiff is the

21   institution, or you're saying that this isn't a self-defense

22   theory, this is some other theory?

23           MR. JOHNSON:  Both, Your Honor.  And that it's -- that

24   if -- Thomas Paine, number one, an affidavit submitted in this

25   case, "We strip churches of armed protection, leaving churches

1    open to attack."  This is the following line, "The urgency and

2    need for such protection cannot be overstated."  It's not about

3    self-defense, that's not about carrying a weapon outside the

4    home for your self-defense; it's about self-defense of others.

5    And they're asserting the right of a church, and none of the

6    affidavits say that -- or the declarations say that the

7    plaintiffs have the authority to do so.  So I think as to a

8    personal case in controversy, which this has to be, Bruen is

9    a -- it's an individual private right.

10          THE COURT:  Okay, I understand that point, but what

11    about the 100-yard --

12          MR. JOHNSON:  Sure.

13          THE COURT:  I seem to recall there were some

14    descriptions of people saying, Look, I want to drive down the

15    street, I don't know if I'm -- I probably -- I inevitably am

16    going to go within 100 yards of one of these locations, so when

17    I'm on that street, walking or driving, when I want to protect

18    myself, I'm in violation.  So what about those individuals?

19          MR. JOHNSON:  So Your Honor, I agree that there --

20    there were allegations -- and I don't think those have to be

21    pled with the specificity as required by the Siegel Court in

22    terms of how often they go out.  Just say you go out into the

23    County and you're within a 100 yards, fine, we would accept

24    that, but if you look at the Siegel Court, Your Honor, talking

25    about going to specific locations, Turtle Back Zoo, Van Saun

1  Zoo, those plaintiffs specifically named the places they were

2  going to.  None of the plaintiffs here have done that, Your

3  Honor.  And --

4          THE COURT:  Didn't one of them talk about their house

5  being within 100 yards of something?

6          MR. JOHNSON:  Sure, Your Honor, but again, to prove

7  standing, it's not just saying, I have a constitutional --

8  there's a constitutional infringement upon my actions, therefore

9  I have standing.  You also --

10         THE COURT:  No, no, I'm saying, if someone says -- and

11  maybe I -- maybe I misread it, but if someone says, My house is

12  100 yards from one of these locations, if I'm in my house with a

13  gun, I'm in violation.  Whether they specifically say, I'm going

14  to be in my house or not, I mean, it's pretty clear that they're

15  going to spend time in their own house.  So why isn't someone

16  like that --

17         MR. JOHNSON:  I think the plaintiffs' argument is, if

18  they go outside their house, they would be within --

19         THE COURT:  Well, either way, whether it's in the

20  driveway or what have you, or the street in front, I mean, it's

21  pretty clear, someone's going to go outside their house at some

22  point, right?

23         MR. JOHNSON:  Yes, Your Honor, it is, but again, you

24  have to show a credible threat of prosecution, right?  As I've

25  stated, the --

51

1          THE COURT:  So 100 -- okay, I understand -- I read

2    that part, and I wasn't sure -- admittedly, I don't know whether

3    the arguments worked in other jurisdictions, but you pass a

4    statute, you're -- I mean, I haven't seen any kind of statements

5    from the County, the Police Department or anybody else, saying,

6    Well, we're not enforcing this against former permit holders,

7    which I guess is some percentage of the plaintiffs, or

8    people in -- I mean, any of the scenarios.  I mean, you're just

9    saying trust us, we're not going prosecute you?

10          MR. JOHNSON:  Your Honor, but that's not -- that's not

11    the burden here.  And I think, respectfully, I believe that's a

12    legal fallacy, is to say that no jurisdiction's ever required a

13    Court to say, We're not going to enforce our laws.  So any- --

14          THE COURT:  Okay, but what is enough?  Because, I

15    mean, you pass a law and the person says, I have a gun, I'm

16    going to do something or go somewhere where I would be in

17    violation; what do they need to show, that they actually have

18    been arrested?  I don't think that's the standard.  So --

19          MR. JOHNSON:  No, it's not, but it's not -- it's not

20    to prove that you would be but it's imminent.  And Your Honor, I

21    think, to that point, having a plaintiff say, I'm going to do

22    this, those statements are made by some of the declarants in

23    this very lawsuit.  So if the argument is, as of November 28,

24    2022, you have to stop this law because we don't know if we

25    could be arrested, we're concerned about that.  You have

52

1   Mr. Shemony, you have -- is it Mr. Wilson, I believe, stating, I

2   carry a loaded firearm in a library, I carry it when I go pick

3   my child up at a private school.  Their addresses are listed on

4   the front of the complaint.  I'd submit to the Court,

5   Your Honor, that probable cause exists to arrest those people

6   right now.  It hasn't happened.  And if you go back to this law,

7   Your Honor --

8           THE COURT:  Give me an example of a case where that

9   sort of argument has worked, where one says, Look, they stated

10  not just that they would do something illegal under this law but

11  that they've got some facts showing it is the kind of thing they

12  might do.  They might pick up their child, they might go to the

13  church or the synagogue to provide whatever security.  I

14  understand the other argument.  And the answer is like, Well,

15  they haven't been arrested yet so there's no standing.  I mean,

16  again, doesn't that basically make the requirement that you have

17  to get arrested?

18          MR. JOHNSON:  No, it doesn't, but it --

19          THE COURT:  Does it have to be that some officer goes

20  up to them and says, I'm going to arrest you, I'm not going to

21  do it today, but I'm going to arrest you tomorrow, and then you

22  can file your complaint?  I don't understand, how do you show

23  the imminent threat without actually having it go to completion,

24  under your theory?

25          MR. JOHNSON:  Well, Your Honor, you have to put

1   forward some kind of facts.

2       THE COURT: Well, give me an example of something

3   that's worked in another case.

4       MR. JOHNSON: So not necessarily something that's

5   worked in a case, but I'll bring it right to this case,

6   Your Honor. And again, you have a law on the books from 1997

7   where there was a 100-yard buffer zone. That's 25 years of data

8   as to how that was enforced, what the arrest rate was, who was

9   arrested. There's been absolutely no -- no evidence put forward

10   about -- that there would be any kind of corollary or any kind

11   of, you know, comparative argument as to what happened before

12   this amendment and what happened afterwards.

13       THE COURT: So again, what case says you look at the

14   arrest rate to decide this? Is there such a case --

15       MR. JOHNSON: No, but I think that's --

16       THE COURT: -- historically? I mean, there are all

17   these other gun cases, which, again, I haven't looked at this

18   exact issue on, including Bruen, including Heller, other cases

19   like that. Then you have other categories of things. I think

20   there used to be historically, you know, some these cases

21   regarding things that were challenged constitutionally,

22   you know, private conduct, sexual relations, so forth. I mean,

23   has anyone succeeded with the argument that you don't have

24   standing because the arrest rate isn't high enough?

25       MR. JOHNSON: I don't think it's specifically to here

54

1    but --

2          THE COURT:  I mean, I'm not saying it's a terrible

3    argument, I'm just saying give me something that supports your

4    argument other than just the idea.  Is there a case that

5    supports that concept?

6          MR. JOHNSON:  Your Honor, there's no specific case on

7    point, but the idea is --

8          THE COURT:  How about not on point?  How about that

9    says vaguely that arrest rates -- without a significant enough

10   arrest rate, you don't have standing?

11         MR. JOHNSON:  It's not specifically arrest rates, but

12   if you look at Susan B. Anthony, if you look at Barall, you look

13   at any of these cases, it talks about prior arrest.  They weigh

14   that heavily.  All of those cases do, they discuss it.  And it's

15   not the burden of the state to say we're not going to enforce

16   our laws, ergo, standing exists.  That would make it --

17         THE COURT:  So why was this law put in place then, if

18   you're not going to enforce it?

19         MR. JOHNSON:  Your Honor, why would any law with a

20   criminal component be put in place?  I think it -- the main

21   point is that -- and when I talk about the historical

22   significance of the law being in place since 1997, it's still

23   yet to be seen.  You know, jaywalkings's on the books, and

24   speeding's on the books, and don't cheat on your taxes, those

25   are on the books, right.  Now, what -- what kind of time,

1  effort, resources has the County put into for County officials,

2  Police Department, Police Department and the State's Attorney,

3  who would ultimately make the decision as to whether these are

4  prosecuted.

5           THE COURT:  Okay.  Give me the case that tells me that

6  I look at all those things, how many times the State's Attorney

7  has done something, how many police officers write tickets for

8  jaywalking.  Where is the case that says all of those things

9  factor into this, and if you don't have enough arrests or

10 tickets for jaywalking, you know, there's no imminent risk.  I

11 mean, again, I'm not saying it's a bad argument, I just don't

12 know where this is coming from.  Give me a case.

13          MR. JOHNSON:  Well, the -- sure -- Your Honor --

14          THE COURT:  What's your best case on this whole topic,

15 or do you even have one, or is this just trying to --

16          MR. JOHNSON:  So in terms of like prior arrests

17 records, no, but the case -- the Supreme Court cases are

18 replete, including the SBA list case, talking about prior

19 arrests.  Also, the case involving the pamphleting, I believe

20 that was it.  I can't remember the case right now, but they all

21 talk about prior arrests.  They all go into -- they all go into

22 analysis on that.  And I don't think that the absence of it

23 means that there's standing.  And if that's the case and

24 Plaintiffs' argument is that We have a standing because there's

25 a law on the books, then anybody who's the target of a law --

1          THE COURT:  What was the pamphleting case?

2          MR. JOHNSON:  That was -- they talk about that, Your

3    Honor, in ... that's Steffel, Your Honor, I believe,

4    S-T-E-F-F-E-L.

5          THE COURT:  Is it in your brief?

6          MR. JOHNSON:  Yes, Your Honor.

7          THE COURT:  Okay.

8          MR. JOHNSON:  Yeah, it was -- it's the Steffel case,

9    Your Honor.  So the plaintiffs have to show something in terms

10   of -- you can't just say there's a law targeting us, the

11   Supreme Court case law.  And these ideas -- and just because

12   there's not case law backing it to say that if you find an

13   arrest record, therefore, that can prove you have standing;

14   these are ideas.  These are the ways that the plaintiffs could

15   prove standing, and which they haven't; they're just saying --

16         THE COURT:  So what was shown -- what was sufficient

17   in Bruen itself; do you know?

18         MR. JOHNSON:  Sufficient to show that there was

19   standing?

20         THE COURT:  Yes.

21         MR. JOHNSON:  I'd say off the top of my head, I do not

22   know, Your Honor.

23         THE COURT:  I mean, isn't that the best marker for --

24   it's the exact same fact pattern.  Someone challenging a state

25   ordinance on Second Amendment grounds.  And I don't know the

57

1  answer either, because frankly, I didn't think that you were

2  going to lean on this that hard, but since you are, again, I

3  definitely don't remember reading about how, Well, the arrest

4  rate was high enough.  Now -- but there must have something.

5  According to you, you need to show something.  So what did they

6  show in that case that got them over the top?

7         MR. JOHNSON:  What did they show in Bruen, Your Honor,

8  to get them over top?

9         THE COURT:  Right.

10        MR. JOHNSON:  They looked at the historical analogue

11 and decided that the actions that they were taking --

12        THE COURT:  No, no, to say that they had standing,

13 that there was a potential that they could get arrested for

14 walking around with a gun.

15        MR. JOHNSON:  Oh, yeah, they applied for permits,

16 Your Honor.  That's what it was.

17        THE COURT:  Okay.  So it's a permits situation,

18 slightly different than this.

19        MR. JOHNSON:  Yeah.  And if you think about it, how

20 would -- if you're going to establish that you have a credible

21 threat -- and some of these plaintiffs said they're doing it,

22 right?  If you're going to establish a credible threat of

23 traveling around the County, how would that occur?  How would an

24 arrest occur where a police officer pulls you over for some

25 other reason, sees a gun in your car --

1          THE COURT:  That happens all the time.

2          MR. JOHNSON:  True.

3          THE COURT:  Have you seen my criminal docket?

4          MR. JOHNSON:  I'm sure.

5          THE COURT:  I mean, almost every case is someone who

6    got pulled over for a broken taillight and then they find a gun.

7          MR. JOHNSON:  Sure.

8          THE COURT:  I mean, that's most of the cases.

9          MR. JOHNSON:  But take it further than that, here,

10   Your Honor, because we're not just talking about finding a gun.

11   It would have to be someone with a wear and carry permit, and

12   the officer would have stop on the Beltway and say, Oh, we're

13   near Holy Cross; I'm going to choose to issue you a criminal

14   citation over --

15         THE COURT:  Okay.  If this is really so unlikely, why

16   don't you just resolve this motion by just agreeing that you're

17   not going to enforce it on these individuals until the case is

18   over?  We could short-circuit this entire motion process if you

19   said, Look, there's no potential harm, because we're going

20   commit -- I mean, again, it doesn't have to be because you filed

21   this case, but the people who had permits before, who had these

22   legitimate reasons that were accepted by the County under the

23   old system, I assume you didn't mean to say that you didn't

24   think those reasons were legitimate anymore, it's just that you

25   didn't like the fact that the permit requirement is so broad now

1  that you weren't comfortable exempting permit holders the way
2  you used to.
3         And I understand that, but again, if this is so
4  remote, why not just put it on paper and say, at least during
5  the life of this case, we're not going to do anything against
6  these individuals, you know, we'll accept effectively an
7  injunction on this point, temporary as it is, until the final
8  ruling in the case.  I mean, why wouldn't you just do that, if
9  you're so certain that no one's going to get prosecuted?
10         MR. JOHNSON:  Two reasons, Your Honor, is, one, I'd
11  like to keep my job, and I don't really -- I can't speak on
12  that.  The County --
13         THE COURT:  Well, no, I think it's a very legitimate
14  position; we've seen it in other cases before.  A motion for
15  preliminary injunction, everyone says, There's no need to
16  adjudicate this, we all -- we can all agree that at least during
17  the life of this case, no action's going to be taken so that the
18  Court can take -- you know, give it the time and attention it
19  deserves rather than coming to a rush to judgment.  Attorneys
20  agree to that all the time.
21         MR. JOHNSON:  Sure.  Yeah, there's -- I will say I do
22  not have authority, as I sit here, to agree with that.  But
23  number two, more importantly, Your Honor, that's not the burden,
24  on the County to say, We're not going enforce our laws.  And the
25  Supreme Court --

1    THE COURT:  Well, I'm just saying you're trying to

2  convince me that there's just no basis to think that anybody

3  would ever -- the County would do anything to anybody over this

4  law, which again, why have the law, then?

5    MR. JOHNSON:  I understand your point --

6    THE COURT:  I think we need to move on from that area.

7    MR. JOHNSON:  Okay, that is --

8    THE COURT:  I mean, honestly, that's where I think the

9  crux of the issue is.  I hadn't given much thought to the

10  standing issue.  You've given me a few things to think about,

11  but I think we've covered enough ground that I can think about

12  them.

13    MR. JOHNSON:  Thank you.  Your Honor, if I can just

14  look over and see if there's just anything else that -- that

15  I think that the -- would help the Court here in looking at the

16  standing issue.

17    (Pause.)

18    MR. JOHNSON:  No.  Thank you, Your Honor.

19    THE COURT:  Okay.  Ms. Ashbarry, thank you for

20  waiting.

21    MS. ASHBARRY:  Yes.  Good afternoon, Your Honor.

22    THE COURT:  So we're on to I think the preliminary

23  injunction motion itself, the merits of it.

24    MS. ASHBARRY:  Correct.

25    THE COURT:  And I know that you heard some of my

61

```
 1   discussion with the -- with Mr. Pennak about this.  So -- and I
 2   don't know where we should start, but even though I understand
 3   Mr. Pennak's motion's broader than this, I thought it would be
 4   helpful to start a little -- with the places of worship and the
 5   100-yard zone in particular.  Starting with the 100-yard zone,
 6   I think Mr. Johnson said it's been around for a long time, but
 7   it wasn't -- it was an exception, if I'm not -- correct, for the
 8   permit holders, correct?
 9           MS. ASHBARRY:  That's correct, Your Honor, that's
10   correct.
11           THE COURT:  So are you aware of any authority out
12   there on buffer zones, any recent cases that have addressed that
13   specific issue?
14           MS. ASHBARRY:  Yes, Your Honor.  Just as an initial
15   matter, the state law that authorizes the County to regulate
16   firearms includes this 100-yard buffer zone.
17           THE COURT:  Yeah, I'm asking more about -- I mean, you
18   could tell, I have a huge appetite to do the state law
19   preemption/authority issue.
20           MS. ASHBARRY:  Right.
21           THE COURT:  I'm just looking from a constitutional
22   standpoint.
23           MS. ASHBARRY:  Right.
24           THE COURT:  Are there any cases that say they are
25   constitutional, these buffer zones?  Or not, that they're not.
```

62

1          MS. ASHBARRY:  Well, I have -- I -- we cite three

2     cases in our brief -- in our opposition, Your Honor, which

3     admittedly all precede Bruen and so therefore have to be viewed

4     under -- with that in mind.  But the main case that comes to

5     mind is United States v. Class case, which was a D.C. Circuit

6     case.  And the defendant in that case was contesting his

7     conviction for having a firearm in a parking lot that was

8     1,000 yards away from the U.S. Capitol.  And the D.C. circuit

9     determined that that parking lot, 1,000 yards -- pardon me,

10    1,000 feet away from the U.S. Capitol was a sensitive place and

11    that the Second Amendment did not attach and did not protect his

12    right to carry firearms there.

13          Additionally, there are two other cases that were

14    cited, also pre-Bruen, but they are federal cases in which

15    defendants who had firearms in the parking lots of postal

16    service property were challenging their convictions under the

17    Second Amendment, and both Courts held that those areas around

18    the postal service were sensitive enough and were considered to

19    be essentially part of the U.S. Postal Service because Postal

20    Service transactions were taking place in those parking lots.

21    And similar to Class, people coming to and from those buildings

22    essentially were entitled to the same protections nearby as they

23    were in the actual buildings themselves.

24          So those -- there were three cases that we were able

25    to find that essentially validated the concept of having a

63

1  buffer zone, if you will, around these sensitive locations.

2           THE COURT:  So they weren't decided based on the fact

3  that Heller doesn't go beyond the home?

4           MS. ASHBARRY:  No, Your Honor.

5           THE COURT:  You know, they were decided on the

6  sensitive places and how far that takes you?

7           MS. ASHBARRY:  Correct, correct.

8           THE COURT:  But am I right, I mean, under your

9  statute, the parking lots are part of the sensitive place, so --

10          MS. ASHBARRY:  Yes.

11          THE COURT:  -- they're just talking about 100 yards

12  beyond that.

13          MS. ASHBARRY:  Yes, yes.

14          THE COURT:  So under that -- and what were the last

15  two cases called, the parking lot cases?

16          MS. ASHBARRY:  Your Honor, one was called Bonidy,

17  B-O-N-I-D-Y, and the other one was called Dorosan,

18  D-O-R-O-S-A-N.

19          THE COURT:  And these are in the brief, or not?

20          MS. ASHBARRY:  Yes, Your Honor, those are in the

21  brief.

22          THE COURT:  Okay.

23          MS. ASHBARRY:  And then also, Your Honor, we had

24  numerous historical examples of buffer zones.  I think that one

25  was in Somerset County in Maryland in 1837.  There is a 50-yard

JA776

64

1    buffer zone around lines for waterfowl, essentially, to protect
2    the waterfowl from hunting.  Additionally, in Maryland,
3    historically, a person could not have a weapon within 1 mile of
4    a polling place, a mile of a polling place.
5              THE COURT:  So what about -- and the polling place
6    might be different, but you heard my discussion with Mr. Pennak
7    about the waterfowl-type cases, and I wanted to get your
8    perspective on that because his argument -- my question was,
9    well, why is it that -- why does is it matter what the purpose
10   was, the point is, someone with a gun who otherwise would think
11   they have a Second Amendment right to carry it at or near the
12   park is told no, you can't, and that infringes on their right.
13   Now, he points us to the language in Bruen about you look at why
14   this provision was enacted.  So what's your response to that
15   point?
16             MS. ASHBARRY:  My response to that is the how and why
17   for the regulation was not the only factor that the Court said
18   should be examined as far as the scope of the government's
19   ability to regulate.  The Court was very clear in Bruen that
20   this historical analogue analysis is not meant to be a
21   straitjacket.  Ultimately, whether we're talking about Somerset
22   County in 1837 or the numerous municipal statutes banning
23   weapons and guns, all of them have buffer zones, Your Honor,
24   that limit or restrict the right to carry in a certain area.
25   And the County's position is, these are sufficient analogues to

65

```
 1   support its argument that within these areas of public assembly
 2   identified by the County, there's a buffer zone that
 3   historically is supported.
 4          And furthermore, Your Honor, there are state laws
 5   presently that incorporate the concept of buffer zones.  You
 6   can't have them, again, at polling places, within 100 feet of a
 7   polling place on election day.  At the state level, within 1,000
 8   feet of a public demonstration, you cannot have a firearm if you
 9   have been advised by a law enforcement officer to move away.
10          THE COURT:  Aren't you just kind of identifying things
11   for Mr. Pennak's next case?  I mean, I'm not sure the fact that
12   the state passed it but it hasn't been put through the Bruen
13   analysis, it only takes us so far, doesn't it?
14          MS. ASHBARRY:  Yes and no, Your Honor.  I think
15   that -- again, the County has established that we have
16   historical examples to support -- numerous historic examples to
17   support this concept of a buffer zone to protect the people or
18   the activity in these sensitive locations.
19          THE COURT:  So in this case, why was it that the
20   County used this 100-yard zone?  I know you said you can under
21   the state statute, but that doesn't mean that you should or that
22   that's the right policy answer.  What was the rationale for
23   doing that, given that, as has been said in the briefs, I mean,
24   this may be different from 100 years ago or 200 years ago, where
25   you would have your park or your post office, and there would be
```

66

1    a lot of space around it.  I mean, we are in a densely populated

2    area now.  100 yards can take you several blocks away from a

3    building, and there's a lot of things people want to do in those

4    areas, or can do, and now they can't, including the former

5    permit holder.

