## No. 23-1719

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARYLAND SHALL ISSUE, INC.; ENGAGE ARMAMENT, LLC; ANDREW RAYMOND; CARLOS RABANALES; BRANDON FERRELL; DERYCK WEAVER; JOSHUA EDGAR; I.C.E. FIREARMS & DEFENSIVE TRAINING, LLC; RONALD DAVID; NANCY DAVID; and ELIYAHU SHEMONY,

*Plaintiffs-Appellees,*

v.

MONTGOMERY COUNTY, MARYLAND,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court
For the District of Maryland
Case No. 8:21-cv-01736
District Judge Theodore D. Chuang

———————————

## BRIEF OF AMICUS CURIAE STATE OF MONTANA AND 18 OTHER STATES SUPPORTING PLAINTIFFS-APPELLEES AND REVERSAL

AUSTIN KNUDSEN
 *Montana Attorney General*

MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

CHRISTIAN B. CORRIGAN
 *Solicitor General*

PETER M. TORSTENSEN, JR.
 *Assistant Solicitor General*

*Counsel for Amicus Curiae
State of Montana*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................ii

INTERESTS OF AMICI CURIAE....................................................... 1

SUMMARY OF ARGUMENT ............................................................ 2

ARGUMENT..................................................................................... 4

I.   The County fails to show that its places-of-public-assembly restrictions align with this Nation's historical tradition of firearm regulations. ................................................................. 7

    A. The County's limited historical evidence, far removed from the founding, fails to establish a historical tradition of similar place-of-worship restrictions. ...................................................... 9

    B. The County's reliance on late-nineteenth century statutes and local ordinances fails to support a historical tradition of public-carry bans in public parks. ........................................................ 16

    C. The County fails to produce relevantly similar historical public carry restrictions in recreational and multipurpose exhibition facilities and public libraries. .................................................... 23

    D. Buffer zones surrounding non-"sensitive places" are categorically unconstitutional, and the constitutionality of those surrounding "sensitive places" is dubious. ...................... 29

CONCLUSION ............................................................................... 31

CERTIFICATE OF COMPLIANCE ................................................. 35

CERTIFICATE OF SERVICE ......................................................... 35

## TABLE OF AUTHORITIES

### CASES

*Andrews v. State,*
    50 Tenn. 165 (1871) ....................................................... 25-26

*Atkinson v. Garland,*
    70 F.4th 1018 (7th Cir. 2023) ...................................... 10, 18

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................... *passim*

*English v. State,*
    35 Tex. 473 (1872) ......................................... 13, 26, 28-29

*Gamble v. United States,*
    139 S. Ct. 1960 (2019) .............................................. 31-32

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ................................... 8, 12, 13-14, 26

*Hill v. State,*
    53 Ga. 472 (1874) ........................................................ 13

*Konigsberg v. State Bar of Cal.,*
    366 U.S. 36 (1961) .......................................................... 4

*Koons v. Platkin,*
     2023 U.S. Dist. LEXIS 85235 (D.N.J. May 16, 2023) ................ 17-18

*McDonald v. City of Chi.,*
    561 U.S. 742 (2010) ................................................... 1, 32

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    142 S. Ct. 2111 (2022) ............................................. *passim*

*Range v. Att'y Gen.,*
    69 F.4th 96 (3d Cir. 2023) ............................................. 14

*United States v. Daniels,*
    2023 U.S. App. LEXIS 20870 (5th Cir. Aug. 9, 2023) ..................... 22

*Wolford v. Lopez,*
   2023 U.S. Dist. LEXIS 138190 (D. Haw. Aug. 8, 2023) ................... 21

*Young v. Hawaii,*
   896 F.3d 1044 (9th Cir. 2018) ................................................. 13, 26

STATUTES AND ORDINANCES

Acts of Assemb. Relating to Fairmont Park,
   §21.II (1870) ....................................................... 18, 20-21

A Digest of the Ordinances of Town Council of
   the Borough of Phoenixville, §1(4) (1906) ....................... 20

A Digest of the Laws & Ordinances, Reading,
   Pa. §20(8) (1897) ................................................. 19

Amends. to Chi. Revised Mun. Code, ch. XLV,
   art. I, §1562 (1905)............................................... 19

Annual Reps. of the City Officers & City Boards
   of the City of Saint Paul, Minn., §7 (1888) .................... 20

Ariz. Terr. Sess. Laws, Act No. 13, §3 ................... 14-15, 24-25, 28

Charter of the City of Wilmington, Del.,
   pt. VII, §7 (1893) ................................................ 20

City of Trenton, N.J., Charter & Ordinances,
   §8 (1903) .......................................................... 20

Code of the City of Birmingham, Ala., ch. XLIV,
   §1544 (1917) ...................................................... 19

Code of the City of Staunton, Va., ch. II, §135 (1910) .................... 19

First Annual Rep. on the Improvement of the
   Central Park, New York (1857 ................................... 16, 20

Ga. Acts & Resolutions, Gen. Assemb., Sess.,
   Act No. 285, §1 (1870)......................................... 11

Gen. Digest of Ordinances & Resolutions, New
   Orleans, La., art. 1 (1831)) ..................................... 24

Gen. Mun. Ordinances of the City of Oakland,
Cal., §9 (1909) ................................................................ 20

Gen. Ordinances of Columbia, Mo., ch. XVII,
§163 (1890)..................................................................... 16

Laws & Ordinances, Williamsport, Pa., §1(21) (1891) .................... 19

Mich. Local Acts, Reg. Sess., §44 ................................. 18, 22

Minn. Laws, ch. 344, § 53 (1905) .................................... 18

Mont. Gen. Laws, ch. XXXV, §3 (1903 ...................................... 28, 29

