No. 23-1719

In the United States Court of Appeals
for the Fourth Circuit

―――――――――――――

MARYLAND SHALL ISSUE, INC., et al.,
*Plaintiffs-Appellants*,

v.

MONTGOMERY COUNTY, MARYLAND,
*Defendants-Appellees*.

―――――――――――――

On Appeal from the United States District Court
for the District of Maryland, No. 21-cv-01736-TDC
United States District Court Judge Theodore D. Chuang

―――――――――――――

**BRIEF OF *AMICUS CURIAE* SECOND AMENDMENT LAW CENTER, CALIFORNIA RIFLE & PISTOL ASSOCIATION, CITIZENS' COMMITTEE FOR THE RIGHT TO KEEP AND BEAR ARMS, SECOND AMENDMENT DEFENSE AND EDUCATION COALITION, GUNS SAVE LIFE, FEDERAL FIREARMS LICENSEES OF ILLINOIS, GUN OWNERS OF AMERICA, GUN OWNERS OF CALIFORNIA, AND GUN OWNERS FOUNDATION AS AMICI CURIAE IN SUPPORT OF APPELLANTS AND REVERSAL**

―――――――――――――

C.D. Michel
Anna M. Barvir
Michel & Associates, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Email: cmichel@michellawyers.com

*Counsel for Amici Curiae*

August 28, 2023

## CORPORATE DISCLOSURE STATEMENT

Under Rules 26.1 and 29(a) of the Federal Rules of Appellate Procedure, Amici Second Amendment Law Center, California Rifle & Pistol Association, Citizens Committee for the Right to Keep and Bear Arms, Second Amendment Defense and Education Coalition, Guns Save Life, Federal Firearms Licensees of Illinois, Gun Owners of America, Gun Owners of California, and Gun Owners Foundation certify that they are nonprofit organizations and thus have no parent corporations and no stock.

Date: August 28, 2023                    */s/ C.D. Michel*_____
                                         C.D. Michel

# TABLE OF CONTENTS

**Page**

Interest of Amici ...................................................................................1

Introduction ..........................................................................................3

Argument...............................................................................................5

I.       Second Amendment Historical Analysis Required by *Bruen* .......................5

II.       "Sensitive Places" Must Be Narrowly Defined Under *Bruen* .....................8

III.      The "Sensitive Places" Created by Chapter 57 Have Not Historically Been
          Understood to be "Sensitive Places" ..........................................................10

          A.       Places of Worship.......................................................................10

          B.       Public Parks ...............................................................................14

          C.       The 100-Yard Exclusionary Zones ..................................................17

III.      Americans with Carry Permits Are Overwhelmingly Law-Abiding ............19

Conclusion ...........................................................................................24

Certificate of Compliance .........................................................................25

Certificate of Service ..............................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Antonyuk v. Hochul*,
  No. 22-cv-0986, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ........... 11, 14, 16

*Antonyuk v. Nigrelli*,
  214 L.Ed.2d 381 (2023) ........................................................................12

*Bonidy v. U.S. Postal Serv.*,
  790 F.3d 1121 (10th Cir. 2015) ............................................................9

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ............................................................................12

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) .....................................................................6

*Espinoza v. Montana Dep't of Revenue*,
  -- U.S.--, 140 S. Ct. 2246 (2020) ...........................................................7

*Gamble v. United States*,
  -- U.S. --,139 S. Ct. 1960 (2019) ........................................................12

*Hardaway v. Nigrelli*,
  No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813 (W.D.N.Y. Nov. 3, 2022).. 11, 13

*Heller v. District of Columbia*,
  670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011)............................................7

*Koons v. Platkin*,
  No. 22-cv-7463, 2023 WL 3478604 (D.N.J. May 16, 2023) ................. 14, 16, 19

*Lambert v. California*,
  355 U.S. 225 (1957)............................................................................18

*New York State Rifle & Pistol Association v. Bruen*,
  -- U.S. --, 142 S. Ct. 2111 (2022) .............................................. passim

*Nken v. Holder*,
  129 S. Ct. 1749 (2009)........................................................................19

*People v. Leon*,
  181 Cal. App. 4th 943 (2010) ..............................................................18

*Spencer v. Nigrelli*,
  No. 22-cv-6486, 2022 U.S. Dist. LEXIS 233341 (W.D.N.Y. Dec. 29, 2022) .....11

*Timbs v. Indiana*,
  -- U.S.--, 139 S. Ct. 682 (2019) ...........................................................................13

*Wolford v. Lopez*,
  No. 23-cv-00265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023)................. 8, 15, 23

**Statutes**

1895 Mich. Local Acts at 595, § 44.......................................................................16

1905 Minn. Laws, ch. 344, § 53 ............................................................................16

1917 Wis. Sess. Laws, ch. 668, § 29.57 ................................................................16

1921 N.C. Sess. Laws 53-54, Pub. Laws Extra Sess., ch. 6, § 1 ...........................16

1921 N.C. Sess. Laws 53-54, Pub. Laws Extra Sess., ch. 6, § 3 ...........................16

Acts of Assembly Relating to Fairmount Park, 18, § 31.II *1870 .........................16

