No. 23-1719

IN THE

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

MARYLAND SHALL ISSUE, INC., ET AL.,

*Plaintiffs-Appellants*,

v.

MONTGOMERY COUNTY, MARYLAND,

*Defendant-Appellee*.

———————————

On Appeal from the United States District Court
for the District of Maryland
(Theodore D. Chuang, Judge)

———————————

**BRIEF OF APPELLEE MONTGOMERY COUNTY, MARYLAND**

———————————

John P. Markovs, County Attorney
Edward B. Lattner, Deputy County
    Attorney
Erin J. Ashbarry, Assistant County
    Attorney
Matthew H. Johnson, Assistant County
    Attorney

Executive Office Building
101 Monroe Street, Third Floor
Rockville, Maryland 20850
(240) 777-6700

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-1719        Caption: Maryland Shall Issue, Inc., et al. v Montgomery County, MD

Pursuant to FRAP 26.1 and Local Rule 26.1,

Montgomery County, Maryland
(name of party/amicus)


who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:


3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                       ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☐NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Edward B. Lattner                    Date:     July 13, 2023

Counsel for: Appellee

- 2 -

[ Print to PDF for Filing ]

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE .............................................................. 1

    Nature of the Case ......................................................................... 1

    Statement of Facts ......................................................................... 3

        The County Enacts Changes to its Firearms Law in the
        Face of Unprecedented Levels of Gun Violence in the
        Country and in the County ......................................................... 3

        An Explanation of the November 2022 Changes by Bill 21-22E ......... 6

        Plaintiffs Unsuccessfully Seek an Injunction to Enjoin
        Enforcement of the County's Firearms Law ...................................... 11

SUMMARY OF THE ARGUMENT .................................................... 18

ARGUMENT ...................................................................................... 18

        Standard of Review ..................................................................... 18

I.    The District Court Correctly Determined that Plaintiffs Did Not
      Demonstrate a Likelihood of Success on the Merits ..................... 19

      A.    Legal Standards: the *Bruen* Framework ............................... 19

          1.    The *Bruen* Court's Template to Assess Firearms
               Regulations ....................................................................... 20

          2.    *Bruen* Does Not Restrict Analysis to the Founding Era .......... 22

ii

3.      *Bruen* Does Not Prohibit Firearms Regulation.........................27

B.      Buffer Zones Around Sensitive Locations, and Inclusion of
        a Place's Parking Lots or Building Grounds ......................................28

        1.      State Law Expressly Permits the County to Prohibit
                Carry Within 100 Yards of Public Assembly ..........................28
        2.      Cases Acknowledge the Concept of Buffer Zones and
                Inclusion of Parking Lots as Part of a Building Where
                the Second Amendment Does Not Apply.................................29
        3.      Historical Analogues for Buffer Zones Demonstrate
                Their Need and Validity...........................................................30

C.      Publicly Parks..................................................................................32

D.      Places of Worship.............................................................................36

E.      Publicly or Privately Owned Recreational Facilities and
        Multipurpose Exhibition Facilities, such as a
        Fairgrounds or Conference Center ....................................................40

II.     Plaintiffs Will Not Suffer Irreparable Harm if the Court Does
        Not Issue a Preliminary Injunction................................................................44

III.    The Balance of the Equities and the Public Interest Weigh in
        Favor of Denying Plaintiffs' Request for a Preliminary Injunction.............48

CONCLUSION...................................................................................................51

CERTIFICATE OF COMPLIANCE.....................................................................52

CERTIFICATE OF SERVICE ............................................................................53

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*, 50 Tenn. 165 (Tenn. 1871)...........................................39

*Ass'n of Cmty. Cancer Cntrs. V. Azar*,
    509 F. Supp. 3d 482 (D. Md. 2020).................................................48

*Barron ex Rel. Tiernan v. Mayor of Balt.*,
    32 U.S. (7 Pet.) 243, 250-51 (1833) ..............................................26

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015)............................29, 30

*Christopher v. Ramsey Cty.*, 621 F. Supp. 3d 972 (D. Minn. 2022) ......................44

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................20, 27, 29, 36

*English v. State*, 35 Tex. 473 (Tex. 1872) .........................................39, 40

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................................26

*Frey v. Nigrelli,* No. 21-CV-05334 (NSR),
    2023 U.S. Dist LEXIS 42067 (S.D.N.Y. March 13, 2023)..........................26

*Gitlow v. New York*, 268 U.S. 652 (1925) ...............................................26

*Goldstein v. Hochul*, No. 22-CV-8300 (VSB),
    2023 U.S. Dist. LEXIS 111124 (S.D.N.Y. June 28, 2023)..........................26

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ......................................26

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*,
    5 F.4th 407, *vacated*, 14 F.4th 322 (2021) ....................................13

*In re Rounds*, 255 Md. App. 205 (2022).................................................10

*Hill v. State*, 53 Ga 472(Ga. 1874)..........................................................39

*Koons v. Platkin,* No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 85235 (D.N.J. May 16, 2023) ...................................................................36

*Lynch v. Donnelly*, 465 U.S. 668 (1983) ...............................................24

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .........................26, 27

*Mountain Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197 (4th Cir. 2019)....16, 44

*Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, *reh'g granted en banc*, 72 F.4th 1346 (11th Cir. 2023) .......................................................13

*New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S. Ct. 2111 (2022)...........................................................*passim*

*Nken v. Holder*, 556 U.S. 518 (2009) ....................................................48

*Oregon Firearms Fed'n v. Kotek*, No. 2:22-cv-01815-IM, 2023 U.S. Dist. LEXIS 121299 (D. Or. July 14, 2023) ......................................3, 24

*Pashby v. Delia*, 709 F.3d 307, (4th Cir. 2013)................................12, 19

*Pursuing America's Greatness v. FEC*, 831 F.3d 5001 (D.C. Cir. 2016)..............48

*Ramos v. Louisiana*, 140 S. Ct. 130 (2020) ...........................................24

*Schall v. Martin*, 467 U.S. 253 (1984)..................................................48

*Teter v. Lopez*, 76 F.4th 938, 2023 U.S. App. LEXIS (9th Cir. 2023) ......................23

*Timbs v. Indiana*, 139 S. Ct. 682 (2019)................................................24

*United States. v. Class*, 930 F.3d 460 (D.C. Cir. 2019)...............................29, 30, 41

*United States v. Cruikshank*, 92 U.S. 542 (1876)......................................26

*United States v. Daniels*, 77 F.4th 337, 2023 U.S. App. LEXIS 20870 (5th Cir. 2023) ...............................................23

*United States v. Dorosan*, 350 Fed. Appx. 874 (5th Cir. 2009) ........................29, 30

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012). ...........................................26

*United States v. Morrison*, 429 U.S. 598 (2000) ......................................................49

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................................48

*Warden v. Nickels*, 697 F. Supp. 2d 1221 (W.D. Wash. 2010) ........................35, 44

*Winter v. NRDC, Inc.,* 555 U.S. 7 (2008) ...........................................................19, 44

*Zaitzeff v. City of Seattle*, 17 Wash. App. 2d 1, 484 P.3d 470 (2021),
    *review denied*, 498 P.3d 478 (Wash. 2021),
    *cert. denied*, 142 S. Ct. 1123 (2022 ............................................................35

**Constitutional Provisions, Statutes, Ordinances, Rules, and Regulations**

**United States Code**

18 U.S.C. § 926B .......................................................................................................9

18 U.S.C. § 926C .......................................................................................................9

**Maryland Code**

Criminal Law § 4-208 .........................................................................................45, 46

Criminal Law § 4-209 ....................................................................................5, 28, 45

Public Safety § 5-306 ..............................................................................................10

2023 Md. Laws Ch. 651 ...........................................................................................10

**Code of Maryland Regulations (COMAR)**

COMAR § 08.07.01.01 ..............................................................................................46

COMAR § 08.07.06.04 ..............................................................................................46

COMAR §11.05.05.02 ....................................................................46

COMAR § 11.05.05.08 ..................................................................46

COMAR § 14.25.01.01 ..............................................................45, 46

COMAR § 14.25.02.06 ..............................................................45, 46

**Maryland Register**

Vol. 2, No. 9 (April 30, 1975).......................................................46

**Montgomery County, Maryland Code**

§ 1-202(a) ....................................................................................11

§ 57-1 ....................................................................................*passim*

§ 57-11 ..............................................................6, 8, 9, 11, 49

**Other Authorities**

Montgomery County, Maryland, Office of Legislative Oversight,
      Memorandum Report No. 2022-13 (2022),
      https://www.montgomerycountymd.gov/OLO/Resources/Files/2022_reports/
      OLOReport2022-13.pdf. ..........................................................3, 6

Larry Buchanan and Laura Leatherby, *Who Stops a 'Bad Guy With a Gun'?*,
      The New York Times, June 22, 2022,
      https://www.nytimes.com/interactive/2022/06/22/us/shootings-police-
      response-uvalde-buffalo.html?searchResultPosition=1 .................50

Patrick J. Charles, *Article: Racist History and the Second Amendment:
      A Critical Commentary*, 43 Cardozo L. Rev. 1343 (2022) ...........36

Zak Failla, *Magruder HS Teen Who Shot Student,15, With 'Ghost Gun' Gets
      18 Years In Prison*, Daily Voice, December 22, 2022,
      https://dailyvoice.com/maryland/montgomery/news/magruder-hs-teen-who-
      shot-student15-with-ghost-gun-gets-18-years-in-prison/852524/..................4

Michael Hernandez, *60 Shots Fired in Briggs Cheney Parking Lot; Man Critically Injured*, Montgomery Community Media, July 11, 2022, https://www.mymcmedia.org/60-shots-fired-in-briggs-chaney-parking-lot-man-critically-injured/#:~:text=A%20total%20of%2060%20rounds,scene%20over%20the%20past%20year . ......................................................................5

Fredrick Kunkle, *Supreme Court Ruling Sets Off Rush for Concealed Gun Permits in Maryland,* The Washington Post (July 25, 2022) https://www.washingtonpost.com/dc-md-va/2022/07/15/concealed-carry-maryland-guns-hogan/ ...............................10

Kevin Lewis, *14-year-old Behind Fatal Shooting in Germantown used a Ghost Gun, Prosecutors Say*, wjla.com, August 20, 2021, https://wjla.com/news/local/14-year-old-shilen-wylie-fatal-quadruple-shooting-germantown-recreation-center-ghost-gun .........................................4

Darcy Spencer, *Maryland Teenager Sentenced to 18 Years for Shooting Student at Magruder High,* NBCwashington.com, December 22, 2022, https://www.nbcwashington.com/news/local/maryland-teenager-sentenced-to-18-years-for-shooting-student-at-magruder-high/3239939/ ......4

Andrew Willinger, *Territorial Gun Regulation and the "Lost" History of the Federal Second Amendment*, Duke Center for Firearms Law Blog (August 8, 2022) https://firearmslaw.duke.edu/2022/08/territorial-gun-regulation-and-the-lost-history-of-the-federal-second-amendment/ .............31

An Act Forbidding and Punishing Affrays, Ch. 49 (Virginia 1786) ................. 40-41

An Ordinance Respecting Public Balls, Art. 1 (1817), *General Digest of the Ordinances and Resolutions of the Corporation of New Orleans* (1831).........................................................................................41

1837 Md. Acts Ch. 101, §§ 1-2........................................................................ 30-31

An Act Prohibiting the Carrying [of] a Certain Class of Arms, Within the Settlements and in Balls § 3, *Laws of the Territory of New Mexico* (1852) ...........................................................................................41

*First Annual Report of the Board of Commissioners of the Central Park,
New York* (1857) ................................................................................. 33

*Minutes and Proceedings of the Board of Commissioners of the
Central Park, New York* (1858) ......................................................... 33

Ch. 82, An Act in addition to an in alteration of "An Act for Forming and
Conducting the Military Force," § 5, *Public Acts Passed by the
General Assembly of the State of Connecticut, May Session, 1859*
61 (1859) ............................................................................................ 31

*Fourth Annual Report of the Board of Commissioners of the Central Park,*
New York (1861) ................................................................................. 33

*Eighth Annual Report of the Board of Commissioners of Prospect Park,
Brooklyn,* Rules and Regulations for the Government of the
Public Parks of Brooklyn (1868) ....................................................... 33

A Supplement to an Act, entitled, 'An Act Appropriating Ground for Public
Purposes in the City of Philadelphia", No. 1020 § 21 *Laws of the
General Assembly of the State of Pennsylvania,
1868 Session,* 1088 (1868) ................................................................ 33

