# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**MARYLAND SHALL ISSUE, INC.**
**9613 Harford Rd., Ste C #1015**
**Baltimore, Maryland 21234-2150**

**ENGAGE ARMAMENT LLC**
**701 E. Gude Dr., Ste 101,**
**Rockville, Maryland 20850**

**ANDREW RAYMOND**
**14819 Poplar Hill Rd**
**Darnestown, MD 20874**

**CARLOS RABANALES**
**7727 Green Valley Rd,**
**Frederick, Maryland 21701**

**BRANDON FERRELL**
**40 Mountain Laurel Court**
**Gaithersburg, Maryland 20879**

**DERYCK WEAVER**
**8712 Lowell Street**
**Bethesda, Maryland 20817**

**JOSHUA EDGAR**
**8416 Flower Hill Terr.**
**Gaithersburg, Maryland 20879**

**I.C.E. FIREARMS & DEFENSIVE**
 **TRAINING, LLC,**
**24129 Pecan Grove Lane**
**Gaithersburg, Maryland 20882**

**RONALD DAVID**
**24129 Pecan Grove Lane**
**Gaithersburg, Maryland 20882**

**NANCY DAVID**
**24129 Pecan Grove Lane**
**Gaithersburg, Maryland 20882**

**Case No. 8:21-cv-01736-TDC (L)**

**Case No. 8:22-cv-01967-DLB**

EXHIBIT
**3**

**ELIYAHU SHEMONY**
**1 Magic Mountain Court**
**Rockville, MD 20852**

*Plaintiffs,*

                    **v.**

**MONTGOMERY COUNTY,**
 **MARYLAND**
**101 Monroe Street**
**Rockville, Maryland 20850**

                    *Defendant.*

---

### VERIFIED SECOND AMENDED
### COMPLAINT FOR DECLARATORY AND EQUITABLE RELIEF
### AND FOR COMPENSATORY DAMAGES, NOMINAL DAMAGES AND
### ATTORNEY'S FEES AND COSTS

COME NOW, the Plaintiffs, through counsel, and sue the Defendant, and for cause state as follows:

### INTRODUCTION

1.     On April 16, 2021, the Defendant, Montgomery County, Maryland ("the County") signed into law Bill 4-21, a copy of which is attached to this complaint as Exhibit A. Bill 4-21 became effective on July 16, 2021. Plaintiffs filed a complaint in the Circuit Court for Montgomery County, Maryland in May of 2021. That complaint was removed by the County to federal district court, where it was assigned Case No. 8:21-cv-01736-TDC. On February 7, 2022, this Court remanded most of the State law claims back to the Circuit Court of Montgomery County, but

2

retained jurisdiction over the "void for vagueness" claims alleged under the Due Process Clause of the Fourteenth Amendment and under the Article 24 of the Maryland Declaration of Rights.

2.    On July 22, 2022, in light of the historic decision of the Supreme Court in *New York State Rifle Pistol Association v. Bruen*, 142 S.Ct. 2111 (2022), plaintiffs filed an amended complaint in the Circuit Court for Montgomery County to allege that Bill 4-21 also violated the Second Amendment to the United States Constitution in multiple ways. On August 8, 2022, the County removed the amended complaint to this Court under 28 U.S.C. § 1441, where it was assigned Case No. 8:22-cv-01967-DLB. By an order entered September 1, 2022, this Court consolidated Case No. 8:21-cv-01736-TDC with Case No. 8:22-cv-01967-DLB, and further ordered that "all future pleadings shall be filed under lead case 8:21-cv-01736-TDC."

3.    On November 15, 2022, the Montgomery County Council enacted Bill 21-22E, and that bill was signed on November 28, 2022 by the County Executive. (Exhibit B). By its terms, Bill 21-22E became effective immediately upon signature by the County Executive. Bill 21-22E amended Montgomery County Code Chapter 57 ("Chapter 57"), including amending portions of Chapter 57 that had been previously amended by Bill 4-21. Pursuant to its terms, Bill 21-22E became immediately effective upon that signature by the County Executive. This Second Amended Complaint challenges Chapter 57, as amended by Bill 4-21 and Bill 21-22E. Pursuant to 42 U.S.C. § 1983, Plaintiffs seek declaratory and injunctive relief, compensatory damages, and an award of nominal damages, for the County's violations of their Federal constitutional rights by Bill 21-22E, as alleged below. Plaintiffs further seek an award of attorneys' fees under 42 U.S.C. § 1988, in an amount to be determined, for the violations of their Federal constitutional rights, as alleged below. Plaintiffs seek declaratory and injunctive relief on their State constitutional and statutory law claims.

3

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 as this Amended Complaint seeks relief afforded by 42 U.S.C. § 1983 for violations of plaintiffs' rights arising under the United States Constitution. This Court has supplemental jurisdiction over claims arising under State law, including claims arising under the Maryland Constitution, under 28 U.S.C. § 1367.

5.      The sole defendant, Montgomery County, Maryland, is a Maryland municipality and carries on its regular business and maintains its principal offices in Montgomery County, Maryland. The events, actions and omissions challenged in this Second Amended Complaint arise in Montgomery County, Maryland. Venue is properly in this Court in this matter pursuant to 28 U.S.C. § 1391.

**MONTGOMERY COUNTY BILL 4-21**

6.      In relevant part, Bill 4-21 amended Section 57-1, to broaden the definition of a "gun or firearm" to include "**a ghost gun**" and, in addition, to provide the following new definitions (additions enacted by Bill 4-21 are **bolded**, portions of existing law that are deleted by Bill 4-21 are in *brackets and italics*):

a. A "**3D printing process**" is defined as "**a process of making a three-dimensional, solid object using a computer code or program, including any process in which material is joined or solidified under computer control to create a three-dimensional object;**"

b. A "**ghost gun**" is defined as "**a firearm, including an unfinished frame or receiver, that lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer under federal law or markings in accordance with 27 C.F.R. § 479.102. It does not include a firearm that has been rendered permanently**

4

**inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968**;"

c. The term "**Undetectable gun**" is defined as:

**(A) a firearm that, after the removal of all its parts other than a major component, is not detectable by walk-through metal detectors commonly used at airports or other public buildings;**

**(B) a major component that, if subjected to inspection by the types of detection devices commonly used at airports or other public buildings for security screening, would not generate an image that accurately depicts the shape of the component; or**

**C) a firearm manufactured wholly of plastic, fiberglass, or through a 3D printing process.**

d. A "**Major component**" is defined as "**with respect to a firearm: (1) the slide or cylinder or the frame or receiver; and (2) in the case of a rifle or shotgun, the barrel**;"

e. A "Place of public assembly" is defined as **a place where the public may assemble, whether the place is publicly or privately owned, including** a *[government owned]* park *[identified by the Maryland-National Capital Park and Planning Commission]*; place of worship; [elementary or secondary] school; *[public]* library; *[government-owned or -operated]* recreational facility, **hospital**; **community health center; long-term facility**; or multipurpose exhibition facility, such as a fairgrounds or conference center. A place of public assembly includes all property associated with the place, such as a parking lot or grounds of a building.

7.      Bill 4-21 amended Section 57-7 of Chapter 57 to provide (new additions in bold):

**(c) A person must not give, sell, rent, lend, or otherwise transfer to a minor:**

  **(1) a ghost gun or major component of a ghost gun;**

  **(2) an undetectable gun or major component of an undetectable gun;**

5

**or**

> **(3) a computer code or program to make a gun through a 3D printing**
>
> **process.**

**(d) A person must not purchase, sell, transfer, possess, or transfer a ghost gun, including a gun through a 3D printing process, in the presence of a minor.**

**(e) A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.**

8.    Bill 4-21 also amended Section 57-11 of Chapter 57 to provide (new provisions added by Bill 4-21 are in **bold**, portions deleted by Bill 4-21 are in *brackets* and *italics*):

(a) [A] **In or within 100 yards of a place of public assembly, a** person must not:

> (1) sell, transfer, possess, or transport **a ghost gun, undetectable gun,** handgun, rifle, or shotgun, or ammunition **or major component** for these firearms [*, in or within 100 yards of a place of public assembly*]**; or**
>
> (2) **sell, transfer, possess, transport a firearm created through a 3D printing process.**

(b) This section does not:

> * * * *;
>
> (3) apply to the possession of a firearm or ammunition, **other than a ghost gun or an undetectable gun**, in the person's own home;
>
> (4) apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner **who has a permit to carry the firearm**, or one authorized employee of the business

6

**who has a permit to carry the firearm**;

(5) apply to the possession of a handgun by a person who has

received a permit to carry the handgun under State law; or

(A) transported in an enclosed case or in a locked firearms rack

on a motor vehicle, **unless the firearm is a ghost gun or an**

**undetectable gun**; or

\* \* \* \*

9.      Bill 4-21 left unaltered the penalties for a violation of Chapter 57. Under Section 57-15 of Chapter 57, with an exception for violations of Section 57-8 not applicable here: "Any violation of this Chapter or a condition of an approval certificate issued under this Chapter is a Class A violation to which the maximum penalties for a Class A violation apply." Under Section 1-19 of the County Code, the maximum penalties applicable for a violation of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, are a $1,000 fine and 6 months in jail. Under Section 1-20(c) of the County Code, "[e]ach day any violation of County law continues is a separate offense."

**MONTGOMERY COUNTY Bill 21-22E**

10.      Bill 21-22E (Exhibit B) amends the scope of Chapter 57, including parts of Chapter 57 that were previously amended by Bill 4-21, to provide new definitions and to modify the areas in which the possession, transport, sale and transfer of firearms and components of firearms and "ghost guns" are prohibited. As set forth below, **boldface** designates language for a heading or defined term, <u>underlining</u> designates language added to existing law by Bill 21-22E, as originally introduced, **[single boldface brackets]** designates language deleted from existing law by Bill 21-22E as originally introduced, <u>double underlining</u> designates material added by amendment to Bill 21-22E, as originally introduced and **[[double boldface brackets]]** designates language deleted

7

from existing law or by amendment to Bill 21-22E, as originally introduced. As thus designated and passed by the Montgomery County Council on November 15, 2022, Bill 21-22E provides:

11.      As amended by Bill 21-22E, the Definitions section of Chapter 57 was amended to provide:

Sec. **1. [[Section]] Sections 57-1, 57-7, and 57-**1 **11 [[is]] are amended as follows: 57-1. Definitions.**

*Gun* or *firearm:* Any rifle, shotgun, revolver, pistol, ghost gun, undetectable gun, air gun, air rifle or any similar mechanism by whatever name known which is designed to expel a projectile through a gun barrel by the action of any explosive, gas, compressed air, spring or elastic.

(2) "Ghost gun" means a firearm, including an unfinished frame or receiver, that:
　　(A) lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer **[[under]]** in accordance with federal law; and
　　(B) lacks markings and is not registered with the Secretary of the State Police in accordance with **[[27 C.F.R. § 479.102]]** Section 5-703(b)(2)(ii) of the Public Safety Article of the Maryland Code.

**[[It]]** "Ghost gun" does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968.

(8) "Undetectable gun" means:

(9) "Unfinished frame or receiver" means a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm.

Place of public assembly: A "place of public assembly" is:
(1) a **[[place where the public may assemble, whether the place is]]** publicly or privately owned: **[[, including a]]**
　　(A) park;
　　(B) place of worship;
　　(C) school;
　　(D) library;
　　(E) recreational facility;
　　(F) hospital;
　　(G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;

8

(H) long-term facility, including any licensed nursing home, group home, or care home; [[or]]

(I) multipurpose exhibition facility, such as a fairgrounds or conference center; or

(J) childcare facility;

(2) government building, including any place owned by or under the control of the County;

(3) polling place;

(4) courthouse;

(5) legislative assembly; or

(6) a gathering of individuals to collectively express their constitutional right to protest or assemble.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

12.    As amended by Bill 21-22E, section 57-7 of Chapter 57, was amended to provide:

**57-7. Access to guns by minors.**

(d) A person must not purchase, sell, transfer, possess, or **[[transfer]]** transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

13.    As amended by Bill 21-22E, section 57-11(b) of Chapter 57 was amended to delete the exception from the Chapter 57-11(a) prohibitions for a person holding a wear and carry permit issued by the Maryland State Police pursuant to MD Code, Public Safety, §5-306, and thus provides:

**57-11. Firearms in or near places of public assembly.**

(a) In or within 100 yards of a place of public assembly, a person must not:

(1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or

(2) sell, transfer, possess, or transport a firearm created through a 3D printing process.

(b) This section does not:

1) prohibit the teaching of firearms safety or other educational or sporting use in the areas described in subsection (a);

(2) apply to a law enforcement officer, or a security guard licensed to carry the firearm;

(3) apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;

9

(4) apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm; or

(5) **[**apply to the possession of a handgun by a person who has received a permit to carry the handgun under State law; or**]**

**[**(6)**]** apply to separate ammunition or an unloaded firearm:

(A) transported in an enclosed case or in a locked firearms rack on a motor vehicle, unless the firearm is a ghost gun or an undetectable gun; or

(B) being surrendered in connection with a gun turn-in or similar program approved by a law enforcement agency.

14.    Bill 21-22E, as enacted, went into effect immediately on the date it became law, providing:

**Sec. 2. Expedited Effective Date.** The Council declares that this legislation is necessary for the immediate protection of the public interest. This Act takes effect on the date on which it becomes law.

15.    Bill 21-22E, as enacted, provides a new severability clause, stating:

**Sec. 3. Severability.** If any provision of this Act, or any provision of Chapter 57, is found to be invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect.

16.    Bill 21-22E, as enacted, provides an interpretation provision, stating:

**Sec. 4.** This Act and Chapter 57 must be construed in a manner that is consistent with regulations of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives, including 87 FR 24652 (effective August 24, 2022), as amended.

## STATE AND FEDERAL FIREARMS LAW

**Federal Firearms Law:**

17.    Under Federal law, a person may legally manufacture a firearm for his own personal use. See 18 U.S.C. § 922(a). See *Defense Distributed v. Department of State*, 838 F.3d 451 (5th Cir. 2016). Firearms manufactured for personal use are not required to be serialized or engraved with a serial number under federal law. Only federally licensed manufacturers and importers are required to assign serial numbers to the firearms they manufacture or import. See 18 U.S.C. § 923(i).

18.     Under Federal law, 18 U.S.C. § 921(a)(3), "[t]he term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm."

19.     Effective August 24, 2022, the Federal Bureau of Alcohol, Tobacco and Firearms ("ATF") newly defined the term "frame or receiver" See 27 C.F.R. § 478.12. Federal law does not require the manufacturer or importer to place any serial number on the slide or cylinder of a handgun or on a barrel of a rifle or shotgun, but rather requires that "an individual serial number" be placed on the "frame or receiver." 27 C.F.R. § 478.92(a)(1)(i). See also 27 C.F.R. § 479.102. While these newly promulgated ATF regulations define a "frame or a receiver" in different ways, depending on the type of firearm, in no case is a frame or a receiver defined to mean the slide or cylinder of a handgun or the barrel of a rifle or shotgun.  See Definition of "Frame or Receiver," and Identification of Firearms, 87 Fed. Reg. 24652, 24735-2438 (April 26, 2022), amending 27 C.F.R. § 478.12. Maryland law does not regulate the placement of serial numbers. Section 4 of Bill 21-22E requires that Chapter 57 and Bill 21-22E "must be construed in a manner that is consistent" with these ATF regulations. A frame or receiver that has been serialized by a federally regulated firearms manufacturer is treated as a "firearm" under Federal law and is thus subject to the full panoply of federal regulation, including the performance of a background check otherwise required by federal law.

