No. 23-1719

IN THE

# United States Court of Appeals
# for the Fourth Circuit

————————

MARYLAND SHALL ISSUE, INC., et al.,

*Plaintiffs-Appellants*,

v.

MONTGOMERY COUNTY, MD,

*Defendant-Appellee*,

————————

On Appeal from the United States District Court
for the District of Maryland
Case No. 8:21-cv-01736
Honorable Theodore D. Chuang

————————

**BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, AND MARCH
FOR OUR LIVES IN SUPPORT OF APPELLEE AND AFFIRMANCE**

JONATHAN L. DIESENHAUS
  *Counsel of Record*
HANNAH M. GRAAE
GIL MCDONALD
AMANDA NECOLE ALLEN
ALEXANDRIA REID
WILL TENBARGE
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
jonathan.diesenhaus@hoganlovells.com

*Counsel for Amici Curiae*

September 26, 2023

(Additional counsel listed on the following page)

ELIZABETH ALICE OCH
HOGAN LOVELLS US LLP
1601 Wewatta St., Suite 900
Denver, CO 80202
Telephone: (303) 899-7300

SOPHIA FANG
HOGAN LOVELLS US LLP
609 Main St.
Houston, TX 77002
Telephone: (713) 632-1400

ESTHER SANCHEZ-GOMEZ
GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
Telephone: (415) 433-2062

DOUGLAS N. LETTER
SHIRA LAUREN FELDMAN
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
Telephone: (202) 370-8100

CIARA MALONE
MARCH FOR OUR LIVES
90 Church Street, #3417
New York, NY 10008
Telephone: (913) 991-4440

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-1719    Caption: MARYLAND SHALL ISSUE, INC., et al v. MONTGOMERY COUNTY, MD

Pursuant to FRAP 26.1 and Local Rule 26.1,

Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence
(name of party/amicus)

March For Our Lives Foundation

 who is _____Amici_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☐NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jonathan Diesenhaus                          Date:        9/26/2023

Counsel for: Amici

Print to PDF for Filing          Reset Form

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

STATEMENT OF INTEREST OF *AMICI* ............................................1

INTRODUCTION ...................................................................................3

   I.    FIREARM RESTRICTIONS IN "SENSITIVE PLACES" SAFEGUARD CIVIC ENGAGEMENT, DEMOCRATIC VALUES, AND CONSTITUTIONAL INSTITUTIONS. .......................5

   II.   BECAUSE FIREARMS DISRUPT AND DETER PEACEFUL PUBLIC ASSEMBLY, PLACES OF ASSEMBLY HAVE LONG BEEN DESIGNATED SENSITIVE PLACES. ............................................................10

        A.    Firearms Disrupt and Deter Peaceful Public Assembly. ...............................................................11

        B.    Reconstruction-Era Precedent Supports Firearm Bans at Peaceful Public Assemblies. ........................15

   III.   GUN BANS IN PLACES OF WORSHIP PROTECT CIVIC LIFE AND ARE CONSISTENT WITH RECONSTRUCTION-ERA HISTORY. .................................16

        A.    Places of Worship Foster And Accelerate Civic Engagement. ..............................................................16

        B.    Reconstruction-Era Laws Support Gun Bans in Places of Worship. .................................................19

CONCLUSION ......................................................................................20

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES:**

*De Jonge v. State of Oregon*,
  299 U.S. 353 (1937)..............................................................................11

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)........................................................................*passim*

*English v. State*,
  35 Tex. 473 (1871), *abrogated by New York State Rifle & Pistol
  Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ....................................20

*Hill v. State*,
  53 Ga. 472 (1874) ..............................................................................20

*Md. Shall Issue, Inc. v. Montgomery Cnty., Md.*,
  No. TDC-21-1736M, 2023 WL 4373260 (July 6, 2023) ...................19

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022).....................................................................*passim*

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980)............................................................................11

*United States v. Cruikshank*,
  92 U.S. 542 (1875)................................................................................6

*Wilson v. State*,
  33 Ark. 557 (1878)..............................................................................20

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend 1.............................................................................10

U.S. Const. art. IV, § 4...........................................................................6

**STATUTES:**

Del. Const. art. XXVIII (1776)............................................................10

ii

Ga. Laws 421, title XVI, no. 285, §1 (1870) ..........................................................10

Miss. Laws 176, ch. 46, § 4 (1878).......................................................................10

Mont. Laws 49, § 3 (1903).....................................................................................19

