No. 23-1719

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————————————

MARYLAND SHALL ISSUE, INC., *et al.*,

*Plaintiffs-Appellants,*

v.

MONTGOMERY COUNTY, MARYLAND,

*Defendant-Appellee.*

———————————————————

On Appeal from the United States District Court
for the District of Maryland
(Hon. Theodore D. Chuang)

———————————————————

## BRIEF OF EVERYTOWN FOR GUN SAFETY
## AS AMICUS CURIAE IN SUPPORT OF
## DEFENDANT-APPELLEE AND AFFIRMANCE

———————————————————

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Kari L. Still
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8141
kstill@everytown.org

September 26, 2023

*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT ..................................................................................................2

    I.     The Correct Historical Analysis Centers on the Reconstruction Era, Not the Founding Era.......................................................................2

    II.    This Court Should Consider Historical Context in Evaluating What Historical Laws Reveal about the Public Understanding of the Right ...............................................................................................18

CONCLUSION..........................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Davenport v. Wash. Educ. Ass'n,*
 551 U.S. 177 (2007)................................................................................23

*District of Columbia v. Heller,*
 554 U.S. 570 (2008)..............................................................2, 5, 13, 17

*Espinoza v. Montana Department of Revenue,*
 140 S. Ct. 2246 (2020)........................................................................18

*Ezell v. City of Chicago,*
 651 F.3d 684 (7th Cir. 2011). ...........................................................6, 9

*Frey v. Nigrelli,*
 No. 7:21-cv-05334, 2023 WL 2473375 (S.D.N.Y. Mar. 13, 2023), *appeal docketed,*
 No. 23-365 (2d Cir. Mar. 16, 2023) ....................................................4

*Friedman v. City of Highland Park,*
 784 F.3d 406 (7th Cir. 2015) ...........................................................23

*Gamble v. United States,*
 139 S. Ct. 1960 (2019)........................................................................18

*Goldstein v. Hochul,*
 No. 1:22-cv-08300, 2023 WL 4236164 (S.D.N.Y. June 28, 2023), *appeal docketed,*
 No. 23-995 (2d Cir. July 6, 2023) ................................................. 3-4

*Gould v. Morgan,*
 907 F.3d 659 (1st Cir. 2018) ..............................................................6

*Hirschfield v. ATF,*
 5 F.4th 407 (4th Cir.), *vacated as moot,* 14 F.4th 322 (4th Cir. 2021)..................7, 8

*Lynch v. Donnelly,*
 465 U.S. 668 (1984)...........................................................................18

*McDonald v. City of Chicago,*
 561 U.S. 742 (2010)..............................................................5, 8, 23

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) ..............................................................8

*Nat'l Ass'n for Gun Rts. v. Lamont,*
    No. 3:22-cv-01118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023), *appeal docketed,*
    No. 23-1162 (2d Cir. Aug. 16, 2023)............................................ 16-17

*Nat'l Rifle Ass'n v. Bondi,*
    61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc,* No. 21-12314,
    2023 WL 4542153 (July 14, 2023)................................................7, 9

*New York State Rifle & Pistol Ass'n v. Bruen,*
    142 S. Ct. 2111 (2022) ...........................................................passim

*Or. Firearms Fed'n v. Kotek,*
    No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023), *appeals docketed,*
    Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.) .......... 2-3

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020) ........................................................................17

*Timbs v. Indiana,*
    139 S. Ct. 682 (2019)..........................................................................17

*United States v. Greeno,*
    679 F.3d 510 (6th Cir. 2012) ...............................................................6

*United States v. Meyer,*
    No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023)........12

*Virginia v. Moore,*
    553 U.S. 164 (2008)............................................................................18

## OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ...............11, 12

Allan Greer, *Commons and Enclosure in the Colonization of North America,* 2 Am. Hist.
    Rev. 365 (2012)....................................................................................21

iv

Ann Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1 (2021) ........................... 20-21

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) ......................................................................... 13

*Bulletin of the Park and Outdoor Art Association* 3 (1901), *available at* https://bit.ly/3NPLSae ................................................................................... 21

Cynthia S. Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure* (2019) ................................................................................................... 20

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ................................................................. 13, 23

David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* (1988) ....................................................................... 19

