IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SUSANNAH WARNER KIPKE, et al.,     *

     Plaintiffs,     *

v.     *     Civil Action No. GLR-23-1293
     Member Case: GLR-23-1295

WES MOORE, et al.,     *

     Defendants.     *

***

## MEMORANDUM OPINION

THIS MATTER is before the Court on: (1) Consol Plaintiffs Katherine Novotny, Sue Burke, Esther Rossberg, Maryland Shall Issue, Inc., Second Amendment Foundation, and Firearms Policy Coalition's (collectively, "Novotny Plaintiffs") Motion for Preliminary Injunction (Novotny et al. v. Moore et al., ("Novotny"), No. GLR-23-1295, ECF No. 24); (2) Plaintiffs Susannah Warner Kipke and Maryland State Rifle and Pistol Association, Inc.'s ("MSRPA") (collectively, "Kipke Plaintiffs") Motion for Preliminary Injunction (Kipke et al. v. Moore et al., ("Kipke"), No. GLR-23-1293, ECF No. 12); (3) Kipke Plaintiffs' Motion for Summary Judgment (Kipke, ECF No. 13); Novotny Plaintiffs' Motion for Summary Judgment (Kipke, ECF No. 18); (4) Defendants Ivan J. Bates, Roland L. Butler, Jr., Alison M. Healey, Joshua Kurtz, Wesley Moore, Scott D. Shellenberger, and Paul J. Wiedefeld's (collectively, "State Defendants")[1] Motion to Dismiss (Novotny, ECF

---

[1] Novotny Plaintiffs and Kipke Plaintiffs do not name exact same individual Defendants—Novotny Plaintiffs name the aforementioned individuals and Kipke Plaintiffs name just Moore and Butler. Regardless, the Defendant is effectively the State itself in both suits, and thus the Court will refer to Defendants collectively as "State Defendants."

No. 36); and (5) State Defendants' Cross Motions for Summary Judgment (Kipke, ECF Nos. 21, 23). The Motions are fully briefed, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant the Motions for Preliminary Injunction in part and deny them in part. The Court will further deny the Motion to Dismiss and the Motions for Summary Judgment without prejudice.

## I.     BACKGROUND

### A.     Senate Bill 1 and Other Maryland Firearm Restrictions

This action concerns Plaintiffs' challenges to the constitutionality of the recently-enacted Gun Safety Act of 2023, also known as Senate Bill 1 ("SB 1"), as well as several other Maryland firearm regulations. Defendant Wes Moore, Governor of the State of Maryland, signed SB 1 into law on May 16, 2023, and it goes into effect on October 1, 2023. 2023 Md. Laws ch. 680 (to be codified at Md. Code Ann. (2023), Crim. Law ["CR"] §§ 4-111(c)–(e), 6-411). The State legislature enacted SB 1 after the Supreme Court's June 23, 2022 decision in New York State Rifle and Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111 (2022). As discussed more fully below, the Supreme Court in Bruen held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." Id. at 2122. It also struck down New York's gun permitting scheme as unconstitutional because it required an applicant to show "proper cause" for carrying a handgun publicly. Id. at 2156. New York's "proper cause" standard was similar

---

See Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (holding that a suit against a state official in his official capacity is a suit against the official's office, not the individual).

to Maryland's prior "good and substantial reason" permitting standard, so <u>Bruen</u> called into question that aspect of the State's permitting scheme. (<u>See</u> <u>Novotny</u>, Defs.' Mem. L. Supp. Mot. Dismiss Opp'n Pls.' Mot. Prelim. Inj. ["Opp'n Novotny Mot."] at 8, ECF No. 36-1).[2] Indeed, the Appellate Court of Maryland later concluded that Maryland's "good and substantial reason" standard was unconstitutional. <u>In re Rounds</u>, 279 A.3d 1048, 1052 (Md.Ct.Spec.App. 2022).

In the 2023 legislative session, Maryland's General Assembly enacted laws to change the State firearm permitting process, <u>see</u> 2023 Md. Laws ch. 651 (to be codified at Md. Code. Ann. (2023), Pub. Safety § 5-133(b)(3)), and SB 1, which places restrictions on areas in which guns may be carried, even with a permit. First, SB 1 identifies three categories of statutorily-defined locations where individuals are prohibited from carrying: (1) an "area for children and vulnerable individuals," (2) a "government or public infrastructure area," and (3) a "special purpose area." 2023 Md. Laws ch. 680 (to be codified at CR §§ 4-111(c)-(e)). Certain exceptions apply, such as for active or retired law enforcement, private property owners with authorized security, and individuals who transport a firearm inside a motor vehicle, as long as they either have a public carry permit or lock the firearm in a container. 2023 Md. Laws ch. 680 (to be codified at CR § 6-411(b)).

An "area for children and vulnerable individuals" relates generally to daycare facilities, private schools, and medical facilities. It is statutorily defined as: (1) "a preschool or prekindergarten facility or the grounds of the facility," (2) "a private primary or

---

[2] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

3

secondary school or the grounds of the school," and (3) "a health care facility," which is defined to include hospitals, ambulatory surgical centers, and facilities that are "organized primarily to help in the rehabilitation of disabled individuals." 2023 Md. Laws ch. 680 (to be codified at CR § 4-111(a)(2)).

A "government or public infrastructure area" generally relates to government buildings, buildings on college and university campuses, polling places, and power plants. It is statutorily defined as:

> (i) a building or any part of a building owned or leased by a unit of State or local government; (ii) a building of a public or private institution of higher education, as defined in § 10-101 of the Education Article; (iii) a location that is currently being used as a polling place in accordance with [the Election Law Article]; (iv) an electric plant or electric storage facility . . .; (v) a gas plant . . .; or (vi) a nuclear power plant facility.

2023 Md. Laws ch. 680 (to be codified at CR § 4-111(a)(4)).

A "special purpose area" relates generally to certain places where the public gathers for entertainment, educational, or other collective social pursuits. It is statutorily defined as "(i) a location licensed to sell or dispense alcohol or cannabis for on-site consumption; (ii) a stadium; (iii) a museum; (iv) an amusement park; (v) a racetrack; or (vi) a video lottery facility [casino] . . . " 2023 Md. Laws ch. 680 (to be codified at CR § 4-111(a)(8)).

Finally, SB 1 prohibits individuals from entering buildings on private property while carrying a firearm without first obtaining permission to do so (the "private building consent rule"). 2023 Md. Laws ch. 680 (to be codified at CR § 6-411). The manner in which permission may be expressed or obtained depends on whether the building at issue is a dwelling. SB 1 provides that an individual carrying a firearm "may not enter or trespass in

the dwelling of another unless the owner or the owner's agent has given express permission, either to the person or to the public generally, to wear, carry, or transport a firearm inside the dwelling." 2023 Md. Laws ch. 680 (to be codified at CR § 6-411(c)).

With regard to all other private property, an individual carrying a firearm may not enter or trespass on such property unless the owner or the owner's agent (1) "has posted a clear and conspicuous sign indicating that it is permissible to" carry a firearm on the property, or (2) "has given the person express permission" to carry a firearm on the property. 2023 Md. Laws ch. 680 (to be codified at CR § 6-411(d)).

Separate from SB 1, Maryland also has firearm restrictions in the following locations:

- In State parks, State forests, and Chesapeake Forest Lands. COMAR 08.07.06.04 (State parks), 08.07.01.04 (State forests), and 08.01.07.14 (Chesapeake Forest Lands).

- On public transit owned or controlled by the Maryland Mass Transit Administration or operated by a private company under contract to the Administration. Md. Code Ann., Transp. § 7-705(b)(6).

