No. 23-1719

---

In the
United States Court of Appeals
for the Fourth Circuit

---

**MARYLAND SHALL ISSUE,** *et al.*,
*Plaintiffs-Appellants*

v.

**MONTGOMERY COUNTY, MARYLAND,**
*Defendant-Appellee*

---

On Appeal from the United States District Court
for the District of Maryland

---

**REPLY BRIEF OF APPELLANTS**

---

David H. Thompson
Peter A. Patterson
Kate Hardiman
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
khrhodes@cooperkirk.com
*Attorneys for Plaintiff MSI*

Mark W. Pennak
LAW OFFICES OF MARK W. PENNAK
7416 Ridgewood Ave
Chevy Chase, MD 20815
Tel: (301) 873-3671
mpennak@marylandshallissue.org
*Attorney for All Plaintiffs*

Matthew Larosiere
LAW OFFICE OF MATTHEW LAROSIERE
6964 Houlton Circle
Lake Worth, FL 33467
Tel: (561) 452-7575
larosieremm@gmail.com
*Attorney for Plaintiff MSI*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................. 1

ARGUMENT ........................................................................................3

   I.    THE CHALLENGED PROVISIONS LIKELY VIOLATE
        PLAINTIFFS' SECOND AMENDMENT RIGHTS ............................4

      A.  The Relevant Historical Period Centers on the Founding, Not 1868 ...4

      B.  A Historical Tradition Requires Proof of Well-Established,
          Representative Analogues and Cannot Rest on Outliers....................10

      C.  The County's Historical Evidence is Unpersuasive............................13

          1.    100-yard Exclusionary Zones ....................................13

          2.    Houses of Worship ..................................................18

          3.    Parks ........................................................................20

          4.    Recreational Facilities and Multipurpose Exhibition
              Facilities ..................................................................23

          5.    Locations Closed to the Public ..................................24

  II.    THE OTHER FACTORS WEIGH IN FAVOR OF INJUNCTIVE
        RELIEF....................................................................................25

      A.    Plaintiffs are Suffering Continuous Irreparable Injury .............25

      B.    An Injunction is Both Equitable and in the Public Interest.......25

CONCLUSION ......................................................................................28

i

# TABLE OF AUTHORITIES

**Cases**                                                          **Page**

*Antonyuk v. Hochul*,
   639 F. Supp. 3d 232 (N.D.N.Y. 2022) ...........................................19

*District of Columbia v. Heller*,
   554 U.S. 570 (2008).................................................4, 5, 13, 19, 27

*Duncan v. Bonta*,
   No.17-cv-1017, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) ...................26

*Espinoza v. Mont. Dep't of Revenue*,
   140 S.Ct. 2246 (2020)....................................................................9

*Foster v. Univ. of Md.-E. Shore*,
   787 F.3d 243 (4th Cir. 2015)......................................................3, 4

*Giovani Carandola, Ltd. v. Bason*,
   303 F.3d 507 (4th Cir. 2002)...................................................25, 26

*Hirschfeld v. ATF*,
   5 F.4th 407 (4th Cir. 2021).........................................................6, 7

*Hirschfeld v. ATF*,
   14 F.4th 322 (4th Cir. 2021).......................................................6, 7

*Kipke v. Moore*,
   No. 1:23-cv-1293, 2023 WL 6381503 (D. Md. Sept. 29, 2023) ...................18

*Koons v. Platkin*,
   No. 22-cv-7464, 2023 WL 3478604 (D.N.J. May 16, 2023) .................18, 19

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
   2 F.4th 330 (4th Cir. 2021).............................................................25

*Marshall v. ATF*,
   142 S.Ct. 1447 (2022)..................................................................6, 7

*Miranda v. Garland*,
   34 F.4th 338 (4th Cir. 2022)..........................................................25

*Moore v. Madigan*,
   702 F.3d 933 (7th Cir. 2012)............................................................7

*New York State Rifle & Pistol Ass'n v. Bruen*,
   142 S.Ct. 2111 (2022).. ……………………………………………1, 2, 3, 4, 5,
   6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................25

*Ramos v. Louisiana*,
140 S.Ct. 1390, 1396 (2020)......................................................6, 8

*Rosenbloom v. Pyott*,
765 F.3d 1137 (9th Cir. 2014).......................................................6

*Timbs v. Indiana*,
139 S.Ct. 682 (2019)....................................................................6

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) ....................................................14

*Wahi v. Charleston Area Med. Ctr., Inc.*,
562 F.3d 599 (4th Cir. 2009).........................................................3

*Wolford v. Lopez*,
No. 1:23-cv-00265, 2023 WL 5043805 (D. Haw. Aug. 8, 2023)......20, 24, 26

*Worth v. Harrington*,
No. 21-cv-1348, 2023 WL 2745673 (D. Minn. Mar. 31, 2023)....................12

**Constitutional Provisions and Statutes**

U.S. CONST. art. VI, cl. 2 ...........................................................13

FED. R. APP. P.
28(a)(8)(A)................................................................................3
28(b)..........................................................................................3

Montgomery County Code
§ 57-11(a)..................................................................................3
§ 57-11(b)(3).............................................................................2
§ 57-11(b)(4).............................................................................2
§ 57-11(b)(5)(A) ........................................................................2

**Other Authorities**

Br. of Ctr. for Hum. Liberty as Amicus Curiae, *Antonyuk v. Hochul*,
No. 22-2908 (2d Cir. Feb. 9, 2023), ECF No. 313 ........................12

