

April 28, 2026

VIA ECF

Nwamaka Anowi, Clerk of the Court
United States Court of Appeals
 for the Fourth Circuit
Lewis F. Powell Jr. Courthouse & Annex
1100 East Main Street, Suite 501
Richmond, VA 23219

Re: Status Report in *Maryland Shall Issue, Inc., et al. v. Montgomery County, Maryland,* Case No. 23-1719 (4th Cir.).

Dear Ms Anowi:

By order entered February 22, 2024, this Court held the above-captioned appeal in abeyance "pending resolution by the Maryland appellate courts of the County's appeal of the Circuit Court for Montgomery County, Maryland's Memorandum Decision and Order, Declaratory Judgment Order, and Order Granting Injunctive Relief." This Court further directed the parties to file a Status Report concerning the County's appeal by March 25, 2024, and every 30 days thereafter and "to immediately notify this Court upon a decision by the Maryland appellate courts." This correspondence is intended to comply with that directive.

The County's appeal was docketed in the Appellate Court of Maryland on February 7, 2024, and assigned a case number of ACM-REG-2319-2023. The Appellate Court heard oral argument on December 5, 2024, and issued a decision on January 24, 2025. That decision reversed the Circuit Court in part and remanded the case for "factual findings," but the decision did not decide the merits of whether the County ordinance at issue in this appeal was preempted by State law or was an invalid "general" law or constituted a Taking under the Maryland Constitution. The Appellate Court's decision also left in place the Circuit Court's injunction that barred enforcement of the County's ordinance. The Appellate Court expressly retained jurisdiction over the case pending the remand.

On February 3, 2025, plaintiffs filed a timely petition for certiorari with the Maryland Supreme Court, requesting that the Court exercise plenary review over the case under MD Code, Courts and Judicial Proceedings, § 12-201 ("The petition may be filed either before or after the Appellate Court of Maryland has rendered a decision"). That petition was docketed as *Engage Armament LLC, et al. v. Montgomery County, MD*, No. SCM-PET-0472-2024. On February 18, 2025, the County filed a cross-petition for certiorari with the Maryland Supreme Court. On February 22, 2025, the Maryland Supreme Court granted plaintiffs' motion to stay enforcement or execution of the Appellate Court's mandate.

On March 21, 2025, the Maryland Supreme Court granted plaintiffs' petition for certiorari in full. The Court also granted the County's cross-petition for certiorari in part, limiting that grant to one question (of five) presented by the County. With the issuance of the writ, the case is now docketed in the Supreme Court of Maryland as No. SCM-REG-0009-2025. The Court's order established a briefing schedule and in accordance with that order, the opening Brief of Petitioners/Cross Respondents (plaintiffs) was filed April 30, 2025, and the Brief of Respondents/Cross Petitioners (the County) was filed May 30, 2025. The Reply and Response Brief of Petitioners/Cross-Respondents was filed June 30, 2025, and the Reply of the County was filed July 21, 2025. Oral argument was held by the Maryland Supreme Court on September 8, 2025.

On April 28, 2026, the Maryland Supreme issued its decision, affirming in part and reversing in part the decision of the Montgomery County Circuit Court. Specifically, the Court held that the County's ban on carry by permit holders within 100 yards of places of public assembly "is not a local law because of its application to holders of State-issued wear-and-carry permits traveling on public highways who cross within 100 yards of a place of public assembly." Slip op. at 66. That means that permit holders may carry in Montgomery County without regard to the County's ordinance so long as they do so in compliance with State law. The Maryland Supreme Court also held that County's regulation of so-called "ghost guns" was preempted by State law "to the extent it includes firearms that have been serialized in compliance with federal and State law." *Id.* The Court also struck down as preempted a section of the County's ordinance which banned a "broad swath of otherwise lawful (and constitutionally protected) conduct by adults merely because it occurs in the presence of a minor, without any apparent connection to whether that activity might result in minors gaining unsupervised access to those firearms." *Id.* at 39. Finally, the Court held that the County overstepped its authority by attempting to regulate firearms within 100 yards of "hospitals, community health centers, long-term facilities, childcare facilities, and 'government building[s], including any place owned by or under the control of the County.'" *Id.* at 34. The Court vacated the decision of the Maryland Appellate Court "with instructions to affirm in part and reverse in part the decision of the Circuit Court for Montgomery County and remand to that court with instructions to enter judgment and award declaratory and injunctive relief consistent with this opinion." *Id.* at 67. A copy of the opinion is attached.

Counsel for plaintiffs-appellants intend to confer with counsel for the County regarding further proceedings in this Court pending the remand ordered by the Maryland Supreme Court. There have also been substantial developments in the case law that bear on plaintiffs' Second Amendment claims in this case, including this Court's decision in *Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026), where this Court struck down as unconstitutional Maryland's presumptive ban on carry on private property held open to the public. By order issued on March 2, 2026, this Court stayed its mandate in *Kipke* to allow the plaintiffs in that case to file a petition for certiorari. That petition is currently scheduled to be filed with the Supreme Court on May 20, 2026. In the meantime, on April 20, 2026, Maryland filed its own "hold petition" for certiorari pending a decision of the Supreme Court in *Wolford v. Lopez.*, No. 24-1046 (argued Jan. 20, 2026). See *Moore v. Kipke*, No. 25-1206 (U.S. docketed April 22, 2026).

Plaintiffs-appellants respectfully suggest that this Court continue to hold this appeal in abeyance temporarily for an appropriate time to allow further review of the decision of the Maryland Supreme Court and permit consultations among counsel to occur. Should plaintiffs-appellants elect to press this appeal, further briefing will be necessary to account for legal

developments that have taken place since this case was initially briefed, including the upcoming merits decision by the Supreme Court in *Wolford*. That decision is expected by the end of the Supreme Court's Term in June. Alternatively, plaintiffs-appellants may ask this Court to hold this case pending final disposition of the petitions for certiorari filed in *Kipke*. Additional time is necessary for undersigned counsel to assess these and any other options after consultations with other counsel.

Respectfully submitted,

*/s Mark W. Pennak*

Mark W. Pennak
Counsel for Plaintiffs-Appellants

cc: All Counsel via ECF.

E-FILED
Gregory Hilton, Clerk,
Supreme Court of Maryland
4/28/2026 2:52 PM

Circuit Court for Montgomery County
Case No. 485899-V
Argued: September 8, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 9

September Term, 2025

_____

ENGAGE ARMAMENT LLC, ET AL.

v.

MONTGOMERY COUNTY, MARYLAND

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: April 28, 2026

To ensure that firearm regulations are largely uniform across the State, the Maryland General Assembly has enacted comprehensive laws regulating many aspects of firearm ownership, possession, and use, and has simultaneously prohibited local jurisdictions from enacting additional regulations, subject to limited exceptions. In 2021 and 2022, Respondent Montgomery County amended provisions of its County Code that regulate firearms. The question before us is whether the County's enactments exceeded either: (1) the scope of authority the General Assembly has provided for the local regulation of firearms; or (2) the County's authority under the Constitution of Maryland to enact local laws.

The petitioners, two businesses and eight individuals (collectively, the "Challengers"), contend that the amended code provisions: (1) are preempted by State law; (2) constitute a general law, not a local law, and are therefore beyond the County's authority to enact; and (3) effected an unconstitutional taking of their property. We conclude that some of the challenged provisions of the ordinance are preempted, either expressly or by conflict, and others are not. Of the preempted provisions, one can be severed from the remaining valid provisions, and others cannot. We further conclude that the amended code provision banning the possession of firearms within 100 yards of or in a place of public assembly is not a local law to the extent it now encompasses carry on public highways by individuals with State-issued handgun wear-and-carry permits. Finally, we conclude that the amended ordinance did not effect an unconstitutional taking.

Under the Home Rule Amendment to the Maryland Constitution, Article XI-A, the General Assembly is directed to "provide a grant of express powers" to charter counties to

"enact many types of county public local laws" and "achieve a significant degree of political self-determination." *Tyma v. Montgomery County*, 369 Md. 497, 504-05 (2002). Montgomery County is one such charter county. *Id.* at 504.

Among the powers the General Assembly expressly granted to charter counties in the Express Powers Act, §§ 10-201 through 10-206 of the Local Government Article (2013 Repl.; 2025 Supp.), is the authority to enact ordinances that "may aid in maintaining the peace, good government, health, and welfare of the county." *Id.* § 10-206(a)(2). That authority is, however, cabined to (1) areas the General Assembly has not expressly reserved for itself, and (2) ordinances that are limited in operation and effect to a single county and that do not conflict with State law. *See id.* § 10-206(b). At issue in this case is the interplay of these limitations and the County's authority to regulate firearms.

The General Assembly has enacted several statutes that expressly preempt local regulation of firearms. Most applicable here is § 4-209(a) of the Criminal Law Article (2021 Repl.; 2025 Supp.), which contains a broad preemption of the right of any local government "to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of" a firearm or ammunition. However, § 4-209(b)(1) carves out an exception to that prohibition for local regulation of "the purchase, sale, transfer, ownership, possession, and transportation" of firearms: (i) "with respect to minors;" (ii) "with respect to law enforcement officials of the subdivision;" and (iii) "within 100 yards of or in a park, church, school, public building, and other place of public assembly."

2

The County regulates firearms in Chapter 57 of the Montgomery County Code. Montgomery County, Md., Code Ch. 57 (2025) ("Chapter 57 (2025)"). In 2021 and 2022, the County enacted amendments to Chapter 57. As relevant here, those amendments: (1) enacted regulations of so-called "ghost guns," which are firearms lacking required serial numbers;[1] (2) expanded the County's prohibition on the carry of firearms in or within 100 yards of a place of public assembly to additional locations; and (3) removed an exception to that prohibition for carriers of State-issued handgun wear-and-carry permits.

The Circuit Court for Montgomery County agreed with the Challengers that Chapter 57, as amended, is preempted by State law, is not a local law, and effects an unconstitutional taking in violation of the Constitution of Maryland. The court granted the Challengers declaratory and injunctive relief. The Appellate Court of Maryland remanded for further explanation and analysis of the preemption and takings claims. Both parties petitioned for certiorari review in this Court, which we granted. *Engage Armament LLC v. Montgomery County*, 490 Md. 121 (2025).

We will vacate the opinion of the Appellate Court, and remand to that court with instructions to: (1) affirm in part and reverse in part the circuit court's entry of summary judgment in favor of the Challengers, as set forth in this opinion; (2) vacate the circuit court's declaratory judgment order and order granting injunctive relief; and (3) remand to

---

[1] We refer to the unserialized firearms at issue as "ghost guns" because that is the term used in the Montgomery County Code. The Challengers prefer "personally manufactured firearms." Our use of the term contained in the County Code has no bearing on our resolution of this appeal.

the circuit court for further proceedings consistent with this opinion, including the entry of new orders awarding declaratory and injunctive relief to the Challengers.

## BACKGROUND

### A.     Legal Background

Chapter 57 of the Montgomery County Code regulates many aspects of the use and possession of firearms and other weapons in the County.  Most relevant here are § 57-1, which defines terms used in the other sections; § 57-7, which regulates access to firearms by minors; and § 57-11(a), which prohibits the sale, transfer, possession, or transportation of firearms in or within 100 yards of a place of public assembly.

In 2021 and 2022, the Montgomery County Council passed Bills 4-21 and 21-22E, which became Chapters 7 and 36 of the 2021 and 2022 Laws of Montgomery County, respectively (collectively, the "Amendments").  We discuss the Amendments in the aggregate for simplicity, noting differences only where relevant.

The Amendments made three relevant categories of changes to Chapter 57.  First, before the Amendments, the County defined "place of public assembly" to encompass only "a government owned park," a "place of worship," an "elementary or secondary school," a "public library," a "government-owned or -operated recreational facility," or a "multipurpose exhibition facility."  Montgomery County, Md., Code Ch. 57, § 57-1 (2014, 2021 Supp.) ("Chapter 57 (2021)").  Through the Amendments, the County expanded that definition, which now provides:

A "place of public assembly" is:

(1) a publicly or privately owned: (A) park; (B) place of worship; (C) school; (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility, including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility;

(2) government building, including any place owned by or under the control of the County;

(3) polling place;

(4) courthouse;

(5) legislative assembly; or

(6) a gathering of individuals to collectively express their constitutional right to protest or assemble.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

Chapter 57, § 57-1 (2025). This had the effect of significantly expanding the geographic scope of the prohibition in § 57-11(a) against the sale, transfer, possession, or transportation of a firearm in or within 100 yards of a "place of public assembly."

Second, the Amendments removed an exception to that same prohibition for holders of a State-issued handgun wear-and-carry permit.