6         So where do the 100 yards come from, just as a matter

7    of how this is defined effectively as the equivalent of a

8    sensitive place, given how densely populated these areas are?

9    And you could be, again, several blocks away from one of these

10   locations where the whole point -- everything you're around is

11   not technically sensitive and yet you're swept in by this law.

12        MS. ASHBARRY:  You know, Your Honor, I don't want to

13   speculate as to why 100 yards was included in the legislation.

14   I can tell the Court that with respect to Bill 21-22 at issue

15   here, the main focus of the Council -- and I think Exhibit 2 to

16   our opposition is essentially the packet that the Council

17   received ahead of the bill, and the focus was Bruen and ensuring

18   that our law complied with Bruen in the sensitive location

19   definition.

20        I think that that 100-yard buffer zone has been there

21   essentially because it was in the state law.  I think -- I would

22   be speculating at this point -- I think it essentially would be

23   there because of the power of firearms today and their

24   ability -- the distance with which they could fire.  But,

25   you know, Your Honor, I don't think that there's anything in the

67

1  record before the Court today that answers that question, and I

2  would not, again, want to speculate on that issue.

3        THE COURT:  Okay.  So then can you -- well, you said

4  you're not aware of any Courts that have analyzed and either

5  upheld or struck down buffer zone legislation since Bruen?

6        MS. ASHBARRY:  Correct.

7        THE COURT:  Okay.  So let me ask for some

8  clarification both on the 100-yard issue and -- well, on the

9  places of worship, really all the areas.  Are you arguing that

10  these locations that are deemed public places of public assembly

11  are sensitive places in the sense that if they're not explicitly

12  listed, like the schools, they are -- fall into that category,

13  they just weren't listed in the case because the case said these

14  are examples, or are you saying that these are not sensitive

15  places, but they meet the last part of the Bruen test, where you

16  do the historical analysis, there's a tradition of regulation in

17  those locations?  It doesn't matter to you either way?

18        MS. ASHBARRY:  You know, I'm not -- you know, I'm not

19  sure I follow your question, Your Honor.

20        THE COURT:  Well, the question is -- so the way I look

21  at it is, the sensitive places have sort of a favored spot in

22  this area, at least under the case.  And again, it's always been

23  curious to me, at least since this case came out, that they give

24  virtually no examples of statutes and the like regarding these

25  sensitive places, they just say, Well, no one ever complained

1   about these areas, even though we can't really find very many

2   examples, but everyone knows they're sensitive, so it's okay.

3   And on the other hand, as Mr. Pennak points out, when you just

4   get to the last level of the historical record, there's at least

5   ways to read the case, as he has read it, that you need a lot of

6   examples, you need a really deep tradition, which, frankly,

7   hasn't been set forth for those sensitive places.

8         So to me, I look at something like schools -- and it's

9   in that list -- you don't need to find that many cases because

10  they pretty much said if you can qualify as a sensitive place,

11  you're okay.  We can get into this question of the definition of

12  schools that he's raised, but if it's something that's not in

13  that area, then you do need to have this historical showing.

14  And I understand that they're sort of related because how

15  you know it's something sensitive requires some sense of

16  history, but I think -- to me, I'm looking at them as two

17  different categories, and I don't know which ones are on which

18  side of that or the other.

19        MS. ASHBARRY:  I think I understand what Your Honor is

20  saying, and you know, the County agrees with your point of view

21  with respect to Bruen, that the Court declared these five zones

22  to be -- or five areas to be sensitive without doing a detailed

23  look at the historical record as part of its declaration.  But

24  what's key from the County's perspective is, again, none of the

25  Courts that have -- or neither Bruen -- Bruen did not say that

69

1  those examples are exhaustive; they are examples.

2       THE COURT:  So how do I decide that something else is

3  a sensitive place, that has this favored status, and how do I

4  decide whether some of these are not really sensitive places in

5  the same category, but then we look at your -- the question of

6  whether you've shown enough of a historical tradition separate

7  and apart from whether they're sensitive places?

8       MS. ASHBARRY:  Right.  And Your Honor, from the

9  County's perspective, there's two ways you can get there.  One

10  is to say that an area or a sensitive location is analogous to

11  one of these five sensitive places in Bruen.  And that's

12  expressly stated in Bruen at -- Court's indulgence -- page 2133,

13  "Courts can use analogies to those historical regulations of

14  sensitive places" -- and this is in the paragraph where it's

15  listing the five sensitive places -- "to determine that modern

16  regulations prohibiting the carry of firearms in new and

17  analogous sensitive places are constitutionally permissible."

18  And I think, Your Honor, with respect to childcare facilities,

19  that would be a prime example where the County would say those

20  are analogous to schools, one of the five sensitive locations

21  identified in Bruen, where governments may constitutionally

22  regulate firearms.

23       With respect to locations that are not analogous to

24  the existing five approved locations for regulation, that's when

25  you have to look to the historical tradition.  So with respect

1    to places of worship, for example, the County would suggest that

2    the Court, under Bruen, would need to look to the statutory

3    analogues identified by the County that prohibited firearms in

4    places of worship.  And the County did identify a number of

5    states that had laws prohibiting firearms at places of worship

6    on the books in excess of a decade.  A couple of those statutes

7    were considered by the Supreme Courts of the day and approved,

8    expressly approved by those courts.

9            THE COURT:  Which ones are those?

10            MS. ASHBARRY:  Your Honor, I believe that that is the

11    Georgia and Texas Supreme Court cases, which I believe are Hill

12    and English.

13            THE COURT:  Okay.  So am I correct, from the way you

14    describe this, you want me to make the analogy that a childcare

15    facility is a sensitive place.  Are you asking me to do that for

16    any other of the listed places of public assembly, or are you

17    leaning only on the historical record for all of those?

18    Understanding that, I think to some degree, the sensitive place

19    determination does require a look at history as well.

20            MS. ASHBARRY:  Correct, Your Honor.  The County would

21    point to childcare facilities as well as private schools, to the

22    extent that those are challenged by plaintiffs here.  The

23    County's argument there is that the Bruen Court did not say only

24    public schools in its ruling, never did.  Neither it Heller,

25    which also referred to schools as a sensitive location.

1            THE COURT:  Would you agree, though, that that doesn't

2   necessarily cover colleges and universities?

3            MS. ASHBARRY:  Your Honor, the County's law, before

4   its recent amendments, was limited to I believe primary and

5   secondary schools -- is that correct -- but as revised by 21-22,

6   it's schools.  And so the County would argue that it's a broad

7   interpretation of that term, and it would encompass universities

8   and colleges, to the extent there are any in Montgomery County.

9            THE COURT:  Well, we have Montgomery College, to start

10  with.

11           MS. ASHBARRY:  Yes, yes.

12           THE COURT:  But you're saying that -- the statute

13  covers that, but does -- are you saying that colleges and

14  universities are sensitive places, under the Bruen construct?

15           MS. ASHBARRY:  Yes.

16           THE COURT:  So what is the analogy that you're

17  drawing, then, because when I think of -- is it that these are

18  places of educational teaching, or is it that this is a place

19  where children are frequently found in large numbers?  What is

20  the thing that makes it sensitive, and what's the basis for that

21  position?

22           MS. ASHBARRY:  I would say both of those.  In other

23  words, not only has the County -- well, schools today, with

24  respect to childcare facilities for children who are younger

25  than kindergarten age frequently combine both preschool and

72

```
1    childcare, Your Honor.  And so to the extent -- ultimately, a
2    school for those individuals, for that group, they're minors,
3    they're away from the protection of their parents, and therefore
4    are -- and that's very similar to a school, historically,
5    Your Honor.
6              And with respect to institutions of higher education,
7    the County would argue that falls under the definition of a
8    school in Bruen.  And also, we would point to there are numerous
9    historical statutes that ban weapons at places of -- for
10   education or literary purposes.
11             THE COURT:  No, I understand that argument.  I'm just
12   trying to understand, what is your definition of sensitive
13   places and which parts of the statute fit within that, and I
14   think you're trying to argue colleges and universities fit
15   within that because they're analogous to schools.
16             MS. ASHBARRY:  Yes.
17             THE COURT:  And I'm just trying to understand --
18   honestly, I don't know if there is any source you can tell me
19   that helps define sensitive places better than just the case
20   itself and that one word, "schools," but you're saying it's
21   anyplace there's a lot of children, anyplace involving learning.
22             MS. ASHBARRY:  Yes.
23             THE COURT:  Not "and" but "or," one or the other.
24             MS. ASHBARRY:  Yes.
25             THE COURT:  And the basis for that is just your own
```

1  analysis; there's no further elucidation of the term "schools"

2  in this case other than the word itself.

3        MS. ASHBARRY:  Correct, Your Honor.

4        THE COURT:  Or is there?  Because I haven't found

5  anything easy to focus on, but --

6        MS. ASHBARRY:  That's correct, Your Honor, and

7  furthermore, you know, the statute authorizing the County --

8  again, the state statute authorizing the County -- authorizes

9  the County to ban weapons at schools.  It's a very broad term in

10  the state statute as well.

11        THE COURT:  Is schools defined anywhere?  Again, I

12  don't know what the Bruen Court meant by that, and I'm not going

13  to say they were necessarily thinking about either a federal

14  statute or something else, but I'm not sure it's the most

15  natural reading of the term to say that it includes colleges and

16  universities.  I think your argument that it would include

17  private schools is probably stronger between those two.  But is

18  there some sort of textual or definition-based argument you can

19  make that colleges and universities are covered by schools?

20        MS. ASHBARRY:  Not within Bruen, Your Honor, no, but

21  with respect to the spirit of the other historical analogues

22  that have been presented to the Court in our filing, that

23  locations for educational or literary purposes are historically

24  locations where firearms were banned or prohibited.

25        THE COURT:  Okay.  So any other categories you're

74

1  saying you have an argument on how it's a sensitive place, as

2  opposed to just something I should just look at the history of?

3          MS. ASHBARRY:  Well, you know -- yes, Your Honor.

4  Essentially, for -- we're very clear in our papers which

5  provisions of the law we view as falling under the exist- -- the

6  existing five areas identified in Bruen.  Private school --

7  buffer zones in private schools, we make our arguments and

8  provide analogues to the Court.  And similar with respect to

9  places of worship.  And I don't -- all of the -- in other words,

10  all of the areas in the County's defin- -- definition of public

11  assembly are either analogous to these five sensitive locations

12  in Bruen or have an historical tradition to support a finding

13  that the County may constitute --

14          THE COURT:  I'm just trying to understand.  I thought

15  just a moment ago you said places of worship was not a sensitive

16  place, and now I just heard you say it was, so which one is it?

17          MS. ASHBARRY:  Yes.  Yes, it is, Your Honor, it is, it

18  is.  My apologies; I did not mean to confuse the Court.  It is a

19  sensitive location where the County could -- may

20  constitutionally ban firearms.

21          THE COURT:  And what's the reasoning behind that

22  theory?  It's analogous to which of the five, or how do you get

23  it into that category?

24          MS. ASHBARRY:  That -- the County does not argue it's

25  analogous to one of the Bruen five.  Instead, the County argues

1   that there is an historical tradition for regulation of firearms

2   at places of worship.  And in fact, we provide numerous statutes

3   where firearms were banned at places of worship.  Additionally,

4   as mentioned, the Georgia and Texas Supreme Courts considered

5   statutes that were in effect at the same time and agreed that --

6        THE COURT:  I mean, I'm still having trouble, because,

7   I mean, I admit that there's perhaps a lot of overlap in the

8   analysis, but what you've just described is, it is one for which

9   the historical record supports this, not that it's analogous to

10   one of the five categories.

11        MS. ASHBARRY:  Correct.  And either it's acceptable

12   under the Court's analysis of Bruen --

13        THE COURT:  Well, I'm just trying to understand which

14   bucket you're putting it in, or at least are you putting it in

15   the category, you have an argument on how it's analogous to one

16   of the five?

17        MS. ASHBARRY:  The County's not arguing that churches

18   are analogous to the five -- to government buildings.

19        THE COURT:  Okay.  Or that it's a sensitive place in

20   some other way that is the same concept, as opposed to just,

21   again, meaning outside this sensitive place doctrine at this

22   point.

23        MS. ASHBARRY:  Well, again, under Bruen, there's two

24   ways something can qualify as a sensitive place:  One, it's

25   analogous to the five locations identified, or there's an

1  historical tradition.

2          THE COURT:  Oh, okay.  I guess, maybe we're just --

3  it's semantics, because again, I think of the sensitive places

4  as those five or things that are equivalent, and the other part

5  is the core of the analysis, which is how they look at

6  everything now.  But I think I understand your point.

7          MS. ASHBARRY:  Okay.

8          THE COURT:  So the only ones that you have an analogy

9  to the five are schools, colleges, private schools,

10  universities, and childcare facilities.

11          MS. ASHBARRY:  Yes, yes, yes.

12          THE COURT:  Not parks, not assisted living facilities,

13  things like that.

14          MS. ASHBARRY:  Correct, Your Honor, that's correct.

15          THE COURT:  Okay.  So what's the -- again, I was

16  hoping to kind of stay within the core of things for purposes of

17  the motion, but what's the argument on how these assisted living

18  facilities fit within your -- you know, meet the test of Bruen?

19          MS. ASHBARRY:  Ultimately, Your Honor, the County

20  identified various statutes that essentially protect vulnerable

21  populations, and so -- that are gathered in large areas.  So to

22  the extent an assisted living facility falls in that same

23  bucket, so to speak, the County would argue that the statutes

24  identified support a finding of an historical tradition of

25  regulation of firearms at those locations.

77

1          THE COURT:  And what are the vulnerable populations

2   protected by the historical statutes besides children, or are

3   you just using the children part from schools and otherwise?

4          MS. ASHBARRY:  Well, in the assisted living arena, it

5   would be, you know, those individuals that are in need of

6   assisted living services or -- and the Court's indulgence.

7          THE COURT:  No, I'm just saying that -- what

8   historical examples and statutes that protected certain

9   locations with vulnerable populations are you referring to when

10  you're saying that you can fairly say that these assisted living

11  facilities fall within that -- it is a fair analogy there.

12         MS. ASHBARRY:  Your Honor, the County pointed to that

13  healthcare facilities, hospitals could fall under the protection

14  or be analogized to those statutes that prohibited firearms at

15  places where persons were assembled for educational, literary,

16  or scientific purposes.  Additionally, the County pointed out

17  that historically, individuals with mental illnesses were not

18  eligible to serve in the militia, state militias, and we

19  attached two statutes to that effect.  And ultimately, these are

20  a reflection of the fact that individuals of, you know, perhaps

21  less than 100 percent physical or mental health should not be

22  around firearms, and firearms around them may be prohibited.

23  And in fact, in Heller, the Supreme Court identified individuals

24  with mental illnesses as a category of persons that may be

25  prohibited constitutionally from firearms.

78

1          THE COURT:  Okay.  My last question on these

2    categories is whether -- are there examples of cases that have

3    ruled on this issue of the places of worship -- possession in

4    places of worship under the Bruen theory, whether it's sensitive

5    places or otherwise?

6          MS. ASHBARRY:  There are, Your Honor, pending in

7    federal court in New York State.  I believe that that's --

8    Antonyuk is one, and that's the one that is presently before the

9    Second Circuit.  Additionally, Goldstein v. Hochul, but I don't

10   think that there is a decision yet in that case.  And to the

11   extent that the Court in Antonyuk held that a place of worship

12   was not a sensitive location, the County would simply argue it's

13   not binding precedent for this Court and that the County's

14   analysis under Bruen is correct.

15         THE COURT:  And what about this larger debate that

16   Mr. Pennak has pointed out, the 1791 versus the 1868; what's

17   your best argument or authority for the idea that I can and

18   should rely on your examples which are largely from the 19th

19   century and not the 18th century?

20         MS. ASHBARRY:  Well, Your Honor, as indicated in

21   Bruen, that debate has not been resolved.  The County would

22   argue that 1791 should not be the sole focus for the Court and

23   that later years are an appropriate era for the Court to

24   consider and are the -- is the appropriate era for the Court to

25   consider with respect to the regulation of firearms.  This is a

1  very thorny area, and frankly, we did not get into it in our

2  brief, given our page limits, because there are law review

3  articles on this issue alone.

4      And additionally, it's a very thorny area in that,

5  you know, the Supreme Court said in 1830 in the Barron case that

6  the Bill of Rights does not apply to the states, and so

7  therefore, a lot of the law interpreting the right to bear arms

8  in the 1800s is not necessarily under the Second Amendment, but

9  the -- it's under the comparable second amendments in the state

10  constitutions in place.  But you know, Your Honor, the County

11  would urge the Court to consider the statutes that we've put

12  forth, the numerous statutes that we've attached as evidence of

13  firearm regulations historically.

14      THE COURT:  Okay, thank you.  Anything else you want

15  to offer that I didn't get to?

16      MS. ASHBARRY:  Your Honor, the County would simply

17  just point out -- and this is in our brief -- that, you know,

18  there are a number of parallels between the County's prohibition

19  against public carry and state law.  So for instance, state law

20  prohibits the carry of weapons at day cares.  So even if the

21  Court were to enter an injunction on that, it would not

22  necessarily cure the alleged irreparable harm that plaintiffs

23  assert that they would experience.  And again, that is in our

24  papers, and I won't go into it at length, but --

25      THE COURT:  That's an interesting point to focus on

1    just as we -- I mean, on the key issues that are most focused on

2    the places of worship and the 100-yard buffer zone, does the

3    state have any laws that overlay what the County does on those

4    topics?

5         MS. ASHBARRY:  No, Your Honor.  The state does have

6    prohibitions at day cares, public schools, state parks, state

7    museums, Ravens Stadium, Camden Yards, et cetera.  So again, the

8    County's position is that its law is very same similar -- is

9    either the same or similar to those laws.  And so to the extent

10   plaintiffs have been able to carry and comply with those state

11   laws without suffering irreparable harm, it begs the question

12   how, by virtue of the County's law, is irreparable harm

13   generated, given the similarities between the two?

14        THE COURT:  Okay.  Thank you.

15        MS. ASHBARRY:  Thank you, Your Honor.

16        THE COURT:  So Mr. Pennak, we've been going quite a

17   while.  I think both sides had quite a bit of time.  I think,

18   because I had you go first, even though the other side filed a

19   motion for remand, I'm not really sure it's appropriate to give

20   you rebuttal on that topic, but I can give you a little rebuttal

21   on the motion for preliminary injunction, which is your motion.

22   But I'd ask you to keep it very limited to sort of the one or

23   two points that you have something directly to say in response

24   to what any of counsel say, just so that we keep this relatively

25   fair among the sides.

1          MR. PENNAK:  That's fine, Your Honor, and I will be

2    very brief.  So on the question of standing, there is a case on

3    point with respect to the likelihood of a case -- of a statute

4    being enforced.  That's the Fourth Circuit's decision in Bryant.

5    That's cited repeatedly in our brief.  And the Court said there

6    is a presumption that there is -- a statute will be enforced.

7    Indeed, in that case, it was a 50-year-old statute that had

8    never been enforced, and yet the Court said, Nonetheless, we're

9    going to entertain a challenge to it.  So that's on point, it's

10   controlling authority, disposes of the matter.  Each of the

11   plaintiffs here have said that they have engaged in this conduct

12   in the past, they -- that's now prohibited, they intend to

13   engage in it in the future, and that they would be arrested if

14   they did, that they fear arrest.  And that's enough, under all

15   the case law.

16          So let me move on to where these matters arise in

17   individual places.  On paragraph 72 of the Second Amendment

18   claim, we have allegations by plaintiff Ronald David, and he

19   says, "regularly carries a loaded firearm with him while

20   attending services at his place of worship in the county, at

21   healthcare facilities during appointments with healthcare

22   professionals in the county, at fairgrounds in the county, at

23   recreational facilities in the county, at a park in the county,

24   and he intends to do so in the future."  So those particular

25   subjects have already been particularly identified.