Montgomery Cnty. Code § 57-1 (2022) ............................... 2

Montgomery Cnty. Code § 57-11(a) (2022)............................. 2

Mo. Gen & Local Laws, 28th Gen. Assemb.,
Reg. Sess. §1 (1875) ................................................... 11

Mo. Rev. Stats., 30th Gen. Assemb., vol. 1, ch. 24,
art. I, §1274 (1879)..................................................... 28, 29

N.C. Sess. Laws, Pub. Laws Extra Sess., ch. 6,
§3 (1921) .............................................................. 19, 22

N.M. Terr. Laws, Second Legis. Assemb., §3 (1852) ............... 24, 25

Revised Ordinances, Boulder, Colo., §511 (1899) ........................ 19

Revised Ordinances of Huntsville, Mo., §1 (1894) ........................ 16

Okla. Terr. Stats., ch. 25, art. 47, §§1, 2, 7 (1890) .................. 15, 25

Okla. Terr. Stats., ch. 25, art. 45, §7 (1893) .................................. 28

Tex. Gen. Laws, 12th Leg., Called Sess., ch. XLVI,
§1 (1870) ............................................................. 11, 24, 28

Tenn. Acts, 36th Gen. Assemb., First Sess., ch. XXII,
§2 (1870) .................................................................. 24

Va. Acts & Joint Resolutions, Gen. Assemb., 2d Sess.,
ch.7, §21 ................................................................. 11

iv

Wis. Sess. Laws, ch. 668, §29.57(4) (1917)) ................................ 18-19

## Publications

David B. Kopel & Joseph G.S. Greenlee, *The 'Sensitive Places' Doctrine*, 13 Charleston L. Rev. 205, 289 (2018) ........ 7, 27, 29-30

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 215 (2006) ...................... 14

William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13–14 (2019) ....................................... 8-9

INTERESTS OF AMICI CURIAE

Just over a year ago, the Supreme Court again reminded lower courts that the right to keep and bear arms "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2156 (2022) (quoting *McDonald v. City of Chi.*, 561 U.S. 742, 780 (2010) (plurality op.)). Even so, district courts across the country, including the district court here, continue to defer to legislative "judgments regarding firearm regulations" despite *Bruen*'s declaration that "judicial deference to legislative interest balancing … is not [the] deference that the Constitution demands." *Id.* at 2131. Rather, "'the right of law-abiding, responsible citizens to use arms' for self-defense" stems from a balance struck by the American people that demands courts' "unqualified deference." *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).

To be sure, courts may use analogies to "historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 2133. And that analogical inquiry requires courts to determine whether a modern and historical regulation are

"relevantly similar"—that is, whether they impose a comparable burden and are comparably justified. *Id.* at 2132–33. To ensure that courts properly employ the "nuanced approach" that *Bruen*'s analogical inquiry requires, the States of Montana, Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, South Carolina, South Dakota, Texas, West Virginia, and Wyoming ("Amici States") submit this amicus brief in support of Plaintiffs-Appellants. Amici States urge this Court to reverse the decision below.

## SUMMARY OF ARGUMENT

In its current form, Section 57 of the Montgomery County Code prohibits the sale, transfer, or possession of firearms "[i]n or within 100 yards of a place of public assembly." Montgomery Cnty. Code §57-11(a) (2022). As relevant here, Section 57 defines "place of public assembly" as a list of enumerated locations, including a publicly or privately owned "park," "place of worship," "school," "library," "recreational facility," "multipurpose exhibition facility," or "childcare facility." *Id.* §57-1. And each "place[] of public assembly" includes "all property associated with the place, such as a parking lot or grounds of a building." *Id.*

2

Plaintiffs Maryland Shall Issue, Inc. ("MSI"), Engage Armament, LLC, I.C.E. Firearms & Defensive Training, LLC, and eight individuals,[1] allege that these place-of-public-assembly restrictions violate their "constitutional right to bear arms in public for self-defense." *Bruen*, 142 S. Ct. at 2156.[2] The district court denied MSI's motion for preliminary injunction in its entirety, finding either that MSI lacked standing to assert certain claims or that it was unlikely to succeed on the merits. JA834–864.

Contrary to the district court, the County failed to "affirmatively prove that its [place-of-public-assembly] regulation [s are] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. *Bruen* demonstrated that the historical record supports a broad right to carry a firearm in public, subject to well-defined restrictions on the manner of carry and permissible arms, as well as *some* longstanding "sensitive locations" where firearms could

---

[1] For ease of reference, the brief refers to all plaintiffs as "MSI" and to defendant as the "County" unless otherwise indicated.

[2] The brief omits discussion of the prior procedural history in the case—thoroughly summarized in the district court opinion, *see* JA828–832—and instead focuses on the background relevant for this Court's review.

be largely prohibited. *See id.* at 2133, 2138, 2150, 2156. But apart from a handful of state laws, local ordinances, and territorial statutes enacted during the late nineteenth century—often more than a century removed from the founding—the historical record doesn't show an "enduring American tradition" of restricting the right to carry in places of worship, public parks, recreational and multipurpose exhibition facilities, public libraries, or in buffer zones surrounding those locations. *Id.* at 2155–56.