First Annual Report on the Improvement of the Central Park, New York, (1857).16

**Other Authorities**

Cal. State Sheriff's Ass'n, Floor Alert to Cal. State Assemb. (Aug. 29, 2022),
  https://tinyurl.com/calstatesheriffsopposeSB918 .................................................20

Cramer, Clayton E. & Kopel, David B., *"Shall Issue": The New Wave of
  Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679 (1995).......................21

Kopel, David B. & Greenlee, Joseph, *The "Sensitive Places" Doctrine*, 13
  Charleston L. Rev. 205 (2018) ................................................................. 9, 10, 11

Fl. Dep't of Agric. & Consumer Servs., Div. of Lic., *Concealed Weapon or
  Firearm License Summary Report Oct. 1, 1987- Jun. 30, 2023*, (June 30, 2023),
  https://ccmedia.fdacs.gov/content/download/7499/file/cw_monthly.pdf ............21

Leo Bernabei, *Taking Aim at New York's Concealed Carry Improvement Act*, Duke
  Center for Firearms Law Blog, (Aug. 7, 2023),
  https://firearmslaw.duke.edu/2023/08/taking-aim-at-new-yorks-concealed-carry-
  improvement-act/ ..................................................................................................17

iv

Press Release, *BCA Releases 2021 Permit to Carry Annual Report, Data Provided to BCA by Minnesota Law Enforcement Agencies* (Mar. 1, 2022), https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-Releases-2021-Permit-to-Carry-Annual-Report.aspx ................................................................22

Steven Walters, *The Legacy of Concealed Carry in Wisconsin*, Urban Milwaukee (Oct. 11, 2021), https://urbanmilwaukee.com/2021/10/11/the-state-of-politics-the-legacy-of-concealed-carry-in-wisconsin/ ........................................................22

Tex. Dep't of Pub. Safety, *Active License/Certified Instructor Counts as of December 31, 2020* (Dec. 31, 2020), https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/actlicandinstr/activelicandinstr2020.pdf .............20

Tex. Dep't of Pub. Safety, *Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2020 – 12/31/2020* (Feb. 11, 2021), https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/convictionratesreport2020.pdf ................................................................................21

U.S. Census Bur., *Texas: 2020 Census, Texas Added Almost 4 Million People in Last Decade* (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html ..............................20

Wisc. Dep't of Just., *Department of Justice Concealed Carry Annual Report – 175.60(19) – January 1 – December 31, 2022*, https://www.doj.state.wi.us/sites/default/files/dles/ccw/2022%20Annual%20CCW%20Statistical%20Report.pdf ................................................................ 22, 23

**INTEREST OF AMICI**

The Second Amendment Law Center, Inc., is a nonprofit corporation headquartered in Henderson, Nevada. It is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, and the public.

Founded in 1875, California Rifle & Pistol Association is a nonprofit organization that defends Second Amendment rights. In service of its mission to preserve the constitutional and statutory rights of gun ownership, CRPA regularly participates as a party or amicus in firearm-related litigation. CRPA has been a party to or amicus in various Second Amendment challenges, including various cases about the right to carry firearms in public.

The Second Amendment Defense and Education Coalition is a nonprofit organization dedicated to defending the right to bear arms and, as relating to the right to bear arms, the rights to free speech and assembly, to be free from unreasonable searches and seizures, and to equal protection under the law. To that end, SADEC participates in litigation that aims to secure and defend the right to bear arms. And it engages in education and outreach to bring awareness to constitutional and civil rights violations—particularly violations of the right to bear arms—and to provide relevant background and legal information in a manner that is widely accessible to the public.

1

Guns Save Life is a Second Amendment civil rights organization founded to protect and defend the rights of law-abiding Americans to keep and bear arms, especially for the lawful purpose of self-defense.

Federal Firearms Licensees of Illinois is a 501(c)(4) nonprofit organization that represents the interests of Federal Firearms Licensees throughout Illinois. The organization focuses on issues affecting Illinois FFLs, as well as the impact on the Second Amendment rights of all Illinois gun owners.

The Citizens Committee for the Right to Keep and Bear Arms, a nonprofit organization, seeks to preserve Second Amendment rights through education and advocacy. It strives to ensure that the Second Amendment is not misinterpreted in derogation of the people's right to keep and bear arms for self-defense and other constitutional purposes. CCRKBA's programs are designed to help all Americans understand the importance of the Second Amendment and its role in keeping Americans free.

Gun Owners of America is a California nonprofit corporation exempt from federal income taxation under IRC §501(c)(4). It was formed in 1976 by the late Sen. H.L. (Bill) Richardson to preserve and defend the Second Amendment rights of gun owners. GOA sees firearms ownership as an issue of freedom and works to defend that freedom through lobbying, litigation, and outreach. GOA has served as a party or amicus in Second Amendment challenges across the country to protect gun owner rights. GOA has also worked with members of Congress, state legislators, and local citizens to protect gun ranges and local gun clubs from closure.