*First Annual Report of the Commissioners of Fairmount Park,
Philadelphia, Pennsylvania* § 21 (1869) ........................................... 33

An Act to Amend the Criminal Laws of the State, Ch. 22 § 2, (December 1, 1869)
*Acts of the State of Tennessee* 23 (1870) ......................................... 41

An Act to Preserve the Peace and Harmony of the People of this State,
and for Other Purposes, Penal Code, Title 16, No. 285, *Acts and
Resolutions of the General Assembly of the State of Georgia*
421 (1870) ..................................................................................... 36-37

An Act to … Empower the Governor to Preserver Peace and Order,
No. 100, § 73, *Acts Passed by the General Assembly of the
State of Louisiana* 159-160 (1870) ................................................... 31

An Act appropriating ground for public purposes, in the City of
    Philadelphia, § 21 (II), *Acts of Assembly Relating to
    Fairmount Park* (1870)....................................................................33

An Act Regulating the Right to Keep and Bear Arms, Ch. 46, § 1,
    *General Laws of the Twelfth Legislature, of the State of Texas* 63
    (1870)...........................................................................................37, 41,

Park Ordinance No. 1, Article I. § 4, *Annual Reports of the Brooklyn
    Park Commissioners* (1873)..........................................................33

Chicago Ordinances, Ch. 31 Parks and Public Grounds, § 6 Firearms and
    Missiles Prohibited–Protection of Shrubbery, *Laws and Ordinances
    Governing the City
    of Chicago* 88 (1873)....................................................................33

1874 Md. Laws 366, Ch. 250, § 1...........................................................31

An Act Regulating the Right to Keep and Bear Arms, Art. 6511 (1870);
    An Act to Regulate the Keeping and Bearing of Deadly Weapons,
    Crim. Code Art. 6514(1871), *A Digest of the Laws of Texas* 1322,
    1323 (1875)..........................................................................37, 41, 42

An Act to Prevent the Carrying of Weapons in Public Assemblies of the
    People, § 1, *Laws of Missouri, General and Local Laws Passed at
    the Regular Session of the Twenty-Eighth General
    Assembly* 50-51 (1875) .................................................................37

San Francisco Park Commissioners Ordinances, Ordinance No. 2 § 2,
    *San Francisco Municipal Reports* 887 (1875) .............................78

Hyde Park, South Park Ordinances, § 6 *Laws and Ordinances
    Governing the Village of Hyde Park (Illinois)* 310 (1876) ...........33

Acts of Virginia Assembly, Ch. 7, of Offences [sic] Against Morality
    and Decency –Protection of Religious Meetings § 21,
    *Acts and Joint Resolutions of the General Assembly of the
    State of Virginia* 305 (1878) .........................................................38

Missouri Code, Crimes and Criminal Procedure § 1274, Carrying of Deadly
    Weapons, *Revised Statutes of the State of Missouri*,
    *Vol. I*, 224 (1879) .........................................................................42

Texas Code, Tit. 9, Ch. 4, Art. 320, Carrying Arms in Church or
    Other Assembly, *The Revised Statutes of Texas* 43 (1879)....................37, 42

Chicago Code, Art. 43 § 1690, *Municipal Code of Chicago* 391 (1881)...............33

St. Louis, Missouri, Ordinance, Art. XI § 3, *The Revised Ordinance of
    the City of St. Louis*, 635 (1881) ....................................................33

Georgia Code, Part IV, Title I, Division IX, § 4528, *The Code of the State of
    Georgia* (1882) .......................................................................36, 37

Danville, Illinois, Ordinances, Ch. 19, § 4, *The Revised Ordinances of
    the City of Danville* 83 (1883) ........................................................33

An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised
    Statutes of Missouri, Entitled "Of Crimes and Criminal Procedure,"
    § 1, *Laws of Missouri Passed at the Session of the Thirty-Second
    General Assembly* 76 (1883) .........................................................42

Rules and Regulations of Tower Grove Park, St. Louis, Missouri,
    *Tower Grove Park of the City of St. Louis Review of its Origin
    and History, Plan of Improvement, Ornamental Features, etc.*
    117 (1883)...............................................................................33

An Act to Prevent the carrying of Guns, Pistols . . . by Any Person in
    Calvert County, on the Days of Election in Said County, Within
    One Mile of the Polls, § 1, 315 Laws of Maryland,
    Ch. 189 (1886) ..........................................................................31

Boston, Massachusetts Park Ordinance No.3, *City of Boston,
    Department of Parks, Thirteenth Annual Report of the Board of
    Commissioners for the Year 1887* 86 (1888)..................................33

An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons,
Ch. 30, § 4, *Acts of the Legislative Assembly of the Territory of
New Mexico, Twenty-Seventh Session* 55, 58 (1887) ...................................31

Maryland Code, Election Districts, § 71 *The Maryland Code,
Public Local Laws, Vol. I* 604 (1888)............................................................31

City of Rochester, New York, Park Commissioners Penal Ordinances § 4,
*Report of the Board of Park Commissioners of the City of
Rochester, NY* 97 (1896)...............................................................................33

Rules and Regulations of the Public Parks and Grounds of the City of
Saint Paul, *Annual Reports of the City Officers and City Boards
of the City of Saint Paul, Minn. For the Fiscal Year Ending
December 31, 1888* 689 (1888) .....................................................................33

Salt Lake City, Utah, Ordinances Ch. 27, § 6, *The Revised Ordinances
of Salt Lake City* 248 (1888)..........................................................................33

An Act Defining and Punishing Certain Offenses Against Public
Peace, § 3, *Session Laws of the Fifteenth Legislative Assembly of
the Territory of Arizona* 17 (1889) ..........................................................38, 43

Harrisburg, Pennsylvania, Ordinances, Park Commission and Parks,
Park Rules § 4(4), *A Digest of the Laws and Ordinances for the
Government of the Municipal Corporation of the City of
Harrisburg, Pennsylvania* 468 (1906)...........................................................34

Columbia, Missouri, General Ordinances, Ch. 17, § 163, *General
Ordinances of the Town of Columbia in Boone County,
Missouri*, 35 (1890) .......................................................................................42

Territory of Oklahoma Statutes, Crimes and Punishment, Art. 47, § 7,
*The Statutes of Oklahoma 1890, Laws Passed by the First
Legislative Assembly of the Territory* 496 (1890) ...................................39, 43

An Ordinance providing for the government and Protection of Public
Parks and Squares in the City of Trenton (June 26, 1890),
*City of Trenton, New Jersey, Charter and Ordinances* 390 (1903).............33

Ordinance of the City of Lynn, Massachusetts, Park Commissioners,
    *Third Annual Report of the Park Commissioners of the City of*
    *Lynn* 23 (1892)............................................................................33

Grand Rapids, Michigan, Ordinance § 556(2)I (April 30, 1914,
    *Compiled Ordinances of the City of Grand Rapids* (1915)...........33

An Ordinance Prescribing the Rules and Regulations for the Government
    and Protection of Brandon Park, Imposing Penalties for the
    Violation of the Same, and Closing Part of Packer Street, § 1 (21)
    *Laws and Ordinances for the Government of the Municipal*
    *Corporation of the City of Williamsport, Pennsylvania*
    141 (1891)...................................................................................33

Mississippi Code, Crimes and Misdemeanors § 1030, *The Annotated*
    *Code of the General Statute Laws of the State of*
    *Mississippi* 327 (1892)................................................................31

Peoria, Illinois, Ordinance Art. 35, § 1724, *Laws and Ordinances of the*
    *City of Peoria, Illinois* 667 (1892) ...............................................33

Spokane, Washington, Municipal Code, Ord. No. A170 § 4,
    *Municipal Code of the City of Spokane, Washington* 123 (1903).................33

Oklahoma Territory Statutes, Art. 45, § 7,
    *Statutes of Territory of Oklahoma, 1893* 504 (1893) .............................39, 43

Pittsburgh, Pennsylvania, Ordinance, Bureau of Parks § 5 (July 1, 1893),
    *A Digest of the Acts of the Assembly Relating to and the General*
    *Ordinances of the City of Pittsburgh* 496 (1897)..........................33

Wilmington, Delaware, Rules and Regulations of the Board of Park
    Commissioners, *The Charter of the City of Wilmington* (1893) ...................33

Huntsville, Missouri, Ordinance in Relation to Carrying Deadly
    Weapons, § 1 *The Revised Ordinances of the City of Huntsville,*
    *Missouri of 1894* 58 (1894) ............................................... 38, 42-43

St. Paul, Minnesota, Ordinance § 680, *General Ordinances and Private*
    *Ordinances of a Public Nature of the City of St. Paul* 208 (1895) .........32, 33

Canton, Illinois, Ordinance § 26, *Revised Ordinances of the City of Canton, Illinois* 204 (1895) ...........................................................33

An Act to amend an act Entitled "An Act Supplemental to the Charter of the City of Detroit, and Relating to Parks, Boulevards and Other Public Grounds…", No. 436 § 44, *Local Acts of the Legislature of the State of Michigan* 596 (1895) ..............................................33

Indianapolis, Indiana, Ordinance § 1971 (June 30, 1896) *General Ordinances of the City of Indianapolis* 648 (1904)......................33

Reading, Pennsylvania, Park Ordinance No. 20 (8), *A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pennsylvania, in Force April 1, 1897* 240 (1897) ..............................................................33

Springfield, Massachusetts Park Ordinances (May 2, 1891), *Park Commissioners' Report, Springfield, Massachusetts* (1897) ..............33

Kansas City Ordinance No. 9637, § 11, *Charter and Revised Ordinances of Kansas City* 657 (1898) ...........................................................33

Boulder, Colorado (October 4, 1898), Ordinance No. 511, § 1, *Revised Ordinances of the City of Boulder* 157 (1899) ..............................33

Arizona Territory Statutes, Crimes and Punishments § 387, *The Revised Statutes of the Arizona Territory* 1252 (1901) ......................38, 43

Hartford, Connecticut, Park Rules and Regulations, *Municipal Register of the City of Hartford* 493 (1907) ....................................34

New Bedford, Massachusetts, Park Ordinances, *Ninth Annual Report of the Department of Parks of the City of New Bedford, Massachusetts* 74 (1902) ...............................................................34

New York City Park Ordinance XXIV, *Proceedings of the Board of Alderman of the City of New York, Vol. IV* 600 (1903)................................33

Rules and Regulations Governing the Public Parks Within the City of
Lowell, *First Annual Report of the Board of Park Commissioners
of the City of Lowell, [Massachusetts]* 58 (1903) .........................................34

An Ordinance in Relation to the Public Parks of the City of Troy and the
Maintenance of Good Order Therein, § 2 *Municipal Ordinances of
the City of Troy* 375 (1905) ...........................................................34

Houston, Texas, Ordinance, Ch. 39, Art. 918, *Charter and Revised Code of
Ordinances of the City of Houston* (1904) ......................................34

Neligh, Nebraska, Ordinance No. 61, Firearms in the Park, *The
Ordinances of the City of Neligh, Nebraska* 37 (1906)...................34

Pueblo, Colorado, Ordinance 678 (Ch. 27, § 656, No. 20), *Ordinances
of the City of Pueblo [Colorado]* (1904)........................................34

Chicago, Illinois, Revised Municipal Code, Chapter Ch. 45, Art. I, § 1562,
*Amendments to "The Revised Municipal Code of Chicago of
1905" and New General Ordinances* 40 (1906) ............................34

Haverhill, Massachusetts, Public Park Rules and Regulations, *Annual
Report of the Park Commissioners of the City of Haverhill,
Massachusetts* 12 (1905) ...............................................................34

Saginaw, Michigan, Charter Title 20, § 22, *Charter of the City of
Saginaw, Michigan* 173 (1905) ......................................................34

Minnesota General Laws Ch. 344, An Act for the Preservation,
Propagation, Protection, Taking, Use and Transportation of
Game and Fish, and Certain Harmless Birds and Animals,
§ 53 (1905)...............................................................................31, 35

Denver, Colorado, Municipal Code Ch. 34 § 1367, *The Municipal
Code of the City and County of Denver* 479 (1906)......................34

Grand Rapids, Michigan, An Ordinance to Regulate the Use of the
    Public Parks of the City of Grand Rapids, and to Provide for the
    Preservation of the Public Property Therein (Passed May 4, 1891,
    Amended June 20, 1892, and October 11, 1897) § 432 (3),
    *Compiled Ordinances of the City of Grand Rapids* 163 (1906)...................33