20.     Persons otherwise prohibited from owning firearms are still legally barred from the manufacture, sale, transfer, or possession of modern firearms or modern ammunition, regardless of the method of manufacture. Such possession, actual or constructive, is a violation of 18 U.S.C. §

11

922(g), which is punishable by up to 10 years imprisonment under federal law. *See* 18 U.S.C. § 924(a)(2). Possession of a firearm by a prohibited person is likewise a serious crime under Maryland law. *See* MD Code, Public Safety, § 5-101(g)(3), § 5-133(b)(1), § 5-205(b)(1).

21.     Under current federal law, it is unlawful to "manufacture, import, sell, ship, deliver, possess, transfer, or receive" any firearm that is not "detectable" by a "Security Exemplar" or any "major component" of which does not show up accurately on airport x-ray machines. 18 U.S.C. § 922(p). A knowing violation of that prohibition is a federal felony, punishable by five years of imprisonment and a fine. *See* 18 U.S.C. § 924(f). For these purposes, federal law provides that "the term "Security Exemplar" means an object, to be fabricated at the direction of the Attorney General, that is-- (i) constructed of, during the 12-month period beginning on the date of the enactment of this subsection, 3.7 ounces of material type 17-4 PH stainless steel in a shape resembling a handgun; and (ii) suitable for testing and calibrating metal detectors." 18 U.S.C. § 922(p)(2)(C).

22.     Law-abiding Americans, including hobbyists, have lawfully manufactured firearms for personal use since before the Revolutionary War and that practice continues up to the present day. While there is no definitive count of such personal-use firearms, the total number of such firearms manufactured for personal use is undoubtedly in the hundreds of thousands and are in common use throughout the United States and Maryland. Such firearms manufactured for personal use include rifles and pistols and all such firearms manufactured for personal use may be used for legitimate lawful purposes, including self-defense in and outside the home.

**The Second Amendment**

23.     The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S.

12

742 (2010). "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). The Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes." (Id. at 625). Privately made firearms ("PMFs") are bearable arms in common use and are typically possessed by law-abiding citizens for lawful purposes. Federal regulations provide that federal firearms licensees are authorized to engrave serial numbers onto the frame or receiver of any PMF that may come into their possession overnight. See 87 Fed. Reg. at 24667, 24707; 27 C.F.R. § 478.92(vi)(B). PMFs are therefore protected arms under the Second Amendment. *Heller*, 554 U.S. at 627 ("the sorts of weapons protected were those 'in common use at the time.'"). See also *Bruen*, 142 S.Ct. at 2118. The Second Amendment guarantees a right to use and possess firearms "for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.

24.     In *Bruen*, the Supreme Court held that the Second Amendment right to bear arms means "a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." 142 S.Ct. at 2135 n.8. The Second Amendment thus "presumptively guarantees" an individual's "right to 'bear' arms in public for self-defense." 142 S.Ct. 2135. The Court ruled that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S.Ct. at 2129. Under this test, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127. Thus, "when the Second Amendment's plain text covers an

individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2129-30.

**Maryland State Firearms Law:**

25.     MD Code, Criminal Law, 4-203(a)(1), provides "[e]xcept as provided in subsection (b) of this section, a person may not: (i) wear, carry, or transport a handgun, whether concealed or open, on or about the person; (ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State." A violation of 4-203(a) is a strict liability offense, and a person may be convicted of the offense without regard to intent, knowledge or state of mind. *Lawrence v. State*, 476 Md. 384, 257 A.3d 588 (2021). A person convicted of a violation of 4-203(a) "is subject to imprisonment for not less than 30 days and not exceeding 3 years or a fine of not less than $250 and not exceeding $2,500 or both." MD Code, Criminal Law, 4-203(c)(2)(i).

26.     Subsection (b)(2) of Section 4-203 provides that Section 4-203(a) does not prohibit "the wearing, carrying, or transporting of a handgun, in compliance with any limitations imposed under § 5-307 of the Public Safety Article, by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article."

27.     Subsection (b)(3) of Section 4-203 further provides that Section 4-203 does not prohibit "the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is

14

unloaded and carried in an enclosed case or an enclosed holster." Such transport and carriage of long guns, such as rifles and shotguns, are permitted under Maryland law without restriction.

28.    Subsection (b)(4) of Section 4-203 further provides that Section 4-203 does not prohibit "the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources-sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while the person is engaged in, on the way to, or returning from that activity if each handgun is unloaded and carried in an enclosed case or an enclosed holster;"

29.    Subsection (b)(5) of Section 4-203 further provides that Section 4-203 does not prohibit " the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster."

30.    Subsection (b)(6) of Section 4-203 further provides that Section 4-203 does not prohibit "the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases." Such persons are not required to possess or obtain a Maryland carry permit under MD Code, Public Safety, § 5-306, for such uses and possession. There is no limitation on the number of handguns or types of ammunition that may be possessed, worn, carried or transported under this provision of Section 4-203(b)(6). Such transport, wear and carriage of rifles and shotguns in a person's residence, real estate or business are permitted under Maryland law without restriction.

31.     Subsection (b)(7) of Section 4-203 further provides that Section 4-203 does not prohibit "the wearing, carrying, or transporting of a handgun by a supervisory employee: (i) in the course of employment; (ii) within the confines of the business establishment in which the supervisory employee is employed; and (iii) when so authorized by the owner or manager of the business establishment." Such persons are not required to possess or obtain a Maryland carry permit under MD Code, Public Safety, § 5-306. There is no limitation on the number of handguns or ammunition that may be possessed, worn, carried or transported under this provision of Section 4-203(b)(7). There is no limitation on the number of supervisory employees whom the employer may authorize to carry a firearm under this section. Such transport, wear and carriage of rifles and shotguns by business employees on business premises are permitted under Maryland law without restriction.

32.     With the exception of possession in a vehicle of a **loaded** long gun by persons **without** a wear and carry permit, which is prohibited by MD Code, Natural Resources, § 10-410(c), transport and carriage of loaded long guns, such as rifles and shotguns, in public is permitted under Maryland law, unless taking place at specific places in which all firearms are banned, such as "public school property," MD Code, Criminal Law, § 4-102(b).

33.     Under MD Code, Public Safety, § 5-133(d)(2)(i), a person under the age of 21 may temporarily transfer and possess a regulated firearm, including a handgun, if the person is "1. under the supervision of another who is at least 21 years old and who is not prohibited by State or Federal law from possessing a firearm; and 2. acting with the permission of the parent or legal guardian of the transferee or person in possession." Under MD Code, Public Safety, § 5-133(d)(2)(iv), a person under the age of 21 may temporarily transfer or possess a regulated firearm, including a handgun, if the person is "1. participating in marksmanship training of a recognized organization; and 2. under

the supervision of a qualified instructor." Such transfer or possession of a long gun by or to a person under 21 is permissible without restriction.

34.    MD Code, Criminal Law, § 4-104, expressly permits a minor child under the age of 16 to have access to any firearm if that access "is supervised by an individual at least 18 years old" or if the minor child under the age of 16 has a certificate of firearm and hunter safety issued under § 10-301.1 of the Natural Resources Article of the Maryland Code. By necessary implication, access to a firearm by a minor child between the ages of 16 and 18 is permitted by Section 4-104 without restriction.

35.    The regulation of unserialized firearms is a matter of significant State-wide and national interest. In the 2021 General Assembly, such unserialized firearms were addressed in three bills. Two bills, House Bill 638 and Senate Bill 624, would have imposed extensive regulation on the possession and transfer of ghost guns, but would have also afforded a path for existing owners to retain possession of their existing, unserialized firearms that they had lawfully manufactured for personal use. One bill, House Bill 1291, would have banned unserialized firearms manufactured for personal use completely. Similar legislation was proposed in the 2020 General Assembly session, with House Bill 910 and Senate Bill 958, and in the 2019 General Assembly session, with House Bill 740 and Senate Bill 882. House Bill 740 passed the House of Delegates in 2019, and it instructed the Maryland State Police to "develop a plan for a system in the State for the registration of firearms not imprinted with a serial number issued by a federally licensed firearms manufacturer or importer and submit a report describing the system . . . ." In the 2021 Session, provisions of House Bill 638 were incorporated into other legislation that had passed the Senate (Senate Bill 190), and that bill, as amended, passed the House Judiciary Committee and was reported to the floor of the House of Delegates, where it was further amended. That bill ultimately did not pass the House.

36.     In the 2022 Session, the Maryland General Assembly enacted Senate Bill 387 and House Bill 425, into law on April 9, 2022, after Governor Hogan advised the General Assembly that he would allow these two bills to become law without his signature. SB 387 was thus enacted under Article II, Section 17(b) of the Maryland Constitution as Chapter 19. HB 425 was enacted under Article II, Section 17(b) of the Maryland Constitution, as Chapter 18. SB 387/HB 425 creates specific deadlines for compliance by existing owners of PMFs, including those regulated by Chapter 57, as amended by Bill 4-21 and Bill 21-22E. Section 57-1, as amended by Bill 4-21 and as further amended by Bill 21-22E, defines a PMF to be a "ghost gun," and Chapter 57 regulates such a PMF in a manner that is in conflict and inconsistent with this newly enacted, State-wide legislation. Senate Bill 387 and House Bill 425 are codified at MD Code, Public Safety, §§ 5-701-5-706.

37.     Under Maryland law, MD Code, Public Safety, § 5-101(h)(1), a "firearm" is defined as "(i) a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or (ii) the frame or receiver of such a weapon." Maryland law does not define "frame or receiver." Maryland law does not define or regulate the possession, sale or transfer of "major components" for firearms. Fully finished frames or receivers are commonly sold with serial numbers already engraved in compliance with Federal law and such fully finished frames or receivers may be lawfully assembled by law-abiding persons for personal use by obtaining other components that lawfully available and sold throughout the United States. Such serialized firearms are not "ghost guns" under the County's definition of that term.

38.     Maryland State law does not prohibit the possession of a loaded or unloaded long gun, e.g., a shotgun or rifle, in public. Maryland State law broadly prohibits a person from the wear, carry or transport of a loaded or unloaded handgun, MD Code, Criminal Law, 4-203(a), but expressly makes exceptions to that prohibition in MD Code, Criminal Law, 4-203(b). One such

18

exception is the wearing, carrying and transport of a loaded handgun on "real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases." MD Code, Criminal Law, 4-203(b)(6). Maryland State law likewise expressly permits the wearing, carrying, or transporting of a loaded or unloaded handgun, "by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article." MD Code, Criminal Law, 4-203(b)(2).

39.     Effective in July 2022, in compliance with the Supreme Court's June 23, 2022 decision in *Bruen*, and on the advice of the Maryland Attorney General and at the direction of the Governor, the Maryland State Police began to issue wear and carry permits on a "shall issue" basis without regard to whether the applicant showed that he or she possessed a "good and substantial reason" otherwise required by Maryland State law, MD Code, Public Safety, § 5-306(a)(6)(ii). The wear and carry permits issued by the Maryland State Police specifically state on the back of every permit that the permit is "not valid where firearms are prohibited by law."

40.     Like federal law, Maryland State law defines "frames or receivers" as firearms and regulates them as firearms. MD Code, Public Safety, 5-101(h). While Maryland State law does not define the terms "frames or receiver," Maryland State law does define an "unfinished frame or receiver" to mean "a forged, cast, printed, extruded, or machined body or similar article that has reached a stage in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm." MD Code, Public Safety, § 5-701(h). Under Section 3 of House Bill 425 and Senate Bill 387, as enacted, the scope and meaning of "unfinished frame or receiver" is determined by reference to the 2022 federal regulations promulgated by the ATF.

41.     Maryland State law provides that a person "may not purchase, receive, sell, offer to sell, or transfer an unfinished frame or receiver unless it is required by federal law to be, and has been, imprinted with a serial number by a federally licensed firearms manufacturer or federally licensed firearms importer in compliance with all federal laws and regulations applicable to the manufacture and import of firearms." MD Code, Public Safety, § 5-703(a)(1). *Possession* of an "unfinished frame or receiver" is prohibited as of March 1, 2023, unless the firearm is "imprinted by a federally licensed firearms manufacturer, federally licensed firearms importer, or other federal licensee authorized to provide marking services, with a serial number in compliance with all federal laws and regulations applicable to the manufacture and import of firearms," MD Code, Public Safety, § 5-703(b)(2)(i), **OR** unless the firearm has been imprinted with a serial number by such a federal licensee in a specified manner and has been registered with the Secretary of the Maryland State Police. MD Code, Public Safety, § 5-703(b)(2)(ii). Either type of serialization is permissible under Maryland State law.

42.     Under Maryland State law, the prohibition on the possession of an unfinished frame or receiver does not apply to a possession of a firearm "unless a person knew or reasonably should have known that the firearm was not imprinted with a serial number as described under this subsection." MD Code, Public Safety, § 5-703(b)(1)(i). The prohibition of possession likewise does not apply to possession of an unfinished frame or receiver that was received through inheritance, if the frame or receiver is serialized within 30 days after such receipt. MD Code, Public Safety, § 5-703(b)(1)(ii). The prohibition on possession of an unfinished frame or receiver likewise does not apply to "a person that made or manufactured the unfinished frame or receiver, without the use of any prefabricated parts, and who is not otherwise prohibited from possessing the unfinished frame or receiver, for a period not exceeding 30 days after the person made or manufactured the unfinished

20

frame or receiver." MD Code, Public Safety, § 5-703(b)(1)(iii). The Maryland State Police is authorized by Maryland State law to issue regulations to carry out these provisions. MD Code, Public Safety, § 5-705.

43.     Subtitle 7 of Title 5 of the Public Safety Article "does not apply to a sale, an offer to sell, a transfer, or a delivery of a firearm or an unfinished frame or receiver to, or possession of a firearm or unfinished frame or receiver by: (i) a federally licensed firearms dealer; (ii) a federally licensed firearms manufacturer; or (iii) a federally licensed firearms importer; or (3) a transfer or surrender of a firearm or an unfinished frame or receiver to a law enforcement agency." MD Code, Public Safety, § 5-702(2).

**MARYLAND CONSTITUTIONAL AND STATUTORY PREEMPTION PROVISIONS**

44.     Maryland law contains several preemption statutes that broadly preempt local jurisdictions from regulating firearms:

*a*. MD Code, Public Safety, § 5-104, provides that "[t]his subtitle supersedes any restriction that a local jurisdiction in the State imposes on a sale of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the sale of a regulated firearm."

*b*. MD Code, Public Safety, § 5-133(a), provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm."

*c*. MD Code, Public Safety, § 5-134(a), provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the transfer by a private party of a

regulated firearm, and the State preempts the right of any local jurisdiction to regulate the transfer of a regulated firearm."

*d.* MD Code, Public Safety, § 5-207(a), enacted into law in 2021 as part of House Bill 4, provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the transfer by a private party of a rifle or shotgun, and the State preempts the right of any local jurisdiction to regulate the transfer of a rifle or shotgun."

*e.* MD Code, Criminal Law, § 4-209, provides:

(a) Except as otherwise provided in this section, the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of:

(1) a handgun, rifle, or shotgun; and
(2) ammunition for and components of a handgun, rifle, or shotgun.

Exceptions

(b)(1) A county, municipal corporation, or special taxing district may regulate the purchase, sale, transfer, ownership, possession, and transportation of the items listed in subsection (a) of this section:

(i) with respect to minors;
(ii) with respect to law enforcement officials of the subdivision; and
(iii) except as provided in paragraph (2) of this subsection, within 100 yards of or in a park, church, school, public building, and other place of public assembly.

(2) A county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety, or other educational or sporting use of the items listed in subsection (a) of this section.