**OTHER AUTHORITIES:**

John Adams, "*V. 'A Dissertation on the Canon and the Feudal Law,' No. 3, 30 September 1765*" (Sept. 30, 1765), https://founders.archives.gov/documents/Adams/06-01-02-0052-0006 .............5

Akhil Reed Amar, *America's Constitution: A Biography* (2005) ...........................6

*Armed Assembly: Guns, Demonstrations, and Political Violence in America*, Everytown for Gun Safety Support Fund & ACLED (2021), https://everytownresearch.org/report/armed-assembly-guns-demonstrations-and-political-violence-in-america/ ...........................11, 12

Penny Edgell Becker & Pawan H. Dhingra, *Religious Involvement and Volunteering: Implications for Civil Society*, 62 Oxford U. Press 315 (2001). ................................................................................18

Sophie Bethune & Elizabeth Lewan, *One-Third of US Adults Say Fear of Mass Shootings Prevents Them from Going to Certain Places or Events*, Am. Psych. Ass'n (Aug. 15, 2019), https://www.apa.org/news/press/releases/2019/08/fear-mass-shooting ...............................................................................13

Ryan Bittan, *Latter-Day Saints Providing Shelter, Assistance to Maui Wildfire Victims* (Aug. 11, 2023), https://www.abc4.com/news/national/church-of-jesus-christ-of-latter-day-saints-providing-shelter-assistance-to-maui-wildfire-victims/;..................................................................................18

Joseph Blocher & Reva B. Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under Bruen*, 98 N.Y.U. L. Rev. 101 (2023) .............................................................................8, 9

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139 (2021) ........................................................9

Mark Chaves & Alison Eagle, *Congregations and Social Services: An Update from the Third Wave of the National Congregations Study*, Duke U. (2016) ....................................................................17

Eric Foner, *The Second Founding: How the Civil War and Reconstruction Remade the Constitution* (2019) ................................................15

Mark Anthony Frassetto, *The Nonracist and Antiracist History of Firearms Public Carry Regulation*, 74 SMU L. Rev. Forum 169 (2021) ..........................................................................................15, 16

*Free English Classes in Maryland*, Asian Pacific Am. Legal Resources Ctr., https://www.apalrc.org/wp-content/uploads/2017/12/MD-ESOL-and-Civics-Classes-Flyer.pdf (lasted visited Sept. 25, 2023)..............................................................18

Carina Bentata Gryting & Mark Anthony Frassetto, *NYSRPA v. Bruen and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C.L. Rev. E. Supp. I.-60 (2022) ............................................................................9, 10

Hamil R. Harris, *Family Homeless Shelter in Montgomery in Limbo as Demand Rises* (Feb. 3, 2016), https://www.washingtonpost.com/local/family-homeless-shelter-in-montgomery-in-limbo-as-demand-rises/2016/02/02/3962ff60-c606-11e5-a4aa-f25866ba0dc6_story.html;......................................................18

*Kentucky Governor Thanks the Church of Jesus Christ for Flood Relief* (May 23, 2023), https://newsroom.churchofjesuschrist.org/article/kentucky-governor-award-flood-relief ...............................................................17

David Moore, *Despite Power Outage, Church Serves Hundreds of Meals After Idalia* (Sept. 11, 2023), https://www.baptistpress.com/resource-library/news/despite-power-outage-church-serves-hundreds-of-meals-after-idalia/;..........................18

Diana Palmer, *Fired Up or Shut Down: The Chilling Effect of Open Carry On First Amendment Expression at Public Protests*, Ne. Univ. (2021). .....................................................................................13

Bobby Ross Jr., *Maui Church Houses Evacuees, Helps with Relief After Deadly Wildfires* (Aug. 14, 2023), https://christianchronicle.org/maui-church-houses-evacuees-helps-with-relief-after-deadly-wildfires/ ....................................................18

Josh Snyder, *Aid Groups in Arkansas Adapted to Tornado Survivors' Urgent Needs; Now They are Preparing for 'Long Haul'* (Apr. 15, 2023), https://www.arkansasonline.com/news/2023/apr/15/aid-groups-in-arkansas-adapted-to-tornado/; ............................................18

Edgar Walters, *After First Amendment Challenge, FEMA May Pay Texas Churches to Rebuild After Harvey* (Jan. 3, 2018), https://www.texastribune.org/2018/01/03/fema-may-pay-texas-churches-rebuild-after-harvey/ ........................................................17

## STATEMENT OF INTEREST OF *AMICI*[1]

This brief is filed by *Amici* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center"), Brady Center to Prevent Gun Violence ("Brady"), and March For Our Lives Foundation ("MFOL"). These are organizations committed to reducing the gun violence that pervades the United States.