Dorceta E. Taylor, *The Environment and the People in American Cities, 1600s-1900s: Disorder, Inequality, and Social Change* (2009) .......................................... 21

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ...... 9

Everytown Center for the Defense of Gun Safety, *Parks Restrictions*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ ............................................................................ 4, 24

Everytown Center for the Defense of Gun Safety, *Restrictions on Carrying in Sensitive Places or While Intoxicated*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places-and-carrying-while-intoxicated-restrictions/ ................................................................................................... 4

Everytown Center for the Defense of Gun Safety, *Sensitive Places*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ .................................................................................. 4

Frederick Law Olmsted, *The Justifying Value of a Public Park* (1881) .......................... 22

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ...........................................................9, 10

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 ..... 11-12

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ...................................................................................................10

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ...........................................................................10

Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517 (2020) .21

National Park Service, *Firearms Regulations in the National Parks 1897-1936* (2008), *available at* https://perma.cc/5SRK-VYXZ.........................................................24

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) .............................................................................10

Stephen T. Mather, *Progress in the Development of the National Parks* (U.S. Dep't of Interior 1916)..........................................................................................................24

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008).........................................9

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021).........................................................................................8

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with nearly ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The firearms restrictions Plaintiffs challenge are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons Defendant Montgomery County (the "County") sets out in its brief. *See* Dkt. 40 ("County Br."). Everytown submits this amicus brief to expand on two points. *First*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should

center its analysis on 1868, when the Fourteenth Amendment was ratified, not

1791. Moreover, 1868 is neither a starting-line nor a cutoff; under *Bruen* and *District*

*of Columbia v. Heller*, 554 U.S. 570 (2008), both earlier and later history are also

relevant. *Second*, *Bruen*'s inquiry requires consideration not just of historical laws but

also of the historical context within which states and localities chose to legislate (or

not to legislate)—a point we illustrate with the historical context surrounding the

regulation of firearms in parks.

## ARGUMENT

## I.    The Correct Historical Analysis Centers on the Reconstruction Era, Not the Founding Era

After *Bruen*, this Court must first decide "whether the plain text of the

Second Amendment protects" a person's "proposed course of conduct." *Bruen*, 142

S. Ct. at 2134.[2] If so, the burden shifts to the government to show its regulation is

"consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

Here, if the Court proceeds to the second, historical inquiry, it should first

conclude that the most relevant time period for that inquiry centers on the

---

[2] Plaintiffs have the burden on this first question. *See, e.g.*, *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *5 n.4 (D. Or. July 14, 2023) (concluding that "the burden is on the plaintiff … to show that the challenged law implicates conduct covered by the plain text of the Second Amendment," in light of *Bruen*'s language and "first principles of constitutional adjudication" (internal quotation marks omitted)), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 &

Reconstruction Era—the years surrounding 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states—not the Founding era. Indeed, the court below recognized as much, concluding that Reconstruction-era sources "are equally if not more probative" of the scope of the Second Amendment right to keep and bear arms as applied to the states. JA844.

To be clear, this Court need not resolve the question of which time period is more relevant to its inquiry to affirm the decision below. In *Bruen*, the Supreme Court recognized "an ongoing scholarly debate" on the question but ultimately did "not address this issue" because, there, the "public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same." 142 S. Ct. at 2138. Here, too, the historical tradition—from the founding era, to the 19th century, through Reconstruction, and into the 20th century—consistently demonstrates the constitutionality of the County's restrictions. *See, e.g.*, County Br. 30-44 (describing relevant historical laws from the founding era into the 20th century); *Goldstein v. Hochul*, No. 1:22-cv-08300, 2023 WL 4236164, at *13-14

---

23-35540 (9th Cir.). And, as Everytown explained below, Plaintiffs have not carried this burden here: they broadly assert that "carry[ing] bearable arms in public locations for self-defense" is "undisputed[ly]" within the Second Amendment's text, Pls. Br. 18, but make no effort to show that the Second Amendment protects their right to do so in the specific areas enumerated by the County's law, *see* Everytown Amicus Br., *Md. Shall Issue v. Montgomery Cnty.*, No. 8:21-cv-01736, Dkt. 66, at 3-6.