- At welcome centers, rest areas, scenic overlooks, roadside picnic areas, and other public use areas within interstate and State highway rights-of-way. COMAR 11.04.07.01, 11.04.07.12.

- On the grounds of public school property. CR § 4-102(b).

- On property of state public buildings, improvements, grounds, and multiservice centers under the jurisdiction of the Department of General Services. COMAR 04.05.01.01, 04.05.01.03.

- In the Camden Yards Sports Complex. COMAR 14.25.01.01(B)(14), 14.25.02.06.

- In a casino. COMAR 36.03.10.48.

- At a demonstration in a public place (or in a vehicle that is within 1,000 feet of a demonstration in a public place) after being informed by a law enforcement officer that a demonstration is occurring and being ordered to leave the area until the individual disposes of the firearm. CR § 4-208(b)(2).

## B.    **The Parties & Procedural History**

On May 16, 2023, two lawsuits were filed challenging SB 1 and the other related firearm regulations set forth above. Kipke Plaintiffs filed the first lawsuit. (Kipke, ECF No. 1). Kipke is a Maryland resident, and she owns and operates Mrs. Kipke's Secure Gun Storage. (Kipke, Compl. ¶ 9, ECF No. 1). Kipke also has a carry permit, and she wishes to carry a handgun outside her home for self-defense. (Id. ¶ 10). The MSRPA is an association dedicated to defending the Second Amendment rights of law-abiding Maryland residents. (Id. ¶ 14). It alleges that SB 1 and other State regulations compromise its "central mission" and the rights of its members. (Id. ¶¶ 15–16). Kipke Plaintiffs allege Kipke and at least one member of the MSRPA "could and would, but for reasonable fear of prosecution . . . exercise their right to carry a handgun for self-defense" in the locations prohibited by SB 1 and Maryland law. (Id. ¶¶ 12, 17). Additionally, Kipke Plaintiffs would like to allow individuals to possess firearms on their property without posting signage or giving express permission. (Id. ¶¶ 13, 18).

Novotny Plaintiffs brought the second lawsuit. (Novotny, ECF No. 1). Novotny, Burke, and Rossberg are Maryland residents with carry permits who wish to carry handguns in locations prohibited by SB 1 and Maryland law. (Novotny, Compl. ¶¶ 22–26, ECF No. 1). Maryland Shall Issue and Firearms Policy Coalition are nonprofit

organizations, and the Second Amendment Foundation is a nonprofit educational foundation. (Id. ¶¶ 27–31). They are dedicated to the advancement of gun ownership rights. (Id. ¶¶ 27–31). Like the Kipke Plaintiffs, the Novotny Plaintiffs claim that SB 1 and Maryland law infringe on their Second Amendment rights and prevent them from carrying firearms in certain locations. (See id. ¶¶ 22–31).

Kipke Plaintiffs make the following claims under 42 U.S.C. § 1983 to challenge the constitutionality of SB 1 and other Maryland firearm regulations: (1) Second and Fourteenth Amendments violations due to restrictions on carrying firearms in State parks, State forests, State highway rest areas, mass transit facilities, public school property, the grounds of preschools or prekindergarten facilities, museums, the Camden Yards Sports Complex, stadiums, healthcare facilities, government buildings, locations selling alcohol, amusement parks, racetracks, casinos, the private building consent rule, and demonstrations in public places (Count I); a First and Fourteenth Amendment violation due to the private building consent rule (Count II); a Second and Fourteenth Amendment Due Process Clause violation due to Maryland's permit process and an applicants' need to satisfy "subjective criteria" (Count III); and a Fourteenth Amendment Equal Protection Clause violation for the State's alleged discriminatory treatment of Kipke Plaintiffs in comparison to retired law enforcement officers (Count IV). (Kipke, Compl. ¶¶ 47–68).

Novotny Plaintiffs' make a similar, but more narrow challenge of Maryland firearm restrictions—their Complaint contains several of the same claims as Count I of the Kipke Complaint. They allege that Maryland cannot restrict firearms in the following locations: healthcare facilities, locations selling alcohol, museums, and private property without the

owner's consent (Count I); mass transit facilities (Count II);  and State parks, State forests, and State Chesapeake forest lands (Count III). (Novotny, Compl. ¶¶ 45–57).

Because of the complete overlap between Novotny Plaintiffs' claims and Count I of the Kipke Complaint, the Court consolidated the two cases on July 13, 2023. (Kipke, ECF No. 15). Prior to consolidation, Novotny Plaintiffs filed a Motion for Preliminary Injunction. (Novotny, ECF No. 24). They seek to enjoin enforcement of the firearm restrictions listed in their Complaint. (Novotny, Mot. Prelim. Inj. at 1, ECF No. 24). State Defendants filed a Motion to Dismiss and Opposition to Preliminary Injunction on June 28, 2023. (Novotny, ECF No. 36). Novotny Plaintiffs filed a Reply to State Defendants' Opposition and an Opposition to State Defendants' Motion to Dismiss on July 12, 2023. (Novotny, ECF No. 38). State Defendants filed a Reply in Support of their Motion to Dismiss on August 2, 2023. (Kipke, ECF No. 22).

In the meantime, on July 20, 2023, Novotny Plaintiffs filed a Motion for Summary Judgment. (Kipke, ECF No. 18). State Defendants filed a Cross Motion for Summary Judgment and Opposition to Novotny Plaintiffs' Motion for Summary Judgment on August 3, 2023. (Kipke, ECF No. 23). On August 11, 2023, Novotny Plaintiffs filed a Reply in Support of their Motion for Summary Judgment and an Opposition to State Defendants' Motion for Summary Judgment. (ECF No. 26).

In the Kipke case, State Defendants filed an Answer on June 30, 2023. (Kipke, ECF No. 11). Kipke Plaintiffs filed a Motion for Preliminary Injunction (Kipke, ECF No. 12) and a Motion for Summary Judgment (Kipke, ECF No. 13) on July 3, 2023. On July 28, 2023, State Defendants filed a Cross Motion for Summary Judgment and Opposition to

Kipke Plaintiffs' Motion for Preliminary Injunction. (Kipke, ECF No. 21). On August 11, 2023, Kipke Plaintiffs filed a Reply in Support of their Motion for Summary Judgment, Response in Opposition to State Defendants' Cross Motion for Summary Judgment, and Reply in Support of their Motion for Preliminary Injunction. (ECF No. 29). State Defendants filed a Reply in support of their Cross Motion for Summary Judgment on September 8, 2023.[3] (ECF No. 30).

## II.    DISCUSSION

### A.    Standard of Review

"A preliminary injunction is an 'extraordinary and drastic remedy.'" See Munaf v. Geren, 553 U.S. 674, 689–90 (2008) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2948, at 129 (2d ed. 1995)). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir. 2009). A moving party must satisfy each requirement as articulated. Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013).

---

[3] Both State Defendants and Novotny Plaintiffs request that the Court hold a hearing and consolidate the Motions for Preliminary Injunction with a trial on the merits under Rule 65. (See Pls.' Reply Mem. Supp. Mot. Prelim. Inj. ["Novotny Pls.' Reply"] at 10, ECF No. 38). As stated above, the Court finds that no hearing is necessary, and it will not consider the dispositive motions at this time.

Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22.

**B.    Analysis**

### 1.  Controlling considerations under Bruen

In Bruen, the Supreme Court held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 142 S.Ct. at 2122. Consistent with its prior decision in District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Id. at 2126. If the plaintiff's conduct is presumptively protected, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Id. at 2130. The Court held that the examination of a firearm law's constitutionality would end with this historical analysis, thereby rejecting the two-step test that courts previously applied. Id. at 2127. Under that two-step test, courts would first perform the historical inquiry, followed by a means-end analysis under strict or intermediate scrutiny to assess whether the government's interest justified the restriction. Id. at 2127–29.