Philip J. Cook et al., *Gun Control After* Heller,
56 UCLA L. REV. 1041 (2009)......................................................2

Clayton E. Cramer, *Colonial Firearm Regulation*,
16 J. FIREARMS & PUB. POL'Y 1 (2004)........................................11

DONALD L. GRANT, THE WAY IT WAS IN THE SOUTH: THE BLACK EXPERIENCE IN GEORGIA 122 (2001) ........................................................................................... 19

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 204 (2018) ........................................................ 11, 12

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD ................................................................................. 9

Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and his Influence on the Founders*, 2020 PEPP. L. REV. 71 (2020) ........................................................ 2

ST. GEORGE TUCKER, 1 BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE (1803) ...................................................................................... 1, 2

## INTRODUCTION

Try as it might, Montgomery County cannot escape the fact that its restrictions on public carry "eviscerate the general right to publicly carry arms for self-defense," *New York State Rifle & Pistol Association v. Bruen*, 142 S.Ct. 2111, 2134 (2022), and therefore violate the Second Amendment. The County fights *Bruen* at every turn. It argues that the only relevant historical period is 1868 (and long after), while ignoring *Bruen*'s primary focus on 1791. It claims that only a few historical regulations can establish a tradition, despite *Bruen*'s instruction that analogues must be well-established and representative of "this Nation's historical tradition," not outliers. It invokes numerous laws from the territories and localities, despite *Bruen*'s instruction that they carry little weight in the historical analysis. And it contends that technological and societal changes factor into the Second Amendment analysis, despite *Bruen*'s contrary instruction.

The County begins by devoting pages to the problem against which it legislated: gun violence. Defendant-Appellee's Br. 3–6 ("Br."). But whether the challenged restrictions are in the public interest is irrelevant. The Second Amendment's "unqualified command" must prevail unless the government can show that its "regulation is consistent with this Nation's historical tradition." *Bruen*, 142 S.Ct. at 2126. *Bruen* could not have been clearer that any "interest balancing," whether overt or covert, is out of bounds. *See, e.g.*, *id.* at 2131. At any rate, the

County's allegations of rising criminal violence rates make the Second Amendment right *more* important, not less. *See* ST. GEORGE TUCKER, 1 BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE 143–44 (1803). Understandably, elevated levels of violence often "cause law-abiding citizens to feel the need to carry a gun for self-defense." *Bruen*, 142 S.Ct. at 2158 (Alito, J., concurring). And as the Founders well understood, because violent criminals cannot be expected to follow gun-control laws, "such laws make things worse for the assaulted and better for the assailants." Mark W. Smith, *Enlightenment Thinker Cesare Beccaria and his Influence on the Founders*, 2020 PEPP. L. REV. 71, 83 (2020). Modern social science confirms that licensed handgun carriers "are at fairly low risk of misusing guns." Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041, 1082 (2009).

Next, the County downplays just how sweeping its restrictions are. Br. 8–9, 27. The County's law allows individuals to carry inside their homes and allows business owners to have "one" firearm and ammunition for "one" firearm inside private businesses they own **if** they also have a carry permit. Montgomery County Code § 57-11(b)(3), (4). The County likewise allows people to transport a firearm in their vehicles, but only if the firearm is "unloaded," separate from the ammunition, and "in an enclosed case or in a locked firearms rack." *Id*. § 57-11(b)(5)(A). Otherwise, the County's law makes it a criminal offense for any person, including permit holders, to possess any firearm within 100 yards of thousands of locations

2

that the County has arbitrarily designated as "sensitive places." *Id.* § 57-11(a). In contrast, *Bruen* recognizes a "general right" to carry for self-defense which means, for permit holders, a loaded firearm. The County does not seriously dispute that its law bans carry at or within thousands of 100-yard exclusionary zones and effectively creates a ban on public carry throughout the County. Plaintiffs-Appellants' Br. 15, 42–48 ("Pls.' Br."). The challenged restrictions "eviscerate the general right to publicly carry arms for self-defense[.]" *Bruen*, 142 S.Ct. at 2134.

Most problematically, the County fails to cite a *single* representative or "distinctly similar" Founding-era analogue to support its 100-yard exclusionary zones and restrictions on carry within houses of worship, parks, recreational facilities, and locations listed in Bill 21-22E that are privately owned. Instead, the County relies on evidence that is both too late and too little under *Bruen*. Neither the public interest nor the equities are served by the County enforcing an unconstitutional law. The judgment below should be reversed.

## ARGUMENT

The County buries many arguments in footnotes. *E.g.*, Br. 8 n.12, 23 n.28, 24 n.30, 40 n.49. The Rules require the County to place its "contentions and the reasons for them" in the body of its argument. FED. R. APP. P. 28(a)(8)(A), (b). Arguments raised only in footnotes are forfeited. *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 607 (4th Cir. 2009); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 n.8

(4th Cir. 2015). While this brief answers all the County's arguments, this Court can reject those confined to footnotes on that basis alone. The County's properly presented arguments fare no better.

## I.    THE CHALLENGED PROVISIONS LIKELY VIOLATE PLAINTIFFS' SECOND AMENDMENT RIGHTS

The County does not contest that Plaintiffs' conduct is protected by the Second Amendment's plain text. Pls.' Br. 17–18; Br. 19. Instead, the County distorts *Bruen*'s historical inquiry by asserting that only 1868 (and later) matters. Br. 22–28. The County compounds that error by incorrectly arguing that a National historical "tradition" of firearms regulation "can be based upon relatively few examples" and by invoking categories of historical evidence that *Bruen* expressly found unpersuasive. *Id.* at 20–22, 28–44. Even taken on its own terms, the County's history fails to support a tradition of restricting carry using large exclusionary zones or in the challenged locations. *Id.* at 28–44.