Third, the Amendments made a series of changes to address ghost guns.[2] Section 57-1 now defines a ghost gun as a firearm that lacks both (1) a unique serial number on the

---

[2] In addition to ghost guns, the Amendments added regulations addressing so-called "undetectable guns" and technology related to firearms that can be created using a 3D printing process. In their complaint, various Challengers identify an intent to manufacture, possess, sell, or serialize ghost guns, but not undetectable guns or technology related to firearms that can be made through a 3D printing process. As a result, we will focus our analysis only on the regulation of ghost guns.

frame or receiver in accordance with federal law, and (2) markings and registration with the Secretary of State Police in accordance with State law. *Id.* § 57-1. Chapter 57 also regulates "major component[s]" of ghost guns, which it defines as "the slide or cylinder or the frame or receiver" of any firearm and the barrel of a rifle or shotgun. *Id.*

Before the Amendments, § 57-7 generally prohibited any person other than an adult parent, guardian, or instructor from giving, selling, renting, lending, or transferring a rifle, shotgun, major component of those firearms, or ammunition to a minor. Chapter 57, § 57-7(a) (2021). It also prohibited minors from entering gun stores without a parent or legal guardian. *Id.* § 57-7(b). As amended, § 57-7 now also prohibits any person from (1) providing a ghost gun or a major component of a ghost gun to a minor, (2) purchasing, selling, transferring, possessing, or transporting a ghost gun or major component of a ghost gun in the presence of a minor, and (3) storing or leaving a ghost gun or major component of a ghost gun "in a location that the person knows or should know is accessible to a minor." Chapter 57, § 57-7(c), (d), (e) (2025).

Additionally, after the Amendments, § 57-11 now expressly includes ghost guns and major components of ghost guns among the firearms that individuals may not possess in or within 100 yards of a place of public assembly. *Id.* § 57-11(a). And, unlike with all other types of firearms, that prohibition applies to ghost guns even inside an individual's own home, if that home overlaps with a prohibited area. *Id.* § 57-11(b)(3).

In addition to those changes, in 2022, the County also adopted an uncodified severability provision, which provides: "If any provision of . . . Chapter 57, is found to be

invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect." 2022 Laws of Montgomery County ("L.M.C."), Ch. 36, § 3.

### B.     Procedural History

The Challengers initiated this action in the Circuit Court for Montgomery County. As stated in the operative Second Amended Complaint, the Challengers contend that Chapter 57, as amended: (1) is preempted by State law (Count I); (2) is not a local law and so violates the Express Powers Act (Count II); (3) effects an unconstitutional taking in violation of the Constitution of Maryland (Count III); (4) violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights (Counts IV, V, and VI); and (5) violates the Second Amendment to the United States Constitution (Counts VII and VIII).

The County removed the case to the United States District Court for the District of Maryland, which then remanded Counts I, II, and III to the Circuit Court for Montgomery County and stayed proceedings concerning the remaining counts. *See Maryland Shall Issue, Inc. v. Montgomery County*, No. TDC-21-1736, 2022 WL 375461 (D. Md. Feb. 7, 2022); *Maryland Shall Issue, Inc. v. Montgomery County*, No. TDC-21-1736, 2023 WL 3276497 (D. Md. May 5, 2023).[3] In the circuit court, both parties moved for summary judgment. The following factual allegations support the Challengers' motion.

---

[3] The district court denied the Challengers' motion for a temporary restraining order and preliminary injunction. *Maryland Shall Issue, Inc. v. Montgomery County*, 680 F.

Petitioner Engage Armament, LLC, a federally licensed firearms dealer, contends that the new restrictions have caused it to suffer a loss in sales. It claims that before the Amendments, it possessed, serialized, and sold ghost guns and their major components. It further contends that it fears prosecution under § 57-7, because minors are sometimes present in its store, and under § 57-11, because its business "arguably" includes a private library and is therefore a place of public assembly.

Petitioner I.C.E. Firearms & Defensive Training, LLC, a company that provides firearms training, avers that it fears prosecution under § 57-11 because it provides firearms training within 100 yards of a place of public assembly. I.C.E. also possesses ghost guns within its facility and provides training to minors.

Of the eight individual Challengers,[4] seven possessed State-issued wear-and-carry permits at the time they filed their complaint, and the eighth had an application pending. Their collective complaints fall largely into three categories. First, they contend that the expanded definition of "place of public assembly" renders them unable to enjoy the privileges of their permits in large swaths of the County. They aver that before the Amendments they regularly engaged in now-prohibited conduct in or within 100 yards of locations now identified as places of public assembly, intend to continue engaging in that

_____

Supp. 3d 567, 594 (D. Md. 2023). On appeal, the Fourth Circuit granted the County's motion for abeyance pending a decision in this case.

[4] The individual Challengers are Andrew Raymond, Carlos Rabanales, Brandon Ferrell, Deryck Weaver, Joshua Edgar, Ronald David, Nancy David, and Eliyahu Shemony.

conduct, and reasonably fear prosecution if they do so. That conduct includes possessing firearms while driving, carrying firearms at work, possessing firearms on their own real estate outside of their homes, and carrying their firearms in or near places of worship, libraries, and schools. Second, some of the individual Challengers allege that they possessed ghost guns in their businesses or homes before the Amendments, that they intend to do so again, and reasonably fear prosecution if they do so. Third, three of the individual Challengers allege that before the Amendments, they assembled and disassembled ghost guns in the presence of minors, intend to do so again, and reasonably fear prosecution if they do so.

In a memorandum opinion and order, the circuit court denied the County's motion for summary judgment and granted the Challengers' motion. The court concluded that "the challenged provisions of" Chapter 57 "conflict with and are preempted by State law." The court determined that Chapter 57 impermissibly seeks to regulate "who may own a firearm, where it may be possessed, and what one may do with it in Montgomery County," which it concluded were all "already the subject of comprehensive State regulation." The court also held that Chapter 57 impermissibly "purports to define what constitutes a firearm[,]" that its "extraordinarily expansive language regarding the definition of 'within 100 [yards] of' a place of public assembly sweeps too broadly[,]" that the County's regulation was intended "to largely eliminate the State granted right to wear and carry a firearm in the County," and that the County had exceeded its authority under the Express Powers Act by

regulating inconsistently with State law. The court's memorandum opinion did not substantively address the Challengers' local law or takings claims.

The circuit court subsequently entered a declaratory judgment and an order granting injunctive relief. In the former, the court declared that §§ 57-1, 57-7, 57-10,[5] and 57-11 are preempted by State law, that Chapter 57 "is not a 'local law' within the meaning of [the] Maryland Constitution," and that Chapter 57 effects an unconstitutional taking. The court did not provide any analysis or explanation of its conclusion that Chapter 57 effected a taking.[6]

In a separate order, the court enjoined the enforcement or application of several definitions included in § 57-1, including the definitions of "ghost gun" and "place of public assembly." The court also enjoined the enforcement of §§ 57-10 and 57-11 in their entirety and enjoined the enforcement of § 57-7 to the extent it purports to regulate: (1) certain actions related to ghost guns "by adults in the presence of minors"; (2) "access to or possession of a 'regulated firearm' . . . by a minor where such access or possession is

---

[5] Section 57-10 provides that it is unlawful for any person to have a firearm on their person or readily available in a motor vehicle subject to several enumerated exceptions. We have not yet introduced § 57-10 because it was not altered by the Amendments or raised in the Challengers' complaint. As we discuss below, the circuit court erred in ordering relief with respect to § 57-10 because that provision was not properly before the court.

[6] At the Challengers' request, the circuit court delayed any determination as to the amount of just compensation that would be required for the taking pending the result of this appeal. The court entered an order pursuant to Rule 2-602 directing the entry of a final judgment as to the matters resolved by its memorandum opinion and order, declaratory judgment, and order of injunctive relief.

permitted by [State law]"; and (3) "access to or the possession of a firearm by a minor who has a certificate of firearm and hunter safety issued by the Maryland Department of Natural Resources[.]" The court also enjoined the County from implementing or enforcing any of the provisions of Chapter 57 relating to ghost guns until it first paid "full and complete just compensation for the taking of these items[.]"

The Appellate Court of Maryland reversed in part and remanded for further proceedings on two issues. *Montgomery County v. Engage Armament, LLC*, No. 2319, Sept. Term, 2023, 2025 WL 289153, at *1 (Md. App. Ct. Jan. 24, 2025). First, the Appellate Court remanded for the circuit court to determine whether the County's expansion of the definition of "place of public assembly" was permissible. *Id.* at *7. The court expressed concern that the expanded definition might include locations that are not places of public assembly and, if not, could have rendered the prohibition too broad to be a local law. *Id.* at *7-8. The court remanded the case to the circuit court to make factual findings concerning "what places of public assembly § 4-209(b)(1)(iii) authorizes localities to regulate aside from those listed in § 4-209(b)(1)(iii)." *Id.* at *7. In the meantime, the court refrained from reaching a conclusion concerning preemption or whether Chapter 57 is a local law. *Id.* at *1.

Second, the Appellate Court remanded for the circuit court to explain its reasoning in concluding that the Amendments effected an unconstitutional taking. *Id.* at *8.

We granted petitions for writs of certiorari filed by both sides. We granted the Challengers' petition to address: (1) whether State law preempts the challenged provisions;

(2) whether Chapter 57 is a local law; and (3) whether the Amendments effected a taking. We granted the County's cross-petition to address whether the circuit court erred in addressing §§ 57-10 and 57-11(d).

## DISCUSSION

### I. RELIEF RELATED TO MONTGOMERY COUNTY CODE §§ 57-10 AND 57-11(D)

We begin our discussion with the County's cross-petition, which addresses the preliminary issue of whether two provisions of Chapter 57 that the circuit court declared invalid and enjoined were properly at issue. The County argues that the circuit court erred by ruling on the validity of §§ 57-10 and 57-11(d), neither of which were altered by the Amendments or mentioned in the complaint. The Challengers respond that they effectively put those provisions at issue by challenging "Chapter 57" throughout their complaint. The Challengers further claim that the County waived its argument by failing to respond to arguments the Challengers raised concerning §§ 57-10 and 57-11(d) in their summary judgment filings.

As an initial matter, the Challengers' complaint did not place all of Chapter 57 at issue. The operative complaint consistently challenges "Chapter 57, as amended by Bills 4-21 and 21-22E." Absent context, that ambiguous phrase could reasonably be interpreted as a challenge to either: (1) the entirety of Chapter 57 as it exists following the passage of Bills 4-21 and 21-22E; or (2) the changes to Chapter 57 made by the passage of Bills 4-21 and 21-22E. Context resolves the ambiguity. The complaint discusses in detail the changes made to §§ 57-1, 57-7, and 57-11(a) and (b), as well as the Challengers' claims relating

12

specifically to those changes. The complaint does not directly or indirectly mention §§ 57-10 or 57-11(d), or any claims relating to those provisions. Reading the complaint as a whole, the challenge to "Chapter 57, as amended by Bills 4-21 and 21-22E" is consistent only with the interpretation that the challenge was to the provisions of Chapter 57 that the County Council had amended. The complaint does not provide reasonable notice of any challenge beyond that.

### A.  Section 57-10

Section 57-10 provides that it is unlawful for any person to have a firearm on their person or readily available in a motor vehicle, subject to several enumerated exceptions. By cross-motion for summary judgment, the Challengers sought "a declaratory judgment that the State has 'occupied the field' and that Sections 57-10 and 57-11 of the County Code are not 'local laws' within the meaning of the Maryland Constitution," and asked the court to enjoin both. In its response, the County objected, arguing in a footnote that § 57-10 was not properly before the court because the operative complaint did not include a single reference to § 57-10. Accordingly, the County stated that it would "not address [the Challengers'] arguments regarding § 57-10."

The circuit court's memorandum opinion and order granting the Challengers' motion for summary judgment also does not mention § 57-10 in the explanation of its rulings. Nonetheless, the circuit court's subsequent declaratory judgment and injunction orders both awarded relief with respect to § 57-10.

Rule 2-302 identifies the permitted pleadings in Maryland's circuit courts, which are limited to complaints, counterclaims, cross-claims, third-party complaints, answers to each of them, and, if ordered by the court, a reply to an answer. The complaint, as the initial pleading, frames a plaintiff's claims and provides notice to the defendant of the claims being made, the basis for them, and the relief being sought. *Liberty Mut. Ins. Co. v. Ben Lewis Plumbing, Heating & Air Conditioning, Inc.*, 121 Md. App. 467, 476-77 (1998) (stating that due process requires that a "claim or defense be asserted with sufficient particularity to put the opposing party on fair notice of both the basis of the claim and the relief sought"). In doing so, it establishes the playing field on which the litigation will proceed. *E.g.*, *Univ. of Md. E. Shore v. Rhaney*, 159 Md. App. 44, 47 (2004) ("The allegations in the complaint frame the issues before the court."); *see* Paul Mark Sandler et al., *Pleading Causes of Action in Maryland* xxix (7th ed. 2022) ("The complaint is the foundation of all verdicts or judgments. Throughout discovery and even during trial, the complaint—the blueprint for the theory of the case—serves as the road map for both counsel and the trier of fact in interpreting and resolving the dispute between the parties.").