1       Now, you have the declarations that are already of

2 record that show that people are carrying not just for the

3 self-defense of others in their congregations but for their own

4 self-defense, and you have -- that's pretty clear, because you

5 hardly can defend others if you're not defending yourself as

6 well. So it's not simply a matter of whether or not there's an

7 historical justification for defending others. At the very time

8 you're defending others, you're also defending yourself. And

9 that's why Plaintiff Eli Shemony says that he carries for

10 himself. That's in the declaration as well, and it's also in

11 his affidavit -- or I mean his allegations in the complaint

12 on -- in the complaint itself.

13       So you have very specific allegations here with

14 respect to churches, and synagogues, and places of worship, and

15 other facilities. Now, we don't know what a recreational

16 facility means. Some of it's obvious, but it can certainly

17 include your backyard playground, because -- and I want to

18 stress this. This statute the County has enacted does not limit

19 it to any place which are open to the public. So that a private

20 library in a private home is covered. The private library at

21 Engage, which says in the complaint that they had maintained a

22 library, is covered. So it's extraordinarily broad. So they've

23 defined public assembly by taking out "public," to include

24 expressly all privately-owned property and without regard to

25 their relieving public access to it. Now, how in the world are

1  you supposed to figure out that?  That goes into the irreparable

2  injury part, because the irreparable injury, part of that

3  analysis is whether or not you have any means of avoiding an

4  arrest, if you even know what you're doing is actually a

5  violation of the County law.

6          The County law does not contain a mens rea

7  requirement, just like the state law does not contain a mens rea

8  requirement.  So you don't even have to know that what you're

9  doing is illegal; they can still arrest you for it.  And again,

10 if you're arrested for a violation of this County law, you're

11 likely to also be arrested for a violation of state law because

12 the carry permit that we've asked for relief on says on the very

13 back of it that it's not valid where firearms are prohibited by

14 law.  And the State Police construe that to mean that that

15 includes County laws or regulations.  So that's a three-year

16 disqualifier and a lifetime disqualifier.  That's a three-year

17 sentence with a lifetime disqualifier.  So that's a huge interim

18 effect associated with that because you lose your access to

19 firearms for life and can spend three years in prison.

20         THE COURT:  Okay.  So I understand.

21         MR. PENNAK:  So --

22         THE COURT:  That was the standing issue.  Anything

23 else, or ...

24         MR. PENNAK:  As to places of worship, the statute that

25 they're -- the County is citing take place in the late 1800s,

1   1870, 1888.  There's some of which go all the way into the

2   1900s.  Our whole point here is that those cannot be deemed to

3   be analogous, much less representative, to the right as it was

4   established in 1791 because they have not pointed to anything.

5   Now, they acknowledged as well, the places of worship -- there

6   were statutes at the time in the Colonial period which required

7   people to bring their firearms to church.  No one disputes that.

8   That carried forward to 1791.  So there has to be something to

9   do to negate that, and they pointed to nothing until they get

10  all the way up to 1870s.  That's not good enough.  That's our

11  whole point.

12          Now, I've looked back on our motion, and we've asked

13  for preliminary relief as to all permit holders without regard

14  to when they got their permit, and that we think is completely

15  appropriate because it restores --

16          THE COURT:  All permit holders?

17          MR. PENNAK:  All permit holders, period, full stop.

18          THE COURT:  And just to clarify, though, you're saying

19  that -- because maybe I misread this the first time.  You're not

20  saying people who had a permit under the old system.

21          MR. PENNAK:  That's correct.

22          THE COURT:  But people who may have just gotten one

23  now under a "shall issue" type --

24          MR. PENNAK:  Those people are certainly encompassed

25  within that relief request.

1        THE COURT:  Okay, I understand.  Maybe I wasn't clear

2   on that before.  I understand.

3        MR. PENNAK:  So I wanted to clarify that for the

4   Court.  If you look back to our motion itself, it makes that

5   very clear, that you -- includes all permit holders, which are

6   the very people that are affected by 21-22E, because they were

7   previously exempted from the County law.  In 21-22E --

8        THE COURT:  Well, really, people who had a permit

9   under the old system were exempted.

10        MR. PENNAK:  Well, no, it doesn't say that,

11   Your Honor.

12        THE COURT:  The -- we don't need to argue about it,

13   it's late, but I just -- you know, we can agree to disagree on

14   that point, that it's -- I don't think it's the same thing to

15   say that someone who just got a permit yesterday is in the same

16   spot as someone who had a permit three years ago under the

17   system where they had to have a reason and they were exempted.

18   I mean, if they just got a permit since the passage of this

19   bill, there's no way you can say they were exempted before,

20   right?  I mean, I don't know any of your plaintiffs fall into

21   that category, maybe they don't, but I do think it's different

22   in terms of saying they were exempted before.

23        MR. PENNAK:  Some had permits prior to the passage of

24   this, some did not.  But I would say as a matter of law, the

25   Supreme Court has abolished the distinction between people who

1  had them before under a good and substantial reason requirement

2  and people who simply don't have that requirement now.

3          THE COURT:  Mm-hmm, Mm-mm, yeah.

4          MR. PENNAK:  So I think that distinction is now put to

5  rest by Bruen itself.  So those people suffered the same

6  irreparable injury that anyone else does as a matter of

7  constitutional law.

8          THE COURT:  Okay, I understand.

9          MR. PENNAK:  So I appreciate the Court's attention

10 today.  I'm happy to entertain any further questions.

11         THE COURT:  I think I'm fine for now.  Obviously, if

12 there's a need for any additional briefing or otherwise, we'll

13 let you know.  I will take this matter under advisement.

14 I think the argument was important for me to fully understand

15 each side's positions and their bests arguments, so I appreciate

16 everyone's time and energy today.

17         Obviously, I know that -- well, on the one hand, the

18 motion for preliminary injunction obviously needs to be dealt

19 with quickly.  I assure you, I have other similar motions in

20 other cases that are also -- I'm moving to try to get through.

21 And part of the issue is not just giving you an answer but

22 giving you the right one, at least as best as I can do, and

23 that's -- in an area such as this, with these -- the historical

24 analysis that comes up, it's not an easy exercise.  And so I'll

25 do my best to get it to you as soon as possible.  And the motion

1  to remand, obviously, while not entirely a prerequisite, is

2  something that we should resolve in the same time frame.

3         So is there anything else about this case that I

4  should know about, any new developments, factually, legally, not

5  things that could have come up in the argument but just -- you

6  know, sometimes there's, you know, potential changes in the

7  statute for some reason, because there was a change during the

8  life cycle of all our litigation here, discussions among the

9  sides about some sort of accommodations that might be reached,

10  anything like that, or is it just -- you're just waiting for a

11  ruling?

12         MR. PENNAK:  There have been no settlement

13  discussions, Your Honor, certainly not.  I think the County has

14  adhered to that position throughout.  We're certainly not

15  backing off.

16         THE COURT:  Okay.  And the County's -- there's no

17  imminent changes in the law like there -- occurred in

18  the last -- during the life cycle of this case?

19         MR. LATTNER:  Not that I know of, Your Honor.

20         THE COURT:  Okay.  Okay, well, thank you very much.

21         MR. PENNAK:  Thank you, Your Honor.

22         THE COURTROOM DEPUTY:  All rise.  This Honorable Court

23  now stands adjourned.

24     (The proceedings were adjourned at 4:56 p.m.)

25

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2          I, Patricia Klepp, Registered Merit Reporter, in and for

3    the United States District Court for the District of Maryland,

4    do hereby certify, pursuant to 28 U.S.C. § 753, that the

5    foregoing is a true and correct transcript of the

6    stenographically-reported proceedings held in the above-entitled

7    matter and the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9                              Dated this 23rd day of February, 2023.

10

11
                             _____/s/_____
12                           PATRICIA KLEPP, RMR
                             Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```

JA801

WES MOORE, Governor                    Ch. 680

Chapter 680

**(Senate Bill 1)**

AN ACT concerning

**Criminal Law – Wearing, Carrying, or Transporting Firearms – Restrictions
(Gun Safety Act of 2023)**

FOR the purpose of prohibiting a person from knowingly wearing, carrying, or transporting a firearm *in certain locations; prohibiting a person from wearing, carrying, or transporting a firearm onto certain property unless the owner or the owner's agent has given certain permission; altering certain provisions of law relating to the authority of the Secretary of State Police to limit the wearing, carrying, or transporting of a handgun at certain times and locations;* ~~onto the real property of another unless the other has given certain permission; prohibiting a person from knowingly wearing, carrying, or transporting a firearm within a certain distance of a certain place of public accommodation prohibiting a person from wearing, carrying, or transporting a firearm under certain circumstances and in certain locations; altering the circumstances under which a person is prohibited from possessing a regulated firearm; altering provisions of law relating to obtaining and revoking a permit to wear, carry, or transport a firearm;~~ and generally relating to restrictions on wearing, carrying, or transporting firearms.

BY adding to
    Article – Criminal Law
    Section 4–111 and ~~4–112~~ 6–411
    Annotated Code of Maryland
    (2021 Replacement Volume and 2022 Supplement)

*BY repealing and reenacting, with amendments,*
    *Article – Criminal Law*
    *Section 4–203(b)*
    *Annotated Code of Maryland*
    *(2021 Replacement Volume and 2022 Supplement)*

~~BY repealing and reenacting, without amendments,~~
    ~~Article – State Government~~
    ~~Section 20–301~~
    ~~Annotated Code of Maryland~~
    ~~(2021 Replacement Volume and 2022 Supplement)~~

~~BY repealing and reenacting, without amendments,~~
    ~~Article – Public Safety~~
    ~~Section 5–301(a), (b), (c), and (e), 5–303, and 5–309~~
    ~~Annotated Code of Maryland~~
    ~~(2022 Replacement Volume)~~

– 1 –

BY repealing and reenacting, with amendments,
        Article – Public Safety
        Section 5–306, 5–307, and 5–310 through 5–312
        Annotated Code of Maryland
        (2022 Replacement Volume)

BY repealing and reenacting, with amendments,
        *Article – Public Safety*
        *Section 5–307*
        *Annotated Code of Maryland*
        *(2022 Replacement Volume)*

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

**Article – Criminal Law**

4–111.

        (A)    IN THIS SECTION, "FIREARM" HAS THE MEANING STATED IN § 4–104 OF THIS SUBTITLE.

        (B)    THIS SECTION DOES NOT APPLY TO:

                (1)    THE WEARING, CARRYING, OR TRANSPORTING OF A FIREARM ON A PORTION OF REAL PROPERTY SUBJECT TO AN EASEMENT, A RIGHT–OF–WAY, A SERVITUDE, OR ANY OTHER INTEREST THAT ALLOWS PUBLIC ACCESS ON OR THROUGH THE REAL PROPERTY;

                (2)    THE WEARING, CARRYING, OR TRANSPORTING OF A FIREARM ON A PORTION OF REAL PROPERTY SUBJECT TO AN EASEMENT, A RIGHT–OF–WAY, A SERVITUDE, OR ANY OTHER INTEREST ALLOWING ACCESS ON OR THROUGH THE REAL PROPERTY BY:

                        (I)    THE HOLDER OF THE EASEMENT, RIGHT–OF–WAY, SERVITUDE, OR OTHER INTEREST; OR

                        (II)    A GUEST OR ASSIGNEE OF THE HOLDER OF THE EASEMENT, RIGHT–OF–WAY, SERVITUDE, OR OTHER INTEREST; OR

                (3)    PROPERTY OWNED BY THE STATE OR A POLITICAL SUBDIVISION OF THE STATE.

WES MOORE, Governor                    Ch. 680

(C)   A PERSON MAY NOT KNOWINGLY WEAR, CARRY, OR TRANSPORT A FIREARM ONTO THE REAL PROPERTY OF ANOTHER UNLESS THE OTHER HAS GIVEN EXPRESS PERMISSION, EITHER TO THE PERSON OR TO THE PUBLIC GENERALLY, TO WEAR, CARRY, OR TRANSPORT A FIREARM ON THE REAL PROPERTY.

(D)   A PERSON WHO VIOLATES SUBSECTION (C) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 1 YEAR.

4–112.

(A)   (1)   IN THIS SECTION THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.

       (2)   "FIREARM" HAS THE MEANING STATED IN § 4–104 OF THIS SUBTITLE.

       (3)   "PLACE OF PUBLIC ACCOMMODATION" HAS THE MEANING STATED IN § 20–301 OF THE STATE GOVERNMENT ARTICLE.

(B)   A PERSON MAY NOT KNOWINGLY WEAR, CARRY, OR TRANSPORT A FIREARM WITHIN 100 FEET OF A PLACE OF PUBLIC ACCOMMODATION.

(C)   A PERSON WHO VIOLATES SUBSECTION (B) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 1 YEAR.

Article – State Government

20–301.

In this subtitle, "place of public accommodation" means:

       (1)   an inn, hotel, motel, or other establishment that provides lodging to transient guests;

       (2)   a restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food or alcoholic beverages for consumption on or off the premises, including a facility located on the premises of a retail establishment or gasoline station;

       (3)   a motion picture house, theater, concert hall, sports arena, stadium, or other place of exhibition or entertainment;

       (4)   a retail establishment that:

– 3 –

JA804

(i)     is operated by a public or private entity; and

(ii)    offers goods, services, entertainment, recreation, or transportation; or

(5)    an establishment:

(i)     1.    that is physically located within the premises of any other establishment covered by this subtitle; or

2.    within the premises of which any other establishment covered by this subtitle is physically located; and

(ii)    that holds itself out as serving patrons of the covered establishment.

4–111.

(A)     (1)    IN THIS SECTION THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.

(2)    "AREA FOR CHILDREN AND VULNERABLE INDIVIDUALS" MEANS:

(I)    A PRESCHOOL OR PREKINDERGARTEN FACILITY *OR THE GROUNDS OF THE FACILITY*;

(II)    A PRIVATE PRIMARY OR SECONDARY SCHOOL *OR THE GROUNDS OF THE SCHOOL*; *OR*

(III)    A YOUTH CAMP, AS DEFINED IN § 14–401 OF THE HEALTH – GENERAL ARTICLE;

(IV)    A HEALTH CARE FACILITY, AS DEFINED IN § 15–10B–01 *§ 15–10B–01(G)(1), (2), (3), AND (4)* OF THE INSURANCE ARTICLE; OR

(V)    A LOCATION THAT IS BEING USED AS A SHELTER FOR RUNAWAY YOUTH.

(3)    "FIREARM" HAS THE MEANING STATED IN § 4–104 OF THIS SUBTITLE.

(4)    "GOVERNMENT OR PUBLIC INFRASTRUCTURE AREA" MEANS:

– 4 –

WES MOORE, Governor                    Ch. 680

(I)    A BUILDING *OR ANY PART OF A BUILDING* OWNED OR LEASED BY A UNIT OF STATE OR LOCAL GOVERNMENT;

(II)    A BUILDING OF A PUBLIC OR PRIVATE INSTITUTION OF HIGHER EDUCATION, AS DEFINED IN § 10–101 OF THE EDUCATION ARTICLE;

(III)    A LOCATION THAT IS CURRENTLY BEING USED AS A POLLING PLACE IN ACCORDANCE WITH TITLE 10 OF THE ELECTION LAW ARTICLE OR FOR CANVASSING BALLOTS IN ACCORDANCE WITH TITLE 11 OF THE ELECTION LAW ARTICLE; ~~OR~~

(IV)    AN ELECTRIC PLANT OR ELECTRIC STORAGE FACILITY, AS DEFINED IN § 1–101 OF THE PUBLIC UTILITIES ARTICLE*;*

*(V)    A GAS PLANT, AS DEFINED IN § 1–101 OF THE PUBLIC UTILITIES ARTICLE; OR*

*(VI)    A NUCLEAR POWER PLANT FACILITY.*

*(5)    "LAW ENFORCEMENT OFFICIAL" HAS THE MEANING STATED IN § 4–201 OF THIS ARTICLE.*

*(6)    "POLICE OFFICER" HAS THE MEANING STATED IN § 3–201 OF THE PUBLIC SAFETY ARTICLE.*

~~(5)    "ORGANIZED SPORTING OR ATHLETIC ACTIVITY" MEANS AN ACTIVITY IN WHICH THREE OR MORE INDIVIDUALS WHO ARE PART OF THE SAME LEAGUE OR ASSOCIATION ARE COMPETING IN A SPORT OR ATHLETIC ACTIVITY TOGETHER AS PART OF THE SAME LEAGUE.~~

~~(6)~~ *(7)*    "ROTC" MEANS RESERVE OFFICER TRAINING CORPS.

~~(7)~~ *(8)*    "SPECIAL PURPOSE AREA" MEANS:

(I)    A LOCATION LICENSED TO SELL OR DISPENSE ALCOHOL OR CANNABIS FOR ON–SITE CONSUMPTION;

(II)    A STADIUM;

(III)    A MUSEUM;

(IV)    ~~A LOCATION BEING USED FOR:~~

~~1.    AN ORGANIZED SPORTING OR ATHLETIC ACTIVITY;~~

– 5 –

~~2.       A LIVE THEATER PERFORMANCE;~~

~~3.       A MUSICAL CONCERT OR PERFORMANCE FOR WHICH MEMBERS OF THE AUDIENCE ARE REQUIRED TO PAY OR POSSESS A TICKET TO BE ADMITTED; OR~~ *AN AMUSEMENT PARK;*

~~4.       A FAIR OR CARNIVAL;~~

(V)      A RACETRACK; *OR*

(VI)      A VIDEO LOTTERY FACILITY, AS DEFINED IN § 9–1A–01 OF THE STATE GOVERNMENT ARTICLE~~; OR~~

~~(VII)   WITHIN 100 YARDS OF A PLACE WHERE A PUBLIC GATHERING, A DEMONSTRATION, OR AN EVENT WHICH REQUIRES A PERMIT FROM THE LOCAL GOVERNING BODY IS BEING HELD, IF SIGNS POSTED BY A LAW ENFORCEMENT AGENCY CONSPICUOUSLY AND REASONABLY INFORM MEMBERS OF THE PUBLIC THAT THE WEARING, CARRYING, AND TRANSPORTING OF FIREARMS IS PROHIBITED.~~

(B)      THIS SECTION DOES NOT APPLY TO:

(1)      A LAW ENFORCEMENT OFFICIAL *OR A POLICE OFFICER* ~~OF THE UNITED STATES, THE STATE, OR A LOCAL LAW ENFORCEMENT AGENCY OF THE STATE;~~

*(2)      AN ON–DUTY EMPLOYEE OF A LAW ENFORCEMENT AGENCY AUTHORIZED BY THE AGENCY TO POSSESS FIREARMS ON DUTY OR WHOSE DUTY ASSIGNMENT INVOLVES THE POSSESSION OF FIREARMS;*

~~(2)~~ *(3)*      A MEMBER OF THE ARMED FORCES OF THE UNITED STATES, ~~OR~~ THE NATIONAL GUARD, *OR THE UNIFORMED SERVICES* ON DUTY OR TRAVELING TO OR FROM DUTY;

~~(3)~~ *(4)*      A MEMBER OF AN ROTC PROGRAM WHILE PARTICIPATING IN AN ACTIVITY FOR AN ROTC PROGRAM;

~~(4)      A LAW ENFORCEMENT OFFICIAL OF ANOTHER STATE OR SUBDIVISION OF ANOTHER STATE TEMPORARILY IN THIS STATE ON OFFICIAL BUSINESS;~~

– 6 –

WES MOORE, Governor                                    Ch. 680

(5)     A CORRECTIONAL OFFICER OR WARDEN OF A CORRECTIONAL FACILITY IN THE STATE;

(6)     ~~A SHERIFF OR FULL–TIME ASSISTANT OR DEPUTY SHERIFF OF THE STATE;~~

(6)     *A RAILROAD POLICE OFFICER APPOINTED UNDER TITLE 3, SUBTITLE 4 OF THE PUBLIC SAFETY ARTICLE;*

(7)     *AN EMPLOYEE OF AN ARMORED CAR COMPANY, IF THE PERSON IS ACTING WITHIN THE SCOPE OF EMPLOYMENT AND HAS A VALID PERMIT TO WEAR, CARRY, OR TRANSPORT A HANDGUN ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE;*

~~(7)~~ *(8)*     SUBJECT TO SUBSECTION (I) OF THIS SECTION, ~~AN OFF–DUTY LAW ENFORCEMENT OFFICIAL OR~~ A PERSON WHO HAS RETIRED AS A LAW ENFORCEMENT OFFICIAL IN GOOD STANDING FROM A LAW ENFORCEMENT AGENCY OF THE UNITED STATES, THE STATE *OR ANOTHER STATE*, OR A LOCAL UNIT IN THE STATE *OR ANOTHER STATE*, WHO POSSESSES A FIREARM, IF:

(I)     1.     THE ~~OFFICIAL OR~~ PERSON IS ~~DISPLAYING~~ *CARRYING* THE ~~OFFICIAL'S OR~~ PERSON'S BADGE OR CREDENTIAL *IN COMPLIANCE WITH THE REQUIREMENTS OF THE BADGE OR CREDENTIAL*;

2.     THE FIREARM CARRIED OR POSSESSED BY THE ~~OFFICIAL OR~~ PERSON IS CONCEALED FROM VIEW UNDER OR WITHIN AN ARTICLE OF THE ~~OFFICIAL'S OR~~ PERSON'S CLOTHING; AND