## ARGUMENT

After *Bruen*, courts must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, "the Constitution presumptively protects that conduct." *Id.* And here, the Amendment's plain text "protects [MSI]'s proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 2134. To justify its place-of-public-assembly restrictions, or "sensitive place" restrictions, the County "must demonstrate that the regulation[s are] consistent with this Nation's historical tradition of firearm regulation"—only then "may a court conclude that [MSI's proposed] conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

*Bruen*'s historical inquiry varies based on whether a challenged regulation addresses a longstanding "societal problem" or "unprecedented societal concerns or dramatic technological changes." *Id.* at 2131–32. In both cases, courts must compare modern regulations with similar historical regulations, but the difference is the fit necessary to show that a modern regulation aligns with our Nation's historical tradition of firearm regulation. *See id.* When a modern regulation addresses an issue that has persisted since the eighteenth century, the modern and historical regulations should be a close fit. *See id.* at 2131 (explaining that, in these "straightforward" cases, the "lack of … distinctly similar historical regulation[s]" addressing the same problem or the presence of regulations addressing it "through materially difference means" is relevant evidence that the modern regulation is unconstitutional).

But when evaluating regulations "that were unimaginable at the founding," courts must employ "a more nuanced approach." *See id.* at 2132. In these cases, the fit need not be so close: the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133. Even so, *Bruen*'s analogical inquiry requires courts to determine that a modern regulation is "relevantly similar" to a

proposed historical analogue—that is, that the "modern and historical regulations impose a comparable burden on the right of armed self-defense and … [are] comparably justified." *Id.* at 2133.

Whether the modern regulation addresses longstanding or new societal problems, discerning "the *original meaning* of the Constitution" remains the guiding light of *Bruen*'s analogical inquiry. *Id.* at 2162 (Barrett, J., concurring).

To be sure, *Bruen* assumed that "it [was] settled" that certain locations—including schools, government buildings, and polling places—were "sensitive places" where carrying a firearm "could be prohibited consistent with the Second Amendment." *Id.* at 2133. But *Bruen*'s list of "settled" sensitive places *omits* places of worship, parks, recreational facilities, multipurpose exhibition facilities, public libraries, and buffer

zones, so the County must still show that these regulations are part of an

enduring American tradition of firearm regulation.[3]

## I.   The County fails to show that its places-of-public-assembly restrictions align with this Nation's historical tradition of firearm regulations.

*Heller* and *Bruen* chart the course for determining whether modern

firearm regulations are consistent with the Second Amendment's text

and history.  And that course requires courts to compare the County's

historical evidence with the "'historical precedent' from before, during,

and even after the founding" to see if those historical materials show "a

comparable tradition of regulation."  *Id.* at 2131–32.

Even though the County's obligation to respect MSI's right to keep

and bear arms flows from the Fourteenth Amendment, not the Second,

---

[3] *Bruen*'s (and *Heller*'s) omission of these locations from the list of "sensitive places" suggests that they haven't historically been viewed as "sensitive places."  And some scholars are skeptical that there is a persuasive "rationale for extending the 'sensitive places' doctrine to places that are not schools or government buildings."  David B. Kopel & Joseph G.S. Greenlee, *The 'Sensitive Places' Doctrine*, 13 CHARLESTON L. REV. 205, 289 (2018).  As for schools, the historical record is unclear as to the reason for treating schools as "sensitive places," but it's likely because they are "places where most persons therein are minors (K-12 schools)."  *Id.* at 289–90.  So the district court's conclusion that public institutions of higher education are "sensitive places" is suspect because, unlike public primary and secondary schools, the student population at these institutions aren't composed mostly of minors.  *See* JA846–847.

the rights enumerated in the Bill of Rights and incorporated against the States after the Fourteenth Amendment's adoption "have the same scope as against the Federal Government." *Id.* at 2137. And the scope of that right is generally "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id.*; *see also id.* at 2136 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" (internal quotations omitted) (emphasis in original)).

*Bruen* cautioned courts "against giving postenactment history more weight than it can rightly bear." *Id.* at 2136. So while a regular course of conduct *can* sometimes "liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution," *id.* (cleaned up), "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text," *id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)); *see also* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13–14 (2019) (liquidation requires indeterminacy because "[i]f first-order

interpretive principles make the meaning clear in a given context, there is no need to resort to liquidation").

To determine whether the County has carried its burden to "affirmatively prove that its [place-of-public-assembly] regulation[s are] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127, this Court must evaluate the historical evidence the County offered in support of its restrictions, including in places of worship, public parks, recreational and multipurpose exhibition facilities, public libraries, and buffer zones.

## A. The County's limited historical evidence, far removed from the founding, fails to establish a historical tradition of similar place-of-worship restrictions.

*Heller* found that the Second Amendment, ratified in 1791, "codified a preexisting right" that "was … rooted in 'the natural right of resistance and self-preservation.'" *Id.* at 2157 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 594). So historical evidence close in time to the Amendment's adoption provides the most relevant insight into its original meaning. *See id.* at 2137 (quoting *Heller*, 554 U.S. at 614). Yet the County offers *no evidence* of any historical place-of-worship regulation between 1791 and 1868. None. Because the County bears the burden to rebut MSI's

presumptively constitutional right to bear arms in public, including at places of worship, its failure to produce evidence of similar laws during this period strongly suggests no such tradition existed. *See id.* at 2150 (not the court's burden "to sift the historical materials for evidence to sustain" the challenged regulations).