Gun Owners of California is a had its origins in 1975 and is exempt from federal income taxes under IRC §501(c)(4). It works to oppose infringements on Second Amendment rights. GOC is dedicated to the unequivocal defense of the Second Amendment and America's extraordinary heritage of firearm ownership. Its advocacy efforts regularly include the participation in Second Amendment litigation, having filed amicus briefs in numerous cases, including cases before the U.S. Supreme Court.

Gun Owners Foundation was incorporated in Virginia in 1983, and it educates the public about the importance of the Second Amendment and to provide legal, expert, and support assistance for law-abiding individuals involved in firearms-related cases. GOF is exempt from federal income taxation under IRC §501(c)(3).

No party or counsel for a party authored any part of this brief, and no person other than amici monetarily contributed to its preparation or submission. All parties have consented to the filing of this brief.

## INTRODUCTION

A little over a year ago, the Supreme Court ruled in *New York State Rifle & Pistol Association v. Bruen*, -- U.S. --, 142 S. Ct. 2111, 2134 (2022), that the Second Amendment protects the right to carry firearms in public for self-defense. The watershed decision invalidated a New York law limiting the right to those with a "special need for self-protection distinguishable from that of the general community," *id.* at 2123, as well as the practices of other states with similar limitations. In response, several jurisdictions, including the states of New York,

3

New Jersey, and Hawaii, chose not to conform their laws to the clear commands of
Supreme Court precedent and, instead, adopted radical plans designed to
undermine *Bruen* and the right to *bear* arms that it confirmed.

Among those detractors was Montgomery County, Maryland, which adopted
sweeping restrictions ("Chapter 57") on the ability to carry a firearm in public,
even pursuant to a valid Maryland Wear and Carry Permit. Among other things,
the County adopted an extraordinarily broad definition of "places of public
assembly" where carry is forbidden, including parks, churches, schools, libraries,
rec centers, hospitals and community health centers, fairgrounds, nursing homes,
childcare facilities, and anywhere a "gathering of individuals" meets to protest or
assemble. But Chapter 57 goes even further. It creates entire gun-free *zones* that
extend 100 yards from any designated "place of public assembly." In short, as the
Appellants convincingly argued, these restrictions have effectively turned the right
to carry firearms in the County into a legal fiction. AOB3. Make no mistake, the
district court below rubberstamped what is effectively a full ban on the right to
carry. And it did so because it completely misunderstood and misapplied *Bruen.*

With this brief, amici hope to assist this Court by building on arguments
made by Appellants as to some of the locations that Chapter 57 designates as
"sensitive," and proving further the absence of relevant historical analogues. And
although the issue of any supposed harm to the County's interests is not relevant to
success on the merits, it does relate to the factors the Court must consider in
granting preliminary injunctive relief. So, on that point, amici will show that
Americans with permits to carry firearms, like Maryland's Wear and Carry permit,

4

commit crimes at rates far less than the general population, making them among the most law-abiding of any demographic. Thus, affirming the district court ruling and preliminarily enjoining enforcement of Chapter 57 will do no harm to the County's interest in public safety.

## ARGUMENT

### I.   SECOND AMENDMENT HISTORICAL ANALYSIS REQUIRED BY *BRUEN*

Last year, the Supreme Court strongly reaffirmed the *Heller* test—"text as informed by history"—for analyzing Second Amendment challenges, applying that test to conclude that the Second Amendment protects the right to armed self-defense in public just as much as it does in the home. *Bruen*, 142 S. Ct. at 2127, 2134-35. The *Bruen* Court reiterated that courts may not apply a "means-ends" "interest-balancing" test akin to "intermediate scrutiny" in Second Amendment cases. *Id*. at 2129. Instead, they must inspect the historical record of the ratification era and then conduct an analogical analysis to determine whether the modern-day restriction infringes on Second Amendment rights. *Id*. at 2129-30. The Court also clarified in crystal-clear language how a proper Second Amendment analysis is to be applied:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 2126.

*Bruen* made emphatically clear that, whenever "the Second Amendment's

5

plain text covers an individual's conduct," the government shoulders the burden of justifying a restriction on the Second Amendment by proving that a longstanding American tradition supports that restriction. Lest there be any confusion, the Court explained the burden on the government repeatedly: "[T]he *government must demonstrate* that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added); *see also id.* at 2127, 2130, 2149, n.25, 2150, 2156.

Even if there were *some* relevant history of a type of gun control law, it is not enough to meet the standard set by the Court when the proposed historical analogue is an outlier, or a law that was not what most states at the time embraced. The historical law must instead be a "well-established and representative historical analogue." *Id*. at 2133. Courts may not uphold a challenged law just because a few similar laws may be found in the past, because doing so "'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021).

For example, in *Bruen*, New York presented, and the Court analyzed, three laws from the colonial era, three turn-of-the-19th-century laws, four 19th-century laws, and five late-19th-century regulations from the Western Territories. *Id*. at 2138-56. The Court held that all that history was not enough to uphold New York's Sullivan Act. The Court emphasized that, as in *Heller*, it will not stake its interpretation of the Second Amendment upon historical outliers that contradict the overwhelming weight of other evidence about the right to bear arms in public for self-defense. *Id*. at 2153.