New York City Park Regulation, Ch. 17, Art. 1 § 17(8), *Ordinances,*
    *Rules and Regulations of the Department of Parks of the City of*
    *New York* 7 (1906) ..........................................................................33

Los Angeles, California, Penal Ordinance No. 13,182 § 2 (2)
    (Approved August 13, 1906), *Penal Ordinances of the City of*
    *Los Angeles* 317 (1921) ...................................................................34

Phoenixville, Pennsylvania, Park Ordinance § 1 (4) (July 2, 1878), *A*
    *Digest of the Ordinances of Town Council of the Borough of*
    *Phoenixville* 135 (1906)...................................................................34

Olean, New York, Park Ordinance § 4 (November 6, 1907),
    *Ordinances of the City of Olean* 26 (1922) ....................................34

Seattle, Washington Ordinance No. 16081 § 100 (May 3, 1907), *The*
    *Charter of the City of Seattle and the Ordinances of the City*
    *of Seattle* 221 (1908).......................................................................34

Memphis, Tennessee, Ordinances Art. 67 § Art. 68 § 1131 (Rule 13)
    (March 4, 1909), *A Digest of the Ordinances and Contracts of*
    *the City of Memphis* 659 (1909) ....................................................34

Oakland, California, Ordinances § 9, *General Municipal Ordinances of*
    *the City of Oakland, California* 15 (1909) ....................................34

Paducah, Kentucky, § 20, An Ordinance Providing for the Regulations
    and Orderly Government of Parks…, § 20 (September 2, 1909),
    *Constitution, Charter and Revision of the Ordinances and Municipal Laws*
    *of the City of Paducah, Kentucky* 489 (1910)................................34

Staunton, Virginia, Code Ch. 2 § 135, *The Code of the City of*
    *Staunton, Virginia* 115 (1910).......................................................34

Colorado Springs, Colorado, Code § 1068, *The Code of Colorado Springs* 450 (1922) .........................................................................34

New York City Ordinance, Ch. 17 Art. 1 § 17 (8) *New Code of Ordinances of the City of New York Including the Sanitary Code, the Building Code, and Park Regulations Adopted June 20, 1916* 389 (1926)................................................................33

Rules and Regulations of the New Haven Commission of Public Parks, Rule 3, *Charter and Ordinances of the City of New Haven, Connecticut and Special Acts* 438 (1914) .......................................34

Birmingham, Alabama, Code Ch. 44 § 1544, *Code of the City of Birmingham, Alabama* 662 (1917)...................................................34

Joplin, Missouri, Code Art. 68 § 1214, *The Joplin Code of 1917* 552 (1917)..........................................................................34

1243 Laws of Wisconsin Ch. 668, Chapter 29 § 29.57(4) (1917)...........................35

Oakland, California, Ordinance No. 129 N.S. § 9 *City of Oakland General Municipal Ordinances* 118 (1918) ...................................34

Salt Lake City, Utah, Ordinances Ch. 42, §1494, *Revised Ordinances of Salt Lake City, Utah* 474 (1920)...............................................33

Burlington, Vermont, Rules and Regulations for the Use of Parks and Cemeteries, Rule 3, *Revised Ordinances of 1921, City of Burlington, Vermont* 1(1921) ........................................................34

1921 N.C. Sess. Laws 54, Pub. Laws Extra Sess., Ch. 6, § 3..................................35

Chattanooga, Tennessee, Ordinances Ch. 2, Art. I § 516 *Digest of the Charter and Ordinances of the City of Chattanooga* 145 (1922) ................34

Brief Addendum (separate volume).................................................................Add. 1

## STATEMENT OF JURISDICTION

Montgomery County accepts Appellants' Statement of Jurisdiction.

## STATEMENT OF THE ISSUE

Did the District Court abuse its discretion when it denied Plaintiffs' request for a preliminary injunction?

## STATEMENT OF THE CASE

**Nature of the Case**

In the face of an unprecedented increase in gun violence, the County amended its Firearms Law[1] by enacting two bills in 2021 (Bill 4-21) and 2022 (Bill 21-22E) to protect areas of the County where large groups and vulnerable populations congregate.

Plaintiffs challenge those amendments under the Second Amendment. Plaintiffs are a non-profit group dedicated to the preservation and advancement of gun owners' rights in Maryland (Maryland Shall Issue, Inc.); a firearms training facility; a firearms dealer; and individuals who have State of Maryland-issued permits to wear and carry guns. (JA 37-50) [2]

---

[1] The County's Firearms Law is codified in Chapter 57 ("Weapons") of the Montgomery County Code (MCC). (JA 680-699)

[2] The procedural history of this case, including its Maryland state court origins, is described in the District Court's underlying Memorandum Opinion. (JA 828-832) Plaintiffs' state-law challenges to the County Firearms Law remain pending in the Circuit Court for Montgomery County.

Plaintiffs moved the District Court for a temporary restraining order and preliminary injunction on December 6, 2022. They asked the District Court to enjoin portions of the County's Firearms Law that prohibits guns in and within 100 yards of defined "places of public assembly."

After briefing and oral argument, the District Court denied Plaintiffs' request for an injunction on July 6, 2023. Plaintiffs noted this interlocutory appeal of that denial on July 7, 2023.

The District Court also denied Plaintiffs' request for an injunction pending appeal on September 12, 2023. Plaintiffs moved this Court for an injunction pending appeal later that same day; the County's Opposition is due September 20, 2023.

In this interlocutory appeal, Plaintiffs challenge the District Court's denial of injunctive relief **only** with respect to: (1) the County's prohibition of firearms in places of worship, parks, recreational facilities, and multipurpose exhibition facilities; and (2) the County's "buffer zone" provision, which prohibits of carrying a firearm within 100 yards of a place of public assembly.

This Court should uphold the District Court's decision as Plaintiffs have not met their burden for the extraordinary relief of a preliminary injunction.

**Statement of Facts**

***The County Enacts Changes to its Firearms Law in the Face of Unprecedented Levels of Gun Violence in the Country and in the County.***

In 2020, the number of firearm-related deaths in the United States rose to 45,222, with an average of 124 people dying from gun violence every day. (JA 407-408) Gun violence is now the leading cause of death in children and adolescents, overcoming car crashes, which were the leading cause of death for the prior 60 years.[3] Three of the worst mass shootings in this country's history happened in the last twenty years.[4]

The County is not immune from this scourge of gun violence:[5]

- From 2017-2021, robberies and assaults made up 80 to 90% of firearms crimes;

---

[3]    *New York State Rifle & Pistol Assoc., Inc. v. Bruen,* 142 S. Ct. 2111, 2165 (2022) (Breyer, J., dissenting) (citations omitted).

[4]    *See Oregon Firearms Fed'n. v. Kotek*, No. 2:22-cv-01815-IM, 2023 U.S. Dist. LEXIS 121299 at *35 (D. Or. July 14, 2023) (listing the three worst mass shootings as: 2007 shooting in Blacksburg, Virginia (32 people killed with 174 rounds fired in approximately 9-10 minutes); 2016 shooting Orlando, Florida (49 people killed); 2017 shooting in Las Vegas, Nevada (60 killed, 410 people shot, over 1,000 rounds fired in approximately 11 minutes).

[5]    Except where indicated otherwise, the following facts come from the Montgomery County Office of Legislative Oversight Memorandum Report No. 2022-13 "Firearms Availability, Data, and Legal Authority in Montgomery County, MD" (Nov. 1, 2022) at ii, 13. https://www.montgomerycountymd.gov/OLO/Resources/Files/2022_reports/OLOreport2022-13.pdf.

- The number of personally manufactured firearms, or "ghost guns," seized by County police in 2020 increased 250% from the prior year;

- In August 2021, a 14-year old used a ghost gun to shoot 4 people, three minors and one adult, killing the adult, at an outdoor basketball court at a County recreation center. He fired at least 16 shots;[6]

- In January 2022, in a County public high school restroom, one student shot another in the middle of the school day with a ghost gun, assembled from parts delivered to his home;[7]

- As of June 2022, homicides in the County involving guns, victims and suspects under the age of 21 more than doubled from 2021 to 2022 (JA 498);

---

[6]    Kevin Lewis, *14-year-old Behind Fatal Shooting in Germantown Used a Ghost Gun, Prosecutors Say*, wjla.com, August 20, 2021, https://wjla.com/news/local/14-year-old-shilen-wylie-fatal-quadruple-shooting-germantown-recreation-center-ghost-gun

[7]    Darcy Spencer, *Maryland Teenager Sentenced to 18 Years for Shooting Student at Magruder High,* NBCwashington.com, December 22, 2022, https://www.nbcwashington.com/news/local/maryland-teenager-sentenced-to-18-years-for-shooting-student-at-magruder-high/3239939/; Zak Failla, *Magruder HS Teen Who Shot Student,15, With 'Ghost Gun' Gets 18 Years In Prison*, Daily Voice, December 22, 2022, https://dailyvoice.com/maryland/montgomery/news/magruder-hs-teen-who-shot-student15-with-ghost-gun-gets-18-years-in-prison/852524/

- On July 10, 2022, a shooter opened fire shortly before 5:20 PM in a County shopping center parking lot, discharging a total of 60 rounds of ammunition, striking cars, local businesses, and critically injuring a man who had to be taken to the hospital (JA 497);[8] and

- As of July 2022, non-fatal gun shootings were up 75% from the year before. (JA 497)

Against the backdrop of this unprecedented increase in gun violence,[9] and pursuant to its authority under State law,[10] the County enacted two changes to its Firearms Law.

---

[8] Michael Hernandez, *60 Shots Fired in Briggs Cheney Parking Lot; Man Critically Injured*, Montgomery Community Media, July 11, 2022 https://www.mymcmedia.org/60-shots-fired-in-briggs-cheney-parking-man-critically-injured/#:~:text=A%20total%20of%2060%20rounds,scene%20over%20the%20past%20year.

[9] The County does not cite these undisputed legislative facts to suggest that this Court engage in the means-end scrutiny that the *Bruen* Court abolished in examining the constitutionality of governmental firearms regulations under the Second Amendment. *See New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2127 (2022). Rather, as discussed below, they evidence the unprecedented societal concerns and dramatic technological changes facing County legislators when they amended the County Firearms Law.

[10] Maryland law authorizes a county to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of a handgun, rifle, or shotgun, their components and ammunition, (1) with respect to minors and (2) within 100 yards of or in a park, church, school, public building, and other place of public assembly. *See* Md. Code Ann., Crim. Law § 4-209(b) (2021).

The first change to the County Firearms Law, Bill 4-21, in April 2021, prohibited "ghost guns" near minors and places of public assembly.[11]

The second change, Bill 21-22E, effective on November 28, 2022, revised the definition of places of public assembly to comport with *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) (hereafter "*Bruen*"). As will be discussed in more detail below, Bill 21-22E also removed a prior exception to the prohibition against carry in places of public assembly for persons who had a State of Maryland-issued wear-and-carry permit.

### An Explanation of the November 2022 Changes by Bill 21-22E

Bill 21-22E did not change an existing prohibition of carrying firearms within 100 yards of a place of public assembly (MCC § 57-11(a)), but revised the definition of a "place of public assembly" (in MCC §57-1) to be consistent with *Bruen.* A place of public assembly is:

  (1)    a publicly or privately owned:

    (A)    park;

    (B)    place of worship;

---

[11]    Montgomery County Office of Legislative Oversight Memorandum Report No. 2022-13 "Firearms Availability, Data, and Legal Authority in Montgomery County, MD" (Nov. 1, 2022) at 4. https://www.montgomerycountymd.gov/OLO/Resources/Files/2022_reports/OLOR eport2022-13.pdf (defining "ghost gun" or "privately made firearm" as "a gun made by an individual that does not have a commercially applied serial number and is typically untraceable by law enforcement. PMFs typically begin as disassembled and partially unfinished components of a firearm").

      (C)    school;

      (D)    library;

      (E)    recreational facility;

      (F)    hospital;

      (G)    community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;

      (H)    long-term facility, including any licensed nursing home, group home, or care home;

      (I)    multipurpose exhibition facility, such as a fairgrounds or conference center; or

      (J)    childcare facility;

   (2)    government building, including any place owned by or under the control of the County;

   (3)    polling place;

   (4)    courthouse;

   (5)    legislative assembly; or

   (6)    a gathering of individuals to collectively express their constitutional right to protest or assemble.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

(JA 384-85, Lines 34-59) Bill 21-22E added several "sensitive places" that *Bruen* expressly indicated were locations where weapons could be constitutionally banned.