For purposes of these preemption provisions, a "regulated firearm" includes any handgun. MD Code, Public Safety, § 5-101(r)(1). For purposes of these preemption provisions, the terms "handgun," "rifle," and "shotgun" are defined in MD Code, Criminal Law, § 4-201.

45.     Section 6 of Chapter 13, of the 1972 Sessions Laws of Maryland provides: "That all restrictions imposed by the law, ordinances, or regulations of the political subdivisions on the

wearing, carrying, or transporting of handguns are superseded by this Act, and the State of Maryland hereby preempts the right of the political subdivisions to regulate said matters." This provision has been held to preclude Montgomery County from regulating the sale of ammunition in the County. See *Montgomery County v. Atlantic Guns, Inc.,* 302 Md. 540, 489 A.2d 1114 (1985).

46.    Montgomery County has chartered home rule under Section 3 of Article XI-A of the Maryland Constitution and, under that provision, the County is empowered to enact "local laws." Such local laws are "subject to the Constitution and Public General Laws of this State." (Id.). Article XI–A, § 6, of the Maryland Constitution provides further that "this Article shall not be construed to authorize the exercise of any powers in excess of those conferred by the Legislature upon said Counties or City as this Article sets forth." Under these provisions, Montgomery County is not empowered to enact "general laws." Under Maryland law, a general law "deals with the general public welfare, a subject which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state." *Steimel v. Board*, 278 Md. 1, 5, 357 A.2d 386, 388 (1976). Thus, "some statutes, local in form, have been held to be general laws, since they affect the interest of the whole state." *Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272, 278 (1968). Similarly, "[a] law may be local in the sense that it operates only within a limited area, but general in so far as it affects the rights of persons without the area to carry on a business or to do the work incident to a trade, profession, or other calling within the area." *Dasch v. Jackson*, 170 Md. 251, 261, 183 A. 534, 538 (1936).

47.    Under the Maryland Express Powers Act, MD Code, Local Government, § 10-202(a), a "[a] county may enact local laws and may repeal or amend any local law enacted by the General Assembly on any matter covered by the express powers in this title." However, MD Code, Local Government, §10-206(a), provides that a county may pass an ordinance, resolution, or bylaw

23

only if such laws are "not inconsistent with State law." Similarly, MD Code, Local Government, §10-206(b), provides that "[a] county may exercise the powers provided under this title only to the extent that the powers are not preempted by or in conflict with public general law." Under binding precedent, a local law is inconsistent with State law when the local law prohibits an activity which is permitted by State law, or permits an activity prohibited by state law. See *City of Baltimore v. Sitnick*, 254 Md. 303, 317, 255 A.2d 376, 382 (1969) ("a political subdivision may not prohibit what the State by general public law has permitted").

**PARTIES**

**Plaintiffs:**

48.    Plaintiff MARYLAND SHALL ISSUE, INC. ("MSI") is a Maryland corporation, located at 9613 Harford Rd., Ste C #1015, Baltimore, MD 21234-2150. MSI is an Internal Revenue Service certified Section 501(c)(4), non-profit, non-partisan, all-volunteer membership organization with approximately 2500 members statewide. MSI is dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. The purposes of MSI include promoting the exercise of the right to keep and bear arms and education, research, and legal action associated with the constitutional right to privately own, possess and carry firearms.

49.    MSI has one or more members who live in Montgomery County, and who possessed "ghost guns" banned by Chapter 57 in their homes and/or in their businesses and engaged in other conduct with "ghost guns" regulated by Chapter 57. These MSI members were forced to dispossess themselves of such "ghost guns" by the enactment of Bill 4-21. MSI has one or members in Montgomery County who legally sold so-called "ghost guns" and which are now banned by Chapter

24

57. Possession of these privately made firearms was perfectly legal under Maryland State law until the enactment of Bill 4-21, which made possession illegal in Montgomery County. But for the enactment of Bill 4-21 and Bill 21-22E and the threat of prosecution by the County, these members of MSI would continue to possess, transport, sell or transfer these privately made firearms and intend to do so in the future. Such MSI members fear prosecution under Chapter 57 if they should do so.

50.     MSI has one or more members who live outside of Montgomery County, but who travel to and/or work within Montgomery County. MSI has one or more members who live in and/or travel through Montgomery County and who also possess a Maryland wear and carry permit issued by the Maryland State Police and the permit possessed by each such member states that the permit is "not valid where firearms are prohibited by law." These members with carry permits have in the past possessed and transport loaded firearms at or within 100 yards of the locations banned by Chapter 57, as amended Bill 21-22E, and possessed and transported such firearms throughout the County, except at those locations in which possession or transport was otherwise prohibited by State or federal law. These members of MSI with carry permits intend to continue to possess and carry loaded firearms at or within 100 yards of such locations banned by Chapter 57. These MSI members reasonably fear prosecution under Chapter 57 if they do so. Among the membership of MSI are "qualified instructors" who engage in firearms training, including firearms instruction of minors.

51.     MSI has one or more members who live in Montgomery County, but who do not have a Maryland carry permit and who have, in the past, lawfully possessed or transported loaded firearms within 100 yards of at least one of the locations in which the possession and transport of loaded firearms are banned by Chapter 57. These MSI members intend to possess and carry a loaded firearm outside the home, as otherwise permitted by State and federal law, but reasonably fear prosecution under Chapter 57 if they do so.

25

52.     One or more MSI members with a wear and carry permit issued by the Maryland State Police intend to possess and transport firearms in the future at or within 100 yards the locations newly banned by Chapter 57, as amended by Bill 4-21 and Bill 21-22E, except for those locations in which the possession or transport of loaded firearms by permit holders would otherwise be prohibited by State or federal law. One or more MSI members without a wear and carry permit issued by the Maryland State Police intend to possess and transport firearms in the future at or within 100 yards the locations newly banned by Chapter 57, as amended by Bill 4-21 and Bill 21-22E, as otherwise permitted by State or federal law.

53.     MSI filed extensive comments with Montgomery County, objecting to Bill 4-21 prior to its enactment. A true and correct copy of those comments are attached to this Second Amended Complaint as Exhibit C. MSI likewise filed extensive comments with Montgomery County, objecting to Bill 21-22E prior to its enactment. A true and correct copy of those comments, along with other testimony presented to the County Council, are attached to this Second Amended Complaint as Exhibit D. The Chairman of MSI also presented oral testimony to the Montgomery County Council in opposition to Bill 21-22E on behalf of MSI. As a participant in this legislative process, MSI has represented the interests of its members in the subject matter addressed by Chapter 57.

54.     Chapter 57, as amended by Bill 4-21 and Bill 21-22E, burdens the ability of MSI members to keep and bear arms within Montgomery County, including firearms and "major components" that are otherwise lawful in Maryland, but nonetheless are banned by Chapter 57. These MSI members have standing to challenge Chapter 57, as amended by Bill 4-21 and Bill 21-22E. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) ("Where "the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has

26

caused him injury, and that a judgment preventing or requiring the action will redress it."). MSI has representational standing to sue on behalf its members who live in Montgomery County or who travel through Montgomery County or who otherwise are injured by the County's unlawful actions. *Hunt v. Washington State Apple Advert. Com'n.,* 432 U.S. 333, 342 (1977). Each of MSI's members who possesses, transports, sells or transfers firearms or "ghost guns" in Montgomery County is injured by Chapter 57, as amended by Bill 4-21 and Bill 21-22E. MSI has at least one such member. The interests that MSI seeks to protect are germane to MSI's purpose and neither the claims asserted herein nor the relief requested require the participation of MSI's individual members. See *Retail Industry Leaders Ass' v. Fielder,* 475 F.3d 180, 186 (4th Cir. 2007).

55.     Plaintiff ENGAGE ARMAMENT LLC ("Engage" or "Engage Armament"), is a Maryland corporation, and is located at 701 E. Gude Dr., Ste 101, Rockville, MD 20850, within Montgomery County. Engage is a federally licensed Type I dealer (retail dealer) a Type VII dealer (firearms manufacturer) and Type X dealer (manufacturer of destructive devices and ammunition for such devices). See 27 C.F.R. § 478.41 *et seq.* Pursuant to MD Code, Public Safety, § 5-106, Engage is a Maryland State licensed firearms dealer and is thus authorized by State law to engage "in the business of selling, renting or transferring regulated firearms." As a federal licensee, Engage is expressly exempt from subtitle 7, of Title 5, of the Public Safety Article of the Maryland Code and thus may sell, offer to sell, deliver and possess an "unfinished frame or receiver." MD Code, Public Safety, § 5-702(2). As such a licensee, Engage is also authorized by State law to perform serialization services for "unfinished frames or receivers" for the public. MD Code, Public Safety, § 5-703(b). Since the enactment of Bill 4-21, Engage has been prohibited from possessing the "ghost guns" banned by Chapter 57, and has thus likewise been prohibited from performing the serialization services otherwise expressly contemplated and permitted by MD Code, Public Safety, § 5-703(b).

As a consequence, Engage has lost substantial sales and fees associated with those activities and services.

56.    As part of its business as a Type VII federally licensed manufacturer, Engage manufactures firearms and uses and possesses components, including slides, cylinders, barrels and frames and receivers, and then assembles such components into finished firearms, which it then sells, all in full compliance with Federal and State law. From time to time, prior to the enactment of Bill 4-21, Engage stocked and sold unserialized unfinished framers or receivers, which were not frames or receivers under federal law, but which could be lawfully machined and built into firearms by the purchaser for personal use. These otherwise lawful items are banned as "ghost guns" by Chapter 57, as amended by Bill 4-21 and Bill 21-22E. But for the enactment of Bill 4-21 and Bill 21-22E, Engage would continue to conduct such business in compliance with State and federal law, but has not done so it fears prosecution under Chapter 57. Engage intends to continue to conduct such business in compliance with State and federal law. Engage reasonably fears prosecution under Chapter 57 if it does so. As part of its business, Engage has transferred firearms in the presence of a minor who is otherwise accompanied by a parent. Engage possesses on its business premises an extensive collection of books and articles related to firearms and other subjects and, from time to time, loans such materials to others and, in that sense, may arguably be said to possess and operate a privately owned library. Each of the owners and the employees have access to this "library." The business location of Engage is arguably at or within 100 yards of a "place of public assembly" as defined by Chapter 57, as amended by Bill 21-22E.

57.    Plaintiff ANDREW RAYMOND is an individual co-owner of Engage, and resides in Montgomery County, Maryland. Plaintiff Raymond regularly conducts the business activities of Engage. He is the father of two minor children who reside with him at his residence in Montgomery

28

County. From time to time, prior to the enactment of Bill 4-21, he possessed, assembled and disassembled a firearm in the presence of a minor child for purposes of instruction and intends to again possess, disassemble and assemble such "ghost guns" in the presence of his minor child. He reasonably fears prosecution under Chapter 57 if he does so. He may possess and transport unserialized firearm parts and components to and from Engage as part of the business of Engage. Prior to the enactment of Bill 4-21, he assembled firearms in the presence of his children in his residence. He intends to do so in the future but reasonably fears prosecution under Chapter 57 if he does so.

58.     Prior to the enactment of Bill 4-21, plaintiff Andrew Raymond owned and possessed "ghost guns" as defined by Chapter 57 in Montgomery County and intends to possess such "ghost guns" in the future. He reasonably fears prosecution under Chapter 57 if he does so. Pursuant to MD Code, Criminal Law, 4-203(b)(7), and as co-owner of Engage, he has authorized more than one supervisory employee at Engage to wear and carry loaded firearms within the business confines of Engage for their self-protection and for the protection of the business and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. At Engage, he possesses more than one firearm for the protection of himself and his business, as permitted by Maryland State law, and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. He possesses a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." As permitted by State law, he regularly carries a loaded firearm at work at Engage, while commuting to and from Engage, and at other places within the County, as otherwise allowed by Maryland State law. He intends to continue to carry a loaded firearm in the County in accordance with State and

federal law. He reasonably fears prosecution under Chapter 57 if he does so. He is a member of MSI.

59.     Plaintiff Andrew Raymond commutes daily to Engage from his home in Montgomery County, Maryland. During that commute, he passes within 100 yards of multiple places of worship, public parks, assisted living facilities, child care centers, schools, a police station, County owned or controlled property, and long-term facilities for assisted living. There is no practical way for him to commute to work without coming within 100 yards of such locations. He intends to continue to commute to his employment at Engage while carrying a loaded firearm in the County as otherwise permitted by State law, and reasonably fears prosecution under Chapter 57 if he does so. Prior to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, he possessed within his home one or more "ghost guns" as defined by Chapter 57, including a rifle and a pistol "ghost gun" and intends to again possess such "ghost guns" in the future. He reasonably fears prosecution under Chapter 57 if he does so.

60.     Plaintiff CARLOS RABANALES is an individual co-owner of Engage. He resides in Frederick County, Maryland, and regularly conducts the business activities of Engage in the County. As co-owner of Engage, he has authorized more than one supervisory employee at Engage to wear and carry loaded firearms within the business confines of Engage for their self-protection and for the protection of the business and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. At Engage, he possesses more than one firearm for the protection of himself and his business, as permitted by Maryland State law and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so.

61.     Prior to the enactment of Bill 4-21, plaintiff Carlos Rabanales possessed in the County one or more "ghost guns" as defined by Chapter 57, and intends to again possess such "ghost

guns" in the future. He reasonably fears prosecution under Chapter 57 if he does so. At Engage, he possesses more than one firearm for the protection of himself and his business. He may possess and transport unserialized firearm parts and components to and from Engage as part of the business of Engage. As permitted by State law, he regularly carries a loaded firearm at work at Engage and while commuting to and from Engage, as well as at other places within the County, as otherwise allowed by Maryland State law. He intends to carry a loaded firearm in the future in the County, in accordance with State and federal law. He reasonably fears prosecution under Chapter 57 if he should do so. He possesses a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." He is a member of MSI.

62.     Plaintiff Carlos Rabanales commutes daily to Engage in Montgomery County from his home in Frederick County, Maryland. During that commute, he routinely passes within 100 yards of child care facilities, parks, churches, a correctional facility, health care facilities, fairgrounds, recreational facilities (playgrounds), private and public schools, a hospital, a community center and government buildings. There is no practical way for him to commute to work without coming within 100 yards of most if not all such locations. He intends to continue to carry a loaded firearm during his commute to his place of employment at Engage and elsewhere in Montgomery County as otherwise permitted by State law. He reasonably fears prosecution under Chapter 57 if he does so.

63.     Plaintiff BRANDON FERRELL is an individual supervisory employee of Engage, and resides in Montgomery County, Maryland. His residence in Gaithersburg is arguably within 100 yards of a park and thus he would violate Chapter 57 if he were to step outside of his home onto his own real estate with a loaded firearm as he has done many times in the past and intends to continue

to do so in the future, as permitted by Maryland State law. He reasonably fears prosecution under Chapter 57 if he does so. Pursuant to MD Code, Criminal Law, 4-203(b)(7), he is a supervisory employee at Engage and wears and carries a fully loaded handgun in the course of his employment at Engage, "within the confines of a business establishment" as "authorized" by the owners of Engage. Prior to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, he possessed within his home one or more "ghost guns" as defined by Chapter 57, and intends to again possess such "ghost guns" in the future. He reasonably fears prosecution under Chapter if he does so. He is a member of MSI.

64.     Plaintiff Brandon Ferrell's home is located within 100 yards of a County park and thus he cannot step outside of his home onto his own real estate with a loaded firearm, as authorized by MD Code, Criminal Law, 4-203(b)(6), as he has done in the past and intends to continue to do so in the future, without violating Chapter 57, as amended by Bill 4-21 and Bill 21-22E. He reasonably fears prosecution under Chapter 57 if he does so. He is a member of MSI.