Formed in 1993 by a group of attorneys after a gun massacre at a San Francisco law firm, Giffords Law Center is a nonprofit organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve community safety. The organization was renamed the Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords. Today, through partnerships with gun violence researchers, public health experts, and community organizations, Giffords Law Center researches, drafts, and defends the laws, policies, and programs proven to effectively reduce gun violence. Together with its partner organization Giffords, Giffords Law Center also advocates for the interests of gun owners and law enforcement officials who understand that Second

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the undersigned counsel further represent that no party or party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparation or submission of this brief; and that no person other than the *amici* and counsel identified herein contributed money that was intended to fund preparation or submission of this brief.

Amendment rights have always been consistent with gun safety legislation and community violence prevention strategies.

Originally founded in 1974, Brady is the nation's most longstanding nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the U.S. Constitution is construed to protect Americans' fundamental right to live, and protecting the authority of democratically elected officials to address the nation's gun violence epidemic. Brady works across Congress, courts, and communities, uniting gun owners and non-gun-owners alike, to act to prevent gun violence. Brady leads a number of initiatives aimed at combating gun violence, including Veterans for Gun reform, the End Family Fire Program, and #ShowYourSafety.

MFOL is a non-profit organization of young people from across the country fighting for sensible gun violence prevention policies that will save lives. Formed after the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, MFOL immediately began organizing the largest single day of protests against gun violence in U.S. history. Hundreds of thousands of people joined its March 24, 2018 march in Washington, D.C., and sibling marches all over the world. Since then, students seeking change have formed hundreds of MFOL chapters across the country. These young people have a vital interest in ensuring that the U.S.

2

Constitution is interpreted correctly to allow the enactment of gun violence prevention measures that will protect themselves, their peers, and all Americans.

Giffords Law Center, Brady, and MFOL have a shared interest in reducing gun violence to protect the lives of all Americans. *Amici* are entities that have deep knowledge and experience regarding firearm regulations and gun violence in the United States. In this brief, *amici* show that Montgomery County's Bill No. 4-21, which prohibits carrying a firearm at or within 100 yards of a place of public assembly, is consistent with the history and tradition of the nation—a history and tradition that preserves and protects the free exercise of civic engagement, political participation and religion—as well as the Supreme Court's "sensitive places" doctrine.

## **INTRODUCTION**

The provisions of Bill No. 21-22E at issue on appeal[2] are few and narrow: whether Defendant-Appellee Montgomery County, Maryland may ban firearms at or within publicly or privately owned places of worship, parks, recreational facilities, or multipurpose exhibition facilities; and whether Montgomery County can apply 100-yard buffer zones around private or public places of public assembly. These provisions of the Bill are fully consistent with Plaintiffs' Second Amendment rights.

---

[2] Plaintiffs-Appellants sought to enjoin additional provisions of the ordinance at the district court, but do not pursue all of them here.

Places of public assembly and places of worship are "sensitive places," where prohibition of firearms by legislative action is constitutional.  Engagement in civic life is a core American value, rooted in tradition, and put into practice through constitutional protections for the right to vote, assemble, and publish, and exemplified by the conventions, debates, and public pronouncements of the nation's Founders.  Protecting the right to peacefully assemble in pursuit of civic engagement is a role played historically by local governments.  Thus, Montgomery County's protection of public assemblies and places of worship as gun-free "sensitive places" helps to safeguard Maryland residents' ability to exercise their First Amendment rights, participate in civic life, and fully engage in civil society.

*Amici* focus this brief on three points:  (1) engagement in civic life is a core American value, essential to a democratic nation, and firearm restrictions in sensitive places are pivotal to safeguarding those engaged in exercising their right to peacefully assemble; (2) the threat posed by the presence of firearms disrupts and deters peaceful public assembly; and (3) places of worship have historically been a gathering site for vulnerable populations and peaceful assembly in furtherance of the exercise of First Amendment rights.

## I. FIREARM RESTRICTIONS IN "SENSITIVE PLACES" SAFEGUARD CIVIC ENGAGEMENT, DEMOCRATIC VALUES, AND CONSTITUTIONAL INSTITUTIONS.