(S.D.N.Y. June 28, 2023) (historical tradition across founding- and Reconstruction-eras supports restricting firearms in places of worship), *appeal docketed*, No. 23-995 (2d Cir. July 6, 2023); *Frey v. Nigrelli*, No. 7:21-cv-05334, 2023 WL 2473375, at *16-17 (S.D.N.Y. Mar. 13, 2023) (same, for public gathering areas with large crowds), *appeal docketed*, No. 23-365 (2d Cir. Mar. 16, 2023).[3] Accordingly, this Court need not resolve the issue of the correct time period. Nevertheless, if this Court wishes to resolve it to guide district courts in future cases, it should hold that the inquiry centers on 1868.[4]

To begin with, in a case challenging the constitutionality of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The U.S. Constitution's

---

[3] *See also, e.g.*, *Sensitive Places*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places/ (citing, excerpting, and linking to a selection of historical sensitive places laws); *Parks Restrictions*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ (same, for restrictions on guns in parks); *Restrictions on Carrying in Sensitive Places or While Intoxicated*, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/sensitive-places-and-carrying-while-intoxicated-restrictions/ (same, for a selection of additional restrictions on guns in other sensitive places, including places of worship and places of public assembly for educational, literary or social purposes). All links were last visited September 26, 2023.

[4] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the County's evidence), it should rely on 19th-century and 20th-century history to clarify that meaning. *See infra* pp. 13-14.

protection of the right to keep and bear arms did not constrain the states until 1868; as *Bruen* correctly observed, and the district court likewise emphasized, JA845, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second,"142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35) (emphasis added in *Bruen*).

Insisting that the 1791 understanding should apply against the states would not make sense given the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge

Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).

Several other circuits reached the same conclusion in analyzing the tradition of firearm regulation at the first, historical step of the then-applicable Second Amendment framework.[5] *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould*, 907 F.3d at 669 ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."). *Bruen* does not alter that conclusion; the step-one analyses in these cases remain, as a general matter, good law. *See* 142 S. Ct. at 2138 (leaving open the question whether 1868 or 1791 is the correct focus); *id.* at 2127 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*").

---

[5] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that analyzing Second Amendment claims should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Bruen*, 142 S. Ct. at 2126-27; *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018) (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27.

A panel of the Eleventh Circuit recently reached the same conclusion post-*Bruen*, holding that, in cases involving state laws, where the understanding of the right to keep and bear arms differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States." *Nat'l Rifle Ass'n v. Bondi* (*Bondi*), 61 F.4th 1317, 1323 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023 WL 4542153 (July 14, 2023). Although that panel opinion has now been vacated for rehearing en banc, its analysis of the relevant time period remains sound and consistent with originalist principles. As the panel explained:

> This is necessarily so if we are to be faithful to the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that it incorporates), "the later-enacted [provision] controls to the extent it conflicts with the earlier-enacted [provision]." … The opposite rule would be illogical.

61 F.4th at 1323-24 (alterations in original) (citations omitted); *see* JA845 (district court decision embracing this reasoning).[6]

---

[6] Plaintiffs ask this Court to ignore *Bondi*'s sound reasoning in favor of a different vacated decision, *Hirschfield v. ATF*, 5 F.4th 407 (4th Cir.), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), *see* Pls. Br. 19, 23-24. But that decision is inapposite; it pre-dated *Bruen* and involved a challenge to a federal statute, so the court did not consider the originalist arguments for applying the Reconstruction-era

The conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from radical. Indeed, it was the position former Solicitor General Paul Clement took as counsel for the NRA's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

It is also the position leading scholars of originalist theory have taken. "Many prominent judges and scholars—across the political spectrum—agree that, at a

---

understanding of the right to keep and bear arms in a case against a state or locality, nor the indications in *Bruen*, discussed below (at pp. 10-11), that point to applying that same understanding in a case against the federal government. *See* 5 F.4th at 410; *see also* County Br. 13 n.22. Likewise, *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012), upon which *Hirschfeld* relied, referred to 1791 but did not hold that 1791 is the only relevant time period for historical inquiry. Nor did it consider the implications for originalism of the fact that the Second Amendment did not apply against the states until 1868. Instead, *Moore* cited a passage in *McDonald* saying that the standards against the state and federal governments should be the same. *See id.* at 935 (citing *McDonald*, 561 U.S. at 765-66, 766 n.14). But that merely flags the issue that *Bruen* acknowledged, *see* 142 S. Ct. at 2137, before leaving open the question whether the 1868 or 1791 understanding should control, *see* 142 S. Ct. at 2138.