The historical analysis required by Bruen considers whether there is "'historical precedent' from before, during, and even after the founding" that "evinces a comparable tradition of regulation." Id. at 2131–32 (quoting Heller, 554 U.S. at 631). The Supreme Court recognized that certain cases would present "straightforward" applications of historical analysis, and that other "modern regulations that were unimaginable at the

10

founding" would require a more "nuanced approach." See id. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy." Id. at 2132. The Supreme Court provided two primary metrics to determine whether a modern regulation is "relevantly similar" to a historical regulation: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Id. at 2132–33. "[C]entral" to this inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." Id. (quoting McDonald v. City of Chicago, 561 U.S. 742, 767 (2010). "[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." Id. at 2133. Although "courts should not 'uphold every modern law that remotely resembles a historical analogue,' . . . analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin." Id. (quoting Drummond v. Robinson, 9 F.4th 217, 226 (3d Cir. 2021)). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." Id.

The Supreme Court then explained that courts may analogize regulations of firearms in certain locations to "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" Id. (quoting Heller, 554 U.S. at 626). The Court declined to "comprehensively define 'sensitive places,'" but it also listed legislative assemblies, polling places, and courthouses as belonging to that category. Id.

11

The Supreme Court further stated that it is "settled" that carrying could be prohibited consistent with the Second Amendment in those locations. Id.

Novotny Plaintiffs argue that the Supreme Court only named legislative assemblies, polling places, and courthouses as examples of sensitive places. (Novotny, Mem. Supp. Pls.' Mot Prelim. Inj. ["Novotny Pls.' Mot."] at 21–22, ECF No. 24-1). They further argue that these sensitive places are defined by "the presence of comprehensive, state-provided security that rendered the need for armed self-defense unnecessary." (Novotny Pls.' Reply at 8). Thus, according to Novotny Plaintiffs, "[t]o draw a valid analogy to 'those historical regulations,' . . . the State must show that any new purportedly sensitive place where it seeks to restrict firearm-carry shares that characteristic." (Id. (quoting Bruen, 142 S.Ct. at 2133)).

Novotny Plaintiffs' strained reading of the sensitive-places doctrine is unsupported by Bruen or any other authority. They claim that the Supreme Court did not include schools or government buildings among the enumerated sensitive places, but the Court expressly adopted Heller's prior identification of those locations as sensitive places. See Bruen, 142 S.Ct. at 2133.[4] Although the Supreme Court in Bruen refused to find that the entirety of Manhattan was a sensitive place simply because it was crowded and protected by police,

---

[4] There is no indication that Bruen disturbed any of the Court's conclusions in Heller. See Bruen, 142 S.Ct. at 2122 ("We too agree, and now hold, consistent with Heller and McDonald, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home."); id. at 2157 ("Nor have we disturbed anything that we said in Heller or McDonald v. Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), about restrictions that may be imposed on the possession or carrying of guns.") (Alito, J., concurring).

id. at 2134, the Court did not comprehensively define sensitive places, id. at 2133. The

Supreme Court merely listed schools, government buildings, legislative assemblies, polling

places, and courthouses as "settled" examples, and invited courts to "use analogies to those

historical regulations of 'sensitive places' to determine that modern regulations prohibiting

the carry of firearms in new and analogous sensitive places are constitutionally

permissible." Id. (emphasis in original). Accordingly, because Bruen conclusively named

schools among the other examples of sensitive places, Novotny Plaintiffs' argument that

sensitive places are limited to buildings with comprehensive, state-provided security is

baseless.

After explaining that Courts could analogize to historical sensitive places, the

Supreme Court provided guidance regarding the relevant time period for historical sources:

> Constitutional rights are enshrined with the scope they were
> understood to have when the people adopted them." Heller,
> 554 U.S. at 634–635, 128 S.Ct. 2783 (emphasis added). The
> Second Amendment was adopted in 1791; the Fourteenth in
> 1868. Historical evidence that long predates either date may
> not illuminate the scope of the right if linguistic or legal
> conventions changed in the intervening years.

Id. at 2136. The Supreme Court left open the question of whether "courts should primarily

rely on the prevailing understanding of an individual right when the Fourteenth

Amendment was ratified in 1868 when defining its scope." Id. at 2138 ("We need not

address this issue today because, as we explain below, the public understanding of the right

to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with

respect to public carry."). In Maryland Shall Issue, Inc. v. Montgomery County, this Court

concluded that "historical sources from the time period of the ratification of the Fourteenth

Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as applied to the states by the Fourteenth Amendment." No. TDC-21-1736, 2023 WL 4373260, at *8 (D.Md. July 6, 2023), appeal docketed, No. 23-1719 (4th Cir. July 10, 2023) (citing Bruen, 142 S.Ct. at 2138).

Plaintiffs argue that this Court erred in considering historical regulations around the ratification of the Fourteenth Amendment. (Novotny Pls.' Reply at 17; Kipke, Reply Supp. Pls.' Mot. Prelim. Inj. ["Kipke Pls.' Reply"] at 37, ECF No. 29). Novotny Plaintiffs argue that the Fourth Circuit has held that 1791, the year the Second Amendment was ratified, is "the critical year for determining the amendment's historical meaning." (Novotny Pls.' Reply at 17 (quoting Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives, 5 F.4th 407, 419 (4th Cir.), as amended (July 15, 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021), cert. denied sub nom., Marshall v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 142 S.Ct. 1447 (2022)). Novotny Plaintiffs recognize that Hirschfeld was vacated and can thus serve only as persuasive authority, not binding precedent. (Id. at 17 n.1). Further, the Supreme Court expressly declined to find that historical evidence from the ratification of the Second Amendment could not be considered. Bruen, 142 S.Ct. at 2138. Accordingly, the Court agrees with the logic in Maryland Shall Issue and will thus consider historical evidence from ratification of the Fourteenth Amendment in 1868.

### 2.  Likelihood of Success on the Merits

The first requirement of a motion for preliminary injunction is that the moving party demonstrate a likelihood of success on the merits. Winter, 555 U.S. at 20. To show a likelihood of success on the merits in the context of the constitutionality of firearm

regulations, plaintiffs must show that their conduct is covered by the plain text of the Second Amendment. See Bruen, 142 S.Ct. at 2126. If plaintiffs succeed, the government must then demonstrate that the regulations are consistent with "the Nation's historical tradition of firearm regulation." Id. at 2130.

As a preliminary matter, the Court notes that there is no dispute that Plaintiffs' conduct is covered by the plain text of the Second Amendment. The Second Amendment protects the individual's right to carry a gun for self-defense outside the home, id. at 2122, and Plaintiffs wish to exercise that right in locations where Maryland law prohibits firearms. Accordingly, the Court turns to whether State Defendants can establish that the challenged provisions are consistent with historical regulation.

The Court will analyze each restriction separately. It will start with the restrictions challenged by all Plaintiffs, which are the carry restrictions in: museums; health care facilities; State parks, State forests, and Chesapeake Forest Lands; mass transit facilities; locations selling alcohol; and private property. (Novotny Pls.' Mot at 8; Kipke, Pls.' Mem. Supp. Mot. Prelim Inj. ["Kipke Pls.' Mot."] at 10–12, ECF No. 12-1). It will then move to the remaining restrictions challenged by the Kipke Plaintiffs, which are: school grounds; government buildings; stadiums, amusement parks, casinos, and racetracks; public demonstrations; and State highway rest areas.[5] (Kipke Pls.' Mot. at 10–12).