### A.    The Relevant Historical Period Centers on the Founding, Not 1868

The County errs in arguing that *only* history from 1868 (and much later) matters. *Id.* at 12, 22–26. *Bruen* was explicit that "not all history is created equal." 142 S.Ct. at 2136; *see also id.* at 2137 (Sources originating "'75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.'" (quoting *District of Columbia v. Heller*, 554 U.S. 570, 614 (2008))). This is so because "[c]onstitutional rights are enshrined with

the scope they were understood to have when the people adopted them[.]" *Heller*, 554 U.S. at 634–35 (2008). The people adopted the Second Amendment in 1791, so the public understanding of the right around that time controls. *Bruen*, 142 S.Ct. at 2136. Consequently, evidence that long pre- or post-dates 1791 is less probative. *Id.* at 2136–37. Laws from the 20th-century are categorically entitled to little or no weight. *Id*. at 2154 n.28.

*Bruen*'s reasoning also underscores that 1791 carries the most weight. After initially rejecting "medieval English regulations," *id*. at 2139, *Bruen* turned to sources leading up to the ratification of the Second Amendment, including the 1689 English Bill of Rights. *Id*. at 2141–42. After finding these sources somewhat probative of the Amendment's *general* original meaning (*i.e.*, that the right to bear arms is an individual, not a collective, right), the Court focused on "the history of the Colonies and early Republic," plus "the first decade after [the Second Amendment's] adoption." *Id.* at 2142–45. And it found that the challenged law had "no historical basis" because no analogue in that relevant historical period supported it. *Id.* at 2145. The Court then considered evidence prior to the Fourteenth Amendment's Ratification in 1868 because such evidence could have informed its

drafters. *Id.* at 2145–50. But it again found no representative or relevant historical analogue. *Id.*

Only after canvassing the historical evidence from these three periods did the Court discuss post-1868 sources and the late-19th century. *Id.* at 2150–56. But the Court found that much of this later evidence "conflict[s] with the Nation's earlier approach to firearm regulation" and is "most unlikely to reflect 'the origins and continuing significance of the Amendment.'" *Id.* at 2154. Thus, the Court declined to rely on such laws and regulations. *See id.* at 2154–55. And it cautioned courts to "guard against giving postenactment history more weight than it can rightly bear." *Id.* at 2136. In other words, the Founding era is the benchmark against which examples from later historical periods must be measured.

*Bruen*'s primary focus on the Founding is nothing new. The Court has employed the same reasoning in cases involving other incorporated rights. *See*, *e.g.*, *Ramos v. Louisiana*, 140 S.Ct. 1390, 1396 (2020) (discussing the history of a unanimous jury right by referencing "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791); *Timbs v. Indiana*, 139 S.Ct. 682, 687–88 (2019) (discussing "colonial-era provisions" and the "constitutions of eight States" when analyzing the Eighth Amendment excessive fines clause). This Court, too, in a vacated opinion that remains persuasive, *see Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 n.14 (9th Cir. 2014), has looked to 1791 as the "critical" period when

assessing a state-law Second Amendment restriction, *see Hirschfeld v. ATF*, 5 F.4th 407, 419 (4th Cir. 2021), *as amended* (July 15, 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021), *cert. denied sub. nom. Marshall v. ATF*, 142 S.Ct. 1447 (2022) (1791 is the "critical year for determining the [Second] [A]mendment's historical meaning." (cleaned up)). *Accord Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (1791 is the "critical" period in evaluating a State ban on carry outside the home.). Other courts of appeals and district courts agree. Pls.' Br. 24–25.

The County does not meaningfully engage with the longstanding focus on 1791. In a footnote, the County puzzlingly states that *Bruen* "clearly did not find [*Timbs* and *Ramos*] . . . persuasive." Br. 24 n.30. Not so. *Bruen* cited these authorities in explaining *why* the period surrounding 1791 is the key era for analysis. 142 S.Ct. at 2137. Longstanding precedent, undisturbed by *Bruen*, thus teaches that Founding-era historical evidence is vital. The County does not dispute that *Bruen* squarely holds that the Second Amendment is not a disfavored right and thus must be accorded the same respect accorded other rights protected by the Bill of Rights. *Id*. at 2156.

The County ignores the Founding, mentions only a few pre-1868 restrictions, and skips straight to laws passed after 1868 and into the 20th century. Br. 23–24, 30–43. For authority, it falls back on a short discussion in *Bruen* acknowledging an ongoing "scholarly debate" about whether courts should rely on "the prevailing

understanding of an individual right when the Fourteenth Amendment was ratified in 1868." *Bruen*, 142 S.Ct. at 2138; Br. 12, 26. The County argues that 1868 is "more probative" in assessing the validity of the challenged provisions because the Second Amendment only applies to the states by virtue of the Fourteenth Amendment. Br. 12, 26.