To ensure that pleadings serve their purpose, Rule 2-303 requires that all averments "be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances[.]" Md. Rule 2-303(a). Each averment also must "be simple, concise, and direct[,]" containing "only such statements of fact as may be necessary to show the pleader's entitlement to relief or ground of defense[,]" and without, among other things, "argument." Md. Rule 2-303(b). And Rule 2-305

14

requires that "[a] pleading that sets forth a claim for relief . . . shall contain a clear statement of the facts necessary to constitute a cause of action and a demand for judgment for the relief sought."

Our rules also govern how pleadings may be amended. Rule 2-341 permits amendments without leave of court by a date set forth in a scheduling order or, if none, "no later than 30 days before a scheduled trial date." Md. Rule 2-341(a). Subsequent amendments may be made only with leave of court. Md. Rule 2-341(b). The rule outlines seven purposes an amendment can serve, including to "change the nature of the action or defense[.]" Md. Rule 2-341(c)(1).

Motions for summary judgment and memoranda in support thereof serve a different purpose. They are not pleadings, and they do not frame the issues to be litigated. *See* Md. Rule 2-302. Instead, they provide a mechanism short of trial to resolve claims that have been pled where "there is no genuine dispute as to any material fact" and a party claims entitlement to judgment as a matter of law. Md. Rule 2-501(a); *see Charles Riley, Jr. Revocable Tr. v. Venice Beach Citizens Ass'n, Inc.*, 487 Md. 1, 16-20 (2024) (discussing the functions of summary judgment). Our rules do not sanction the amendment of pleadings through summary judgment practice. *See Liberty Mut. Ins. Co.*, 121 Md. App. at 481 (holding that asserting a defense for the first time in a response to a motion for summary judgment, when the defense was required to be asserted in an answer, does not meet pleading requirements); *see also Qian v. Sec'y, Dep't of Veterans Affs.*, 432 F. App'x 808, 809-10 (11th Cir. 2011) ("[E]ven liberal pleading standards do not afford plaintiffs

with an opportunity to raise new claims at the summary judgment stage. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint. . . ." (citation modified)); *In re Petition of Waitsfield-Fayston Tel. Co.*, 928 A.2d 1219, 1223 (Vt. 2007) ("Failure to plead a claim means that the claim is not in the case, and the court may not grant relief on it unless the claim subsequently comes before the court" through a formal "amendment of the complaint" or by "express or implied consent of the parties[.]").

Here, as noted, the operative complaint did not raise any issue or seek any relief concerning § 57-10. Instead, the Challengers first raised a challenge to that provision in their cross-motion for summary judgment and in their associated 103-page memorandum in support thereof. When they did so, the County properly objected. Had the Challengers wanted to pursue a challenge to § 57-10 at that point, they should have sought leave to amend their complaint. They did not do so. Under those circumstances, the court erred in granting relief concerning that section.

### B. Section 57-11(d)

We reach a different conclusion with respect to § 57-11(d). Section 57-11(d) is a carve-out from the prohibition against possession of firearms in or within 100 yards of a place of public assembly in § 57-11(a). Adopted in 1997, § 57-11(d) allows firearms dealers who were licensed to operate before January 1, 1997, to continue to "conduct regular, continuous operations" thereafter in the same location, but imposes certain restrictions on those operations. As with § 57-10, the operative complaint never mentions

16

§ 57-11(d). Although the complaint contains several references to § 57-11, each of those, in context, is specific to § 57-11(a) or (b). Unlike with § 57-10, however, when the Challengers raised § 57-11(d) in their cross-motion for summary judgment, the County did not object. Accordingly, the County did not preserve its appellate argument that the court should not have addressed § 57-11(d) at all.

## II.      MONTGOMERY COUNTY'S AUTHORITY AS A CHARTER COUNTY

Montgomery County is a charter county. *Tyma v. Montgomery County*, 369 Md. 497, 504 (2002). As such, its legislative authority is provided by the Home Rule Amendment, Article XI-A of the Constitution of Maryland; and the Express Powers Act, Title 10 of the Local Government Article. Article XI-A authorizes the "transfer [of] the General Assembly's power to enact many types of county public local laws to the . . . home rule counties." *McCrory Corp. v. Fowler*, 319 Md. 12, 16 (1990), *superseded by statute as stated in Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 627-29 (2010).

Article XI-A provides a structure for the interplay between State and local power. Section 2 of Article XI-A directs the General Assembly to "provide a grant of express powers" for charter counties. Section 3 provides the County Council of a charter county with the "full power to enact local laws . . . upon all matters covered by the express powers granted" by the General Assembly, and further provides "that in case of any conflict between said local law" and any general law enacted by the General Assembly, the general law "shall control." Section 4 then prohibits the General Assembly from enacting local laws "on any subject covered by express powers granted." Taken together, these sections

17

authorize a shift of authority to legislate on "matters of purely local concern" from the General Assembly to charter counties. *State v. Stewart*, 152 Md. 419, 422 (1927).

The General Assembly carried out its charge under § 2 of Article XI-A by adopting the Express Powers Act, which "endows charter counties with a wide array of legislative and administrative powers[.]" *Angel Enters. Ltd. P'ship v. Talbot County*, 474 Md. 237, 261 (2021) (alteration in original) (quoting *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel County*, 283 Md. 48, 57 (1978)). Most relevant here, § 10-206(a)(2) of the Local Government Article provides that a "county council may pass any ordinance . . . not inconsistent with State law that . . . may aid in maintaining the peace, good government, health, and welfare of the county." Section 10-206(b) reinforces that a "county may exercise the powers provided under this title only to the extent that the powers are not preempted by or in conflict with public general law."

In summary, pursuant to the Home Rule Amendment and the Express Powers Act, ordinances enacted pursuant to the County's otherwise broad authority to legislate to promote "the peace, good government, health, and welfare of the county" must: (1) not be inconsistent with, preempted by, or in conflict with State law; and (2) be local laws. The Challengers contend that the challenged provisions of Chapter 57 fail on both counts. We will take each argument in turn.

### A. Preemption

Preemption protects "the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern. When properly invoked, the

doctrine precludes local legislative bodies from enacting any legislation whatsoever in the pre-empted field." *Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County*, 307 Md. 307, 324 (1986). State law may preempt local ordinances in three ways: express preemption, preemption by conflict, and implied preemption. *Talbot County v. Skipper*, 329 Md. 481, 487-88 (1993).

"Express preemption occurs when the General Assembly prohibits local legislation in a field by specific language in a statute." *Worton Creek Marina, LLC v. Claggett*, 381 Md. 499, 512 n.6 (2004). Preemption by conflict occurs when a local government ordinance "conflicts with a public general law enacted by the General Assembly." *Coal. for Open Doors v. Annapolis Lodge No. 622*, 333 Md. 359, 379-80 (1994). And implied preemption occurs when an ordinance "deal[s] with an area in which the [State] Legislature has acted with such force that an intent by the State to occupy the entire field must be implied[.]" *County Council for Montgomery County v. Montgomery Ass'n*, 274 Md. 52, 59 (1975). The Challengers contend that all three types of preemption are implicated here.

### 1. *Express Preemption*

The Challengers identify six preemption provisions that they contend expressly preempt some or all of the challenged provisions of Chapter 57: Criminal Law § 4-209(a); Public Safety §§ 5-104, 5-133(a), 5-134(a), and 5-207(a); and § 6 of Chapter 13 of the 1972 Laws of Maryland. For its defense, the County contends that § 4-209(b)(1) of the Criminal Law Article expressly authorizes the challenged provisions. The Challengers respond that (1) § 4-209(b)(1) does not supersede the express preemption provisions, and (2) even if it

does, the challenged provisions of Chapter 57 go beyond what is authorized by § 4-209(b)(1). Accordingly, we must first address whether the express preemption provisions have abrogated § 4-209(b)(1). Because we conclude that they have not, we will then examine whether § 4-209(b)(1) authorizes the challenged provisions of Chapter 57.

### i. Criminal Law § 4-209(a) and (b)(1)

Section 4-209 contains both a broad preemption of local regulation of firearms, in subsection (a), and an express authorization of local regulation of firearms in three specific areas, in subsection (b)(1). As relevant here, § 4-209(a) and (b)(1) provide:

> (a) Except as otherwise provided in this section, the State preempts the right of a county . . . to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of:
>
> (1) a handgun, rifle, or shotgun; and
>
> (2) ammunition for and components of a handgun, rifle, or shotgun.
>
> (b)(1) A county . . . may regulate the purchase, sale, transfer, ownership, possession, and transportation of the items listed in subsection (a) of this section:
>
> (i) with respect to minors;
>
> (ii) with respect to law enforcement officials of the subdivision; and
>
> (iii) except as provided in paragraph (2) of this subsection, within 100 yards of or in a park, church, school, public building, and other place of public assembly.

In construing the scope of § 4-209, and the interplay between subsections (a) and (b)(1), we employ our familiar canons of statutory construction. As we summarized recently:

The goal of statutory construction is to discern and carry out the intent of the Legislature. Our search for legislative intent begins with the text of the provision we are interpreting, viewed not in isolation but within the context of the statutory scheme to which it belongs. Our review of the text is wholistic, seeking to give effect to all of what the General Assembly included and not to add anything that the General Assembly omitted. In our analysis of statutory text, we therefore take the language as we find it, neither adding to nor deleting from it; we avoid forced or subtle interpretations; and we avoid constructions that would negate portions of the language or render them meaningless. When statutory terms are undefined, we often look to dictionary definitions as a starting point, to identify the ordinary and popular meaning of the terms, before broadening our analysis to consider the other language of the provisions in which the terms appear and the statutory scheme as a whole, including any legislative purpose that is discernible from the statutory text. Presuming the General Assembly intends its enactments to operate together as a consistent and harmonious body of law, we also seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

After exhausting the tools available for our textual analysis, viewed in context of the statutory scheme and in light of apparent legislative purpose, we determine whether the statute is ambiguous. Ambiguity can arise in two different ways: Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme. If neither applies, our inquiry generally ceases at that point and we apply the statute as written. If, however, the statute is ambiguous, we seek to resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. Such sources include the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it.

Finally, in every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense. When one interpretation of statutory language would produce such a result, we will reject that interpretation in favor of another that does not suffer the same flaw.

*Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644-46 (2024) (citation modified).

Applying these familiar rules to § 4-209 is straightforward. Section 4-209(a) is a broad express preemption of local firearm regulations addressing nine types of conduct, "[e]xcept as otherwise provided in this section[.]" Section 4-209(b)(1) then provides express authorization for local firearm regulations addressing six of those types of conduct in three specific areas: (1) with respect to minors; (2) with respect to law enforcement officials; and (3) within 100 yards of or in a park, school, public building, or other place of public assembly. Thus, under § 4-209, County regulations of the purchase, sale, transfer, ownership, possession, and transportation of firearms are permissible when—and only when—limited to one of those three specific areas.

### ii. Public Safety §§ 5-104, 5-133(a), 5-134(a), 5-207(a), and 1972 Maryland Laws, Chapter 13, § 6

Sections 5-104, 5-133(a), 5-134(a), and 5-207(a) of the Public Safety Article and § 6 of Chapter 13 of the 1972 Laws of Maryland all also expressly preempt certain types of local firearm regulations. Public Safety § 5-104 provides that Subtitle 1 of Title 5 of the Public Safety Article supersedes and preempts all local regulation of the sale of regulated firearms.[7] Sections 5-133(a) and 5-134(a) each "preempt[] the right of any local jurisdiction to regulate" the possession and transfer, respectively, of regulated firearms.

---

[7] A "regulated firearm" is a defined term meaning "a handgun" or any of a list of "specific assault weapons or their copies[.]" Pub. Safety § 5-101(r). Although other long guns are regulated by State law, *see id.* §§ 5-201 – 5-207, they do not fall within the statutory definition of a regulated firearm.

Section 5-207(a) does the same for the transfer of rifles and shotguns. And § 6 of Chapter 13 of the 1972 Laws of Maryland does the same for the wear, carry, or transportation of handguns.

None of these provisions is ambiguous when considered on its own. Each employs absolute language with no express exceptions. However, all become ambiguous when considered alongside Criminal Law § 4-209(b)(1). Section 4-209(b)(1) employs similarly absolute language, authorizing localities to regulate in certain areas, subject only to a self-contained exception for regulations addressing teaching or training in firearms safety and other educational or sporting uses. Crim. Law § 4-209(b)(2). Accordingly, we "seek to resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Westminster Mgmt.*, 486 Md. at 645.