3.     THE ~~OFFICIAL OR~~ PERSON IS AUTHORIZED TO CARRY A HANDGUN UNDER THE LAWS OF THE STATE OR THE UNITED STATES; OR

(II)    1.     THE ~~OFFICIAL OR~~ PERSON POSSESSES A VALID PERMIT TO WEAR, CARRY, OR TRANSPORT A HANDGUN ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE; AND

2.     THE FIREARM CARRIED OR POSSESSED BY THE ~~OFFICIAL OR~~ PERSON IS CONCEALED FROM VIEW UNDER OR WITHIN AN ARTICLE OF THE ~~OFFICIAL'S OR~~ PERSON'S CLOTHING;

~~(8)~~ *(9)*     FOR A LOCATION THAT IS NOT OWNED BY, LEASED BY, OR OTHERWISE UNDER THE CONTROL OF THE STATE OR A POLITICAL SUBDIVISION OF THE STATE:

(I)     THE OWNER OR LESSEE OF THE LOCATION; OR

– 7 –

Ch. 680                    2023 LAWS OF MARYLAND

          **(II)**     A PERSON WHO IS AUTHORIZED BY THE OWNER OR LESSEE OF THE LOCATION TO WEAR, CARRY, OR TRANSPORT A FIREARM AT THE LOCATION FOR THE PURPOSE OF:

              **1.**     EMPLOYMENT AS A SECURITY GUARD LICENSED UNDER TITLE 19 OF THE BUSINESS OCCUPATIONS ARTICLE; OR

              **2.**     PROTECTING ANY INDIVIDUAL OR PROPERTY AT THE LOCATION ~~WITHOUT~~ *WITH AN EXPRESS AGREEMENT BETWEEN THE PARTIES,* REMUNERATION, OR COMPENSATION; *OR*

        ~~**(9)**~~ *(10)*     A LOCATION BEING USED WITH THE PERMISSION OF THE PERSON OR GOVERNMENTAL UNIT THAT OWNS, LEASES, OR CONTROLS THE LOCATION FOR:

          **(I)**     AN ORGANIZED SHOOTING ACTIVITY FOR EDUCATIONAL PURPOSES;

          **(II)**     A HISTORICAL DEMONSTRATION USING A FIREARM; OR

          **(III)**     HUNTING OR TARGET SHOOTING*; OR*

        *(11)     A FIREARM THAT IS CARRIED OR TRANSPORTED IN A MOTOR VEHICLE IF THE FIREARM IS:*

          *(I)     LOCKED IN A CONTAINER; OR*

          *(II)     A HANDGUN WORN, CARRIED, OR TRANSPORTED IN COMPLIANCE WITH ANY LIMITATIONS IMPOSED UNDER § 5–307 OF THE PUBLIC SAFETY ARTICLE, BY A PERSON TO WHOM A PERMIT TO WEAR, CARRY, OR TRANSPORT THE HANDGUN HAS BEEN ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE*~~; OR~~

        ~~**(10)**~~ ~~A FIREARM THAT IS CARRIED OR TRANSPORTED IN A MOTOR VEHICLE IF THE FIREARM IS:~~

          ~~**(I)**~~ ~~UNLOADED; AND~~

          ~~**(II)**~~ ~~LOCKED IN A CONTAINER THAT IS SEPARATE FROM ANY AMMUNITION THAT IS SUITABLE FOR USE IN THE FIREARM.~~

– 8 –

WES MOORE, Governor                    Ch. 680

(C)   A PERSON MAY NOT WEAR, CARRY, OR TRANSPORT A FIREARM IN AN AREA FOR CHILDREN OR VULNERABLE INDIVIDUALS.

~~(D)~~ *(D)*      *(1)*   A PERSON MAY NOT WEAR, CARRY, OR TRANSPORT A FIREARM IN A GOVERNMENT OR PUBLIC INFRASTRUCTURE AREA.

*(2)   A GOVERNMENT OR PUBLIC INFRASTRUCTURE AREA SPECIFIED UNDER SUBSECTION (A)(4)(I) OF THIS SECTION MUST DISPLAY A CLEAR AND CONSPICUOUS SIGN AT THE MAIN ENTRANCE OF THE BUILDING OR THE PART OF A BUILDING THAT IS OWNED OR LEASED BY THE UNIT OF STATE OR LOCAL GOVERNMENT INDICATING THAT IT IS NOT PERMISSIBLE TO WEAR, CARRY, OR TRANSPORT A FIREARM IN THE BUILDING OR THAT PART OF THE BUILDING.*

(E)   ~~(1)   THIS SUBSECTION DOES NOT APPLY TO AN ORGANIZED SPORTING OR ATHLETIC ACTIVITY FOR WHICH THE WEARING, CARRYING, TRANSPORTING, OR USE OF A FIREARM IS A CUSTOMARY PART OF THE SPORT OR ATHLETIC ACTIVITY.~~

~~(2)~~   A PERSON MAY NOT WEAR, CARRY, OR TRANSPORT A FIREARM IN A SPECIAL PURPOSE AREA.

~~(F)   A PERSON MAY NOT VIOLATE SUBSECTION (C), (D), OR (E) OF THIS SECTION WITH INTENT TO CAUSE DEATH OR INJURY TO ANOTHER.~~

~~(G)~~   ~~(1)~~ *(F)*   A PERSON WHO *WILLFULLY* VIOLATES SUBSECTION (C), ~~(D)~~ *(D)(1)*, OR (E) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO~~:~~

~~(I)   FOR A FIRST CONVICTION,~~ IMPRISONMENT NOT EXCEEDING ~~90 DAYS~~ *1 YEAR* OR A FINE NOT EXCEEDING ~~$3,000~~ *$1,000* OR BOTH~~, AND~~

~~(II)   FOR A SECOND OR SUBSEQUENT CONVICTION, IMPRISONMENT NOT EXCEEDING 15 MONTHS OR A FINE NOT EXCEEDING $7,500 OR BOTH.~~

~~(2)   A PERSON WHO VIOLATES SUBSECTION (F) OF THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 15 MONTHS OR A FINE NOT EXCEEDING $7,500 OR BOTH.~~

~~(H)~~ *(G)*      (1)   A CONVICTION UNDER THIS SECTION MAY NOT MERGE WITH A CONVICTION FOR ANY OTHER CRIME BASED ON THE ACT ESTABLISHING THE VIOLATION OF THIS SECTION.

– 9 –

Ch. 680                          2023 LAWS OF MARYLAND

**(2)    A SENTENCE IMPOSED UNDER THIS SECTION MAY BE IMPOSED SEPARATE FROM AND CONSECUTIVE TO OR CONCURRENT WITH A SENTENCE FOR ANY CRIME BASED ON THE ACT ESTABLISHING THE VIOLATION OF THIS SECTION.**

**(1) (H)    FOR PURPOSES OF THIS SECTION, A REQUIREMENT TO KEEP A HANDGUN CONCEALED IS NOT VIOLATED BY:**

**(1)    THE MOMENTARY AND INADVERTENT EXPOSURE OF A HANDGUN; OR**

**(2)    THE MOMENTARY AND INADVERTENT EXPOSURE OF THE IMPRINT OR OUTLINE OF A HANDGUN.**

*__(I)    NOTHING IN THIS SECTION LIMITS THE POWER OF AN ADMINISTRATIVE HEAD OF A MARYLAND COURT TO PUNISH FOR CONTEMPT OR TO ADOPT RULES OR ORDERS REGULATING, ALLOWING, RESTRICTING, OR PROHIBITING THE POSSESSION OF WEAPONS IN ANY BUILDING HOUSING THE COURT OR ANY OF ITS PROCEEDINGS, OR ON ANY GROUNDS APPURTENANT TO THE BUILDING.__*

*4–203.*

*(b)    This section does not prohibit:*

*(1)    the wearing, carrying, or transporting of a handgun by a person who is authorized at the time and under the circumstances to wear, carry, or transport the handgun as part of the person's official equipment, and is:*

*(i)    a law enforcement official of the United States, the State, or a county or city of the State;*

*(ii)    a member of the armed forces of the United States or of the National Guard on duty or traveling to or from duty;*

*(iii)    a law enforcement official of another state or subdivision of another state temporarily in this State on official business;*

*(iv)    a correctional officer or warden of a correctional facility in the State;*

*(v)    a sheriff or full–time assistant or deputy sheriff of the State; or*

*(vi)    a temporary or part–time sheriff's deputy;*

*(2)    the wearing, carrying, or transporting of a handgun[, in compliance with any limitations imposed under § 5–307 of the Public Safety Article,] by a person to*

– 10 –

WES MOORE, Governor                                Ch. 680

*whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;*

*(3)    the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is unloaded and carried in an enclosed case or an enclosed holster;*

*(4)    the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources–sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while the person is engaged in, on the way to, or returning from that activity if each handgun is unloaded and carried in an enclosed case or an enclosed holster;*

*(5)    the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster;*

*(6)    the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases;*

*(7)    the wearing, carrying, or transporting of a handgun by a supervisory employee:*

    *(i)    in the course of employment;*

    *(ii)    within the confines of the business establishment in which the supervisory employee is employed; and*

    *(iii)    when so authorized by the owner or manager of the business establishment;*

*(8)    the carrying or transporting of a signal pistol or other visual distress signal approved by the United States Coast Guard in a vessel on the waterways of the State or, if the signal pistol or other visual distress signal is unloaded and carried in an enclosed case, in a vehicle; or*

*(9)    the wearing, carrying, or transporting of a handgun by a person who is carrying a court order requiring the surrender of the handgun, if:*

    *(i)    the handgun is unloaded;*

– 11 –

Ch. 680                    2023 LAWS OF MARYLAND

*(ii)    the person has notified the law enforcement unit, barracks, or station that the handgun is being transported in accordance with the court order; and*

*(iii)    the person transports the handgun directly to the law enforcement unit, barracks, or station.*

**6–411.**

(A)    (1)    IN THIS SECTION THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.

(2)    (I)    "DWELLING" MEANS A BUILDING OR PART OF A BUILDING THAT PROVIDES LIVING OR SLEEPING FACILITIES FOR ONE OR MORE INDIVIDUALS.

(II)    "DWELLING" DOES NOT INCLUDE:

1.    COMMON ELEMENTS OF A CONDOMINIUM, AS DEFINED IN § 11–101 OF THE REAL PROPERTY ARTICLE;

2.    PROPERTY OF A COOPERATIVE HOUSING CORPORATION OTHER THAN A UNIT AS DEFINED IN § 5–6B–01 OF THE CORPORATIONS AND ASSOCIATIONS ARTICLE; OR

3.    COMMON AREAS OF A MULTIFAMILY DWELLING AS DEFINED IN § 12–203 OF THE PUBLIC SAFETY ARTICLE.

(3)    "FIREARM" HAS THE MEANING STATED IN § 4–104 OF THIS ARTICLE.

*(4)    "LAW ENFORCEMENT OFFICIAL" HAS THE MEANING STATED IN § 4–201 OF THIS ARTICLE.*

*(5)    "POLICE OFFICER" HAS THE MEANING STATED IN § 3–201 OF THE PUBLIC SAFETY ARTICLE.*

*(6)    (I)    "PROPERTY" MEANS A BUILDING.*

*(II)    "PROPERTY" DOES NOT INCLUDE THE LAND ADJACENT TO A BUILDING.*

(B)    THIS SECTION DOES NOT APPLY TO:

– 12 –

WES MOORE, Governor                               Ch. 680

(1)   A LAW ENFORCEMENT OFFICIAL *OR POLICE OFFICER* ~~OF THE UNITED STATES, THE STATE, OR A LOCAL LAW ENFORCEMENT AGENCY OF THE STATE;~~

*(2)   AN ON–DUTY EMPLOYEE OF A LAW ENFORCEMENT AGENCY AUTHORIZED BY THE AGENCY TO POSSESS FIREARMS ON DUTY OR WHOSE DUTY ASSIGNMENT INVOLVES THE POSSESSION OF FIREARMS;*

~~(2)~~ *(3)*   A MEMBER OF THE ARMED FORCES OF THE UNITED STATES, ~~OR OF~~ THE NATIONAL GUARD*, OR THE UNIFORMED SERVICES* ON DUTY OR TRAVELING TO OR FROM DUTY;

~~(3)   A LAW ENFORCEMENT OFFICIAL OF ANOTHER STATE OR SUBDIVISION OF ANOTHER STATE TEMPORARILY IN THIS STATE ON OFFICIAL BUSINESS;~~

(4)   A CORRECTIONAL OFFICER OR WARDEN OF A CORRECTIONAL FACILITY IN THE STATE;

~~(5)   A SHERIFF OR FULL–TIME ASSISTANT OR DEPUTY SHERIFF OF THE STATE;~~

~~(6)~~ *(5)*   THE WEARING, CARRYING, OR TRANSPORTING OF A FIREARM ON A PORTION OF REAL PROPERTY SUBJECT TO AN EASEMENT, A RIGHT–OF–WAY, A SERVITUDE, OR ANY OTHER PROPERTY INTEREST THAT ALLOWS PUBLIC ACCESS ON OR THROUGH THE REAL PROPERTY; OR

~~(7)~~ *(6)*   THE WEARING, CARRYING, OR TRANSPORTING OF A FIREARM ON A PORTION OF REAL PROPERTY SUBJECT TO AN EASEMENT, A RIGHT–OF–WAY, A SERVITUDE, OR ANY OTHER PROPERTY INTEREST ALLOWING ACCESS ON OR THROUGH THE REAL PROPERTY BY:

(I)   THE HOLDER OF THE EASEMENT, RIGHT–OF–WAY, SERVITUDE, OR OTHER PROPERTY INTEREST; OR

(II)   A GUEST OR ASSIGNEE OF THE HOLDER OF THE EASEMENT, RIGHT–OF–WAY, SERVITUDE, OR OTHER PROPERTY INTEREST.

(C)   A PERSON WEARING, CARRYING, OR TRANSPORTING A FIREARM MAY NOT *ENTER OR TRESPASS IN THE DWELLING OF ANOTHER UNLESS THE OWNER OR THE OWNER'S AGENT HAS GIVEN EXPRESS PERMISSION, EITHER TO THE PERSON OR TO THE PUBLIC GENERALLY, TO WEAR, CARRY, OR TRANSPORT A FIREARM INSIDE THE DWELLING.*

– 13 –

Ch. 680                     2023 LAWS OF MARYLAND

*(D)    A PERSON WEARING, CARRYING, OR TRANSPORTING A FIREARM MAY NOT*:

*(1)*    ENTER OR TRESPASS ON PROPERTY ~~THAT IS POSTED CONSPICUOUSLY AGAINST WEARING, CARRYING, OR TRANSPORTING A FIREARM ON THE PROPERTY,~~ *UNLESS THE OWNER OR THE OWNER'S AGENT HAS POSTED A CLEAR AND CONSPICUOUS SIGN INDICATING THAT IT IS PERMISSIBLE TO WEAR, CARRY, OR TRANSPORT A FIREARM ON THE PROPERTY; OR*

*(2)*    ENTER OR TRESPASS ON PROPERTY ~~AFTER HAVING BEEN NOTIFIED BY THE OWNER OR THE OWNER'S AGENT THAT THE PERSON MAY NOT~~ *UNLESS THE OWNER OR THE OWNER'S AGENT HAS GIVEN THE PERSON EXPRESS PERMISSION TO* WEAR, CARRY, OR TRANSPORT A FIREARM ON THE PROPERTY~~; OR~~.

~~*(3)    ENTER OR TRESPASS IN THE DWELLING OF ANOTHER UNLESS THE OTHER HAS GIVEN EXPRESS PERMISSION, EITHER TO THE PERSON OR TO THE PUBLIC GENERALLY, TO WEAR, CARRY, OR TRANSPORT A FIREARM INSIDE THE DWELLING.*~~

~~*(D)*~~ *(E)*    A PERSON WHO *WILLFULLY* VIOLATES THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO~~:~~

~~*(1)    FOR A FIRST CONVICTION,*~~ IMPRISONMENT NOT EXCEEDING ~~90 DAYS~~ *1 YEAR* OR A FINE NOT EXCEEDING ~~$500~~ *$1,000* OR BOTH~~;~~

~~*(2)    FOR A SECOND CONVICTION OCCURRING WITHIN 2 YEARS AFTER THE FIRST CONVICTION, IMPRISONMENT NOT EXCEEDING 6 MONTHS OR A FINE NOT EXCEEDING $1,000 OR BOTH; AND*~~

~~*(3)    FOR EACH SUBSEQUENT CONVICTION OCCURRING WITHIN 2 YEARS AFTER THE PRECEDING CONVICTION, IMPRISONMENT NOT EXCEEDING 1 YEAR OR A FINE NOT EXCEEDING $2,500 OR BOTH*~~.

*(F)    (1)    A CONVICTION UNDER THIS SECTION MAY NOT MERGE WITH A CONVICTION FOR ANY OTHER CRIME BASED ON THE ACT ESTABLISHING THE VIOLATION OF THIS SECTION.*

*(2)    A SENTENCE IMPOSED UNDER THIS SECTION MAY BE IMPOSED SEPARATE FROM AND CONSECUTIVE TO OR CONCURRENT WITH A SENTENCE FOR ANY CRIME BASED ON THE ACT ESTABLISHING THE VIOLATION OF THIS SECTION.*

**Article – Public Safety**

– 14 –

WES MOORE, Governor    Ch. 680

*5–307.*

*~~(a)~~ A permit is valid for each handgun legally in the possession of the person to whom the permit is issued.*

*(B) (1) SUBJECT TO SUBSECTION (C) OF THIS SECTION, A PERMIT ISSUED UNDER THIS SUBTITLE SHALL RESTRICT THE WEARING, CARRYING, AND TRANSPORTING OF A HANDGUN BY THE PERSON TO WHOM THE PERMIT IS ISSUED TO WEARING, CARRYING, OR TRANSPORTING A HANDGUN CONCEALED FROM VIEW:*

*(I) UNDER OR WITHIN AN ARTICLE OF THE PERSON'S CLOTHING; OR*

*(II) WITHIN AN ENCLOSED CASE.*

*(2) THE REQUIREMENT IN PARAGRAPH (1) OF THIS SUBSECTION TO KEEP A HANDGUN CONCEALED IS NOT VIOLATED BY:*

*(I) THE MOMENTARY AND INADVERTENT EXPOSURE OF A HANDGUN; OR*

*(II) THE MOMENTARY AND INADVERTENT EXPOSURE OF THE IMPRINT OR OUTLINE OF A HANDGUN.*

*(C) A PERSON IS NOT SUBJECT TO THE REQUIREMENT IN SUBSECTION (B) OF THIS SECTION TO KEEP A HANDGUN CONCEALED IF THE PERSON IS AUTHORIZED AT THE TIME AND UNDER THE CIRCUMSTANCES TO WEAR, CARRY, OR TRANSPORT THE HANDGUN AS PART OF THE PERSON'S OFFICIAL EQUIPMENT, AND IS:*

*(1) A PERSON EXEMPTED UNDER § 4–203(B)(1) OF THE CRIMINAL LAW ARTICLE;*

*(2) A SECURITY GUARD LICENSED UNDER TITLE 19 OF THE BUSINESS OCCUPATIONS ARTICLE ACTING WITHIN THE SCOPE OF EMPLOYMENT;*

*(3) A CORRECTIONAL OFFICER OR WARDEN OF A CORRECTIONAL FACILITY IN THE STATE ACTING WITHIN THE SCOPE OF EMPLOYMENT;*

*(4) A RAILROAD POLICE OFFICER APPOINTED UNDER TITLE 3, SUBTITLE 4 OF THIS ARTICLE ACTING WITHIN THE SCOPE OF EMPLOYMENT; OR*

*(5) AN EMPLOYEE OF AN ARMORED CAR COMPANY ACTING WITHIN THE SCOPE OF EMPLOYMENT.*

– 15 –

*[(b)    The Secretary may limit the geographic area, circumstances, or times of the day, week, month, or year in which a permit is effective.]*

5–301.

(a)    In this subtitle the following words have the meanings indicated.

(b)    "Handgun" has the meaning stated in § 4–201 of the Criminal Law Article.

(c)    "Permit" means a permit issued by the Secretary to carry, wear, or transport a handgun.

(e)    "Secretary" means the Secretary of State Police or the Secretary's designee.

5–303.

A person shall have a permit issued under this subtitle before the person carries, wears, or transports a handgun.

5–307.

(a)    A permit is valid for each handgun legally in the possession of the person to whom the permit is issued.

(b)    (1)    A PERMIT ISSUED UNDER THIS SUBTITLE SHALL RESTRICT THE WEARING, CARRYING, AND TRANSPORTING OF A HANDGUN BY THE PERSON TO WHOM THE PERMIT IS ISSUED TO WEARING, CARRYING, OR TRANSPORTING A HANDGUN CONCEALED FROM VIEW:

(1)    (I)    UNDER OR WITHIN AN ARTICLE OF THE PERSON'S CLOTHING; OR

(2)    (II)    WITHIN AN ENCLOSED CASE.