But even if the district court is correct that historical evidence closer in time to the ratification of the Fourteenth Amendment is "equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states,"[4] *see* JA844, the County's historical evidence still fails to support the existence of a historical tradition of similar place-of-worship restrictions. Rather, the County cobbles together a handful late nineteenth-century state and territorial statutes and local

---

[4] The district court's conclusion here is shaky at best. *See Bruen*, 142 S. Ct. at 2137 (explaining that "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources'" (quoting *Heller*, 554 U.S. at 614)); *see also Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) (explaining that "the pertinent question … is what the Founders understood the Second Amendment to mean" and noting that *Bruen* "cautioned against giving too much weight to laws passed [long] before or after the Founding"). But the County's evidence fails to show a relevant historical tradition in either period, so this Court need not resolve that thorny question.

ordinances that shed little if any light on the original understanding of the scope of the public-carry right.

***State Statutes.*** The County identified four place-of-worship restrictions, enacted between 1870 and 1878, in Georgia, Texas, Missouri, and Virginia. JA849. In 1870, both Georgia and Texas enacted laws prohibiting the possession of pistols, revolvers, and other dangerous weapons in churches or other places of worship. Ga. Acts & Resolutions, Gen. Assemb., Sess., Act No. 285, §1 (1870) (JA544); Tex. Gen. Laws, 12th Leg., Called Sess., ch. XLVI, §1 (1870) (JA557). And between 1875 and 1878, Missouri and Virginia enacted substantially similar prohibitions. Mo. Gen & Local Laws, 28th Gen. Assemb., Reg. Sess., at 50, §1 (1875) (JA562); Va. Acts & Joint Resolutions, Gen. Assemb., 2d Sess., ch.7, §21 (1878) (JA569).

But four statutes passed between 1870 and 1878 provide little insight into whether place-of-worship restrictions, like the County's, align with the Second Amendment's original scope. *See Bruen*, 142 S. Ct. at 2136 (cautioning courts "against giving postenactment history more weight than it can rightly bear"). As *Bruen* explained, the historical evidence supported the existence of a broad right to carry firearms in public

11

for self-defense.  *See id.* at 2156.  So "the bare existence of [some] localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry."  *See id.* at 2154. So too here.  And the "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text"— like the handful of laws identified in Texas, Georgia, Missouri, and Virginia—is insufficient to "overcome or alter that text." *Id.* (quoting *Heller*, 670 F.3d at 1274 n.6).

The district court erroneously discounted MSI's evidence that some states, including Georgia and Virginia, required individuals to carry firearms to places of worship because both Georgia and Virginia later amended those laws to prohibit public carry in places of worship.[5] JA864. But at that time, Georgia courts made clear that they understood the Second Amendment to secure, not an individual right, but a collective

---

[5] The district court assumed MSI needed to rebut the County's evidence of analogous place-of-worship restrictions.  *See* JA863–864 (stating that there was no evidence in the record "that during the relevant historical time period … [similar] restrictions … were 'rejected on constitutional grounds'" (quoting *Bruen*, 142 S. Ct. at 2131)).  Not so.  The burden to "*affirmatively prove* that these [place-of-worship] regulation [are] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *see Bruen*, 142 S. Ct. at 2127 (emphasis added), rests on the County's shoulders.  This Court should ensure it stays there.

right to keep and bear arms tied to militia service. *See, e.g.*, *Hill v. State*, 53 Ga. 472, 475 (1874) ("In what manner the right to keep and bear these pests of society [dirks, bowie knives, and more], can encourage or secure the existence of a militia, and especially of a well regulated militia, I am not able to d[i]vine."). Likewise, Texas courts during that time also understood the Second Amendment to secure a collective, and not individual, right to keep and bear arms. *English v. State*, 35 Tex. 473, 476 (1872) ("The word 'arms' in the connection we find it in the Constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense.").[6] But *Heller* and *Bruen* both soundly rejected that conception of the right. *See, e.g.*, *Young v. Hawaii*, 896 F.3d 1044, 1057–58 (9th Cir. 2018) (explaining that "*Heller* knocks out the load-bearing bricks in the foundation" of cases holding that the Second Amendment was only a right to be exercised in connection with a militia). Because these cases reflect a conception of the Second Amendment that's "*inconsistent* with the original meaning of the constitutional text" they

---

[6] *English* even appears to concede that the law under review "was an *innovation* upon the customs and habits of the people." 35 Tex. at 479 (emphasis added). It justified that "innovation" because "the latter half of the nineteenth century is not too soon for Christian and civilized States to legislate against any and every species of crime." *Id.* at 479–80.

provide no historical support for the County's place-of-worship restriction. *See Bruen*, 142 S. Ct. at 2154 (quoting *Heller*, 670 F.3d at 1274 n.6).

Nor does Virginia's decision in 1878 to prohibit public carry in places of worship support the existence of a historical tradition of similar restrictions. It wasn't until 1971 that Virginia enacted an analogous provision in its state constitution to safeguard the right to keep and bear arms. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 215 (2006). And because Virigina had provided no state constitutional protection for that right when it passed its place-of-worship restriction in 1878, "it's unclear what [that] law[] prove[s] about the contours of the *Second Amendment* right." *Range v. Att'y Gen.*, 69 F.4th 96, 108 (3d Cir. 2023) (en banc) (Porter, J., concurring); *see also Bruen*, 142 S Ct. at 2162 (Barrett, J., concurring) (discerning "the *original meaning* of the Constitution" is the focus of the inquiry).

**Territorial Statutes.** The County also identified late nineteenth-century place-of-worship restrictions from two western territories—Arizona and Oklahoma. JA849. In 1889, Arizona barred persons from carrying pistols or other firearms "into any church or religious assembly."

14

Ariz. Terr. Sess. Laws, 15th Legis. Sess., Act No. 13, §3 (1889) (JA597). The next year, Oklahoma did the same. Okla. Terr. Stats., ch. 25, art. 47, §§1, 2, 7 (1890) (JA603–604).