6

The Court also explained that late-19th-century evidence is relevant only if it provides confirmation of what had been established before. "'[P]ostratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text'." *Id*. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011 (Kavanaugh, J., dissenting)). As the Supreme Court has repeatedly made clear, even before *Bruen*, Reconstruction-era sources are to be used—at most—only as *confirmation* of a historical tradition that *already* existed during the founding. For example, in *Espinoza v. Montana Dep't of Revenue*, -- U.S.--, 140 S. Ct. 2246 (2020), the Court rejected the fact that "more than 30 States" had enacted a type of legislation in the mid-to-late 19th century, explaining that even such a pattern "cannot by itself establish an early American tradition." *Id*. at 2258-59. And, naturally, 20th century antecedents are even less relevant; indeed, the Court discussed such laws only in a brief footnote. *Bruen*, 142 S. Ct. at 2154 n.28.

Finally, *Bruen*'s observation that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," *id.* at 2132, to determining whether a law is consistent with historical tradition does not apply here. This case is "fairly straightforward" because Chapter 57 "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. When that is the case, *Bruen* is clear that the "lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. (emphasis added). Even assuming that people carrying firearms in public is a "societal problem," it is

7

not a novel one. And very few of the purported "sensitive places" at issue here are places that did not also exist in the 18th century.[1] So this Court has no latitude to employ a "more nuanced approach" or allow the County to justify its modern carry ban by resorting to historical analogues that are not *distinctly* similar.

These parameters create what is, no doubt, an exacting test that the County may find difficult to meet. This is entirely appropriate given that what is at stake is an enumerated constitutional right that expressly commands that it "shall not be infringed."

## II. "SENSITIVE PLACES" MUST BE NARROWLY DEFINED UNDER *BRUEN*

As to special locations where the right to bear arms may be constitutionally restricted, the Court explained that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited...." *Bruen*, 142 S. Ct. at 2133. And it cautioned that:

> **[E]xpanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly** ... [it] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*Id*. at 2133-34 (double emphasis added).

In short, "sensitive places" restrictions are intended to be the narrow *exception* to the rule that firearms must be permitted because only "relatively few"

---

[1] For those that did not, the County must find historical laws that restricted public carry in sufficiently similar places. *See*, *e.g.*, *Wolford v. Lopez*, No. 23-cv-00265, 2023 WL 5043805, at *29 (D. Haw. Aug. 8, 2023) (historical laws barring the carry of firearms on enclosed private plantations without permission are not sufficiently similar to a modern law barring carry on all private property held open to the public unless the owner gives permission).

sensitive places existed historically. *Id.* at 2133. According to *Bruen*, the historical record essentially supports the restriction of legal firearm carry in just three categories of sensitive places: legislative buildings, courthouses, and polling places. *Id*. (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36 (2018)). Beyond restrictions on carry in those places, there is no well-represented tradition of restricting carry in other public places that could satisfy *Bruen*'s exacting test. But even if the government could restrict carry in other truly "sensitive" places, history does not support the County's broad ban on carry in *most* public spaces at issue.

Indeed, it appears the County engaged in no thoughtful consideration of *Bruen* when adopting Chapter 57. Through both the places it designates as "sensitive" and its 100-yard exclusionary zones, the law bans carry in virtually every public place. But the County's mere declaration that a place is "sensitive" does not make it so. As one judge has explained, "most places are 'sensitive' for someone. If a declaration were all that was required, … the government [would have] untrammeled power to restrict Second Amendment rights in any place even plausibly considered 'sensitive.'" *Bonidy v. U.S. Postal Serv*., 790 F.3d 1121, 1136-37 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part).

The County's attempt to restrict firearm possession in so many places that people visit every day illustrates well the concern Judge Tymkovich identified in *Bonidy*. And it flouts the Supreme Court's command that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated

from law enforcement defines the category of 'sensitive places' far too broadly."
*Bruen*, 142 S. Ct. at 2134. As the Kopel & Greenlee article cited in *Bruen*
explained:

> The government's behavior can demonstrate the true importance of the alleged government interest. Passing a statute declaring some place to be a 'gun free zone' does nothing to deter criminals from entering with guns and attacking the people inside. In contrast, when a building, such as a courthouse, *is protected by metal detectors and guards*, the government shows the seriousness of the government's belief that the building is sensitive . . . Conversely, *when the government provides no security at all*—such as in a Post Office or its parking lot—*the government's behavior shows that the location is probably not sensitive*.

Kopel & Greenlee, *supra*, at p. 292 (emphasis added).

The County's failure to provide security to protect any of the places it
declares to be "sensitive" in Chapter 57, section 1, suggests that it does not really
consider those places to be sensitive. Compare this to truly sensitive places like
courthouses and legislative buildings, which generally have police presence and
metal detectors at the door. Frankly, it is hard to believe that Chapter 57 is about
public safety at all. If it were, it would not strip law-abiding citizens of their ability
to carry in its list of prohibited places without providing security at such places.

## III. THE "SENSITIVE PLACES" CREATED BY CHAPTER 57 HAVE NOT HISTORICALLY BEEN UNDERSTOOD TO BE "SENSITIVE PLACES"

Amici now turn to a discussion of some of the claimed "sensitive places"
covered by Chapter 57 to explain why restrictions on carry in those places simply
cannot survive *Bruen*'s history-based analysis.