(JA 384-85, Lines 51-55)

Plaintiffs overstate grossly the reach of the County Firearms Law, characterizing the County's restrictions on public carry as banning the ability to carry a firearm throughout the County, including private property.[12] This is simply not true. The County's restriction of firearms in places of public assembly does **not** apply to:

- possession of a firearm or ammunition in a person's home;[13]

- possession of a firearm and its ammunition at a business by its owner

---

[12]     Pls.' Br. 29-30; 41-42. Notably, Plaintiffs' newfound map (Pls.' Br. 45 n.7) is not in the record and was not submitted to the District Court as part of the Motion for a Preliminary Injunction. The map is inaccurate and misleading, as it fails to show the private residence or business exceptions where a gun may be kept.

Plaintiffs argue that the County Firearms Law applies to private locations that are not open to the public. App. Br. 41-42. As noted by the District Court, all places listed in the County's Firearms Law are modified by "place of public assembly"; thus any private location listed in the County Firearms Law must be open to the public in order to be subject to the County's law. JA 833.

Last, Plaintiff Engage Armament, a firearms dealer, continues to call books on a shelf that it occasionally loans to customers in its store a "private library." Pls. Br. a 41; JA 41 ¶ 56. Engage Armament does not hold itself out to the public as a library with books available for loan, unlike other private libraries in the County inviting the public to come and enjoy 1000s of titles on their premises. *Compare* https://www.engagearmament.com/ (making no reference at all to books available for public loan), *with* https://jacarefund.org/japaneselibrary/ (Japanese American Care Fund Library with free loan of more than 12,000 books) ands https://montgomeryhistory.org/resources-at-the-jane-c-sween-library/ (Montgomery History non-profit library).

[13]     *See* MCC § 57-11(b)(3). (JA 694) This exception does not include ghost guns and undetectable guns. *See id.* (JA 694)

or an authorized employee of the business;[14]

- a law enforcement officer or a licensed security guard;[15]

- a retired law enforcement officer;[16] and

- the transport of a firearm in a vehicle when it is locked in a case, separate from its ammunition.[17]

(JA 385-86, Lines 77-92)

Prior to Bill 21-22E, the above list of exceptions included State handgun permit holders. In other words, before Bill 21-22E, if an individual had a permit from the State to wear and carry a handgun, that individual could still carry near places of public assembly. Bill 21-22E removed that exception. (JA 386, Lines 85-86)

---

[14]    *See* MCC § 57-(b)(4). (JA 694) Both the business owner and employee must have State-issued wear-and-carry permits. *See id.* (JA 694)

[15]    *See* MCC § 57-11(b)(2). (JA 694)

[16]    The Law Enforcement Officers Safety Act (LEOSA) permits a qualified law enforcement officer or a qualified retired or separate law enforcement officer to carry a concealed weapon regardless of state or local laws. *See* 18 U.S.C. §§ 926B, 926C. There are exceptions to that law however for State or County-owned properties; LEOSA expressly states weapons bans on those properties must still be honored. *See id.* §§ 926B(b)(2); 926C(b)(2).
Plaintiffs' assertion that the County Firearms Law renders houses of worship "'sitting ducks' for mass murders" (Pls.' Br. 30) is distasteful and inaccurate considering this exception and the exception for security guards.

[17]    *See* MCC § 57-11(b)(5)(A). (JA 694-695) This exception does not include ghost guns and undetectable guns. *See id.* (JA 694-695)

The County removed this exception via Bill 21-22E in part based upon the exponential increase in the number of concealed handgun permit applications in Maryland after *Bruen.* Prior to *Bruen*, Maryland required a person demonstrate "good and substantial reason" to receive a wear-and-carry gun permit. Md. Code Ann., Pub. Safety § 5-306(a)(6)(ii) (2018). Immediately after *Bruen,* Maryland Governor Larry Hogan instructed the Maryland State Police to no longer enforce this requirement.[18] In the weeks after Governor Hogan's instruction, the number of applications for carry permits received by Maryland State Police increased **eleven-fold**.[19] As carry permit holders would no longer have to demonstrate any justification for a carry permit, and the number of carry permit holders increased substantially post-*Bruen*, the County Firearms Law prevents a person from carrying a firearm within 100 yards of a place of public assembly even if they have a valid State carry

---

[18]     Also after *Bruen*, the Appellate Court of Maryland struck down the "good and substantial reason" requirement. *See In re Rounds*, 255 Md. App. 205 (2022). The "good and substantial reason" requirement is stricken from the law effective October 1, 2023. 2023 Md. Laws ch. 651.

[19]     *See also* Fredrick Kunkle, *Supreme Court ruling sets off rush for concealed gun permits in Maryland,* The Washington Post (July 25, 2022). https://www.washingtonpost.com/dc-md-va/2022/07/15/concealed-carry-maryland-guns-hogan/.

permit.[20]

### *Plaintiffs Unsuccessfully Seek an Injunction to Enjoin Enforcement of the County's Firearms Law*

In response to Bill 21-22E, Plaintiffs filed a Second Amended Complaint on November 30, 2022, and moved for an injunction and temporary restraining order based upon Count VII only. (JA 14-98) Count VII asserts that the County's regulation of firearms in places of public assembly violates the Second Amendment because it is not a permissible regulation of "sensitive places" as set out by *Bruen*.[21] (JA 81-91)

On December 6, 2022, Plaintiffs moved for a temporary restraining order and preliminary injunction to prevent and enjoin the County from enforcing MCC Section 57-11(a), as amended by County Bill 21-22E (with newly defined places of public assembly), as whole. (JA 832). Alternatively, Plaintiffs sought more limited relief: to restrain the County from enforcing MCC Section 57-11(a) as to (1) carry permit holders who allegedly "provide armed security to places of worship and/or to

---

[20]    Bill 21-22E has a severability provision that provides its remaining provisions remain in full force and effect if any provision of the Bill is found to be unenforceable by the final judgment of a court of competent jurisdiction. (JA 286, Lines 97-100) *See also* MCC § 1-202(a) ("it is the intent of the Council that the provisions of this Code and all laws enacted by the County Council are severable. If a provision is held invalid or inapplicable, the remainder of the Code or the law remains in effect").

[21]    Plaintiffs style Count VII as: "Alleged Violations of the Second Amendment Right to Armed Self-Defense in Public." (JA 81)

private schools"; and (2) the 100-yard restriction around places of public assembly as to carry permit holders. (ECF No. 54 at 1-2).

After County Opposition and oral argument, the District Court issued a 40-page opinion denying the Plaintiffs' motion because they did not establish a likelihood of success on the merits. (JA 827-866) Although the District Court noted that this finding made it unnecessary to address the remaining factors, *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013), the District Court wrote that "even if they were considered, the remaining factors collective weigh against a preliminary injunction." (JA 864-866)

Initially, the District Court summarized the *Bruen* decision. The District Court noted that *Bruen* did not resolve whether a court reviewing firearms restrictions is limited to historical sources from the time period of the ratification of the Second Amendment in 1791, or from the time period of the ratification of the Fourteenth Amendment in 1868, at which point the protections of the Second Amendment became applicable to local firearms restrictions. The District Court concluded that historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms because, as *Bruen* noted, states are bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second. The District Court found additional support for this conclusion in *Nat'l Rifle*

*Ass'n v. Bondi*, 61 F.4th 1317, *reh'g granted en banc*, 72 F.4th 1346 (11th Cir. 2023).[22] (JA 844-845)

The District Court then addressed the Plaintiffs' claims regarding the specific categories of places of public assembly under the County Firearms Law.[23] As to places of worship, the District Court concluded that the historical record in the years following the ratification of the Fourteenth Amendment, as presented by the County, demonstrated a well-established and representative number of statutes that prohibited firearms in places of worship. (JA 848-850).

As to public parks,[24] the District Court again found that the historical record provided by the County demonstrated a history of restricting firearm possession and

---

[22]    The *Bondi* decision was still good law at the time of the District Court's decision, but as indicated, the Eleventh Circuit vacated the decision pending a rehearing en banc. Without a hint of irony Plaintiffs attack the District Court's citation of *Bondi* because the Eleventh Circuit vacated it, while they urge this Court to follow its vacated decision *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, *vacated*, 14 F.4th 322 (2021). *Hirschfeld's* conclusion that legislation circa 1791 is the sole source for understanding the scope of the Second Amendment is at odds with the *Bruen* Court's broader reliance on laws both at the time of this country's founding as well as Reconstruction era laws. *Bruen* at 2132.

[23]    The District Court found that the Plaintiffs lacked standing to challenge the County Firearms Law as to some of the categories of places of public assembly. (JA 834-841). Plaintiffs do not challenge that aspect of the District Court's ruling.

[24]    The District Court found that the Plaintiffs did not have standing to challenge firearms restrictions in privately owned parks. (JA 839-840). Plaintiffs do not challenge this finding.

carrying in public parks and at locations where large numbers of people engaged in recreation. (JA 850-852). The District Court cited over a dozen state and municipal laws from before, during, and after the ratification of the Fourteenth Amendment in support of its finding.

The District Court turned aside the Plaintiffs' argument that some of these historical statutes should be discounted because their purpose may have been to protect waterfowl or wildlife. First, the District Court noted that, under *Bruen*, the "how and why" historical regulations burden rights relating firearms are not applicable when there is a clear historical example of the exact same type of regulation—in this instance, restrictions on carrying firearms in parks—but are instead applicable only when the Court is asked to reason by analogy in order to uphold a new form of restriction that did not exist at the time of the ratification. (JA 852, citing *Bruen* at 2132-33). Second, the District Court wrote, even if these considerations must be examined, the historical statutes restrict the carrying firearms in the exact same way as the County Firearms Law, by barring the carrying of a firearm in a park regardless of what self-defense concerns might exist, and they do so for apparently similar reasons, "[p]ublic safety and the peaceful enjoyment of parks," in densely populated and urban areas. (JA 852)

As to the County Firearms Law's restrictions on firearms in recreational facilities and multipurpose exhibition facilities, the District Court concluded that the

historical statutes prohibiting firearms in parks "are fairly deemed to be well-established and representative historical analogues because such facilities, like parks, are locations at which large numbers of person gather to engage in recreation." (JA 853) The District Court also cited state and municipal statutes directly restricting the carrying of firearms in recreational facilities and multipurpose exhibition facilities. "Whether viewed as direct historical precedent or historical analogues, these statutes and ordinances demonstrate a historical tradition of restricting the carrying of firearms in places where individuals gather for recreation or social activities such as the recreational facilities and multipurpose exhibition facilities covered by [the County Firearms Law]." (JA 853-854) The burden these statutes imposed on the right to bear arms is comparable to the burden imposed by the County Firearms Law, the District Court wrote, because they both generally prohibit the carrying of firearms in these locations with no exception relating to possible self-defense needs. And the reasons for these historical restrictions, to protect individuals engaged in recreational and social activities from confrontation and encounters involving firearms or other dangerous weapons, are comparable to the reasons for the restrictions in the County Firearms Law, which the legislative record revealed is to address possible gun violence in or near places of public assembly. (JA 854)

The District Court found that the County's historical record included numerous examples of laws prohibiting firearm in buffer zones ranging from 50

yards to two miles around a "sensitive place," including polling places, election registration locations, schools and universities, and parks or other common areas. (JA 856-859) Again, the District Court refuted Plaintiffs' argument that these historical laws were enacted to protect wildlife and not to restrict the right to self-defense, noting that many of the statutes had nothing to do with hunting. First, the District Court wrote, these historical restrictions "were plainly enacted to further presumptively valid restrictions on the right to self-defense in the area immediately adjacent to such locations for purpose of public safety and to allow the activity at issue, such as voting or the education of children, to occur without concern for violence or other interruption." Second, the District Court disagreed that the purpose of the laws restricting the carrying of firearms in parks was solely to prevent poaching or hunting: many apply to parks in distinctly urban settings and specifically include prohibitions on throwing any projectile without regard to whether the action endangers wildlife. Finally, these historical statutes and the County Firearms Law imposed comparable burdens on the right to armed self-defense. (JA 857-858)

The District Court found that the Plaintiffs did not make the required "clear showing" that they would suffer irreparable harm that is "neither remote nor speculative, but actual and imminent." (JA 864-865, citing *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019)). Though the District Court found a sufficient possibility that the County enforce its law to

establish standing, the Plaintiffs did not provide "any examples of prosecutions against permit holders for possessing a firearm in the scenarios they have referenced, such as a prosecution for possessing a firearm on a public street or area that happens· to be within 100 yards of a place of public assembly, or for carrying a firearm at a place of worship with the permission of the leadership of that institution." (JA 865)

Lastly, the District Court found that the balance of the equities and the public interest weighed against a preliminary injunction. Although *Bruen* expressly prohibits consideration of the public interest (e.g., the sharp increase in the number of mass shootings in American communities) in assessing whether a firearm restriction violates the Second Amendment, the District Court concluded that it could consider that as a public interest factor in assessing a request for preliminary injunction. The District Court was persuaded that the public interest weighed against prematurely enjoining enforcement of the County Firearms Law given statistics demonstrating a recent significant increase in gun violence in the County. (JA 866)

Plaintiffs now appeal that determination as to publicly or privately owned places of worship, parks, recreational facilities, and multipurpose exhibition facilities. Plaintiffs also challenge the County's prohibition against carrying within 100 yards of a place of public assembly.