65.     While plaintiff Brandon Ferrell does not currently possess a wear and carry permit, he has applied for such a permit and expects to be issued such a permit within the 90 day window in which permit applications are adjudicated by the Maryland State Police, as specified in MD Code, Public Safety, 5-312(a)(2). During his daily commute to Engage, he passes within 100 yards of multiple places of worship, parks, long-term facilities for senior citizens, child care facilities, schools, places of worship, County owned or controlled property, a recreational facility and long-term facilities for assisted living. Once he is issued a wear and carry permit, he intends to carry a loaded firearm while commuting and while otherwise traveling within the County. There is no practical way for him to commute to work without coming within 100 yards of the locations in

which possession and transport of a loaded firearm is banned by Chapter 57, as amended by Bill 21-22E. He reasonably fears prosecution under Chapter 57 if he should he do so.

66.    Plaintiff DERYCK WEAVER is a supervisory employee of Engage, and resides in Bethesda, Maryland. His home is arguably within 100 yards of a "place of public assembly" as that term is defined in Bill 21-22E, and thus he cannot step outside of his home onto his property with a loaded firearm, as he has done many times in the past and intends to continue to do so in the future, without violating Chapter 57, as amended by Bill 4-21 and Bill 21-22E. He reasonably fears prosecution under Chapter 57 if he does so. He is the father of one minor child who lives with him at his residence. He is a qualified handgun instructor within the meaning of MD Code, Public Safety, §5-101(q), as well as a National Rifle Association-certified handgun instructor and National Rifle Association-certified Chief Range Safety Officer. He possesses a wear and carry permit as issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." He is a member of MSI.

67.    From time to time, prior to the enactment of Bill 4-21, plaintiff Deryck Weaver possessed, assembled and disassembled a "ghost gun" and other firearms in the presence of a minor child for purposes of instruction and intends to again disassemble and assemble such "ghost guns" and other firearms in the presence of his minor child. He has possessed and transported "ghost guns" in the presence of his child and intends to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. Pursuant to MD Code, Criminal Law, 4-203(b)(7), he has worn and carried a fully loaded handgun in the course of his employment at Engage, "within the confines of a business establishment" as "authorized" by the owners of Engage and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57, as amended by Bill 4-21 and Bill 21-22E if he does so. He is a member of MSI.

33

68.     Plaintiff Deryck Weaver commutes daily to Engage from his home in Montgomery County, Maryland. During his commute to Engage, he regularly passes within 100 yards of multiple places of worship, multiple parks, health care facilities, child care facilities, schools, a library, a County owned or controlled property, a recreational facility and long-term facilities for assisted living. There is no practical way for him to commute to work without coming within 100 yards of such locations. He intends to continue to carry a loaded firearm during his commute to his employment at Engage and elsewhere in Montgomery County, as otherwise permitted by State law, and reasonably fears prosecution under Chapter 57 if he does so.

69.     Plaintiff JOSHUA EDGAR works as a contractor at Engage, and resides in Gaithersburg, Maryland. His residence is within 100 yards of a park and thus he would immediately be in violation of Chapter 57, as amended by Bill 21-22E and Bill 4-21, should he step outside his home onto his real estate with a loaded firearm as he has done many times in the past and intends to continue to do so in the future, as permitted by MD Code, Criminal Law, 4-203(b)(6). He reasonably fears prosecution under Chapter 57 if he does so. Prior to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, he possessed within his home one or more "ghost guns" as defined by Chapter 57, and intends to again possess such "ghost guns" in the future. He reasonably fears prosecution under Chapter if he does so. From time to time, prior to the enactment of Bill 4-21, he assembled and disassembled a "ghost gun" in the presence of a minor child for purposes of instruction and intends to again disassemble and assemble such "ghost guns" in the presence of his minor child. He fears prosecution under Chapter 57 if he should do so. He possesses a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." He is a member of MSI.

70.     Plaintiff I.C.E. FIREARMS & DEFENSIVE TRAINING, LLC, ("ICE Firearms") is a Maryland corporation located at 24129 Pecan Grove Lane, Gaithersburg, Maryland. ICE Firearms provides firearm training to individuals with handguns, rifles and shotguns. ICE Firearms is arguably located within 100 yards of a "place of public assembly" as that term is used in Chapter 57, as amended by Bill 21-22E. ICE Firearms provides instruction in the safe use of firearms to adults, and to minors with the consent of their parents. Prior to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, ICE Firearms possessed within its location one or more "ghost guns" as defined by Chapter 57, and intends to again possess such "ghost guns" in the future. It reasonably fears prosecution under Chapter if it does so

71.     Plaintiff RONALD DAVID is the owner and operator of ICE Firearms. He resides in Gaithersburg, Maryland and his home is arguably within 100 yards of a school as that term is used by Bill 21-22E. Thus, should he step outside his home onto his real estate with a loaded firearm, as he has done many times in the past and intends to continue to do so in the future, as permitted by Maryland State law, he would violate Chapter 57. He reasonably fears prosecution under Chapter 57 if he does so. He is a "qualified handgun instructor" within the meaning of MD Code, Public Safety, § 5-101(q), and a National Rifle Association-certified Training Counselor in every shooting discipline. He possesses a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." He is a member of MSI.

72.     As permitted by State law, plaintiff Ronald David regularly carries a loaded firearm with him while (1) attending services at his place of worship located in the County, (2) at health care facilities during appointments with health care professionals in the County, (3) at fairgrounds in the County, (4) at recreational facilities within the County, and (5) at a park within the County, and intends to continue to do so at all these locations in the future. He reasonably fears prosecution under

Chapter 57 if he does so. He also regularly carries a loaded firearm with him while otherwise traveling within the County and does so within 100 yards of public and private schools, a polling place, a government building, parks, a library and a senior center, and intends to continue to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. Prior to the enactment of Bill 4-21, he likewise possessed one or more unfinished frames or receivers as defined and banned by Chapter 57 as a "ghost gun," and intends to possess such "ghost guns" in the future. He reasonably fears prosecution under Chapter 57 if he does so.

73.    Plaintiff NANCY DAVID resides in Gaithersburg, Maryland, and her home is arguably within 100 yards of a school as that term is used by Chapter 57, as amended by Bill 4-21 and Bill 21-22E. Thus, should she step outside her home onto her real estate with a loaded firearm, as she has done many times in the past and intends to continue to do so in the future, as permitted by Maryland State law, she would violate Chapter 57, as amended by Bill 4-21 and Bill 21-22E. She reasonably fears prosecution under Chapter 57 if she does so. She is a "qualified handgun instructor" within the meaning of MD Code, Public Safety, § 5-101(q). As permitted by State law she regularly carries a loaded firearm while otherwise traveling within the County and does so within 100 yards of schools, a polling place, a government building, parks, a library and intends to continue to do so in the future. She reasonably fears prosecution under Chapter 57 if she does so. She has a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." She is a member of MSI.

74.    Plaintiff ELIYAHU SHEMONY is an Orthodox Jew who is a former head of security for his synagogue located in the County. He was a member of the Special Forces of the Israeli Defense Force before immigrating to the United States and becoming an American citizen and is highly trained and proficient in the use of firearms. As permitted by State law, and because

36

Jewish synagogues and communities are under constant threat of attack in the United States[1] and in Montgomery County,[2] he regularly carries a loaded firearm while attending services at his synagogue for his own self-defense and for the defense of others and intends to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. As permitted by State law, he also regularly carries a loaded firearm with him (1) while going to and inside a public library in the County, and (2) while picking up minor children at their private school on private school property and intends to do so in the future. He reasonably fears prosecution under Chapter 57, as amended by Bill 4-21 and Bill 21-22E, if he does so. As permitted by State law, he also regularly carries a loaded firearm within 100 yards of a school, a childcare facility, a polling place, a government building, and the County building in which the County holds legislative assemblies, as well as other locations throughout Montgomery County and intends to do so in the future. He reasonably fears prosecution under Chapter 57 if he does so. He possesses a wear and carry permit issued by the Maryland State Police and that permit states that the permit is "not valid where firearms are prohibited by law." He is a member of MSI.

75.     Accompanying this Second Amended Complaint are the sworn declarations of each of the plaintiffs verifying the factual allegations set forth herein. (Exhibits E, F, G, H, I, J, K, L, M). Each of the foregoing individual plaintiffs, each of the two corporate plaintiffs and MSI members

---

[1] https://www.nytimes.com/2022/11/04/nyregion/new-jersey-synagogue-security-threat-suspect.html.

[2] https://www.washingtonpost.com/dc-md-va/2022/11/14/bethesda-trail-antisemetic-graffiti/; https://www.washingtonjewishweek.com/sharp-rise-in-anti-semitism-in-maryland-virginia-and-d-c-adl-reports/

are directly regulated by Chapter 57, as amended by Bill 4-21 and Bill 21-22E. Each of these plaintiffs and MSI members is injured by Chapter 57, as amended by Bill 4-21 and Bill 21-22E, in ways that are directly traceable to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, and these injuries are redressable through the relief sought in this case. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) ("Where "the plaintiff is himself an object of the action ... there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

76.     Chapter 57 is a penal statute as a violation of Chapter 57 is a Class A violation that can result in a $1,000 criminal fine and up to six months imprisonment for each day in which the violation continues. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, contains no *mens rea* requirement of any type and thus these punishments may be imposed without regard to the defendant's intent or knowledge or state of mind.

77.     Each of the plaintiffs is entitled to bring a pre-enforcement challenge to Chapter 57, as amended by Bill 4-21 and Bill 21-22E. In order to show injury in a pre-enforcement challenge, plaintiffs need only show "'an intention to engage in a course of conduct arguably affected with a constitutional interest.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014), quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). See also *FEC v. Cruz*, 142 S.Ct. 1638, 1649 (2022); *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,* 139 S.Ct. 2051 (2109) (noting that plaintiffs may bring "both facial, pre-enforcement challenges and as-applied challenges to agency action"). The allegations of each of the plaintiffs satisfy these requirements.

78.     Each of the plaintiffs in this case has engaged in constitutionally protected conduct in the past that would have violated Chapter 57, as amended by Bill 4-21 and Bill 21-22E, and each of the plaintiffs affirmatively have alleged that they fully intend to engage in such conduct in the

38

future. Each of these plaintiffs reasonably fears prosecution under Chapter 57 if they do so. Nothing "requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony*, 573 U.S. at 163. See also *Cruz,* 142 S.Ct. at 1649; *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 129 (2007); *Free Enter. Fund. v. Pub.Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010). Plaintiffs are not required "to risk criminal prosecution to determine the proper scope of regulation." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965). Maryland law provides that a plaintiff need only have "an interest such that he or she is personally and specifically affected in a way different from the public generally" to bring a pre-enforcement action. *Pizza di Joey, LLC v. Mayor of Baltimore*, 470 Md. 308, 343-44, 235 A.3d 873 (2020) (collecting cases).

79.     "[I]n numerous pre-enforcement cases" the Supreme Court "did not place the burden on the plaintiff to show an intent by the government to enforce the law against it," but rather the Court "presumed such intent in the absence of a disavowal by the government or another reason to conclude that no such intent existed." *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013). See *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010*); Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *Babbitt*, 442 U.S. at 301. The County in this case has not disavowed full enforcement of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, and there is no reason to believe that the County will not fully and vigorously fully enforce Chapter 57 at its time and place of choosing. Under the forgoing principles, the individual and corporate plaintiffs, and MSI, on behalf of its members, all have standing to seek pre-enforcement review of Chapter 57, as amended by Bill 4-21 and Bill 21-22E. See *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 217 (4th Cir. 2021).

39

**Defendant:**

80.     The Defendant is Montgomery County, Maryland, with its principal place and seat located in Rockville, Maryland. Montgomery County is a "person" for purposes of the relief sought by this suit within the meaning of MD Code, Courts and Judicial Proceedings, § 3-401, and 42 U.S.C. § 1983. Chapter 57, as amended by Bill 4-21 and Bill 21-22E. For purposes of Section 1983, the actions challenged herein are official actions and policies of the County. The County may be named and sued *eo nomine* under 42 U.S.C. § 1983. *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Starbuck v. Williamsburg James City County School Board,* 28 F.4th 529, 533-34 (4th Cir. 2022); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

## COUNT I – VIOLATIONS OF THE MARYLAND CONSTITUTION

81.     The Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint.

82.     Chapter 57, as amended by Bill 4-21 and Bill 21-22E, regulates "matters of significant interest to the entire state." *Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272, 278 (1968). Chapter 57, as so amended, "affects the rights of persons without the area to carry on a business or to do the work incident to a trade, profession, or other calling within the area." *Steimel v. Board,* 278 Md. 1, 5, 357 A.2d 386, 388 (1976).

83.     The General Assembly has repeatedly debated and introduced legislation, in both the House of Delegates and in the Senate, addressing the subject matters regulated by Chapter 57. One such bill, House Bill 740, passed the House of Delegates in 2019. More recently, the General Assembly has enacted into law Senate Bill 387 and House Bill 425. Senate Bill 387 was enacted under Article II, Section 17(b) of the Maryland Constitution as Chapter 19. House Bill 425 was enacted under Article II, Section 17(b) of the Maryland Constitution as Chapter 18. This legislative

40

activity is strong evidence that the matter is of general, state-wide interest, thereby demonstrating that Bill 4-21 is not a "local law" within the meaning of Article XI–A, § 3 of the Maryland Constitution and is thus *ultra vires*. See *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 631 A.2d 77 (1993).

84.     Chapter 57, as amended by Bill 4-21 and Bill 21-22E, has defined the "place of public assembly" to mean:

"(1) a publicly or privately owned:

(A) park;

(B) place of worship;

(C) school;

(D) library;

(E) recreational facility;

(F) hospital;

(G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;

(H) long-term facility, including any licensed nursing home, group home, or care home;

(I) multipurpose exhibition facility, such as a fairgrounds or conference center; or

(J) childcare facility;

(2) government building, including any place owned by or under the control of the County;

(3) polling place;

(4) courthouse;

(5) legislative assembly; or

(6) a gathering of individuals to collectively express their constitutional right to protest or assemble."

41

Chapter 57, as amended by Bill 4-21 and Bill 21-22E, has further defined the "place of public assembly" to mean:

"A 'place of public assembly' includes all property associated with the place, such as a parking lot or grounds of a building."

85.     Bill 4-21 amended Section 57-11 of Chapter 57 to provide: "(a) In or within 100 yards of a place of public assembly, a person must not: (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or (2) sell, transfer, possess, or transport a firearm created through a 3D printing process." Bill 21-22E left these provisions unaltered. Bill 4-21 left unaltered the pre-existing exemption for "a person who has received a permit to carry the handgun under State law" found in Section 57-11(b) of Chapter 57. Bill 21-22E amended Section 57-11(b) of Chapter 57 to eliminate the prior exemption for permit holders under Section 57-11. As thus amended, the bans imposed by Section 57-11(a) now apply equally to persons whom have been issued wear and carry permits by the Maryland State Police.

86.     Chapter 57's definition of a "place of public assembly," the bans imposed by Section 57-11(a) of Chapter 57, and the repeal of the pre-existing exception for permit holders by Bill 21-22E, makes it impracticable, if not virtually impossible, for any person with a carry permit issued by the Maryland State Police to legally carry a loaded firearm within most of Montgomery County because it would be virtually impossible, as a practical matter, for a person with a wear and carry permit to travel through the urban portions of Montgomery County without passing within 100 yards of the places at which possession and transport of a firearm is now banned Chapter 57, as amended by Bill 21-22E. Since Chapter 57 imposes no *mens rea* requirement, any possession or transport within such areas would create strict criminal liability for permit holders without regard to the permit holder's knowledge, intent or state of mind.