"Sensitive places" from which governments can constitutionally ban firearms are recognized with unequivocal approval by the U.S. Supreme Court in *District of Columbia v. Heller* and in *New York State Rifle & Pistol Association, Inc. v. Bruen* to include schools, legislative assemblies, government buildings, polling places, and courthouses. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008). One key reason such places are "sensitive" is because they are essential to advancing and preserving our nation as a civil and democratic society with a republican form of government.

Civic engagement is a core American democratic value, identified as such by the founders of our democracy. In the words of John Adams, "liberty cannot be preserved without general knowledge among the people." John Adams, "*V. 'A Dissertation on the Canon and the Feudal Law,' No. 3, 30 September 1765*" (Sept. 30, 1765), https://founders.archives.gov/documents/Adams/06-01-02-0052-0006. The U.S. Constitution establishes, protects, and preserves institutions that require civic engagement to function. Congress and the Presidency continue to exist as institutions of government for the people and by the people because of constitutional

protections for civic engagement, which produces an informed and engaged electorate.

Moreover, this interest in protecting civil engagement is not limited to the federal level. The Constitution includes a direction that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them . . . against domestic Violence." U.S. Const. art. IV, § 4. As the Supreme Court has explained, "a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs . . . ." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875). *See* Akhil Reed Amar, *America's Constitution: A Biography* 278-79 (2005) (historical documents describe a republican form of government as one in which "the people are sovereign," "the people are . . . the fountain of all power," "all authority should flow from the people," and "all laws are derived from the consent of the people . . . ."). In light of this understanding of what a "Republican Form of Government" means, a civically engaged and informed populace is essential.

By expressly recognizing the doctrine of "sensitive places" in locations where Americans gather peacefully and regularly, the Supreme Court has thus already determined that the Second Amendment does not interfere with the authority of the Nation's many legislative bodies to preserve the ability of Americans to engage in civic activities by assuring that they do not feel inhibited from doing so by the

presence of dangerous weapons. As elucidated below, this history is reflected in the fact that Reconstruction Era laws banned guns in public assemblies and places of worship.

Recognizing this history in *Bruen*, the Supreme Court reaffirmed the "longstanding . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . ." 142 S. Ct. at 2133 (internal quotation marks and citation omitted). In reaffirming its "sensitive places" doctrine, the Supreme Court declined to "comprehensively define 'sensitive places,'" thereby leaving it open to the relevant legislative bodies to do so. *Id.* The Court did though instruct that sensitive places include those locations where weapons were historically prohibited—and places relevantly analogous to such locations—and also explained that modern-day firearms regulations need not be "a dead ringer for historical precursors" in order to "pass constitutional muster." *Id.* The *Bruen* Court's affirmance of *Heller*'s sensitive places analysis invites legislatures and courts to analogize to historical regulations of sensitive places by determining if the modern analogue is "relevantly similar." *Id.* at 2132-133.

The Supreme Court has made clear that barring guns in sensitive places is constitutionally valid, so legislatures and courts can analogize to the "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'" to decide if modern regulations pass constitutional muster.

*Id.* at 2118. Sensitive places such as schools, legislative assemblies, government buildings, polling places, and courthouses are relevant, but not exclusive sources of analogy. *Id.* Notably, the unifying quality of all these locations is their role as vital to participation in American democracy and civic engagement.

*Bruen* elaborated that modern firearms prohibitions might be considered sufficiently analogous to historical predecessors via "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. "Whether modern and historical regulations impose a comparable burden on the right of armed self-defense . . . and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* at 2118 (internal citations, quotation marks, and emphasis omitted).

Deciding whether a burden on the right of armed self-defense is "comparably justified" to those enumerated in *Heller* (schools and government buildings) and *Bruen* (legislative assemblies, polling places, and courthouses) means understanding why (*i.e.*, for what interests) governments traditionally imposed restrictions at these sites. Together, these sensitive places represent a common law history that affirms government authority to "exclud[e] weapons from these places of public gathering protects a public sphere for democratic dialogue, democratic governance, and the reproduction of *democratic community* in which people can relate freely without intimidation or coercion." Joseph Blocher & Reva B. Siegel, *Guided by History:*

8

*Protecting the Public Sphere from Weapons Threats Under Bruen*, 98 N.Y.U. L. Rev. 101, 104 (2023).

Supreme Court precedent shows that the government has the authority to "protect valued civic activities and the ability of all citizens to live free of terror and intimidation." Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 Nw. U. L. Rev. 139, 176 (2021) (referencing *Heller*). *Heller* relies on common law history that affirms the government's authority, and responsibility, to protect such activities. *See Heller*, 554 U.S. at 626-28.