minimum, 'the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.'" *Bondi*, 61 F.4th at 1322 n.9 (quoting *Ezell*, 651 F.3d at 702) (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see also* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal location for applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment …. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right" that 1868 meaning controls); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"). Others who have endorsed this

view include Professors Michael Rappaport[7] and Stephen Siegel.[8] In sum, originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.[9]

To be sure, if the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of

---

[7] Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008). Professor Rappaport directs the University of San Diego School of Law's Center for the Study of Constitutional Originalism.

[8] Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

[9] To be clear, we do not suggest that each of these scholars also believe that 1868 is the correct focus for analyzing the public meaning of the right to keep and bear arms in cases against the federal government. Professors Blackman and Shapiro, for example, maintain that 1868 is the correct focus for cases against a state and 1791 is correct for cases against the federal government. *See* Blackman & Shapiro, 8 Geo. J.L. & Pub. Pol'y at 51. As discussed below, because *Bruen* subsequently rejected the possibility of different standards for the state and federal governments, originalists must choose one period or the other, and the weight of authority and analysis favors 1868. *See infra* pp. 10-13.

different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Plaintiffs suggest that pre-*Bruen* doctrine resolves this choice between 1791 and 1868. *See* Pls. Br. 19-21. Not so. *Bruen* noted only that prior decisions had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." 142 S. Ct. at 2137. If the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id*. at 2138. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2),

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*, signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[10] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 142 S. Ct. at 2138. On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with the passage in *Bruen* instructing the

---

[10] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

lower courts on historical methodology through the example of sensitive-places restrictions. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[11]

Further, while any historical inquiry this Court conducts should focus on the period around 1868, that date is neither a starting-line nor a cutoff. *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct.

---

[11] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right. Equally, even if a court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it found evidence in that period indeterminate, it should recognize that later laws (and other historical evidence of regulatory authority) settle the meaning of the Second Amendment right and demonstrate that the challenged laws are constitutional.

Here, state and local laws from the period beginning around Reconstruction—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the constitutionality of the County's law.

*See* County Br. 30-44.[12] And, in any event, regardless of whether the Court concludes that the relevant focus for its analysis is 1791 or 1868, it should consider this later historical evidence and the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like the County's law.

Plaintiffs and their amici, the Second Amendment Law Center et al. ("SALC") and a coalition of states led by Montana, offer nothing to undermine this analysis. They fail to address the central originalist issue—the fact that, in a case against a state, applying the 1868 understanding is the only way to satisfy the Supreme Court's mandate that constitutional rights "are enshrined with the scope they were understood to have *when the people adopted them*." *See supra* pp. 4-5 (quoting *Bruen* quoting *Heller*). Whereas *Bruen* marked the path for originalists to apply the 1868 understanding in federal cases too—by citing leading scholars who explain that the Fourteenth Amendment *updated* the meaning of the Second Amendment for the federal government as well as the states—Plaintiffs and their amici provide no justification for forcing on the states a 1791 understanding of the right to keep

---

[12] To be clear, whether laws precisely like the challenged law existed in 1868 (or 1791) is not the question before this Court. *Bruen* stressed that in applying analogical reasoning, the government must identify a "well-established and representative historical *analogue*, not a historical *twin*." 142 S. Ct. at 2133 (emphasis in original). Therefore, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

and bear arms that the 1868 generation did not share when they bound the states to respect that right.