---

[5] After State Defendants explained that Maryland law only prohibits displaying a firearm at a highway rest area, not carrying a concealed handgun, Kipke Plaintiffs withdrew their challenge to COMAR 11.04.07.12. (Opp'n Kipke Pls.' Mot. Prelim. Inj. ["Opp'n Kipke Mot."] at 60–61, ECF No. 21-1; Kipke Pls.' Reply. at 34). Accordingly, the Court will not determine whether to preliminarily enjoin enforcement of Maryland's firearm restrictions in State highway rest areas.

### a.    **Firearm Carry Restrictions Challenged By All Plaintiffs**

### i.    **Museums**

Plaintiffs first challenge SB 1's prohibition on carrying firearms at museums. They argue that firearm violence and museums existed at the time of the founding, but that guns were not banned in museums. (See Novotny Pls.' Mot. at 26–27, 34–35; Kipke Pls.' Mot. at 28–29). Thus, according to Plaintiffs, SB 1 cannot be consistent with historical regulations. (Id.). State Defendants respond that museums are analogous to schools, and therefore they are sensitive places "outside of the purview of the Second Amendment." (Opp'n Novotny Mot. at 37). State Defendants also argue that the restrictions in museums are supported by historical regulations related to "place[s] where persons are assembled for educational, literary, or scientific purposes." (Id. at 37–38).

Plaintiffs' challenge on this point is unlikely to succeed. First, as set forth above, Bruen affirmed that schools are sensitive places, and museums are like schools because they serve an educational purpose and are often geared towards children. (See e.g., Decl. Anita Kassof ¶¶ 4–7, ECF No. 36-8 (noting that the Baltimore Museum of Industry's ["BMI"] exhibits are designed for children and stating that the museum hosts over 200 children at a time); (Mark J. Potter Decl. ¶ 6, ECF No. 36-9 (explaining that the Maryland Science Center hosts as many as 2,000 children at once). Further, because Maryland's restrictions on firearms in museums can be justified by the protection of children as a vulnerable population, regulations banning firearms in museums are similar to those in schools.

Second, SB 1's prohibition on carrying in museums is supported by a representative number of historical statutes that demonstrate a historical tradition of firearm regulation in places of gathering for education, literary, or scientific purposes. (See Gen. L. Tx., ch. 46 § 1 (1870), ECF No. 36-17); Gen. L. Mo., Crim. § 1 (1874), ECF No. 36-18); Sess. L. Az. § 3 (1889), ECF No. 36-19); Ok. Stat. Crim., ch. 25 §§ 7–10 (1890), ECF No. 36-20; Mt. Gen. L, ch. 35 § 3 (1903), ECF No. 36-22). These historical provisions imposed a similar burden to SB 1 on the right to bear arms, and they are comparably justified by the need to prevent disruption of educational, literary, or scientific purposes.[6] See Md. Shall Issue, Inc., 2023 WL 4373260, at *12 (denying motion for preliminary injunction as to carrying restrictions in libraries because libraries are "places for gathering for literary or educational purposes"). Accordingly, the Court finds that, at this stage in the litigation, Plaintiffs have failed to demonstrate a clear likelihood of success on the merits as to their challenge to SB 1's museum restriction.

---

[6] The Court acknowledges that Bruen identified several jurisdictions, including Arizona, New Mexico, Idaho, and Oklahoma, as comprising of less than 1% of the United States' population in 1890, 142 S.Ct. at 2154, and that the Supreme Court cautioned against using outlier jurisdictions or statutes as representative historical analogues, id. at 2133. Nevertheless, Bruen did not designate Texas as an outlier jurisdiction—it merely found that two firearm bans not at issue here were unusually broad compared to other State regulations at the time. Id. at 2153.

In the instant case, although State Defendants do cite some statutes from outlier jurisdictions, they also cite Texas and Missouri statutes prohibiting firearms where persons are assembled for education, literary, or scientific purposes. (See Opp'n Novotny Mot. at 37–38 (citing Gen. L. Tx., ch. 46 § 1; Gen. L. MO, Crim. § 1)). Further, the instant case can be distinguished from Bruen because the State Defendants here have successfully analogized museums to schools as sensitive places. See Bruen, 142 S.Ct. at 2134 (rejecting the State of New York's argument that the island of Manhattan is a sensitive place).

### ii.    Health Care Facilities

Similarly, Plaintiffs have not demonstrated a clear likelihood of success regarding SB 1's prohibition on carrying firearms at health care facilities because health care facilities are sensitive places, and their regulation is similar to historical analogues that prohibited firearms in places where people assembled for scientific purposes. Plaintiffs argue that State Defendants cannot point to similar historical regulations, and there is "no doubt the medical profession existed in 18th and 19th century America, and so too did firearm violence." (See Novotny Pls.' Mot. at 28 (internal citation removed)); Kipke Pls.' Mot at 30–31). Plaintiffs' argument is unconvincing because health care facilities, like schools, serve a vulnerable population, and their regulation is justified by the protection of that population.

Further, as discussed above, there are representative historical statutes aimed at protecting places for educational, literary, or scientific purposes, and health care facilities clearly advance a scientific purpose. While these statutes do not expressly prohibit firearms in health care facilities, Bruen does not require historical statutes to be a "twin" or "dead ringer" for the modern regulation. 142 S.Ct. at 2133. Additionally, as this Court explained in Maryland Shall Issue, "hospitals did not exist in their modern form at the time of the ratification of the Second or Fourteenth Amendments," 2023 WL 4373260, at *14, and thus a more nuanced analysis involving other historical analogues is appropriate. Consequently, the Court concludes that Plaintiffs are unlikely to succeed as to their challenge of SB 1's prohibition on carrying guns in health care facilities.

iii.    **State Parks, State Forests, and Chesapeake Forest Lands**

Plaintiffs next argue that SB 1's ban of firearms in State parks, forests, and Chesapeake Forest Lands violates their Second Amendment rights. They contend that the ban covers "thousands of acres of land" without justification, and that there are no comparable historical regulations, despite the existence of public parks at the founding. (Novotny Pls.' Mot. at 31–32; Kipke Pls.' Mot. at 23–25). State Defendants make three arguments in response: (1) parks are State property, and thus the state, as the proprietor, may restrict firearms, (2) parks are sensitive places, and (3) SB 1's restriction on firearms in parks is consistent with historical firearm regulation. (Opp'n Novotny Mot. at 44–48). The Court will address each of these arguments.

As to the State-as-proprietor argument, State Defendants correctly point out private property owners are unrestricted by the Second Amendment, and they may choose to prohibit firearms. See Cedar Point Nursery v. Hassid, 141 S.Ct. 2063, 2072 (2021) (explaining that the right to exclude is "'one of the most essential sticks in the bundle of rights that are commonly characterized as property'"). Further, it is also clear that when the State acts as a market participant and proprietor by operating a business, it typically has the same rights as a private proprietor to manage its internal affairs. See Reeves, Inc. v. Stake, 447 U.S. 429, 445–46 (1980) (holding that a State-operated cement plant was not subject to the Commerce Clause). However, States acting in their proprietary capacities do not necessarily enjoy "absolute freedom" from constitutional constraints. See United States v. Kokinda, 497 U.S. 720, 725–26 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints,

19

as does a private business[.]"). Indeed, <u>Bruen</u> did not opine on a State's right as a property owner to exclude firearms, so <u>Bruen</u>'s historical test for determining whether gun restrictions are constitutional did not take this issue into account. Consequently, the Court concludes that even if the State regulates firearms in its proprietary capacity, State Defendants must still show that the laws are consistent with historical regulation, or they must successfully analogize the restricted location to an established sensitive place. <u>See</u> <u>Bruen</u>, 142 S.Ct. at 2132 (describing required historical analysis).