But even if the Fourteenth Amendment somehow imbued the Bill of Rights with new meaning, laws enacted in the years *preceding* its ratification would be most probative of what that new meaning is. *See, e.g.*, *Ramos*, 140 S.Ct. at 1396 (looking to the "backdrop" of many state constitutions against which the Founders drafted and the states ratified the Sixth Amendment). The County instead engages in "freewheeling reliance on historical practice from the mid-to-late 19th century[,]" which cannot establish the Second Amendment's meaning in *either* 1868 or 1791. *Bruen*, 142 S.Ct. at 2163 (Barrett, J., concurring). Indeed, given the political turmoil present in the post-Civil-War South (where many of the County's analogues come from), laws from that era and region are unlikely to be probative of the Second or Fourteenth Amendment's original meaning, much less a "National" tradition.

The County also ignores *Bruen*'s response about the Fourteenth Amendment's effect. *Bruen* explained that the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* at 2137. In all cases, the scope

of those rights—whether applied to the Federal or state governments—"is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Id*. In other words, the relevant historical period for both state and federal restrictions is the Founding. *See* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD.

To be sure, the Court did not "need [to] address" the extent to which 1868 matters because "the public understanding of the right" at issue was "the same" in both 1791 and 1868. *Bruen*, 142 S.Ct. 2138. But it looked at *both* periods, and privileged the Founding by using it as the benchmark against which later historical periods must be measured. Nowhere does *Bruen* suggest that 1868-era history, or history stretching into the 20th century, could drive the inquiry to the exclusion of Founding-era history or was "more probative" than the Founding era. On the contrary, the Court confirmed that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 2137 (cleaned up). *Accord Espinoza v. Mont. Dep't of Revenue*, 140 S.Ct. 2246, 2258–59 (2020) (finding unpersuasive "more than 30" provisions of state law from the "second half of the 19th Century" because they were not grounded in Founding-era practices regarding the Free Exercise Clause). In other words, *all* post-Founding evidence functions as "mere

9

confirmation of what the Court thought had already been established." *Bruen*, 142 S.Ct. at 2137 (cleaned up).

### B.    A Historical Tradition Requires Proof of Well-Established, Representative Analogues and Cannot Rest on Outliers

The County also incorrectly asserts that "relatively few examples" can support a "historical tradition of firearms regulation." Br. 20. *Bruen* requires the County to "identify a well-established and representative historical *analogue*[.]" 142 S.Ct. at 2133. And *Bruen* repeatedly rejected regulations applying only to a handful of States or that covered small portions of the population. *See id.* at 2155 (rejecting regulations applying to only 1% of the American population); *see also id.* at 2133 (historical "outlier[s]" should be disregarded). In other words, a smattering of regulations is not a "historical tradition" sufficient to inform the original public meaning of the right at the Founding. Pls.' Br. 27 n.4.

While *Bruen* identified three "sensitive places" where firearms could lawfully be prohibited at the Founding, Pls.' Br. 28, *Bruen* did not hold that only a few laws were sufficient to establish them as sensitive. Br. 20. Neither *Bruen* nor *Heller* "undert[ook] an exhaustive historical analysis" of sensitive places. 142 S.Ct. at 2134 (cleaned up). Rather, *Bruen* merely "assume[d]" that legislative assemblies, polling places, and courthouses were among the "relatively few" places where weapons could be completely prohibited, especially given the lack of disputes throughout history. *Id.* at 2133. Nothing in these statements allows the County to provide only

10

a few historical analogues to establish a representative tradition, much less for the many places in which the County's law bans all firearms. *See, e.g.*, *id.* at 2153 (rejecting restrictions in one state statute and two state court decisions as not representative); *id.* at 2142 (doubting that "*three* colonial regulations could suffice to show a tradition of public-carry regulation."). Nor do they relieve the County of the burden to establish *why* these places were considered sensitive at the Founding and *how* they burdened Second Amendment rights. Without that "how" and "why," analogical reasoning cannot proceed.

The County misapplies the "why" inquiry by asserting that it may ban firearms "where large groups and vulnerable populations congregate." Br. 1. That rationale is flatly inconsistent with *Bruen*'s holding that banning arms in locations merely because they are crowded construes the narrow sensitive places exception "far too broadly." 142 S.Ct. at 2133–34. Nor is "vulnerability" a permissible reason to ban arms. The Founders protected vulnerable populations by *requiring* the bearing of arms because disarming the vulnerable and their caretakers makes them *more* defenseless, not less. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 204, 232–34 & n.108, 244 (2018); Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. Firearms & Pub. Pol'y 1 (2004).

11

For a place truly to be sensitive, the government must treat it as such. This is demonstrated by the enhanced government-provided security present at polling places, legislative assemblies, and courthouses at the Founding. Pls.' Br. 42–43; Br. of Ctr. for Hum. Liberty as Amicus Curiae 8–17, *Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Feb. 9, 2023), ECF No. 313 (collecting laws). Students in schools could be disarmed not because they were vulnerable but rather because of the schools' *in loco parentis* authority. *See Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673 at *12–14 (D. Minn. Mar. 31, 2023); Ctr. for Hum. Liberty Br. 20–22. And Founding-era laws restricting firearms on campus applied only to students, not to faculty, staff, or visitors. *See* Kopel & Greenlee at 249–52; Ctr. for Hum. Liberty Br. 20–22 (collecting laws).