The General Assembly enacted § 4-209 as Chapter 724 of the 1985 Laws of Maryland. Notably, the year before, Governor Harry Hughes vetoed legislation that would have completely preempted local firearms regulations, except with respect to discharge. S.B. 66; H.B. 315, 392nd Md. Gen. Assemb., Reg. Sess. (1984).[8] In his veto letter, Governor Hughes expressed his intent to protect existing local regulations from

---

[8] Senate Bill 66 and House Bill 315 from the 1984 legislative session would have "preempt[ed] the rights of any county . . . to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation" of, among other things, handguns, rifles, shotguns, and ammunition for any of them. Section 2 of those bills would further have repealed all inconsistent laws or parts of laws.

preemption.  Veto Letter from Gov. Hughes, S.B. 66, 392nd Gen. Assemb., Reg. Sess. (May 29, 1984).  Governor Hughes acknowledged the importance of uniformity in firearm regulations throughout the State but stated that preserving "beneficial existing local legislation" for the sake of "public safety" was even more important.  *Id.*

The following year, at a time when all but one of the other express preemption provisions at issue had already been enacted,[9] the General Assembly passed Chapter 724, which contained three provisions that expressly preserved or authorized local firearms regulations.  First, as we have discussed, subsection (b)(1) of what is now § 4-209

---

[9] The provisions now codified as Public Safety §§ 5-104, 5-133(a), and 5-134(a) were originally enacted in 1966 and codified in former Article 27 of the Maryland Code. *See* 1966 Md. Laws, Ch. 502 (enacting, among others, Art. 27 §§ 442(a) (precursor to § 5-104) and 445(a) (precursor to §§ 5-133(a) and 5-134(a))).  Those provisions were moved to the Public Safety Article in 2003 as part of the code revision process. *See* 2003 Md. Laws, Ch. 5, § 2, at 215 (§ 5-104); *id.* at 248 (§ 5-133(a)); *id.* at 250-51 (§ 5-134(a)). The only substantive change identified in the revisor's note was to break out what had been a single provision in § 445 of former Article 27, regulating "possession and transfer" of regulated firearms, into two separate provisions, with § 5-133 regulating possession and § 5-134 regulating transfer. *See* 2003 Md. Laws Ch. 5, § 2, at 250 Revisor's Note; *id.* at 252-53 Revisor's Note.

Similarly, what is now Criminal Law § 4-209 was originally codified in former Article 27 of the Maryland Code. *See* 1985 Md. Laws, Ch. 724.  It became part of the Criminal Law Article in 2002 as part of the code revision process.  2002 Md. Laws, Ch. 26, at 348-49.  The Challengers contend that we should treat the Public Safety provisions as more recently enacted than § 4-209 because the Public Safety Article was adopted one year after the Criminal Law Article.  That contention is meritless.  When examining legislative intent, we focus on the time of adoption or, if relevant, substantive change. *See State v. Ghajari*, 346 Md. 101, 115 (1997) (noting that, if two statutes conflict irreconcilably, "the statute whose relevant substantive provisions were enacted most recently" prevails (quoting *State v. Harris*, 327 Md. 32, 39 (1992))).  Because the Public Safety provisions were neither newly adopted nor substantively changed in 2003, we will not treat them as more recently enacted than Criminal Law § 4-209.

authorized local firearm regulations of six types of conduct in three specific areas. 1985 Md. Laws, Ch. 724. Second, subsection (c) of what is now § 4-209 allowed limited changes to existing local firearms regulations provided that the changes did "not create an inconsistency with this section or expand existing regulatory control[.]" *Id.* And third, uncodified § 2 of Chapter 724 provided "[t]hat this Act shall not affect or repeal any local ordinance in existence as of January 1, 1985." *Id.*

In his letter reviewing the legislation that became Chapter 724, Attorney General Steven Sachs identified certain "interpretive problems," including how § 4-209(b)(1) would interact with existing express preemption provisions related to firearms. Md. Att'y Gen. Letter to Gov. Hughes, H.B. 176 Bill File at 1 (May 23, 1985). The Attorney General discussed two "well settled" principles of statutory interpretation that he found to be dispositive. *Id.* at 3. First, "to the extent the provisions of the two statutes are irreconcilable, the later statute governs." *Id.* (citing *Carroll County Educ. Ass'n v. Bd. of Educ.*, 294 Md. 144, 152 (1982)). Second, "a specific provision controls over a general provision on the same subject matter." *Id.* (citing *Balt. Nat. Bank v. State Tax Comm'n*, 297 U.S. 209, 215 (1936); *Montgomery County v. Lindsay*, 50 Md. App. 675, 678-79 (1982)). Attorney General Sachs concluded that "[u]nder either principle, the new authority [under what is now § 4-209(b)(1)] to regulate in specific ways would control over the older broad preemption [provisions]." *Id.* After receiving the Attorney General's bill review letter and analysis, Governor Hughes signed Chapter 724 into law.

We agree with the Attorney General's contemporaneous analysis for essentially the same reasons. When possible, this Court "attempt[s] to harmonize provisions dealing with the same subject so that each may be given effect." *Doe v. Montgomery County Bd. of Elections*, 406 Md. 697, 713 (2008). But when integrating the two statutes is impossible, as is the case here, we must determine which statute the General Assembly intended to prevail. As Attorney General Sachs noted, in making that determination we have frequently called upon the principles that a later enacted statute will ordinarily prevail over an earlier enacted one, and a more specific statute will ordinarily prevail over a more general one. *See, e.g.*, *Dep't of Motor Vehicles v. Greyhound Corp.*, 247 Md. 662, 667 (1967) (observing that a newer statute may more accurately reflect the General Assembly's intent as the "last expression of the legislative will"); *Maguire v. State*, 192 Md. 615, 623 (1949) (stating "an old and familiar rule" that when a particular statute and a general one conflict, "the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment" (quoting *Pretty v. Solly* (1859) 53 Eng. Rep. 1032, 1034 (Ch.)). With respect to Public Safety §§ 5-104, 5-133(a), and 5-134(a), and § 6 of Chapter 13 of the 1972 Maryland Laws, both the legislative history and our interpretive principles point persuasively in the same direction: the General Assembly's intent was for the later-enacted and more specific § 4-209(b)(1) to prevail over the earlier-enacted and more general preemption provisions, thus permitting local regulation of firearms in the three specific areas set forth in § 4-209(b)(1).

We ultimately reach the same conclusion with respect to Public Safety § 5-207(a), although the analysis is slightly more complicated because the General Assembly enacted that provision after Criminal Law § 4-209. At times, the application of multiple canons of construction "may lead to conflicting interpretations[.]" *Wheeling v. Selene Finance LP*, 473 Md. 356, 378 (2021). When at this crossroad, to determine "which standard wins the day[,]" *id.*, we return to our ultimate purpose in applying these canons—"discern[ing] the legislative intent underlying the provision[s,]" *Bennett v. Harford County*, 485 Md. 461, 468 (2023).

Public Safety § 5-207(a), enacted by the General Assembly in 2021, is part of a statute generally regulating the transfer of long guns in Maryland. 2021 Md. Laws, Chs. 11, 37. While enacted after Criminal Law § 4-209(b), Public Safety § 5-207(a) is the more general statute when applied to the subject they both address, the local regulation of long gun transfers. While Public Safety § 5-207(a) broadly preempts all local regulation of transfers of long guns, § 4-209(b)(1) expressly permits such local regulation in three limited areas.

Ultimately, we resolve the conflict between these two provisions on the ground that whatever preemptive authority Public Safety § 5-207(a) might have is irrelevant to the provisions under review here. Criminal Law § 4-209(b)(1) expressly authorizes local regulation of the "purchase, sale, transfer, ownership, possession, and transportation" of all firearms in three specific areas. Public Safety § 5-207(a) precludes local regulation only of the transfer of long guns. It does not purport to preclude local regulation of the

possession of long guns. And if a county may regulate the possession of long guns within 100 yards of or in a place of public assembly, it can implicitly regulate the transfer of long guns in those same areas because possession, in this context, is a prerequisite to transfer. Notably, the challenged provisions of Chapter 57 do not purport to alter or deviate from any of the substantive regulations concerning the transfer of long guns that are set forth in Public Safety § 5-207(b) and (c). Whether an attempt to modify those substantive regulations in connection with any purported exercise of authority granted by Criminal Law § 4-209(b)(1) would be preempted by Public Safety § 5-207(a) must await a case that presents that issue. Any such preemptive authority is irrelevant to the questions presented here.

In sum, we conclude that § 4-209(b)(1) has not been abrogated by any of the express preemption provisions we have discussed.

### iii. *Criminal Law § 4-209(b)(1)*

We now consider whether Criminal Law § 4-209(b)(1) authorizes the challenged provisions. As discussed, § 4-209(b)(1) authorizes local regulation of six types of conduct related to firearms in three areas, two of which are relevant here: "with respect to minors"; and "within 100 yards of or in a park, church, school, public building, and other place of public assembly." Crim. Law § 4-209(b)(1)(i), (iii). Any local firearm regulation that does not fit within the scope of that authorization is expressly preempted by, among other provisions, § 4-209(a).

The County contends that its regulation of firearms near places of public assembly in § 57-11(a) and its regulation of ghost guns in § 57-7 fall within the scope of regulation authorized by § 4-209(b)(1).  The Challengers reject both claims.

### a. The County's Regulation of Firearms In or Within 100 Yards of a Place of Public Assembly

Section 57-11(a) bans the sale, transfer, possession, or transport of a firearm, ammunition, or a major component of a firearm in or within 100 yards of a place of public assembly.  In 2022, the County significantly expanded the scope of that prohibition, at least partially in response to the United States Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).  Two aspects of that decision were particularly influential in the County Council's adoption of the 2022 amendments.  First, the Supreme Court found that New York's "may issue" handgun carry permitting scheme—issuing permits only to individuals who "demonstrate a special need" to carry a handgun in public—violated the Second Amendment to the United States Constitution.  *Id.* at 11-14.  The ruling in *Bruen* meant that Maryland's own "may issue" permitting scheme, which was similar to New York's, *see Woollard v. Gallagher*, 712 F.3d 865, 868-70 (4th Cir. 2013) (describing Maryland's pre-*Bruen* permitting scheme), was also unconstitutional, *see In re Rounds*, 255 Md. App. 205, 206 (2022).

Second, the Supreme Court recognized a presumptively constitutional historical practice of banning firearms within "sensitive places," such as "legislative assemblies, polling places, and courthouses[.]"  *Bruen*, 597 U.S. at 30.  The Court opined that lower courts might "use analogies to those historical regulations of 'sensitive places' to determine

that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.*

Reacting to *Bruen*, the County: (1) expanded its definition of place of public assembly; and (2) eliminated an exception in the ordinance for holders of State-issued wear-and-carry permits. 2022 L.M.C., Ch. 36, § 1. In a memorandum to the County Council, the County's Senior Legislative Attorney explained that the expanded definition of place of public assembly was adopted "[i]n order to make this definition more closely aligned with *Bruen*'s approach to 'sensitive places' . . . and in order to include places that *Bruen* has specifically said do qualify as 'sensitive places[.]'"

As noted, a "place of public assembly" now includes all of the following, along with "all property associated with the place, such as a parking lot or grounds of a building":

(1) a publicly or privately owned: (A) park; (B) place of worship; (C) school; (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility, including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility;

(2) government building, including any place owned by or under the control of the County;

(3) polling place;

(4) courthouse;

(5) legislative assembly; or

(6) a gathering of individuals to collectively express their constitutional right to protest or assemble.

Chapter 57, § 57-1 (2025).

The issue before this Court is not whether any of the locations the County has defined as "places of public assembly" qualify as "sensitive places" for Second Amendment purposes. Before us is only whether these new locations qualify as parks, churches, schools, public buildings, or "other place[s] of public assembly," as that phrase is used in Criminal Law § 4-209(b)(1)(iii). We conclude that some do, and others do not.

As an initial matter, several of the locations the County has identified as "places of public assembly" are either enumerated in § 4-209(b)(1)(iii) or are directly analogous to one of those enumerated locations. Thus, we readily conclude that § 4-209(b)(1)(iii) authorizes the inclusion of a park, place of worship, school, library, courthouse, and legislative assembly on that list. Parks and schools are enumerated locations. A place of worship is an analogue to a church. And libraries, courthouses, and legislative assemblies are paradigmatic examples of public buildings.

The Challengers nonetheless argue that even these locations exceed the County's authority because they apply to places that are "privately owned." We disagree. Section 4-209(b)(1)(iii) does not limit its scope only to locations that are publicly owned. Indeed, such a limitation would be nonsensical as applied to churches and many schools. The important limitation § 4-209(b)(1)(iii) places on what a local jurisdiction may identify as a "place of public assembly" is not ownership but, as we discuss next, whether the location is open to the public for assembly. To the extent the Challengers contend that there may be private parks or libraries in the County that do not meet that standard, such a claim is more appropriately adjudicated on an individual as-applied basis.