(2)    THE REQUIREMENT IN PARAGRAPH (1) OF THIS SUBSECTION TO KEEP A HANDGUN CONCEALED IS NOT VIOLATED BY:

(I)    THE MOMENTARY AND INADVERTENT EXPOSURE OF A HANDGUN; OR

(II)    THE MOMENTARY AND INADVERTENT EXPOSURE OF THE IMPRINT OR OUTLINE OF A HANDGUN.

– 16 –

WES MOORE, Governor                    Ch. 680

~~(C)    The Secretary may limit the geographic area, circumstances, or times of the day, week, month, or year in which a permit is effective.~~

~~5–309.~~

~~(a)    Except as provided in subsection (d) of this section, a permit expires on the last day of the holder's birth month following 2 years after the date the permit is issued.~~

~~(b)    Subject to subsection (c) of this section, a permit may be renewed for successive periods of 3 years each if, at the time of an application for renewal, the applicant possesses the qualifications for the issuance of a permit and pays the renewal fee stated in this subtitle.~~

~~(c)    A person who applies for a renewal of a permit is not required to be fingerprinted unless the Secretary requires a set of the person's fingerprints to resolve a question of the person's identity.~~

~~(d)    The Secretary may establish an alternative expiration date for a permit to coincide with the expiration of a license, certification, or commission for:~~

~~(1)    a private detective under Title 13 of the Business Occupations and Professions Article;~~

~~(2)    a security guard under Title 19 of the Business Occupations and Professions Article; or~~

~~(3)    a special police officer under § 3–306 of this article.~~

~~5–310.~~

~~(a)    The Secretary [may revoke a permit on a finding that the holder] SHALL:~~

~~(1)    REVOKE A PERMIT ON A FINDING THAT THE HOLDER does not meet the qualifications described in § 5–306 of this subtitle; [or] AND~~

~~(2)    REGULARLY REVIEW INFORMATION REGARDING ACTIVE PERMIT HOLDERS USING THE CRIMINAL JUSTICE INFORMATION SYSTEM CENTRAL REPOSITORY OF THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES TO DETERMINE WHETHER ALL PERMIT HOLDERS CONTINUE TO MEET THE QUALIFICATIONS DESCRIBED IN § 5–306 OF THIS SUBTITLE.~~

~~(B)    THE SECRETARY MAY REVOKE A PERMIT ON A FINDING THAT THE HOLDER violated § 5–308 of this subtitle.~~

– 17 –

Ch. 680                    2023 LAWS OF MARYLAND

(C)  IF THE SECRETARY REVOKES A PERMIT UNDER THIS SECTION FROM A PERSON THE SECRETARY DETERMINES IS PROHIBITED FROM POSSESSING A REGULATED FIREARM UNDER § 5–133 OF THIS TITLE, THE SECRETARY SHALL TAKE REASONABLE STEPS TO ENSURE THE SURRENDER OF ANY REGULATED FIREARMS IN THE PERSON'S POSSESSION.

[(b)] (D)     A holder of a permit that is revoked by the Secretary shall return the permit to the Secretary within 10 days after receipt of written notice of the revocation.

5–311.

(A)     IF THE SECRETARY DENIES A PERMIT OR RENEWAL OF A PERMIT OR REVOKES OR LIMITS A PERMIT, THE SECRETARY SHALL PROVIDE WRITTEN NOTICE OF THAT INITIAL ACTION TO THE APPLICANT, INCLUDING A DETAILED EXPLANATION OF THE REASON OR REASONS FOR THE INITIAL ACTION.

[(a)] (B)     A person who is denied a permit or renewal of a permit or whose permit is revoked or limited may request the Secretary to conduct an informal review by filing a written request within 10 days after receipt of THE written notice of the Secretary's initial action UNDER SUBSECTION (A) OF THIS SECTION.

[(b)] (C)     An informal review:

        (1)     may include a personal interview of the person who requested the informal review; and

        (2)     is not subject to Title 10, Subtitle 2 of the State Government Article.

[(c)] (D)     (1)     In an informal review, the Secretary shall sustain, reverse, or modify the initial action taken and notify the person who requested the informal review of the decision in writing within 30 days after receipt of the request for informal review.

        (2)     THE WRITTEN NOTICE OF THE RESULTS OF THE SECRETARY'S INFORMAL REVIEW UNDER PARAGRAPH (1) OF THIS SUBSECTION SHALL INCLUDE A DETAILED EXPLANATION OF THE REASON OR REASONS FOR THE SECRETARY'S DECISION TO SUSTAIN, REVERSE, OR MODIFY THE INITIAL ACTION.

[(d)] (E)     A person need not file a request for an informal review under this section before requesting review under § 5–312 of this subtitle.

5–312.

(a)     (1)     A person who is denied a permit or renewal of a permit or whose permit is revoked or limited may request to appeal the decision of the Secretary to the Office of

– 18 –

JA819

WES MOORE, Governor                                    Ch. 680

Administrative Hearings by filing a written request with the Secretary and the Office of Administrative Hearings within 10 days after receipt of written notice of the Secretary's final action.

(2)     A person whose application for a permit or renewal of a permit is not acted on by the Secretary within 90 days after submitting the application to the Secretary may request a hearing before the Office of Administrative Hearings by filing a written request with the Secretary and the Office of Administrative Hearings.

(b)     (1)     Within 60 days after the receipt of a request under subsection (a) of this section from the applicant or the holder of the permit, the Office of Administrative Hearings shall schedule and conduct a de novo hearing on the matter, at which witness testimony and other evidence may be provided.

(2)     Within 90 days after the conclusion of the last hearing on the matter, the Office of Administrative Hearings shall issue a **WRITTEN** finding of facts and a decision.

(3)     A party that is aggrieved by the decision of the Office of Administrative Hearings may appeal the decision to the circuit court.

(c)     (1)     Subject to subsection (b) of this section, any hearing and any subsequent proceedings of judicial review shall be conducted in accordance with Title 10, Subtitle 2 of the State Government Article.

(2)     Notwithstanding paragraph (1) of this subsection, a court may not order the issuance or renewal of a permit or alter a limitation on a permit pending a final determination of the proceeding.

(d)     **(1)**     On or before **[**January 1, 2019, 2020, 2021, and 2022,**]** **JANUARY 1 EACH YEAR,** the **SECRETARY SHALL REPORT TO THE GOVERNOR AND, IN ACCORDANCE WITH § 2–1257 OF THE STATE GOVERNMENT ARTICLE, THE GENERAL ASSEMBLY THE FOLLOWING INFORMATION DISAGGREGATED BY AN APPLICANT'S COUNTY OF RESIDENCE, RACE, ETHNICITY, AGE, AND GENDER:**

**(I)     THE TOTAL NUMBER OF PERMIT APPLICATIONS MADE UNDER § 5–304 OF THIS SUBTITLE WITHIN THE PREVIOUS YEAR;**

**(II)     THE TOTAL NUMBER OF PERMIT APPLICATIONS THAT THE SECRETARY GRANTED IN THE PREVIOUS YEAR;**

**(III)     THE TOTAL NUMBER OF PERMIT APPLICATIONS THAT THE SECRETARY DENIED IN THE PREVIOUS YEAR;**

**(IV)     THE TOTAL NUMBER OF PERMITS THAT WERE REVOKED IN THE PREVIOUS YEAR; AND**

– 19 –

~~**(V)**     THE   TOTAL   NUMBER   OF   PERMITS   THAT   ARE   PENDING BEFORE THE SECRETARY.~~

~~**(2)**     ON   OR   BEFORE   JANUARY   1   EACH   YEAR,   THE   Office   of Administrative Hearings shall report to the Governor and, in accordance with § 2–1257 of the State Government Article, the General Assembly THE FOLLOWING INFORMATION DISAGGREGATED BY AN APPLICANT'S COUNTY OF RESIDENCE, RACE, ETHNICITY, AGE, AND GENDER:~~

~~**[(1)]   (I)**    the number of appeals of decisions by the Secretary that have been filed with the Office of Administrative Hearings within the previous year;~~

~~**[(2)]   (II)**    the   number   of   decisions   by   the   Secretary   that   have   been sustained, modified, or reversed by the Office of Administrative Hearings within the previous year;~~

~~**[(3)]   (III)**   the number of appeals that are pending; and~~

~~**[(4)]   (IV)**    the   number   of   appeals   that   have   been   withdrawn   within   the previous year.~~

~~SECTION 2. AND BE IT FURTHER ENACTED, That the Laws of Maryland read as follows:~~

~~**Article – Public Safety**~~

~~5–306.~~

~~**(a)**    Subject  to  [subsection]  SUBSECTIONS  (c)  AND  (D)  of  this  section,  the Secretary shall issue a permit within a reasonable time to a person who the Secretary finds:~~

~~**(1)    (I)**    is [an adult] AT LEAST 21 YEARS OLD; OR~~

~~**(II)    IS AN ADULT WHO:~~

~~**1.     IS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES OR THE NATIONAL GUARD; OR~~

~~**2.     IS   REQUIRED   TO   WEAR,   CARRY,   OR   TRANSPORT   A HANDGUN IN THE REGULAR COURSE OF THE PERSON'S EMPLOYMENT;~~

~~**(2)    (i)**    has not been convicted of a felony or of a misdemeanor for which a sentence of imprisonment for more than 1 year has been imposed; or~~

– 20 –

~~(ii)    if convicted of a crime described in item (i) of this item, has been pardoned or has been granted relief under 18 U.S.C. § 925(c);~~

~~(3)    has not been convicted of a crime involving the possession, use, or distribution of a controlled dangerous substance;~~

~~(4)    is not presently an alcoholic, addict, or habitual user of a controlled dangerous substance unless the habitual use of the controlled dangerous substance is under legitimate medical direction;~~

~~**(5)    DOES NOT SUFFER FROM A MENTAL DISORDER AS DEFINED IN § 10–101(I)(2) OF THE HEALTH – GENERAL ARTICLE AND HAVE A HISTORY OF VIOLENT BEHAVIOR AGAINST THE PERSON OR ANOTHER;**~~

~~**(6)    IS NOT A RESPONDENT AGAINST WHOM:**~~

~~**(I)    A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE;**~~

~~**(II)    A CURRENT EXTREME RISK PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 5–601 OF THIS TITLE; OR**~~

~~**(III)    ANY OTHER TYPE OF CURRENT COURT ORDER HAS BEEN ENTERED PROHIBITING THE PERSON FROM PURCHASING OR POSSESSING FIREARMS;**~~

~~**[(5)] (7)**    except as provided in subsection (b) of this section, has successfully completed prior to application and each renewal, a firearms training course approved by the Secretary that [includes:~~

~~(i)    **1.**    for an initial application, a minimum of 16 hours of instruction by a qualified handgun instructor; or~~

~~**2.**    for a renewal application, 8 hours of instruction by a qualified handgun instructor;~~

~~(ii)    classroom instruction on:~~

~~**1.**    State firearm law;~~

~~**2.**    home firearm safety; and~~

~~**3.**    handgun mechanisms and operation; and~~

(iii) a firearms qualification component that demonstrates the applicant's proficiency and use of the firearm;] MEETS THE MINIMUM CRITERIA SPECIFIED IN SUBSECTION (A–1) OF THIS SECTION; and

[(6)] (8) based on an investigation:

(i) has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another; and

(ii) [has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger] IS NOT PROHIBITED BY STATE OR FEDERAL LAW FROM PURCHASING OR POSSESSING A HANDGUN.

(A–1) THE FIREARMS TRAINING COURSE REQUIRED UNDER SUBSECTION (A) OF THIS SECTION SHALL INCLUDE:

(1) (I) FOR AN INITIAL APPLICATION, A MINIMUM OF 16 HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR; OR

(II) FOR A RENEWAL APPLICATION, 8 HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR;

(2) CLASSROOM INSTRUCTION ON:

(I) STATE AND FEDERAL FIREARM LAWS, INCLUDING LAWS RELATING TO:

1. SELF–DEFENSE;

2. DEFENSE OF OTHERS;

3. DEFENSE OF PROPERTY;

4. THE SAFE STORAGE OF FIREARMS;

5. THE CIRCUMSTANCES UNDER WHICH AN INDIVIDUAL BECOMES PROHIBITED FROM POSSESSING A FIREARM UNDER STATE AND FEDERAL LAW, INCLUDING BECOMING A RESPONDENT AGAINST WHOM:

A. A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE;

– 22 –

~~B. AN ORDER FOR PROTECTION, AS DEFINED IN § 4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT; OR~~

~~C. A CURRENT EXTREME RISK PROTECTIVE ORDER HAS BEEN ENTERED UNDER SUBTITLE 6 OF THIS TITLE;~~

~~6. THE REQUIREMENTS AND OPTIONS FOR SURRENDERING, TRANSFERRING, OR OTHERWISE DISPOSING OF A FIREARM AFTER BECOMING PROHIBITED FROM POSSESSING A FIREARM UNDER STATE OR FEDERAL LAW;~~

~~7. THE REQUIREMENTS FOR REPORTING A LOSS OR THEFT OF A FIREARM TO A LAW ENFORCEMENT AGENCY AS REQUIRED BY § 5–146 OF THIS TITLE;~~

~~8. THE FIREARMS AND FIREARM ACCESSORIES WHICH ARE BANNED UNDER STATE AND FEDERAL LAW;~~

~~9. THE TYPES OF FIREARMS THAT REQUIRE A SPECIAL PERMIT OR REGISTRATION TO ACQUIRE OR POSSESS UNDER STATE OR FEDERAL LAW;~~

~~10. THE LAW PROHIBITING STRAW PURCHASES;~~

~~11. THE LAW CONCERNING ARMED TRESPASS UNDER § 6–411 OF THE CRIMINAL LAW ARTICLE; AND~~

~~12. THE LOCATIONS WHERE A PERSON IS PROHIBITED FROM POSSESSING A FIREARM REGARDLESS OF WHETHER THE PERSON POSSESSES A PERMIT ISSUED UNDER THIS SUBTITLE;~~

~~(II) HOME FIREARM SAFETY;~~

~~(III) HANDGUN MECHANISMS AND OPERATION;~~

~~(IV) CONFLICT DE–ESCALATION AND RESOLUTION;~~

~~(V) ANGER MANAGEMENT; AND~~

~~(VI) SUICIDE PREVENTION; AND~~

– 23 –

~~**(3)**    A  FIREARMS  QUALIFICATION  COMPONENT  THAT  INCLUDES LIVE–FIRE  SHOOTING  EXERCISES  ON  A  FIRING  RANGE  AND  REQUIRES  THE APPLICANT TO DEMONSTRATE:~~

~~**(I)**    SAFE HANDLING OF A HANDGUN; AND~~

~~**(II)**    SHOOTING PROFICIENCY WITH A HANDGUN.~~

~~(b)    An applicant for a permit is not required to complete a certified firearms training course under subsection (a) of this section if the applicant:~~

~~(1)    is a law enforcement officer or a person who is retired in good standing from service with a law enforcement agency of the United States, the State, or any local law enforcement agency in the State;~~

~~(2)    is a member, retired member, or honorably discharged member of the armed forces of the United States or the National Guard;~~

~~(3)    is a qualified handgun instructor; or~~

~~(4)    has completed a firearms training course approved by the Secretary.~~

~~(c)    An applicant under the age of 30 years is qualified only if the Secretary finds that the applicant has not been:~~

~~(1)    committed  to  a  detention,  training,  or  correctional  institution  for juveniles for longer than 1 year after an adjudication of delinquency by a juvenile court; or~~

~~(2)    adjudicated delinquent by a juvenile court for:~~

~~(i)    an act that would be a crime of violence if committed by an adult;~~

~~(ii)    an act that would be a felony in this State if committed by an adult; or~~

~~(iii)    an act that would be a misdemeanor in this State that carries a statutory penalty of more than 2 years if committed by an adult.~~

~~**(D)**    **(1)**    THE SECRETARY MAY NOT ISSUE A PERMIT TO A PERSON IF THE PERSON:~~

~~**(I)**    HAS  BEEN  CONVICTED  OF  A  SECOND  OR  SUBSEQUENT VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE; OR~~

WES MOORE, Governor                                    Ch. 680

~~(II)     HAS BEEN CONVICTED OF A VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE IF THE VIOLATION RESULTED IN THE USE OF A LOADED FIREARM BY A CHILD CAUSING DEATH OR SERIOUS BODILY INJURY TO THE CHILD OR ANOTHER PERSON.~~

~~(2)     SUBJECT TO PARAGRAPH (1) OF THIS SUBSECTION, THE SECRETARY MAY NOT ISSUE A PERMIT TO A PERSON WHO HAS BEEN CONVICTED OF A VIOLATION OF § 4–104 OF THE CRIMINAL LAW ARTICLE FOR 5 YEARS FOLLOWING THE DATE OF THE CONVICTION.~~

~~[(d)] (E)     The Secretary may issue a handgun qualification license, without an additional application or fee, to a person who:~~

~~(1)     meets the requirements for issuance of a permit under this section; and~~

~~(2)     does not have a handgun qualification license issued under § 5–117.1 of this title.~~

~~SECTION 3. AND BE IT FURTHER ENACTED, That Section 2 of this Act shall be construed to apply only to an initial application or renewal application for a permit to wear, carry, or transport a handgun that is submitted to the Secretary of State Police on or after the effective date of this Act. Section 2 may not be construed to affect the requirements to maintain a permit to wear, carry, or transport a handgun that was issued by the Secretary of State Police before the effective date of this Act until the permit is subject to renewal.~~

SECTION 4. *2.* AND BE IT FURTHER ENACTED, That if any provision of this Act or the application thereof to any person or circumstance is held invalid for any reason in a court of competent jurisdiction, the invalidity does not affect other provisions or any other application of this Act that can be given effect without the invalid provision or application, and for this purpose the provisions of this Act are declared severable.

SECTION 2. ~~5.~~ *3.* AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 2023.

**Approved by the Governor, May 16, 2023.**

– 25 –

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC.,
ENGAGE ARMAMENT, LLC,
ANDREW RAYMOND,
CARLOS RABANALES,
BRANDON FERRELL,
DERYCK WEAVER,
JOSHUA EDGAR,
I.C.E. FIREARMS & DEFENSIVE
TRAINING, LLC,
RONALD DAVID,
NANCY DAVID and
ELIYAHU SHEMONY,

        Plaintiffs,

        v.

MONTGOMERY COUNTY, MARYLAND,

        Defendant.

Civil Action No. TDC-21-1736

## MEMORANDUM OPINION

Plaintiffs Maryland Shall Issue, Inc. ("MSI"), Engage Armament, LLC, I.C.E. Firearms &

Defensive Training, LLC, and eight individuals ("the Individual Plaintiffs") have filed suit against

Defendant Montgomery County, Maryland ("the County") challenging recent amendments to

Chapter 57 of the Montgomery County Code ("Chapter 57"), which imposes regulations and

restrictions relating to the possession and use of weapons in the County. Presently pending before

the Court is Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction,

which is fully briefed. On February 6, 2023, the Court held a hearing on the Motion. For the

reasons set forth below, the Motion will be DENIED.

## BACKGROUND

Prior relevant factual background and procedural history is set forth in the Court's February 7, 2022 Memorandum Opinion on Plaintiffs' Motion to Sever and Remand All State Law Claims and to Hold in Abeyance, and the Court's May 5, 2023 Memorandum Opinion on the County's Motion to Remand Counts I, II, and III and Stay Counts IV through VIII, which are incorporated by reference. *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. TDC-21-1736, 2022 WL 375461 (D. Md. Feb. 7, 2022) ("*MSI I*"); *Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. TDC-21-1736, 2023 WL 3276497 (D. Md. May 5, 2023). Additional facts and procedural history are provided below as necessary.

On May 28, 2021, Plaintiffs filed the original Complaint in this case in the Circuit Court for Montgomery County, Maryland ("the Circuit Court") challenging Bill No. 4-21, a provision to amend Chapter 57 that was passed by the Montgomery County Council in April 2021. Among other amendments, Bill No. 4-21 added provisions to regulate ghost guns, undetectable guns, 3D-printed guns, and major components of such guns. Bill No. 4-21 also expanded the definition of "place of public assembly," which identifies locations at which it is unlawful to "sell, transfer, possess, or transport" firearms. Montgomery Cnty. Code, § 57-11(a) (2022); Bill No. 4-21 at 4, Second Am. Compl. ("SAC") Ex. A, ECF No. 49-1. While the prior definition consisted of a specific list of locations, including a "government owned park," a "place of worship," an "elementary or secondary school," a "public library," a "government-owned or -operated recreational facility," and a "multipurpose exhibition facility, such as fairgrounds or a conference center," the new definition generally included any "place where the public may assemble, whether the place is publicly or privately owned" and listed as examples "a park; place of worship; school; library; recreational facility; hospital; community health center; long-term facility; or multi-

2

purpose exhibition facility." Bill No. 4-21 at 4–5. Bill No. 4-21 also expanded the area at or near a place of public assembly in which firearm possession is restricted to include areas "within 100 yards of a place of public assembly." *Id.* at 4.