For the same reasons *Bruen* identified, these restrictions provide little support for the County's place-of-worship restriction. *See* 142 S. Ct. at 2154–56. *First*, this Court should not "stake [its] interpretation on [two] temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, [that] governed less than 1% of the American population," and that conflict with "'the overwhelming weight' of other, more contemporaneous historical evidence" regarding the right to carry firearms in public for self-defense. *Id.* at 2154–55. *Second*, "these territorial laws were rarely subject to judicial scrutiny," so "the basis for their perceived legality is unclear." *Id.* at 2155. *Third*, many territorial laws were short-lived, so they "appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation." *Id.* at 2155. *Bruen* found these territorial statutes to be of little instructive value, and so should this Court.

15

*Local Ordinances.* The County also pointed to two late nineteenth century local ordinances in Missouri—in Columbia and Huntsville—that prohibited carrying firearms or other dangerous weapons into churches or places of religious assembly. Gen. Ordinances of Columbia, Mo., ch. XVII, §163 (1890) (JA601); Revised Ordinances of Huntsville, Mo., at 58–59, §1 (1894) (JA624–625). But these local ordinances—passed more than two decades after Reconstruction and a century after the founding—shed little light on the meaning of the Second Amendment, especially against the backdrop of a broad right to carry firearms in public for self-defense.

## B. The County's reliance on late-nineteenth century statutes and local ordinances fails to support a historical tradition of public-carry bans in public parks.

The County points to *one* local ordinance in New York City's Central Park, enacted in 1857 by the Park's board of commissioners, that prohibited "carry[ing] firearms or … throw[ing] stones or other missiles" in the Park. First Annual Rep. on the Improvement of the Central Park, New York, at 106 (1857) (JA526). But "the bare existence of [a single] localized restriction[]" between 1791 and 1868 "cannot overcome the overwhelming evidence of an otherwise enduring American tradition

permitting public carry." *Bruen*, 142 S. Ct. at 2154. For similar reasons to those discussed above, *see* Sect.I.A, the County's failure to point to more than a single local ordinance during this time falls far short of affirmatively establishing a historical tradition of restricting public carry in public parks.

Even so, the district court found that County established a "historical precedent" of a "comparable tradition of regulation" by pointing to state laws and local ordinances passed after 1868. JA852 (quoting *Bruen*, 142 S. Ct. at 2131–32); *see also* JA850–852. Yet even a cursory look at the County's so-called "historical precedent" reveals at most only feeble support for a historical tradition of categorically banning public carry in public parks.

*Bruen* directs courts to canvas the period around the founding and through Reconstruction for similar regulations, always with an eye to "what the Founders understood the Second Amendment to mean." *Atkinson*, 70 F.4th at 1020. And because public parks have existed, in some form or another, since the founding, *see, e.g.*, *Koons v. Platkin*, 2023 U.S. Dist. LEXIS 85235, at *250–55 (D.N.J. May 16, 2023) (tracing historical evidence for parks, or their historical analogues, to the establishment of

Boston Common in 1634), the County must point to "distinctly similar regulation[s] addressing *that* problem." *Atkinson*, 70 F.4th at 1020 (emphasis added).

**State Statutes.** The County identified public-carry restrictions in public parks—passed between 1870 and 1921—in Pennsylvania, Michigan, Minnesota, Wisconsin, and North Carolina. In 1870, Pennsylvania prohibited persons from "carry[ing] fire-arms[] or shoot birds in [Fairmont] Park." Acts of Assemb. Relating to Fairmont Park, at 18 §21.II (1870) (JA552). A quarter-century later, Michigan restricted public carry in Detroit's public parks, providing that "[n]o person shall fire or discharge any gun or pistol or carry firearms, or throw stones or other missiles within said park … *without the permission of said commissioners*." Mich. Local Acts, Reg. Sess., at 596 §44 (1895) (emphasis added) (JA633). Ten years later, Minnesota banned hunting and trapping in "state public park[s]" and thus prohibited carrying firearms in "any such park" unless the firearm was unloaded and sealed by a park commissioner. Minn. Laws, ch. 344, §53 (1905) (JA658). Twelve years later, Wisconsin banned hunting and trapping in "any wild life refuge, state park, or state fishery lands" and thus barred possessing a "gun or rifle" unless it was unloaded

and secured in a carrying case. Wis. Sess. Laws, ch. 668, §29.57(4) (1917) (JA676–677). And in 1921, North Carolina required people to first obtain written permission from the owner or manager of a public park before carrying a firearm into that park. N.C. Sess. Laws, Pub. Laws Extra Sess., at 54, ch. 6, §3 (1921) (JA679).

*Local Statutes and Ordinances.* Along with the 1857 Central Park ordinance, the County pointed to eleven other local statutes and ordinances—passed between 1888 and 1921—that imposed public-carry restrictions in public parks. These restrictions applied either to specific parks or to public parks in those cities. *See, e.g.*, Laws & Ordinances, Williamsport, Pa., at 141, §1(21) (1891) (Brandon Park) (JA608); A Digest of the Laws & Ordinances, Reading, Pa., at 240, §20(8) (1897) (Penn's Common) (JA638); Revised Ordinances, Boulder, Colo., at 157, §511 (1899) (public parks in Boulder) (JA642); Amends. to Chi. Revised Mun. Code, ch. XLV, art. I, §1562 (1905) (city parks in Chicago) (JA655); Code of the City of Staunton, Va., ch. II, §135 (1910) (city parks in Staunton) (JA671); Code of the City of Birmingham, Ala., ch. XLIV, §1544 (1917) (city parks in Birmingham) (JA673–674).