### A.    Places of Worship

As a handful of courts have already held, there is simply no historical

10

tradition of restricting carry in churches. To the contrary, during the founding, there were "statutes all over America that required bringing guns into churches, and sometimes to other public assemblies." Kopel & Greenlee, *supra*, at p. 244; *see also Koons v. Platkin*, No. 22-cv-7463, 2023 WL 3478604, *21 (D.N.J. May 16, 2023) ("[S]everal colonial governments passed laws requiring colonists to bring arms to church.").

In defending its similar ban on carrying in churches in *Hardaway* and *Spencer*, New York cited a handful of historical laws, but the Western District of New York held that the state had failed to "demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense at all places of worship or religious observation across the state." *Hardaway v. Nigrelli*, No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813, *14 (W.D.N.Y. Nov. 3, 2022). The few laws the state did cite were "spasmodic enactments involving a small minority of jurisdictions governing a small minority of population. And they were passed nearly a century after the Second Amendment's ratification in 1791." *Spencer v. Nigrelli*, No. 22-cv-6486, 2022 U.S. Dist. LEXIS 233341, *12 (W.D.N.Y. Dec. 29, 2022).

In *Antonyuk*, the Northern District of New York court ruled similarly. The court observed that the few states that restricted carry in churches in the 19th century made up only a small minority of the nation's population, and there was no evidence of founding era restrictions on carry in places of worship. *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 WL 16744700, *62 (N.D.N.Y. Nov. 7, 2022).

Chapter 57's restriction fails for the same reasons.[2]

The district court below made a critical error. Faced with the stubborn problem that founding era analogues supported Appellants' arguments (and not the government's), the court relied only on laws from the period following the ratification of the Fourteenth Amendment. JA845-47. It held that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment." JA845. The district court did not bother to explain why no other constitutional right is treated this way.[3] And it disregarded *Bruen*'s clear instruction that such sources do not provide "as much insight" into the meaning of the Second Amendment as sources from the founding. 142 S. Ct. at 2137. To the extent 19th-century evidence matters at all, it is "treated as mere *confirmation* of what the Court thought had already been established." *Gamble v. United States*, -- U.S. --,139 S. Ct. 1960, 1976 (2019)

---

[2] The Second Circuit stayed the *Antonyuk* decision, as well as others challenging New York's carry restrictions. The Supreme Court denied emergency relief, but Justices Alito and Thomas encouraged the plaintiffs to refile if the Second Circuit did not move reasonably quickly. *Antonyuk v. Nigrelli*, 214 L.Ed.2d 381, 381 (2023) (Alito, J, and Thomas, J., concurring) ("The District Court found, in a thorough opinion, that the applicants were likely to succeed on a number of their claims, and it issued a preliminary injunction as to twelve provisions of the challenged law…I understand the Court's denial today to reflect respect for the Second Circuit's procedures in managing its own docket, rather than expressing any view on the merits of the case. Applicants should not be deterred by today's order from again seeking relief if the Second Circuit does not, within a reasonable time, provide an explanation for its stay order or expedite consideration of the appeal.")

[3] "[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2137.

(citing *District of Columbia v. Heller*, 554 U.S. 570, 605-10 (2008)) (emphasis added).

What was already established, of course, was a tradition of carrying firearms in places of worship. In discussing the same history, the *Hardaway* court explained that "[t]hese outlier [19th-century] enactments also contrast with colonial-era enactments that, in fact, *mandated* such carry at places of worship." 2022 WL 16646220, at *16. Given the existence of this history, the historical laws the district court relied on are irrelevant because "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154.

Attempting to justify its flawed analysis, the district court even took the Supreme Court's ruling out of context when it observed that "'[s]trictly speaking,' states are 'bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second.'" JA845 (quoting *Bruen*, 142 S. Ct. at 2137). The district court ignored the critical next sentence, which explains that "[n]onetheless, we have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S. Ct. at 2130. That rights apply equally to the states and federal government is not a novel idea. Indeed, the Supreme Court observed that "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires." *Timbs v. Indiana*, -- U.S.--, 139 S. Ct. 682, 687 (2019).

This guidance from the Supreme Court obliterates the faulty logic of the

district court's ruling that somehow state (or local) gun laws are treated differently than their federal counterparts. Like our other constitutional rights, there is but one Second Amendment, and it has no evil twins that only apply to the states. The district court's historical analysis of restrictions on carry in places of worship was plain error, and this Court should reverse it.

### B.    Public Parks

As other courts have found, the existence of parks and similar recreational facilities pre-dates the founding, and there is little historical support for barring carry in them. In *Antonyuk*, New York presented several local laws that barred guns in city parks, but the court explained that "even if the number and geographical origins of these city laws … were sufficient to constitute a tradition that was established, they do not constitute a tradition that was representative of the Nation…." 2022 WL 16744700, at *67. The court also noted how even that small degree of historical support vanishes when applied to parks outside of cities: "[A]t most, the city laws support a historical tradition of banning firearms in public parks *in* a city (where the population density is generally higher), not public parks *outside of* a city (where people are generally free to roam over vast expanses of mountains, lakes, streams, flora and fauna)." *Id.* at *66.