## SUMMARY OF THE ARGUMENT

The District Court properly denied Plaintiffs preliminary injunctive relief as they failed to meet their burden to make a clear showing for the extraordinary remedy of a preliminary injunction to prohibit enforcement of a duly enacted law.

Plaintiffs are not likely to succeed on the merits. The County provides an ample historical record of regulations, as required by *Bruen*, that are either a precise "twin" or that are analogous to the County's Firearms Law.

Although the Court need not reach the remaining factors for a preliminary injunction if Plaintiffs are not likely to succeed, those remaining factors weigh against issuing an injunction. The balance of the equities weighs against enjoining enforcement of the County's duly enacted law, designed to protect members of the public from gun violence.

## ARGUMENT

### Standard of Review

This Court reviews "a district court's denial of a preliminary injunction for abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021).

As the District Court correctly noted, to obtain a preliminary injunction, a moving party must establish that (1) it is likely to succeed on the merits; (2) it is

likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307,320 (4th Cir. 2013).

Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## I.       The District Court Correctly Determined that Plaintiffs Did Not Demonstrate a Likelihood of Success on the Merits.

The County's regulation of firearms is constitutional and consistent with evolving Supreme Court Second Amendment precedent. The County Firearms Law constitutionally prohibits firearms in places of public assembly that, historically, were areas where other state and local jurisdictions prohibited firearms. Alternatively, the prohibited carry locations are analogous to similar historical precursors prohibiting the carry of weapons in certain locations.

### A.       Legal Standards: The *Bruen* Framework.

Under *Bruen*, if the Second Amendment applies to the conduct regulated by the government, there is only one step for a court to consider: whether the government can justify its regulation by demonstrating it is "[c]onsistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

19

1.    **The *Bruen* Court's Template to Assess Firearms Regulations.**

A historical tradition of firearms regulation can be based upon relatively few examples. For example, the *Bruen* Court deemed it "settled" that firearms could be banned in legislative assemblies, polling places, and courthouses, even while acknowledging that "the historical record yields relatively few 18th- and 19th-century" laws identifying them as "sensitive locations" where firearms could lawfully be prohibited. *Bruen* at 2133.

*Bruen* identified five[25] "sensitive places" where firearms historically could be prohibited: schools, government buildings, legislative assemblies, polling places, and courthouses. *See id.* at 2133. The Court instructed courts to "use analogies to those historical regulations of 'sensitive places' to determine [whether] modern regulations prohibiting the carry of firearms in **new** and analogous sensitive places are constitutionally permissible." *Id.* At 2133 (emphasis in original).

The five sensitive places in *Bruen* are not exhaustive, and a government may justify its regulation by identifying other analogous or "relevantly similar" historical regulations. *See id.* at 2132. *Bruen* listed two metrics for courts for a "relevantly

---

[25]    Plaintiffs acknowledged that *Bruen* identified five sensitive places where firearms may constitutionally be prohibited in its District Court filings. *See* ECF 54-1 at 13, 15, 19, 25, 31. Before this Court, Plaintiffs now argue incorrectly that *Bruen* identified only three sensitive places, Pls.' Br. 6, 28, 29, 42, and that the other two locations cited in *Bruen* are "dicta" from *Heller*. Pls.' Br. 28.

similar" analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The historical analogue analysis therefore should review "[w]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

The "how" and "why" metrics are central to the analysis, but they are not the only metrics for a court to review. *See id.* at 2132. In addition to the "how" and "why" metrics, the task of analogue analysis can be a "straightforward" assessment if the challenged law "addresses a general societal problem that has persisted since 18th century." *Id.* at 2131.[26] The absence of a similar law addressing the ongoing historical problem is relevant evidence that the new law is unconstitutional. *See id.* at 2131.[27] But for laws that implicate "unprecedented societal concerns or dramatic technological changes," a more "nuanced" approach may be required, as "[t]he regulatory challenges posed by firearms today are not always the same as those that

---

[26]    Plaintiffs state incorrectly the County's amendments to Chapter 57 address "a general societal problem." Pls.' Br. 29. As noted above, the County's Firearms Law responded to unprecedented levels of gun violence in the country and in the County, with firearms technolog, unavailable to and unknown by the Founders.

[27]    Of course, the lack of a distinctly similar historical law could simply reflect the fact that a state chose not to pursue a legislative response to the particular problem, not that any response would be unconstitutional.

preoccupied the Founders in 1791 **or the Reconstruction generation in 1868**.” *Id.* at 2132 (emphasis added).

To that end, the analogue analysis as “[n]either a straightjacket nor a regulatory blank check.” *Id.* at 2133. Analogical reasoning only requires that the government “[i]dentify a well-established and representative historical **analogue**, not a historical **twin**.” *Id.* at 2133 (emphasis in original). Even if a challenged law is not a “[d]ead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.” *Id.* at 2133.

> **2.    *Bruen* Does Not Restrict Analysis to the Founding Era.**

*Bruen* does not support Plaintiffs’ argument that only “Founding Era” laws

are instructive in the analogue analysis.[28] The *Bruen* Court acknowledged the debate

between whether the laws at the time of the Second Amendment's adoption (1791)

or the ratification of the Fourteenth Amendment (1868) are more instructive. *See*

*Bruen* at 2138. But the *Bruen* Court **expressly** did not weigh in on which era is

definitive. *See id.*[29] Rather, the Court stated the laws in both eras supported its

---

[28]     *See, e.g.*, Pls.' Br. at 18, 20. Plaintiffs cite two Circuit Court decisions as "looking to 1791" for their Second Amendment analysis. Pls.' Br. 24. In addition to having no precedential weight for this Court, those decisions are inapt here. *United States v. Daniels*, 77 F.4th 337, 2023 U.S. App. LEXIS 20870 (5th Cir. 2023), considered a Second Amendment challenge to a **federal** law. Laws from 1791 may be more relevant than Reconstruction generation laws when reviewing the constitutionality of a federal law because the Second Amendment unquestionably applied to the Federal Government from its inception. *See id.* at * 20. The instant case is a Second Amendment challenge to a local law, not a federal law. In *Teter v. Lopez*, 76 F.4th 938, 2023 U.S. App. LEXIS (9th Cir. 2023), Hawaii's ban on butterfly knives did not survive a Second Amendment challenge because they are similar to pocketknives, in existence for hundreds of years, yet Hawaii identified no statute banning possession of pocketknives. *See id.* at *29 ("Hawaii cites no analogues in which Congress or any state legislature imposed an outright ban on the possession of pocketknives to remedy this problem near 1791 or 1868"). Unlike Hawaii, the County provides ample historical twins and analogues for the County Firearms Law.

And contrary to Plaintiffs' arguments, post-*Bruen*, District Courts do not "uniformly" look to 1791. *See* n. 32, *infra* (citing two District Court decisions that considered Reconstruction Era statutes). And all but one of the District Court decisions cited by Plaintiffs (Pls. Br. at 24-25) challenged federal gun restrictions following *Bruen*; their use of 1791 as a frame of reference is not guidance for this case involving regulation by a local government.

[29]     Plaintiffs have it right in their brief when they state that the Supreme Court "found no need to resolve" the question of whether 1791 or 1868 determined the scope of the Second Amendment right. Pls.' Br. 20.

conclusion that New York's law requiring "proper cause" to carry in public did not pass constitutional muster. *Id. See also Bruen* at 2150 ("[A] short review of the public discourse surrounding Reconstruction is useful in demonstrating how public carry for self-defense remained a central component of the protection that the Fourteenth Amendment secured for all citizens.").[30]

*Bruen* instructs, "[a]lthough its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen* at 2132.

With respect to firearms, this Country is well beyond what the Founders specifically anticipated. In 1791, to fire a gun, an individual needed anywhere from 10 to 30 seconds to properly load the weapon with powder and shot for **one** discharge of their weapon, and then repeat that process. *Oregon Firearms Fed'n. v. Kotek*, No.

---

[30]      The *Bruen* Court mentions *Ramos v. Louisiana*, 140 S. Ct. 130 (2020) and *Timbs v. Indiana*, 139 S. Ct. 682 (2019). *See Bruen* at 2137. But the *Bruen* Court clearly did not find those decisions – and their use of 1791 as the touchpoint for Bill of Rights provisions applied to state – persuasive, as Plaintiffs' brief implies. Pls. Br. at 20-21. As noted above, the *Bruen* Court did not resolve the question as to which era is definitive for purposes of Second Amendment challenges to state gun regulation. *See id.* And the Supreme Court in *Lynch v. Donnelly*, an Establishment Clause case, found the decisions of the 1789 Congress to be of "special significance" (Pls. Br. at 21) because 17 members of that First Congress were Delegates to the Constitutional Convention. *See Lynch v. Donnelly*, 465 U.S. 668, 674 (1983). Their presence in the First Congress, and its approval of legislation for paid chaplains for the House and Senate, was of "special significance" to the Court's Establishment Clause analysis. *See id.* The case and its deference to the 1789 Congress is not relevant here, especially given *Bruen*'s more recent and relevant Second Amendment analysis.

2:22-cv-01815-IM, 2023 U.S. Dist. LEXIS 121299 at *46-48 (D. Or. July 14, 2023). The commonly available firearms, single-shot guns, were difficult to keep loaded and at the ready for spontaneous self-defense as they used corrosive gunpowder. *See id.* at *47-49. Repeating firearms were not commonly in use at the time of the Founding; they were beyond the mechanical and technical capacity at the time. *See id.* at *46-49. The technological limits meant that "[i]nterpersonal gun violence was not widespread in society prior to the middle of the nineteenth century." *Id.* at *49.

With the expiration of the Colt's patent on its revolver in 1857, and the end of the Civil War in 1865, manufacturers turned to the civilian market to continue to sell revolvers. *See id.* at *63. This led to an increase in revolvers being used for interpersonal violence, and a concomitant increase in their regulation by governments. *See id.* at *65-*68.

Notably, once firearms came into existence in the mid-1800s that were capable of easier discharge (and that did not take 30 to 60 seconds to load and fire), statutes started to appear at the state and local level prohibiting their use in various highly populated areas. This is not a sign of warping the right to bear arms in a manner inconsistent with that as envisioned at the time of the Founding, as again, the weaponry involved was not commonly in use at the time of the Founding. It is therefore particularly appropriate to rely upon 1868 laws (Reconstruction generation) that addressed firearms bans in places of public assembly in light of the

increased use of firearms that were more commercially available, easier to load, and capable of repeating.

Many courts, both prior to *Bruen*[31] and after,[32] considered Reconstruction Era laws as pertinent to Second Amendment challenges to government regulations. As noted by the District Court, the Second Amendment originally applied only to the Federal Government. *See McDonald v. City of Chicago*, 561 U.S. 742, 754 (2010); *Barron ex Rel. Tiernan v. Mayor of Balt.*, 32 U.S. (7 Pet.) 243, 250-51 (1833). Thus, sources from the time of the Fourteenth Amendment's ratification are "equally if not more probative of" the scope of the Second Amendment's right to bear arms.[33] (JA 844)

---

[31] *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012).

[32] *See Goldstein v. Hochul*, No. 22-CV-8300 (VSB), 2023 U.S. Dist. LEXIS 111124, at *30-31 (S.D.N.Y. June 28, 2023); *Frey v. Nigrelli,* No. 21-CV-05334 (NSR), 2023 U.S. Dist LEXIS 42067 at *39, *48-49 (S.D.N.Y. March 13, 2023).