42

87.     Allowing county governments to expand their regulatory powers in the manner accomplished by Chapter 57, will create a nightmarish hodgepodge of local laws that vary from county to county, from city to city and from town to town, all of which could impose criminal penalties of the sort imposed by Montgomery County under Chapter 57. This reality directly and adversely affects the rights of non-residents of Montgomery County "to carry on a business or to do the work incident to a trade, profession, or other calling within the area." *Dasch v. Jackson*, 170 Md. 251, 261, 183 A. 534, 538 (1936). By criminalizing conduct that takes place within 100 yards of such locations, Montgomery County has exceeded its authority beyond that allowed by MD Code, Criminal Law, § 4-209. Through the enactment of Bill 4-21 and Bill 21-22E, the County has effectively nullified the preemption provisions of Section 4-209 as well as other provisions of Maryland firearms law, including express preemption provisions.

88.     Bill 4-21 is not a "local law" within the meaning of Article XI–A, § 3 of the Maryland Constitution because it regulates "matters of significant interest to the entire state" and "deals with" a matter "which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state." *Cole v. Secretary of State*, 249 Md. 425, 434, 240 A.2d 272 (1968). Bill 4-21 also "affects the rights of persons without the area to carry on a business or to do the work incident to a trade, profession, or other calling within the area," including the rights of the plaintiffs. *Steimel v. Board*, 278 Md. 1, 5, 357 A.2d 386, 388 (1976). Bill 4-21 is thus unconstitutional under Article XI–A, § 3 of the Maryland Constitution.

89.     Under Section 3 of Article XI-A of the Maryland Constitution, all laws passed by the County are "subject to the Constitution and Public General Laws of this State." As more fully set forth in Count II, below, Bill 4-21 conflicts and is inconsistent with "General Laws" passed by

43

the General Assembly and is thus in violation of Article XI–A, § 3 of the Maryland Constitution for this additional reason.

90. Under Section 6 of Article XI-A of the Maryland Constitution, the home rule powers conferred on the County by Article XI-A "shall not be construed to authorize the exercise of any powers in excess of those conferred by the Legislature upon said Counties or City as this Article sets forth." Under Section 6 of Article XI-A, the County's home rule powers thus do not include the power to pass any law that is in conflict or inconsistent with "General Laws" passed by the General Assembly as otherwise specified in Section 3 of Article XI-A of the Maryland Constitution. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, conflicts and is inconsistent with "General Laws" in violation of Section 3 of Article XI-A and thus is unconstitutional and *ultra vires* under Section 6 of Article XI-Al.

## COUNT II – VIOLATION OF THE EXPRESS POWERS ACT

91. Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint.

92. Under the Express Powers Act, MD Code, Local Government, § 10-206, Montgomery County laws must be "not inconsistent with State law" and the County is barred from enacting laws that are "preempted by or in conflict with public general law." Under Section 3 of Article XI-A of the Maryland Constitution, all laws passed by the County are "subject to the Constitution and Public General Laws of this State."

93. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, violates the foregoing provisions of the Express Powers Act and Section 3 of Article XI-A in multiple ways:

    *a.* MD Code, Criminal Law, § 4-209(a) preempts the County regulation of the "purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation"

44

of all firearms, but allows the County to regulate such matters "within 100 yards of or in a park, church, school, public building, and other place of public assembly." By redefining a "place of public assembly," the County has illegally expanded the scope of its authority provided by Section 4-209 beyond the bounds permitted by the language of Section 4-209. To the extent Bill 4-21 and Bill 21-22E purport to apply to these expanded areas, it is expressly preempted by the preemption provisions of Section 4-209(a).

*b.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans the "transfer" of all firearms within 100 yards of the County's illegally redefined "place of public assembly." In so far as this ban on such transfers includes regulated firearms that ban is separately preempted by MD Code, Public Safety, § 5-134(a), which provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the transfer by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the transfer of a regulated firearm."

*c.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans the "sale" of all firearms within 100 yards of the County's illegally redefined "place of public assembly." In so far as Chapter 57's ban on such sales includes rifles and shotguns, that ban is preempted by MD Code, Public Safety, § 5-207(a), which provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the transfer by a private party of a rifle or shotgun, and the State preempts the right of any local jurisdiction to regulate the transfer of a rifle or shotgun."

*d.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans the "possession" of all firearms within 100 yards of the County's illegally redefined "place of public assembly." In so far as this ban on such sales includes regulated firearms, including handguns, that ban is preempted by MD Code, Public Safety, § 5-133(a) which provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated

45

firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm.

*e.* Chapter 57, as amended by Bill 4-21, expressly precludes any person, including a parent, from giving, lending or otherwise transferring to a minor a "ghost gun or a major component of a ghost gun." In so far as this provision regulates the temporary transfer of a regulated firearm, it illegally bans an activity that is expressly permitted by MD Code, Public Safety, § 5-133(d), which allows a minor to transfer and possess a regulated firearm under the active supervision of an adult with a parent's permission. Such transfers often include instruction in the use of firearms. To the extent that Bill 4-21 burdens such instruction, Bill 4-21 is preempted by MD Code, Criminal Law, § 4-209(b)(2), which provides that "[a] county, municipal corporation, or special taxing district may not prohibit the teaching of or training in firearms safety, or other educational or sporting use of the items listed in subsection (a) of this section." These provisions fully apply to instruction in the use of unserialized regulated firearms lawfully manufactured for personal use.

*f.* Chapter 57, as amended by Bill 4-21, expressly precludes any person, including a parent, from giving, lending or otherwise transferring to a minor a "ghost gun or a major component of a ghost gun," including the slide or a cylinder of a handgun or a barrel of a rifle. MD Code, Criminal Law, § 4-104, expressly permits a minor child under the age of 16 to have access to any firearm if that access "is supervised by an individual at least 18 years old" or if the minor child under the age of 16 has a certificate of firearm and hunter safety issued under § 10-301.1 of the Natural Resources Article. By necessary implication, access to a firearm by a minor child between the ages of 16 and 18 is likewise permitted by Section 4-104 without any restriction. These provisions fully apply to the transfer of unserialized firearms lawfully manufactured by an individual for personal

use. Bill 4-21's ban on lending, giving, or transferring a ghost gun to a minor is inconsistent with these provisions.

g. Chapter 57, as amended by Bill 4-21 provides that a "person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor." MD Code, Criminal Law, § 4-104, expressly permits a minor child under the age of 16 to have access to any firearm if that access "is supervised by an individual at least 18 years old" or if the minor child under the age of 16 has a certificate of firearm and hunter safety issued under § 10-301.1 of the Natural Resources Article. By necessary implication, access to a firearm by a minor child between the ages of 16 and 18 is permitted by Section 4-104 without restriction. In so far as these provisions limit a minor's access to a ghost guns or components in a manner that Section 4-104 permits, Bill 4-21 is inconsistent with Section 4-104.

h. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, expressly bans the transport, in a vehicle and otherwise, of a "ghost gun," within 100 yards of the County's illegally expanded "place of public assembly." This ban on transport is inconsistent with MD Code, Criminal Law, § 4-203(b)(3), which provides that a person is permitted to transport a handgun "on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is unloaded and carried in an enclosed case or an enclosed holster." Transport of unloaded rifles and shotguns, including unserialized rifles and shotguns, is permitted under Maryland law without restriction.

47

*i.* Chapter 57, as amended Bill 4-21 and Bill 21-22E, expressly bans the "transport," in a vehicle and/or otherwise, of a "ghost gun" within 100 yards of the County's illegally expanded "place of public assembly." This ban is inconsistent with MD Code, Criminal Law, § 4-203(b)(5), which expressly permits "the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster." Such transport and carriage of unloaded rifles and shotguns, including unserialized rifles and shotguns, are permitted under Maryland law without restriction.

*j.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, expressly bans the sale, transfer, possession or transport of a firearm, including a "ghost gun" or a "major component" of any firearm, within 100 yards of the County's illegally expanded "place of public assembly." These bans are inconsistent with and preempted by § 6 of Ch. 13, of Session Laws of 1972 of Maryland, which expressly preempts all local law restrictions on the wearing, carrying, or transporting of handguns in the following language:

"SEC. 6. Be it further enacted, That all restrictions imposed by the law, ordinances, or regulations of the political subdivisions on the wearing, carrying, or transporting of handguns are superseded by this Act, and the State of Maryland hereby preempts the right of the political subdivisions to regulate said matters." See *Montgomery County v. Atlantic Guns, Inc*., 302 Md. 540, 543-44, 489 A.2d 1114, 1115-16 (1985).

*k.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, expressly bans the mere possession in the home of a "ghost gun" if the home is within 100 yards of the County's illegally expanded "place of public assembly." In so far as this ban on home possession applies to handguns, the ban is inconsistent with MD Code, Criminal Law, § 4-203(b)(6), which expressly permits "the

48

wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides…." Home possession of unserialized handguns, rifles and shotguns lawfully manufactured for personal use is currently permitted under Maryland law without restriction.

*l*. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans possession of a firearm or ammunition by a business, if the business is within 100 yards of the County's illegally expanded "place of public assembly." Section 57-11(b) of Chapter 57 provides that the bans otherwise imposed by Section 57-11(a) do not "apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm." The requirement that the owner must have "a permit to carry the firearm" is inconsistent with MD Code, Criminal Law, § 4-203(b)(6), which permits "the wearing, carrying, or transporting of a handgun by a person . . . within the confines of a business establishment that the person owns or leases." Such persons are not required to possess or obtain a Maryland carry permit. The limitation to possession of "one" firearm by the owner, imposed by Chapter 57, as amended by Bill 4-21, is likewise inconsistent with Section 4-203(b)(6), as that section imposes no limitation on the number of handguns that may be possessed, worn, carried or transported under this provision of Section 4-203(b)(6). Transport, wear, carriage and possession of rifles and shotguns, including unserialized rifles and shotguns, in a person's business are currently permitted under Maryland law without restriction.

*m*. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans possession of a firearm or ammunition, if the business is within 100 yards of the County's illegally expanded "place of public assembly." Chapter 57 provides that the bans otherwise imposed by Section 57-11(a) do not apply "to the possession of one firearm, and ammunition for the firearm, at a business by … one

authorized employee of the business who has a permit to carry the firearm." The requirement that the "authorized employee" must have "a permit to carry the firearm" is inconsistent with MD Code, Criminal Law, § 4-203(b)(7), which expressly permits "the wearing, carrying, or transporting of a handgun by a supervisory employee: (i) in the course of employment; (ii) within the confines of the business establishment in which the supervisory employee is employed; and (iii) when so authorized by the owner or manager of the business establishment." Such authorized persons covered by Section 4-203(b)(7) are not required to possess or obtain a Maryland carry permit to carry within the business confines of the employer's business. Chapter 57's limitation to possession of "one" firearm by "one" authorized employee is likewise inconsistent with Section 4-203(b)(7), as that section imposes no limitation on the number of handguns or ammunition that may be possessed, worn, carried or transported under this provision of Section 4-203(b)(7), and imposes no limitation on the number of employees who may be "authorized" by the employer under Section 4-203(b)(7). Transport, wear, carriage and possession of rifles and shotguns, by business employees are permitted under Maryland law without restriction.

*n.* Chapter 57, as amended by Bill 4-21 and Bill 21-22E, provides that the bans otherwise imposed by Section 57-11(a) do not apply to "separate ammunition or an unloaded firearm: (A) transported in an enclosed case or in a locked firearms rack on a motor vehicle, unless the firearm is a ghost gun or an undetectable gun." These requirements are inconsistent with MD Code, Criminal Law, § 4-203(b)(3), which permits transports of an unloaded handgun "in an enclosed case or an enclosed holster," imposes no requirements whatsoever on the manner in which ammunition is transported, and imposes no ban whatsoever on the transport of a "ghost gun."

*o.* The Staff Report for the amendments to Bill 21-22E (attached hereto as Exhibit D) indicates that the amendments to the "ghost gun" provisions of Chapter 57 were intended to make

50

Bill 21-22E consistent with State law regulating PMFs. However, Chapter 57, as amended by Bill 21-22E, regulates "ghost guns" in Montgomery County in multiple ways that are in direct conflict or inconsistent with the State-wide regulation of PMFs imposed by Senate Bill 387, 2022 Session Laws, Chapter 19, and House Bill 425, 2022 Session Laws, Chapter 18, by:

> **(i)** imposing bans on possession, sale, transfer and transport of a "ghost gun" and on "major components" without regard to and in direct conflict with those provisions of MD Code, Public Safety, § 5-703(b)(1), that (1) expressly permit possession by persons who lack the requisite *mens rea* (subsection (b)(1)(i)), (2) allow possession through inheritance (subsection (b)(1)(ii)); and (3) allow possession associated with manufacture of an unfinished frame or receiver (subsection (b)(1)(iii));

> **(ii)** imposing bans on the possession, sale, transfer, or delivery of a "ghost gun" and on "major components" by a federally licensed dealer, firearms manufacturer and firearms importer, in direct conflict with those provisions of MD Code, Public Safety, § 5-702(2), which expressly allow such federally licensed dealers, manufacturers and importers to possess, sell, transfer and deliver "ghost guns";

> **(iii)** imposing bans on possession, sale, transfer, or delivery of a "ghost gun" by a federally licensed dealer, manufacturer or importer, and thus precluding such dealers, manufacturers or importers from performing serialization services expressly authorized and contemplated by MD Code, Public Safety, §§ 5-703(b)(1) and (b)(2);

51

**(iv)** imposing bans on the otherwise lawful possession of a "ghost gun" and of "major components" possessed by a person prior to March 1, 2023, as permitted by MD Code, Public Safety, § 5-703(b)(2);

**(v)** imposing bans on the possession of "ghost guns" and of "major components" by lawful owners and thus precluding such owners from serializing such "ghost guns" through federally licensed dealers, manufacturers and importers located in Montgomery County, as expressly authorized by MD Code, Public Safety, § 5-703(b)(2);

**(vi)** imposing bans on possession of "ghost guns" that have been serialized by "other federal licensee[s] authorized to provide marking services," as expressly permitted by MD Code, Public Safety, §§ 5-703(b)(2)(i), in addition to firearms serialized "by a licensed manufacturer, maker, or importer" as specified by Section 57-1(2)(A) of Chapter 57, as amended by Bill 21-22E;

**(vii)** continuing to impose bans on "major components" even though House Bill 425 and Senate Bill 387 do not regulate such components other than frames or receivers.

## COUNT III – VIOLATION OF THE MARYLAND TAKINGS CLAUSE AND DUE PROCESS CLAUSE

94.     Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count arises under the Maryland Takings Clause, Article III, § 40 of the Maryland Constitution, and the Due Process Clause, Article 24 of the Maryland Declaration of Rights.

52

95.     Personal property interests of Maryland residents are protected by both the Maryland Takings Clause, Article III, § 40 of the Maryland Constitution, and the Due Process Clause, Article 24 of the Maryland Declaration of Rights. These provisions are interpreted *in pari materia* with the Fifth Amendment of the United States Constitution, fully encompass personal property and may afford more protection than the Fifth Amendment. *Dua v. Comcast Cable*, 370 Md. 604, 805 A.2d 1061, 1070-72 (2002).

96.     Maryland's Taking Clause and Due Process Clause are violated "[w]henever a property owner is deprived of the beneficial use of his property or restraints are imposed that materially affect the property's value, without legal process or compensation." S*erio v. Baltimore County*, 384 Md. 373, 863 A.2d 952, 967 (2004).