In fact, there is a longstanding history and tradition of governmental regulation of firearms in places of participation in the democratic community. Indeed, "weapons laws—including sensitive place restrictions—historically were used not only to preserve life, but . . . to protect the public peace and thus the freedom of all people to participate in democratic community without terror and intimidation." Blocher & Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats Under Bruen* at 109.

For example, sensitive place restrictions have long existed in both polling places and courthouses. "[M]any colonies and states had broad restrictions on carrying weapons in public." Carina Bentata Gryting & Mark Anthony Frassetto, *NYSRPA v. Bruen and the Future of the Sensitive Places Doctrine: Rejecting the*

*Ahistorical Government Security Approach*, 63 B.C.L. Rev. E. Supp. I.-60, I.-63 (2022).

At or after the Founding, sensitive place restrictions existed at elections sites and schools. *See* Del. Const. art. XXVIII (1776) (prohibiting people from going to elections armed in order "[t]o prevent any violence or force being used at the said elections"); Miss. Laws 176, ch. 46, § 4 (1878) (a law that prohibited students "of any university, college or school" from carrying concealed a deadly weapon); Ga. Laws 421, title XVI, no. 285, §1 (1870) (prohibiting deadly weapons in "any court of justice, or any election ground or precinct or any place of public worship, or any other public gathering").

Indeed, in 1776, "Delaware and Maryland forbade weapons at election grounds." Gryting & Frassetto, *NYSRPA v. Bruen and the Future of the Sensitive Places Doctrine* at I.-63. Likewise, "in 1810, the University of Georgia prohibited students from possessing firearms on campus." *Id.* at I.-63-64

## II. BECAUSE FIREARMS DISRUPT AND DETER PEACEFUL PUBLIC ASSEMBLY, PLACES OF ASSEMBLY HAVE LONG BEEN DESIGNATED SENSITIVE PLACES.

Peaceful public assembly is the apex of civic engagement in American society. *See* U.S. Const. amend. 1. Places of public assembly and peaceful lawful protest are "sensitive places" critical to civic engagement and a democratic community. The Supreme Court has explained that "[f]rom the [nation's] outset, the

right of assembly was regarded not only as an independent right but also as a catalyst to augment the free exercise of the other First Amendment rights with which it was deliberately linked by the draftsmen." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 577 (1980). The "right of peaceable assembly" is "equally fundamental" to other constitutionally protected rights. *De Jonge v. State of Oregon*, 299 U.S. 353, 364 (1937). As recognized by both Reconstruction-Era lawmakers and confirmed by modern-day academics, the presence of firearms at public assemblies increases the risk of harm to attendees and chills constitutionally protected rights of speech, assembly, and worship.

### A. Firearms Disrupt and Deter Peaceful Public Assembly.

The presence of firearms during public assembly threatens the peace and increases the likelihood of mayhem, violence, and death.

In 2021, the Armed Conflict Location & Event Data Project ("ACLED") and Everytown for Gun Safety Support Fund ("Everytown") conducted a study on demonstrations[3] throughout the United States from January 2020 to June 2021, and documented at least 560 events where demonstrators, counter-demonstrators, or

---

[3] The ACLED defines demonstrations as "all physical congregations of three or more people . . . when they are directed against a political entity, government institution, policy, group or individual, tradition or event, businesses, or other private institutions." *Armed Assembly: Guns, Demonstrations, and Political Violence in America*, Everytown for Gun Safety Support Fund & ACLED (2021), https://everytownresearch.org/report/armed-assembly-guns-demonstrations-and-political-violence-in-america/.

other groups or individual attendees carried or brandished firearms.  Everytown for Gun Safety Support Fund & ACLED, *supra* note 3.  The data revealed that armed demonstrations[4] were six times more likely than unarmed demonstrations to be violent or destructive.[5]

One out of every six demonstrations where firearms were present included reports of violent or destructive activity, whereas that figure is one out of 37 for demonstrations where no firearms were identified.  These figures are magnified for events involving fatalities—fatalities were reported at one of every sixty-two armed demonstrations, whereas a fatality occurred in merely one of every 2,963 demonstrations where no firearm was identified.  *Id.*  Moreover, the study identified over 100 incidents of armed demonstrations at legislative buildings and vote counting centers across twenty-five states and Washington, D.C.  *Id.*  These findings directly contradict gun rights activists' fundamentally mistaken argument that easy access to firearms promotes public safety.  And even if this point were debatable, our system of government establishes that the representatives of the people acting in

---

[4] The ACLED and Everytown define armed demonstrations as demonstrations "in which individuals and groups—including militias, militant social movements, and unaffiliated individuals and groups—are present and identified as equipped with firearms in print, photographs, and/or video." *Id.*

[5] The study classified actions such as looting or vandalism as destructive behavior. *Id.*

popularly elected legislatures are empowered to make this type of judgment, as occurred here with regard to the Montgomery County Council.