Plaintiffs and their amici also fail to account for *Bruen*'s reliance, in discussing sensitive places, on "18th- *and 19th*-century" laws; it is simply not plausible that the Court intended only half of that phrase to refer to operative laws (and the other half to "mere confirmation"). *See supra* pp. 12-13; *cf.* Pls. Br. 21-23; SALC Br. 7; Br. of Montana et al. ("Montana Br.") 8-9. Furthermore, Plaintiffs and SALC simply ignore *Bruen*'s recognition that later practice can "liquidate" indeterminate or unsettled meaning. *See supra* pp. 13-14; *cf.* Montana Br. 8, 12, 14-15, 20-21, 26, 28-31 (acknowledging this principle but then discounting evidence of later practice). At the same time (as Plaintiffs and their amici apparently recognize, *see* Pls. Br. 22; SALC Br. 13, 17; Montana Br. 8), *Bruen* rejected reliance on late 19th- and early 20th-century evidence only because that evidence "*contradicted*" what the Court understood to be affirmative earlier evidence of a right to bear arms in public for self-defense without showing special need. *See supra* p. 14; *see also, e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 3:22-cv-01118, 2023 WL 4975979, at *31 n.51 (D. Conn. Aug. 3, 2023) (noting that "[n]owhere does *Bruen* forbid consideration of any regulations or history after the end of the 19th century," and that the Supreme Court "chose not to address the 20th century evidence submitted because it 'contradicts earlier evidence,' not because 20th century evidence is *per se*

irrelevant"), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023).[13] Here, Plaintiffs

point to no affirmative evidence that the founding generation (or any other

generation) would have considered the County's restrictions unconstitutional. *See*

JA863-864 (explaining insufficiency of Plaintiffs' few cited counterexamples); *see also*

*infra* at pp. 20-23.

    Finally, Plaintiffs' reliance on pre-*Bruen* Supreme Court cases that looked to

founding-era history does not advance their position. *See* Pls. Br. 20-21 (discussing

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) and *Timbs v. Indiana*, 139 S. Ct. 682

(2019)). Both cases consulted a wide range of history, stretching at least through the

Reconstruction era, and none found a conflict between earlier and later history.[14]

---

    [13] For the same reason, Plaintiffs and their amici are incorrect that *Bruen* rejected reliance on laws that cover "only a handful of States" or "a small portion of the population." Pls. Br. 26-27 & n.4; *see* SALC Br. 6; Montana Br. 11-12, 15-16, 21-22, 25, 31. As with the aforementioned late 19th- and 20th-century evidence, *Bruen* hesitated to rely on some laws covering only a few states and territories because it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted these historical analogues to New York's proper-cause law. *See* 142 S. Ct. at 2153-55 (quoting *Heller*, 554 U.S. at 632); *see also* SALC Br. 6 (acknowledging *Bruen* disfavored evidence covering few states because it was "contradict[ed]" by the "overwhelming weight of other evidence"). Here, there is no such "overwhelming" evidence of a right to carry in any of the locations that the County's law regulates. *See* JA863-864 (district court noting that historical record was "reinforce[d] and supplement[ed]" by territorial examples and not contradicted by other meaningful evidence).

    [14] *See Ramos*, 140 S. Ct. at 1395-96 (looking to sources from fourteenth through late nineteenth centuries to determine meaning of Sixth Amendment right to jury trial); *Timbs*, 139 S. Ct. at 687-89 (looking to sources from Magna Carta to colonial era to Reconstruction to present day in interpreting Eighth Amendment

Whether for that reason or because they simply never considered the implications of the Fourteenth Amendment's ratification for originalist methodology, none of those cases had occasion to resolve the time-period question that *Bruen* left open. *See* County Br. 24 n.30.[15]

## II. This Court Should Consider Historical Context in Evaluating What Historical Laws Reveal about the Public Understanding of the Right

In evaluating the historical laws the County has presented, this Court should recognize that context matters. Close historical cousins to a modern regulation will not exist before the societal or technological condition that prompted regulation arose. Accordingly, regulations that emerged alongside or soon after a new condition should carry particular weight, and to the extent that a court seeks additional, older historical analogues, it must accept more distant cousins as sufficient. In *Bruen*'s words, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to history. 142 S. Ct. at 2132.

---

excessive fines clause and finding that it applies against the states).

[15] Plaintiffs separately cite *Lynch v. Donnelly*, 465 U.S. 668 (1984), *Virginia v. Moore*, 553 U.S. 164 (2008), *Gamble v. United States*, 139 S. Ct. 1960 (2019), and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), *see* Pls. Br. 21-22, but those cases likewise did not address the significance of the Fourteenth Amendment's ratification and, like the other cases *Bruen* cited, cannot have resolved the issue that *Bruen* expressly left open. *See Bruen*, 142 S. Ct. at 2137-38.