Here, State Defendants have neither shown that Maryland acts as a proprietor in regulating firearms in its parks, nor that parks are sensitive places. State Defendants have, however, provided a sufficient historical record to show that SB 1's park restrictions are consistent with historical regulations.

First, although the State owns the property in its parks, parks are not businesses, and State Defendants have not established Maryland acts as a market participant by owning parks open to the public. <u>See</u> <u>Reeves</u>, 447 U.S. at 445–46 (discussing South Dakota's participation in the free market as the operator of a cement plant). State Defendants have also failed to show that parks are sensitive places. As Plaintiffs point out, Maryland's parks cover thousands of miles, and while children surely visit these parks for education or recreation, State Defendants do not allege that the parks are primarily geared towards children or any other vulnerable population. Additionally, the Court notes that <u>Bruen</u> named just a few examples of sensitive places, and the Court is not convinced that parks are sufficiently analogous to schools, government buildings, legislative assemblies, polling places, or courthouses.

20

Nevertheless, State Defendants have shown that SB 1's restriction on firearms in parks is consistent with historical firearm regulation. Very few public parks existed at the time the Second Amendment was ratified, and those that did exist were typically located in cities. (See Saul Cornell Decl. ¶¶ 54–56, ECF No. 36-3). Plaintiffs thus argue that because these parks existed and were not regulated, there is no historical tradition of regulation in parks. Their argument misses the mark for several reasons. First, Plaintiffs point to just a handful of parks in existence at the time of the founding such as Boston Common and New York's City Hall Park. (Novotny Pls.' Mot. at 31–32; Kipke Pls.' Mot. at 23–24). The Court cannot infer that parks were historically not regulated from so few places. Further, not only were there few parks at that time, but these parks did not resemble the modern, expansive State and federal park system that the United States has today. Boston Common, for example, "was used primarily as a pasture, a place of execution, and site for the militia to muster and drill." (Cornell Decl. ¶ 54). Notably, it was not completely unregulated, and militia were prohibited from "coming to muster with a loaded firearm." (Id.).

The historical record further shows that as States and cities created more parks, they also imposed firearm regulations. Around the time the Fourteenth Amendment was ratified, several jurisdictions prohibited firearms in public parks, including: New York City (Mins. Proceedings Brd. Comm'rs (1858) at 3–5, ECF No. 36-37); Philadelphia (Gen. L. Pa., § 21, (1868), ECF No. 36-39); Chicago (L. Chicago, ch. 31 § 6 (1873), ECF No.36-41); St. Louis (St. Louis Ordinance, Art. 11 § 3 (1881), ECF No. 36-46); and Boston (Park Ordinances, Brd. Comm'rs § 3 (1886), ECF No. 36-49). See Md. Shall Issue, 2023 WL 4373260 at *11

(discussing historical regulations in public parks); (Cornell Decl. at ¶ 56) (same). Novotny Plaintiffs argue that these are urban parks, so there is no precedent for a ban of all state parks. (Novotny Pls.' Reply at 39–40). However, rural, more isolated state parks were not established in significant numbers until after the ratification of the Fourteenth Amendment, and thus the Court will not infer a lack of regulation from the absence of laws governing rural state parks at that time. (See Cornell Decl. ¶ 57,). Lastly, the Court finds that SB 1's public park ban imposes the same burden on the right to armed self-defense as these historical statutes, and the laws are comparably justified by the need for public safety.[7] Accordingly, the Court finds that Plaintiffs are unlikely to succeed in their challenge of SB 1's prohibition on firearms in parks.

### iv.    Mass Transit Facilities

Plaintiffs challenge Maryland's ban of firearms in mass transit facilities and in vehicles owned by the State. They argue that firearm violence existed at the founding, as did transportation, and that transportation was not regulated. (Novotny Pls.'s Mot. at 29–30; Kipke Pls.' Mot. at 25–27). State Defendants respond that the State acts in its proprietary capacity in providing transportation, and therefore the State is free to restrict firearms. (Opp'n Novotny Mot. at 35–36). State Defendants further argue that mass transit facilities are sensitive places. (Id. at 36–37). The Court agrees with State Defendants.

---

[7] The need to advance public safety may be less apparent in rural, isolated areas. The Court also acknowledges that when it denied the motion for preliminary injunction in Maryland Shall Issue as to the ban on firearms in Montgomery County parks, the Court specifically noted that Montgomery County was densely populated. 2023 WL 4373260, at *11. Nevertheless, even isolated parks can draw large crowds, and the public safety justification remains the same.

While there is no doubt that transportation existed at the time of the founding, almost all transportation was provided by private companies. (Decl. Dr. Brennan Rivas ¶ 13, ECF No. 36-5). Plaintiffs point to only one public ferry in South Carolina that was established as early as 1725. (Novotny Pls.'s Mot. at 29; Kipke Pls.' Mot. at 25). As explained above in the Court's analysis of the small number of public parks in existence in the eighteenth century, the Court cannot infer a lack of regulation from the absence of public transportation regulations at that time. Rather, because State-operated transit barely existed at the founding, the Court must take a more nuanced approach to the historical analysis. See Bruen, 142 S.Ct. at 2132 (requiring a "nuanced approach" where modern concerns were not contemplated at the founding).

This approach indicates that mass transit facilities are sensitive places because they are analogous to both schools and government buildings. Like schools, mass transit facilities are crowded spaces that serve vulnerable populations like children and disabled people. Additionally, some mass transit facilities, such as bus, train, or subway stations, could also be categorized as government buildings, which are established sensitive places. The Court also notes that in providing transportation services, Maryland is a market participant, and thus it may have the ability to exclude firearms on its property, just as a private entity engaged in transportation services could. See Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R. I., Inc., 507 U.S. 218, 231–32 (1993) (explaining that a State may "manage its own property when pursuing a purely proprietary interest . . . where analogous private conduct would be permitted"). As explained above, the Supreme Court has not provided guidance on the State's powers as a

proprietor or property owner in the context of the Second Amendment, and thus the Court relies on the identification of mass transit facilities as sensitive places in its determination that Plaintiffs are unlikely to succeed in their challenge of Maryland's mass transit ban.

### v.    Locations Selling Alcohol

Plaintiffs also claim that SB 1's ban on firearms in locations licensed to sell alcohol violates the Second Amendment. Plaintiffs argue that such locations, like bars and restaurants, as well as firearm violence, existed at the time of the founding, and that there is no corresponding historical tradition of firearm regulation. (Novotny Pls.' Mot. at 25–26; Kipke Pls.' Mot. at 22–23). State Defendants respond that locations selling alcohol are sensitive places because they are crowded and serve vulnerable people. (Opp'n Novotny Mot. at 38–39). Further, State Defendants claim that the firearm ban in these locations is consistent with historical regulations. (Id.). They cite an 1890 Oklahoma law banning firearms where liquor is sold, (Ok. Stat. Crim., ch. 25 § 7, ECF No. 36-20), and several laws prohibiting intoxicated people from carrying, (see Patrick J. Charles Decl. ¶ 26, ECF No. 36-4).