While acknowledging *Bruen*'s holding that "how" an analogue burdens the right and "why" it does so is important, the County argues that its bans are justified because they implicate "unprecedented societal concerns" and "technological changes." Br. 5 n.9, 21 & n.26, 24–25. Nonsense. *Bruen* suggested that "a more nuanced approach" may be appropriate in cases involving "unprecedented societal concerns or dramatic technological changes," 142 S.Ct. at 2132, but when a regulation purports to address "a general societal problem" that was also present during the Founding the historical analogues must be "distinctly similar," *id.* at 2131. Here, the County says that it was motivated by increased "gun violence," Br. 3–5,

15, 17, 18, 21 n.26, but it ignores *Bruen's* holding that there is nothing remotely unprecedented about "firearm violence" or "'handgun violence,'" 142 S.Ct. at 2131. "Gun violence" as a societal "problem" has existed since and before the Founding, *Heller*, 554 U.S. at 636, and bans like the County's "could have [been] adopted" (but weren't) by the Founders, *Bruen*, 142 S.Ct. at 2131.

Finally, the challenged restrictions do not stem from any "dramatic technological change." *Id.* at 2132. There is nothing "dramatic" about the evolution of firearms technology or the "regulatory challenges" posed by the ordinary firearms regulated by the County's law. *Heller* and *Bruen* hold that all bearable modern firearms in common use by law-abiding Americans are protected arms. *Id.*; *Heller*, 554 U.S. at 582. Neither decision supports the notion that firearms in common use represent some sort of dramatic technological change requiring a "more nuanced" approach.

### C.    The County's Historical Evidence is Unpersuasive

### 1.    100-yard Exclusionary Zones

Rather than beginning with *Bruen*, the County asserts that its 100-yard exclusionary zones are permissible because state law "authorizes" them, and courts (pre-*Bruen*) upheld a few such zones. Br. 28. But even if state law sanctions the County's restrictions, it cannot override the Constitution. *See* U.S. Const. art. VI, cl. 2 ("[T]he Constitution . . . shall be the supreme Law of the Land . . . any Thing

13

in the Constitution or Laws of any State to the Contrary notwithstanding."). The Constitution controls, not State law.

The precedent on which the County relies, Br. 29–30, is pre-*Bruen* and thus did not attempt to engage in the analogical reasoning it requires. These cases also only involved parking lots around government buildings. *United States v. Class* reasoned that guns could be banned in a parking lot 1,000 feet from the U.S. Capitol's entrance, but expressly noted that this area could be easily avoided and thus did not affect carry elsewhere in the District. 930 F.3d 460, 466 (D.C. Cir. 2019). Two other decisions held that guns could be restricted in U.S. Postal Service parking lots. Br. 30 (citing *Bonidy v. U.S.P.S.*, 790 F.3d 1121 (10th Cir. 2015) and *United States v. Dorosan*, 350 F. App'x 874 (5th Cir. 2009)). These parking lot bans do not compare to the burden on the right of self-defense imposed by thousands of interlocking 100-yard exclusionary zones created by the County's law. Pls.' Br. 8, 43. *See Bruen*, 142 S.Ct. at 2133 ("the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry" (emphasis in original)).

When the County finally turns to *Bruen*, Br. 30–32, it quickly becomes clear that there is not a shred of relevant Founding-era evidence supporting its 100-yard exclusionary zones. The 1837 Maryland law with which it leads, Br. 30–31, prohibits navigating on a boat with a firearm near waterfowl blinds "with intent to shoot or

14

molest any wild fowl,"[1] Add.6. This law is not "distinctly similar" to the challenged restrictions because its "why" is protecting fowl, and its "how" is prohibiting firearms on boats navigating "Hearn's Straits, in Somerset county" and "the upper side of Holland's Straits." *Id.* Contrary to the County's contentions, Br. 14, *Bruen*'s "how" and "why" test applies to *all* analogues. 142 S.Ct. 2132–33. And a waterfowl law is not a "clear historical example of the exact same type of regulation," Br. 14, for many reasons, including that it only applies to people hunting birds in boats in a specific location. The "burden" of this law on the right of self-defense is not remotely "comparable" to that inflicted by the County's law.

The County's only other pre-1868 analogue supporting its exclusionary zones is an 1859 Connecticut law, Br. 31, that regulated liquor, not guns. It directs law enforcement to remove "any booth, shed, tent, or other temporary erection" used for selling liquor within a mile of military parade grounds. Add.20. This is not remotely, let alone "distinctly," like the County's exclusionary zones for firearms. So too the County's post-1868 laws. Several of them only prohibit carry of firearms at and around polling places on election days. Br. 31 (1886 Calvert County laws and 1870

---

[1] 1837 is not considered Founding-era under *Bruen*, which looked to the years around 1791 and ten years after. 142 S.Ct. at 2145.

Louisiana law).[2] Others prohibited carry anywhere in a county on election days. *Id.* (1874 prohibition on carry in *three* of Maryland's 24 counties on election day). "How" these restrictions burden Second Amendment rights differs in duration (one day vs. every day) and breadth (surrounding only polling places). Again, the burden on the right is not "comparable."

The County is left with two other state laws passed more than a century after the Founding. An 1892 Mississippi law prohibited *concealed* carry within two miles of a college, *id.*, but that limited ban applied only to students and still preserved open carry as a means of self-defense. Add.169; *see Bruen*, 142 S.Ct. at 2144 (noting that restrictions on concealed carry typically did not prohibit open carry). The burden on the right imposed is thus not comparable to the County's law, which prohibits carriage of *all* firearms by *anyone* within 100 yards of the *fifteen* categories of publicly *or* privately owned places "of public assembly," as defined by the County. The County cites a 1905 Minnesota law that prohibited guns within a half-mile of state parks. Add.300. But because this restriction was limited to state parks, it is not a "distinctly similar" analogue for exclusionary zones around *all* places of public assembly, particularly where a "place of public assembly" is defined to include all

---

[2] The County's reference to an 1888 Calvert County law appears to be a duplicate (or reenactment) of the 1886 Calvert County law. *Compare* Add.115, *with* Add.124.

publicly or privately owned locations (including associated grounds and parking lots). It also a 20th-century law and thus "does not provide insight into the meaning of the Second Amendment." *Bruen*, 142 S.Ct. at 2154 n.28.