For the remaining locations, our analysis turns on the meaning of "place of public assembly." "When statutory terms are undefined, we often look to dictionary definitions as a starting point, to identify the 'ordinary and popular meaning' of the terms, before broadening our analysis to consider the other language of the provisions in which the terms appear and the statutory scheme as a whole[.]" *Hollabaugh v. MRO Corp.*, 491 Md. 165, 176-77 (2025) (alteration in original) (quoting *Westminster Mgmt.*, 486 Md. at 644).

Affording the terms their plain meaning, a place of public assembly is a location that is open for members of the public to gather for a common purpose, such as deliberating, legislating, worship, entertainment, education, or recreation. *See Public*, Merriam-Webster's Collegiate Dictionary 1005 (11th ed. 2014) (defining "public" as "accessible to or shared by all members of the community"); *Public*, New Oxford American Dictionary 1411 (3rd ed. 2010) (defining "public" as "open to or shared by all the people of an area or country"); *Assembly*, Merriam Webster's Collegiate Dictionary 73-74 (defining "assembly" as "a company of persons gathered for deliberation and legislation, worship, or entertainment"); *Assembly*, New Oxford American Dictionary 96 (defining "assembly" as "a group of people gathered together in one place for a common purpose").

As applied to § 4-209(b)(1)(iii), that definition comports with the doctrine of *ejusdem generis*, a canon of statutory construction that instructs that "when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned." *In re Wallace W.*, 333 Md. 186,

190 (1993) (quoting *Giant of Md. v. State's Att'y*, 274 Md. 158, 167 (1975)).  Here, "place of public assembly" follows the specific terms park, church, school, and public building. Crim. Law § 4-209(b)(1)(iii).  Parks are generally open to members of the public for entertainment and recreation.  Churches are generally open for worship.  Public buildings are generally open to attend to the business of government.  And although many schools are generally not open to the public during the school day, they provide a place for students and teachers to assemble during the school day and, outside of that time, they have traditionally served as places for public assembly.  *See, e.g.*, Lee Benson et al., *The Enduring Appeal of Community Schools: Education Has Always Been a Community Endeavor*, Am. Educator 24 (2009) ("By 1913, 71 cities in 21 states reported having schools that functioned as social centers; by 1914, 17 states had enacted legislation allowing wider use of school facilities by communities."); *Facility Reservation – Montgomery County Public School Facilities*, Community Use of Public Facilities, https://www.montgomerycountymd.gov/CUPF/info-reservation/MCPS.html, *archived at* https://perma.cc/7YEC-AXFL (describing the availability of Montgomery County school buildings for rental for "community events and activities").[10]

---

[10] The County website's Facility Reservation page for public school facilities includes the following introductory statement:

> Schools are great places to conduct a wide variety of activities, classes, performances, camps, cultural and religious programs, recreational activities, sports tournaments, instructional dance, and so much more. There are more than 200 school sites, each with several rooms, both large and small, available for use by the community.  We welcome all

Applying our plain meaning definition, we conclude that a "recreational facility," a "multipurpose exhibition facility, such as fairgrounds or conference center," and a "polling place" are all fairly encompassed within the phrase "place of public assembly." Although recreational facility is not defined, we interpret it in context to encompass only recreational facilities that are open to the public—with or without a fee—for recreational purposes. We similarly interpret multipurpose exhibition facility in context, and with the aid of the included examples, as a facility open to the public for recreational, entertainment, educational, or similar purposes. And polling places, many of which would likely already be covered as schools or other public buildings, are open to the public for the purpose of assembling for the common purpose of voting.

In contrast, we conclude that hospitals, community health centers, long-term facilities, childcare facilities, and "government building[s], including any place owned by or under the control of the County," are not fairly encompassed within the definition of a "place of public assembly."[11] Hospitals, community health centers, long-term facilities,

---

> responsible parties to utilize these facilities for community events and activities at reasonable costs to County residents and businesses. Come on in!

*Facility Reservation – Montgomery County Public School Facilities*, Community Use of Public Facilities, https://www.montgomerycountymd.gov/CUPF/info-reservation/MCPS.html, *archived at* https://perma.cc/7YEC-AXFL.

[11] Notably, the carry of firearms in all these locations—although not within 100 yards of them—is now prohibited by State law. In 2023, the General Assembly, also acting in the wake of the *Bruen* decision, enacted § 4-111 of the Criminal Law Article. 2023 Md. Laws, Ch. 680. Subject to exceptions that do not include holders of State-issued

and childcare facilities are not generally open to the public for any purpose of assembly. And although some "government building[s]" would certainly qualify as "public buildings," if open to the public for purposes we have described, the County goes too far in including within that term "any place owned by or under the control of the County." The County owns buildings throughout its borders, including single-family homes, that cannot reasonably be described as places of public assembly. *See* Publicly Owned Land, Montgomery County, https://www.mcatlas.org/county_owned_land/ (last visited Apr. 27, 2026). To be sure, we are not opining here on whether the County could preclude the carry of firearms on any property it owns in its proprietary capacity. But § 4-209(b)(1)(iii) does not authorize the County to preclude carry of firearms within 100 yards of its property unless the property is a "place of public assembly."

---

wear-and-carry permits, that section prohibits the wear, carry, or transport of a firearm in "an area for children or vulnerable individuals," "in a government or public infrastructure area," and "in a special purpose area." Crim. Law § 4-111(c), (d)(1), (e). The section defines an area for children and vulnerable individuals to include, among other things, "a preschool or prekindergarten facility or the grounds of the facility" and "a health care facility." *Id.* § 4-111(a)(2). It defines government or public infrastructure area to include, among other things, "a building or any part of a building owned or leased by a unit of State or local government[.]" *Id.* § 4-111(a)(4). And it defines special purpose area to include stadiums, museums, amusement parks, racetracks, casinos, and locations that sell alcohol or cannabis. *Id.* § 4-111(a)(9). The United States Court of Appeals for the Fourth Circuit recently upheld the constitutionality of all these restrictions. *Kipke v. Moore*, 165 F.4th 194, 204-05 (4th Cir. 2026) (upholding Maryland's prohibitions on firearms in government buildings, State parks and forests, museums, healthcare facilities, and locations that sell alcohol; at stadiums, racetracks, amusement parks, and casinos; on public transportation and school grounds; and within 1,000 feet of a public demonstration; but holding unconstitutional Maryland's prohibition on carrying guns on private property without express permission).

Finally, a "gathering of individuals to collectively express their constitutional right to protest or assemble" is not a location. Although that language may describe a "public assembly," it does not describe a "*place* of public assembly" for which § 4-209(b)(1)(iii) authorizes local regulation.

In summary, we conclude that the County's regulation of firearms in or within 100 yards of a place of public assembly is authorized by § 4-209(b)(1)(iii) to the extent it extends to a park, place of worship, school, library, recreational facility, multipurpose exhibition facility, polling place, courthouse, and legislative assembly. The County's regulation is not authorized by § 4-209(b)(1)(iii)—and therefore is preempted by § 4-209(a)—to the extent it includes a hospital, community health center, long-term facility, childcare facility, other government building (as defined), or gathering of individuals without regard to the place they are gathering.

As noted, the County adopted a severability provision to save valid provisions of Chapter 57 in the event any provisions of that chapter are found invalid. 2022 L.M.C., Ch. 36, § 3. If these were the only deficiencies in § 57-11, we would proceed to a severability analysis to determine if the valid provisions of the County Code could be severed from the unauthorized locations. *See, e.g.*, *Sugarloaf Citizens Ass'n, Inc. v. Gudis*, 319 Md. 558, 573-77 (1990) (describing and performing a severability analysis). Because we will identify other deficiencies within § 57-11 that cannot be rectified by severing the valid provisions from the unauthorized locations, we will not undertake that analysis here.

### b. The County's Regulation of Firearms With Respect to Minors

Through the Amendments, the County expanded its regulation in § 57-7, titled "Access to guns by minors," by adding what are now subsections (c), (d), and (e):

> (c) A person must not give, sell, rent, lend, or otherwise transfer to a minor:
>
> > (1) a ghost gun or major component of a ghost gun;
> >
> > (2) an undetectable gun or major component of an undetectable gun; or
> >
> > (3) a computer code or program to make a gun through a 3D printing process.
>
> (d) A person must not purchase, sell, transfer, possess, or transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.
>
> (e) A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

Chapter 57, § 57-7(c), (d), (e) (2025).

The County contends that the new subsections fall within the authorization of § 4-209(b)(1)(i) to regulate firearms "with respect to minors." According to the County, the plain language of that phrase gives it the authority to regulate in any manner that "bears a reasonable relation to minors' access to, or use of, firearms." The Challengers respond that "with respect to minors" cannot be interpreted so broadly as to impermissibly regulate the sale, transfer, possession, and transport of ghost guns by adults. The resolution of that dispute turns on the meaning of "with respect to minors" in § 4-209(b)(1)(i).

In interpreting the scope of regulation permitted "with respect to minors," we are cognizant of both the breadth of the phrase—*see, e.g.*, *Respect*, Merriam-Webster's Collegiate Dictionary 1061 (defining "with respect to" as "concerning," "with reference to," and "in relation to")—and its placement within a statutory scheme that broadly preempts all local firearms regulations, subject to exceptions in three specific areas. We consider statutory language within its larger statutory scheme. *Westminster Mgmt.*, 486 Md. at 644-45. Here, that context suggests that the General Assembly intended to authorize local regulations that meaningfully address minors' unsupervised use of and access to firearms, but not in such a way as to undermine the General Assembly's intent to create a mostly uniform set of firearms regulations statewide.

Although not binding on our analysis, the Attorney General has twice opined on the intended breadth of § 4-209(b)(1)(i). *See A.S. Abell Publ'g Co. v. Mezzanote*, 297 Md. 26, 40 (1983) ("While an opinion of the Attorney General is entitled to consideration in determining legislative intent, it is not binding upon the courts."). In 1991, the Attorney General advised that the predecessor to § 4-209(b)(1)(i) authorized a local bill prohibiting any person from leaving a loaded firearm without a trigger lock in a location where the person knows a minor may have access to it. 76 Op. Md. Att'y Gen. 240, 242 (1991). Although noting that the legislation would regulate the conduct of adults, not children, the Attorney General observed that "since children gain access to firearms because adults are careless, no other manner of regulation would serve the goal of protecting children." *Id.*

The Attorney General opined that what is now § 4-209(b)(1)(i) authorized "any regulation that bears a reasonable relation to minors' access to, or use of, firearms." *Id.*

In 1997, the Attorney General reached the same conclusion concerning a similar proposed local regulation but added a caveat. 82 Op. Md. Att'y Gen. 84, 85-86 (1997). He cautioned "that authorization for local regulation 'with respect to minors' cannot be a pretext for regulation of *adults*' access to handguns. . . . The Legislature could not have intended to authorize localities to achieve indirectly what they may not achieve directly: across-the-board regulation of firearms." *Id.* at 86. We find the Attorney General's analysis, including the point of caution raised in his 1997 opinion, to be persuasive and correct.

Returning to § 57-7, two of the provisions added to that section fall comfortably within the scope of the authority provided by § 4-209(b)(1)(i). Subsection (c) prohibits any person from providing a minor with certain types of firearms. And subsection (e) precludes persons from storing or leaving those same types of firearms "in a location that the person knows or should know is accessible to a minor." Those provisions directly regulate activities that would provide minors with unsupervised access to specific types of firearms and present minimal intrusion on firearm ownership and use by adults.

Subsection (d) is different. Unlike subsections (c) and (e), this provision prohibits a broad swath of otherwise lawful (and constitutionally protected) conduct by adults merely because it occurs in the presence of a minor, without any apparent connection to whether that activity might result in minors gaining unsupervised access to those firearms. The

County has not identified any such connection, and we cannot divine any. Accordingly, § 57-7(d) is not authorized by § 4-209(b)(1)(i) and so is preempted by § 4-209(a).

Unlike with § 57-11, we have not identified other deficiencies in § 57-7. Accordingly, we undertake a severability analysis to determine whether the valid portions of that section can be severed from § 57-7(d) and "continue in full force and effect." *See* 2022 L.M.C., Ch. 36, § 3.