Plaintiffs alleged four counts, numbered as follows: (I) that by expanding the "place of public assembly" definition, the County exceeded its authority under Article XI-E of the Maryland Constitution to enact local laws; (II) that Bill No. 4-21's amendments are inconsistent with and preempted by existing state law, in violation of the Maryland Express Powers Act, Md. Code Ann., Local Gov't § 10–206 (LexisNexis 2013); (III) that Bill No. 4-21 violates the Takings Clause of the Maryland Constitution, Md. Const. art. III, § 40 ("the Maryland Takings Clause"), and the Due Process Clause in Article 24 of the Maryland Declaration of Rights ("the Maryland Due Process Clause") by depriving gun owners of property without legal process or compensation; and (IV) that Bill No. 4-21's definitions of "place of public assembly," "ghost gun," "major component," and other terms are unconstitutionally vague, in violation of the Maryland Due Process Clause and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

On July 12, 2021, the County removed the case to this Court. On February 7, 2022, the Court granted in part and denied in part Plaintiffs' Motion to Sever and Remand in that it severed and remanded the state law claims in Counts I–III to the Circuit Court and stayed Count IV. *MSI I*, 2022 WL 375461, at *6. On June 23, 2022, the United States Supreme Court issued its opinion in *New York State Rifle and Pistol Association v. Bruen,* 142 S. Ct. 2111 (2022), which found unconstitutional a New York statute requiring a showing of a special need to obtain a license to carry firearms. *Id.* at 2122. On July 22, 2022, Plaintiffs filed a First Amended Complaint in the Circuit Court, which added Count V, a claim in which they alleged that, in light of *Bruen*, the provisions of Section 57-11 of the Montgomery County Code ("Section 57-11") restricting the

3

carrying of firearms in places of public assembly violate the Second Amendment to the United States Constitution. On August 8, 2022, the County removed the First Amended Complaint to this Court, which was docketed as Civil Action No. 22-1967. On September 1, 2022, this Court consolidated that newly removed case with the original case, No. 21-1736, which remained with this Court for resolution of the federal claim.

On November 15, 2022, in response to *Bruen*, the Montgomery County Council passed Bill No. 21-22E, signed into law by the County Executive on November 28, 2022, which further amended Chapter 57's firearm restrictions that were the subject of the original Complaint. As relevant here, Bill No. 21-22E returned the definition of a "place of public assembly" to an enumerated list of facilities, which now consists of:

> (1) a publicly or privately owned (A) park; (B) place of worship; (C) school; (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility; including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility.
>
> (2) government building, including any place owned by or under the control of the County;
>
> (3) polling place;
>
> (4) courthouse;
>
> (5) legislative assembly; or
>
> (6) a gathering of individuals to collectively express their constitutional right to protest or assemble.

Bill No. 21-22E at 3–4, SAC Ex. B, ECF No. 49-2; Montgomery Cnty. Code § 57-1. A "place of public assembly" includes "all property associated with the place, such as a parking lot or grounds of a building." Bill No. 21-22E at 4; Montgomery Cnty. Code § 57-1. Bill No. 21-22E retained

4

Bill No. 4-21's provision restricting firearm possession within 100 yards of a "place of public

assembly," such that the present prohibition contained in Section 57-11 states that:

> (a) In or within 100 yards of a place of public assembly, a person must not:
>
>> (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or
>>
>> (2) sell, transfer, possess, or transport a firearm created through a 3D printing process.

Montgomery Cnty. Code § 57-11(a).

In light of *Bruen*'s holding that state firearm permits generally must be issued without

requiring a showing of "special need," *see Bruen*, 142 S. Ct. at 2138, which effectively invalidated

Maryland's prior permit regime which required applicants to make such a showing, *see* Md. Code

Ann., Pub. Safety § 5–306(a)(6)(ii) (LexisNexis 2018), Bill No. 21-22E also removed a provision

that had previously exempted from the prohibition on firearm possession within 100 yards of a

"place of public assembly" "the possession of a handgun by a person who has received a permit to

carry the handgun under State law." Bill No. 21-22E at 5. The effective date of Bill No. 21-22E

was November 28, 2022.

On November 29, 2022, Plaintiffs filed a Second Amended Complaint in the present case

to add challenges to the provisions of Bill No. 21-22E. Generally, Counts I, II, and III continue to

assert the same state law claims as in the earlier complaints, consisting of challenges under the

Maryland Constitution, the Express Powers Act, and the Maryland Takings Clause and Maryland

Due Process Clause, respectively, but they have been expanded to apply also to the provisions of

Bill No. 21-22E. Count IV of the Second Amended Complaint asserts that certain terms used in

Chapter 57's definition of "place of public assembly," including the terms "library," "recreational

facility," "community health center," "school," "park," and "long-term facility" are

5

unconstitutionally vague in violation of the federal and state constitutional rights to due process of law. Count V alleges that the restrictions relating to "major components" of firearms violate due process rights because they are arbitrary, irrational, and fail to serve a legitimate governmental objective. Count VI asserts that certain provisions in Bill No. 4-21 and Bill No. 21-22E that restrict activities relating to firearms in the presence of a minor or in locations accessible to minors violate the due process rights of parents of minor children to care for their children and to instruct them in the safe use and handling of firearms and components, in violation of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. Count VII alleges that the restrictions in Bill No. 4-21 and Bill No. 21-22E, particularly those prohibiting the carrying of firearms in or near places of public assembly, unconstitutionally infringe on the Second Amendment right to armed self-defense in public as articulated in *Bruen*. Finally, Count VIII asserts that the restrictions on ghost guns and privately made firearms and components infringe on Plaintiffs' Second Amendment rights.

## DISCUSSION

Plaintiffs have now filed a Motion for a Temporary Restraining Order and a Preliminary Injunction in which they request that the County be preliminarily enjoined from enforcing the ban on handgun possession at or within 100 yards of a place of public assembly against individuals who have been issued permits to carry a handgun by the Maryland State Police, specifically, as to the prohibition on carrying a handgun within 100 yards of a private school, public institution of higher education, childcare facility, place of worship, library, park, recreational facility, multipurpose exhibition facility, hospital, community health center, or long-term facility. Plaintiffs assert that in light of *Bruen*, these provisions violate their Second Amendment right to

6

carry a firearm in public for self-defense purposes, and that they face an imminent likelihood of irreparable harm in the absence of a preliminary injunction.

In opposing the Motion, the County argues that (1) Plaintiffs lack standing to assert their claims; (2) Plaintiffs have not demonstrated a likelihood of success on the merits of their claim that the prohibition on carrying a firearm at or within 100 yards of a place of public assembly, as set forth in Section 57-11 as amended by Bill No. 4-21 and Bill No. 21-22E, violates the Second Amendment; (3) Plaintiffs will not suffer irreparable harm if the Court does not issue an injunction; and (4) the balance of equities and the public interest are not in Plaintiffs' favor.

In considering the Motion, the Court construes all of the identified "places of public assembly" to be locations modified by that term itself. Specifically, while Plaintiffs argue that Section 57-11 prohibits the carrying of a firearm in purely private locations because a backyard pool could be construed as a "recreational facility," or an in-house library at Engage Armament LLC or a room with books in a private home could be construed as a "library," the Court disagrees. Based on the plain language of Bill No. 21-22E and Section 57-11, all identified locations, even those that are privately owned, necessarily are modified by the term "place of public assembly," so privately owned libraries, recreational facilities, and other locations referenced in the definition of "place of public assembly" meet the definition only if they are actually open to members of the public. The Court therefore need not and does not address the claim that Section 57-11 infringes on the right to armed self-defense by prohibiting carrying firearms in such purely private locations, or that it is unconstitutionally vague because it arguably could include such locations.

I.    **Legal Standard**

To obtain a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary

7

relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## II.   Standing

As a threshold matter, the County argues that Plaintiffs lack standing to assert their claims primarily because they have not shown that there is a sufficiently "credible threat of imminent prosecution." Opp'n Mot. Preliminary Inj. ("Opp'n") at 10, ECF No. 59-2. Because Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," plaintiffs in federal civil actions must demonstrate standing to assert their claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (citations omitted). An injury in fact must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). Standing must be established for each claim and form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). For purposes of the Motion, the claims at issue are the Second Amendment claims asserted in Count VII. When there are multiple plaintiffs, the Court need only determine that there is at least one plaintiff with standing

8

for a particular claim in order to consider the claim. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

In asserting a concrete injury necessary to establish standing to assert the Second Amendment claims in Count VII, Plaintiffs allege that because most of the Individual Plaintiffs have Maryland firearm permits and regularly travel to, or come within 100 yards of, one or more of the "places of public assembly" while carrying a firearm, they face a risk of prosecution during such activities, in violation of their Second Amendment right to carry a firearm for self-defense. The County, however, argues that there is no injury in fact because Plaintiffs have not demonstrated a likelihood that they would actually be prosecuted for carrying a firearm in or within 100 yards of a place of public assembly.

A plaintiff may challenge the prospective operation of a statute when there is "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). When challenging a criminal statute, it is not necessary that the plaintiff first be exposed "to actual arrest or prosecution to be entitled to challenge [the] statute" that the plaintiff "claims deters the exercise of . . . constitutional rights." *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). A plaintiff can satisfy the injury-in-fact requirement by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt*, 442 U.S. at 298.

The County argues that there is no credible threat of prosecution because Plaintiffs have not actually been threatened with prosecution, and they have not established that anyone else has been prosecuted for violations of the amendments to Section 57-11. Although courts have found

9

JA835

standing when there was an actual threat of prosecution, they have not required such a threat. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding standing to challenge a criminal trespass law as violating First Amendment rights where the plaintiff was warned that he would likely be prosecuted if he continued to distribute handbills at a shopping center). Rather, in *Babbitt*, the Supreme Court held only that "[w]hen plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible" they have failed to "allege a dispute susceptible to resolution by a federal court." *Babbitt*, 442 U.S. at 298-99. Thus, a plaintiff whose prosecution is at least "remotely possible," and whose fear of prosecution is not "imaginary or speculative," can demonstrate a credible threat of prosecution. *Id.*

In *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383 (1988), several organizations of booksellers brought a First Amendment challenge to a Virginia law prohibiting the commercial display of sexually explicit material that is "harmful to juveniles." *Id.* at 386. The Supreme Court held that the booksellers established an injury in fact for purposes of standing even in the absence of any specific threat to prosecute the plaintiffs or anyone else, because the Virginia law was aimed directly at the booksellers, and they would either have to take significant and costly compliance measures or risk criminal prosecution. *Id.* at 392. Moreover, where the state government did not suggest that the newly enacted law would not be enforced, the plaintiffs had a "well-founded fear that the law will be enforced against them." *Id.* at 393.

Likewise, the firearm restrictions in Section 57-11 relating to places of public assembly are plainly targeted at gun owners who, like Plaintiffs, must either forgo the asserted constitutional right to carry a firearm in such locations or risk criminal prosecution. Plaintiffs have stated that their past conduct would violate the present version of Section 57-11 and have expressed a concrete

10

intention to continue to engage in conduct that would violate Section 57-11. *Cf. Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 218 (4th Cir. 2020) (finding a lack of a credible threat of prosecution where the state had not threatened prosecution, there was no evidence of the law being enforced as feared, *and* the plaintiffs had not alleged any "concrete intention" to take actions to violate the law at issue). Notably, at the hearing on the Motion, counsel for the County declined to commit to refraining from prosecuting Plaintiffs or others for violations of these restrictions. Indeed, the County has not explained why it would enact firearms laws such as Section 57-11 if it does not intend to enforce them. Where, as in *American Booksellers Association,* the Individual Plaintiffs have alleged that in the course of their regular activities they will take actions that would violate Section 57-11, and the relevant governmental authority has not disavowed prosecuting them for such a violation, Plaintiffs have sufficiently alleged "an actual and well-founded fear that the law will be enforced against them" and thus an imminent, impending injury based on a reasonable fear of prosecution. *See Am. Booksellers Ass'n*, 484 U.S. at 393.

The County, however, has also argued that Plaintiffs have not alleged sufficient facts to assert standing for the Second Amendment challenges to firearm restrictions relating to specific categories of places of public assembly. Because, as discussed below, the challenge to a particular location category requires a different legal analysis, the Court construes each such challenge to be a separate claim for which standing must be established. *DaimlerChrysler Corp.*, 547 U.S. at 352. Indeed, courts considering similar Second Amendment challenges to firearm restrictions on specific sensitive places or places of public assembly have conducted a standing analysis relating to each specific location category. *See Antonyuk v. Hochul*, No. 22-0986(GTS/CFH), 2022 WL 16744700, at *11–*37 (N.D.N.Y. Nov. 7, 2022); *Koons v. Platkin*, No. 22-7463(RMB/AMD), 2023 WL 3478604, at *44–*48 (D.N.J. May 16, 2023). Considering the categories of places of

11

JA837

public assembly referenced in Chapter 57-11, Plaintiffs have specifically alleged facts demonstrating that an Individual Plaintiff would regularly carry a firearm in some of the identified locations in the future, which in turn supports standing to challenge the restriction on carrying at or near those locations.

As to private schools and public libraries, the Second Amended Complaint alleges that Plaintiff Eliyahu Shemony regularly carries a firearm with him and intends to continue doing so while "going to and inside a public library" and while "picking up minor children at their private school." SAC ¶ 74. As to places of worship, MSI members David Sussman and Allan Barall submitted declarations stating that they serve as volunteer armed security personnel for their synagogues and that they previously obtained Maryland permits to carry a firearm in order to provide such security. As to places of worship, recreational facilities, and multipurpose exhibition facilities, the Second Amended Complaint alleges that Plaintiff Ronald David regularly carries a firearm with him and intends to continue doing so while at his place of worship, recreational facilities, and fairgrounds, which are part of the definition of "multipurpose exhibition facility." SAC ¶ 72. Although these allegations do not identify the specific locations that David intends to visit, for purposes of the Motion the Court finds them sufficient. Based on multiple allegations that certain Plaintiffs regularly travel within 100 yards of a "place of public assembly," they have also alleged facts sufficient to challenge the part of the definition of "place of public assembly" that includes such a buffer zone.

In contrast, however, the Court finds that Plaintiffs have failed to allege facts demonstrating standing to challenge the firearm restrictions relating to public institutions of higher education, such as colleges and universities. The Second Amended Complaint lacks allegations that any Plaintiff intends to visit a college or university in Montgomery County while carrying a firearm.

12

Plaintiffs therefore have failed to allege an injury in fact sufficient to challenge the application of Section 57-11 to institutions of higher education. Likewise, the allegations are insufficient to establish standing to challenge restrictions on private libraries. While the Second Amended Complaint references libraries on multiple occasions, and on some occasions specifically references public libraries, it does not assert that a Plaintiff regularly carries a firearm in a privately owned library, by name or otherwise. Where public libraries are prevalent in Montgomery County, and Plaintiffs have not even identified any specific private library in Montgomery County, much less one regularly visited by a Plaintiff, the Court will not stretch the general allegations relating to libraries beyond the breaking point to establish an injury in fact relating to carrying firearms in a private library. The Court therefore finds that Plaintiffs have not established standing to challenge the restriction on carrying firearms in private libraries.

As to public and private parks, David asserts that he regularly carries a loaded firearm with him "at a park within the County" and intends to continue to do so. SAC ¶ 72. Neither this allegation nor any other allegations in the Second Amended Complaint identifies any particular park, and while some allegations specifically reference public parks, none asserts that a Plaintiff regularly carries a firearm in a privately owned park, by name or otherwise. Where the term "park" ordinarily refers to public parks, which are prevalent in Montgomery County, and Plaintiffs have not even identified any specific private park in Montgomery County, much less one regularly visited by a Plaintiff, the Court will not unreasonably stretch the general allegations relating to parks to establish an injury in fact relating to carrying firearms in a private park, particularly when the analysis relating to private parks differs from that relating to public parks to the point that it effectively relates to a different claim. *See infra* Part III.E. The Court therefore finds that Plaintiffs

13

JA839

have established standing to challenge the restrictions on carrying firearms in public parks, but not those relating to private parks.

As to hospitals, community health centers, and long-term care facilities such as a "licensed nursing home, group home, or care home," Bill No. 21-22E at 3-4, there are no allegations that a Plaintiff regularly visits or intends to visit a hospital or other identified health care facility while carrying a firearm. Indeed, there are no references of any kind in the Second Amended Complaint to community health centers or facilities licensed by the Maryland Department of Health. *See Antonyuk*, 2022 WL 16744700, at *23, *25 (finding a lack of standing to challenge New York firearm restrictions relating to "[t]he location of any program licensed, regulated, certified, operated, or funded by the office for people with developmental disabilities" and relating to "[r]esidential settings licensed, certified, regulated, funded, or operated by the department of health"). While the Second Amended Complaint generally references visits to "health care facilities" and mentions travel near facilities for "assisted living," *e.g.*, SAC ¶¶ 59, 62, Plaintiffs do not identify any specific facilities, and the Court does not construe these general terms to fall within the categories referenced in Bill No. 21-22E, which consist of licensed community health centers or the equivalent and long-term care facilities akin to licensed nursing homes, group homes, or care homes, not assisted living facilities which typically do not involve communal living and do not necessarily include the provision of health care. *See Koons*, 2023 WL 3478604, at *47 (finding that allegations that the plaintiffs frequented certain specific types of health care facilities did not establish standing to challenge firearm restrictions relating to numerous other types of health care facilities). Accordingly, the Court finds that Plaintiffs have not provided sufficient allegations to establish standing to challenge the restrictions on carrying firearms at these types of facilities.

14

The Second Amended Complaint contains a single reference to a hospital: Plaintiff Carlos Rabanales alleges that he carries a loaded firearm and intends to continue doing so on his daily commute to work, during which he passes within 100 yards of a hospital, and that there is no practical way for him to avoid coming within 100 yards of a hospital during his commute. Rabanales does not identify the hospital at issue and does not allege that he has carried or will likely carry a firearm into a hospital. This allegation arguably could establish that Rabanales faces a concrete injury relating to the prohibition on carrying firearms within a 100-yard buffer zone around a "place of public assembly," Montgomery Cnty. Code § 57-11, but it does not support standing to challenge the bar on carrying a firearm inside a hospital itself and thus could not provide a basis to support an injunction against enforcement of that ban. Nevertheless, because Rabanales's potential injury from the 100-yard buffer zone may indirectly derive from the bar on carrying a firearm in a hospital, the Court will address the likelihood of success on the merits of the challenge to that provision as implicated by proximity to a hospital.

As for the remaining requirements for standing, Plaintiffs have sufficiently alleged that the injury is fairly traceable to the actions of the County, in the form of potential prosecution by the County, and that the injury would be redressable through the injunctive relief sought. The Court therefore finds standing as to the Second Amendment claims relating to the prohibitions on carrying a firearm at a private school, a childcare facility, a place of worship, a public park, a recreational facility or multipurpose exhibition facility, a public library, and within 100 yards of any place of public assembly. Montgomery Cnty. Code § 57-11. It does not find standing as to the claims relating to the rest of the identified locations.

15

JA841

**III.    Likelihood of Success on the Merits**

The first requirement for a preliminary injunction is that the moving party demonstrate a likelihood of success on the merits of its claims, which for purposes of the Motion, and based on the Court's findings relating to standing, consist of the Second Amendment challenge to the prohibition on Maryland firearm permit holders carrying a firearm in the following "places of public assembly": a private school, a childcare facility, a place of worship, a public park, a recreational facility or multipurpose exhibition facility, a public library, and within 100 yards of a place of public assembly. The Court will analyze each of these categories separately.

**A.    Legal Standards**

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court held that the Second Amendment protects "an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122. However, "the right secured by the Second Amendment is not unlimited." *Id.* at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).

In *Bruen*, the Supreme Court considered the two-step test that Courts of Appeals had generally adopted for assessing Second Amendment claims after *District of Columbia v. Heller*, 554 U.S. 570 (2008). At the first step, the Government could justify a firearm regulation by showing that the challenged law regulates activity outside the scope of the Second Amendment right as originally understood, and if it successfully does so, "then the analysis can stop there; the regulated activity is categorically unprotected." *Bruen*, 142 S. Ct. at 2126. At the second step, courts engaged in a means-end analysis, applying either strict or intermediate scrutiny to assess whether the governmental interest underlying the law justified the restriction. *Id.*

16

The *Bruen* Court generally reaffirmed the first step by stating that it "is broadly consistent with *Heller*," but it rejected the means-end second step. *Id.* at 2127. It then adopted a Second Amendment test of considering, first, whether the "Second Amendment's plain text covers an individual's conduct," and if so, "the Constitution presumptively protects that conduct." *Id.* at 2129–30. Notably, the Supreme Court identified certain "sensitive places," including schools, government buildings, legislative assembles, polling places, and courthouses, for which it is "settled" that "arms carrying could be prohibited consistent with the Second Amendment," even in the absence of a significant historical record from the 1700s or 1800s of such restrictions. *Id.* at 2133. If the regulation covers Second Amendment conduct, rather than engaging in a means-end inquiry, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. This historical inquiry considers whether there is "historical precedent" from before, during, and after the enactment of the Second Amendment that "evinces a comparable tradition of regulation" in the same manner as the present day restriction. *Id.* at 2131–32.