Yet many of the local ordinances prohibited people from "carry[ing] firearms or *shoot[ing] birds*" in public parks. Annual Reps. of the City Officers & City Boards of the City of Saint Paul, Minn., at 689 §7 (1888) (emphasis added) (JA592); *see also* Charter of the City of Wilmington, Del., pt. VII, §7 (1893) (similar) (JA613); City of Trenton, N.J., Charter & Ordinances, at 390 §8 (1903) (similar) (JA651); A Digest of the Ordinances of Town Council of the Borough of Phoenixville, at 135 §1(4) (1906) (similar) (JA666); Gen. Mun. Ordinances of the City of Oakland, Cal., at 15 §9 (1909) (similar) (JA669).

For three reasons, the County fails to establish a historical tradition of "relevantly similar" regulations. *First*, nearly all of the seventeen state statutes and local ordinances the County points to were enacted more than 20 years after Reconstruction—in some cases, *more than 40 years*—so even if Reconstruction-era evidence is more probative, the district court still erred by giving that evidence "more weight than it can rightly bear." *Bruen*, 142 S. Ct. at 2136. The only pre-1868 evidence was an 1857 ordinance restricting public carry in Central Park. JA526. And the only other close-in-time restriction was an 1870 Pennsylvania statute that banned public carry and shooting birds in Fairmont Park—a

20

restriction apparently drawn to prevent hunting in the public park. JA552. Every other statute or local ordinance that the County identified was passed between 1888 and 1921—*20 to 53 years following Reconstruction*. Even if these regulations were relevantly similar, they are far too late-in-time to establish the existence of a historical tradition of public-carry restrictions in parks. *See Wolford v. Lopez*, 2023 U.S. Dist. LEXIS 138190, \*65–68 (D. Haw. Aug. 8, 2023) (rejecting the district court's reliance *here* on "one local ordinance and one state law … to find that there was a national historical tradition of prohibiting the carrying of firearms at parks at the time of the Fourteenth Amendment's ratification").

*Second*, the state statutes and local ordinances applied to a narrow cross-section of the population, so the County's evidence fails to establish the existence of a *national* tradition of similar regulations. *See Bruen*, 142 S. Ct. at 2154. The County identified laws in five states—Pennsylvania, Michigan, Minnesota, Wisconsin, and North Carolina—but the Pennsylvania law applied only to a single park and the Michigan law applied only to Detroit public parks. Even if all these laws applied broadly across all five states, they would still fail to establish a national tradition of similar regulations. Nor do the twelve local ordinances change the

calculus—at most, it suggests that twelve local communities had a tradition of regulating public carry in parks, but that still leaves *the rest* of the country under a presumed right of public carry. *See United States v. Daniels*, 2023 U.S. App. LEXIS 20870, *12 (5th Cir. Aug. 9, 2023) (finding that *Bruen* requires courts to construe "silence" in the historical record "as evidence that the public did not approve of such a regulation" so long as "the public experienced the harm the modern-day regulation attempts to address").

*Third*, many of these statutes and local ordinances either didn't impose a comparable burden on the public carry right or weren't comparably justified. *See Bruen*, 142 S. Ct. at 2133. For example, the Michigan and North Carolina statutes both permitted public carry in the parks if the person obtained permission beforehand, *see* Mich. Local Acts, §44 (no public carry in Detroit parks "without the permission of said commissioners") (JA633); N.C. Sess. Laws, ch. 6, §3 (no public carry in parks without prior written permission) (JA679), so these statutes imposed less of burden on the right than §57-11's complete ban. And many of the state statutes—in Pennsylvania and Minnesota—and local ordinances—in Saint Paul, Minnesota; Wilmington, Delaware; Trenton, New Jersey;

Phoenixville, Pennsylvania; and Oakland, California—were enacted to prevent unlawful hunting in public parks, so they were not designed to address the same public safety interest that §57-11 targets. These differences substantially diminish the weight of the County's evidence.

### C. The County fails to produce relevantly similar historical public carry restrictions in recreational and multipurpose exhibition facilities and public libraries.

The district court found that the historical evidence supporting public-carry restrictions in parks also lent historical support for §57-11's similar restrictions in recreational and multi-purpose exhibition facilities because both "are locations at which large numbers of people gather to engage in recreation." JA853. But the district court's analysis falters for two reasons. For one, the County's historical evidence fails to show a historical tradition of regulating public parks as "sensitive places," *see supra* Sect.I.B, so that same evidence likewise fails to show a historical tradition here. And another, *Bruen* rejected New York's similar attempt to broadly define sensitive places as "all places of public congregation that are not isolated from law enforcement," *see* 142 S. Ct. at 2133–34; this Court should do the same here.

***State Statutes.*** In 1870, Tennessee and Texas prohibited carrying pistols, six-shooters, guns, and other dangerous weapons in various public gatherings, including fairs, race courses, ball rooms, social parties, and other public assemblies. Tenn. Acts, 36th Gen. Assemb., First Sess., ch. XXII, §2 (1870) (banning carry "for any person attending any fair, race course, or other public assembly of the people") (JA541–542); Texas Gen. Laws, ch. XLVI, §1 (banning carry in "a ball room, social party or other social gathering composed of ladies and gentlemen") (JA557).

***Local Ordinances.*** The County also pointed to a New Orleans ordinance, adopted in 1817, that prohibited entering "a public ball-room with any cane, stick, sword or any other weapon." Gen. Digest of Ordinances & Resolutions, New Orleans, La., at 371, art. 1 (1831) (JA507).