In examining New Jersey's similar law, the *Koons* court concluded that the state "failed to come forward with any laws from the 18th century that prohibited firearms in areas that today would be considered parks. Consistent with the *Koons* [p]laintiffs' findings, this [c]ourt has only uncovered colonial laws that prohibited discharging firearms in areas that were the forerunners of today's public park."

14

*Koons v. Platkin*, 2023 WL 3478604, at *83. As to the late-19th century laws that New Jersey cited, they were not "representative of the entire nation. By 1890, those laws—one state law and about 25 local ordinances—governed less than 10% of the nation's entire population and thus are unrepresentative." *Id.* at *85.

The District of Hawaii in *Wolford*, which was decided after the district court ruled here, agreed:

> [O]ut of the seventeen laws the [the district court] reviewed, only one local ordinance was enacted before the Fourteenth Amendment's ratification and only one state law was enacted "during" the time of the Fourteenth Amendment's ratification. This Court is not convinced that there was a national historical tradition of prohibiting the carrying of firearms in parks at the time of the Fourteenth Amendment's ratification."

2023 WL 5043805, at *24.

As far as amici are aware, the district court is the only court to have arrived at the opposite conclusion. JA850-54. That is likely because, the court made several fundamental errors in its application of *Bruen*'s historical test.

First, it relied almost exclusively on *local* regulations on carry in parks, JA850-51 (citing ordinances in New York City, NY (1857), Chicago, IL (1905), St. Paul (1888), Williamsport, PA (1891), Wilmington, DE (1893), Reading, PA (1897), Boulder, CO (1899), Trenton, NJ ( 1903), Phoenixville, PA (1906), Oakland, CA (1909), Staunton, VA (1910), and Birmingham, AL (1917)). But *Bruen* contemplated an "enduring American tradition of *state* regulation," not just a smattering of local ordinances. *Bruen*, 142 S. Ct. at 2155 (emphasis added). While evidence of local regulation might have some relevance when paired with a broad tradition of state regulation, relying solely on such laws can hardly suffice to

meet *Bruen*'s strict command. As the *Antonyuk* and *Koons* courts held, these ordinances were not representative of the nation as a whole, given that the overwhelming majority of Americans were not subject to them. *Antonyuk*, 2022 WL 16744700, at *67; *Koons*, 2023 WL 3478604, at *85.

Second, even if it were appropriate to rely on historical restrictions from the Reconstruction Era and ignore the fact that no relevant Founding-Era laws existed, *the district court cited just two laws of any kind from that period*. JA848 (citing First Annual Report on the Improvement of the Central Park, New York at 106 (1857); Acts of Assembly Relating to Fairmount Park at 18, § 31.II *1870. *Bruen* was clear that relying on just a few state laws would not be enough to establish an enduring tradition of historical regulation. 142 S. Ct. at 2153. Regardless, the district court cited *just one state law* from that period—and even that law applied only to a single park. JA850 (citing Acts of Assembly Relating to Fairmount Park at 18, § 31.II *1870). Another law, passed by the Michigan legislature in 1895, similarly limited its reach to the parks of a single city. JA850 (citing 1895 Mich. Local Acts at 595, § 44). The earliest statewide law that banned carry in state parks generally was not passed until the 20th century. JA851 (citing 1905 Minn. Laws, ch. 344, § 53). And, even then, only two states followed, adopting regulations on carry in parks. JA 851 (citing 1917 Wis. Sess. Laws, ch. 668, § 29.57(4); 1921 N.C. Sess. Laws 53-54, Pub. Laws Extra Sess., ch. 6, §§ 1, 3).

In short, realizing the obvious deficiencies in the historical record, the district court relied on a series of mostly local laws from the late 19th and early 20th centuries. JA848-52. But the Supreme Court did not "endorse freewheeling

16

reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring). And it did not bother with 20th-century history at all because, "[a]s with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

Here, the handful of late-in-time laws and ordinances contradict the history of generally allowing carry in parks. Chapter 57's ban on carrying in parks fails for the same reasons the New York, New Jersey, and Hawaii laws did.

### C.    The 100-Yard Exclusionary Zones

While examining each place Chapter 57 restricts is important, this Court should also consider that each of the prohibited places, "when considered in combination…effectively exempt [the County] from the Amendment's protections." Leo Bernabei, *Taking Aim at New York's Concealed Carry Improvement Act*, Duke Center for Firearms Law Blog, (Aug. 7, 2023), https://firearmslaw.duke.edu/2023/08/taking-aim-at-new-yorks-concealed-carry-improvement-act/. This is especially relevant here because of the 100-yard exclusionary zones that attach to purported "places of public assembly." JA828.

The ban extends to all property associated with the place, including parking lots, and there is no exception for even streets or sidewalks. Chapter 57 does not even bother to allow right of way access to people just moving through the area while carrying. Indeed, as Appellants note in their brief, several of them cannot even leave their own homes without intruding into such a zone. In *Bruen*, the

17

Supreme Court warned that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." 142 S. Ct. at 2119. Likewise, there is no basis for the County to limit carry such that anyone who attempts to do so is playing the hardest game of "the floor is lava" ever conceived, as the Appellants demonstrated with their submitted map.