[33] The Supreme Court did not identify the Fourteenth Amendment as the vehicle through which it could "incorporate" specific provisions of the Bill of Rights and apply them to the states, until 1925, almost half a century after the Fourteenth Amendment was adopted. *Gitlow v. New York*, 268 U.S. 652 (1925). Indeed, less than a decade after its adoption, the Supreme Court disclaimed any notion that the Fourteenth Amendment made the Bill of Rights applicable to the states. *United States v. Cruikshank*, 92 U.S. 542 (1876). The Supreme Court "incorporated" the Second Amendment a scant 13 years ago, in *McDonald v. Chicago*, 561 U.S. 742 (2010).

### 3. *Bruen* Does Not Prohibit Firearms Regulation.

Contrary to Plaintiffs' assertion of broad rights of armed confrontation, the Second Amendment right to bear arms is not a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The Second Amendment right to bear arms for purposes of self-defense is most acute in one's own home. *See Heller*, 554 U.S. at 628. Moreover, an individual's Second Amendment right to possess a firearm for self-defense is not limitless and is appropriately subject to government regulation. *See Bruen* at 2162 (Kavanaugh, J., concurring) ("[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations" (quoting *Heller*, 554 U.S. at 636)); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (noting that it is "important to keep in mind" that *Heller* did not cast doubt on certain "longstanding regulatory measures" in connection with firearms); *Heller*, 554 U.S. at 595 (2008) (the right to keep and bear arms is "not unlimited").

Unlike the law at issue in *Bruen*, which required individuals to demonstrate "proper cause" to carry a weapon **anywhere** outside of the home, the County's law is much more limited in scope. The County's law addresses the right to carry in places of public assembly, or where large groups of persons are likely to be gathered and therefore more likely vulnerable to gun violence.

As the County's regulation of firearms in places of public assembly is

consistent with *Bruen*, the District Court correctly held that Plaintiffs did not meet their burden of demonstrating that they would likely succeed on the merits. The challenged locations in the County's definitions of "place of public assembly" either have exact historical statutory matches, or have historical statutory analogues that regulated firearms in a similar manner and for similar reasons as the County Firearms Law.

**B.    Buffer Zones Around Sensitive Locations, and Inclusion of a Place's Parking Lots or Building Grounds**

The County Firearms Law prohibits carry within 100 yards of a place of public assembly. (JA 692) Plaintiffs challenge this as overly broad and restrictive of their ability to travel throughout the County. Pls.' Br. at 43. Plaintiffs are unlikely to prevail on their arguments because the State of Maryland expressly authorizes the County to create a buffer zone and, courts prior to *Bruen* upheld the concept of a buffer zone, and many historical analogues included buffer zones around sensitive areas and populations.

**1.    State Law Expressly Permits the County to Prohibit Carry Within 100 Yards of Public Assembly.**

State law expressly authorizes the County to include a "buffer zone" in any regulation of the carry of weapons in places of public assembly. *See* Md. Code Ann., Crim. Law § 4-209(b)(1)(iii) (2021). The law provides that a county may regulate the "purchase, sale, transfer, ownership, possession and transportation" of a

handgun, rifle, or shotgun, or the ammunition for and components thereof, "within 100 yards of or in a park, church, school, public building, and any other place of public assembly." *Id.* This is reflective of the fact that both case law and prior statutes recognize that not only should a sensitive location be protected, but similarly the area surrounding it is entitled to protection.

### 2. Cases Acknowledge the Concept of Buffer Zones and Inclusion of Parking Lots as Part of a Building Where the Second Amendment Does Not Apply.

Several recent appellate decisions found that a parking lot associated with federal property qualified as a "sensitive location" in which the Second Amendment right to bear arms did not apply.

For example, a parking lot reserved for government employees 1,000 feet from the U.S. Capitol's entrance was "sufficiently integrated" with the Capitol to be considered a sensitive place where firearms may be banned in *United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019).[34] The Court relied upon several factors to support this conclusion: 1) the lot had been set aside for the use of government employees, 2) the lot was in close proximity to the Capitol building, and 3) the lot was on land owned by the government. *See id.* at 464. The Court had "[l]ittle trouble concluding

---

[34]    While this decision and the next two discussed predated *Bruen*, all nevertheless relied heavily upon *Heller* and its historical analysis of "sensitive locations," which *Bruen* augmented. *See Class*, 930 F.3d at 464; *Bonidy* 790 F.3d at 1124-25; *Dorosan* at 350 Fed. Appx. at 875-76.

that the same security interests which permit regulation of firearms 'in' government buildings permit regulation of firearms on the property surrounding those buildings as well." *Id.* at 464.

In addition to *Class*, two other Courts of Appeals found that the Second Amendment right to bear arms does not apply in the parking lots around government buildings in *Bonidy v. United States Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) and *United States v. Dorosan*, 350 Fed. Appx. 874 (5th Cir. 2009). Both cases involved challenges to federal regulations that prohibited storage and carriage of firearms on U.S. Postal Service property. *See Bonidy*, 790 F. 3d at 1123; *Dorosan*, 350 Fed. Appx. At 875. Both Courts held that the ban on guns in government buildings apply with the same force to the parking lot as to the building itself. *See Bonidy*, 790 F. 3d at 1126; *Dorosan*, 350 Fed. Appx. At 875-76.

The same logic applies here: the same security interests that permit regulation of firearms in sensitive locations permits the County's regulation of firearms in the parking lot or on building grounds.

### 3. Historical Analogues for Buffer Zones Demonstrate Their Need and Validity.

The County's buffer zone is supported by many historical laws that prohibit weapons within a certain distance of various areas, activities, and populations.

Maryland has several examples of laws providing buffer zones to protect activities or populations of value. To protect water fowl, Somerset County in 1837

banned guns in or within 50 yards of any water fowl blind on Smith Island. (Add. 6)
Maryland prohibited guns within one mile of polling places, recognized by *Bruen* as
a sensitive area, on election days in Calvert County (1886 and 1888). (Add 115,
124). In 1874, Maryland protected elections with an enormous buffer zone in Kent,
Queen Anne's, and Montgomery Counties: on election days, persons could not carry
a gun **anywhere** in those counties. (Add. 64-65)

In addition to Maryland, many other states enacted "buffer zones" that
prohibited guns around certain areas or activities:

- Connecticut in 1859 barred the sale of liquor within one mile of any
  military "parade-ground, muster-field, or encampment." (Add. 20)

- Louisiana in 1870 prohibited guns within "one-half mile of any place
  of registration" for elections. (Add. 46)

- New Mexico, when it was still a Territory in 1887,[35] prohibited the
  unlawful brandishing of a weapon within a "settlement," defined to
  mean "any point within three hundred yards of any inhabited house."
  (Add. 120)

- The concealed carry of weapons could not occur within two miles of a
  university, college, or school in Mississippi in 1892. (Add. 169)

- Minnesota barred guns within a half mile of any of its parks in 1905.
  (Add. 300)

---

[35] *See* Andrew Willinger, *Territorial Gun Regulation and the "Lost" History
of the Federal Second Amendment*, Duke Center for Firearms Law Blog (August 8,
2022) https://firearmslaw.duke.edu/2022/08/territorial-gun-regulation-and-the-lost-history-of-the-federal-second-amendment/ (arguing the Second Amendment has
always applied in territories, and historical territorial laws should be given weight
despite *Bruen* court's discounting of the same).

In addition to the state restrictions above, six localities between 1868 and 1890 (Philadelphia (1868, 1869, 1870); St. Paul (1888); Trenton, New Jersey (1890); Pittsburgh (1893); St. Paul, Minnesota (1894); Reading, Pennsylvania (1897)) banned guns within 50 or 100 yards of their parks, squares, or common areas. (Add. 33, 37, 50, 130, 151, 183, 199, 227).

These historical laws **expressly** prohibit weapons in buffer zones around sensitive areas; the County's prohibition of guns in buffer zones is consistent with this historical tradition and is constitutional.

The foregoing authority in State law, federal appellate decisions identifying parking lots as integrated with sensitive locations, and historical statutes support a determination that the County's regulation of firearms within 100 yards of places of public assembly and in parking lots and building grounds of places of public assembly is consistent with historical tradition and constitutional. If Maryland historically protected water fowl with a buffer zone, certainly human life in areas of public assembly can similarly be protected by a buffer zone.

### C.    Publicly Parks

Examples of historical laws prohibiting weapons in parks abound. Before 1900, the following 27 municipalities in 13 states prohibited firearms in public parks:

1. New York City, New York (1857, 1858, 1861, 1903, 1906, 1912) (Add. 12, 14, 23, 257, 313, 375);
2. Brooklyn, New York (1868, 1873) (Add. 25, 58);
3. Philadelphia, Pennsylvania (1868, 1869, 1870) (Add. 33, 37, 50);
4. Chicago, Illinois (1873, 1881, 1922) (Add. 60, 101, 418);
5. San Francisco, California (1875) (Add. 78);
6. Hyde Park, Illinois (1875) (Add. 83);
7. St. Louis, Missouri (1881, 1883) (Add. 104, 112);
8. Danville, Illinois (1883) (Add. 107);
9. Boston, Massachusetts (1887) (Add. 118);
10. Salt Lake City, Utah (1888, 1920) (Add. 134, 404);
11. St. Paul, Minnesota (1888, 1894) (Add. 130);
12. Trenton, New Jersey (1890) (Add. 151);
13. Grand Rapids, Michigan (1891, 1906) (Add. 159, 308);
14. Lynn, Massachusetts (1891) (Add. 154);
15. Rochester, New York (1896) (Add. 127);[36]
16. Williamsport, Pennsylvania (1891) (Add. 166);
17. Peoria, Illinois (1892) (Add. 172);
18. Spokane, Washington (1892) (the prohibition against firearms also included "other public grounds of the city" (Add. 177);
19. Pittsburgh, Pennsylvania (1893) (Add. 183);
20. Wilmington, Delaware (1893) (Add. 190);
21. Canton, Illinois (1895) (Add. 204);
22. Detroit, Michigan (1895) (Add. 212);
23. Indianapolis, Indiana (1896) Add. 217
24. Reading, Pennsylvania (1897) (Add. 227);
25. Springfield, Massachusetts (1897) (Add. 231);
26. Kansas City, Missouri (1898) (Add. 237);
27. Boulder, Colorado (1899) (Add. 243);

By 1887, six major metropolitan areas (New York, Chicago, Philadelphia, St. Louis, Boston, and San Francisco) all banned guns in their parks.

---

[36] Rochester, New York, prohibited the discharge of any firearm. (Add. 127)

After 1900, 27 more municipalities in 9 more states banned firearms in parks:

1.   Hartford, Connecticut (1902) (Add. 250);
2.   New Bedford, Massachusetts (1902) (Add. 253);
3.   Lowell, Massachusetts (1903) (Add. 260);
4.   Troy, New York (1903) (Add. 264);
5.   Houston, Texas (1904) (Add. 269);
6.   Neligh, Nebraska (1904) (Add. 274);
7.   Pueblo, Colorado (1904) (Add. 280);
8.   Chicago, Illinois (1905) (Add. 286);
9.   Haverhill, Massachusetts (1905) (Add. 290);
10.  Harrisburg, Pennsylvania (1905) (Add. 142);
11.  Saginaw, Michigan (1905) (Add. 297);
12.  Denver, Colorado (1906) (Add. 302);
13.  Los Angeles, California (1906) (Add. 317);
14.  Phoenixville, Pennsylvania (1906) (Add. 323);
15.  Olean, New York (1907) (Add. 328);
16.  Seattle, Washington (1907) (Add. 337);
17.  Memphis, Tennessee (1909) (Add. 347);
18.  Oakland, California (1909) (Add. 352);
19.  Paducah, Kentucky (1909) (Add. 359);
20.  Staunton, Virginia (1910) (Add. 363);
21.  Colorado Springs, Colorado (1911) (Add. 365);
22.  New Haven, Connecticut (1914) (Add. 378);
23.  Birmingham, Alabama (1917) (Add. 381);
24.  Joplin, Missouri (1917) (Add. 385);
25.  Oakland, California (1918) (Add. 395);
26.  Burlington, Vermont (1921) (Add. 409); and
27.  Chattanooga, Tennessee (1922) (Add. 416).

In total, 54 municipalities in 22 states prohibited firearms in public parks between 1857 and 1922.