97.     Maryland's Taking Clause and Due Process Clause govern retrospective laws. "Retrospective statutes are those 'acts which operate on transactions which have occurred or rights and obligations which existed before passage of the act." *Muskin v. State Dept. of Assessments and Taxation*, 422 Md. 544, 30 A.3d 962, 969 (2011).

98.     Under the Maryland's Taking Clause and Due Process Clause, "[n]o matter how 'rational' under particular circumstances, the State is constitutionally precluded from abolishing a vested property right or taking one person's property and giving it to someone else." *Dua v. Comcast Cable of Maryland, Inc*., 370 Md. 604, 623, 805 A.2d 1061 (2002).

99.     The property adversely affected and banned by the provisions of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, constitute protected personal property within the meaning of the Maryland Takings Clause and Due Process Clause as the term property for these purposes "embraces 'everything which has exchangeable value or goes to make up a man's wealth." *Dodds v. Shamer*, 339 Md. 540, 663 A.2d 1318, 1322 (1995). The personal property regulated by Chapter

57 has exchangeable value. Plaintiffs have vested property rights in the continued possession and use of the property regulated by Chapter 57.

100.     Chapter 57, as amended by Bill 4-21 and Bill 21-22E, is a retrospective ordinance as it will deprive the plaintiffs of the beneficial use and possession of their lawful vested property rights and property that was lawfully acquired and possessed prior to the County's enactment of Bill 4-21 and Bill 21-22E. The restraints and bans imposed by Chapter 57, as amended by Bill 4-21 and Bill 21-22E, materially affect the value of this previously lawfully acquired and possessed property, all without legal process or compensation.

101.     Chapter 57, as amended by Bill 4-21 and Bill 21-22E, violates Maryland Takings Clause, Article III, § 40, and the Due Process Clause, Article 24 of the Maryland Declaration of Rights. Under Maryland law, a court may enjoin a statute that violates Article 40 "unless and until condemnation proceedings in accordance with law be had, and just compensation awarded and paid for tendered." *Department of Natural Resources v. Welsh*, 308 Md. 54, 65, 521 A.2d 313, 318 (1986). Plaintiffs are entitled to declaratory and equitable relief for the unconstitutional taking of their vested property rights by Chapter 57.

**COUNT IV – THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT AND ARTICLE 24 OF THE MARYLAND DECLARATION OF RIGHTS**

**Chapter 57 is Unconstitutionally Vague**

102.     Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count addresses violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, defendant Montgomery County has acted under

"color of state law" within the meaning of Section 1983 in enacting Chapter 57, as amended by Bill 4-21 and Bill 21-22E. This Count also arises under Article 24 of the Maryland Declaration of Rights.

103. The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Article 24 of the Maryland Declaration of Rights provides that "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

104. The Due Process Clause of the Fourteenth Amendment prohibits the enactment or enforcement of vague legislation. *Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018) ("the prohibition of vagueness in criminal statutes…is an 'essential' of due process, required by both 'ordinary notions of fair play and the settled rules of law"). A penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "[A] vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).

105. Such a statute need not be vague in all possible applications in order to be void for vagueness. *Johnson v. United States*, 576 U.S. 591, 602 (2015) ("our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp"). "*Johnson* made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'" *Dimaya*, 138 S.Ct. at 1214 n.3. A court "cannot construe a criminal statute on the assumption that the Government will use it responsibly," *United States v.*

*Stevens,* 559 U.S. 460, 480 (2010), and "cannot find clarity in a wholly ambiguous statute simply by relying on the benevolence or good faith of those enforcing it." *Wollschlaeger v. Governor, Fla.*, 848F.3d 1293, 1322 (11th Cir. 2017) (en banc).

106.     Article 24 of the Maryland Declaration of Rights prohibits the enactment or enforcement of vague legislation. *Galloway v. State*, 365 Md. 599, 614, 781 A.2d 851 (2001) ("The void-for-vagueness doctrine as applied to the analysis of penal statutes requires that the statute be "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties."). Under Article 24, a statute must provide "legally fixed standards and adequate guidelines for police ... and others whose obligation it is to enforce, apply, and administer [it]" and "must eschew arbitrary enforcement in addition to being intelligible to the reasonable person." (Id. at 615).

107.     Chapter 57, as amended by Bill 4-21 and Bill 21-22E, criminally punishes conduct that takes place at or within 100 yards of "a place of public assembly," which is defined to include, whether "publicly or privately owned," a "park; place of worship; school; library; recreational facility; hospital; community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; long-term facility, including any licensed nursing home, group home, or care home; or multipurpose exhibition facility, such as a fairgrounds or conference center or childcare facility." Chapter 57, as amended by Bill 4-21 and Bill 21-22E, includes within these places "all property associated with the place, such as a parking lot or grounds of a building."

108.     Nothing in Chapter 57 requires that any of these specified locations actually be open to the public at large and some, such a private schools, nursing homes, care homes, group homes, and childcare facilities, are not typically open to the public at all. Chapter 57, as amended by Bill 4-

56

21 and Bill 21-22E, fails to provide constitutionally adequate notice to the public and likewise fails to provide "legally fixed standards and adequate guidelines for police ... and others whose obligation it is to enforce, apply, and administer [it]" and fails to "eschew arbitrary enforcement in addition to being intelligible to the reasonable person."

109.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans conduct taking place at or within 100 yards of a publicly or private owned "library," but includes no definition of "library." Bill 4-21 deleted Chapter 57's former definition of "library" as limited to a "public" library and Chapter 57, as amended by Bill 4-21 and Bill 21-22E, now expressly covers libraries regardless of whether the place is "publicly or privately owned." The term "library" could thus be arguably read to include any "library" of any type or size, regardless of whether the library is in the home or private building, and regardless of whether the library is, in fact, open to the public. There is no published inventory of the locations of such "privately owned" libraries and plaintiffs are left to guess as to the locations of such "libraries." Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

110.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, does not define "recreational facility," but Bill 4-21 deleted the ordinance's former limitation to "government-owned or operated" recreational facility. The terms "recreation" or "recreational" has no established legal meaning and are exceeding broad in common usage. Thus "recreational facility" could be arguably read to include a backyard swing set or private playground, swimming pool, gym, billiards room, or any other place where any sort of "recreation" may take place, regardless of whether the facility is privately owned or is open to the public. Plaintiffs are left to guess as to the locations encompassed within the vague use of this term. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

111.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, covers "community health center, including any health care facility or community-based program licensed by the Maryland Department of Health," but does not define the term "community health center" or what the term includes, other than a program licensed by the Maryland Department of Health. As a practical matter, plaintiffs have no way of ascertaining whether a particular location has "a program licensed by the Maryland Department of Health." That term "community health center," has no well-established legal meaning. It could arguably include private doctor's offices or private clinics, which are located throughout the County. Plaintiffs are left to guess as to the locations encompassed within the vague use of this term. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

112.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, covers any publicly or privately owned "school," but Bill 4-21 amended Chapter 57 to delete the ordinance's former limitation to "elementary or secondary" school, and therefore the Chapter 57's bans are intended to go beyond the ban on possession of a firearm "on public school property," otherwise imposed by MD Code, Criminal Law, § 4-102(b). The term "school" as used in Chapter 57 thus arguably includes a ban on possession or transport of a firearm at or within 100 yards of any "school" of any size and of any type, private or public, including public or private colleges or universities. The term "school" could likewise include a trade school, such as for electricians, hair salons, truck drivers, HVAC technicians, plumbers, travel agents, dental or medical assistants and medical billing and coding, or any other place where occupational or tutorial instruction may take place. Plaintiffs are left to guess as to the locations encompassed within the vague use of the term "school." Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

58

113.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, imposes its bans at or within 100 yards of a publicly or privately owned "park," but Bill 4-21 deleted the ordinance's former definition of "park" as including only a "government owned" park that was "identified by the Maryland-National Capital Park and Planning Commission." The term "park" may include a County or government-owned park, the term also could be arguably read to include a private commercial "park," any area with grass or trees, a sporting arena, or even an industrial park, regardless of whether the location is, in fact, open to the public. Plaintiffs are left to guess as to the locations encompassed within the vague use of "park." Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

114. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, covers any "long-term facility, including any licensed nursing home, group home, or care home" but does not define the term "long-term facility" or what the term includes other than any "licensed nursing home, group home, or care home." As a practical matter, plaintiffs have no way of ascertaining whether a particular location has been "licensed" as a "nursing home, group home, or care home." There is no established definition for the term "long-term facility," as that term is not even textually limited to facilities that offer care.  Plaintiffs are left to guess as to the locations encompassed within the vague use of this term. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

115.    The use of vague and undefined terms in Chapter 57, as amended by Bill 4-21 and Bill 21-22E, deprives ordinary people, including plaintiffs and MSI members, of adequate notice concerning where possession, transport, sale, or transfer of firearms is prohibited and where such conduct is not. This use of vague terms, including Chapter 57's reach into the home and other private

property, provides little or no guidance for enforcement and thus permits and encourages arbitrary and discriminatory enforcement of its provisions. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability for any violation without regard to the defendant's intent, knowledge or state of mind.

116.     Each of the individual and corporate plaintiffs and at least one member of MSI has engaged and intends to engage in conduct arguably regulated by the unconstitutionally vague provisions of Chapter 57, as amended by Bill 4-21 and Bill 21-22E. These persons have been chilled in the actions they may take by the prospect of enforcement of Chapter 57's unconstitutionally vague provisions. Each of the individual and corporate plaintiffs and MSI's members are hindered or chilled in their right to live or work in Montgomery County or to otherwise travel through Montgomery County by the threat of arbitrary or discriminatory enforcement of the unconstitutionally vague provisions of Chapter 57. Each of the plaintiffs has been harmed and is imminently threatened with future harm by the prospect of enforcement of the unconstitutionally vague provisions of Chapter 57.

117.     Pursuant to 42 U.S.C. § 1983, plaintiffs are entitled to declaratory and equitable relief and compensatory damages, including nominal damages, for the foregoing violations of their Due Process rights under the Fourteenth Amendment. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). Plaintiffs are likewise entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the foregoing violations of their Due Process rights under the Fourteenth Amendment. Plaintiffs are entitled to declaratory and equitable relief for their claims arising under Article 24 of the Maryland Declaration of Rights.

**COUNT V – DUE PROCESS**

**Violation of Fundamental Rights Regarding "Major Components"**

118. Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count addresses violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, defendant Montgomery County has acted under "color of state law" within the meaning of Section 1983 in enacting Chapter 57, as amended by Bill 4-21 and Bill 21-22E. This Count also arises under Article 24 of the Maryland Declaration of Rights.

119. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, imposes its bans for possession, sale, transport or transfer of a "major component" of a firearm and defines that term to include "the slide or cylinder" of a handgun, and, in the case of a rifle or shotgun, the "barrel." Chapter 57, as amended by Bill 4-21 and Bill 21-22E, also bans the sale, rental, lending or the giving of a "major component" of a "ghost gun" to a minor or affording access to a "major component" to a minor. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, also bans, at or within 100 yards of its illegally defined place of "public assembly," the sale, transfer, possession, or transport of a "major component." While Chapter 57 makes an exception for a "firearm or ammunition" possessed in the home, no such exception is made for the home possession of a "major component" otherwise banned by Chapter 57. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability without regard to the defendant's intent, knowledge or state of mind.

120. A "major component" of a firearm, in so far as the term is defined by Chapter 57 to include "the slide or cylinder" of a handgun and, in the case of a rifle or shotgun, the "barrel," is not a firearm under federal or Maryland law and a "major component," as thus defined, may be lawfully obtained, purchased, transferred and transported by any person, including minors, without

61

restrictions under Federal and Maryland law. A "frame or receiver" is serialized under federal law. 18 U.S.C. § 923(i) ("Each licensed manufacturer or importer must "identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer."). See also see 27 C.F.R. §§ 478.92, 479.102. Other than such frames or receivers, a "major component" of a firearm, including a slide or cylinder of a handgun, and the barrel of a rifle or shotgun, is not serialized under federal or State law. See 27 C.F.R. § 478.12(a)(1),(2), amended by 87 Fed. Reg., at 24735.

121.    A "major component," as thus defined by Chapter 57, can be lawfully used by a law-abiding person otherwise legally entitled to own and possess a firearm, to build a fully *serialized* firearm for personal use simply by using a frame or a receiver that has a serial number engraved in accordance with federal law, 18 U.S.C. § 923(i). Such serialized frames and receivers are treated as firearms under State and federal law and are commercially available for purchase or ordering from most if not all federally licensed firearms dealers, nationwide, subject to background checks and other regulatory provisions applicable to the sale or transfer of firearms. There is no practical way to distinguish a "major component" that can be used to build *a non-serialized* firearm from a "major component" that can be used to build *a serialized* firearm.

122.    A serialized firearm may be easily disassembled into its "major component" parts, including a slide, a cylinder or a barrel, for cleaning, repair or replacement. Many firearms are designed to facilitate the replacement or exchange of such "major components, including many if not most semi-automatic handguns, as well as many shotguns and rifles. See, e.g., 87 Fed. Reg. 24739, amending 27 C.F.R. 478.12(i) (providing that for the AR-15 type of firearms, "[t]he receiver is the lower part of the weapon that provides the housing for the trigger mechanism and hammer,

62

i.e., lower receiver"). Under Chapter 57, the mere possession of such "major components" of a serialized firearm are indistinguishable from the major components of a non-serialized firearm. Because Chapter 57 makes no exception for the possession of major components in the home, Chapter 57's bans also fully apply to the home. The definition of "major components" to include a slide, cylinder and a barrel and the criminalization of the mere possession of such components invites arbitrary and discriminatory enforcement actions at the unfettered whim and discretion of law enforcement officials. Because Chapter 57 contains no *mens rea* requirement, Chapter 57 imposes strict criminal liability for mere possession of "major components" in the home and elsewhere without regard to the defendant's intent, knowledge or state of mind.

123.    The bans imposed by Chapter 57 with respect to "major components" of all firearms are arbitrary, irrational and fail to serve any legitimate government objective. Bill 21-22E provides that its terms are to be interpreted by reference to ATF regulations which do, in fact, define the term "frame or receiver." See, e,g, 27 C.F.R. 478.12 (defining a frame or receiver). Yet, Chapter 57, as amended by Bill 4-21 and Bill 21-22E irrationally then imposes bans on "major components" of firearms and then defines such major components to be a slide or cylinder of a handgun or the barrel of a long gun, notwithstanding that these "major components" are not firearms and not regulated under these same federal regulations.

124.    Chapter 57's bans on "major components" impose strict criminal liability on otherwise innocent conduct, including the mere possession or transport of "major components" that may arise from the disassembly of a serialized firearm lawfully owned and possessed. There is no legitimate or reasonable justification for such bans. See, e.g., *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (the Due Process Clause protects the individual against "the exercise of power without any reasonable justification in the service of a legitimate governmental objective"). "The

touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). See also *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised).

125.    The Second Amendment right "to keep and bear Arms" necessarily encompasses and protects the possession, sale, transport and transfer of "major components" as without such major components there can be no firearm at all to "keep and bear" under the Second Amendment. Similarly, the right to "keep and bear Arms" necessarily implies the right to clean, maintain and repair such firearms so as to keep them ready for use for lawful self-defense. See *Andrews v. State*, 50 Tenn. 165, 178 (1871) (recognizing that "this right of keeping arms … necessarily involves the right to purchase and use them in such a way as is usual"), cited with approval in *Heller*, 554 U.S. at 608, 612, 629.