Research also shows that citizens are significantly less likely to attend protests when they believe that firearms will be present. *See* Diana Palmer, *Fired Up or Shut Down: The Chilling Effect of Open Carry On First Amendment Expression at Public Protests*, Ne. Univ. (2021). Empirical evidence unsurprisingly demonstrates that many Americans fear guns in public spaces. *See* Sophie Bethune & Elizabeth Lewan, *One-Third of US Adults Say Fear of Mass Shootings Prevents Them from Going to Certain Places or Events*, Am. Psych. Ass'n (Aug. 15, 2019), https://www.apa.org/news/press/releases/2019/08/fear-mass-shooting.

Building off that principle, author and academic expert Diana Palmer conducted a study on protest participants' perception of firearms at public protests and how open carry affected their desire to attend, carry signs, or speak out in the presence of guns. *See* Palmer, *Fired Up or Shut Down: The Chilling Effect of Open Carry On First Amendment Expression at Public Protests* at 26. Dr. Palmer's study comprised a control group, for which firearms were not mentioned in the survey questions, and an experimental group for which firearms were mentioned. *Id.* at 54. The experimental group participants were much less willing to participate in expressive activities than the control group participants to whom firearms were not mentioned–this was true regardless of political ideology, gun ownership, and region.

*Id.* at 150.  The mere presence of firearms at a protest was a "deal-breaker" for many.

*Id.* at 127.  Participants shared, *inter alia*, the following sentiments:

- "I think the presence of firearms is meant to intimidate the opposition with the potential for physical violence. Not my type of protest."[6]

- "I'd be afraid of getting hurt or killed."[7]

- "An accident could happen, and someone (myself included) could get hurt.  I'm also very uncomfortable around firearms, so that would be a dealbreaker."[8]

- "As long as protesters are carrying firearms, I am not in."[9]

- "If a subject interests me, I am usually inclined to participate in demonstrations, but I am absolutely against firearms because humans are emotional and unpredictable animals.  I prefer not to risk [sic]."[10]

Gun owners and non-gun owners alike shared similar sentiments about distrusting others with guns and indicated a shared belief that firearms can be dangerous at protests.  *Id.* at 137-38.  While Dr. Palmer's study illustrates the chilling effect that the mere presence of firearms has on citizens' interest in engaging in their First Amendment rights to free speech and peaceful assembly, research from gun safety advocates such as the ACLED and Everytown validates the commonly held

---

[6] *Id.* at 135.

[7] *Id.*

[8] *Id.* at 128

[9] *Id.*

[10] *Id.*

fear that access to firearms during public assemblies increases the risk of violence or death to attendees.

### B. Reconstruction-Era Precedent Supports Firearm Bans at Peaceful Public Assemblies.

Historical precedent from the era of the Fourteenth Amendment's ratification "evinces a comparable tradition of regulation" of firearms at public assemblies like the ban implemented by Section 57-11. *Bruen*, 142 S. Ct. at 2132. Reconstruction-Era laws are frequently referenced in discussions concerning gun regulation. *See, e.g.*, *Heller,* 554 U.S. at 614. Scholars (and the Supreme Court) view the Reconstruction Era to be the Nation's second founding, aimed at protecting the civic rights of recently freed persons. *See* Eric Foner, *The Second Founding: How the Civil War and Reconstruction Remade the Constitution* (2019). The Amendments borne from this era—the 13th, 14th, and 15th—each contain a clause that "empower[s] Congress to enforce their provisions, guaranteeing that Reconstruction would be an ongoing process, not a single moment in time." *Id.*

During the Reconstruction Era, a number of states enacted gun laws aimed at protecting freed persons. *See* Mark Anthony Frassetto, *The Nonracist and Antiracist History of Firearms Public Carry Regulation*, 74 SMU L. Rev. Forum 169, 175 (2021). In the South, post-Civil War elections saw many freed persons gain government office, and in turn, numerous laws were enacted that regulated the public right to carry guns in order to protect freed persons "from the extreme levels of racist

15

violence from groups like the Ku Klux Klan." *Id.* For example, South Carolina enacted a law that prohibited carrying weapons in public. *Id.* Similarly, Georgia enacted a law that prohibited carrying weapons at public assemblies. *Id.*

Most notably, in 1871, the Texas state legislature enacted a law that prohibited the public carry of handguns and numerous other weapons "without a specific threat to a person's safety." *Id.* The passage of this law received unanimous support from Texas's Black state assemblymen and state senators. *Id.* These are just a few examples of Reconstruction-Era laws that modestly curbed the right to bear arms to meet the essential need to protect civic rights.