The County's restrictions on firearms in public parks exemplify this point. As the district court found, dozens of historical laws from the mid-19th century through the early 20th century establish that prohibiting firearms in parks is "consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126; *see* JA850-852 (canvassing 19th- and early 20th-century parks prohibitions and finding historical tradition of prohibiting firearms in parks). Given that 1868 is the correct focus for this Court's analysis, these laws establish beyond doubt that prohibiting firearms in parks is constitutional. But even if the Court were to focus its analysis on an earlier period, it should still give these 19th- and 20th-century laws particular weight, because parks in the modern sense did not begin to emerge until the mid-19th century. *See generally* David Schuyler, *The New Urban Landscape: The Redefinition of City Form in Nineteenth-Century America* 1-8 (1988) (describing emergence in 19th century of "new urban landscape," whose proponents urged establishment of public parks to "create[] communal spaces" where "rural scenery might sooth the 'nerves and mind' of visitors," and identifying Central Park as "the first major attempt to achieve" the proponents' goals). Given Central Park's position as the foundational paradigm of this new movement, it is particularly significant that its original 1858 rules, brief enough to appear on a single sheet and "posted in conspicuous locations that would be easily seen by all

visitors," Cynthia S. Brenwall, *The Central Park: Original Designs for New York's Greatest Treasure* 26 (2019), forbade "[a]ll persons" to "carry fire-arms":



*Id.* at 27.

Plaintiffs assert that "[t]here is nothing new about parks" and that an absence of prohibitions on guns in colonial-era greens and commons—Boston Common and two similar prepark landscapes in New York City—would establish their case. *See* Pls. Br. 35-36; *see also* SALC Br. 14-15; Montana Br. 17-18. They are mistaken on both points. First, history confirms that early commons and greens were different in kind from modern-day parks.[16] Their core functions were far

---

[16] Even the article Plaintiffs rely on (at Pls. Br. 35) in attempting to paint modern parks as no different from colonial-era green spaces acknowledges that "[p]ublic parks did not appear in the United States until the second half of the nineteenth century," and refers to those earlier green spaces as "prepark landscapes." Ann Beamish, *Before Parks: Public Landscapes in Seventeenth- and Eighteenth-*

afield from those of parks today—serving, for instance, as sites to grow crops, graze livestock, and harvest firewood and other resources. *See* Allan Greer, *Commons and Enclosure in the Colonization of North America*, 2 Am. Hist. Rev. 365, 370-73 (2012).[17] Boston Common, for example, was primarily used as shared grazing land during its first two centuries, and was also used for militia assembly. *See, e.g.,* Nadav Shoked, *Property Law's Search for A Public*, 97 Wash. U.L. Rev. 1517, 1556-57 (2020); *Bulletin of the Park and Outdoor Art Association* 3 (1901), *available at* bit.ly/3NPLSae (Common was used for grazing and militia assembly "till a very recent date" and "not until 1859" was it "finally settled" that "Boston Common should be a public park"); *see also* Pls. Br. 35 (admitting Boston Common was used for "militia purposes"). By contrast, parks in the modern sense were developed in the 19th century to serve functions centered on "tranquilizing recreation" and natural beauty. Taylor, *supra*, at 228 (internal quotation marks omitted).[18]

Frederick Law Olmsted, Central Park's principal architect and first Commissioner, explained this evolution in 1881: "Twenty-five years ago we had no

---

*Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 1, 13 (2021).

[17] They also served as "sites of executions, rallies, and protests; and homes for civic institutions." Dorceta E. Taylor, *The Environment and the People in American Cities, 1600s-1900s: Disorder, Inequality, and Social Change* 227 (2009).

[18] Far from enabling the extractive purposes that earlier commons had served, parks authorities prohibited visitors from disrupting the parks' beauty by harvesting flowers, fruits, or twigs. Taylor, *supra*, at 289.

parks, park-like or otherwise, which might not better have been called something else. … Allow me to use the term *park movement*, with reference to what has thus recently occurred[.]" Olmsted, *The Justifying Value of a Public Park* 7-8 (1881). Olmsted explained that this notion of parks was revolutionary, not simply "an improvement on what we had before, growing out of a general advance of the arts applicable to them." *Id.* at 8. Parks in the modern sense were thus an "unprecedented societal concern[]" in the late 19th and early 20th centuries. Under *Bruen*, that is reason enough to conclude that the County's historical park regulations amply justify its current restriction, since those regulations appeared as soon as the new societal condition of modern parks emerged.