At bottom, the Court agrees with Plaintiffs and finds that they have shown a clear likelihood of success in their challenge of SB 1's firearm ban in locations selling alcohol. First, bars and restaurants are not analogous to any established sensitive place. While it is true that such businesses can attract crowds and there are risks associated with alcohol consumption, the Court is unconvinced that intoxicated people qualify as a vulnerable population, like children or hospitalized individuals. Additionally, while some crowded spaces are considered sensitive places, Bruen rejected the argument that Manhattan was

sensitive "simply because it is crowded and protected generally by the New York City Police Department." 142 S.Ct. at 2134. Applying the same logic here, the Court finds that locations selling alcohol cannot be designated as sensitive places merely because they are crowded.

Additionally, the Court concludes that SB 1's restriction on locations selling alcohol is not consistent with historical regulations. The Supreme Court has already identified Oklahoma as a non-representative jurisdiction, Bruen, 142 S.Ct. at 2154, and thus the Court will not interpret the Oklahoma statute as evincing the nation's tradition of firearm regulation. As for the other statutes cited by State Defendants, they are not similar to SB 1's restriction on locations selling alcohol because they do not impose a "comparable burden on the right of armed self-defense." See id. at 2133. Those historical statutes prevented only intoxicated individuals from carrying firearms, while SB 1 bans all people present at locations selling alcohol from carrying. Novotny Plaintiffs have represented that they "have no objection to prohibiting intoxicated people from carrying firearms." (Novotny Pls.' Reply at 35–36). Indeed, existing Maryland law already bans carrying a firearm while under the influence of alcohol or drugs. COMAR 29.03.02.02. But SB 1 does not mirror that more narrow prohibition, and because it broadly prevents anyone at a location selling alcohol from carrying, Plaintiffs are likely to succeed on the merits in their Second Amendment challenge related to those locations.

### vi.    Private Building Consent Rule

### A.    <u>Standing</u>

As a threshold matter related to Plaintiffs' challenge of SB 1's private building consent rule, State Defendants argue that Plaintiffs lack standing. (Opp'n Novotny Mot. at 49). SB 1 prohibits carrying a firearm into private property unless the owner has posted clear and conspicuous signage or given express permission allowing individuals to carry a firearm into that building. 2023 Md. Laws ch. 680 (to be codified at CR § 6-411(c)). Plaintiffs allege that the private building consent rule injures them because were it not for the rule, they would carry firearms into private property where no signage or consent is provided, such as grocery stores, drug stores, and gas stations. (See <u>Novotny</u>, Compl. ¶ 22; <u>Kipke</u>, Compl. ¶ 40).

Article III of the United States Constitution limits the jurisdiction of federal courts to "cases" and "controversies," so plaintiffs in federal civil actions must demonstrate standing to assert their claims. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." <u>Id.</u> at 560–61 (citations omitted). An injury in fact must be "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 339 (2016) (quoting <u>Lujan</u>, 504 U.S. at 560). A plaintiff can satisfy the injury-in-fact requirement by alleging "'an intention to engage in a course of conduct arguably affected

26

with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 159 (2014) (quoting <u>Babbitt v. Farm Workers</u>, 442 U.S. 289, 298 (1979)).

State Defendants argue that Plaintiffs cannot establish any of the three elements. First, they contend that Plaintiffs have not suffered an injury in fact because their claim is "based on the premise that there exists some private building (that plaintiffs wish to enter armed) for which the owner both (1) consents to individuals entering their building armed, and (2) for whatever reason will decline to express that consent through a sign (or other express permission)." (Opp'n Novotny Mot. at 49–50). Plaintiffs respond that they have suffered an injury in fact because:

> [They] currently do carry firearms into private buildings open to the public where no sign either expresses or denies consent to that act, but will be forced to cease doing so when [SB 1] takes effect . . . Moreover, the need to ensure consent before engaging in constitutionally protected conduct is itself a burden on that conduct and thus an injury in fact.

(Novotny Pls.' Reply. at 41–42; <u>see also</u> Kipke Pls.' Reply at 47–48).

The Court agrees with Plaintiffs and finds that they have suffered an injury in fact. The Second Amendment "presumptively guarantees" citizens the right to carry arms "in public for self defense." <u>Bruen</u>, 142 S.Ct. 2111, 2135 (2022). Plaintiffs have alleged that they carry firearms in privately-owned buildings that are open to the public and that do not contain signage granting consent to carry. Thus, they have expressed an intention to engage in a course of conduct affected with their Second Amendment rights, and SB 1 creates a credible threat of prosecution. <u>See</u> <u>Susan B. Anthony List</u>, 573 U.S. at 159.

Second, State Defendants argue that Plaintiffs have failed to establish traceability because any alleged injury to Plaintiffs' Second Amendment rights would be caused by the discretion of third-party property owners, not the State. (Opp'n Novotny Mot. at 50). Plaintiffs acknowledge that private property owners are not bound by the Second Amendment, so they have a right to prohibit firearms. (See Novotny Pls.' Reply at 44; Kipke Pls.' Reply at 49); Cedar Point Nursery, 141 S.Ct. at 2072. But the right to exclude does not equate to a break in the chain of constitutional causation that would create a lack of traceability to the State. To the contrary, Plaintiffs have alleged that they currently carry firearms in buildings open to the public, and that they will not be able to do so because of SB 1. The ability of private property owners to remedy Plaintiffs' injury is irrelevant, and the case law cited by State Defendants is inapposite. For example, State Defendants rely on Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 44 (1976), where the Supreme Court held that indigent patients lacked standing to challenge an IRS ruling that extended charitable tax exemptions to nonprofit hospitals that did not provide hospitalization services to patients who could not pay. Id. The Supreme Court found that the alleged harm—reduced access to hospital services—was not traceable to the IRS's ruling because it was "purely speculative" whether the denials of medical service could be traced to the IRS's "encouragement" to limit services, or if the denials instead resulted from independent hospital policy decisions. Id. at 42–43. This differs greatly from the instant case, where

Plaintiffs are prevented from carrying in certain privately owned buildings because of SB 1.[8]

Lastly, the Court finds that Plaintiffs have established redressability for similar reasons. State Defendants argue that private property owners can exclude firearms, so the injury—not being able to carry a firearm into private buildings—would not be redressed by enjoining SB 1. (Opp'n Novotny Mot. at 52). State Defendants mischaracterize Plaintiffs' injury—it is not merely the inability to carry in privately-owned buildings. Rather, their injury is the threat of prosecution for carrying firearms in places that, under prevailing law, they have previously had the presumptive right to do so absent express prohibition by the property owner. Accordingly, enjoining SB 1 would redress Plaintiffs' injury.

## B.    Historical Analysis

The Court now moves to whether SB 1's private building consent rule is consistent with historical firearm regulation.[9] State Defendants cite a 1715 Maryland colonial law that imposed criminal penalties against anyone "of evil fame, or a vagrant, or dissolute liver,

---

[8] The Court also notes that while a private property owners' right to exclude is unquestioned, SB 1 does not merely codify this longstanding right. The right to exclude presumes that individuals may carry a gun unless the property owner prohibits it—SB 1's private building consent rule does the opposite, because it presumptively bans firearms unless the property owner expressly consents.

[9] State Defendants also argue that the Second Amendment does not cover Plaintiffs' conduct in carrying firearms in privately-owned buildings. (Opp'n Novotny Mot. at 48–49). For the reasons set forth infra in the Court's discussion of standing, the Court disagrees. Again, private property owners can freely exclude firearms, but absent their prohibition, Plaintiffs have a presumptive right to carry in buildings open to the public. Accordingly, Plaintiffs' conduct related to carrying in privately owned buildings is covered by the Second Amendment.

that shall shoot, kill or hunt, or be seen to carry a gun, upon any person's land, whereon there shall be a seated plantation, without the owner's leave, having been once before warned." (Md. Acts., ch. 26 § 7 (1715), ECF No. 36-24). This statute appears to be aimed at limiting hunting and the carrying rights of criminals, not the general population, and thus it cannot serve as evidence of a historical tradition of prohibiting people from carrying on private property.