The County relies heavily on two categories of historical evidence—territories and localities—that *Bruen* expressly held carry "little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." *Id.* at 2154–55. Even if laws from territories and localities could be considered, New Mexico's 1887 law prohibits only the "unlawful draw, flourish or discharge" of a gun near a settlement, not carry or possession. Add.120. And it includes an exception for "lawful defense" of a person, his family, or his property. *Id.* This law cuts against the County because it suggests that carry for self-defense was permitted.

The County next references six localities' restrictions, most from the late 1800s, banning firearms in and around parks. Br. 32. But these laws sometimes applied only to individual parks, *e.g.*, Add.28, 37, 226 (Fairmount and Penn's Common Parks), and were often coupled with restrictions on shooting animals, *e.g.*, Add.50, 130. And in any event, analogues from a few municipalities fail to establish a representative National tradition justifying the County's 100-yard exclusionary zones around any place of "public assembly." *Bruen*, 142 S.Ct. at 2154–55.

### 2.    Houses of Worship

The common theme continues: the County presents no Founding-era evidence justifying its carry restrictions in houses of worship. Worse, it largely ignores Plaintiffs' Founding-era evidence that six of the thirteen original colonies required citizens to go armed to religious services. Pls.' Br. 31 (citing *Koons v. Platkin*, No. 22-cv-7464, 2023 WL 3478604, at *73 (D.N.J. May 16, 2023)). That affirmative evidence establishes the historical backdrop and post-Reconstruction-era evidence is thus probative only if it does not conflict with this established, earlier tradition of carry in churches. *Bruen*, 142 S.Ct. at 2154.

The County provides no evidence from years leading up to (or during) 1868. Br. 36–38. And its post-1868 analogues conflict with the Founding-era tradition of carry in church. For example, it points to a Virginia statute in 1878 prohibiting weapons in places of worship. Br. 37–38. But this statute had a "good and sufficient" cause exception, suggesting that carry was permissible in at least some circumstances. Add.92. And from the Founding *until* 1878, Virginia permitted "each county's chief militia officer to order all enlisted militiamen 'to go armed to their respective parish churches.'" *Koons*, 2023 WL 3478604, at *73. Because the County's later evidence conflicts with Founding-era practice, it must be discounted. *Cf. Kipke v. Moore*, No. 1:23-cv-1293, 2023 WL 6381503, at *16 (D. Md. Sept. 29, 2023) (agreeing that Founding-era statutes '"required their citizens to go armed"' to

18

public assemblies and declining to consider later contradictory evidence (quoting *Koons*, 2023 WL 3478604, at \*73)). More, there is evidence that Georgia's 1870's ban on public carry was only selectively enforced—white supremacists went armed to the polls despite it to prevent Republicans from voting. *See* DONALD L. GRANT, THE WAY IT WAS IN THE SOUTH: THE BLACK EXPERIENCE IN GEORGIA 122 (2001); *Cf. Bruen*, 142 S.Ct. at 2152 n.27 (discussing racist enforcement of concealed carry restrictions).

The County's analogues are unpersuasive for other reasons, too. Two of the Missouri restrictions are only about concealed carry and thus did not impose a "comparable" burden on the right of self-defense. Add.96, 110. And the evidence from localities and territories carries "little weight[.]" *Bruen,* 142 S.Ct. at 2155. Other courts have already dismissed many of the County's analogues as insufficient to establish a historical tradition. *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 320 (N.D.N.Y. 2022); *Koons*, 2023 WL 3478604, at \*73–74.

Precedent from the 1870s is equally unpersuasive. Br. 39. Because the "Constitution was written to be understood by the voters," this Court must look to its "[n]ormal meaning . . . known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576–77. And regardless, the Georgia and Texas decisions rely on a militia-based reading of the Second Amendment, Pls.' Br. 32–33, which *Heller* rejected as an improper interpretation of the Second Amendment, *Bruen*, 142 S.Ct.

at 2153 (finding the laws at issue in these decisions unpersuasive for this reason).

That *Bruen* discussed these laws in a different factual context does not matter. Br. 40

n.49. They cannot be used to *bar* the right to carry (as the County has done) any

more than they can be used to *restrict* the right to carry (as in *Bruen*). And *Bruen*'s

finding that the Georgia and Texas decisions rested on improper interpretations of

the Second Amendment is equally true here.

### 3. Parks

The County claims it has many "historical 'twins'" for its restrictions on carry

in parks, *id*. at 36, but provides no Founding-era analogues, *id.* at 32–35. Because

there is nothing new about parks or potential violence in them, this total absence of

Founding-era regulations is dispositive. *Bruen*, 142 S.Ct. at 2156; *Wolford v. Lopez*,

No. 1:23-cv-00265, 2023 WL 5043805, at *22–24 (D. Haw. Aug. 8, 2023)

(disagreeing with the district court's reliance on late 19th- and 20th-century statutes

and ordinances and finding its approach to parks "unpersuasive").