We recognize a "strong presumption 'that a legislative body generally intends its enactments to be severed if possible.'" *Sugarloaf*, 319 Md. at 574 (quoting *State v. Burning Tree Club, Inc.*, 315 Md. 254, 297 (1989)). However, even the existence of a severability clause "only raises the presumption of severability" because not all valid provisions of a legislative act are severable. *County Council of Prince George's County v. Chancey Enters. L.P.*, 454 Md. 514, 539-40 (2017). The test to determine whether a provision is severable is if a legislative body would "have enacted the statute or ordinance if it knew that part of the enactment was invalid[.]" *Id.* at 540 (quoting *Anne Arundel County v. Moushabek*, 269 Md. 419, 428 (1973)). "When the dominant purpose of an enactment may largely be carried out notwithstanding the [enactment's] partial invalidity, courts will generally hold the valid portions severable and enforce them." *O.C. Taxpayers for Equal Rights, Inc. v. Mayor & City Council of Ocean City*, 280 Md. 585, 601 (1977).

Here, the legislative intent is clear. The County Code includes a general presumption of severability. Montgomery County, Md., Code § 1-202 (2025) ("[I]t is the intent of the Council that the provisions of this Code and all laws enacted by the County

Council are severable.  If a provision is held invalid or inapplicable, the remainder of the Code or the law remains in effect.").  Taking a belt-and-suspenders approach, the County Council also adopted a special severability provision applicable only to Chapter 57.  2022 L.M.C., Ch. 36, § 3 (stating that if "any provision of Chapter 57[] is found to be invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect").  We will therefore sever the valid provisions of § 57-7 from the invalid provision if possible.

Severance is possible here.  Section 57-7(d) is a standalone prohibition.  No other provision of Chapter 57 is dependent on § 57-7(d), nor would the application of any other provision of the Chapter be altered in any way if that provision is severed.  Accordingly, the dominant purpose of the remainder of § 57-7 may be carried out without § 57-7(d).  We therefore hold that the remainder of § 57-7 is severed from the invalid § 57-7(d).

### 2.  *Implied Field Preemption*

In addition to their express preemption arguments, the Challengers also argue that § 4-209(b)(1) has been impliedly abrogated by the State's significantly increased regulation of firearms in the years since it was enacted, thus resulting in the implied preemption of local laws enacted pursuant to its authority, including Chapter 57.  Implied field preemption occurs only when a local law "deal[s] with an area in which the [State] Legislature has acted with such force that an intent by the State to occupy the entire field must be implied[.]"  *Talbot County v. Skipper*, 329 Md. 481, 488 (1993) (first two alterations in original) (quoting *County Council for Montgomery County v. Montgomery Ass'n*, 274 Md.

41

52, 59 (1975)); *Bd. of County Comm'rs of Washington County v. Perennial Solar, LLC*, 464 Md. 610, 620 (2019) (noting that this Court has "stated repeatedly that '[t]he primary indicia of legislative purpose to preempt an entire field of law is the comprehensiveness with which the General Assembly has legislated in the field'" (quoting *Howard County v. Potomac Elec. Power Co.*, 319 Md. 511, 523 (1990))).

The primary problem with the Challengers' implied preemption claim is that, here, the General Assembly has not left us searching for its intent in implication. The General Assembly has expressly preempted local regulation of firearms where that has been its intent, and, in § 4-209(b)(1), it has expressly authorized limited local regulation of firearms in three specific areas. The Challengers are correct that the extent of the State's regulation of firearms has increased substantially since the adoption of § 4-209. However, we would be hard pressed to infer from that increased regulation an intent to implicitly repeal the express grant of authority contained in § 4-209(b)(1), and thereby impliedly preempt the local laws enacted under its authority. We will not do so here.

### 3. *Conflict Preemption*

The Challengers argue that even if authorized by § 4-209(b)(1) and not preempted by implication, certain portions of the Amendments place Chapter 57 in conflict with State law and are therefore preempted.

While it has been "recognized with some frequency" that the General Assembly intends there to be "concurrent power" and "functional interplay between State and local legislation[,]" *Mayor & City Council of Baltimore v. Sitnick*, 254 Md. 303, 312 (1969), a

"local government ordinance which conflicts with a public general law enacted by the General Assembly is preempted and thus is invalid[,]" *Coal. for Open Doors v. Annapolis Lodge No. 622*, 333 Md. 359, 379 (1994). A local ordinance conflicts with public general law when "it either prohibits an act that under State law is permitted, or it permits an act that under State law is prohibited." *Worton Creek Marina, LLC v. Claggett*, 381 Md. 499, 513 (2004). However, although "a political subdivision may not prohibit what the State by general public law has permitted . . . it may prohibit what the State has not expressly permitted." *Coal. for Open Doors*, 333 Md. at 381 (emphasis omitted) (quoting *Sitnick*, 254 Md. at 317). In other words, "[t]he State's prohibition of certain[, but not all,] activity in a field does not impliedly guarantee that all other activity [in that field] shall be free from local regulation[.]" *Id.*

"Not all conflicts . . . fit squarely within the 'prohibit-permit' category." *Worton Creek Marina*, 381 Md. at 513. Even where a local law does not specifically permit an act prohibited by the State, or specifically prohibit an act permitted by the State, the local law may nevertheless be invalid if it creates a "direct conflict" with a State statute regulating the same matter. *See id.* at 514 (collecting cases).

Much of the Challengers' argument concerning conflict preemption constitutes a general complaint that certain aspects of §§ 57-7 and 57-11(a), (b), and (d) are more restrictive than State law. For example, the Challengers complain that while Public Safety §§ 5-114 and 5-145 require firearms dealers to implement "safe storage" in a safe, vault, or special room only "outside of business hours," § 57-11(d)(3) requires dealers to secure

43

their firearms at all times. The Challengers similarly assert that the County's safe storage requirements for ghost guns are more restrictive than the general safe storage provisions in § 4-104 of the Criminal Law Article in two ways. First, § 4-104 applies only to loaded firearms, while § 57-7(e) applies to ghost guns whether loaded or not, and second, § 57-7(e) lacks an exception contained in § 4-104 for minors with certificates of firearm and hunter safety.[12]

An established rule in our conflict preemption jurisprudence is that, while "ordinances which assume directly or indirectly to permit acts or occupations which the State statutes prohibit, or to prohibit acts permitted by statute or Constitution, are . . . uniformly declared to be null and void[,]" that is not the case if the local regulation is merely an "[a]dditional regulation" supplementing State law. *Rossberg v. State*, 111 Md. 394, 416 (1909) (holding that a municipal ordinance can impose greater penalties on the possession and sale of cocaine than imposed under State law without causing conflict). The "fact[] that an ordinance enlarges upon the provisions of a [State] statute by requiring more than the statute requires creates no conflict[.]" *Sitnick*, 254 Md. at 315 (quoting *E. Tar Prods. Corp. v. State Tax Comm'n*, 176 Md. 290, 296-97 (1939)).

Our caselaw also has consistently recognized the distinction between State laws that affirmatively permit conduct—thus protecting that conduct from encroachment by local

---

[12] The Challengers also complain that § 57-7(a) includes an exception allowing "parental supervised minor access to components of a rifle or a shotgun" but not to components of handguns. However, § 57-7(a) does not regulate handguns at all, so an "exception" related to components of handguns would be nonsensical.

legislation—and laws that merely exempt certain conduct from the reach of a State prohibition. In *Sitnick*, for example, we held that Baltimore City could apply its local minimum wage ordinance to taverns even though taverns were exempted from the State's minimum wage law. 254 Md. at 311. We concluded that by exempting taverns from the reach of the State law, the General Assembly had left them open to local regulation, rather than making "an affirmative guarantee against local regulation." *Id.* at 324.

Similarly, in *National Asphalt Pavement Association v. Prince George's County*, we held that Prince George's County could apply its ordinance prohibiting employment discrimination to employers with fewer than 15 employees even though the State exempted such employers from its analogous statute. 292 Md. 75, 80-81 (1981). We reasoned that the "state statute would have to *permit* discrimination by employers with less than fifteen employees for there to be a conflict under the test set forth in our cases[,]" not just exempt such employers from the regulation. *Id.* at 79 n.3.

And in *Mayor & City Council of Baltimore v. Hart*, we held that a Baltimore City ordinance permitting emergency vehicles to pass red lights only after coming to a full stop at the intersection was not preempted by a State law permitting such vehicles to pass red lights "only after slowing down as necessary for safety[.]" 395 Md. 394, 405, 409 (2006). We concluded that the City ordinance merely imposed an "additional requirement[]" that did "not allow conduct the State statute prohibits." *Id.* at 406; *see also Mayor & Alderman of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 393 (1979) ("Municipalities are free to provide for additional standards and safeguards in harmony

with concurrent state legislation."); *E. Tar Prods. Corp.*, 176 Md. at 296-97 (holding that Baltimore could set an earlier deadline than State law for applications for a tax exemption).

In contrast, in *Heubeck v. Mayor & City Council of Baltimore*, we struck down a Baltimore City ordinance prohibiting landlords from initiating litigation to evict tenants who continued to pay rent after the termination of a lease because it conflicted with a State law authorizing landlords to file tenant holding over actions to evict tenants. 205 Md. 203, 210-11 (1954). There, the City ordinance purported to prohibit what State law expressly permitted. *Id.*

Local jurisdictions also may not permit what State law prohibits. Thus, in *Levering v. Williams*, we held that a Baltimore City ordinance permitting professionals to play baseball on Sundays conflicted with a State law declaring that "no person whatsoever shall work or do any bodily labor on . . . Sunday[.]" 134 Md. 48, 53, 60 (1919).

As in *Sitnick*, *National Asphalt*, and *Hart*, most of the Challengers' allegations of conflict between State law and Chapter 57 are examples of the County supplementing State law, rather than true conflicts. Requiring firearms dealers to secure firearms during business hours does not conflict with State law requiring them to be secured at other times.[13] And ensuring that minors do not have access to ghost guns in certain circumstances does not conflict with State law ensuring that minors do not have access to

---

[13] For this reason, although the circuit court did not err in addressing § 57-11(d), *see* discussion above at 17, we nonetheless conclude that the court erred in striking down § 57-11(d) on the merits because it is not in conflict with State law.

firearms in other circumstances.  Accordingly, other than as specifically discussed next, we reject the Challengers' arguments concerning conflict preemption.

Two categories of alleged conflict preemption challenges merit more analysis.  First, the Challengers contend that the County's removal of the exception previously in § 57-11(b) for holders of State-issued wear-and-carry permits places that provision in conflict with Criminal Law § 4-203.  Second, the Challengers argue that aspects of the County's regulation of ghost guns in §§ 57-7 and 57-11 conflict with a recent State law regulating such firearms.

### i.  *Alleged Conflict with State Law Regulating Permit Holders*

Before the Amendments, § 57-11(b)(5) excepted all holders of State-issued wear-and-carry permits from the restrictions contained in § 57-11(a).  Chapter 57, § 57-11(b)(5) (2021).  The Challengers argue that the removal of that exception places § 57-11(a) in conflict with § 4-203 of the Criminal Law Article.

Section 4-203(a) broadly prohibits the "wear, carry, or transport [of] a handgun, whether concealed or open, on or about the person" or "in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State[.]"  Section 4-203(b) carves out several exceptions to that general prohibition, three of which are particularly relevant here:

> (b) This section does not prohibit:
>
> . . .

(2) the wearing, carrying, or transporting of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;

. . .

(6) the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases;

(7) the wearing, carrying, or transporting of a handgun by a supervisory employee:

(i) in the course of employment;

(ii) within the confines of the business establishment in which the supervisory employee is employed; and

(iii) when so authorized by the owner or manager of the business establishment[.]

The Challengers contend that § 57-11 conflicts with each of these exceptions because it now contains no exception for permit holders and because the exceptions in § 57-11 related to homes and businesses are significantly narrower than the exceptions in § 4-203(b)(6) and (7). In particular, § 57-11(b)(3) excepts "the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's home," but not on other real estate the person owns, leases, or resides in, as does § 4-203(b)(6). And § 57-11(b)(4) excepts only "the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm[.]" That exception does not apply to carry in a business establishment the person owns or leases, as does

§ 4-203(b)(6), or by a supervisory employee when authorized by the owner or manager, as does § 4-203(b)(7).

Resolving these challenges requires us to determine whether the exceptions in Criminal Law § 4-203(b)(2), (6), and (7), function as carve-outs from a general prohibition, like the exception in *Sitnick* for taverns, or affirmative grants of permission to engage in the conduct described, like the authorization to file a tenant holding over action at the end of a lease term at issue in *Heubeck*.