Present-day firearm regulations that were "unimaginable at the founding," such as those that relate to "unprecedented societal concerns or dramatic technological changes," may still be upheld as consistent with the historical tradition of firearm regulation based on "reasoning by analogy." *Id.* at 2130, 2132. The Supreme Court stated that two primary metrics are relevant for determining whether such a modern regulation is "relevantly similar" to a historical regulation: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. "[C]entral" to this inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* "[A]nalogical reasoning under the Second Amendment is neither a regulatory

17

straightjacket nor a regulatory blank check." *Id.* at 2133. Although "courts should not 'uphold every modern law that remotely resembles a historical analogue,' . . . analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

In addressing the types of historical sources to be considered when analyzing this second prong in relation to a state law restriction on firearms, the Supreme Court "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Id.* at 2138. However, the Court declined to take a position on this issue and thus left open the question whether courts may consider only historical sources from the time period of the ratification of the Second Amendment in 1791, or whether they may, and perhaps should primarily consider, historical sources from the time period of the ratification of the Fourteenth Amendment in 1868, at which point the protections of the Second Amendment became applicable to state firearm restrictions. *Id.*

Upon consideration of this issue, the Court concludes that historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment. "[T]he Second Amendment[] originally applied only to the Federal Government." *McDonald v. City of Chicago*, 561 U.S. 742, 754 (2010). Indeed, in 1833, the Supreme Court so held and rejected the proposition that the first eight constitutional amendments operated as limitations on the States. *See Barron ex rel. Tiernan v. Mayor of Balt.*, 32 U.S. (7 Pet.) 243, 250–

18

51 (1833). However, after the ratification of the Fourteenth Amendment, the Court "eventually incorporated almost all of the provisions of the Bill of Rights" as applying to the States. *McDonald*, 561 U.S. at 764. In *McDonald*, the Supreme Court held that the Fourteenth Amendment makes the Second Amendment right to keep and bear arms fully applicable to the States. *Id.* at 750. Thus, as the *Bruen* Court noted, "[s]trictly speaking," states are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 142 S. Ct. at 2137.

Relying in part on this point, the United States Court of Appeals for the Eleventh Circuit recently held that "[h]istorical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era" when considering state law firearm restrictions. *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023). The court reasoned that "because the Fourteenth Amendment is what caused the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters." *Id.* This conclusion is necessary "to be faithful to the principle that '[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*,'" because "it makes no sense to suggest that the States would have bound themselves to an understanding of the Bill of Rights—including that of the Second Amendment—that they did not share when they ratified the Fourteenth Amendment." *Id.* at 1323–24 (quoting *Bruen*, 142 S. Ct. at 2136). The Court agrees with the Eleventh Circuit's reasoning and will consider historical sources from the time period of the ratification of the Fourteenth Amendment.

19

**B.    Schools**

Plaintiffs challenge certain aspects of Section 57-11's prohibition on the carrying of firearms at "schools" within the County. Montgomery Cnty. Code §§ 57-1, 57-11. Where the Supreme Court has specifically deemed "schools" and "government buildings" to be "sensitive places" at which the carrying of firearms could be prohibited consistent with the Second Amendment, *Bruen*, 142 S. Ct. at 2133, Plaintiffs do not challenge the restriction relating to public elementary and secondary schools. Rather, they assert that private schools or public institutions of higher education are not "sensitive places" under *Bruen*, such that to the extent that the firearm restrictions relating to schools apply to those locations, they are barred by the Second Amendment.

The Court finds that Plaintiffs' challenge on this point is unlikely to succeed. *Bruen* did not distinguish between public schools and private schools or limit the term "schools" based on the age of the students. *See Bruen*, 142 S. Ct. at 2133. Nor did *Heller*, which first designated "schools" as "sensitive places" for purposes of the Second Amendment. *Heller*, 554 U.S. at 626. Particularly where public school education was not mandatory in a single state until 1852 or throughout the country until 1918, *see* Michael S. Katz, *A History of Compulsory Education Laws* 5 (Donald W. Robinson ed. 1976), to limit schools deemed to be "sensitive places" to public schools is likely inconsistent with the relevant history that underlies Second Amendment analysis. Where no distinction between different kinds of schools exists in *Bruen*, and where Plaintiffs have pointed to no authority warranting such a distinction, the Court declines to create one and finds that Plaintiffs are unlikely to succeed on their challenge to Section 57-11's restriction on the carrying of firearms in "schools" as applied to private schools. *Cf. Antonyuk*, 2022 WL 16744700, at *68 (finding that restrictions on carrying arms in nursery schools and preschools were permissible in light of historical analogues to laws forbidding arms in schools).

20

As for public institutions of higher education, as discussed above, Plaintiffs lack standing to challenge the restriction as applied to such institutions. *See supra* part II. Even if the Court were to consider the merits of this issue, it would also find that Plaintiffs are unlikely to succeed on the merits because *Bruen* made no distinction among schools based on the age of the students, a restriction relating to a public college is analogous to the undisputedly lawful prohibitions on carrying firearms at public elementary or secondary schools, and the only institutions of higher education in the County—Montgomery College and the Universities at Shady Grove, which is part the University System of Maryland—are public institutions consisting of government buildings which are themselves "sensitive places" under *Bruen* and *Heller*. *Bruen*, 142 S. Ct. at 2133; *Heller*, 554 U.S. at 626. Finally, as discussed below, restrictions on carrying firearms in such an institution are also consistent with the historical tradition of firearm regulations in places of learning. *See infra* part III.F.

### C.    Childcare Facilities

Although childcare facilities are not listed among the "sensitive places" identified in *Bruen*, the Court finds that they are properly deemed to be sensitive places because they are analogous to schools. In *Bruen*, the Supreme Court instructed that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Bruen*, 142 S. Ct. at 2133. Although childcare facilities likely did not exist in any significant numbers at the time of the ratification of the Second and Fourteenth Amendments, the facilities are sufficiently analogous to schools to be deemed sensitive places for purposes of Second Amendment analysis. First, the burden imposed on the right to self-defense is the same between prohibitions on carrying firearms into schools and prohibitions on carrying arms into childcare facilities. Second, the

21

burdens are comparably justified, because schools, like childcare facilities, are tasked with providing education and socialization to attendees, purposes furthered by prohibitions on bringing firearms into those locations. Moreover, prohibitions on firearms in both schools and childcare facilities are meant to protect the same or similar vulnerable populations, consisting of students and children. Indeed, childcare facilities often provide care for school-age children immediately before or after the school day, or they provide care for children below school age. Under these circumstances, the Court finds that childcare facilities are "sensitive places" by analogy to schools, such that restrictions on carrying firearms in childcare facilities are consistent with the Second Amendment. *See Antonyuk*, 2022 WL 16744700, at *68 (finding that restrictions on carrying arms in nursery schools and preschools were permissible in light of historical analogues to laws forbidding arms in schools). Plaintiffs are therefore unlikely to succeed on the merits of their challenge to Section 57-11 as it relates to childcare facilities.

### D. Places of Worship

Plaintiffs are not likely to succeed on the merits of their claim that the County's restriction on carrying a firearm at a place of worship violates the Second Amendment. The historical record in the years following the ratification of the Fourteenth Amendment, as presented by the County, demonstrates a well-established and representative number of statutes that prohibited firearms in places of worship.

For example, in 1870, only two years after the ratification, Georgia enacted an amendment to the Georgia Penal Code that prohibited a person from carrying "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" to "any . . . place of public worship." 1870 Ga. Acts & Resolutions, tit. XVI, § 1, Opp'n Ex. 18, ECF No. 59-22. Also in 1870, Texas enacted a statute that prohibited any person from going "into any church or religious assembly" while having "about

22

his person . . . fire-arms, whether known as a six shooter, gun or pistol of any kind." 1870 Tex. Gen. Laws, ch. XLVI, § 1, Opp'n Ex. 21, ECF No. 59-25. In 1875, Missouri prohibited individuals from "go[ing] into any church or place where people have assembled for religious worship" while "having upon or about his person any kind of fire arms." 1875 Missouri Gen. and Local Laws at 50, § 1, Opp'n Ex. 23, ECF No. 59-27. In 1878, Virginia prohibited "carrying any gun, pistol . . . or other dangerous weapon" to "any place of worship while a meeting for religious purposes is being held at such place." 1878 Va. Acts and Joint Resolutions, ch. VII, § 21, Opp'n Ex. 24, ECF No. 59-28. In 1889, the Territory of Arizona prohibited the carrying in "any church or religious assembly" of "a pistol or other firearm." 1889 Ariz. Session Laws of the Fifteenth Legislative Assembly of the Territory of Arizona at 17, § 3, ECF No. 59-38. In 1890, in Columbia, Missouri, an ordinance was adopted which prohibited any person who enters "any church, or place where people have assembled for religious worship" from carrying "any fire arms or other deadly or dangerous weapon." 1890 Columbia, Mo. Gen. Ordinances, ch. XV11, § 163, Opp'n Ex. 35, ECF No. 59-39. In 1890, the Territory of Oklahoma banned the carrying of a "pistol" or "revolver," or certain other dangerous weapons, "into any church or religious assembly." 1890 Okla. Statutes, art. 47, §§ 1–2, 7, ECF No. 59-40. Finally, in 1894, the City of Huntsville, Missouri prohibited the carrying of "any kind of fire-arms" into "any church or place where people have assembled for religious worship." 1894 Huntsville, Mo. Revised Ordinances at 58–59, § 1, Opp'n Ex. 42, ECF No. 59-46.

These historical statutes and ordinances demonstrate that there is "historical precedent" from the time period of the ratification of the Fourteenth Amendment that "evinces a comparable tradition of regulation" of firearms at places of worship. *Bruen*, 142 S. Ct. at 2131–32. Where the historical record provides a strong basis upon which to conclude that Section 57-11's bar on

23

carrying a firearm in a place of worship is "consistent with the Nation's historical tradition of firearm regulation," *id.* at 2130, the Court finds that Plaintiffs are not likely to succeed on the merits of their Second Amendment claim relating to the carrying of firearms in places of worship.

**E.    Public Parks, Recreational Facilities, and Multipurpose Exhibition Facilities**

In considering Plaintiffs' challenge to Section 57-11's restrictions on carrying firearms in public parks, recreational facilities, and multipurpose exhibition facilities, the Court finds that the historical record provided by the County demonstrates a history of restricting firearm possession and carrying in public parks and at locations where large numbers of people engaged in recreation.

As to public parks, numerous historical statutes and ordinances from the time period before and following the ratification of the Fourteenth Amendment imposed such restrictions in relation to parks. First, during that time period, numerous local governments similarly situated to Montgomery County, in states all over the United States, prohibited firearms in parks. These restrictions included prohibitions on carrying firearms in parks in major American cities, such as an 1857 ordinance stating that "[a]ll persons are forbidden . . . [t]o carry firearms or to throw stones or other missiles" within Central Park in New York City, *see* First Annual Report on the Improvement of the Central Park, New York at 106 (1857), Opp'n Ex. 13, ECF No. 59-17; an 1870 law enacted by the Commonwealth of Pennsylvania stating that "[n]o persons shall carry fire-arms" in Fairmount Park in Philadelphia, Pennsylvania, *see* Acts of Assembly Relating to Fairmount Park at 18, § 21.II (1870), Opp'n Ex. 20, ECF No. 59-24; an 1895 Michigan state law providing that "No person shall fire or discharge any gun or pistol or carry firearms, or throw stones or other missiles" within a park in the City of Detroit, *see* 1895 Mich. Local Acts at 596, § 44, Opp'n Ex. 43, ECF No. 59-47; and a 1905 ordinance in Chicago, Illinois stating that "all persons are forbidden to carry firearms or to throw stones or other missiles within any of the Parks

24

. . . of the City," 1905 Chi. Revised Mun. Code, ch. XLV, art. I, § 1562, Opp'n Ex. 49, ECF No. 59-53. Similar restrictions were enacted to bar the carrying of firearms in (1) Saint Paul, Minnesota, *see* Annual Reports of the City Officers and City Boards of the City of Saint Paul at 689 (1888), Opp'n Ex. 32, ECF No. 59-36; (2) Williamsport, Pennsylvania, *see* 1891 Williamsport, Pa. Laws and Ordinances at 141, § 1, Opp'n Ex. 37, ECF No. 59-41; (3) Wilmington, Delaware, *see* 1893 Wilmington, Del. Charter, Part VII, § 7, Opp'n Ex. 39, ECF No. 59-43; (4) Reading, Pennsylvania, *see* A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania at 240, § 20(8) (1897), Opp'n Ex. 44, ECF No. 59-48; (5) Boulder, Colorado, *see* 1899 Boulder, Colo. Revised Ordinances at 157, § 511, Opp'n Ex. 45, ECF No. 59-49; (6) Trenton, New Jersey, *see* 1903 Trenton, N.J. Charter and Ordinances at 390, Opp'n Ex. 48, ECF No. 59-52; (7) Phoenixville, Pennsylvania, *see* A Digest of the Ordinances of Town Council of the Borough of Phoenixville at 135, § 1 (1906), Opp'n Ex. 52, ECF No. 59-56; (8) Oakland, California, *see* 1909 Oakland, Cal. Gen. Mun. Ordinances at 15, § 9, Opp'n Ex. 53, ECF No. 59-57; (9) Staunton, Virginia, *see* 1910 Staunton, Va. Code, ch. II, § 135, Opp'n Ex. 54, ECF No. 59-58; and (10) Birmingham, Alabama, *see* 1917 Birmingham, Ala. Code, ch. XLIV, § 1544, Opp'n Ex. 55, ECF No. 59-59.

On a state level, in 1905, Minnesota prohibited the possession of firearms within state parks unless they were unloaded and sealed by a park commissioner. 1905 Minn. Laws, ch. 344, § 53, Opp'n Ex. 50, ECF No. 59-54. In 1917, Wisconsin prohibited bringing a "gun or rifle" into any "wild life refuge, state park, or state fish hatchery lands" unless it was unloaded and in a carrying case. 1917 Wis. Sess. Laws, ch. 668, § 29.57(4), Opp'n Ex. 56, ECF No. 59-60. In 1921, North Carolina enacted a law prohibiting the carrying of firearms in both private and public parks without

25

the permission of the owner or manager of that park. *See* 1921 N.C. Sess. Laws 53–54, Pub. Laws Extra Sess., ch. 6, §§ 1, 3, Opp'n Ex. 57, ECF No. 59-61.

These laws which, like Section 57-11, categorically bar the carrying of firearms in parks, demonstrate that there is "historical precedent" from before, during, and after the ratification of the Fourteenth Amendment that "evinces a comparable tradition of regulation" of firearms in parks. *See Bruen*, 142 S. Ct. at 2131–32. Although Plaintiffs argue that some of these historical statutes should be discounted because their purpose may have been to protect waterfowl or wildlife, this argument is unpersuasive for two reasons. First, the considerations of "how and why" historical regulations burden rights relating to firearms are applicable not when there is clear historical example of the exact same type of regulation—in this instance, restrictions on carrying firearms in parks—but are instead applicable only when the Court is asked to reason by analogy in order to uphold a new form of restriction that did not exist at the time of the ratification. *See Bruen*, 142 S. Ct. at 2132–33. Second, even if these considerations must be examined, these provisions restrict the carrying of firearms in the exact same way, by barring the carrying of a firearm in a park regardless of what self-defense concerns might exist, and they do so for apparently similar reasons. Though some of the historical statutes may have prohibited firearms from parks in order to protect wildlife and property, many plainly served to advance public safety and the peaceful enjoyment of parks, such as those that also prohibited the throwing of objects in parks, including the laws that applied to parks in densely populated urban areas, such as New York, Philadelphia, Detroit, and Chicago. The Court therefore finds that Plaintiffs are unlikely to succeed on the merits of their challenge to Section 57-11's restriction on carrying firearms in parks in Montgomery County, which is also a densely populated area.

26

As for Section 57-11's restriction on carrying firearms in recreational facilities and multipurpose exhibition facilities, the historical statutes applicable to parks are fairly deemed to be well-established and representative historical analogues because such facilities, like parks, are locations at which large numbers of people gather to engage in recreation. In addition, there are historical statutes and regulations from states and territories that directly restricted the carrying of firearms in recreational facilities and multipurpose exhibition facilities. In the early 1800s, New Orleans, Louisiana prohibited individuals from entering "into a public ballroom with any cane, stick, sword, or any other weapon." General Digest of the Ordinances and Resolutions of the Corporation of New Orleans at 371, art. 1 (1831), Opp'n Ex. 7, ECF No. 59-11. Similarly, in 1852, the Territory of New Mexico prohibited firearms or other deadly weapons at balls or dances. 1852 N.M. Laws at 67–68, § 3, Opp'n Ex. 12, ECF No. 59-16. In 1870, Tennessee prohibited the carrying of a pistol or other "deadly or dangerous weapon" at "any fair, race course, or other public assembly of the people." 1870 Tenn. Acts, ch. XXII, § 2, Opp'n Ex. 17, ECF No. 59-21. In 1870, Texas prohibited firearms, including "a six shooter, gun or pistol of any kind" in "a ball room, social party or other social gathering composed of ladies and gentlemen." 1870 Tex. Gen. Laws, ch. XLVI, § 1. In 1889, the Territory of Arizona banned firearms in any "place where persons are assembled for amusement . . . or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering." 1889 Ariz. Session Laws at 17 § 3. In 1890, the Territory of Oklahoma prohibited arms in any "place where persons are assembled . . . for amusement . . . or any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering." Okla. Statutes, art. 47, § 7 (1890).

Whether viewed as direct historical precedent or historical analogues, these statutes and ordinances demonstrate a historical tradition of restricting the carrying of firearms in places where

27

individuals gather for recreation or social activities such as the recreational facilities and multipurpose exhibition facilities covered by Section 57-11. Because these provisions, like Section 57-11, generally prohibit the carrying of firearms in these locations, with no exception relating to possible self-defense needs, they impose a comparable burden on the right to bear arms as Section 57-11. The reasons for these historical restrictions, which appear to be to protect individuals engaged in these recreational and social activities from confrontations and encounters involving firearms or other dangerous weapons, are comparable to the reason for the prohibitions of Section 57-11, which is to address possible gun violence in or near places of public assembly. *See* Legislative Request Report, Opp'n Ex. 2 at 17, ECF No. 59-6.

Where there is a distinct foundation of historical precedent demonstrating that prohibitions on carrying firearms in public parks, places of recreation, and social gatherings are part of the "Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130, the Court finds that Plaintiffs are not likely to succeed on the merits of their challenges to Section 57-11's prohibitions on carrying firearms in public parks, recreational facilities, and multipurpose exhibition facilities.

### F. Public Libraries

Plaintiffs are also not likely to succeed on the merits of their claim as to public libraries. First, all public libraries in Montgomery County are in government buildings, which are "sensitive places" where arms carrying can be prohibited consistent with the Second Amendment. *Bruen*, 142 S. Ct. 2133. Second, as presented by the County, there is a representative number of historical statutes that demonstrate a historical tradition of firearm regulation in places of gathering for literary or educational purposes, including public libraries.

For example, in 1870, Texas enacted a law prohibiting the carrying of firearms in "any school room or other place where persons are assembled for educational, literary or scientific

28

purposes." 1870 Tex. Gen. Laws, ch. XLVI, § 1. In 1879, Missouri prohibited the carrying on one's person of "any kind of firearms" in "any school room or place where people are assembled for educational, literary or social purposes." 1879 Mo. Revised Statutes, ch. 24, art. II, § 1274, Opp'n Ex. 25, ECF No. 59-29. In 1889, the Territory of Arizona prohibited the carrying of a "pistol or other firearm" into any "place where persons are assembled for . . . educational or scientific purposes." 1889 Ariz. Session Laws at 17, § 3. Similarly, in 1893, the Territory of Oklahoma outlawed bringing a pistol, revolver, or any other instrument manufactured "for the purpose of defense" into any "place where persons are assembled for . . . educational or scientific purposes." 1893 Okla. Statutes, ch. 25, art. 45, § 7, Opp'n Ex. 40, ECF No. 59-44. Finally, in 1903 Montana prohibited the carrying of "a pistol or other firearm" in "any school room or other place where persons are assembled for . . . educational or scientific purposes." 1903 Mont. Gen. Laws, ch. XXXV, § 3, Opp'n Ex. 47, ECF No. 59-51. Based on a straightforward reading of the language of these provisions, they necessarily apply to public libraries. Although the Court has found a lack of standing to challenge firearm restrictions relating to private libraries, the Court notes that none of these laws limits its prohibitions to public facilities where people were assembled for educational, literary, or scientific purposes, so they also demonstrate a historical tradition of firearm regulation in privately operated libraries open to the public.

These historical provisions imposed comparable burdens on the right to bear arms as Section 57-11's restriction on carrying firearms in a library. Where these historical laws apparently were aimed at preventing disruption of educational and literary activities and ensuring safety during those activities, the burdens imposed by them and by Section 57-11 are comparably justified. Accordingly, the Court finds that Plaintiffs are unlikely to succeed on the merits of their challenge to Section 57-11 as to libraries.

29

JA855

Finally, the Court notes that while it has found that Plaintiffs lack standing to challenge to Section 57-11 as applied to public institutions of higher education, to the extent that it were to consider the merits of that challenge, the same historical examples, based on their plain language, encompass restrictions on carrying firearms at such institutions and thus provide a basis to find a lack of a likelihood of success on that claim.