***Territorial Statutes.*** In 1852, the Territory of New Mexico required persons "desiring to give a [b]all or [f]andango" to obtain a license, which required the licensee to refuse entry to persons "with fire arms or other deadly weapons" whenever alcohol was served. N.M. Terr. Laws, Second Legis. Assemb., at 67–68, §3 (1852) (JA523–524). In 1889 and 1890, the Territories of Arizona and Oklahoma, respectively, banned firearms in places "where persons are assembled for amusement," including

"any circus, show or public exhibition of any kind, or into any ball room, social party or social gathering." Ariz. Terr. Sess. Laws, Act No. 13, §3 (JA597); Okla. Terr. Stats., ch. 25, art. 47, §7 (same) (JA604).

The County's historical evidence suffers from many of the same deficiencies plaguing its place-of-worship and public-park restrictions. *See supra* Sect.I.A.–B. That is, it identifies only two pre-1868 restrictions—an 1817 local ordinance and an 1852 territorial statute—one of which only restricted public carry whenever alcohol was served. *See* N.M. Terr. Laws, §3 (JA523–524). Only one of these two restrictions, the New Orleans ordinance, imposed a comparable burden (complete ban), but a single ordinance in one city is "too slender a reed on which to hang a historical tradition of restricting the right to public carry" in similar recreational facilities. *See Bruen*, 142 S. Ct. at 2149.

While the County identified two state laws, passed in 1870, that restricted public carry in locations arguably analogous to recreational and multipurpose exhibition facilities, both states—Tennessee and Texas—understood the Second Amendment to secure only a militia-connected right to keep and bear arms. *See, e.g.*, *Andrews v. State,* 50 Tenn. 165, 177–78 (1871) (holding a state law unconstitutional to the extent

that it bars the public carry of a "soldier's weapon"); *see also English*, 35 Tex. at 476 ("The word 'arms' in the connection we find it in the Constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense."). But *Bruen* and *Heller* soundly rejected that understanding of the Second Amendment right, so those statutes fail to provide historical support for the County's regulation. *See Bruen*, 142 S. Ct. at 2154 (quoting *Heller*, 670 F.3d at 1274 n.6); *see also Young*, 896 F.3d at 1057–58 ("*Heller* knocks out the load-bearing bricks in the foundation [of cases holding that the Second Amendment protects only militia-connected right].").

Nor do the County's remaining territorial statutes change the calculus. For one, the Arizona and Oklahoma territorial statutes—passed in 1889 and 1890, respectively—post-date Reconstruction by more than 20 years, so they shed little light on "the *original meaning* of the [Second Amendment]." *See Bruen*, 142 S. Ct. at 2162 (Barrett, J., concurring). And another, many territorial laws were short-lived and thus could not claim any "part of an enduring American tradition of state regulation," *see id.* at 2155, so these laws provide little insight into the scope of the public-carry right.

26

Turning to public libraries, the district court found that because "all public libraries in Montgomery County are in government buildings, which are 'sensitive places'" under *Bruen*, §57-11's public-carry restrictions in public libraries are permissible.  JA854.  But the district court read *Bruen*'s (and by extension *Heller*'s) reference to government buildings too broadly.  *See Bruen*, 142 S. Ct. at 2133 (noting "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'" (quoting *Heller*, 554 U.S. at 626)).  *Bruen* explained that the relevant historical record for "'sensitive places' where weapons were altogether prohibited" included "legislative assemblies, polling places, and courthouses."  *Id.*; *see also* Kopel & Greenlee, *supra* note 3, at 289 (observing that "gun bans in certain government buildings … have historical precedent, [but] bans that apply to *all* government buildings do not.").  So *Bruen* concluded that it "was settled that *these locations*"—"*e.g.*, legislative assemblies, polling places, and courthouses"—"were 'sensitive places' where arms carrying could be regulated consistent with the Second Amendment."  142 S. Ct. at 2133 (emphasis added).  Thus, the County must show historical evidence for §57-11's public-library restriction.

***State Statutes.***   In 1870, Texas prohibited carrying firearms into "any school room or other place where persons are assembled for educational, literary or scientific purposes."  Texas Gen. Laws, ch. XLVI, §1 (JA557).  And the County pointed to two other state laws—passed 11 to 35 years after Reconstruction—that banned *concealed carry* in "any school room or place where people have assembled for educational, literary or social purposes."  Mo. Rev. Stats., 30th Gen. Assemb., vol. 1, ch. 24, art. I, §1274 (1879) (JA573); Mont. Gen. Laws, ch. XXXV, §3 (1903) (same) (JA648–649).

***Territorial Statutes.***   Similarly, the Territories of Arizona and Oklahoma—in 1889 and 1893, respectively—banned carrying firearms into places where people were assembled for "educational or scientific purposes."  Ariz. Terr. Sess. Laws, Act No. 13, §3 (JA597); Okla. Terr. Stats., ch. 25, art. 45, §7 (1893) (JA616).

The County identifies *no* pre-1868 evidence of similar restrictions, and they only point to three post-1868 state statutes possibly imposing similar public-carry restrictions.  But for the reasons discussed above, the 1870 Texas statute is not a viable historical analogue because it relied on a now-rejected understanding of the Second Amendment right.  *See*

*English*, 35 Tex. at 476.  And neither the Missouri nor the Montana statutes—which were passed *11 to 35 years after Reconstruction*—imposed a comparable burden because they banned only concealed carry.  *See* Mo. Rev. Stats., vol. 1, ch. 24, art. I, §1274 (JA573); Mont. Gen. Laws, ch. XXXV, §3 (JA648–649); *see also Bruen*, 142 S. Ct. at 2131 ("[I]f if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.").  Nor do the Arizona and Oklahoma territorial statutes move the needle—both were passed *more than* 20 years after Reconstruction, so they provide little evidence that public-library restrictions are "part of an enduring American tradition of state regulation." *Bruen*, 142 S. Ct. at 2155.