As that map made clear, even if someone tried to both exercise their right to carry and comply with Chapter 57, they are likely to accidentally violate the law. Indeed, there are plenty of places on the map that are impossible to legally cross while carrying. But worse still, most regular citizens will never see that helpful map, nor will they usually have any idea where an exclusionary zone may begin or end. It is not as if Chapter 57 requires the County to post signs liberally making it clear exactly where carry is prohibited.

In this way, Chapter 57 also violates due process because it denies law-abiding citizens of notice. As the Supreme Court has explained, "[i]ngrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed." *Lambert v. California*, 355 U.S. 225, 228 (1957). While some places may be obvious in terms of general knowledge that carry is not allowed in them, such as courthouses or legislative buildings, the exclusionary zones implemented by Chapter 57 do not fall into this category. *See also People v. Leon*, 181 Cal. App. 4th 943, 952 (2010) (deciding that a probation condition requiring a defendant not

18

frequent areas with gang-related activity was unconstitutionally vague because he could not always reasonably know when he was in such an area). Faced with the daunting task of trying to determine exactly where they can legally carry, many regular citizens will simply stop exercising their right to carry altogether to avoid being criminally charged for carrying a firearm in an off-limits place. Of course, that was likely the County's impermissible goal.

## III.  AMERICANS WITH CARRY PERMITS ARE OVERWHELMINGLY LAW-ABIDING

The Supreme Court has repeatedly banned interest-balancing analyses in Second Amendment cases. *Bruen*, 142 S. Ct. at 2127. That said, at the preliminary injunction stage, factors for courts to consider include the public interest and balance of hardships between the parties. *See Nken v. Holder*, 129 S. Ct. 1749, 1753 (2009). The district court wrongly agreed with the County that Chapter 57 serves the public interest and that the balance of equities "weigh against a preliminary injunction" because it "reduc[es] the risk of gun violence." JA865.

Unlike Appellants, who would have their right to carry eviscerated because they could effectively carry almost nowhere, the County will face no hardship whatsoever. Indeed, like other state governments advancing similar arguments, the County has presented no evidence that *people with carry permits* compared to those who carry illegally, are causing a significant amount of gun-related crime (or any crime, for that matter). *See Koons*, 2023 WL 3478604, at *108 ("[D]espite ample opportunity for an evidentiary hearing, the [s]tate has failed to offer any evidence that law-abiding responsible citizens who carry firearms in public for

self-defense are responsible for an increase in gun violence.") The County presented no such evidence because it does not exist. In fact, Americans with carry permits are an extremely law-abiding demographic.

When California recently tried to pass SB 918, a law similar to Chapter 57, the California State Sheriffs' Association opposed the bill because people with carry permits seldom commit crimes, and they do not generally pose a problem to law enforcement. The Association wrote that SB 918 "greatly restricts when and where licensees may carry concealed and could severely restrict the exercising of [the right to bear arms]…individuals who go through the process to carry concealed legally are exceedingly unlikely to violate the law, yet SB 918 turns much of the state into 'no-carry' zones that will do nothing to foster public safety." Cal. State Sheriff's Ass'n, Floor Alert to Cal. State Assemb. (Aug. 29, 2022), https://tinyurl.com/calstatesheriffsopposeSB918.

Evidence from other states that maintain data on crimes committed by carry permit holders also establishes that people with carry permits are overwhelmingly peaceable. For example, in 2020 (before it enacted constitutional carry) Texas had 1,626,242 active carry license holders.[4] Carry permit holders thus made up about 5.6% of the state population of 29,145,505 in 2020.[5] But according to the Texas Department of Public Safety, they made up just 114 of the state's 26,304

---

[4] Tex. Dep't of Pub. Safety, *Active License/Certified Instructor Counts as of December 31, 2020*, at 1 (Dec. 31, 2020), https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/actlicandinstr/activelicandinstr2020.pdf.

[5] U.S. Census Bur., *Texas: 2020 Census, Texas Added Almost 4 Million People in Last Decade* (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html.

convictions.[6] That is just 0.4334% of the state's serious crimes. Even among those few convictions, most involved no gun at all. Of those that did, permit holders were responsible for an even smaller percentage. For example, there were 1,441 convictions for aggravated assault with a deadly weapon in 2020, but people with a valid carry permit committed just 4 of those—or just 0.2776% of the total.

Evidence from Florida confirms this pattern as well. As of June 2023, the state had issued 5,795,150 concealed weapon licenses since October 1, 1987. Of those, 2,593,004 are active.[7] In that 26-year period, only 18,435 permits have been revoked without being reinstated, or roughly 0.3% of the total issued. *Id.* The modern right-to-carry movement gathered steam in Florida, though a handful of states had liberal permit-issuance policies before then. The state's enactment of "shall-issue" permitting was met with predictions of wild-west style violence and "blood in the streets," but none of that happened. At least one prominent opponent of the law admitted his error: Representative Ronald A. Silver stated in 1990 that "[t]here are lots of people, including myself, who thought things would be a lot worse as far as that particular situation [carry reform] is concerned. I'm happy to say they're not." Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679, 692-93 (1995).