Of note, two state legislatures adopted local laws to ban guns in parks within specific cities: the Pennsylvania General Assembly adopted the restrictions for

34

Philadelphia, Pennsylvania in 1868,[37] and the Michigan General Assembly adopted the restrictions in Detroit in 1895.[38] These prohibitions therefore reflect a larger understanding of permissible restrictions in those states as opposed to just in those localities. Similarly, three states – Minnesota, Wisconsin and North Carolina – prohibited firearms in their state parks in 1905, 1917, and 1921, respectively. (Add. 300, 390, 412)

In addition to the above statutes, courts considering firearms bans in parks in recent years have held they are "sensitive places." Courts so held after finding that the need for self-defense, and by extension carrying a firearm in parks, is not as acute as in the home, given that parks are places where children recreate. *See, e.g.*, *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) (finding a city park is a "sensitive place" where it is permissible for the city to ban firearms because, in part, "[t]he need for self-defense is not 'most acute' at city parks and community centers where children and youth recreate"); *Zaitzeff v. City of Seattle*, 17 Wash. App. 2d 1, 17, 484 P.3d 470, 479 (2021), *review denied*, 498 P.3d 478 (Wash. 2021), *cert.*

---

[37]    A Supplement to an Act, entitled, 'An Act Appropriating Ground for Public Purposes in the City of Philadelphia", No. 1020 § 21 *Laws of the General Assembly of the State of Pennsylvania, 1868 Session,* 1088 (1868). (Add. 27, 28, 33)

[38]    An Act to amend an act Entitled "An Act Supplemental to the Charter of the City of Detroit, and Relating to Parks, Boulevards and Other Public Grounds…", No. 436 § 44, *Local Acts of the Legislature of the State of Michigan* 596 (1895). (Add. 206-208, 212)

*denied*, 142 S. Ct. 1123 (2022) (observing that although the Supreme Court in *Heller* "[d]oes not list parks as sensitive areas, the public safety concerns underlying the sensitive area distinction also apply here, particularly the concern about protecting children").

Given the numerous historical "twins" prohibiting weapons in parks, Plaintiffs did not meet their burden of demonstrating a likelihood of success in their claim that the County's gun restriction in parks is unconstitutional.

## D.    Places of Worship

There are many historical analogues to support the County's ban on guns in places of worship.[39]

Georgia in 1870 and 1882 prohibited the carrying of a pistol or revolver, or any kind of deadly weapon, to any place of public worship, "or any other public

---

[39] Many southern states historically required white male church attendees to bring arms to church as a precaution to thwart slave revolts. *See* Patrick J. Charles, *Article: Racist History and the Second Amendment: A Critical Commentary*, 43 Cardozo L. Rev. 1343, 1351 (2022). Plaintiffs quote one such statute from Virginia in 1755 as evidence that the District Court erroneously ignored Founding Era "tradition" of permitting guns in church. *See* Pls. Br. at 33 (citing *Koons v. Platkin,* No. 22-7464 (RMB/AMD), 2023 U.S. Dist. LEXIS 85235, at *225 (D.N.J. May 16, 2023)). That Virginia statute required militia members to go to church armed "to quell potential slave revolts." *See* Charles at 1351.

gathering" in the state.[40] Georgia's 1882 prohibition did not apply to law enforcement. (Add. 428) In 1870, 1871, and 1879, Texas prohibited any person from going into any church or religious assembly with a gun, and its laws in the latter two years also prohibited guns at "any other public assembly."[41] The Texas laws did not apply to law enforcement. *See id.*

Missouri in 1875, 1879, and 1883 prohibited firearms in any church or place where people assembled for religious worship.[42] Virginia prohibited pistols or other

---

[40]     *See* An Act to Preserve the Peace and Harmony of the People of this State, and for Other Purposes, Penal Code, Title 16, No. 285, *Acts and Resolutions of the General Assembly of the State of Georgia* 421 (1870) (Add. 42); Georgia Code, Part IV, Title I, Division IX, § 4528, *The Code of the State of Georgia* (1882). (Add. 427-428)

[41]     *See* An Act Regulating the Right to Keep and Bear Arms, Ch. 46, § 1, *General Laws of the Twelfth Legislature, of the State of Texas* 63 (1870) (Add. 55); An Act Regulating the Right to Keep and Bear Arms, Art. 6511 (1870) (Add. 70); An Act to Regulate the Keeping and Bearing of Deadly Weapons, Crim. Code Art. 6514(1871), *A Digest of the Laws of Texas* 1322, 1323 (1875) (Add. 71); Texas Code, Tit. 9, Ch. 4, Art. 320, Carrying Arms in Church or Other Assembly, *The Revised Statutes of Texas* 43 (1879). (Add. 98)

[42]     An Act to Prevent the Carrying of Weapons in Public Assemblies of the People, § 1, *Laws of Missouri, General and Local Laws Passed at the Regular Session of the Twenty-Eighth General Assembly* 50-51 (1875) (Add. 74); An Act to Prevent the Carrying of Weapons in Public Assemblies of the People, § 1, *Laws of Missouri, General and Local Laws Passed at the Regular Session of the Twenty-Eighth General Assembly* 50-51 (1875) (Add. 96); An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes and Criminal Procedure," § 1, *Laws of Missouri Passed at the Session of the Thirty-Second General Assembly* 76 (1883). (Add. 110)

dangerous weapons in 1877 in "any place of worship while a meeting for religious purposes is being held at such a place, or without good or sufficient cause therefor."[43]

In the 1890s, two localities in Missouri prohibited weapons at religious assemblies. Columbia, Missouri, prohibited the carry of dangerous weapons "into any church, or place where people have assembled for religious worship" in 1890.[44] In 1894, Huntsville, Missouri, prohibited the carry of a deadly or dangerous weapon in "any church or place where people have assembled for religious worship."[45] This prohibition did not apply to police officers.[46]

Arizona, while still a territory in 1889 and 1901, prohibited the carrying a pistol or other firearm in any church or religious assembly.[47] Similar to Texas's law,

---

[43]     Acts of Virginia Assembly, Ch. 7, of Offences [sic] Against Morality and Decency –Protection of Religious Meetings § 21, *Acts and Joint Resolutions of the General Assembly of the State of Virginia* 305 (1878). (Add. 92)

[44]     *See* Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, *General Ordinances of the Town of Columbia, in Boone County, Mo.* 34, 35 (1890). (Add. 146)

[45]     Huntsville, Missouri, Ordinance in Relation to Carrying Deadly Weapons, § 1 *The Revised Ordinances of the City of Huntsville, Missouri of 1894* 58 (1894). (Add.193)

[46]     *See id.* § 2. (Add. 194)

[47]     An Act Defining and Punishing Certain Offenses Against Public Peace, § 3, *Session Laws of the Fifteenth Legislative Assembly of the Territory of Arizona* 17 (1889) (Add. 137); Arizona Territory Statutes, Crimes and Punishments § 387, *The Revised Statutes of the Arizona Territory* 1252 (1901). (Add. 246)

this did not apply to law enforcement. *See id.* When it was still a territory, Oklahoma in 1890 and 1893 prohibited the carry of firearms into "any church or religious assembly."[48]

These historical precursors are exact matches of the County's prohibition of guns in places of worship. Indeed, like these laws, the County's law exempts law enforcement officers or security guards.

In addition to these analogous historical statutory precursors, several courts in the 1870s viewed churches or places of worship as no place for firearms. *See Hill v. State*, 53 Ga 472, 475 (Ga. 1874) (carrying arms at places of worship "[i]s a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee"); *English v. State*, 35 Tex. 473 478-79 (Tex. 1872) ( finding it "[l]ittle short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church…"); *Andrews v. State*, 50 Tenn. 165, 182 (Tenn. 1871) (observing a "[m]an may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them

---

[48] *See* Territory of Oklahoma Statutes, Crimes and Punishment, Art. 47, § 7, *The Statutes of Oklahoma 1890, Laws Passed by the First Legislative Assembly of the Territory* 496 (1890) (Add. 149); Oklahoma Territory Statutes, Art. 45, § 7, *Statutes of Territory of Oklahoma, 1893* 504 (1893). (Add. 181)

to such places is not an appropriate use of them").[49]

Given the "twin" historical analogues above, as well as the historical views of courts on the propriety of firearms in places of worship, the District Court correctly concluded that Plaintiffs were unlikely to demonstrate that the County's gun restriction in places of worship is unconstitutional.

### E.    Publicly or Privately Owned Recreational Facilities and Multipurpose Exhibition Facilities, such as a Fairgrounds or Conference Center

The County's ban of firearms in public or private recreational or exhibition facilities calls upon this Court to apply the "nuanced" approach described by *Bruen*, as recreational activities today do not always have a precise "twin" in 18th and 19th century America.

Many historical statutes banned firearms at ballrooms, balls, or a "Fandango," with some specifying that the prohibition applied only in public rooms, and others making the prohibition broad enough to include private rooms or any other public assembly. Virginia forbade arms "in fairs or markets, or in other places, in terror of

---

[49]    To the extent the *Bruen* court distinguished the *English* decision and some of the statutes relied upon by the County, it was in the context of assessing the "proper cause" requirement in in New York's public carry law, not in the context of a "sensitive places" analysis. *Bruen* at 2133-34 (observing defenders of New York's law "[e]rr in their attempt to characterize New York's proper-cause requirement as a 'sensitive-place law'").

the county" in 1786.[50] In 1817, New Orleans required ball attendees to check their

firearms at the ball room door.[51] When it was still a territory in 1852, New Mexico

prohibited firearms in "balls or Fandangos."[52] Tennessee broadly prohibited in 1869

the carrying pistols at any fair, race course, "or other public assembly."[53] Texas in

1870 prohibited firearms in ballrooms, social parties, and social gatherings,[54] and in

1871 expanded that list of banned carry to places "for amusement, or for educational

or scientific purpose," or carrying "into any circus, show, or public exhibition of any

---

[50]    *See* An Act Forbidding and Punishing Affrays, Ch. 49 (Virginia 1786). (Add. 1)

[51]    *See An Ordinance Respecting Public Balls,* Art. 1 (1817)*, General Digest of the Ordinances and Resolutions of the Corporation of New Orleans* 371 (1831) (prohibiting "any person to enter into a public ball-room with any cane, stick, sword or any other weapon" and requiring weapons be checked before entering a ball room). (Add. 3)

[52]    An Act Prohibiting the Carrying [of] a Certain Class of Arms, Within the Settlements and in Balls § 3, *Laws of the Territory of New Mexico* (1852) (prohibiting any person in New Mexico territory from "enter[ing] said Ball or room adjoining said ball where Liquors are sold, or to remain in said balls or Fandangos with fire arms or other deadly weapons"). (Add. 9-10)

[53]    An Act to Amend the Criminal Laws of the State, Ch. 22 § 2, (December 1, 1869), *Acts of the State of Tennessee* 23 (1870) (prohibiting the carry of a pistol at any "fair, race course, or other public assembly of the people"). (Add. 39)

[54]    An Act Regulating the Right to Keep and Bear Arms, Art. 6511 (1870); *A Digest of the Laws of Texas* 1322 (1875). (Add. 55)

kind, . . . or to any other public assembly."[55] Texas's prohibition in those same

locations remained in 1879.[56] Missouri in 1879 and 1883 prohibited guns where

people assembled for "educational, literary, or social purposes, . . .[or] any other

public assemblage of persons met for any lawful purpose."[57]

Two localities in Missouri enacted prohibitions at public social gatherings. In

1890, Columbia prohibited firearms similarly in public assemblies "for educational,

literary or social purposes, . . . [or] any other public assemblage of persons met for

any lawful purpose."[58] Huntsville, in 1894, similarly prohibited firearms in "any . .

. place where people are assembled for educational, literary, or social purposes, . . .