126.    Because these bans imposed by Chapter 57 with respect to "major components" interfere with the exercise of the fundamental Second Amendment right "to keep and bear Arms," they are subject to strict scrutiny under the Due Process Clause. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) (strict scrutiny is required "when state laws impinge on personal rights protected by the Constitution"); *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999) ("If the claimed violation is by legislative enactment (either facially or as applied), analysis proceeds by a different two-step process that does not involve any threshold "conscience-shocking" inquiry. The first step in this process is to determine whether the claimed violation involves one of "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,'" * * * If the asserted interest has been determined to be 'fundamental,' it is entitled in the second step to the protection of strict scrutiny judicial review of the challenged legislation.").

127.    In so far as Chapter 57 imposes bans on a "major component of a ghost gun," as defined to include a slide or cylinder of a handgun or a barrel of a long gun, it bans conduct protected by the Second Amendment. By definition, a "ghost gun" is merely a frame or receiver that has not been serialized. A slide and cylinder of a handgun and a barrel of a long gun are not serialized under controlling federal law and thus are used in ordinary firearms which are otherwise fully serialized in accordance with State and federal law. The "major component of a ghost gun" is thus indistinguishable from a "major component" of a serialized firearm. The County does not have a legitimate interest, much less a compelling interest, in imposing bans on "major components" of serialized firearms. Nor has the County employed the least restrictive means of accomplishing any legitimate government interest. The County's regulation of "major components" is unconstitutional under the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

128.    At least one of the individual and corporate plaintiffs and at least one member of MSI has engaged and intends to engage in conduct arguably regulated by the bans on "major components" by Chapter 57, including the actual or constructive possession of "major components" in the presence of a minor child and/or at or within 100 yards of those locations in which such possession and transport of a "major component" are banned by Chapter 57. These persons have been chilled in the exercise of constitutionally protected conduct they may undertake by the prospect of enforcement of Chapter 57's irrational provisions. Each of these plaintiffs intends to engage in that conduct in the future and has been harmed and is imminently threatened with future harm by the prospect of enforcement of the irrational provisions of Chapter 57.

129.    Pursuant to 42 U.S.C. § 1983, plaintiffs are entitled to declaratory and equitable relief and compensatory damages, including nominal damages, for the foregoing violations of their

Due Process rights under the Fourteenth Amendment. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). Plaintiffs are likewise entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the foregoing violations of their Due Process rights under the Fourteenth Amendment. Plaintiffs are entitled to declaratory and equitable relief for their claims arising under Article 24 of the Maryland Declaration of Rights.

## COUNT VI – DUE PROCESS

### Violation of Parental Rights

130.    Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count addresses violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, defendant Montgomery County has acted under "color of state law" within the meaning of Section 1983 in enacting Chapter 57, as amended by Bill 4-21 and Bill 21-22E. This Count also arises under Article 24 of the Maryland Declaration of Rights.

131.    Section 57-7 of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, provides, in part that:

> (c) A person must not give, sell, rent, lend, or otherwise transfer to a minor: (1) a ghost gun or major component of a ghost gun; (2) an undetectable gun or major component of an undetectable gun; or (3) a computer code or program to make a gun through a 3D printing process.

> (d) A person must not purchase, sell, transfer, possess, or transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

> (e) A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

These provisions impose absolute bans on all persons, making no exceptions for parents or a certified firearms instructor or for firearms training. And because these bans extend to a "major

66

component of a ghost gun" these bans imposed by these provisions extend to parts that are not legally considered to be firearms, such as a barrel of a long gun or the slide or a cylinder of handgun.

132.    One or more of the plaintiffs is a parent of minor children who resides with that plaintiff. Parents of minor children have a fundamental constitutional right protected by the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights "in the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 64 (2000); *Frase v. Barnhart*, 379 Md. 100, 124, 840 A.2d 114 (2003); *Koshko v. Haining*, 398 Md. 404, 422-27, 921 A.2d 171 (2007). Parents have a constitutional right to instruct their children in the safe use and handling of firearms and components otherwise protected by the Second Amendment, including the assembly and disassembly of handguns and long guns. Such assembly and disassembly necessarily includes the possession and handling of a slide or cylinder of a handgun or the barrel of a long gun. That process may also include the possession of a serialized firearm or of a "ghost gun" prior to disassembly or after assembly. In so far as the bans imposed by Section 57-7 of Chapter 57 purport to apply to regulate parents and their relationships with their minor children, Section 57-7 of Chapter 57 violates the fundamental constitutional right of parents "in the care, custody, and control of their children."

133.    At least one or more of the individual plaintiffs is a parent with minor children who reside with him and has engaged in the conduct banned by the foregoing provisions of Section 57-7 of Chapter 57. These persons have been chilled in the actions they may take with their minor children by the prospect of enforcement of Section 57-7's unconstitutional provisions. Each of these plaintiffs intends to engage in such conduct in the future and has been harmed and is imminently threatened with future harm by the prospect of enforcement of Chapter 57.

134.    Pursuant to 42 U.S.C. § 1983, plaintiffs are entitled to declaratory and equitable relief and compensatory damages, including nominal damages, for the foregoing violations of their parental rights under the Due Process Clause of Fourteenth Amendment. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). Plaintiffs are likewise entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the foregoing violations of their Due Process rights under the Fourteenth Amendment. Plaintiffs are entitled to declaratory and equitable relief for their claims arising under Article 24 of the Maryland Declaration of Rights.

### COUNT VII -- SECOND AMENDMENT

### Violations of the Second Amendment Right to Armed Self-Defense in Public

135.    Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count addresses violations of the Second Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For purposes of this Count, defendant Montgomery County has acted under "color of state law" within the meaning of Section 1983 in enacting Chapter 57, as amended by Bill 4-21 and Bill 21-22E.

136.    The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme Court has squarely held that the Second Amendment bestows an individual right to keep and bear arms and that right may be exercised by all responsible, law-abiding Americans. *District of Columbia v. Heller,* 554 U.S. 570 (2008). The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

68

137.    On June 23, 2022, the Supreme Court decided *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). In *Bruen*, the Supreme Court held that the Second Amendment right to bear arms means "a State may not prevent law-abiding citizens from publicly carrying handguns because they have not demonstrated a special need for self-defense." 142 S.Ct. at 2135 n.8. This holding abrogates the holding of the Maryland Court of Appeals in *Williams v. State*, 417 Md. 479, 496, 10 A.3d 1167 (2011), that the Second Amendment does not apply outside the home. Under *Bruen*, "the Second Amendment guarantees a general right to public carry." *Bruen*, 142 S.Ct. at 2135.

138.    Th    e *Bruen* Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. The Court went on to reject the "means-end," two-step, intermediate scrutiny analysis used by the lower courts to sustain gun regulations, holding that "[d]espite the popularity of this two-step approach, it is one step too many." *Bruen*, 142 S.Ct. at 2127. The Court ruled that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126.

139.    The historical analogue required by *Bruen* to justify a firearms regulation looks to 1791 or, at the latest, 1868, when the 14th Amendment was adopted. See *Bruen*, 142 S.Ct. at 2135-36 (finding it unnecessary to resolve the scholarly dispute about which time period is controlling). That is because "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen*, 142 S.Ct. at 2136, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008). 20th century and late 19th century statutes and regulations "cannot

provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154 & n.28. Under *Bruen*, the historical analogue necessary to justify regulation must be "a well-established and representative historical analogue," not outliers. *Bruen*, 142 S.Ct. at slip op. at 2133.

140.    Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. *Bruen*, 142 S.Ct. at 2133, 2153, 2147 n.22 & 2156. This analysis required by the Supreme Court is a legal inquiry that examines legal history, which is appropriately presented in the briefs. See *Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "legal questions" that judges are capable of addressing) (emphasis in original); see also id. at 2135 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). Accordingly, the required analysis is a legal inquiry and does not require fact-finding by a court.

141.    *Bruen* holds that governments may presumptively regulate the public possession of firearms at "legislative assemblies, polling places, and courthouses" and notes that governments may also regulate firearms "in" schools and government buildings. *Bruen*, 142 S.Ct. at 2133, citing *Heller*, 554 U.S. at 599. *Bruen* states that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." (Id.). The *Bruen* Court rejected New York's "attempt to characterize New York's proper-cause requirement as "a 'sensitive-place' law," ruling that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 142 S.Ct. at 2134. As the Court explained, "[p]ut simply, there is no historical basis for New York

70

to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." (Id.).

142.     The government bears the burden of proof to show such "well-established and representative historical analogue." See *Bruen*, 142 S.Ct. at 2150 ("we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). Public safety concerns are not part of the analysis and cannot be used to justify any statute or regulation that restricts the general right to carry arms in public. Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S.Ct. at 2129-30. A government "may not simply posit that the regulation promotes an important interest," but rather "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S.Ct. at 2126. Under *Bruen*, a court must "closely scrutinize *all* gun restrictions for a historically grounded justification," *Frein v. Pennsylvania State Police*, 47 F.4th 247, 254 (3d Cir. 2022) (emphasis in original).

143.     The text of the Second Amendment, as construed by the Supreme Court and lower courts, indisputably covers the "possession, sale, transport, and transfer" of firearms and ammunition, as regulated by Chapter 57. In so far as these regulations imposed by Chapter 57 ban the possession or transport of a firearm in locations other than schools, government buildings, courthouses, polling places and legislative assemblies, as identified in *Bruen*, these prohibitions imposed by Chapter 57 are not supported by any showing that they are "consistent with this Nation's historical tradition of firearm regulation." Nothing in *Bruen* can be read to allow a State (or a municipality) to regulate or ban firearms at all these other places which the County defines to be a "place of public assembly." Nor may the County define any of these five areas, such as schools, in such a way that is inconsistent with how those terms were used and understood in 1791. There is,

71

for example, no history or tradition banning the possession of firearms in trade schools or other places of instruction of adults. The County thus violated the Second Amendment when it redefined "schools" in Bill 4-21 to expand that definition beyond primary and secondary schools, as the term was previously defined by Chapter 57 prior to Bill 4-21.

144.    In enacting Bill 21-22E after the Supreme Court's decision in *Bruen*, the County made no effort to identify any historical analogue for the restrictions and bans imposed by Chapter 57, as amended by Bill 21-22E. Beyond the five locations specifically identified by the Supreme Court in *Bruen*, *viz*, "in" schools, public buildings, polling places, courthouses and legislative assemblies, as these terms are properly understood and delineated by history and tradition, as there is no appropriate historical analogue that would permit the County to ban all possession, sale, transfer or transport of firearms or ammunition at a "place of public assembly," as defined by Chapter 57, as amended Bill 21-22E. Nor is there any appropriate historical analogue for any such regulation within 100 yards of such locations. Montgomery County is no more a "sensitive place" than is Manhattan. See *Antonyuk v. Hochul*, --- F.Supp.3d ----, 2022 WL 16744700 at *86 (N.D.N.Y. 2022) (applying *Bruen* and holding unconstitutional New York's ban on possession of a firearm at or on (1) any location providing behavioral health or dependence services, (2) any place of worship, (3) any public parks and zoos, (4) airports where a person is complying with otherwise applicable federal regulations, (5) buses, (6) any establishment where alcohol is consumed, (7) theaters, conference centers and banquet halls, (8) any gathering of individuals to collectively express their constitutional rights, and (9) private property); *Hardaway v. Nigrelli,* --- F.Supp.3d ----, 2022 WL 11669872 at *17-18 (W.D.N.Y. 2022) (applying *Bruen* and holding that New York's ban on the possession of firearms in or at any place of worship violated the Second Amendment); *Christian v.*

*Nigrelli*, No. 22-cv-695 (W.D.N.Y. Nov. 22, 2022) (preliminarily enjoining New York's ban on carry on all private property open to the public).

145.    The restricted locations specified by Chapter 57's definition of a place of public assembly are very common and located on the major roads and in many neighborhoods throughout the County. The vagueness and/or ubiquity associated with these places makes avoiding such places impossible because, as a practical matter, there is no way for an ordinary permit holder to know, for example, the location of a "library" on privately owned land, or the meaning or location of a privately owned "recreational facility," a privately owned "park," or other privately or publicly owned locations in which possession and transport is banned by Chapter 57. A permit holder, particularly a person who may be unfamiliar with the area, could easily find himself or herself driving within 100 yards of any of these locations in which possession and transport is banned by Chapter 57 without any intent or knowledge of doing so. Such a permit holder would nonetheless be in violation of Chapter 57.

146.    Taken together, the broad sweep of the locations in which possession and transport are banned by Chapter 57, the vagueness associated with these places, and the strict criminal liability imposed by Chapter 57 for any violation, create an *in terrorem* effect for wear and carry permit holders who are at risk of arrest and prosecution for otherwise carrying a loaded firearm anywhere in the County, including those locations in which carry is otherwise permitted by State law. Any such arrest or prosecution could severely and adversely affect the plaintiffs' employment status, ability to conduct business or maintain other legal relationships. Such an arrest or prosecution would likely lead to a revocation of the person's wear and carry permit for carrying in places where firearms are prohibited by law, thus abrogating the ability of that person to exercise his or her Second Amendment right of armed self-defense in public, recognized in *Bruen*.

147.     Because the Maryland wear and carry permit is "not valid where firearms are prohibited by law," any violation of Chapter 57 by a wear and carry permit holder could also easily lead to arrest and prosecution under MD Code, Criminal Law, § 4-203(a). A violation of Section 4-203(a) is a strict liability offense, and is punishable by up to three years imprisonment and a substantial fine for the first offense. Under federal law, 18 U.S.C. § 922(g), and 18 U.S.C. § 921(a)(20), any conviction under Section 4-203 would result in a lifetime federal firearms disability and the consequent destruction of the permit holder's Second Amendment rights. See *Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir.), *cert. denied,* 138 S.Ct. 500 (2017). Subsequent possession of a modern firearm or ammunition by a person subject to this firearms disability is a violation of 18 U.S.C. § 922(g), which is punishable by up to 10 years imprisonment under federal law. 18 U.S.C. § 924(a)(2). The same firearms disability is imposed under Maryland law. See MD Code, Public Safety, § 5-101(g)(3) (defining disqualifying crime), § 5-133(b)(1) (regulated firearms), § 5-205(b)(1) (long guns). A violation of MD Code Public Safety, § 5-133(b), is punishable by imprisonment for up to 5 years and/or a fine not exceeding $10,000. MD Code, Public Safety, § 5-144(b). A violation of MD Code, Public Safety, § 5-205(b), is punishable by up to 3 years imprisonment and/or a $1,000 fine. MD Code, Public Safety, § 5-205(e). These draconian punishments and disqualifications make the *in terrorem* effect of Chapter 57 even more severe.

148.     Chapter 57 imposes strict criminal liability without regard to a person's intent or knowledge or state of mind. Given that imposition of strict liability and the proximity of the "sensitive places" to public roads and streets, an ordinary permit holder would find it impossible to avoid transporting a loaded firearm within 100 yards of such locations. Through Chapter 57, as amended by Bill 4-21 and Bill 21-22E, the County has enacted a legal scheme that effectively "den[ies] ordinary citizens their right to public carry." *Bruen*, 142 S.Ct. at 2138 n.9. Chapter 57

74

"defines the category of 'sensitive places' far too broadly" and "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *Bruen*, 142 S.Ct. at 2134. Chapter 57, as amended by Bill 4-21 and Bill 21-22E, is therefore unconstitutional under the Second Amendment.

149.    Under the Second Amendment, the County may presumptively regulate the five, specific locations identified in *Bruen* and *Heller*, *viz*, "in" schools, public buildings, polling places, courthouses and legislative assemblies, to the extent such regulations are otherwise authorized by State law. Such places are relatively easy to identify and avoid by a permit holder and thus do not have the *in terrorem* effect inflicted by Chapter 57. The County may not enact or enforce firearms or ammunition regulations for any location or place *beyond* the five, specific locations that were specified as presumptively appropriate in *Bruen* and *Heller,* without identifying and proving that "a well-established and representative historical analogue" for any such regulation exists. The County has made no attempt to do so.