## III. GUN BANS IN PLACES OF WORSHIP PROTECT CIVIC LIFE AND ARE CONSISTENT WITH RECONSTRUCTION-ERA HISTORY.

Places of worship facilitate civic engagement and make important contributions to civic life. Places of worship have historically been and continue to be gathering sites for vulnerable populations exercising First Amendment rights and building community and civil society. And history and tradition from the Reconstruction Era support gun bans in places of worship.

### A. Places of Worship Foster And Accelerate Civic Engagement.

Congregations from churches, synagogues, and mosques make significant contributions to civic life. These contributions commonly take the form of direct social services, civic bridging, and education, which are all important forms of civic engagement that must be protected.

16

One of the most common forms of this civic engagement is providing direct services to the community. More than 80% of congregations engage in social service activities intended to help people outside of their congregation. *See* Mark Chaves & Alison Eagle, *Congregations and Social Services: An Update from the Third Wave of the National Congregations Study*, Duke U. 1 (2016). Congregations provide community services in numerous ways: they feed the hungry, they shelter the unhoused, they provide school supplies to children in need, they support help with societal re-entry after prison, and they provide numerous other public health and welfare services. *See id.* at 4. This past May, Governor Andy Beshear (Democrat) of Kentucky honored the Mormon church with a service award for its humanitarian work in the wake of devastating flooding in Eastern Kentucky. *Kentucky Governor Thanks the Church of Jesus Christ for Flood Relief* (May 23, 2023), https://newsroom.churchofjesuschrist.org/article/kentucky-governor-award-flood-relief. And after Hurricane Harvey, Texas Governor Greg Abbott (Republican) noted the "vital role" that churches and other houses of worship played "in the ongoing recovery effort." Edgar Walters, *After First Amendment Challenge, FEMA May Pay Texas Churches to Rebuild After Harvey* (Jan. 3, 2018), https://www.texastribune.org/2018/01/03/fema-may-pay-texas-churches-rebuild-after-harvey/. Moreover, individual members of a congregation are more likely to volunteer, which includes volunteering with organizations outside of their house of

worship, to provide direct services to the community. *See* Penny Edgell Becker &

Pawan H. Dhingra, *Religious Involvement and Volunteering: Implications for Civil*

*Society*, 62 Oxford U. Press 315, 315 (2001).

Places of worship also foster civic engagement. Places of worship—including

specifically in Montgomery County—also offer both English classes and citizenship

classes: critical facilitators of civic engagement. *See Free English Classes in*

*Maryland*, Asian Pacific Am. Legal Resources Ctr., https://www.apalrc.org/wp-

content/uploads/2017/12/MD-ESOL-and-Civics-Classes-Flyer.pdf (lasted visited

Sept. 25, 2023). They also assist communities in times of crisis, such as

homelessness or in the wake of natural disasters.[11] In short, these institutions often

---

[11] *See, e.g.*, Hamil R. Harris, *Family Homeless Shelter in Montgomery in Limbo as Demand Rises* (Feb. 3, 2016), https://www.washingtonpost.com/local/family-homeless-shelter-in-montgomery-in-limbo-as-demand-rises/2016/02/02/3962ff60-c606-11e5-a4aa-f25866ba0dc6_story.html; David Moore, *Despite Power Outage, Church Serves Hundreds of Meals After Idalia* (Sept. 11, 2023), https://www.baptistpress.com/resource-library/news/despite-power-outage-church-serves-hundreds-of-meals-after-idalia/; Josh Snyder, *Aid Groups in Arkansas Adapted to Tornado Survivors' Urgent Needs; Now They are Preparing for 'Long Haul'* (Apr. 15, 2023), https://www.arkansasonline.com/news/2023/apr/15/aid-groups-in-arkansas-adapted-to-tornado-/; Ryan Bittan, *Latter-Day Saints Providing Shelter, Assistance to Maui Wildfire Victims* (Aug. 11, 2023), https://www.abc4.com/news/national/church-of-jesus-christ-of-latter-day-saints-providing-shelter-assistance-to-maui-wildfire-victims/; Bobby Ross Jr., *Maui Church Houses Evacuees, Helps with Relief After Deadly Wildfires* (Aug. 14, 2023), https://christianchronicle.org/maui-church-houses-evacuees-helps-with-relief-after-deadly-wildfires/.

foster and accelerate civic engagement by encouraging members to actively participate in the social, political, and cultural life of their society.