The second reason why Plaintiffs and their amici are mistaken is that even if, contrary to fact, colonial-era greens and commons had been parks at the founding, the fact that the historical record has not (yet) yielded a prohibition on carrying firearms in those places proves nothing about whether Bostonians or New Yorkers historically understood the right to keep and bear arms to foreclose such a prohibition. If public carry in those cities was rare (because of social mores, limited availability of suitable firearms, carry regulations not specific to particular locations, or any other reason), then their inhabitants may have seen no need to enact sensitive-places prohibitions; or they simply may have chosen, for policy reasons, not to regulate (if that is what they chose) to the constitutionally

permissible limit. *Cf., e.g.*, *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions.").[19] Just as states and localities today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up), Boston and New York historically may have chosen not to prohibit firearms in early greens and commons, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412.[20]

---

[19] Even if there were evidence of a *practice* of carrying in colonial-era commons, that would not suggest the existence of a *right* to do so. *Compare* Kopel & Greenlee, 13 Charleston L. Rev. at 235 (arguing that Americans historically tolerated arms in legislative assemblies and that it was "common for Congressman to be armed"), *with Bruen*, 142 S. Ct. at 2133 (relying on Kopel & Greenlee article in endorsing constitutionality of prohibiting arms in legislative assemblies).

[20] Plaintiffs' state amici seek to discount some of the County's historical parks evidence as inapposite on the basis that those laws aimed to protect animals, rather than people. *See* Montana Br. 22-23. The court below correctly rejected this argument, explaining that those restrictions were direct historical precedent because they likewise prohibited firearms in parks (regardless of their purpose) and

Plaintiffs' remaining complaint about the County's parks restriction is that its coverage is simply too large—applying to "immense" areas and "vast expanses of the great outdoors." Pls. Br. 34-36 (citation omitted) (referring to individual parks of up to 6,300 acres). Again, this nation's historical tradition of firearms regulation belies their objection. In 1897, when Yellowstone National Park regulations prohibited firearms,[21] the park covered over *two million* acres[22]—more than six times the *entire* size of Montgomery County. Soon after, regulations prohibited firearms in Yosemite National Park's over 700,000 acres and in Glacier National Park's almost one million acres.[23] These regulations put beyond doubt that the generations that established national parks did not see any constitutional problem with prohibiting guns in genuinely "vast expanses of the great outdoors."

---

were, in any event, analogous in that they sought to promote public safety and peaceful enjoyment. *See* JA852.

[21] *See* National Park Service, *Firearms Regulations in the National Parks 1897-1936* 1 (2008) ("*Firearms Regulations*"), *available at* https://perma.cc/5SRK-VYXZ.

[22] *See* Stephen T. Mather, *Progress in the Development of the National Parks* 28 (U.S. Dep't of Interior 1916) (reporting areas of national parks, in square miles, including: 3,348 for Yellowstone; 1,125 for Yosemite; and 1,534 for Glacier).

[23] *See Firearms Regulations*, *supra* note 21, at 15 (Yosemite 1902); *id.* at 42 (Glacier 1910); *supra* note 22. These are merely examples. *See also Firearms Regulations* (providing historical restrictions for 19 national parks plus 1936 Service-wide regulations); Parks Restrictions, https://everytownlaw.org/everytown-center-for-the-defense-of-gun-safety/parks-restrictions/ (excerpting historical prohibitions on firearms in several state park systems).

## CONCLUSION

The Court should affirm the district court's decision.

Dated: September 26, 2023        Respectfully submitted,
<u>/s/ Kari L. Still</u>
Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Kari L. Still
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017

*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6,460 words, excluding the portions exempted by Fed. R. App. P. 32(f), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

/s/ Kari L. Still
Kari L. Still
*Counsel for amicus curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2023, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ Kari L. Still
Kari L. Still
*Counsel for amicus curiae*
*Everytown for Gun Safety*