Next, State Defendants cite other eighteenth century laws from Pennsylvania, New Jersey, New York, and Massachusetts, but these statutes are similarly aimed at prohibiting hunting on another's land. (See Pa. Stat., ch. 246 § 3 (1721), ECF No. 36-25; Nj. Acts, ch. 305 § 4 (1722), ECF No. 36-26; Ny. L., ch. 1233 § 1 (1763), ECF No. 36-27; Acts. Colony Nj., § 1 (1771), ECF No. 36-28; Acts. L. Ma., ch. 28 (1789), ECF No. 36-29). Under the Bruen framework, these laws are not representative of SB 1's private building consent rule because they are not similarly justified. See Antonyuk v. Hochul, 639 F.Supp.3d 232, 340–42 (N.D.N.Y. 2022) (identifying the laws from Pennsylvania, New Jersey, and New York as "'anti-poaching laws,' aimed at preventing hunters . . . from taking game off of other people's lands").

State Defendants then cite the laws from the ratification of the Second Amendment, including statutes from Louisiana and Texas. (Acts. La., § 1 (1865), ECF No. 36-30; L. Tx., 11 Crim. Code ch. 6508(a) (1867), ECF No. 36-31). Louisiana and Texas created these laws as part of their discriminatory "Black Codes," which sought to deprive African Americans of their rights. See McDonald, 561 U.S. at 847 (Thomas, J., concurring in part and concurring in the judgment) (describing this history). The Supreme Court has

cautioned against relying on such laws, and this Court will not infer a historical tradition of regulation consistent with the private building consent rule from these statutes. See Bruen, 142 S.Ct. at 2149 (concluding that two discriminatory statutes were "surely too slender a reed on which to hang a historical tradition of restricting the right to public carry"). Further, laws primarily aimed at only one group of people do not have the same impact on the right to bear arms as the private building consent rule, which broadly bans carrying without consent in private buildings for all citizens. Nor are these laws comparably justified because their intent was to discriminate, rather than to advance public safety.

Lastly, State Defendants reference an 1893 Oregon law, which may have been aimed at hunting and is thus dissimilar to SB 1's private building consent rule. (Gen. L. Or., ch. 79 §§ 1–3, (1893), ECF No. 36-32 (prohibiting armed persons from entering another's property without permission and with a dog)). Even if this statute was not aimed at preventing poaching, the Court concludes that this single law does not evince a historical tradition of prohibiting firearms on private property absent the owner's consent. See Bruen, 142 S.Ct. at 2133 (warning against "endorsing outliers that our ancestors would never have accepted."). Accordingly, the Court finds that Plaintiffs are clearly likely to succeed in their challenge of SB 1's private building consent rule.[10]

---

[10] Kipke Plaintiffs also argue that the private building consent rule violates the First Amendment and must be enjoined for that reason. (Kipke Pls.' Mot. at 35). Because the Court has already found that Plaintiffs are likely to succeed in their claim for a violation of the Second Amendment, and will further grant the Plaintiffs' Motions as to that claim as explained below, the Court need not address the First Amendment argument.

### b.    Firearm Carry Provisions Challenged by Kipke Plaintiffs

Having determined whether Novotny and Kipke Plaintiffs' mutual claims are likely to succeed, the Court now turns to the additional claims brought by the Kipke Plaintiffs. Kipke Plaintiffs challenge firearm restrictions in the following locations: school grounds; government buildings; stadiums, racetracks, amusement parks, and casinos; and within 1,000 feet of a public demonstration. (Kipke Pls.' Mot. at 10–12).

### i.    School Grounds

First, Kipke Plaintiffs do not challenge Maryland's ban on carrying firearms inside School buildings, but they argue that the restrictions prohibiting carrying on school grounds are unconstitutional. (Id. at 31–32). Specifically, they claim that historical regulations on firearms in schools did not mention the grounds, and therefore firearms cannot be restricted there. (Id.).

The Court is not convinced. It is settled law that schools are sensitive places. Heller, 554 U.S. at 626 ("nothing in [this] opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.]"); McDonald, 561 U.S. at 786 (repeating "assurances" that schools and government buildings are sensitive places); Bruen, 142 S.Ct. at 2133 (identifying schools and government buildings as sensitive places). Kipke Plaintiffs fail to acknowledge that school grounds are plainly analogous to school buildings, and therefore the grounds may also be designated as sensitive places. See Bruen, 142 S.Ct. at 2134 (explaining that schools are sensitive places, and "courts can use analogies to those historical regulations of sensitive places to determine that modern regulations prohibiting the carry of firearms in

new and analogous sensitive places are constitutionally permissible.") (cleaned up). Like schools themselves, school grounds serve children through places like drop-off and pick-up areas, playgrounds, and recreational areas. Thus, the bans in schools and school grounds are comparably justified by vulnerable populations and public safety, and the burden on the right to self-defense is the same. Accordingly, the Kipke Plaintiffs are not likely to succeed in their challenge of Maryland's ban on carrying on school grounds.

### ii.        Government Buildings

Similarly, Kipke Plaintiffs are unlikely to succeed on the merits regarding their challenge of Maryland's ban on carrying firearms in government buildings. Government buildings are indisputably sensitive places. Heller, 554 U.S. at 626; McDonald, 561 U.S. at 786; Bruen, 142 S.Ct. at 2133. While it is true that Bruen identifies legislative assemblies, polling places, and courthouses as additional examples of sensitive places, 142 S.Ct. at 2133, nothing in that opinion, nor in Heller or McDonald, indicates that only these types of government buildings are sensitive places. On the contrary, Heller and McDonald refer only to "government buildings" generally, and Bruen expressly adopts "Heller's discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.'" Id. at 2133 (quoting Heller, 554 U.S. at 626). Consequently, the Court concludes that Kipke Plaintiffs have not demonstrated a clear likelihood of success on the merits as to their challenge of Maryland's ban on carrying in government buildings.

### iii. Stadiums, Racetracks, Amusement Parks, and Casinos

Next, Kipke Plaintiffs challenge firearm regulations in stadiums (including Camden Yards), racetracks, amusement parks, and casinos. This Court has previously upheld regulations in similar places, such as recreational facilities and multipurpose exhibition facilities, because there is a historical tradition of restricting carrying in these locations. Md. Shall Issue, 2023 WL 4373260, at *12 (citing same statutes as State Defendants in the instant case); (see Opp'n Kipke Pls.' Mot. at 48). Kipke Plaintiffs contend that Maryland Shall Issue was wrongly decided because the statutes cited by the State are not analogous to modern regulations on entertainment venues, and the Court mistakenly relied on historical sources from the ratification of the Fourteenth Amendment. (Kipke Pls.' Reply at 37).

The Court disagrees. Kipke Plaintiffs have not explained how the Court allegedly erred in its reasoning by analogy in Maryland Shall Issue, so they have not met their burden as movants to establish a clear likelihood of success on the merits. Additionally, as set forth above, Bruen did not confine historical analysis to the time period of the ratification of the Second Amendment. Bruen, 142 S.Ct. at 2136 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.") (cleaned up). In fact, the Supreme Court declined to opine on "whether courts should primarily rely" on historical evidence from the ratification of the Second or Fourteenth Amendments. Id. at 2138. Accordingly, this

Court will follow <u>Maryland Shall Issue</u> in considering historical sources from the nineteenth century. Consistent with that decision, the Court concludes that the regulations restricting firearms in stadiums, racetracks, amusement parks, and casinos are analogous to historical statutes banning them in gathering places for entertainment, and thus Kipke Plaintiffs have failed to show a likelihood of success as to that claim.