The County cites only two Reconstruction-era state laws. Br. 34–35. But one

of these, an 1868 Pennsylvania law, applied only to one park in Philadelphia. Add.28,

33. The other, an 1895 Michigan law, appears to ban carry of firearms only in Detroit

parks. Add.207, 208, 212. Two state laws do not begin to establish a historical

tradition even if they applied state-wide, and these laws are more limited. *Bruen*,

142 S.Ct. at 2142 (three state laws not sufficient). They do not justify the County's

total ban on carry in its 693 parks, some of which span thousands of rural acres. Pls.' Br. 34.

The County is left with municipal laws, only five of which were enacted before or during 1868. Br. 32–33. And of those five, three pertain to the same location (New York's Central Park). *Id.* More, these five regulations are hardly a model of constitutionality, barring things like "indecent language," Add.25, 34, or even conversing with construction workers, Add.14. Regardless, *Bruen* made clear that the laws of localities—here only 26[3]—cannot establish a representative National historical tradition. 142 S.Ct. at 2154.

Further inspection of these laws indicates that several are not "distinctly similar" to the County's ban in all parks, including in federal parks in which carry by permit holders is allowed by federal law. Pls.' Br. 37 n.6. First, as noted, three of the New York regulations apply only to Central Park. Add.12, 14, 23. So too the three Philadelphia restrictions, which apply only to Fairmount Park, Add.27, 37, 50, and the 1883 St. Louis law, which applies only to Tower Grove Park, Add.111. These laws—banning carry in individual parks—do not impose a "comparable burden" to the County-wide ban here. *Bruen*, 142 S.Ct. 2133. Second, two of the laws—San

---

[3] The County lists 27 municipalities, but as it concedes, the Rochester law prohibits only discharge of firearms, not carry. Br. 33 n.6. The County also references "six major metropolitan areas" that prohibited firearms in parks, Br. 33, but it does not provide additional citations to laws governing those areas.

Francisco's in 1875 and Detroit's in 1895—allow firearm carry after receiving permission, Add.78, 212, a requirement analogous to carry permits discussed in *Bruen*. 142 S.Ct. at 2138 n.9. Indeed, the San Francisco law (which also banned only concealed carry) allowed "peaceable person[s]" to carry for self-defense at night if the police approved. Add.77. Like the New Mexico law discussed above, these two laws undercut, rather than support, the County's sweeping restrictions. Third, the 1881 St. Louis law is within a "Protection of Birds" statute, Add.104, so its "why"—protecting birds—differs from the concerns motivating the County. The County's reliance on municipal bans after 1900 is similarly unpersuasive. More than 10,000 municipalities existed as of 1900, Pls.' Br. 48, so these few outlier regulations are not probative of the Nation's historical tradition of firearm regulation in parks. *Bruen*, 142 S.Ct. at 2126. And again, 20th-century laws are entitled to no weight. *Id.* at 2154 n.28.

Finally, the County's decisions from federal and state courts in Washington all pre-date *Bruen* and thus did not engage in analogical reasoning. Br. 35–36. And these decisions relied on the flawed logic that the need for self-defense evaporates in places where children play. As noted, carry for self-defense and for defense of the vulnerable is *most* acute there because vulnerable individuals are *less* capable of defending themselves. Criminals and mass murderers will not respect the County's law.

### 4.     Recreational Facilities and Multipurpose Exhibition Facilities

The County fails to establish a historical tradition of firearms regulation justifying its restrictions in recreational facilities and multipurpose exhibition facilities—undefined terms so broad it is difficult to tell what they encompass. The County provides only one Founding-era analogue—a 1786 Virginia statute forbidding carrying arms in fairs and markets "in terror of the county." Br. 40–41 (cleaned up). But *Bruen* rejected this very statute as a viable analogue, 142 S.Ct. at 2144, because it only prohibits bearing arms in a way that spreads terror among the people, not carry for self-defense, *see id.*

The County next cites one local and one territorial restriction prior to 1868 banning firearms in ballrooms. Br. 41 (1817 New Orleans and 1852 New Mexico). But these laws carry "little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." *Bruen*, 142 S.Ct. at 2154–55. The New Orleans ordinance affected a tiny portion of the Nation's population, Pls.' Br. 38, and the Territory of New Mexico's restriction was only about concealed carry, Add.9. Further, "how" these restrictions burden carry is far different from the County's nebulous restriction on carry in and 100 yards around *any* recreational or multipurpose facility.

The County's post-1868 analogues also have flaws. "[T]he reliance on local ordinances that were enacted **after the ratification** of the Fourteenth Amendment

cannot sufficiently assist in determining the prevailing understanding of the right to bear arms in public **at the time of ratification.**" *Wolford*, 2023 WL 5043805, at *22 n.18 (bolding in original). Here, the broad bans on public carry total three local or territorial restrictions far removed from the Founding *and* 1868. Br. 42–43 (1894 Huntsville, 1889 and 1901 Arizona, and 1890 Oklahoma laws). The only state law broadly banning carry, Add.39–40 (1869 Tennessee law), involves only *concealed* carry, as does another of the County's local restrictions, Add.146 (1890 Columbia, Missouri law).

Left without any distinctly similar analogues, the County turns to two district court cases that did not apply *Bruen*. Br. 44. And *Bruen* explodes their logic that guns may be prohibited just because people "congregate" at a location. 142 S.Ct. at 2133–34. Again, the County ignores that holding.