For three reasons, we conclude that the exceptions in § 4-203(b)(2), (6), and (7) function as carve-outs from the general prohibition against the carry of handguns in § 4-203(a). First, that conclusion best fits the plain language of § 4-203(b), which does not provide the holders of carry permits with an affirmative right, but instead states only what "[t]his section does not prohibit[.]"[14] Second, that conclusion also best matches the structure of the statutory scheme, which identifies a broad prohibition and several specific exceptions. Third, the provisions now codified in § 4-203 existed at the time the General Assembly authorized local jurisdictions to regulate possession of firearms within 100 yards of or in schools, churches, parks, public buildings, and other places of public assembly. Nothing about the statutory scheme or legislative history suggests that the General Assembly intended to mandate that local jurisdictions allow permit holders to carry

---

[14] The provisions of the Public Safety Article relating to handgun carry permits similarly describe a permit as being required to carry a handgun, but not as establishing an entitlement or right to do so. *See, e.g.*, Pub. Safety § 5-303 ("A person shall have a permit issued under this subtitle before the person carries, wears, or transports a handgun.").

concealed firearms in or in close proximity to, for example, schools and courthouses. We see no conflict between the exceptions in § 4-203(b)(2), (6), and (7) and § 57-11 as amended.[15]

### ii. *Alleged Conflict with State Law Regulating Ghost Guns*

The Challengers further contend that the new ghost gun provisions added to Chapter 57 conflict with a recent State law. The County first regulated ghost guns in 2021. In 2022, the State regulated ghost guns for the first time, through provisions codified at §§ 5-701 through 5-703 of the Public Safety Article. *See* 2022 Md. Laws, Chs. 18, 19. Later that same year, the County amended the ghost gun provisions in Chapter 57 to more closely conform with the new State law. *See* 2022 L.M.C., Ch. 36, § 1. The Challengers contend that the remaining differences in the two schemes place Chapter 57 in conflict with the State law. We begin by exploring the differences between the two schemes.

The County defines ghost gun to mean:

a firearm, including an unfinished frame or receiver, that:

(A) lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer in accordance with federal law; and

---

[15] As discussed above in footnote 11, in 2023, the General Assembly enacted § 4-111 of the Criminal Law Article, which prohibits carry of firearms, including by holders of State-issued wear-and-carry permits, in several types of locations, including schools, government-owned buildings, and healthcare facilities. The General Assembly thus does not see any conflict between the State's carry permit scheme and legislation prohibiting carry in specific locations even by holders of those permits.

(B) lacks markings and is not registered with the Secretary of the State Police in accordance with Section 5-703(b)(2)(ii) of the Public Safety Article of the Maryland Code.

"Ghost gun" does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968.

Chapter 57, § 57-1 (2025). In essence, a ghost gun for purposes of Chapter 57 is a firearm that is required by federal law to contain a serial number on its frame or receiver and that has neither a serial number nor alternative markings made in accordance with State law.[16]

Currently, Chapter 57 regulates ghost guns in both §§ 57-7 and 57-11. Section 57-7 contains three such provisions. As we already held § 57-7(d) to be preempted, *see* above at 39-40, we will not discuss that further here. Section 57-7(c) prohibits an individual from providing a ghost gun or a major component of a ghost gun to a minor. And § 57-7(e) prohibits an individual from leaving a ghost gun or a major component of a ghost gun in a location that the person knows or should know is accessible to a minor. For purposes of Chapter 57, a "major component" includes "the slide or cylinder or the frame or receiver" of any firearm and the barrel of a rifle or shotgun. *Id.* § 57-1.

---

[16] The terms "frame" and "receiver" are defined in 27 C.F.R. § 478.12. A "frame" is the part of a handgun "that provides housing or a structure for the component . . . designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence[.]" *Id.* § 478.12(a)(1). A "receiver" is the part of a long gun "that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence." *Id.* § 478.12(a)(2). The regulation provides helpful illustrations of both frames and receivers. *See id.* § 478.12(a)(4).

Section 57-11 now includes a ghost gun and a major component of a ghost gun among the types of firearms that cannot be sold, transferred, possessed, or transported in or within 100 yards of a place of public assembly. That regulation treats ghost guns like any other type of handgun, rifle, or shotgun, with one difference: There is no exception allowing a ghost gun to be possessed in a person's own home. Thus, the County bans the sale, possession, transfer, or transport of a ghost gun in or within 100 yards of a place of public assembly, even if that area includes one's own home.

Maryland law does not use the term "ghost gun." However, § 5-703 of the Public Safety Article generally: (1) prohibits the purchase, receipt, sale, offer to sell, and transfer of an unfinished frame or receiver unless it is required by federal law to be imprinted with a serial number and has been so imprinted, Pub. Safety § 5-703(a)(1); and (2) prohibits the sale, offer to sell, transfer, or possession of a firearm unless it either (a) has been imprinted with a serial number if required to be so under federal law; or (b) has been registered with the Secretary of the Maryland State Police and imprinted with a unique number that includes the zip code and initials of the owner or person who made the firearm, *id.* § 5-703(a)(2), (b)(2). Section 5-703 contains several relevant exceptions, including for the possession of such a firearm by a person who: (1) neither knew nor reasonably should have known that it was not imprinted with a serial number; (2) inherited it, for a period not exceeding 30 days; or (3) made or manufactured it, for a period not exceeding 30 days. *Id.* § 5-703(b)(1).

The Challengers identify three primary alleged conflicts arising from the differences between Chapter 57 and Public Safety § 5-703. First, they claim that under § 57-7(c), but not State law, minors are prohibited from having access to major components of ghost guns. The Challengers point out that although § 57-1 defines "major component" to include a slide, cylinder, or barrel of a firearm, in addition to a frame or receiver, federal and State law require only the frame or receiver to be serialized or marked. And because components of firearms are often interchangeable, a slide, cylinder, or barrel that is not currently attached to a frame or receiver could just as easily be attached to a serialized frame or receiver as one that is not serialized. Thus, the Challengers argue, a major component of a ghost gun can be the same as, and completely interchangeable with, a major component of a serialized firearm.

The inclusion of major components of ghost guns in Chapter 57 does not create a conflict with State law. Chapter 57 simply regulates something the State law does not. Nonetheless, the Challengers have identified a potential difficulty in the application of Chapter 57. Because of their interchangeability, an unattached slide, cylinder, or barrel will sometimes, perhaps often, not be readily identifiable as a major component of either a ghost gun or a firearm that is not a ghost gun. In such circumstances, because such a component could not be identifiable as a major component of a ghost gun, it would not be prohibited under Chapter 57. In other words, § 57-7 regulates items that *are* major components of ghost guns, not items that *could become* major components of ghost guns. Any challenge based on the difficulty of determining whether a particular slide, cylinder,

53

or barrel is a major component of a ghost gun will be more appropriately addressed on a case-by-case basis. *Cf. Pizza di Joey, LLC v. Mayor & City Council of Baltimore*, 470 Md. 308, 361 (2020) (noting that when a person asserts a facial vagueness challenge to a statute, the person "must establish that there is no set of circumstances under which the [statute] would be constitutional" (alteration in original) (quoting *Motor Vehicle Admin. v. Seenath*, 448 Md. 145, 181 (2016))).

Second, the Challengers argue that there is a conflict between Chapter 57 and State law concerning the possession and transport of ghost guns in certain circumstances. Specifically, the Challengers note that under § 57-11, individuals are prohibited from having a ghost gun in a home that is located within 100 yards of a place of public assembly for any length of time or from transporting a ghost gun through such areas. By contrast, State law provides a 30-day grace period to get a firearm serialized in two circumstances: (1) after inheriting it; and (2) after making or manufacturing it. Pub. Safety § 5-703(b)(1)(ii), (iii). Thus, the Challengers argue, the State scheme contemplates the transport of ghost guns to a federal firearms licensee for serialization.

The Challengers have again identified a difference but not a conflict with State law. The 30-day grace periods included in Public Safety § 5-703(b)(1) operate as exceptions from the general prohibition against ownership of ghost guns, not as extensions of an affirmative right to possess ghost guns in those circumstances for that period. And they certainly do not establish a right to possess ghost guns in or within 100 yards of a place of public assembly or to make them available to minors. In any event, we agree with the

County that Chapter 57, in requiring the serialization of firearms for lawful possession in a home located within 100 yards of a place of public assembly, also contemplates the lawful transport of ghost guns for serialization.[17]

Third, the Challengers contend that Chapter 57 conflicts with Public Safety § 5-703(b)(2) because the latter permits possession of firearms serialized by federally licensed firearms dealers, while Chapter 57 does not. State law permits possession of firearms if serialized in accordance with federal law by a federally licensed firearms manufacturer, importer, "or other federal licensee authorized to provide marking services." Pub. Safety § 5-703(b)(2). Federal regulations permit licensed dealers to provide such services. 27 C.F.R. § 478.92(a)(2). In contrast, Chapter 57 defines a ghost gun as one lacking serialization in accordance with federal law "by a licensed manufacturer, maker or importer[,]" omitting federal firearm dealers. Chapter 57, § 57-1 (2025). Chapter 57 thus appears to reject serialization by federally licensed firearms dealers in conformance with federal serialization requirements as a mechanism to make an unserialized firearm legitimate.[18]

---

[17] At oral argument, the County disavowed any interpretation of Chapter 57 that would prohibit an individual from transporting a ghost gun for the purpose of having it imprinted with a serial number.

[18] Both State law and Chapter 57 recognize an alternate pathway to rendering lawful firearms that lack serial numbers in compliance with federal law, which is the separate marking and registration system provided by Public Safety § 5-703(b)(2)(ii). Those markings may be "imprinted by a federally licensed firearms dealer," among others. *Id.* § 5-703(b)(2)(ii)(1).

We agree with the Challengers that a conflict exists between § 5-703(b)(2) and Chapter 57 to the extent that Chapter 57, read literally, would not recognize serialization by a federally licensed firearms dealer in accord with federal requirements as sufficient. Although the County can regulate the possession of firearms that are not compliant with federal and State law to the extent of its authority under § 4-209(b), it cannot dictate who may render those firearms compliant with federal and State law in a manner that is inconsistent with those authorities. On remand, the circuit court should enjoin the County from enforcing the ghost-gun-related provisions of §§ 57-7 and 57-11(a) with respect to firearms that have been serialized by firearms dealers in compliance with federal and State law. Otherwise, Chapter 57 is not in conflict with State law.

### B. Local Law

The Challengers also contend that Chapter 57, as amended in 2021 and 2022, violates Article XI-A of the Maryland Constitution because it is not substantively a local law. As discussed above, Article XI-A provides charter counties legislative authority to enact local laws to the extent the General Assembly has authorized them. Through the Express Powers Act, the General Assembly has authorized charter counties to enact local laws that promote "the peace, good government, health, and welfare of the county." Local Gov't § 10-206(a)(2). However, that authority is limited to enacting "local laws," as distinct from general laws. Md. Const. art. XI-A, § 4; *Baltimore City Bd. of Elections v. Mayor & City Council of Baltimore*, 489 Md. 465, 478 (2025) (observing that while the Home Rule Amendment gives "local jurisdictions the ability to share . . . powers formerly

reserved to the General Assembly[,]" it cabins counties' jurisdiction to local laws). Even an act of the General Assembly cannot validly authorize a county to pass a general law. *Holiday Universal, Inc. v. Montgomery County*, 377 Md. 305, 318-19 (2003).

A general law ordinarily deals with "a subject which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state." *Id.* at 315 (quoting *Steimel v. Bd. of Election Supervisors of Prince George's County*, 278 Md. 1, 5 (1976)). By contrast, a local law "applies to only one subdivision" and "pertains only to a subject of local import." *Tyma v. Montgomery County*, 369 Md. 497, 507 (2002). "[W]hether a law is general or local is 'to be determined by the application of settled legal principles to the facts of particular cases in which the distinction may be involved.'" *Id.* at 508 (quoting *Dasch v. Jackson*, 170 Md. 251, 260 (1936)).

This Court looks "beyond the form of the ordinance to its substance" because "'some statutes, local in form,' are [effectively] 'general laws[.]'" *Holiday Universal*, 377 Md. at 315 (quoting *Cole v. Sec'y of State*, 249 Md. 425, 434 (1968)). A law is not local "merely because its operation is confined to . . . a single county[.]" *Gaither v. Jackson*, 147 Md. 655, 667 (1925). "Where a charter county attempts to enact an ordinance on 'matters of significant interest to the entire state,' [this Court has] determined that it is not, in fact, 'a local law' under Article XI-A." *Assanah-Carroll v. Law Offs. of Edward J. Maher, P.C.*, 480 Md. 394, 425 (2022) (quoting *McCrory Corp. v. Fowler*, 319 Md. 12, 19 (1990)). Thus, a law that is executed in only one county but "substantially affects persons and entities outside of" the county is not a local law. *Holiday Universal*, 377 Md. at 319.

We have recognized that distinction for more than a century. In *Bradshaw v. Lankford*, for example, we addressed a law authorized by the General Assembly that submitted to the voters of Somerset County the question of whether to prohibit the taking of oysters from the County's waters.[19] 73 Md. 428, 429 (1891). We held that the enactment was "in no sense" a local law. *Id.* at 431. Although purportedly limited to the waters of Somerset County, the Court observed that the law would "deprive[] the people of the entire State of the common right which they enjoyed to take oysters by scoop or dredge within the waters of [Somerset] County." *Id.* This made the law, in effect, a general law. *Id.* at 431-32. We noted that a law is local only when it is both "local in [its] operation, and affect[s only] the people" who live in the county. *Id.* at 431.