### G. 100-Yard Buffer Zones

Finally, as to all of the specific locations constituting "places of public assembly," Plaintiffs argue that Section 57-11's prohibition on carrying a firearm within 100 yards of a place of public assembly violates the Second Amendment right to bear arms for self-defense. Because the definition of "place of public assembly" includes "all property associated with the place, such as a parking lot or grounds of a building," Bill No. 21-22E at 4; Montgomery Cnty. Code § 57-1, the 100-yard buffer zone necessarily includes land outside the boundary of a parking lot or grounds associated with a school, library, or other place of public assembly.

The historical record provided by the County includes numerous examples of laws prohibiting firearms in buffer zones of a certain distance around a "sensitive place" or other location at which the government could prohibit the carrying of firearms. For example, in the years following the ratification of the Fourteenth Amendment, Maryland prohibited the carrying of a gun or pistol within 300 yards of polling places in Calvert County and in any location on Election Day in Kent County, Queen Anne's County, and Montgomery County. 1886 Md. Laws, ch. 189, § 1 (Calvert County), Opp'n Ex. 30, ECF No. 59-34; 1874 Md. Laws, ch. 250, § 1 (Kent, Queen Anne's, and Montgomery Counties), Opp'n Ex. 22, ECF No. 59-26. Similarly, in 1870, Louisiana prohibited the carrying of any gun, pistol, or other dangerous weapon within "one-half mile of any place of registration" for elections. 1870 La. Acts, No. 100, § 73, Opp'n Ex. 19, ECF

30

JA856

No. 59-23. In Mississippi, an 1892 law prohibited students from carrying, bringing, receiving, owning, or having a concealed weapon "within two miles" of "any university, college, or school." 1892 Miss. Code Ann. at 327, § 1030, Opp'n Ex. 38, ECF No. 59-42.

Similarly, many municipalities prohibited the carrying of firearms within 50 or 100 yards of their parks, squares, or common areas, including: (1) Philadelphia, Pennsylvania, *see* Acts of Assembly Relating to Fairmount Park at 18, § 21.II (1870) (50 yards); (2) St. Paul, Minnesota, *see* Annual Reports of the City Officers and City Boards of the City of Saint Paul at 689 (1888) (50 yards); (3) Pittsburgh, Pennsylvania, *see* A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, from 1804 to Jan. 1, 1897, at 496, § 5 (1893), Opp'n Ex. 41, ECF No. 59-45 (100 yards); (4) Reading, Pennsylvania, *see* A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania at 240, § 20(8) (1897) (50 yards); and (5) Trenton, New Jersey, *see* 1903 Trenton, N.J. Charter and Ordinances at 390 (50 yards). There is thus a historical tradition of firearm regulation consisting of restrictions on carrying a firearm within a certain reasonable buffer zone around "sensitive places" and other locations at which firearms could be restricted.

Plaintiffs argue that these historical buffer zone laws are not relevantly similar historical analogues because they were not necessarily enacted to restrict the right to self-defense. In particular, they reference buffer zones around parks, which they argue were enacted to protect wildfowl and other wildlife. This argument is unpersuasive for two reasons. First, as noted above, many of the buffer zone statutes cited by the County focused on increasing the restricted area around sensitive places or other places at which the carrying of firearms was prohibited that have nothing to do with hunting, such as those relating to polling places, election registration locations, and schools. Such restrictions were plainly enacted to further presumptively valid restrictions on

31

the right to self-defense in the area immediately adjacent to such locations for purposes of public

safety and to allow the activity at issue, such as voting or the education of children, to occur without

concern for violence or other interruption. They are therefore "comparably justified" to Section

57-11's 100-yard buffer zone. *Bruen*, 142 S. Ct. at 2133.

Second, the Court disagrees that the laws restricting the carrying of firearms in parks, and

the corresponding buffer zone provisions, were enacted solely to prevent poaching or hunting.

Where several apply to parks in distinctly urban settings, and many specifically refer to

prohibitions on both carrying a firearm and throwing any projectile or missile without regard to

whether the action endangers birds or wildlife, it is clear that these laws were enacted in whole or

in part to promote public safety and the ability of visitors to use the park for recreation without the

potential for violence or other disturbances. *See, e.g.*, Acts of Assembly Relating to Fairmount

Park (Philadelphia) at 18, § 21.II (1870); Annual Reports of the City Officers and City Boards of

the City of Saint Paul at 689 (1888); A Digest of the Laws and Ordinances for the Government of

the Municipal Corporation of the City of Reading, Pennsylvania at 240, § 20(8) (1897);  1903

Trenton, N.J. Charter and Ordinances at 390. Thus, "why" the buffer zones burden the right to

armed self-defense is similar. *Bruen*, 142 S. Ct. at 2133. Finally, beyond the purpose of the

statutes, these restrictions impose a "comparable burden" in that "how" they burden the right to

armed self-defense is the same. *Id.* Under the plain language of these statutes, individuals were

prohibited from bringing a firearm into a park or carrying one within the identified buffer zone

distance regardless of whether they had any intention to hunt or poach in the park, so they, like

Section 57-11, imposed absolute restrictions on the right to carry a firearm for self-defense in such

areas. Thus, where numerous historical examples of buffer zone statutes exist, and where they

impose the same burden on Second Amendment rights and are comparably justified, the Court

32

finds that Plaintiffs are unlikely to succeed on the merits of their challenge to Section 57-11's 100-yard buffer zones.

### H.      Buffer Zones Near Hospitals

Finally, to the extent that Plaintiffs' argument relating to the buffer zones may include a claim that restrictions on firearms within 100 yards of a hospital fail not because of the existence of a buffer zone, but because of a lack of a basis to restrict firearms from the hospitals on which the buffer zone is based, the Court finds that the County has sufficiently demonstrated a historical basis for such restrictions. While the County has not presented historical examples of specific restrictions on the carrying of firearms at hospitals, that fact is not remarkable, because hospitals did not exist in their modern form at the time of the ratification of the Second or Fourteenth Amendments. As noted in *Bruen*, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced" historical analysis. *Bruen*, 142 S. Ct. at 2132. It was not until the late nineteenth century, "as society became increasingly industrialized and mobile and as medical practices grew in their sophistication and complexity," that there was a shift from the norm of medical care at home to "the professionalization of health care practices that eventually included the development of a full and competitive commercial market for medical services that increasingly took place in hospitals." Barbra Mann Wall, *History of Hospitals*, Univ. of Pa. School of Nursing, https://www.nursing.upenn.edu/nhhc/nurses-institutions-caring/history-of-hospitals/ (last visited July 5, 2023). "Between 1865 and 1925 in all regions of the United States, hospitals transformed into expensive, modern hospitals of science and technology." *Id.* Thus, hospitals were only beginning to become prevalent at the time of the ratification of the Fourteenth Amendment, developed because of advances in modern medicine, and did not resemble

33

their modern counterparts until the twentieth century. The Court thus considers whether there are historical analogues for firearm regulation at hospitals.

The County has identified historical statutes demonstrating a history of firearm restrictions at locations operated for scientific purposes. For example, in 1870, two years after the ratification of the Fourteenth Amendment, Texas enacted a statute prohibiting the carrying of firearms into "any school room or other place where persons are assembled for educational, literary or scientific purposes." 1870 Tex. Gen. Laws, ch. XLVI, § 1. In 1890, the Territory of Oklahoma prohibited carrying a pistol or firearm into "any school room or other place where persons are assembled for . . . educational or scientific purposes." 1890 Okla. Statutes, ch. 25, art. 47, § 7. In 1901, the Territory of Arizona similarly prohibited carrying a firearm into "any school room, or other place where persons are assembled for . . . educational or scientific purposes." 1901 Arizona Revised Statutes, tit. 11, § 387, Opp'n Ex. 46, ECF No. 59-50. Finally, in 1903, the state of Montana prohibited the carrying of firearms into "any school room or other place where persons are assembled . . . for educational or scientific purposes." 1903 Mont. Gen. Laws, ch. XXXV, § 3. These almost identical laws passed in the years following the ratification of the Fourteenth Amendment imposed bans on the carrying of firearms in both schools and places of scientific activity.

Although not a "historical twin" or a "dead ringer," these statutes can be fairly construed as providing "historical analogue[s]" for Section 57-11's restrictions on the possession of firearms at hospitals. *Bruen*, 142 S. Ct. at 2133. Hospitals are certainly locations at which people are engaged in scientific activities, including medical care. Moreover, specifically as to Montgomery County, most of the hospitals in the County are also involved in teaching or clinical research that constitutes educational or scientific activities, including the National Institutes of Health Clinical

34

Center, which conducts clinical research, *see* Welcome from the Clinical Center, NIH Clinical Center, https://clinicalcenter.nih.gov/welcome.html (last visited June 27, 2023); Suburban Hospital, which is a member of Johns Hopkins Medicine and has a "vibrant and growing research program," *see* Research and Discovery at Suburban Hospital, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/suburban_hospital/research/index.html (last visited June 27, 2023); Walter Reed National Military Medical Center, which engages in medical research, *see* Department of Research Programs, Walter Reed National Military Medical Center, https://walterreed.tricare.mil/About-Us/Department-of-Research-Programs (last visited June 27, 2023); MedStar Montgomery Medical Center, which is engaged in clinical trials and research studies, *see* At a Glance, MedStar Montgomery Medical Center, https://www.medstarhealth.org/-/media/project/mho/medstar/pdf/at-a-glance-flyer_022822.pdf (last visited June 27, 2023) ("Our culture encourages clinicians and associates to test new ideas to improve care and experiences [and] to participate in clinical trials and research studies . . . ."); and Holy Cross Health and Holy Cross Germantown Hospital, which have academic partnerships and a location on Montgomery College's Germantown campus for the purposes of educational training and development, *see* About Us, Holy Cross Health, https://www.holycrosshealth.org/about-us/ (last visited June 27, 2023) ("With a commitment to education, Holy Cross Health has numerous academic partnerships and Holy Cross Germantown Hospital is the first hospital in the nation located on a community college campus to advance educational training and development.").

Where the historical laws generally prohibited firearms at locations used for educational or scientific purposes, they imposed an equal burden on the right to bear arms as does Section 57-11 in relation to these hospitals. They are also "relevantly similar" to Section 57-11 because they all apparently "burden a law-abiding citizen's right to armed self-defense" for the same reason:

35

providing public safety so as to allow significant scientific activity to be conducted properly and successfully. *Bruen*, 142 S. Ct. at 2132–33. Section 57-11's prohibition of firearms in hospitals is therefore analogous to historical statutes prohibiting arms in locations of scientific activity.

Lastly, the Court notes that some of the hospitals in Montgomery County, such as Walter Reed National Military Medical Center and the National Institutes of Health Clinical Center, are public facilities located in government buildings and therefore also qualify as "sensitive places." *Bruen*, 142 S. Ct. at 2133.

Because there are persuasive arguments that Section 57-11's restriction on carrying firearms at hospitals is consistent with the Nation's historical tradition of firearm regulations, the Court cannot conclude at this early stage that Plaintiffs' challenge to the 100-yard buffer zone restriction as applied to areas within that distance of a hospital is likely to succeed on the merits of that particular claim.

I.      **Sufficiency of the Historical Record**

As to all of the locations, in response to the County's arguments based on the historical record it has submitted, Plaintiffs argue that the County has not identified a sufficient number of historical statutes in support of its argument, and that the statutes come from states or territories that encompass a low percentage of the total population of the United States. As to the number of statutes cited, *Bruen* did not establish a minimum threshold for the number of statutes that must be identified as part of the historical analysis to support the conclusion that a present firearm restriction is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. C.t at 2130. Indeed, the Supreme Court has acknowledged that certain locations are properly construed as "sensitive places" at which the carrying of firearms may be prohibited based on only a limited number of historical examples. As to legislative assemblies, identified in *Bruen* as

36

"sensitive places," the Supreme Court acknowledged that there are "relatively few" relevant historical statutes, *id.* at 2133, and the secondary source upon which it relied includes citations to only two laws, both from the same state. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 235 (2019). Similarly, the sources cited by the Supreme Court to support the designation of courthouses as "sensitive places" include only two state statutes, one from Georgia and one from Virginia. *See id.* at 246 (Georgia statute); Brief of *Amicus Curiae* the Independent Institute in Support of Petitioners at 12, *Bruen*, 142 S. Ct. 2111 (No. 20-843) (Virginia statute). Under these circumstances, and where the Court's analysis as to many of the "places of public assembly" covered by Section 57-11 is whether they are, or are analogous to, "sensitive places," the Court concludes that the number of statutes and ordinances identified by the County is sufficient.

Moreover, the *Bruen* Court, while discussing the breadth of the historical examples and their reach and disfavoring the historical examples presented in that case that came from territories rather than states, *Bruen*, 142 S. Ct. at 2154–55, did not impose any specific requirement that the historical statutes considered must have applied to a certain number of states or a certain percentage of the relevant population. Notably, its criticism of the limited number of statutes presented and of territorial statutes was based in part on its conclusion that the proffered examples were countered by the weight of historical evidence. Here, the examples from territories merely reinforce and supplement the historical tradition based on laws from the states, and the record does not demonstrate that the examples cited by the County are outliers or contradicted by a more substantial historical record.    The only location on which Plaintiffs offer meaningful counterexamples is places of worship, as to which Plaintiffs cited an article referencing pre-Second Amendment laws requiring individuals to carry firearms in places of worship or to public meetings.

37

*See* Kopel & Greenlee, *supra,* at 233 & n. 108. However, the only specific statutes referenced in that article were from states—Virginia and Georgia—which later changed their laws around the time of the ratification of Fourteenth Amendment to prohibit firearms at places of worship. *See id.* at 249 (stating that "Virginia in 1877 . . . forbade all arms carrying at places of worship where religious meetings were being conducted"); *see supra* part III.D (1870 Georgia statute). Finally, the Court notes that the record lacks any evidence that during the relevant historical time period, restrictions or proposed restrictions on carrying firearms such as those cited by the County were "rejected on constitutional grounds." *Bruen,* 142 S. Ct. at 2131.

Accordingly, the Court finds that Plaintiffs have not established a likelihood of success on the merits of the claims at issue on the Motion.

## IV.    Remaining Factors

Because the Court does not find a likelihood of success on the merits of Plaintiffs' claims relating to the Motion, the Court need not address the remaining factors. *See Pashby,* 709 F.3d at 320. The Court notes that even if they were considered, the remaining factors collectively weigh against a preliminary injunction. As to the likelihood of irreparable harm, Plaintiffs correctly assert that as a legal matter, the denial of a constitutional right, if established, would qualify as irreparable harm. *Ross v. Meese,* 818 F.2d 1132, 1135 (4th Cir. 1987); *see also Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion) (finding that infringement on a First Amendment right, even for "minimal periods of time, unquestionably constitutes irreparable injury"). However, the likelihood of irreparable harm on this basis is dependent on the likelihood of success on the merits of the claim. *See Miranda v. Garland,* 34 F.4th 338, 365 (4th Cir. 2022).

Plaintiffs have not shown that the other asserted forms of irreparable harm are likely to occur. To establish irreparable harm, a plaintiff "must make a 'clear showing' that it will suffer

38

JA864

harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline,*
*LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v.*
*Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Though an arrest and conviction
for a felony firearm offense may permanently prevent a plaintiff from possessing a firearm,
Plaintiffs have not shown a likelihood of this outcome. While the Court has found a sufficient
possibility that the County would enforce Chapter 57 to establish standing, Plaintiffs have not
provided any examples of prosecutions against permit holders for possessing a firearm in the
scenarios they have referenced, such as a prosecution for possessing a firearm on a public street or
area that happens to be within 100 yards of a place of public assembly, or for carrying a firearm at
a place of worship with the permission of the leadership of that institution. Nor have they
established that a specific incident of violence for which a firearm would be necessary for self-
defense is imminent or likely.

Even to the extent that the irreparable harm prong could be deemed to be satisfied, the
Court finds that the balance of the equities and the public interest weigh against a preliminary
injunction. When one party is the Government, these two factors merge and are properly
considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). *Bruen* expressly prevents a Court
from considering the public interest, including considerations such as the sharp increase in the
number of mass shootings in American communities, in assessing whether a firearm restriction is
unconstitutional under the Second Amendment. *Bruen*, 142 S. Ct. at 2129–30. Whether a
preliminary injunction should be entered relating to the time period before a final determination
on constitutionality is made, however, is a different question for which the public interest must
expressly be considered. *See Winter*, 555 U.S. at 20, 26. Here, the County argues that the
amendments in Bill No. 21-22E serve the public interest of reducing the risk of gun violence in

39

JA865

places where vulnerable populations are found and cites statistics demonstrating that deaths from gun violence in 2020 were the highest of any year with recorded data, and that gun violence in the County increased significantly from 2021 to 2022. Opp'n at 42. Thus, there is a public interest in not prematurely enjoining Section 57-11 before a final determination on constitutionality is made.

Although Plaintiffs allege that there is a particular need at the present time for individual members of religious congregations to carry firearms while attending services to protect against attacks based on religious discrimination, Section 57-11 does not prohibit the carrying of firearms by security guards at places of worship, nor does it limit the number of security guards that a place of worship may have. Plaintiffs also have not persuasively demonstrated how the Second Amendment right to armed self-defense extends to a right to act as an armed security guard for private institutions. Thus, in considering the balance of the equities and the public interest, the Court finds that these factors weigh against a preliminary injunction, as the County's interest in protecting public safety warrants permitting the relevant parts of Section 57-11 to remain in effect until a final determination is made on their constitutionality.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction, ECF No. 54, will be DENIED. A separate Order shall issue.

Date:   July 6, 2023

THEODORE D. CHUANG
United States District Judge

40

JA866

## UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

MARYLAND SHALL ISSUE, INC.,
ENGAGE ARMAMENT, LLC,
ANDREW RAYMOND,
CARLOS RABANALES,
BRANDON FERRELL,
DERYCK WEAVER,
JOSHUA EDGAR,
I.C.E. FIREARMS & DEFENSIVE
TRAINING, LLC,
RONALD DAVID,
NANCY DAVID and
ELIYAHU SHEMONY,

      Plaintiffs,

      v.

MONTGOMERY COUNTY, MARYLAND,

      Defendant.

Civil Action No. TDC-21-1736

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, Plaintiffs' Motion

for a Temporary Restraining Order and a Preliminary Injunction, ECF No. 54, is DENIED.

Date:   July 6, 2023



THEODORE D. CHUANG
United States District Judge

JA867

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**MARYLAND SHALL ISSUE, INC.**
**9613 Harford Rd., Ste C #1015**
**Baltimore, Maryland 21234-2150**

**ENGAGE ARMAMENT LLC**
**701 E. Gude Dr., Ste 101,**
**Rockville, Maryland 20850**

**ANDREW RAYMOND**
**14819 Poplar Hill Rd**
**Darnestown, MD 20874**                          **Case No. 8:21-cv-01736-TDC (L)**

**CARLOS RABANALES**                    **Case No. 8:22-cv-01967-DLB**
**7727 Green Valley Rd,**
**Frederick, Maryland 21701**

**BRANDON FERRELL**
**40 Mountain Laurel Court**
**Gaithersburg, Maryland 20879**

**DERYCK WEAVER**
**8712 Lowell Street**
**Bethesda, Maryland 20817**

**JOSHUA EDGAR**
**8416 Flower Hill Terr.**
**Gaithersburg, Maryland 20879**

**I.C.E. FIREARMS & DEFENSIVE**
**  TRAINING, LLC,**
**24129 Pecan Grove Lane**
**Gaithersburg, Maryland 20882**

**RONALD DAVID**
**24129 Pecan Grove Lane**
**Gaithersburg, Maryland 20882**

**NANCY DAVID**
**24129 Pecan Grove Lane**
**Gaithersburg, Maryland 20882**

1

JA868

**ELIYAHU SHEMONY**
**1 Magic Mountain Court**
**Rockville, MD 20852**
  *Plaintiffs,*

        **v.**

**MONTGOMERY COUNTY,**
 **MARYLAND**
**101 Monroe Street**
**Rockville, Maryland 20850**
  *Defendant.*

---

### NOTICE OF APPEAL

        Pursuant 28 U.S.C. § 1292(a)(1), all the plaintiffs, including each plaintiff captioned

above, hereby appeal, to the United States Court of Appeals for the Fourth Circuit, the district

court's order (Docket # 83)  and memorandum opinion (Docket # 82), dated and filed on July 06,

2023, denying plaintiffs' motion for a preliminary injunction, which was filed on December 6,

2022 (Docket ## 53, 54).

                            Respectfully submitted,

                            */s/ Mark W. Pennak*

                            MARK W. PENNAK
                            MARYLAND SHALL ISSUE, INC.
                             9613 Harford Rd
                             Ste C #1015
                             Baltimore, MD 21234-21502
                             mpennak@marylandshallissue.org
                             Phone: (301) 873-3671
                             MD Atty No. 1905150005
                             District Court Bar No. 21033

Dated: July 7, 2023                    *Counsel for Plaintiffs*

                                2