### D. Buffer zones surrounding non-"sensitive places" are categorically unconstitutional, and the constitutionality of those surrounding "sensitive places" is dubious.

To the extent that the County's place-of-public-assembly restrictions apply to locations that are not "sensitive places" under *Bruen* and its progeny, its prohibition on carrying firearms within 100 yards of those locations violates the Second Amendment.  *See* Kopel & Greenlee, *supra* note 3, at 290 (explaining that "buffer zones are not sensitive

places" because "*Heller* allow[ed] for carry bans 'in' sensitive places," not "'around' or 'near' sensitive places"); *see also Bruen*, 142 S. Ct. at 2133 (referencing *Heller*'s discussing of laws "forbidding the carrying of firearms *in* sensitive places" (emphasis added)). So, at a minimum, §57-11's 100-yard buffer zone around places of worship, public parks,[7] recreational and multipurpose exhibition facilities, and some government buildings is unconstitutional. *See supra* Sect.I.A–C.

Nor does the County's historical evidence support its broad buffer-zone restriction. *See* JA856–857. At most, its historical evidence provides limited support for buffer zones around polling places and other election sites. *See* JA856 (citing two Maryland laws imposing buffer zones around polling places and election sites and a Louisiana law imposing a buffer zone around an election registration site). But like the County's other historical evidence, none of these laws pre-date

---

[7] Because the County fails to show a historical tradition of public-carry restrictions in public parks, *see supra* Sect.I.B, the historical evidence it marshals in support of buffer zones around parks is irrelevant. *See* JA857. But even if this Court were to consider that historical evidence, it suffers from the same flaws as the County's evidence supporting the public-park restriction, *see supra* Sect.I.B—it includes only one restriction from 1870 and every other restriction was enacted 20 years or more after Reconstruction, *see* JA857.

Reconstruction, so they provide little insight into whether such restrictions align with the Second Amendment's original meaning. And even if these laws were adequate historical analogues, it's doubtful that three laws covering four Maryland counties and the State of Louisiana are enough to establish a historical tradition of similar regulations.

## CONCLUSION

As *Bruen* explained, "when it comes to interpreting the Constitution, not all history is created equal." 142 S. Ct. at 2136. Rather, "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (quoting *Heller*, 554 U.S. at 634–35 (emphasis in original)). So evidence closer in time to the Second Amendment's adoption is most relevant for understanding the Amendment's scope. Of course, evidence of historical regulations through the end of the nineteenth (or even twentieth) century *could* be relevant, but only to the extent that it confirms what prior evidence "already … established." *Id.* at 2137 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)). Otherwise, *Gamble* clarified "that *Heller*'s interest in mid-to late-19th-century commentary was secondary." *Id.*; *Gamble*, 139 S. Ct.

at 1975–76 (*Heller* considered this evidence "only after surveying what it regarded as a wealth of authority for its reading").

The Second Amendment protects the right to possess handguns, both in the home and in public, for the purpose of self-defense. *McDonald*, 561 U.S. at 767; *Bruen*, 142 S. Ct. at 2156. With few exceptions, the County relies on proposed historical analogues passed more than 20 years after Reconstruction. Even if Reconstruction-era statutes and local ordinances provide more probative evidence of the Second Amendment's original meaning, the County's evidence *still fails* to identify relevantly similar historical analogues for §57-11's public-carry restrictions discussed above. Sweeping aside the County's irrelevant evidence yields only a handful of arguably relevant evidence supporting §57-11's place-of-public-assembly restrictions—"surely too slender a reed on which to hang a historical tradition of restricting the right to public carry" in the locations challenged here. *See Bruen*, 142 S. Ct. at 2149. This Court should reverse.

DATED this 28th day of August, 2023.

AUSTIN KNUDSEN
  *Montana Attorney General*

CHRISTIAN B. CORRIGAN
  *Solicitor General*

*s/Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.
  *Assistant Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549

*Counsel for Amicus Curiae*
*State of Montana*

## ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of
Alabama*

TREG TAYLOR
*Attorney General of
Alaska*

TIM GRIFFIN
*Attorney General of
Arkansas*

CHRISTOPHER M. CARR
*Attorney General of
Georgia*

RAÚL R. LABRADOR
*Attorney General of
Idaho*

THEODORE E. ROKITA
*Attorney General of
Indiana*

BRENNA BIRD
*Attorney General of
Iowa*

KRIS KOBACH
*Attorney General of
Kansas*

DANIEL CAMERON
*Attorney General of
Kentucky*

JEFF LANDRY
*Attorney General of
Louisiana*

LYNN FITCH
*Attorney General of
Mississippi*

ANDREW BAILEY
*Attorney General of
Missouri*

MICHAEL T. HILGERS
*Attorney General of
Nebraska*

ALAN WILSON
*Attorney General of
South Carolina*

MARTY J. JACKLEY
*Attorney General of
South Dakota*

ANGELA COLMENERO
*Provisional Attorney General of
Texas*

PATRICK MORRISEY
*Attorney General of
West Virginia*

BRIDGET HILL
*Attorney General of
Wyoming*

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,482 words.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font and is double-spaced except for footnotes and for quoted and indented material.

/s/    *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: August 28, 2023        /s/    *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.