Wisconsin has similar data. In 2022, the state issued 38,326 new permits,

---

[6] Tex. Dep't of Pub. Safety, *Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2020 – 12/31/2020*, at 5 (Feb. 11, 2021), https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/convictionratesreport2020.pdf.

[7] Fl. Dep't of Agric. & Consumer Servs., Div. of Lic., *Concealed Weapon or Firearm License Summary Report Oct. 1, 1987- Jun. 30, 2023*, at 1 (June 30, 2023), https://ccmedia.fdacs.gov/content/download/7499/file/cw_monthly.pdf

and 60,838 renewals.[8] While Wisconsin does not appear to consistently report the number of active permits, as of 2021, 458,630 total permits had been issued.[9] According to the 2022 report, 1,334 licenses were revoked. *Wisc. Dep't of Just., supra* n.8, at 3. Of those, 463 were revoked because the permit holder was no longer a resident, while another 332 were revoked because the permittee unlawfully used a controlled substance (but committed no other crime). *Id.* The remaining 539 were a mix of misdemeanors and felonies, involuntary commitments, and more. *Id.* It is unclear how many were revoked because the holder had used a firearm in a crime—the relevant concern. What *is* clear is that Wisconsinites with carry permits rarely commit violent crimes of any kind.

Minnesota goes a step further and identifies not just the infrequent crimes committed by permit holders, but also the proportion of crimes involving firearms. According to the Department of Public Safety, the state had 387,013 valid carry permits in 2021—and only 40 permits were revoked that year.[10] In addition, 3,863 crimes were committed by people with carry permits. Press Release, *supra* n.10. This sounds much larger than the other states discussed above, but that is because

---

[8] Wisc. Dep't of Just., *Department of Justice Concealed Carry Annual Report – 175.60(19) – January 1 – December 31, 2022*, at 1-2, https://www.doj.state.wi.us/sites/default/files/dles/ccw/2022%20Annual%20CCW%20Statistical%20Report.pdf (last visited July 12, 2023) (the state accepted 40,306 new applications, of which 1,980 were denied, for a total of 38,326 new applications approved and new permits issued).

[9] Steven Walters, *The Legacy of Concealed Carry in Wisconsin*, Urban Milwaukee (Oct. 11, 2021), https://urbanmilwaukee.com/2021/10/11/the-state-of-politics-the-legacy-of-concealed-carry-in-wisconsin/.

[10] Press Release, *BCA Releases 2021 Permit to Carry Annual Report, Data Provided to BCA by Minnesota Law Enforcement Agencies* (Mar. 1, 2022), https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-Releases-2021-Permit-to-Carry-Annual-Report.aspx.

Minnesota greatly expands the definition of what constitutes a "crime." Indeed, of those 3,863 crimes, more than 60% were traffic offenses or DWIs. *Id.* Just over 2% of the crimes—or about 80 of them—were crimes where a firearm was used. *Id.* In other words, in Minnesota, only about 0.02% of people with carry permits used a firearm in furtherance of a crime in 2021.

There are probably other states with similar data, but these examples, along with the California State Sheriffs Association's opposition to SB 918, make the point. *Bruen* forbids interest balancing, but even if the County could use "public safety" as a reason to curtail the right to carry in places that are not truly sensitive, people with carry permits are dramatically more law-abiding than the population at large and are thus unlikely to pose a criminal threat. Indeed, the *Wolford* court cited this evidence, which amici presented to that court, to conclude that there is negligible threat from people with carry permits:

> Although it is possible post-*Bruen* that more conceal carry permits are eventually issued in Hawai'i, that alone does not negate Plaintiffs' position that the vast majority of conceal carry permit holders are law-abiding. *See, e.g.*, GOA Amicus Brief at 21–22 (stating that Texas in 2020 had 1,4441 convictions for aggravated assault with a deadly weapon but only four of those convictions were people with valid concealed carry permits – roughly 0.278% of the total).

2023 WL 5043805, at *32.

The criminals that the County should be worried about already carry illegally. The data presented here merely confirms what common sense tells us: An individual willing to go through the trouble to follow the law is incredibly unlikely to use his legally carried firearm to engage in violent crime. With Chapter 57, the

23

County is punishing the law-abiding while not stopping real crime.

## CONCLUSION

For these reasons and those discussed in Appellants' brief, this Court should reverse the district court.

Date: August 28, 2023                    Respectfully submitted,

*/s/ C.D. Michel*
C.D. Michel
Anna M. Barvir
Michel & Associates, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: 562-216-4444
Email: cmichel@michellawyers.com

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __23-1719__    **Caption:** __Maryland Shall Issue, Inc. v. Montgomery County, MD__

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains ____6,518____ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
__Microsoft Word 365__ [*identify word processing program*] in
__Size 14, Times New Roman__ [*identify font size and type style*]; **or**

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) __C.D. Michel__

Party Name __Amici Second Am. Law Center, etal__

Dated: __August 28, 2023__