---

[55]    An Act to Regulate the Keeping and Bearing of Deadly Weapons,
Crim. Code Art. 6514(1871), *A Digest of the Laws of Texas* 1323 (1875). (Add. 71)

[56]    Texas Code, Tit. 9, Ch. 4, Art. 320, Carrying Arms in Church or
Other Assembly, *The Revised Statutes of Texas* 43 (1879). (Add. 99)

[57]    Missouri Code, Crimes and Criminal Procedure § 1274, Carrying of
Deadly Weapons, *Revised Statutes of the State of Missouri*, *Vol. I*, 224 (1879) (Add.
96); An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised
Statutes of Missouri, Entitled "Of Crimes and Criminal Procedure," § 1, *Laws of
Missouri Passed at the Session of the Thirty-Second General Assembly* 76 (1883).
(Add. 110)

[58]    Columbia, Missouri, General Ordinances, Ch. 17, § 163, *General
Ordinances of the Town of Columbia in Boone County, Missouri*, 35 (1890). (Add.
146)

[or] into any other public assemblage of persons met for any lawful purpose."[59]

Arizona and Oklahoma, when they were still territories, prohibited weapons at locations of public amusement. Arizona in 1889 and 1901 banned the carry of firearms at any "place where persons are assembled for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering, or to any other public assembly."[60] The Territory of Oklahoma in 1890 banned guns anywhere people assembled "for amusement," into any ball room, party, social gathering, or "to any other public assembly."[61] That list expanded in 1893 to include "any circus, show or public exhibition of any kind, or to any political convention," and to any place where persons assembled "for educational or scientific purposes."[62]

The burden placed upon the Second Amendment right by these analogous

---

[59]     Huntsville, Missouri, Ordinance in Relation to Carrying Deadly Weapons, § 1 *The Revised Ordinances of the City of Huntsville, Missouri of 1894* 58 (1894). (Add. 193)

[60]     An Act Defining and Punishing Certain Offenses Against Public Peace, § 3, *Session Laws of the Fifteenth Legislative Assembly of the Territory of Arizona* 17 (1889) (Add. 137); Arizona Territory Statutes, Crimes and Punishments § 387, *The Revised Statutes of the Arizona Territory* 1252 (1901). (Add. 246)

[61]     Territory of Oklahoma Statutes, Crimes and Punishment, Art. 47, § 7, *The Statutes of Oklahoma 1890, Laws Passed by the First Legislative Assembly of the Territory* 496 (1890). (Add. 137)

[62]     Oklahoma Territory Statutes, Art. 45, § 7, *Statutes of Territory of Oklahoma, 1893* 504 (1893). (Add. 181)

statutes to not bring firearms into places where the public gathers for purposes of amusement, education, scientific, or social purposes is similar to the burden created by the County's ban on carrying in recreational facilities and convention centers.

Further, courts considering the issue have found that fairgrounds or community centers are in fact "sensitive locations" where the Second Amendment does not protect the right to carry and guns may be restricted. *See, e.g., Christopher v. Ramsey Cty.*, 621 F. Supp. 3d 972, 981(D. Minn. 2022) (finding state fairgrounds as during the State Fair "are a sensitive location with thousands of people and children present in often crowded conditions" and upholding gun ban as constitutional); *Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) (finding for Second Amendment purposes "[n]o logical distinction between a school on the one hand and a community center where educational and recreational programming for children is also provided on the other").

## II. Plaintiffs Will Not Suffer Irreparable Harm if the Court Does Not Issue a Preliminary Injunction.

Plaintiffs did not make a clear showing that "irreparable injury is **likely** in the absence of an injunction." *Winter v. NRDC, Inc.,* 555 U.S. 7, 22 (2008) (emphasis in original). The harm to be suffered may not be "remote or speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 (4th Cir. 2019) (quotation omitted). Additionally, harm is irreparable when it cannot be fully rectified by the final judgment after trial. *Id.*

Many provisions of the County's ban on places of public assembly are authorized expressly by State law and are analogous to gun restrictions in State law. As such, Plaintiffs will not suffer irreparable harm if the County's restrictions remain in effect.

The County's prohibition against carrying within a buffer zone of 100 yards of places of public assembly is authorized by State law. *See* Md. Code Ann., Crim. Law § 4-209(b)(1)(iii). Further, the County's use of a 100-yard buffer zone around places of public assembly mirrors Maryland's use of buffer zones on election day, near public demonstrations, and around Ravens Stadium and Oriole Park at Camden Yards. *See* Md. Code Ann., Elec. Law § 16-903(a)(3) (2022) (prohibiting the carry or display of a gun "within 100 feet of a polling site" on election day); Md. Code Ann., Crim. Law § 4-208(b)(2) (2021) (prohibiting a person from having a firearm in a vehicle within 1,000 of a demonstration in a public place after being advised by law enforcement of the demonstration and being ordered to leave); COMAR §§ 14.25.02.06; 14.25.01.01(B)(2) (weapons prohibition at offices, restaurants, stores, museums, parking facilities, and other facilities located at Ravens Stadium and Oriole Park at Camden Yards includes "the grounds and walkways surrounding the facilities" and "adjacent parking lots or garages owned or controlled by" the State).

State law expressly authorizes the County to ban guns within 100 yards of a park. *See* Md. Code Ann., Crim. Law § 4-209(b)(1)(iii). Maryland also bans guns in

State parks. *See* COMAR § 08.07.06.04; § 08.07.01.01. Maryland's ban on guns in parks has been in effect since at least 1975. *See* Md. Reg., Vol. 2, No. 9 (April 30, 1975) at 692. (Add. 420, 424) If Plaintiffs could not carry guns in State parks for nearly 50 years without suffering irreparable harm, the County's comparable ban in its parks does not present an immediate, imminent harm now.

Another example of a similarity between County's law and the State's firearms ban exists with respect to the constitutional right to public assembly. The State prohibits firearms at a demonstration in a public place after being advised by law enforcement to leave the area because a demonstration is occurring. *See* Md. Code Ann., Crim. Law § 4-208(b)(2) (2021). While the County's law does not include the requirement of interaction with a law enforcement officer, the State's prohibition of a weapon in a "demonstration in a public place" aligns with the County's prohibition against bearing arms around those assembled to exercise their constitutional rights.

Finally, the State similarly prohibits weapons in areas that are for recreational use or are used for convention-type events. *See* COMAR §§ 14.25.02.06, 14.25.01.01(B)(2) (prohibiting weapons at Oriole Park at Camden Yard and Ravens Stadium, and at offices, restaurants, stores, museums, parking facilities, and other facilities located on the Camden Yards Sports Complex); COMAR §§ 11.05.05.08(C); 11.05.05.02(B)(16) (prohibiting possession or carrying, either

openly or concealed, of any weapon on Baltimore World Trade Center property, except for official purposes and by authorized personnel); COMAR § 34.04.08.04 (prohibiting a person other than an authorized law enforcement officer from possessing a weapon at a State museum). The County's inclusion of recreational or convention facilities as places of public assembly where weapons may not be carried is comparable to these State restrictions.

Enjoining the County's prohibitions against carrying in places of public assembly will not preserve Plaintiffs' status quo as to the foregoing analogous locations and activities where the State bans weapons. And as noted, many of the County's defined places of public assembly are in fact identical to State prohibitions. As law-abiding citizens with State-issued carry permits, the individual Plaintiffs were apparently able to comply with the same or similar State carry prohibitions to date without suffering irreparable harm.[63] Plaintiffs' attestations of irreparable harm due to the County's gun ban at similar locations and activities in the County, even with a State permit, ring hollow.

---

[63] *See*, *e.g.,* Plaintiff MSI's website listing "Places and Times In Which Firearms Can Not Be Legally Carried by a Permit Holder," *https://www.marylandshallissue.org/jmain/information/md-carry-permits#f*.

**III.    The Balance of the Equities and the Public Interest Weigh in Favor of Denying Plaintiffs' Request for a Preliminary Injunction.**

When a temporary restraining order is sought against the government, "the government's interest is the public's interest," and the third and fourth elements necessary for an injunction – the balance of the equities and the public interest – merge. *See Ass'n of Cmty. Cancer Cntrs. v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020) (citing *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) and *Nken v. Holder*, 556 U.S. 518, 435 (2009)).[64]

Courts historically recognize that public safety – albeit in a means-end scrutiny context – is a compelling governmental interest. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 750 (1987) ("the Government's general interest in preventing crime is compelling"; *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("[t]he legitimate and compelling state interest in protecting the community from crime cannot be doubted" (quotation omitted)).

In the context of injunctive relief, a government's "[i]nability to enforce its

---

[64] Bizarrely, Plaintiffs argues that the *Bruen* Court somehow modified the balancing of the equities test in determining whether to issue a preliminary injunction. *See* Pls.' Brief 15 (arguing that by balancing the equities, the District Court "resurrected the means-end balancing test that *Bruen* abolished"). Contrary to Plaintiffs' argument, *Bruen* did not discuss the test for whether to issue an injunction at all; the word "injunction" appears nowhere in the *Bruen* decision. *Bruen* did abolish the means-end scrutiny appellate courts previously applied in determining whether governmental regulation of guns are constitutional under the Second Amendment. *See Bruen* at 2127. The District Court did not apply that means-end scrutiny analysis.

duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). This is especially true when the law involves public safety. *See Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3 (2012).

The Founders reserved to the states, and by extension local governments such as the County, police powers to protect the public and jto prevent violence. *See United States v. Morrison*, 429 U.S. 598, 618 (2000) (stating there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims"). Staying enforcement of Bill 21-22E will undermine the strong interest that the County has in the safety of the public, and in preventing gun violence in areas where people, especially vulnerable populations, congregate.

As noted by the District Court, a sharp increase in gun violence is not properly considered post-*Bruen* in assessing whether the County's law is constitutional, but "there is a public interest in not prematurely enjoining Section 57-11 before a final determination on constitutionality is made." (JA 866)

There is also a public interest in safety for persons who exercise their First Amendment right to assemble in public.[65] *See, e.g.*, *State v. Spencer*, 75 Wash. App.

---

[65]    *See* Pls.' Br. at 7 (quoting the County Council President "on the right of me and my family to go to a movie theater without having to wonder or worry about someone sitting next to me is carrying a gun on them").

118, 124, 876 P.2d 939, 942 (1994) (observing "[p]eople have a strong interest in being able to use public areas without fearing for their lives"). Given the recent torrent of mass shootings in the United States, any person would feel trepidation knowing an individual, who is not a law enforcement officer, brought lethal force to any of the County's defined places of public assembly. *See, e.g., Bruen* at 2165 (Breyer, J., dissenting) (observing that "[s]ince the start of this year alone (2022), there have already been 277 reported mass shootings—an average of more than one per day"). And any assertion that the public should feel safer knowing a law-abiding, licensed firearm carrier is standing beside them and could stop a mass shooting is simply not statistically accurate. *See* Larry Buchanan and Laura Leatherby, *Who Stops a 'Bad Guy With a Gun'?*, The New York Times, June 22, 2022[66] (stating that out of 433 active shooting attacks, armed bystanders–who were not armed security or off duty police officers–stopped less than 3% of the attacks).

The balance of the equities and the public interest weigh in favor of the County, which again, enacted this law neither to flout the Second Amendment nor *Bruen*, but rather, to combat the rise of gun violence, and to protect the rights of the public to exercise their constitutional rights to assemble in public without fear of being shot.

---

[66]     https://www.nytimes.com/interactive/2022/06/22/us/shootings-police-response-uvalde-buffalo.html?searchResultPosition=1. (JA 499)

## CONCLUSION

The District Court correctly held Plaintiffs are not entitled to injunctive relief and its decision should be affirmed by this Honorable Court.

Respectfully submitted,

_/s/ John P. Markovs_
John P. Markovs
County Attorney

_/s/ Edward B. Lattner_
Edward B. Lattner
Deputy County Attorney

_/s/ Erin J. Ashbarry_
Erin J. Ashbarry
Assistant County Attorney

_/s/ Matthew H. Johnson_
Matthew H. Johnson
Assistant County Attorney

Executive Office Building
101 Monroe Street, Third Floor
Rockville, Maryland 20850
(240) 777-6700
(240) 777-6705 fax
Attorneys for Appellee Montgomery
County, Maryland

## CERTIFICATE OF COMPLIANCE WITH RULE 32(g)

Certificate of Compliance With Length Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the length limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12.358 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

s/ *Erin J. Ashbarry*
Attorney for Appellee
Dated: September 19, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of September, 2023, the foregoing Brief and Certificate of Compliance were served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the address listed below:

Mark W. Pennak
Maryland Shall Issue, Inc.
9613 Harford Rd., Ste C #1015
Baltimore, Maryland 21234-21502
mpennak@marylandshallissue.org
*Attorney for All Plaintiffs*

David H. Thompson
Peter A. Patterson
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
*Attorneys for Plaintiff MSI*

Matthew Larosiere
Law Office of Matthew Larosiere
6464 Houlton Circle
Lake Worth, Florida 33467
larosieremm@gmail.com
*Counsel for all Plaintiffs*

　　　　　　　　　　　　　　/s/ *Erin J. Ashbarry*

_____