150.    There is no "well-established, representative historical analogue" for Chapter 57's bans on the possession, transport, sale or transfer of firearms and components at a "(A) park; (B) place of worship; … (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility, including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility" or for "all property associated with the place, such as a parking lot or grounds of a building" for these areas. Likewise, there is no "well-established, representative historical analogue" for Chapter 57's bans imposed on the 100-yard zone around any of these locations or at the five locations specified in *Bruen*, or for any other location.

151.    The County made no apparent attempt to identify any such "well-established, representative historical analogues" prior to the enactment of Bill 21-22E. See Exhibit D. To the contrary, the lead sponsor of Bill 21-22E, the President of the County Council, expressed hostility to the Court's decision in *Bruen* and to the right of armed self-defense. https://www.youtube.com/watch?v=dt4-vSmq7sw&t=35s. The County Council did likewise. https://www.youtube.com/watch?v=i_H2cLLD2nY&t=7453s (starting at 2:04) The County Executive also expressed hostility to armed self-defense. https://www.fox5dc.com/news/montgomery-county-to-review-concealed-carry-ban-proposal (commenting that "there is no excuse for walking around with a gun in this County"). The County Council passed Bill 21-22E unanimously.

152.    Chapter 57 is facially unconstitutional under the Second Amendment to the extent that it purports to impose any regulatory restrictions on the possession, transfer, sale or transport of firearms and ammunition in or at any place other than in the five specific locations specified in *Bruen* and *Heller*. Chapter 57 is also facially unconstitutional under the Second Amendment to the extent that it purports to impose any regulatory restrictions on the possession, transfer, sale or transport of firearms and ammunition in or at any place within 100 yards of any location.

153.    Chapter 57 is unconstitutional under the Second Amendment *as* applied to the named plaintiffs and to any member of plaintiff MSI to the extent that it purports to impose any regulatory restrictions on the possession, transfer, sale or transport of firearms or ammunition in or at any place other than "in" the five specific locations specified in *Bruen* and *Heller*. Chapter 57 is unconstitutional under the Second Amendment as applied to the named plaintiffs and to any member of plaintiff MSI to the extent that it purports to impose any regulatory restrictions on the possession,

transfer, sale or transport of firearms or ammunition in or at any place within 100 yards of any location.

154.    To the extent that MD Code, Criminal Law, § 4-209(b), purports to authorize County or local regulation for areas other than "in" the five locations, or in any manner or scope beyond the manner or scope permitted in *Heller* and *Bruen*, it is likewise unconstitutional under the Second Amendment and thus cannot legally or constitutionally authorize such local regulation. To the extent that MD Code, Criminal Law, § 4-209(b) purports to authorize County or local regulation on the possession, transfer, sale or transport of firearms or ammunition in or at any place within 100 yards of *any* location it is likewise unconstitutional under the Second Amendment and thus cannot legally or constitutionally authorize any such local regulation.

155.    Each of the individual plaintiffs and MSI members with carry permits and who live in the County or transport loaded firearms in the County are directly, substantially and adversely affected by the foregoing violation of the Second Amendment. Such plaintiffs and MSI members with wear and carry permits have, prior to the enactment of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, lawfully possessed and transported loaded firearms within the County at or within 100 yards of the locations that Chapter 57, bans the possession, transport, sale or transfer of firearms. All the individual plaintiffs and MSI members with carry permits intend to possess and transport firearms in such locations in the future. All these plaintiffs and MSI members have a reasonable fear of prosecution under Chapter 57 if they do so.

156.    The business locations of plaintiffs Engage Armament and ICE Firearms arguably are at or within 100 yards of one or more of the locations in which the possession, transport, sale and transfer of firearms is now banned by Chapter 57, as amended by Bill 21-22E. Under Chapter 57 Engage would be unable to engage and the possession, sales, transports and transfer of firearms,

at its business location. All these activities are essential for the operation of a business by a federally licensed and State licensed firearms dealer. Plaintiff Engage Armament, as a Type I, Type VII and Type X, federal firearms licensee, intends to continue to possess, transport, sell and transfer firearms and "major components" at its business establishment, as otherwise authorized by State and federal law. It reasonably fears prosecution under Chapter 57 if it does so.

157.     ICE Firearms likewise possesses, transports and temporarily transfers firearms at its business location as part of the firearms training programs it conducts. ICE Firearms intends to continue to possess, transport and temporarily transfer firearms at its business location. ICE Firearms reasonably fears prosecution under Chapter 57 should it engage in these activities now banned by Chapter 57. Engage Armament and ICE Firearms each have standing to bring this Second Amended Complaint on behalf of themselves and their actual and potential customers. *Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 212 (4th Cir. 2020).

158.     Pursuant to 42 U.S.C. § 1983, plaintiffs are entitled to declaratory and equitable relief and compensatory damages, including nominal damages, for the foregoing violations of their Second Amendment rights. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). Plaintiffs are likewise entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the foregoing violations of their Second Amendment rights.

**COUNT VIII -- SECOND AMENDMENT**

**Violation of the Second Amendment Right to Possess**

**Privately Made Firearms and Components for Personal Use**

159.     Plaintiffs reallege and incorporate herein by reference all the foregoing allegations of this Second Amended Complaint. This Count addresses violations of the Second Amendment to the United States Constitution and is brought pursuant to and arises under 42 U.S.C. § 1983. For

purposes of this Count, defendant Montgomery County has acted under "color of state law" within the meaning of Section 1983 in enacting Chapter 57, as amended by Bill 4-21 and Bill 21-22E.

160.    The Second Amendment, as construed by the Supreme Court "'protects the possession and use of weapons that are in common use at the time'" the Second Amendment was adopted in 1791. *Bruen*, 142 S.Ct. at 2128, quoting *Heller*, 554 U.S. at 627 (internal quotes and citation omitted). "Ghost guns," as defined by Chapter 57, as amended by Bill 4-21 and Bill 21-22E, are simply ordinary long guns and pistols which lack a serial number engraved by a federally licensed manufacturer or importer. Such long guns and pistols without serial numbers are "bearable arms," and are suitable to be carried "upon the person" ready "for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S at 582, 584. Because "ghost guns" are simply firearms that lack a serial number, they fall within the "text" of the Second Amendment's right to "keep and bear Arms." Under *Bruen*, it is therefore the County's burden to demonstrate that "ghost guns" are not in common use and thus may be banned. See *Rigby v. Jennings*, --- F.Supp.3d ----, 2022 WL 4448220 at *7 (D. Del. 2022). The County made no attempt to do so.

161.    Serial numbers were not required to be engraved on firearms until the federal Gun Control Act of 1968, Public Law 90-618, 82 Stat. 1213 (1968), was enacted on October 22, 1968, and that portion of the Act requiring serial numbers (enacted as part of Section 102 of the Act) did not go into effect until December 16, 1968. See Section 105(a), 82 Stat. at 1226. During the time period around 1791, personally made firearms for personal use were in common use by law-abiding citizens for lawful purposes. None of these firearms were serialized during the relevant time period and no serialization was required. To this day, nothing in federal law requires persons to engrave serial numbers on firearms manufactured by non-licensees for personal use. Such manufacture is also permissible in the vast majority of States. To this day, unserialized rifles and pistols

79

manufactured by non-licensees for personal use are "in common use" for lawful purposes by law-abiding persons.

162.    The right to "keep and bear arms" protected by the Second Amendment indisputably covers the "possession" and "transport" of firearms and ammunition, including firearms that are defined by Chapter 57 as "ghost guns," and "major components" from which firearms may be assembled or built. There is a long tradition and history in the United States, dating back to before 1791 and extending to the present day, of manufacture and possession of firearms and components for personal use by otherwise law-abiding, responsible persons. See *Rigby v. Jennings*, --- F.Supp.3d ----, 2022 WL 4448220 (D. Del. 2022). The ATF regulations, issued in 2022, confirm that law-abiding persons are not required to serialize PMFs under federal law. See 87 Fed. Reg. 24653 ("the final rule does not mandate unlicensed persons to mark their own PMFs for personal use, or when they occasionally acquire them for a personal collection or sell or transfer them from a personal collection to unlicensed in-State residents consistent with Federal, State, and local law.").

163.    Chapter 57, as amended by Bill 4-21 and Bill 21-22E, flatly bans the possession, transport, sale and transfer of "ghost guns" and "major components," as defined in Chapter 57, at or within 100 yards of the specified locations, including in the home. These bans burden constitutionally protected conduct because the possession and transport of such items are textually within the scope of the Second Amendment's right to "keep and bear Arms." See *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014) (hollow-point ammunition); *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) (ammunition magazines over 10 rounds); *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (discussing authorities acknowledging the right to acquire arms*); Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (holding that the Second Amendment "implies a corresponding right to acquire and maintain proficiency" with arms). Under

*Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S.Ct. at 2126. The Second Amendment thus "presumptively protects" the right of otherwise law-abiding persons to "keep and bear" "ghost guns," and "major components," as those terms are defined by Chapter 57, as amended by Bill 4-21 and Bill 21-22E.

164. *Bruen* holds that "[t]o justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. As demonstrated by the Staff Report on the amendments made to Bill 21-22E (Exhibit D), in enacting Bill 4-21 and Bill 21-22E, the County made no apparent effort to demonstrate or determine that its regulation of "ghost guns" and "major components" are consistent "with this Nation's historical tradition of firearm regulation." The County "has not shown that these firearms and components are not commonly owned by law-abiding citizens for lawful purposes." *Rigby*, 2022 WL 4448220 at *8. Chapter 57's regulation of "ghost guns" and "major components" is inconsistent "with this Nation's historical tradition of firearm regulation." The County's bans on "ghost guns" and "major components" lack an historical analogue from "before, during, and even after the Founding." *Bruen*, 142 S.Ct. at 2131–32. Chapter 57's bans on "ghost guns" and "major components" are therefore unconstitutional under the Second Amendment.

165. At least one of the individual plaintiffs and plaintiffs Engage and ICE Firearms and at least one MSI member have possessed "ghost guns" and "major components" in the County and intend to continue to do so in the future. All these persons reasonably fear prosecution under Chapter 57 if they do so. All these plaintiffs and MSI members thus are directly, substantially and adversely affected by the foregoing violation of the Second Amendment with respect to "ghost guns" and

81

"components." These plaintiffs and MSI members have, prior to the enactment of Bill 21-22E, lawfully possessed and transported "ghost guns" and "components" at or within 100 yards of one or more of the locations in which possession and transport of these items is banned by Chapter 57, as amended by Bill 21-22E. All such individual plaintiffs, and MSI members, intend to possess and transport such "ghost guns" and "major components" in their homes or businesses or at or within 100 yards of the locations at which Chapter 57, as amended by Bill 4-21 and Bill 21-22E, bans possession and transport of these items. All these plaintiffs and MSI members reasonably fear prosecution under Chapter 57 if they do so.

166.    The business location of plaintiffs Engage Armament is arguably at or within 100 yards of one or more of the locations in which the possession, transport, sale and transfer of firearms is now banned by Chapter 57, as amended by Bill 21-22E. Engage Armament uses, manufactures, transfers and sells "major components" as part of its business as a Type VII federally licensed firearms manufacturer. It would be unable to engage in any of these activities at its place of business. Plaintiff Engage Armament, as a Type I, Type VII and Type X federal firearms licensee and State firearms licensee, intends to possess, transport, sell and transfer "ghost guns" and "major components" at its business establishment. Engage Armament reasonably fears prosecution under Chapter 57 if it does so.

167.    ICE Firearms likewise is arguably located at or within 100 yards of one or more of the in which the possession, transport, sale and transfer of firearms are now banned by Chapter 57, as amended by Bill 21-22E. ICE Firearms likewise intends to continue to conduct its firearms training at its location, including using or providing "ghost guns" and "major components," to customers for use in training activities. ICE Firearms reasonably fears prosecution under Chapter 57 should it do so.

168.     To the extent that MD Code, Criminal Law, § 4-209(b), purports to authorize County regulation of "ghost guns" or "components" in any manner or scope beyond the manner or scope permitted in *Heller* and *Bruen*, it is likewise unconstitutional under the Second Amendment and thus cannot legally or constitutionally authorize Chapter 57's regulation of "ghost guns" and "major components."

169.     Pursuant to 42 U.S.C. § 1983, plaintiffs are entitled to declaratory and equitable relief and nominal damages, for the foregoing violations of their Second Amendment rights. *Uzuegbunam v. Preczewski*, 141 S.Ct. 792 (2021). Plaintiffs are likewise entitled to reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, for the foregoing violations of their Second Amendment rights.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request:

A. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E, is not a "local law," and is in conflict and inconsistent with the "General Law" as enacted by the General Assembly is thus unconstitutional under Article XI–A, § 3 and Article XI–A, § 6, of the Maryland Constitution, as more fully set forth in Count I, above;

B. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E, violates the Express Powers Act, MD Code, Local Government, § 10-206, in that it is in conflict or inconsistent with, and/or preempted by Maryland statutes, as more fully set forth in Count II, above;

C. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E, violates the Maryland Takings Clause, Article III § 40, and the Due Process Clause of Article 24 of the Maryland Declaration of Rights, in so far as it deprives plaintiffs and MSI

83

members of the beneficial use of their lawfully acquired, vested property rights, as more fully set forth in Count III above. In accordance with Maryland law, the Court should enjoin enforcement of Chapter 57, as amended by Bill 4-21 and Bill 21-22E, until just compensation is paid, calculate the amount of compensation due, and order the County to pay such compensation to each plaintiff who was deprived of the use and possession of his property by Chapter 57;

D. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E, is void for vagueness under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights, as more fully set forth in Count IV, above;

E. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E is unconstitutional under the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights in so far as Chapter 57 regulates "major components" of firearms, as more fully set forth in Count V, above;

F. That this Court issue a declaratory judgment that Section 57-7 of Chapter 57 is unconstitutional under the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights in so far as Section 57-7 purports to regulate the rights of parents in relationship with their minor children, as more fully set forth in Count VI, above;

G. That this Court issue a declaratory judgment that Chapter 57, as amended by Bill 4-21 and Bill 21-22E, are unconstitutional under the Second Amendment, as more fully set forth in Counts VII and VIII, above.

H. That this Court find that all plaintiffs have been and/or will be irreparably harmed by the conduct of defendant challenged in Counts I, II, III, IV, V, VI, VII and VIII, and enter a preliminary

and permanent injunction barring the County from enforcing Chapter 57, as amended by Bill 4-21 and Bill 21-22E, against plaintiffs and the members of MSI;

I. That this Court award plaintiff Engage compensatory damages for the County's violations of the its rights, including, without limitation, nominal damages, as authorized by 42 U.S.C. § 1983;

J. That this Court award all the plaintiffs and MSI members nominal damages, as authorized and required by 42 U.S.C. § 1983;

K. That this Court award attorney's fees and costs against defendant, as authorized by 42 U.S.C. § 1988;

L. That this Court award the plaintiffs such other and further relief as in law and justice they may be entitled to receive.

Respectfully submitted,

*/s/ Mark W. Pennak*

MARK W. PENNAK
Maryland Shall Issue, Inc.
9613 Harford Rd
Ste C #1015
Baltimore, MD 21234-21502
mpennak@marylandshallissue.org
Phone: (301) 873-3671
MD Atty No. 1905150005

Date: November 29, 2022                    *Counsel for Plaintiffs*

85