### B. Reconstruction-Era Laws Support Gun Bans in Places of Worship.

As the District Court concluded, there is "historical precedent" from the time of the Fourteenth Amendment's ratification that "evinces a comparable tradition of regulation" of firearms in places of worship as was implemented by Section 57-11. *Md. Shall Issue, Inc. v. Montgomery Cnty., Md.*, No. TDC-21-1736M, 2023 WL 4373260, at *10 (July 6, 2023) (citing *Bruen*, 142 S. Ct. at 2131-132). The District Court provided a lengthy, non-exhaustive list of historical statutes and ordinances demonstrating this historic precedent.[12] *Id.* Further exploration of the historic record provides even greater support for the District Court's conclusion. There are, for example, additional statutes that the District Court did not include in its reasoning, including a law adopted by Montana in 1903, that prohibited the concealed carrying of any "pistol or other firearm, dirk, dagger, slung shot, sword cane, knuckles, or bowie knife" at "any church or religious assembly." Mont. Laws 49, § 3 (1903).

The tradition of regulation evinced in these Reconstruction-Era laws, is further bolstered by multiple state supreme courts strongly endorsing prohibitions on firearms in places of worship. The Georgia Supreme Court, for example,

---

[12] Defendant provides additional context through statutes and cases. Def.'s Br. at 36-37.

observed that "[t]he practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the [Georgia state] constitution have used words broad enough to give it a constitutional guarantee." *Hill v. State*, 53 Ga. 472, 475 (1874).

The Supreme Court of Texas thought it "little short of ridiculous" to claim a right to carry "into a peaceable public assembly, as, for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together." *English v. State*, 35 Tex. 473, 478-79 (1871), *abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *see also Wilson v. State*, 33 Ark. 557, 560 (1878) ("No doubt in time of peace, persons might be prohibited from wearing war arms to places of public worship, or elections, etc."). In short, there is a robust historic record showing a tradition of prohibiting firearms in places of worship.

## <u>CONCLUSION</u>

Firearm regulations in "sensitive places" protect key parts of our democracy: civic engagement, democratic values, and constitutional institutions. Places of assembly have historically been considered "sensitive places" because firearms disrupt and deter peaceful public assembly, a core American value. Finally, bans on firearms in places of worship safeguard civic life and is supported by

Reconstruction-Era history.  For the foregoing reasons, as well as those set forth in

Montgomery County's brief, the District Court's order should be affirmed.

Respectfully submitted,

/s/ *Jonathan L. Diesenhaus*

JONATHAN L. DIESENHAUS
*Counsel of Record*
HANNAH M. GRAAE
GIL MCDONALD
AMANDA NECOLE ALLEN
ALEXANDRIA REID
WILL TENBARGE
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
jonathan.diesenhaus@hoganlovells.com

ELIZABETH ALICE OCH
HOGAN LOVELLS US LLP
1601 Wewatta St., Suite 900
Denver, CO 80202
Telephone: (303) 899-7300

SOPHIA FANG
HOGAN LOVELLS US LLP
609 Main St.
Houston, TX 77002
Telephone: (713) 632-1400

ESTHER SANCHEZ-GOMEZ

GIFFORDS LAW CENTER TO PREVENT
GUN VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
Telephone: (415) 433-2062

DOUGLAS N. LETTER
SHIRA LAUREN FELDMAN
BRADY CENTER TO PREVENT GUN
VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
Telephone: (202) 370-8100

CIARA MALONE
MARCH FOR OUR LIVES
90 Church Street, #3417
New York, NY 10008
Telephone: (913) 991-4440

*Counsel for Amici Curiae*

September 26, 2023

## **CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the type-volume limitations in Fed. R. App. P. 29(a)(5) and 32(a)(7) because it contains 4,492 words, excluding those parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief was produced in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

/s/ *Jonathan L. Diesenhaus*
Jonathan L. Diesenhaus

## **CERTIFICATE OF SERVICE**

I certify that on September 26, 2023, the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. All counsel of record are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/*Jonathan L. Diesenhaus*
Jonathan L. Diesenhaus