### iv.    Public Demonstrations

Lastly, Maryland law bans carrying a firearm within 1,000 feet of public demonstration after "(i) the person has been advised by a law enforcement officer that a demonstration is occurring at the public place; and (ii) the person has been ordered by the law enforcement officer to leave the area of the demonstration until the person disposes of the firearm." CR § 4-208(b)(2). As a threshold matter, State Defendants argue that Kipke Plaintiffs do not have standing to challenge this provision. State Defendants contend that there is no injury in fact because Kipke Plaintiffs' alleged injury is speculative and based on "a highly attenuated chain of possibilities." (Opp'n Kipke Mot. at 69–70).

The Court disagrees. Kipke alleges that if not for her fear of persecution, she would carry a handgun at a public demonstration and remain there after a law enforcement officer ordered her to leave. (Supp. Kipke Decl. ¶ 2, ECF No. 29-1). Thus, she has adequately alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." <u>Susan B. Anthony List</u>, 573 U.S. at 159 (quoting <u>Babbitt</u> 442 U.S. at 298). Further, she has also alleged a credible threat of persecution. Although State Defendants suggest that no individual has ever been prosecuted under the statute, (Opp'n Kipke Mot. at 71 n.47), they have also failed to

disavow prosecution, and Kipke's desired conduct is barred by the statute's plain language. Kenny v. Wilson, 885 F.3d 280, 288 (4th Cir. 2018) ("Threat of prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future") (quoting Susan B. Anthony List, 573 U.S. at 163). The Court therefore concludes that Kipke Plaintiffs have standing.[11]

As to the merits of the public demonstration claim, Kipke Plaintiffs have also demonstrated a clear likelihood of success. Just before the ratification of the Second Amendment, "six out of the thirteen original colonies required their citizens to go armed when attending . . . public assemblies." Koons v. Platkin, No. CV 22-7463 (RMB/AMD), 2023 WL 3478604, at *73 (D.N.J. May 16, 2023) (citing Heller, 554 U.S. at 601) (observing that "[m]any colonial statutes required individual arms bearing for public-safety reasons"). State Defendants cite to several nineteenth-century statutes that prohibited firearms at public assemblies. (See Opp'n Kipke Pls.' Mot. at 71). Bruen nevertheless makes it clear that "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." 142 S.Ct. at 2154.

The Court notes that it is obligated to question the constitutionality of Maryland's restriction on carrying at public demonstrations because of Bruen's narrow historical

---

[11] When there are multiple plaintiffs, the Court need only determine that there is at least one plaintiff with standing for a particular claim in order to consider the claim. Town of Chester v. Laroe Ests., Inc., 581 U.S. 433, 439 (2017). Therefore, because Kipke has standing, the Court may consider Kipke Plaintiffs' claim.

framework. If the Court were permitted to apply intermediate or even strict scrutiny to public demonstration restriction, the law would almost certainly pass constitutional muster, because it does not categorically ban all firearms at public demonstrations. Rather, it prohibits guns only in a narrow set of circumstances designed to promote public safety while preserving the right to bear arms. Even so, the Supreme Court has rejected this means-ends analysis, and this Court must conclude Kipke Plaintiffs are likely to succeed in their challenge of the public demonstration restriction.

### 3. Irreparable Harm

The Court now turns to the second element of a preliminary injunction claim: the likelihood of suffering irreparable harm in the absence of preliminary relief. Winter, 555 U.S. at 20. The deprivation of a constitutional right "unquestionably constitutes irreparable injury." Miranda v. Garland, 34 F.4th 338, 365 (4th Cir. 2022) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)). Thus, in the context of an alleged constitutional violation, the likelihood of irreparable harm necessarily depends on the likelihood of success on the merits of the claim. See id. ("Without his alleged constitutional injury, [plaintiff] has failed to show that he will suffer irreparable harm."). Accordingly, because Plaintiffs have shown a likelihood of success on the merits as to their challenges of the firearm restrictions in private property, locations selling alcohol, and within 1,000 feet of public demonstrations, they have also established irreparable harm as to those claims only.

### 4. Balance of the Equities and the Public Interest

Lastly, the Court will consider the balance of the equities and the public interest together because these factors merge when the State is the opposing party. See Nken v.

<u>Holder</u>, 556 U.S. 418, 435 (2009). State Defendants argue that the challenged firearm restrictions advance public safety and that the State is entitled to enforce its duly enacted laws. (Opp'n Kipke Mot. at 88−90). Plaintiffs respond that preserving Second Amendment rights is in the public interest and that <u>Bruen</u> rejected the State's public interest arguments. (Kipke Pls.' Reply at 45; <u>see also</u> Novotny Pls.' Mot. at 49).

Plaintiffs are correct that the public has a strong interest in upholding constitutional rights and the State is not harmed by an injunction preventing it from enforcing unconstitutional laws. <u>See</u> <u>Legend Night Club v. Miller</u>, 637 F.3d 291, 302–03 (4th Cir. 2011). Therefore, because Plaintiffs have shown a likelihood of success in their challenge to the private building consent rule and the regulations on public demonstrations and locations selling alcohol, the balance of the equities and the public interest tip in Plaintiffs' favor as to those claims, and the Court will enjoin enforcement of those provisions.

Regarding Plaintiffs' remaining claims, the Court finds that the balance of the equities and the public interest weighs against a preliminary injunction. As the Court explained in <u>Maryland Shall Issue</u>, <u>Bruen</u> prevents courts from considering the public interest, including safety concerns, only "[when] assessing whether a firearm restriction is unconstitutional under the Second Amendment." <u>Md. Shall Issue</u>, 2023 WL 4373260, at *16 (citing <u>Bruen</u>, 142 S.Ct. at 2129–30). <u>Bruen</u> did not consider whether a preliminary injunction should be granted, and thus it did not apply the test established in <u>Winter</u>, 555 U.S. at 20, which requires this Court to consider the public interest in determining whether to temporarily enjoin enforcement of a law. <u>Id.</u>

Accordingly, the Court will consider State Defendants' public interest arguments, and it finds them persuasive. The devastating effects of firearm violence on Marylanders and United States citizens are self-evident. Enjoining enforcement of the Maryland firearm restrictions that either protect sensitive places or are consistent with historical regulations would undermine the public's interest in preventing gun violence. Plaintiffs' Motions will therefore be denied as to their remaining claims.

### 5.    Dispositive Motions

Having decided to grant partial injunctive relief, the Court will deny State Defendants' Motion to Dismiss and the Motions for Summary Judgment without prejudice. (Novotny, ECF No. 36; Kipke, ECF Nos. 13, 18, 21, 23). The parties may, if they wish, refile dispositive motions after having the opportunity to supplement them and participate in discovery prior to a trial on the merits.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant Plaintiffs' Motions for Preliminary Injunction (Novotny, ECF No. 24; Kipke, ECF No. 12) in part and deny them in part. The Motions will be granted as to the claims regarding the private building consent rule and the regulations on locations selling alcohol and public demonstrations, and the Motions will be denied in all other respects. The Motion to Dismiss (Novotny, ECF No. 36) and the Motions for Summary Judgment (Kipke, ECF Nos. 13, 18, 21, 23) will be denied without prejudice. A separate Order follows.

Entered this 29th day of September, 2023.

_____/s/_____
George L. Russell, III
United States District Judge