**5.    Locations Closed to the Public**

The County again refuses to disclaim that its law sweeps in privately owned locations not open to the public in Bill 21-22E's list. Br. 8–9 (listing only the *owner* of a private business as exempt from its law); *id.* at 8 n.12 (citing the district court's *sua sponte*, non-binding construction). Therefore, unless and until there is a binding state court decision to the contrary, the Court should enjoin the Bill's application to those locations. The County offers no historical tradition for banning firearms for all such areas. In sum, the County's analogues suffer from "several serious flaws []

beyond their temporal distance from the founding." *Bruen*, 142 S.Ct. at 2154.

## II.    THE OTHER FACTORS WEIGH IN FAVOR OF INJUNCTIVE RELIEF

### A.    Plaintiffs are Suffering Continuous Irreparable Injury

The County returns to its argument that state law "authorize[s]" its 100-yard exclusionary zones around places of public assembly to argue that Plaintiffs do not suffer irreparable harm. Br. 44–47. For the reasons discussed *supra* in Part I.C.1, this is irrelevant. Plaintiffs have shown that the County's ban infringes on their Second Amendment right to public carry in the challenged locations and thus "'unquestionably'" suffer continuous irreparable harm. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022); *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc).

### B.    An Injunction is Both Equitable and in the Public Interest

While likelihood of success on the merits and irreparable harm are the "most critical" factors for injunctive relief, *Nken v. Holder*, 556 U.S. 418, 434 (2009), the final two factors (merged in a suit against the Government) favor Plaintiffs too. The County is not harmed if it cannot enforce restrictions that likely infringe Second Amendment rights. *Leaders of a Beautiful Struggle*, 2 F.4th at 346 ("[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is

25

improved by such an injunction." (cleaned up)). And "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).

The County suggests that its interest in "public safety" and preventing gun violence should tip the final two injunctive relief factors in its favor. Br. 48–49. But as explained above, using violent crime statistics to argue that the public interest supports disarming law-abiding citizens fails because permit holders are not a threat to public safety. *Accord Wolford*, 2023 WL 5043805, at *32 (finding insufficient Hawaii's professed public safety concerns where "the challenged provisions only affect those individuals who have been granted a permit to carry firearms[.]").

The County gives no weight to the right of self-defense, asserting that armed bystanders "stop" less than 3 percent of active shooting attacks. Br. 50. But "the right to keep and bear Arms historically encompasse[s] an individual right to possess and carry weapons in case of confrontation," *Bruen*, 142 S.Ct. at 2177 (cleaned up), and thus cannot be measured by the number of shots fired. The County's calculation also only includes times in which an armed bystander *shot* the attacker, rather than subdued or scared him away. *See Duncan v. Bonta*, No. 3:17-cv-1017, 2023 WL 6180472, at *11 (S.D. Cal. Sept. 22, 2023) ("[a]ctual firing of a handgun" is "irrelevant" under *Heller*). Ordinary citizens use firearms to protect themselves from

criminal attack "up to 2.5 million times per year." *Bruen*, 142 S.Ct. at 2159 (Alito, J., concurring).

Regardless, *Bruen* prohibits this Court from considering the public interest in assessing whether a restriction on Second Amendment rights is constitutional. *Id.* at 2133–34; Br. 49. Sneaking such interest balancing in at the equities stage of the preliminary injunction inquiry is no less permissible than conducting means-end scrutiny on the merits. And it undermines *Bruen* to say that despite Plaintiffs' likelihood of success on the merits, interest balancing could support denying an injunction anyway. Doing so risks "eviscerat[ing] the general right to publicly carry arms for self-defense," *Bruen*, 142 S.Ct. at 2134, during the pendency of years-long court proceedings.

As *Bruen* noted, the Second Amendment "'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* at 2131 (quoting *Heller*, 554 U.S. at 635). Because of "this balance—struck by the traditions of the American people," *id.*,—"certain policy choices" have been taken "off the table," *Heller*, 554 U.S. at 636, including the County's policy choice to ban public carry in and around the thousands of broadly-defined places of "public assembly."

## CONCLUSION

For all these reasons, this Court should reverse the judgment below.

Dated: October 10, 2023                    Respectfully submitted,


                                           _/s/ Mark W. Pennak_____

David H. Thompson                          Mark W. Pennak
Peter A. Patterson                         LAW OFFICES OF MARK W. PENNAK
Kate Hardiman                              7416 Ridgewood Ave.
COOPER & KIRK, PLLC                        Chevy Chase, MD 20815
1523 New Hampshire Ave., N.W.              Tel: (301) 873-3671
Washington, D.C. 20036                     mpennak@marylandshallissue.org
Tel: (202) 220-9600                        *Attorney for All Plaintiffs*
Fax: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com                  Matthew Larosiere
khrhodes@cooperkirk.com                    LAW OFFICE OF MATTHEW LAROSIERE
*Attorneys for Plaintiff MSI*              6964 Houlton Circle
                                           Lake Worth, FL 33467
                                           Tel: (561) 452-7575
                                           larosieremm@gmail.com
                                           *Attorney for Plaintiff MSI*

28

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,475 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

Dated: October 10, 2023

/s/ Mark W. Pennak_____
Mark W. Pennak
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on October 10, 2023, the foregoing "Reply Brief of Appellants" was served on all counsel of record via CM/ECF service.

Dated: October 10, 2023

/s/ Mark W. Pennak_____
Mark W. Pennak
*Counsel for Plaintiffs-Appellants*