In *Gaither v. Jackson*, this Court addressed changes Baltimore City made to local laws regulating the conduct of auctions and auctioneers in the City. 147 Md. at 664. The issue was whether the changes were authorized under the City's authority to revise local laws that had been in existence at the time it adopted home rule. *Id.* at 663-64. The changes included the transfer of authority over auctions from a State-controlled board to a City-controlled board and a requirement that payments for auction licenses be made to the City, rather than the State. *Id.* at 664. We observed that "the mere designation of a law as a

---

[19] The issue in *Bradshaw* was whether the General Assembly had the power to submit to the voters of Somerset County the question of whether it should be "unlawful for any person to take oysters by scoop or dredge within the waters of said county." 73 Md. at 429. The answer turned on whether the law to be enacted was a local law, limited in effect to Somerset County, or a general law. *Id.* Because we determined that the law had general effect, it could not be decided by the voters of Somerset County. *Id.* at 432.

local law or its treatment as such by the General Assembly does not make it a local law for all purposes," and that "a law is not necessarily a local law merely because its operation is confined to Baltimore City or to a single county, if it affects the interests of the people of the whole State." *Id.* at 667. Because the effect of the City's amendments would have been to shift a revenue stream from the State to the City, which would necessarily have effect on the State as a whole, we held that the amendments were beyond the City's authority. *Id.*; *see also Dasch*, 170 Md. at 261 (determining that a State law regulating the conduct of paper hangers in Baltimore City was a general law because it directed funds raised by licensing fees to be deposited in the general treasury of the State and because it affected the rights of persons not residing in the City).

And in *Holiday Universal, Inc. v. Montgomery County*, we held unconstitutional a Montgomery County ordinance making it unlawful to engage in unfair trade practices related to future service contracts. 377 Md. at 308. The ordinance applied to any "future service contract where the performance of the contract" was "'primarily' in Montgomery County or, regardless of where performance [would take] place, when the contract [was] merely signed in Montgomery County." *Id.* at 307-08. We held "that, because of its significant extraterritorial impact, the ordinance is not a 'local law'" and so was beyond the authority of the County to enact. *Id.* at 308.

By contrast, in *Cole v. Secretary of State*, we held that a law enacted by the General Assembly that substituted "a people's court for a system of justices of the peace, constables, and magistrates" in Cecil County was a local law because "in subject matter

and substance it [was] a law which is confined in its operation to prescribed territorial limits, equally applicable to all persons within such limits."[20] 249 Md. at 426, 435.

Similarly, in *Tyma v. Montgomery County*, we upheld as a valid local law a Montgomery County ordinance "extend[ing] employment benefits to the domestic partners of county employees." 369 Md. at 500. We observed that the ordinance "affects only the personnel policies of Montgomery County and does not implicate the State's interest in marriage or affect the State's ability to regulate marriage on a statewide basis." *Id.* at 515.

The Challengers contend that Chapter 57, as amended, while local in form, is not local in effect. They argue that the cumulative effect of the amendments to Chapter 57— especially the expanded definition of place of public assembly and the elimination of the exception for permit holders from the restrictions in § 57-11(a)—prohibits all permit holders from carrying their firearms in a substantial portion of Montgomery County, including the State and county highways running through the County.

---

[20] At the time the General Assembly enacted the legislation under review in *Cole*, Cecil County was not a charter county and so the General Assembly retained authority to enact local laws for the county. *See* Local Gov't §§ 10-102, 10-202 (granting charter counties the right to enact local laws); Cheryl Mattix, *Charter Government Finally Prevails in Cecil County*, Cecil Whig (Nov. 3, 2010), https://www.cecildaily.com/business/charter-government-finally-prevails-in-cecil-county/article_1b18d654-e756-11df-adb9-001cc4c002e0.html, *archived at* https://perma.cc/JMU8-23UW (noting that the Cecil County Charter was passed in 2010 and took effect in 2012). At issue in *Cole* was the number of votes required to petition the legislation to referendum. 249 Md. at 427-28. If the law was a local law, the petitioners had met the threshold; if it was a general law, they had not. *Id.*

The County does not really dispute the Challengers' contentions concerning the effect of the Amendments to Chapter 57 on the ability of permit holders to carry firearms in or while traveling through the County. When questioned at oral argument about whether § 57-11(a) applies to a permit holder driving through the County on a State highway within 100 yards of a place of public assembly, the County asserted that it does. According to the County, permit holders traveling through the County could comply with the law by either (1) identifying all places of public assembly in the County, creating maps identifying the areas in which carry is prohibited, and avoiding those areas, or (2) placing their firearms in an enclosed case or locked firearms rack as permitted in § 57-11(b)(5)(A).

We hold that § 57-11(a), as amended, is not a local law because of its application to holders of State-issued wear-and-carry permits traveling on public highways who cross within 100 yards of a place of public assembly. In effect, the County's regulation creates pockets of roadway throughout the County's lengthy and complex highway system in which travelers with State-issued wear-and-carry permits are banned from carrying firearms based on the proximity of those segments of roadway to buildings or locations that might not abut or even be visible from the road. That highway system carries large volumes of traffic coming from or going to the seven jurisdictions directly bordering the County—Prince George's, Frederick, Carroll, and Howard Counties in Maryland; Fairfax and Loudoun Counties in Virginia; and Washington, D.C.—including traffic originating in other locations throughout Maryland and beyond. Indeed, highways passing through Montgomery County such as Interstates 495 and 270, US Route 29, and State Route 97

serve as primary corridors of travel for much of the State of Maryland into Washington, D.C. and portions of Virginia, and vice versa.[21] Applying the County's regulation in that way imposes a burden on travel "of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state."[22] *Holiday Universal*, 377 Md. at 315 (quoting *Steimel*, 278 Md. at 5).

The County's proposed solutions do not solve its State constitutional problem. To the contrary, both options burden permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders. As currently constructed, § 57-11(a) has significant extraterritorial impact. Therefore, it is not a local law and is beyond the authority of the County.

---

[21] This list of such highways is intended to be illustrative, not exclusive, as the impact of § 57-11(a) on non-Montgomery County residents traveling on such highways in Montgomery County is alone sufficient for us to conclude that § 57-11(a) is not a local law. Because our other holdings in this opinion ensure that any revised version of § 57-11(a) will necessarily be different from the version before us, we will not venture further with our local law analysis of the current ordinance. This opinion should not be construed to suggest, one way or the other, whether similar concerns would exist with respect to any other highway in Montgomery County under any revised version of the ordinance. *See* footnote 23.

[22] Although our State Constitution would prevail to the extent of any conflict with a State statute, we note that we see no genuine conflict between this result and the intent underlying § 4-209(b)(1) of the Criminal Law Article. The clear intent underlying the statute is to authorize local regulation of firearms where they pose localized threats, i.e., when possessed within 100 yards of or in a place of public assembly. It seems unlikely that the General Assembly had travelers riding in vehicles on public highways, with little or no access to the locations they are passing, in mind in carving out that exception.

We decline to offer any opinion concerning the Challengers' other contentions that Chapter 57, as amended, is not a local law. We have held that several portions of Chapter 57 are invalid. Given that the scope of any revised ordinance the County may enact will differ from that currently under review, any further review of the County's authority should await such a revised ordinance.[23]

In sum, we hold that § 57-11(a), as amended and currently constructed, is not a local law, and so is beyond the legislative authority of the County.

## III.    TAKING

The Challengers' final contention is that § 57-11's regulation of ghost guns and their major components is a taking under Article III, § 40 of the Maryland Constitution without just compensation and a deprivation of property without due process under Article 24 of the Maryland Declaration of Rights. The circuit court, without explanation or analysis, agreed. We do not.

A taking occurs when a governmental entity physically appropriates property from its owner and thus the government is required to compensate the property owner. *Serio v. Baltimore County*, 384 Md. 373, 399 (2004). A regulation can also amount to a taking when an owner (1) suffers permanent physical invasion of their property because of the

---

[23] Our holding that § 57-11(a) is not a local law because it reaches non-Montgomery County residents traveling within the County on public highways should not be interpreted as a determination that an exception for travel on public highways would alone remedy the problem and transform § 57-11(a) into a local law. Any determination of whether an amended § 57-11(a) is a local law will depend on the scope of the amended law and evidence concerning its effects.

regulation, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982), or

(2) is denied all economically beneficial or productive use of the land, *Assateague Coastal*

*Trust, Inc. v. Schwalbach*, 448 Md. 112, 128 (2016). Outside of those two categories,

"most regulatory takings cases should be resolved by balancing the public and private

interests at stake, considering three primary factors: (1) the economic impact of the

regulation on the claimant, (2) the extent to which the regulation has interfered with distinct

investment-backed expectations, and (3) the character of the governmental action." *Neifert*

*v. Dep't of Env't*, 395 Md. 486, 517 (2006).

Here, we need not engage in that analysis because, for three reasons, the circuit court

erred in determining that the Amendments constituted a taking of ghost guns. First, the

circuit court declared the portions of Chapter 57 regulating ghost guns to be invalid and

enjoined their enforcement. Unenforceable laws cannot accomplish a taking, at least not a

permanent one,[24] and the Challengers cannot receive compensation for something they did

not lose.

Second, the Amendments did not require the owners of ghost guns who wanted to

possess them in or within 100 yards of a place of public assembly to surrender them; it

simply required that they either keep them in other locations or get them serialized. *See*

Chapter 57, §§ 57-1, 57-11 (2025). Other than the Challengers' flawed argument that the

---

[24] The Challengers did not make a temporary takings claim, for which damages are measured "between the initial taking and the time that the property is returned or restored." *See Reichs Ford Rd. Joint Venture v. State Rds. Comm'n of the State Highway Admin.*, 388 Md. 500, 511 (2005).

ordinance prohibits them from getting ghost guns serialized, *see discussion above* at 54-55, neither the Challengers nor the circuit court explained how a serialization requirement could amount to a taking.

Third, by the time the circuit court ruled, the State had enacted legislation generally banning most ghost guns everywhere in the State, with minor exceptions. *See* Pub. Safety §§ 5-701 – 5-703. The Challengers have not presented any viable argument that the relatively minor differences between the State and County regulations effected a taking.

## CONCLUSION

First, we hold that the circuit court erred in awarding the Challengers relief with respect to § 57-10 of the County Code.

Second, we hold that Criminal Law § 4-209(b)(1) has not been abrogated, and that it authorizes local regulation of firearms, as relevant here, with respect to minors and within 100 yards of or in a park, church, school, public building, and other place of public assembly.

Third, we hold that the County exceeded its authority under Criminal Law § 4-209(b)(1)(iii) when it included within the definition of a place of public assembly the following locations: hospital, community health center, long-term facility, childcare facility, government building (as defined), and gathering of individuals without regard to the place in which they are gathering. The other locations the County includes in its definition of place of public assembly in § 57-1 fall within the authorization of § 4-209(b)(1)(iii).

Fourth, we hold that the County exceeded its authority under Criminal Law § 4-209(b)(1)(i) in adopting § 57-7(d) of the County Code. The remainder of § 57-7 is authorized by § 4-209(b)(1)(i) and is severable from § 57-7(d).

Fifth, we hold that the provisions of Chapter 57 that are authorized by § 4-209(b)(1) are not preempted by implied field preemption.

Sixth, we hold that the definition of "ghost guns" in § 57-1 conflicts with State law to the extent it includes firearms that have been serialized in compliance with federal and State law. Accordingly, the provisions of §§ 57-7 and 57-11(a) addressing ghost guns are preempted to the extent they purport to apply to firearms that have been serialized by firearms dealers in compliance with federal and State law. Otherwise, §§ 57-7 and 57-11(a), (b), and (d) are not preempted by conflict with State law.

Seventh, we hold that § 57-11(a), as amended, is not a local law because of its application to holders of State-issued wear-and-carry permits traveling on public highways who cross within 100 yards of a place of public assembly.

Eighth, we hold that the amendments to Chapter 57 of the County Code did not effect a taking in violation of the Constitution of Maryland.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND VACATED WITH INSTRUCTIONS TO AFFIRM IN PART AND REVERSE IN PART THE DECISION OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND TO THAT COURT WITH INSTRUCTIONS TO ENTER JUDGMENT AND AWARD DECLARATORY AND INJUNCTIVE RELIEF CONSISTENT WITH THIS OPINION; COSTS TO BE PAID TWO-THIRDS BY THE RESPONDENT AND ONE-THIRD BY THE PETITIONER.**